## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DR. LEONARD E. SALTZMAN,  KENT EUBANK, THOMAS RIVA, WILLIAM and NANCY EHORN, individually and on behalf of all other similarly situated;<br><br>                Plaintiffs,<br><br>    v.<br><br>PELLA CORPORATION, an Iowa corporation, and PELLA WINDOWS AND DOORS, INC., a Delaware corporation,<br>                Defendants. | **06 CV 4481**<br><br>**JUDGE ZAGEL**<br>**MAGISTRATE JUDGE ASHMAN**<br><br><br>**DEFENDANTS' BRIEF IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

WILDMAN, HARROLD, ALLEN & DIXON LLP
John A. Roberts
225 West Wacker Drive, 30th Floor
Chicago, IL 60606-1229
Phone: (312) 201-2121

FAEGRE & BENSON, LLP
James A. O'Neal
John P. Mandler
2200 Wells Fargo Center
90 South Seventh St.
Minneapolis, MN  55402-3901
(612) 766-7000

Attorneys for Defendants

## INTRODUCTION

Plaintiffs' motion for class certification fails to grapple with the critical difficulties under Rule 23 that make any class in this case insusceptible to certification. The predominance of individual issues and other Rule 23 problems require that plaintiffs' motion be denied, just as the Illinois trial court recently denied an analogous motion on similar claims. *Pappas v. Pella Corp.,* Case No. 02-L 14558, Order, Aug. 21, 2007. (Attached to Aff. of John Mandler as Ex. 1.)

The putative class representatives in themselves demonstrate the abundance of individual issues that render this case insusceptible of fair resolution on a class wide basis. Dr. Saltzman is the only named class member with ProLine clad casements as the majority of windows installed in his home.[1] Plaintiffs and their experts spend the bulk of their brief addressing this design. Yet Saltzman only has had problems with a handful of the 52 ProLine clad casement windows in his home, even after thirteen years of service and a myriad of individual construction defects that contributed to water intrusion. As recently as this June, Dr. Saltzman's contractor removed three ProLine clad casement windows that exhibited no damage to the window, other than slight staining caused by improper installation. (Ltr. from Robert Kudder to John Mandler, dated June 2, 2008, attached as Ex. 4 to Mandler Aff.)

The Ehorns, from the northern shore of California, could not be more differently situated. The Ehorns have no ProLine windows, having installed 44 Pella original clad casement windows in their home in 1990. In the eighteen years since the installation, only a large, mulled-together, multi-window combination in their living room, has experienced water intrusion issues. This mulled combination of units faces onto the Pacific Ocean, a very challenging environment, and inspection revealed that the original installer failed to put mullion caps where needed, thus

---

[1] The Saltzman home does have 3 Designer Series clad casement windows; and the Eubanks home has 7 ProLine transom windows, along with 31 Designer Series and Original Pella casement windows. *See infra* pp. 9-13.

1

allowing water to enter the windows and the home, and failed to provide sufficient structural support for the large mulled combination of units.  The Ehorns, who claim property damage to their home beyond the rot of wood inside their windows, also admittedly believed their windows were defective dating well back into the 1990s, putting them well outside the applicable statute of limitations.  (W. Ehorn Dep. 23-26, 32; N. Ehorn Dep. at 47-50, 56.)[2]

Similarly, the Riva and Eubanks claims abound with individual issues.  The inspections of their homes, as described in Defendants' expert reports, made clear that each home and each window with an alleged failure raises particularized issues about how the window was installed, whether there were construction defects that contributed to any water damage, and the nature and extent of damages.  (*See, e.g.*, Chin Rep. at 14; Kudder Rep. at 8; Smith Rep. at 1)[3]

No class wide trial, and certainly not the unclear and unconstitutional proceeding proposed by plaintiffs in their trial management plan, could fairly and finally resolve the causation and damages issues to be determined for every class member.  This Memorandum describes the Rule 23 problems in more detail and discusses many cases which have, on similar facts, denied certification of any class.  *See, e.g., Amchem Products v. Windsor,* 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) (individual issues predominate in product liability case); *In re Bridgestone/Firestone,* 288 F.3d 1012 (7th Cir. 2002) (individual issues predominate in product liability case); *Kitzes v. Home Depot, U.S.A., Inc.,* 872 N.E.2d 53 (Ill. App. Ct. 1st Dist. 2007) (individual issues predominate in consumer fraud case alleging defective treated wood products, due to variations in wood, soil, usage and environmental conditions).  This

---

[2] The deposition transcripts of William and Nancy Ehorn are attached to the Affidavit of John Mandler as Exhibits. 5 and 6, respectively.
[3] The reports of Defendants' experts are attached as Exhibits 1-3 to Defendants' Opposition to Plaintiffs' Motion to Strike Defendants' Expert Testimony, Docket No. 123.

Memorandum also addresses the severe conflicts of law problems presented here.

## FACTUAL BACKGROUND

### I.     Pella Corporation

Defendant Pella Corporation ("Pella") is a manufacturer of windows, entry door systems, and patio doors.  Among other things, Pella currently manufactures three different lines of aluminum-clad wood windows and doors in a variety of shapes, styles and designs.  Pella is an Iowa corporation with its corporate headquarters located in Pella, Iowa.  Defendant Pella Windows and Doors ("PWD") is a Delaware corporation that buys and resells Pella Products in the Chicago metro area.  PWD does not sell product in the entire state of Illinois; other independently owned distributors have much of the territory within the state.[4]

### II.     Plaintiffs' Allegations and the Proposed Class

#### A.     The Proposed Class Definition

Plaintiffs' present motion asks this Court to certify a class defined as follows:

"Plaintiffs seek class treatment . . . on behalf of cohesive multistate subclasses of substantially similar laws for persons who own structures in the states of Illinois, Iowa, Florida, New Jersey, California, Texas, New York, Ohio, Michigan and North Carolina with ProLine Windows.

(Dkt. 114 at 1)[5]

In contrast to this definition, the putative class representatives own a hodgepodge of

---

[4] Pella windows are sold or have been sold by a variety of retailers, such as Lowe's and Home Depot, lumber yards and independent branches, in the state of Illinois and around the country.  To the extent that Plaintiffs allege liability on the part of PWD, that liability is not uniform as to class members that purchased windows from other retailers or from other Pella distributors.   Such variety in the chain of purchase itself creates individual issues that make claims under the Illinois Consumer Fraud Act inappropriate for certification.  *See Kitzes,* which found that where 40% of Home Depot's treated-wood product sales were made, not to end users, but to professional customers, such as home builders, contractors, and construction professionals, there were individual issues of fact as to what information the contractors may have conveyed to end users.   The exact same analysis applies equally to Pella, many of whose sales involve professional "intermediaries" such as home builders, contractors and construction professionals.

[5] Plaintiffs, in the First Amended Complaint, sought a broader class including "All persons who own a structure with Pella ProLine, Architect Series and Designer Series aluminum-clad windows and doors."  Plaintiffs have failed to produce an expert report or any other explanation for the initial inclusion, and subsequent abandonment, of these designs in the class definition.

different window styles, lines and designs, including not just the three series identified in the First Amended Complaint, but also prior model Pella windows and windows made by other manufacturers.[6]  (*See, e.g.*, Exs to Gerdes Aff.)  Moreover, the Architect and Designer windows have different designs than the ProLine windows, and Plaintiffs' window design expert ruled out extending his opinions to those designs.  (Still Dep. 69:11-69:19)[7]  The Architect and Designer windows were not subject to the ProLine Customer Service Enhancement Program.  In short, there is essentially no evidence before the Court about those window lines (or any doors for any line), and no justification for including them in the class definition.

Plaintiffs also seek to include Pella ProLine double-hung windows in the certified class.  There is a similar absence of evidence regarding this design.   The ProLine double-hung windows operate differently and are a different design from ProLine casement windows.  (Middleswart Aff. ¶ 6).   Plaintiffs' window design expert Charles Still explicitly ruled out including ProLine Double Hung windows in his opinions.   (Still Dep. at 70:2-70:14).

### B.    The *Pappas* Litigation

On August 21, 2007, the Circuit Court of Cook County, Illinois, denied class certification for a second time in *Pappas v. Pella Corp.*, No. 06 L 12771.  (Order, Aug. 21, 2007, attached as Ex. 1 to Mandler Aff.)  In *Pappas*—a similar case to this one involving the same defendants, but different plaintiffs—the plaintiffs sought to certify a class of Illinois consumers who purchased aluminum-clad Architect Series Pella windows from 1991 to 1997.  The *Pappas* court initially denied class certification on tort causes of action.  (Order, Sept. 15, 2004, attached as Exhibit 2 to Affidavit of John Mandler)  The court then dismissed the plaintiffs' attempt to re-plead a class

---

[6] For the Court's benefit, a diagram showing the parts of a window is attached to the Affidavit of Andy Middleswart as Exhibit 1.

[7] The deposition of Plaintiffs' Expert Charles Still is attached to the Appendix of Depositions to Plaintiff's Memorandum in Support of Their Motion for Class Certification, Docket 117, at DEPAPPEND00000587-644.

action under the Illinois Consumer Fraud Act ("ICFA"). *See Pappas v. Pella Corp.*, 844 N.E.2d 995, 997-98 (Ill. App. Ct. 1st Dist. 2006). After successfully appealing the dismissal, the plaintiffs claimed that Pella violated the ICFA by failing to disclose the existence of an alleged design defect that allowed water to penetrate the wood components of the windows and cause premature wood deterioration. *Id.*

On remand, the *Pappas* court denied plaintiffs' second motion for class certification because it found that "there exists such potential vast differences in choice of action, type of claimed injury, and especially, the varied causal connections between the claimed injuries and the claimed reason therefore." *Pappas v. Pella Corp.*, No. 06 L 12771, Order, Aug. 21, 2007, at 5.[8] That conclusion is equally applicable to the case at hand.

### C. The Alleged Defect

Plaintiffs' expert, Charles Still, opines that three design defects exist in ProLine casement windows. First, Still claims that the use of roll-formed aluminum to clad the wood creates a radius gap along the sash at the edge of the glass sightline that allows water to pool and erode the sealant, creating an entry point in the window that allows water to get behind the cladding and come in contact with the wood components of the window. (Dkt. 114 at 13) Second, Still contends that not sloping or abutting the aluminum cladding against the glass allows opportunities for water to penetrate the sealant, allowing water to get behind the cladding and come into contact with the wood components of the window. (*Id.*) Finally, Still argues that the use of angled lapped joints in the corners creates an entry point for water to penetrate gaps in the aluminum or the sealant in the window, which allows water to get behind the cladding and come

---

[8] Plaintiffs attempted to appeal this Order denying class certification. However, the First District Appellate Court of Illinois denied plaintiffs' Petition for Leave of Appeal on October 18, 2007. *Pappas v. Pella Corp.*, No. 07-2596, Order, Oct. 18, 2007. A true and correct copy of this Order is attached as Exhibit 3 to the Affidavit of John Mandler.

in contact with the wood components of the window. (*Id.*)

Plaintiffs' theories ignore, for example, that the butyl sealant that fills the joint in the radius gap along the sash prevents the water from getting behind the cladding. They also overlook that the wood is treated with preservative, that the product was designed understanding that incidental water might get behind the cladding, and that weep holes in the sash allow drainage of water that may get behind the cladding. Plaintiffs' theories also ignore that the allegedly defective product features are similar to the product features in many windows, even some made by other window manufacturers. The class definition encompasses ***millions*** of windows in commercial and residential buildings throughout the country.

### D. Pella's Warranty and Warranty Data

Pella stands behind its products through the Pella Limited Warranty. Beginning in 1996, Pella provides a 20-year warranty for glass and a 10-year warranty for other components. (Jablonski Aff. ¶ 9.)[9] For warranted components of window products, Pella distributors provide replacement parts and then submit a request for credit to Pella Corporation. (*Id.* ¶ 3.) When submitting a credit request, the distributor assigns the window a code that allows Pella to track the reason for the warranty claim. (*Id.*) The credit request system, known as the "Returns and Allowances" or "R&A" system, allows Pella to calculate a percentage of windows in any given vintage and design type for which a particular defect is claimed.

Based on this data, the actual rate of warranty returns for "wood deterioration" for the 1996 Pella ProLine Clad Casement window alleged to be in the Saltzman home is **1.1%** after approximately ten years. (*See id.* at ¶ 4) The data for this year is complicated because the warranty changed from one to ten years in 1996, but even just considering production during the

---

[9] This fact alone raises different issues, and potential conflicts, between post-1996 class members who had the 10 year warranty, and pre-1996 class members who had only a one year warranty.

months where the ten year warranty was applicable, the percent of windows involved in some

sort of warranty claim for wood deterioration (generally just replacement of a part of the

window, such as the sash) in ten years was only 3.313%. (*Id.*) Even including all warranty

codes that could possibly be used for the claims Plaintiffs define in the First Amended Complaint

(including water infiltration, glazing seal defects, damaged or defective cladding, and air

infiltration in addition to wood deterioration),[10] the rate of warranty return for the vintage alleged

to be in the Saltzman home is **1.2%** in ten years. (*Id.*) The comparable rate considering only

windows produced during the months the ten year warranty was applicable was 3.464%. (*Id.*)

This means that over approximately a ten year span *more than 96 percent* of the 1996 ProLine

casement windows have not required any warranty service based on the conditions Plaintiffs

allege.[11]

Plaintiffs make much of the testimony of Pella engineer Robert Jablonski that Pella ran

regression analyses to see if it could predict the performance of windows over a period of 20

years (recognizing that ProLine windows at the time have not yet been in existence for 20 years)

and that these analyses resulted in varying projections, some for the ProLine casement windows

being much higher than the actual 10-year experience of 1.2 percent for the 1996 vintage.

(Jablonski Dep. at 146-149).[12] Plaintiffs, however, selectively ignore Mr. Jablonski's further

testimony that these analyses were given little weight because it was the wrong analytical tool

for products, such as windows, that are not subject to the same environment, use, or installation

each and every time. The regression analyses assumed that 100 percent of the windows are

---

[10] A large percentage of the warranty returns in these categories would be unrelated to the claims plaintiffs are
asserting, such as returns for cladding that has been scratched or dented before installation.

[11] For the 2001 vintage ProLine double-hung alleged to be in the Riva home, the warranty rates are 0.05% claims for
wood deterioration and 0.13% for all five categories. (*See* Jablonski Aff. ¶ 5). Thus for ProLine double hung
windows of the same type owned by Mr. Riva, 99.87% of the these windows have not required any warranty service
based on the conditions Plaintiffs allege. (*Id.*)

[12] The deposition of Robert Jablonski is attached to the Appendix of Depositions to Plaintiff's Memorandum in
Support of Their Motion for Class Certification, Docket 117, at DEPAPPEND00000167-216.

subject to identical conditions and usage.  (*Id.*)  But regression analyses do not accurately predict window performance for the same reason that class certification is inappropriate here:  each window, and each window environment, tells its own story.  Regression analysis as an analytical tool may be predictive, for example, of the expected life of a rotor making a consistent number of rotations per minute. But this analytical tool does not accurately capture the performance of windows subject to widely varying conditions, exposures, usages, and construction practices, not to mention the fact that wood is an inherently variable biological material.  (Jablonski Dep. at 146-147.)  Second, with Pella's ten year warranty program, there tends to be a rise in warranty claims in the last year of the warranty, which mathematically skews the curve and results in an unreasonably steep slope and a resulting unreasonably high prediction of warranty claims over time.  (Jablonski Dep. at 150).  Mr. Jablonski testified that Pella has no confidence in the results given by these analyses.  (Jablonski Dep. at 183.)  Pella expert Robert Kudder agreed that since the failure of windows is not a linear function, the regression analysis is not meaningful. (Kudder Dep. at 53-55.)[13]

### E.    The ProLine Customer Service Enhancement Program

Plaintiffs make much of the supposed "secret" ProLine Customer Service Enhancement Program.  In fact, the program was never secret.  A memorandum describing the program, which is for Pella distributors, was sent to all distributors that service ProLine casement units.  (Dkt. 115, Ex. 3)  Indeed, as Plaintiffs admit, Mr. Saltzman learned of it from a representative of the Chicago area Pella distributorship.  (Dkt. 114 at 6)[14]  The program enhanced the existing 10-year warranty on ProLine casements and made available a descending scale of additional warranty

---

[13] The deposition of Defendants' expert Robert Kudder is attached to the Appendix of Depositions to Plaintiff's Memorandum in Support of Their Motion for Class Certification, Dkt. 117, at DEPAPPEND00000218-294.
[14] Of course the Ehorns were not eligible for the program because they did not have ProLine windows.   The Rivas and Eubanks also did not have windows that were subject to the program.

payments during the period of time from 10 to 15 years after the purchase of the windows. (Dkt. 115, Ex. 3)

Mr. Jablonski testified that the program was motivated by two factors. First, Pella noted that there was an increasing trend of warranty payments during the last two years of the warranty on the ProLine casements, which contributed to the problem with the regression curves as described above. (Jablonski Dep. at 35-36.) Second, Pella sales leaders received feedback during meetings with personnel in the Pella distribution network in 2006, that it would be helpful if the distributors could have money available from Pella to provide enhanced customer satisfaction for ProLine casement customers in the years after their warranty expired. (Jablonski Dep. at 36.) Such a voluntary warranty extension is neither unusual nor sinister, quite the reverse. It reflects a customer-oriented approach. In any case, any inference that the creation of the program is suggestive of a product defect, which again is not the issue on this Motion, would be forbidden by the subsequent remedial measure doctrine and Rule 407 of the Federal Rules of Evidence.

### F.      Plaintiffs' Own Windows

There are design variations between product lines and within product lines; for example, the wood preservative used with ProLine windows has changed more than once. (Gjovik Dep. at 74-78)[15]  Further, the variations in factual circumstances surrounding each of the class representatives' homes exemplify why this case is rife with individual issues. Inspections showed that most of their windows are fine, and those that are not reflect a variety of problems unrelated to window design or manufacture.

---

[15] The deposition of Plaintiffs' expert Lee Gjovik is attached to the Appendix of Depositions to Plaintiffs' Memorandum in Support of Their Motion for Class Certification, Dkt. 117, at DEPAPPEND00000123-165.

      1.      **The Saltzman Home Exhibits Individualized Installation, Construction, and Owner-Caused Condensation Problems that Negatively Affect Window Performance.**

The Saltzman home, located in Lake Forest, Illinois, contains 43 Pella ProLine aluminum clad casement windows, 9 Pella ProLine aluminum clad fixed windows, 2 Pella Designer Series casement windows, and 1 Pella Designer Series fixed window. (Kudder Report at 5) Defendants inspected the Saltzman home on January 18, 2007, and again on June 21, 2007. (*Id.*; Chin Report at 12; Smith Report at 6) The vast majority of the windows in the Saltzman residence are performing well after about 13 years of use. (Chin Rep. at 14) For the few windows that showed damage, these inspections revealed numerous installation, construction, and maintenance problems, including:

Ÿ      a proper sealant joint was not installed between the EIFS and the perimeter of window and door frames, which will allow water to penetrate the exterior wall system around the perimeter of the windows (*Id.*; Smith Rep. at 6-8; Kudder Rep. at 5)

Ÿ      sealant was improperly applied at the butt joint between the EIFS and the window frame and this improper application resulted in debonding (*Id.*)

Ÿ      cracks exist in the EIFS cladding at and adjacent to the windows, and these cracks will allow water to penetrate into the exterior wall system at the windows (Chin Rep. at 12; Smith Rep. at 6-8.)

Ÿ      condensation, which is moisture generated in the interior of the home unrelated to window design, was observed on the interior side of several windows, along with water staining on the wood window components resulting from condensation (Chin Rep. at 13-14; Kudder Rep. at 5)

Ÿ      several windows were installed without flashing, which exposed the nailing fins to water that penetrated the wall, causing deterioration of some wood window components (Chin Rep. at 13-14)

Ÿ      the EIFS was improperly installed at the windows, which prevented proper bonding of the EIFS to the plywood wall sheathing and allowed water to flow directly to the wood stud wall system (Chin Rep. at 12-14; Smith Rep. at 6-7.)

Ÿ      sealant was not installed between the back of the nailing fins of the windows and the wall sheathing, which allowed the water that penetrated the wall at the

improperly installed EIFS and at the improper joint between the EIFS and the window to migrate into the building (Chin Rep. at 12-14.)

Ÿ    the nailing fin on some windows was not attached to the wood frame of the building, making the connection between the window and the opening of the wall weaker and more flexible than intended, which allowed the windows to deflect and move more than intended under wind forces (Chin Rep. at 13-14.)

Ÿ    some operable windows were installed under separate triangular fixed windows, and the triangular windows allowed water infiltration (Kudder Rep. at 5.)

Additionally, on May 22, 2008, the Saltzmans had a window removed from their home. Dr. Robert Kudder observed the removal and reported that "[t]he window exhibited no symptoms of distress or water staining on the interior." (Mandler Aff., Ex. 4) However, Dr. Kudder noted that "the perimeter sealant had significant failures" and the rough opening in the wall revealed water staining. (*Id.*) Dr. Kudder concluded that "[t]he staining appeared to originate from improper EIFS installation and sealant failures around the perimeter of the window." (*Id.*)

### 2.    The Riva Home Demonstrates Individualized Problems Caused by Improper Sealing and Finishing of Wood Components.

On February 19, 2007, Defendants inspected the Riva residence in Sarasota, Florida. (Smith Rep. at 3; Kudder Rep. at 5.) The Riva residence contains 18 Pella Proline double-hung windows, 1 ProLine fixed window, and 8 Pella Architect Series double-hung windows, but no ProLine casement units. (Kudder Rep. at 5) The inspection revealed that most windows exhibit no damage to the frames or sashes. (Smith Rep. at 8) But, a few windows showed signs of damage attributable to the following individual installation and maintenance problems:

Ÿ    the window frames were not properly sealed to the surrounding wood trim; in some cases the sealant was improperly sized and in others no sealant was present (Smith Rep. at 3; Kudder Rep. at 5.)

Ÿ    the exposed wood on the bottom of the sash rail was never painted or otherwise finished, and failure to finish exposed wood allows damage to occur (*Id.*)

Ÿ    the inside of the top sash rail in several windows was not painted or otherwise finished and remains exposed to moisture; failure to paint or finish exposed wood allows damage to occur (*Id.*).

Ÿ    the wood trim around the window openings was installed so tightly against the window frames that insufficient space was available for installation of sealant and backer rod as required by Pella and industry standards; in some cases the only "seal" was paint on the wood trim that partially covers the aluminum frame of the window (Smith Rep. at 3)

       **3.**     **The Eubank Home Exhibits Individualized Construction and Installation Defects that Negatively Impact Window Performance.**

On March 9 and August 22, 2007, Pella representatives inspected the home of Kent Eubank in Des Moines, Iowa. The Eubank home has 38 Pella windows, comprised of 15 Designer Series casements, 16 Original Pella casements, and 7 ProLine awning windows. (Chin Rep. at 5) Inspection of the Eubank home revealed that the vast majority of the windows were performing well after about 15 years of use. (*Id.* at 9) However, the inspection found that a few windows showed problems, caused by many construction and installation issues:

Ÿ    The closure strip of the metal siding on the home butted directly against the window frames with no sealant. (*Id.* at 7)

Ÿ    The exterior brick butted against the window frames with no sealant. (*Id.*)

Ÿ    Improperly applied sealant was observed, as were visible gaps between the metal siding and the siding closure strips. (*Id.* at 8)

Ÿ    Several windows lacked flashing at the head, which exposed the installation fins to water and resulted in deterioration. (*Id.*)

Ÿ    Several windows lacked sealant between the backs of the installation fins and the OSB sheathing, which will allow water to penetrate the building. (*Id.*)

Ÿ    Some windows were affixed to the structural frame of the wall with staples instead of nails, which weakened the installation of the windows. (*Id.*)

Ÿ    A gutter was not shielded with flashing, which allowed water to flow directly off the roof and onto a window. (*Id.*)

Ÿ    15 of the 38 windows showed evidence of condensation caused by moisture generated inside the residence by the homeowner, which, in some cases, led to staining and wood deterioration.  (*Id.*)  Condensation is unrelated to window manufacture or design.  (*Id.*)

All of these conditions are construction or installation issues, not window design issues.  (*Id.* at 9-10)

### 4.    The Hadjipetkov Home Showed Unusual and Unauthorized Window Modifications and Improper Installation and Defendants Have No Record of Ever Selling to the Hadjipetkovs.

Pella representatives inspected the home of formerly proposed class representatives Lubo and Maria Hadjipetkov in Montclair, New Jersey on February 22, 2007. (Gerdes Aff. ¶ 5)  Their windows were a peculiar mix of windows from a variety of vintages, including old, original design Pella windows; 1998 Architect Series clad casements; later vintage Architect Series windows; Pella Pro Line awnings; and non-Pella products. (*Id., Ex. 3*)   There were unusual modifications in the way some of the windows were installed.  (*Id.*, Ex. 3)  This combination of facts raised questions about whether the windows were purchased in the second hand market and whether they were installed by qualified personnel.  (*Id.*, Ex. 3)  The home exhibited significant interior condensation problems (condensation is not caused by window design, but can cause window damage), not limited to the ProLine windows.  The home also had significant window installation and construction defects.  (Kudder Rep. at 7; Smith Rep. at 9-10)

### 5.    The Ehorn Home Exhibits Individualized Issues Concerning Construction, Installation, and Architectural Design.

In 1990, Bill and Nancy Ehorn built their house on an acreage overlooking the Pacific Ocean in Smith River, California.   The Ehorn home has 33 Pella Designer Series or Original Pella  aluminum clad casement windows.[16]  (Chin Rep. at 1)  There are no ProLine units.  (*Id.*)

---

[16] Because the Ehorn home contains no Proline Series windows, the Ehorns are not proper class representatives. However, a brief discussion of their home illustrates the individualized inquiry into the facts surrounding the home

Of these windows, "the vast majority" are performing well. (*Id*. at 5)   The only windows showing any signs of deterioration are part of a large, multi-window combination facing the Pacific Ocean, where windows are "mulled" (or joined) together to create a wall of windows. (*Id*. at 3-5)   This wall of windows faces driving rains from the Pacific and leaks due to a failure to install a mullion cap and improper structural support, which led to an outward bowing of the windows. (*Id*.) This bowing allowed water to enter the window system. (*Id*.) In addition, this wall of windows was installed without flashing at the head of the windows, which created an improper joint that allowed water to flow into the top of the mullions, causing corrosion, structural weakness, and water staining and deterioration of the wood sill. (*Id*. at 4) Similarly, sealant was not installed between the installation fins of the windows and the back of the interior wall, which will allow water to penetrate the building. (*Id*. at 4-5)

None of the other Pella windows (in use at the Ehorn home for eighteen years) have any issues with water intrusion or sash wood deterioration. (*Id*. at 5)   The Ehorns testified that absent the problems with the large wall of windows they would have been generally satisfied with their Pella windows, and that there appears to be "something different" about the composite windows. (W. Ehorn Dep. 38-39)

All of the named Plaintiffs' claims raise significant comparative fault issues among the homeowners, architects, general contractors, subcontractors, window installers, and Pella. These are just five examples.  Class members throughout the country would have similar issues and many more, such as application of the statute of limitations, who they bought the windows from, what they were or were not told by Pella sales representatives, what product literature they did or did not see, and a myriad of installation, environmental, construction, and maintenance issues.  Even if the Plaintiffs here disagree with Pella's positions as to the cause of any problems

---

of each and every class member that would be necessary should the Court certify Plaintiffs' proposed class.

in their individual situations, those issues will still need to be resolved on an individual basis and so this case is insusceptible to class treatment, just as the trial court found in *Pappas*.

## ARGUMENT

### I.      Rule 23 Sets a High Standard For Class Certification.

Under Rule 23(a), class certification is proper *only* if the Plaintiffs prove each of the following prerequisites:

(1)      The class is so numerous that joinder of all members is impracticable.
(2)      There are questions of fact or law common to the class.
(3)      The claims or defenses of the representative parties are typical of the claims or defenses of the class.
(4)      The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition to the prerequisites of Rule 23(a), Plaintiffs must also satisfy one of the Rule 23(b) requirements to maintain a class action.  Rule 23(b) requires Plaintiffs to show that (1) separate actions would create a risk of inconsistent results or would be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interest, (2) the defendant acted on grounds generally applicable to the class, or (3) common questions of law or fact predominate over individual concerns, with a class action being superior to other available methods for fair and efficient adjudication of the controversy. *See* Fed. R. Civ. P. 23(b).  In attempting to satisfy these burdens under Rule 23, the plaintiff may not only rely on his pleadings and allegations, but instead must ensure that "[t]he District Court [has] before it 'sufficient material . . . [to] rule on compliance with [Rule 23's] requirements . . . .".  *Walker v. World Tire Corp. Inc.,* 563 F.2d 918, 921 (8th Cir. 1977) (quoting *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976)).  The Court may properly certify a class only if it is satisfied "after rigorous analysis" that plaintiff

15

satisfied its burden to prove every element of Rule 23. *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982); *Allen v. City of Chicago*, 828 F. Supp. 543, 551 (N.D. Ill. 1993).

## II.    Plaintiffs Failed To Establish Commonality or Predominance Because Individual Issues of Fact Overwhelm Any Common Issues Among the Homeowners.

An examination of the facts underpinning each of the named Plaintiffs' claims highlights the impossibility of trying this case on a class basis, without either (1) ignoring a multitude of critical individualized issues, or (2) ending the trial with a meaningless verdict that resolves nothing and leaves the actual resolution of individual class members' claims—and alleged damages—to an endless series of complex mini-trials. Predominance is a rigorous standard for class certification. Indeed, the predominance inquiry is far more demanding than Rule 23(a)'s commonality requirement. *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997). "If individual issues predominate, then class certification is usually not a superior method for resolving the controversy, since management of such issues by a court will not be efficient." *Murry v. America's Mortg. Banc. Inc.*, 2005 U.S. Dist. LEXIS 11751, 03 C 5811, 03 C 6186, 2005 WL 1323364, *3 (N.D. Ill. May 5, 2005) (citing *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001)).

In this case, individual issues clearly predominate. Pella's returns and allowances data belies Plaintiffs' claims that each and every ProLine Window—numbering in the millions—is defective. Indeed, Pella's data shows that the "defect" that Plaintiffs allege Pella failed to disclose has not caused water infiltration or wood deterioration in the vast majority of windows, and there are a multitude of alternative causes for water infiltration and wood deterioration.

In a very similar putative class action, focused on Architect windows, the Circuit Court of Cook County, Illinois, refused to certify a putative class because of the predominance of individual factual issues surrounding the cause of window damage. *See Pappas v. Pella Corp.*,

No. 06 L 12771, Order, Aug. 21, 2007, at 4-5. The *Pappas* plaintiffs claimed that aluminum-clad windows made by Pella were defective and allowed water to contact the wood sash components, allegedly causing the sashes to deteriorate and rot. *Pappas,* 844 N.E.2d at 997. Plaintiffs alleged that all of the aluminum clad windows manufactured and sold by Pella had latent, undiscoverable defects and that Pella never disclosed these defects. *Id.* Plaintiffs claimed that Pella's failure to disclose the alleged defects constituted unfair, deceptive, or fraudulent business practices under the ICFA. *Id.*

The *Pappas* court found that various causes could result in the plaintiffs' claimed injuries, and these causes could only be determined window by window. *Pappas,* No. 06 L 12771, Order, Aug. 21, 2007, at 4. Accordingly, the court denied plaintiffs' motion for class certification, citing the "potential vast differences in choice of action, type of claimed injury, and, especially, the varied causal connections between the claimed injuries and the claimed reason therefore." *Id.* at 4-5.

Further, in *Kitzes v. Home Depot,* the First District Appellate Court of Illinois denied class certification in a case involving fraud by omission claims relating to a construction product. The plaintiffs in *Kitzes* claimed that Home Depot misrepresented that certain treated wood products it sold were safe, while failing to disclose that the toxic wood treatment agent, arsenic, could leach to the surface of the wood and to nearby soil. *Kitzes*, 872 N.E.2d at 1054-55. In denying class certification, the *Kitzes* court emphasized that class treatment was inappropriate because of the factual variables that would need to be analyzed on an individualized basis. Indeed, the court stated that "since there is variation in wood, soil, usage, and environmental conditions, it is almost impossible to claim that the class members truly share common issues of fact, because some pieces of wood may pose more of a potential threat than other pieces." *Id.* at

17

1060. Here, of course, there are similar variations in wood, usage, environmental conditions, representations, chain of distribution, and on and on.

Here, as in *Pappas* and *Kitzes*, common factual issues—if any—are overwhelmingly outweighed by individual factual questions, such as environmental exposure, installation and construction defects, and improper maintenance. The following outline demonstrates some of the many and complex individual issues that each member of the putative class must address:

**A. Non-Disclosure:** Was each class member actually deceived by the alleged non-disclosure of the "defect" alleged by Plaintiffs?

1. Did the class member receive **any** communication from Pella or PWD?
   - ϒ  If so:
     - ϒ  What was the representation?
     - ϒ  Who made it?
     - ϒ  Was that person authorized by Pella or PWD to make such representation?
   - ϒ  Was the class member actually deceived by the representation?

   - If not, was the class member actually deceived by an omission of communication?
     - Given the lack of communication, could Pella or PWD have affected the class member's decision to purchase a Pella window?

2. Did the class member purchase her windows from Pella or PWD?
   - If the class member purchased the windows from a contractor, home seller or national retailer such as Lowe's or Home Depot, was there an omission by Pella?

3. Was the class member aware of the "defect" Plaintiffs allege?
   - If so, was there an omission by Pella?

**B. Actual Injury:** Did each class member have actual injury from the alleged defect?

1. Actual Injury to Window: Did water contact the wooden components of the sash?
   - If so, did the water drain from the weep holes allowing the wooden sash to dry?
     - If not, did wood preservative prevent the onset of wood deterioration?
       - If not, is there any damage?
         - If there is damage, does the repair involve replacing the entire window or replacing only a window part such as the sash?

2. Actual Injury to Other Property: Does the class member seek to recover damage for other parts of the house, such as walls, window framing, floor coverings, or interior finishes?
   - If so, what is the nature of the alleged other property injury?
   - What is the nature of the alleged needed repairs, e.g. replacement of walls, mold remediation, etc.?

3. Personal Injury: Does the class member seek to recover for personal injury allegedly caused by the defect?

4. Incidental Damages: Does the class member seek incidental damages, such as the cost of replacing window shades, interest on home equity loans, or storage or removal costs?

**C. Proximate causation:** Was each class member's actual injury proximately caused by the alleged defect and not some alternative cause?

1. Window: Was the injury caused by the alleged defect or by any of the following alternative causes:

   - Was the window treated improperly prior to installation?
     - Improper storage of window units on the job-site before installation
     - Dropping a window prior to installation
   - Was the window installed incorrectly?
     - Failing to install a window plumb, level, and square
     - Improper shimming or anchorage
     - Damage to the sash or frame of a window during installation or practices that allow the racking or bowing of the window unit
     - Damage to window during the installation of home security systems or television wiring
     - Absence of adequate sealant around window
     - Improper structural support and sealant between combined window units
     - Improper finish on interior of unit
   - Was there a failure to maintain the window?
     - Clogging a window's weep system
     - Failure to maintain the windows or the caulking around the windows
   - Did other features/conditions at the home cause the injury?
     - Irrigation systems spraying directly on the windows
     - Complex roof lines or kick outs that direct rain water directly onto the window
     - Siding or cladding systems which introduce water at the window openings
     - Absence of overhangs or gutters
     - Lack of flashing or improper flashing dumping water on windows
     - Paint or other finishing that ruins weatherstrip, mohair pads or other parts
     - Heavy vegetation growing on or against the window units
     - Condensation on the inside of windows, caused by high interior humidity, that results in dripping into the wooden interior of the sash

19

2. Other Property: Was the injury to other property caused by the alleged defect or by any of the following alternative construction defects that allow water to penetrate a home:

- Ÿ Failure of roofing systems or roof / wall interfaces
- Ÿ Failure of wall systems (including cracks in stucco) that allow water into a wall
- Ÿ Failure of water barrier systems
- Ÿ Failures of the HVAC system
- Ÿ Improper flashing of the window or the improper (or non-existence of) caulking around the window (especially in stucco or artificially clad homes)
  - For any of these construction defects, is there a third party contractor or sub-contractor that is responsible for the water penetration that should be liable for all or a portion of the injury to other property?
  - If a defect in the window caused damage, was it the sole cause of damage or a partial cause, and if so, how much damage was caused by alternative causes and how will the damage be allocated?

**A.      There is No Commonality Regarding Whether the Putative Class Members Actually Were Deceived by the Alleged Omission Regarding the Alleged Defect.**

**1.      Plaintiffs' Proposed Class Definition Is Overbroad and Necessarily Includes Persons to Whom Defendants Made No Representations and Who Cannot Show Reliance or Actual Deception as a Matter of Law.**

Plaintiffs' proposed multistate class, which purports to include all owners of a structure containing Pella ProLine windows in Illinois, Iowa, Florida, New Jersey, California, Texas, New York, Ohio, Michigan, and North Carolina, is fatally overbroad.   A class cannot be so broad that it includes numerous individuals who are unlikely to have the claim being litigated.  *See, e.g., Neuser v. Carrier Corp.*, No. 06-C-645-S, 2007 U.S. Dist. LEXIS 36026 at * 10 (W.D. Wis. May 15, 2007).  Stated differently, a class cannot be defined so broadly that it includes "individuals who are without standing to maintain an action on their own behalf."  *McElhaney v. Eli Lilly & Co.*, 93 F.R.D. 875 (D.S.D. 1982).

In *Neuser*, plaintiffs sought to certify a class consisting of "all individuals and entities in the State of Wisconsin that own or owned high-efficiency furnaces manufactured by [defendant] Carrier since January 1, 1998."  *Neuser*, 2007 U.S. Dist. LEXIS 36026 at *9.  The class asserted

fraud claims against Carrier based on its alleged intentional concealment of the likelihood that the heat exchanger in its furnaces would probably fail before the end of the expected useful life of the furnace. *Id*. at *7.

The court refused to certify the proposed class because many of the putative class members "have no claim." *Id*. at *10. Specifically, the court said that "those class members who sold homes prior to furnace failure clearly sustained no damages and have no basis to rescind a contract for the purchase of a furnace they have subsequently resold." *Id*. at *11 (parenthetical omitted). The court also found "most troubling" those class members whose furnaces will last longer than their expected lifespan and also suffered no damages. *Id*. After noting that more than half of the class members had furnaces that never failed, the court stated "it is impossible to distinguish class members whose furnaces will fail from those who will not. The class of plaintiffs for which certification is sought is too broad and there is no reasonable means to reduce it to those individuals who might actually have claims similar to those of the named plaintiffs." *Id*. Similarly here, most of the putative class members will have windows without wood deterioration, and there is no feasible way to distinguish them from those whose windows might have problems.

### 2. The Omission Identified by Plaintiffs Cannot Underpin a Class Action Claim Under the Illinois Consumer Fraud Act.

Plaintiffs argue that Pella failed to disclose the alleged defects in ProLine Series casement windows, and that this omission gives rise to claims under the ICFA. However, the Supreme Court of Illinois recently held that a similar "implicit representation" constituted puffery and so it would be inappropriate to certify a class action based upon it. *Barbara's Sales, Inc. v. Intel Corp*., 879 N.E.2d 910, 926-27 (Ill. 2007). In *Barbara's Sales*, a putative class brought similar claims against Intel on the theory that the name "Pentium 4" is an inherent and implicit

representation that the Pentium 4 was the best and fastest processor on the market. *Id.* at 926. However, the court held that "4 is better than 3" was puffery, no different than subjective non-factual statements such as "high-quality," "custom quality," "perfect," and "magnificent." *Id.* Further, the court explained that "an implicit representation is not an affirmative one, and plaintiffs point to no affirmative representations made uniformly to the class as a whole." *Id.* at 927. Accordingly, the court held that the implicit representation claims based on the "4 is better than 3" theory were not actionable under the ICFA and, as there were individual differences as to who did or did not receive what representation, no class could be certified. *Id.* at 928.

Like the unsuccessful plaintiffs in *Barbara's Sales*, Plaintiffs in this case have not pointed to one affirmative representation made by Pella or PWD to all class members, that can support a fraud claim.

### 3. Actual Deception is Required under the Illinois Consumer Fraud Act.

Causation under the ICFA may not be presumed and is thus an individual question of fact for each class member. A plaintiff must prove actual deception in order to establish proximate causation under the ICFA. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 199-201 (Il.. 2005); *Shannon v. Boise Cascade Corp.*, 208 Ill. 2d 517, 524-5 (Ill. 2004); *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 154-5 (Ill. 2002); *Zekman v. Direct Am. Marketers*, 182 Ill. 2d 359, 374-6 (Ill. 1998). In *Avery*, the Illinois Supreme Court stated:

> . . . the important legal principle established in *Zekman*, *Oliveria* and *Shannon* is that in a case alleging deception under the Act, it is not possible for a plaintiff to establish proximate causation unless the plaintiff can show that he or she was, "in some manner, deceived" by the misrepresentation. . . . Proximate causation is an element of all private causes of action under the Act.

216 Ill. 2d at 200 . *Avery* further states that to establish a claim, plaintiff must show that he was *actually* "deceived by anything [Defendant] said, or did not say." *Id.* at 202 (emphasis added).

This standard requires specific inquiry into whether each class member held a false impression of Pella windows based on the alleged material omission. *Price v. Philip Morris, Inc*, 219 Ill.2d 182, 269-71 (Ill. 2005). As the Illinois Supreme Court noted in *Price* the but-for causation required for the ICFA is not susceptible to class-wide proof. *Id.*

In *Kitzes v. Home Depot,* the First District Appellate Court of Illinois denied class certification in a case involving fraud by omission claims relating to a construction product. The plaintiffs in *Kitzes* claimed that Home Depot misrepresented that certain treated wood products it sold were safe, while failing to disclose that the toxic wood treatment agent, arsenic, could leach to the surface of the wood and to nearby soil. *Kitzes*, 872 N.E.2d at 55. Although Plaintiffs had been told by a contractor that all such wood products contained arsenic, the court held that "[t]o the extent that the contractor did not expressly mention leaching, the named plaintiffs might be able to prove that they were actually deceived, but that would not prove that all members of the potential class were actually deceived." *Id*. at 61. Indeed, discovery revealed that some consumers knew that the wood products leached arsenic but purchased the product anyway. *Id.*

Accordingly, the question of the knowledge possessed by putative class members is not susceptible to class-wide proof. Instead, this knowledge must be proven on an individual plaintiff-by-plaintiff basis. Thus, class certification should be denied.

### B.     There is No Commonality Regarding Whether the Putative Class Members Had *Actual Injury* from Water Penetration in their Windows.

To establish liability under the ICFA, it is not sufficient for Plaintiffs to claim that some feature of the Pella windows they purchased has a "defect" and if they had only known about that feature they would not have purchased the windows.   Plaintiffs (and every class member) also must show that the alleged "defect" that they claim Pella should have disclosed actually resulted in some damage, i.e., that the product actually failed to perform and this failure caused

some demonstrable damage. *Avery*, 216 Ill. 2d at 180; *Oliveira*, 201 Ill. 2d at 149; s*ee also Price*, 219 Ill. 2d at 268-9; *Kitzes*, 872 N.E.2d at 62.

In this case, Plaintiffs cannot establish common questions with respect to the elements of **actual injury** that was **proximately caused** by Pella. Plaintiffs do not even plead that every class member suffered actual harm in the form of water infiltration or wood rot. Indeed, the inspection reports of each named Plaintiff's home show that the vast majority of their windows have functioned perfectly. (Chin Rep. at 14; Kudder Rep. at 5-7; Smith Rep. at 11) These reports further show that the failures of the small number of affected windows were proximately caused by factors other than window design. (*Id*.) Even if the named Plaintiffs are somehow able to establish they individually suffered any actual injury proximately caused by Pella, they will have done nothing to establish "actual injury" or "proximate cause" on behalf of any other class member. As the First District Illinois Court of Appeals stated in *Kitzes*, "even assuming for the sake of argument that plaintiffs could produce evidence of actual damages, the inquiries into any actual damage suffered by each member of the class are likely to be highly individualized and site specific." *Kitzes*, 872 N.E.2d at 62.

The design characteristics which Plaintiffs criticize certainly do not automatically lead to wood rot, as the Plaintiffs suggest. Pella's ProLine design uses butyl tape to seal the aluminum cladding. (Middleswart Aff. ¶ 7) Butyl is a long-established material, widely used for this purpose. (Kudder Rep., 2-3) Plaintiffs expert, Charles Still, opined that the butyl sealant in Pella's ProLine windows breaks down because it comes into contact with water over time. (Still Dep. at 80:19-81:3.) However, Mr. Still even acknowledged that many individualized factors— wholly unrelated to window design—could cause butyl to deteriorate:

> Q: But there are other issues, other alternative causes that break the [butyl] seal unrelated to the design of the window, correct?

> A: It can, yes.
> . . . .
> Q: When people are putting eaves down and it splatters around and you want to clean up, they'll take a razor blade and that might break it down ?
> A: I saw that, yes, sir.
> Q: Cleaning products can break it down?
> A: Sure can.
> Q: Settling of the house, I think you testified can break it down?
> A: Yes, sir.
> Q: All of that's outside the control of the window manufacturer, correct?
> A: That's correct, yes, sir.

(Still Dep. 82:5-83:1.)

Still conceded that these factors must be analyzed on a window-by-window basis:

> Q: So there are a lot of variables that you have to kind of look at it on a window-by-window [basis] to see if the butyl actually has broken down?
> A: That's correct.

(Still Dep. 81:17-81:20.) Thus in this proposed class, and consistent with Pella data, not every window will be subject to the issues alleged by Mr. Still.

A California Superior Court, faced with similar data, denied California statewide class certification against a window manufacturer alleged to have manufactured a defective product. *See Camenson v. Milgard Mfg., Inc.*, Case No. FCS 021177, County of Solano, California (2006), *aff'd*, No. A115829, 2008 WL 2381904 (Cal. App. 1st Dist. June 12, 2008) (Attached to Mandler Aff. as Ex. 7). In *Camenson*, a window manufacturer asserted that as few as 5.2% of its windows in the state of California were ever reported as having a window leak. Faced with this data, the court denied statewide class certification, stating, "Without the basic foundational information regarding the . . . substantial likelihood of failure during useful life of the subject window models, this court cannot determine that common questions predominate as to any of the claims asserted by the purported class members on behalf of the purported class." *Id.* at 5. Similarly, here, Pella's data shows only 1.1 percent of 1996 ProLine casement windows across

the country received some sort of warranty service for wood durability issues in 10 years. (Jablonski Aff. ¶ 4) If one considers only production during the months in 1996 when a 10 year warranty applied, the figure is 3.313%. There is simply no class-wide commonality. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017-19 (7th Cir. 2002) (holding that when a small percentage of class members actually experienced product failure, a class action is not the appropriate manner to resolve those claims).

> **C.** **There is No Commonality Regarding Whether There is *Proximate Cause* Between Pella's Alleged Failure to Disclose a "Defect" and the Alleged Damages Suffered.**

> **1.** **There is No Commonality Regarding Whether the Alleged Defect Proximately Caused Damage to Each Class Member's Windows.**

Even for units that leak or show signs of deterioration, there are a multitude of reasons, totally unrelated to the design of the window, why such a condition might occur. Indeed, each named Plaintiff's home shows examples of other factors that can cause window deterioration.

The Saltzman home illustrates the effect on window performance of faulty installation and maintenance problems and/or construction defects as shown by the cracks in the stucco and EIFS exterior of the home. Inspection of the Riva home revealed a failure to finish the exposed wood components with paint or other finish. The Eubank home suffered from serious condensation problems, which are attributable to the homeowner, as well as multiple construction defects that negatively impact window performance. The Ehorn claim raises individual issues regarding the architectural design and installation of separate window units into the wall of windows at the home.

Each of the alternative causes of water infiltration set forth above involves culpable conduct of third party contractors or material suppliers, or the homeowners themselves, all of whom may be legally responsible for damage at any individual home. Pella has the right to

investigate and take discovery regarding these potential causes of water infiltration and present

evidence of alternative causes of alleged deterioration for each window and each home with

alleged defective windows.  *See In re Stucco Litig.,* 175 F.R.D. 210, 215 (E.D.N.C. 1997) (court

must consider contribution of third-party contractors to the failure of the stucco product); *In re*

*Masonite Corp. Hardboard Siding Products Liability Litig.,* 170 F.R.D. 417, 425 (E.D. La. 1997)

(defendant siding company could not receive a fair trial without a process that permitted a

thorough presentation of defense that construction errors caused product to fail).  The necessity

of individual fact inquiry regarding causation must defeat Plaintiffs' request for certification.

> **2.      There is No Commonality Regarding Whether The Alleged Defect
> Caused Water Infiltration Into the Wall Cavity and Property Damage
> to the Home.**

Plaintiffs in this case seek "their individual damages."  (Dkt. 20, at pp. 19, 23, 25, 27,

28.)  In their depositions, the named Plaintiffs confirmed that they would seek money damages

for property damage allegedly caused by water infiltration.  (W. Ehorn Dep. 32:21-33:24; L.

Saltzman Dep. 71:17-73-20; K. Eubank Dep. 127:1-127:4; T. Riva Dep. at 122:13-122:18.[17])

A claim for recovery of individualized damages such as property damage, personal

injury, and consequential damages, is fundamentally inconsistent with class treatment.  In

addition to the alternative causes for water infiltration of window sashes, water can also enter a

wall cavity for a host of reasons unrelated to window design, including those outlined above.

Pella has the right to investigate potential causes of water infiltration and present evidence of

alternative causes for each structure in the class.  *See In re Stucco Litig.*, 175 F.R.D. at 215;  *In re*

*Masonite Corp.*, 170 F.R.D. at 425.

---

[17] The deposition transcripts of Mr. Saltzman is attached to the Appendix of Depositions to Plaintiff's Memorandum
in Support of Their Motion for Class Certification, Docket 117, at DEPAPPEND00000387-415; Mr. Eubank's
deposition transcript is attached as DEPAPPEND00000082-112; Mr. Riva's deposition is attached as
DEPAPPEND00000348-386.

For this reason, certification is often denied in cases involving construction products and property damage. For example, in the *In re Stucco* litigation, the court held that the need to assess the contribution of third-party contractors to the damages alleged for each class member's property destroyed predominance and precluded class certification. 175 F.R.D. at 215 (individualized questions of fact would "predominate because the claims of every class member will require an assessment of the conduct of third parties" which would impact determinations of liability, causation and comparative fault); *see also Lienhart v. Dryvit Systems*, 255 F.3d 138, 148-149 (4th Cir. 2001) (decertifying class of homeowners claiming siding product was defective, because individual inquiry necessary to determine whether applicators followed the defendant's instructions destroyed predominance); *In re Masonite Corp.*, 170 F.R.D. at 426 (denying class certification where mini-trials are required on issues of causation and comparative fault); *Schutte v. Beazer Homes Holdings Corp.*, 124 P.3d 530, 535 (Nev. 2005) ("Because single family construction defect litigation often raises diverse, individualized claims and defenses . . . generally, the requirements for class certification cannot be met"). Similarly here, individual property damage claims cannot be lumped into a class action.[18]

### 3. There is No Commonality Regarding Whether the Alleged Defect Caused Personal Injury to Any Class Members.

In addition, some members of the putative class may seek damages for alleged personal injuries. For example, Kent Eubank testified that he is reserving the right to seek personal injury damages for the exacerbation of his preexisting mold allergies allegedly caused by mold in his bedroom window. (K. Eubank Dep. 130:13-131:3.) Absent class members may also want to pursue such claims.

---

[18] These deficiencies cannot be saved by certification of common issues only, as such bifurcation of issues runs afoul of the Seventh Amendment. *See, e.g., In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302-03 (7th Cir. 1995); *Castano v. American Tobacco Co.*, 84 F.3d 734, 750 (5th Cir. 1996).

Just as there are multiple potential causes of water damages, personal injuries relating to mold exposure can also be attributed to many different causes. Preexisting conditions, such as the one Mr. Eubank testified to, are of particular significance. Pella has the right to investigate any and all alternative causes of any alleged personal injuries, which would essentially transform this case to a series of personal injury lawsuits.

Plaintiffs cannot divert attention from these inherently individual issues by focusing their "defect" claims on the window sash while still attempting to recover for property damage due to water intrusion into the home. This court recently held that a plaintiff cannot avoid inherently individual issues by selectively pleading to limit the class action to common questions. *Hyderi v. Wash. Mut. Bank, FA*, 235 F.R.D. 390, 398 (N.D. Ill. 2006) ("a class action movant cannot gerrymander predominance by suggesting that only a single issue be certified for class treatment . . . when other individualized issues will dominate the resolution of class members' claims").

## III.  Individual Issues of Law Overwhelm Any Common Issues Advanced by Plaintiffs.

Seventh Circuit law is clear. "*No class action is proper unless all litigants are governed by the same legal rules*." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) (Easterbrook, J.)(emphasis added). Indeed, "[t]he Seventh Circuit has warned repeatedly against the certification of unwieldy multistate classes because the difficulties inherent in applying the laws of numerous states defeats both predominance and manageability." *Phillips v. Sears Roebuck & Co.*, Civ. No. 06-412-GPM, 2008 U.S. Dist. LEXIS 37689, at * 23 (S.D. Ill. May 8, 2008); *see also Porcell v. Lincoln Wood Prods., Inc.*, No. 07-cv-729-bbc, 2008 U.S. Dist. LEXIS 34339, at *5 (W.D. Wis. April 23, 2008).

In *Bridgestone/Firestone,* the district court held that the claims of a proposed nationwide class of owners and lessees of Ford Explorers equipped with Firestone tires that allegedly were

unusually susceptible to failure could be maintained as a class action because the claims were governed solely by the law of the states where the defendant manufacturers were headquartered. *See Bridgestone/Firestone,* 288 F.3d at 1014-15.

On appeal, the Seventh Circuit reversed the grant of class certification. The Seventh Circuit held that under the conflict of laws rules of the state where the district court sat, the court was required to apply the laws of the fifty states where the class members lived to the class claims. *See id.* at 1016-18 at 1016-18. The court acknowledged that the conflict of laws rule crafted by the district court might "be good on many dimensions." *Id.* at 1016 at 1016. However, the court concluded that:

> Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

*Id.* at 1020 at 1020 (citations omitted).

As Judge Easterbrook cautioned, "[a] nationwide class in what is fundamentally a breach-of-warranty action, coupled with a claim of fraud, poses serious problems about choice of law, the manageability of the suit, and thus the propriety of class certification." *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 674 (7th Cir. 2001) (Easterbrook, J.). Indeed, "[t]hese and other potential sources of variation account for the fact that few warranty cases have ever been certified as class actions-let alone as nationwide classes, with the additional choice-of-law problems that complicate such a venture." *Id.*

### A. The Law of Each Putative Class Member's Home State Will Apply to His or Her Claims.

It is well-established that in a diversity suit such as this, "the federal court applies the conflicts principles of the state in which it sits." *Carris v. Marriott Int'l, Inc.,* 466 F.3d 558, 560

(7th Cir. 2006). Illinois conflicts principles "require the court to select the law of the jurisdiction that has the 'most significant relationship' to the events out of which the suit arose, and to the parties." *Id.* (citing *Esser v. McIntyre,* 169 Ill. 2d 292, 297-98, 661 N.E.2d 1138, 1141, 214 Ill. Dec. 693 (1996)).

For tort claims, courts look to (1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered. *Tanner v. Jupiter Realty Corp.,* 433 F.3d 913, 916 (7th Cir. 2006). "[T]he law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties." *Id.* at 915-16 (quoting *Esser,* 169 Ill. 2d at 298, 661 N.E.2d at 1141).

For contract claims, courts consider (1) the place of contracting; (2) the place of the negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile and nationality of the parties. *Curran v. Kwon,* 153 F.3d 481, 488 (7th Cir. 1998).

In a class action, the determination of applicable law must be made with respect to *each* member of the class. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985) (holding that due process requires consideration of proposed state's contacts "to the claims asserted by each member of the plaintiff class"); *Hague*, 449 U.S. at 308 (imposing same requirement under Full Faith and Credit Clause); *see also Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520, 532 (N.D. Ill. 1998) (no application of Illinois law if claim did not arise in state)

In this case, Plaintiffs attempt to avoid this roadblock by alleging claims under various state consumer fraud and deceptive trade practices acts and dividing the nationwide class into groups of subclasses organized by state. As the Illinois Supreme Court has recognized, "individual questions of state law [are] inherent in the application of the laws of the 50 states."

31

*Miner v. The Gillette Co.*, 87 Ill. 2d 7, 17 (1981). In addition to the Constitutional concerns discussed above, the choice-of-law analysis is required to determine suitability of class certification, since in multi-state class actions, "[d]ifferences in state law, no matter how slight, are important and must be addressed *prior* to certification because such differences may swamp any common issues and defeat predominance" *In re: Baycol Products Litigation*, 218 F.R.D. 197, 208 (D. Minn. 2003). Plaintiffs must prove that individualized state law issues do not preclude class adjudication. They have made no such showing, nor can they.

### 1. Differences in Consumer Fraud Acts, Deceptive Trade Practices Acts, and Common Law.

Just as in *Szabo*, this case is also plagued with "nagging issues of choice of law, commonality, and manageability." *Szabo*, 249 F.3d at 677. Indeed, "[s]tate consumer protection laws vary considerably." *Bridgestone/Firestone*, 288 F.3d at 1018. As just one example, Mr. Eubank lives in Iowa, and the Iowa Consumer Fraud Act does not allow class actions or any other manner of private enforcement. Iowa Code § 714.16.

### 2. Pella's Defenses

Pella's defenses under the economic loss doctrine, the Pella Limited Warranty, statutes of limitation and repose, and contribution and indemnity must be addressed for each state's law and with respect to each individual class member. In fact, without the ability to probe individually into the circumstances of each class member's case under the appropriate state law, Pella will be denied the opportunity to prepare defenses.

For example, with regard to statutes of limitation, the Ehorn claim illustrates the difficulty. California law requires that actions created by statute—such as consumer fraud and deceptive trade practices—as well as unjust enrichment claims, must be raised within three years. Cal. Civ. Code § 338; *First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1670

(Cal. Ct. App. 1992). Mr. and Mrs. Ehorn both testified that they became aware of water infiltration issues with their windows as early as January 1991, and that these issues recurred periodically from 1992-1995. (W. Ehorn Dep. 23:20-24:6, 26:10-26:20, 32:9-32:20; N. Ehorn 47:13-48:7, 49:21-50:10, 56:9-56:17.) Indeed, Mr. Ehorn testified that "we've been in that house – uh – 16 –17 years – you know, and we just have this same problem over and over again." (W. Ehorn Dep. 26:10-26:20.) Mrs. Ehorn corroborated this history:

> Q: . . . . Can you tell me when the first problem – um – with any of the windows or doors was experienced?
> A: Yes. The very first winter and probably after the first time we had any – any rain at all this . . . . So that was within months of moving in.
> . . . .
> Q: Okay. So after a rain in the winter of 1990 to '91; is that right?
> A: Yeah, it would have been '91 . . . .
> . . . .
> Q: . . . . I understand now that you had – um – recurring problems with water coming in, in the area of those mullioned windows in the living room; correct?
> A: Correct.
> Q: And is it your belief that each winter from at least '92 through '95 you would have these issues?
> A: Yes.

(N. Ehorn Dep. 47:13-48:7; 56:9-56:17.)

As their testimony shows, the Ehorns had notice and actual knowledge of the problems giving rise to their claims well over *ten years* before the complaint in this case was amended to designate the Ehorns as representative plaintiffs. Therefore, the Ehorns claims are barred by the statute of limitations and they are not proper class representatives. There may be legions of other putative class members with a similar problem, making class certification inappropriate.

In addition, as discussed above, installation, construction, and maintenance are all crucial inquiries in determining the cause of a window failure. Defendants will be entitled to explore these issues and identify third parties that may be responsible for negligent installation, construction, or maintenance. Comparative fault principles vary by state. Some states use

"pure" comparative fault, while others use a "greater fault" bar to recovery, and still others use an "equal fault" bar to recovery. Consequently, inquiry will be required under each state's laws for each class member. As one commentator stated:

> A court simply cannot accurately determine and 'fairly and efficiently' apply all of the differences in states' laws. Whether there are five or forty-five varying laws, the possibility of incorrectly applying the law would be better described as a probability… A class action cannot be fairly and efficiently administered if multiple states' laws are applied, and if the very nuances that draw the lines in the law must be discarded in order to certify, then a class action cannot be a superior means of adjudication.

R. Ryan, *Uncertifiable?: The Current States of Nationwide State Law Class Actions*, 54 Baylor L. Rev. 467, 501-02 (Spring 2002).[19]

## IV.    Plaintiffs Fail to Put Forward a Trial Plan and Fail to Establish That Class Certification Would be a Fair and Efficient Adjudication.

Plaintiffs' motion also should be denied because Plaintiffs do not establish that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Indeed, class certification would have the opposite effect—it would transform a straightforward warranty claim by the Plaintiffs into a massive and complex litigation, requiring thousands of separate trials regarding the individual issues outlined above and separate questions on potential third-party liability.

---

[19] Plaintiffs' attempt to jump the conflict of laws hurdle by using sub-classes is unavailing. First, "each subclass certified must be represented by a separate class representative who must be a member of the subclass with essentially the same injury and interests as the members of the subclass…" 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 4:45 (3d ed. 2006). Plaintiffs suggest ten subclasses for ten states, yet only proffer four representatives from four states. Second, "[t]he proponent of certification . . . cannot evade compliance with the requirements of Rule 23 by dispersing class members among subclasses. When the number or complexity of uncommon issues is too great, subclasses no longer offer an effective control mechanism." 1 McLaughlin on Class Actions § 4:45. Thus even if there were not significant conflict of law problems, the predominance of individual issues prevents certification of subclasses just as it does of classes. *Zinser v. Accufix Res. Inst., Inc.*, 253 F.2d 1180, 1192 n.8 (9th Cir. 2001) ("Variations in state law cannot be so simply resolved" by subclassing); *In re Gen. Motors Corp. Dex-Cool Products Liability Litig.*, 241 F.R.D. 305, 314 (S.D. Ill. 2007) ("A district court cannot manufacture predominance through the nimble use of subdivision (c)[5]" (citation omitted)); *cf. Wall v. Merrill Lynch, Pierce, Fenner & Smith*, No. 92C1642, 1992 WL 245540, at *4 (N.D. Ill. Sept. 21, 1992) (unpublished) ("[T]his court would not certify a class on the state law statutory counts. It would be unmanageable to consider potentially 50 different state statutes (or perhaps more if some states have more than one applicable statute).").

In this matter, Plaintiffs bear the burden to provide a blueprint for how a trial would be conducted. *See In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 349-50 (D.N.J. 1997). Plaintiffs, however, fail to submit a workable plan and, given the existence of individual factual issues in this litigation, no workable plan is possible. Plaintiffs do not address how possible third-party causes of action against general contractors and subcontractors will be handled and do not address how individual issues can be addressed.

Moreover, judicial efficiency, another important factor, also is lacking. When it is necessary to hold mini-trials on factual issues of actual damage and causation, a class action becomes unmanageable and serves no judicial efficiency. *Lienhart*, 255 F.3d at 149; *In re Masonite Corp.*, 170 F.R.D. at 426.

### A.      Plaintiffs' Exemplar Trial Plan is Fatally Flawed.

Plaintiffs' Exemplar Trial Management Plan, while lengthy, in fact oversimplifies and fudges over the serious problems inherent in any attempt to try this case as a class action. Plaintiffs purport that there can be a trial of "common issues," which they assert should include whether there is a design defect, Pella's conduct with respect to the ProLine Customer Service Enhancement Program and whether Pella violated consumer protection laws of a number of states. Of course, even these are not all common issues, as reflected in this Memorandum's earlier discussion of the elements of proof required for a consumer protection claim, even under just the law of Illinois. (*Supra,* pp. 21-26 .)

Plaintiffs essentially admit that their plan fails to resolve the plentitude of critical individual issues, as they punt them to a wholly unspecified "Phase Two." Such critical issues as causation, damage and whether there is contribution liability in particular cases on the part of installers, contractors or others, are all left unresolved by the largely useless "Phase One" trial,

which would not resolve a single class member's claim to the point that judgment could be entered. The parties would have a constitutional right to trial by jury on all the individual issues which plaintiffs would cast into the dark night of "Phase Two." *See, e.g., In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995) ("The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them . . ., and not reexamined by another finder of fact.") Plaintiffs' "plan" nowhere suggests how these myriad claims would be resolved other than by an "endless series of mini-trials" of the sort that are clearly not intended by the class action device.

### B.     Plaintiffs Submit a Proposal for Claim-Splitting that would Seriously Prejudice the Rights of Absent Class Members.

By foregoing potential warranty, contract, tort and personal injury claims,[20] Plaintiffs have deliberately—but improperly—split their causes of action in hopes of improving the prospects for class certification. It is well-settled that a "certify-at-any-cost" approach such as this, which splits causes of action and leads named Plaintiffs to jeopardize other claims by other class members, also makes them inadequate representatives and makes certification inappropriate. *See* e.g., *Pearl v. Allied Corp.*, 102 F.R.D. 921, 922 (E.D. Pa. 1984).

Claim-splitting is specifically precluded by principles of *res judicata*. The doctrine of *res judicata* provides that a final judgment on the merits is an absolute bar to a subsequent action involving the same claim, demand or cause of action between the parties. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). The doctrine extends not only to those claims actually decided in the first action, but also to those issues that could have been decided in that suit. *Lee v. Peoria*, 685 F.2d

---

[20] Plaintiffs not only would split these unpled causes of action on behalf of the putative class, they are prepared to jettison two causes of action pled in the First Amended Complaint, the Count III common law fraud by omission (implicitly acknowledging that issues of scienter, reliance and causation create individual issues) and breach of implied warranty of merchantability on behalf of the New Jersey subclass. *See* Plaintiffs' Exemplar Trial Management Plan, FN 2.

196, 199 (7th Cir. 1982) ("The doctrine of *res judicata* is that a final judgment on the merits in a court of competent jurisdiction bars the same parties or their privies from relitigating not only the issues which were in fact raised and decided but also all other issues which could have been raised in the prior action."); *see, e.g., Licari v. City of Chicago*, 298 F.3d 664, 667 (7th Cir. 2002) (barring claims that "could have been raised" in the prior action). Thus, a party is barred from subsequently seeking relief by splitting a single cause of action into more than one proceeding. *See Shaver v. F.W. Woolworth Co.*, 840 F.2d 1361, 1365 (7th Cir. 1988) ("[T]he doctrine of *res judicata* prevents the splitting of a single cause of action and the use of several theories of recovery as the basis for separate suits."). Because the Plaintiffs seek certification of a multi-state class, the Court must consider how the *res judicata* doctrine affects absent class members' causes of action under the laws of each applicable jurisdiction.[21]

Plaintiffs and their counsel have an irreconcilable conflict with absent class members. Plaintiffs' willingness to abandon claims and damages on behalf of the class without regard to the preclusive effects for putative class members of their actions renders them inadequate class representatives. *Pearl v. Allied Corp.*, 102 F.R.D. at 922. In *Pearl*, the named Plaintiffs brought negligence, strict liability, and breach of express and implied warranty claims based on alleged property damage and personal injury allegedly suffered as a result of installation of the defendant's formaldehyde foam insulation in their residence. *Id.* Upon moving for class

---

[21] Class members face preclusion in their home states because other states also apply *res judicata* principles to bar claim-splitting. For example, Indiana courts have held "multiple legal theories supporting relief on account of one transaction must be litigated at one go." *Erie Ins. Co. v. George*, 681 N.E.2d 183, 189, 190 (Ind. 1997). The courts in Maine prohibited a plaintiff from splitting a claim and pursuing it in a subsequent action where the plaintiff had a reasonable opportunity to argue in the prior action. *Camps Newfound/Owatonna Corp. v. Town of Harrison*, 705 A.2d 1109, 1114 (1998). In Alaska, "[a]ll claims arising out of a single transaction must be brought in a single suit, and those that are not become extinguished by the judgment in the suit in which some of the claims were brought." *Robertson v. Am. Mech.*, 54 P.3d 777, 780 (Alaska 2002). Virginia also follows the general rule of disfavoring claim-splitting. *Bill Greever Corp v. Tazewell Nat'l Bank*, 256 Va. 250, 504 S.E.2d 854, 859 (1998) (providing that the right to waive the rule against claim-splitting is reserved for the defendant alone and the court is not permitted to reserve the ability to split the claims).

certification, however, plaintiffs later chose not to pursue claims for present physical injury or diminution in property value, and abandoned their claim for breach of express warranty. The court denied certification, finding that individual issues of causation for formaldehyde emissions still predominated on the remaining claim for removal of the insulation, and that the plaintiffs, by abandoning the claims initially alleged in the complaint, were no longer adequate representatives. *Id.*; *see also Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595 (S.D.N.Y. 1982) (serious question of adequacy of representation arises when plaintiffs tailor their claims to improve commonality by excluding claims for property damage and personal injury and therefore create the significant risk that putative class members will later be told they had impermissibly split a single cause of action).

Similarly, in *Kitzes v. Home Depot,* the court expressed concern about claim-splitting and the effect of *res judicata* on the claims omitted by the class representatives. In *Kitzes,* Plaintiffs claimed that Home Depot violated the ICFA by misrepresenting that certain treated wood products it sold were safe, while failing to disclose that the toxic wood treatment agent, arsenic, could leach to the surface of the wood and to nearby soil. *Kitzes*, 872 N.E.2d at 1054-55. However, Plaintiffs sought to exclude individuals with claims for increased personal risk, personal injury, or property damage stemming from the treated wood products. *Id.* at 1063. The court expressed concern "that splitting the potential causes of action raised at least the possibility that any future personal injury actions stemming from treated wood injuries would forever be barred by *res judicata*, which tended to suggest that plaintiffs seeking only limited economic damages may not adequately represent consumers" of the treated wood products at issue. *Id.* (citing *Jacobs v. Osmose, Inc.*, 213 F.R.D. 607, 617 n.12 (S.D. Fla. 2003)).

In this case, by avoiding personal injury and express warranty claims, the representative

Plaintiffs are "cherry-picking" causes of action with a higher likelihood of class certification. However, the omission of such claims from this action likely bars other class members from seeking complete relief. For example, the Plaintiffs in *Smith v. Pella Corp.*, Case No. 01-6962-CA-JBR (Lee County, Fla.), brought a multitude of claims allegedly stemming from window leakage, including property damage, mold damage, and personal injury claims.[22] Had *Saltzman* been litigated as a class action before the *Smith* case, the Smiths' personal injury and property damage claims would likely be barred by *res judicata,* as the Smiths would have been included within the proposed class definition and their claims arguably arose from the same operative facts and should have been brought in the class action. Plaintiffs' attempted claim-splitting illustrates their "certify at any cost" approach, which is plainly contrary to the best interests of many individual class members. Accordingly, the named Plaintiffs are inadequate class representatives, and the Court should deny Plaintiffs' Motion for Class Certification.

## V. The Individual Claims of Class Members Could Proceed Even in the Absence of Class Certification.

Individual construction defect cases are proper avenues for homeowners. The deposition testimony of each of the representative Plaintiffs in this case shows that each spent tens of thousands of dollars on their windows—far from the *de minimis* amount of loss at issue in many class actions.[23] Individual lawsuits regarding Pella windows are economically feasible, as exemplified by the Smiths' pursuit of their lawsuit on an individual basis. *See Szabo*, 249 F.3d at 678 (finding it unnecessary to certify a nationwide class in part because "each buyer [had] a substantial claim, of the sort that could be, and often is, pursued independently").

---

[22] The parties have settled this case, and the case has been dismissed with prejudice.

[23] The Saltzmans allege they spent $29,846.03 on windows and installation. (Dkt. 20 at ¶ 22.) The Eubanks allegedly spent approximately $20,000 on their windows alone and presumably spent additional sums on installation and finishing. (*Id.* at ¶ 28.) The Rivas allegedly spent approximately $20,000 on their windows and installation. (*Id.* at ¶ 35.) Mrs. Ehorn testified that she spent approximately $15,000 on the windows and doors in her home. (N. Ehorn Dep. 35:3-35:7.)

## CONCLUSION

Water damage claims have been fairly and efficiently adjusted on an individual basis, either through the warranty process or through court actions when necessary, for many years. There is no necessity, no legal justification and no sense in trying to cobble together inherently individual claims into an improper class, in plain violation of the dictates and intentions of Rule 23. Plaintiffs' motion for class certification should be denied in its entirety, allowing Plaintiffs' claims to proceed on an individual basis.

Dated: July 8, 2008

WILDMAN, HARROLD, ALLEN & DIXON LLP
John A. Roberts
225 West Wacker Drive, 30th Floor
Chicago, IL 60606-1229
Phone: (312) 201-2121

FAEGRE & BENSON, LLP
James A. O'Neal
John P. Mandler
2200 Wells Fargo Center
90 South Seventh St.
Minneapolis, MN 55402-3901
(612) 766-7000

Attorneys for Defendants

fb.us.2940185.22