**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| DR. LEONARD E. SALTZMAN, KENT EUBANK, THOMAS RIVA, WILLIAM and NANCY EHORN, individually and on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | No.: 06 C 4481 |
| v. | The Honorable James B. Zagel |
| PELLA CORPORATION, an Iowa corporation, and PELLA WINDOWS AND DOORS, INC., a Delaware corporation, | |
| Defendants. | |

**CLASS REPRESENTATIVES' COMBINED RESPONSE IN OPPOSITION TO THE
MOTION FOR PRELIMINARY APPROVAL OF THE CLASS ACTION SETTLEMENT
AND MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT**

Plaintiffs and named Class Representatives Kent Eubanks, Thomas Riva, and William and Nancy Ehorn, (Named Class Reps) by their counsel, respond in opposition to the Joint Motion for Preliminary Approval of the Class Action Settlement (Doc. 277), Defendants' Memorandum of Law in Support of the Joint Motion for Preliminary Approval of the Class Action Settlement (Doc. 283), and Plaintiffs' Motion for Leave to File Third Amended Class Action Complaint (Doc. 275), and in support state as follows:

**INTRODUCTION AND BACKGROUND**

Following a hearing on concerns regarding the proposed settlement by the Named Class Reps on March 16, 2012, the Court suggested Class Counsel attempt to finalize the settlement. On March 27, 2012, Class Counsel requested the Named Class Reps identify their concerns. Exhibit 1. Named Class Reps in response asked for the current terms of the settlement. *Id.* On

May 7, 2012, one month later, the Named Class Reps again renewed their request for current terms of the settlement stating "[it] only seems logical that to advance the settlement you would want the Class Representatives' comments on the current terms as opposed to their comments on an outdated version of the terms." Exhibit 2. Class Counsel remained silent until Friday afternoon, June 15, 2012, when they provided the Named Class Reps the Settlement Agreement for review. Exhibit 3. On Monday, June 18, Class Counsel notified the Named Class Reps the proposed settlement was to be filed on Tuesday, June 19, 2012, thereby making futile any practical effect of the Named Class Reps comments to the terms of the proposed settlement. Exhibit 4. The Named Class Reps responded the terms of the proposed settlement were provided too late for effective comments. *Id.* On June 19, 2012, Class Counsel and Defendants filed their proposed Settlement Agreement. Doc. 277-1. Class Counsel and Defendants have also further filed supporting motions and papers which include soliciting the Court to substitute Court approved named class representatives, after years of active and substantial participation protecting the interests of the class, with settlement class representatives who are being appointed solely to support the proposed Settlement Agreement over the objections of the Named Class Reps.

The Named Class Reps have had the opportunity to review the proposed settlement. The proposed Settlement Agreement is not within the range of reasonableness and should not be granted preliminary approval. Similarly, the motion to substitute the Named Class Reps with settlement class representatives to protect the class must be denied.

## LEGAL STANDARD

When presented with proposed class action settlements a district judge is "expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel

are behaving as honest fiduciaries for the class as a whole" because "class actions are rife with potential conflicts of interest between class counsel and class members." *Mirfasihi v. Fleet Mortgage Corp.,* 356 F.3d 781, 785 (7th Cir.2004)(collected cites omitted).  The Seventh Circuit has stated that a district judge must therefore "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" to consider whether the settlement is "fair, adequate, and reasonable, and not a product of collusion." *Mirfasihi v. Fleet Mortgage Corp.,* 450 F.3d 745, 748 (7th Cir.2006).  In this context the Seventh Circuit has stated that a district court judge functions as a fiduciary of the class subject to the high duty of care the law requires of fiduciaries.  *Id.*  Indeed, the Seventh Circuit insists that district courts "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions."  *Synfuel Technologies, Inc., v. DHL Express (USA), Inc.,* 463 F.3d 646, 652 (7th Cir. 2006)(citing *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279 (7th Cir.2002)).

"In determining whether to preliminarily approve a settlement, courts should consider: (1) the strength of plaintiffs' case compared to the terms of the proposed settlement; (2) the likely complexity, length, and expense of continued litigation; (3) the amount of opposition to settlement among affected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed."  *Butler v. American Cable & Telephone, LLC,* 2011 WL 4729789 at *9 (N.D. Ill. Oct. 6, 2011)(citing In *re AT & T Mobility Wireless Data Servs. Sales Litig.,* 270 F.R.D. 330, 346 (N.D.Ill.2010)).

Within this framework the Seventh Circuit has identified two complimentary approaches to scrutinize the strength of plaintiffs' case compared to the terms of the proposed settlement. One approached is to 'value the litigation' or value the 'probability of plaintiff prevailing.'  This valuing the litigation approach was discussed in *Mars Steel Corp., v. Continental Illinois Nat.*

3

*Bank And Trust Co. of Chicago*, 834 F.2d 677, 682 (7th Cir. 1987)(citing in *In re General Motors Corp. Engine Interchange Litigation, supra,* 594 F.2d 1106, 1132 n. 44 (7th Cir. 1979)); *Mirfasihi v. Fleet Mortgage Corp.,* 450 F.3d 745, 749 (7th Cir.2006)(it is the duty of the district judge to estimate the litigation value of the claims), and *Synfuel Technologies, Inc., v. DHL Express (USA), Inc.,* 463 F.3d 646, 655 (7th Cir. 2006).

The Seventh Circuit has explained this approach as an effort to translate intuitions about the strength of the plaintiffs' case, the range of possible damages, and the likely duration of the litigation if it was not settled, into numbers that would permit a responsible evaluation of the reasonableness of the settlement. *Reynolds,* 288 F.3d at 285. The Circuit Court recognized that while a high degree of precision cannot be expected in valuing litigation, especially regarding the estimation of the probability of particular outcomes, that quantification can be made by estimating four possible outcomes: "high, medium, low, and zero. High might be in the billions of dollars, medium in the hundreds of millions, low in the tens of millions. Some approximate range of percentages, reflecting the probability of obtaining each of these outcomes in a trial (more likely a series of trials), might be estimated, and so a ballpark valuation derived." *Id.* In *Reynolds* the Court provided arbitrary numbers indicating the type of analysis it was envisaging:

| Possible Outcomes | Dollar Values Based on Valuation Range | Probability of Victory at Trial | Litigation Value |
|---|---|---|---|
| High | $ 5,000,000,000 | 0.5 % | $ 25,000,000 |
| Medium | $ 200,000,000 | 20.0 % | $ 40,000,000 |
| Low | $ 10,000,000 | 30.0 % | $ 3,000,000 |
| Zero | $ 0 | 49.5 % | $ 0 |
| Total | | 100.0 % | $ 68,000,000 |

*Id.,* (repeated in table form). This approach is applicable to every class action settlement, and arguably is an attempt to objectively review the recovery to the class.

The second approach to scrutinizing the terms of a settlement are to identify and analyze

4

'warning signals'.  *Mirfasihi*, 450 F.3d at 747.  Another term used by the Seventh Circuit for this approach is to identify and analyze 'suspicious circumstances' about the settlement.  *Reynolds*, 288 F.3d at 284.  This approach accounts for the fact that "many imponderables enter into the evaluation of a settlement."  *Mars Steel*, 834 F.2d at 682.

The Seventh Circuit has identified conditions which when present signal a settlement is suspicious and its terms may fall outside the reasonable range.  There is no checklist; instead there is a need to independently examine each settlement.  The warning signs and suspicious circumstances which the Circuit Court has found worthy to identify in opinions include, *inter alia*:  (1) the class gaining nothing because there is no concession of liability, (2) the class losing the possibility of any collective proceeding for damages, (3) the promise of value in the future as opposed to a recovery now (*Crawford v. Equifax Payment Services, Inc*., 201 F.3d 877 (7th Cir. 2000));  (4) money reverting back to the defendant, (5) unremarked conflict of interests within the class, (6) the possibility of a reverse-auction, (7) injunctive relief the value of which no one has attempted to monetize, (8) an effective settlement value of zero for a portion of the class claims (*Reynolds*, 288 F.3d 277);  (9) inadequate representation by settling plaintiffs (*Smith v. Sprint Communications Co., L.P.,* 387 F.3d 612 (7th Cir. 2004));  (10) payment of disgorged profits to one subclass despite those profits coming from another subclass, (11) a handsome fee to class lawyers despite the meagerness of relief provided to the class members, (12) no separate counsel for each subclass, (13) that the defendant may actually recoup half of the payout to the class, (14) class members not receiving any direct payment, (15) concerns the lawyers sold a subclass down the river, (16) details in the settlement agreement which reduce the liability of the defendant, (17) failing to consider the availability of statutory damages (*Mirfasihi,* 450 F.3d 745, 748 (7th Cir.2006));  (18) class recovery analogous to providing coupons (which doubtfully

5

provides any meaningful compensation to the class, fails to disgorge ill-gotten gains, forces class members to do future business with the defendant), and (19) bias in the settlement towards compensation in kind (*Synfuel Technologies, Inc., v. DHL Express (USA), Inc.,* 463 F.3d 646 (7th Cir. 2006).

These two approaches are complimentary.  Taking the above cited cases as a whole, general rules regarding scrutinizing the fairness of a proposed settlement appear.  First, the "most important factor relevant to the fairness of a class action settlement . . . is the . . . strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel,* 463 F.3d at 653)(citing *In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1132 (7th Cir.1979)(citing the MANUAL FOR COMPLEX LITIGATION § 1.46 at 56 (4th ed.1977)). If the balance of the settlement amount against the strength of the case on the merits is in favor of settlement, then a settlement is likely reasonable.  A reasonable settlement can overlook *some* warning signs.  In discussing the warning signs in *Mirfasihi,* 450 F.3d at 749, the Circuit Court stated "these wrinkles, standing alone, are not enough for us to find that the district court abused its discretion in approving the settlement."  However, certain warning signs on their own, or in total, can force what appears to be an otherwise reasonable settlement to fail getting court approval.  *See Crawford*, 201 F.3d 877.

## ARGUMENT

Applying the rules for determining the reasonableness of a class action settlement, makes it clear preliminary approval of the proposed settlement should not be granted.

### I.  The First Approach – Value the Litigation

Despite being forewarned the settlement would be scrutinized, Class Counsel and Defendants (or Pella) have presented the Settlement Agreement without a valuation as if

expecting automatic approval. It's as if neither knows or wants to share their opinion of the value.

That this case involves an issue certified class should make no difference in the value analysis. A finding the windows were defective when they left the factory will have value by making a real and immediate impact on warranty claims and other pending litigation where causation and damages are being argued. The numbers in the settlement and supporting papers must be valued per the Litigation Value Table.

Defendants state there are 6,430,000 windows in the settlement class. Doc. 284-4 page 4, par. 7. This means the zero to high spectrum of the Litigation Value Table is a simple function of the number of warranty claims, which is equal to the failure rate. Rationally picking numbers for the number of warranty claims is easy too. Zero is zero. Low can be the failure rate as provided by Defendants, medium can be the failure rate provided by an analysis of the Defendants' warranty data, and high might be all windows. The anticipated criticism that these failure rates are inaccurate is obviated by the Seventh Circuit's approved approach using the probability of success multiplied against each. Further, the Seventh Circuit has explicitly recognized that while a high degree of precision cannot be expected in valuing litigation, especially regarding the estimation of the probability of particular outcomes, nonetheless quantification can be made by estimating possible outcomes. *Reynolds,* 288 F.3d at 285. Pella submits the failure rate is .51% to 3.7%. Doc. 284-3 page 3, par. 4. To simplify, the average of these is 2.1%.[1] An analysis of Defendants' warranty data revealed a failure rate with a linear increasing slope, approximately 24% at year 20. Exhibit 5. And for the high, instead of a 100% failure rate, a 50% failure rate will be used.

---

[1]     $(.51 + 3.7) \div 2 = 2.105$

The value of a warranty replaced window is simply the cost to a warranty holder of having to replace the window as if there were no warranty. This is precisely what has happened to each Named Class Rep. However, the costs incurred by Saltzman highlight the problems with the proposed settlement. As submitted at hearing, Saltzman replaced two three window units, or a total of six windows, with an average cost to replace one window of $844.66.[2] Multiplying the number of windows times the varying warranty claim rates times the per window replacement cost[3] fills in the first column of the table. Simply borrowing the percentages the Seventh Circuit used in its example fills in the remainder:

| Possible Outcomes | Dollar Values Based on Valuation Range | Probability of Victory at Trial | Litigation Value |
|---|---|---|---|
| High | $ 2,715,581,900.00 | 0.5 % | $ 13,577,909.50 |
| Medium | $ 1,303,479,312.00 | 20.0 % | $ 260,695,862.40 |
| Low | $ 114,054,439.80 | 30.0 % | $ 34,216,331.94 |
| Zero | $ 0.00 | 49.5 % | $ 0.00 |
| Total | | 100.0 % | $ 308,490,103.84 |

As reflected in the table under this analysis, the litigation value is approximately $380,000,000. This rough estimate of the value falls in line with the case valuation range submitted at the March hearing, attached hereto as Exhibit 6. Consequently, the Court should ascribe a degree of confidence in the estimate.

The proposed Settlement Agreement does not provide a settlement value to be compared with the estimated litigation value. Nevertheless, there are warning signs the settlement value is inadequate. Those warning signs are addressed next.

---

[2]      Labor and finishing $2,490 + windows $2,578 = $5,068. The average cost to actually replace one window is $5,068 ÷ 6 = $844.66.

[3]      6,430,000  x    2.1 %  x  $844.66 = $   114,054,439.80
         6,430,000  x  24.0 %  x  $844.66 = $ 1,303,479,312.00
         6,430,000  x  50.0 %  x  $844.66 = $ 2,715,581,900.00

## II. The Second Approach – Warning Signs

A close examination of the proposed Settlement Agreement and related circumstances reveals several separate and independent warning signs that the settlement terms are not fair and reasonable for the Class:

1. Conflicted Class Representative Saltzman Previously Turned Down Pella's Offer of More Money Than Saltzman Now Says The Class Should Settle For

2. The Settlement Excludes A Determination of Value And the High Attorney Fees Raises The Question Are Defendants Buying Off Class Counsel

3. The $750 Cash Claim or $6,000 Arbitration Recovery Are Illusory – Pella Reserves All Its Defenses Which Precipitated The Instant Suit

4. The Chance Of A $6,000 Arbitration Recovery Is Illusory When Class Members Must Pay Their Own Attorney Fees In Arbitration

5. The Arbitration Proceeding Provides The Class No Real Value

6. $2,000,000 "Kickforward" War Chest Payoff From Pella to Lead Counsel Is Unprecedented and Has No Legitimate Purpose Than to Preserve and Protect the Settlement

7. $2,000,000 "Kickforward" Places Class Counsels' Interests Ahead of the Class

8. Conflicts Between the Sub-Classes Require Separate Representation

9. The $100 Deductible Per Window for Class Members to Get Benefits Adds a Condition Not Contained in the Original Product Warranty

10. Three Of The Sub-Classes Are Really Coupon Classes

11. The Court Certified An Issue Class And The Proposed Settlement Has No Resolution Of That Issue

12. The Uncertainties Of An Issue Certified Class Do Not Reduce Class Counsels' Obligations To Act In The Best Interests Of The Class

13. Recent Window Class Action Settlements Provide More Settlement Benefits To Their Respective Classes Than The Proposed Settlement

14. Class Counsel Pursued No Discovery of The Defendants' Ability To Pay A Lump Sum Settlement

Each of these will be addressed in turn. As discussed below several are individually fatal to preliminarily approval of the settlement.

### 1. Conflicted Class Representative Saltzman Previously Turned Down Pella's Offer of More Money Than Saltzman Now Says The Class Should Settle For

Class Representative Saltzman is the father-in-law of Class Counsel Paul Weiss. Saltzman is the father of Jamie Weiss, Paul's wife and law partner. Class Counsel stands to benefit substantially from the attorney fees to be paid in connection with the proposed settlement. The conflict of interest inherent in that relationship is patent. Further, no other member of the Class has such a conflict. At a minimum therefore, the Court should review with substantial skepticism Saltzman's proposed settlement which would result in payments to the Class, if any, of less money than Saltzman refused to accept for his own claim.

On October 18, 2006, Pella sent Saltzman a check for $783.46 for just two replacement sashes. The cover letter accompanying the check broke down the dollar amounts between sash, installation and finishing costs.



> As discussed, Pella Corporation is refunding you for the two replacement sashes you purchased. We are also providing you compensation toward the costs you incurred for installation and finishing. The enclosed check in the amount of $783.46 includes a refund of $413.46 for the two Pella replacement sashes you purchased as well as $250.00 in installation costs through our Service Technicians and $120.00 toward finishing costs.

"As discussed, Pella Corporation is refunding you for the two replacement sashes you purchased. We are also providing you compensation for the costs you incurred for installation and finishing. The enclosed check in the amount of $783.46 includes a refund of $413.46 for the two Pella replacement sashes you purchased as well as $250.00 in installation costs through our Service Technicians and $120.00 toward finishing costs."

Attached as Exhibit 7.

By simple division Pella was offering Saltzman $206.73 per sash, $125.00 per sash for installation, and $60.00 per sash for finishing costs.[4] Saltzman **rejected** Pella's offer. Saltzman testified under oath at his deposition:

> "...if accepting the payment would constitute acceptance of Pella's payment as settlement of all claims against them, and, you know, I would not do that."

Exhibit 8, pg. 71 lines 5-8. During the deposition Saltzman also explained the full extent of his concerns about recovery from Pella:

> "And to the extent that a little farther, I'm concerned about the rest of my house. I mean, I don't see any reason why this wouldn't be happening with all the windows in my home at some point."

Exhibit 8, pg. 72 lines10-13.

The difference between the offer from Pella that Saltzman rejected for himself and the settlement value he is willing to impose class wide under the proposed Settlement Agreement is demonstrated in the following tables:

---

[4]
$413.46 \div 2 = \$ 206.73$
$250.00 \div 2 = \$ 125.00$
$120.00 \div 2 = \$ 60.00$

| Per Sash Allowance Comparison | | |
|---|---|---|
| | | |
| Settlement Agreement | | |
| Paragraph | | |
| 68 b.i. | $ 100 | Includes installation and finishing |
| 68 b.ii. | $ 60 | Sash only |
| 69 b.i.1.b) | $ 60 | Sash only |
| 69 b.i.2.a) | $ 60 | Sash only |
| 69 b.ii.b) | $ 60 | Sash only |
| Pella's 2006 Offer Saltzman Previously Turned Down | | |
| | $ 206.73 | Sash only |

| Per Sash Installation and Finishing Allowance Comparison | | |
|---|---|---|
| | | |
| Settlement Agreement | | |
| Paragraph | | |
| 68 b.i. | $ 100 | Includes sash |
| 69 b.i.1.a) | $ 120 | Installation and finish only |
| 69 b.ii.a) | $ 100 | Installation and finish only |
| Pella's 2006 Offer Saltzman Previously Turned Down | | |
| | $ 185 | Install and finish only |

Not only was the amount Saltzman turned down $783.46 greater than the $750.00 cap he now wants to impose on the Class, the amount Saltzman turned down per sash was 344% greater[5] than what he now feels is good enough for the other members of the Class, and the amount Saltzman turned down as per sash installation and finishing allowance was 54.2% to 85% greater[6] than what he now feels is sufficient for the Class.

The $750.00 cap Saltzman wants the Court to approve for the Class is a per structure cap for _all_ the windows in any structure. Tellingly, Saltzman rejected an amount greater than that

---

[5]      $206.73 \div 60.00 = 3.4455$

[6]      $185.00 \div 120.00 = 1.5416$
        $185.00 \div 100.00 = 1.8500$

12

proposed cap, $783.46, for just <u>two</u> windows.

Independent of his conflict of interest, which is discussed below, the mere comparison of the amount Saltzman previously turned down with the amount Saltzman now proposes should be deemed acceptable for the Class raises a clear and unmistakable warning sign that the settlement is not fair and reasonable.

>    **2.    The Settlement Excludes A Determination of Value And the High Attorney Fees Raises The Question Are  Defendants Buying Off Class Counsel**

Nowhere in the Settlement Agreement, the proposed notice or any supporting papers is there a mention of the value of the settlement to the Class. That glaring omission cannot be inadvertent.

Just taking the numbers Pella recently submitted, without regard to any issue that otherwise might be raised regarding their accuracy, there are 6,430,000 windows in the settlement class (Doc. 284-4 page 4, par. 7) with a window failure rate of .51% to 3.7% (Doc. 284-3 page 3, par. 4). Taking the highest failure rate of 3.7% and assuming a normal distribution of the ten windows per structure (Doc. 284-4 page 4, par. 6) across the Class yields an estimate of roughly 23,791 structures[7] with failed windows. Multiplying the $750 per structure cap by the number of affected structures, the cash value of the settlement would be only $17,843,250[8]. Using Pella's lower failure rate of .51%, yields an even lower cash value amount of $2,459,475.[9]

Therefore, using Pella's recently submitted numbers suggests a settlement cash payout value amount of between $2,459,475 to $17,843,250. Those figures beg the question why is Pella willing to pay $11,000,000 in attorneys' fees? The disparity between the likely value to the

---

[7]    643,000 x 3.7% = 23,791

[8]    23,791 x $750 = $17,843,250

[9]    643,000 x .51% x $750 = $2,459,475

Class and the magnitude of fees to be paid strongly suggests something is amiss. Consequently, the failure of Pella and Class Counsel to provide a settlement value is yet another warning sign. More importantly, sacrificing a potential recovery at trial of more than $300,000,000 for a possible settlement recovery of between $2,500,000 to $18,000,000 is not in any way reasonable.

Of course in addition to the $750 cash option, the Settlement Agreement purports to include an arbitration option with a cap of $6,000, which arguably affects the total value of the settlement. However as discussed next, the full cash and arbitration recoveries are illusory, merely shifting the burden of proving liability from Class Counsel back to the Class, which begs the additional question of what value has Class Counsel actually obtained for the Class.

### 3. The $750 Cash Claim or $6,000 Arbitration Recovery Are Illusory – Pella Reserves All Its Defenses Which Precipitated The Instant Suit

The claim procedure agreed to in the Settlement Agreement is tilted unjustifiably in favor of Pella. In the Settlement Agreement Pella has specifically retained the following defenses to any asserted cash or arbitration claim:

- Lack of causation
- Failure to Follow Pella's Installation Instructions
- Installation Issues
- Home Construction Issues
- Environmental Conditions Issues
- Maintenance Issues

Doc. 277-1 par. 61.

Further, Pella is not responsible under the Settlement Agreement for an open-ended list of non-recoverable damage. Specifically, the Settlement Agreement states "non-recoverable" damage "includes, **but is not limited to**," damages caused by:

- Misuse

14

- Racking, covering or blocking of weep holes
- Improper storage, handling, installation, modification, or maintenance
- Finishes, sealants or caulking not applied by Pella
- Failure to finish the product in a timely manner
- Natural weathering
- Exterior leaks
- Interior condensation

Doc. 277-1 par. 61 (emphasis added).

What is troubling about these causes of damages is they are the exact same type of causation issues complained of in the proposed Third Amended Complaint as being pretextual and alleged to be asserted by Pella in a pattern and practice of improperly denying damage claims. Doc. 275-1. The Third Amended Complaint states:

- "when questioned about leakage problems, Pella would claim **faulty installation** as the culprit" (par. 18);

- "Pella further, wrongly attributed the damage to **faulty installation**" (par. 26);

- "Whether Defendants have a pattern and practice of attributing damages claimed by Plaintiffs and the Class to '**faulty installation**' or **improper maintenance**, and not due to the complained of defect" (par. 57(e));

- "rather, Defendants attributed resulting damage to **faulty installation**, **maintenance** or **other third-party conduct**" (par. 62).

(emphasis added).

Even more troubling is that during the inspections of the four Class Representatives' homes, Pella attributed *all* of the damage to the Class Representatives' windows to the causes Pella would preserve for defensive use under the Settlement Agreement. As such, under the Settlement Agreement, none of the Class Representatives would be guaranteed the full cash or arbitration recovery amounts, or would even be certain of recovering even $1. The following 45

15

causes of damage, other than from the defect itself, were cited by Pella during the inspections of just those four homes. All 45 causes are preserved under the Settlement Agreement for Pella to use to avoid payment of any and all settlement claims:

1. "probably due to **condensation**. The formation of condensation is a result of the exterior temperature, the interior temperature and humidity and not a window product issue." Exhibit 9, page 4;

2. "do not have a correctly installed line of perimeter **sealant**. The installation instructions recommended a continuous line of backer rod and sealant around the entire perimeter of the windows and doors." *Id*.;

3. "an indication that the **stucco** has failed due to these stress conditions" *Id*.;

4. "improper and/or missing perimeter **sealants**" *Id*.;

5. "The **roof configuration** drains much of the roof area into this location." *Id*.;

6. "It is possible that there is some distress of the **glazing seal**" *Id*.;

7. "The metal **roof edge** dumps directly onto the horizontal surface of the synthetic stucco. This detail may be introducing water into the head of window" *Id*.;

8. "**paint** on the sash had adhered to the weather stripping" *Id*.;

9. "It did not appear that many of the windows were **operated at regular intervals**." *Id*.;

10. "the original **installation** was not in compliance with the published installation instruction issued by Pella Corporation." Exhibit 10, page 2;

11. "**Condensation**" Exhibit 11, page 3;

12. "It did not appear that the product had been **refinished** since its installation." *Id*.;

13. "Water infiltration around **penetrations**" *Id*.;

14. "This window is in close proximity to the termination of a **roof system**." *Id*.;

15.  "The moisture source was probably the inadequate perimeter **sealant**" *Id*.;

16.  "**Installation** deficiencies" *Id*.;

17.  "There were several points of the **installation instructions** that were not followed." *Id*.;

18.  "We did not observe any window or door product that had a correctly installed line of perimeter **sealant**." *Id*.;

19.  "It is unclear if the head of the window was properly integrated into the **weather resistive barrier** at these locations." *Id*.;

20.  "**Prior repairs**" *Id*.;

21.  "Additional **sealant** was applied to the corner of the clad frame windows and also between the frame and the glazing of these windows." *Id*.;

22.  "Deferred **maintenance**" *Id*., page 4;

23.  "The lack of routine **maintenance** can greatly shorten the life of any building component, including window and door products." *Id*.;

24.  "**Other construction components**" *Id*.;

25.  "there are a number of other apparent **construction deficiencies** in this home.  Some or all of these items are likely to be contributing to water entry in the home." *Id*.;

26.  "Missing or failed **sealants** at dissimilar materials." *Id*.;

27.  "The **eave detailing** appears to be introducing water behind the siding installation." *Id*.;

28.  "It is unclear what the root cause of the sash deterioration was.  It may be caused by the **condensation** noted above, by a **glazing seal** leak or by the introduction of **moisture from other sources**." *Id*.;

29.  "The lack of a **weather resistive barrier** and the associated flashings seems to be the primary cause of the deterioration and staining noted on the sheathing, framing material and window product of this home." Exhibit 12, page 2;

30.  "The **instructions** issued by Pella Corporation for the installation of this product were not followed." *Id*.;

17

31. "The missing **nail fin** on the bottom of the window may have also contributed to the water infiltration around the window." *Id.*;

32. "Without a properly installed **weather-resistive barrier** the moisture was free to enter the wall cavity at penetrations such as windows and doors." *Id,*;

33. "Water entry behind the nailing fin at the head of the windows is an indication that the **flashing system** used on this home was not functioning properly." Exhibit 13, page 1;

34. "The products observed on this home do not have a correctly installed line of perimeter **sealant**." Exhibit 14, page 3;

35. "The improper and/or missing perimeter **sealants** can allow bulk water entry behind the siding installation." *Id.*;

36. "If the **weather resistive barrier** is incorrectly flashed or if it has any voids, water can enter the wall cavity." *Id.*;

37. "Some of the widows have minor staining that is probably due to **condensation**. The formation of condensation is a result of the exterior temperature, the interior temperature and humidity and not a window product issue" *Id.*;

38. "We believe this discoloration is due to a combination of **condensation** and **maintenance issues**." *Id.*

39. "The products observed in this home do not have a correctly installed line of perimeter **sealant**." Exhibit 15, page 1;

40. "The improper and/or missing perimeter **sealants** can allow bulk water entry behind the siding installation." *Id.*, page 3;

41. "No **finish** had been installed on this product at the time of our inspection, even though the Owner's manual clearly states that all product must receive a finish right away." *Id.*;

42. "The **finish** that was installed on the product did not extend all of the way to the weather-stripping" *Id.*;

43. "It seems very plausible that the deterioration observed on this home is linked to the incomplete **finish** application" *Id.*;

44. "It was unclear if the cause of deterioration was the lack of **finish**, a **storm** event that exceeded the capacity of the product, or some **other unknown cause**." *Id.*;

18

45.     "the product was in need of minor **maintenance and repair**" *Id*.;

Again, this long list is just from four homes.  The highlighted terms show Pella's

willingness to use the same excuses, repeatedly, as alleged in the complaint.  The long list also

shows the extent to which Pella will go to avoid assuming responsibility for any window

damage.

There can be no reasonable expectation that Pella will abandon its approach under the

claims process of the Settlement Agreement.  As such, proponents of the Settlement Agreement

are deluding themselves if they think the claims process in the Settlement Agreement will bring

any real recovery to the Class, when Pella's tried and true 'blame anything else' approach has

allowed Pella to keep window warranty claims to a historic range of a paltry .51% to 3.7% (Doc.

284-3 page 3, par. 4).

Under the proposed settlement Class members are not entitled to receive direct payments.

Instead, they must submit claims subject to the preserved causation defenses.  The failure of

class members to receive a direct payment was deemed a material warning signal in *Mirfashi,*

450 F.3d at 748*.*  It is even more so here, because Pella purports to reserve its litany of pretextual

defenses to settlement claims, therefore, the chance of Class members receiving either a $750

cash payment or $6,000 arbitration award is at least greatly diminished and plausibly zero.  A

portion of the class receiving an effective settlement value of zero was found to be a material

warning signal in *Reynolds*, 288 F.3d at 284.  It is here so as well.  The defenses preserved by

Pella will clearly reduce its overall liability to the Class.  Details in a settlement agreement which

serve merely to reduce the liability of the defendant were held to be another warning signal in

*Mirfashi,* 450 F.3d at 748.  The same is here.  As such, the preservation of Pella's pretextual

causation defenses and their effect on the claims process necessary for recovery, makes the

proposed settlement patently unfair and unreasonable to the Class.

### 4. The Chance Of A $6,000 Arbitration Recovery Is Illusory When Class Members Must Pay Their Own Attorney Fees In Arbitration

The Settlement Agreement provides for written discovery and home inspections as part of the arbitration process. Doc. 277-1 par. 94. Further, the arbitrator is to apply the rules of comparative fault with no joint and several liability. Doc. 277-1 par. 96. In addition, the settlement provides that evidence showing that Pella ProLine windows were 'defective' shall not to be admitted in the arbitration. *Id.* Furthermore, under the rules established in the settlement, the Class claimant has the burden to prove that a 'defect' caused the damages for which he/she is seeking compensation in arbitration. *Id.* And with the causation defenses reserved by Pella for the arbitration process, a Class Claimant is likely to need construction and/or engineering expertise to be successful. Finally, the settlement stipulates that the arbitrator's decision is binding and non-appealable. *Id.*

Within this framework, a Class claimant is effectively deprived of any possibility of recovery unless represented by counsel. Since the Settlement Agreement includes an arbitration award cap of $6,000 (Doc. 277-1 par. 83), an amount lower than the jurisdictional amount in small claims court in Illinois of $10,000 (IL. Sup. Ct. Rule 281), there is no reasonable expectation a Class claimant will be able to retain counsel for the arbitration and also afford expert assistance. Even if a Class claimant were to obtain counsel, the attorney's fees would reduce a claimant's recovery if payment was made on a 33% contingent basis or negate it entirely if counsel were to be paid on an hourly basis. The imposition of attorney's fees on the Class members' ability to recover is a warning sign that the arbitration recovery is illusory, or at least has a real value of well less than $6,000. Accordingly, the arbitration portion of the proposed settlement is unreasonable.

20

### 5.     The Arbitration Proceeding Provides The Class No Real Value

The most significant difference between what a claimant would have to prove in court had no class action been filed, and what a claimant will now have to prove in arbitration, is reflected by the proposed cap on the recovery amount in arbitration.  The settlement merely shifts the burden of proving Pella windows are defective from Class Counsel to each individual Class Claimant, preserving to Pella any and all defenses it would have enjoyed in a court of law. The same risks and costs of a law suit are present in the settlement arbitration proceeding, as noted above, because there is no likelihood of success in arbitration without legal assistance and expert testimony.

The full arbitration procedure is set forth in the Settlement Agreement in Section H, paragraphs 83-98.  The process requires that to even be eligible for arbitration a settlement claimant must have pre-notified Pella of the wood deterioration, wood durability or water intrusion problems (Doc. 277-1 par. 84.b.), and arbitration claims can be denied for failing to meet all the procedural requirements (Doc. 277-1 par. 87).  The following table compares the settlement arbitration process to the process in a civil suit:

|  | Civil Law Suit | Settlement Claim Arbitration Proceeding |
|---|---|---|
| Commencement Through Filing | √ | √ |
| Pre-filing Notice Requirement | No | Yes |
| Potential to Have Filing Dismissed on Procedural Grounds | √ | √ |
| Burden of Proof on Claimant | √ | √ |
| Written Discovery | √ | √ |
| Inspection of the Structure | √ | √ |

| Issue of Causation | √ | √ |
|---|---|---|
| Defenses Based on Engineering Principles | √ | √ |
| Use of Witnesses at Trial or Hearing | √ | √ |
| Appealable | Yes | No |
| Damages Cap | No | Yes |
| Availability of Award of Attorney Fees | Yes | No |

If a Class Claimant had instead filed a civil suit (1) there would not be a pre-filing notice requirement (Doc. 277-1 par. 84.b.); (2) there would not be a waiver of appeal (Doc. 277-1 par. 97); (3) there would not be a cap on recovery (Doc. 277-1 par. 83); and (4) there would not be a waiver of the right to an award of statutory attorney fees (Doc. 277-1 par. 93). Therefore, by going into the settlement arbitration process a Class Claimant is actually in a worse position than if this suit had ever been filed. Proponents of the settlement will likely point to the option of a Class member opting-out of the settlement. But they cannot simply wish away this fatal indicia that the settlement is not reasonable, simply put, each and every Class member would be in a better position if they opt-out than if they go into arbitration under the terms of the settlement.

### 6. $2,000,000 "Kickforward" War Chest Payoff From Pella to Lead Counsel Is Unprecedented and Has No Legitimate Purpose Than to Preserve and Protect the Settlement

Under the terms of the Settlement Agreement, within ten days after an order approving the settlement, Pella will deposit $11,000,000 into an escrow account for attorneys' fees. Doc. 277-1 par. 102. Once this money is placed in escrow, Class Counsel can immediately withdraw up to $2,000,000. Doc. 277-1 par. 102.(e). The Settlement Agreement specifically provides the $2,000,000 withdrawal is available even prior to notice being sent to the Class (Doc. 277-1 pars.

102, 24 and 19), prior to the time for an approved settlement to be taken up on appeal, and the agreement also specifically provides the withdrawal is available even if the settlement is later overturned on appeal. Doc. 277-1 pars. 102.(b)i. and ii (incorporating par. 19). Thus, if this Court approves the settlement, Pella will forward $2,000,000 to Class Counsel to provide Class Counsel financing for the fairness hearing and any subsequent appeal. Pella has asked for a letter of credit before the $2,000,000 can be taken. Doc. 277-1 par. 102(e). However, whether the $2,000,000 is a straight payment, an advance on fees or a loan from the Defendants to Class Counsel makes no difference, it is an unprecedented financial arrangement between Class Counsel and Defendants.

This 'kickforward' war chest payoff from Pella to Lead Counsel is such a large amount it is inherently prejudicial to any Class members who may want to object at the fairness hearing, or to any Class members who may want to appeal an approved settlement. Objecting to and appealing an approved settlement is hard enough in ordinary circumstances, but it would be made increasingly more difficult against exceedingly well-funded Class Counsel bought and paid for by their supposed adversary. Indeed, Pella is clearly advancing the funds to preserve and protect its interest in the settlement. This begs the question of just how favorable the settlement is to Pella if Pella is willing to pay, advance or loan $2,000,000 to Class Counsel to maintain the proposed settlement through a fairness hearing and appeal. Can Class Counsel be relied upon to exercise objective judgment and preserve the interest of the Class under threat of having to repay $2,000,000 in the event Pella's interests in the settlement are not upheld? This is another fatal warning sign the settlement is not fair and not reasonable to the Class.

Should this Court find any portion of the settlement to be reasonable, the $2,000,000 payment, advance or loan from Defendants to Class Counsel should still be prohibited and

stricken from the Settlement Agreement before approval.

### 7. $2,000,000 "Kickforward" Places Class Counsels' Interests Ahead of the Class

The recovery in every class action includes a simple relationship between class recovery (zero, low, medium and high) to attorney fees (zero, low, medium and high). The mere possibility that Class Counsel could get $2,000,000 in attorneys' fees <u>even if</u> the settlement is overturned on appeal is appalling. As reflected in the following matrix, the possibility of Class Counsel taking $2,000,000 and the class getting nothing is the worst of all scenarios in class action litigation and is clear evidence Class Counsel has put its own interests ahead of the Class.



No more serious breach of Class Counsel's obligations to the Class can be contemplated than the Class getting nothing and Class Counsel getting paid handsomely.  Yet that possibility is embodied in the proposed settlement.  Class Counsel and Defendants will likely respond that the $2,000,000 is backed by a letter of credit.  Doc. 277-1 par. 102(e).  However, this begs the question: why are Defendants providing this money if Class Counsel can obtain a letter of credit?  Be it a payment, advance or loan, the $2,000,000 looks and sounds like a 'pay-off' and is a blatant warning sign of suspicious circumstances that the settlement is nowhere near fair and reasonable to the Class.

### 8.    Conflicts Between the SubClasses Require Separate Representation

Pella windows are supposed to last for at least thirty years.  Doc. 144, page 4.  Moreover, the issues certified in this case all revolve around whether the windows were manufactured with an inherent defect.  Somehow though, the Settlement Agreement, Section F pages 32-34, has a somewhat confusing labyrinth of 'buckets' for class benefits centered on the time period of repair, the time period of purchase and whether prior notice was given to Defendants:

- Windows repaired or replaced before August 18, 2003 and no prior notice

- Windows repaired or replaced before August 18, 2003 with prior notice
  if the date of prior notice was within 10 years after the date of sale

- Windows repaired or replaced before August 18, 2003 with prior notice
  if the date of prior notice was within years 11-15 after the date of sale

- Windows repaired or replaced on or after August 3, 2003 and no prior notice
  for dates of sale from 1991 through 2003

- Windows repaired or replaced on or after August 3, 2003 and no prior notice
  for dates of sale from 2004 through 2006

25

- Windows repaired or replaced on or after August 3, 2003 and prior notice for dates of sale from 1991 to 2003 if the date of prior notice was within 10 years after the date of sale

- Windows repaired or replaced on or after August 3, 2003 and prior notice for dates of sale from 1991 to 2003 if the date of prior notice was within years 11-15 after the date of sale

- Windows repaired or replaced on or after August 3, 2003 and prior notice for dates of sale from 2004 to 2006

By making the settlement overly complex Class Counsel has created the need for separate representation of each subclass. Section F of the Settlement Agreement, pages 32-34, treats each of the subclasses differently, some getting cash and some getting just a discount on future purchases. If these windows were all defective in the same manner when they left the factory, the time period of repair, the time period of purchase and whether prior notice was given to Defendants are irrelevant. The following table shows the inequity in recoveries among the subclasses which creates the conflict requiring separate representation for each:

| Sub-Classes | Discount | For un-reimbursed expenditures for windows, sashes, installation or finishing | For the cost of the window or sash | For the cost of installation / finishing | For other damages to the structure |
|---|---|---|---|---|---|
| Windows repaired or replaced before August 18, 2003 and no prior notice | 15% | | | | |
| Windows repaired or replaced before August 18, 2003 with prior notice if the date of prior notice was within 10 | | up to $175 per window or $100 per sash | | | |

| | | | | |
|---|---|---|---|---|
| years after the date of sale | | | | |
| Windows repaired or replaced before August 18, 2003 with prior notice<br>if the date of prior notice was within years 11-15 after the date of sale | | | Up to $60 per window or per sash | |
| Windows repaired or replaced on or after August 3, 2003 and no prior notice<br>for dates of sale from 1991 through 2003 | 15% | | | |
| Windows repaired or replaced on or after August 3, 2003 and no prior notice<br>for dates of sale from 2004 through 2006 | 10% | | | |
| Windows repaired or replaced on or after August 3, 2003 and prior notice for dates of sale from 1991 to 2003 if the date of prior notice was within 10 years after the date of sale | | up to $100 per window or $60 per sash | up to $250 per window or $120 per sash | up to $100 per structure |
| Windows repaired or replaced on or after August 3, 2003 and prior notice for dates of sale from 1991 to 2003 if the date of prior notice was within years 11-15 after the date of sale | | up to a total of $100 per window or $60 per sash | | |

27

| | | | | | |
|---|---|---|---|---|---|
| Windows repaired or replaced on or after August 3, 2003 and prior notice for dates of sale from 2004 to 2006 | | | up to $100 per window or $60 per sash | up to $175 per window or $100 per sash | up to $100 per structure |

More than once the Seventh Circuit has held a settlement which creates conflict between subclasses is a warning sign the settlement cannot be approved. *See Reynolds*, 288 F.3d 277; *Smith v. Sprint Communications,* 387 F.3d 612; and *Mirfasihi,* 450 F.3d 745. The proposed settlement, as currently structured, creates the clear need for separate representation of each subclass to ensure fairness of recovery. Every member of the Class purchased a window. It is unfair and unreasonable that Class members are treated disparately, without meaningful basis, and some Class members will potentially receive cash, while others only a discount on a future purpose.

The lack of separate representation for each sub-class is fatal and requires that the Court deny preliminary approval of the settlement.

### 9. The $100 Deductible Per Window for Class Members to Get Benefits Adds a Condition Not Contained in the Original Product Warranty

Under two of the subclasses Pella will charge a $100 deductible per window before those Class members receive any benefits. For windows with dates of sale from 2004 to 2006, the Settlement Agreement, at par. 77.2., states that Class members are only entitled to relief "after the Settlement Class Member has expended a deductible amount of $100 per unit." Perplexing is how a $100 per window deductible can be justified when the recovery under the settlement for this subclass is just $60 to $175 per window. This makes no real economic sense from the perspective of these Class members who are only entitled to $60, $100 and $175 recovery per

window.  After applying the deductible, all or nearly all of the damages incurred will be borne by

the members of the subclass.  Many will receive nothing after applying the deductible.  Others

will receive only a fraction of the amount provided in the agreement.  The fact that the

Defendants may actually recoup a significant portion of the purported payout to the class, and

inclusion of details in the settlement agreement which reduce significantly the liability of the

defendant, both of which are present here, are material warning signs a settlement is

unreasonable.  *Mirfasihi,* 450 F.3d at 748.

In addition, from the perspective of Pella, the $100 deductible per window it is a

windfall.  Pella's original product warranty, attached to the complaint (Doc. 20-2), did not

include a deductible.  But now, under the terms of the Settlement Agreement (par. 77.2.i.(a)),

Class members will have to pay a $100 deductible even to receive to which they would have

been entitled under the original product warranty.  A Class member cannot get "the remedies and

benefits offered by the product warranty . . . [until] after the Settlement Class Member has

expended a deductible amount of $100 per unit."  The result is Class Counsel has unjustifiably

added a condition not contained in the original product warranty.  The only beneficiary of that

condition is Pella.  This net reduction in Pella's original product warranty represents another

example of how Class members are <u>worse off</u> with the proposed settlement than without it.

The charging of a deductible to receive a warranty benefit that was not contained in the

original product warranty is not in the best interests of the Class.  Inclusion of the condition

raises yet again another serious warning sign that the proposed settlement is unfair to the Class.

**10.   Three Of The SubClasses Are Really Coupon Classes**

As shown in the table above comparing the recoveries of the different subclasses, three of

those subclasses would receive only a discount on future purchases, and the discounts amongst

those three groups are not equal – 15, 15 and 10%.   Offering a discount is effectively nothing more than providing a settlement coupon without the cumbersome distribution of the piece of paper.  The trouble with coupon settlements is well understood and documented, and requires a high degree of scrutiny post CAFA.  *See Synfuel Technologies, Inc., v. DHL Express (USA), Inc.,* 463 F.3d 646 (7th Cir. 2006)(class recovery analogous to providing coupons is compensation in kinds and doubtfully provides any meaningful compensation to the class, fails to disgorge ill-gotten gains, and forces class members to do future business with the defendant).

Attempting to sneak through a coupon type recovery to subparts of the Class is not fair and reasonable to those Class members.  It further compels the conclusion that the proposed settlement is not reasonable and should not get approved.

### 11.   The Court Certified An Issue Class And The Proposed Settlement Has No Resolution Of That Issue

It is counterintuitive, but the proposed settlement of this certified issue class actually provides no resolution of the underlying issue.  This is, to say the least, problematic.  By leaving resolution of the certified issue out of the settlement, the Class members are no better off than before this litigation began.  As discussed above, the settlement also adds substantive and procedural hurdles non-existent before this suit was filed, including but not limited to: a pre-filing notice requirement (Doc. 277-1 par. 84.b.); waiver of appeal (Doc. 277-1 par. 97); a cap on recovery (Doc. 277-1 par. 83); a waiver of the right to an award of statutory attorney fees (Doc. 277-1 par. 93); and a newly imposed deductible to warranty claims (Doc. 277-1 par. 77.2). Class members were undeniably better off with a pre-suit warranty claim or law suit which had none of these restrictions.

The issue or issues certified in this case all revolve around whether the windows were manufactured with an inherent defect.  The Settlement Agreement at par. 96, states "[w]hether

30

the Pella ProLine Casement windows were 'defective' shall not be admitted, but shall not be disputed by Defendants for purposes only of the arbitration." A reasonable interpretation of this provision means the burden of proving the defect still rests with the Class Claimant. This is relevant given the general rules of fault and causation with which the arbitrators will be charged. This is also relevant because without an assumption or admission that the windows are defective, the causation defenses reserved by Pella are that much more powerful and determinative. In other words, a Class Claimant's chance of success in an arbitration without having to prove the defect are exponentially greater than in an arbitration wherein the defect has to be proven – all while still staying profitable within the $6,000 cap.

It is unfair and unreasonable to the Class not to have resolution in some degree of the single issue binding the Class together without obtaining adequate compensation for having to assume the risk of proving that very issue in the settlement claims process.

### 12. The Uncertainties Of An Issue Certified Class Do Not Reduce Class Counsels' Obligations To Act In The Best Interests Of The Class

Proponents of the settlement argue that even if the Class were to prove liability at trial on the issues certified, the risk of individual determination of causation and damages in later phases of the litigation supports approval of the settlement as proposed. The proponents' argument misses the mark on three key points.

First, a proper analysis of the relative strength of Plaintiffs' case requires an examination of how successful the Plaintiffs will be at proving liability at trial, not examining the later phases of the litigation which will involve issues of causation and damages. This is an issue certified Class and testing the strength of the settlement should not summarily dismiss the strength of Plaintiffs' ability to prove the defect at trial. In fact, this is a case where Defendants have admitted to creating a secret warranty program to cover the defect alleged.

Secondly, once Class Counsel sought certification of an issue only Class, they assumed the risk of later phases of litigation. To now say the risk of later phases of litigation is so great as to warrant settlement suggests Class Counsel never intended to do any more than file, get certified and settle (and extract a princely sum of attorney's fees). That is a fundamental breach of Class Counsel's obligations to representing the Class.

Finally, should the Class prevail at trial and prove liability, *i.e.*, that the windows were defective when they left the factory, the burden of proving causation would then shift to Defendants to demonstrate that something other than the defect caused the damage. This shifting of the burden of proof would have immediate and real effect on warranty claims and pending law suits against Pella. Moreover, there is no reason that a settlement following a trial on liability could not be accomplished. Where, as here, a class gains nothing in the settlement because there was no concession of liability, and where a class loses the possibility of collective proceedings for damages under the agreement, are both warning signs that a settlement is not reasonable. *Crawford*, 201 F.3d 877.

The Named Class Reps do not deny that the sooner a resolution is reached the better it is for the Class. However, the mere fact that there is a 'settlement at hand' is not sufficient justification to find this proposed settlement falls within the range of reasonableness. The Class has a strong case to prove liability. Moreover, because Class Counsel and Defendants were able to create a process for the determination of damages now does not mean that cannot be accomplished again.

### 13. Two Recent Window Class Action Settlements Provide More Settlement Benefits To Their Respective Classes Than The Proposed Settlement

Further indicating the unfairness the unfairness of the proposed settlement is the simple fact that two recent window class action settlements provide more benefits for their respective

classes than the proposed settlement does here.  On August 9, 2011, settlement papers were filed

in *Barden v. Hurd Millwork Company, Inc.*, No. 2:06-cv-00046-LA (E. D. WI.).  In the

stipulated settlement agreement in the *Barden* case, attached as Exhibit 16, at par. 6.2 that

window class was awarded 12% of their purchase price, reduced pro rata if the settlement fund is

fully depleted.  On March 18, 2011, notice was issued in *Everett et al v. A.B.C. Products, Inc.*,

Case No. RIC 425649 (Riverside County Sup. Ct., Cal.).  In the notice for *Everett*, attached as

Exhibit 17, that window class was awarded a $1,000 lump sum cash payment or $250 per

window with no per structure cap.

Both of these settled cases awarded more to their respective classes than does the

proposed settlement here.  A refund of a percentage of purchase price, increasing the lump sum

cash payment while eliminating the claims process, or increasing the per window allowance

while eliminating the per structure cap are all good ideas to increase this proposed settlement.

Neither of these settled cases included an arbitration claims process.  The lack of reasonableness

of the proposed settlement is thus further revealed by comparing it to these other two window

cases.

### 14. Class Counsel Pursued No Discovery Of The Defendants' Ability To Pay A Lump Sum Settlement

Defendants are privately held entities and are reported to have yearly sales of over $1

billion.  Exhibit 18.  On June 22, 2012, Pella issued a press release that this case has settled.

Exhibit 19.  In that press release Pella states it is "financially strong."  However, at no time

during pre-certification discovery or settlement discovery has Class Counsel obtained

Defendants' financial statements.  Class Counsel noticed Defendants' CFO for deposition, but

that deposition was never taken.

It is extremely difficult to gauge the reasonableness of the proposed settlement without

some insight into Defendants' ability to reimburse the Class. Compared to the problems of the current settlement structure, a lump sum settlement fund is not an unreasonable alternative. At least minimal discovery should have been undertaken to gauge the Defendants' financial status. Class Counsels' failure in that regard further requires rejection of preliminary approval.

### 15. The Warning Signs Require That Preliminary Approval Of the Settlement Be Denied

Several of the warning signs, described above, are in and of themselves fatal to granting preliminary approval of the proposed settlement. The Settlement Agreement provides no real value to the Class. The $2,000,000 payoff to Class Counsel is outrageous. The absence of separate representation for the subclasses is unjustifiable. Each requires disapproval of the settlement, independent of the purported litigation value.

The Court also can and should take into account the further warning signs also detailed above. The value to the Class is less than the offer previously refused by Saltzman, fully refuting his contention that the terms are reasonable. Indeed, there is no basis provided by the proponents to evaluate reasonableness of the Class benefits since they failed to provide determination of value. Finally, and outrageously, the cash and arbitration recovery procedures render the benefit illusory. In addition the recovery would pale in comparison to other similar settlements and Class Counsel also neglected their fiduciary duties by failing even to explore Defendants' ability to make a lump sum settlement. Each of these indicia contributes to the conclusion that the settlement is not fair and reasonable for the Class. Accordingly the Court should deny preliminary approval.

### III. The Proposed Settlement Falls Outside Of The Range Of Reasonableness

There is no clear predictor of the expected mix of claims for the $750 cash option and the $6000 arbitration option. Thus, even speculation about this ratio is unsound. Any settlement

34

value must be discounted, therefore, by the proof problems facing Class claimants in either the

cash and arbitration claims processes, the likelihood that a portion of the Class members will get

nothing, the fact that a portion of the Class members are only getting discounts, and that some

Class members must incur a $100 deductible before they get benefits.   Since it is difficult to

determine any settlement value, how can the Court make even a preliminary finding that the

settlement is reasonable to the Class?  Therefore, the proposed agreement cannot pass even the

first prong of the range of reasonableness test (considering the strength of plaintiffs' case

compared to the terms of the proposed settlement).

      Likewise, as detailed above, there are multiple warning signs the terms of the proposed

settlement are not in the best interest of the Class.  In sum the proposed settlement sets forth a

complex claims process which resolves the litigation but at the expense of reducing the chance of

a reasonable recovery per Class member.  As such, the second prong of the reasonableness test

(the likely complexity, length, and expense of continued litigation) also does not favor approval.

      The third prong of the reasonableness test (the amount of opposition to settlement among

affected parties) also weighs in favor of denial as the clear majority, 75%, of the named Class

Representatives oppose the settlement.  The fourth prong (the opinion of competent counsel) is at

best neutral.  The final prong (the stage of the proceedings and the amount of discovery

completed) does not favor approval.  Although the case has been pending since 2006 and there is

a real need for final resolution, a prompt but unfair settlement is not preferred to one later on

better terms.  At a minimum, there still has been no discovery done to determine the Defendants'

ability to pay a more meaningful settlement to the Class.

      Finally, a closer examination of the first prong using the two approaches set forth by the

Seventh Circuit, the value of the litigation clearly and substantially outweighs the value of the

settlement.  There are also fatal warning signs that the terms of the settlement are unfair.  As

such, the Settlement Agreement should <u>not</u> be preliminarily approved.

### IV. The Proposed Replacement Of Named Class Representatives With Settlement Representatives Undermines The Fundamental Principles Of Rule 23(a)(4)

The Named Class Reps have vigorously fought to obtain a fair and reasonable settlement

for the Class.  Their criticisms of the proposed settlement are well founded and, as described

above, require this Court to deny preliminary approval.  Instead of facing this reality, Class

Counsel has moved to remove four of the five Court approved Class Representatives in effect to

reduce settlement opposition.  Class Counsel proposes that this Court instead substitute a group

of sycophant settlement representatives, led by Class Counsel's father-in-law Saltzman, to

proceed with the settlement.

Federal Rule of Civil Procedure 23(a)(4) requires "the representative parties will fairly

and adequately protect the interests of the class."  Due process requires that the criteria for a

class action, particularly the adequacy of representation, be strictly applied to ensure that the

interests of the absent class members are well protected.  *Issen v. GSC Enterprises, Inc.,* 508

F.Supp. 1278, 1296 (N.D.Ill. 1981).  Initial determination that a representative would be an

adequate representative of class should be based on two criteria: first, the representative must

have common interests with the unnamed members of the class; and second, the representative

will vigorously prosecute the interests of the class. *Helfand v. Cenco, Inc.,* 80 F.R.D. 1, 6-7

(D.C.Ill. 1977).  The precedent set by granting Class Counsel's motion to replace four of the five

named Class Representatives with unknown (but presumably more malleable and controllable)

settlement representatives would turn these long settled fundamental principles on their heads.

The Named Class Reps have fulfilled their duties as class representatives and do not

deserve to be eliminated from the case after years of active and substantial participation

36

protecting the interests of the Class. Allowing the Named Class Reps to be replaced would render the class representative requirements above meaningless. The replacement representatives have undergone no vetting. There has been no inquiry into the adequacy of these new individuals to be class representatives. Defendants have not even inspected the windows in their homes to determine if they are even in the Class. At a minimum, the replacement representatives should be deposed and questioned on their specific damages and numerous other topics including, but not limited to:

- Were they informed of the concerns raised at the March hearing regarding the proposed settlement;

- Were they were informed that four of the five Court approved Class Representatives have raised questions that the settlement is not fair to the Class;

- Were they informed the son-in-law and daughter of the sole Court approved Class Representative supporting the settlement are in the law firm representing the Class and stand to personally gain over $4,000,000 from the settlement;

- Were they informed the defenses Pella has used to deny their warranty claims will be used to deny their settlement claims;

- Were they aware of the $2,000,000 payment to Class Counsel; and

- Have they been fully informed of the concerns with the settlement raised in this brief.

The appointment, without further inquiry, of these new individuals to be settlement representatives would violate the due process requirements applicable to appointment of class representatives. *See, Issen*. Further, there is a serious question as to whether these new individuals will actually vigorously prosecute the interests of the Class when they are being appointed solely to support a settlement with obvious problems. *See, Helfand.*

Class Counsel has recommended an incentive award of $10,000 to be paid to Saltzman

and $5,000 to be paid to each of the new plaintiffs. Doc. 277-1 pg. 116. By making Saltzman,

the only Court approved Class Representative, lead settlement representative Class Counsel has

violated the holding of *Susman v. Lincoln American Corp.*, 561 F.2d 86 (7th Cir. 1977). The

Court in *Susman* found that the possible conflict of interest of a class representative must be

considered in conjunction with public perception. 561 F.2d at 95. Here, it does not require

much to anticipate the adverse public perception where the Class Representative father-in-law of

lead counsel seeks to impose a class wide recovery limited to an amount less than the sum he

previously rejected for his own claim, in a case where his son-in-law and daughter stand to

personally earn approximately $4,000,000 in attorney's fees. Moreover, in discussing class

representatives who were the brother and mother of class counsel, the Court in *Susman*

specifically stated:

> We find for similar reasons that the district court properly concluded in
> Lincoln American that Michael Susman is under the circumstances an
> inadequate class representative. Michael Susman's possible recovery as
> plaintiff is dwarfed by attorney's fees which could be awarded to his
> brother as class counsel. As the district judge stated:
>
> Even though plaintiff does not expect to share in any attorney's fees
> recovered in this cause, there exists the possibility that one so situated will
> become more interested in maximizing the "return" to his counsel than in
> aggressively presenting the proposed class' action.
>
> In addition, the likelihood of a conflict of interest is also supported by "the
> natural assumption that brothers enjoy a close personal and family
> relationship and, consequently, would be inclined to support each other's
> interests." SCA Services, Inc., No. 77-1194, at 116.[FN14]
>
> FN14. We also agree with the district court that Ann Flamm is not by
> herself an adequate class representative. As the district court pointed out,
> Ann Flamm is also subject to a conflict of interest analysis because of her
> relationship as the mother of Arnold Flamm.

*Id*. The same concerns are undoubtedly implicated in this case.

Class Counsel's motion to amend the complaint eliminating the Named Class Reps and

substituting new plaintiffs should be denied. Moreover, this Court should now find the inherent

conflict of interest of Saltzman too great and remove Saltzman as a Class Representative.

## CONCLUSION

The task at hand is to determine whether the proposed settlement is within the range of reasonableness to gain preliminary approval. The Named Class Reps assert it is not. The proposed settlement fails the first prong of that test. By the simple ballpark gauge espoused by the Seventh Circuit the Class is looking at recovering possibly $380,000,000 in value at trial. The proposed settlement has value, but determining that value is made difficult by the warning signs addressed above. As it currently reads the Settlement Agreement is unlikely to result in any class member receiving anywhere near the cap amounts of $750 cash or $6,000 in arbitration. Pella's reserved defenses and the legal issues of causation and liability cut against Class members faring well in the claim or arbitration process. Further, with no discovery into Defendants' ability to make a lump sum payment into a settlement fund, there is really nothing to judge whether there is a risk to go to trial. Using Defendant's numbers, the settlement may have a cash payout value of just $2,459,475 to $17,843,250. As the terms of the proposed settlement currently read, there are too many instances of Class members being better off without the settlement than with.

Analysis of the remaining prongs of the range of reasonableness test fail to salvage preliminary approval. There are just too many things wrong with the terms of the proposed settlement.

Regarding the motion to amend the complaint and replace the Named Class Reps, that motion should be denied. Moreover, the inherent conflict of interest of Saltzman is too great to ignore, and Saltzman should be removed as a Class Representative.

## OPTIONS GOING FORWARD

Indeed this proposed settlement is so fundamentally flawed in so many respects that denial of preliminary approval is not just warranted, it is necessary. There are so many problems of such a significant nature that this proposal should be scrapped and the parties required to start again to attempt to reach an agreement that is reasonable and fair to the Class; although the Named Class Reps question whether, in light of past history, Class Counsel can ever be expected to fairly represent the interests of the Class.  It would have been easier to propose a working leadership option going forward had all of the firms making up Class Counsel not joined whole heartedly in supporting the proposed settlement, and so quick to support removal of the Named Class Reps from the complaint.  The Named Class Reps can assemble a team to independently pursue settlement or trial, and provide that roster at the Court's request.  However, should the Court wish the firms currently comprising Class Counsel to participate in further pursuing settlement or trial, the Named Class Reps recognize there are individuals within those firms who will take those responsibilities seriously whom the Named Class Reps would gladly accept as part of their team.

Dated: August 8, 2012

Respectfully submitted,

Kent Eubank, Thomas Riva and
William and Nancy Ehorn, Class Plaintiffs,

By: ___/s/ George K. Lang_____
     Their counsel

George K. Lang
Lang Law Office
217 N. Jefferson Street
Suite 602
Chicago, Illinois  60661
773-575-5848