# EXHIBIT 1



**RE: Pella - Confidential**                                      Wednesday, March 28, 2012 4:03 PM
**From:** "Shub, Jonathan" <jshub@seegerweiss.com>
  **To:** "'George Lang'" <langlawoffice@att.net>

Dear George:

I'm afraid your response misses the point of my email. As Judge Zagel stated when
he denied your motion to replace Class Counsel, the parties should endeavor to work
together and listen to your clients' concerns about the settlement. My email was an
effort to do that. Rather than provide the basis for your clients' concerns, you have
requested a draft of a document that is confidential and may only be shared by Class
Counsel and Pella. I will ask again for the specific concerns of your clients
regarding the terms of the settlement as you currently understood them to be when
you filed your papers purportedly attacking the settlement as "inadequate" and
which you pressed during your direct examination. See Lang Motion, at 9. Thanks.


Jonathan Shub
Seeger Weiss LLP
www.seegerweiss.com

**From:** George Lang [mailto:langlawoffice@att.net]
**Sent:** Wednesday, March 28, 2012 3:26 PM
**To:** Shub, Jonathan
**Subject:** Re: Pella - Confidential

Jon,

Please provide the draft agreement, and any supporting information and documents
that Pella has provided, and I will forward to the Class Representatives for
comment.
Thanks.

George

Lang Law Office
217 N. Jefferson Street
Suite 602
Chicago, Illinois 60661


_____

**From:** "Shub, Jonathan" <jshub@seegerweiss.com>
**To:** George Lang <langlawoffice@att.net>
**Sent:** Tue, March 27, 2012 10:43:03 AM

**Subject:** RE: Pella - Confidential

Dear George:

I am writing as Class Counsel in connection with the Pella litigation. As you know, we are in the midst of trying to finalize the settlement with Pella and move for preliminary approval. In connection with that effort, we are interested in hearing your clients' specific concerns about the terms and conditions of the proposed settlement. Thus, I am requesting that you send me a document that is as specific and detailed as possible so that we may consider it while we attempt the finalize the proposed settlement. If you think it makes sense to also meet in person, I am happy to do that as well. Let me know. Regards.

Jonathan Shub
Seeger Weiss LLP
www.seegerweiss.com

---

**From:** George Lang [mailto:langlawoffice@att.net]
**Sent:** Thursday, February 16, 2012 4:01 PM
**To:** richard@complexlitgroup.com; paul@complexlitgroup.com; Seeger, Chris; Shub, Jonathan; steve@pathtojustice.com; mark@pathtojustice.com; bschwartzman@bwslawgroup.com
**Cc:** dvoelker@voelkerlitigationgroup.com; rgoldlaw@aol.com; dtucker@thetuckerfirm.com
**Subject:** Pella - Call From Pella's Attorney Jim O'Neal and Subpoena From Paul Weiss

I recevied a call from Jim O'Neal.

He has been informed that my clients do not agree with the terms of the settlement. So we are all clear the named Class Representatives Kent Eubanks, William and Nacy Ehorn and Thomas Riva (3 of the 4) are my clients.

Jim asked what the next steps are and I stated if Plaintiffs' counsel can not work things out that this will get before the Judge in one manner or another. In full disclosure I stated that based on the response I got from certain unnamed Plaintiffs' counsel it appears unlikely that things can be worked out.

Chris, Jon, Steve, Mark, Ben -- Paul, Rich and Jeff made numerous personal attacks towards me in emails yesterday that you were not included on. I ignored them, but have not forgotten them. I am willing to share those and my responses with anyone who wishes to see them.

Finally, Jim made it clear he is aware of the litigation between Paul Weiss and Eric Freed. I have cc'd Paul's, Eric's and the LLC's attorneys on this email. I invite Chris, Jon, Steve, Mark and Ben to contact all three parties and inquire as to the status and facts of that litigation and draw your own conclusions as to the adequacy of the Complex Litigation Group to further represent the Class. Further, Chris, Jon, Steve, Mark, Ben you need to be informed that Paul's counsel in the litigation with Eric Freed has issued me a subpoena in that Cook County case for information regarding Class Representatives Kent Eubanks, William and Nacy Ehorn

and Thomas Riva.
Thanks

George

## Lang Law Office
415 N. LaSalle Street
Suite 301
Chicago, Illinois 60654

---

# EXHIBIT 2


**YAHOO!® MAIL**
Classic

**Pella**                                                    Monday, May 7, 2012 6:36 PM

**From:** "George Lang" <langlawoffice@att.net>
  **To:** jshub@seegerweiss.com, paul@complexlitgroup.com, steve@pathtojustice.com,
      bschwartzman@bwslawgroup.com
  **Cc:** hsterling@lbbslaw.com

Jonathan,

At the hearing you and Mr. Burke stated there has been substantial work on the settlement that the Class Representatives I now represent are not aware of, implying that the current terms of the settlement are not known to my clients. It only seems logical that to advance the settlement you would want the Class Representatives' comments on the current terms as opposed to their comments on an outdated version of the terms.

On March 29, 2012 you, not I, raised the confidentiality between class counsel and the defendant as the basis that prevented you from sharing the current terms of the settlement with the Class Representatives. It is your position that class counsel has privileged obligations with the defendant that trump the privileged obligations of class counsel to the class representatives. This position is contrary to the law.

 On April 5, 2012 a request was made to amend the protective order to remove this inequity. It is now class counsel alone who object to sharing the current terms of the settlement with the Class Representatives as Pella's counsel has no objections to amending the protective order accordingly. You remained silent to this request until May 4, 2012.

Therefore, I ask again for each to please identify your position on amending the Protective Order in the case to allow the Class Representatives access to the current settlement terms:

Paul Weiss allow to amend or not allow to amend
Jon Shub allow to amend or not allow to amend
Steve Jaffe allow to amend or not allow to amend
Ben Schwartzman allow to amend or not allow to amend


Thanks

George

**Lang Law Office**
217 N. Jefferson Street
Suite 602
Chicago, Illinois  60661

# EXHIBIT 3



**Pella - CONFIDENTIAL**

Friday, June 15, 2012 1:50 PM

**From:** "Shub, Jonathan" <jshub@seegerweiss.com>
**To:** "'George Lang'" <langlawoffice@att.net>
    1 File (216KB)



Saltzman...

CONFIDENTIAL - NOT TO BE DISTRIBUTED OR SHARED - SETTLEMENT COMMUNICATION

Dear George:

Please find attached a draft of the settlement agreement. As you are aware, we
previously invited you to provide your clients' concerns and issues regarding the
proposed settlement but you declined to do so. Class Counsel and Pella intend to file
for preliminary approval next Tuesday. We are giving you another opportunity to
articulate your clients' concerns or issues with the proposed terms and conditions
prior to filing with the Court.
Additionally, the settlement agreement and prior court orders require us to file a
Second Amended Complaint which we are preparing. Your clients will not be named. As
you know, Class Counsel filed papers yesterday to formally withdraw as counsel for
them. Feel free to discuss these matters with me at anytime.


--------------
Jonathan Shub
Seeger Weiss LLP
www.seegerweiss.com

# EXHIBIT 4



**RE: Pella**

Monday, June 18, 2012 3:31 PM

**From:** "George Lang" <langlawoffice@att.net>
**To:** "JonathanShub" <jshub@seegerweiss.com>

Jon,

For the record, you failed to provide the terms of the settlement until it was too late for effective comments from four of the five Class Representatives in breach of your fiduciary obligations to the Class Representatives.

Your sending of the draft Settlement Agreement on a Friday with an email on the next Monday that you will be filing papers on Tuesday only proves my point. You have given my clients less than one business day to review the document.

<u>Lang Law Office</u>
217 N. Jefferson Street
Suite 602
Chicago, Illinois 60661

--- On **Mon, 6/18/12, Shub, Jonathan *<jshub@seegerweiss.com>* wrote:**

> From: Shub, Jonathan <jshub@seegerweiss.com>
> Subject: RE: Pella
> To: "'George Lang'" <langlawoffice@att.net>
> Date: Monday, June 18, 2012, 3:26 PM
>
> Dear George:
>
> I will not engage in a back and forth on the issue of your participation in the settlement process. The record is clear on that issue. The point of my email was to provide your clients an opportunity to give class counsel a pre filing critique of the terms and conditions of the settlement so that we could consider them prior to executing the agreement. Your client's failure to do so is noted. We will be filing papers tomorrow which you will receive by ECF.
>
> From: George Lang [mailto:langlawoffice@att.net]
> Sent: Monday, June 18, 2012 3:11 PM
> To: Shub, Jonathan
> Subject: Pella
>
> Dear Jon,
>
> I have received the draft Settlement Agreement and will review it and discuss the same with four of the five named Class Representatives.

I must, however, respond now to your email to clear up your false statements.

First, four of the five named Class Representatives and myself have never declined to comment on the proposed settlement. In fact my clients and myself undertook to present at hearing and in filings the myriad of problems Seeger Weiss and other Class Counsel have ignored. At that same hearing Seeger Weiss and Complex Litigation Group took the position that the settlement had substantially advanced and thereon adamantly refused to share the current terms of the settlement -- making it impossible for four of the five Class Representatives to comment on the current settlement terms. The refusal to share the current terms was called out as gamesmanship and in violation of your obligations to the Class Representatives, a plea you ignored for almost two months. Your supplying the draft Settlement Agreement with your email is an admission that your prior refusal to share this information was unsubstantiated and was as it was called -- gamesmanship and in violation of your obligations to four of the five named Class Representatives.

You also characterize your sending the draft Settlement Agreement as "another opportunity to articulate your client's concerns". As this is the first time four of the five Class Representatives have been provided the current settlement terms this will be their first opportunity to provide such comments.

Since the Class Representatives I represent remain Class Representatives I object to any filing of any complaint in this case on behalf of the Class without their participation.


Lang Law Office
217 N. Jefferson Street
Suite 602
Chicago, Illinois  60661

# EXHIBIT 5

| | | YEAR OF RETURN | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1993 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011/01 |
| **V I N T A G E** | **1992** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **1993** | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 |
| | **1994** | 0 | 0 | 0 | 0 | 13 | 2 | 0 | 0 |
| | **1995** | 0 | 0 | 0 | 3 | 10 | 4 | 0 | 0 |
| | **1996** | 0 | 0 | 147 | 54 | 54 | 3 | 0 | 0 |
| | **1997** | 0 | 0 | 946 | 2,919 | 161 | 22 | 0 | 0 |
| | **1998** | 0 | 0 | 483 | 4,569 | 3,521 | 169 | 4 | 0 |
| | **1999** | 0 | 0 | 257 | 2,493 | 6,581 | 4,083 | 36 | 4 |
| | **2000** | 0 | 0 | 104 | 977 | 2,421 | 5,734 | 3,409 | 41 |
| | **2001** | 0 | 0 | 98 | 664 | 1,833 | 2,922 | 3,903 | 454 |
| | **2002** | 0 | 0 | 59 | 598 | 1,429 | 2,145 | 3,540 | 334 |
| | **2003** | 0 | 0 | 10 | 211 | 799 | 1,301 | 2,327 | 207 |
| | **2004** | 0 | 0 | 2 | 41 | 72 | 112 | 84 | 4 |
| | **2005** | 0 | 0 | 3 | 6 | 30 | 23 | 28 | 1 |
| | **2006** | 0 | 0 | 4 | 39 | 9 | 11 | 6 | 0 |
| | **2007** | 0 | 0 | 0 | 14 | 11 | 1 | 2 | 0 |
| | **2008** | 0 | 0 | 0 | 0 | 28 | 10 | 4 | 0 |

**Table 1**

Pella has provided limited Returns & Allowance (R&A) data from which to provide a statistical view of the wood durability failure rates. This data is comprised of the PSEP return data (meaning those windows returned for a wood rot problem under the PSEP established in 2006). **Table 1** is a table of that return data. Separate and apart from the fact that the PSEP is not publicized or disclosed in any way, there are certain characteristics of this data that need to be understood:

- The vertical axis ($y$) is the vintage year of the window returned, and the horizontal axis ($x$) is the age of the window when returned.

- Because the PSEP began in 2006 there is no data before that time. Notice that the first year of data is the return data for 2006. This is meaningful because the PSEP benefit was for windows 10 years (120 months) and *younger*, with minimal benefit for older windows. For windows > 10 year old, the return data drops off significantly. Since either the distributorship or the homeowner bear most if not all the cost of a > 10 yr. window there is scant PSEP data after 120 months of age - not because of few failures but because of PSEP benefit expiration.

1

- The return year 2011/01 indicates returns for only January 2011. One could assume that the full year return is 12 times that data. For instance the 2001 vintage windows returned throughout 2011 would be 5,448.

- The significance of Table 1 is the very rapid acceleration of returns from years 6-10. For instance vintage 2001 goes from 98 to 4,000. The rapid rate of increase is 1) Evidence of an inherent design defect; and 2) Evidence of increasing rates of failure when projected to 15-30 years, *i.e.,* the anticipated lifespan of the windows.

Because there are some significant gaps in the data for the entire class range of the windows 1991 to 2009, the data is selective. Pella of course selected this data and has yet to produce any R&A data prior to the PSEP. Plaintiff has sought all R&A data as well as other materials which could indicate proxy indicators of window failure, and reliability tests for the PSEP data provided. Regrettably Pella has dragged its feet terribly in this respect.

Because wood rot is latent, meaning that it likely exists for years before it becomes manifest, wood rot returns will likely not begin to show up until years 6-10 (assuming a cut-off at 10 years) after vintage year. The pre-PSEP R&A would certainly be helpful especially since Pella itself projected a failure rate of 14%. However, looking at the PSEP returns just from 2006, for windows vintage 2003 and younger, the data is an unreliable indicator of future returns because the windows are well within the latency period. As such a "reliable" subset of the data needs to be selected. This is called a "radix" of the cohort.

In Table 2 we have selected 1999 to 2002 and excluded the 10th year data (even though high returns appeared in that 10th year). This is from an assumed universe of 350,000 windows manufactured.

| | YEARS TO DETERIORATE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 1999 | 0 | 0 | 0 | 0 | 0 | 0 | 257 | 2,493 | 6,581 | 4,083 |
| 2000 | 0 | 0 | 0 | 0 | 0 | 104 | 977 | 2,421 | 5,734 | 3,409 |
| 2001 | 0 | 0 | 0 | 0 | 98 | 664 | 1,833 | 2,922 | 3,903 | |
| 2002 | 0 | 0 | 0 | 59 | 598 | 1,429 | 2,145 | 3,540 | | |
| average | 0 | 0 | 0 | 14.8 | 174 | 549.25 | 1303 | 2,844 | 5,406 | 3,746 |

**Table 2**

A graph of the radix appears below.



**Table 3**

Pella has proposed to do a KAPLAN-MEIR analysis which seeks to measure the probability of survival against the probability of failure, projected to 15 years. Pella chooses this analysis because it allows for significant variation from favorable to unfavorable depending how you treat the slope of the data on a year by year basis. KAPLAN-MEIR when applied to the data set is capable of providing at least *eight* different results. The variations are shown below.

3



**Table 4**

These curves are color coded as follows: R2=**black**, R3=red, R4=blue, R5=green, R6=magenta, R7=yellow, and R8=cyan.

Note that R3 (the red curve) turns down since the slope decreases from years 8-9 to 9-10. This is because the data for year 10 is suspect. Indeed, it is so suspect that we excluded it in our analysis in Table 3. This curve is included to illustrate the difficulties of trying to predict the future with suspect data. The percent failure predictions for each of these regressions are as follows: (R2, 7.88%), (R3, 3.41%), (R4, 12.06%), (R5, 14.55%), (R6, 14.50%), (R7, 13.76%), (R8, 12.84%). The (R2, 7.88%) approximates the 6% Pella told us it had achieved.

While we do not accept the use of KAPLAN-MEIER as the proper method for establishing accurate failure rates (mostly because it is subject to inherent biases effecting the result), even using this method, our analysis shows that its probable boundaries for a 15 years failure rate are closer to 7% as the low boundary, and 12% on the upper boundary.

4

# EXHIBIT 6



# MEMORANDUM

TO:        File

FROM:     George K. Lang

DATE:      January 3, 2011

RE:        *Pella* Analysis of Strategies for Settlement Counsel

VIKING SETTLEMENT

The Viking Settlement has some items we can use and some we might want to avoid.

There are 4 categories of payments to the class:

Replaced windows (current or former owners) $100 per window
Window Damage - three categories - $50, $100, $150

Max payment for each property $500

Reps received $12,500

Attny Fees $4 Mill  Costs $1.6 Mill

ANALYSIS

USING VIKING NUMBERS - We simply don't know how many homes have Pella ProLine windows or how many Pella ProLine windows were replaced.  We do know approx 7 mill were manufactured.  Taking the 14% regression analysis estimate that puts 980,000 failed windows into play. Taking the average of the window damage above of $100 that puts the value of the case at $98,000,000 + fees / costs / reps.

VIKING VALUE - $98,000,000 on 14% failure rate + fees / costs / reps

USING PSEP NUMBERS - The PSEP has two categories for payouts, those in and those out of warranty.  In warranty gets (1) new window (2) labor of $60 - $200 (3) finishing costs of $60 -

$100. Since we have the DJ on the warranty time limit I will assume all windows are still under warranty. The costs of these windows (sash only) is $150 to $1000 and up (see Krenz docs). Fixed windows will have to be replaced, casements can be sash only (labor but not finishing costs). Also note that pursuant to the PSEP Pella sent a check for $783 to Dr. Saltzman (ie no $500 cap). A loose assumption of 15% fixed windows applied to the 14% failure rate gives the following value of ((980,000 * 15%)($130 ave labor + $80 ave finish)) + (980,000 * 85%)($130 ave labor)) + (980,000 * $200 ave cost) = $307,377,000 + fees / costs / reps

PSEP VALUE (all windows under warranty) - $307,377,000 on 14% failure rate + fees / costs / reps

The PSEP coverage for out of warranty (over 10 years) provides a discount on the replacement product of year 11-45%; 12-40%; 13-35%; 14-30%; 15-25%. Finishing and labor are applicable here. Noting that there is a downward trend in the percentage I am assuming for now that the actual costs of the replacement products is far greater than the ave cost of $200 that I used, so for simplification I am netting these two out.

USING ACTUAL NUMBERS - taking the cost of Dr. Saltzman to replace two 3 window units (labor and finishing $2,490 + windows $2,578 = $5,068) the ave cost to actually replace one window is ($5,068 / 6) $844.66. Assuming all 14% of failed windows have been or will need to be replaced then the actual costs are 980,000 * $844.66 = $827,766,800.

ACTUAL VALUE - $827,766,800 on 14% failure rate

USING A FLAT WARRANTY VALUE - taking the above assumptions and heavily discounting them, a flat warranty payment of $500 per window is an acceptable compromise since it is low but also concedes that some windows have given some value of use over time. Applying this flat rate to all 7 mill windows results in $3,500,000,000.

ACTUAL FLAT WARRANTY VALUE - $3,500,000,000 + fees / costs / reps

CASE VALUE RANGE
$   98,000,000
$  307,377,000
$  827,766,800
$ 3,500,000,000

NOTES

1. We have disputed the 14% failure rate as too low 2. The ave costs above (labor / finishing / replacement product) are all low

# EXHIBIT 7



Pella® Windows & Doors

October 25, 2006

Dr. and Ms. Bonnie Saltzman
1189 Winwood Drive
Lake Forest, IL 60045

Ref:    Follow up from Service Event Number 205761 and previous service visits

Dear Dr. and Ms. Saltzman:

I am writing to follow up on our conversation from the service visit to your residence on
Thursday, September 21, 2006.  As I indicated to you during our conversation, prior to
our visit I reviewed the various service events related to the Pella units installed in your
home.   Pella recently enhanced the service provided for Pella's ProLine product and can
offer you a refund on the replacement product you purchased in 2005.

As discussed, Pella Corporation is refunding you for the two replacement sashes you
purchased.  We are also providing you compensation toward the costs you incurred for
installation and finishing. The enclosed check in the amount of $783.46 includes a refund
of $413.46 for the two Pella replacement sashes you purchased as well as $250.00 in
installation costs through our Service Technicians and $120.00 toward finishing costs.

You indicated during the Service visit to replace weather-stripping on your Pella door
that you had no other concerns that you wished to have addressed regarding the Pella
Products installed in your home.  However, our records indicated that you contacted us
earlier this year about concerns with other products in your home.  If you do have
additional concerns you would like us to address, please contact me.  Our goal is your
satisfaction.

This customer service enhancement demonstrates Pella's commitment to customer
satisfaction.  Please feel free to contact me should you have any further questions.

Sincerely,

Tom Wengel

Tom Wengel
Field Service Manager

Encl. – Check # 163719

VIEWED TO BE THE BEST.

2505 Enterprise Circle
West Chicago, IL 60185

163719

# 163719



| PAYMENT NUMBER | CHECK DATE | | | | |
|---|---|---|---|---|---|
| PMT0056140 | 10/18/2006 | | | | |
| DATE | AMOUNT | AMOUNT PAID | DISCOUNT | WRITE-OFF | NET |
| '17/2006 | $783.46 | $783.46 | $0.00 | $0.00 | $783.46 |
| | $783.46 | $783.46 | $0.00 | $0.00 | $783.46 |



DOCUMENT CONTAINS SECURITY FEATURES - SEE BACK FOR DETAILS

)ORS

**LaSalle Bank N.A.**
Chicago, Illinois

# 163719

2-50/710

| DATE | AMOUNT |
|---|---|
| 10/18/2006 | $783.46 |

46 Cents

VOID AFTER 90 DAYS

AUTHORIZED SIGNATURE

MP

⑂710005051⁚ 5800923400⑈

# EXHIBIT 8

1

1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF ILLINOIS

3             EASTERN DIVISION

4  DR. LEONARD E. SALTZMAN, KENT EUBANK,  )

5  THOMAS RIVA, LUBO and MAIRA  )

6  HADJIPPETKOV, WILLIAM and NANCY EHORN, )

7  individually and on behalf of all  )

8  others similarly situated,  )

9        Plaintiffs,  )

10        vs.  )  No. 06 CV 4481

11  PELLA CORPORATION, an Iowa  )

12  corporation, and PELLA WINDOWS AND  )

13  DOORS, INC., a Delaware corporation,  )

14        Defendants.  )

15

16        Videotaped Deposition of

17  LEONARD SALTZMAN, taken before GREG S. WEILAND, CSR,

18  RMR, CRR, Notary Public, pursuant to the Federal

19  Rules of Civil Procedure for the United States

20  District Court pertaining to the taking of

21  depositions, at Suite 3000, 225 West Wacker Drive,

22  in the City of Chicago, Cook County, Illinois,

23  commencing at 10:37 o'clock a.m., on the 14th day of

24  June, 2007.

2

```
 1   PRESENT:

 2        RICHARD J. BURKE LLC

 3        1010 Market Street

 4        Suite 650

 5        St. Louis, Missouri 63101

 6        (314) 621-8647

 7        BY: MR. RICHARD J. BURKE

 8        E-mail: rich@richardjburke.com

 9             -and-

10        FREED & WEISS LLC

11        111 West Washington Street

12        Suite 1331

13        Chicago, Illinois 60602

14        (312) 220-0000

15        BY: MR. GEORGE K. LANG

16        E-mail: george@freedweiss.com

17                    On behalf of the Plaintiffs;

18

19

20

21

22

23

24
```

4

1          THE VIDEOGRAPHER:  This is Nick Page in

2  association with Veritext Court Reporting Services.

3  I'm the operator of this camera.

4          This video deposition of Dr. Leonard

5  Saltzman is being taken on behalf of the Defendants

6  at 225 West Wacker Drive, Chicago, Illinois, on

7  June 14th, 2007, at 10:37 a.m., as indicated on

8  the video screen.

9          The case is captioned Dr. Leonard

10  Saltzman, et al., versus Pella Corporation, et al.

11  Case number is 06 CV 4481.

12          Will the attorneys please identify

13  themselves for the video record.

14          MR. LANG:  George Lang with Freed & Weiss

15  for the Plaintiffs' firm.

16          MR. BURKE:  Richard Burke for the

17  Plaintiff.

18          MR. MANDLER:  John Mandler for Defendants

19  Pella Corp. and Pella Windows & Doors.

20          THE VIDEOGRAPHER:  Thank you very much.

21          And will the court reporter please

22  identify himself and swear in the witness.

23          THE COURT REPORTER:  My name is

24  Greg Weiland.  I'm a court reporter in Chicago,

5

1   Illinois.

2              (Witness sworn.)

3              MR. MANDLER:  Before I begin, we've been

4   joined by John Roberts, also on behalf of the

5   Defendants Pella Corp. and Pella Windows & Doors.

6                  LEONARD SALTZMAN

7   after being first duly sworn, testified as follows:

8                    EXAMINATION

9   BY MR. MANDLER:

10      Q.   Good morning, Dr. Saltzman.

11      A.   Good morning.

12      Q.   We've met before.  I'll reintroduce

13   myself.  I'm John Mandler representing Pella.

14           Can you state your name and address for

15   the record, please.

16      A.   Leonard Saltzman, 1189 Winwood Drive,

17   Lake Forest, Illinois.

18      Q.   Dr. Saltzman, have you had your deposition

19   taken before?

20      A.   Yes.

21      Q.   And can you tell me in what matter or

22   matters you've been deposed?

23      A.   It was a case against a company in Texas

24   for a telephone charge, ECI I believe it was.  That

6

1  was done at my office.

2      Q.    How long ago was that deposition?

3      A.    I don't remember, probably six to seven

4  years ago.

5      Q.    Other than that case, have you been

6  deposed in any other litigation?

7      A.    No.

8      Q.    I'll review briefly for you some of the

9  rules that we follow in a deposition just to refresh

10  that for you.

11          I'll be asking a series of questions and

12  ask that you give me your best answer today.  And

13  one of the first rules that I'll ask that you'll

14  answer out loud rather than uh-huh or huh-uh or a

15  nod of the head.

16      A.    Okay.

17      Q.    Okay.  Is there any reason today that you

18  can't give me the best answers available?

19      A.    No.

20      Q.    Okay.  If I ask any question that is

21  unclear or that you don't understand, I'd ask that

22  you ask me to rephrase it or re-ask the question.

23  That way we will make sure that we're always

24  communicating clearly, okay?

7

```
1        A.   All right.
2        Q.   If at any time you want to take a break,
3   as long as there's not a question pending, just let
4   me know, and we will do that.
5        A.   All right.
6        Q.   And then finally, if you let me finish all
7   of my questions before you start answering even
8   though you probably will know where I'm going a lot
9   of times, and I'll do the same for you, I'll let you
10  finish an answer before I start another question,
11  that way we're not both talking at the same time.
12       A.   Fair enough.
13       Q.   Okay.  Dr. Saltzman, are you married?
14       A.   Yes.
15       Q.   And when were you married?
16       A.   1965.
17       Q.   And your wife's name?
18       A.   Bonnie, B-o-n-n-i-e.
19       Q.   And do you have children?
20       A.   Two.
21       Q.   Who are they?
22       A.   Jamie Weiss now and Brook Glickson,
23  G-l-i-c-k-s-o-n.
24       Q.   And is Jamie Weiss the Jamie Weiss that's
```

1   an attorney at Freed & Weiss?

2        A.   Yes.

3        Q.   And Paul Weiss then is your son-in-law?

4        A.   Yes.

5        Q.   Can you summarize for me briefly your

6   educational history, Dr. Saltzman?

7        A.   Grade school, high school, graduated from

8   the University of Wisconsin in Madison, four years

9   of dental school at Northwestern University, two

10  years of postgraduate training at Northwestern

11  University.

12       Q.   All right.  The undergrad degree at

13  Madison was in what year?

14       A.   1965.

15       Q.   And your degree from Northwestern, your

16  first degree from Northwestern?

17       A.   1969.

18       Q.   And your post-grad work?

19       A.   1971.

20       Q.   Can you summarize briefly for me your

21  professional job history?

22       A.   I've been a practicing dentist since 1971.

23       Q.   Do you have your own practice?

24       A.   My own business, yes.

9

1    Q.   And have you had your own business since
2  '71?
3    A.   Yes.
4    Q.   Prior to living at 1189 Winwood Drive in
5  Lake Forest, had you ever purchased a home where it
6  was built primarily for you?
7    A.   No.
8    Q.   And prior to living at 1189 Winwood Drive,
9  had you ever purchased any Pella products or Pella
10 windows?
11   A.   Yes.
12   Q.   When was that?
13   A.   We've been here 12 years.  Let me go back
14 and think.
15        Probably about 16 years ago as best I can
16 remember.  We did some remodeling in our Northbrook
17 home, and we put Pella windows in.
18   Q.   What was the address or location of your
19 Northbrook home?
20   A.   2655 Farnsworth, F-a-r-n-s.
21   Q.   When did you move into that residence?
22   A.   Let me think.  Jamie was 3, she's 37.
23 Approximately 34 years ago.
24   Q.   Okay.  Other than the remodel that you did

10

1   at the Northbrook residence and anything that you

2   did while you were at 1189 Winwood, have you done

3   any remodeling of any other residences?

4        A.   No.

5        Q.   Okay.  And can you tell me to the best of

6   your recollection the year that you remodeled the

7   Northbrook home?

8        A.   That same year that the windows were put

9   in.

10       Q.   So you said 16 years ago, which puts us at

11  '89?

12       A.   '89 roughly.

13       Q.   Can you give me a sense of the scope of

14  the remodel?

15       A.   We put an addition on the house, and we

16  extended our bedroom window out a little bit.  That

17  was the Pella window that was put in.

18       Q.   How many windows total were in the

19  addition?

20       A.   One, one unit.

21       Q.   And do you know what kind of Pella window

22  it was?

23       A.   It was a triple window, ceiling to floor,

24  casement, wood clad.

11

1  Q. You mean aluminum clad wood window?

2  A. No, it was wood.  It had to be painted.

3  Q. Okay.  Do you recall the contractor you

4 worked with on that job?

5  A. No.

6  Q. Do you recall any of the subcontractors or

7 any names in association --

8  A. No.  There was one contractor who did the

9 windows, and I don't remember his name.  It was not

10 a huge job, so ...

11  Q. Dr. Saltzman, were you involved in the

12 selection of the Pella window for that remodel at

13 the Northbrook home?

14  A. The contractor had recommended a Pella

15 window for the application we needed as far as size

16 and quality.

17  Q. Okay.  Did you talk to anybody from Pella

18 relating to that purchase?

19  A. No.

20  Q. Did you talk to anybody from the local

21 Pella retailer related to that purchase?

22  A. Not for that purchase, no.

23  Q. And did you receive any representations in

24 writing relating to that purchase from Pella or the

12

1 Pella retailer?

2      A.    I probably got some information with the

3 window, the paperwork that usually comes with it,

4 but I didn't get any representations, no.

5      Q.    Other than the contractor recommending

6 that size and type of Pella window, was there

7 anything else that you relied on in making a

8 decision to use Pella windows for the Northbrook

9 remodel?

10     A.    No.   I trusted the contractor.   He

11 recommended it as a quality product.

12     Q.    Okay.   What year did you purchase the home

13 at 1189 Winwood Drive?

14     A.    That would have been 1994 we purchased the

15 property, the house that was in existence there.

16     Q.    And I understand you had a major remodel

17 on that property?

18     A.    Right.   It was not totally new

19 construction.   It was considered by the city and the

20 permit was for a remodel.

21     Q.    When did the remodel take place?

22     A.    Between 1994 and 1995.   It began in the

23 fall or the winter actually of '94.

24     Q.    I assume you purchased the property with

13

1  doing this sort of project in mind?

2      A.   Yes.

3      Q.   Who was the contractor for the remodel

4  project at the --

5      A.   Blair Construction.

6      Q.   And was there an individual or somebody

7  who took the lead from Blair Construction that you

8  interacted with?

9      A.   There were two people.  Allison Glendon.

10  It was a husband and wife.  She kept her maiden

11  name.  And her husband's name obviously was Blair.

12  I think it was Bill.

13      Q.   How did you come to select

14  Blair Construction to do the remodel?

15      A.   We were acquaintances of these people.

16  They had a construction company, and we told them

17  that we were looking for some property and

18  interested in doing a remodel.

19      Q.   Do you recall any of the subcontractors

20  that may have been used by Blair Construction?

21      A.   I know some of them.  There was a

22  carpentry company called I believe Graffeo Boys,

23  G-r-a-f-f-e-o.

24          I don't remember any of the other

14

1  subcontractors because we dealt as far as everything

2  with the contractor.

3      Q.   And do you know who between the contractor

4  and subcontractors did the window installation?

5      A.   Actually no.  You know, we weren't there

6  to see who was doing what, so I don't know who

7  actually installed the windows.  I'm assuming it was

8  the carpenters, but ...

9      Q.   Do you know which contractor or

10 subcontractor worked on the exterior cladding, the

11 stucco or the EFIS?

12     A.   There's a company that's still in

13 existence.  I don't recall the name.  I haven't seen

14 them recently, so ...

15     Q.   Can you give me a sense of the scope of

16 the remodel at 1189 Winwood Drive?

17     A.   We used the existing structure, the

18 foundation, and expanded on it and added on and made

19 the house larger.

20     Q.   As well as expanding out, did you expand

21 up?  Did you add a floor?

22     A.   We -- there was an addition that was added

23 to the house that was multifloor, but the existing

24 portion of the house that we remodeled remained a

1  single story.  The roof was raised, but it still

2  remained a single story.

3      Q.    Okay.  Were all new windows installed at

4  the time of the remodel?

5      A.    All new.

6      Q.    And was all new exterior put in at the

7  time of the --

8      A.    All new.

9      Q.    Did you have a written contract with

10 Blair Construction?

11     A.    Yes.

12     Q.    Do you still have a copy of that?

13     A.    No.

14     Q.    When did you dispose of your contract?

15     A.    I couldn't even tell you.  We had a lot of

16 paperwork.  I still have some.  I don't have it all.

17 A lot of it was done on this mimeopaper that had

18 faded to white when I was looking through for

19 records.  A lot of these are just blank pages now.

20 There's nothing on him.

21     Q.    When you say you still have some, can you

22 describe what it is that you do have?

23     A.    I still have some copies of contracts

24 for -- with subcontractors, some bills that we had

1  paid for some of the things that were purchased for

2  the house.  I believe I supplied some of the

3  information for Pella windows that we had purchased

4  because those I had invoices for, and I had copies

5  of checks and things that we had written.

6      Q.   Do you still have a set of plans that were

7  used at the time of the remodel?

8      A.   Yes, I have some.  I don't know if we have

9  them all, but I have some.

10     Q.   Are these all in one spot within your

11 home?

12     A.   They're in boxes.

13     Q.   And can you give me a sense of the volume?

14     A.   It's a blueprint.

15     Q.   No.  I mean all of these records we've

16 been talking about relating to the remodel.  I mean,

17 is it a box or a folder full?

18     A.   It's in one of those tubes that you roll

19 up blueprints and put them in.

20     Q.   That includes the invoices and the bills

21 and all that?

22     A.   No, those are in a separate box.  It's in

23 a small plastic box, whatever I have left, one of

24 those little files things.

17

1          MR. MANDLER:  Counsel, rather than try to

2    figure out each individual thing, if we could just

3    get a copy of that file, those plans and that

4    information.

5          MR. LANG:  Sure.  We will take care of

6    that.

7          John, do you want the plans too?

8          MR. MANDLER:  Yes, please.

9          MR. LANG:  Can we go off the record?

10         MR. MANDLER:  Sure.

11         THE VIDEOGRAPHER:  Off the record at

12   10:52.

13              (Whereupon, an off-the-record

14              discussion was held.)

15         THE VIDEOGRAPHER:  Back on the record at

16   10:52.

17   BY MR. MANDLER:

18      Q.   I'd like to turn, Dr. Saltzman, to the

19   selection of your windows for your remodel at

20   1189 Winwood Drive.

21         Can you describe for me how you selected

22   the Pella windows for that project?

23      A.   The contractor gave us some names of

24   windows that we could look at.  As I recall, we

1  looked at two different brands.  One was a company

2  called Estate Windows in Lake Forest.  I don't know

3  if that was their brand or if they sold someone

4  else's windows.  We looked at those.  And then we

5  went to the Pella store, which at that time was in

6  Northbrook, and we looked at the windows there.

7              And for what we were looking at in terms

8  of the volume of the windows, the type of windows,

9  the way they opened, the aluminum cladding, the

10  Pella windows seemed the best selection.  The Pella

11  people told us they made the best windows, and the

12  contractor had recommended them too, and that's what

13  we decided to go with.

14      Q.   Who made the actual selection of the

15  windows, of the Pella windows for your remodel

16  project?

17      A.   To decide on the Pella windows you mean?

18      Q.   Yes.

19      A.   We did.

20      Q.   That's you and your wife?

21      A.   Right.  We were given, you know, the

22  choice of are these the windows you would like, and

23  we said yes.

24      Q.   You mentioned that your contractor,

1  Blair Construction, made a recommendation for the

2  Pella windows?

3       A.   Right.

4       Q.   And can you tell me what you recall about

5  that recommendation?

6       A.   Well, they recommended the windows because

7  they came in the sizes that we needed.  They

8  recommended the windows because they came with the

9  aluminum cladding, which was supposed to be no

10  maintenance.  That was one of the big features.  I

11  tried to make this house as no or low maintenance as

12  possible, and we were told with the aluminum

13  cladding that we would never have to paint them and

14  they would just be fine.

15       Q.   Okay.  Is there anything else you can

16  recall your contractor saying as far as the

17  recommendation to purchase the Pella windows?

18       A.   No.

19       Q.   You mentioned the Northbrook store.

20            Did you personally go to the Northbrook

21  store?

22       A.   Yes.

23       Q.   And were you shown examples of windows?

24       A.   Yes.

20

1    Q.    And did you meet with somebody there?

2    A.    There was a salesman there, yes, that we

3  talked to.

4    Q.    Do you remember who you met with?

5    A.    No.

6    Q.    How many times did you go to the

7  Northbrook store?

8    A.    Probably just once as I recall just to

9  look at the windows and say fine.

10   Q.    Did Mrs. Saltzman go with you?

11   A.    Yes.

12   Q.    Tell me what you remember seeing when you

13 went to the Northbrook store, Pella store.

14   A.    Windows.  You know, we needed doors.  We

15 needed some large window units.  We wanted casement

16 windows, which they provided.  And our house is a

17 lot of glass, and we looked at all the different

18 styles and the applications that they would be

19 needed for, and, you know, it was mainly just

20 deciding that that was the type of window, and then

21 the contractor figured out what we would need in

22 terms of quantity and what would fit in which place.

23   Q.    I assume you had some discussions with the

24 salesperson who was there?

1    A.   Yes.  We, you know, we asked -- the main

2  thing that we focused on was the no maintenance.

3  That was the whole idea of doing this, that we

4  wouldn't have to do anything with the windows.

5    Q.   Okay.  You expressed to the salesperson

6  you wanted no maintenance windows?

7    A.   Absolutely.  That's why we did the

8  aluminum cladding.

9    Q.   Okay.  Is there anything else that you

10  remember telling the salesperson as far as what you

11  were looking for in a window?

12    A.   No.

13    Q.   And tell me then what you recall the

14  salesperson --

15    A.   Well, yes, in terms of that we wanted

16  windows that had the tinting in them because we have

17  a south exposure, so we had that.

18    Q.   Okay.  So you wanted low-maintenance

19  windows that had tinting.

20         Is there anything else you can recall

21  telling the salesperson that you were looking for?

22    A.   No.

23    Q.   And tell me what you remember then the

24  salesperson telling you during your visit to Pella's

1  Northbrook store.

2      A.    As far as I can recollect, all I remember

3  is that they told us they were the best windows you

4  could get for your house, which is one reason we

5  decided upon them, and that they required no

6  maintenance.

7      Q.    Anything else?

8      A.    No.

9      Q.    And that's the only meeting with Pella

10  representatives you can recall?

11      A.    Yes.   The contractor took care of

12  everything after that.

13      Q.    Did you receive any materials from either

14  Pella or the brands Pella Windows & Doors, any

15  written materials before you made your decision to

16  purchase the windows?

17      A.    Nothing more than the brochures that they

18  had in the store, and those were mostly just

19  illustrating the different styles of windows and the

20  different types.   You could have wood that would be

21  painted or aluminum that didn't need it.

22      Q.    Did you take any of the written materials,

23  the brochures, back with you after leaving the

24  store?

23

1    A.   No.   The contractor really took care of

2  those because we didn't know what quantity or sizes

3  we needed, so ...

4    Q.   Do you recall being involved in any

5  discussions about the different designs that Pella

6  offered?

7    A.   Do you mean in terms of the different

8  lines of windows that they had?

9    Q.   Yes, that's what I mean.

10    A.   Yes, they said there were several lines,

11  and in terms of deciding which line was the most

12  appropriate, I believe the contractor just told us

13  these are the ones that you need.

14    Q.   Okay.

15    A.   I didn't know enough about them, and it

16  wasn't my decision to make.

17    Q.   So no one at either from your contractor

18  or the brand, or the sales location explained to you

19  the different features of Proline versus Designer

20  Series versus Architect Series?

21    A.   Well, as I understood it from what they

22  explained, they varied in price, and according to

23  where you were putting the windows, you might want

24  one or the other.

24

1          What we were looking for was a quality

2   window that would be able to stand up to weather and

3   block the sun with the tinting in it, and the

4   selection was based on that, that we were told that

5   these were the correct windows.

6        Q.    And do you know --

7        A.    We didn't look to get the cheapest

8   windows.  We got the ones that they recommended.

9        Q.    They being your contractor?

10        A.    Both, you know.  I'm assuming Pella also

11   discussed with the contractor which ones were

12   appropriate too.

13        Q.    And as you sit here today, do you know

14   which line of windows ultimately were put in your

15   home?

16        A.    As I recollect, I believe we have some of

17   the Proline.  I think maybe the majority of the

18   windows are Proline, and I think some of the

19   interior doors and windows may be the whatever the

20   next line up was, the Executive, because those

21   wouldn't be exposed to any weather.  They're

22   actually inside the house.

23        Q.    Do you have a sense between the Proline

24   Series, the Designer Series and the Architect Series

25

1  which were the most expensive or least expensive?

2      A.   No, I actually don't remember.  We didn't

3  as I say pick on the basis of price.  We picked on

4  the basis of what was supposed to be the best for

5  the application.

6      Q.   Did your contractor go over or discuss

7  with you relative costs of one series of windows

8  versus another?

9      A.   Not to any great extent.  We were just

10  told how much it would be, and as I say, cost was

11  not the determining factor here.

12      Q.   Is there anything else that you can recall

13  as far as any representations, written or spoken,

14  from either Pella or the Pella branch that you heard

15  before your decision to buy the windows?

16      A.   No.  Just as I stated, we looked at the

17  different types of windows and went with the one

18  that seemed the most appropriate and was maintenance

19  free.

20      Q.   You reference in some of your written

21  answers to the interrogatories in this case that you

22  relied on a, quote, campaign of quality, longevity

23  and durability.

24      A.   Right.

1    Q.    Is there anything that you can point to

2  other than what we've already talked about this

3  morning to --

4    A.    Well, other than what we talked about with

5  the Pella people in person, just the same way Pella

6  advertises on television now, that their products

7  are quality products, that they last, that, you

8  know, they're top of the line, you know.  You get

9  that sense from looking at these commercials that if

10  you're going to build something, this is the kind of

11  a window you want.  You know, obviously I had seen

12  the name Pella before from advertising too.

13        So we based it on that, that we had had

14  exposure to the name and we were told it was a good

15  product.

16    Q.    And do you recall actually seeing

17  television advertisements prior to when you

18  purchased your windows in 1994?

19    A.    I can't recall a specific ad, but I'm sure

20  that we saw it, just the same way we see it now on

21  television.  I mean, I notice the Pella ads more on

22  TV now.

23    Q.    But you don't have a specific recollection

24  of any ads or wording of an ad?

27

1      A.    No, just the sense that I've been exposed

2  to the name and the fact that it was a quality

3  product.

4      Q.    Who is Kevin Flannary?

5      A.    I don't know.

6      Q.    To the extent that in the pleadings in

7  this case you've identified him as a person with

8  knowledge of the case, you don't know what his

9  knowledge is or who he is?

10      A.    His name apparently came up.  I don't know

11  who Kevin Flannary is.  He may have been --

12          MR. LANG:  For the record, John, we tried

13  to correct that.  He is not with Blair Construction.

14  So I believe his name pops up on the paperwork from

15  your client somewhere.

16          MR. MANDLER:  I understand.  I'm just

17  trying to get the witness' sense of what he knows.

18          THE WITNESS:  Right.  I do not recall the

19  name Kevin Flannary.

20  BY MR. MANDLER:

21      Q.    Okay.  Rick Hides, do you know who that

22  is?

23      A.    No.

24      Q.    And to the extent he's listed as a person

28

1  with knowledge, you wouldn't know what his knowledge

2  is?

3      A.    No.

4      Q.    Steve Tanis?

5      A.    No.

6      Q.    Tom Wengel?

7      A.    No.

8      Q.    Mark Fox?

9      A.    No.

10     Q.    And Chris Holub, H-o-l-u-b?

11     A.    No.

12     Q.    Do you have any recollection of any

13 particular issues that arose at the time that the

14 remodeling was going on as it relates to the

15 installation of the windows?

16     A.    No.  The construction went as planned, and

17 I was never told there was any kind of a problem or

18 anything.

19     Q.    Same question generally, not limited to

20 the windows.

21     Do you have any recollection of any

22 problems that arose for any construction-related

23 issue as the remodeling was going on?

24     A.    No.  Everything went very smoothly.

29

1      Q.   Have you had any communications with

2  Blair Construction or its principals after the

3  completion of the remodeling?

4      A.   Not since 1995.  I believe they're no

5  longer here.  I don't think they live here anymore.

6      Q.   And when you say not since --

7      A.   I haven't seen them, anything, since '95.

8      Q.   Did you have communications with them in

9  '95 after the completion of the project?

10     A.   After we moved in, actually no.

11     Q.   There were no issues they needed to follow

12  up on, anything like that?

13     A.   No, we didn't really have anything related

14  to construction.  The construction was fine.  We had

15  some other things, you know, painters and things who

16  came in, but nothing with the construction company.

17     Q.   Now, in addition to the Pella windows that

18  were installed during your remodeling, you also had

19  a good number of Pella doors installed?

20     A.   Yes.

21     Q.   To the extent my earlier questions on the

22  representations may have been limited to windows, I

23  want to make sure that you didn't receive any

24  different instructions --

30

1     A.    No.

2     Q.    -- or representations regarding the doors.

3     A.    No.   When we looked at them, the doors

4   were the same design as the windows.   It was just a

5   different version.

6     Q.    When did you first experience any issues

7   or problems with the Pella windows or doors that

8   were put into your addition?

9     A.    The first thing that we had noticed, which

10  Pella came out and took care of, was on what we call

11  our sunroom.   One of the windows where there's a

12  crank, it's a casement, had just rotted away.   And

13  in terms of when this happened, I would probably say

14  anywhere from four to six years ago.   That was the

15  first window that was replaced, and Pella did come

16  out and replace it.

17    Q.    What about doors?

18    A.    The doors, as far as I know, the only

19  thing Pella ever came out to take care of with the

20  doors was to work on the locks.   We had an issue

21  with the keys not all being the same, and we had one

22  door where the locking mechanism wasn't working

23  properly.   Pella came out and worked on that.   That

24  was the first thing.

31

1     Q.   Okay.  And that preceded this sunroom

2 window that you just mentioned?

3     A.   This was a window facing south.  Yes.

4     Q.   No, I'm sorry.  The issue where Pella came

5 and assisted you with some of the locking

6 mechanisms, that happened before the issue with the

7 sunroom window?

8     A.   Possibly.  Some of it may have been

9 before, some of it may have been -- there was more

10 than one service call for the locks.

11     Q.   The service call for the locks was all

12 addressed within the context of your Pella warranty?

13     A.   Yes.

14     Q.   And they took care of it for you?

15     A.   Yes.

16                (Saltzman Exhibit 1 was marked

17                   for identification.)

18 BY MR. MANDLER:

19     Q.   Dr. Saltzman, I'm going to show you what

20 we've marked as Saltzman Exhibit Number 1.

21     A.   Okay.

22     Q.   I'll represent to you that this is a

23 schematic of your house that was put together

24 shortly after the time when all the folks came out

1  for the inspection.

2      A.    Right.

3      Q.    And the only reason I want to refer to it

4  today is so that we have a uniform way to refer to

5  the various windows.

6      A.    Okay.

7      Q.    We've numbered them, for lack of a better

8  system, and I apologize that some of these numbers

9  are awfully small to read, but that way when we

10  refer to windows, if we can do it by number, we can

11  later go back and track so we're all talking about

12  the same thing.

13      A.    Okay.

14      Q.    All right.  Can you identify or show me on

15  Exhibit Number 1 where the sunroom window was that

16  you just identified?

17      A.    It was Window Number 25.

18      Q.    Okay.  And that's on the first page of

19  Exhibit 1?

20      A.    Right.

21      Q.    Okay.  Tell me what you recall observing

22  when you first saw a problem with Window Number 25.

23      A.    The entire bottom frame of the window was

24  totally rotted away, and the mechanism that opens

33

1  and closes it just fell out of the window.

2      Q.   And by the bottom frame, do you mean the

3  bottom part of the sash, the part that opens and

4  closes?

5      A.   Right.

6      Q.   Before it got to that point where it was

7  all rotted away and the crank fell off, had you

8  noticed any problems with the window prior to that?

9      A.   No, because we don't open those very

10 often.  This just happened to be an occasion where

11 we opened the window, and you noticed that it was

12 just all rotted, and it wasn't functioning.

13     Q.   What did you do then?

14     A.   Called Pella.

15     Q.   Okay.  Do you know who you called?

16     A.   Whatever their service number was at the

17 time.  I know they've changed service numbers

18 periodically, and they've relocated some of their

19 facilities, so, you know, we just looked up the

20 number and called.

21     Q.   And do you know whether you called Pella

22 Corp. versus Pella Windows & Doors, the branch here

23 in Illinois?

24     A.   I don't know.  There was a service number

34

1  that was -- I found somewhere.

2       Q.    Okay.  Did you make the call yourself?

3       A.    Yes.

4       Q.    Do you know who you talked to?

5       A.    No.

6       Q.    And can you tell me what you recall of the

7  conversation when you called?

8       A.    I told them that the window was rotted on

9  the bottom and the mechanism wasn't working, and we

10 needed someone to come out and take care of it.

11      Q.    You said this was four to six years ago?

12      A.    As I recollect, yes, to my best knowledge.

13      Q.    Could it have been as late as May of 2005?

14      A.    No.

15      Q.    Dr. Saltzman, both in the First Amended

16 Class Action Complaint at Paragraph 25 and in your

17 answers to Interrogatory Number 3, you've stated

18 that the first problem arose in approximately May of

19 2005, and that's where I got that date from.

20            Do you know why that would be stated in

21 the complaint if something actually happened

22 earlier?

23      A.    No.  We did have a problem in 2005, but it

24 was not the first one.  It was a totally different

35

1    window.

2        Q.    I'm trying to get a better sense of the

3    time frame.

4            Do you believe it was then about 2001,

5    2002 that this happened?

6        A.    I can't remember exactly, but one way I

7    know this is the case is because this was replaced

8    under warranty.  When we started having problems in

9    2005, we were told the windows were out of warranty.

10       Q.    When you received your windows, did you

11   get a written warranty with them?

12       A.    The replacement windows or the new ones?

13       Q.    No.    When you received -- when you

14   received the windows for the remodel in 1994-95.

15       A.    Did I get a written warranty?

16       Q.    Right.

17       A.    Not that I know of.  There may have been

18   some paperwork that was with them, but we didn't

19   keep everything.

20       Q.    You've gone back and looked to see if you

21   could find a written warranty?

22       A.    Yes, I did.

23       Q.    Do you recall having any conversations

24   with your contractor prior to your purchase of the

36

1 Pella windows as to what the length of your warranty

2 was?

3     A.   No.

4     Q.   Do you recall having any conversations

5 with the representatives from Pella Windows & Doors

6 at the Northbrook branch what the length or the

7 details of the Pella warranty were?

8     A.   No, I don't.

9     Q.   Dr. Saltzman, have you had an opportunity

10 to look at the, for lack of a better term, the

11 service records regarding your residence that have

12 been produced by Pella?

13     A.   You mean besides the ones that I supplied?

14     Q.   Right, the ones that came from Pella.

15     A.   I don't know if I've seen a copy of that

16 yet in terms of what Pella sent.

17     Q.   You haven't reviewed the Pella documents,

18 the service record documents?

19     A.   I've looked at some of the documents. I

20 don't recall if I saw that particular one or not.

21     Q.   I'm not asking if you saw a particular

22 one. I'm asking if you've seen any of them.

23     A.   I don't know.

24     Q.   And the reason I ask is the Pella internal

1   records show that between '97 and 2000 there were a

2   number of service calls as it relates to doors, like

3   you described, and then the next service call

4   happened in May of 2005, which seems to match up

5   with your interrogatory answers and what you say in

6   the complaint, and there's really no reference to

7   anything that happened in the 2001-2002 time frame.

8          And my question is based on those

9   documents, does that change your recollection of

10  when this incident happened with the sunroom window?

11         MR. BURKE:  Well, I'm going to object to

12  the form of the question.  You compounded it with an

13  analysis of pleadings, so I really -- you know, in

14  order for him to answer the final question that

15  you've given, he would have to agree or to some

16  reference to the pleadings.

17         Now, if you would just rephrase the

18  question.  If you want to give him the document, but

19  the way it's phrased right now, you had so much

20  prelude to it, it really wasn't a question so much

21  as how would you like to comment to my

22  representation regarding the pleadings.

23         So it's an objection to the form of the

24  question.  I don't mean that objection to be overly

38

1  long, but I think you understand what I mean.

2  BY MR. MANDLER:

3      Q.   Dr. Saltzman, did you have a chance to

4  look at the complaint before it was filed in this

5  case?

6      A.   Yes, I did.

7      Q.   And do you understand in Paragraph 25 that

8  it says in or about May 2005 Plaintiff discovered

9  water leaks, condensation, wood rot and other damage

10 to windows in the main structure of the house?

11     A.   Right, I saw that.

12     Q.   Okay.  And in answer to --

13     A.   But that also doesn't say that was the

14 first time.

15     Q.   I understand.

16     A.   Yeah.

17     Q.   In answer to Interrogatory Number 3, which

18 said the approximate date you first noted water

19 infiltration/penetration, moisture

20 infiltration/penetration, leakage, condensation or

21 wood rot, you answered approximately May of 2005.

22          Is that correct?

23          MR. BURKE:  Is it correct that that's what

24 the interrogatory says?

1            MR. MANDLER:  Yes.

2            MR. BURKE:  Well, it says what it says.

3  Do you want to know whether or not it conforms to

4  his recollection?

5            MR. MANDLER:  No.

6            MR. BURKE:  Okay.  Well, then we will

7  agree it says what it says.

8  BY MR. MANDLER:

9     Q.  Did you review these interrogatory answers

10  before they were served, Dr. Saltzman?

11     A.  Yes, I did, and that's correct.  I did

12  observe that at the time that was mentioned in

13  there.

14     Q.  But the question asked when you first

15  observed it.  Do you want to look at Question

16  Number --

17            MR. BURKE:  3B.

18  BY MR. MANDLER:

19     Q.  -- 3B?  Do you see that?

20     A.  I may have thought that to indicate which

21  windows we were having the present problem with, but

22  I have -- if I haven't seen that original Pella

23  document, if it says that the original service calls

24  were for doors only, that's incorrect.  Pella should

40

1   have a record of the fact that they replaced the

2   window too.

3        Q.   So I just want to make sure we're clear

4   here.

5             To the extent you --

6        A.   I may have misunderstood that to mean the

7   windows that we were having a current problem with.

8        Q.   So to the extent the interrogatories that

9   you served say that you first observed the problem

10  in May of 2005, you now believe that that's

11  incorrect?

12       A.   As far as the wood rot, it started

13  happening prior to that.

14       Q.   I'll take that back.

15            Okay.  Tell me what you recall the person

16  from Pella saying when you made the call to ask for

17  service on Window 25, the sunroom window.

18       A.   They scheduled a service call.

19       Q.   And somebody came out?

20       A.   Someone came out.

21       Q.   Were you there when they came out?

22       A.   No, my wife was home.

23       Q.   Other than making the initial call to ask

24  for the service, did you have any other interaction

41

1  with Pella related to that particular service event

2  on the sunroom window?

3      A.   No.   The serviceman came out and said the

4  window had to be replaced, and they ordered a new

5  window for it.

6      Q.   Your wife relayed that to you?

7      A.   Yeah.

8      Q.   Okay.

9      A.   They ordered it, and then they came and

10 installed it.

11     Q.   So I guess my question was, other than the

12 initial call, did you personally have any other

13 conversations with anybody?

14     A.   No, I just called, told them there was a

15 problem, they scheduled a service call.

16     Q.   As I understand it, they came out and

17 replaced the sash, the part that cranks open?

18     A.   I wasn't there when they replaced it, so I

19 don't know if they replaced the glass or the sash or

20 the mechanism or what, but they fixed it.

21     Q.   And that was under the terms of your

22 warranty?

23     A.   Yes.

24     Q.   In other words, there was no charge to

42

1  you?

2      A.    Yes.

3      Q.    At that time in the 2001-2002 time frame

4  when you had the Window 25 in the sunroom replaced,

5  did you do anything to inspect the rest of the

6  windows in the house?

7      A.    No, it wasn't recommended by anyone.

8  Pella never suggested it.  We didn't -- we thought

9  it was an isolated problem.

10      Q.    Did you have any communications with

11  anybody other than Pella about that window?

12      A.    No.

13      Q.    Okay.  When is the next problem or issue

14  with Pella windows that you can recall after this

15  first problem with Window 25?

16      A.    The next problem that we had was with

17  Window Number 31, and in terms of the timing, also

18  door Unit Number 37 and 38 approximately within a

19  year of each other; that we had the same problem

20  with Window Number 31, it rotted away at the bottom

21  with the opening and closing mechanism, and that one

22  was replaced, but as I recall, we paid for the glass

23  to be made for that.

24      Q.    Do you recall when you first observed

43

1   problems with Window 31?

2       A.   Several years ago.

3       Q.   Was this the May of 2005 issue?

4       A.   It may have been that one.  There were a

5   few that kind of came close together there.

6       Q.   What did you do when you found a problem

7   with Window 31?

8       A.   I called Pella again.  And we also had a

9   problem with Door 37 and 38 with water leaking in

10  around the windows.

11      Q.   I'll get to the door in a minute.

12      A.   Okay.

13      Q.   Was it the same call you made to Pella for

14  the window and the door or separate calls?

15      A.   No, those were separate.

16      Q.   Okay.  Stick with the window then.

17      A.   Okay.

18      Q.   Did you personally make the call yourself?

19      A.   Yes, I called Pella service again.

20      Q.   And do you know whether you were calling

21  Pella Corp. versus Pella Windows & Doors?

22      A.   No, I don't.

23      Q.   Do you know who you talked to?

24      A.   No, I don't.

44

1     Q.   Tell me what you can recall of the

2  conversation.

3     A.   I told them we had a window that was

4  rotting, and we needed someone to come out and fix

5  or replace it.

6     Q.   What did they say?

7     A.   They scheduled a service call.

8     Q.   And were you there when the service

9  individual came?

10     A.   This one I believe I was home for.

11     Q.   And tell me what you remember of that.

12     A.   He said that the window would have to be

13  replaced.  Again, I don't recall if it was the glass

14  and the sash or just the sash, but we were told

15  there would be a charge for that.

16     Q.   And do you recall why there would be a

17  charge?

18     A.   I think possibly because the windows were

19  either out of warranty or it had to be custom made

20  or something.  I don't remember the exact terms.

21     Q.   What is your understanding of what the

22  warranty is for the windows that you purchased?

23     A.   I believe that the Pella people started

24  telling me that it was a ten-year warranty on the

45

1   windows because they started looking at the code

2   number on the windows.

3       Q.   Okay.  Did you have that window replaced,

4   31?

5       A.   Yes, Pella replaced that window.

6       Q.   And was it Pella's service or Pella

7   Windows & Doors' service personnel --

8       A.   Yes.

9       Q.   -- that actually did the work to replace

10  it?

11           And do you know whether it was simply a

12  sash replacement versus the entire frame of the

13  window being replaced?

14      A.   No, I don't.  I don't know what parts they

15  replaced.

16      Q.   I know you said you were there when the

17  Pella service tech came out the first time.

18           Were you there during the process of when

19  they replaced it?

20      A.   No.

21      Q.   And do you know whether your wife was

22  there?

23      A.   I would assume so.

24      Q.   Were there any problems with the adjacent

46

1   windows, 32 and 33, at that time?

2       A.   Not as far as I know.

3       Q.   Is there anything else you can recall

4   being stated by the Pella service rep?

5       A.   No.   This was the second one we replaced,

6   and he didn't recommend checking all the other

7   windows or anything else at that point.   He didn't

8   mention anything.

9            And the same thing with the first window

10  replacement, nobody said anything to me about

11  anything that I had to do in terms of maintenance or

12  inspection.

13      Q.   And I assume that you didn't do anything

14  to inspect --

15      A.   No.

16      Q.   -- the rest of the windows?

17           Do you use a window cleaning service at

18  all?

19      A.   No, not really.   We have -- our cleaning

20  woman usually just cleans the windows with spray and

21  a rag.

22      Q.   Okay.   Inside and outside?

23      A.   Yeah, mostly inside, once in a while

24  outside.

47

1    Q.   And I assume your cleaning woman has never

2  brought any problems with the windows to your

3  attention?

4    A.   No.

5    Q.   All right.  Tell me what you can recall

6  about the issues relating to the doors that are

7  designated 37 and 38.

8    A.   The Door Units 37 and 38, we noticed that

9  water was coming in around the base of several of

10 the doors.  Only one of those opens.  The 37, the

11 unit that's labeled 37, the one with the handle on

12 it is the one that opens.  The other part of that in

13 38 are fixed units.  They don't open.

14      And we noticed water on the carpeting

15 inside, that it was running through the doors, not

16 from the bottom but from around the glass.

17   Q.   And if I remember from when I was at your

18 home, Dr. Saltzman, these are the doors that are at

19 the lowest level, kind of below where the sunroom

20 and the pool area are?

21   A.   Right.

22   Q.   Okay.  How is it that you know that the

23 water is coming through the glass and not under the

24 door?

48

1    A.    I could see it when it rained.  The water

2  was running where the glass meets the top part of

3  the bottom part of the window.  The water was

4  actually running down along the window frame.

5    Q.    Okay.  How do you know water also wasn't

6  coming under the door?

7    A.    It didn't look like there was, and two of

8  those doors don't open.  So theoretically how could

9  they leak?  They're fixed units.

10    Q.    And in that lower patio area that's right

11  outside of the doors, do you ever have a situation

12  where enough water comes down where that --

13    A.    No.

14    Q.    -- fills up?

15    A.    There's a drain right there that drains

16  into our main storm sewer system.  There's never any

17  water accumulating in there.  The drain sits right

18  in front of the door.

19    Q.    Okay.  So what did you do when you

20  observed the water entering in Doors 37 and 38?

21    A.    I called Pella.

22    Q.    And tell me what you recall of that

23  conversation.

24    A.    Pella scheduled a service call for someone

49

1  to come out.

2      Q.   Did they come out?

3      A.   Yes, they did.

4      Q.   And what did they do?

5      A.   He placed caulking on the bottom part of

6  the frame around the window.  He used a caulking gun

7  and some kind of white caulk and did a very in my

8  opinion inept, smeary job of just forcing caulk into

9  these areas and told us that this would seal the

10  windows and stop them from leaking.

11     Q.   Do you recall when this was?

12     A.   Several years ago, probably about two

13  years ago or so.

14     Q.   Did you save any paperwork as it relates

15  to any of these Pella service calls?

16     A.   Any paperwork that I have I've supplied to

17  my attorneys, which they've given you copies of.  I

18  did not get receipts every time from Pella when they

19  were out there.  We would get bills occasionally,

20  but sometimes they would come out and just do the

21  work.

22          I believe when he came out and caulked

23  these windows no one was even home because he did it

24  on the outside, so he didn't leave any paperwork at

1  all.

2                    (Saltzman Exhibit 2 was marked

3                    for identification.)

4  BY MR. MANDLER:

5      Q.   Dr. Saltzman, I'm handing you what we've

6  marked as Saltzman Exhibit 2.

7      A.   Okay.

8      Q.   We were provided these documents from your

9  attorney.

10         Can you identify this document for me?

11     A.   Which one?  The entire?

12     Q.   The entire exhibit.

13     A.   Yes.

14     Q.   What is that?

15     A.   These are all the invoices and things from

16 Pella that I still had that I supplied to my

17 attorney as far as what was ordered and also any

18 other things that we had with statements, checks

19 that were paid to Pella.

20     Q.   Okay.

21     A.   And then, you know, you have your copy of

22 the service calls.

23     Q.   Dr. Saltzman, in my review of Saltzman

24 Exhibit 2, which is Bates number SALT4 through 17,

51

1    it looks to me that these all relate to your

2    original purchase of the windows at the time of the

3    remodel.

4          Do you agree with that?

5      A.    Up to the service invoice do you mean?

6    Are these pages numbered?

7          MR. BURKE:  Yes, lower right.

8          THE WITNESS:  Oh, well, it looks to be

9    like Page 1 -- or 4 through 12 relate to the

10   original purchase, unless there are others in the

11   back, and also 13, which is just a bill, but I can't

12   read what it's for.

13   BY MR. MANDLER:

14     Q.    Okay.  What I'd like to do then is let's

15   amend Exhibit 2 to include just 4 through 13, those

16   documents that relate to the original purchase, and

17   we will mark these others as a separate exhibit,

18   okay?

19     A.    Okay.

20                    (Saltzman Exhibit 3 was marked

21                     for identification.)

22   BY MR. MANDLER:

23     Q.    Okay.  So we're in agreement that

24   Exhibit 2 are the materials that relate -- that you

52

1  still have in your possession that relate to your

2  original purchase of the windows, correct?

3      A.   Yes.

4      Q.   And then can you identify what those

5  exhibits are in Exhibit 3, which are SALT14 through

6  17?

7      A.   Well, the first one is for the hallway

8  window, that would be Window Number 31 I believe,

9  that was replaced, and it says part of the 3 wide

10 the sash the wood has broken or wood is broken.  It

11 wasn't broken.

12     Q.   Okay.

13     A.   So that was Window Number 31, I believe.

14     Q.   And SALT15?

15     A.   SALT15 was a charge for that service call,

16 I believe.

17     Q.   All right.  And SALT16?

18     A.   SALT16, this was for Window Number -- let

19 me find it on here -- Unit Number 44 to 46.

20     Q.   Okay.  And that's a separate problem than

21 we've been talking about?

22     A.   That's a separate problem.

23          MR. MANDLER:  All right.  Let's take a

24 break.  We have got to change the tape, and then we

53

1   will get into that after we do that.

2         THE VIDEOGRAPHER:  This is the end of

3   Tape 1.  We're off the record at 11:33.

4                    (Whereupon, a short recess was

5                    taken.)

6         THE VIDEOGRAPHER:  This is the beginning

7   of Tape 2.  We're back on the record at 11:40.

8   BY MR. MANDLER:

9       Q.    Dr. Saltzman, before we move to the next

10  problem with windows, which is 34, 35 and 36 were

11  the next set?

12      A.    44 to 46.

13      Q.    44 to 46?

14      A.    Right.

15      Q.    Before we move to those, I want to make

16  sure we've exhausted anything that you remember

17  about the last set.

18         Is there anything more that you can recall

19  discussing with Pella relating to Window 31 and the

20  replacement of that window?

21      A.    No.  It was almost the exact same thing

22  that had happened with Window Number 25.

23      Q.    Okay.  And then how about for the Doors 37

24  and 38?  You described a service call where there

54

1   was some caulking. Any other discussions?

2       A.   They came out and did some caulking. He

3   may have done something with the weather stripping.

4   I don't think they did. I think he just caulked the

5   window on the outside. As I say, he did that on a

6   day when no one was home because he did it all from

7   the outside.

8       Q.   And did you make any other calls after he

9   was there to do the caulking?

10      A.   On this particular window?

11      Q.   No, this particular door, 37.

12      A.   This particular door, not related to that

13  service incident.

14      Q.   Okay. Was there a subsequent call on that

15  door?

16      A.   Yeah, we had a subsequent call on that

17  door, and they actually came out and replaced the

18  stripping around the window at that time.

19      Q.   Around the door?

20      A.   The one that opens, yes. That would be

21  the left side of Number 37. It was leaking around

22  the door itself all the way around, and water was

23  coming in underneath at the base.

24      Q.   Do you recall when you made the call and

55

1  when the service was when the caulking was

2  accomplished on Doors 37 and 38?

3      A.  The caulking was done a couple of years

4  ago.  The gasket replacement on that door was done

5  within the last year.

6      Q.  Was that the one that was scheduled and

7  happened in September of '06?

8      A.  That would sound right, yes.  I don't --

9  you know, there were a number of service calls, so

10  it could be that one.  I don't know if there were

11  any subsequent to that.

12         But the last service call that Pella made

13  at my house, whenever the date of that was, was when

14  they replaced that gasket.

15     Q.  Okay.  Before that service call, there's

16  nothing else you can recall about the visit or

17  conversations you had with Pella as it relates to

18  the service on Doors 37 and 38?

19     A.  No.  When they came out to look at the

20  door and decide what to do, he told me that it was

21  leaking around the glass and that the best thing to

22  do would be to -- again, my recollection is that he

23  said there was a piece that had to be replaced on

24  the outside and then it would be caulked.  Now, I

56

1   don't know if he replaced that piece because I

2   wasn't there when they did it, so they may have,

3   they may have not, but I don't have any record.  He

4   never gave me anything in writing.

5       Q.   Now have you told me everything you

6   recall --

7       A.   Yes.

8       Q.   -- about that event?  Okay.

9            All right.  Turning back to Exhibit 3, I

10  think we were on SALT16.

11      A.   Correct.

12      Q.   And you indicated you believe that sheet

13  relates to a service event on Windows 45 -- 44, 45

14  and 46?

15      A.   Yes.

16      Q.   When did you observe a problem on those

17  windows?

18      A.   That's a bedroom upstairs that we don't

19  use real frequently.  Usually the shades are down

20  because no one really goes up there, and it faces

21  south.  And I believe my wife raised the shade one

22  day and said it looked like there was a hole in the

23  middle section, Window Number 45, and she asked me

24  to look at it when I got home, and when I came home,

1   it looked like the entire frame was rotting again at

2   the bottom, the sash I guess you'd call it.

3          When I went to open Window Number 44,

4   which is one of the casements, the window wouldn't

5   close because the bottom of that was rotted and the

6   mechanism wouldn't work.  I had to pull the window

7   shut with my hands, so 44 and 45 were rotted out.

8   45 is a nonopening window, but the entire bottom

9   frame, I poked my finger through and it went right

10  through the bottom of the sash.

11         Q.   Do you recall when this was?

12         A.   Well, the service call was in August.  I

13  must have called them immediately, so I'm assuming

14  it was around August 11th.

15         Q.   Of 2006?

16         A.   Or request date August 9th it says on

17  here, so it was probably a couple days before.  And

18  then they sent a service person out to look at the

19  window again.

20         Q.   Okay.  So again, August of 2006?

21         A.   August 2006, correct.

22         Q.   And it would have been within a few days

23  of the date on Exhibit 3?

24         A.   Yeah.  Where it says request date, that's

1   the day I called, so, you know, I may have seen it

2   the day before, but I called as soon as I could.

3        Q.   Okay.  And again, you called the Pella

4   service number?

5        A.   Yeah, I'm assuming.  I don't have the

6   number, but I'm assuming it's the number that's on

7   here, Pella Windows & Doors.

8        Q.   And it was you who made the call?

9        A.   I made the call, correct.

10       Q.   Tell me what you recall about that call.

11       A.   I called and told them we had another

12  window that was rotting and I needed someone to come

13  out and look at it because this one was really bad,

14  because the previous ones had all been windows where

15  the problem was with the casement part that opened,

16  but here I had the center section that doesn't open,

17  and the whole bottom sash was rotting out.

18       Q.   Okay.  And what did they tell you?

19       A.   They scheduled a service call, and the

20  results of that are on this service ticket.

21       Q.   Were you there when they came out for the

22  service call?

23       A.   Yes, I was.

24       Q.   Can you tell me what you recall about

59

1  that?

2      A.    There was a young woman who came out, and

3  she looked at the window.  She told me that the

4  window was unrepairable, that the entire window had

5  to be removed from the wall and it would need a

6  brand new window unit put in.

7           And she also stated that Pella would not

8  do that, that I would have to find a contractor or

9  they could supply me with the name of a

10 Pella-approved contractor to replace the window, but

11 it was not covered under any kind of warranty.  And

12 that's when I really got mad.

13     Q.    And this was mid August 2006?

14     A.    Yes.

15     Q.    Okay.  And can you tell me anything else

16 about that conversation that you recall?

17     A.    I kept asking her why it wouldn't be

18 replaced if it was literally the same problem we'd

19 had before, and she said because it's not in

20 warranty anymore.  And I said, well, if it does have

21 to be replaced, can't I have Pella do it, and she

22 said no, that someone else, an outside contractor

23 would have to come in and do it.

24     Q.    Did she tell you why Pella wouldn't do it?

60

1      A.    No.  She just said that they didn't do the

2  out-of-warranty repairs, that a contractor could get

3  a Pella window, but they wouldn't do it.

4      Q.    Okay.  Is there anything else about that

5  conversation you recall?

6      A.    No, not really.  I asked her if she could

7  get me -- well, yeah, the other thing I remember is

8  I asked her if she could get me a number or a

9  specification for the window so that if I did find a

10 contractor to do it, you know, presumably I could

11 find someone to replace the window, I would know

12 exactly what we needed to order.  And even though

13 she told me that she was going to give me some names

14 of Pella-approved contractors, I never heard from

15 her again.

16          I had her cell phone number.  I

17 subsequently tried to contact her, which I did a

18 week or two later, and she told me she no longer

19 worked for Pella.  I just had her cell phone number.

20     Q.    Do you know her name?

21     A.    No, I don't.

22     Q.    Do you still have the cell phone number?

23     A.    No.  She gave me a Pella card with her

24 name on it, but I threw it away when she told me she

61

1  didn't work for Pella anymore.

2      Q.    Okay.  Have you told me everything you can

3  recall about any conversation you had with that

4  Pella service representative?

5      A.    I believe so.

6      Q.    At that time, did you do anything to

7  inspect any of the rest of your windows or doors?

8      A.    Yes, I did.

9      Q.    What did you do?

10      A.    I started looking at all the windows in

11  the house, and I found the exact same problem that

12  this window had with -- going back again to window

13  Unit Number 31, 32, 33, I instead of opening the

14  windows and looking for a problem looked for the

15  center unit that didn't open, and Window Number 32

16  had the exact same problem as Window Number 45 where

17  the center part that doesn't open was rotting in the

18  middle, and I just pushed it with my finger and

19  there was nothing underneath it.  There was

20  literally just a hole there.

21      Q.    Okay.  Other than Window 32, did you find

22  any problems with any of the other windows when you

23  did that inspection?

24      A.    The only other thing that I saw was on

1  Door Number 13, I believe, on the south elevation

2  where there was no hole but it looked like the frame

3  around the door was warped or buckling as if water

4  were leaking inside there.

5          And I also believe when they came out for

6  the inspection that time that was pointed out to me

7  too, that it wasn't just a paint problem or a frame

8  problem, that it was a water leakage problem.

9      Q.    Who is they that came out for the

10 inspection?

11     A.    When your people and my people all came

12 out and went through the entire house --

13     Q.    And was it --

14     A.    -- because I wasn't really looking at the

15 doors up until then.  I was thinking this was a

16 window problem.

17     Q.    Who was it that you had the conversation

18 with that pointed that out to you?

19     A.    I believe it was our expert who came out

20 there who showed me that.

21     Q.    And do you know his name?

22     A.    I'd have to ask the attorney.

23          MR. LANG:  It's on the ID list.  That

24 would be Mike Solender.

63

1     MR. MANDLER:  I'm sorry?

2     MR. LANG:  Mr. Solender.

3  BY MR. MANDLER:

4     Q.   All right.  We will get back to that

5  inspection because it comes a little later in time

6  and I'll ask you about that.

7          Okay.  So at the time after you had the

8  problems with Windows 44 through 46, you did your

9  own inspection, found an additional problem with

10  Window 32.

11          Other than that additional problem with

12  Window 32, at that time did you find any other

13  problems?

14     A.   No, except for the fact that we seem to

15  still have a water leakage problem with Door

16  Number 37 because the carpeting seems to be getting

17  worse and worse on the inside there.  Even though

18  they replaced the gasket and caulked the windows,

19  the carpeting is just all discolored there too.

20     Q.   Okay.  What did you do then?

21     A.   When I discovered the other window, this

22  31 to -- well, Window Number 32 where it was rotting

23  in the middle, I started to think that I was in some

24  serious trouble here because my house is all doors

64

1  and windows, and I'm now looking at the prospect of

2  replacing all my windows, which is like building a

3  new house, and I got upset and I got a little scared

4  because I didn't want to rebuild my house.

5          And at that time I contacted

6  Freed & Weiss, and I asked them if there had been --

7          MR. LANG:  You don't have to get into

8  conversations with us.

9          THE WITNESS:  Okay.  That's fine.  Okay.

10 BY MR. MANDLER:

11   Q.   When approximately did you contact

12 Freed & Weiss?

13   A.   It would be very shortly after that

14 service call that they made on the upstairs window

15 when I was told that it wasn't covered under

16 warranty, so it would be mid August.

17   Q.   Did you have any further conversations

18 with Pella about what you were finding or

19 Pella Windows & Doors?

20   A.   Not that I can recall.

21          Now, the service call to replace the

22 gasket around Door Number 37 occurred after this

23 August, mid August inspection of Window 44 to 46.

24   Q.   Okay.

65

1      A.    And Pella was out after that, so, you

2   know, I talked to the serviceman when he was there,

3   and again, we just dealt with Door Number 37.  There

4   was no other discussion about anything else that was

5   going on there.

6      Q.    Do you recall when you made the call

7   requesting further service on Door Number 37?

8      A.    No.  I don't know if that was before or

9   after she came out to look at Window Number 44-45.

10  There were a lot of service calls.

11     Q.    That was my question.

12     A.    Yeah.

13     Q.    You don't recall if it was before or

14  after?

15     A.    No, I don't remember.

16     Q.    When the Pella service individual came for

17  the gasket on Door 37, you didn't have any

18  conversation about the additional problem you found

19  on Window 32?

20     A.    There were two people who came.  There was

21  a serviceman who did the work, and there was someone

22  who came with him who identified himself as a

23  supervisor, and at the time, he was making

24  conversation with me while the serviceman was

66

1  working on the door, and he mentioned to me or he

2  asked me if I had any other problems around the

3  house, which I thought rather odd, because if he's a

4  supervisor, why would he be asking me that.

5         And he also, again which I thought

6  peculiar for a supervisor, said to me, do you know

7  we have a new extended warranty program where if you

8  have any problems you can be reimbursed.  I never

9  asked him about it.  I never mentioned anything

10 about any other problems, but he seemed aware of the

11 issues.

12        And for that reason, I just didn't say

13 anything to him because it looked more like he was

14 an attorney there who was interrogating me and

15 asking me questions, and I thought it totally

16 inappropriate to discuss the matter with him.

17    Q.   And you recall him using that term,

18 extended warranty?

19    A.   Yes.

20    Q.   Is there anything else you can recall him

21 saying?

22    A.   No.  He never gave me anything in writing

23 about an extended warranty.  He never mentioned a

24 particular problem.  He only said that if there was

67

1  any problem with anything else that Pella was

2  offering an extended warranty --

3      Q.  Okay.  And you didn't --

4      A.  -- but he gave me no details of it.

5      Q.  And you didn't ask for the details of that

6  to see if it would apply to Window 32 where you had

7  discovered the problem?

8      A.  No, I didn't, because they had told me

9  that Pella wasn't going to replace the window, and I

10 thought personally he was just fishing for

11 information.

12     Q.  You had already started litigation at this

13 point?

14     A.  I had already contacted my attorneys, and

15 I just thought this very strange.

16     Q.  And already had filed a complaint by that

17 point?

18     A.  I don't know if the complaint was filed.

19 I had contacted the attorneys, so I don't know the

20 exact date that that was filed.  I would have to

21 look at the thing to see if it was before, during or

22 after.  I can't remember the dates that were on the

23 complaint.

24     Q.  Let me show you a copy of the original

68

1 complaint.

2     A.    All right.    The complaint was

3 August 18th.    Then it was probably after the

4 complaint was filed then.

5     Q.    Anything else that you can remember about

6 any conversations during that service visit for the

7 door gasket with either the service individual or

8 the supervisor?

9     A.    No.    He -- the serviceman who was doing

10 the actual service replaced the door gasket and said

11 that should take care of it, and which I don't think

12 it has personally because it looks like it's still

13 leaking, and they left.    And I never heard anything

14 from them again until, as you know, I received a

15 check from Pella unsolicited.

16     Q.    Did you -- were you charged for that

17 service call with the gasket?

18     A.    I don't recall.

19                        (Saltzman Exhibit 4 was marked

20                          for identification.)

21 BY MR. MANDLER:

22     Q.    Dr. Saltzman, I'm showing you what we've

23 marked as Exhibit Number 4.

24     A.    Okay.

1    Q.   Can you identify that document for me?

2    A.   Yes.  This was the one I believe that came

3  with the check.

4    Q.   Do you recognize the name of Tom Wengel?

5    A.   I am assuming that's the gentleman who

6  identified himself as a supervisor at the time, and

7  when he says, as I indicated to you during our

8  conversation prior to our visit I reviewed the

9  service events, that doesn't really fit in with what

10  he said to me because he said did you have any other

11  problems or do you have any other problems, and I

12  didn't mention anything.  He obviously had reviewed

13  the record.

14        And then says as discussed, Pella is

15  refunding you for the two replacement sashes.  We

16  didn't discuss anything about a refund at all.

17    Q.   At this point, had you yet replaced the

18  windows for Windows 44, 45 and 56?

19    A.   No, those have not been replaced yet at

20  all.

21    Q.   And likewise, you hadn't replaced 32?

22    A.   That whole unit needs to be replaced.

23  That 31 to 33 unit needs to be replaced just like 44

24  to 46.

70

1     Q.   Right.  But you had previously replaced

2  Window 31 --

3     A.   Right.

4     Q.   -- at your expense at one point?

5     A.   Correct.

6     Q.   Okay.  Did you understand the letter to

7  cover your previous replacement of Window 31 at your

8  expense?

9     A.   Well, the check was supposed to cover the

10  replacement of the sashes as well as installation

11  costs and finishing costs, but I don't know what my

12  finishing costs were.  Obviously we had to have

13  painting done and everything after that.  I don't

14  know how much I paid the painter at that point.

15         And where it says you indicated during the

16  service visit to replace the weather stripping, you

17  had no other concerns you wished to have addressed,

18  our records indicated you contacted us earlier this

19  year, I mean, they knew very well what it was, which

20  was why I thought it was odd that he was asking me

21  if I knew anything because he knew the answer, and

22  at that point it was more like being interrogated,

23  and I didn't answer him.

24     Q.  I assume you have not accepted this

1  payment?

2       A.   No, I did not.

3       Q.   And what --

4       A.   Because I don't know if it's a correct

5  amount, and again, I'm not sure what it's for, if

6  accepting the payment would constitute acceptance of

7  Pella's payment as settlement of all my claims

8  against them, and, you know, I would not do that.

9       Q.   Where is the check right now?

10      A.   I forwarded the check to Freed & Weiss.

11      Q.   Okay.  Have you had any further

12  conversation with Pella about whether this extended

13  warranty applies to the problems that you're

14  alleging with Windows 44 to 46 or 31 to 33?

15      A.   No, I have not.

16      Q.   And why not?

17      A.   The main reason being that instead of

18  replacing individual windows now, I'm talking about

19  tearing the walls out of my house now to replace

20  these windows, which not only involves replacing the

21  window unit, I'm going to have to have all the

22  stucco fixed; I'm going to have to have new moldings

23  put around the windows; I'm going to have to have

24  painting done.

72

1        One of these window units we have

2    permanent glass shelves installed.  They have to be

3    removed.  I have no idea what my other costs are

4    going to be.

5        I also have a carpeting problem

6    downstairs.  I think we have to replace the

7    carpeting around that door, and I didn't see any

8    indication that Pella was going to take care of any

9    of this.

10       And to extend that a little farther, I'm

11   concerned about the rest of my house.  I mean, I

12   don't see any reason why this wouldn't be happening

13   with all the windows in my home at some point.

14       Q.   Are the costs associated with all the

15   things you just listed something you're seeking to

16   recover in this litigation?

17       A.   Well, I would certainly like to have this

18   recovered, yes, because I don't even know what the

19   costs are.  And I would not only want these covered

20   but if it's a problem with all these windows I want

21   to be covered for future problems.  I'm worried

22   about the resale value of my home.  If this becomes,

23   you know, an issue with all my windows rotting and

24   someone comes in and looks at the house, how do I

73

1  sell a house where I say you may have to replace all

2  these windows?

3       Q.   And so the potential negative impact on

4  the resale value of the home is also something you

5  seek to recover?

6       A.   It's a huge concern for me.

7       Q.   But it's something you seek to recover in

8  this litigation?

9       A.   Well, I don't necessarily know about that.

10 I'd have to talk to my attorneys about that, but

11 it's a potential problem as I see it.

12      Q.   Well, you're the plaintiff, and I get to

13 ask you --

14      A.   Yeah.

15      Q.   -- and I only have this one chance to chat

16 with you.

17           Is that something that you hope to recover

18 in this litigation?

19      A.   If it's a loss that I would face, yes, I

20 would want to recover it.

21      Q.   All right.  After the last visit, I think

22 we were in approximately September of 2006, from the

23 Pella representatives, did you at any time prior to

24 when the big group of experts came out, did you have

74

1 anybody look at or inspect your house or your

2 windows?

3     A.   No.

4     Q.   So the next event was when everybody came

5 out to your house?

6     A.   Right.

7     Q.   Okay. As part of that, did you have, you

8 yourself, have any conversations with your expert?

9     A.   Prior to the inspection?

10     Q.   No, at the time of the inspection or

11 after.

12     A.   I only spoke with him while he was there.

13     Q.   Okay. And tell me what he told you.

14     A.   He looked at the windows and just said to

15 me that they're rotting, and he expressed his

16 opinion to me that it was a problem with the way the

17 cladding was put on. And he pointed out several

18 things, including that Door Number 13, that I hadn't

19 really looked at that closely, that there was water

20 leaking in through there too.

21     Q.   You say he made a statement that the

22 windows are rotting.

23         Did you make that in reference to any

24 particular window?

75

1    A.    Well, the ones that we were looking at in

2  particular, which were the 44 to 46 unit and the 31

3  to 33 unit.

4    Q.    Okay.  Other than those units, did he make

5  any particular comments about specific windows?

6    A.    No.

7    Q.    And then other than pointing out the

8  issues that you described for Door 13, did he make

9  any other comments relating to doors?

10    A.    Outside of the Window Number 13, just that

11  37-38 unit again, that it looked like it was still

12  leaking water.

13    Q.    Okay.  Any others?

14    A.    Not that I can recall.

15    Q.    Have you received anything in writing from

16  your expert?

17    A.    Me personally?

18    Q.    Yes.

19    A.    No.

20    Q.    Earlier you were making comments about now

21  all of your windows need to be replaced in your

22  house.

23         Has somebody told you that?

24    A.    No, I didn't say they had to be replaced.

1  I said I'm worried about the possibility that they

2  might have to be replaced.  I don't know what the

3  odds are, what the chances are that this is going to

4  recur.  I mean, I've replaced several already, and

5  now we're at a point where Pella themselves told me

6  I can't replace just the sash, I've got to tear the

7  window units out of the walls.  I have two like that

8  right now.

9          I mean, I have a house of windows and

10 doors.  The prospect of doing that all over my house

11 is terrifying.

12     Q.    So in other words, nobody has told you

13 that that needs to be done yet?

14     A.    No, no.

15     Q.    No contractor or expert?

16     A.    No one has told me, and Pella has not told

17 me that either, but Pella never told me that

18 anything might go wrong with any of the other

19 windows either.

20     Q.    Other than what you've described as far as

21 your conversations with your expert on the day of

22 the inspection of your home, have you had any other

23 conversation with your expert?

24     A.    With my experts, no.

1       Q.    Have you had any other conversations with

2  any other experts or somebody who inspected your

3  home?

4       A.    As far as an inspection, no.

5       Q.    Have you had any contact with contractors

6  for the repair of your home?

7       A.    Yes.

8                       (Saltzman Exhibit 5 was marked

9                        for identification.)

10  BY MR. MANDLER:

11       Q.    Dr. Saltzman, I'm going to show you what

12  we've marked as Exhibit 5.

13            Can you identify that document for me?

14       A.    Yes, this is from Fiore Carpentry.  This

15  is a carpenter that I contacted.  I'm familiar with

16  him.  I know he does nice work from other clients of

17  his, and I contacted him to come out and look at

18  these window units as far as replacing them.

19       Q.    So when I asked if you've had contact with

20  a contractor, it's Fiore that you had the contact

21  with?

22       A.    Yes.  Martin Fiore is his name.

23       Q.    And when did you contact Fiore Carpentry?

24       A.    Back in April of this year, the beginning

78

1    of April.

2        Q.    Is this the same entity that did the

3    carpentry work on your first --

4        A.    No.

5        Q.    -- at the time of the addition?

6        A.    No.

7        Q.    Tell me again the name of that company.

8        A.    The addition on our Northbrook home?

9        Q.    No, no, the addition on your present home.

10       A.    Oh, no, no, he had nothing to do with

11   Blair Construction.  This is somebody I contacted.

12       Q.    I'm sorry, it was Graffeo Boys.

13       A.    Right, that was one of the -- we had other

14   carpenters that came in.

15       Q.    So you haven't used Fiore Carpentry before

16   this?

17       A.    No.

18       Q.    And how have you heard of him?

19       A.    He's a well-known carpenter in

20   Lake Forest.

21       Q.    What is it that you've asked

22   Fiore Carpentry to do?

23       A.    At the present time, to replace the two

24   Window Units 44 to 46 and 31 to 33.  Those are the

1    two that I know of right now that need replacement.

2         I did talk to him about Door Number 13.

3    We haven't talked about replacing that yet.  That

4    would be an extremely difficult thing to do, to put

5    a door into that spot the way they're installed,

6    because it would be hard to do that without

7    disrupting all the construction in that area.  So we

8    haven't pursued that at this point.

9         Right now my big concern are these two

10   window units because there's literally a hole from

11   the inside to the outside.

12   Q.   When did you first contact

13   Fiore Carpentry?

14   A.   Sometime in the beginning of April to come

15   out and look at the windows and give me an estimate.

16   Q.   And the estimate is what's reflected in

17   Exhibit 5?

18   A.   Exactly.  That was for the labor for the

19   windows and for the price of the windows, which have

20   already been purchased.

21        And also I talked to him -- this was again

22   not something that was suggested by Pella but was

23   suggested by him.  He expressed his opinion to me

24   that he has seen this problem before with the Pella

80

1  clad windows, and he suggested caulking every single

2  window where the aluminum cladding touches the

3  window to try to prevent any further leakage.  This

4  was an expensive proposition.  He charged me $3,385,

5  and I had him caulk every single window in the house

6  with the exception of the two that are going to be

7  replaced.

8      Q.    That's already happened?

9      A.    That's already done.

10     Q.    When did that happen?

11     A.    That happened about two weeks ago, because

12 I just didn't want to take a chance with any more

13 water leakage.

14          So he didn't touch the windows other than

15 to place caulking around them, the same way Pella

16 did around that other window, but he used a clear

17 silicone caulk that you can't see.

18     Q.    Did you inform your counsel that this was

19 going to happen?

20     A.    I believe I told them I was going to have

21 this done, yes.  I didn't tell them when.

22          And as a homeowner, I'm trying to do

23 everything I possibly can to protect myself.  His

24 advice as a carpenter, who has had problems with

81

1  this before, was to caulk all these windows as

2  quickly as possible to try to prevent further water

3  infiltration.

4      Q.   Tell me what you recall him telling you

5  about the fact that he alleges he has seen this

6  problem before.

7      A.   He said he has seen these Pella windows

8  rot around the cladding before.

9      Q.   Did he say where?

10     A.   No.

11     Q.   Did he say when?

12     A.   No.

13     Q.   Did he say how often?

14     A.   No.  But his other statement was that if

15  he were replacing the windows at this point in time

16  and had the choice, he would use Andersen windows,

17  not Pella.

18     Q.   Anything else you can recall him saying?

19     A.   No.  The main thing was that he

20  recommended caulking these windows as soon as

21  possible, and to protect myself, I just went ahead

22  and did it.  I didn't feel like I had to get

23  permission from anybody.  It's my house.

24     Q.   Did you ask him to inspect the rest of the

82

1  windows?

2      A.   As far as for wood rotting or

3  infiltration, no.  His thing was completely on the

4  outside, other than checking these two windows,

5  making measurements, and having windows

6  manufactured.  The replacement windows are Pella

7  because they have to be.  Otherwise, they won't

8  match the other windows in my house.

9      Q.   I'll get to that issue.

10     A.   Okay.

11     Q.   Obviously as part of caulking every window

12  he had to see every window.

13     A.   From the outside.

14     Q.   Yes.

15     A.   Not the inside.

16     Q.   Right.

17     A.   So he's only dealing with the aluminum

18  cladding on the outside of the house.

19     Q.   So did he report any problems back to you

20  after he caulked every window in the house?

21     A.   As far as any particular areas, no.

22     Q.   Have you had any discussions with

23  Mr. Fiore about whether there is damage to any of

24  the surrounding areas to the windows?

83

1    A.    He told me as far as surrounding areas we

2  wouldn't know until we took the window units out.

3  At the time they're removed, he would inspect the

4  walls and the surrounding areas and see if there was

5  any other damage.

6    Q.    Okay.  Is there anything else that you can

7  recall about the caulking part of the project, is

8  there any conversations that you had with Mr. Fiore

9  relating to that?

10    A.    No.  It seemed to be a very simple process

11 of just placing caulk around all the windows.

12    Q.    Okay.  Let's move to the replacement of

13 the two window series 45 through 46 and 31 through

14 33.

15        Mr. Fiore has given you a bid for that,

16 and that's reflected in Exhibit Number 5?

17    A.    Correct.

18    Q.    Which includes both the price of the

19 windows and his labor, correct?

20    A.    Correct.

21    Q.    And I understand that hasn't happened yet?

22    A.    I have purchased the windows.  The windows

23 are in my garage.

24    Q.    Okay.

84

1      A.    They were just delivered.  And I have paid

2  for the windows.

3      Q.    You purchased those from Menards?

4      A.    Right.  He placed the order.  I paid for

5  the windows.

6      Q.    And you've already mentioned that you've

7  made the decision to replace them with Pella

8  windows?

9      A.    Right.  I was told that this was the only

10 thing that would match.

11     Q.    Now, they're Pella Proline windows, do you

12 know?

13     A.    It doesn't really say on here which they

14 are.  I haven't really opened -- you know, the

15 windows are in boxes in my garage, so I don't know

16 if they're Proline or not.

17     Q.    So you're unaware and he hasn't told you

18 what design of windows they are?

19     A.    Well, they're supposed to be exactly like

20 the ones we have where -- the aluminum clad, but my

21 understanding is the cladding is done differently

22 now.

23     Q.    And where do you get that understanding?

24     A.    Actually from my attorneys.  I was told

85

1 that the windows are now being manufactured in a

2 different way.

3     Q.   And did that go into your decision to use

4 Pella to replace --

5     A.   No.  The major decision to use Pella was

6 so that my house wouldn't look like a conglomeration

7 of different things.

8     Q.   In addition to the remodeling you did in

9 1994-95, you did some subsequent work, remodeling

10 work on your house; is that correct?

11     A.   We took a room upstairs that was kind of

12 an attic with no windows and we installed a window

13 unit in there.

14     Q.   And that's what became, for lack of a

15 better term, the playroom for the grandchildren?

16     A.   That's a playroom, yes.  That's what we

17 call it.

18     Q.   When was that work done?

19     A.   That was done probably about three to four

20 years ago.

21     Q.   Was it done after the time that you had

22 the initial problem with Window Number 25?

23     A.   Yes.

24     Q.   Was it done before or after when you had

1  the next problem with Window Number 31?

2      A.    I don't recall.

3      Q.    Who did the work on that project?

4      A.    Dirsmith Construction, D-i-r-s-m-i-t-h.

5      Q.    Who did you deal with at

6  Dirsmith Construction?

7      A.    Tim Dirsmith is the owner.

8      Q.    And how did you make the selection of him

9  for the contractor?

10     A.    I happen to know him.  His family is a

11 patient of mine, and again, he's a well-known

12 North Shore contractor.

13     Q.    You put Pella windows into that remodel of

14 the attic playroom?

15     A.    Correct.

16     Q.    And why did you decide to do that?

17     A.    Because they had to match all the other

18 windows.

19     Q.    And do you believe that they're the same

20 design as the windows in the rest of the house?

21     A.    No, they're not.  I can tell just by

22 looking at them they're designed differently.  They

23 look the same on the outside, but if you look at

24 them, they're not made the same way.

87

1     Q.   I'll represent to you it's Pella's belief

2  that the windows in the playroom are Designer

3  Series.

4     A.   I don't recall which series they are.

5     Q.   I'm not asking you to agree or disagree.

6           I'm just asking, do you have any reason

7  why you picked a different type of window for that

8  playroom?

9     A.   I didn't even select the window for that.

10  All we did was pick the size.  I never went to a

11  Pella store.  I just told him it had to match.  I

12  told him how big we wanted the window.  He ordered

13  the window unit and installed it.

14     Q.   Have you had any issues with the window in

15  the playroom?

16     A.   No.

17     Q.   As long as we're jumping back here, did

18  you ever have any issues with the Pella window that

19  was installed in your Northbrook house?

20     A.   No.

21     Q.   You were happy with the performance of

22  that window?

23     A.   Yeah.  It was a different type of window

24  completely, so it was a transom unit, and it was a

88

1  wood unit.

2      Q.    What do you know about the timing of when

3  Mr. Fiore intends to install the two new windows for

4  31 to 33 and 44 to 46?

5      A.    He had several jobs going.  I actually

6  left a message for him this morning.  If possible, I

7  would like him to come in next week to start this

8  work.  We need to try to do this during good weather

9  obviously because I have to tear open the walls of

10  my house.

11      Q.    Have you gotten any written materials or

12  representations relating to those Pella windows that

13  you just purchased?

14      A.    There's probably paperwork in the boxes or

15  crates that the windows are in.  I haven't touched

16  them.

17      Q.    How about the windows that you purchased

18  for the playroom addition, did you get any

19  representations or paperwork for that?

20      A.    Not that I can recall, no.

21      Q.    And you didn't go out and visit the

22  showroom or anything as far as that?

23      A.    No, not for those.  I just needed windows

24  that matched, that's all.

89

1      Q.   Other than this pending work by

2  Fiore Carpentry, the replacement of the two sets of

3  windows, do you have any other work scheduled or

4  anticipated on your home?

5      A.   Nothing is scheduled at the moment.

6      Q.   Do you have any other plans or have you

7  had any other discussions with any construction

8  company or outside expert about the need for other

9  work?

10      A.   We talked about that Door Number 13 and

11  what might be done with that.  I haven't pursued

12  that at this point because he thought that might be

13  a really difficult unit to replace, and I don't know

14  exactly what the issue is.  It's not the exact same

15  thing as the windows, but everybody seemed to agree

16  there was a problem there with water infiltration.

17      Q.   When you say everybody, you mean all of

18  your experts?

19      A.   Well, no.  When everybody came out for

20  that mass inspection, you know, your people took

21  plenty of photos of that door as did ours, and

22  everyone was looking at it, so I'm assuming that

23  they've made some notes about that too.

24      Q.   Right.  And it's just that assumption,

1  nobody from Pella told you they agree that there's a

2  problem with it, correct?

3      A.   No.

4      Q.   Okay.  Tell me what you can recall about

5  any discussions you had with Mr. Fiore about

6  Door 13.

7      A.   He just said it looked like there was a

8  water problem there and that the biggest thing we

9  would face would be trying to pull out one of these

10 door units because they're all connected.  And, you

11 know, from a size and matching standpoint, it's not

12 like taking a single window unit and replacing it.

13 We've got to match it to the ones that are still

14 there.  That might be a problem.

15         But I've just kind of let that sit for

16 now.  I need to replace these two windows with holes

17 in them.

18     Q.   Is there anything else you can recall

19 about the conversations with Mr. Fiore on the topic

20 of Door 13?

21     A.   No.

22     Q.   I assume if that door and the surrounding

23 areas need to be replaced, that's something you're

24 also seeking to recover in this litigation?

91

1    A.    Yes.

2    Q.    Including whatever extra costs are

3 incurred because of the complexity of the

4 construction you just mentioned?

5    A.    Right.  And I have the issue with these

6 door units that are still leaking water and

7 replacing the carpeting too.

8    Q.    And that's 37 and 38?

9    A.    Right, yeah.  I would like to kind of get

10 that resolved.

11    Q.    Not wanting to ask you about any

12 conversations you had with your attorneys, so

13 excluding that, did you take the initiative or make

14 any independent decisions that you wanted to pursue

15 this case as a class action?

16    A.    As an individual, no.

17    Q.    Are you aware of any written agreement

18 that you may have regarding your role as a class

19 representative?

20    A.    I don't recall if I signed anything or

21 not.  I probably did, but I can't recall.  I may

22 have, I may not.  There's been a lot of paperwork.

23    Q.    Do you recall anything --

24    A.    I know I did agree to serve as a

92

1  plaintiff, so ...

2      Q.    And you also know that you're purporting

3  to represent a class of other people?

4      A.    Yes.

5      Q.    And you don't remember one way or the

6  other if there was a written agreement relating to

7  that?

8      A.    I think I did sign something, I believe.

9      Q.    Tell me what you remember about the

10  context of that written agreement.

11     A.    Well, it was a complaint, you know.  I got

12  a copy of a complaint that was filed against Pella,

13  and I don't remember if I signed a separate paper

14  from that or if I signed the complaint.  It's not my

15  field.

16     Q.    Have you communicated with any of the

17  other named plaintiffs in the case?

18     A.    No.

19     Q.    Have you communicated with any other

20  potential class members?

21     A.    No.

22     Q.    What do you understand to be your

23  responsibilities as a class representative?

24     A.    I'm supposed to do a deposition if I have

93

1  to, which I'm fulfilling.  I obviously have let

2  everyone come into my house and check everything.  I

3  understand that Pella wants to send a representative

4  or something when we replace these windows so they

5  can be there to observe.  I've agreed to that.

6        And I just follow the advice of my

7  attorneys as to what my duties are as a plaintiff.

8     Q.   That all relates to your duties as a

9  plaintiff.

10       Do you have any separate understandings as

11 to what your duties or responsibilities are as

12 somebody who is representing all the other potential

13 members of the litigation?

14    A.   I don't know if I have any separate role

15 other than to, you know, do what's requested of me

16 as a plaintiff.

17    Q.   This is not the first case where you've

18 been a class representative, correct?

19    A.   No.

20    Q.   You were a class representative in the

21 case of Saltzman v. MCI Telecom?

22    A.   It was ECI, I believe.

23                    (Saltzman Exhibit 6 was marked

24                     for identification.)

94

BY MR. MANDLER:

1    Q.    Dr. Saltzman, I'm just going to show you
what we've marked as Exhibit Number 6.  I don't have
multiple copies of that.  I'll represent to you
that's a docket sheet from a Federal Court action
that's titled Saltzman v. MCI Telecom.

        Does that refresh your recollection about
that case?

    A.    No.  I don't remember having anything to
do that I had to participate in as far as this is
concerned.

    Q.    You don't remember starting a case against
MCI Telecom --

    A.    No.

    Q.    -- where you were represented by
Freed & Weiss?

    A.    Not to my recollection, no.

        I had one -- the deposition that I gave
was for a case where there were some false charges
on my phone bill, and that was the case that I
participated in, and I did a deposition in my
office.

        But I don't recall this one.

    Q.    You don't remember any conversations with

95

1   your daughter or your son-in-law about acting as a

2   representative in that case?

3       A.   I don't remember any, no.  They may have

4   taken place.  I don't remember them.

5       Q.   Do you know Michael Freed?

6       A.   I know who he is.  I've never met him.

7       Q.   Do you know Christopher Stuart?

8       A.   No.

9       Q.   Eric Freed?

10      A.   I know Eric.

11      Q.   And do you know Steve Berman?

12      A.   I know who he is.

13      Q.   And you didn't have any interaction with

14  any of those attorneys regarding this Saltzman v.

15  MCI Telecom case?

16      A.   Not that I can recall, no.

17      Q.   Would it surprise you that it was filed

18  without your knowledge?

19           MR. BURKE:  I'm going to object to the

20  form of the question as argumentative.

21           Go ahead.

22           THE WITNESS:  Do I need to answer?

23           MR. BURKE:  Well, I'm not sure how you

24  answer.  I guess the question is --

1      THE WITNESS:  Yeah.

2      MR. BURKE:  -- would you be surprised if

3  it had been filed without your knowledge.

4      MR. MANDLER:  Let's limit the speaking

5  objections.

6      MR. BURKE:  That was the question.

7      THE WITNESS:  I am not really aware of

8  this case at all.  I mean, it may have happened.  If

9  there's nothing with my signature on it, then I

10  don't recall signing anything with this.

11  BY MR. MANDLER:

12      Q.  You wouldn't expect somebody to file a

13  case on your behalf without you knowing about it,

14  would you?

15      MR. BURKE:  I'm going to object --

16      THE WITNESS:  I don't know.

17      MR. BURKE:  -- to the form of the question

18  as argumentative.

19      MR. LANG:  Asked and answered.

20      MR. MANDLER:  Let's have one lawyer

21  representing the plaintiff here.

22      MR. BURKE:  How many lawyers do you have?

23      MR. MANDLER:  One speaking.

24      MR. BURKE:  Well, you have more than one

97

1 lawyer representing the defendant, don't you?

2      MR. MANDLER:  Let's have one lawyer

3 speaking on behalf of the plaintiff then.

4      MR. BURKE:  You had a question pending?

5      THE WITNESS:  What was the question?

6      MR. BURKE:  I think you answered it.

7      THE WITNESS:  Okay.

8 BY MR. MANDLER:

9      Q.   You also served as a class representative

10 in the other case you just mentioned versus Enhanced

11 Service Billing, Inc.?

12      A.   Was it ESB?  I was thinking ECI.  Right.

13      Q.   Is that correct?

14      A.   Yes.

15      Q.   Tell me what you know about that case.

16      A.   That was one where I had noticed some

17 charges on my telephone bill from my business that I

18 had no knowledge of and didn't know what it was for.

19 I contacted them, and the company that had that 800

20 number said it was for some kind of a thing on the

21 internet.  I had never requested it.

22      And subsequently I was put on this as a

23 representative of a class against this company

24 because they were putting charges onto people's

98

1  phone bills.  The way it was explained to me was

2  that the phone company was just passing these

3  charges on without verifying whether people had

4  authorized them.

5      Q.  Were you a part of the decision to act as

6  a class representative in the case?

7      A.  No.  I didn't decide that this should be a

8  class action, no.

9      Q.  Were you --

10      A.  I agreed to represent the class.

11      Q.  Were you -- over and beyond whatever your

12  individual loss was based on the actions of Enhanced

13  Service Billing, were you compensated for your role

14  as a class action representative?

15      A.  Yes.

16      Q.  And how much?

17      A.  Several thousand dollars.

18      Q.  Do you have any paperwork that you've

19  retained regarding that litigation?

20      A.  Not at this point, no.

21      Q.  Are you aware of any agreement in this

22  case that would compensate you for your role as a

23  class action representative?

24      A.  No, there's no agreement as far as what I

99

1   would be compensated for.

2       Q.   Do you know what the outcome of the

3   Saltzman v. Enhanced Service Billing, Inc. case was?

4       A.   In terms of the decision in the case?

5       Q.   Or how it was resolved?

6       A.   I believe it was resolved where they

7   agreed to make a settlement and pay the class

8   members a certain amount of money.

9       Q.   And as a class representative, did you

10  review and approve that settlement?

11      A.   Yes.

12      Q.   Do you know how much your lawyers

13  received?

14      A.   No.

15      Q.   Do you know how much the class received?

16      A.   No.

17      Q.   And over and above the amount that you

18  were paid as a class representative, how much did

19  you receive in that case?

20      A.   The amount that was on my phone bill which

21  was credited, which was, you know, a minimal amount.

22  It was just the fact that the charges were being put

23  on that brought this to everyone's attention.

24      Q.   Is there any other litigation that you can

1 recall where you have served as a class

2 representative?

3     A.   I've been a member of a class in a number

4 of security things that I just get something in the

5 mail if you have a stock in a certain company,

6 you're a member of a class.

7         But other than that, no.

8     Q.   Any other time that you've been a

9 plaintiff in litigation?

10     A.   No, not that I can recall.

11     Q.   Any other time where you've been a

12 defendant in litigation?

13     A.   No.

14         MR. MANDLER:  Dr. Saltzman, we're making

15 good progress. I think I'm very close to the end,

16 so let me review my notes and take a quick break

17 here, and I think we will be able to finish up.

18         THE WITNESS:  Okay.

19         MR. BURKE:  I saw that expression like my

20 gosh, we could be actually finished.

21         MR. MANDLER:  I know.

22         THE VIDEOGRAPHER:  Off the record at

23 12:34.

24

101

1    (Whereupon, a short recess was

2    taken.)

3    THE VIDEOGRAPHER:  We're back on the

4    record at 12:40.

5    MR. MANDLER:  Dr. Saltzman, I have no

6    further questions.  Thanks for your time and

7    patience today.

8    THE WITNESS:  You're welcome.

9    MR. BURKE:  And we will read the depo.

10   THE VIDEOGRAPHER:  This ends the

11   deposition.  We are off the record at 12:41.

12   (Whereupon, the deposition was

13   concluded at 12:41 p.m.)

14

15

16

17

18

19

20

21

22

23

24

102

1 | Saltzman, et al., vs. Pella

2 | 06 CV 4481

3

4 |        I hereby certify that I have read the

5 | foregoing transcript of my deposition, given on

6 | June 14th, 2007, at the place aforesaid, consisting

7 | of pages 1 through 101, inclusive, and I do again

8 | subscribe and make oath that the same is a true,

9 | correct, and complete transcript of my deposition so

10 | given as aforesaid, as it now appears.

11 |      Please check one:

12 |      _____ I made no corrections

13 |      _____ Number of errata sheets submitted

14

15 |      (signed) _____
                    LEONARD SALTZMAN

16

17 |      ALSO PRESENT:_____

18

19 | SUBSCRIBED AND SWORN TO
     before me this ____ day

20 | of _____ 2007.

21 | _____
     Notary Public

22

23

24

103

CORRECTION PAGE

CASE NAME:     Saltzman, et al., vs. Pella

DEPOSITION OF:  Leonard Saltzman

DATE TAKEN:     June 14th, 2007

PAGE          LINE          CHANGE

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

\_\_\_\_     \_\_\_\_     _____

DATE:                _____

SIGNATURE:           _____

104

1                          CORRECTION PAGE

2

3    CASE NAME:      Saltzman, et al., vs. Pella

4    DEPOSITION OF:  Leonard Saltzman

5    DATE TAKEN:     June 14th, 2007

6

7    PAGE        LINE        CHANGE

8    _____       _____       _____

9    _____       _____       _____

10   _____       _____       _____

11   _____       _____       _____

12   _____       _____       _____

13   _____       _____       _____

14   _____       _____       _____

15   _____       _____       _____

16   _____       _____       _____

17   _____       _____       _____

18   _____       _____       _____

19   _____       _____       _____

20   _____       _____       _____

21   _____       _____       _____

22   _____       _____       _____

23   DATE:                   _____

24   SIGNATURE:              _____

## CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, GREG S. WEILAND, a Certified Shorthand Reporter of the State of Illinois, do certify that I reported stenographically the proceedings had in the afore-entitled cause on the date and at the time so specified, and that the foregoing is a true and correct transcript of those proceedings by me so reported.

IN WITNESS WHEREOF, I have set my hand and seal this day of          ,          .

Certified Shorthand Reporter # 084-003472

107

1                            INDEX

2   June 14th, 2007

3   LEONARD SALTZMAN

4                                                PAGE

5   Examination by Mr. Mandler ...................    5

6

7                    DEPOSITION EXHIBITS

8   NUMBER              DESCRIPTION              PAGE

9   Saltzman 1  Saltzman Property Schematic       31

10              Elevations with Window Numbers,

11              3 pages

12  Saltzman 2  Group exhibit, Bates labeled      50

13              PL-SALT00000004 through 00000013

14  Saltzman 3  Invoices, Bates labeled           51

15              PL-SALT00000014 through 00000017

16  Saltzman 4  Letter dated October 25, 2006,    68

17              Bates labeled PL-SALT00000002

18              through 00000003

19  Saltzman 5  Letter dated 4/30/07, 2 pages     77

20  Saltzman 6  Civil Docket for Case #:          94

21              1:98-cv-02180, 5 pages

22

23

24

**A**

**able** 24:2 100:17
**Absolutely** 21:7
**acceptance** 71:6
**accepted** 70:24
**accepting** 71:6
**accomplished** 55:2
**accumulating** 48:17
**accurate** 105:15
**acquaintances** 13:15
**act** 98:5
**acting** 95:1 105:13
**action** 34:16 91:15
   94:5 98:8,14,23
**actions** 98:12
**actual** 18:14 68:10
**ad** 26:19,24
**add** 14:21
**added** 14:18,22
**addition** 10:15,19
   14:22 29:17 30:8
   78:5,8,9 85:8 88:18
**additional** 63:9,11
   65:18
**address** 5:14 9:18
**addressed** 31:12
   70:17
**adjacent** 45:24
**ads** 26:21,24
**advertisements** 26:17
**advertises** 26:6
**advertising** 26:12
**advice** 80:24 93:6
**aforementioned**
   105:17
**aforesaid** 102:6,10
**ago** 6:2,4 9:15,23
   10:10 30:14 34:11
   43:2 49:12,13 55:4
   80:11 85:20
**agree** 37:15 39:7 51:4
   87:5 89:15 90:1
   91:24
**agreed** 93:5 98:10
   99:7
**agreement** 51:23
   91:17 92:6,10 98:21
   98:24

**ahead** 81:21 95:21
**al** 4:10,10 102:1
   103:3 104:3
**alleges** 81:5
**alleging** 71:14
**ALLEN** 3:10
**Allison** 13:9
**aluminum** 11:1 18:9
   19:9,12 21:8 22:21
   80:2 82:17 84:20
**amend** 51:15
**Amended** 34:15
**amount** 71:5 99:8,17
   99:20,21
**analysis** 37:13
**Andersen** 81:16
**answer** 6:12,14 7:10
   37:14 38:12,17
   70:21,23 95:22,24
**answered** 38:21
   96:19 97:6
**answering** 7:7
**answers** 6:18 25:21
   34:17 37:5 39:9
   105:12,16
**anticipated** 89:4
**anybody** 11:17,20
   41:13 42:11 74:1
   81:23
**anymore** 29:5 59:20
   61:1
**apologize** 32:8
**apparently** 27:10
**appears** 102:10
**application** 11:15
   25:5
**applications** 20:18
**applies** 71:13
**apply** 67:6
**appropriate** 23:12
   24:12 25:18
**approve** 99:10
**approximate** 38:18
**approximately** 9:23
   34:18 38:21 42:18
   64:11 73:22
**April** 77:24 78:1
   79:14
**Architect** 23:20

24:24
**area** 47:20 48:10 79:7
**areas** 49:9 82:21,24
   83:1,4 90:23
**argumentative** 95:20
   96:18
**arose** 28:13,22 34:18
**asked** 21:1 39:14
   56:23 60:6,8 64:6
   66:2,9 77:19 78:21
   96:19 105:16
**asking** 6:11 36:21,22
   59:17 66:4,15 70:20
   87:5,6
**assisted** 31:5
**associated** 72:14
**association** 4:2 11:7
**assume** 12:24 20:23
   45:23 46:13 47:1
   70:24 90:22
**assuming** 14:7 24:10
   57:13 58:5,6 69:5
   89:22
**assumption** 89:24
**attached** 105:21
**attention** 47:3 99:23
**attic** 85:12 86:14
**attorney** 8:1 50:9,17
   62:22 66:14
**attorneys** 4:12 49:17
   67:14,19 73:10
   84:24 91:12 93:7
   95:14
**August** 57:12,14,16
   57:20,21 59:13
   64:16,23,23 68:3
**authorized** 98:4
**available** 6:18
**aware** 66:10 91:17
   96:7 98:21
**awfully** 32:9
**a.m** 1:23 4:7 105:9

**B**

**back** 9:13 17:15
   22:23 32:11 35:20
   40:14 51:11 53:7
   56:9 61:12 63:4
   77:24 82:19 87:17

101:3
**bad** 58:13
**base** 47:9 54:23
**based** 24:4 26:13
   37:8 98:12
**basis** 25:3,4
**Bates** 50:24 107:12
   107:14,17
**bedroom** 10:16 56:18
**began** 12:22
**beginning** 53:6 77:24
   79:14
**behalf** 1:7 2:17 3:17
   4:5 5:4 96:13 97:3
**belief** 87:1
**believe** 5:24 13:22
   16:2 23:12 24:16
   27:14 29:4 35:4
   40:10 44:10,23
   49:22 52:8,13,16
   56:12,21 61:5 62:1
   62:5,19 69:2 80:20
   86:19 92:8 93:22
   99:6
**BENSON** 3:2
**Berman** 95:11
**best** 6:12,18 9:15
   10:5 18:10,11 22:3
   25:4 34:12 55:21
**better** 32:7 35:2
   36:10 85:15
**beyond** 98:11
**bid** 83:15
**big** 19:10 73:24 79:9
   87:12
**biggest** 90:8
**bill** 13:12 51:11
   94:20 97:17 99:20
**Billing** 97:11 98:13
   99:3
**bills** 15:24 16:20
   49:19 98:1
**bit** 10:16
**Blair** 13:5,7,11,14,20
   15:10 19:1 27:13
   29:2 78:11
**blank** 15:19
**block** 24:3
**blueprint** 16:14

**blueprints** 16:19
**Bonnie** 7:18
**bottom** 32:23 33:2,3
    34:9 42:20 47:16
    48:3 49:5 57:2,5,8
    57:10 58:17
**box** 16:17,22,23
**boxes** 16:12 84:15
    88:14
**Boys** 13:22 78:12
**branch** 25:14 33:22
    36:6
**brand** 18:3 23:18
    59:6
**brands** 18:1 22:14
**break** 7:2 52:24
    100:16
**briefly** 6:8 8:5,20
**brochures** 22:17,23
**broken** 52:10,10,11
**Brook** 7:22
**brought** 47:2 99:23
**buckling** 62:3
**build** 26:10
**building** 64:2
**built** 9:6
**Burke** 2:2,7 4:16,16
    37:11 38:23 39:2,6
    39:17 51:7 95:19,23
    96:2,6,15,17,22,24
    97:4,6 100:19 101:9
**business** 8:24 9:1
    97:17
**buy** 25:15
**B-o-n-n-i-e** 7:18

_____
            C
_____

**C** 105:3
**call** 30:10 31:10,11
    34:2 37:3 40:16,18
    40:23 41:12,15
    43:13,18 44:7 48:24
    52:15 53:24 54:14
    54:16,24 55:12,15
    57:2,12 58:8,9,10
    58:19,22 64:14,21
    65:6 68:17 85:17
**called** 13:22 18:2
    33:14,15,20,21 34:7

41:14 43:8,19 48:21
    57:13 58:1,2,3,11
**calling** 43:20
**calls** 37:2 39:23 43:14
    49:15 50:22 54:8
    55:9 65:10
**camera** 4:3
**campaign** 25:22
**can't** 6:18 26:19 35:6
    51:11 59:21 67:22
    76:6 80:17 91:21
**captioned** 4:9
**card** 60:23
**care** 17:5 22:11 23:1
    30:10,19 31:14
    34:10 68:11 72:8
**carpenter** 77:15
    78:19 80:24
**carpenters** 14:8
    78:14
**carpentry** 13:22
    77:14,23 78:3,15,22
    79:13 89:2
**carpeting** 47:14
    63:16,19 72:5,7
    91:7
**case** 4:9,11 5:23 6:5
    25:21 27:7,8 35:7
    38:5 91:15 92:17
    93:17,21 94:8,12,19
    94:20 95:2,15 96:8
    96:13 97:10,15 98:6
    98:22 99:3,4,19
    103:3 104:3 105:23
    107:20
**casement** 10:24 20:15
    30:12 58:15
**casements** 57:4
**caulk** 49:7,8 80:5,17
    81:1 83:11
**caulked** 49:22 54:4
    55:24 63:18 82:20
**caulking** 49:5,6 54:1
    54:2,9 55:1,3 80:1
    80:15 81:20 82:11
    83:7
**ceiling** 10:23
**cell** 60:16,19,22
**center** 3:3 58:16

61:15,17
**certain** 99:8 100:5
**certainly** 72:17
**certify** 102:4
**chance** 38:3 73:15
    80:12
**chances** 76:3
**change** 37:9 52:24
    103:7 104:7
**changed** 33:17
**charge** 5:24 41:24
    44:15,17 52:15
**charged** 68:16 80:4
**charges** 94:19 97:17
    97:24 98:3 99:22
**chat** 73:15
**cheapest** 24:7
**check** 68:15 69:3
    70:9 71:9,10 93:2
    102:11
**checking** 46:6 82:4
**checks** 16:5 50:18
**Chicago** 1:22 2:13
    3:13 4:6,24 105:8
**children** 7:19
**choice** 18:22 81:16
**Chris** 28:10
**Christopher** 95:7
**city** 1:22 12:19 105:7
**Civil** 1:19 107:20
**clad** 10:24 11:1 80:1
    84:20
**cladding** 14:10 18:9
    19:9,13 21:8 74:17
    80:2 81:8 82:18
    84:21
**claims** 71:7
**class** 34:16 91:15,18
    92:3,20,23 93:18,20
    97:9,23 98:6,8,10
    98:14,23 99:7,9,15
    99:18 100:1,3,6
**cleaning** 46:17,19
    47:1
**cleans** 46:20
**clear** 40:3 80:16
**clearly** 6:24
**client** 27:15
**clients** 77:16

**close** 43:5 57:5
    100:15
**closely** 74:19
**closes** 33:1,4
**closing** 42:21
**code** 45:1
**come** 13:13 30:15
    34:10 44:4 49:1,2
    49:20 58:12 59:23
    77:17 79:14 88:7
    93:2
**comes** 12:3 48:12
    63:5 72:24
**coming** 47:9,23 48:6
    54:23
**commencing** 1:23
    105:8
**comment** 37:21
**comments** 75:5,9,20
**commercials** 26:9
**communicated** 92:16
    92:19
**communicating** 6:24
**communications**
    29:1,8 42:10
**company** 5:23 13:16
    13:22 14:12 18:1
    29:16 78:7 89:8
    97:19,23 98:2 100:5
**compensate** 98:22
**compensated** 98:13
    99:1
**complaint** 34:16,21
    37:6 38:4 67:16,18
    67:23 68:1,2,4
    92:11,12,14
**complete** 102:9
    105:15
**completely** 82:3
    87:24
**completion** 29:3,9
**complexity** 91:3
**compounded** 37:12
**concern** 73:6 79:9
**concerned** 72:11
    94:11
**concerns** 70:17
**concluded** 101:13
**condensation** 38:9,20

conforms 39:3
conglomeration 85:6
connected 90:10
considered 12:19
consisting 102:6
constitute 71:6
construction 12:19
  13:5,7,14,16,20
  15:10 19:1 27:13
  28:16 29:2,14,14,16
  78:11 79:7 86:4,6
  89:7 91:4
construction-related
  28:22
contact 60:17 64:11
  77:5,19,20,23 79:12
contacted 64:5 67:14
  67:19 70:18 77:15
  77:17 78:11 97:19
context 31:12 92:10
CONTINUED 3:1
contract 15:9,14
contractor 11:3,8,14
  12:5,10 13:3 14:2,3
  14:9 17:23 18:12,24
  19:16 20:21 22:11
  23:1,12,17 24:9,11
  25:6 35:24 59:8,10
  59:22 60:2,10 76:15
  77:20 86:9,12
contractors 60:14
  77:5
contracts 15:23
conversation 34:7
  44:2 48:23 59:16
  60:5 61:3 62:17
  65:18,23 69:8 71:12
  76:23
conversations 35:23
  36:4 41:13 55:17
  64:8,17 68:6 74:8
  76:21 77:1 83:8
  90:19 91:12 94:24
Cook 1:22 105:8
  106:2
copies 15:23 16:4
  49:17 94:4
copy 15:12 17:3
  36:15 50:21 67:24

92:12 105:21
Corp 4:19 5:5 33:22
  43:21
corporation 1:11,12
  1:13 4:10
correct 24:5 27:13
  38:22,23 39:11 52:2
  56:11 57:21 58:9
  70:5 71:4 83:17,19
  83:20 85:10 86:15
  90:2 93:18 97:13
  102:9
CORRECTION
  103:1 104:1
corrections 102:12
cost 25:10
costs 25:7 70:11,11
  70:12 72:3,14,19
  91:2
couldn't 15:15
counsel 17:1 80:18
  105:23
County 1:22 105:3,8
  106:2
couple 55:3 57:17
court 1:1,20 4:2,21
  4:23,24 94:5
cover 70:7,9
covered 59:11 64:15
  72:19,21
crank 30:12 33:7
cranks 41:17
crates 88:15
credited 99:21
CRR 1:18 105:6
  106:6
CSR 1:17 105:6
  106:6
current 40:7
custom 44:19
CV 1:10 4:11 102:2

───────────
        D
───────────
damage 38:9 82:23
  83:5
date 34:19 38:18
  55:13 57:16,23,24
  67:20 103:5,23
  104:5,23

dated 107:16,19
dates 67:22
daughter 95:1
day 1:23 54:6 56:22
  58:1,2 76:21 102:19
  105:9 106:3
days 57:17,22
deal 86:5
dealing 82:17
dealt 14:1 65:3
decide 18:17 55:20
  86:16 98:7
decided 18:13 22:5
deciding 20:20 23:11
decision 12:8 22:15
  23:16 25:15 84:7
  85:3,5 98:5 99:4
decisions 91:14
defendant 97:1
  100:12
Defendants 1:14 3:17
  4:5,18 5:5
degree 8:12,15,16
Delaware 1:13
delivered 84:1
dental 8:9
dentist 8:22
depo 101:9
deponent 105:21
deposed 5:22 6:6
deposition 1:16 4:4
  5:18 6:2,9 92:24
  94:18,21 101:11,12
  102:5,9 103:4 104:4
  105:4,20 107:7
depositions 1:21
describe 15:22 17:21
described 37:3 53:24
  75:8 76:20
DESCRIPTION
  107:8
design 30:4 84:18
  86:20
designated 47:7
designed 86:22
Designer 23:19 24:24
  87:2
designs 23:5
details 36:7 67:4,5

determining 25:11
didn't 12:4 22:21
  23:2,15 24:7 25:2
  29:13,23 35:18 42:8
  46:6,7,13 48:7
  49:24 60:1 61:1,15
  64:4 65:17 66:12
  67:3,5,8 69:12,16
  70:23 72:7 75:24
  80:12,14,21 81:22
  87:9 88:21 95:13
  97:18 98:7
different 18:1 20:17
  22:19,20 23:5,7,19
  25:17 29:24 30:5
  34:24 85:2,7 87:7
  87:23
differently 84:21
  86:22
difficult 79:4 89:13
Dirsmith 86:4,6,7
disagree 87:5
discolored 63:19
discovered 38:8
  63:21 67:7
discuss 25:6 66:16
  69:16
discussed 24:11
  69:14
discussing 53:19
discussion 17:14 65:4
discussions 20:23
  23:5 54:1 82:22
  89:7 90:5
dispose 15:14
disrupting 79:7
District 1:1,2,20
DIVISION 1:3
DIXON 3:10
docket 94:5 107:20
document 37:18
  39:23 50:10 69:1
  77:13
documents 36:17,18
  36:19 37:9 50:8
  51:16
doesn't 38:13 58:16
  61:17 69:9 84:13
doing 13:1,18 14:6

21:3 68:9 76:10
**dollars** 98:17
**don't** 6:3,21 11:9
13:24 14:6,13 15:16
16:8 18:2 25:2
26:23 27:5,8,10
29:5 33:9,24 36:8
36:15,20,23 37:24
41:19 43:22,24
44:13,20 45:14,14
47:13 48:8 54:4
55:8,10 56:1,3,18
58:5 60:21 64:7
65:8,13,15 67:18,19
68:11,18 70:11,13
71:4 72:12,18 73:9
76:2 84:15 86:2
87:4 89:13 91:20
92:5,13 93:14 94:3
94:9,12,23,24 95:3
95:4 96:10,16 97:1
**door** 30:22 42:18
43:9,11,14 47:8,24
48:6,18 54:11,12,15
54:17,19,22 55:4,20
62:1,3 63:15 64:22
65:3,7,17 66:1 68:7
68:10 72:7 74:18
75:8 79:2,5 89:10
89:21 90:6,10,20,22
91:6
**doors** 1:13 4:19 5:5
20:14 22:14 24:19
29:19 30:2,3,7,17
30:18,20 33:22 36:5
37:2 39:24 43:21
45:7 47:6,10,15,18
48:8,11,20 53:23
55:2,18 58:7 61:7
62:15 63:24 64:19
75:9 76:10
**downstairs** 72:6
**Dr** 1:4 4:4,9 5:10,18
7:13 8:6 11:11
17:18 31:19 34:15
36:9 38:3 39:10
47:18 50:5,23 53:9
68:22 77:11 94:2
100:14 101:5

**drain** 48:15,17
**drains** 48:15
**Drive** 1:21 3:11 4:6
5:16 9:4,8 12:13
14:16 17:20 105:7
**duly** 5:7 105:10
**durability** 25:23
**duties** 93:7,8,11
**D-i-r-s-m-i-t-h** 86:4

**E**

**E** 1:4
**earlier** 29:21 34:22
70:18 75:20
**EASTERN** 1:3
**ECI** 5:24 93:22 97:12
**educational** 8:6
**EFIS** 14:11
**EHORN** 1:6
either 22:13 23:17
25:14 44:19 68:7
76:17,19
**elevation** 62:1
**Elevations** 107:10
**else's** 18:4
**ends** 101:10
**Enhanced** 97:10
98:12 99:3
**entering** 48:20
**entire** 32:23 45:12
50:11,12 57:1,8
59:4 62:12
**entity** 78:2
**Eric** 95:9,10
**errata** 102:13
**ESB** 97:12
**Estate** 18:2
**estimate** 79:15,16
**et** 4:10,10 102:1
103:3 104:3
**EUBANK** 1:4
**event** 41:1 56:8,13
74:4
**events** 69:9
**everybody** 74:4
89:15,17,19
**everyone's** 99:23
**exact** 44:20 53:21
61:11,16 67:20

89:14
**exactly** 35:6 60:12
79:18 84:19 89:14
**Examination** 5:8
107:5
**examined** 105:11
**examples** 19:23
**exception** 80:6
**excluding** 91:13
**Executive** 24:20
**exhausted** 53:16
**exhibit** 31:16,20
32:15,19 50:2,6,12
50:24 51:15,17,20
51:24 52:5 56:9
57:23 68:19,23 77:8
77:12 79:17 83:16
93:23 94:3 107:12
**exhibits** 52:5 107:7
**existence** 12:15 14:13
**existing** 14:17,23
**expand** 14:20
**expanded** 14:18
**expanding** 14:20
**expect** 96:12
**expense** 70:4,8
**expensive** 25:1,1 80:4
**experience** 30:6
**expert** 62:19 74:8
75:16 76:15,21,23
89:8
**experts** 73:24 76:24
77:2 89:18
**explained** 23:18,22
98:1
**exposed** 24:21 27:1
**exposure** 21:17 26:14
**expressed** 21:5 74:15
79:23
**expression** 100:19
**extend** 72:10
**extended** 10:16 66:7
66:18,23 67:2 71:12
**extent** 25:9 27:6,24
29:21 40:5,8
**exterior** 14:10 15:6
**extra** 91:2
**extremely** 79:4
**E-mail** 2:8,16 3:8,16

**F**

**face** 73:19 90:9
**faces** 56:20
**facilities** 33:19
**facing** 31:3
**fact** 27:2 40:1 63:14
81:5 99:22
**factor** 25:11
**faded** 15:18
**FAEGRE** 3:2
**Fair** 7:12
**fall** 12:23
**false** 94:19
**familiar** 77:15
**family** 86:10
**far** 11:15 14:1 19:16
21:10 22:2 25:13
30:18 40:12 46:2
50:17 76:20 77:4,18
82:2,21 83:1 88:22
94:10 98:24
**Fargo** 3:3
**Farnsworth** 9:20
**farther** 72:10
**features** 19:10 23:19
**Federal** 1:18 94:5
**feel** 81:22
**fell** 33:1,7
**field** 92:15
**figure** 17:2
**figured** 20:21
**file** 17:3 96:12
**filed** 38:4 67:16,18,20
68:4 92:12 95:17
96:3
**files** 16:24
**fills** 48:14
**final** 37:14
**finally** 7:6
**find** 35:21 52:19 59:8
60:9,11 61:21 63:12
**finding** 64:18
**fine** 19:14 20:9 29:14
64:9
**finger** 57:9 61:18
**finish** 7:6,10 100:17
**finished** 100:20
**finishing** 70:11,12

**Fiore** 77:14,20,22,23
78:15,22 79:13
82:23 83:8,15 88:3
89:2 90:5,19
**firm** 4:15
**first** 5:7 6:13 8:16
30:6,9,15,24 32:18
32:22 34:15,18,24
38:14,18 39:14 40:9
42:15,24 45:17 46:9
52:7 78:3 79:12
93:17 105:10
**fishing** 67:10
**fit** 20:22 69:9
**fix** 44:4
**fixed** 41:20 47:13
48:9 71:22
**Flannary** 27:4,11,19
**floor** 10:23 14:21
**focused** 21:2
**folder** 16:17
**folks** 31:24
**follow** 6:9 29:11 93:6
**follows** 5:7
**forcing** 49:8
**foregoing** 102:5
105:4,14
**Forest** 5:17 9:5 18:2
78:20
**form** 37:12,23 95:20
96:17
**forwarded** 71:10
**found** 34:1 43:6
61:11 63:9 65:18
**foundation** 14:18
**four** 8:8 30:14 34:11
85:19
**Fox** 28:8
**frame** 32:23 33:2
35:3 37:7 42:3
45:12 48:4 49:6
57:1,9 62:2,7
**free** 25:19
**Freed** 2:10 4:14 8:1
64:6,12 71:10 94:16
95:5,9
**frequently** 56:19
**front** 48:18
**fulfilling** 93:1

**full** 16:17
**functioning** 33:12
**further** 64:17 65:7
71:11 80:3 81:2
101:6
**future** 72:21
**F-a-r-n-s** 9:20

**G**

**garage** 83:23 84:15
**gasket** 55:4,14 63:18
64:22 65:17 68:7,10
68:17
**generally** 28:19
**gentleman** 69:5
**George** 2:15 4:14
**george@freedweis...**
2:16
**getting** 63:16
**give** 6:12,18 10:13
14:15 16:13 37:18
60:13 79:15
**given** 18:21 37:15
49:17 83:15 102:5
102:10
**glass** 20:17 41:19
42:22 44:13 47:16
47:23 48:2 55:21
72:2
**Glendon** 13:9
**Glickson** 7:22
**go** 9:13 17:9 18:13
19:20 20:6,10 25:6
32:11 76:18 85:3
88:21 95:21
**goes** 56:20
**going** 7:8 26:10 28:14
28:23 31:19 37:11
60:13 61:12 65:5
67:9 71:21,22,23
72:4,8 76:3 77:11
80:6,19,20 88:5
94:2 95:19 96:15
**good** 5:10,11 26:14
29:19 88:8 100:15
**gosh** 100:20
**gotten** 88:11
**Grade** 8:7
**graduated** 8:7

**Graffeo** 13:22 78:12
**grandchildren** 85:15
**great** 25:9
**Greg** 1:17 4:24 105:5
106:6
**group** 73:24 107:12
**guess** 41:11 57:2
95:24
**gun** 49:6
**G-l-i-c-k-s-o-n** 7:23
**G-r-a-f-f-e-o** 13:23

**H**

**HADJIPPETKOV**
1:6
**hadn't** 69:21 74:18
**hallway** 52:7
**handing** 50:5
**handle** 47:11
**hands** 57:7
**happen** 80:10,19
86:10
**happened** 30:13 31:6
33:10 34:21 35:5
37:4,7,10 53:22
55:7 80:8,11 83:21
96:8
**happening** 40:13
72:12
**happy** 87:21
**hard** 79:6
**HARROLD** 3:10
**hasn't** 83:21 84:17
**haven't** 14:13 29:7
36:17 39:22 78:15
79:3,8 84:14 88:15
89:11
**head** 6:15
**heard** 25:14 60:14
68:13 78:18
**held** 17:14
**hereinabove** 105:18
**he's** 27:24 66:3 78:19
82:17 86:11
**Hides** 27:21
**high** 8:7
**history** 8:6,21
**hole** 56:22 61:20 62:2
79:10

**holes** 90:16
**Holub** 28:10
**home** 9:5,17,19 10:7
11:13 12:12 16:11
24:15 40:22 44:10
47:18 49:23 54:6
56:24,24 72:13,22
73:4 76:22 77:3,6
78:8,9 89:4
**homeowner** 80:22
**hope** 73:17
**house** 10:15 12:15
14:19,23,24 16:2
19:11 20:16 22:4
24:22 31:23 38:10
42:6 55:13 61:11
62:12 63:24 64:3,4
66:3 71:19 72:11,24
73:1 74:1,5 75:22
76:9,10 80:5 81:23
82:8,18,20 85:6,10
86:20 87:19 88:10
93:2
**huge** 11:10 73:6
**huh-uh** 6:14
**husband** 13:10
**husband's** 13:11
**H-o-l-u-b** 28:10

**I**

**idea** 21:3 72:3
**identification** 31:17
50:3 51:21 68:20
77:9 93:24
**identified** 27:7 32:16
65:22 69:6
**identify** 4:12,22
32:14 50:10 52:4
69:1 77:13
**Illinois** 1:2,22 2:13
3:13 4:6 5:1,17
33:23 105:1,8 106:2
**illustrating** 22:19
**immediately** 57:13
**impact** 73:3
**inappropriate** 66:16
**incident** 37:10 54:13
**include** 51:15
**includes** 16:20 83:18

**including** 74:18 91:2
**inclusive** 102:7
**incorrect** 39:24 40:11
**incurred** 91:3
**independent** 91:14
**INDEX** 107:1
**indicate** 39:20
**indicated** 4:7 56:12
  69:7 70:15,18
**indication** 72:8
**individual** 13:6 17:2
  44:9 65:16 68:7
  71:18 91:16 98:12
**individually** 1:7
**inept** 49:8
**infiltration** 81:3 82:3
  89:16
**infiltration/penetr...**
  38:19,20
**inform** 80:18
**information** 12:2
  16:3 17:4 67:11
**initial** 40:23 41:12
  85:22
**initiative** 91:13
**inside** 24:22 46:22,23
  47:15 62:4 63:17
  79:11 82:15
**inspect** 42:5 46:14
  61:7 74:1 81:24
  83:3
**inspected** 77:2
**inspection** 32:1 46:12
  61:23 62:6,10 63:5
  63:9 64:23 74:9,10
  76:22 77:4 89:20
**install** 88:3
**installation** 14:4
  28:15 70:10
**installed** 14:7 15:3
  29:18,19 41:10 72:2
  79:5 85:12 87:13,19
**instructions** 29:24
**intends** 88:3
**interacted** 13:8
**interaction** 40:24
  95:13
**interested** 13:18
  105:22

**interior** 24:19
**internal** 36:24
**internet** 97:21
**interrogated** 70:22
**interrogating** 66:14
**interrogatories** 25:21
  40:8 105:11
**interrogatory** 34:17
  37:5 38:17,24 39:9
**invoice** 51:5
**invoices** 16:4,20
  50:15 107:14
**involved** 11:11 23:4
**involves** 71:20
**Iowa** 1:11
**isolated** 42:9
**issue** 28:23 30:20
  31:4,6 42:13 43:3
  72:23 82:9 89:14
  91:5
**issues** 28:13 29:11
  30:6 47:6 66:11
  75:8 87:14,18
**it's** 16:14,18,22 30:12
  37:19,23 51:12 58:6
  59:19 62:23 68:12
  71:4,5 72:20 73:6,7
  73:11,19 77:20
  81:23 87:1 89:14,24
  90:11 92:14
**I'd** 6:21 17:18 51:14
  62:22 73:10
**I'll** 5:12 6:8,11,13 7:9
  7:9 31:22 40:14
  43:11 63:6 82:9
  87:1 94:4
**I'm** 4:3,24 5:13 7:8
  14:7 24:10 26:19
  27:16 31:4,19 35:2
  36:21,22 37:11 50:5
  57:13 58:5,6 63:1
  64:1 68:22 71:5,18
  71:21,22,23 72:10
  72:21 76:1 77:11,15
  78:12 80:22 87:5,6
  89:22 92:24 93:1
  94:2 95:19,23 96:15
  100:15
**I've** 8:22 27:1 36:15

36:19 49:16 76:4,6
  90:15 93:5 95:6
  100:3

**J**

**J** 2:2,7
**Jamie** 7:22,24,24
  9:22
**jmandler@faegre....**
  3:8
**job** 8:21 11:4,10 49:8
**jobs** 88:5
**John** 3:7,15 4:18 5:4
  5:13 17:7 27:12
**joined** 5:4
**jumping** 87:17
**June** 1:24 4:7 102:6
  103:5 104:5 105:9
  106:3 107:2

**K**

**K** 2:15 105:3
**keep** 35:19
**KENT** 1:4
**kept** 13:10 59:17
**Kevin** 27:4,11,19
**keys** 30:21
**kin** 105:23
**kind** 10:21 26:10
  28:17 43:5 47:19
  49:7 59:11 85:11
  90:15 91:9 97:20
**knew** 70:19,21,21
**know** 7:4,8 10:21
  13:21 14:3,5,6,9
  16:8 18:2,21 20:14
  20:19 21:1 23:2,15
  24:6,10,13 26:8,8
  26:11 27:5,8,10,21
  28:1 29:15 30:18
  33:15,17,19,21,24
  34:4,20 35:7,17
  36:15,23 37:13 39:3
  41:19 43:20,23
  45:11,14,16,21 46:2
  47:22 48:5 50:21
  55:9,10 56:1 58:1
  60:10,11,20 62:21
  65:2,8 66:6 67:18

67:19 68:14 70:11
  70:14 71:4,8 72:18
  72:23 73:9 76:2
  77:16 79:1 83:2
  84:12,14,15 86:10
  88:2 89:13,20 90:11
  91:24 92:2,11 93:14
  93:15 95:5,6,7,10
  95:11,12 96:16
  97:15,18 99:2,12,15
  99:21 100:21
**knowing** 96:13
**knowledge** 27:8,9
  28:1,1 34:12 95:18
  96:3 97:18
**knows** 27:17

**L**

**labeled** 47:11 107:12
  107:14,17
**labor** 79:18 83:19
**lack** 32:7 36:10 85:14
**Lake** 5:17 9:5 18:2
  78:20
**Lang** 2:15 4:14,14
  17:5,9 27:12 62:23
  63:2 64:7 96:19
**large** 20:15
**larger** 14:19
**late** 34:13
**lawyer** 96:20 97:1,2
**lawyers** 96:22 99:12
**lead** 13:7
**leak** 48:9
**leakage** 38:20 62:8
  63:15 80:3,13
**leaking** 43:9 49:10
  54:21 55:21 62:4
  68:13 74:20 75:12
  91:6
**leaks** 38:9
**leave** 49:24
**leaving** 22:23
**left** 16:23 54:21 68:13
  88:6
**length** 36:1,6
**Leonard** 1:4,17 4:4,9
  5:6,16 102:15 103:4
  104:4 105:5 107:3

letter 70:6 105:21
  107:16,19
let's 51:14 52:23
  83:12 96:4,20 97:2
level 47:19
License 106:6
likewise 69:21
limit 96:4
limited 28:19 29:22
line 23:11 24:14,20
  26:8 103:7 104:7
lines 23:8,10
list 62:23
listed 27:24 72:15
literally 59:18 61:20
  79:10
litigation 6:6 67:12
  72:16 73:8,18 90:24
  93:13 98:19 99:24
  100:9,12
little 10:16 16:24
  63:5 64:3 72:10
live 29:5
living 9:4,8
LLC 2:2,10
LLP 3:2,10
local 11:20
location 9:18 23:18
locking 30:22 31:5
locks 30:20 31:10,11
long 6:2 7:3 38:1
  87:17
longer 29:5 60:18
longevity 25:22
look 17:24 20:9 24:7
  36:10 38:4 39:15
  48:7 55:19 56:24
  57:18 58:13 65:9
  67:21 74:1 77:17
  79:15 85:6 86:23,23
looked 18:1,4,6 20:17
  25:16 30:3 33:19
  35:20 36:19 56:22
  57:1 59:3 61:14
  62:2 66:13 74:14,19
  75:11 90:7
looking 13:17 15:18
  18:7 21:11,21 24:1
  26:9 45:1 61:10,14

62:14 64:1 75:1
  86:22 89:22
looks 51:1,8 68:12
  72:24
loss 73:19 98:12
lot 7:8 15:15,17,19
  20:17 65:10 91:22
loud 6:14
Louis 2:5
low 19:11
lower 48:10 51:7
lowest 47:19
low-maintenance
  21:18
LUBO 1:5

**M**

mad 59:12
Madison 8:8,13
maiden 13:10
mail 100:5
main 21:1 38:10
  48:16 71:17 81:19
maintenance 19:10
  19:11 21:2,6 22:6
  25:18 46:11
MAIRA 1:5
major 12:16 85:5
majority 24:17
making 12:7 40:23
  65:23 75:20 82:5
  100:14
Mandler 3:7 4:18,18
  5:3,9,13 17:1,8,10
  17:17 27:16,20
  31:18 38:2 39:1,5,8
  39:18 50:4 51:13,22
  52:23 53:8 63:1,3
  64:10 68:21 77:10
  94:1 96:4,11,20,23
  97:2,8 100:14,21
  101:5 107:5
manufactured 82:6
  85:1
mark 28:8 51:17
marked 31:16,20
  50:2,6 51:20 68:19
  68:23 77:8,12 93:23
  94:3

Market 2:3
married 7:13,15
Martin 77:22
mass 89:20
match 37:4 82:8
  84:10 86:17 87:11
  90:13
matched 88:24
matching 90:11
materials 22:13,15
  22:22 51:24 88:11
matter 5:21 66:16
matters 5:22
MCI 93:21 94:6,13
  95:15
mean 11:1 16:15,16
  18:17 23:7,9 26:21
  33:2 36:13 37:24
  38:1 40:6 51:5
  70:19 72:11 76:4,9
  89:17 96:8
measurements 82:5
mechanism 30:22
  32:24 34:9 41:20
  42:21 57:6
mechanisms 31:6
meet 20:1
meeting 22:9
meets 48:2
member 100:3,6
members 92:20 93:13
  99:8
Menards 84:3
mention 46:8 69:12
mentioned 18:24
  19:19 31:2 39:12
  66:1,9,23 84:6 91:4
  97:10
message 88:6
met 5:12 20:4 95:6
Michael 95:5
mid 59:13 64:16,23
middle 56:23 61:18
  63:23
Mike 62:24
mimeopaper 15:17
mind 13:1
mine 86:11
minimal 99:21

Minneapolis 3:5
Minnesota 3:5
minute 43:11
Missouri 2:5
misunderstood 40:6
moisture 38:19
moldings 71:22
moment 89:5
money 99:8
morning 5:10,11 26:3
  88:6
move 9:21 53:9,15
  83:12
moved 29:10
multifloor 14:23
multiple 94:4

**N**

name 4:23 5:14 7:17
  11:9 13:11,11 14:13
  26:12,14 27:2,10,14
  27:19 59:9 60:20,24
  62:21 69:4 77:22
  78:7 103:3 104:3
named 92:17
names 11:7 17:23
  60:13
NANCY 1:6
necessarily 73:9
need 20:21 22:21
  23:13 59:5 75:21
  79:1 88:8 89:8
  90:16,23 95:22
needed 11:15 19:7
  20:14,15,19 23:3
  29:11 34:10 44:4
  58:12 60:12 88:23
needs 69:22,23 76:13
negative 73:3
never 19:13 28:17
  42:8 47:1 48:16
  56:4 60:14 66:8,9
  66:22,23 68:13
  76:17 87:10 95:6
  97:21
new 12:18 15:3,5,6,8
  35:12 41:4 59:6
  64:3 66:7 71:22
  88:3

nice 77:16
Nick 3:20 4:1
nod 6:15
nonopening 57:8
North 86:12
Northbrook 9:16,19
  10:1,7 11:13 12:8
  18:6 19:19,20 20:7
  20:13 22:1 36:6
  78:8 87:19
NORTHERN 1:2
Northwestern 8:9,10
  8:15,16
Notary 1:18 102:21
  105:6,14 106:2
noted 38:18
notes 89:23 100:16
notice 26:21
noticed 30:9 33:8,11
  47:8,14 97:16
number 4:11 29:19
  31:20 32:10,15,17
  32:22 33:16,20,24
  34:17 37:2 38:17
  39:16 42:17,18,20
  45:2 50:24 52:8,13
  52:18,19 53:22
  54:21 55:9 56:23
  57:3 58:4,6,6 60:8
  60:16,19,22 61:13
  61:15,16 62:1 63:16
  63:22 64:22 65:3,7
  65:9 68:23 74:18
  75:10 79:2 83:16
  85:22 86:1 89:10
  94:3 97:20 100:3
  102:13 107:8
numbered 32:7 51:6
numbers 32:8 33:17
  107:10

—————— O ——————

O 105:3,3
oath 102:8
object 37:11 95:19
  96:15
objection 37:23,24
objections 96:5
observe 39:12 56:16

93:5
observed 39:15 40:9
  42:24 48:20
observing 32:21
obviously 13:11
  26:11 69:12 70:12
  82:11 88:9 93:1
occasion 33:10
occasionally 49:19
occurred 64:22
October 107:16
odd 66:3 70:20
odds 76:3
offered 23:6
offering 67:2
office 6:1 94:22
official 106:1
off-the-record 17:13
Oh 51:8 78:10
okay 6:16,17,20,24
  7:13 9:24 10:5 11:3
  11:17 12:12 15:3
  19:15 21:5,9,18
  23:14 27:21 31:1,21
  32:6,13,18,21 33:15
  34:2 38:12 39:6
  40:15 41:8 42:13
  43:12,16,17 45:3
  46:22 47:22 48:5,19
  50:7,20 51:14,18,19
  51:23 52:12,20
  53:23 54:14 55:15
  56:8 57:20 58:3,18
  59:15 60:4 61:2,21
  63:7,20 64:9,9,24
  67:3 68:24 70:6
  71:11 74:7,13 75:4
  75:13 82:10 83:6,12
  83:24 90:4 97:7
  100:18
once 20:8 46:23
ones 23:13 24:8,11
  35:12 36:13,14
  58:14 75:1 84:20
  90:13
open 33:9 41:17
  47:13 48:8 57:3
  58:16 61:15,17 88:9
opened 18:9 33:11

58:15 84:14
opening 42:21 61:13
opens 32:24 33:3
  47:10,12 54:20
operator 4:3
opinion 49:8 74:16
  79:23
opportunity 36:9
oral 105:11
order 37:14 60:12
  84:4
ordered 41:4,9 50:17
  87:12
original 39:22,23
  51:2,10,16 52:2
  67:24
outcome 99:2
outside 46:22,24
  48:11 49:24 54:5,7
  55:24 59:22 75:10
  79:11 82:4,13,18
  86:23 89:8
out-of-warranty 60:2
overly 37:24
owner 86:7
o'clock 1:23 105:9

—————— P ——————

P 3:7
page 3:20 4:1 32:18
  51:9 103:1,7 104:1
  104:7 107:4,8
pages 15:19 51:6
  102:7 107:11,19,21
paid 16:1 42:22
  50:19 70:14 84:1,4
  99:18
paint 19:13 62:7
painted 11:2 22:21
painter 70:14
painters 29:15
painting 70:13 71:24
paper 92:13
paperwork 12:3
  15:16 27:14 35:18
  49:14,16,24 88:14
  88:19 91:22 98:18
Paragraph 34:16
  38:7

part 33:3,3 41:17
  47:12 48:2,3 49:5
  52:9 58:15 61:17
  74:7 82:11 83:7
  98:5
participate 94:10
participated 94:21
particular 28:13
  36:20,21 41:1 54:10
  54:11,12 66:24
  74:24 75:2,5 82:21
parties 105:24
parts 45:14
passing 98:2
patience 101:7
patient 86:11
patio 48:10
Paul 8:3
pay 99:7
payment 71:1,6,7
peculiar 66:6
Pella 1:11,12 4:10,19
  4:19 5:5,5,13 9:9,9
  9:17 10:17,21 11:12
  11:14,17,21,24 12:1
  12:6,8 16:3 17:22
  18:5,10,10,15,17
  19:2,17 20:13 22:9
  22:14,14 23:5 24:10
  25:14,14 26:5,5,12
  26:21 29:17,19 30:7
  30:10,15,19,23 31:4
  31:12 33:14,21,22
  36:1,5,7,12,14,16
  36:17,24 39:22,24
  40:16 41:1 42:8,11
  42:14 43:8,13,19,21
  43:21 44:23 45:5,6
  45:17 46:4 48:21,24
  49:15,18 50:16,19
  53:19 55:12,17 58:3
  58:7 59:7,21,24
  60:3,19,23 61:1,4
  64:18,19 65:1,16
  67:1,9 68:15 69:14
  71:12 72:8 73:23
  76:5,16,17 79:22,24
  80:15 81:7,17 82:6
  84:7,11 85:4,5

86:13 87:11,18
88:12 90:1 92:12
93:3 102:1 103:3
104:3
**Pella's** 21:24 45:6
71:7 87:1
**Pella-approved**
59:10 60:14
**pending** 7:3 89:1
97:4
**people** 13:9,15 18:11
26:5 44:23 62:11,11
65:20 89:20 92:3
98:3
**people's** 97:24
**performance** 87:21
**periodically** 33:18
**permanent** 72:2
**permission** 81:23
**permit** 12:20
**person** 26:5 27:7,24
40:15 57:18
**personally** 19:20
41:12 43:18 67:10
68:12 75:17
**personnel** 45:7
**pertaining** 1:20
**phone** 60:16,19,22
94:20 98:1,2 99:20
**photos** 89:21
**phrased** 37:19
**pick** 25:3 87:10
**picked** 25:3 87:7
**piece** 55:23 56:1
**place** 12:21 20:22
80:15 95:4 102:6
105:17
**placed** 49:5 84:4
**placing** 83:11
**plaintiff** 4:17 38:8
73:12 92:1 93:7,9
93:16 96:21 97:3
100:9
**plaintiffs** 1:9 2:17
4:15 92:17
**planned** 28:16
**plans** 16:6 17:3,7
89:6
**plastic** 16:23

**playroom** 85:15,16
86:14 87:2,8,15
88:18
**pleadings** 27:6 37:13
37:16,22
**please** 4:12,21 5:15
17:8 102:11
**plenty** 89:21
**PL-SALT00000002**
107:17
**PL-SALT00000004**
107:13
**PL-SALT00000014**
107:15
**point** 26:1 33:6 46:7
67:13,17 69:17 70:4
70:14,22 72:13 76:5
79:8 81:15 89:12
98:20
**pointed** 62:6,18
74:17
**pointing** 75:7
**poked** 57:9
**pool** 47:20
**pops** 27:14
**portion** 14:24
**possession** 52:1
**possibility** 76:1
**possible** 19:12 81:2
81:21 88:6
**possibly** 31:8 44:18
80:23
**postgraduate** 8:10
**post-grad** 8:18
**potential** 73:3,11
92:20 93:12
**practice** 8:23
**practicing** 8:22
**preceded** 31:1
**prelude** 37:20
**present** 2:1 3:1,19
39:21 78:9,23
102:16
**presumably** 60:10
**prevent** 80:3 81:2
**previous** 58:14 70:7
**previously** 70:1
**price** 23:22 25:3
79:19 83:18

**primarily** 9:6
**principals** 29:2
**prior** 9:4,8 26:17
33:8 35:24 40:13
69:8 73:23 74:9
**probably** 6:3 7:8
9:15 12:2 20:8
30:13 49:12 57:17
68:3 85:19 88:14
91:21
**problem** 28:17 32:22
34:18,23 39:21 40:7
40:9 41:15 42:9,13
42:15,16,19 43:6,9
52:20,22 53:10
56:16 58:15 59:18
61:11,14,16 62:7,8
62:8,16 63:9,11,15
65:18 66:24 67:1,7
72:5,20 73:11 74:16
79:24 81:6 85:22
86:1 89:16 90:2,8
90:14
**problems** 28:22 30:7
33:8 35:8 43:1
45:24 47:2 61:22
63:8,13 66:2,8,10
69:11,11 71:13
72:21 80:24 82:19
**Procedure** 1:19
**process** 45:18 83:10
**produced** 36:12
**product** 12:11 26:15
27:3
**products** 9:9 26:6,7
**professional** 8:21
**program** 66:7
**progress** 100:15
**project** 13:1,4 17:22
18:16 29:9 83:7
86:3
**Proline** 23:19 24:17
24:18,23 84:11,16
**properly** 30:23
**property** 12:15,17,24
13:17 107:9
**proposition** 80:4
**prospect** 64:1 76:10
**protect** 80:23 81:21

**provided** 20:16 50:8
**Public** 1:18 102:21
105:6,14 106:2
**pull** 57:6 90:9
**purchase** 11:18,21,22
11:24 12:12 19:17
22:16 35:24 51:2,10
51:16 52:2
**purchased** 9:5,9
12:14,24 16:1,3
26:18 44:22 79:20
83:22 84:3 88:13,17
**purporting** 92:2
**pursuant** 1:18
**pursue** 91:14
**pursued** 79:8 89:11
**pushed** 61:18
**put** 9:17 10:8,15,17
15:6 16:19 24:14
30:8 31:23 59:6
71:23 74:17 79:4
86:13 97:22 99:22
**puts** 10:10
**putting** 23:23 97:24
**p.m** 101:13

## Q

**quality** 11:16 12:11
24:1 25:22 26:7
27:2
**quantity** 20:22 23:2
**question** 6:20,22 7:3
7:10 28:19 37:8,12
37:14,18,20,24
39:14,15 41:11
65:11 95:20,24 96:6
96:17 97:4,5
**questions** 6:11 7:7
29:21 66:15 101:6
105:12,16
**quick** 100:16
**quickly** 81:2
**quote** 25:22

## R

**rag** 46:21
**rained** 48:1
**raised** 15:1 56:21
**read** 32:9 51:12

101:9 102:4
**real** 56:19
**really** 23:1 29:13
  37:6,13,20 46:19
  56:20 58:13 59:12
  60:6 62:14 69:9
  74:19 84:13,14
  89:13 96:7
**reason** 6:17 22:4 32:3
  36:24 66:12 71:17
  72:12 87:6
**rebuild** 64:4
**recall** 11:3,6 13:19
  14:13 17:24 19:4,16
  20:8 21:13,20 22:10
  23:4 25:12 26:16,19
  27:18 32:21 34:6
  35:23 36:4,20 40:15
  42:14,22,24 44:1,13
  44:16 46:3 47:5
  48:22 49:11 53:18
  54:24 55:16 56:6
  57:11 58:10,24
  59:16 60:5 61:3
  64:20 65:6,13 66:17
  66:20 68:18 75:14
  81:4,18 83:7 86:2
  87:4 88:20 90:4,18
  91:20,21,23 94:23
  95:16 96:10 100:1
  100:10
**receipts** 49:18
**receive** 11:23 22:13
  29:23 99:19
**received** 35:10,13,14
  68:14 75:15 99:13
  99:15
**recess** 53:4 101:1
**recognize** 69:4
**recollect** 22:2 24:16
  34:12
**recollection** 10:6
  26:23 28:12,21 37:9
  39:4 55:22 94:7,17
**recommend** 46:6
**recommendation**
  19:1,5,17
**recommended** 11:14
  12:11 18:12 19:6,8

24:8 42:7 81:20
**recommending** 12:5
**record** 4:13 5:15 17:9
  17:11,15 27:12
  36:18 40:1 53:3,7
  56:3 69:13 100:22
  101:4,11 105:15
**records** 15:19 16:15
  36:11 37:1 70:18
**recover** 72:16 73:5,7
  73:17,20 90:24
**recovered** 72:18
**recur** 76:4
**refer** 32:3,4,10
**reference** 25:20 37:6
  37:16 74:23
**referred** 105:18
**reflected** 79:16 83:16
**refresh** 6:9 94:7
**refund** 69:16
**refunding** 69:15
**regarding** 30:2 36:11
  37:22 91:18 95:14
  98:19
**reimbursed** 66:8
**reintroduce** 5:12
**relate** 51:1,9,16,24
  52:1
**related** 11:21 29:13
  41:1 54:12
**relates** 28:14 37:2
  49:14 55:17 56:13
  93:8
**relating** 11:18,24
  16:16 47:6 53:19
  75:9 83:9 88:12
  92:6
**relative** 25:7
**relayed** 41:6
**relied** 12:7 25:22
**relocated** 33:18
**remained** 14:24 15:2
**remember** 6:3 9:16
  11:9 13:24 20:4,12
  21:10,23 22:2 25:2
  35:6 44:11,20 47:17
  53:16 60:7 65:15
  67:22 68:5 92:5,9
  92:13 94:9,12,24

95:3,4
**remodel** 9:24 10:14
  11:12 12:9,16,20,21
  13:3,14,18 14:16
  15:4 16:7,16 17:19
  18:15 35:14 51:3
  86:13
**remodeled** 10:6
  14:24
**remodeling** 9:16 10:3
  28:14,23 29:3,18
  85:8,9
**removed** 59:5 72:3
  83:3
**rep** 46:4
**repair** 77:6
**repairs** 60:2
**rephrase** 6:22 37:17
**replace** 30:16 44:5
  45:9 59:10 60:11
  64:21 67:9 70:16
  71:19 72:6 73:1
  76:6 78:23 84:7
  85:4 89:13 90:16
  93:4
**replaced** 30:15 35:7
  40:1 41:4,17,18,19
  42:4,22 44:13 45:3
  45:5,13,15,19 46:5
  52:9 54:17 55:14,23
  56:1 59:18,21 63:18
  68:10 69:17,19,21
  69:22,23 70:1 75:21
  75:24 76:2,4 80:7
  90:23
**replacement** 35:12
  45:12 46:10 53:20
  55:4 69:15 70:7,10
  79:1 82:6 83:12
  89:2
**replacing** 64:2 71:18
  71:20 77:18 79:3
  81:15 90:12 91:7
**report** 82:19
**reporter** 4:21,23,24
**Reporting** 4:2
**represent** 31:22 87:1
  92:3 94:4 98:10
**representation** 37:22

**representations**
  11:23 12:4 25:13
  29:22 30:2 88:12,19
**representative** 61:4
  91:19 92:23 93:3,18
  93:20 95:2 97:9,23
  98:6,14,23 99:9,18
  100:2
**representatives**
  22:10 36:5 73:23
**represented** 94:15
**representing** 5:13
  93:12 96:21 97:1
**request** 57:16,24
**requested** 93:15
  97:21
**requesting** 65:7
**required** 22:5
**resale** 72:22 73:4
**residence** 9:21 10:1
  36:11
**residences** 10:3
**resolved** 91:10 99:5,6
**responsibilities** 92:23
  93:11
**rest** 42:5 46:16 61:7
  72:11 81:24 86:20
**results** 58:20
**retailer** 11:21 12:1
**retained** 98:19
**review** 6:8 39:9 50:23
  99:10 100:16
**reviewed** 36:17 69:8
  69:12
**re-ask** 6:22
**Richard** 2:2,7 4:16
**rich@richardjbur...**
  2:8
**Rick** 27:21
**right** 7:1,5 8:12 12:18
  18:21 19:3 25:24
  27:18 32:2,14,20
  33:5 35:16 36:14
  37:19 38:11 47:5,21
  48:10,15,17 51:7
  52:17,23 53:14 55:8
  56:9 57:9 63:4 68:2
  70:1,3 71:9 73:21
  74:6 76:8 78:13

79:1,9 82:16 84:4,9
89:24 91:5,9 97:12
**RIVA** 1:5
**RMR** 1:18 105:6
106:6
**Roberts** 3:15 5:4
**roberts@wildman....**
3:16
**role** 91:18 93:14
98:13,22
**roll** 16:18
**roof** 15:1
**room** 85:11
**rot** 38:9,21 40:12
81:8
**rotted** 30:12 32:24
33:7,12 34:8 42:20
57:5,7
**rotting** 44:4 57:1
58:12,17 61:17
63:22 72:23 74:15
74:22 82:2
**roughly** 10:12
**rules** 1:19 6:9,13
**running** 47:15 48:2,4

**S**

**S** 1:17 105:5 106:6
**sales** 23:18
**salesman** 20:2
**salesperson** 20:24
21:5,10,14,21,24
**Saltzman** 1:4,17 4:5
4:10 5:6,10,16,18
7:13 8:6 11:11
17:18 20:10 31:16
31:19,20 34:15 36:9
38:3 39:10 47:18
50:2,5,6,23,23
51:20 53:9 68:19,22
77:8,11 93:21,23
94:2,6 95:14 99:3
100:14 101:5 102:1
102:15 103:3,4
104:3,4 105:5 107:3
107:9,9,12,14,16,19
107:20
**SALT14** 52:5
**SALT15** 52:14,15

**SALT16** 52:17,18
56:10
**SALT4** 50:24
**sash** 33:3 41:17,19
44:14,14 45:12
52:10 57:2,10 58:17
76:6
**sashes** 69:15 70:10
**save** 49:14
**saw** 26:20 32:22
36:20,21 38:11
61:24 100:19
**saying** 19:16 40:16
66:21 81:18
**says** 38:8,24 39:2,2,7
39:7,23 52:9 57:16
57:24 69:7,14 70:15
**scared** 64:3
**scheduled** 40:18
41:15 44:7 48:24
55:6 58:19 89:3,5
**schematic** 31:23
107:9
**school** 8:7,7,9
**scope** 10:13 14:15
**screen** 4:8
**seal** 49:9 106:1
**second** 46:5
**section** 56:23 58:16
**security** 100:4
**see** 14:6 26:20 35:20
39:19 48:1 67:6,21
72:7,12 73:11 80:17
82:12 83:4
**seeing** 20:12 26:16
**seek** 73:5,7
**seeking** 72:15 90:24
**seen** 14:13 26:11 29:7
36:15,22 39:22 58:1
79:24 81:5,7
**select** 13:13 87:9
**selected** 17:21
**selection** 11:12 17:19
18:10,14 24:4 86:8
**sell** 73:1
**send** 93:3
**sense** 10:13 14:15
16:13 24:23 26:9
27:1,17 35:2

**sent** 36:16 57:18
**separate** 16:22 43:14
43:15 51:17 52:20
52:22 92:13 93:10
93:14
**September** 55:7
73:22
**series** 6:11 23:20,20
24:24,24,24 25:7
83:13 87:3,4
**serious** 63:24
**serve** 91:24
**served** 39:10 40:9
97:9 100:1
**service** 31:10,11
33:16,17,24 36:11
36:18 37:2,3 39:23
40:17,18,24 41:1,15
43:19 44:7,8 45:6,7
45:17 46:4,17 48:24
49:15 50:22 51:5
52:15 53:24 54:13
55:1,9,12,15,18
56:13 57:12,18 58:4
58:19,20,22 61:4
64:14,21 65:7,10,16
68:6,7,10,17 69:9
70:16 97:11 98:13
99:3
**serviceman** 41:3 65:2
65:21,24 68:9
**Services** 4:2
**set** 16:6 53:11,17
**sets** 89:2
**settlement** 71:7 99:7
99:10
**seven** 6:3
**Seventh** 3:4
**sewer** 48:16
**shade** 56:21
**shades** 56:19
**sheet** 56:12 94:5
**sheets** 102:13
**shelves** 72:2
**she's** 9:22
**Shore** 86:12
**short** 53:4 101:1
**shorthand** 105:12
**shortly** 31:24 64:13

**show** 31:19 32:14
37:1 67:24 77:11
94:2
**showed** 62:20
**showing** 68:22
**shown** 19:23
**showroom** 88:22
**shut** 57:7
**side** 54:21
**sign** 92:8
**signature** 96:9
103:24 104:24
105:19 106:1
**signed** 91:20 92:13
92:14 102:14
**signing** 96:10
**silicone** 80:17
**similarly** 1:8
**simple** 83:10
**simply** 45:11
**single** 15:1,2 80:1,5
90:12
**sit** 24:13 90:15
**sits** 48:17
**situated** 1:8
**situation** 48:11
**six** 6:3 30:14 34:11
**size** 11:15 12:6 87:10
90:11
**sizes** 19:7 23:2
**small** 16:23 32:9
**smeary** 49:8
**smoothly** 28:24
**sold** 18:3
**Solender** 62:24 63:2
**somebody** 13:6 20:1
40:19 75:23 77:2
78:11 93:12 96:12
**son-in-law** 8:3 95:1
**soon** 58:2 81:20
**sorry** 31:4 63:1 78:12
**sort** 13:1
**sound** 55:8
**south** 3:4 21:17 31:3
56:21 62:1
**speaking** 96:4,23
97:3
**specific** 26:19,23 75:5
**specification** 60:9

spoke 74:12
spoken 25:13
spot 16:10 79:5
spray 46:20
SS 105:2
St 2:5
stand 24:2
standpoint 90:11
start 7:7,10 88:7
started 35:8 40:12
  44:23 45:1 61:10
  63:23 67:12
starting 94:12
state 5:14 105:1
stated 25:16 34:17,20
  46:4 59:7
statement 74:21
  81:14
statements 50:18
States 1:1,19
stenographer 105:13
Steve 28:4 95:11
Stick 43:16
stock 100:5
stop 49:10
store 18:5 19:19,21
  20:7,13,13 22:1,18
  22:24 87:11
storm 48:16
story 15:1,2
strange 67:15
Street 2:3,11 3:4
stripping 54:3,18
  70:16
structure 14:17
  38:10
Stuart 95:7
stucco 14:11 71:22
styles 20:18 22:19
subcontractor 14:10
subcontractors 11:6
  13:19 14:1,4 15:24
submitted 102:13
  105:20
subscribe 102:8
SUBSCRIBED
  102:18
subsequent 54:14,16
  55:11 85:9

subsequently 60:17
  97:22
suggested 42:8 79:22
  79:23 80:1
summarize 8:5,20
sun 24:3
sunroom 30:11 31:1
  31:7 32:15 37:10
  40:17 41:2 42:4
  47:19
supervisor 65:23
  66:4,6 68:8 69:6
supplied 16:2 36:13
  49:16 50:16
supply 59:9
supposed 19:9 25:4
  70:9 84:19 92:24
sure 6:23 17:5,10
  26:19 29:23 40:3
  53:16 71:5 95:23
surprise 95:17
surprised 96:2
surrounding 82:24
  83:1,4 90:22
swear 4:22
sworn 5:2,7 102:18
  105:10
system 32:8 48:16

————————————
          T
————————————
take 7:2 12:21 17:5
  22:22 30:19 34:10
  40:14 52:23 68:11
  72:8 80:12 91:13
  100:16
taken 1:17 4:5 5:19
  53:5 95:4 101:2
  103:5 104:5 105:5
  105:12
talk 11:17,20 73:10
  79:2
talked 20:3 26:2,4
  34:4 43:23 65:2
  79:3,21 89:10
talking 7:11 16:16
  32:11 52:21 71:18
Tanis 28:4

tape 52:24 53:3,7
tear 76:6 88:9
tearing 71:19
tech 45:17
Telecom 93:21 94:6
  94:13 95:15
telephone 5:24 97:17
television 26:6,17,21
tell 5:21 10:5 15:15
  19:4 20:12 21:13,23
  32:21 34:6 40:15
  44:1,11 47:5 48:22
  58:10,18,24 59:15
  59:24 74:13 78:7
  80:21 81:4 86:21
  90:4 92:9 97:15
telling 21:10,21,24
  44:24 81:4
ten-year 44:24
term 36:10 66:17
  85:15
terms 18:7 20:22
  21:15 23:7,11 30:13
  36:16 41:21 42:17
  44:20 46:11 99:4
terrifying 76:11
testified 5:7
Texas 5:23
Thank 4:20
Thanks 101:6
that's 7:24 14:12
  18:12,20 21:7 22:9
  23:9 32:18 34:19
  38:23 39:11,24
  40:10 47:11 48:10
  52:20,22 56:18
  57:24 58:6 59:12
  64:9 69:5 80:8,9
  83:16 85:14,16,16
  88:24 90:23 91:8
  94:5,6
theoretically 48:8
there's 7:3 14:12
  15:20 30:11 37:6
  48:15,16 55:15
  79:10 88:14 90:1
  91:22 96:9 98:24
they're 16:12 24:21
  26:8 29:4 48:9

74:15 79:5 83:3
84:11,16,19 86:19
86:21,22,24 90:10
they've 33:17,18
  49:17 89:23
thing 17:2 21:2 30:9
  30:19,24 32:12 46:9
  53:21 55:21 60:7
  61:24 67:21 79:4
  81:19 82:3 84:10
  89:15 90:8 97:20
things 16:1,5,24
  29:15,15 50:15,18
  72:15 74:18 85:7
  100:4
think 9:14,22 13:12
  24:17,18 29:5 38:1
  44:18 54:4,4 56:10
  63:23 68:11 72:6
  73:21 92:8 97:6
  100:15,17
thinking 62:15 97:12
THOMAS 1:5
thought 39:20 42:8
  66:3,5,15 67:10,15
  70:20 89:12
thousand 98:17
three 85:19
threw 60:24
ticket 58:20
Tim 86:7
time 7:2,11 15:4,7
  16:7 18:5 28:13
  31:24 33:17 35:3
  37:7 38:14 39:12
  42:3,3 45:17 46:1
  49:18 51:2 54:18
  61:6 62:6 63:5,7,12
  64:5 65:23 69:6
  73:23 74:10 78:5,23
  81:15 83:3 85:21
  100:8,11 101:6
  105:17
times 7:9 20:6
timing 42:17 88:2
tinting 21:16,19 24:3
titled 94:6
today 6:12,17 24:13
  32:4 101:7

told 13:16 18:11 19:12 22:3 23:12 24:4 25:10 26:14 28:17 34:8 35:9 41:14 44:3,14 49:9 55:20 56:5 58:11 59:3 60:13,18,24 61:2 64:15 67:8 74:13 75:23 76:5,12 76:16,16,17 80:20 83:1 84:9,17,24 87:11,12 90:1
Tom 28:6 69:4
top 26:8 48:2
topic 90:19
total 10:18
totally 12:18 32:24 34:24 66:15
touch 80:14
touched 88:15
touches 80:2
track 32:11
training 8:10
transcript 102:5,9
transom 87:24
tried 19:11 27:12 60:17
triple 10:23
trouble 63:24
true 102:8 105:15
trusted 12:10
try 17:1 80:3 81:2 88:8
trying 27:17 35:2 80:22 90:9
tubes 16:18
turn 17:18
Turning 56:9
TV 26:22
two 7:20 8:9 13:9 18:1 48:7 49:12 60:18 65:20 69:15 76:7 78:23 79:1,9 80:6,11 82:4 83:13 88:3 89:2 90:16
type 12:6 18:8 20:20 87:7,23
types 22:20 25:17

**U**

uh-huh 6:14
ultimately 24:14
unaware 84:17
unclear 6:21
undergrad 8:12
underneath 54:23 61:19
undersigned 105:13 105:22
understand 6:21 12:16 27:16 38:1,7 38:15 41:16 70:6 83:21 92:22 93:3
understanding 44:21 84:21,23
understandings 93:10
understood 23:21
uniform 32:4
unit 10:20 42:18 47:11 52:19 59:6 61:13,15 69:22,23 71:21 75:2,3,11 85:13 87:13,24 88:1 89:13 90:12
United 1:1,19
units 20:15 47:8,13 48:9 72:1 75:4 76:7 77:18 78:24 79:10 83:2 90:10 91:6
University 8:8,9,11
unrepairable 59:4
unsolicited 68:15
upset 64:3
upstairs 56:18 64:14 85:11
use 12:8 46:17 56:19 81:16 85:3,5
usually 12:3 46:20 56:19

**V**

v 93:21 94:6 95:14 99:3
value 72:22 73:4
varied 23:22
various 32:5
verifying 98:3

Veritext 4:2
version 30:5
versus 4:10 23:19,20 25:8 33:22 43:21 45:12 97:10
video 4:4,8,13
Videographer 3:20 4:1,20 17:11,15 53:2,6 100:22 101:3 101:10
Videotaped 1:16
visit 21:24 55:16 68:6 69:8 70:16 73:21 88:21
volume 16:13 18:8
vs 1:10 102:1 103:3 104:3

**W**

Wacker 1:21 3:11 4:6 105:7
waived 105:20
wall 59:5
walls 71:19 76:7 83:4 88:9
want 7:2 17:7 23:23 26:11 29:23 32:3 37:18 39:3,15 40:3 53:15 64:4 72:19,20 73:20 80:12
wanted 20:15 21:6,15 21:18 87:12 91:14
wanting 91:11
wants 93:3
warped 62:3
warranty 31:12 35:8 35:9,11,15,21 36:1 36:7 41:22 44:19,22 44:24 59:11,20 64:16 66:7,18,23 67:2 71:13
Washington 2:11
wasn't 23:16 30:22 33:12 34:9 37:20 41:18 42:7 48:5 52:11 56:2 62:7,14 64:15 67:9
water 38:9,18 43:9 47:9,14,23 48:1,3,5

48:12,17,20 54:22 62:3,8 63:15 74:19 75:12 80:13 81:2 89:16 90:8 91:6
way 6:23 7:11 18:9 26:5,20 32:4,9 35:6 37:19 54:22 74:16 79:5 80:15 85:2 86:24 92:5 98:1
weather 24:2,21 54:3 70:16 88:8
week 60:18 88:7
weeks 80:11
Weiland 1:17 4:24 105:6 106:6
Weiss 2:10 4:14 7:22 7:24,24 8:1,3 64:6 64:12 71:10 94:16
welcome 101:8
Wells 3:3
well-known 78:19 86:11
Wengel 28:6 69:4
went 18:5 20:13 25:17 28:16,24 57:3 57:9 62:12 81:21 87:10
weren't 14:5
West 1:21 2:11 3:11 4:6 105:7
we'd 59:18
we're 6:23 7:11 32:11 40:3 51:23 53:3,7 76:5 87:17 100:14 101:3
we've 5:3,12 9:13 16:15 26:2 31:20 32:7 50:5 52:21 53:16 68:22 77:12 90:13 94:3
what's 79:16 93:15
white 15:18 49:7
wide 52:9
wife 13:10 18:20 40:22 41:6 45:21 56:21
wife's 7:17
WILDMAN 3:10
WILLIAM 1:6

**window** 10:16,17,21
  10:23 11:1,12,15
  12:3,6 14:4 20:15
  20:20 21:11 24:2
  26:11 30:15 31:2,3
  31:7 32:15,17,22,23
  33:1,8,11 34:8 35:1
  37:10 40:2,17,17
  41:2,4,5 42:4,11,15
  42:17,20 43:1,7,14
  43:16 44:3,12 45:3
  45:5,13 46:9,17
  48:3,4 49:6 52:8,8
  52:13,18 53:19,20
  53:22 54:5,10,18
  56:23 57:3,4,6,8,19
  58:12 59:3,4,4,6,10
  60:3,9,11 61:12,12
  61:15,16,21 62:16
  63:10,12,21,22
  64:14,23 65:9,19
  67:6,9 70:2,7 71:21
  72:1 74:24 75:10
  76:7 77:18 78:24
  79:10 80:2,3,5,16
  82:11,12,20 83:2,13
  85:12,22 86:1 87:7
  87:9,12,13,14,18,22
  87:23 90:12 107:10
**windows** 1:12 4:19
  5:5 9:10,17 10:8,18
  11:9 12:8 14:7 15:3
  16:3 17:19,22,24
  18:2,4,6,8,8,10,11
  18:15,15,17,22 19:2
  19:6,8,17,23 20:9
  20:14,16 21:4,6,16
  21:19 22:3,14,16,19
  23:8,23 24:5,8,14
  24:18,19 25:7,15,17
  26:18 28:15,20
  29:17,22 30:4,7,11
  32:5,10 33:22 35:9
  35:10,12,14 36:1,5
  38:10 39:21 40:7
  42:6,14 43:10,21
  44:18,22 45:1,2,7
  46:1,7,16,20 47:2
  49:10,23 51:2 52:2

53:10 56:13,17 58:7
  58:14 61:7,10,14,22
  63:8,18 64:1,2,19
  69:18,18 71:14,18
  71:20,23 72:13,20
  72:23 73:2 74:2,14
  74:22 75:5,21 76:9
  76:19 79:15,19,19
  80:1,14 81:1,7,15
  81:16,20 82:1,4,5,6
  82:8,24 83:11,19,22
  83:22 84:2,5,8,11
  84:15,18 85:1,12
  86:13,18,20 87:2
  88:3,12,15,17,23
  89:3,15 90:16 93:4
**winter** 12:23
**Winwood** 5:16 9:4,8
  10:2 12:13 14:16
  17:20
**Wisconsin** 8:8
**wished** 70:17
**witness** 4:22 5:2
  27:17,18 51:8 64:9
  95:22 96:1,7,16
  97:5,7 100:18 101:8
  105:5,10,17,19
  106:1
**woman** 46:20 47:1
  59:2
**won't** 82:7
**wood** 10:24 11:1,2
  22:20 38:9,21 40:12
  52:10,10 82:2 88:1
**wording** 26:24
**words** 41:24 76:12
**work** 8:18 30:20 45:9
  49:21 57:6 61:1
  65:21 77:16 78:3
  85:9,10,18 86:3
  88:8 89:1,3,9
**worked** 11:4 14:10
  30:23 60:19
**working** 30:22 34:9
  66:1
**worried** 72:21 76:1
**worse** 63:17,17
**wouldn't** 21:4 24:21
  28:1 57:4,6 59:17

59:24 60:3 72:12
  83:2 85:6 96:12
**writing** 11:24 56:4
  66:22 75:15
**written** 15:9 16:5
  22:15,22 25:13,20
  35:11,15,21 88:11
  91:17 92:6,10
**wrong** 76:18

_____
      **Y**
**yeah** 38:16 41:7
  46:23 54:16 57:24
  58:5 60:7 65:12
  73:14 87:23 91:9
  96:1
**year** 8:13 10:6,8
  12:12 42:19 55:5
  70:19 77:24
**years** 6:4 8:8,10 9:13
  9:15,23 10:10 30:14
  34:11 43:2 49:12,13
  55:3 85:20
**young** 59:2
**you'd** 57:2
**you'll** 6:13
**you're** 26:10 71:13
  72:15 73:12 84:17
  90:23 92:2 100:6
  101:8
**you've** 5:22 27:7
  34:17 35:20 36:22
  37:15 76:20 77:19
  78:21 84:6,6 93:17
  98:18 100:8,11

_____
      **$**
**$3,385** 80:4

_____
      **0**
**00000003** 107:18
**00000013** 107:13
**00000017** 107:15
**06** 1:10 4:11 55:7
  102:2
**084-003472** 106:6

_____
      **1**
**1** 31:16,20 32:15,19

51:9 53:3 102:7
  107:9
**1:98-cv-02180** 107:21
**10:37** 1:23 4:7 105:8
**10:52** 17:12,16
**101** 102:7
**1010** 2:3
**11th** 57:14
**11:33** 53:3
**11:40** 53:7
**111** 2:11
**1189** 5:16 9:4,8 10:2
  12:13 14:16 17:20
**12** 9:13 51:9
**12:34** 100:23
**12:40** 101:4
**12:41** 101:11,13
**13** 51:11,15 62:1
  74:18 75:8,10 79:2
  89:10 90:6,20
**1331** 2:12
**14th** 1:23 4:7 102:6
  103:5 104:5 105:9
  107:2
**16** 9:15 10:10
**17** 50:24 52:6
**18th** 68:3
**1965** 7:16 8:14
**1969** 8:17
**1971** 8:19,22
**1994** 12:14,22 26:18
**1994-95** 35:14 85:9
**1995** 12:22 29:4

_____
      **2**
**2** 50:2,6,24 51:15,24
  53:7 107:12,19
**20th** 106:3
**2000** 37:1
**2001** 35:4
**2001-2002** 37:7 42:3
**2002** 35:5
**2005** 34:13,19,23
  35:9 37:4 38:8,21
  40:10 43:3
**2006** 57:15,20,21
  59:13 73:22 107:16
**2007** 1:24 4:7 102:6
  102:19 103:5 104:5

105:9 106:3 107:2
**201-2000** 3:14
**220-0000** 2:14
**2200** 3:3
**225** 1:21 3:11 4:6
  105:7
**25** 32:17,22 34:16
  38:7 40:17 42:4,15
  53:22 85:22 107:16
**2655** 9:20

---
**3**

**3** 9:22 34:17 38:17
  51:20 52:5,9 56:9
  57:23 107:11,14
**3B** 39:17,19
**3000** 1:21 3:12 105:7
**31** 42:17,20 43:1,7
  45:4 52:8,13 53:19
  61:13 63:22 69:23
  70:2,7 71:14 75:2
  78:24 83:13 86:1
  88:4 107:9
**312** 2:14 3:14
**314** 2:6
**32** 46:1 61:13,15,21
  63:10,12,22 65:19
  67:6 69:21
**33** 46:1 61:13 69:23
  71:14 75:3 78:24
  83:14 88:4
**34** 9:23 53:10
**35** 53:10
**36** 53:10
**37** 9:22 42:18 43:9
  47:7,8,10,11 48:20
  53:23 54:11,21 55:2
  55:18 63:16 64:22
  65:3,7,17 91:8
**37-38** 75:11
**38** 42:18 43:9 47:7,8
  47:13 48:20 53:24
  55:2,18 91:8

---
**4**

**4** 51:9,15 68:19,23
  107:16
**4/30/07** 107:19
**44** 52:19 53:12,13

56:13 57:3,7 63:8
  64:23 69:18,23
  71:14 75:2 78:24
  88:4
**44-45** 65:9
**4481** 1:10 4:11 102:2
**45** 56:13,13,23 57:7,8
  61:16 69:18 83:13
**46** 52:19 53:12,13
  56:14 63:8 64:23
  69:24 71:14 75:2
  78:24 83:13 88:4

---
**5**

**5** 77:8,12 79:17 83:16
  107:5,19,21
**50** 107:12
**51** 107:14
**55402-3901** 3:5
**56** 69:18

---
**6**

**6** 93:23 94:3 107:20
**60602** 2:13
**60606-1229** 3:13
**612** 3:6
**621-8647** 2:6
**63101** 2:5
**650** 2:4
**68** 107:16

---
**7**

**71** 9:2
**766-7221** 3:6
**77** 107:19

---
**8**

**800** 97:19
**89** 10:11,12

---
**9**

**9th** 57:16
**90** 3:4
**94** 12:23 107:20
**95** 29:7,9
**97** 37:1



EXHIBIT
Saltzman 1
tm  09/14/07

Salzman Property
Schematic Elevations
with Window Numbers

SEE
DWG. 6

DOOR

① NORTH ELEVATION
SCALE: No Scale

② SOUTH ELEVATION
SCALE: No Scale



Salzman Property
Schematic Elevations
with Window Numbers

SEE DWG. 4
(BELOW)

## WEST ELEVATION
SCALE: No Scale

③

## PARTIAL WEST ELEVATION
SCALE: No Scale

④



EAST ELEVATION
SCALE: No Scale

SEE NORTH ELEVATION

DOOR

5

PARTIAL EAST ELEVATION
(SUNROOM AT REAR OF HOUSE)
SCALE: No Scale

6

Salzman Property
Schematic Elevations
with Window Numbers



EXHIBIT
Saltzman 2
tw 6/14/07

## FINAL WAIVER OF LIEN

STATE OF ILLINOIS
SS
COUNTY OF DUPAGE

TO WHOM IT MAY CONCERN:

WHEREAS the undersigned has been employed by: BLAIR CONSTRUCTION
to furnish: WINDOWS
for the premises known as: 1189 WINWOOD LAKE FOREST, ILLINOIS
of which SALTZMAN is the owner.

THE undersigned, for and in consideration of FOUR HUNDRED SIXTEEN DOLLARS & 66/100
($ 416.66 ) Dollars, and other good and valuable considerations, the receipt whereof is hereby acknowledged, do(es) hereby waive and release any and all lien or claim of, or right to, lien under the statutes of the State of Illinois, relating to mechanics' liens, with respect to and on said above-described premises, and the improvements thereon, and on the material, fixtures, apparatus or machinery furnished, and on the moneys, funds or other considerations due or to become due from the owner, on account of labor services, material, fixtures, apparatus or machinery, heretofore furnished, or which may be furnished at any time hereafter, by the undersigned for the above-described premises.

Given under our hand and seal this
7TH day of NOVEMBER 19 95.
Signature and Seal: KEVIN FLANNERY, GENERAL MANAGER

NOTE: All waivers must be for the full amount paid. If waiver is for a corporation, corporate name should be used, corporate seal affixed and title of officer signing waiver should be set forth; if waiver is for a partnership, the partnership name should be used, partner should sign and designate himself as partner.

## CONTRACTOR'S AFFIDAVIT

STATE OF ILLINOIS
SS
COUNTY OF DUPAGE
TO WHOM IT MAY CONCERN.

THE undersigned, being duly sworn deposes and says that he is KEVIN FLANNERY
GENERAL MANAGER of the PELLA WINDOWS AND DOORS,INC.
who is the contractor for the WINDOWS work on the
building located at 1189 WINWOOD LAKE FOREST, ILLINOIS.
owned by SALTZMAN
that the total amount of the contract including extras is $ 29846.03 on which he has received payment of
$ 29429.37 prior to this payment. That all waivers are true, correct and genuine and delivered unconditionally and that there is no claim either legal or equitable to defeat the validity of said waivers. That the following are the names of all parties who have furnished material or labor, or both, for said work and all parties having contracts or sub contracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications.

| NAMES | WHAT FOR | CONTRACT PRICE | AMOUNT PAID | THIS PAYMENT | BALANCE DUE |
|---|---|---|---|---|---|
| ALL MATERIAL TAKEN FROM FULLY PAID | | | | | |
| STOCK AND DELIVERED BY PELLA TRUCKS | | | | | |
| PRINCIPAL SUPPLIER : PELLA CORPORATION | | | | | |
| 102 MAIN ST. | | | | | |
| PELLA, IOWA 50219 | | | | | |
| 515-628-1000 | | | | | |
| TOTAL LABOR AND MATERIAL TO COMPLETE | | | | | |

That there are no other contracts for said work outstanding, and that there is nothing due or to become due to any person for material, labor or other work of any kind done or to be done upon or in connection with said work other than above stated.

Signed this 7TH day of 19 95.

Signature

"OFFICIAL SEAL"
DAWN M. LEONARD
Notary Public, State of Illinois
My Commission Expires 6/13/99

Subscribed and sworn before me this 7TH day of NOVEMBER 19 95

Provided by Chicago Title Insurance Company

10/18/95  15:42  ☎708 205 0759    PELLA WINDOWS NB           ☎002 009
08/31/95  16:09  ☎708 894 1173    PELLA WINDOWS  →→→ NORTHBROOK    ☎001/001

# PELLA WINDOWS & DOORS, INC.
### 101 Regency Drive
### Glendale Hts., IL 60139
### 708-894-1000
### 708-894-1173 FAX

288
2050 290

# FAX COVER SHEET

**FROM:** Terry Miceli, Credit Manager  **EXT:** 586
**TO:** Dr. & Mrs. Salzman  **FAX:** 708-604-9108
**RE:** Order 726560
Blair Construction - Contractor
**DATE:** August 31, 1995

PAGER:
461-0222

**Number of pages including cover sheet:** 13

**MESSAGE:**

Attached are copies of all invoices related to your job. Ji   eparski told me that he has
faxed copies of your contract and all revisions. The fol   ving is a reconciliation of your
account:

| | | |
|---|---|---|
| Original Contact | $23,447.00 | |
| Revision 1 | 5,940.00 | |
| Revision 2 | (231.81) | |
| Revision 3 | 963.00 | |
| Revision 4 | (432.71) | $29,685.48 |
| | | |
| Invoice 186327 | 23,447.00 | |
| Invoice 191057 | 5,940.00 | |
| Invoice 191216 | 963.00 | |
| Invoice 192085 | (231.81) | |
| Invoice 197054 | 456.99 | |
| Invoice 197530 | (1,032.18) | |
| Invoice 198016 | 313.03 | 29,846.03 |
| | | |
| Payments: | | |
| Ck. 109 Rec'd. 3/08.95 | | (23,447.00) |
| Ck. 506 Rec'd. 5/23/95 | | (5,930.37) |
| | | |
| Balance due | | $468.66 |

Please note that your total contract price is $160.55 less than the total invoices. This
is because Jim is in the process of putting through a 5th revision for the muntins that
you decided to keep. After this revision is added to the contract, the amounts will agree.

As we discussed, I will have our Sales Manager, Rick Hides, contact you via your pager
to address the issues you have been trying to resolve. Rick is in budget meetings for
the remainder of this week but I assure that he will contact you as soon as he is free.

Thank you for your patience.

PL-SALT00000005

10/16/85   15:43   ☎703 205 0759          PELLA WINDOWS NB                    ☑004/009

**Pella**

LIST PRICE FOR RETURNED MUNTINS & SCREENS:          $3,419.00

NORMAL CANCELLATION CHARGE AT 50% LIST =    1,709.50
ADJUSTED CANCELLATION CHARGE AT 35% LIST = $1,196.65

DISCOUNTED PRICE CHARGED & CREDITED FOR
RETURNED MUNTINS & SCREENS :          $2,244.85

12  WHITE  SCREENS  ADDED      =    270.00
WHITE  HDWR.                   =    430.52
3  MOW COVERS                  =     18.00
                                    718.52

CREDIT FOR RET'D GOOD :        $2,244.85

ADDITIONAL COST OF PRODUCT:     718.52

                                526.33
                        TAX       3.03
                        CREDIT  $1,629.36
            CANCELLATION CHARGE   196.65
                    NET CREDIT   $432.71

*Quality Like This Only Comes From Pella.*

PL-SALT00000006

10/16/95  18:42  ☎708 205 0759       PELLA WINDOWS NB                    Ø003/003

1) ORIGINAL ORDER INCLUDED MUNTNS & CHAN. HDWE
   & FR. DOOR SCRNS

2) CHANGE 1 - ADDED AGNTS & FR. DOORS OR PORCH
   INCLUDED SCRNS FOR DOORS BUT NO MUNTNS

3) CHANGE 2 - DELETED FR. DOORS FROM REV. 1
   & ADDED FR. SLDING DOOR W/NO MUNTNS

4) CHANGE 3 - ADDED 3 LEAD FRMD TRIANGLES

5) CHANGE 4 - DELETED ALL PRO MUNTNS.
   PRO FR DOOR SCRNS.
   ADDED INT. HDWRE

*Quality Like This Only Comes From Pella.*

PL-SALT00000007

10/16/95  15:43  ☎708 205 0759          PELLA WINDOWS ND                    @005/009

# CHANGE ORDER

PELLA WINDOWS & DOORS, INC.
141 REGENCY DR. GLENDALE HEIGHTS, IL. 60139  PHONE: (708) 894-1000

CONTACT No.

10/16/95   15:47   ☎705 205 0759          PELLA WINDOWS NB                    ⌀008/009

JOB NAME: _____

ORDER #: _____

PRICE SHEET    REVISION: A

DATE: 8-2-95    PAGE 1 OF 2

NOTES

TOTAL QUANTITIES

10/16/96  15:47  ☎708 205 0759    PELLA WINDOWS NB    ☒009/009

10/16/95   15:45   ☎708 205 0759          PELLA WINDOWS NB                    ⌘006/009

**PELLA WINDOWS & DOORS, INC.**

**SALES QUOTATION/CONTRACT**

SOLD TO: _____

PAGE 2 OF 3

| Qty | | Description | | | | | ORDER# |
|---|---|---|---|---|---|---|---|
| 20 | 1 | DFW 3781 F | | | PFNL | | |
| 19 | 3 | DFW 7281 AF | | | PFNL | | |
| 18 | 3 | DFW 7281 FA | | | PFNL | | |
| | | DELETE TRANSOM | DOOR SCREEN | | | | |
| | | 3681 F | | | P | | |
| 21 | | DFH 7281 RH | | | P | | |
| | | DFH 3681 F | | | P | | |
| 26 | 3 | DFW 7281 F | | | PFNL | | |
| 18 | 3 | DFW 7281 AF | | | PFNL | | |
| 11 | 1 | DFW 7285 AF | | | PFNL | | |
| 16 | 1 | PCC 2453-2 | | | PCSL | | |
| 15 | 1 | PCC 2453-2 | | | PCSL | | |
| 13 | 1 | PCC 2453-2 | | | PCSL | | |
| 12 | 1 | PCC 2453 | | | PCSL | | |
| 11 | 1 | PCC 2453 | | | PCSL | | |
| 10 | 1 | PCC 2453-2 | | | PCSL | | |
| 8 | 1 | PCC 2453-2 | | | PCSL | | |
| 11 | 1 | PCC 2453-3 | | | PCSL | | |
| 16 | 1 | PCC 2559 | | | PCSL | | |
| | | DELETE MUNTINS | | | | | |

PL-SALT00000011

10/10/95   15:46   ☎708 205 0759          PELLA WINDOWS NB                    ☑007/009

PELLA WINDOWS & DOORS, INC.

SALES QUOTATION/CONTRACT

SOLD TO:

ORDER #:

ORDER DATE:

PAGE 2 OF 3

PL-SALT00000012



**PELLA WINDOWS AND DOORS, INC.**
DEPARTMENT 92 P.O. BOX 1546
BENSENVILLE, ILLINOIS 60106-1546
PHONE: (708) 894-1000
FAX: (708) 894-0763



STATEMENT

ACCOUNT NO.
27972

BLAIR CONSTRUCTION
P O BOX 4352
NORTHBROOK, IL 60062

STATEMENT DATE
05/27/95



CODES: I=INVOICE DR=DEBIT MEMO CR=CREDIT MEMO BF=BALANCE FORWARD P=PAYMENT DA=DISCOUNT ALLOWED FC=FINANCE CHARGE

| DATE | CODE | REFERENCES | CHARGES | CREDITS | BALANCE |
|------|------|------------|---------|---------|---------|



| | PLEASE PAY ⇒ | 740.82 |

| CURRENT | > 30 | > 60 | > 90 | > 120 |
|---------|------|------|------|-------|
| | | | 0.00 | 0. |

PL-SALT00000013

## Pella Windows & Doors, Inc.
112 Alexandra Way
Carol Stream, IL 60188

Phone: (630) 588-3870
Fax: (630) 588-3875
Email: service@pellawin.com

Report: ServiceTicket.rpt
Printed: May 27, 2005
Service Event: 166862

| | | | | |
|---|---|---|---|---|
| File XRef: | UK | Service Event: | 166862 | Terms: COD |
| Created By: | Hodous, Donna | Service Tech: | A  Provenzano Tom  4 | |
| Request Date: | Monday, May 23, 2005 | Schedule Date: | Thursday June 02, 2005 | 02:00 PM |
| Requested By: | DH/PHONE/DR | Bill To Other: | No  Account # 75- | |

| | |
|---|---|
| Home Owner: SALTZMAN, BONNIE<br>1189 WINWOOD<br>LAKE FOREST, IL 60045<br><br>Home (847) 604-9108 | Bill To |

Directions: WAUKEGAN & 176

### 1  Estimate       Wood Deterioration - Sash/Panel       Location: HALLWAY

| Qty | 1 | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Brand: | Designer w/DGP | (DS) | Glazing: | 5/8" InsulShld IG | (52IS) |
| | | Product: | Casement | (CM) | Finishing: | Left Hinge | (LH) |
| Orig. Order: | | Accessory: | | | Color: | White | (WHI) |
| UNKN | | Variant: | 041996 | | Size: | 2953? | |

Material Billing Category:  Charge       Labor Billing Category:  Charge

Comment: SERVICE TO ESTIMATE REPAIRS OR REPLACEMENT OF LH CM IN THE HALL WAY THAT IS PART OF A 3 WIDE THE  SASH HAS THE WOOD IS BROKEN OR DETERIATION ON THE SASH PANEL  CUSTOMER GAVE VG 23-7/8 X 47=5/8  WOULD LIKE TECH TO COME OUT TO MEASURE AND ESTIMATE FOR REPLACMENT.

| Part No. | Description | Order No. | Qty | Unit Price | Ext Price |
|---|---|---|---|---|---|
| | | | | | |

Completed ☐   Incomplete ☐   Cancelled ☐   Order Parts ☐   Add'l Trip ☐   Est. Hours   0.50   Act. Hours

Resolution/Reason:  EST for sash replacement

ETCHING: IGCC CBA IGMAC CIG-2 4-96

---

EXHIBIT
Saltzman 3
bu          6/14/07

PL-SALT00000014

**Pella Windows & Doors, Inc.**
112 Alexandra Way
Carol Stream, IL 60185
Phone: (630) 588-3870
Fax: (630) 588-3875
Email: service@pellawin.com

Report: ServiceTicket.rpt
Printed: May 27, 2005
Service Event: 166862

| | | |
|---|---|---|
| Travel Hours | Est 0.25 | |

**Payment Method**

☐ Check #
☐ Credit Card

Amount Paid

Credit Card Vendor    Exp. Date

Account #

Customer Signature                           Date

Last anticipated deposit:
Date: 5/23/2005
Amount: $0.01
Charge: Mastercard ************1256
Expiration Date: 2/23/2006

| | |
|---|---|
| Parts | $0.00 |
| Labor | $50.00 |
| Tax Total | $0.00 |
| Total Charge | $100.00 |
| Adj Trip Charge | $50.00 |
| Amt Paid | $0.00 |
| Balance Due | $100.00 |

For information regarding the finishing, maintenance, service, and warranty for all Pella products, visit the Pella Website at www.pella.com          Page:

PL-SALT00000015

**Pella Windows & Doors, Inc.**
2505 Enterprise Cr.
West Chicago, IL 60185
Phone: (630) 588-3870
Fax: (630) 588-3875
Email: service@pellawin.com

Report: ServiceTicket.rpt
Printed: August 11, 2006
Service Event: 204284

| Fin. XRef: | CH | Service Event: | 204284 | Terms: | COD |
| Created By: | Slack, Paula | Service Tech: | S Tanis Steve 19 | | |
| Request Date: | Wednesday, August 09, 2006 | Schedule Date: | Thursday August 10, 2006 | | 02:30 PM |
| Requested By: | PS/PHN/DR. SALTZMAN | Bill To Other: | No. Account # | 6666 | |

Home Owner
SALTZMAN, BONNIE
1189 WINWOOD
LAKE FOREST, IL 60045

Home: (847) 604-9108

Bill To

Directions WAUKEGAN & 176

| Diagnos | | | |
| --- | --- | --- | --- |
| Qty | Brand | Glazing | |
| | Product | Binding | |
| | Accessory | Color | |
| | Vintage | Size | |

| Part No. | Description | Order No. | Qty | Unit Price | Ext Price |
| --- | --- | --- | --- | --- | --- |

PROPOSAL FOR NEW ISSUE

For information regarding the finishing, maintenance, service, and warranty for all Pella products, visit the Pella Website at www.pella.com    Page:

PL-SALT00000016

**Pella Windows & Doors, Inc.**
2505 Enterprise Cr.
West Chicago, IL 60185

Phone: (630) 585-3870
Fax: (630) 585-3875
Email: service@pellawin.com

Report: ServiceTicket.rpt
Printed: August 11, 2006
Service Event: 204284

| Travel Hours | 0.75 |
| --- | --- |

**Payment Method**

☑ Check #
☐ Credit Card

Amount Paid

Credit Card Vendor      Exp Date

Account #

Customer Signature                     Date

Last anticipated deposit:

Date: 8/ 9/2006

Amount: $0.01

Charge: Mastercard ************9643

Expiration Date: 6/30/2008

| | |
| --- | --- |
| Parts | $0.00 |
| Labor | $50.00 |
| Tax Total | $0.00 |
| Total Charge | $50.00 |
| Adj | $0.00 |
| Amt Paid | $0.00 |
| Balance Due | $50.00 |

For information regarding the finishing, maintenance, service, and warranty for all Pella products, visit the Pella Website at www.pella.com

Page

PL-SALT00000017



Pella° Windows & Doors

October 25, 2006

Dr. and Ms. Bonnie Saltzman
1189 Winwood Drive
Lake Forest, IL 60045

Ref:   Follow up from Service Event Number 205761 and previous service visits

Dear Dr. and Ms. Saltzman:

I am writing to follow up on our conversation from the service visit to your residence on Thursday, September 21, 2006.  As I indicated to you during our conversation, prior to our visit I reviewed the various service events related to the Pella units installed in your home.   Pella recently enhanced the service provided for Pella's ProLine product and can offer you a refund on the replacement product you purchased in 2005.

As discussed, Pella Corporation is refunding you for the two replacement sashes you purchased.  We are also providing you compensation toward the costs you incurred for installation and finishing. The enclosed check in the amount of $783.46 includes a refund of $413.46 for the two Pella replacement sashes you purchased as well as $250.00 in installation costs through our Service Technicians and $120.00 toward finishing costs.

You indicated during the Service visit to replace weather-stripping on your Pella door that you had no other concerns that you wished to have addressed regarding the Pella Products installed in your home.  However, our records indicated that you contacted us earlier this year about concerns with other products in your home.  If you do have additional concerns you would like us to address, please contact me.  Our goal is your satisfaction.

This customer service enhancement demonstrates Pella's commitment to customer satisfaction.  Please feel free to contact me should you have any further questions.

Sincerely,

*Tom Wengel*

Tom Wengel
Field Service Manager

Encl. – Check # 163719

EXHIBIT

Saltzman 4

6w     6/14/07

VIEWED TO BE THE BEST.

2505 Enterprise Circle
West Chicago, IL 60185

PL-SALT00000002

163719

163719

| PAYMENT NUMBER | CHECK DATE | | | | |
|---|---|---|---|---|---|
| PMT0055140 | 10/18/2006 | | | | |
| DATE | AMOUNT | AMOUNT PAID | DISCOUNT | WRITE OFF | NET |
| '17/2006 | $783.46 | $783.46 | $0.00 | $0.00 | $783.46 |

| | | | | | |
|---|---|---|---|---|---|
| | $783.46 | $783.46 | $0.00 | $0.00 | $783.46 |

DOCUMENT CONTAINS SECURITY FEATURES SEE BACK FOR DETAILS

)ORS

LaSalle Bank N.A.
Chicago, Illinois
2-50/710

163719

| DATE | AMOUNT |
|---|---|
| 10/18/2006 | $783.46 |

46 Cents

VOID AFTER 90 DAYS

_____
AUTHORIZED SIGNATURE

⑈710005051⑈ 580092340011⑈



# Fiore Carpentry, Inc

1043 Fairview Avenue
Lake Forest, Il 60045

Phone: 847-482-0024
Cell: 847-323-0645
Email: jfiore@comcast.net

4/30/07

Dr. Saltzman
1181 W. Winwood Dr.
Lake Forest, Il 60045

Installing 2 new windows/removal of old windows/installing new trim to match existing
if possible otherwise trim will be best match. LABOR ONLY.  $2,490.00

PELLA WINDOWS will be used because customer would like windows to match
throughout house and we were unable to find match with other window companies.

Fiore Carpentry, Inc. will use the utmost care in the removal and installation of the new
windows. In the event of Dryvit damage, Fiore Carpentry, Inc. will not be financially
responsible for the repair of the Dryvit. In addition because of the nature of Dryvit there
may be some unlikely water or mold damage. Fiore Carpentry, Inc will notify the
customer if this is the case.

Silicon caulking of 29 windows Labor and materials:  $3,385.00

50% down payment required before start of work.
This proposal may be withdrawn if not accepted within 30 days.
Scheduling starts with a signed contract.
Service charge of 1 1/2 percent per month will be added to all past due accounts. Any alterations from above
specifications involving extra costs, will be executed only upon written orders, and will become and extra charge over
and above the contract, billed at $70.00 per hour plus additional material. All agreements contingent upon strikes,
accidents, or delays beyond our control. Buyer to carry fire, tornado and other necessary insurance. The purchaser in
accepting this proposition, agrees to assume all responsibility of materials covered in this proposal, after delivery.
Woodwork must be sealed within two weeks after installation. Customer agrees to pay all costs of collection, including
court costs and attorneys fees if suit is filed for collection.
Acceptance
The above prices, specifications and conditions are hereby accepted.
Payment will be made as outlined above.

_____

Signature

_____

Acceptance Date

_____

Martin Fiore, President

SERVING THE NORTH SHORE FOR 20 YEARS

EXHIBIT

Saltzman 5

6/14/07



**MENARDS**

MENARDS QUOTE

120 OAK CREEK PLAZA
MUNDELEIN, IL 60060
Phone: (847) 569-7083
Fax: (847) 569-7109
Store Number 3514
Store Code: MUND

Date: 04/20/2007



"VIEWED TO BE THE BEST"

Guest:

Team Member: ROS

| ITEM & SIZES | LOCATION/TAG | PRODUCT DESCRIPTION | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|---|
| # 0035 | | Product: Windows | | |
| Qty. = 2 | | Type: Casements | | |
| Frame Size = 86 1/4" W x 52 3/4" H | | Product Configuration: 3-Wide | | |
| RO Size = 87" W x 53 1/2" H | | Exterior Color: White | | |
| | | Interior Finish: Unfinished-ready for site finishing | | |
| | | Direction: LFR | | |
| | | Glazing: Energy Saving Low E Glass (Recommended) | | |
| | | Tempered Glass: No | | |
| | | Handle Hardware: White FoldAway Hardware (Additional Charge) | | |
| | | Fiberglass Insect Screen: White | | |
| | | Wall Depth: 4 9/16" Applied | | |
| | | Series / Profile: 860 Series | | |
| | | Part Numbers: | | |
| | | HC2WEA5LFR | | |
| | | COMPMULLCHARGE | | |
| | | HC2WLHDWPACK | | |
| | | HC2WRHDWPACK | | |
| | | HC2WSCR (2) | | |

HC2WEA5LFR Casements LFR 86 1/4" x 52 3/4"  Energy Saving Low E Glass : $ 1,144.05
COMPMULLCHARGE Custom Composite Factory Mull Charge: $ 30.10
HC2WFLHDWPACK White Handle $ 8.86
HC2WRHDWPACK White Handle $ 8.86
HC2WSCR (2) Screen: $ 54.61
4 9/16" Applied Jamb $ 42.79

$ 1,289.45 5    2,578.96

PROTO, SCHENKIER, TERMED

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 3.0 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:98-cv-02180

Saltzman v. MCI Telecommc Corp
Assigned to: Hon. James F. Holderman
Demand: $0
Cause: 28:1441 Petition for Removal

Date Filed: 04/09/1998
Date Terminated: 11/04/1998
Jury Demand: Both
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Plaintiff**

**Leonard Saltzman**
*Dr., on behalf of himself and all others
similarly situated*
*TERMINATED: 11/04/1998*

represented by **Michael Jerry Freed**
Freed Kanner London & Millen, LLC
2201 Waukegan Road
Suite 130
Bannockburn, IL 60015
(224) 632-4500
Email: mfreed@fklmlaw.com
*TERMINATED: 11/04/1998*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher James Stuart**
Much, Shelist, Freed, Denenberg,
Ament & Eiger, P.C.
200 North LaSalle Street
Suite 2100
Chicago, IL 60601
(312) 346-3100
*TERMINATED: 11/04/1998*

**Eric D. Freed**
Freed, Weiss & Flaum
111 West Washington Street
Suite 1331
Chicago, IL 60602
(312) 220-0000
*TERMINATED: 11/04/1998*

**Paul M. Weiss**
Freed, Weiss & Flaum
111 West Washington Street
Suite 1331
Chicago, IL 60602
(312) 220-0000
Email: paul@freedweiss.com



EXHIBIT
Saltzman 6
6/7/07

*TERMINATED: 11/04/1998*
*ATTORNEY TO BE NOTICED*

**Steve W. Berman**
Hagens & Berman
1301 Fifth Avenue
Suite 2929
Seattle, WA 98101
*TERMINATED: 11/04/1998*
*ATTORNEY TO BE NOTICED*

## V.

### Defendant

**MCI Telecommunications
Corporation**

represented by **Darryl Mark Bradford**
Jenner & Block
One IBM Plaza
Suite 4400
Chicago, IL 60611
(312) 222-9350
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Jay Hurtado**
Jenner & Block LLP
330 North Wabash
Chicago, IL 60611
(312)222-9350
Email: dhurtado@jenner.com
*ATTORNEY TO BE NOTICED*

**Stephen Charles Hackney**
Hedlund, Hanley & John
233 South Wacker Drive
5700 Sears Tower
Chicago, IL 60606
(312) 441-8600

| Date Filed | # | Docket Text |
|---|---|---|
| 04/09/1998 | 1 | NOTICE OF REMOVAL by defendant MCI Telecommc Corp from Circuit Court of Cook County with copy of state court complaint and summons, case no. 98CH02813; jury demand - Civil cover sheet - Appearance(s) of Darryl Mark Bradford as attorney(s) for defendant MCI Telecommc Corp ( Documents: 1-1 through 1-3) (fce) (Entered: 04/10/1998) |
| 04/09/1998 | | RECEIPT regarding payment of filing fee paid; on 4/9/98 in the amount of $ 150.00, receipt # 510667. (fce) (Entered: 04/10/1998) |

| 04/10/1998 | | MAILED notice of removal letter to plaintiff's counsel. (fce) (Entered: 04/10/1998) |
|---|---|---|
| 04/14/1998 | 2 | MEMORANDUM by MCI Telecommc Corp in support of its motion to dismiss; Notice of filing. (vmj) (Entered: 04/16/1998) |
| 04/14/1998 | 4 | MOTION by defendant MCI Telecommc Corp to dismiss complaint ; Notice of motion. (vmj) (Entered: 04/20/1998) |
| 04/16/1998 | 3 | ATTORNEY APPEARANCE for plaintiff by Michael J. Freed, Christopher James Stuart. (vmj) (Entered: 04/17/1998) |
| 04/16/1998 | 5 | MINUTE ORDER of 4/16/98 by Hon. James F. Holderman: Status hearing set for 5/11/98 at 10:00 a.m. Plaintiff granted to 5/13/98 to file answering brief to defendant's motion to dismiss [4-1]. Reply is due 5/27/98. Court will rule by mail. No notice (vmj) (Entered: 04/20/1998) |
| 05/11/1998 | 6 | MINUTE ORDER of 5/11/98 by Hon. James F. Holderman: Status hearing held and continued to 6/16/98 at 10:00 a.m. Plaintiff granted to 5/27/98 to file an amended complaint. Date to file responsive pleading will be set at the next status hearing. No notice (vmj) (Entered: 05/12/1998) |
| 05/20/1998 | 7 | ATTORNEY APPEARANCE for plaintiff by Michael J. Freed, Christopher J. Stuart. (vmj) (Entered: 05/27/1998) |
| 05/20/1998 | 8 | ATTORNEY APPEARANCE for plaintiff by Steve W. Berman, Paul M. Weiss. (vmj) (Entered: 05/27/1998) |
| 05/27/1998 | 9 | FIRST AMENDED CLASS ACTION COMPLAINT by plaintiff; jury demand; Notice of filing. (vmj) (Entered: 05/29/1998) |
| 05/28/1998 | 10 | AGREED MOTION by plaintiff for leave to file amended class action complaint instanter ; Notice of motion. (vmj) (Entered: 06/02/1998) |
| 05/29/1998 | 11 | MINUTE ORDER of 5/29/98 by Hon. James F. Holderman: Plaintiff's agreed motion for leave to file amended class action complaint, instanter, is granted [10-1]. Telephoned notice (vmj) (Entered: 06/02/1998) |
| 05/29/1998 | 12 | FIRST AMENDED CLASS ACTION COMPLAINT [9-1] by plaintiff; jury demand (Exhibits). (vmj) (Entered: 06/02/1998) |
| 06/16/1998 | 13 | MINUTE ORDER of 6/16/98 by Hon. James F. Holderman: Status hearing held and continued to 7/29/98 at 10:00 a.m. Defendant granted to 7/16/98 to answer or otherwise plead to the amended complaint. Parties shall hold a planning meeting and file parties report of planning meeting (form 35) on 7/27/98. No notice (vmj) (Entered: 06/18/1998) |
| 06/23/1998 | 14 | MINUTE ORDER of 6/23/98 by Hon. James F. Holderman: Leave granted to Eric D. Freed to file an appearance as additional counsel for plaintiff. Mailed notice (vmj) (Entered: 06/24/1998) |
| 06/23/1998 | 15 | ADDITIONAL ATTORNEY APPEARANCE for plaintiff by Eric D. Freed. (vmj) (Entered: 06/24/1998) |
| | | |

| | | |
|---|---|---|
| 07/08/1998 | 16 | ATTORNEY APPEARANCE for defendant by Daniel Jay Hurtado, Stephen Charles Hackney. (vmj) (Entered: 07/10/1998) |
| 07/16/1998 | 17 | ANSWER and affirmative defenses of MCI Telecommc Corp ; Notice of filing. (tlm) (Entered: 07/17/1998) |
| 07/27/1998 | 18 | REPORT of parties planning meeting. (vmj) (Entered: 07/29/1998) |
| 07/29/1998 | | SCHEDULE set on 7/29/98 by Hon. James F. Holderman : Status hearing held and continued to 10/2/98 at 10:00 a.m. ess a broader class is certified, fact discover completion date is 1/31/99. Expert reports are due from plaintiff by 2/28/99 and from defendant by 4/30/99. Plaintiff's experts shall be deposed by 3/30/99 and defendants experts by 5/30/99. Parties granted to 10/1/98 to join additional parties and to amend the pleadings. All dispositive motions are due 6/1/99. no notice (fce) (Entered: 07/29/1998) |
| 09/28/1998 | 19 | AGREED MOTION by defendant for for entry of protective order (Exhibit); Notice of filing. (vmj) (Entered: 10/02/1998) |
| 09/29/1998 | 20 | AGREED PROTECTIVE ORDER. (vmj) (Entered: 10/02/1998) |
| 09/29/1998 | 21 | MINUTE ORDER of 9/29/98 by Hon. James F. Holderman: Defendant's agreed motion for entry of protective order is granted [19-1]. Enter agreed protective order. Mailed notice (vmj) (Entered: 10/02/1998) |
| 10/02/1998 | | SCHEDULE set on 10/2/98 by Hon. James F. Holderman : Status hearing held and continued to 10:00 11/4/98 . no notice (fce) (Entered: 10/02/1998) |
| 10/15/1998 | 22 | TRANSCRIPT of proceedings for the following date(s): 5/11/98 and 6/16/98 Before Honorable Judge Holderman (2 vols: 22-1, 22-2). (vmj) (Entered: 10/19/1998) |
| 11/02/1998 | 23 | MOTION by plaintiff to dismiss pursuant to Fed.R.Civ.P.41(a)(2) (Exhibit); Notice of motion. (vmj) (Entered: 11/03/1998) |
| 11/04/1998 | 24 | MINUTE ORDER of 11/4/98 by Hon. James F. Holderman: Status hearing held. Plalintiff's motion to dismiss pursuant to Fed.R.Civ.P.41(a)(2) is granted [23-1]. Plaintiff Dr. Leonard Saltzman is dismissed with prejudice , remaining potential class plaintiffs are dismissed without prejudice. Each side to bear their own costs. terminating case Mailed notice (vmj) (Entered: 11/05/1998) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/07/2007 10:30:06 | | |
| **PACER Login:** | fb0466 | **Client Code:** | 26998 341280 2171 |
| **Description:** | Docket Report | **Search Criteria:** | 1:98-cv-02180 |
| | | | |

| Billable Pages: | 2 | Cost: | 0.16 | |
|---|---|---|---|---|