# EXHIBIT 9

**Project: Saltzman Residence**
**Address: 1189 Windwood Drive, Lake Forest, IL**
**Branch Number/Location: 096 - Chicago, IL**
**Product: Proline Clad Casement windows, Proline Clad Hinged Patio Doors, Designer**
**Sliding French Patio Door, Designer Clad Casement windows**
**Vintage: 1994, 1995, and 2003**
**Date of Inspection: January 18, 2007**

**REPRESENTATIVES PRESENT:**
Greg Gerdes, Pella Corporation
Theresa Kininger, Pella Corporation
William Smith Glazing Consultants, Inc.
John Mandler, Faegre & Benson
Dennis Johnson, Raths, Raths and Johnson
Robert Kudder, Raths, Raths and Johnson
Ian Chin, Wiss Janney Elstner Associates, Inc.
George Lang, Freed & Weiss LLC
Michael Solender, The Solander Group, Inc.
John Sheehan, Eastwood-Stein
John Roberts, Wildman Harrold
Bryan Rouse, Wiss, Janney, Elstner Associates, Inc.

**PURPOSE OF VISIT:**
To conduct an initial, non-intrusive, site investigation at the above mentioned address in conjunction with on-going legal action.

**GENERAL INFORMATION:**
The home is a split-level ranch design. Most of the home is on a single level. One section of the home has two levels. The elevations of the floors are offset so that the lower level of the two section area is below the main floor level. The site is fairly level. There is one set of doors that exit from the lower level, so they are set in a sunken area created with retaining walls and stairs.
The exterior finish on the home is hard coat stucco with synthetic stucco banding around some of the windows. The roofing is asphalt shingles.
The "bonus" room was reportedly finished in 2003. There are three vintage 2003 Designer Series casement units joined in a combination window that were installed at that time.

**OBSERVATIONS:**
A numbering system to identify the window and door penetrations was established and used in the production of this report. Appendix A contains sketches showing the identification number and the approximate location of the window and door product on this home.

1

**Attorney Work Product**

**Attorney Client Privilege**

The vintage and product identification are recorded for each penetration on the following spreadsheets. These spreadsheets also refer to the appropriate photograph numbers which appear later in this report.

Visual Observation Summary of
The Saltzman residence, 1189 Windwood Drive, Lake Forest, IL
Date of Inspection: January 18, 2007

| Window or Door # | Brand | Description | Sill Stamp | Screen Stamp | Glazing Stamp | Comments | Photo #'s |
|---|---|---|---|---|---|---|---|
| 1 | NA | Non-Pella Sidelight | * | * | * | | |
| 2 | NA | Circle Head over door - Non-Pella | * | * | * | | 5-8 |
| 3 | NA | Non-Pella Sidelight | * | * | * | | |
| 4 | Proline | Single Casement | * | * | * | | 9-13 |
| 5 | Proline | Clad Casement - operable | * | * | * | Mulled to #6. | |
| 6 | Proline | Clad Casement - Fixed | * | * | * | Mulled to #5 and #7. | 14-20 |
| 7 | Proline | Clad Casement - operable | 905CC | * | * | Mulled to #6. | |
| 8 | Proline | Clad Casement - operable | 905CC | 904 | * | | 21-23 |
| 9 | Proline | Clad Casement - Operable | | 905 | * | | 24-27 |
| 10 | Proline | Clad Hinged Patio Door | * | * | * | | 28-34 |
| 11 | Proline | Clad Hinged Patio Door | * | * | * | | 35-41 |
| 12 | Proline | Clad Hinged Patio Door | * | * | 4-94 | | 42-48 |
| 13 | Proline | Clad Hinged Patio Door | * | * | 4-94 | | 49-53 |
| 14 | Proline | Clad Hinged Patio Door | * | * | 4-94 | | 54-58 |
| 15 | Proline | Clad Hinged Patio Door | * | * | 4-94 | | 59-63 |
| 16 | Designer | Clad French Sliding Door with Sidelight | * | * | 1-95 | | 64-69 |
| 17 | Proline | Clad Casement - operable | * | * | 1-95 | Mulled to #18 | |
| 18 | Proline | Clad Casement - operable | 905CC | 905 | 1-95 | Mulled to #17 and #19. | 70-79 |
| 19 | Proline | Clad Casement - operable | | * | 1-95 | Mulled to #18 and #20. | |
| 20 | Proline | Clad Casement - operable | | 905 | 1-95 | Mulled to #19. | |
| 21 | Clad Frame | Triangular Clad frame. | * | * | * | | 80-83 |
| 22 | Clad Frame | Triangular Clad frame. | * | * | * | | 84-87 |
| 23 | Proline | Clad Casement - operable | 905CC | 905 | * | Mulled to #24 | |
| 24 | Proline | Clad Casement - operable | 905CC | 905 | * | Mulled to #23 and #25 | 88-99 |
| 25 | Proline | Clad Casement - operable | | 905 | 1-95 | Mulled to #24 and #26 | |
| 26 | Proline | Clad Casement - operable | | 905 | 1-95 | Mulled to #25 | |
| 27 | Proline | Clad Casement - operable | * | * | * | Mulled to #28. | |
| 28 | Proline | Clad Casement - operable | * | * | * | Mulled to #27 and #29 | |
| 29 | Proline | Clad Casement - operable | * | * | * | Mulled to #28 and #30 | 100-108 |
| 30 | Proline | Clad Casement - operable | * | * | * | Mulled to #29 | |
| 31 | Proline | Clad Casement - operable | * | * | * | Mulled to #32 | |
| 32 | Proline | Clad Casement - Fixed | * | * | * | Mulled to #31 and #33. | 109-116 |
| 33 | Proline | Clad Casement - operable | * | * | 4-94 | Mulled to #33 | |
| 34 | Proline | Clad Casement - operable | 904CC | 905 | * | Mulled to #35 | |
| 35 | Proline | Casement joined to 34 and 36. | * | 905 | * | Mulled to #34 and #36. | 117 |
| 36 | Proline | Clad Casement - operable | * | 905 | * | Mulled to #35 | |
| 37 | Proline | Clad Hinged Patio Door. | * | * | * | Mulled to #39 | |
| 38 | Proline | Fixed Clad Patio Door Panel. | * | * | * | Mulled to #38 | 118-130 |
| 39 | Proline | Clad Casement - operable | 905CC | 905 | 4-94 | Mulled to #40 | |
| 40 | Proline | Clad Casement - operable | | * | 4-94 | Mulled to #41 | 131-135 |
| 41 | Proline | Clad Casement - operable | 905CC | 905 | * | Mulled to #42 | |
| 42 | Proline | Clad Casement - Fixed | * | * | * | Mulled to #41 and #43 | 136-143 |
| 43 | Proline | Clad Casement - operable | * | * | * | Mulled to #42 | |

2

Attorney Work Product

Attorney Client Privilege

Visual Observation Summary of
The Saltzman residence, 1189 Windwood Drive, Lake Forest, IL
Date of inspection: January 18, 2007

| Window or Door # | Brand | Description | Sill Stamp | Screen Stamp | Glazing Stamp | Comments | Photo #'s |
|---|---|---|---|---|---|---|---|
| 44 | Proline | Clad Casement - operable | 904CC | * | 4-94 | Mulled to #45 | |
| 45 | Proline | Clad Casement - Fixed | * | * | 4-94 | Mulled to #44 and #46 | 144-159 |
| 46 | Proline | Clad Casement - operable | * | * | 4-94 | Mulled to #45 | |
| 47 | Proline | Clad Casement - operable | 904CC | * | * | Mulled to #48 | |
| 48 | Proline | Clad Casement - Fixed | * | * | * | Mulled to #47 and #49 | 160-167 |
| 49 | Proline | Clad Casement - operable | * | * | * | Mulled to #48 | |
| 50 | Proline | Clad Casement - operable | 905CC | * | 4-94 | Mulled to #49 | 168 |
| 51 | Proline | Clad Casement - operable | * | * | 4-94 | Mulled to #50 | |
| 52 | Proline | Single operable casement | * | 905 | * | | 169-170 |
| 53 | Proline | Clad Casement - operable | * | 905 | * | Mulled to #54 | 171-172 |
| 54 | Proline | Clad Casement - operable | * | * | 4-94 | Mulled to #53 | |
| 55 | Designer | Clad Casement - operable | * | * | * | Mulled to #56. Information tag indicates a manufacture date of 5-03. | 173-174 |
| 56 | Designer | Clad Casement - Fixed | * | * | * | Mulled to #55 and #57. Information tag indicates a manufacture date of 5-03. | |
| 57 | Designer | Clad Casement - operable | * | * | * | Mulled to #56. Information tag indicates a manufacture date of 5-03. | |
| 58 | Proline | Single operable casement | 905CC | 905 | * | | 175 |
| 59 | NA | Non-Pella entry door | * | * | * | | 176-179 |
| 60 | Proline | Clad Casement - Fixed | * | * | * | Mulled to #61 | |
| 61 | Proline | Clad Casement - Fixed | * | * | * | Mulled to #60 and #62 | 180-193 |
| 62 | Proline | Clad Casement - Fixed | * | * | * | Mulled to #61 | |
| 63 | NA | Non-Pella Door | * | * | * | | 194 |
| 64 | Proline | Clad Casement - Fixed | * | * | * | Mulled to #65 | |
| 65 | Proline | Clad Casement - operable | * | 905 | 4-94 | Mulled to #64 and #66 | 195-197 |
| 66 | Proline | Clad Casement - Fixed | * | * | * | Mulled to #65 and #67. | |
| 67 | Proline | Clad Casement - operable | * | 905 | 4-94 | Mulled to #66. | |
| 68 | Proline | Clad Casement - operable | * | * | * | Mulled to #69 | |
| 69 | Proline | Clad Casement - operable | * | * | * | Mulled to #68 and #70 | 198-201 |
| 70 | Proline | Clad Casement - operable | * | * | * | Mulled to #69 and #71 | |
| 71 | Proline | Clad Casement - operable | * | 904 | * | Mulled to #70 | |
| S1 | | Kitchen | * | * | * | | 203-205 |
| S2 | | | * | * | * | | |
| S3 | | Master Bath | * | * | * | | 206-208 |
| S4 | | | * | * | * | | |
| S5 | | Kitchen | * | * | * | | 209-211 |
| S6 | | Kitchen | * | * | * | | 212-215 |
| S7 | | | * | * | * | | 216 |
| S8 | | | * | * | * | | |

**OBSERVATIONS (Continued):**

The specific observations for each penetration are recorded on the attached photo log.

3

Attorney Work Product

Attorney Client Privilege

**DISCUSSION ON OBSERVATIONS:**

The vast majority of the windows are not showing any signs of deterioration or problems. Some of the windows have minor staining that is probably due to condensation. The formation of condensation is a result of the exterior temperature, the interior temperature and humidity and not a window product issue.

The products observed on this home do not have a correctly installed line of perimeter sealant. The installation instructions recommended a continuous line of backer rod and sealant around the entire perimeter of the windows and doors.

This line of sealant was to be recessed, so that the interior wall of the sealant is deeper than the accessory groove of the window. The sealant joint allows for the differential movement between the stucco and the aluminum frame of the window to occur without concentrating stresses at the corners of the windows. The cracks noted at the corner of many of the windows are an indication that the stucco has failed due to these stress concentrations.

The location of the perimeter sealant is important to tie the perimeter sealants with the internal sealant lines in the combination windows and to allow the accessory grooves to drain to the exterior of the home.

The improper and/or missing perimeter sealants can allow bulk water entry behind the stucco installation. If the weather resistive barrier is incorrectly flashed or if it has any voids, water can enter the wall cavity.

There were two combination windows that have deteriorated sashes. The three wide combination containing units #31-33 are installed very close to grade. The roof configuration drains much of the roof area into this location. The lower sunroom room has a gutter system, but the main, upper roof drains freely into this area. This protected area would appear to impede direct sunlight and air circulation and would also be subject to drifting snow accumulation. These factors would appear to combine to keep the lower portions of the windows saturated for rather long periods of time, which may have contributed to the sash deterioration noted. These sashes are replaceable items.

The other combination window that is showing deteriorated sashes is the combination window containing units #44-46. The sashes could be replaced on these units to correct the deficiencies noted. The streaking noted on the stucco wall surface may be an indication that water is gaining entry above the window location. If water is entering above or around the window, that could lead to frame degradation.

Water drips were also at the head of window #24. It is possible that there is some distress of the glazing seal of the clad frame of window #22 which is above this window. The detailing of the synthetic stucco band at the gable edge is also suspect. The metal roof edge dumps directly onto the horizontal surface of the synthetic stucco. This detail may be introducing water into the head of window #22 and the water is exiting at the head of window #24.

The large accumulations of ice and the rusting of the fixtures at the eaves is an indication that the venting of the area under the shingles in inadequate. The sunroom in particular, appears to have inadequate ventilation. Poor ventilation can lead to the accumulation of moisture in the attic and eave spaces.

Many of the sashes in the home were sealed shut because the paint on the sash had adhered to the weather stripping. We were able to get these windows to open by inserting a steel ruler between the weather stripping and the sash and then "cutting" the weather-stripping away from the sashes. This is either because the sash were closed while the paint was still wet, or because the paint does not have a sufficient level of "blocking". Either of these conditions are not a product issue. It did not appear that the many of the windows were operated at regular intervals.

4

**Attorney Work Product**

**Attorney Client Privilege**

**DISCUSSION ON OBSERVATIONS (CONTINUED):**

It appears that there have been several efforts to control the water infiltration around doors #37 and #38. As noted earlier in this report, these doors are in a sunken "well" next to the home. Roof water drains uncontrolled into this well area. It seems likely that there are substantial amounts of water accumulation in this well during periods of heavy rain. The door products are not designed to resist water infiltration in a submerged condition.

There appear to be a number of maintenance items on this home that should be addressed. The perimeter sealant that has been applied at the sill of some of the windows and doors is failing. This failed sealant can allow water entry into the wall cavity. There were several open cracks noted in the stucco. Some repairs have been attempted, but they have been ineffective.

_____

Name: Gregory Gerdes, P.E.

Title: Senior Field Service Representative
Date: June 27, 2007

5

**Attorney Work Product**

**Attorney Client Privilege**

**PELEXPS00001035**

# EXHIBIT 10

**Project: Saltzman Residence**
**Address: 1189 Winwood Drive, Lake Forest, IL**
**Branch Number/Location: 096 - Chicago, IL**
**Product: Proline Clad Casement windows**
**Vintage: 1994**
**Date of Inspection: June 21, 2007**

**PURPOSE OF VISIT:**
To observe the removal of two combination windows in the home.

**GENERAL INFORMATION:**
The home is a split-level ranch design. Most of the home is on a single level. One section of the home has two levels. The elevations of the floors are offset so that the lower level of the two section area is below the main floor level. The site is fairly level. There is one set of doors that exit from the lower level, so they are set in a sunken area created with retaining walls and stairs.

The exterior finish on the home is hard coat stucco with synthetic stucco banding around some of the windows. The roofing is asphalt shingles.

**OBSERVATIONS:**
The windows scheduled for removal are in the master bedroom on the second level and in the hallway to the family room on the lower level. These windows were identified as windows #44-46 and #31-33 respectively. Both of these combination windows consist of two operable casement windows flanking a fixed casement window. All of the product is Proline Series and the vintage is believed to be 1994.

The contractor chose to cut the product into pieces to make the removal easier (or possible). The contractor also cut off the nailing fin to permit removal of the window product from the opening. It appears that the windows were installed after the installation of the plywood sheathing. Then a plastic weather barrier was installed and then the synthetic stucco banding was installed. The plastic mesh reinforcement of the synthetic stucco was exposed under the frame of the window. It would appear that the top coat, if not the entire stucco system was applied after the window installation. The plastic weather barrier was folded outward and cut off approximately even with the location of the exterior side of the window frame.

After the stucco was applied, it appears that a line of sealant was topically applied between the surface of the stucco and the window frame.

We did not see any shim usage in the original installation. Fiberglass batt insulation was installed into the cavity between the frame of the window and the rough opening.

The windows in the master bedroom (#44-46) were removed first. The contractor removed the operable sash and then cut through the frame. No deterioration was discovered in the frames of the operable units (#44 and #46). The frame was deteriorated under the center fixed unit (#45). The sheathing was showing some signs of deterioration in the same area as the frame deterioration. The contractor deemed this minor and decided not to remove and replace the wood components of the rough opening.

1

**Attorney Work Product**

**Attorney Client Privilege**

## OBSERVATIONS (Continued)

The contractor installed new Pella Proline window product in the same configuration as the original installation. The contractor set the new unit in the opening and lined up the new frame with the old sealant lines. Fasteners were installed through the frame to secure the window product in the opening. No shims were used in the new installation. Other than aligning the new product with the old, little attempt was made to check to see if the product was installed plumb level and square.

The windows in the hallway (#31-33) were removed next. The contractor followed essentially the same demolition sequence as in the master bedroom windows. The window extraction was somewhat complicated by the interior window stool installed on this window combination No deterioration was discovered in the frames of the operable units (#31 and #33). The frame was deteriorated under the center fixed unit (#32). There was some staining and evidence of water in the rough opening, but the wood components did not appear to be deteriorated.

Due to scheduling conflicts, we did not observe the installation of the new window into the hallway opening.

We did review the drainage for the sliding patio doors outside of the family room. There is one area drain in the recessed area with an approximately 2-1/2" diameter drain pipe. The area enclosed by the retaining walls and stairs is approximately 140 square feet. Approximately 14 foot of the roof area also drains into this areaway.

## DISCUSSION ON OBSERVATIONS:

The installation process revealed that the original installation was not in compliance with the published installation instruction issued by Pella Corporation. Those recommendations would have required wrapping of the weather barrier into the opening prior to setting the window, installation of sealant on the back side of the nailing fin after setting the window and setting the sill of the window on wooden shims. None of these recommendations were followed on the installation observed. In fact, the way the weather barrier was wrapped outward to the outer edge of the frame of the window may have created a "funnel" to direct any water that may have bypassed the joint between the stucco and the window frame into the rough opening below the window. This trapped water may have contributed to the deterioration noted in the frames of units #32 and #44.

The operable window units that were removed had no deterioration of the frame. It is possible that the repair could have been accomplished by removing the fixed panel from the combination window and replacing any sash that may have been deteriorated on the operable windows.

The new windows were not installed in accordance with the Pella installation instructions. These instructions would have required the installation of a "panning system" in the rough opening prior to the installation of the windows. Shims should have also been used to level and support the product. The synthetic stucco system should have been repaired to establish a return around the entire perimeter of the window so a correctly detailed perimeter sealant joint could be installed. The product, as installed, has the potential of allowing continued water entry into the wall cavity.

Name: Gregory Gerdes, P.E.

Title: Senior Field Service Representative

Date: September 5, 2007

2

Attorney Work Product

Attorney Client Privilege

# EXHIBIT 11

**Project: Eubanks (Saltzman Case)**
**Address: 1110 South Willow Circle, West Des Moines, IA**
**Branch Number/Location: 129 – Des Moines, IA**
**Product: Clad Frames, Original Pella Casement windows, Designer Series Casement**
**windows, Proline Series Casement windows, Proline Series Awning windows, Designer**
**Series Contemporary Sliding Patio Door**
**Vintage: 1993**
**Date of Inspection: March 9, 2007**

**REPRESENTATIVES PRESENT:**
Greg Gerdes, Pella Corporation
Theresa Keninger, Pella Corporation
Bob Kudder, Raths, Raths & Johnson, Inc.
Ian Chin, Wiss, Janney, Elstner Associates, Inc.
Charles Still, CES Consulting
George Lang, Freed & Weiss LLC
John Sheehan, Eastwood-Stein

**PURPOSE OF VISIT:**
To conduct an initial, non-intrusive, site investigation at the above mentioned address in conjunction with on-going legal action.

**GENERAL INFORMATION:**
The home is a ranch style home with an attached garage and a full basement. The lot slopes from west to east. Creating a walk-out basement on the east elevation of the home.
The home is primarily clad with vinyl siding. A small area of face brick was installed on the west elevation of the home.
The roofing is asphalt shingles.

**OBSERVATIONS:**
A numbering system to identify the window and door penetrations was established and used in the production of this report.
Our observations regarding the vintages and product types are recorded on the attached spreadsheets. These spreadsheets also refer to the appropriate photograph numbers which appear later in this report.

1

**Attorney Work Product**

**Attorney Client Privilege**

Visual Observation Summary of
The Eubanks Residence, 1110 South Willow Circle, West Des Moines, IA
Date of Inspection: February 22, 2007

| Window or Door # | Brand | Description | Frame Stamp | Screen Stamp | Glazing Stamp | Comments | Report Photo #'s |
|---|---|---|---|---|---|---|---|
| 1A | Support | Clad Frame - half circle | - | - | - | | |
| 1B | NA | Entry door | - | - | - | | 3-12 |
| 2 | Designer | Clad Casement - Fixed | - | - | - | Left hand (exterior) side in bay window grouping. | 13-18 |
| 3 | Designer | Clad Casement - Operable | 902C | - | - | Mulled to #4. Center unit in bay assembly. Staining on lower sash rail. | |
| 4 | Designer | Clad Casement - Operable | 902C | - | - | Mulled to #3. Center unit in bay assembly. | 19-35 |
| 5 | Designer | Clad Casement - Fixed | - | - | - | Right hand (exterior) side in bay window grouping. | 36-41 |
| 6 | Designer | Clad Casement - Operable | - | - | - | Mulled to #7. | |
| 7 | Designer | Clad Casement - Operable | - | - | - | Mulled to #6. | 42-60 |
| 8 | Designer | Clad Casement - Operable | - | 903 | - | | 61-70 |
| 9 | Designer | Clad Casement - Operable | - | 903 | - | | 71-81 |
| 10 | Designer | Clad Casement - Operable | - | 903 | - | Mulled to #11. | |
| 11 | Designer | Clad Casement - Operable | - | 903 | - | Mulled to #15. | 82-101 |
| 12A | Profile | Clad Awning - Fixed | - | - | - | | |
| 12B | Support | Clad Frame | - | - | 93-CF | | |
| 12C | Profile | Clad Awning - Operable | 903 | - | - | | 102-124 |
| 13A | Profile | Clad Awning - Fixed | - | - | - | | |
| 13B | Support | Clad Frame | - | - | 93-CF | | |
| 13C | Profile | Clad Awning - Operable | 903 | - | - | We could not get window to operate | 125-141 |
| 14A | Profile | Clad Awning - Fixed | - | - | - | | |
| 14B | Support | Clad Frame | - | - | 93-CF | | |
| 14C | Profile | Clad Awning - Operable | 903 | - | - | We could not get window to operate | 142-165 |
| 15A | Profile | Clad Awning - Fixed | - | - | - | | |
| 15B | Support | Clad Frame | - | - | 93-CF | | |
| 15C | Profile | Clad Awning - Operable | 903 | - | - | | 166-194 |
| 16 | Original Pella | Clad Casement - Operable | - | - | - | Mulled to #17. | |
| 17 | Original Pella | Clad Casement - Operable | - | - | - | Mulled to #16. | 195-222 |
| 18 | Original Pella | Clad Casement - Operable | - | - | - | Mulled to #19. | |
| 19 | Original Pella | Clad Casement - Operable | - | - | - | Mulled to #18. | 224-231 |
| 20 | Designer | Sliding Patio Door | - | - | - | | 232-252 |
| 21 | Original Pella | Clad Casement - Operable | - | - | - | Mulled to 21 | |
| 22 | Original Pella | Clad Casement - Fixed | - | - | - | Mulled to 20 | 253-274 |
| 23 | Original Pella | Clad Casement - Fixed | - | - | - | Mulled to 24 | |
| 24 | Original Pella | Clad Casement - Operable | - | - | - | Mulled to 23 | 275-288 |
| 25 | Profile | Clad Casement - Operable | - | - | - | Mulled to 26 | |
| 26 | Profile | Clad Casement - Operable | - | - | - | Mulled to 25 | 289-310 |
| 27 | NA | Entry door | - | - | - | | 311 |
| 28 | NA | Overhead Garage Door | - | - | - | | 312 |
| 29 | NA | Overhead Garage Door | - | - | - | | 312 |
| 30 | Designer | Clad Casement - Fixed | - | - | - | | |
| 31 | Designer | Clad Casement - Operable | - | - | - | Mulled to #32 | |
| 32 | Designer | Clad Casement - Operable | - | - | - | Mulled to #31 | |
| 33 | Designer | Clad Casement - Fixed | - | - | - | | 313-356 |
| 34 | Designer | Clad Casement - Operable | - | 903 | - | | 357-368 |
| 35 | Original Pella | Clad Casement - Operable | - | 903 | - | Mulled to #36 | |
| 36 | Original Pella | Clad Casement - Fixed | - | - | - | Mulled to #35 and #37. | |
| 37 | Original Pella | Clad Casement - Fixed | - | 903 | - | Mulled to #36 | 369-399 |
| 38/39 | Designer | Sliding Patio Door | - | - | - | | 400-415 |
| 40 | Original Pella | Clad Casement - Operable | - | 902C | - | Mulled to #43 and 42 | |
| 41 | Original Pella | Clad Casement - Fixed | - | - | - | Mulled to #41. | |
| 42 | Original Pella | Clad Casement - Operable | - | 903C | - | Mulled to #41. | 416-442 |
| 43 | Original Pella | Clad Casement - Operable | - | - | - | Mulled to #44 | |
| 44 | Original Pella | Clad Casement - Operable | - | - | 903CC | Mulled to #43. | 443-469 |

2

**Attorney Work Product**

**Attorney Client Privilege**

PELEXPS00001456

**DISCUSSION ON OBSERVATIONS:**

We have broken the observations up into several general categories.

**CONDENSATION:** There were many windows that have deterioration of the finish on the interior wooden components. It did not appear that the product had been refinished since its installation. In some instances this finish degradation has exposed the wood grain to moisture. On the direct glazed products like the Proline Series windows or the clad frame products, this staining occurs near the glass and it is somewhat concentrated at the corners of the glazing. There are numerous examples of this throughout the home. See photos #66, 218 and 364 for examples of this staining. The Designer Series and the Original Pella products use a Dual Glazing Panel (DGP) concept where there is a removable interior glazing panel. On this type of product, the staining was noticed on the lower sash rail, between the primary glazing and the DGP. See photographs # 67, 296 and 345 for examples of this staining. Unfinished wood left exposed to moisture for long periods of time can begin to deteriorate. Some of the dark staining noted may be the start of wood deterioration. Most of the window product would remain serviceable for a long period of time if the exposed wood was refinished.

**WATER INFILTRATION AROUND PENETRATIONS:** There were signs of water entry around the windows in several locations. The most noticeable was around window #9. Photo #76 shows moisture at the upper and lower corners of this window, even though this window was not being hit by rain. This window is in close proximity to the termination of a roof system. Windows #8 and #24 are located in similar situations.

Water staining was noted at the mullion terminations of some of the combination windows. Photos #137, 140, 155, 157, 178 and 180 show water staining that appears to be emanating from the mullion joint. The moisture source was probably the inadequate perimeter sealant discussed later in this report.

**INSTALLATION DEFICIENCIES:** There were several portions of the installation instructions that were not followed. We did not observe any window or door product that had a correctly installed line of perimeter sealant. Many of the penetrations had no sealant installed. What sealant that was installed appeared to be a topically applied line of sealant. The installation instructions recommend a 3/8" thick bead of sealant and backer rod around all of our product. Many of the windows were installed directly under the aluminum soffit. It is unclear if the head of the window was properly integrated into the weather resistive barrier at these locations. The recessed grooves in the soffit can provide a path for the wind driven moisture to travel directly to the head of the window. Photos #24, 47, 62, 72, 197, 230 and 320 show staining or corrosion that is occurring on the soffit panels. This could be an indication that water is entering the soffit area.

**PRIOR REPAIRS:** We noted that some of the windows had repairs completed on them. Additional sealant was applied to the corner of the clad frame windows and also between the frame and the glazing on these windows. Photos #156 and 163 show face nailing on the glass stop of the clad frame. This is an indication that this component was probably removed. Photo #56 shows a sash stop that is not tight to the sash. It is not clear if this was provided this way or modified after it was installed.

3

**Attorney Work Product**

**Attorney Client Privilege**

PELEXPS00001457

**DEFFERRED MAINTENANCE:** The failure to maintain the finishes on the wood components on the exterior of the windows has exposed these components to moisture. The staining noted varies from light staining which is probably not a serious issue to a darker staining, which may be an indication of wood deterioration. Photo # 248 shows damage to weather stripping on the door. Photo # 258 shows a sash where the paint has been rubbed off, exposing the aluminum base metal. The cable routing through window #15C has created a condition which makes it impossible for this window to seal properly. This has likely caused much of the staining and deterioration noted on this window. The lack of routine maintenance can greatly shorten the life of any building component, including window and door products.

**OTHER CONSTRUCTION COMPONENTS:** As noted in this report there are a number of other apparent construction deficiencies in this home. Some or all of these items are likely to be contributing to water entry in the home. These items include:
- Missing or failed sealants at dissimilar materials. Photos #46 is an example.
- Security sensors installed through the frames of the product. Photos #13, 70, 211, 221, 241, 249, 273 346 and 349 are examples.
- The eave detailing appears to be introducing water behind the siding installation. Depending on how the weather resistive barrier is detailed, this may be introducing water into the wall construction.

**SASH CONDITION:** The sashes on windows #15C, 40 and 43 are in poor condition and should be replaced. There were other sashes that are questionable and may have deterioration that has proceeded to the point that replacement will be required. Photos #103, 147, 171, 196 and 225 show cladding movement that may be an indication that deterioration has occurred in the sash. It is unclear what the root cause of the sash deterioration was. It may be caused by the condensation noted above, by a glazing seal leak or by the introduction of moisture from other sources. Whatever the cause of the deterioration, the repair procedure would be to replace the sashes.

Name: Gregory Gerdes, P.E.

Title: Senior Field Service Representative

Date: June 27, 2007

4

**Attorney Work Product**

**Attorney Client Privilege**

PELEXPS00001458

# EXHIBIT 12

**Project: Eubanks (Saltzman Case)**
**Address: 1110 South Willow Circle, West Des Moines, IA**
**Branch Number/Location: 129 – Des Moines, IA**
**Product: Clad Frames, Original Pella Casement windows, Designer Series Casement windows, Proline Series Casement windows, Proline Series Awning windows, Designer Series Contemporary Sliding Patio Door**
**Vintage: 1993**
**Date of Inspection: August 22, 2007**

**REPRESENTATIVES PRESENT:**
    Greg Gerdes
    Ian Chin

**PURPOSE OF VISIT:**
    To review progress of window removal and replacement project. We will be reviewing the construction detailing used and the condition of the window product in place on this home.

**GENERAL INFORMATION:**
    The home is a ranch style home with an attached garage and a full basement. The lot slopes from west to east, creating a walk-out basement on the east elevation of the home.
    The home is primarily clad with aluminum siding. A small area of face brick was installed on the west elevation of the home.
    The roofing is asphalt shingles.

**OBSERVATIONS:**
    The aluminum siding had been removed on a portion of the rear elevation of the home. The siding was removed around the wall penetrations identified as #10, 11, 12A, 12B, 12C, 38, 39, 40, 41, 42, 43 and 44). It appeared that the aluminum siding was installed over an approximately ¾" wide extruded polystyrene insulation, which was installed over the Oriented Strand Board (OSB) sheathing. No weather barrier or flashing systems were noted on the home. A small area was noted where a urethane foam based product was used for sheathing instead of the OSB sheathing.
    Staining was noted on the OSB at the corners and at some of the center mullions of the window openings. Staining was also noted at the other penetrations and corners of the siding installation.
    The contractor indicated that the scope of work anticipated did not include removal of the sliding door numbered 38-39. The other windows were being removed and replaced with windows manufactured by Marvin Corporation.

1

Attorney Work Product

Attorney Client Privilege

PELEXPS00001901

**OBSERVATIONS (Continued):**

We were present for the extraction of window #43-44. As noted in previous reports this window is a two-wide combination window. The series is "Original Pella" and the vintage is believed to be 1993. The nailing fin was not installed on the sill of the window. The sill was set in sealant, similar to a door installation method. There were nailing fins on the jambs and head of the window. These were set dry on the sheathing (no sealant). It appeared that pneumatic staples were used to secure the window to the structure. No shims were noted in the installation.

We noted staining at the head and sill of the window. The staining at the head seemed to be concentrated at the left hand (exterior) side, but was evident across the head of the window. The staining at the sill was most prominent at the center mullion location. Staining was noted in the rough opening framing materials at the head and sill also.

**DISCUSSION OF OBSERVATIONS:**

The lack of a weather resistive barrier and the associated flashings seems to be the primary cause of the deterioration and staining noted on the sheathing, framing material and window product of this home. Aluminum siding is not generally considered a weather resistive barrier. Most aluminum siding manufacturers that we are familiar with recommend the use of a weather barrier with their product. Since the model building codes require the use of a weather barrier, this deficiency is probably not only poor construction practice but also a building code violation.

The instructions issued by Pella Corporation for the installation of this product were also not followed. The installation instructions at that time recommended wrapping the weather barrier into the opening, setting the unit on shims to raise it off from the rough opening and to level it up, installing sealant on the back side of the nailing flange, setting the window unit into the rough opening, shimming the jambs until the unit was plumb, level and square, and then installing sealant between the siding material and the frame of the window. None of these steps were apparently followed.

The missing nailing fin on the bottom of the window may have also contributed to the water infiltration around the window. Setting the window sill in sealant may have trapped the moisture that was flowing around the window at the sill of the opening.

The water staining noted at the head of the window and at the sheathing in areas that do not have a window or door penetration is an indication that water was bypassing the aluminum siding. Without a properly installed weather-resistive barrier the moisture was free to enter the wall cavity at penetrations such as windows and doors.

_Gregory Gerdes_

Name: Gregory Gerdes, P.E.

Title: Senior Field Service Representative

Date: December 11, 2007

2

Attorney Work Product

Attorney Client Privilege

PELEXPS00001902

# EXHIBIT 13

**Project: Eubanks (Saltzman Case)**
**Address: 1110 South Willow Circle, West Des Moines, IA**
**Branch Number/Location: 129 – Des Moines, IA**
**Product: Clad Frames, Original Pella Casement windows, Designer Series Casement**
**windows, Proline Series Casement windows, Proline Series Awning windows, Designer**
**Series Contemporary Sliding Patio Door**
**Vintage: 1993**
**Date of Inspection: September 12, 2007**

**REPRESENTATIVES PRESENT:**
Greg Gerdes

**PURPOSE OF VISIT:**
To review the progress of the window replacement project. If possible, we will review the condition of the windows removed and investigate the construction details used in the installations of the window and door product.

**GENERAL INFORMATION:**
The home is a ranch style home with an attached garage and a full basement. The lot slopes from west to east, creating a walk-out basement on the east elevation of the home.
The home is primarily clad with aluminum siding. A small area of face brick was installed on the west elevation of the home.
The roofing is asphalt shingles.

**OBSERVATIONS:**
The contractor was working on replacing windows and installing siding on the south elevation of the home. Window #9 had been removed and was lying on the ground near the work area. The other windows that had been removed were stored in the garage area. We were permitted to review the condition of that product.
Water staining was noted at the heads of many of the windows. There was staining and deterioration noted on the sill area of some of the windows, particularly at the mullion and corner locations. There were some sash that were showing signs of deterioration.

**COMMENTS ON OBSERVATIONS:**
There appears to be a pretty good correlation between the water staining noted at the heads of the windows and the deterioration of the frame sills. Water entry behind the nailing fin at the head of the windows is an indication that the flashing system used on this home was not functioning properly. This is not surprising since no weather barrier with the associated flashing system was established to control the moisture migration in the wall components.
There were sash that had deteriorated, requiring replacement. The replacement of those sash would not have required the removal of the window frames to accomplish that repair.

1

Attorney Work Product

Attorney Client Privilege

PELEXPS00001937

Name:  Gregory Gerdes, P.E.

Title: Senior Field Service Representative

Date:   December 11, 2007

2

**Attorney Work Product**

**Attorney Client Privilege**

**PELEXPS00001938**

# EXHIBIT 14

**Project: Ehorn Residence (Saltzman Case)**
**Address: 225 Surfsound Drive, Smith River, CA**
**Branch Number/Location: 299/Portland, OR**
**Product: Proline Series – Clad Casement windows (fixed and operable), Designer Series –**
**Smart Sash III, Clad Casement windows, Designer Series Clad out-swing French doors**
**Vintage: 1990 and 1995**
**Date of Inspection: February March 29, 2007**

**REPRESENTATIVES PRESENT:**
      Will Smith, Glazing Consultants
      Theresa Keninger, Pella Corporation
      Greg Gerdes, Pella Corporation
      Ian Chin, Wiss, Janney, Elstner Associates, Inc.
      Mike Solender, The Solander Group
      Shawn Bailey, Attorney

**PURPOSE OF VISIT:**
      To conduct an initial, non-intrusive, site investigation at the above mentioned address in conjunction with on-going legal action.

**GENERAL INFORMATION:**
      The home is a one-story home that appears to be on a crawlspace. There appears to be a small cellar area on the north-west corner of the home. The site slopes sharply towards the ocean. The exterior of the home is horizontal lap siding with wood trim installed around the windows and doors. The roofing is cement tiles cast in shapes to resemble slate.

**OBSERVATIONS:**
      A numbering system to identify the window and door penetrations was established and used in the production of this report. Appendix A contains sketches showing the identification number and the approximate location of the window and door product on this home.

      Information regarding the type, brand and vintages of the windows and door products are recorded for each penetration on the following spreadsheet. These spreadsheet also refer to the appropriate photograph numbers which appear later in this report.

      The photograph descriptions contain the observations noted on the Pella products during the visual inspection.

      Several of the windows appear to have been worked on in the past. This was particularly noticeable on the two large combination windows (#23 and 24) but was also noted on several of the other window units.

1

**Attorney Work Product**

**Attorney Client Privilege**

Visual Observation Summary of
The Eulhorn Residence, 225 Surfsound Drive, Smith River, CA
Date of Inspection: March 29, 2007

| Window or Door # | Brand | Description | Screen Stamp | Glazing Stamp | Comments | Recent Photo #s |
|---|---|---|---|---|---|---|
| 1 | Entry Door | Entry door with two sidelights | - | - | | 3-18 |
| 2 | Original Pella | Clad Casement - Operable | 9-00 | 2-99 | Mulled to #3 | |
| 3 | Original Pella | Clad Casement - Fixed | - | 2-99 | Mulled to #2 and #4 | |
| 4 | Original Pella | Clad Casement - Fixed | - | 2-99 | Mulled to #3 | 19-37 |
| 5 | Original Pella | Clad Casement - Fixed | 9-00 | 1-00 | | 38-50 |
| 6 | Original Pella | Clad Casement - Operable | - | 2-99 | Mulled to #7 | |
| 7 | Original Pella | Clad Casement - Operable | - | 2-99 | Mulled to #6 and #8 | |
| 8 | Original Pella | Clad Casement - Operable | 9-00 | 2-00 | Mulled to #7 | 51, 52-70 |
| 9 | Original Pella | Clad Casement - Operable | - | 2-99 | | 71-80 |
| 10 | NA | Clad Casement - Operable | - | - | | 81 |
| 11 | Original Pella | Clad Casement - Fixed | - | 1-00 | Mulled to #12 | |
| 12 | Original Pella | Clad Casement - Fixed | - | 1-00 | Mulled to #11 | 82-96 |
| 13 | Designer | French Patio Door - Out-swing | - | - | | 97-106 |
| 14 | Original Pella | Clad Casement - Fixed | - | 1-00 | Mulled to #15 | |
| 15 | Original Pella | Clad Casement - Fixed | - | 1-00 | Mulled to #14 and #16 | |
| 16 | Original Pella | Clad Casement - Fixed | - | 1-00 | Mulled to #15 and #17 | |
| 17 | Original Pella | Clad Casement - Operable | - | 2-00 | Mulled to #16 | 107-130 |
| 18 | Original Pella | Clad Casement - Fixed | - | 1-00 | Mulled to #19 | |
| 19 | Original Pella | Clad Casement - Fixed | - | 1-00 | Mulled to #18 and #20 | |
| 20 | Original Pella | Clad Casement - Operable | - | 2-00 | Mulled to #19 | 131-163 |
| 21 | Original Pella | Clad Casement - Operable | - | 2-99 | | 164-169 |
| 22A | Original Pella | Clad Casement - Operable | 9-00 | 2-00 | Mulled to #22B and #22C | |
| 22B | Original Pella | Clad Casement - Fixed | - | - | Mulled to #22A and #22D | |
| 22C | Original Pella | Clad Casement - Fixed | - | - | Mulled to #22A and #22D | |
| 22D | Support | Clad Frame | - | - | Mulled to #22B, #22C and #22D | |
| 22E | Support | Clad Frame | - | - | Mulled to #22C | |
| 24A | Original Pella | Clad Casement - Fixed | - | - | Mulled to #24B and #24C | |
| 24B | Original Pella | Clad Casement - Operable | 9-00 | 2-00 | Mulled to #24A and #24D | |
| 24C | Original Pella | Clad Casement - Fixed | - | - | Mulled to #24A and #24E | |
| 24D | Support | Clad Frame | - | - | Mulled to #24B and #24C | |
| 24E | Support | Clad Frame | - | - | Mulled to #24C | 159-213 |
| 25 | Designer | French Patio Door - Out-swing | - | | | 214-227 |
| 27 | Original Pella | Clad Casement - Fixed | - | 1-00 | Mulled to #28 | |
| 28 | Original Pella | Clad Casement - Fixed | - | 2-00 | Mulled to #27 and #29 | |
| 29 | Original Pella | Clad Casement - Fixed | - | 2-00 | Mulled to #28 and #30 | |
| 30 | Original Pella | Clad Casement - Operable | 9-00 | 2-00 | Mulled to #29 | 209-239 |
| 31 | Original Pella | Clad Casement - Fixed | - | 1-00 | Mulled to #32 | |
| 32 | Original Pella | Clad Casement - Fixed | - | 1-00 | Mulled to #31 | 240-253 |
| 33 | Designer | French Patio Door - Out-swing | - | - | | 254-266 |
| 34 | Designer | Clad Casement - Fixed | - | 4-04 | | 267-277 |
| 35 | Designer | Clad Casement - Operable | - | 1-95 | Mulled to #36 | |
| 36 | Designer | Clad Casement - Fixed | - | 1-95 | Mulled to #35 | 278-296 |
| 37 | NA | Entry Door - NonPella | - | - | | 298-305 |
| 38 | NA | Sliding Alum. Window - NonPella | - | - | | 306-307 |
| 39 | NA | Entry Door - NonPella | - | - | | 308-314 |
| 40 | NA | Sliding Alum. Window - NonPella | - | - | | 315 |
| 41 | NA | Single overhead garage door - NonPella | - | - | | 316 |
| 42 | NA | Double overhead garage door - NonPella | - | - | | 317 |

2

Attorney Work Product

Attorney Client Privilege

PELEXPS00001696

## DISCUSSION ON OBSERVATIONS:

The vast majority of the windows are not showing any signs of deterioration or problems. Some of the windows have minor staining that is probably due to condensation. The formation of condensation is a result of the exterior temperature, the interior temperature and humidity and not a window product issue

The products observed on this home do not have a correctly installed line of perimeter sealant. The installation instructions recommended a continuous line of sealant around the entire perimeter of the windows and doors. This line of sealant was to be recessed, so that the interior wall of the sealant is behind the accessory groove of the window. The sealant joint allows for the differential movement between the wood siding and the aluminum frame of the window. The location of the perimeter sealant is important to tie the perimeter sealants with the internal sealant lines in the combination windows and to allow the accessory grooves to drain to the exterior of the home. The improper and/or missing perimeter sealants can allow bulk water entry behind the siding installation. If the weather resistive barrier is incorrectly flashed or if it has any voids, water can enter the wall cavity.

Windows #33, 34, 35 and 36 are of a newer vintage than the rest of the home. It appears that the "in-law suite" was added at a later date. The product in this area consists of fixed and operable Designer Smart Sash III casement windows, but the interior Double-Glazed Panel (DGP) was not in place. The design of this window includes breather vents installed through the sash to help prevent condensation between the primary glazing and the DGP. Without the DGP panel, water can enter through these vents. We did not see evidence of this occurring, but would recommend either reinstalling the DGP or plugging the breather vents.

There was some minor discoloration noted on some of the sash in the home. This was most prevalent in the bathroom windows numbered 6-8. We believe this discoloration is due to a combination of condensation and maintenance issues.

The large combination windows in the living room (#23 and #24) appear to be in poor condition. It appears that the vertical mullion caps were left open at the top. All of the Pella product on this project was installed utilizing a drip cap, except these two composite windows. Without a drip cap, water is free to enter the mullion cavity. In our opinion, that is what has been occurring at this location since the windows were installed. This uncontrolled water has led to the frame deterioration and staining noted, and may have caused deterioration of other components of the home (like sheathing and studs).

The structural capacity of these combination windows is not sufficient. The only "structural" reinforcement is the plywood strip installed in the two vertical mullions. According to the Architectural Design Manual published by Pella Corporation, plywood is not considered a structural member. The location of this home would appear to be a rather high wind exposure, so a corresponding high structural load would be anticipated on the window grouping. Drawings were prepared by Pella Corporation for a replacement window assembly. This design concept indicated that 2" by 6" wood member were required in both the upper and lower horizontal joints as well as in the two vertical mullion joints. An insufficient structural frame to carry the loading can lead to excessive deflection of the assembly, putting additional stress on the interior lines of sealant both in and around the product.

There was a small discoloration noted on the sill of window #17. It is unclear if this is related to additional water infiltration around the windows, or if it is simply a variation in the coloration of the wood.

In addition to being a high wind location, this building site is also exposed to corrosive salt air. The effects of this corrosion was noted on several of the items on the home like the crawlspace vents, the electrical covers, the patio furniture and on the skin of door #37. The window components appear to be in excellent condition with little apparent upkeep.

3

**Attorney Work Product**

**Attorney Client Privilege**

PELEXPS00001697

Name: Gregory Gerdes, P.E.

Title: Senior Field Service Representative

Date: July 2, 2007

4

**Attorney Work Product**

**Attorney Client Privilege**

**PELEXPS00001698**

# EXHIBIT 15

**Project: Riva Residence (Saltzman Case)**
**Address: 9725 Fruitville Road, Sarasota, FL**
**Branch Number/Location: 065 / Jacksonville, FL**
**Product: Proline Series – Clad Double-Hung windows, Proline Series – Fixed Clad**
**Casement windows, Architect Series – Clad Double-Hung windows, Designer Series Clad**
**Sliding patio doors, Designer Series Clad out-swing French doors**
**Vintage: 2000**
**Date of Inspection: February 19, 2007**

**REPRESENTATIVES PRESENT:**
> John Roberts, Wildman Harrold
> Charles Still, CES Consulting
> John Sheehan, Eastwood-Stein
> Will Smith, Glazing Consultants International, Inc.
> Theresa Keninger, Pella Corporation
> Dennis Johnson, Rath, Rath and Johnson
> Greg Gerdes, Pella Corporation

**PURPOSE OF VISIT:**
> To conduct an initial, non-intrusive, site investigation at the above mentioned address in conjunction with on-going legal action.

**GENERAL INFORMATION:**
> The home is a two story home without a basement. The site is nearly level. The exterior of the home is horizontal lap siding with wood trim installed around the windows and doors. The roofing is asphalt shingles.
> We did note fasteners installed around some of the windows which are apparently used to fasten storm protection over some of the window units.

**OBSERVATIONS:**
> A numbering system to identify the window and door penetrations was established and used in the production of this report. Appendix A contains sketches showing the identification number and the approximate location of the window and door product on this home.
> The specific observations are recorded for each penetration in the following photo log. A spreadsheet is attached that identifies the product and vintages on the window and door products observed on this home. This spreadsheet also refers to the appropriate photograph numbers which appear later in this report.

**DISCUSSION ON OBSERVATIONS:**
> The vast majority of the windows are not showing signs of deterioration or problems. We did not see any deterioration of the frame on any of the window product.
> The products observed on this home do not have a correctly installed line of perimeter sealant. The installation instructions recommended a continuous line of backer rod and sealant around the entire perimeter of the windows and doors.

1

**Attorney Work Product**

**Attorney Client Privilege**

Visual Observation Summary of
The Riva residence, 9725 Riviviere Road, Sarasota, FL
Date of Inspection: February 19, 2007

| Window or Door # | Brand | Description | Date on Sticker | Glazing Stamp | Comments | Report Photo #s |
|---|---|---|---|---|---|---|
| 1 | N/A | Non-Pella Entry Door | | | | - |
| 2 | Architect | Double Hung window in bay configuration | 0700 | 3-00 | | 8-11 |
| 3 | Proline | Fixed Casement in center of bay configuration | 0700 | 2-00 | | 12-15 |
| 4 | Architect | Double Hung window in bay configuration | 0700 | " | | 16-21 |
| 5 | N/A | Non-Pella Passage door | | " | | 22-25 |
| 6 | Proline | Double Hung | 0600 | " | | 26-31 |
| 7 | Proline | Double Hung | 0600 | 2-00 | | 32-36 |
| 8 | Proline | Double Hung in three wide combination | 0700 | 2-00 | Mulled to #9 | |
| 9 | Proline | Double Hung in three wide combination | 0100 | 1-00 | Mulled to #8 and #10 | |
| 10 | Proline | Double Hung in three wide combination | 0700 | 3-00 | Mulled to #9 | 37-53 |
| 11 | Architect | Double Hung in three wide combination | " | " | Mulled to #12 | |
| 12 | Architect | Double Hung in three wide combination | " | " | Mulled to #11 and #13 | |
| 13 | Architect | Double Hung in three wide combination | " | " | Mulled to #12 | 54-71 |
| 14 | N/A | Passage Door | " | " | | - |
| 15 | N/A | Non-Pella passage Door | " | " | | 72-76 |
| 16 | Proline | Double hung window | 0800 | 3-00 | | 77-80 |
| 17 | Proline | Double hung | 0600 | 1-00 | | 81-89 |
| 18 | Proline | Double hung | 0700 | 2-00 | | 90-97 |
| 19 | Proline | Double hung | 0700 | 2-00 | 4-04 on upper sash glazing stamp. Sash is unfinished. | 98-104 |
| 20 | Designer | Sliding patio door with clad frame transom, F, O, O, F | 0700 | | | 105-114 |
| 21 | Designer | Sliding patio door with clad frame transom, F, O, O, F | " | " | | 115-126 |
| 22 | Designer | Outswing French Patio Doors | 0700 | " | | 127-138 |
| 23 | N/A | NOT USED | | | | - |
| 24 | Proline | Double Hung in two wide combination | 0600 | 3-00 | Mulled to #25 | |
| 25 | Proline | Double Hung in two wide combination | 0600 | 3-00 | Mulled to #24 | 139-148 |
| 26 | Proline | Double hung window | 0600 | 2-00 | | 150-154 |
| 27 | Proline | Double hung window | 0600 | 2-00 | | 155-160 |
| 28 | Proline | Double hung window | 0600 | 3-00 | | 161-166 |
| 29 | Architect | Double hung window in three wide combination | 0700 | 3-00 | Mulled to #30 | |
| 30 | Architect | Double hung window in three wide combination | 0700 | 3-00 | Mulled to #29 and #31 | |
| 31 | Architect | Double hung window in three wide combination | 0700 | 3-00 | Mulled to #30 | 168-179 |
| 32 | Proline | Double hung window | 0600 | 1-00 | | 178-183 |
| 33 | Proline | Double hung window | " | 1-00 | 2-06 on lower sash glazing stamp | 184-159 |
| 34 | Proline | Double hung window | 0600 | 2-00 | 2-04 on upper sash glazing stamp | 180-193 |
| 35 | Proline | Double hung window | " | 3-00 | 2-04 on upper sash glazing stamp | 194-198 |

2

**Attorney Work Product**

**Attorney Client Privilege**

PELEXPS00001152

**DISCUSSION ON OBSERVATIONS (Continued):**

This line of sealant was to be recessed, so that the interior wall of the sealant is behind the accessory groove of the window. The sealant joint allows for the differential movement between the wood trim and the aluminum frame of the window .

The location of the perimeter sealant is important to tie the perimeter sealants with the internal sealant lines in the combination windows and to allow the accessory grooves to drain to the exterior of the home.

The improper and/or missing perimeter sealants can allow bulk water entry behind the siding installation. If the weather resistive barrier is incorrectly flashed or if it has any voids, water can enter the wall cavity.

There were four windows where it appeared that the sash had been replaced. The upper sash had apparently been replaced on windows #19, 34 and 35. The glass etching indicates that this product was manufactured in early 2004. The lower sash was replaced on window #33. From the information on that glass etching it appears that product was manufactured early in 2005. No finish had been installed on this product at the time of our inspection, even though the Owner's manual clearly states that all product must receive a finish right away.

The finish that was installed on the product did not extend all of the way to the weather-stripping locations on any of the double-hung windows in this home. Wood was left exposed outside of the primary weather-stripping at two main locations. One was at the lower edge of the bottom sash. See photographs #30, 40, 41, 47, 50, 84, 154, 164 and 174 for examples of the missing finish at this location. The other location is below the primary weather-stripping on the upper sash. Photographs #31, 78 and 160 show this missing finish location. In photograph #160 is appears that the deterioration is starting at the exposed wood and beginning to spread. Finish was also not installed on the edges of the door product. See photos #130, 133 and 134 for this condition.

Wood left exposed to the elements will deteriorate. It seems very plausible that the deterioration observed on this home is linked to the incomplete finish application noted.

The upper sash on windows #6, 18 and 27 appear to have experienced some level of deterioration at the time of our inspection. It was unclear if the cause of this deterioration was the lack of finish, a storm event that exceeded the capacity of the product, or some other unknown cause. Although we could not determine specific cause of the deterioration, these sash panels could be replaced in a manner similar to those that were replaced prior to our inspection.

Several of the windows appear to have had the primary weather-stripping on the lower sash replaced. There appears to be a good correlation between this remedial work and the window frames being installed out of square. It is more difficult to obtain a positive seal on product that is incorrectly installed. If the product is too far out of square, there is nothing that can be done by our service personnel to correct the problem. The window must be removed and correctly installed.

We did note some of the product that was in need of minor maintenance and repair. The weather stripping was folded or displaced on some of the product. See photograph #8 for an example of this. At least one of the DGP clips were note engaged (photo#116) and the foam pads at the lower edges of the lower sash were missing or displaced (photos 171 and 172) on some of the product.

_Gregory Gerdes_

Name:  Gregory Gerdes, P.E.

Title:   Senior Field Service Representative

Date:   August 1, 2007

3

**Attorney Work Product**

**Attorney Client Privilege**

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WISCONSIN

DOUGLAS E. BARDEN, Individually, and as a
Representative of a Class of Similarly Situated
Consumers,

       Plaintiff,

    v.                           Civ No. 2:06-cv-00046-LA

HURD MILLWORK COMPANY, INC.,
HURD WINDOWS & DOORS, INC., f/k/a
MONARCH ACQUISITON COMPANY,
HURD WINDOWS & DOORS, INC.,
MONARCH HOLDINGS, INC., and UIS, INC.

       Defendants.

---

## STIPULATED SETTLEMENT AGREEMENT

---

THIS SETTLEMENT AGREEMENT is entered into this 11th day of August, 2011 by

and between Plaintiff, on his behalf and on behalf of the Class, through their counsel of record,

and by Defendant, HMC, Inc., formerly known as Hurd Millwork Company, Inc., and Defendant

UIS, Inc., through their counsel of record.   This Agreement is subject to Court approval.

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

WHEREAS, Plaintiff brought this action against Hurd Millwork Company, Inc., and others, on his behalf and on behalf of a class defined as:

All purchasers of Hurd inert gas-filled insulated glass products (not fitted with breather tubes) in the United States located east of the Continental Divide to the Atlantic shore (excluding specifically those consumers from the states of Washington, Idaho, Montana, Oregon, Utah, Colorado, Arizona, New Mexico, California, Nevada, Alaska, Wyoming and Hawaii) during the time period that Hurd marketed its inert gas-filled insulated glass products which were covered under its 1994 warranty effective January 1, 1994; and

WHEREAS, Plaintiff has alleged that Defendant Hurd Millwork Company, Inc., manufactured inert gas-filled insulated windows and doors are defective and not as represented in that said windows and doors did not retain the inert gas, but suffer loss of inert gas over time, thus, reducing their thermal rating and efficiency, and causing damage to the plaintiff and class members; and

WHEREAS, Plaintiff, in its Amended Complaint dated December 1, 2005, asserted individual and class action claims against Hurd Millwork Company, Inc., and others for breach of express warranty, misrepresentation, fraud in the inducement, claims against UIS, Inc., under Wis. Stat. § 242.05(2) and § 242.05(1), for fraudulent transfer and Wis. Stat §§ 242.04(1)(a) and (1)(b) for assets distributed at dissolution. Plaintiff claimed that he and members of the Class have suffered and will continue to suffer harm from the damage described above and therefore seek monetary and non-monetary relief to compensate him and the Class; and

WHEREAS, this Action was removed from State Court to this Court on January 10, 2006; and

WHEREAS, in this Action an Order was entered on March 28, 2008 by the Court certifying a plaintiff class as:

[a]ll purchasers of Hurd inert gas-filled insulated glass products (not fitted with breather

2

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

tubes) in the United States located in the states of Connecticut, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Vermont, Virginia, West Virginia, Wisconsin, and the District of Columbia during the time period that Hurd marketed its inert gas-filled insulated glass products which were covered under its 1994 warranty effective January 1, 1994, excluding Hurd, its affiliates (including parents, subsidiaries, predecessors, successors and, any other entity or its affiliate which has a controlling interest), its and their current, former, and future employees, officers, directors, partners, members, indemnities, agents, attorneys, and employees, and its and their assigns and successors; and

WHEREAS, the Parties to this Agreement agree that the class definition needs to be modified so that the end users of the Hurd Millwork Company, Inc. inert gas-filled insulated window and door products are the beneficiaries of this settlement, and to avoid recovery by others who have been compensated in other actions; and

WHEREAS, in this Action, an Order was entered on September 5, 2006 by the Court dismissing on summary judgment the claims of misrepresentation, fraud in the inducement; and

WHEREAS, in this Action, an Order was entered on November 5, 2009 by the Court dismissing on summary judgment the claim of breach of warranty; and

WHEREAS, plaintiff filed its Notice of Appeal on February 26, 2010; and

WHEREAS, Defendant Hurd Millwork Company, Inc. and UIS, Inc., have denied and continue to deny each and every allegation and all charges of wrongdoing or liability of any kind whatsoever asserted or which could have been asserted in this Action and have asserted and continue to assert various defenses to Plaintiff's and class claims; and

WHEREAS, Plaintiff and Defendants Hurd Millwork Company, Inc., and UIS, Inc., have agreed to enter into this Settlement Agreement in order to put to rest all controversy and avoid further expense and burdensome, protracted and costly litigation that would be involved in prosecuting or defending this action, without in any way acknowledging any fault or liability;

3

NOW, THEREFORE, in consideration of the foregoing promises and the covenants recited herein, the sufficiency of which is hereby acknowledged, and upon entry by the Court of a Final Order and Judgment approving this settlement and directing the implementation of the terms and conditions of this Agreement, this action shall be settled and compromised upon the following terms and conditions:

## 1. DEFINITIONS.

As used in this Agreement and the attached Exhibits, in addition to any definitions elsewhere in this Agreement, the following terms shall be defined as set forth below:

1.1 "Action" means the above-captioned Action entitled: Douglas E. Barden, individually, and as a Class Representative of a class of similarly situated consumers versus Hurd Millwork Company, Inc., Hurd Windows & Doors, Inc., f/k/a Monarch Acquisition Company; Hurd Windows & Doors, Inc., Monarch Holdings, Inc., and UIS, Inc., filed in the United States District Court in and for the Eastern District of Wisconsin under Case No. 06-C-0046.

1.2 "Agreement" means this Settlement Agreement, including all Exhibits.

1.3 "Claim" means a claim submitted pursuant to the Claim Program established by this Agreement.

1.4 "Claim Administrator" means The Garden City Group, Inc., Attn: Jeanne C. Finegan, Senior Vice President, P.O. Box 9728, Dublin, OH 43017-5628, and such successor entities designated by Class Counsel and Defendant's counsel.

1.5 "Claim Form" means the claim form referred to in Section 5 of this Agreement,

4

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

substantially in the form attached as Exhibit C.

1.6    "Claim Period" means the 120 day period commencing upon and running from the date the Court enters Final Order and Judgment.

1.7    "Claim Program" means the procedure set forth in Section 5 below.

1.8    "Class" means

All current owners of real property located in the states of Connecticut, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Vermont, Virginia, West Virginia, Wisconsin and the District of Columbia, whose homes, condominiums, apartment or commercial building have inert gas-filled insulated windows or doors manufactured by Hurd Millwork Company, Inc. between January 1, 1994 and December 31, 1998 ("1994 warranty"). Excluded from the Class are all persons who, in accordance with the terms of this Agreement, properly execute and timely deliver a Request for Exclusion and Opt-Out from the Class. Also excluded from the Class is the Defendants, their parents, subsidiaries, predecessors, together with their current and former officers or directors, employees, partners, members, indemnities, agents, attorneys and their successors and assigns. Also excluded are all persons and entities who made a claim in the *McKernan v. Hurd Millwork Co.* lawsuit, Santa Clara, California Superior Court Case No. CV772488.

1.9    "Class Area" means the geographic limits of the twenty (20) states comprising the states of Connecticut, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Vermont, Virginia, West Virginia, Wisconsin and the District of Columbia.

1.10    "Class Counsel" means the following law firms: Cannon & Dunphy, S.C. and O'Neil, Cannon, Hollman, DeJong & Laing, S.C.

1.11    "Class Member" means a member of the Class and any "Sub-Class" thereof.

1.12    "Class Representative" means the named plaintiff, Douglas E. Barden.

5

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

1.13    "Court" means the United States Federal District Court in and for the Eastern District of Wisconsin, in which the Action is pending.

1.14    "Defendant HMC" means HMC, f/k/a/ Hurd Millwork Company, Inc., a dissolved Wisconsin corporation.

1.15    "Defendant UIS" means UIS, Inc., formerly a New York corporation, now a Washington corporation.

1.16    "Defendants" means collectively HMC, f/k/a Hurd Millwork Company, Inc., a dissolved Wisconsin corporation, and UIS, Inc., formerly a New York corporation, now a Washington corporation.

1.17    Defendants' Counsel means Witherspoon, Kelley, Davenport & Toole, P.S.

1.18    "Direct Notice" means the form of Court approved notice to be mailed directly to those Class members whose identities and addresses are known to Class Counsel and Defendant, if any.

1.19    "Eligible Claimant" means a Class Member who timely files a Claim Form that satisfies the terms of the Claim Program provisions of this Agreement.

1.20    "Escrow Agent" means the Escrow Agent identified in the Escrow Agreement.

1.21    "Escrow Agreement" means the agreement which governs distribution of funds pursuant to this Agreement.

1.22    "Exclusion Request" means the timely written request of a Class Member to be excluded from the Class.

1.23    "Fairness Hearing" means the Settlement approval hearing(s) to be conducted by the Court in connection with the determination of the fairness, adequacy, good

6

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

faith and reasonableness of this Agreement in accordance with the Federal Rules of Civil Procedure.

1.24    "Final Order and Judgment" means the Order to be entered by the Court pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, in a form that is mutually agreeable to the Parties, approving this Agreement as fair, adequate and reasonable and in the best interest of the Class as a whole in accordance with applicable law, and making such other findings and determinations as the Court deems necessary and appropriate to effectuate the terms of this Agreement.

1.25    "Fund" means the monetary fund created by Defendant UIS for the benefit of the Class in settlement of this Action, which includes the "Fund Deposit" as well as the "Initial Deposit."

1.26    "Fund Deposit" means a $1.65 million (U.S.) deposit by Defendant UIS into a qualified settlement fund under Section 468B of the Internal Revenue Code, or Rev. Proc. 93-34, or liquidating trust and the regulations now or hereafter promulgated.

1.27    "Initial Deposit" means a $500,000 (U.S.) deposit by Defendant UIS into a qualified settlement fund under Section 468B of the Internal Revenue Code, or Rev. Proc. 93-34, or liquidating trust and the regulations now or hereafter promulgated.

1.28    "Initial Notice Date" means the first date upon which the Notice of Proposed Class Action Settlement is mailed to the Class or published in the form approved by the Court.

7

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

1.29 "Notice of Proposed Class Action Settlement" means the Court approved notice to Class Members of the proposed Settlement in substantially the form attached as Exhibit A to this Agreement.

1.30 "Notice Administrator" means The Garden City Group, Inc. and such successor entities designated by Class Counsel and Defendants' Counsel.

1.31 "Notice Order" means the Court's order which, among other things, grants preliminary approval of the Settlement and directs the type and form of Notice to Class Members of the terms of the Settlement.

1.32 "Notice Period" means the time between entry of the Notice Order and the date by which Class Members must object to the proposed Settlement or Request Exclusion from this Settlement, which time will be determined by the Court but will be at least sixty (60) days after entry of the Notice Order.

1.33 "Opt-Out Period" means the time period commencing upon entry of the Order of Preliminary Approval and ending on such date as this Court may designate, for which any Class Member can Request Exclusion from this Settlement, which Opt-Out Period is more than sixty (60) days from the Initial Notice Date.

1.34 "Parties" means Plaintiff, the Class and Defendant HMC and Defendant UIS.

1.35 "Person" means any individual or legal entity or their successors or assigns.

1.36 "Plaintiff" means the individual acting as a named class representative in this Action.

1.37 "Order of Preliminary Approval" means the Court's order preliminarily approving this Agreement, which shall be deemed entered upon the Court's execution of an

8

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

order granting preliminary approval of this settlement

1.38 "Product" means any inert gas-filled insulated window or door unit manufactured by HMC, f/k/a Hurd Millwork Company, between January 1, 1994 and December 31, 1998.

1.39 "Property" means improved real property, including homes, condominiums, apartments or commercial buildings.

1.40 "Settlement Date" means the date on which the Final Order and Judgment is entered.

1.41 "Settlement Class" and "Settlement Class Member" means all members of the Class except those Members who timely make a valid Exclusion Request.

1.42 "Short Form Notice" means the abbreviated Notice of Proposed Class Action to be approved by the Court and which will be directed to Class Members by publication in substantially the form attached as Exhibit B to this Agreement.

1.43 "Sub-Classes" means those portions of the Class as defined by the Court.

**2.    IDENTIFICATION OF CLASS.**

2.1    Within ten (10) days prior to the hearing of the Preliminary Approval by the Court of this Agreement, Defendants or its Counsel shall file, or cause to be filed, an affidavit (i) listing, according to the records of Defendant HMC as of the date of this Agreement, all mailing addresses for each Class Member known to it and (ii) specifying Product identification information sufficient for Class Members to complete Claim Forms regarding the type of Product they own. Said mailing addresses will be furnished to the Notice Administrator.

**3.    PRELIMINARY APPROVAL.**

9

3.1     On or about_____, 2011, or sooner if allowed by the Court pursuant to mutual request of the parties hereto, the Court will hold a hearing to consider redefining the scope of the Class for settlement purposes, confirmation of Class Counsel, approval of the Notice plan and to determine preliminarily whether this settlement is fair, just, reasonable and adequate to the Class. Prior to the Preliminary Approval hearing, the Parties shall jointly submit this Agreement, together with Exhibits and a Stipulated Order for Preliminary Approval and requested modification to class certification, through their respective attorneys, to the Court for Preliminary Approval. At the Fairness Hearing the Court will be requested to rule upon the fairness and good faith of this proposed Settlement.

## 4.     SETTLEMENT TERMS AND CONTINUING JURISDICTION.

4.1     As part of the Final Order and Judgment entered in this action in which the Parties will dismiss all claims against one another with prejudice and without costs, the Parties agree to the following settlement terms, in light of the fact that summary judgment has previously been entered in this action dismissing the individual and class claims for breach of warranty and misrepresentation, and Defendant HMC has been dissolved and no longer manufactures any windows or doors, and the desire to resolve fully and finally this protracted Action, as follows:

4.2     <u>Initial Deposit</u>.     Within fourteen (14) business days following Preliminary Approval, Defendant UIS shall establish a qualified settlement Fund under Section 468B of the Internal Revenue Code, or Rev. Proc. 93-34, or liquidating trust and the regulations now or hereafter promulgated thereunder and shall deposit the sum of $500,000.00 (U.S.) into an escrow account to be administered by counsel for these defendants. This deposit shall be known as the "Initial Deposit."   In the event this Settlement is not finally approved by the Court, or this

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

Settlement is abrogated by agreement of the Parties, the total sum of the Fund and Initial Deposit, plus interest earned net of taxes, if any, shall revert to Defendant UIS except as set forth in Section 9 of this Agreement.

4.3 <u>Fund Deposit</u>. Within ten (10) business days following entry of the Final Order and Judgment, Defendant UIS shall deposit an additional $1.65 million (U.S.) into the Fund. This shall be known as the "Fund Deposit."

4.4 <u>Application of Deposits</u>. The Parties have agreed to a Notice Plan and Claim Administration, which will be provided by The Garden City Group, Inc. The parties have dedicated the Initial Deposit, $500,000.00, for the costs of notice and claim administration. Any costs in excess of the $500,000.00 agreed upon plan will be paid for by the Defendant UIS. The costs of the Notice Plan and Claims Administration will be paid out of the Initial Deposit. If the costs of the Notice Plan and Claims Administration are less than $500,000.00, the difference between $500,000.00 and the actual costs will be reimbursed to Defendant UIS from the Initial Deposit. The Fund Deposit, $1,650,000.00 is available for payment to any Eligible Claimant for any approved claim amount and for payment of Court approved class counsel's fees and cost application.

4.5 <u>Continued Jurisdiction</u>.

The Court shall retain jurisdiction over the implementation of the proposed Agreement, hearing and determining Class Counsel's application for attorney fees, costs, interest, expenses, and enforcing and administering the proposed Settlement. Retention of jurisdiction shall not affect finality of the Final Order and Judgment. Without affecting the finality of this Final Order and Judgment, the Court retains jurisdiction over the remainder of the litigation between

11

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

Plaintiffs and all non-settling Defendants, and the implementation and administration of the settlement, specifically including consideration of any application for an award of attorneys' fees and expenses to Settlement Class Counsel and distribution of settlement funds to members of the Settlement Class pursuant to a plan of distribution approved by the Court.

**5.     CLAIM PROGRAM.**

5.1     Only Eligible Claimants (as defined in this Agreement) are eligible for participation in the Claim Program.

5.2     Class Members seeking compensation from the Fund shall submit a verified Claim Form containing the following basic information to establish that they own a covered Product:

a.     name;

b.     address;

c.     telephone number,

d.     address of Property for which a Claim is being made;

e.     proof that the claim is for a Product covered by the 1994 warranty;

f.     verification of the present ownership of the Property (such as a property tax bill, closing statement, deed, deed of trust, or affidavit) or assignment of the right to make a Claim;

g.     approximate date of purchase of the inert gas-filled insulated windows or doors and/or the Property, together with proof of purchase and price paid; and

h.     number and model(s) of Hurd inert gas-filled insulated windows or doors owned.

5.3     To establish that the Product is an inert gas-filled insulated window or door, Class Members may submit:

        a.     serial number identification located on the Product(s);

        b.     copies of invoices or receipts indicating the Product(s) purchased;

        c.     a declaration from a builder or installation contractor verifying the brand and model of Product(s) purchased;

        d.     documentation from the sale or purchase of the Property which details the brand and model of the Products on the Property;

        e.     a declaration signed by the Claimant under penalty of perjury;

        f.     other documentation complying with the specifications listed in the Affidavit of Defendant to be filed with this Court in accordance with Paragraph 2.1 of this Agreement.

5.4     All Eligible Claimants shall be entitled to payment from the Fund Deposit in accordance with Section 6.

5.5     In no event shall Defendants, any attorneys representing Defendants, Plaintiffs or Class Counsel have any liability for claims of wrongful or negligent conduct by the Claim Administrator, or their respective agents or employees.

5.6     The Claim Administrator shall, under the supervision of the Court, administer the relief provided by this Settlement Agreement in accordance with the terms of this Agreement and shall resolve Claims in a rational, responsive, cost effective, and timely manner.  The Claim Administrator shall maintain the records of its activities in computerized database form and shall provide such periodic and special reports and such other information as the Court, Class Counsel,

13

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

and Defendant may reasonably request. Class Counsel and Defendants' Counsel shall establish an oversight committee, to be comprised of one attorney for the Class and one attorney for Defendant. The purpose of the Oversight Committee will be to audit the work of the Claim Administrator and, when necessary or appropriate, assist the Claim Administrator in resolving claims and administration issues.

5.7    In the event either Class counsel or Defendants' reasonably believe that the Claim Administrator is not properly applying any of the terms of this Agreement or in the event there is a question concerning the application of the terms of this Agreement by the Claim Administrator, then:

       a.    The objecting Party's counsel shall notify counsel for the other Parties to this Agreement in writing of the concern;

       b.    Class Counsel and counsel for Defendants shall meet within 14 days of receipt of the written notification to resolve the concern; and

       c.    In the event counsel for the Parties are unable to resolve the concern, it will be submitted to the Court, Hon. Lynn Adelman presiding, for resolution.

5.8    Class Counsel and counsel for Defendants shall meet in person or by telephone conference as necessary during the Claims Period to discuss the implementation and execution of this Agreement and to attempt to resolve any concerns of the Parties.

## 6.    ALLOCATION AND DISBURSEMENT OF THE FUND DEPOSIT.

6.1    As soon as reasonably practicable after the Claims Period expires and the Claim Administrator has verified all Claims to its and the Defendant's counsel's satisfaction, the Claim

14

Administrator shall distribute the Fund Deposit, less Class Counsel's attorneys' fees and costs that may be approved by the Court (hereafter referred to as the "Net Settlement Fund"), to each Eligible Claimant other than the Class Representative on a pro rata basis.

6.2     With the exception of 6.4 below, the total of all claims will form the denominator for the pro rata basis. Such will be based on the number of inert gas-filled insulated windows or door products claimed. Each individual claim will form the numerator for pro rata determination, also on a number of inert gas-filled insulated window or door products claimed. Each individual claim recovery, even on a pro rata basis, is capped at twelve (12) percent of the purchase price of the Products being claimed.

6.3     In the event there is more than one Eligible Claimant for a Property involving multiple owners at the same time, the award to each such Claimant shall be further pro rated between them based on their respective ownership interests.

6.4     Payment on the claim of the Class Representative, Douglas E. Barden, will be made as follows. Because a named plaintiff is an essential ingredient of any class action, an incentive award to the named plaintiff is appropriate, if it is fair, to encourage litigants to bring class litigation and further the public policy underlying Rule 23. Douglas E. Barden has served as Class Representative since before April 9, 2004, when this action was originally commenced in Wisconsin state court. Through his continued efforts over the past seven (7) years—including by participating in discovery, reviewing pleadings, subjecting himself to sanctions under Wis. Stat. § 802.05 and FRCP 11, and continuing to prosecute the Action after all claims were dismissed and the action was temporarily stayed due to a Suggestion of Bankruptcy—the Class will benefit through the creation of the Fund. In recognition of having performed additional

15

services and having spent considerable time, effort and risk associated with the duties as Class Representative, Douglas E. Barden shall receive an incentive payment of One Hundred (100) percent of the purchase price of the Products being claimed plus the cost of installation, for a total payment of $3,448.52.

6.5    In the event that residual funds remain in the Net Settlement Fund after distribution to all Eligible Claimants and payment of Class Counsel's attorney fees and costs the residual amount shall be distributed *cy pres* to Defendant UIS.

**7.    NOTICE OF PROPOSED CLASS ACTION SETTLEMENT.**

7.1    As the Court may direct, the Parties shall provide to the Class Members Notice of the Proposed Class Action Settlement describing the terms of this proposed Agreement and of the Fairness Hearing.

7.2    Subject to Court approval, Notice of the Proposed Class Action Settlement shall be mailed, first class postage prepaid, to each member of the Class identified on the Affidavit filed by Defendant pursuant to Section 2. In addition, such mailing shall be sent to each member of the Class whose identity becomes known as a result of publication of the Notice of the Proposed Class Action Settlement, and other subsequent mailings will be made as the identities or addresses of additional Class Members become known.

7.3    The form of Notice and Notice Program to be submitted for Court approval shall be substantially in the form attached as Exhibits A and B and shall include a short form of Notice of the Proposed Class Action Settlement to be published in a manner reasonably calculated to reach members of the Class, as more particularly described in the Notice Plan approved by the Court. The parties have agreed to retain The Garden City Group, Inc. or such successor entities

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

designated by Class Counsel and Defendants' counsel as the Notice Administrator to design and implement the Notice Plan. The short form of Notice of the Proposed Class Action Settlement shall inform the reader of a toll-free telephone number or numbers through which he or she may arrange for a mailing of the long form of Notice of the Proposed Class Action Settlement.

7.4     No later than the first dissemination of Notice of the Proposed Class Action Settlement, the Notice Administrator shall cause a nationwide toll-free telephone facility to be established. The Notice Administrator shall be capable of (a) receiving requests for a long form Notice of the Proposed Class Action Settlement and other materials described in this Section; (b) providing generalized information concerning deadlines for Opt-Outs and presentations to the Court at the Fairness Hearing; and (c) mailing materials to Class Members as provided in this Section. The Notice Administrator may, as appropriate under instructions from Class Counsel and counsel for Defendants, refer individual inquiries to Class Counsel and counsel for Defendants for response. The Notice Administrator shall maintain records of all mailings and such other information in such form and in such manner as Class Counsel and Defendants' counsel jointly direct.

7.5     Direct Notice of the Proposed Class Action Settlement shall be disseminated throughout the Opt-Out period as Class Counsel, Defendant or the Notice Administrator identify additional Class Members.

## 8.      CLASS MEMBERS' RIGHT TO OBJECT/REQUEST EXCLUSION.

8.1     A Class Member may opt out of the Class only during the Opt-Out Period. To exercise the opt-out right set forth in this Section, the Class member must submit a request for exclusion from the Class ("Exclusion Request"). The Exclusion Request must be in writing

17

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

signed by the Class Member, and must state the address of the Class Member's property(ies) that contains Defendant's Products. Such request must be mailed to the Claim Administrator and postmarked on or before the end of the Opt-Out Period.

8.2    All Class Members, unless they execute a timely and proper Exclusion Request, will be deemed Class Members for all purposes under this Agreement and will be bound by the Final Order and Judgment.

8.3    Any objection of any Class Member to the terms of the Settlement will not be considered by the Court unless no later than ten (10) days prior to the Fairness Hearing, such person files with the Court and serves upon counsel as described in paragraph 17.8 below a signed written statement indicating the basis for any such objection.

**9.    EXPENSES AND FEES ASSOCIATED WITH NOTICE ADMINISTRATION.**

9.1    All reasonable fees and expenses incurred by the Notice Administrator in administering this Agreement, the cost of all notices as a result of this Agreement, and all costs of implementing and administering the Notice Program, shall be paid for by Defendant UIS, including from the Initial Deposit.

9.2    If the Court does not issue the Final Order and Judgment, Defendant UIS shall bear, in accordance with the terms of this Agreement, the costs of Notice of the Proposed Class Action Settlement and any expenses associated with this Settlement incurred to such point by the Notice Administrator, and any associated shutdown expenses, including any notices the Court may direct, excluding attorneys' fees.

**10.    ATTORNEYS' FEES AND COSTS.**

18

10.1    Class Counsel shall seek from the Court an award of attorneys' fees and costs in this action to be paid from the Fund Deposit.

10.2    Attorneys' fees and costs in the amount awarded by the Court shall be payable to Class Counsel from the Fund Deposit within ten (10) business days following entry of an Order on such fee and cost application.

## 11.    RELEASES.

11.1    Upon entry of Final Order and Judgment, and subject to Paragraphs 4.1 and 4.2 of this Agreement,  Plaintiff and each Class Member who has not timely submitted an Exclusion Request ("Included Class Members") and regardless of whether such Included Class Member executes and delivers a written release, shall be deemed to have released and discharged fully, finally and forever Defendants, and their past and present assignees, affiliates, insurers (whether on a primary, excess, umbrella or contingent basis), including parents, subsidiaries, predecessors, successors, distributors, and it and their respective officers, directors, indemnitees, agents, attorneys, partners and employees (hereinafter collectively referred to as the ("Defense Group"), from all claims or causes of action, demands, rights, liabilities of any kind or nature, of law or in equity, for any relief including claims for damages, whether known or unknown, direct, indirect, incidental, consequential or for economic loss, based on statute, code, regulatory or common or case law any member of the Class may have against the Defense Group, whether known or unknown, arising out of or relating to loss of inert gas from the Product.

## 12.    ENFORCEMENT OF AGREEMENT.

12.1    In the event that either Defendant UIS or Defendant HMC fails to perform under the Agreement, Class Counsel shall then give Defendant written notice of the breach. If a

19

claimed breach is not cured within ten (10) business days after Defendant's receipt of notice of breach under this Agreement, Class Counsel shall apply to the Court for relief.

12.2    In the event of a breach by Class Members or Defendants under this Agreement, the Court may exercise all equitable powers over the breaching party(ies) to enforce this Agreement and the Final Order and Judgment regardless of the availability or adequacy of any such remedy at law. Such powers include, among others, the power to compel specific performance and to award injunctive relief.

**13.    REPRESENTATIONS AND WARRANTIES.**

13.1    Defendants represent and warrant that (i) they have all requisite corporate power and authority to execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby, (ii) the execution, delivery, and performance of this Agreement and the consummation by it of the actions contemplated herein have been duly authorized by all necessary corporate action on the part of Defendants; and (iii) this Agreement has been duly and validly executed and delivered by Defendant and UIS and constitutes its legal, valid and binding obligation.

**14.    TERMINATION OF THE AGREEMENT.**

14.1    The performance of this Agreement is expressly contingent upon entry of the Final Order and Judgment by the Court. If the Court fails to issue such Final Order and Judgment, this Agreement will be terminated, having no force or effect whatsoever, and will be void ab initio, and not admissible as evidence for any purpose in any pending or future litigation in any jurisdiction involving any of the Parties except as may be necessary to enforce the provisions of Section 9.

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

14.2    In the event that the number of Class Members requesting exclusion reaches a level that threatens to frustrate the essential purpose of this Agreement, Defendants may elect to terminate this Agreement by so notifying Class Counsel and the Court within ten (10) business days after the end of the Opt-Out Period. The number of timely and valid opt-outs at which this election arises has been agreed upon by the Parties, shall be submitted to the Court under seal, and shall remain confidential. Class Counsel and Defendant shall have the right to challenge the timeliness and validity of any Exclusion Request, as well as the right to effectuate the withdrawal of any Exclusion Request filed in error and any Exclusion Request that a present or former Class Member wishes to withdraw for purposes of participating in the Settlement as set forth in this Agreement. The Court shall determine whether any of the contested Exclusion Requests are valid.

14.3    Notwithstanding any other provision of this Agreement, if this Agreement is terminated for any reason, the Parties shall return to status quo ante as of March 1, 2010.

## 15.    CONFIDENTIALITY.

15.1    The Parties acknowledge that certain confidential information was disclosed through discovery and/or during settlement discussions. None of the material which the Parties have disclosed pursuant to discovery or settlement discussions shall be used by any of the Parties or their counsel for any business, commercial, competitive, personal or other purposes other than in connection with the administration of this litigation. Within sixty (60) days after entry of the Final Order and Judgment in this matter, all documents which have been produced labeled confidential or subject to any protective order and have not been previously destroyed will be destroyed, except to the extent Class Counsel deems such documents necessary to prosecute this

Action against the remaining defendants, in which case, such documents shall be destroyed for the producing party within sixty (60) days after conclusion of this Action. Counsel for the parties shall provide written verification that such documents have been destroyed.

**16.   PUBLICITY**.

16.1    Except as contemplated by the Notice Plan, the Parties hereto agree to minimize any communication with the media until after entry of the Final Order and Judgment. Thereafter, communications with the media may disclose the Agreement terms, the name of the Class representative, the names of Class Counsel, the general nature of the litigation and any matter of public record. The Parties and their counsel agree to cooperate in good faith to issue a joint press release upon the date of Final Order and Judgment.

**17.   MISCELLANEOUS PROVISIONS.**

17.1    This Agreement is for settlement purposes only, and neither the fact nor any provision contained in this Agreement or its Exhibits, nor any action taken hereunder, shall constitute, be construed as, or be admissible as evidence of any admission of the validity of any claim, any defense or any fact alleged by any Party in this action or in any other pending or subsequently filed action or of any wrongdoing, fault, violation of law, or liability of any kind on the part of any Party or admission by any Party of any claim, defense or allegation made in this Action.

17.2    This Agreement, any document referred to herein, or any action taken to carry out this Agreement is not to be construed as an admission or concession by or against Defendants on any point of law or fact, or of any alleged fault, wrongdoing or liability whatsoever.

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

17.3    All pronouns and any variation of same shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or persons may require.

17.4    This Agreement, including all attached Exhibits hereto, shall constitute the entire Agreement among the Parties with regard to the subject matter of this Agreement and shall supersede any previous agreements and understandings between the parties. This Agreement may not be changed, modified, or amended except in writing signed by Class Counsel and Defendants' counsel and subject to Court approval. The Parties contemplate that the Exhibits may be modified by subsequent agreement of the Parties prior to dissemination to the Class Members.

17.5    This Agreement may be executed by the counsel for the Parties in one or more counterparts, including by facsimile, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

17.6    This Agreement shall be binding upon and inure to the benefit of the Class, the Parties, and their representative, heirs, successors, and assigns.

17.7    The headings of the sections of this Agreement are included for convenience only and shall not be deemed to constitute part of this Agreement or to affect its construction. The decimal numbering of provisions herein is intended to designate sub-sections where applicable.

17.8    Any demand, request or notice that any member of any Party hereto desires or may be required to make or deliver to the other shall be in writing and shall be deemed delivered when personally delivered, or when delivered by private courier service (such as Federal Express), or three (3) days after being deposited in the United States Mail, in registered or certified form, postage prepaid, return receipt requested and addressed as follows:

TO THE CLASS:

        Mark L. Thomsen
        Cannon & Dunphy, S.C.
        595 N. Barker Rd.
        Brookfield, WI 53045

TO THE DEFENDANTS:

        Thomas D. Cochran
        Witherspoon, Kelley, Davenport
        & Toole, P.S.
        422 West Riverside Avenue
        1100 U.S. Bank Building
        Spokane, Washington 99201
        509-624-5265

      For the purpose of construing or interpreting this Agreement, this Agreement is deemed to have been drafted equally by all Parties hereto, and shall not be construed strictly for or against any Party.

      The Parties and their attorneys agree to cooperate fully with one another in seeking Court approval of this Agreement, and to use their best efforts to accomplish the terms and conditions of and effect the consummation of this Agreement.

      This Agreement shall be governed, construed and enforced in accordance with the laws of the State of Wisconsin, without reference to principles of choice or conflicts of law.

24

WITHERSPOON · KELLEY

CANNON & DUNPHY, S.C.

s/Thomas D. Cochrane

s/Mark L. Thomsen

Thomas D. Cochran, WSBA #5910
Timothy M. Lawlor, WSBA #16352
Attorneys for UIS, INC.
422 W. Riverside Ave., Suite 1100
Spokane, WA  99201
Telephone:  (509) 624-5265
tdc@witherspoonkelley.com
tml@witherspoonkelley.com

Mark L. Thomsen, State Bar No. 01018839
Brett A. Eckstein, State Bar No. 1036964
Attorneys for Plaintiff
595 North Barker Road
PO Box 1750
Brookfield, WI 53008-1750
Telephone:  (262) 796-3703
mthomsen@cannon-dunphy.com

GODFREY & KAHN, S.C.

O'NEIL, CANNON, HOLLMAN, DeJONG
& LAING

s/Michael Apfeld

s/Patrick G. McBride

Michael Apfeld, State Bar No. 1016749
John L. Kirtley, State Bar No. 1011577
Attorneys for Defendant UIS, Inc.
780 North Water Street
Milwaukee, WI 53202-3590
Telephone:  (414) 273-3500
mbapfeld@gklaw.com
jkirtley@gklaw.com
kwaple@gklaw.com

Patrick G. McBride, State Bar No. 1024920
William Wiseman, State Bar No. 1015696
Attorneys for Plaintiff
Chase Tower, Suite 1400
111 East Wisconsin Avenue
Milwaukee, WI 53202-4870
Telephone:  (414)276 5000
Patrick.Mcbride@wilaw.com

25

J:\MLTCASES\Barden_00482\Pleadings\DRF_00120110412_201104120936.docx

# EXHIBIT 17

# ABC Window Class Action Lawsuit Settlement

March 18, 2011

**<span style="color:red">If You Are A California Property Owner With ABC Windows Manufactured From May 11, 1995 through August 1, 1997, Your Rights May Be Affected By A Class Action Settlement.</span>**

A class action settlement has been reached in a class action lawsuit against A.B.C. Products, Inc. ("ABC Products" or "Defendant") in the Riverside County Superior Court in California (styled *Everett et al v. A.B.C. Products, Inc.* Class Action Case No. RIC 425649) alleging, among other things, that there are defects in certain ABC window products including (1) an alleged "Water Stain" to the finished surface of the interior sill or jamb reveal, (2) alleged blistering, peeling, flaking, or spider web cracking of the paint or finished surface of the sill or jamb reveal or (3) alleged evidence of deterioration, decay to the Interior Sill or Jamb Reveal or other "Loss of Integrity of the Sill or Jamb Reveal" in the form of swelling, warping, softened or crumbling of the material, excluding its finished surface, according to the ABC Window class action settlement website and settlement notice.

ABC Window settlement class members reportedly include all current homeowners from May 11, 1995 through August 1, 1997 whose buildings presently contain a Window Product, but does not include such homeowners who have already released their claims in prior lawsuits concerning the Windows Products or homeowners who request exclusion or "opt out" from the Settlement Class.

The ABC Window class action settlement reportedly will provide money to Class Members that timely (on or before June 17, 2011) submit a Claim Form which satisfies the Settlement Qualifications. Class Members will reportedly be given the option of two compensation payments:

A. **The "Liquidated Payment Option."** In lieu of the right to receive compensation on a Per Window Compensation basis, an eligible Class Member who makes a claim may elect to receive a lump sum cash payment of one thousand dollars ($1,000.00), or "Liquidated Payment Option." Only one $1,000.00 Liquidated Payment will be available for each home that contains an ABC Window Product, regardless of the number of ABC Window Products in the home or the number of Class Members who own or reside in said home.

OR

B. **The "Per Window" Compensation Option**. Under this option, Class Members may apply for compensation of two hundred fifty dollars ($250.00) per Window Product. To qualify for this compensation, Class Members must present evidence of (1) a "Water Stain" to the finished surface of the interior sill or jamb reveal ("Water Stain" means a discoloration associated with

the presence of water, present or past, to the finished surface of the interior sill adjacent to a Window Product); (2) blistering, peeling, flaking, or spider web cracking of the paint or finished surface of the sill or jamb reveal that can be repaired by sanding and re-painting; or (3) evidence of deterioration, decay to the Interior Sill or Jamb Reveal or other "Loss of Integrity of the Sill or Jamb Reveal" in the form of swelling, warping, softened or crumbling of the material, excluding its finished surface ("Loss of Integrity of the Sill or Jamb Reveal" means swelling, warping, softened or crumbling of the drywall or wood trim adjacent to the aluminum Window Product frame, or damage that is immediately adjacent to a Window Product).

The reported deadline to opt out or object to the ABC Window settlement is April 18, 2011.

The Court will reportedly hold a final class action settlement approval hearing on May 6, 2011 at 4050 Main Street, Riverside, California 92501, at which time the Court will reportedly consider whether the ABC Window products settlement is fair, reasonable, and adequate.

For more information on the ABC Window products class action lawsuit settlement, call the ABC Window Settlement Administrator at 1-877-271-5522 or visit the ABC Settlement website:

www.abcwindowsettlement.com

## Milstein Adelman, LLP Announce Pendency of Class Action Lawsuit Against ABC Windows

SANTA MONICA, Calif., March 18, 2011 /PRNewswire/ -- Please be advised that the California Superior Court for Riverside County entered an Order in litigation against ABC preliminarily approving a proposed class action settlement.

The litigation involves ABC windows installed in California homes from MAY 11, 1995 THROUGH AUGUST 1, 1997. Plaintiffs allege that there are defects in ABC windows and sliding doors that cause them to leak and breach implied warranties. ABC denies plaintiffs allegations. If you are a Class Member, you have the following three choices: 1) participate in the settlement; 2) do not participate in the settlement; or 3) object to the settlement. Please be advised if Class Members do not submit a timely request for exclusion, they will not be allowed to exclude themselves from the Class, and they will be bound by the judgment in this case.

To participate in the settlement, Class Members must mail a completed Claim Form, postmarked not later than June 17, 2011, to the Settlement Administrator. Class Members may obtain a Claims Packet

by calling 1-877-271-5522 or by visiting the settlement website at www.ABCWindowSettlement.com
The Claims Packet provides detailed information about how to make a claim. If Class Members do not
want to participate in the settlement, they must mail a properly completed Request for Exclusion
postmarked on or before April 18, 2011. Details on how to properly request exclusion may be found
on the detailed notice available at www.ABCWindowSettlement.com or by calling the Settlement
Administrator at 1-877-271-5522. If Class Members wish to object to the Settlement, they have the
right to be heard in person, in writing or through an attorney in support of or in opposition to the
settlement. Details on how to be heard in person, in writing or through an attorney, may be found in
the detailed notice available at www.ABCWindowSettlement.com or by calling the Settlement
Administrator at 1-877-271-5522.

If Class Members have further questions or need further information, they may contact (1) the
Settlement Administrator at 1-877-271-5522; (2) Class Counsel Paul Stevens at (310) 396-9600 or at
pstevens@milsteinadelman.com; or (3) visit the settlement website at
www.ABCWindowSettlement.com. **PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S
OFFICE FOR INFORMATION.**

SOURCE Milstein Adelman, LLP

Back to top

RELATED LINKS
http://www.abcwindowsettlement.com

# EXHIBIT 18

Search Site                    ⊙O          Job Center    eBuying Guide    Resources    Subscribe    Advertise    About

**WindowDoor**        AND LET US BUILD IT FOR YOU!    **ph** TECH
                      CONTACT US                      *Reach further*

| Strategies & Practices | Design & Performance | Markets & Trends | News | Products | The Talk | Special Features |



**TRUTH HARDWARE**
*better from every perspective*

Give Your Customers the Quality and Innovation They Deserve

# Top 100 Manufacturers of 2011 - Rankings

*Category sponsor:*
*Premium links:*

## Category 1

**Companies with Annual Sales of More than $1 Billion**

*Window & Door's Top 100 presents the 100 largest manufacturers of residential window and door products based on annual sales. Companies are listed alphabetically within nine sales range categories. See bottom of page for links to other sales range categories.*



*Patio door component production at Pella Corp.*

**Andersen Corp.**
Headquarters: Bayport, Minn.
Employees: 10,000
Product Lines: Wood windows and patio doors. Composite replacement windows. Vinyl windows and doors.
Web Sites: www.andersenwindows.com, www.renewalbyandersen.com, www.emcodoors.com, www.eaglewindow.com, www.dashwood.com, www.silverlinewindow.com, www.americancraftsmanwin.com

**Formosa Plastics Group**
Headquarters: Taipei, Taiwan
Employees: 90,000
Product Lines: Fiberglass entry doors and composite frames. Fiberglass patio door systems. PVC window and door components
Web Sites: www.plastproinc.com, www.neumadoors.com, www.fpg.com/tw

**Jeld-Wen Inc.***
Headquarters: Klamath Falls, Ore.
Employees: 20,000
Product Lines: Wood, vinyl, and aluminum windows and patio doors. Wood, steel, and composite entry doors. Interior doors. Millwork products.
Web Site: www.jeld-wen.com

**Masonite International Inc.**
Headquarters: Mississauga, Ont., Canada
Employees: 8,000
Product Lines: Steel, wood, fiberglass and composite entry and patio doors. Interior doors, French doors, and bi-fold doors.
Web Site: www.masonite.com

**Pella Corp.***
Headquarters: Pella, Iowa
Employees: 8,200
Product Lines: Wood, vinyl, fiberglass window, patio door and entry door products, as well as steel entry doors. Architectural windows, curtain wall, storefronts and entrances.
Web Sites: www.pella.com, www.pellareplacement.com

**VKR Holdings A/S**
Headquarters: Hoersholm, Denmark
Employees: 16,000
Product Lines: Skylights and roof windows. Wood, aluminum and vinyl windows and patio doors.
Web Sites: www.veluxusa.com, www.gienow.com, www.loewen.com, www.vkr-holding.com

**YKK AP Inc.**
Headquarters: Tokyo, Japan
Employees: 40,000


win PARADIGM




*Trust. Right from the start!*    URBAN


*the next level*    *Special Online Advertising Section*


**2011 Dealers of the Year**


STORE    *Download the latest industry Reports and more!*

Product Lines: Vinyl windows and doors for the new construction, replacement and impact markets. Commercial windows, doors, curtainwall and entrances, including blast and impact products.

Web Site(s): **www.ykkap.com**

*Sales volumes not confirmed by company*

## More Rankings

*Window & Door* ranks the Top 100 manufacturers alphabetically within 10 sales range categories. Follow these links to see companies in the other categories:

| More than $1 Billion | $500 Million to $1 Billion | $300 Million to $500 Million | $200 Million to $300 Million | $100 Million to $200 Million |
|---|---|---|---|---|
| | | | | |

| | $50 Million to $100 Million | $40 Million to $50 Million | $30 Million to $40 Million | $15 Million to $30 Million |
|---|---|---|---|---|

**Read the introductory feature article**

**Purchase the complete report** - including descriptive information and updates on each company, a comprehensive cross-reference section breaking out companies by products manufactured and materials handled, also plant locations, top executives and more.

| Strategies & Practices | Design & Performance | Markets & Trends | News | Products | The Talk | Special Features

Job Center | eBuying Guide | Resources | Subscribe | Advertise | About

Copyright © 2012 NGA – National Glass Association. All Rights Reserved. Questions? Comments? Contact the Webmaster

Powered by: Digital Loom

# EXHIBIT 19





PR Newswire
United Business Media

Vhqg#d#uhohdvh
Ehfrph#d#p hp ehu P hp ehu#Vljq#Lq
Iru#mrxuqdolvw Iru#eorjjhuv
Joredo#Vlwhv

Search Advanced Search
Products & Services News Releases

Products & Services | Knowledge Center | Browse News Releases | Contact PR Newswire

See more news releases in: Construction & Building, Legal Issues

# Shood#dqqrxqfhv#djuhhp hqw#iru#roghu#SurOlqhª #fdvhp hqw#z lqgrz v

Like Tweet Share

## Continues, extends claims process for earlier products;

## Proposed settlement does not involve any products currently sold

CHICAGO, June 22, 2012 /PRNewswire/ -- Pella Corporation today announced a proposed settlement agreement to resolve the *Saltzman vs. Pella* class-action lawsuit involving Pella® ProLine casement, awning and transom windows made in 2006 and earlier. Pending court approval of the settlement, the proposed agreement will extend customer service support with a claims process for early products with service needs. The lawsuit does not involve any products currently sold by Pella.

"We are pleased to have created a settlement framework that extends our existing customer support program with a claims process for older ProLine casement, awning and transom windows," said Pat Meyer, president and chief executive officer (CEO) of Pella Corporation. "In the overwhelming majority of cases, our Pella windows performed extremely well and as designed. We know that each home or building is unique and the settlement is designed to address the relatively small number that may have experienced a problem.

"Pella continues to innovate in the design and features of our windows and doors to improve their performance and customer benefits," he added. "For example, we have added EnduraGuard® wood treatment as a triple protection for Pella wood windows and other enhancements and design changes, as part of our continuous product improvement and enhancement efforts at Pella."

Pella and the plaintiff's law firm filed the settlement agreement proposal with the federal district court in Chicago for the court's approval, prior to being implemented. Pending review by the court, customer notifications could begin as early as this fall.

"As a financially strong, customer-focused company, Pella Corporation is prepared to provide for claims if and as needed, while continuing to serve our customers well just as we've done since 1925," Meyer said.

**About Pella**

Pella Corporation is a leader in designing, testing, manufacturing and installing quality windows and doors for new construction, remodeling and replacement applications.

As a family-owned and professionally managed privately-held company, Pella is known for its 87-year history of making innovative products, providing quality service and delivering on customer satisfaction.

For more information on the company, visit pella.com.

SOURCE Pella Corporation

Back to top
RELATED LINKS
http://www.pella.com

Like Tweet Share

Next in Construction & Building News

**Custom Packages**

Browse our custom packages or build your own to meet your unique communications needs.

Start today.

**PR Newswire Membership**

Fill out a PR Newswire membership form or contact us at (888) 776-0942.

**Learn about PR Newswire services**

Request more information about PR Newswire products and services or call us at (888) 776-0942.

Site Preview Close Site Preview View FullScreen

**Featured Video**

America's Dog Owners Are Invited To Dream Up Their Ultimate Play Destination With Their Four-legged Best Buddies

Print Email RSS

Share it

Blog it

Blog Search

**More in These Categories**

**Construction & Building**

SBA Proposes Increases to Size Standards in Utilities, Construction, Arts, Entertainment and Recreation Sectors

Atlas Sales & Rentals Launches "Web 2.0" Site

The Beck Group Celebrates 100 Years of Building Success

**Legal Issues**

**Most Read**

**Most Emailed**

**Journalists and Bloggers**

Visit **PR Newswire for Journalists** for releases, photos, ProfNet experts, and customized feeds just for Media.

View and download archived video content distributed by MultiVu on **The Digital Center**.

- Industry's best protection from drafts and leaks
- Wide array of panel designs
- ENERGY STAR® qualified
- Exclusive decorative glass patterns

→Design your own Entry Door
→Learn about exclusive performance features



## WE'LL COME TO YOU

Pella experts are ready to help.
Request an in-home consultation
and receive a quote.

GET A FREE QUOTE →





$100 off
select windows and doors†
**Hurry! Ends August 16.**

START SAVING NOW →



"From start to finish, we couldn't be
happier. And the results are stunning."

– Richmond, VA

SEE CUSTOMER STORIES →

Questions? Just call your local Pella expert.
1-800-374-4758 | pellawebsupport@pella.com | Pella.com

VIEWED TO BE THE BEST®  

About PR Newswire|Contact PR Newswire|PR Newswire's Terms of Use Apply|Careers|Privacy|Site Map|RSS Feeds|Blog
Copyright © 2012 PR Newswire Association LLC. All Rights Reserved.
A UBM plc company.
Dynamic Site Platform powered by Limelight Networks.