**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DR. LEONARD E. SALTZMAN, BRAD
ZURN, TIM BASTIAANSE, JOSEPH
PALMIOTTO, ELIZABETH D'ANGELO,
AND JUDITH MCCLOSKY, individually and
on behalf of all others similarly situated;

                              Plaintiffs,

     v.

PELLA CORPORATION, an Iowa
corporation, and PELLA WINDOWS AND
DOORS, INC., a Delaware corporation,

                            Defendants.

06 CV 4481

Judge James Zagel

**AFFIDAVIT OF PAUL TAYLOR, Ph.D., P.E.
IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL**

STATE OF CALIFORNIA        )
                                 ) ss
COUNTY OF SAN MATEO      )

      Paul Taylor, being duly sworn, hereby states as follows:

      1.      I am a Principal Engineer at Exponent Failure Analysis Associates

(Exponent).  Exhibit A is a current copy of my curriculum vitae.  I obtained a

Bachelor of Science degree in Mechanical Engineering from Rensselaer Polytechnic

Institute in 1978, and a Master of Science and Ph.D. in Mechanical Engineering from

1

Stanford University in 1979 and 1986, respectively. The topic of my Ph.D. thesis was a study of the dynamic response and the damping characteristics of metal bellows (a component used in a wide variety of applications, such as space shuttles and electrical circuit breakers). Since 1986, I have been employed at Exponent, an engineering consulting firm that specializes in the analysis and prevention of failures and accidents. My areas of research are focused on the mechanical design of systems and the investigation of accidents and failures. As part of my practice, I analyze databases, such as complaint, incident, and warranty databases, to assist in my evaluations of the real-world performance of products. I have performed such analyses for a wide range of products including appliances, passenger cars and trucks, and components used in consumer products. I am a Registered Professional Mechanical Engineer in the State of California, License 31069.

2.      I hold the opinions expressed in this report to a reasonable degree of engineering certainty. I reserve the right to supplement this report and to expand or modify these opinions based on my review of additional material as it becomes available through any further work by me or by others.

**Scope**

3.      I am submitting this affidavit at the request of counsel of record for Pella. I was asked by counsel to provide the percentage of sashes and full-unit

windows[1] that have been and will be replaced due to wood deterioration. I was also asked to explain the bases and methodology I used to obtain these numbers.

4.      I was further asked by counsel to review the terms of the Settlement Agreement negotiated between the parties and to calculate the projected value of that Agreement based on the calculated replacement rate as discussed below.

5.      In addition, I was asked to review and comment on a Net Expected Valuation of Continued Litigation using a) certain assumptions of probability of success that were provided by counsel; b) the calculated replacement rates discussed below; and c) certain assumed costs to Pella for each sash or full-unit window replacement.

**Background**

6.      The windows in this analysis are 1991-2006 vintage ProLine series casement, awning and transom windows ("Subject Windows"). I understand that significant improvements were made to the window design regarding water management during 2003 - 2006. (Affidavits of Andy Middleswart and Preston Rhamy, Docket 284-1, 2). Pella's most recent forecast on warranty replacements due to water infiltration and related wood deterioration for ProLine casement windows shows a significant drop for windows produced during 2004 - 2006. (Affidavit of Chris Gray, Docket 284-3).

7.      I understand that Plaintiffs' defect theory is that the sealing design of the Subject Windows was inadequate, leading to an increase in propensity for water

---

[1] For a casement, awning or transom window, a full unit includes both the sash and the frame. The sash is the structure that holds the panes of a window (typically the moving portion of the window), while the window frame is the structure that attaches to the building on its outer perimeter, and attaches to the sash on the inner perimeter. Aluminum cladding covers the exterior of the window.

intrusion ("Alleged Defect"). It is further my understanding that sustained water intrusion behind the cladding (such as from Plaintiffs' defect theory) could lead to deterioration of the wood in the sash and water-related damage to surrounding areas ("Alleged Damage"). It is also my understanding that wood deterioration of the sash and window frame can result from other causes, such as improper installation, which could permit water intrusion and subsequent wood deterioration. In my analysis, however, I assumed that all repairs for wood deterioration were due to the Alleged Defect, recognizing that some unknown percentage of such repairs was due to installation issues that are outside the scope of Plaintiffs' defect theory. I performed my analysis for combined sashes and full frame windows, as well as for sashes alone.

**Findings**

8.     I have calculated that by fifteen years in service, nearly 6.5% of the Subject Windows may have a repair due to wood deterioration. Of the windows that were already repaired due to wood deterioration, I have found that 83% of the repairs were a sash-only replacement, while 17% of the repairs were a full-unit replacement. That equates to 5.4% of Subject Windows that will have a sash-only replacement due to wood deterioration, with the balance of 1.1% of Subject Windows having a full-unit replacement due to wood deterioration. These rates were obtained by matching warranty repair data and shipment data for replacement sashes. Using warranty repair data alone (without matching sash shipment data), the replacement rate at 15 years would be less than 5%.

9.     The data and methods used to calculate these percentages are discussed in the following sections.

**Data Sources**

10.     I used two data sources to calculate the rates discussed in paragraph 8. The data source I used to obtain repair data was Pella's Returns and Allowances ("R&A") database. The database I used to get quantities of windows and sashes shipped was Pella's Shipments Database.

11.     The R&A database contains information on all units where Pella provided a replacement product or serviced the product under warranty, including under the PSEP program,[2] or for goodwill claims (i.e. claims outside of any warranty).

---

[2] PSEP is the ProLine Customer Satisfaction Enhancement Program that Pella introduced in late 2006.

A reason for the repair, such as wood deterioration or a repair under the PSEP, is contained within the database. The R&A database has a useable set of data starting at the end of 1996. Included in the R&A data is whether the repair involved a replacement of a full window unit or just a sash.

12.　　It is my understanding that starting in 1996, the Subject Windows were offered with a 10-year limited warranty in which defects in materials or workmanship (not covered by the glass warranty) would be repaired for ten years (with no labor charge for the first two years), and parts would be provided free for the full ten year warranty period. The PSEP extended the warranty for 1991-2003 vintage windows to cover labor reimbursement to the Pella Distribution Sales Network ("PDSN") for ten years for wood deterioration problems, and provided discounted parts for windows 11-15 years old with a reduced labor reimbursement to the PDSN. For years 11-15, the PDSN may also choose to provide a reimbursement or discount on finishing or labor for these customers.

13.　　My analyses of repair rates for wood deterioration were performed using R&A data for 1997 to 2003 vintage windows with repairs from calendar year 1997 through the end of calendar year 2010, and so included several vintages of windows with the full ten years of warranty coverage plus some vintages having coverage in years 11-13 under the PSEP.

14.　　Pella also supplied window shipment data, which included information on whether a full window was shipped, or whether just a sash was shipped. Window shipments were available from two database sources back to 1991, but sash shipment

data was available starting only in 2000. Shipment data includes the destination for the shipment, which was typically a PDSN, a national account (such as Lowes), or a builder. The ultimate destination (address where the unit was installed) is generally not available in shipment data.

15.     Shipment data was used to determine the number of Subject Windows in the market, including the vintages of each Subject Window, allowing for calculations of rates of wood deterioration repairs (i.e., numbers of repairs as a percentage of windows shipped).

**Methodology**

16.     The R&A data was queried to determine what percentage of window repairs due to wood deterioration resulted in a sash-only replacement, and what percentage resulted in a replacement of the full unit. This query determined that 83% of window repairs due to wood deterioration resulted in replacement of the sash only, while 17% resulted in replacement of the full window.

17.     To estimate the rate of repairs due to wood deterioration for periods beyond when warranty data are available, a method for projecting the rate of repairs is needed. Since many mathematical models can be used that result in different predictions for repair rates, a method to assess the predictive models' accuracy is required. For this analysis, the accuracy of predictive models under consideration was tested in two ways. The first verification method was to compare the models' predictions to the known rates of repairs due to wood deterioration during the ten-year warranty period. Models that reasonably fit the available data were then tested with

the second method, which was to account for the total number of sashes that were shipped. This second method will be described in the next paragraph.

18.     Consider all repairs that resulted in just a sash replacement. There are two types of such repairs: those sash replacements for which Pella paid for some or all of the parts cost and that appear in the R&A data, and those sash replacements that were customer-paid and do not appear in the R&A data. Sash shipment data includes sashes shipped from Pella for any reason to any branch or customer. Thus, sash shipment data would include both sash replacements performed outside of warranty (i.e., after ten years or one year, depending on window vintage), and those where the sash cost was paid in part or in full by Pella. Sash shipments provide an effective means to account for both Pella-paid and customer-paid sash replacements. Note that some sashes were repaired for causes other than wood deterioration (e.g. broken window pane), so the counts of sash shipments must be adjusted to account for non-wood deterioration causes.[3] The accuracy of a predictive model can be tested by comparing the number of sashes the model predicts should have been shipped, to the number of sashes that were actually shipped.

19.     If the model predicts substantially more sashes shipped than were actually shipped, then the model would over-predict the out-of-warranty replacements. Conversely, if the model predicts fewer sashes shipped, the model would under-predict out-of-warranty replacements.

---

[3] The R&A data was queried for the causes of sash replacements. The proportion of sashes that were replaced due to wood deterioration was found to be 77%, calculated as the number of sashes replaced due to wood deterioration divided by the total number of sashes replaced in the R&A data. This proportion was used in the analysis.

20.     A predictive model was developed that accurately predicts sash shipments and reasonably fits the warranty repair data.  This predictive model generates the number of sashes that should have been replaced due to wood deterioration for different times in service.  A comparison of the model's prediction of sash shipments to actual shipments is shown in Figure 1.  The horizontal axis represents the calendar year of sash shipments.  Plotted on the vertical axis are the cumulative numbers of sashes shipped.  Sash shipments are counted through December 31 of the calendar year plotted on the horizontal axis.  The dots are the actual sash shipment data, and the line is the model prediction.  The sash shipments are adjusted for the 23% of replacements not due to wood deterioration.

21.     The model used to make these predictions resulted in a calculated wood deterioration replacement rate at 20 years of 5.4% for sashes only, and 6.5% for sash and full unit replacements ("6.5% Model").

22.     The rate of replacements for wood deterioration, by time in service, are shown in Figure 2.  In this figure, the years in service are plotted along the horizontal axis, and the cumulative percentages of windows repaired are plotted on the vertical axis.  The black line is the rate of window repairs due to wood deterioration calculated using the 6.5% Model.  The inset in Figure 2 shows an enlarged vertical scale; the 6.5% Model is again plotted, and markers have been added that identify the actual cumulative rates of repairs due to wood deterioration for each vintage of window (e.g. the blue diamond represents data for windows shipped in calendar year 1997).

9

23.     Referring again to the inset in Figure 2, 1997 vintage windows have a wood deterioration repair rate of less than 4.5% by 13 years in service, and would likely not reach 5% by 15 years in service.  The 1997 vintage windows have among the highest rates of repairs for the plotted vintages.  Thus, projecting the trend for wood deterioration replacements using only R&A data for ten years in service and later, without matching to sash shipment data, one would predict that less than 5% of windows would be replaced due to wood deterioration within 15 years.

**Settlement Agreement Projected Valuation**

24.     The model predicting 6.5% replacements (see paragraph 21), along with data on Subject Window shipments and paid R&A claim data, were used to calculate the value of the Settlement Agreement according to the terms described in that agreement.  The method I used for this valuation is described in the following paragraphs.

25.     The Settlement Agreement specified different groupings of potential claimants depending on the vintage and age of the windows, whether the repair required replacement of just the sash or of the full unit, whether property damage resulted, whether good will repairs had been provided, etc.  To address each of these groupings, a matrix was created where each cell represented the valuation of a specific vintage of Subject Window at a specific age (for example, 1999 vintage windows at 4 years of age).  This allowed for a detailed accounting of how many windows would be affected, how many claims had been compensated, how many would be eligible, and future claims on a year-by-year, vintage-by-vintage basis.

10

26.     The assumptions used for settlement valuation are shown in Figure 3, color coded to match the cells of the matrix used in the calculation (Figures 4 and 5). Throughout these calculations, it was assumed that 83% of window repairs due to wood deterioration resulted in a sash replacement, and 17% resulted in a full-unit replacement (see paragraph 8).  These percentages are shown in the 2nd and 3rd row of Figure 3).  In addition, it was assumed that 10% of all R&A repairs for wood deterioration included other property damage (not product, installation or finishing, see the 4th row of Figure 3.)  Sash-only wood deterioration would be less likely to result in other property damage; only some portion of the full-unit replacements would potentially result in property damage.  Thus, the other property damage claims due to wood deterioration, which are currently unknown, would be between 0% and 17% of all R&A claims.  A round number of 10% (near the midpoint of the range) was chosen.   Assuming that 10% of all wood deterioration R&A claims were accompanied by other property damage implies that nearly 60% of full unit window replacements for wood deterioration were assumed to be accompanied by other property damage.[4]  It was also assumed that 2004-2006 vintage windows would have the same wood deterioration experience as earlier vintages, even though changes made to windows starting in 2003 should reduce the rates of wood deterioration. Consequently, the valuation for these later vintage windows is expected to be an overestimate.

---

[4] The percent of full unit repairs resulting in property damage was calculated as (assumed 10% of R&A with property damage) / (17% of R&A full unit replacements) = 59%.

27.     Combining the model predictions for counts of repairs due to wood deterioration, the cost per repair, the assumptions discussed in the previous paragraph, and the paid repairs as found in Pella R&A data, a matrix of values was generated. This is shown in Figure 4.  The different colors correspond to different portions of the settlement agreement.  The original valuation of the settlement agreement was calculated to be $17.1 Million dollars.  This calculation assumed windows repaired under the original warranty due to wood deterioration would not accrue any additional benefits since parts were supplied by Pella.  The current settlement allows owners of these windows to apply for benefits for installation and finishing (if such were paid by the owner) up to prescribed reimbursement caps.  Consequently, an additional $4.3 Million was added to the original $17.1 Million, totaling $21.4 Million dollars to account for installation and finishing costs for windows repaired under the original 10-year warranty[5].

28.     I was asked to also perform a calculation assuming that starting in calendar year 2011, all benefits associated with the PSEP should be included in the calculation of the benefits of the settlement.  With this assumption, the valuation was calculated to be $21.5 Million, as shown in Figure 5.  As in the previous paragraph, the additional labor amount of $4.3 Million was added, so the new total is $25.8 Million.

_____

[5] The supplemental value of labor for installation and finishing was based on warranty claims for wood deterioration in the R&A that were not PSEP repairs.  Reimbursement was calculated using the caps specified in the Settlement Agreement.  The calculations conservatively assumed that all windows required finishing at installation and thus incurred finishing labor, and that all claimants would receive the maximum value under the terms of the settlement.

**Net Valuation of Ongoing Litigation**

29.     I was asked by counsel for Pella to perform a calculation of the net valuation of ongoing litigation.  The results of this valuation are shown in Figure 6.  The net valuation determined from this process is about $14.4 Million.  The assumptions for the numbers used in the valuation came from a variety of sources.  These sources are listed in Figure 7, along with formulas used in the calculated fields.



Figure 1. Cumulative sash shipments by calendar year: comparison of actual shipment data to model predictions after adjusting for repairs not due to wood deterioration.



Figure 2. Cumulative window repairs due to wood deterioration by time in service. Inset shows a zoomed image and includes markers that represent different window vintages along with 6.5% Model prediction

| Cost component | Value |
|---|---|
| Retail price of a window | $200 |
| Sash fraction | 0.83 |
| Window fraction | 0.17 |
| Assumed rate of window R&A resulting in property damage | 0.10 |
| Window, years 1-10 | $175 |
| Sash, years 1-10 | $100 |
| Unit, years 11-15 | $60 |
| Sash, years 1-10 (labor and product) | $180 |
| Window, years 1-10 (labor and product) | $350 |
| Other damages per house | $100 |
| Sash, years 11-15 | $60 |
| Window, years 11-15 | $100 |
| Sash Labor | $120 |
| Window Labor | $250 |
| Other damages per house | $100 |
| Labor fee per sash (PSEP) | $120 |
| Labor fee per full unit (PSEP) | $240 |
| Other damages per house | $100 |
| Sliding scale: year 11=45% discount; 12-40%; 13-35%; 14-30%; 15-25% | |
| Window, years 1-10 | $175 |
| Sash, years 1-10 | $100 |
| Other damages per house | $100 |
| Sash, PDSN labor+finishing less $100 discount (yrs 1-10) | $20 |
| Window, PDSN labor+finishing less $100 discount (yrs 1-10) | $140 |

Figure 3.  Assumptions used in settlement calculations

|  | Vintage of Window | | | | | | | | | | | | | | | |
| Year of Repair | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1991 | $0 | | | | | | | | | | | | | | | |
| 1992 | $0 | $0 | | | | | | | | | | | | | | |
| 1993 | $0 | $0 | $0 | | | | | | | | | | | | | |
| 1994 | $0 | $226 | $0 | $0 | | | | | | | | | | | | |
| 1995 | $113 | $1,128 | $451 | $0 | $0 | | | | | | | | | | | |
| 1996 | $451 | $4,848 | $2,030 | $226 | $0 | $0 | | | | | | | | | | |
| 1997 | $1,015 | $15,898 | $6,201 | $0 | $0 | $0 | $0 | | | | | | | | | |
| 1998 | $2,030 | $40,477 | $20,408 | $0 | $0 | $0 | $0 | $0 | | | | | | | | |
| 1999 | $3,270 | $80,504 | $54,684 | $9,133 | $0 | $7,893 | $0 | $0 | $0 | | | | | | | |
| 2000 | $3,946 | $125,153 | $133,271 | $62,013 | $0 | $21,423 | $16,123 | $0 | $0 | $0 | | | | | | |
| 2001 | $3,721 | $151,874 | $204,641 | $138,908 | $38,222 | $47,130 | $36,418 | $8,922 | $0 | $0 | $0 | | | | | |
| 2002 | $1,440 | $143,869 | $277,591 | $263,384 | $128,422 | $51,076 | $95,499 | $26,496 | $11,839 | $0 | $0 | $0 | | | | |
| 2003 | $840 | $56,640 | $273,983 | $340,167 | $258,085 | $52,429 | $174,988 | $55,360 | $16,800 | $18,942 | $0 | $0 | $0 | | | |
| 2004 | $401 | $36,406 | $121,843 | $611,161 | $591,786 | $94,045 | $255,389 | $122,805 | $59,389 | $37,819 | $7,190 | $0 | $0 | $0 | | |
| 2005 | $134 | $16,433 | $70,474 | $147,628 | $557,037 | $144,663 | $414,863 | $217,426 | $97,784 | $98,359 | $27,610 | $10,929 | $0 | $0 | $0 | |
| 2006 | $67 | $5,812 | $31,797 | $86,372 | $139,011 | $127,119 | $594,038 | $353,029 | $209,373 | $121,367 | $68,449 | $46,735 | $17,400 | $0 | $0 | $0 |
| 2007 | | $1,603 | $10,087 | $38,944 | $79,425 | $192,184 | $8,810 | $0 | $18,860 | $20,380 | $9,140 | $0 | $0 | $11,102 | $0 | $0 |
| 2008 | | | $1,403 | $4,075 | $18,704 | $94,522 | $204,141 | $12,500 | $0 | $26,990 | $14,460 | $1,110 | $0 | $12,246 | $7,668 | $0 |
| 2009 | | | | $0 | $0 | $15,164 | $84,435 | $196,793 | $7,020 | $1,230 | $23,420 | $10,670 | $1,470 | $28,956 | $7,210 | $4,921 |
| 2010 | | | | | $0 | $0 | $39,946 | $121,776 | $257,648 | $19,960 | $24,530 | $14,340 | $9,030 | $42,118 | $24,836 | $13,162 |
| 2011 | | | | | | $4,943 | $401 | $401 | $9,346 | $7,014 | $8,800 | $5,910 | $1,870 | $5,937 | $2,175 | $229 |
| 2012 | | | | | | | | | | | | | | $265,946 | $167,726 | $77,675 |
| 2013 | | | | | | | | | | | | | | $322,739 | $260,683 | $154,591 |
| 2014 | | | | | | | | | | | | | | $305,814 | $316,382 | $240,307 |
| 2015 | | | | | | | | | | | | | | $214,950 | $269,794 | $291,627 |
| 2016 | | | | | | | | | | | | | | $124,160 | $210,720 | $276,302 |
| 2017 | | | | | | | | | | | | | | $56,000 | $121,720 | $194,240 |
| 2018 | | | | | | | | | | | | | | $19,720 | $54,880 | $112,200 |
| 2019 | | | | | | | | | | | | | | $5,400 | $19,320 | $50,600 |
| 2020 | | | | | | | | | | | | | | | $5,320 | $17,600 |
| 2021 | | | | | | | | | | | | | | | | $4,880 |

| | |
|---|---|
| sub total | $ 16,009,154 |
| additional damage (1) | $ 2,062,439 |
| sub total | $ 17,088,693 |
| Additional labor for pre-PSEP warranty-paid repairs (2) | $ 4,294,680 |
| Grand Total | $ 21,363,273 |

Total: $21.4 MM

(1) This line item includes those repairs for "wood deterioration" claims within the 10-year warranty period that were made after the start of the PSEP where Pella has paid for the parts, but the local branch did not request labor reimbursement from Pella. About 14,500 units with a value of about $2 MM were identified. The local branch (PDSN) may have done the repair work as goodwill for the customer, or may not have billed Pella for their labor, so this number is likely to overestimate the value of such claims to the customer.

(2) Includes additional labor for installation plus finishing for "wood deterioration" repairs before the PSEP where Pella paid for parts but was not obligated to pay for labor. Assumes that none of the units were pre-finished, no customers received goodwill from the installer, and that all customers would receive the cap values of $175/$100 for windows/sashes pre-2004, and $250/$120 for 2004-2006 windows/sashes.

Figure 4.  Settlement values by calendar year and vintage with additional labor charges added.

| Year of Repair | Vintage of Window | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| 1991 | $0 | | | | | | | | | | | | | | | |
| 1992 | $0 | $0 | | | | | | | | | | | | | | |
| 1993 | $0 | $0 | $0 | | | | | | | | | | | | | |
| 1994 | $0 | $226 | $0 | $0 | | | | | | | | | | | | |
| 1995 | $113 | $1,128 | $451 | $0 | $0 | | | | | | | | | | | |
| 1996 | $451 | $4,848 | $2,030 | $226 | $0 | $0 | | | | | | | | | | |
| 1997 | $1,015 | $15,898 | $6,201 | $0 | $0 | $0 | $0 | | | | | | | | | |
| 1998 | $2,030 | $40,477 | $20,408 | $0 | $0 | $0 | $0 | $0 | | | | | | | | |
| 1999 | $3,270 | $80,504 | $54,684 | $9,133 | $0 | $7,893 | $0 | $0 | $0 | | | | | | | |
| 2000 | $3,946 | $125,153 | $133,271 | $62,013 | $0 | $21,423 | $16,123 | $0 | $0 | $0 | | | | | | |
| 2001 | $3,721 | $151,874 | $204,641 | $138,908 | $38,222 | $47,130 | $36,418 | $9,922 | $0 | $0 | $0 | | | | | |
| 2002 | $1,440 | $143,869 | $277,591 | $263,384 | $128,422 | $51,076 | $95,499 | $26,496 | $11,839 | $0 | $0 | $0 | | | | |
| 2003 | $840 | $56,640 | $273,983 | $340,167 | $258,085 | $52,429 | $174,988 | $55,360 | $16,800 | $18,942 | $0 | $0 | $0 | | | |
| 2004 | $401 | $36,406 | $121,843 | $611,161 | $591,786 | $94,045 | $255,389 | $122,805 | $59,389 | $37,819 | $7,190 | $0 | $0 | $0 | | |
| 2005 | $134 | $16,433 | $70,474 | $147,628 | $557,037 | $144,663 | $414,863 | $217,426 | $97,784 | $98,359 | $27,610 | $10,929 | $0 | $0 | $0 | |
| 2006 | $67 | $5,812 | $31,797 | $86,372 | $139,011 | $127,119 | $594,038 | $353,029 | $209,373 | $121,367 | $68,449 | $46,735 | $17,400 | $0 | $0 | $0 |
| 2007 | | $1,603 | $10,087 | $38,944 | $79,425 | $192,184 | $8,810 | $0 | $18,860 | $20,380 | $9,140 | $0 | $0 | $11,102 | $0 | $0 |
| 2008 | | | $1,403 | $4,075 | $18,704 | $94,522 | $204,141 | $12,500 | $0 | $26,990 | $14,460 | $1,110 | $0 | $12,248 | $7,668 | $0 |
| 2009 | | | | $0 | $0 | $15,164 | $84,435 | $196,793 | $7,020 | $1,230 | $23,420 | $10,670 | $1,470 | $28,956 | $7,210 | $4,921 |
| 2010 | | | | | $0 | $0 | $39,946 | $121,776 | $257,648 | $19,960 | $24,530 | $14,340 | $9,030 | $42,118 | $24,836 | $13,182 |
| 2011 | | | | | | $4,943 | $401 | $401 | $6,346 | $7,014 | $8,800 | $5,910 | $1,870 | $5,837 | $2,175 | $229 |
| 2012 | | | | | | | $3,680 | $15,160 | $48,200 | $112,480 | $203,320 | $949,799 | $1,031,621 | $265,946 | $167,726 | $77,675 |
| 2013 | | | | | | | | $4,160 | $16,960 | $50,720 | $117,440 | $195,440 | $977,409 | $322,739 | $269,683 | $154,591 |
| 2014 | | | | | | | | | $4,680 | $17,840 | $52,960 | $112,920 | $201,160 | $305,814 | $316,382 | $240,367 |
| 2015 | | | | | | | | | | $4,920 | $18,640 | $50,920 | $116,200 | $214,960 | $299,794 | $291,627 |
| 2016 | | | | | | | | | | | $5,120 | $17,920 | $52,400 | $124,160 | $210,720 | $276,302 |
| 2017 | | | | | | | | | | | | $4,920 | $18,440 | $56,000 | $121,720 | $194,240 |
| 2018 | | | | | | | | | | | | | $5,080 | $19,720 | $54,880 | $112,200 |
| 2019 | | | | | | | | | | | | | | $5,400 | $19,320 | $50,600 |
| 2020 | | | | | | | | | | | | | | | $5,320 | $17,800 |
| 2021 | | | | | | | | | | | | | | | | $4,880 |

| | |
|---|---|
| subtotal | $ 19,416,663 |
| additional damage (1) | $ 2,062,439 |
| subtotal | $ 21,479,102 |
| Additional labor for pre-PSEP warranty -paid repairs (2) | $ 4,294,680 |
| Grand Total | $ 25,773,782 |

*Includes pre-existing PSEP benefit as a new benefit to the customer*

Total: $25.8M

(1) This line item includes those repairs for "wood deterioration" claims within the 10-year warranty period that were made after the start of the PSEP where Pella has paid for the parts, but the local branch did not request labor reimbursement from Pella. About 14,500 units with a value of about $2 MM were identified. The local branch (PDSN) may have done the repair work as goodwill for the customer, or may not have billed Pella for their labor, so this number is likely to overestimate the value of such claims to the customer.

(2) Includes additional labor for installation plus finishing for "wood deterioration" repairs before the PSEP where Pella paid for parts but was not obligated to pay for labor. Assumes that none of the units were pre-finished, no customers received goodwill from the installer, and that all customers would receive the cap values of $175/$100 for windows/sashes pre-2004, and $250/$120 for 2004-2006 windows/sashes.

Figure 5.     Settlement values by calendar year and vintage with additional benefit afforded to future 97-03 vintage windows

| Probability of Prevailing on Legal Challenges to Class Claims | Probability of Prevailing at Trial of Common Issues | Range of Replacement Rates | | Available Recovery at Replacement Rate | Amounts of Warranty Remedies Already Provided by Pella | Net Available Recovery at Replacement Rate | Probability of Replacement Rate | Weighted Average of Potential Recovery Before Claim Rate and Individual Trials | Percentage of Class That Pursues Individual Trials re Causation and Damages | Probability of Prevailing in Individual Trials re Causation and Damages |
|---|---|---|---|---|---|---|---|---|---|---|
| 75% | 50.50% | High | 20% | $ 234,923,000 | $ (18,694,000) | $ 216,229,000 | 1% | $ 2,162,000 | 50% | 50% |
| | | Med | 6.5% | $ 76,350,000 | $ (18,694,000) | $ 57,656,000 | 90% | $ 51,890,000 | | |
| | | Low | 5.0% | $ 58,731,000 | $ (18,694,000) | $ 40,037,000 | 9% | $ 3,603,000 | | |
| 25% | 49.50% | N/A | N/A | $ - | | | --- | | | |
| | | | | | | **Total** | 100% | $ 57,656,000 | $ 28,828,000 | **$ 14,414,000** |

Figure 6.    Net expected valuation of continued litigation

**Calculation Method and Source of Data for Net Expected Valuation of Continued Litigation**

| Metric | | Value | Source |
|---|---|---|---|
| Plaintiffs' probability of prevailing on legal challenges to class claims | | 75% | Counsel for Pella |
| Pella's probability of prevailing on legal challenges to class claims | | 25% | Counsel for Pella |
| Plaintiffs' probability of prevailing at trial of common issues | | 50.5% | Objectors' Response, page 4 [*1] |
| Pella's probability of prevailing at trial of common issues | | 49.5% | Objectors' Response, page 4 [*1] |
| Range of Replacement Rates | | | |
| | High | **20%** | Plaintiff's spreadsheet [*2] |
| | Medium | **6.5%** | Exponent calculations using R&A data and sash shipments |
| | Low | **5.0%** | Exponent calculations using extrapolation of R&A data |
| Subject Windows | | 6,430,000 | Objector's Response, page 7 [*1] |
| | Full Unit Window Repair Cost | $ 844.66 | Objector's Response, page 8 [*1] |
| | Sash Repair Cost | $ 391.73 | Objector's Response, page 11 [*1] |
| | % of Repairs that were Full Unit Windows | 20% | Plaintiff's spreadsheet [*2], close to Exponent's 17% |
| | % of Repairs that were Sash Only | 80% | Plaintiff's spreadsheet [*2], close to Exponent's 83% |
| Available Recovery at Replacement Rate | | | # affected windows or sashes times the value of repair per window or sash |
| | High | $ 234,922,860 | 75% * 50.5% * 6,430,000 * **20%** (20% * $844.66 + 80% * $391.73) |
| | Medium | $ 76,349,929 | 75% * 50.5% * 6,430,000 * **6.5%** (20% * $844.66 + 80% * $391.73) |
| | Low | $ 58,730,715 | 75% * 50.5% * 6,430,000 * **5.0%** (20% * $844.66 + 80% * $391.73) |
| | Warranty Repairs under the PSEP | 81,612 | R&A Data through July 27, 2012 [*3] |
| | Warranty Repairs not under the PSEP | 39,767 | R&A Data through July 27, 2012 [*3] |
| | Value of Warranty Repairs under PSEP | $ 39,362,773 | 81612 * (20% * ($844.66 + 80% * $391.73) Full Repair, Objector's Response |
| | Value of Warranty Repairs not under PSEP | $ 9,994,083 | 39767 * (20%*($844.66-$415) + 80%*$206.73) Parts Only, Objector's Response |
| | Value of warranty repairs already provided | $ 18,693,909 | ($ 39362773 + $ 9994083) * 75% * 50.5% |
| Net Available Recovery at Replacement Rate | | | Calculated as Available Recovery less value of repairs provided |
| | High | $ 216,228,950 | $ 234922859 - $ 18693909 |
| | Medium | $ 57,656,020 | $ 76349929 - $ 18693909 |
| | Low | $ 40,036,805 | $ 58730714 - $ 18693909 |
| Probability of replacement rate occurring | | | |
| | High | 1% | Objectors' Response, page 4, rounded up |
| | Medium | 90% | Estimate for this analysis only |
| | Low | 9% | Estimate for this analysis only |
| Potential Recovery Before Claim Rate and Individual Trials | | | Calculated as Net available recovery times probability |
| | High | $ 2,162,290 | 1% * $ 216228950 |
| | Medium | $ 51,890,418 | 90% * $ 57656019 |
| | Low | $ 3,603,312 | 9% * $ 40036805 |
| Weighted Average of Potential Recovery before claim rate and individual trials | | $ 57,656,020 | Sum of high, medium and low values |
| Percentage of class that pursues individual trials re causation and damages | | 50% | Counsel for Pella |
| Potential recovery of class that pursues individual trials re causation and damages | | $ 28,828,010 | 50% * $ 57656019 |
| Probability of prevailing in individual trials re causation and damagaes | | 50% | Counsel for Pella |
| **Net Expected Valuation** | | **$ 14,414,005** | 50% * $ 28828009 |

Notes

[*1] - *Class Representatives' Combined Response in Opposition to the Motion for Preliminary Approval of the Class Action Settlement and Motion for Leave to File a Third Amended Complaint*, 8/8/12

Page 4: Table.  Probability of Victory at Trial [for Plaintiffs] sums to 50.5%, and the probability of Pella prevailing at trial is listed as 49.5%

Page 8: average cost to replace one window: $844.66.  Labor and finishing for 6 windows = $2490, or $415/window for labor & finishing

Page 11: $206.73 per sash parts, installation ($125), and finishing ($60).  Labor is $125 + $60 = $185, Total is $206.73 + $185 = $391.73

[*2] - *11-12-15 RJB Pella - Settlement Model (current).xlsx* , tab: *Damages - Summary* , cell B38 for 20% repair rate, rows 45-46 for distribution of sashes and frames.

[*3] - Includes warranty repairs due to wood deterioration through 10 years of service.  Assumes that repairs performed under the PSEP included parts and labor, while repairs not under the PSEP included only parts.  Does not include any goodwill repairs, or repairs after 10 years under the PSEP where a discounted part price was offered.

Figure 7.  Calculation sheet and assumption sources for Net Expected Valuation of Continued Litigation table

THIS CONCLUDES MY AFFIDAVIT.

_____
Paul M. Taylor, Ph.D., P.E.

Subscribed and sworn to before me
this 27th day of August, 2012.

_____
Notary Public

MELINDA S. PALM
Commission # 1882872
Notary Public - California
San Mateo County
My Comm. Expires Apr 11, 2014

21

# EXHIBIT A

CV of Paul Taylor, Ph.D., P.E.



Exponent
149 Commonwealth Drive
Menlo Park, CA 94025

telephone 650-326-9400
facsimile 650-326-8072
www.exponent.com

## Paul M. Taylor, Ph.D., P.E.
**Principal Engineer**

### Professional Profile

Dr. Paul Taylor is a Principal Engineer at Exponent, specializing in the investigation and analysis of products and systems in the consumer, transportation, and industrial environments. His practice focuses on the investigation of accidents involving consumer products, vehicles, or industrial equipment, and concerns relating to the mechanical design of parts or systems, such as automotive components. Dr. Taylor's practice areas include fire cause and origin, liquid and gas flow, heat transfer, and vibration and mechanics. He regularly performs analyses of warranty and accident databases during his evaluations of the real world performance of products, particularly in automotive applications. His engineering work includes laboratory investigations and experiments, such as accident reconstruction and vehicle testing.

Prior to joining Exponent, Dr. Taylor was an independent consultant.

### Academic Credentials and Professional Honors

Ph.D., Mechanical Engineering, Stanford University, 1986
M.S., Mechanical Engineering, Stanford University, 1979
B.S., Mechanical Engineering, Rensselaer Polytechnic Institute (*cum laude*), 1978

Stanford University Fellowship; Tau Beta Pi; Pi Tau Sigma

### Licenses and Registrations

Registered Professional Mechanical Engineer, California, #31069

OSHA 40-Hour Certification, Hazardous Waste Operations and Emergency Response Training; OSHA Supervisory Training

### Patents

Patent 5,651,810: Apparatus and method for filtering and sampling airborne respiratory contaminants.

**Publications**

Mikolajczak CJ, Taylor PM.  A method for assessing the potential for a dermal burn hazard from malfunctioning consumer electronic devices.  J Burn Care Res 2008; 29(2):338–345.

Flaherty DK, Taylor PM, Hopkins WE, Holland ME, Schlueter DP.  A new mask filter cartridge used to determine applicator inhalation exposure to an alachlor herbicide (Lasso®) during normal spraying operations.  J Occupat Env Med 1995; 37(9).

McCarthy GE, Taylor PM.  The effect of sample width on burn rate in Federal Motor Vehicle Safety Standard 302 testing.  Proceedings, American Society of Mechanical Engineers Winter Annual Meeting, SERA-Vol. 2, Safety Engineering and Risk Analysis, November 1994.

Taylor P, Dudek R, Flaherty D, Kaempfe.  Evaluation of two instruments for the measurement of aerosols.  J Aerosol Sci 1994; 25(2):419–423.

McCarthy GE, Taylor PM, Kendall GR, Aboba BD, Subbaiah MV.  Review of selected computational programs for atmospheric dispersion.  Proceedings, 5th American Institute of Aeronautics and Astronautics/American Society of Mechanical Engineers Thermophysics and Heat Transfer Conf., Seattle, WA, June 1990.

Taylor PM.  The dynamics and damping of formed metal bellows.  Ph.D. Thesis, Stanford University, June 1986.

**Presentations**

Adler D, Taylor PM.  A procedure for obtaining velocity vector from two high response impact pressure probes.  14th Israel Conference on Mechanical Engineering, Technion—Israel Institute of Technology, Haifa, Israel, 1980.

**Reports**

Mikolajczak CJ, Taylor P, Heberer C.  Cell phone usage at gasoline stations.  Exponent Failure Analysis Associates, Inc., December 1999.

McCarthy G, Marble F, Taylor P, Malladi S.  Flow and water quality computations in a canal with closed ends.  Exponent Failure Analysis Associates, Inc., March 1996.

Taylor PM, Lee J, et al.  Final report, TWT reliability improvement study.  TMEC-152, December 1984.

Taylor PM, Shitzer A, Cohen Y, Stotter A.  Cooling methods for inland power stations, Part I.  Energy Engineering Center, Technion, Report EEC-102, June 1980.



**Professional Affiliations**

- American Society of Mechanical Engineers (member)
- National Fire Protection Association (member)

Eᵡ™