**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| DR. LEONARD E. SALTZMAN, et al. individually and on behalf of all others similarly situated; | |
| Plaintiff, | No. 06 C 4481 |
| v. | Honorable James B. Zagel |
| PELLA CORPORATION, an Iowa corporation, and PELLA WINDOWS AND DOORS, INC., a Delaware corporation, | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY
APPROVAL OF CLASS SETTLEMENT AND MOTION FOR
CERTIFICATION OF SETTLEMENT CLASS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

THE FOUR CATEGORIES OF OBJECTIONS.................................................... 2

ARGUMENT .................................................................................................... 3

I.    OBJECTORS VASTLY OVERVALUE THE BENEFIT TO THE CLASS FROM
PROCEEDING THROUGH A COMMON LIABILITY TRIAL AND INDIVIDUAL
DAMAGES TRIAL, AND UNDERSTATE THE RISKS THAT CLASS MEMBERS
FACE ALONG THE WAY.................................................................................. 4

    a.   Plaintiffs' Valuation Is Based On Substantial Discovery. ......................... 7

    b.   Class Counsel's Valuation of the Settlement. ............................................ 8

    d.   Objectors' Reynolds Analysis Is Faulty And Uninformative................... 11

    e.   Objectors Ignore the Fact that A Successful Liability Trial Will Result in Zero
Damages............................................................................................................ 12

    f.   Class Counsel's Reynolds Evaluation....................................................... 13

II.   THE PROPOSED SETTLEMENT PROVIDES SUBSTANTIAL BENEFITS AND
IS WELL WITHIN THE RANGE OF REASONABLENESS DESPITE THE ALLEGED
"WARNING SIGNS" RAISED BY OBJECTORS.............................................. 14

    a.   For Class members Who Contacted Pella, The Benefits of the Settlement Are In
Addition to the PSEP, and Not instead of the PSEP. ...................................... 14

    b.   The Settlement Does Not Exclude a Determination of Value, and Determinations
of Value Were Made and Are Included Here. ................................................. 15

    c.   Each of the Defenses Pella Preserved for Arbitration Would Have Been Available
to Pella in an Individual Damages Trial Following the Common Liability Trial......... 16

    d.   An Individual Damages Trial Following the Common Liability Trial Would
Require the Class Member to Engage In A Far More Complex and Expensive Mini-
Trial, Likely Many Years In The Future, Whereas the Settlement's Arbitration
Process Provides the Class Real Value, Requires No Lawyer, Will Occur Swiftly, and

Provides the Benefit of No Dispute Over The Window Defect.......................................... 17

    e.    The "Kickforward" Objectors Complain of is Not Only a Common Feature of Class Settlements, it is Beneficial to the Class.................................................. 18

    f.    The Attorneys Fees Are Low in Comparison to The Benefit. .................................. 20

    g.    There is No Conflict Among Class Members Created by the Settlement. .............. 21

    h.    The Deductible Was the Product of Compromise and Does Not Lessen the Fact That the Settlement Provides Substantial and Immediate Benefits................................ 24

    i.    The Discount Class Recipients Receive a Substantial Value in Comparison to the Legal Peril They Face From Not Having Contacted Pella for Service. .......................... 24

    j.    The Proposed Settlement Definitively Establishes Resolution of the Issue of Liability for Any Class Member Who Does Not Opt Out of the Settlement.................. 26

    k.    Objectors Do Not Challenge the Hard Fought and Lengthy Nature of the Settlement Process That Included Two Professional Mediators...................................... 26

    l.    The Proposed Settlement Compares favorably to the Two Windows Settlements Objectors Claim are Superior. ............................................................................. 27

    m.    Pella's Ability to Pay is a Minor Factor in the Settlement, and a Claims Made Settlement With no Aggregate Cap is a Superior Benefit to the Class in Comparison to a Common Fund. .............................................................................................. 28

III.    ALL OF THE CLASS REPRESENTATIVES ON THE AMENDED COMPLAINT ARE ADEQUATE UNDER RULE 23 ................................................................... 28

CONCLUSION ....................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Allen v. Holiday Universal*, 249 F.R.D. 166, 182 (E.D. Pa. 2008) .................................. 24

*America Int'l Group, Inc. v. ACE INA Holdings, Inc*., 2012 WL 651727 at *4 (N.D. Ill. Feb. 28, 2012)................................................................................................................................. 4

*American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974) ......................................... 16

*Charron v. Pinnacle Group N.Y. LLC*, 2012 WL 2053530 at *2 (S.D.N.Y. June 6, 2012) ... 27, 30

*E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F. 2d 884, 889 (7th Cir. 1985) .............................. 14

*Fischer v. ITT Corp.,* 72 F.R.D. 170 (E.D.N.Y. 1976) ................................................. 30

*Gunnells v. Healthplan Services, Inc*., 348 F.3d 417, 431 (4th Cir. 2003)................................... 23

*Henry v. Sears Roebuck & Co*., 1999 WL 33496080 at *9 (N.D. Ill. 1999) ............................... 25

*In re AT & T Mobility Wireless Data Services Sales Tax Litig.,* 789 F. Supp. 2d 935, 961 (N.D. Ill. June 2, 2011)......................................................................................................... 12

*In re Chambers Development Sec. Litig*., 912 F. Supp. 822, 840 (W.D. Pa. 1995) .................... 27

*In re Cuisinart Food Processor Antitrust Litig*., 1983 U.S. Dist. LEXIS 12412, M.D.L. 447, 1983 WL 153, at *4 (D. Conn. Oct. 24, 1983) ........................................................ 25

*In re Mex. Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001)......................................... 25

*In re Pet Food Prods. Liab. Litig*., 629 F.3d 333, 349 (3d Cir. 2010)......................................... 23

*Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)............................................................. 2, 14, 25

*Lewis v. Goldsmith,* 95 F.R.D. 15 (D.N.J. 1982) ........................................................ 30

*Malchman v. Davis,* 761 F.2d 893 (2d Cir.1985) *cert. denied,* —— U.S. ——, (1986)............... 29

*Mirfasihi v. Fleet Mortg. Corp*, 450 F.3d 745 (7th Cir. 2006)............................................... 17, 23

*Phemister v. Harcourt Brace Jovanovich, Inc.*, 1984 WL 21981, 8 (N.D. Ill. 1984)...................25

*Radosti v. Envision EMI,* 717 F.Supp.2d 37, 63 (D.D.C. 2010)....................................27

*Reynolds v. Beneficial Nat. Bank*, 288 F. 3d 277, 285 (7th Cir. 2002)...................................passim

*Rodriques v. West Publishing*, 563 F.3d 948, 965 (9th Cir. 2009) ....................................4

*Saltzman v. ESBI*, 348 Ill. App. 3d 740 (Ill. App. Ct. 2004)...........................................29

*Schulte v. Fifth Third Bank,* 805 F. Supp. 2d 560, 583 (N.D. Ill. 2011)......................................12

*Shaw v. Toshiba American Info. Sys., Inc.*, 91 F. Supp. 2d 942, 960-61 (E.D. Tex. 2000)..........25

*Smith v. Sprint Communications Co., L.P.,* 387 F.3d 612 (7th Cir. 2004) ....................................23

*Srail v. Village of Lisle,* 249 F.R.D. 544, 555 (N.D. Ill. 2008)....................................23

*Susman v. Lincoln American Corp.*, 561 F.2d 86 (7th Cir. 1977) ....................................30

*Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).........5

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).........23

*Vaughn v. Am. Honda Motor Co., Inc.*, 507 F.3d 295, 300 (5th Cir. 2007) ................................20

**Other Authorities**

Fitzpatrick, The End of Objector Blackmail?, 62 VANDERBILT L. REV. 1623, 1643 (2008)........20

## INTRODUCTION

Three Class Representatives[1] object to Plaintiffs' request that the Court preliminarily approve the proposed settlement which is a product of more than six years of hard fought litigation and intense settlement negotiation. These owners' (hereinafter "Objectors") position is that the settlement is so feeble that the Court should stop the settlement process dead in its tracks and thus not even permit the dissemination of class-wide notice giving Class Members the opportunity to opt out or otherwise weigh in on their views of the settlement. This position is meritless both on the facts and the law. Further, it exhibits a fundamental failure to understand the settlement terms and the applicable standard that the Court should apply at this stage.

While this Court must scrutinize the proposed settlement even at the preliminary approval stage, it should not put the "cart before the horse." Objectors seek to turn preliminary approval into a final fairness hearing. However, the Seventh Circuit, consistent with its sister circuits and the Manual for Complex Litigation, has for the last thirty years endorsed a two-stage process: a preliminary approval hearing and, following notice to the class, a final approval hearing. As explained below, the standards for preliminary approval – whether the settlement is in the "range of reasonableness" – is different and less stringent than the standard the court will apply at final approval.

While Class Counsel believes that, at the appropriate time, it will demonstrate that the Settlement easily meets the requirements for final approval, we are not at that stage in the settlement process. The need to distinguish between the standards applied at preliminary versus final approval preserves the right of the class to raise and litigate their own objections without

---

[1] Of the three Objectors, two are made entirely whole by the proposed settlement, and the other (Ehorns) are not even a member of the settlement class and therefore lacks standing. *See* Pella's Reply In Support of Joint Motion for Preliminary Approval.

the *fait accompli* of a prior adjudication. Nevertheless, careful scrutiny at this stage is welcome, as the proposed settlement here easily falls within the range of fairness and reasonableness.

At the end of the day the record will establish this settlement to have been the product of a complex class certification order, imperfect predictions of future product failure rates imposed upon inconsistent data, and hard bargaining with give and take on both sides. The Court did not certify the issues of causation and damages because it concluded that the issues could not be resolved on a class wide basis. Thus, it cannot be disputed that "continuation of the litigation 'would require the resolution of many difficult and complex issues,' and would 'entail considerable additional expense,' and would 'likely involve weeks, perhaps months, of trial time.'" *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996). This record establishes that this settlement is clearly in the range of reason. Accordingly, the Court should grant preliminary approval and permit the settlement process to continue to final approval.

## THE FOUR CATEGORIES OF OBJECTIONS

Objectors' brief exhibits a fundamental lack of understanding of the settlement and the nature of the litigation. While Objectors' brief lists what it calls fifteen "warning signs", these "15" arguments can be broken down into four basic categories:

- **Objections Based on a Mistaken Understanding of the Limited Nature of the Certified Classes**: Objectors misunderstand the nature of the certified classes, which were limited to liability only and could result in no finding of causation or an award of damages, meaning that without this settlement and assuming a successful liability trial, each class member would likely need to engage counsel and pursue a second trial where they would face myriad legal perils and the expense of litigation before that class member could recover. The mistaken understanding of what the class could achieve from the class trial infests all aspects of Objectors' arguments, especially where the objections focus on the areas of compromise between the parties as though compromise was itself objectionable, and as though this litigation would have somehow resulted in all windows from 1991 to 2009 being recalled and replaced with new windows at Pella's sole expense. Not only is this outcome highly improbable as a settlement, but the objection provides no legal theory from which this wished for remedy could legally result.

2

- **Objections Based on a Mistaken Understanding of the Benefits Provided Under the Settlement Agreement**: Objectors misunderstand the nature of the class benefit, which for most claimants is in addition to, not instead of, the existing benefits under Pella product warranty, and the ProLine Service Enhancement Project ("PSEP"), and for other claimants recognizes that they failed to provide Pella any opportunity to inspect the windows and provide warranty benefits. Objectors also misunderstand the Pella warranty as well as the PSEP as it currently exists – but for the Settlement, Pella has no legal obligation to provide any PSEP benefits to any class members. The PSEP was created as a cost sharing mechanism between Pella and its distributors for windows of vintage 1991 to 2003, not between Pella and Pella window owners, and not for windows 2004-2006. In addition to the other settlement benefits, the PSEP is for the first time made a direct and enforceable legal obligation of Pella to each class member, and is retroactively applied. The Settlement also extends the existing written warranty between Pella and class members, which was limited to ten years and provided no benefits for installation and finishing. The settlement benefits extend beyond ten years, and include the costs for installation and finishing.

- **Objections Based on a Mistaken Understanding of the Arbitration Process that the Settlement Establishes for Larger Dollar Claims**: Objectors misunderstand the nature of the arbitration process established by the settlement for larger dollar claims, which is intended to be a paper process that should not require attorney assistance and which eliminates the need for the claimant to prove the product defect.

- **False Allegations of Self-Dealing in the Settlement Process**: Objectors erroneously assert process based objections despite ample evidence of the absence of self-dealing and the adequacy of class counsel and class representative Dr. Saltzman as well as the proposed new class representatives.

Objectors' misunderstanding of the limited nature of the certified class establishes the paucity of Objectors' arguments. Contrary to Objectors' fanciful imagination of damages resulting from the class trial possibly totaling as much as $2.7 billion dollars, the actual maximum amount of damages that could be awarded by the Court from the liability class trial is exactly zero.

## ARGUMENT

Objectors identify what they believe to be two approaches for analyzing the merits of a settlement under Seventh Circuit jurisprudence: a "Value of the Litigation" and a "Warning Signs" approach. Preliminary approval is merited under either approach.

3

I.  **OBJECTORS VASTLY OVERVALUE THE BENEFIT TO THE CLASS FROM PROCEEDING THROUGH A COMMON LIABILITY TRIAL AND INDIVIDUAL DAMAGES TRIAL, AND UNDERSTATE THE RISKS THAT CLASS MEMBERS FACE ALONG THE WAY.**

Objectors' valuation is not the primary issue this Court need analyze, as preliminary approval is not withheld "whenever the parties disagree on the value of plaintiffs' claims. If that were the law, objectors could thwart settlement by presenting a facially plausible net valuation analysis that contradicts the settlement proponents' predictions. . . . [T]he court's role is to ensure that the settlement proponents' analysis is a reasonable one." *America Int'l Group, Inc. v. ACE INA Holdings, Inc*., 2012 WL 651727 at *4 (N.D. Ill. Feb. 28, 2012). In any event, Objectors' valuation is fatally flawed as it fails to account for the following: risk of decertification; risk of loss of liability trial; large percentage of replacements being limited to the sash and not the entire window structure; discount based on small number of class members opting to pursue an individual trial; and risk that individual class members will lose the individual causation, and or damages trial.

In an attempt to bring sense to their flawed approach, Objectors vastly overvalue plaintiffs' case, and make several egregious errors in the valuation methodology. Objectors' first error is that they misapply the valuation of the litigation methodology suggested by the Seventh Circuit in *Reynolds v. Beneficial Nat. Bank*, 288 F. 3d 277, 285 (7th Cir. 2002). In *Reynolds*, the Seventh Circuit, in analyzing a motion for final approval, believed that the "suspicious circumstances" of the settlement justified imposing a "greater effort to quantify the net expected value of continued litigation to the class" and to "estimat[e] the range of possible outcomes and ascribing a probability to each point on the range." *Id*. at 285.[2] The seeming simplicity of the

---

[2] Accepting the general wisdom that one size frequently does not fit all, the Ninth Circuit in *Rodriques v. West Publishing*, 563 F.3d 948, 965 (9th Cir. 2009) stated "We put a good deal of

4

*Reynolds* calculus is belied by the lack of precision that many valuation efforts present. Although the Seventh Circuit has recognized that "'[a] high degree of precision cannot be expected in valuing a litigation,' the court should nevertheless 'insist[ ] that the parties present evidence that would enable [ ] possible outcomes to be estimated,' so that the court can at least come up with a 'ballpark valuation.'" *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (*citing Reynolds* 288 F.3d at 285). The "point" of *Reynolds* is to present evidence that would enable the Court "to translate his intuitions about the strength of the plaintiff's case, the range of possible damages, and the likely duration of the litigation if it was not settled now into that would permit a responsible evaluation of the reasonableness of the settlement." *Reynolds*, 288 F.3d at 285. However, a translation of intuition into a responsible evaluation of reasonableness requires numbers that have some rational basis. Because the Objectors' valuation is not based upon any evidence, it is devoid of a rational basis in the record and does not inform a responsible evaluation of the reasonableness of the settlement.

Objectors chide Class Counsel and Defendants for failing to provide a "valuation" of their Settlement in their preliminary approval papers, "as if expecting automatic approval. It's as if neither knows or wants to share their opinion of the value." (Dkt. 286 at p. 7). Nothing can be further from the truth. Objectors' counsel is well aware of the extensive efforts of Class Counsel to precisely calculate the Settlement, prior to and throughout the negotiation process, because Mr. Lang, Objectors' counsel, assisted Class Counsel in those efforts, at least until his termination, and knew that Class Counsel wanted a fact based value assessment. Under normal circumstances the valuation of the settlement would be presented at the preliminary approval, or

---

stock in the product of an arms-length, non-collusive, negotiated resolution…'[u]ltimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations and rough justice.'"

final fairness hearings. However because of the peculiar circumstances presented by this case, i.e., an objection prior to settlement, and now a second objection prior to preliminary approval, this brief is the proper mechanism for Class Counsel to demonstrate, what Objectors' counsel already knows to exist, that the Settlement has significant value well within the range reasonableness, and in fact is a fair, reasonable and adequate Settlement.

The particulars of this case complicate a *Reynolds* calculation. To begin with the "range of possible damages" must be considered in light of the fact that causation and damages are severed in this case. The road to a damage award for these Classes is lengthy indeed. As for the countervailing "strength of the plaintiff's case," it would, at a minimum, need to be assessed in terms of dispositive motions, affecting the entirety of the case pre-trial, such as decertification, for the class liability trial on product defect, and for the follow-on individual trials on causation and damages. Success on the merits at any level does not presuppose a successful award of damages in the subsequent individual trials. Should the *Reynolds* calculus be strictly applied, probability of success on the dispositive motions and class trial would then be multiplied by the probability of success of the series of mini-trials such that a 50% probability of success in the class trial multiplied by the same probability of success of 50% in the mini-trial, equates to a 25% probability.[3]

*Reynolds*, even apart for the scenario of multiple subsequent litigations, requires at a minimum least two valuations: (1) the valuation of the Settlement; and (2) the valuation of success on the merits times the probability of that success. The Objectors' Value the Litigation analysis fails on two fundamental prongs: it does not value the Settlement; and it values the

_____

[3] With all due respect, the *Reynolds* calculus, like most generalities, suffers from exposure to reality. Assessing "probability" of success is not a precise exercise to say the least, especially when considered from the opposite poles of the litigants and the multiple opportunities to derail any final award of damages.

6

litigation using such arbitrary numbers for every variable[4] as to produce ranges so random as to render the resulting product ($380,000,000) meaningless.[5]

**a. Plaintiffs' Valuation Is Based On Substantial Discovery.**

As Objectors' counsel is well aware, Class Counsel devoted a great deal of effort in conducting discovery on the failure rate[6] of the Pella ProLine casement windows, and in calculating that failure rate from existent data. The single most disputed factual issue between the parties is whether the Pella ProLine Casement windows had any warrantable defect at all, and secondly whether the recorded warranty claims were indicative of the existence of any design defect systemic to the windows themselves or other causes. The parties took differing view on these critical issues, and employed the warranty data to support opposite conclusions. Nevertheless, the failure rate is material to two issues: 1. whether it indicates the existence of a design defect; and 2. to predict the number of windows to which settlement benefits could apply such that those benefits can be valued. The principle focus of statistical evidence of a design defect for settlement purposes is the ability to predict the distribution of settlement benefits to the Class for failed windows.

It is to be remembered that settlement benefits are provided to current and former owners whose windows manifest the defect, *i.e.* experience a failure. The settlement is not limited to

---

[4] In fact Objectors use the same probability of success percentages that Judge Posner is *Reynolds* itself states are "arbitrary figures". *Reynolds*, at 285.

[5] Objectors assert total window failure rates ranging from 2.1% to 50% and multiplies those failure rates times full window replacement costs. (Dkt. 286 at p. 8, n. 3.) The actual data has never shown anything close to a 50% failure rate. The data has also not shown 100% total window failures, the limited data on sash replacements suggested an 80% sash replacement and 20% full window replacement. And it ignores that many windows are within the 10 year warranty period and replaced without any product cost under the warranty.

[6] By "failure rate" Class Counsel means the probability over time that the window will manifest the defect alleged in the Complaint. The manifestation of the defect may be subtle and limited to sash only, or it may be catastrophic, meaning a complete failure of the entire window unit.

how many claimants there are, nor to how many windows "fail." Rather, the settlement provides recovery for the failure of any Pella ProLine Casement, Awning and Transom windows manufactured from 1991 to 2006, regardless of how many there are, until 2021.

In order to value the settlement it is important to make some rational determination of how many windows can reasonably be assumed to manifest the defect. The universe of Pella ProLine Casement windows is approximately 6.4-6.5 million windows. It is unknown how many are no longer in existence. The existing data source of the known "failed" windows is contained in the Returns and Allowances ("R&A") database maintained by Pella. While the completeness and consistency of this data is disputed, it is a data source of approximately 147,032 warranty claims containing approximately 11,000 data points, as such it is a meaningful sample that must be the starting point for any reasonably precise valuation. The list of documents containing various databases that comprised Class Counsel's valuation of the settlement and the warranty data are listed in Appendix A.

### b. Class Counsel's Valuation of the Settlement.

At Class Counsel's request, various regression analyses were conducted on the Pella databases.[7] Calculations of failure rates for window vintages from 1991 to 2006 were conducted both on the data as a whole, as well as on selection subsets of the data. It is to be recognized that the data was very inconsistent with respect to the claim of wood deterioration and wood rot. The PSEP warranty data showed a significant increase in claims once the PSEP was initiated. This would indicate that prior to the PSEP wood deterioration claims were either not recognized, or were rejected as unwarrantable. Therefore from 1991 until 2006, when the PSEP began, many windows that have the defect alleged in the Complaint simply were not reflected in the R&A

---

[7] A portion of the regression analysis appears as Dkt. 286-5, however, what Objectors' provided was an incomplete, preliminary draft only.

data. Second, the data, either when looked at as a whole, or by sub-part showed a very steep increasing slope beginning at about 6-7 years of age, meaning that at about this time the windows were failing at a highly accelerated rate. Because of these characteristics, Class Counsel performed a regression on window return data from 1998 to 2002 because it included the PSEP return data for as close to a ten-year period as possible (*i.e.*, the 2002 windows reached 10 years in 2011).

The regression was conducted on the sub-set which sought to remove the effects of any skewed data prior to the PSEP, and presumably was a more accurate reflection of the universe of windows. The regression also was conducted on each one-year set for windows 1998 to 2002 to detect the impact of sub-parts of the data. And the regression was conducted on selected distributorships to determine variance in warranty reporting. The regression results on the subset was then applied to all vintages in the settlement, 1991-2006.

The regression was done so that it could produce the probability of failure of each vintage, for each year, for 15 years from date of manufacture. This produced not only the total number of windows that have failed over those 15 years, but how many of each vintage will likely fail in each year. The regression produced an overall failure rate of slightly above 14% in the 15th year, not the 20% Objectors claim. (Dkt. 286, p. 7). The 14% failure rate was and is considered by Class Counsel as the most reliable. While the exact numbers are available, the approximate number of Pella ProLine casement windows subject to settlement benefits is 900,000.

Because the regression analysis conducted by Class Counsel was detailed, it could be applied to each component of the settlement terms. The result produced a total settlement value of $171,794,674, at failure rate of 14%, and $60,055,385 at 6%. This valuation backs out

9

approximately $9,000,000 worth of PSEP benefits already paid by Pella. As discussed above, prior to this Settlement, Pella had no obligation to provide any PSEP benefits, which at most were reimbursement benefits to their distributors and not to window owners, and no obligation in their warranty to provide for any costs of labor and finishing for any Pella product. The Settlement makes the PSEP a direct obligation of Pella to every member of the Class. However, in order to be conservative, the valuation as stated does not include the PSEP benefits. Nevertheless, Class Counsel has established the value of the Settlement without considering the value of these PSEP benefits. Class Counsel similarly assumes Objectors' statements of per window unit ($844) and per sash values ($392), although the actual values are likely to be considerably less.

### c. Objectors Misinterpretation of The Data And The Regression.

Objectors rely on a valuation created by Mr. Lang in January 2011 (Dkt. 286-6, "Lang valuation"), but that valuation is deeply flawed. It is not based on any actual data, other than Dr. Saltzman's replacement of his six windows, a sample far too small to be considered reliable. Further, the actual failure rate is much disputed among the parties. However, the Settlement provides for benefits irrespective of the number of claimants, and is bounded only by the $6000 arbitration cap. Under the Settlement, there is no fixed limit to the number of windows for which claims can be made. Assuming that all 6,400,000 windows fail, and that there are ten windows per structure (640,000 claims), at $6000 per arbitration claim there is an implicit cap at $3.8 billion. As such, even assuming the restriction of the $6000 arbitration cap, the number is so enormous it is unlikely to pose a real limitation on recovery for the Class.

The meaningfulness of the analysis in Exhibit 5 of Objector's brief (Dkt. 286-5) is lost on Objectors. The Objectors remark "An analysis of Defendants warranty data revealed a failure

rate with a linear increasing slope, approximately 24% at year 20, Exhibit 5." (Dkt. 286 at p. 7.) Exhibit 5 shows nothing of the sort, indicating that Objectors simply do not understand the document. Objectors' selection of Exhibit 5 is inexplicable given that it was a preliminary draft only, was not calculated with actual data, and literally dozens of other documents were prepared as part of Class Counsel's valuation analysis, all of which Objectors' counsel is aware.

### d. Objectors' *Reynolds* Analysis Is Faulty And Uninformative.

Here, Objectors use faulty analyses to come to a fanciful valuation of $380,000,000. The Objectors reach their "Value the Litigation" figures by multiplying two numbers, "Dollar Values Based On Valuation Range", times "Probability of Victory At Trial" to reach "Litigation Value". Objectors offer no rational basis to support their calculations. Objectors concocted "Dollar Values" are premised upon an assumption that 50% of Pella ProLine windows will fail, that the failure will be the entire window unit and not the sash, and that each will cost $844.66 to replace including both the cost of product and labor and finishing. There is simply nothing in this case from which it can be assumed that any trial will result in a damage award based upon a finding of 50% failure rate. Objectors apply the $844.66 by taking Dr. Saltzman's total window replacement and dividing it by six. This presupposes that all window failures are total unit failures in spite of data that suggests that the majority are sash-only failures. It also presupposes that the cost of windows and sash products should be included in spite of the fact that Pella's ten-year warranty provides product replacement without cost.[8] More distressing is the calculation of the "Probability of Victory at Trial" percentages, which are lifted directly from the example used in the *Reynolds* case, which itself states that the numbers are arbitrary and for example only. The

---

[8] It has always been the case in this litigation that Pella's warranty was insufficient because of its failure to pay the cost of installation (labor) and finishing. The PSEP was an attempt at mitigation, but it was too low and never was offered directly to class members.

*Reynolds* analysis done by Objectors is so divorced from the facts, and constructs a "ballpark" with a margin of error so vast, as to render it useless for conducting a "responsible evaluation of the reasonableness of the settlement."

Objectors also fail to compute the present value of any of their calculations, an especially serious consideration given that many of the individual damages trials might not occur until several years from now, would only cover at most window vintages from 1991 to 2009, which by that point would be considerably older. As one recent court noted in evaluating approval of a class settlement, "[i]t must also be remembered that 'a dollar today is worth a great deal more than a dollar ten years from now,' *Reynolds,* 288 F.3d at 284, and a major benefit of the Settlement is that Class Members may obtain these benefits much more quickly than had the parties not settled. If the Class Members were 'required to await the outcome of a trial and inevitable appeal, [* * *] they would not receive benefits for many years, if indeed they received any at all.'" *Schulte v. Fifth Third Bank,* 805 F. Supp. 2d 560, 583 (N.D. Ill. 2011) (quoting *In re AT & T Mobility Wireless Data Services Sales Tax Litig.,* 789 F. Supp. 2d 935, 961 (N.D. Ill. June 2, 2011)).

### e. Objectors Ignore the Fact that A Successful Liability Trial Will Result in Zero Damages.

But putting aside the flawed numbers and assumptions in Objectors' valuation, the shortcomings of any *Reynolds* analysis applied in this case is staggering because Objectors conveniently ignore a critical fact – a successful outcome at a class trial will result in *zero damages*. It would only be the first step to individual trials, which would be conducted over many years. Moreover, with the exception of contesting the defect itself, Pella would be able to assert every defense in its arsenal. The number of class members who would actually pursue such individual lawsuits is entirely unknown. Not surprisingly, Objectors make no effort at

estimation.

Here, Objectors use faulty analyses to come to fanciful high end valuations of a
successful outcome at trial that are as high as $2.7 billion dollars. But Objectors fail to even
attempt to quantify the impact of the most significant legal and factual burdens class members
would face if the case were not settled. Objectors' valuations are bereft of fact, logic or veracity
and cannot be used to value the maximum likely outcome of the case after a successful trial.
Because of these flaws, the Court cannot conduct a "responsible evaluation of the reasonableness
of the settlement" making use of Objectors' figures.

f. **Class Counsel's *Reynolds* Evaluation.**[9]

| Range of Failure Rates | | Available Recovery at Failure Rate | Probability of Failure Rate | Weighted Average of Potential Recovery Before Claim Rate and Individual Trials | Percentage of Class That Pursues Individual Trials re Causation and Damages | Probability of Prevailing in Individual Trials re Causation and Damages |
|---|---|---|---|---|---|---|
| High | 14% | $171,794,674 | 20% | $34,358,934 | | |
| Med | 6% | $60,055,385 | 20% | $12,011,077 | 50% | 50% |
| Low | 3% | $18,153,151 | 20% | $3,630,630 | | |
| Zero | --- | $0 | 40% | $0 | | |
| | | **Total** | 100% | **$50,000,641** | $25,000,320 | $12,500,160 |

---

[9] Due to the confidential nature of the material relied upon to conduct the *Reynolds* evaluation,
Class Counsel is not attaching those supporting materials at this point; however, they can be
made available for *in camera* review by the Court if necessary. Further, Class Counsel hired two
consultants to assist with the valuation determination, Veris Consulting and Professor James
Burke, both of which will be available to testify if necessary.

13

## II.   THE PROPOSED SETTLEMENT PROVIDES SUBSTANTIAL BENEFITS AND IS WELL WITHIN THE RANGE OF REASONABLENESS DESPITE THE ALLEGED "WARNING SIGNS" RAISED BY OBJECTORS.

Objectors also nitpick the settlement, pointing to things they wish were different.  But a settlement is just that.    As the Seventh Circuit has made clear, "[t]he essence of settlement is compromise…Each side gains the benefit of immediate resolution of the litigation and some measure of vindication for its position while foregoing the opportunity to achieve unmitigated victory…Thus, the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution after trial." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F. 2d 884, 889 (7th Cir. 1985) (citations omitted).  It is for this reason that courts "do not focus on individual components of the settlement[], but rather view them in their entirety in evaluating their fairness." *Isby,* 75 F.3d at 1199.  Objectors here focus on individual components rather than the whole, and they complain about the nature of the compromises reached, but in so doing they both (i) overstate the value of the case absent settlement and (ii) understate the value of the proposed settlement itself.

### a.   For Class members Who Contacted Pella, The Benefits of the Settlement Are In Addition to the PSEP, and Not instead of the PSEP.

Objectors assert that the settlement is flawed because some class members would have benefitted more under the PSEP than under the settlement, an argument which is flawed in several ways.  First, Pella has, absent the settlement, no legal obligation to offer the PSEP to anyone, and Pella has been extremely sparing in offering the PSEP benefits which are not part of any contract between Pella and its windows purchasers.  Second, the PSEP is a secret program, and unless Pella or the Pella distributor informs the class member of the PSEP, they would not even know about the PSEP program.  Third, in many instances, the settlement provides the settlement benefit in addition to the PSEP benefit, meaning that the class member weighing the

14

value of the settlement is not placed into a forced choice circumstance.

Objectors also erroneously argue that Pella's "pick off" settlement offer was superior to the benefits of the settlement, and that therefore Dr. Saltzman's rejection of that "pick off" settlement must mean that the current class settlement is inadequate. Specifically, Objectors note that Dr. Saltzman rejected Pella's effort to "pick him off" as a class representative by offering him the PSEP benefits – an offer that only came after Dr. Saltzman had filed the instant litigation. The implication of Objector's argument is just backwards – had he accepted a settlement at that early date, he would have been putting his own self-interest above that of the class he was seeking to represent. He chose not to. And any experienced class action lawyer knows that "pick off" settlement offers are frequently many multiples of maximum potential damages, yet such settlement offers are routinely rejected by class representatives who refuse to sell out the class for their own self-interest.

But Objectors even get the facts wrong here: the PSEP benefit Dr. Saltzman was offered was not superior to what Dr. Saltzman could achieve under the settlement, as Dr. Saltzman can get as much as $6000 through the arbitration process established by the settlement, while his PSEP benefits were, by Objectors' own admission, capped at $780.[10]

b. **The Settlement Does Not Exclude a Determination of Value, and Determinations of Value Were Made and Are Included Here.**

Objectors claim that the Preliminary Approval should be rejected because its proponents did not value the settlement. This claim is inaccurate, and Objectors' counsel knows that because he assisted Class Counsel in preparing the extensive valuations that were performed.

---

[10] Further, paragraph 65 of the settlement agreement provides, "Settlement Class Members who have, or had, windows or Structures with Eligible Damage may be eligible for limited cash payments, *in addition to* any Discounts, or benefits under the agreed scope of the ProLine Service Enhancement Program, as described below."

The valuation performed by Class Counsel in conjunction with professional statisticians and accountants analyzed extensive amounts of data and resulted in a flexible spreadsheet which can calculate the benefit of the settlement for each subset of the class (*e.g.*, already repaired and replaced, windows of 1-10 and 11-15 years), at any given time from 2009 to 2021, at any given failure rate, at any ratio of replacement of the full window units to replacement of just sashes, and for each benefit component of the settlement. Class Counsel has provided the Court with its valuation, and has prepared a functional spreadsheet that allows for automatic valuation from adjustment of numerous variables

      c. **Each of the Defenses Pella Preserved for Arbitration Would Have Been Available to Pella in an Individual Damages Trial Following the Common Liability Trial.**

Objectors erroneously argue that the settlement allows Pella to assert *all* of its defenses in the claims and arbitration process. Again, Objectors misread the agreement. Pella has reserved no more than the defenses it is entitled to under the class certification order. Meaningfully, the statute of limitations tolling by the holding of *American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974), has extended the limitations period for a significant portion of the class; however, most importantly, the class members are relieved of the need to prove a design defect in the windows. This should be of no surprise to Objectors, given that following a common liability trial Pella would be able to assert each of those defenses in the individual damages trials. However, the advantages of the settlement lies in (i) the streamlining of the resolution of these defenses through a paper arbitration process; and (ii) relief from proving a design defect. It must be remembered that the record reveals that the defect most often manifests late, or after the ten-year warranty has expired, and that fact is rendered legally irrelevant for those who do not opt out of

16

the settlement.[11]

    d.   **An Individual Damages Trial Following the Common Liability Trial Would Require the Class Member to Engage In A Far More Complex and Expensive Mini-Trial, Likely Many Years In The Future, Whereas the Settlement's Arbitration Process Provides the Class Real Value, Requires No Lawyer, Will Occur Swiftly, and Provides the Benefit of No Dispute Over The Window Defect.**

Objectors' arguments against the arbitration process established by the settlement rely on the flawed premise that the arbitration is merely litigation relocated from court to an arbitral forum. (Dkt. 286 at p. 20.) Objectors misread the settlement agreement. The arbitration process is designed to make it easy for the average consumer to be able to make a claim. It is not necessary to hire a lawyer to prepare a lawsuit or even to prepare a court filing fee. Instead, the Claims Administrator ensures that all necessary paperwork to establish eligibility is provided (which in turn class members can provide to the arbitrator), and arbitrations may be done telephonically, further minimizing the impact on class members.[12] (Dkt. 277-1, Settlement

---

[11] Objectors rely on *Mirfasihi* for the proposition that "the failure of class members to receive a direct payment was deemed a material warning signal" and "details in a settlement agreement which serve merely to reduce the liability of the defendant". Objectors' reliance on *Mirfasihi* is puzzling as *Mirfasihi* does not even mention this "warning signal". *Mirfasihi v. Fleet Mortg. Corp*, 450 F.3d 745 (7th Cir. 2006). *Mirfasihi* does discuss a few factors that can be "warning signals" that a settlement is not appropriate for approval, but none are applicable to the case at bar. There is no category of class members in this settlement that is receiving absolutely no benefit (*id.* at 748), there is no provision that allows Pella to pay expenses from a fund dedicated to class members (*id.*), nor does the settlement essentially dismiss a subsection of the class creating an issue for the Court to analyze multiple states' laws to determine whether there is a valid claim (*id.*). None of these factors are present in the settlement, and *Mirfasihi* does not provide any support to deny preliminary approval.

[12] The arbitration process requires class members to fill out the Arbitration Form, which has sections to fill out pertaining to each criteria of eligibility. (Dkt. 277-1 at ¶85.) The Arbitration Form is a detailed, 13 page document, and clearly walks class members through each step of the process. (Dkt. 277-1, Ex. A.) Upon completing the Arbitration Form, Class Members merely need to submit the form, and any evidence required by the form, to the claims administrator. The Claims Administrator will review all submissions to ensure completeness and will notify class members of any omissions or errors in submitting a claim under the arbitration process. (Dkt.

Agreement, at ¶95.)  Further, the only discovery provided for is "abbreviated written discovery" on a limited number of topics and an inspection at Pella's election and at Pella's expense.  (*Id.* at ¶94.)  The calling of witnesses is permitted but not required at the arbitration hearing, and it is entirely possible the arbitrator can decide the issues based on the paperwork submitted.

Absent a settlement, a class member would have to file a lawsuit seeking an individual damages trial following the common liability trial, which would require the class member to retain counsel, file a lawsuit, and prevail on appeal, and all which would not occur for many years.  The cost to bring a lawsuit in court would be significantly more than the cost to hire an attorney for an expedited arbitration process such as the one in this settlement.  Furthermore, the time frame for an individual suit to go from inception to resolution would be significantly longer than the timeframe of the expedited arbitration.  Lastly, the arbitration process gives the class members the benefits of not having to prove a product defect, an expensive and time-consuming endeavor.  These benefits would not be available but for the settlement, and those class members who opt out of the settlement will be subject to these defenses.  Of course, any class member wishing to "go it alone" can opt out of the settlement.

e. **The "Kickforward" Objectors Complain of is Not Only a Common Feature of Class Settlements, it is Beneficial to the Class.**

The settlement agreement provides that, only after final approval, Class Counsel shall have the right to withdraw up to $2,000,000 of their requested fees provided that Class Counsel agrees to return the monies should the settlement not be approved or if it is overturned on appeal.

---

277-1 at ¶86.)  If all steps are met, Class Members will receive a notification informing them that they are eligible for arbitration.  (*Id.* at ¶89; Dkt. 277-1, Ex. I.)  A list of approved arbitrators and their respective contact information will be provided to Class Members, and Pella will pay the cost of the arbitrator. (Dkt. 277-1 at ¶93.)

(Dkt. 277-1 at ¶¶ 102, 114.)  Objectors take issue with this provision, inappropriately terming it a kickforward" [sic] payment to Class Counsel.  (Dkt. 286 at pp. 22-25.)  Objectors claim that this "kickforward" is to occur "even prior to notice being sent to the Class."  Objectors have either not read the settlement provisions regarding this payment, or they are intentionally misrepresenting the terms.  The availability of this payment only occurs after final approval, not before.  Objectors complain that "Objecting to and appealing an approved settlement…would be made increasingly more difficult against exceedingly well-funded Class Counsel brought and paid for by their supposed adversary."  (Dkt. 286 at p. 23).  They further claim that "Pella is clearly advancing the funds to preserve and protect its interest in the settlement."  (*Id*.)  As an initial matter, the attorneys' fees agreed to by the parties is in addition to, and not taken from, settlement benefits.  There is nothing to support Objectors' contentions that Class Counsel is somehow being bribed into a settlement it has spent over 18 months negotiating, and the $2,000,000 is supported by a letter of credit so that Pella retains its ability to get a return of the money in the event of reversal and remand.

Objectors contend, without a shred of legal support, that this provision is unprecedented and "inherently prejudicial" to class members who may object to or appeal the settlement. (*Id*. at 23.) These contentions again exhibit a fundamental misunderstanding of the settlement and are baseless for additional reasons as Class Counsel explains below.

First, Objectors mischaracterize the terms of the advance of fees provision, which is not unconditional.  If the settlement is reversed on appeal, Class Counsel is obligated to return any advanced funds. Thus, this provision does not, as Objectors' contend, have the potential to compromise Class Counsels' responsibility to the Class. In fact, just the opposite is true. The fact that no money can be withdrawn by Class Counsel until *after* final approval, combined with the

19

obligation to return any advances in the event the settlement is overturned on appeal assures that Class Counsel will work diligently to get the settlement approved.

Second, Objectors contend that such a fee advance is "unprecedented", despite their counsel's own participation in numerous settlements where the entire fee was paid before any appeal was taken (what is commonly known as a "quick pay"). Indeed, Objectors fail to cite a single case where such a provision has been disapproved or even where a court has suggested there is any impropriety with such a provision. To the contrary, in this unfortunate age of "professional objectors," whereby objectors file objections and appeals in an attempt to hold hostage class member benefits and class counsel fees during the appellate process, such fee advance provisions are routinely contained in class settlement agreements because such a provision acts as a disincentive to such unseemly "blackmail" litigation tactics. *See, e.g.*, *Vaughn v. Am. Honda Motor Co., Inc.*, 507 F.3d 295, 300 (5th Cir. 2007) ("In some circumstances objectors may use an appeal as a means of leveraging compensation for themselves or their counsel."); Fitzpatrick, The End of Objector Blackmail?, 62 VANDERBILT L. REV. 1623, 1643 (2008).[13]

### f. The Attorneys Fees Are Low in Comparison to The Benefit.

Objectors' "warning sign" based on the size of the attorneys' fees is baseless. At a valuation of $139,232,200, or $61,117,313, respectively, which assumes 14% and 6% failure rates, and does not include the value of the PSEP, the fee is between 8% to 18% of the value of the settlement. And this settlement was reached after substantial litigation where it will reward

---

[13] Objectors' contention that the provision prejudices Class Members' ability to object to or appeal the settlement is illogical and unexplained. The provision changes nothing in what an objector must show on appeal. What the provision does do is ensure than an objector cannot visit hardship on class counsel by starving them of funds while an appeal is pending as a means of extracting a share of the fees.

Class Counsel at or near lodestar by the time the settlement process runs its course. The fees are not of the magnitude which signifies a warning sign, and the unrebutted fact that the fees were negotiated after the class benefit, and were the result of a separate mediation presided over by a former judge, further erodes Objectors' assertions.[14]

### g. There is No Conflict Among Class Members Created by the Settlement.

Objectors seek to create several "subclasses" based on forms of relief available under the Settlement and then contend that each one requires separate representation. This contention is based on at least two flawed premises (i) that class members have common issues with regard to causation and damages, and (ii) that differences in relief among class members is unusual and suspicious (when in fact it is common in class action settlements). Indeed, this is not a settlement where a common fund is created and different categories of class members are forced to compete against each other for a piece of the limited pie. There is no conflict here.

First, the Objectors erroneously conclude that a single purportedly common circumstance among all Class Members—a defect in windows—must automatically yield identical relief to the entire class. Thus, in Objectors' skewed view, because the Settlement provides for different categories of relief for different class members, sub-classing and separate representation are warranted. (Dkt. 286 at p. 26.) Objectors' argument ignores that all class members receive the identical benefit of the issue class certified: for purposes of making claims under the settlement, every class member gets the benefit of Pella agreeing not to contest the existence of a defect in the ProLine window.

Objectors' position ignores that this Court expressly found that common treatment of relief for Class Members (*i.e.* causation and damages) was not possible because of the varying

---

[14] Mr. Lang incidentally has previously taken the position in this litigation and other court filings that the negotiated fee was "too low."

circumstances of Class Members. With the Court's limited class certification ruling in mind, the Parties intentionally structured a Settlement Agreement that recognized that differing circumstances of Class Members by necessity yield different categories of relief based on each Settlement Class Member's individual issues of causation and damages. The Settlement provides a process for efficient resolution of class members' claims based on the individual circumstances that would have affected the value and strength of each class members' claim in an individual trial following a common liability trial. Some of the circumstances used in the Settlement that are tailored to the claims of individual Settlement Class Members include:

- Whether Class Members previously made repairs or replaced their windows—the court itself drew a distinction between those Class Members whose windows had exhibited wood rot and were replaced.[15]
- Whether Class Members gave Pella notice prior to repairing or replacing their windows—where Pella was provided notice in advance of repairs or replacements yet *did not* provide any warranty or PSEP services where it should have done so, those Class Members are entitled to higher benefits, as Pella was on notice of the problem experienced by the Class Member. For those who never made a claim to Pella and have still not contacted Pella regarding problems with their windows, they have no expectation of recovery against Pella.
- Whether Class Members are in or outside their 10-year Limited Pella warranty— if they are in warranty, their warranty rights are still relevant, and they can obtain warranty coverage in addition to any other benefits that they are entitled to under the Settlement Agreement.
- Whether Class Members own windows with dates of sale from 2004 through 2006—Pella claims to have made changes to the manufacturing process in 2004 which altered the window at issue relating in part to the issues in the case and August 2006 is when the case was originally filed.
- Windows repaired or replaced before or after August 18, 2003—this is three years before the case was filed, and those with windows before this date are limited by the statute of limitations.

Second, and perhaps on a more basic level, the Objectors fail to identify the actual fundamental conflict(s) of interest between or among Class Members that purportedly necessitate the creation of sub-classes with separate representation by their counsel and how the continued representation of Class Members by the Named Plaintiffs and Class Counsel (as defined in the

---

[15] Dkt. 163 at p. 30.

Settlement) will harm members of the Settlement Class. "[V]aried relief among class members with differing claims in class settlements is not unusual." *See In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) ("objectors fail to articulate any conflict or adversity among class representatives and class members. It is not enough for objectors to point to differences in claims, allocation amounts, or state laws without identifying how such differences demonstrate a conflict of interest.").[16] Nor do differences in relief among class members based on the relative strength of a claim or relative value of his or her claim such as those present in this case create conflicts. *Id.* at 347.

For a conflict of interest to defeat the adequacy requirement, the conflict must not only be specifically identified, but also "must be fundamental. It must go to the heart of the litigation." *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 431 (4th Cir. 2003)(citations omitted); *see also Srail v. Village of Lisle*, 249 F.R.D. 544, 555 (N.D. Ill. 2008) ("A conflict or potential conflict alone will not ... necessarily defeat class certification-the conflict must be 'fundamental.'") (citations omitted). A conflict is "fundamental" "where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). That situation is not present here, as no form of relief for one category of claimants is diminished by the other. There is no pool of money over which Settlement Class Members compete whereby

---

[16] The cases the Objectors cite do not alter this conclusion. In *dicta*, the Seventh Circuit in *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir.2002), simply made an incidental comment about "an unremarked conflict," that did not rise to the level of presenting an impermissible conflict. *Smith v. Sprint Communications Co., L.P.*, 387 F.3d 612 (7th Cir. 2004) is inapplicable because that case involved representative plaintiffs who had previously been class representatives in state class actions certified for litigation purposes who later attempted to certify a national settlement against the defendant on different terms. *Mirfasihi v. Fleet Mortg. Corp*, 450 F.3d 745 (7th Cir.2006) simply overturned the lower court's decision because of a failure to discuss the value of the settlement. In *Mirfasihi*, the proposed settlement would have extinguished 1.4 million (facially colorable) claims at no cost to the defendant. *Id.* at 785.

one group is trying to lessen the other's funds because to do so would increase the first group's take. "Conflicts between class members based on their respective relationships to the defendant are relevant only when the class representatives' economic interests and objectives *substantially* conflict with those of absent class members." *Allen v. Holiday Universal*, 249 F.R.D. 166, 182 (E.D. Pa. 2008). The differing forms of relief (as indicated above) are rationally tied to the differing values of each Class Member's claim and his or her circumstances. Named Plaintiffs' are not in competition with other Settlement Class Members over the relief they claim. Sub-classes with separate counsel are not warranted.

### h. The Deductible Was the Product of Compromise and Does Not Lessen the Fact That the Settlement Provides Substantial and Immediate Benefits.

Objectors point to the $100 per unit deductible as being somehow objectionable. Class Counsel would have liked to have received everything on their "wish list", including a waiver of the deductible, but this point resulted from extensive negotiation and compromise. The deductible, however, only applies to the non-product costs of labor and finishing, and does not apply to the product warranty or the PSEP discounts on replacement windows and sashes. Thus, as has been repeatedly made clear, Objectors' position is based on the mistaken assumption that the settlement is a substitute for warranty and PSEP benefits, when in fact the benefits of the settlement are in addition to the warranty and PSEP benefits, which are in any event made a binding part of the relationship between Pella and class members, a situation that would not be true absent the settlement.

### i. The Discount Class Recipients Receive a Substantial Value in Comparison to the Legal Peril They Face From Not Having Contacted Pella for Service.

Nor is Objectors' effort to analogize the Settlement's inclusion of a discount for certain Settlement Class Members to a coupon settlement a "warning sign" requiring denial of

preliminary approval. The question is not whether, in isolation, discounts on future product purchases *per se* indicate an unreasonable settlement. "Instead one must ask whether the value of relief in the aggregate is a reasonable approximation of the value of plaintiffs' claim." *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001). To that end, the Seventh Circuit instructs us not to "focus on individual components of the settlements, but rather view them in their entirety in evaluating their fairness." *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996).

The discount component was carefully designed with respect to the circumstances of Settlement Class Members. "[D]iscount rights are valuable and provide a significant benefit to class members." *Phemister v. Harcourt Brace Jovanovich, Inc.*, 1984 WL 21981, 8 (N.D. Ill. 1984). Moreover, that the discounts are transferable enhances their value.[17] The value of the Settlement including the discount component is real, and Objectors have provided no evidence that the discounts are without value. *See Phemister*, 1984 WL 21981, at *8. Objectors instead simply rely on some generalized, negative view of coupons fostered in the popular media (Dkt. 286 at pp. 39-40).[18] "That a portion of the Settlement consideration will be provided in the form of special coupons does not diminish the value of the Settlement to the [Settlement] Class." *Henry v. Sears Roebuck & Co.*, 1999 WL 33496080 at *9 (N.D. Ill. 1999).

---

[17] *See, e.g., Shaw v. Toshiba American Info. Sys., Inc.*, 91 F. Supp. 2d 942, 960-61 (E.D. Tex. 2000) (holding that transferable discount coupons, which were redeemable for one year to purchase defendant's products and which could be aggregated, constituted a significant benefit for all class members and were a "model" for the design of non-cash class action settlements); *In re Cuisinart Food Processor Antitrust Litig.*, 1983 U.S. Dist. LEXIS 12412, M.D.L. 447, 1983 WL 153, at *4 (D. Conn. Oct. 24, 1983) ("fact that the coupons are transferable enhances their economic value"). Under the Settlement Agreement, the discounts are transferable. (Dkt. 277-1 at ¶ 18.)

[18] The issue of "coupons" usually comes into play with regard to counsel fees, but here the "coupon" is a very small part of the overall benefits conferred by the settlement, and Class Counsel's fee is low by comparative standards just focusing on the non-"coupon" portions of the settlement. *See supra* at II.f.

j. **The Proposed Settlement Definitively Establishes Resolution of the Issue of Liability for Any Class Member Who Does Not Opt Out of the Settlement.**

Objectors erroneously argue that the settlement does not "resolve" whether the windows at issue are defective. To the contrary, the Agreement expressly provides that the defect as alleged in the Complaint will not be disputed. Class Members who opt to pursue recovery either through the Claims Process or the Arbitration Process do *not* have to prove the existence of a defect, and they only have to carry the burden of proving that the defect *caused* the damage for which they seek compensation (a burden significantly lowered by virtue of the nature of the defect alleged). (Dkt. 277-1 at ¶ 96 ("Settlement Class Members will not have to prove that their Pella ProLine Casement Windows have a 'defect' in the aluminum cladding of the window and the window Sash at the corner joint of the cladding or at the glazing/Sash interface").) Objectors apparently want Pella to admit liability for any class member who opts out of the class, which is simply illogical and would not be a "settlement" by Pella but would instead be a capitulation.

k. **Objectors Do Not Challenge the Hard Fought and Lengthy Nature of the Settlement Process That Included Two Professional Mediators.**

In the prior briefing over the effort to disqualify Class Counsel, extensive evidence was submitted concerning the hard-fought and lengthy nature of the settlement process, the large number of formal and informal mediation sessions, and the participation of two former judges as mediators. None of this evidence was addressed by Objectors, and the clean nature of the process establishes the absence of so-called "warning signs."

l.    **The Proposed Settlement Compares favorably to the Two Windows Settlements Objectors Claim are Superior.**

Objectors' attempt to undermine the benefits of this settlement by comparing it to two other recent settlements should be rejected. First, the comparison to other cases is legally irrelevant, as "the reasonableness of the settlement agreement must be considered in the context of this case, not in comparison to terms of other [ ] settlements." *Radosti v. Envision EMI,* 717 F.Supp.2d 37, 63 (D.D.C. 2010). Second, Objectors fail to provide the Court any of the context in which these other settlements are reached, and an understanding of that context establishes that these other settlements are inapposite. For example, neither settlement was reached after certification was limited to a liability class and where causation and damages were left to be proven on an individual basis in subsequent trials. *Compare Charron v. Pinnacle Group N.Y. LLC*, 2012 WL 2053530 at *2 (S.D.N.Y. June 6, 2012) (noting that obstacles that remain in a class with an issue only certification is a critically important factor in evaluating a settlement). Third, Objectors claim, with little explanation, that these settlements "awarded more" to Class Members than the settlement here. However, Objectors fail to explain what it means to be "awarded more." Merely comparing the gross potential recovery, or the percentage of the recovery versus the purchase price, is, at best, patently unhelpful. *See In re Chambers Development Sec. Litig*., 912 F. Supp. 822, 840 (W.D. Pa. 1995). For example, a flat rate of 12% per window would be better for some class members but patently worse for others. Finally, while Objectors suggest that Class Counsel should cherry-pick provisions from these settlements because they are "good ideas," that is certainly not a compelling reason to find that the compromise reached here is not within the range of reasonableness.

m. **Pella's Ability to Pay is a Minor Factor in the Settlement, and a Claims Made Settlement With no Aggregate Cap is a Superior Benefit to the Class in Comparison to a Common Fund.**

Objectors' also place some significance on the absence of discovery into Pella's financial ability to pay a large upfront common fund settlement. But Pella's "ability to pay" was not a factor in the settlement. Indeed, the claims made process here, which unlike most class action settlements extends years into the future, is markedly superior to a common fund settlement -- a common fund has a limited amount of money, and a common fund can get "overclaimed" meaning that the class members would have to wait until the claims period is over to receive anything, and they could receive less than their maximum benefit if proration based on over-claiming must be implemented. There is no risk of such proration here, and class members get their money contemporaneously and do not have to wait until the end of the claims process to receive their funds. Most importantly, under the proposed settlement, Pella must pay all claims made, meaning that if the failure rate reaches 40%, Pella would have to pay all the claims and not receive the benefit of some arbitrarily negotiated maximum cap that is part of a common fund settlement.

## III. ALL OF THE CLASS REPRESENTATIVES ON THE AMENDED COMPLAINT ARE ADEQUATE UNDER RULE 23

Objectors demonstrate a short memory in chastising Class Counsel for seeking to withdraw from representing them while replacing them with new Class Representatives who favor the settlement, as it was only a few months ago that Objectors discharged Class Counsel and retained Mr. Lang to represent their interests in this settlement. *It was their choice to terminate Class Counsel and collaterally attack the settlement*. For the reasons stated in their motion to withdraw as counsel for the Objectors, Class Counsel was ethically required to

withdraw from representing them. (Dkt. 268.) Objectors have failed to respond to the substantial law in Class Counsel's motion that is directly on point, and since the motion is uncontested, it should be granted.

Notwithstanding their failure to contest Class Counsels' motion, Objectors claim that the new Class Representatives do not meet the adequacy requirements of Fed. R. Civ. P 23(a)(4). However, consistent with their approach to the other objections, they cite no evidence or cases to support their position. Instead, they attempt to concoct a situation that requires that these new class representatives be subjected to burdensome discovery and sit for depositions. This desperate attempt to hijack this litigation and derail the settlement process should not be condoned. The failure to point to any specific evidence of inadequacy is particularly telling given that the new proposed class representatives are no strangers to Objectors' counsel – each of the proposed new class representatives was a client of CLG when Mr. Lang was employed there, and Mr. Lang interacted with and spoke to each of these new proposed representatives in his capacity as a lawyer at Complex Litigation Group.

Objectors also attempt to repeat their earlier effort to remove Plaintiff Saltzman as a Class Representative on the sole grounds that he has a family relationship to one of the lawyers at the Complex Litigation Group, the Lead Class Counsel law firm. This Court rejected this effort previously, and Objectors have presented no evidence at all which suggests that Dr. Saltzman's support of the settlement is the product of this familial relationship. Indeed, it should be noted that Dr. Saltzman has been found to be an adequate class representative in other litigation. *Cf. Saltzman v. ESBI*, 348 Ill. App. 3d 740 (Ill. App. Ct. 2004). Further, courts have routinely rejected arguments similar to what Objectors are making here. *See, e.g., Malchman v. Davis,* 761 F.2d 893 (2d Cir.1985) *cert. denied,* —— U.S. ——, (1986)(named plaintiff was a

brother of class counsel); *Lewis v. Goldsmith,* 95 F.R.D. 15 (D.N.J. 1982) (named plaintiff represented by uncle's law firm); *Fischer v. ITT Corp.,* 72 F.R.D. 170 (E.D.N.Y. 1976) (named plaintiff was father of the class attorney).[19]  Objectors' arguments are suppositions of the worst kind that impugn Dr. Saltzman's integrity.  It is indisputable that Dr. Saltzman has been an exemplary class representative since this litigation was commenced in 2006.  He has actively participated in discovery, has produced documents, sat for deposition, and actively consulted with Class Counsel on the status of the litigation and the pending settlement.  He has a large number of windows that he has already replaced and was the original and sole class representative on the original complaint who urged this case be brought.  Dr. Saltzman is a sophisticated class representative, and he has been actively engaged in the litigation.  His adequacy is beyond reproach.

## CONCLUSION

The settlement presented to this Court for preliminary approval is fair, reasonable, and adequate and should be preliminarily approved.  While Class Counsel quoted Judge McMahon's cogent analysis from *Charron v. Pinnacle Group N.Y. LLC*, No. 07 Civ. 6316, 2012 WL 2053530 at *2 (June 6, 2012) in their opening brief, it bears repeating because Objectors fail entirely to account for it, instead blithely insisting on a rosy view of the litigation that is simply not supported by the nature of the class certified nor the process that would follow a common liability trial.  As Judge McMahon noted,

The path from this stage of the litigation to a final judgment on the issue of

---

[19] Objectors reliance on *Susman v. Lincoln American Corp*., 561 F.2d 86 (7th Cir. 1977), is misplaced. *Susman*, does not, as Objectors imply, impose a per se rule that a relative of class counsel is an inadequate class representative.  Instead, the court requires a case by case analysis. *Id.* at 91 ("Whether a party would adequately protect the interest of the class is a question of fact depending on the circumstances of each case.")

Defendants' liability . . . would be long, complicated, and expensive. As this Court has explained: "It could be ten years from now before you get anything if everybody goes after everything that he wants." Notwithstanding the strength of the evidence Plaintiffs elicited during the pre-suit investigation and discovery, additional discovery would be required to establish liability and damages, including depositions of Class Members, Defendants, and Defendants' employees, managers, and partners. A fact-intensive trial would be necessary, and while the Class Members are sure they will win, they might in fact lose. Preparing and putting on evidence at such a trial would consume tremendous amounts of time and resources and demand substantial judicial resources. Plus, only certain issues would be tried. In particular, damages to the individual Class Members would not be awarded; those would require additional trials, which would be costly and further defer closure. Establishing a mechanism for adjudicating causation and damages will present many of the difficulties that the Claims Administration Process redresses. Thus, if the Settlement is denied, individual Class Members could find themselves in approximately the same position as if it were approved, except that time, resources, and effort would have been bled out of both sides along the way. Finally, post-trial motions and appeal would delay resolution and increase costs still more. . . . The entire process will take years. . . . The Settlement is not, and cannot be, all things to all people. However, I believe that it is fair, reasonable, and adequate to the class as a whole. This is a case where the perfect could easily become the enemy of the good; that would not be in the best interests of the class as a whole. I thus approve the Settlement.

The settlement presented to the Court for preliminary approval is fair, reasonable, and adequate, and should be preliminary approved.

DATED:  August 28, 2012          Respectfully submitted,

**DR. LEONARD E. SALTZMAN, et al.,**
**Class Plaintiffs,**

By:    /s/ Richard J. Burke
           One of Their Attorneys

Richard J. Burke
**COMPLEX LITIGATION GROUP LLC**
1010 Market Street
Suite 1340
St. Louis, MO  63101
(847) 433-4500
rich@complexlitgroup.com

Paul M. Weiss
Julie D. Miller
**COMPLEX LITIGATION GROUP LLC**
513 Central Ave., Suite 300
Highland Park, Illinois  60035
(847) 433-4500
paul@complexlitgroup.com
julie@complexlitgroup.com

Jonathan Shub
**SEEGER WEISS LLP**
1515 Market St.
Suite 1380
Philadelphia, PA  19102
(215) 564-2300
jshub@seegerweiss.com

**Counsel for Plaintiffs and**
**Proposed Plaintiff Classes**

**APPENDIX 1:**
**DOCUMENTS RELIED UPON FOR VALUING THE**
**BENEFIT OF THE SETTLEMENT TO THE CLASS**

Class Counsel conducted a valuation of the proposed settlement that used extensive data that was applied to multiple regression models which permitted Class Counsel to calculate the value of each settlement component.

**(1) THE VALUATION IS BASED ON SUBSTANTIAL DISCOVERY.**

As an initial matter, Class Counsel devoted a great deal of effort in conducting discovery on the failure rate of the Pella ProLine casement windows. The failure rate was determined using a statistical analysis of known window failures and conducting a regression analysis to predict failure rates into the future.

Class Counsel learned through discovery that Pella conducted a similar analysis in 2006 as part of its development of the PSEP, although it has since distanced itself from the 14% failure rate within 20 years its own model predicted. Class Counsel thus sought to independently duplicate this regression result.

In order to model any kind of regression with respect to probable window failure, Class Counsel requested the production of certain databases from Pella. These databases were produced in a series of Excel spreadsheets. The data provided by Pella that went into the regression model included:

- Spread sheet No. 29419 contained 147,032 returns for all damage categories that might[20] involve wood deterioration due to water penetration behind the aluminum. The data captured all warranty returns to Pella for vintages 1991,by distributorship, year of return, year of vintage, damage category, and number of returns in the year of return for each vintage.

---

[20] The purpose of these categories was to discover warranty data ("R&A") that was over inclusive of the wood rot, wood deterioration, and the PSEP wood deterioration "06" claims that are the subject of the litigation. Damage codes for wood rot, air infiltration, water infiltration, glazing seal, and damage defective cladding were included. PELSALT00008376-8492

- Sales data for each year for each vintage were also provided in order to determine , by vintage, the total number of windows sold.   [Spreadsheet PELSALT00029427, by distributorship, by year and PELSALT00022871 for years 1991to 1996, and 1007 to June 2009]

- Sash replacement data was provided, by year, from 2001 to 2009 which allowed Class Counsel to calculate the approximate ratio of sash replacement to full unit replacements. [PELSALT00029428]

- The cost to Pella of the PSEP from its beginning in September 2006 to December 2010 was determined in order to back out this value from the settlement ($9,607,555). [PELSALT00022873].

- Total shipment by distributorship in each year from 1997 to 2009 of ProLine casement windows was provided (total shipped was 6,477,515).  [PELSALT00029427].

- Data was provided showing the PSEP warranty data ("Wood Deterioration ProLine 06" Credit Memo) for each ProLine Casement, Awning, and transom window for vintages 1991 through July 2009 and the year of return, and the amount paid by Pella for the credit. [PELSALT00022867].

- Data was provided showing wood rot warranty return data for each ProLine casement, awning and transom window, by type of window, vintage of window from 1992 to 2009, and year of return from 1993 to 2009. [PELSALT00022872]

- Data was provided showing all ProLine Casement, Awning and Transome bookings and shipments for each year from 1991 through June 2009. [PELSALT00022871].

- Data was provided showing each warranty damage code.  [PELSALT00008492].

- Warranty return data was provided for ProLine Casement for vintages 1992 and 1996 and the number returned each year from 1993 to 1999. [PELSALT00008491].

- Warranty return data for ProLine Casement for vintages 1992, 1996 and 2001with the number returned each year from 2000 to 2006  [PELSALT00008490].

Nevertheless, by analyzing the selected data, failure rates could be determined for each vintages from 1991 to 2006, together with the number that would fail for each of the 15 years. This means that Class Counsel could produce a reasonably precise probability that each window would fail and the year that it would fail.  The aggregate number of windows to fail for each vintage for each year for 15 years was 863,519.