**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DR. LEONARD E. SALTZMAN, BRAD ZURN, TIM BASTIAANSE, JOSEPH PALMIOTTO, and JUDITH MCCLOSKY, individually and on behalf of all others similarly situated; | |
|    Plaintiffs, | No.: 06 C 4481 |
| v. | The Honorable James B. Zagel |
| PELLA CORPORATION, an Iowa corporation, and PELLA WINDOWS AND DOORS, INC., a Delaware corporation, | Magistrate Judge Martin Ashman |
|    Defendants. | |

**MEMORANDUM IN SUPPORT OF JOINT MOTION FOR ORDER CERTIFYING
SETTLEMENT CLASS AND FINAL APPROVAL OF SETTLEMENT**

# TABLE OF CONTENTS

I.    **PRELIMINARY STATEMENT** ........................................................ 1

II.   **STATEMENT OF FACTS** ........................................................... 3

A.   **Factual Background and Procedural History** ................................... 3

B.   **Settlement Negotiations** .......................................................... 6

C.   **Terms of the Settlement** .......................................................... 7

D.   **Preliminary Approval** ............................................................. 8

E.   **Class Notice** ...................................................................... 9

III.   **THE SETTLEMENT CLASS SHOULD BE CERTIFIED BECAUSE IT MEETS ALL THE REQUIREMENTS OF RULE 23** ................................... 10

A.   **The Settlement Class Satisfies Rule 23(a)** .................................... 11
    1.  **Numerosity** ................................................................... 12
    2.  **Commonality** ................................................................ 12
    3.  **Typicality** .................................................................... 12
    4.  **Adequacy** .................................................................... 13

B.   **The Settlement Class Meets the Requirements of Rule 23(b)(3).** ............ 14
    1.  **Predominance** ............................................................... 15
    2.  **Superiority** ................................................................... 16

IV.   **THE SETTLEMENT MEETS EACH OF THE SEVENTH CIRCUIT'S *ISBY* STANDARDS GOVERNING FINAL APPROVAL OF CLASS ACTION SETTLEMENTS AND SHOULD THEREFORE BE GRANTED FINAL APPROVAL** ................................ 16

A.   **The Strength of Plaintiffs' Case Measured Against the Settlement Supports Final Approval of the Settlement** ............................................ 18

B.   **The Complexity, Length, and Expense of Continued Litigation if the Settlement Is Not Approved Supports Final Approval of the Settlement** ......... 23

C.   **The Amount of Opposition to the Settlement Was Minuscule, Supporting Final Approval of the Settlement** .................................................. 23

D.   **There Is No Evidence of Collusion** ............................................. 24

E.   **The Stage of the Proceedings and the Amount of Discovery and Investigation Completed When Settlement was Achieved** .......................... 25

F.      The Amount of Discovery and Investigation Completed When Settlement Was Achieved Supports Final Approval ................................................................................................................ 27

V.      THE OBJECTIONS TO THE SETTLEMENT SHOULD BE REJECTED ................ 27

A.      The Settlement Provides Substantial Benefits and Value to the Class ............................ 29
    1.      The Objections Regarding The Monetary Caps Ignore The Additional Warranty And PSEP Benefits Provided Under The Settlement. ....................................................................... 31
    2.      The Settlement Is Fair, Reasonable And Adequate, Because, In Part, There Is No Lump Sum Payment By Pella To The Class. ............................................................................... 32

B.      The Claims Process Is Not Onerous. ......................................................................... 32
    1.      No Additional Burdens Are Placed On Class Members That Did Not Exist Prior To The Settlement. 33
    2.      There Is No Need For Lawyers In The Arbitration Process. ..................................... 33

C.      The Class Definition And Exclusions Are Fair, Reasonable, And Adequate. .................. 34

D.      Class Counsel And Representative Saltzman Are Adequate Under Rule 23. ................... 35

E.      Some Objectors Have No Standing. ........................................................................... 36

F.      Analysis Of What Objectors Would Get Under The Settlement Establishes The Unfounded Nature Of Their Objection ............................................................................................... 37

G.      The Pro Se Objectors ............................................................................................... 38

VI.     CONCLUSION ....................................................................................................... 39

# TABLE OF AUTHORITIES

## CASES

*Abigana, et al. v. Rylock Co., Ltd.*, No. 2002 076625 (Cal. Sup. Ct.) .......................................... 31

*Am. Civil Liberties Union of Ill. v. U.S. Gen. Servs. Admin.*, 235 F. Supp. 2d 816 (N.D. Ill. 2002) ........................................................................................................................................ 17

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................................... 10

*Angretti v. ANR Freight System Inc.*, 982 F.2d 242 (7th Cir. 1992) ........................................... 36

*Armstrong v. Board of School Directors of the City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980) ........................................................................................................................................ 16, 24

*Azian v. Federated Dept. Stores, Inc.*, No. 03-3559 (N.D. Cal.) ................................................. 28

*Benacquisto v. American Express*, No. 00-cv-1980 (D. Minn.) ................................................... 28

*Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 904 (S.D. Ohio 2001) ....................................... 26

*Cannon v. Texas Gulf Sulphur Co.*, 55 F.R.D. 308 (S.D.N.Y. 1969) .......................................... 27

*Carson v. American Brands, Inc.*, 450 U.S. 79 (1981) ............................................................... 17

*Cartwright v. Viking Indus., Inc.*, No. 2:07-CV-02159 (E.D. Cal. Aug. 27, 2010) ..................... 31

*Charron v. Pinnacle Group N.Y. LLC*, 2012 WL 2053530 (S.D.N.Y. June 6, 2012) ................... 2

*Clark v. Experian Information Solutions, Inc.*, Civ. A. 8:00-1217-22 to 1219-22 (D.S.C.) ......... 28

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) ...................................... 12

*Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) .............................................................. 26

*Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002) ................................................ 14

*De La Fuente v. Stokely-VanCamp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) .............................. 13

*DeBoer v. Mellon Mortg.*, 64 F.3d 1171 (8th Cir. 1995) ............................................................ 26

*EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d at 889, *cert. denied*, 478 U.S. 1004 (1986) . 17, 18, 22

*EEOC v. Hiram Walker*, 768 F.2d 884 (7th Cir. 1985) ............................................................... 17

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ............................................................. 10, 19

*General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir. 1997) ........... 17

*Gould v. Alleco, Inc.*, 883 F.2d 281 (4th Cir. 1989) ................................................................... 36

*In re AT & T Mobility Wireless Data Services Sales Tax Litig.*, 789 F. Supp. 2d 935, 974 (N.D. Ill. 2011) ...................................................................................................................... 10, 24

*In re AT&T Mobility Wireless Data Services Sales Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010) ....... 10

*In re Bank One Sec. Litig./Chicago S'holder Claims*, 00 CV 0767, 2002 U.S. Dist. LEXIS 8709, at *9 (N.D. Ill. May 9, 2002) ........................................................................................... 12

*In re Brand Name Prescription Drugs Antitrust Lit.*, 1996 WL 351180 (N.D. Ill. June 24, 2996) ........................................................................................................................................ 36

*In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000) ........................................ 26

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659, 667 (D. Minn. 1974) .................................................................................................................... 26

*In re Disposable Contact Lens Antitrust Litig.*, 94-MDL-1030 ................................................... 28

*In re Insurance Brokerage Antitrust Litig*, MDL No. 1663 (D.N.J.) ........................................... 28

*In re Lucent Tech.*, 327 F.Supp.2d 426 (D.N.J. 2004), 04-1120 (3d Cir.) ................................... 28

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) .................... 24

*In re PayPal Litig.*, No. 02-1227, 2004 WL 24452444 (N.D. Cal. 2004) .................................... 28

*In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) ................................................... 28

*In re RJR Nabisco, Inc. Secs. Litig.*, Nos. 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24,

1992) ............................................................................................................. 26

*In re Servone Prod. Liab. Litig.*, No MDL 1477, 2006 WL 333006 (S.D.W.V. 2006)............... 28

*In re Trans Union Corp. Privacy Litig.*, 00 c 4729 (N.D. Ill.)....................................................... 28

*In re United Health group, Inc. PSLRA Litig.*, 643 F. Supp. 3d 1107 (D. Minn. 2009).............. 28

*In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503 (E.D.N.Y. 2003) ............... 28

*In re Wal-mart Wage and Hour Employment Practices Litig.*, 2:06-CV-00225-PMP-PAL (D. Nev.).............................................................................................................................................. 28

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002)...................................... 28

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)........................................ 10

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996).................................................................... 16, 17, 18

*Mars Steel v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677 (7th Cir. 1987) ....................... 24

*O'Hara v. Marvin Lumber and Cedar Co.*, No. PD-00-014027 (Minn. Dist.Ct. 2001).............. 31

*Pella Corp. v. Saltzman*, 606 F. 3d. 391 (7th Cir. 2010) ................................................... 6, 15, 30

*Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277 (7th Cir. 2002) ................................................ 21

*Saltzman v. Pella*, 257 F.R.D. 471 (N.D. Ill. 2009).................................................... 12, 13, 15, 16

*Schwartz v. Universal Bank*, 00-75 (C.D.C.A) .......................................................................... 28

*Sec'y of Labor v. Fitzsimmons,* 805 F.2d 682 (7th Cir. 1986)..................................................... 13

*Stout v. Jeld-Wen, Inc.*, No. 08-cv -0652 (N.D. Ohio Aug. 6, 2010);........................................... 31

*Thompson v. Metropolitan Life*, 00-05071 (S.D.N.Y.)................................................................. 28

*Williams v. First Nat'l Bank of Pauls Valley*, 216 U.S. 582 (1910) ............................................ 16

## RULES

Fed. R. Civ. P. 23 ......................................................................................................... 10, 13, 15

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs Leonard Saltzman, Brad Zurn, Tim Bastiaanse, Joseph Palmiotto, and Judith McClosky ("Plaintiffs") respectfully submit this Memorandum in Support of the Parties' Joint Motion For Final Approval of the Class Action Settlement (D.E. # 338), the specific terms of which are set forth in the Class Action Settlement Agreement (D.E. # 227-1), dated June 12, 2012 (the "Settlement Agreement").

## I. PRELIMINARY STATEMENT

This case is unusual in that all of the issues relevant to final approval were fully aired during the preliminary approval process by the Lang Group of objectors. The handful of professional objectors who joined the Lang Group in objecting to the final approval of the settlement have raised practically no issues that were not already litigated at preliminary approval. After fully considering the objections to preliminary approval, the Court rejected those objections[1] and specifically found that the settlement "appear[s] upon the Court's preliminary review to be fair, reasonable, and adequate and accordingly preliminary approved pending a final hearing on the proposed settlement." (D.E. # 301 at ¶ 2.) The only thing that changed in the interim is that the Class has been heard from and they resoundingly support this Settlement.

Of the 236,000 persons who received direct notice of the settlement, only 117 opt outs have been received and there are only nine objectors to the settlement, six of whom are represented by so-called professional objectors or the Lang Group. This was not a passive class. Class Counsel knows from data from the Settlement Administrator that the Class has reviewed the settlement. The numbers of "hits" to the settlement website exceeded 1.4 million, there were

---

[1] The Court reserved judgment on the objections relating to the payment to Class Representative Saltzman and attorneys' fees. (10/15/12 Tr. Prelim. App. Hearing, at 40:23-41:2, attached as Exhibit H) ("With respect to some particular objections that are made here, I'm reserving them for final approval, and that is the payment to Saltzman. And I will probably examine the nature of the legal fee under the circumstances and its ultimate resolution.").

1

over 13,600 calls received by the Settlement Administrator, and over 30,500 claim forms have already been downloaded. The Court can thus be confident that the Class has reviewed the Settlement and decided to embrace it.

The Class sees what Objectors will not – the settlement offers clear and certain benefits, especially in comparison to proceeding with a liability only trial followed by individual damages and causation trials. The Class' embrace of the settlement is an indication the Class members well understood the reasoned observations of Judge McMahon quoted in Plaintiffs' preliminary approval reply brief, where he approved a settlement of a class that similarly had been certified as to liability only:

> The path from this stage of the litigation to a final judgment on the issue of Defendants' liability . . . would be long, complicated, and expensive. As this Court has explained: "It could be ten years from now before you get anything if everybody goes after everything that he wants." (10/28/11 Tr. at 15:1–3, Dkt. 154.) Notwithstanding the strength of the evidence Plaintiffs elicited during the pre-suit investigation and discovery, additional discovery would be required to establish liability and damages, including depositions of Class Members, Defendants, and Defendants' employees, managers, and partners. A fact-intensive trial would be necessary, and while the Class Members are sure they will win, they might in fact lose. Preparing and putting on evidence at such a trial would consume tremendous amounts of time and resources and demand substantial judicial resources. Plus, only certain issues would be tried. In particular, damages to the individual Class Members would not be awarded; those would require additional trials, which would be costly and further defer closure. Establishing a mechanism for adjudicating causation and damages will present many of the difficulties that the Claims Administration Process redresses. …. Finally, post-trial motions and appeal would delay resolution and increase costs still more. . . . The entire process will take years. . . . The Settlement is not, and cannot be, all things to all people. However, I believe that it is fair, reasonable, and adequate to the class as a whole. This is a case where the perfect could easily become the enemy of the good; that would not be in the best interests of the class as a whole. I thus approve the Settlement.

(D.E. # 285 at 2) (citing *Charron v. Pinnacle Group N.Y. LLC*, 2012 WL 2053530, at *2 (S.D.N.Y. June 6, 2012)).

This exemplary Settlement, which was reached after extensive pre-trial discovery and

after lengthy arm's length negotiation, meets all of the factors articulated by the Seventh Circuit for final approval.  It may not be perfect, but it is far better than merely a good settlement.  The positions of objectors plainly seek to make the perfect the enemy of the good.  For these reasons, as well as the reasons set forth in the numerous pleadings previously filed in support of the Settlement, it should be given final approval.

## II.    STATEMENT OF FACTS

### A.  Factual Background and Procedural History

While this Court is intimately familiar with the facts of this case, and has previously addressed objections to the Settlement lodged by George Lang and his clients (the "Lang Group"), a brief description of the events leading to this Settlement is appropriate.

ProLine Casement Windows are aluminum clad wood windows designed and manufactured by Pella and introduced in the US market in 1991.  Pella sells ProLine Casement Windows nationally through Pella's sales and service organization of Pella-owned and independently-owned Pella retail stores, and through major retail chains such as Lowes under model names such as "250 Series" and "450 Series".

Plaintiffs have alleged that Pella ProLine Casement Windows were manufactured with an inherent design defect and that Pella knew or should have known of this defect and concealed it from its customers.  The defect alleged by Plaintiffs results in water penetrating behind the aluminum cladding, exposing the interior wood components, particularly the sash, to premature rotting thereby reducing the useful life of the windows.  Plaintiffs alleged the wood rot to be wide spread affecting not only the window components themselves, but the window frame and possibly the structure as well. However, the ProLine Casement Window defect is latent, as the aluminum cladding masks the rot, and the rot is commonly not discernible by consumers until

3

several years of progressive deterioration, often after the warranty period has expired, when the internal wood components of windows or entire windows have to be replaced.

Plaintiffs further alleged that complaints about wood deterioration became so pervasive that in 2006 Pella's window distributors began to complain about excessive warranty returns and associated costs the distributors were bearing. Pella examined the problem and initially projected a 14% failure rate,[2] and in response secretly developed the ProLine Service Enhancement Program ("PSEP") to reimburse its distributors for a portion of the costs they were experiencing in honoring Pella warranties for wood deterioration in their Pella ProLine Casement Windows manufactured between 1991 and 2003, and providing limited benefit to customers to cover the costs of installation and finishing. However, Pella did not inform current customers of the alleged defect nor of the availability of PSEP benefits, and did not inform prospective customers of the defect.

Plaintiffs' Third Amended Complaint[3] alleges that Pella has uniformly failed to disclose the defect to the Settlement Class *before* they purchased ProLine Casement Windows, or since, and that the PSEP was an amendment to the Pella warranty mandating full disclosure to all Pella ProLine Window purchasers and the owners of structures containing those Pella windows. The Third Amended Complaint also asserts various claims for negligence, negligent misrepresentation, breach of contract, breach of express warranty, products liability, breach of implied warranty of merchantability, unjust enrichment, declaratory relief pursuant to 28 U.S.C. 2201, violation of Illinois Consumer Fraud and Deceptive Business Practices Act and substantially similar laws of certain other States, violation of similar Uniform Deceptive Trade Practices Acts, and common law fraud by omission. *Id.* ¶¶ 18-27.

---

[2] Pella has a competing view of the failure rate. *See* (D.E. # 312 at note 7); Section IV(A) infra.
[3] The Parties' Settlement Agreement contemplates the filing of a Third Amended Complaint (D.E. # 275) in order to align the proposed Settlement Class with the Settlement Agreement.

In its class certification order (D.E. # 163), the Court certified two classes of Plaintiffs (the "litigation classes"). The first class is a nationwide Fed. R. Civ. P. 23(b)(2) declaratory judgment class consisting of all class members who own structures containing Pella ProLine aluminum-clad casement windows manufactured from 1991 to the date of certification (June 4, 2009) whose windows did not yet manifest the alleged defect, or had manifest wood rot but had not been repaired or replaced. Upon successful prosecution, this class would potentially be entitled to six declarations essentially declaring that all Pella ProLine Casement Windows contain a defect resulting in premature wood rot meriting disclosure by Pella; and that the PSEP is a warranty modification.[4]

The second class was a six-state Fed. R. Civ. P. 23(b)(3) liability class consisting of "[a]ll persons in the states of Illinois, California, Florida, Michigan, New Jersey, and New York, who purchased a Pella ProLine aluminum clad casement window/s and/or own a structure containing a Pella ProLine aluminum clad case window, between January 1, 1991 and [June 4, 2009]". The Rule 23(b)(3) class was a liability class only, to determine whether Pella had violated state consumer protection laws by failing to disclose the defect. The Court declined to certify the issues of causation and damages. As a result, the trial on the merits would only determine the scope of Pella's warranty, the nature of the PSEP and whether it amended the warranty, whether and when the Pella aluminum casement windows suffered from an inherent wood durability defect, whether and when Pella knew of the defect, and whether and when Pella publically announced the defect and the PSEP. The trial ***would not*** determine whether the defect was the cause of the Plaintiffs' damages, nor the amount of those damages. The class was

---

[4] The additional declarations include Pella's obligation to notify all owners of the defect; that the 10 year limitation on the warranty is removed for the purpose of remediating the defect as warranted; reassessment of prior warranty rejections for the defect; and to provide, at its costs, inspections of all class members' windows.

limited to class members whose windows had already been repaired and replaced. As such *the trial would not result in an award of damages to the Rule 23(b)(3) class*; rather, further proceedings over several years would have been required to bring the claims to final resolution.

In affirming this certification, the Seventh Circuit noted that this Court's order afforded "class treatment of the narrow liability issue." *Pella Corp. v. Saltzman*, 606 F. 3d. 391, 393 (7th Cir. 2010). The Seventh Circuit also noted that "[u]nder the district court's plan, class members still must prove individual issues of causation and damages," and that the "cumulative effect" of the certified classes would be "[t]he contemplated process in which members may file a claim with Pella for service" and "[i]ssues of causation and damage issues, such as whether the defect caused the damage to a particular window and how much the design contributed to the rot, will be handled individually." *Id*. The Settlement presented to this Court for final approval effectuates the "cumulative effect" process that the Seventh Circuit expected would result from a fully litigated suit.

### B. Settlement Negotiations

The Settlement is a result of multiple mediations and in person meetings over the course of more than a year. Shortly after the Supreme Court denied review, the parties began to discuss potential settlement structures. The parties met with a well-respected mediator, retired Judge Richard Solum, in May 2011 to work towards a settlement for the class. Over the course of the next seven months, in addition to proceeding with the litigation, the parties met in person, conducted conference calls, and exchanged many emails to reach an appropriate settlement benefit for the class. This mediation resulted in the parties' Settlement Term Sheet. After agreeing on the substantive terms of the settlement, the parties then met with a second mediator, Judge Erwin Katz, to negotiate attorneys' fees in December 2011 and reached a resolution.

From December 2011 through May 2012, the parties worked zealously to finalize all the details of the Settlement Agreement, culminating in a signed agreement on June 19, 2012. Both mediators have submitted Declarations supportive of the arm's length negotiations conducted. *See* Exhibit A (Katz Affidavit); (D.E. # 312-1, Ex. D (Solum Affidavit)).

### C.  Terms of the Settlement

The proposed Settlement is the result of substantial arm's length negotiations between Plaintiffs and Pella, by their respective counsel. The Settlement provides for the process contemplated by this Court and the Seventh Circuit, and  results in the Settlement Class recovering immediate and certain relief. The basic terms of the Settlement Agreement are as follows:

1. "The Settlement provides benefits related to Settlement Class Members' unreimbursed out of pocket expenses for Eligible Damage. Some Settlement Class Members have already experienced Eligible Damage and have already repaired or replaced such damage. Other Settlement Class members have experienced Eligible Damage but have yet to repair or replace such damage. A third group of Settlement Class Members have yet to experience Eligible Damage but may do so in the future. Each of these groups of Settlement Class Members have had different experiences with respect to their Pella ProLine Casement Windows for which the benefits are set forth herein." (D.E. # 277-1 at ¶ 54).

2. The settlement provides for warranty benefits as well as cash benefits. There are two ways for Class Members to make a claim under the settlement: (1) a claims process and (2) an arbitration process.

    a. With respect to warranty benefits: Under the Claims Process,  "Settlement Class Members who have, or had, windows or Structures with Eligible Damage may be eligible for limited cash payments, ***in addition to*** any Discounts, or benefits under the agreed scope of the ProLine Service Enhancement Program, as described [in Paragraph 35 of the Settlement Agreement]." *Id.* at ¶ 65 (emphasis added).

    b. With respect to cash benefits: "Under the Claims Process, Eligible Claimants may receive a maximum cash benefit of up to $750 per Structure … Under the Arbitration Process, Eligible Claimants may receive up to $6,000 per Structure." *Id.* at ¶ 55.

3.  The Claims Process provides benefits for three categories of Class Members:

    a.  Settlement Class Members who have Eligible Damage and otherwise meet the requirements of the Claims Process and this Settlement Agreement, and who repaired or replaced a Pella ProLine Casement Window before August 18, 2003.  Paragraph 68 of the Settlement Agreement outlines the specific benefits that these Class Members are entitled to.

    b.  Settlement Class Members who have Eligible Damage and otherwise meet the requirements of the Claims Process and this Settlement Agreement, and who repaired or replaced a Pella ProLine Casement Window on or after August 18, 2003.  Paragraph 69 of the Settlement Agreement outlines the specific benefits that these Class Members are entitled to.

    c.  Settlement Class Members who have Eligible Damage and otherwise meet the requirements of the Claims Process and this Settlement Agreement, and who have Pella ProLine Casement Windows with Eligible Damage unrepaired prior to the Initial Notice Date.  Paragraph 77 of the Settlement Agreement outlines the specific benefits that these Class Members are entitled to.

4.  Additionally, the Settlement provides benefits for future damage occurring after the close of the Claims Period. This group consists of Class Members who have Eligible Damage and otherwise meet the eligibility criteria of this Agreement and who seek relief for repairs for Eligible Damage after the close of the Claim Period but within the maximum period for which this Settlement provides them benefits (15 years from date of window manufacture).  These benefits, outlined in Paragraph 99 of the Settlement Agreement, will be provided by Pella directly.

5.  Alternatively, Class Members may opt to file a claim through the Arbitration Process if they meet the eligibility requirements.  "Settlement Class Members who have, or had, Eligible Damage to their Pella ProLine Casement Windows or to other property such as the Structure surrounding those windows may be eligible to seek a cash award in binding arbitration in lieu of the Claims Process, described above, for unreimbursed expenditures made by the Settlement Class Member, and/or for necessary expenditures to remedy existing damage to the Structure (if the Settlement Class Member still owns the Structure)."  *Id.* at ¶ 83.  The costs of the Arbitration itself are to be paid by Pella.[5]  "The cash award will in all cases be limited to a maximum of $6,000 per Structure, for all damage, including damage to the window(s) and the structure." *Id*.

**D.  Preliminary Approval**

Plaintiffs and Pella jointly moved for preliminary approval on June 19, 2012 (D.E. #

---

[5] Class members who opt for the arbitration are not responsible for costs of the arbitrator and/or arbitral forum provider.

277).  While it is rare for a class action settlement to be attacked at the preliminary approval stage, the Lang Group did just that, filing a 40 page brief in which they opposed almost every material term of the settlement, including its notice provisions. (D.E. # 286.)  Notably, Lang previously supported the substantive settlement terms when he was employed at CLG, and in his state court complaint, Lang had actually alleged that the attorneys fees here were too low and not too high.  The Court held a lengthy hearing on the preliminary approval motion (D.E. # 300), at which time the Lang Group unleashed a series of attacks on both the settlement and Class Counsel.[6]

This Court rejected each of the Lang Group's objections,[7] and granted Preliminary Approval on November 1, 2012 (D.E. # 301).  As the Lang Group has renewed their objections despite the Court's prior rejection, this memorandum will address them (and the other objections) as appropriate.[8]

### E.  Class Notice

The parties, through professional settlement administrator EPIQ, Inc., have fully complied with this Court's Preliminary Approval Order directing notice to the Settlement Class. Rule 23 requires the Settlement Class receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through

---

[6] This was not the first time the Lang Group challenged the settlement and Class Counsel.  (See D.E. # 255).  The Court held a lengthy evidentiary hearing and denied the Lang Group's first challenge to the Settlement and Class Counsel.  (D.E. # 265.)

[7] As stated above in Note 1, the Court reserved for final approval the objections to the Saltzman payment and noted that the Court will examine the legal fee.

[8] Judge Gettleman recently rejected the proposition that the court should address the same objections that were made by the same objector at the preliminary approval stage.  *Am. Int'l Group, Inc. v. ACE INA Holdings, Inc.*, 2012 WL 651727, *7 (N.D.Ill. Feb. 28, 2012) (Having asked the court to rule on those objections [at preliminary approval], the Objectors are not in a position to complain that the court should revisit those objections again.").

reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin,* 417 U.S. 156 (1974); *see also In re AT&T Mobility Wireless Data Services Sales Litig.*, 270 F.R.D. 330, 351 (N.D. Ill. 2010). What comprises the best notice possible depends on various elements, including the size of the class, whether the class members can be easily identified, and the probability notice will reach the intended audience. *See, e.g., Eisen,* 417 U.S. at 166–67. The parties sent individual notice to more than 236,000 class members. That notice effort was supplemented by publication notice and a dedicated website which received more than 1.4 million visits and more than 30,500 claim form downloads. *See* Declaration of Cameron Azari, attached as Exhibit B.

## III. THE SETTLEMENT CLASS SHOULD BE CERTIFIED BECAUSE IT MEETS ALL THE REQUIREMENTS OF RULE 23

While a class must meet all of the requirements of Fed. R. Civ. P. 23, "[s]ettlement is relevant to a class certification" motion and is "a factor in the calculus." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619, 622 (1997). Indeed, the Supreme Court "has expressly approved the use of the settlement class" and noted that "the 'settlement only' class has become a stock device." *Id.* at 618. Importantly, the potential manageability problems that might be an obstacle to certification are not relevant in the settlement context. Thus, for example, "[t]he fact that the claims also implicate the laws of different states does not defeat predominance for the purpose of certifying a settlement class." *In re AT & T Mobility Wireless Data Services Sales Tax Litig.*, 789 F. Supp. 2d 935, 974 (N.D. Ill. 2011); *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004) ("the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class.").

10

Plaintiffs seek certification of such a Settlement Class under Rule 23(b)(3), as well as appointment of Class Representatives and Class Counsel. Notably, no objector has argued that the proposed Settlement fails to meet the commonality and predominance requirements of Rule 23 and should not be certified. The fact that a six-state 23(b)(3) class and a 50 state 23(b)(2) class were already certified and affirmed establishes that the Settlement Class defined in the Settlement Agreement meets the requirements of Rule 23.

The Settlement Class here is more expansive than the previously certified litigation classes. The Settlement Class is defined as:

> all persons in the United States who are current or former owners of Structures containing Pella ProLine® brand casement, awning, and/or transom windows (including 250 and 450 Series) manufactured by Pella Corporation between January 1, 1991 and December 31, 2006.[9]

This revised nationwide class definition provides relief to both past and current owners, and is expanded to include awning and transom windows in addition to casement windows. Temporally, it differs as it cuts the class off at ProLine casement, awning, and transom windows manufactured after December 31, 2006, as opposed to June 2009, as the parties have compromised on the cut-off date based on the alleged design changes made to the windows beginning in 2007.[10]

### A. The Settlement Class Satisfies Rule 23(a)

---

[9] The Settlement Class excludes: (i) all persons who timely opt out of the Lawsuit pursuant to the terms of this Agreement (ii) all persons who, individually or as a member of a class, initiated legal proceedings against Defendants (other than this Lawsuit initiated by the Named Plaintiffs), whether resolved or not, before the entry of the Preliminary Approval Order by settlement, judgment, release, dismissal, or other final disposition resulting in the termination of the proceedings; (iii) all owners of Pella ProLine Casement Windows manufactured on or after January 1, 2007; and (iv) all of Defendants' current employees.

[10] Pella alleges the materiality of these design changes and Class Counsel had reviewed testing data in this regard. The acceptance of the 2007 window cut off was the product of compromise rather than any definitive determination that such design changes were effective in remediation of the alleged defect. The claims of ProLine aluminum clad casement windows manufactured after December 31, 2006 are carved out of the release and their claims remain unaffected by this Settlement.

Rule 23(a) establishes four prerequisites to certification of any class, and like the originally certified class, the proposed Settlement Class satisfies each of the Rule 23(a) prerequisites.

### 1. Numerosity

This Court previously noted with regard to a six-state 23(b)(3) class that "[n]umerosity is not at issue in this case," *Saltzman v. Pella*, 257 F.R.D. 471, 478 (N.D. Ill. 2009), and numerosity has only increased with the addition of 44 additional (b)(3) states. As with the previously certified litigation classes, joinder of all owners of approximately six million windows, who are geographically dispersed, would be impracticable. *See In re Bank One Sec. Litig./Chicago S'holder Claims*, 2002 U.S. Dist. LEXIS 8709, at *9 (N.D. Ill. May 9, 2002); *see also Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (numerosity is presumed when there are more than 40 class members).

### 2. Commonality

The common issues identified by the Court in the course of certifying the litigation classes are equally present in the proposed Settlement Class. In this Court's own words,

> Plaintiffs maintain that common questions include the scope of Pella's warranty, the nature of the PSEP and whether it amended the warranty, whether and when Pella ProLine Windows suffered from an inherent wood "durability" defect, whether and when Pella knew of the defect, and whether and when Pella publicly announced the defect and the PSEP. These are questions that are common to the class, and are allegedly a result of Pella's standardized conduct toward the class members. Were each member in the class to bring separate actions under state consumer fraud statutes, "these questions would necessarily be litigated over and over, and the same evidence would be presented in each case."

*Saltzman*, 257 F.R.D. at 478 (internal citations omitted).

### 3. Typicality

12

Rule 23(a)(3) "can be met when the representative party's claim arises from the same course of conduct that gives rise to the claims of other class members and all of the claims are based on the same legal theory." *Saltzman*, 257 F.R.D. at 479 (*citing De La Fuente v. Stokely-VanCamp, Inc.,* 713 F.2d 225, 232 (7th Cir. 1983)). "Additionally, courts have permitted named plaintiffs to represent class members from other states in which the representatives did not reside or make purchases." *Id.* at 480.

Here, all proposed Class Representatives of the proffered Third Amended Complaint are members of the Class and have windows with manifest defect and/or have repaired or replaced windows with wood deterioration caused by the alleged defect. The claims of the Plaintiffs arise from the same alleged products and conduct by Pella as do the claims of the other Settlement Class members and Pella's alleged conduct pertinent to proof of liability would not differ among the Settlement Class members. Accordingly, the typicality requirement is satisfied.

### 4. Adequacy

Finally, Rule 23(a)(4) requires that the named class representatives "fairly and adequately protect the interests of the class." The adequacy standard involves two elements: one relates to the adequacy of the named plaintiffs' representation of the class and requires that there be no conflict between the interests of the representative and those of the class in general; the other relates to the adequacy of class counsel's representation. *Sec'y of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir. 1986) (*en banc*). As this Court previously held, "Named Plaintiffs are alleging a mixture of latently defective and manifestly defective windows (both replaced and not yet replaced), so they will adequately be able to represent all of the certified subclasses." *Saltzman*, 257 F.R.D. at 483.

Similarly here, Named Plaintiffs' interests are aligned with all Settlement Class members

as they are all current and/or former owners of structures containing Pella ProLine aluminum clad casement, transom and/or awning windows. Plaintiffs have no interests antagonistic to the other Settlement Class members' interests and each has fulfilled his or her duty to the Class by remaining informed of the negotiations with Pella and approving the Settlement prior to any discussion with Pella regarding any compensation that he or she may receive.

As to the second element, the attorneys representing a class must be qualified, experienced, and generally able to conduct the litigation. *See Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002). Indeed, Class Counsel, who have already been twice approved by this Court, have fervently fought for Plaintiffs' claims for the past six years. Furthermore, when the Lang Group previously attacked Class Counsel's qualifications, this Court overruled those concerns.[11] Plaintiffs and their counsel are qualified to continue serving as Class Counsel and Class Representatives for Rule 23(a)(4) and (g) purposes.

In yet another rarity, the Lang Group sought removal of Class Representative Dr. Saltzman and Class Counsel Complex Litigation Group pursuant to Fed. R. Civ. P. 23(g) (D.E. # 255) even before the parties had executed their Settlement Agreement, and before Preliminary Approval. While this gambit was unsuccessful, the Lang Group have re-iterated these complaints. Additional objectors likewise challenge the adequacy of Class Representatives and/or some of Class Counsel; as with those of the Lang Group, the objections are baseless and are addressed below at Section V(D).

### B.  The Settlement Class Meets the Requirements of Rule 23(b)(3).

---

[11] Indeed, upon the filing of the Lang Group's Motion to (a) Substitute Counsel for Kent Eubank, Thomas Riva and William and Nancy Ehorn, (b) Appoint New Fed. R. Civ. P. 23(g) Class Counsel Based On Exceptional Circumstances And, (c) Remove Class Representative Dr. Leonard Saltzman Based On Exceptional Circumstances (D.E. # 255), the Court held a more than five-hour long evidentiary hearing, after which the Lang Group's Motion was denied in its entirety (D.E. # 265 ("Motion to substitute attorney [255] is denied for the reasons stated in open court.")).

In addition to satisfying Rule 23(a), the Settlement Class satisfies the certification requirements of, and therefore should be certified under, Rule 23(b)(3).

### 1. Predominance

Rule 23(b)(3) requires that a plaintiff show that "questions of law or fact common to class members predominate over any questions affecting only individual members . . . ." The predominance requirement may be satisfied when "the central questions in the litigation are the same for all class members." *Pella Corp.*, 606 F.3d at 394. This Court previously found that common issues predominate over individual issues. *Saltzman*, 257 F.R.D. at 486 ("Defendants' arguments with regard to predominance do not defeat class certification under Rule 23(b)(3).... Due to the predominance of other issues, differences in applicable statutes of limitations do not bar class certification under Rule 23(b)(3)."). "[T]he fact that proving damages must be handled individually does not preclude certification on the issue of liability." *Id.*

As previously noted, the central issue in this litigation is whether Pella's windows were inherently defective because of their design, and whether Pella knew or should have known of the design defect and disclosed the design defect. While some Settlement Class members may have repaired and replaced their windows and others may not have replaced them yet, the predominant question still is whether the design defect exists and this question is common to the Class. Further, with regard to the causation and damages issue the Court previously found to be predominantly individual, the Settlement ameliorates those considerations. For those Class members opting to accept the non-arbitration process, the issues of causation and damages have been dramatically streamlined into the proof of claim process. (Agreement at ¶¶ 61-62) For those Class members who opt for the arbitration procedure, the Settlement provides an efficient

mechanism and forum for addressing causation and damages, and does so on a class member-by-class member basis. Therefore, the Rule 23(b)(3) predominance requirement is satisfied.

### 2. Superiority

In certifying the litigation classes, this Court held "[b]ecause common issues of law and fact predominate, and trying these claims separately would result in a substantial amount of repetition, I find that proceeding as a class action is the superior form of adjudication for this case." *Saltzman*, 257 F.R.D. at 487. In so holding, the Court noted that by "certifying the consumer fraud class as to the issue of liability only, and damages will be handled individually, issues will not be overlapping, and the same issue will not be reexamined by different juries." *Id.* The arbitration and non-arbitration compensation mechanisms afford Class members a choice, and the tiny number of opt-outs establishes that the Class views the Settlement's processes to be superior to individual litigation in court.

## IV. THE SETTLEMENT MEETS EACH OF THE SEVENTH CIRCUIT'S *ISBY* STANDARDS GOVERNING FINAL APPROVAL OF CLASS ACTION SETTLEMENTS AND SHOULD THEREFORE BE GRANTED FINAL APPROVAL

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval for the compromise of claims brought on a class basis. It is long settled that "compromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank of Pauls Valley*, 216 U.S. 582, 585 (1910). This overriding public interest in settling and quieting litigation is particularly true in class actions. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *Armstrong v. Board of School Directors of the City of Milwaukee*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement.").

In determining whether a district court should exercise its discretion to approve a class

settlement as "fair," the Seventh Circuit has explained that district courts should "consider the facts in the light most favorable to the settlement," *Isby*, 75 F.3d at 1198-99 (*citing EEOC v. Hiram Walker*, 768 F.2d 884, 888-89 (7th Cir. 1985)), and has identified several factors for analyzing whether a class action settlement should be given final approval including the:

1.  strength of plaintiff's case on the merits measured against terms of the settlement;

2.  complexity, length, and expense of continued litigation;

3.  amount of opposition to the settlement;

4.  presence of collusion in gaining a settlement;

5.  stage of the proceedings; and

6.  amount of discovery completed.

*General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997); *see also Am. Civil Liberties Union of Ill. v. U.S. Gen. Servs. Admin.*, 235 F. Supp. 2d 816, 818 (N.D. Ill. 2002). In weighing these factors, the district court should "recognize[] that the first factor, the relative strength of the plaintiffs' case on the merits as compared to what the defendants offer by way of settlement, is the most important consideration." *Isby*, 75 F.3d at 1199.

The Supreme Court has cautioned, however, that in reviewing a proposed class settlement, a court should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *see also EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d at 889, *cert. denied*, 478 U.S. 1004 (1986); *Isby*, 75 F.3d at 1196-97. Instead, a court's inquiry should be "limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate." *Isby*. 75 F.3d at 1196.

Likewise, the Seventh Circuit has urged district courts to be mindful that "[t]he essence

17

of settlement is compromise," and so "the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution *after* trial." *Hiram Walker*, 768 F.2d at 889. Indeed, a district court should not reject a settlement "solely because [the settlement] does not provide a complete victory to the plaintiffs." *Isby*, 75 F.3d at 1200.

### A. The Strength of Plaintiffs' Case Measured Against the Settlement Valued at Over $90 Million Supports Final Approval of the Settlement

Class Counsel believe that they have a strong case on the merits, but they also recognize the restrictions that the limited class certification imposes on the strong evidence related to the common issues. With regard to the common liability issue, Class Counsel believe that, as a result of discovery and their independent investigation, they would be able to establish at trial the existence of a defect in Pella ProLine aluminum clad casement windows and that Pella knew, or should have known, of the defect, failed to disclose the defect, and modified their warranty to provide additional warranty benefits without notice to warranty beneficiaries.

While Plaintiffs believe in the strength of their liability case, they must realistically recognize that a finding of no liability is possible. Plaintiffs also must acknowledge the many other risks and uncertainties facing them absent settlement. If Plaintiffs were to be successful at trial establishing Pella's liability, that would just be the beginning of the road as each Class member would then need to individually litigate issues of causation, damages, limitations and other defenses. These individual trials could be a protracted process with uncertain results, a fact which strongly weighs in favor of final approval. Because separate, individual trials on causation and damages are mandated, the strengths and weaknesses of those individual cases, either individually or in the aggregate cannot easily be determined.

In addition, absent the Settlement, the members of the Class would have to carry the

expenses of their own individual causation and damages trial, and if this case were to be litigated and proceed to judgment, the cost of the Class Notice would be a liability borne by those who might prevail through individual litigation. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178-79 (1974) (the longstanding rule in federal court is that "the plaintiff must pay for the cost of notice [to a class] as part of the ordinary burden of financing his own suit."). [12]

Compared to these risks and pitfalls, the benefits the Settlement Class will enjoy if the Settlement is approved are substantial. The scope of those who can receive relief through the Settlement is broader than were the certified liability classes, as under the Settlement, both previous and current owners who spent money to repair the windows and current owners who have damages that are yet unrepaired all participate in the benefits process. Damages that occur after the claims period closes are also covered under the Settlement for up to 15 years from the purchase date, even though Pella's warranty runs for only ten years.

As for monetary relief, this Settlement requires Pella to extend its PSEP benefits directly to Class members with enhancements calculated to remediate the costs of installation and finishing of replacement windows. The Settlement will, for the first time, make Pella's warranty program, with the enhancement of the PSEP benefits augmented by the Settlement, available to all eligible claimants. This benefit is in addition to the other payments provided by the Settlement and applies even to those who were improperly denied warranty coverage in the past and have already repaired and/or replaced their windows. The value of this relief, which would not have come about but for the efforts of the Plaintiffs, their counsel, and their negotiation with Pella, is in addition to the monetary compensation available under the Settlement.

---

[12] Because a liability finding would produce no damage award, a successful litigation would not result in a fund from which the cost of notice could be recovered. While the implications of notice and its costs have not been, and need not be, fully explored here, it is reasonable to observe that irrespective of how costs might be recovered without Settlement, the Settlement provides that Pella will bear those costs.

In addition, many Settlement Class Members are entitled to additional monetary relief beyond the warranty and PSEP benefits with a $750 cap per Structure under the Claims Process or a $6,000 cap per Structure under the Arbitration Process as set forth in the Settlement Agreement. Even the costs of receiving these benefits are being borne by Pella, as Pella has agreed to bear the full costs of the arbitrator's fees for class members, costs of notice to the class, significant attorneys' fees, and the costs of settlement administration. Thus, none of the typical costs associated with class relief will be borne by the Settlement Class.

Class Counsel have retained professional accountants, Veris Consulting, to value the Settlement and based on that independent analysis, Class Counsel believe that the aggregate value of this benefit to Settlement Class Members exceeds $90 million. Class Counsel and Veris Consulting have engaged in an exhaustive analysis of the value of the settlement benefits, which began with an analysis of 147,032 recorded warranty credit memos (accepted warranty claims) from 1991 through 2011 based upon defects likely indicative of wood rot.[13]

From the review of this data, it was determined that a regression analysis should be based on the 1999 to 2002 vintages for which credit memos were issued after 2006 was selected for regression. The regression analysis was performed by two independent sources, including Veris Consulting (*see* Declaration of Larry Johnson, attached as Exhibit C; Declaration of Richard Burke, D.E. 312-1 at ¶¶ 48 and 60), producing a conservative window failure rate of 13%. This failure rate was then applied to each vintage year from 1991 to 2006, and further subdivided into

---

[13] Segments of the warranty claims were separately reviewed to determine whether year of claim, location of claim, distributorship through which claim was submitted, or vintage of window played a role in whether a claim was accepted. From this segmented analysis, it was determined that warranty claims made after 2006 for all vintages, with the most complete data available for vintages 1999 and 2002 (as by 2012 the ten year Pella warranty had fully run), were accepted in significantly higher proportion to all other data. While there was also significant disparity between distributorships, that disparity was directly affected during the same period post 2006. This overall increase in warranty acceptance corresponded directly to Pella's implementation of the PSEP, which shows that wood rot warranty claims were not properly credited before the PSEP.

each benefit category: already repaired and replaced ("ARR") before August 13, 2003, ARR after August 13, 2003, Current Damages, and Future damages). This analysis determined the number of windows likely to fail in each year from 1991 to 2021, for each vintage from 1999 to 2006. The Settlement benefits were then applied to each window in the year it was likely to fail. The amount paid by Pella under the PSEP ($9,607,555) was backed out, leaving an aggregate Settlement benefit value of $103,685,576, having a present value of $91,097,821.

The risks of continued litigation versus the $91 million independent valuation of the Settlement adequately addresses the Lang Group's critique of the Settlement at Preliminary Approval based on the analysis of *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279 (7th Cir. 2002) (D.E. # 286), which was discussed and rebutted by Plaintiffs (D.E. # 291 at 16) and need not be reiterated here. Suffice it to say, what *Reynolds* requires is a reasonable effort to "quantify the net expected value of continued litigation" acknowledging that "a high degree of precision cannot be expected." *Reynolds*, 288 F.3d at 285. The net value of continued litigation involves at least two calculations: (1) the approximate number of windows likely to fail, and when (at some point everything "fails"); and (2) the value of compensation due for that failure assuming Plaintiffs win on the merits. The parties have gone to great lengths to resolve the failure rate.[14] The "compensation due" from a successful litigation on the merits of this case is of course no damages being awarded given the severed nature of the proceedings. Therefore the real issue becomes whether the Settlement is a fair, reasonable and adequate method of resolving the follow-on proceedings, not to value the net result of "complete victory" of follow-on proceedings by employing assumptions so speculative to deny the result of reasonableness. Viewed in this light, the Settlement provides a structured method of dispute resolution at no cost

---

[14] Plaintiffs compute 851,712 windows over 15 years from a 13% failure rate; Pella reaches 196,352 at a 3% failure rate.

to the Class; benefits in excess of the Pella warranty; an obligation in certain instances to pay the costs of installation and finishing for windows within the ten year warranty, in addition to replacement product; PSEP benefits extended for three additional vintage years, 2004, 2005 and 2006; making wood rot a warrantable defect; the defect is assumed in the resolution process without the need of proof; and an award up to $6000 in Arbitration provided there is proof of causation and damages.

Some objectors have myopically argued that the $90 million benefits from the Settlement are not enough. But a settlement will not be rejected simply because it does not provide a complete victory to the plaintiffs (assuming that "complete victory" could be defined within the context of this litigation). *See Hiram Walker,* 768 F.2d at 889. While it is entirely possible that, if the case were litigated to a conclusion, some Class members would be able, at some unknown point in the future, to obtain a greater recovery through individual proceedings, it is also possible they could get less or nothing at all. Further, absent settlement, the members of the Settlement Class would have to continue to deal with their rotting windows, or pay out of pocket for replacement and repair costs while hoping such costs could be fully recouped during the ongoing litigation. As a factual matter, a favorable ruling on the window defect, Pella's knowledge, and the status of the PSEP program at trial would only be one step in the process toward obtaining any relief. However, absent the Settlement, all questions, including the window defect, Pella's knowledge, and the extent of the product warranty remain unresolved and at the mercy of an adverse determination on the merits. There is a significant risk that the Class would receive less or nothing at all if litigation proceeded to the bitter end. The Settlement Agreement, as a practical matter, already resolves these questions in the Class' favor and moves directly to resolution of claims, largely at no costs to the Class, that would not be resolved at trial, even if

the Plaintiffs were to prevail.

In sum, when the many obstacles to success on the merits were this class action to be litigated further are balanced against the monetary benefits contemplated by the Agreement, this Settlement is fair, reasonable and adequate.

### B. The Complexity, Length, and Expense of Continued Litigation if the Settlement Is Not Approved Supports Final Approval of the Settlement

This will be an extremely expensive case to litigate for all parties and would take a very long time to reach final resolution. It will also be complex, not only because of the sheer number of affected Structures. Costs of testifying experts, discovery, summary judgment motion practice, possible de-certification motion practice, as well as pre-trial and trial on liability and likely ensuing appeals, then second phase proceedings related to causation, particular defenses like statute of limitations, and damages, would have been substantial. Even assuming that successful resolution would lead to an expedited warranty claims process, that process would be conducted by Pella, not an independent, free Claims Administrator or Arbitrator. The warranty process would still leave Pella with all of its defenses, the merits of which are to be decided by Pella. This Settlement provides a reasonably prompt resolution with meaningful relief to all Settlement Class members without these additional major expenditures of time and money. Without this Settlement, it would be years – if ever – before any class member would recover any benefit whatsoever. This factor weighs in favor of final approval.

### C. The Amount of Opposition to the Settlement Was Minuscule, Supporting Final Approval of the Settlement

There have been a miniscule number of objections to the Settlement and just 117 potential class members out of a universe of 236,000 have opted-out. Unlike a passive notice regime, here actual Class interest can be measured. In light of the actual measurement of Class

interest, compared to the inconsequential number of objectors, the numbers indicate that the class members consider the settlement to be in their best interest. There have been over 1.4 million hits to the website, 30,500 forms downloaded, and 13,600 calls to the settlement administrator so far. Thus, using the number of class members as a metric, there has been almost no opposition to the settlement. *See In re AT& T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 961 (N.D. Ill. 2011) ("[I]t is illuminative that only a tiny fraction of the Class Members saw fit to opt out or to object."); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (holding that the fact that "99.9% of class members have neither opted out nor filed objections ... is strong circumstantial evidence in favor of the settlements"), *aff'd,* 267 F.3d 743 (7th Cir. 2001)

### D.  There Is No Evidence of Collusion

This Settlement is not the result of collusion between the parties to trade the rights of absent class members for a large fee award for class counsel.  To the contrary, notwithstanding the many impediments to recovery by the class, the Plaintiffs and Pella have reached a settlement that would result in Settlement Class members getting certain and immediate tangible benefits. As a matter of law, a court should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion in the absence of evidence to the contrary. *Mars Steel v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677, 681-82 (7th Cir. 1987); *Armstrong*, 616 F.2d at 325. This presumption is applicable here.  Those who have already claimed that the settlement was tainted by collusive conduct and self-dealing have had their days in court, and the Court twice denied the credibility of these claims.[15] To the contrary,

---

[15] (*See* D.E. # 255) (Lang Group Motion to Substitute Counsel) and (D.E. # 286) (Lang Group Response to Preliminary Approval).  Both times, the Lang Group has had plenty of opportunities to fully explain all positions in exhaustive briefing and in open court during lengthy hearings. (D.E. # 265) (evidentiary hearing held and motion to substitute counsel denied) and (D.E. # 300) (motion hearing held and

the Settlement was reached only after six years of litigation and protracted and often spirited arm's length negotiation including mediation[16] among the Parties.

Moreover, no discussion of attorneys' fees or costs or compensation to Plaintiffs occurred prior to the agreement between Pella and Plaintiffs on substantive portions of the Agreement related to the benefits the Settlement would confer on the Settlement Class. The first discussion of these fees and compensation to class plaintiffs took place in December 2011, in the presence of an independent mediator, Erwin Katz (*see* Katz Decl. attached as Exhibit A), and only after the substantive terms of the Agreement had been worked out in the Term Sheet. At the fee mediation, both sides disagreed, and continue to disagree, about the number of windows likely to fail as a result of the wood rot defect alleged. This disagreement results in a disagreement about the monetary value of the Settlement. Class Counsel negotiated for a higher fee, and Pella negotiated for a lower fee. The $11 million fee agreement was reached as a result of considerable compromise on both sides, and not as a result of any agreement of the failure rate of the windows. The Settlement is thus not the product of collusion in any way, as the Court has already ruled. This factor weighs in favor of final approval.

### E. The Stage of the Proceedings and the Amount of Discovery and Investigation Completed When Settlement was Achieved

The Settlement comes after six years of vigorous litigation. Actual, pending litigation – rather than the mere threat of litigation – informed negotiations. The parties have gone through depositions, document reviews, expert testing, motions to dismiss, class certification, and appeals in the Seventh Circuit and the United States Supreme Court. After Pella's Petition for *Writ of Certiorari* was denied, the parties began settlement discussions. For the past year, Plaintiffs and

---

preliminary approval granted).
[16] *Bert v. AK Steel Corp.*, 2008 WL 4693747, at *2 (S.D. Ohio Oct. 23, 2008) ("The participation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties.") (citations omitted).

their counsel conducted intensive arm's length negotiations with Pella through numerous in person mediations and meetings, telephonic conferences, and the exchange of several written proposals. The Settlement Agreement itself took nearly six months to finalize and was not without further disagreement and compromise. All the negotiations were informed by extensive statistical analyses of Pella warranty and claims data, Class Counsel's interaction with hundreds of Pella windows owners, and the settlement valued across a myriad of potential outcomes. Ultimately the Settlement was subjected to extensive statistical analysis by Veris Consulting. *See* Exhibit C, Larry Johnson Affidavit. All of the work enabled Class Counsel to negotiate a complicated Settlement benefit that incorporates the many different categories of potential class members.

Additionally, in considering a settlement, a court is required to take Class Counsel's views into account. *DeBoer v. Mellon Mortg.*, 64 F.3d 1171, 1178 (8th Cir. 1995) ("The views of the parties to the settlement must also be considered."); *In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d 235, 255 (D.N.J. 2000) ("Significant weight should be attributed to the belief of experienced counsel that settlement is in the best interest of the class.") (citation and internal quotation marks omitted); *In re RJR Nabisco, Inc. Secs. Litig.*, Nos. MDL No. 818 (MBM), 88 Civ. 7905 (MBM), 1992 WL 210138, at *4, (S.D.N.Y. Aug. 24, 1992) (court "should give deference, when considering the fairness of the proposed settlement, to the judgment of experienced class counsel"). A corollary to this deferential level of scrutiny is the rule that "an individual who objects has a heavy burden of proving the settlement is unreasonable." *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 904 (S.D. Ohio 2001); *see also In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659, 667 (D. Minn. 1974); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (holding that in analyzing a class

settlement, a trial court may rely on the judgment of experienced counsel and "absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel"). Also significant is the fact that Pella and its counsel support this Settlement. *Cannon v. Texas Gulf Sulphur Co.*, 55 F.R.D. 308, 316 (S.D.N.Y. 1969) (the Court may consider the views of all involved counsel when deciding whether to approve a settlement).

### F. The Amount of Discovery and Investigation Completed When Settlement Was Achieved Supports Final Approval

As discussed above in Section II, the settlement comes after six years of litigation including formal discovery, expert work, motions to dismiss, class certification proceedings, and appeals to the Seventh Circuit and Supreme Court. The record indicates 276 docket entries, preceding Preliminary Approval; seven (7) engineering experts; 31,607 pages of documents; and analysis of 147,032 wood rot warranty claims. (See Richard Burke Declaration, D.E. 312-1.) The Plaintiffs also conducted both formal and informal discovery over the course of the litigation that allowed them to evaluate the strengths and weaknesses of their claims.

## V.    THE OBJECTIONS TO THE SETTLEMENT SHOULD BE REJECTED

From the 236,000 class members sent notice, only nine (9) have asserted objections to the Settlement. Three of these, Eubank, Riva and the Ehorns, merely incorporate their earlier objections to the preliminary approval of the Settlement (D.E. # 318, referencing D.E. # 286).[17] Three of these are lawyer-driven objections:[18] the objections of Lyle Schulte  by attorneys John

---

[17]   Additionally, these objectors simply object, without any asserted basis, "to the requirements required to file their objections." The requirements to lodge objections to the settlement in this class litigation are nothing out of the ordinary: identify yourself, your membership in the class, and state your objections to the Court, class counsel and counsel for the defendant. Indeed, the fact that these objectors timely filed their objections is evidence that the process to do so is anything but burdensome.

[18] Class Counsel have explained in their briefing in support of their petition for fees why these serial-objectors should be looked at with the utmost skepticism, including the condemnation made of them by other courts.  (*See* D.E. # 311 (Fee Reply), at 3-8.)

Pentz and Ed Cochran[19] (D.E. # 316), the objections of Michael J. Schulz by attorney Christopher A. Bandas (D.E. # 319), and the objections of Dave Thomas by attorney Joseph Darrell Palmer (D.E. # 323). The three remaining objections have been filed on a *pro se* basis.[20]

At the heart of the lawyer-driven objections lie the standard attack on the fees, particularly as measured against the purported value of the Settlement to the Class; the value of the settlement; the details of the claims process and who is entitled to participate in the claims process; and the adequacy of some of Class Counsel and Class Representative Saltzman. Nevertheless, as this Court knows, the Settlement is the result of a long negotiation overseen by two independent mediators, not an unsupervised, back-room deal.

The legitimacy of the fees to be paid to Class Counsel has been briefed separately (D.E. # 312). While many of the other objections were subject to extensive briefing by Pella and Class Counsel (*see* D.E. # 289, 291, 312), particularly in response to the resuscitated objections

---

[19] Mr. Pentz filed a late objection on behalf of Ron Pickering (D.E. # 335), which does not comply with the Court's Order and should be disregarded. Substantively, it is a cut and paste of the other objection filed by Mr. Pentz in this matter, and these objections are addressed herein. Also, Class Counsel have already outlined the long-history of Mr. Pentz as a professional objector. (D.E. # 311, at 5-7). Mr. Pentz came to represent Mr. Schulte through Mr. Cochran who is a business partner with Mr. Schulte's daughter. Ex. I, pp. 22:2-23. Mr. Cochran and Mr. Pentz are fellow travelers in lodging objections to class settlements, tallying objections to over 15 class action settlement as objecting co-counsel. *In re Wal-mart Wage and Hour Employment Practices Litig.*, 2:06-CV-00225-PMP-PAL (D. Nev.); *In re Trans Union Corp. Privacy Litig.*, 00 c 4729 (N.D. Ill.); *Azian v. Federated Dept. Stores, Inc.*, No. 03-3559 (N.D. Cal.); *Benacquisto v. American Express*, No. 00-cv-1980 (D. Minn.); *Clark v. Experian Information Solutions, Inc.*, Civ. A. 8:00-1217-22 to 1219-22 (D.S.C.); *In re Disposable Contact Lens Antitrust Litig.*, 94-MDL-1030; *In re Insurance Brokerage Antitrust Litig*, MDL No. 1663 (D.N.J.); *In re Lucent Tech.*, 327 F.Supp.2d 426 (D.N.J. 2004), 04-1120 (3d Cir.); *In re PayPal Litig.*, No. 02-1227, 2004 WL 24452444 (N.D. Cal. 2004).; *In re Relafen Antirust Litig.*, 231 F.R.D. 52 (D. Mass. 2005); *In re Servone Prod. Liab. Litig.*, No MDL 1477, 2006 WL 333006 (S.D.W.V. 2006); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503 (E.D.N.Y. 2003); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002); *Schwartz v. Universal Bank*, 00-75 (C.D.C.A); *Thompson v. Metropolitan Life*, 00-05071 (S.D.N.Y.) This history does not include Mr. Cochran's ventures on his own as an "objector[ ] who ha[s] contributed nothing." *In re United Health group, Inc. PSLRA Litig.*, 643 F. Supp. 3d 1107, 1109 (D. Minn. 2009).

[20] There were two other *pro se* objectors who withdrew their objections after speaking with Class Counsel and/or Pella and acknowledged that what they are entitled to under the Settlement was satisfactory. (D.E. # 327; D.E. # 328).

initially put forward by the Lang Group and reiterated by the professional objectors, Class Counsel will only summarize these arguments here.

### A.  The Settlement Provides Substantial Benefits and Value to the Class

The attorney-driven objections assert without any independent review or assessment or even knowledge of the facts of the case that the value of the Settlement is insufficient.  For example, Objector Thomas, represented by Mr. Bandas, comes up with his own (de)valuation of the Settlement at $1-2 million, but without any real basis in fact.  Class Counsel submits that the extensive briefing throughout the judicial review of the Settlement has provided ample facts to appreciate the benefits and value of the Settlement.  Indeed, each of these objections ignore the fact that a large part of the value of the Settlement is forward-looking in nature, and that whatever the window failure rate and the claims made, Pella will pay the benefits.  It is Pella, not the Class, that faces the risk that the future damages will exceed projections.

In addition, the Objectors misunderstand what the Class had before the Settlement.  They argue as if there was a pay-day at the end of a class trial.  However, only the existence of a defect had been certified for common treatment at trial, and the Class would have had no tangible benefits, even after a Class liability trial.  A win at that trial would not determine damages, nor the cause of those damages.  The challenge here was to determine a process by which causation and damages could be resolved in an efficient fashion while preserving the finding of product defect and Pella's individual defenses.  The Seventh Circuit, in affirming class certification, properly understood the economy of class-wide resolution "in one fell swoop" of the prominent, common questions relating to product defect, thereby eliminating that costly impediment to follow on individual proceedings.  While Pella does not admit "any deficiency or defect with or in Pella ProLine Casement Windows," (¶ 127) "Settlement Class members will not have to prove

that their Pella Proline Casement windows have a 'defect'." (¶ 96)  The practical effect is that claimants do not need to prove product defect, nor when Pella knew or should have known of the defect, to obtain relief.  Because the determination of product defect was the common predominant question certified for class treatment, the Settlement provides a material benefit as Class members no longer have to litigate the issue.  The Seventh Circuit, in their affirmance of class certification, recognized the resolution of product defect in the Class' favor as the principle benefit to be derived from litigation in the district court: "declaration that there is an inherent design flaw, that the warranty extends to them and specific performance of the warranty to replace the windows when they manifest the defect."  *Pella*, 606 F.3d at 395.  The Settlement allows the class members who opt for the arbitration process to move directly past the liability issue without having to spend the time or expense of litigating those issues.  Class members instead will only have to arbitrate the issues they would have had to litigate on their own even absent a settlement – causation and damages.  The "fast forwarding" of the Settlement past the liability issues is a substantive and immediate benefit for the members of the class.

Accordingly, as Class Counsel determined based on a statistical analysis of Pella's actual R&A data, the total value of the Settlement, including a conservative estimation of the future warranty claims permitted only as a result of the Settlement, is approximately $90 million.[21] (D.E. # 291; *see also* Exhibit C, Larry Johnson Affidavit).

---

[21] The discrepancy between the figures arrived at by Class Counsel and Pella have also been discussed extensively throughout the briefing related to the Settlement.  At base, the difference lay in Class Counsel's assumption that because Pella's R&A data undercounted "failure rates" prior to establishing the PSEP, a failure rate of 14% (arrived at after further analysis of the data) and not 6%, the figure relied on by Pella and taken at face value from its R&A data, should be used.  Even using the lower "failure rate" preferred by Pella, the Settlement has a value that may exceed $60,055,385.  (*See* D.E. # 291 at 9 (Class Counsel calculating settlement value at either 6% or 14% failure rate ), D.E. # 289 at 15 (Pella stating 6.5% failure rate under 15 year warranty), and D.E. # 312 at 13-14).

In contrast, the Objectors pay little heed to the actual data in coming up with their failure rate to the extent they make any consideration of such fundamental data.  This is true even for the objections

Furthermore, as has been previously discussed with the Court, the Settlement offers far more to the Class than comparable class action settlements involving other windows. *See Cartwright v. Viking Indus., Inc.*, No. 2:07-CV-02159 (E.D. Cal. Aug. 27, 2010); *Stout v. Jeld-Wen, Inc.*, No. 08-cv -0652 (N.D. Ohio Aug. 6, 2010); *O'Hara v. Marvin Lumber and Cedar Co.*, No. PD-00-014027 (Minn. Dist.Ct. 2001); *Abigana, et al. v. Rylock Co., Ltd.*, No. 2002 076625 (Cal. Sup. Ct.) (Settlement Agreements attached to D.E. # 283, Exs. A-D). The Settlement exceeds these others in the combined benefits of potential recovery per window, potential amount of recovery per structure, the inclusion of damage to other property, and the terms of extending benefits beyond the current warranty period.

### 1. The Objections Regarding The Monetary Caps Ignore The Additional Warranty And PSEP Benefits Provided Under The Settlement.

Pella's original warranty was for a period of ten years to repair or replace defects in material and workmanship. In 2006, Pella instituted the PSEP as a cost sharing mechanism between it and its distributorships. The PSEP imposed no obligation on Pella to any customers, and was a "secret program" in the true sense. The PSEP extended to only windows manufactured between 1991 and 2003 and reimbursed distributorships for the partial cost of installation and finishing, and product discounts for "beyond warranty" claims. It did not concede that wood rot was a warrantable claim and only imposed an "expectation" that all costs of installation and finishing would be covered by the distributorship.

Under the Settlement, wood rot is a warrantable claim, and the PSEP benefits are extended to all Eligible Claimants. In addition, the PSEP is enhanced under the Settlement, as it extends the benefits to the 2004 through 2006 vintages. All of these warranty and PSEP benefits are *in addition to* any cash award provided by the Settlement. The PSEP and enhanced benefits

---

filed by George Lang, which purported to complete its own valuation of the litigation and the Settlement. (*see e.g.* D.E. # 289 at 2-3).

as part of the Settlement Agreement are directly enforceable by the Class, as a court order.   *See* Section IV(A) *supra*.

### 2.   The Settlement Is Fair, Reasonable And Adequate, Because, In Part, There Is No Lump Sum Payment By Pella To The Class.

Objectors argue that the settlement is not fair, reasonable, or adequate because there is no lump sum payment made to the class.  However, what objectors fail to recognize is that the Class is in a better position without a set, lump-sum payment.  Here, Pella is on the hook to pay any and all eligible claims that are filed.  The payments to Class Members will not be diminished in value based on the number of claimants.  Whoever files a qualifying claim will get the full value that they are entitled to up to the appropriate caps.

### B.   The Claims Process Is Not Onerous.

The Settlement expedites the individual claims process, giving the Class access to immediate payment (the $750.00 payment)  or the right to proceed with simplified arbitration (allowing for up to $6,000 in damages to be awarded).  Indeed, with the Settlement, arbitration proceeds as if the Class had prevailed at the Class trial: the defect is assumed to exist, and Class Members need not establish the alleged wood rot defect, nor its warrantability.  Moreover, litigating further and without the Settlement would deny the Class the extended warranty benefits being offered.

Additionally, the requirements to participate in the claims process (*e.g.* providing evidence of expenditures made and ownership of windows) is far less burdensome than would be required of Class Members in order to prevail in individual causation and damages trials if the case did not settle.  This case is about the windows located in people's homes, and many people keep documentation relating to such large expenses, or remember who the contractor is that performed the service, and can get those records from the contractor.

32

### 1. No Additional Burdens Are Placed On Class Members That Did Not Exist Prior To The Settlement.

As discussed above in Section II A, the Court declined to certify the issues of causation and damages. As a result, the trial on the merits would only determine the scope of Pella's warranty, the nature of the PSEP and whether it amended the warranty, whether and when the Pella aluminum casement windows suffered from an inherent wood durability defect, whether and when Pella knew of the defect, and whether and when Pella publically announced the defect and the PSEP. The trial would not determine whether the defect was the cause of the Plaintiffs' damages, nor the amount of those damages; rather, further proceedings over several years would have been required to bring the claims to final resolution. Pella would retain all causation defenses if the case proceeded in litigation.

Under the Settlement, the defect is presumed. Class Members proving causation and damages is exactly what the Seventh Circuit envisioned would likely result from litigation, and that is exactly how the Settlement is structured under the Arbitration Process.

### 2. There Is No Need For Lawyers In The Arbitration Process.

Similarly, objections to the arbitration claiming that legal representation and experts are needed are unfounded. The proof in these proceedings will be narrow and factual, focusing on the out-of-pocket expenses paid, and whether they are legitimately attributable to the defect which is assumed for the purposes of these proceedings. The pattern of damage associated with the defect is clear and well established, leaving little to dispute in the proceeding except the legitimate costs. Indeed, this Court noted that the use of lawyers in the arbitration process is unlikely.[22] While claimants are free to use the benefits of legal counsel or other experts, such advice is not needed to benefit from the arbitration.

---

[22] 10/15/12 Tr. Prelim. App. Hearing, at 39:1-2, attached as Exhibit H. ("I almost believe, in the context of this case, that they don't need a lawyer for arbitration.").

### C.  The Class Definition And Exclusions Are Fair, Reasonable, And Adequate.

In addition to the general attack on the value of the Settlement, claiming it offers no "real benefit" to the Class (addressed earlier), Mr. Thomas, represented by Mr. Palmer, singles out purported differences between the class definition in the Settlement Agreement and the Notice and argues that, standing alone, they provide a sufficient basis to doom the Settlement.   While he correctly notes that the Notice does not precisely quote the language of Paragraph 44(2) of the Settlement Agreement, these two differences were both made to enhance the readability of the Notice: (1) The Notice inserts a date "November 1, 2012" in the notice while the Settlement Agreement provided, prior to preliminary approval, that the initiation was to be "before the entry of the Preliminary Approval Order"; and (2) the Notice omits the Settlement language "by settlement, judgment, release, dismissal, or other final disposition resulting in the termination of the proceedings" which appears after "initiated legal proceedings".   Thomas cites no authority that the notice must quote the settlement agreement, and in fact, the settlement agreement was made available to the class, and the website "hits" of the class website suggest the agreement has been read by tens (if not hundreds) of thousands.

Further, Mr. Thomas argues that the exclusion in the class definition for those who have or are suing Pella is too broad and "[t]herefore, the Proposed Settlement is not fair and reasonable to the class members."   (D.E. # 323 at 5).   First, Mr. Thomas's argument applies strictly to non-class members, and those excluded release none of their claims under the Settlement Agreement.   Mr. Thomas lacks standing to raise such issues.   Second, Pella is making clear in its brief in support of the Joint Motion that the exclusion apples only to those who have sued Pella over the windows covered in the settlement release.

Finally, the argument concerning the coupon expiration, to the extent it is not clear, has been definitively clarified in Pella's brief – the coupon benefit expires two years from when the

settlement becomes final, which means two years after any appeal has been resolved if such an appeal is filed.

### D. Class Counsel And Representative Saltzman Are Adequate Under Rule 23.

In addition to a boilerplate attack on the value of the Settlement to challenge the award of attorneys' fees, objectors challenge the adequacy of Class Representative Saltzman and Class Counsel Paul Weiss. Initially, the objection accomplishes nothing. As an initial matter, challenges to Class Representative Saltzman and Class Counsel Complex Litigation Group have already been rejected by the Court. No new facts have been presented since the lengthy evidentiary vetting of this issue on March 16, 2012. (D.E. # 265). Irrespective of whether Dr. Saltzman as a Class Representative, or Mr. Weiss as Class Counsel, are adequate, which they surely are, the Settlement is supported by four (4) other Settlement Class Representatives, three (3) other law firms, and seven (7) other Class Counsel appointed by this Court. (D.E. # 301 at 3). None of this posturing by objectors has the remotest relationship to the merits of the Settlement presented to the Court for approval.

The challenge to Mr. Weiss is unseemly and, in all candor, completely irrelevant to any issue on Final Approval. Whatever may be happening in Mr. Weiss' law practice, there is simply nothing from which to manufacture, try as they might, a claim that the Settlement was in any way effected. Whether the Class has been "sold out" is dependent on whether they in fact have been sold out, and there is certainly no evidence of that here. Every step of the negotiations was placed before two competent mediators, supported by exhaustive analysis, and representation, on both sides, by able counsel. And this is as it should be. The challenge to Dr. Saltzman is equally impoverished.[23] Mere familiarity between counsel and client is not enough. The Court has twice

---

[23] The sole case on which Mr. Bandas relies is factually inapposite. Indeed, it notes that "as long as class counsel is 'competent and zealous,' the named plaintiffs are not inadequate merely because 'of perceived

35

found that Dr. Saltzman was ably fulfilling his duties as a class representative and that Class

Counsel were likewise ably fulfilling their duties as counsel for the class in spite of incessant,

shameless critiques by those ignorant of the facts, and motivated by self-gain. There are no facts

presented challenging this Court's prior findings.

### E. Some Objectors Have No Standing.

An individual must have standing to object to a settlement. *In re Brand Name

Prescription Drugs Antitrust Lit.*, 1996 WL 351180, at *2 (N.D. Ill. June 24, 1996) ("We note

that standing of these non-class members to object to . . . the settlements (to which they are not a

party) is doubtful.") *See Angretti v. ANR Freight System Inc.*, 982 F.2d 242, 246-48 (7th Cir.

1992) (a non-party to settlement agreement has no standing to object to class action settlement").

Here, Objectors William and Nancy Ehorn do not have standing to object to the Settlement, as

they are not members of the Class; the Ehorns do not own any ProLine casement, awning, or

transom windows, which are all that the Settlement covers.[24]  *Gould v. Alleco, Inc.*, 883 F.2d

281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only

class members to object to settlement proposals.").

Furthermore, purported objector Dave Thomas, represented by Mr. Palmer, has not

complied with the requirements for filing an objection and therefore his objection should be

disregarded per this Court's order. (*See* D.E. # 301 at 7(b) ("Any papers not filed and served in

the prescribed manner and time will not be considered at the Final Approval Hearing, and all

objections not made in the prescribed manner and time shall be deemed waived.").) Importantly,

---

lack of subjective interest,' but only if . . . 'they virtually have abdicated to their attorneys conduct of the case.'" *London v. Wal-Mart Stores, Inc.*,  340 F.3d 1246, 12554 (11th Cir. 2003).

[24]  When this issue was raised at Preliminary Approval, the Ehorns' counsel did not deny the facts. He instead argued that, even though "the Ehorns don't have ProLine windows . . . the Ehorns' opinions regarding the proposed settlement are certainly relevant under any of the tests of reasonableness suggested by the parties . . . ." (D.E. # 292-1 at 9)  There was no authority cited for that proposition then, and none exists now. The Ehorns, as a matter of law, lack standing.

Mr. Thomas failed to cooperate with Class Counsels' efforts to discover whether Mr. Thomas is properly part of the class, because his counsel, Mr. Palmer, not only failed to comply with the Court's Order regarding setting forth the content of objections, but he also refused to present Mr. Thomas for deposition. As this Court is aware, it ordered as part of preliminary approval of the Settlement that "Any Settlement Class member who objects . . .. shall make themselves available to be deposed by Class Counsel . . . in the county of the objector's . .. residence within 21 days of service of his or her timely written objections." (D.E. # 301 at 7(c)).[25] Mr. Thomas' objections should be rejected for his (and his counsel's) violation of this Court's Preliminary Approval Order, and because he has not established his standing to object.[26]

### F. Analysis Of What Objectors Would Get Under The Settlement Establishes The Unfounded Nature Of Their Objection

The other two Lang Group clients, Mr. Eubank and Mr. Riva are made whole by the Settlement. Of his 35 windows, Mr. Riva has only one (1) ProLine window which has neither been replaced not manifested any wood rot (D.E. # 289 at 20), and as Pella explained, even if all of Mr. Eubank's ProLine windows had wood rot (that is Eligible Damage), he would be made whole, even under the figures used by the Lang objectors (D.E. # 289 at 20). These facts support

---

[25] In furtherance of that Order, on February 1, 2013, Class Counsel duly noticed, through his counsel, the deposition of Mr. Thomas for February 11, 2013, in La Mesa, CA, and enclosed a copy of the Order. *See* Exhibit D. In an email sent the morning of the deposition of Mr. Thomas, Mr. Palmer claimed to Class Counsel that he was not able to present his client on that day because Mr. Palmer was overseas until February 13, 2013, the following Wednesday. *See* Exhibit E, February 11, 2013 Email from Palmer to Shub. Class Counsel appeared at the deposition, and Mr. Thomas did not appear. *See* 2/11/13 Statement of Nonappearance, attached as Exhibit F. However, Mr. Palmer was not "overseas" as he claimed. In fact, Mr. Palmer appeared in court in the Northern District of California on February 12, 2013 before the Honorable Susan Illston to face sanctions as counsel for an objector (who happened to be his wife) in *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 07-MDL-1827 SI., Feb. 12, 2013 Tr., pp. 3:4-4:8, 8:7-9:16 (attached as Exhibit G). Ironically, the basis for sanctions was his refusal to produce his client for deposition notwithstanding the court's order to do so. *Id.*, pp. 8:7-9:16, 11:5-12. Class Counsel reserve the right to seek sanctions against Mr. Palmer in this case for the costs incurred relating to the deposition of his client.

[26] The fact that Mr. Thomas is represented by Mr. Palmer is a further basis for skepticism regarding Mr. Thomas' standing as Mr. Palmer has a demonstrated track record of putting forth objectors who lack standing. (*See* D.E. # 333-1 at 6).

the adequacy of the Settlement.

Likewise, Mr. Schulte is made whole under the settlement. He has suffered no Eligible Damage, i.e. wood rot. Deposition of Lyle Schulte, February 19, 2013 ("Schulte Depo."), p. 51:1-8, attached as Exhibit I. Also, he is not even certain if he has ProLine casement windows. Ex. I, pp. 45:1-5, 11-19. Moreover, only one window has been replaced in his home, which was done so by the prior owner and paid for by the prior owner, for a problem outside the realm of this Settlement.[27] Mr. Schulte's primary concern was the coverage for possible future damage to his windows (Ex. I, pp. 51:6-8, 97:5-98:4), and this concern is addressed by the Future Relief provided under the Settlement. (*See* D.E. # 277-1 at 99.)

### G. The Pro Se Objectors

Of the three remaining objectors, two are Class members genuinely seeking guidance, and not properly seen as objectors. Mr. Fernando's filing (D.E. # 330) presented his misunderstanding about warranty coverage he had been seeking prior to the Settlement being curtailed. Mr. Fernando's objection was that in spite of warranty claims being made within the 10 year warranty period, the Settlement fixed the "end point" for warranty claims, the Settlement Claim date and not the earlier claim date. This is a misreading of the Settlement. Class Counsel has reviewed the matter with Defense Counsel and all acknowledge that any claims for particular windows made during the warranty period will be considered as made within the warranty

---

[27] Of the twenty (20) windows in the home he had purchased in 2012, one had developed condensation between the panes. Ex. I, pp. 31:8-25, 43:15-44:4. Inspection by a professional home inspector and by Mr. Schulte discovered no wood rot at any of the windows, not even the one with condensation between the panes. Ex. I, pp. 43:15-17, 45:24-46:3, 70:12, 96:5-8. Even the condensation in the one window, which was a double-hung window and is not part of the class, caused Mr. Schulte no harm because the fogging was discovered before he purchased the home, and the prior owner arranged for replacement. Ex. I, pp. 41:15-19, 70:5-11. Indeed, Mr. Schulte's documents showed that this window had been replaced under warranty by Pella for IG Seal Failure NOT any wood rot. *See* Ex 1C to Ex. I. Ultimately, IG Seal failures are not even covered by the Settlement. Finally, 19 of Schulte's 20 windows are double-hung windows, and therefore not part of the class.

irrespective of the later Settlement Claim date filing. Class Counsel and Pella Counsel have communicated this to Mr. Fernando. Richard Burke, one of Class Counsel, has addressed Mt. Fernando's concerns in a letter dated February 7, 2013. *See* Letter to Fernando, attached as Exhibit J. Similarly, Mr. Thoresen makes clear that his letter was meant to be a "placeholder" (D.E. # 329) while he seeks to appreciate how to best proceed with his claim and obtain more information about the scope of damages covered by the arbitration provided for under the Settlement. His main complaint appears to be that he wants Pella to replace his 1995 windows, and that replacing the 1995 windows will cost more than $6,000. Class Counsel has called and left messages to speak with Mr. Thoresen but have not yet been able to reach him.

Lastly, Mr. Solberg's "objection" should simply be disregarded as entirely deficient. While objections were required to state each specific reason for the objection, Mr. Solberg failed to comply with this simple requirement. He only sent a letter addressed to Class Counsel and Counsel for Pella which merely stated, in its entirety: "As of today's date, January 28, 2013, I own the home located at 710 Ashland Avenue, River Forest, Illinois 60305. This home contains Pella ProLine Casement Windows. I object to the proposed settlement. Should you have any questions or concerns, feel free to contact me." He provides no reason for his objection, and it should therefore be overruled.[28]

## VI.    CONCLUSION

For the foregoing reasons, the Court should finally approve Plaintiffs' Settlement with Pella; certify the Settlement Class and appoint Plaintiffs as representatives thereof; appoint Plaintiffs' counsel as Class Counsel, and grant Class Counsel's Motion for Approval of

---

[28] When Class Counsel contacted Mr. Solberg to answer any questions he had, he informed Class Counsel that (i) he was the brother of an attorney at the Anderson Wanca law firm for which Mr. Oppenheim, Mr. Lang's co-counsel, works, and (ii) that he did not have any specific questions or issues that he wanted to discuss with Class Counsel.

Attorneys' Fees, Costs and Expenses and for Approval of Incentive Awards.  The Settlement is fair, reasonable, and adequate and, therefore, deserving of final approval.

DATED: March 11, 2013                     Respectfully submitted,

                                          **DR. LEONARD E. SALTZMAN, TIM**
                                          **BASTIAANSE, JOSEPH PALMIOTTO, BRAD**
                                          **ZURN, and JUDITH MCCLOSKY,**
                                          **Class Plaintiffs,**


                                           /s/ Richard J. Burke
                                          Richard J. Burke
                                          Paul M. Weiss
                                          Julie D. Miller
                                          **COMPLEX LITIGATION GROUP LLC**
                                          513 Central Avenue, Suite 300
                                          Highland Park, IL 60035
                                          (847) 433-4500
                                          rich@complexlitgroup.com
                                          paul@complexlitgroup.com
                                          julie@complexlitgroup.com

                                          Jonathan Shub
                                          **SEEGER WEISS LLP**
                                          1515 Market St., Suite 1380
                                          Philadelphia, PA  19102
                                          (215) 564-2300
                                          jshub@seegerweiss.com

                                          Steven R. Jaffe
                                          Mark Fistos
                                          **FARMER JAFFE, WEISSING, EDWARDS,**
                                          **FISTOS & LEHRMAN, P.L.**
                                          425 North Andrews Ave., Suite 2
                                          Ft. Lauderdale, FL 33301
                                          (954) 524-2820
                                          steve@pathtojustice.com
                                          mark@pathtojustice.com

                                          Ben Schwartzman
                                          **BANDUCCI WOODARD SCHWARTZMAN**
                                          **PLLC**
                                          802 W. Bannock Street, Suite 500
                                          Boise, Idaho 83702
                                          (208) 342-4411
                                          BScwartzman@BWSlawgroup.com

                                          *Attorneys for Plaintiffs and Settlement Class*