

CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# In the
# United States Court of Appeals
## For the Seventh Circuit

————————

Nos. 13-2091, -2133, -2136, -2162, -2202

KENT EUBANK, *et al.*,

*Plaintiffs-Appellants,*

*and*

LEONARD E. SALTZMAN, *et al.*,

*Plaintiffs-Appellees,*

*v.*

PELLA CORPORATION and PELLA WINDOWS
AND DOORS, INC.,

*Defendants-Appellees.*

APPEALS OF: RON PICKERING and MICHAEL J. SCHULZ,

*Objecting class members.*

————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 06 C 4481 — **James B. Zagel**, *Judge.*

————————

ARGUED APRIL 22, 2014 — DECIDED JUNE 2, 2014

————————

Before POSNER, WILLIAMS, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. The class action is an ingenious procedural innovation that enables persons who have suffered a wrongful injury, but are too numerous for joinder of their claims alleging the same wrong committed by the same defendant or defendants to be feasible, to obtain relief as a group, a class as it is called. The device is especially important when each claim is too small to justify the expense of a separate suit, so that without a class action there would be no relief, however meritorious the claims. Normally only a few of the claimants are named as plaintiffs (sometimes only one, though there are several in this case). The named plaintiffs are the representatives of the class—fiduciaries of its members—and therefore charged with monitoring the lawyers who prosecute the case on behalf of the class (class counsel). They receive modest compensation, in addition to their damages as class members, for their normally quite limited services—often little more than sitting for a deposition—as class representatives. Invariably they are selected by class counsel, who as a practical matter control the litigation by the class. The selection of the class representatives by class counsel inevitably dilutes their fiduciary commitment.

The class action is a worthwhile supplement to conventional litigation procedure, David L. Shapiro, "Class Actions: The Class As Party and Client," 73 *Notre Dame L. Rev.* 913, 923–24 (1998); Arthur R. Miller, "Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the 'Class Action Problem'," 92 *Harv. L. Rev.* 664, 666–68 (1979), but it is controversial and embattled, see Robert H. Klonoff, "The Decline of Class Actions," 90 *Wash. U. L. Rev.* 729, 731–33 (2013), in part because it is frequently abused. Martin H. Re-

dish, *Wholesale Justice: Constitutional Democracy and the Problem of the Class Action Lawsuit* 1–2 (2009); Jonathan R. Macey & Geoffrey P. Miller, "The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform," 58 *U. Chi. L. Rev.* 1, 3–4 (1991); John C. Coffee, Jr., "Rethinking the Class Action: A Policy Primer on Reform," 62 *Ind. L.J.* 625, 627 (1987). The control of the class over its lawyers usually is attenuated, often to the point of nonexistence. Except for the named plaintiffs, the members of the class are more like beneficiaries than like parties; for although they are authorized to appeal from an adverse judgment, *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2379 (2011); *Devlin v. Scardelletti*, 536 U.S. 1, 9–10 (2002), they have no control over class counsel. In principle the named plaintiffs do have that control, but as we've already hinted this is rarely true in practice. Class actions are the brainchildren of the lawyers who specialize in prosecuting such actions, and in picking class representatives they have no incentive to select persons capable or desirous of monitoring the lawyers' conduct of the litigation.

A high percentage of lawsuits is settled—but a study of certified class actions in federal court in a two-year period (2005 to 2007) found that *all* 30 such actions had been settled. Emery G. Lee III et al., "Impact of the Class Action Fairness Act on the Federal Courts" 2, 11 (Federal Judicial Center 2008). The reasons that class actions invariably are settled are twofold. Aggregating a great many claims (sometimes tens or even hundreds of thousands—occasionally millions) often creates a potential liability so great that the defendant is unwilling to bear the risk, even if it is only a small probability, of an adverse judgment. At the same time, class counsel, ungoverned as a practical matter by either the named plaintiffs

or the other members of the class, have an opportunity to maximize their attorneys' fees—which (besides other expenses) are all they can get from the class action—at the expense of the class. The defendant cares only about the size of the settlement, not how it is divided between attorneys' fees and compensation for the class. From the selfish standpoint of class counsel and the defendant, therefore, the optimal settlement is one modest in overall amount but heavily tilted toward attorneys' fees. As we said in *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011), "we and other courts have often remarked the incentive of class counsel, in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers—the deal that promotes the self-interest of both class counsel and the defendant and is therefore optimal from the standpoint of their private interests. *Reynolds v. Beneficial National Bank*, [288 F.3d 277, 279 (7th Cir. 2002)]; *Culver v. City of Milwaukee*, [277 F.3d 908, 910 (7th Cir. 2002)]; *Greisz v. Household Bank (Illinois), N.A.*, 176 F.3d 1012, 1013 (7th Cir. 1999); *Duhaime v. John Hancock Mutual Life Ins. Co.*, 183 F.3d 1, 7 (1st Cir. 1999); *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 805 (3d Cir. 1995); *Plummer v. Chemical Bank*, 668 F.2d 654, 658 (2d Cir. 1982)."

Fortunately the settlement, including the amount of attorneys' fees to award to class counsel, must be approved by the district judge presiding over the case; unfortunately American judges are accustomed to presiding over adversary proceedings. They expect the clash of the adversaries to generate the information that the judge needs to decide the

case. And so when a judge is being urged by both adversaries to approve the class-action settlement that they've negotiated, he's at a disadvantage in evaluating the fairness of the settlement to the class. *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, *supra*, 55 F.3d at 789–90; Redish, *supra*, at 188.

Enter the objectors. Members of the class who smell a rat can object to approval of the settlement. See, e.g., *Reynolds v. Beneficial National Bank*, *supra*, 288 F.3d at 287–88; Edward Brunet, "Class Action Objectors: Extortionist Free Riders or Fairness Guarantors," 2003 *U. Chi. Legal F.* 403, 411–12. If their objections persuade the judge to disapprove it, and as a consequence a settlement more favorable to the class is negotiated and approved, the objectors will receive a cash award that can be substantial, as in *In re Trans Union Corp. Privacy Litigation*, 629 F.3d 741 (7th Cir. 2011).

In this case, despite the presence of objectors, the district court approved a class action settlement that is inequitable—even scandalous. The case underscores the importance both of objectors (for they are the appellants in this case—without them there would have been no appellate challenge to the settlement) and of intense judicial scrutiny of proposed class action settlements.

The suit was filed in the summer of 2006, almost eight years ago. Federal jurisdiction was based on the Class Action Fairness Act's grant of federal jurisdiction over class actions in which there is at least minimal (as distinct from complete) diversity of citizenship. 28 U.S.C. § 1332(d)(2)(A). The defendants are Pella Corporation and an affiliate that we can ignore. Pella is a leading manufacturer of windows. The suit alleges that its "ProLine Series" casement windows (a case-

ment window is a window attached to its frame by hinges at the side) manufactured and sold between 1991 and 2006 had a design defect that allowed water to enter behind the window's exterior aluminum cladding and cause damage to the window's wooden frame and to the house itself. Pella's sale of the defective windows is alleged to have violated the product-liability and consumer-protection laws of a number of states in which the windows were sold.

The district judge certified two separate classes: one for customers who had already replaced or repaired their defective windows, the other for those who hadn't. The latter class sought only declaratory relief and so was nationwide, but the former sought damages and was limited to customers in six states, with a separate subclass for each state. We upheld the certifications over Pella's objections in *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) (per curiam).

Class counsel negotiated a settlement of the class action with Pella in the fall of 2011. The district judge gave final approval to the settlement in 2013, precipitating the objectors' appeals. The settlement agreement ignores the certification of the two classes and purports to bind a single nationwide class consisting of all owners of Pella ProLine windows containing the defect, whether or not the owners have already replaced or repaired the windows. This provision is the first of many red flags that the judge failed to see: "the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups." *In re Joint Eastern & Southern District Asbestos Litigation*, 982 F.2d 721, 743 (2d Cir. 1992); see also *Amchem Products, Inc. v.*

*Windsor*, 521 U.S. 591, 627–28 (1997); *Smith v. Sprint Communications Co.*, 387 F.3d 612, 614–15 (7th Cir. 2004).

Initially there was only one named plaintiff, a dentist named Leonard E. Saltzman. His son-in-law, Paul M. Weiss, was lead counsel for the class, continuing in that role throughout the district court proceedings that culminated in the approval of the settlement. Technically the law firm of which he is the founder and senior partner (Complex Litigation Group LLC) is a lead class counsel too, along with two of his partners in the firm. The settlement agreement designates still another firm as a lead class counsel as well; but the fee petition describes that firm as merely a class counsel. The agreement gave lead class counsel "sole discretion" to allocate the award of attorneys' fees to which the parties had agreed among the class counsel, and Weiss proposed to allocate 73 percent of the fees to his own firm. Realistically *he* was the lead class counsel.

Weiss's wife—Saltzman's daughter—is a lawyer too, and a partner in her husband's firm. Both spouses are defendants in a lawsuit charging them with misappropriation of the assets of their former law firm, Freed & Weiss LLC, and other misconduct relating to that firm. *Freed v. Weiss*, No. 2011-CH-41529 (Ill. Cook County Ch. Div.). Weiss is also a defendant in a second, similar suit, *Lang v. Weiss*, No. 2012-CH-05863 (Ill. Cook County Ch. Div.). (The two suits are discussed in Sarah Zavala, "Cook County Suits Involve Alleged Takeover at Freed and Weiss," *Madison-St. Clair Record*, March 7, 2012, pp. 1, 8.) The Freed & Weiss firm was still another class counsel in the present case; and one of the objectors points out that "the dissolution and descent into open warfare that consumed Freed & Weiss in 2011 and 2012

clearly rendered that firm inadequate class counsel, especially in light of the articulated financial needs of the partners that drove the settlement of this case." And six weeks ago the Hearing Board of the Illinois Attorney Registration and Disciplinary Commission recommended in a 94-page report that the Supreme Court of Illinois suspend Weiss from practicing law for 30 months because of repeated misconduct. *In re Paul M. Weiss*, No. 08 CH 116 (Ill. Att'y Registration & Disciplinary Commission Hearing Board, Apr. 17, 2014). The recommended penalty is severe by Illinois standards; the state allows lawyers sanctioned with "disbarment" to apply for reinstatement to the bar after 60 (in some cases just 36) months. Ill. S. Ct. R. 767(a); Illinois Attorney Registration & Disciplinary Commission, *Annual Report of 2013*, at 21, 25.

The impropriety of allowing Saltzman to serve as class representative as long as his son-in-law was lead class counsel was palpable. See *Greisz v. Household Bank (Illinois)*, 176 F.3d 1012, 1014 (7th Cir. 1999); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1155 (8th Cir. 1999); *Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102, 104 (5th Cir. 1978); *Turoff v. May Co.*, 531 F.2d 1357, 1360 (6th Cir. 1976) (per curiam); "Developments in the Law—Class Actions," 89 *Harv. L. Rev.* 1318, 1585–86 n. 29 (1976). Weiss may have been desperate to obtain a large attorney's fee in this case before his financial roof fell in on him.

Early in the case four other class members had been added as plaintiffs, making a total of five including Saltzman. When the settlement was presented to the district court for preliminary approval, the four class members who had been added as named plaintiffs opposed it, leaving only Saltzman among the original class members to support it. But pursu-

ant to a motion filed by George Lang, who at the time was a partner of Weiss, four other class members were added as named plaintiffs. (Lang says that Weiss rather than he picked them.)

Weiss removed the original four class members who had opposed the settlement; naturally their replacements joined Saltzman in supporting it.

Lang now represents the defrocked named plaintiffs, who are four of the six objectors. A lawyer's switching sides in the same lawsuit would normally be considered a fatal conflict of interest, but the courts are lenient when it is a class action lawyer. E.g., *Bash v. Firstmark Standard Life Ins. Co.*, 861 F.2d 159, 161 (7th Cir. 1988). For often "only the attorneys who have represented the class, rather than any of the class members themselves, have substantial familiarity with the prior proceedings, the fruits of discovery, the actual potential of the litigation. And when an action has continued over the course of many years, the prospect of having those most familiar with its course and status be automatically disqualified whenever class members have conflicting interests would substantially diminish the efficacy of class actions as a method of dispute resolution." *In re "Agent Orange" Product Liability Litigation*, 800 F.2d 14, 18–19 (2d Cir. 1986).

As finally approved by the district judge, the settlement directed Pella to pay $11 million in attorneys' fees to class counsel. The basis of this figure was the plaintiffs' claim that the settlement was worth $90 million to the class. Were that so, then considering the multistate scope of the suit and perhaps the length of time that elapsed between its filing and the approval of the settlement by the district court in May

2013 (our "perhaps" reflecting doubt that the time was well spent), the fee award, equal to 12 percent of the amount of the settlement earmarked for the class members, would have been defensible. But the settlement did not specify an amount of money to be received by the class members as distinct from class counsel. Rather it specified a procedure by which class members could claim damages. So there was an asymmetry: class counsel was to receive its entire award of attorneys' fees up front; class members were to obtain merely contingent claims, albeit with a (loosely) estimated value of $90 million (actually far less, as we'll see).

The named plaintiffs were each awarded compensation (an "incentive award," as it is called) for their services to the class of either $5,000 or $10,000, depending on their role in the case. Saltzman, being the lead class representative, was slated to be a $10,000 recipient.

Although the judge rightly made incentive awards to the class representatives who had opposed the settlement as well as to those who had approved it, the settlement agreement itself had provided for incentive awards only to the representatives who supported the settlement. This created a conflict of interest: any class representative who opposed the settlement would expect to find himself without any compensation for his services as representative. Still another questionable provision of the settlement, which the judge refused to delete, made any reduction in the $11 million attorneys' fee award revert to Pella, rather than being added to the compensation of the class members.

Not only did the settlement agreement not quantify the benefits to the class members, but the judge approved it before the deadline for filing claims. He made no attempt to

estimate how many claims were likely to be filed, though without such an estimate no responsible prediction of the value of the settlement to the members of the class could be made. Furthermore, the judge's approval of the settlement (over the objection of the former class representatives and other class members) is squeezed into two two-page orders (the second addressed to the attorneys' fee award) that ignore virtually all the objections to the settlement. Unheeded was our warning that "because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (citations omitted).

The settlement should have been disapproved on multiple grounds. To begin with, it was improper for the lead class counsel to be the son-in-law of the lead class representative. Class representatives are, as we noted earlier, fiduciaries of the class members, and fiduciaries are not allowed to have conflicts of interest without the informed consent of their beneficiaries, which was not sought in this case. Only a tiny number of class members would have known about the family relationship between the lead class representative and the lead class counsel—a relationship that created a grave conflict of interest; for the larger the fee award to class counsel, the better off Saltzman's daughter and son-in-law would be financially—and (which sharpened the conflict of interest) by a lot. They may well have had an acute need for an infusion of money, in light not only of Weiss's ethical embroilment, which cannot help his practice, but also

of the litigation against him by his former law partners and his need for money to finance his new firm. The appellees (primarily Saltzman, who is still a named plaintiff, and Pella) point out that Saltzman was one of five class representatives, and the other four didn't have a conflict of interest. But the four other *original* class representatives had opposed the settlement, whereupon they had been replaced by new named plaintiffs—selected by the conflicted lead class counsel.

Weiss's ethical embroilment was another compelling reason for kicking him and Saltzman off the case. The disciplinary proceeding against Weiss was already under way when the settlement agreement was negotiated. It was very much in his personal interest, as opposed to the interest of the class members, to get the settlement signed and approved *before* the disciplinary proceeding culminated in a sanction that might abrogate his right to share in the attorneys' fee award in this case. He could negotiate a quick settlement only by giving ground to Pella, which upon discovering the box that Weiss was in would have stiffened its terms (it plays hardball, as its conduct throughout this litigation has demonstrated).

So Weiss's ethical troubles should have disqualified him from serving as class counsel even if his father-in-law hadn't been in the picture. Another suspicious feature of the settlement, doubtless also related to Weiss's woes, was Pella's agreeing to a $2 million advance of attorneys' fees to lead class counsel before notice of the settlement was sent to the members of the class.

Counsel for a certified class is appointed by the district judge presiding over the class action, and in deciding to appoint a lawyer to be class counsel the court "may consider,"

besides the lawyer's competence, experience, and related professional qualifications, "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B), (g)(4). "When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class." *Creative Montessori Learning Centers v. Ashford Gear LLC, supra*, 662 F.3d at 918. Weiss was unfit to represent the class.

Rule 23(a)(4) of the Federal Rules of Civil Procedure requires that "the representative parties will fairly and adequately protect the interests of the class." This both Saltzman and the other class representatives who approved the settlement failed to do. The settlement that the district judge approved is stacked against the class. Pella itself estimates the value of the settlement to the class at only $22.5 million—and that is an overestimate. The settlement strews obstacles in the path of any owner of a defective ProLine Series casement window. A member of the class may either file a claim with Pella, period, or file a claim that he must submit to arbitration with Pella. If he chooses the first option, he is limited to a maximum damages award of $750 per "Structure," confusingly defined not as a window but as the entire building containing the window. There's also a per-window damages cap that ranges from $60 to $100 (with an additional $0 to $250 for the cost of installation), depending on when the class member purchased his window and when he replaced it. And the cap falls to zero unless he gave "notice" to Pella before replacing the defective window.

A class member who chooses arbitration can receive up to $6000 per "Structure" (defined the same way), and doesn't

have to prove that his window or windows were in fact defective, only that they were in the category of Pella windows that contained the design defect. But if Pella convinces the arbitrator that the damage the claimant is seeking compensation for was not caused by the defect or by "any other defect in the structure" (whatever that means), or that the claimant was compensated for the damage from some other source, the claimant gets nothing; and likewise if Pella successfully interposes a complete defense, such as that the statute of limitations had run. The settlement allows Pella to assert ten categories of defenses, including "natural weathering." And the limitations periods applicable to the class members' claims vary from three to five years and involve different accrual and tolling rules. Statutes of repose are also in the picture.

Pella also reserved in the settlement agreement the right to plead and prove partial defenses such as comparative fault and failure to mitigate damages. And some claimants are entitled only to "coupons" (discounts on *future* purchases of Pella windows, discounts that may be worth very little to current owners of Pella's defective windows)—a warning sign of a questionable settlement. *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006); *In re HP Inkjet Printer Litigation*, 716 F.3d 1173, 1179–80 (9th Cir. 2013); Christopher R. Leslie, "The Need to Study Coupon Settlements in Class Action Litigation," 18 *Geo. J. Legal Ethics* 1395, 1396–98 (2005); Geoffrey P. Miller & Lori S. Singer, "Nonpecuniary Class Action Settlements," *Law & Contemp. Probs.*, vol. 60, Autumn 1997, pp. 97, 108; cf. 28 U.S.C. § 1712 (Coupon Settlements).

Nos. 13-2091, -2133, -2136, -2162, -2202                    15

Some class members may be entitled only to an extension of warranty, under a program (the "ProLine Service Enhancement Program") that Pella had adopted *before* the settlement and that requires class members to deduct $100 per window from the cost of installation or other labor services required to replace it. The $90 million estimate of the value of the settlement to the class includes the value of these warranty extensions even though they were a contractual entitlement that preceded the settlement rather than being conferred by it and thus were not part of the value created by the settlement, although the settlement does forbid Pella to revoke the extensions, which confers a bit of extra value.

The claim forms are long—12 pages for the "simple" claim with its $750 ceiling, 13 pages for the claim that has the higher ceiling ($6000) but requires the claimant to run the gauntlet of arbitration, doubtless without assistance of counsel or expert witnesses, because the legal fees and experts' fees would quickly mount to or above $6000, leaving the claimant with nothing or even less than nothing: additional bills to pay. There is no provision for shifting the legal or expert-witness costs of a victorious claimant in the arbitration proceeding to Pella.

Both forms require a claimant to submit a slew of arcane data, including the "Purchase Order Number," "Glass Etch Information," "Product Identity Stamp," and "Unit ID Label" of each affected window. The claim forms are so complicated that Pella could reject many of them on the ground that the claimant had not filled out the form completely and correctly.

And that's assuming that class members even *attempt* to file claims. The notice of settlement that was sent to them is

divided into 27 sections, some with a number of subsections. For example, the section on eligibility for benefits under the settlement lists nine criteria that must be satisfied while the section on "How Do I Get Out of the Settlement?" specifies six requirements that must be met for a class member to be allowed to opt out of the settlement. And to object to the settlement the class member must satisfy seven other criteria, one of which is again multiple, as it requires listing "each specific reason for your objection."

Considering the modesty of the settlement, the length and complexity of the forms, and the unfamiliarity of the average homeowner with arbitration, we're not surprised that only 1276 claims (of which only 97 sought arbitration) had been filed as of February 2013, out of the more than 225,000 notices that had been sent to class members. The claims sought in the aggregate less than $1.5 million and were likely to be worth even less because Pella would be almost certain to prevail in some, maybe most, of the arbitration proceedings. It's been found that on average consumers prevail in arbitration roughly half the time, and those who win are awarded roughly half of what they seek. Christopher R. Drahozal & Samantha Zyontz, "An Empirical Study of AAA Consumer Arbitrations," 25 *Ohio St. J. Dispute Resolution* 843, 898–900 (2010). The implication is that Pella would be able to knock 75 percent off the damages sought by class members who filed claims that were submitted to arbitration.

A class recovery of little more than $1 million is a long way from the $90 million that the district judge thought the class members likely to receive were the suit to be litigated. It's true that another 9500 or so simple claims were filed after the district court entered its final judgment, plus another

1387 claims that would require arbitration. But Pella's estimate that the class will recover $22.5 million assumes against all reason that every one of the claims will reap the maximum authorized benefits—$750 for the simple claims and $6000 for the claims that go to arbitration. And that recovery would be only $17 million, not $22.5 million (Pella contends, however, that the extension of its warranty is worth another $5.5 million to the class). There is no evidence that Pella would pay the maximum benefits on all, or indeed on any, of the claims.

If the average payment were half the amount of the claim—a very generous assumption given the estimate of a 75 percent success rate for Pella—the aggregate value of the settlement to the class ($8.5 million) would be less than the attorneys' fees ($11 million). Even the $8.5 million figure is an exaggeration, because the settlement subtracts from the award compensation received from any other source—and one of the other sources is the warranty program.

We don't understand the judge's valuing the settlement at $90 million or thinking the feeble efforts of class counsel led by Weiss to obtain benefits for the class (as distinct from benefits for themselves in the form of generous attorneys' fees) worth $11 million. The restrictions that Pella was allowed to place on the settlement would, if upheld, enormously reduce the class members' recovery of their losses, and the residue is to be returned to Pella. Class counsel sold out the class.

The class as we said could not expect to receive more than $8.5 million from the settlement, given all the obstacles that the terms of the settlement strewed in the path of the class members. And even that figure seems too high. For if

the class received that amount, this would indicate that Pella had agreed to pay attorneys' fees equal to 56 percent of the total settlement ($11 million = .56 × ($8.5 million + $11 million)) in order to induce class counsel to settle the case on terms that would minimize Pella's overall liability.

We note the remarkable statement in Saltzman's brief defending the settlement that "in comparison to this $90 million independent valuation of the Settlement, a trial of the certified claims here, even with a complete victory, would result in an award of $0." Zero? But if Pella has no liability, why would it agree to a $33.5 million settlement ($22.5 million in estimated damages plus the $11 million in attorneys' fees)? Saltzman appears to believe that the alternative of litigating the class action to judgment would be infeasible because the court would go crazy trying to determine the damages of each of several, maybe many, thousand class members. He neglects to mention that we rejected this argument when we approved class certification. *Pella Corp. v. Saltzman*, *supra*, 606 F.3d at 395–96; see also 1966 Advisory Committee Notes to Fed. R. Civ. P. 23; *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013); *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, 722 F.3d 838, 860–61 (6th Cir. 2013); *Tardiff v. Knox County*, 365 F.3d 1, 6–7 (1st Cir. 2004); 2 *Newberg on Class Actions* § 4:54, pp. 205–10 (5th ed. 2012). Pella argues that it would fight the individual damages claims if the case were litigated. But the settlement agreement allows it to fight the damages claims submitted to it pursuant to the agreement.

In the district court Saltzman valued the case if it went to trial at $50 million. If he was lying and actually thinks the

case worthless, how could he have been an effective class representative even if he had had no conflict of interest?

The mystery deepens: Pella thinks the case if tried would be worth only $14.5 million to the class members. If that is so, why has it agreed to a settlement that it claims will cost it $33.5 million? Because it would incur legal fees and other expenses of more than $19 million ($14.5 million + $19 million = $33.5 million)? But if the case were tried, class counsel would incur heavy expenses as well, which would induce it to settle for less than $14.5 million. The truth must be that, protected by the bristling technicalities of the settlement agreement, Pella does not believe that the settlement will cost it anywhere near $14.5 million.

If Saltzman is right and damages if the case were tried would be zero, a settlement of $90 million would be a remarkable achievement. (Also an inexplicable one.) But the district judge did not find that the trial would yield zero damages. He didn't estimate the likely outcome of a trial, as he should have done in order to evaluate the adequacy of the settlement. *Reynolds v. Beneficial National Bank, supra*, 288 F.3d at 285.

Saltzman as we said defends the $90 million figure as an "independent valuation" of the settlement. But the only evidence we can find supporting that valuation is the affidavit of an accountant—hired and paid by Weiss's law firm, so hardly independent. Maybe by "independent" Saltzman is referring (though he doesn't say so) to the fact that the settlement was mediated by two retired judges. One, however, stopped mediating (we don't know why) before the negotiations were completed and the other limited his mediation to issues of attorneys' fees.

Saltzman and Pella argue that the objectors did not present an expert witness to support their estimate of the value of the litigation, and Saltzman did: the brother of one of Saltzman's lawyers! Anyway Saltzman has implicitly repudiated his expert, who did *not* testify that the value of the suit if litigated was $0.

Saltzman and Pella point out that the notice of the settlement sent to the class members provoked few objections. Of course not; it was not intended to; it was incomplete and misleading. It failed to mention that four of the five original class representatives had opposed the settlement and been promptly replaced by other persons, selected by class counsel; that the only original representative who had supported the settlement was the father-in-law of the lead class counsel who was both in financial trouble and ethically challenged; that up to half the recipients of the notice would if they filed a claim and it was accepted receive only a coupon discount on a future purchase of a Pella window; and that four of the original class representatives believed the notice of the settlement misleading because it implied that class members would be guaranteed at least $750 or $6000 in response to their claim, whereas these were ceilings and were not even potential payments to those class members entitled only to coupons. The judge was informed of these objections to the notice but declined to order it modified. He said that the notice was "fair," that it was "a neutral communication from the court." It was not neutral and it did not provide a truthful basis for deciding whether to opt out. The judge said the objectors could send their own notice to the class members. But what would the recipient of two conflicting notices do? And it wouldn't be just two. For if the objectors sent their own notice class counsel would send out a rebuttal notice.

Better for the court to make sure that the single notice it sent would be a responsible communication rather than an un-candid communication from class counsel than to subject the class members to a blizzard of conflicting notices.

All this is academic, however, because opting out of a class action is very rare. Virtually no one who receives notice that he is a member of a class in a class action suit opts out. He doesn't know what he could do as an opt-out. He's unlikely to hire a lawyer to litigate over a window. In fact the opt-outs in this case were only one twentieth of one percent of the recipients of the notice of approved settlement. A study of other product-liability class actions found that the average opt-out percentage was less than one tenth of one percent. Theodore Eisenberg & Geoffrey Miller, "The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues," 57 *Vand. L. Rev.* 1529, 1549 (2004); see also *Mars Steel Corp. v. Continental Illinois National Bank & Trust Co. of Chicago*, 834 F.2d 677, 680–81 (7th Cir. 1987). Contrary to the statement in Pella's brief, a low opt-out rate is no evidence that a class action settlement was "fair" to the members of the class.

In sum, almost every danger sign in a class action settlement that our court and other courts have warned district judges to be on the lookout for was present in this case. See, e.g., *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, *supra*, 463 F.3d at 654; *Smith v. Sprint Communications Co.*, 387 F.3d 612, 614 (7th Cir. 2004); *Mirfasihi v. Fleet Mortgage Corp.*, *supra*, 356 F.3d at 785–86; *Reynolds v. Beneficial National Bank*, *supra*, 288 F.3d at 282–83; *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877, 880 (7th Cir. 2000); *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 946–47 (9th

Cir. 2011); *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). Most were not even mentioned by the district judge, and those that were received a brush-off. The settlement flunked the "fairness" standard by the one-sidedness of its terms and the fatal conflicts of interest on the part of Saltzman and Weiss. This is a case in which "the lawyers support the settlement to get fees; the defendants support it to evade liability; the court can't vindicate the class's rights because the friendly presentation means that it lacks essential information." *Kamilewicz v. Bank of Boston Corp.*, 100 F.3d 1348, 1352 (7th Cir. 1996) (dissent from denial of rehearing en banc).

A couple of loose ends remain to be tied up:

1. Saltzman has moved to dismiss the appeals on the ground that the appellants—objectors to the settlement approved by the district judge—lack standing to litigate their objections. Since absent objectors have standing to appeal from an adverse judgment, *Devlin v. Scardelletti, supra,* 536 U.S. at 14, named objectors must as well. Even named plaintiffs who *settle* nevertheless have standing to appeal a denial of class certification. *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 876 (7th Cir. 2012).

2. Objector Schulz asks us to sanction Saltzman's lawyers for filing the motion on standing. Saltzman's removal as lead plaintiff and his lawyers' removal as class counsel are sanction enough; because the motion on standing was indeed frivolous, little time was spent on it either by us judges or by the objectors' lawyers. Both motions (standing and sanctions) are therefore denied.

To conclude:

After eight largely wasted years, much remains to be done in this case. For starters, Saltzman, Paul Weiss, and Weiss's firm, Complex Litigation Group, must be replaced as class representative (Saltzman), and as class counsel (Weiss and his firm), respectively. And since we are rejecting the settlement agreement, the plaintiffs named in the third amended complaint, whom that agreement caused to be substituted for the original named plaintiffs (other than Saltzman), must be discharged and the four original named plaintiffs (whom we've called the "defrocked" plaintiffs) reinstated.

The judgment is reversed and the case remanded for further proceedings in conformity with this opinion.

REVERSED AND REMANDED.