**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KENT EUBANK, JERRY DAVIS, RICKY FALASCHETTI, RITA CICINELLI, ROBERT JOSEPHBERG, JEFFREY ACTON,  KENNETH HECHTMAN, LEO BATEMAN, JAMES NEIMAN, AMY CHASIN and EDWARD RUHNKE, individually and on behalf of all others similarly situated;<br><br>                    Plaintiff,<br><br>    v.<br><br>PELLA CORPORATION, an Iowa corporation, and PELLA WINDOWS AND DOORS, INC., a Delaware corporation,<br><br>                 Defendants. | No.: 06 C 4481<br><br>Honorable James B. Zagel |

## SEVENTH AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kent Eubank, Jerry Davis, Ricky Falaschetti, Rita Cicinelli, Robert Josepberg, Jeffrey Acton,  Kenneth Hechtman, Leo Bateman, James Neiman, Amy Chasin, and Edward Ruhnke, individually and on behalf of all others similarly situated, allege as and for their Class Action Complaint against Defendants Pella Corporation and Pella Windows and Doors, Inc. (collectively "Pella" or "Defendants"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigation made by their attorneys, as follows:

## INTRODUCTION

1.    This is class action brought by Plaintiffs on behalf of themselves and other consumers of Pella ProLine casement windows (collectively, "Pella windows" or "Pella ProLine

windows"), as defined more fully herein. Plaintiffs and the Class are owners of structures that contain Pella ProLine aluminum-clad casement windows. Unknown to Plaintiffs and the Class, Pella ProLine aluminum-clad casement windows contain a latent defect that allows water to penetrate and leak behind the aluminum cladding, resulting in premature wood rot and other physical damage to both the window and the main structure. Pella's acts and omissions in connection with its sale and delivery of these defective windows violate the consumer protection laws of the states of residence of Plaintiffs and the Class; Pella's acts and omissions constitute fraud and deception under the states' consumer fraud and deception statutes, breach of implied warranty and warrant declaratory relief as appropriate.

## <u>PARTIES</u>

1. *Kent Eubank*. Plaintiff Kent Eubank is a natural person and resident of Iowa.

2. *Jerry Davis*. Plaintiff Jerry Davis is a natural person and resident of Illinois.

3. *Ricky Falaschetti*. Plaintiff Rick Falaschetti is a natural person and resident of Illinois.

4. *Rita Cicinelli*. Plaintiff Rita Cicinelli is a natural person and resident of Michigan.

5. *Robert Josephberg*. Plaintiff Robert Josephberg is a natural person and resident of New York.

6. *Jeffrey Acton*. Plaintiff Jeffrey Acton is a natural person and resident of California.

7. *Kenneth Hechtman*. Plaintiff Kenneth Hechtman is a natural person and resident of Illinois

8. *Leo Bateman*. Plaintiff Leo Batemen is a natural person and resident of Florida.

9.      *James Neiman*. Plaintiff James Neiman is a natural person and resident of Florida.

10.     *Amy Chasin*. Plaintiff Amy Chasin is a natural person and resident of New Jersey.

11.     *Edward Ruhnke*. Plaintiff Edward Ruhnke is a natural person and resident of New Jersey.

12.     *Pella Corporation.*  Defendant Pella Corporation is a corporation organized under the laws of Iowa with its principal place of business in Pella, Iowa.

13.     *Pella Windows and Doors, Inc.*  Defendant Pella Windows and Doors, Inc., is a Delaware corporation with its principal place of business in Pella, Iowa.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the putative plaintiff class are citizens of States different from Defendants.

15.     Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391. Defendants regularly transact and solicit business in this District.

## OVERVIEW

16.     This case concerns Pella's failure to disclose to purchasers of its ProLine aluminum-clad casement windows (hereinafter, "aluminum-clad windows" or "windows" or "Pella windows") that there was a substantial risk those windows would develop leaks because of the defect alleged herein, and that (a) the defect might not manifest itself until after the warranty period expired, and that (b) if the latent defect did not manifest itself until after the warranty expired, Pella was not committed to repairing the windows.

-3-

17.     In essence, Pella knew, or should have known, prior to sale to Plaintiffs and the Class that, for the indefinite future, there was a substantial risk that its aluminum-clad windows would leak and would develop wood rot.  Knowledge and information of that risk and defect was known exclusively by Pella.  Nevertheless, Pella failed to disclose that risk and defect, thereby depriving consumers of the opportunity to negotiate additional warranty coverage, to negotiate a lower price to reflect the risk and defect or to simply avoid the risk and defect altogether by purchasing a different product.  Thereafter, the undisclosed risk and defect materialized – Plaintiffs' windows (and thousands of others) have leaked and rotted – and Plaintiffs and the Class have been damaged in the amount it will, or already has, cost to repair the defective windows and the damage caused by the defective windows.

18.     Consumers reasonably expect that their windows will not leak due to defective design and manufacturing processes and materials, and consumers reasonably had no expectation that Pella's windows would leak and cause damage.

19.     Further, consumers reasonably expect that if Pella knew or should have known that the subject windows had an inherent and substantial defect:

(a)     that a manufacturer such as Pella would make a disclosure to consumers if it determined there was a widespread leakage problem – i.e., that Pella would make a disclosure if it determined that the leakage risk was no longer insubstantial; and

(b)     that a manufacturer such as Pella would repair the latent defect – even if the defect did not manifest until after the warranty period expired – because the occurrences and potential causes of the defect are within Pella's exclusive control and responsibility as the designer and manufacturer of the product.

## PELLA'S CONDUCT WITH RESPECT
## TO THE WIDESPREAD LEAKAGE PROBLEM

20.     Prior to Plaintiffs' purchases, if not before, Pella knew or should have known that its windows contained an inherent defect that caused or permitted leakage.

21.     Pella knew or should have known that it was receiving and would continue to receive complaints and reports of leakage. Based on its accumulated experience and knowledge with consumer complaints about leakage and the defect of its windows, as well as its knowledge and history concerning window design and manufacturing, Pella also knew that if it devoted resources to ascertain the cause of the problem, it would take years and significant resources to: (a) identify the steps necessary to solve the problem, both retrospectively and prospectively; and (b) implement those steps.

22.     Thus, Pella knew or should have known that for the indefinite future: (a) there existed a substantial risk of leakage (and the attendant damages), (b) Pella's customers were unaware of that risk, and (c) Pella's customers had a reasonable expectation that Pella would timely disclose that risk and cure the latent defect, even if the defect (leakage) did manifest itself until after the warranty period had expired.

23.     Despite its exclusive knowledge, Pella did not disclose to prospective purchasers that: (a) there was a substantial risk their windows would manifest the defect (leaks), (b) the defect might not manifest itself until after the warranty expired, and (c) if the latent defect did not exhibit itself until after the warranty expired, Pella was not committing to repair the defect.

24.     Furthermore, when questioned by consumers about leakage problems, and instead of accepting responsibility for the defect, Pella claimed faulty installation, excessive humidity, and other factors as the culprit, or would simply deny claims as "out of warranty" without disclosing the defect.

25.     On information and belief, in an attempt to correct the defect, Pella subsequently changed the way it applies glue sealant to the window's sash line.  While the sealant had previously been manually applied, in or about April 2006, Pella purchased a machine that now mechanically applies the glue sealant.

26.     On information and belief, in an attempt to correct the defect, Pella subsequently changed the sealant applied to the wood behind the aluminum cladding.  The previous wood sealant had failed to protect the wood when exposed to moisture from leaking.

## NAMED PLAINTIFFS' ALLEGATIONS

27.     **Kent Eubank.** Plaintiff built his home in 1992, and had Pella "ProLine" aluminum-clad windows installed in his residence in West Des Moines, Iowa.  The cost of the windows, not including installation of finishing of wood trim, was approximately $20,000.00.

28.     Pella aluminum-clad wood windows, unknown to Plaintiff, were defective in that they allowed water to penetrate the area behind the aluminum cladding, which caused condensation, wood rot, leaks and other failures

29.     The characteristics of the window defect (that allowed for the water to penetrate the aluminum cladding and failed to protect the wood from rot) were present in the windows when they left the factory, and were part of the window by design and manufacture.

30.     In 2001, Plaintiff contacted Pella to correct a few problems at Pella's expense, which it refused on the grounds that the windows were no longer under warranty.  Pella applied silicon caulk around the windows as a repair and charged Plaintiff for it.

31.     In September 2006, Plaintiff discovered that several sashes had deteriorated, including one that had deteriorated to the point that the glass had fallen down about an inch behind the aluminum clad of the window.

32.     Upon discovering the aforesaid damage, Plaintiff again contacted Pella and requested repair or replacement of the windows at Pella's expense, which it refused on grounds that the windows were no longer under warranty.

33.     The following are representative of the defect and damage:

 

34.     **Jerry Davis.**  In 2000, Plaintiff purchased Pella "ProLine" aluminum-clad and Pella "Architect" windows, which were installed in his residence in Dix, Illinois.

35.     During the year 1999, Jerry Davis gave much consideration to his selection and purchase of windows for their home. As part of his selection process for windows, Jerry Davis encountered marketing materials for Pella in magazines such as Better Homes and Gardens and Midwest Living, and also in big box stores that sold Pella products. The advertisements by Pella displayed the yellow logo with the phrase: "Viewed to be the best." A representative logo and slogan are below:



## VIEWED TO BE THE BEST.®

36. Mr. Davis accepted as true Pella's representation; namely, that Pella was the best. Mr. Davis noted that no other manufacturer of similar type windows, such as Anderson or Marvin, made claims of being the best. In reliance on Pella's holding itself out as "the best," Jerry Davis chose to purchase Pella windows. At all times Mr. Davis remained unaware that the windows were defective and would fail as a result of the defect.

37. Six Pella aluminum-clad wood windows, unbeknownst to Plaintiff, were defective in that they allowed water to penetrate the area behind the aluminum cladding, which caused condensation, wood rot, leaks and other failures.

38. The characteristics of the window defect (that allowed for the water to penetrate the aluminum cladding and failed to protect the wood from rot) were present in the windows when they left the factory, and were part of the window by design and manufacture.

39. In July 2005, Plaintiff contacted Pella to replace, at Pella's expense, windows with leakage and wood rot. In October 2005, Pella refused such responsibility on the grounds that the windows were no longer under warranty.

40. In connection with examining the defective windows, a Pella technician told Plaintiff that the ProLine windows were "substandard." Consequently, Plaintiff replaced his Pella windows with a different brand of window, Earthwise.

41. The design and/or manufacturing defect, as well as Pella's failure to warn consumers of the defect over the years, have caused damage to Plaintiff's property.

42.     The following are representative of the defect and damage:

 

43.     **Ricky Falaschetti.**     Plaintiff's home was built in 1997, and which time he had Pella "ProLine" aluminum-clad windows installed in his residence in Frankfort, Illinois.

44.     Pella aluminum-clad wood windows, unbeknownst to Plaintiff, were defective in that they allowed water to penetrate the area behind the aluminum cladding, which caused condensation, wood rot, leaks and other failures.

45.     The characteristics of the window defect (that allowed for the water to penetrate the aluminum cladding and failed to protect the wood from rot) were present in the windows when they left the factory, and were part of the window by design and manufacture.

46.     In 2007 Plaintiff contacted Pella several times to complain of the windows leaking and rotting. Pella denied knowledge of a defect and denied responsibility for the leakage and rotting.

47.     Nevertheless, in Spring 2007, Pella sent a technician to inspect the windows in Plaintiff's home. At the time of the inspection by Pella, the technician instructed the Plaintiff to lay a bead of caulk around all of the windows where the aluminum clad meets the glass. Further,

-9-

the technician informed Plaintiff that some of the windows were beyond "repair" and, instead, needed replacement.

48.     Pella mailed to Plaintiff one replacement window, which Plaintiff paid to have stained and installed in Fall 2007. Thereafter, Pella sent Plaintiff four sashes (i.e., window frames). Plaintiff hired a contractor to install the sashes on the worst of the leaky, rotting windows. The contractor reported to Plaintiff that the sashes were not suitable for re-installation on any windows in the home, because the saches were not properly measured for the existing windows. The sashes were unusable.

49.     The subject windows have further deteriorated as a result of the defect. Many windows are inoperable, because the windows had to be caulked to prevent leakage into the home and because the hardware fell off of the windows as a consequence of the rotting wood.

50.     The design and/or manufacturing defect, as well as Pella's failure to warn consumers of the defect over the years, have caused damage to Plaintiff's property.

51.     The following is representative of the defect and damage:



52.     **Rita Cicinelli.** In 1998, Plaintiff purchased Pella "ProLine" aluminum-clad windows for approximately $10,000.00, and had them installed in her residence in Ortonville, Michigan.

53.     Pella aluminum-clad wood windows, unbeknownst to Plaintiff, were defective in that they allowed water to penetrate the area behind the aluminum cladding, which caused condensation, wood rot, leaks and other failures.

54.     The characteristics of the window defect (that allowed for the water to penetrate the aluminum cladding and failed to protect the wood from rot) were present in the windows when they left the factory, and were part of the window by design and manufacture.

55.     In 2008, and again in 2009, Plaintiff contacted Pella to complain of the windows leaking and rotting. Pella denied knowledge of a defect and denied responsibility for the leakage and rotting. Specifically, Pella informed Plaintiff that the windows were no longer under warranty. When Plaintiff referred Pella to her 2008 call, Pella contended that they had no record of such a call from Plaintiff.  Nevertheless, in 2009, Pella mailed to Plaintiff one sash.  Pella expected Plaintiff to hire a contractor to install one sash into one of the defective windows in Plaintiff's home.

56.     The subject windows further deteriorated as a result of the defect. At one point, and for several years thereafter, the windows had to remain shut. Opening a window caused the windows to fall out as a result of the wood having rotted around the brackets.

57.     Plaintiff experienced increases in her heating bills, because the cold air was coming through the rotted wood. Using air conditioning was similarly inefficient, as the cool air was leaving through the same rotted wood. Mold grew around the windows and the hardware fell

out of the windows' rotted wood. To keep insects and air out, wood filler was placed around the windows.

58. Plaintiff again contacted Pella in 2012 and 2013 to complain of the damage caused by the windows. In 2013 Plaintiff could finally afford to replace the windows for $18,786.00.

59. The design and/or manufacturing defect, as well as Pella's failure to warn consumers of the defect over the years, have caused damage to Plaintiff's property.

60. The following are representative of the defect and damage:

 

61. **Robert Josephberg.** In 1994, Plaintiff purchased approximately one hundred Pella "ProLine" aluminum-clad windows, which were installed in his residence in Briar Cliff Manor, New York.

62. Unbeknownst to Plaintiff, the aluminum clad wood windows were universally defective in that they allowed water to penetrate the area behind the aluminum cladding, which caused condensation, wood rot, leaks and other failures.

63.     The characteristics of the window defect (that allowed for the water to penetrate the aluminum cladding and failed to protect the wood from rot) were present in the windows when they left the factory, and were part of the window by design and manufacture.

64.     In 2009, Plaintiff contacted Pella to replace, at Pella's expense, windows with leakage and wood rot. Pella replaced one window in 2011, but subsequently refused such responsibility for other windows on the grounds that the windows were no longer under warranty.

65.     Consequently, Plaintiff paid $7,600.00 to replace rotted windows.

66.     The design and/or manufacturing defect, as well as Pella's failure to warn consumers of the defect over the years, have caused damage to Plaintiff's property.

67.     **Jeffrey Acton**.  Plaintiff Acton's home was built in 2000, remodeled in 2007, and had Pella "ProLine" aluminum-clad windows installed in his residence in Scotts Valley, California.

68.     Unbeknownst to Plaintiff, were defective in that they allowed water to penetrate the area behind the aluminum cladding, which caused condensation, wood rot, leaks and other failures.

69.     The characteristics of the window defect (that allowed for the water to penetrate the aluminum cladding and failed to protect the wood from rot) were present in the windows when they left the factory, and were part of the window by design and manufacture.

70.     The design and/or manufacturing defect, as well as Pella's failure to warn consumers of the defect over the years, have caused damage to Plaintiff's property.

71.     **Kenneth Hechtman**.  Plaintiff's home was built in 2009 with Pella "ProLine" aluminum-clad windows.

72.     Unbeknownst to Plaintiff, were defective in that they allowed water to penetrate the area behind the aluminum cladding, which caused condensation, wood rot, leaks and other failures.

73.     The characteristics of the window defect (that allowed for the water to penetrate the aluminum cladding and failed to protect the wood from rot) were present in the windows when they left the factory, and were part of the window by design and manufacture.

74.     The design and/or manufacturing defect, as well as Pella's failure to warn consumers of the defect over the years, have caused damage to Plaintiff's property.

75.     The following are representative of the defect and damage:









76.     **Leo Bateman.** In 2004, Plaintiff purchased a home built with approximately forty ("40") Pella "ProLine" aluminum-clad windows, in Fort Meyers, Florida.  At the time of purchase, Plaintiff noted the Pella brand of windows and considered the windows of premium quality and worthy of the home's price.

77.     Unbeknownst to Plaintiff, the aluminum clad wood windows were universally defective in that they allowed water to penetrate the area behind the aluminum cladding, which caused condensation, wood rot, leaks and other failures. Plaintiff would not have purchased the home had he known of the Proline's defects.

78.     The characteristics of the window defect (that allowed for the water to penetrate the aluminum cladding and failed to protect the wood from rot) were present in the windows when they left the factory, and were part of the window by design and manufacture.

79.    In 2005, Plaintiff remodeled a bathroom and notice a pattern of rot around the windows and wall. Thereafter, Plaintiff contacted Pella to replace, at Pella's expense, windows with leakage and wood rot. Pella refused responsibility for the replacement of any windows on the grounds that the windows were no longer under warranty.  Pella offered to come to the Plaintiff's home to inspect windows for a $150.00 fee.

80.    Consequently, Plaintiff paid several thousand dollars to replace rotted windows, walls surrounding the windows and two sections of hardwood flooring.

81.    The design and/or manufacturing defect, as well as Pella's failure to warn consumers of the defect over the years, have caused damage to Plaintiff's property for which Plaintiff is entitled to compensation.

82.    **James Neiman.** In 2007, Plaintiff purchased a Fort Meyers home built with approximately forty ("40") Pella "ProLine" aluminum-clad windows, in Bellaire, Florida.  At the time of purchase, Plaintiff noted the Pella brand of windows and considered the windows of premium quality and worthy of the home's price. The windows were manufactured in 2004.

83.    Unbeknownst to Plaintiff, the aluminum clad wood windows were universally defective in that they allowed water to penetrate the area behind the aluminum cladding, which caused condensation, wood rot, leaks and other failures. Plaintiff would not have purchased the home had he known of the Proline's defects.

84.    The characteristics of the window defect (that allowed for the water to penetrate the aluminum cladding and failed to protect the wood from rot) were present in the windows when they left the factory, and were part of the window by design and manufacture.

-17-

85.     Shortly after moving into the home, the windows displayed signs of rotting. Eventually, Plaintiff was unable to open five windows because they were unstable due to extensive rotting. Plaintiff contacted Pella to replace, at Pella's expense, windows with leakage and wood rot. In January, 2012, Pella inspected the windows, and despite stating that the windows were manufactured in 2003, refused responsibility for the replacement of any windows on the grounds that the windows were no longer under warranty. Pella offered to replace the sashes on five windows for approximately $1,700.00. At that time, Pella also identified additional windows as needing eventual replacement though, in Pella's opinion, not at that time.

86.     The design and/or manufacturing defect, as well as Pella's failure to warn consumers of the defect over the years, have caused damage to Plaintiff's property for which Plaintiff is entitled to compensation.

87.     **Amy Chasin**. In 1998, Plaintiff built a home with Pella "ProLine" aluminum-clad windows, in Livingston, New Jersey.

88.     Unbeknownst to Plaintiff, the aluminum clad wood windows were universally defective in that they allowed water to penetrate the area behind the aluminum cladding, which caused condensation, wood rot, leaks and other failures. Plaintiff would not have purchased the Pella windows for her home had she known of the Proline's defects.

89.     The characteristics of the window defect (that allowed for the water to penetrate the aluminum cladding and failed to protect the wood from rot) were present in the windows when they left the factory, and were part of the window by design and manufacture.

90.     In 2011, Plaintiff noticed rot around the windows and wall. Plaintiff contacted Pella to replace, at Pella's expense, the sixty (60) windows in her home that displayed leakage

and wood rot. Pella refused responsibility for the replacement of any windows on the grounds that the windows were no longer under warranty. Thereafter, Pella quoted Plaintiff a replacement cost of approximately $30,000.00.

91.     Plaintiff has observed other homes in her subdivision that also contain Pella Proline windows and those windows similarly display rot.

92.     The design and/or manufacturing defect, as well as Pella's failure to warn consumers of the defect over the years, have caused damage to Plaintiff's property for which Plaintiff is entitled to compensation.

93.     **Edward Ruhnke.** In 2005, Plaintiff purchased Pella "ProLine" aluminum-clad windows for his home in Grandville, New Jersey.

94.     Unbeknownst to Plaintiff, the aluminum clad wood windows were universally defective in that they allowed water to penetrate the area behind the aluminum cladding, which caused condensation, wood rot, leaks and other failures.

95.     The characteristics of the window defect (that allowed for the water to penetrate the aluminum cladding and failed to protect the wood from rot) were present in the windows when they left the factory, and were part of the window by design and manufacture.

96.     Within a few years of purchase, Plaintiff noticed rot around the windows and wall. Plaintiff contacted Pella to replace, at Pella's expense, the eleven (11) windows in his home that displayed leakage and wood rot. Pella refused responsibility for the replacement of any windows on the grounds that the windows were no longer under warranty. Pella never came to inspect the windows.

97.     Since that time, additional windows in Plaintiffs home have displayed signs of rotting.

98.     The design and/or manufacturing defect, as well as Pella's failure to warn consumers of the defect over the years, have caused damage to Plaintiff's property for which Plaintiff is entitled to compensation.

## CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring all claims herein as class claims pursuant to Fed. R. Civ. P. 23. The requirements of Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) are met with respect to the class defined below.

**A.     Class Definition(s)[1]**

100.    The Nationwide (b)(2) Injunctive Relief Class consists of:

All persons who own a structure with Pella ProLine Series aluminum-clad windows (the "Class") whose windows have some wood rot but have not yet been replaced.

101.    The Six (b)(3) State Sub-Classes consist of:

All members in California, Florida, Illinois, Michigan, New Jersey, and New York, whose windows have exhibited wood rot and who have replaced the affected windows.

Excluded from the Class and Sub-Classes are: Defendants, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees, and members of such persons immediate families; also excluded are the presiding judges in this action and the judges' immediate family.

---

[1]     On June 4, 2009, the Court certified a nationwide 23(b)(2) Class and six 23(b)(3) Sub-Classes for the states of California, Florida, Illinois, Michigan, New Jersey and New York. Plaintiffs reserve the right to amend the class definitions based upon future investigation, discovery and the proofs at trial.

**B.      Numerosity**

102.    At this time, Plaintiffs do not know the exact size of the Classes; however, due to the nature of the trade and commerce involved, and the claims history consequent upon the claims process initiated under the settlement of this action, but overturned on appeal, Plaintiffs confidently and reasonably believe that the class members are so numerous that joinder of all members is impracticable.  The number and identities of Class members is administratively feasible and can be determined through appropriate discovery.

**C.      Commonality**

103.    There are questions of law or fact common to the class, including at least the following:

(a)      Whether Pella aluminum-clad windows contain the latent defect alleged herein;

(b)      Whether the complained of defect caused the damages of Plaintiffs and other members of the Classes;

(c)      Whether the latent defect is a necessary cause of the water leaks and resulting wood rot and damage;

(d)      Whether Defendants had actual or imputed knowledge of the defect but failed to disclose it to Plaintiffs or the Class and whether knowledge of an information about the defect resided exclusively with Defendants;

(e)      Whether Defendants have a pattern and practice of attributing damages claimed by Plaintiffs and the Classes to "faulty installation," improper maintenance, and other factors, instead of the defect alleged herein;

(f)      Whether Defendants have a pattern and practice of denying Plaintiffs' and the Classes' claims as 'out of warranty', instead of the defect alleged herein;

(g)      Whether Defendants have acted or refused to act on grounds generally applicable to the Class;

(h)      Whether Defendants' conduct constitutes consumer fraud or an unfair or deceptive trade practice;

-21-

(i)     Whether Plaintiffs and other members of the Classes have been damaged, and if so, what is the proper measure of such damages?

**D.     Typicality**

104.    Plaintiffs have the same interests in this matter as all other members of the Classes, and their claims are typical of all members of the classes.

**E.     Adequacy**

105.    Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in the successful prosecution and resolution of consumer class actions. Plaintiffs will fairly and adequately represent the interests of the class members and do not have interests adverse to the Class.

**F.     The Prerequisites of Rule 23(b)(2) are Satisfied**

106.    The prerequisites to maintaining a class action for injunctive and equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) exist as Defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole.

107.    The prosecution of separate actions by members of the class would create a risk of establishing incompatible standards of conduct for Defendants.  For example, one court might decide that the challenged actions are illegal and enjoin them, while another court might decide that those same actions are not illegal.  Individual actions may, as a practical matter, be dispositive of the interest of Class members, who would not be parties to those actions.

108.    Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs seek, *inter alia*, equitable remedies with respect to the class as a whole.

109.    Defendants' systemic policy and practices make declaratory relief with respect to the class as a whole appropriate.

**G.      The Prerequisites of Rule 23(b)(3) are Satisfied**

110.    This case satisfies the prerequisites of Fed. R. Civ. P. 23(b)(3).  The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class, and a class action is the superior method for fair and efficient adjudication of the controversy.  The likelihood that individual members of the Class will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, especially when compared to the relatively modest amount of monetary, injunctive and equitable relief at issue for each individual Class member.  This action will be prosecuted in a manner that ensures the Court's able management of this case as a class action on behalf of the classes defined above.

## PELLA'S FRAUDULENT CONCEALMENT

111.    Throughout the Class period, Defendants affirmatively concealed from Plaintiffs and Class the defect alleged herein.

112.    Defendants had a duty to inform Plaintiffs and Class of the defect described herein, of which it knew or should have known.  Notwithstanding their duty, Defendants never disclosed the defect to Plaintiffs or the Class; rather, Defendants attributed resulting damage to faulty installation, maintenance or other third-party conduct.

113.    Despite exercising reasonable diligence, Plaintiffs and Class could not have discovered the defects or Defendants' scheme to avoid disclosure of the defect.  The alleged defects and information that apprised, or should have apprised, Defendants of the defects were in Defendants' exclusive access and control.  Thus, the applicable statutes of limitations have been

tolled with respect to any claims that Plaintiffs or the Class have brought or could have brought as a result of the unlawful and fraudulent course of conduct described herein.

114.    Defendants are further estopped from asserting any limitations defense, statutory, equitable, contractual or otherwise, to the claims alleged herein by virtue of its acts of fraudulent concealment.

## CAUSES OF ACTION

## COUNT I

### (Violation of Illinois Consumer Fraud and Deceptive Business Practices Act and Substantially Similar Laws of California, Florida, Michigan, New Jersey, and New York)

115.    Plaintiffs repeat and reallege the allegations of the prior paragraphs as if fully stated herein.

116.     At all times relevant hereto, there was in full force and effect the Illinois Consumer Fraud and Deceptive Practices Act ("IFCA"), 815 ILCS 505/1 et seq., and substantially similar state consumer protection statutes. Materially similar statutes are in effect in many jurisdictions within the United States, including the laws of the other five states for which statutory consumer protection subclasses were certified by this Court. (Doc. 163).  This Seventh Amended Complaint names a class representative that resides in each of these six states: California, Florida, Illinois, Michigan, New Jersey, and New York.[2]

117.    Section 2 of the Act provides in relevant part as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use of or employment of

---

[2] The consumer fraud claims are brought on behalf of Plaintiffs and resident absent class members in these states under the following consumer protection statutes analogous to the IFCA: California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., and California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770(a)(5) & (a)(7) et seq.;; Florida's Unfair and Deceptive Trade Practices Act ("FDUPTA"), Fla. Stat. § 501.201 et seq.; Michigan's Consumer Protection Act ("MCPA"), M.C.L. 445.903(1) et seq.; Mich. Stat. Ann. § 19.418(1) et seq.; New Jersey Consumer Fraud Act ("NJCFA"), N.J. Rev. Stat. § 56:8-1 et seq.; N.J. Rev. Stat. § 56:12-1 et seq.;  N.Y. Gen. Bus. Law, § 349 et seq.

any deceptive, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use of employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby, In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2 (footnotes omitted).

118.    Plaintiffs and other Class members are consumers within the meaning of Consumer Fraud Acts given that Defendants' business activities involve trade or commerce, are addressed to the market generally and otherwise implicate consumer protection concerns.

119.    Section 2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, renders unlawful the "use or employment of any deception [including the] concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact ... in the conduct of any trade or commerce…"

120.    Except as noted below, the consumer fraud statutes and/or interpretative case law of other states have also either: (a) expressly prohibited omissions of material fact, without regard for reliance on the deception, or (b) have not addressed those issues.

121.    Once the defect's risk became significant, consumers (such as Plaintiffs) were entitled to disclosure of that fact because:

(a)    A significant risk of leakage would be a material fact in a reasonable consumer's decision-making process, and

(b)    Without Pella's disclosure, reasonable consumers would not know that there is any risk of leakage.

122.     Moreover, because Pella's warranties are limited in duration, consumers were further entitled to know that leakage might not exhibit itself until after their warranties expired, and if that occurred, Pella was not committing to repair the condition.  All of these facts were material to consumers' (such as Plaintiffs') purchase decisions.

123.     Specifically, at all times relevant, Pella continuously and consistently failed to disclose to consumers (such as Plaintiffs):

       (a)    there was a substantial risk of leakage or wood rot;

       (b)    that leakage or wood rot may not exhibit itself until after the warranty has expired; and

       (c)    that if leakage or wood rot exhibited itself after the warranty period expired Pella was not committing to repair the condition.

Pella failed to make these disclosures despite opportunities through its employees, agents, sales literature, advertising, its website and other media.

124.     By engaging in such conduct and omissions of material facts, Pella has violated state consumer laws prohibiting representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," representing that "goods and services are of a particular standard, quality or grade, if they are of another", and/or "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding"; and state consumer laws prohibiting unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices.

125.     Pella intended that Plaintiffs and the Class would rely on the deception by purchasing its windows, unaware of the material facts described above.  This conduct constitutes consumer fraud and deception within the meaning of the various consumer protection statutes.

126.    Plaintiffs and the Class have been damaged by Pella's deception because: (a) they purchased Pella windows that developed the undisclosed risk/defect – leakage and wood rot and other damage to the structure, (b) in many instances the condition exhibited itself after Plaintiffs' warranty period expired, and (c) Pella refused to pay to repair the condition because the warranty had expired.

127.    If Pella had disclosed the above facts to Plaintiffs, they could have (and would have) prevented economic injury by either negotiating additional warranty coverage, negotiating a lower price to reflect risk or simply avoiding the risk altogether by purchasing a different manufacturer's windows.

128.    Pella could have and should have disclosed the above facts.  Multiple direct and indirect communications from Pella reached consumers nationwide, including the Plaintiffs and consumers in the states of California, Florida, Illinois, Michigan, New Jersey and New York.

129.    During the class period Pella undertook direct mailings, print advertising, retail advertising, web advertising, point of purchase advertising and product packaging advertisement directed to consumers nation-wide, including in California, Florida, Illinois, Michigan, New Jersey and New York.

130.    During the class period Pella provided promotional materials, installation materials and product materials to third parties intending the same to assist in the sale of Pella products to consumers nation-wide, including consumers in California, Florida, Illinois, Michigan, New Jersey and New York.

131.    During the class period, Pella specifically held out its windows as windows that "exceed expectations," as windows that were "extraordinary" and "Built to impossibly high

standards." Pella held out its windows as offering "Satisfaction *Plus*" and "Quality. Any way you look at it."

132. In addition to print ads, during the class period, Pella utilized defined mediums, including photography, digital media, video and photo realism, at points of purchase, trade shows and showroom displays, to visually demonstrate, enhance and promote the high standards of their windows, for the purpose of convincing and enticing consumers (including Plaintiffs), builders and contractors to purchase its products which it held out as superior.

133. Pella retained advertising giant Young & Rubicam in the late 1990s to purposefully project its image as superior. The company wanted its brands to be seen as belonging to a class of high-end home products. In an interview with *Adweek* (January 20, 1997), Pella's marketing director Jerry Dow explained, "We're competing with Sub-Zero refrigerators, Jacuzzi tubs, and Kohler faucets, not just other door and window manufacturers like Andersen." Consumers, nation-wide, indeed viewed Pella as superior and high-end.

134. During the class period, Pella began a $10 million advertising campaign, directed at consumers, including the Plaintiffs and members of the class, to convey its high-end persona. The campaign included print ads and televised ads that stated Pella was "viewed to be the best." In the late 1990s and throughout the early and mid-2000s, Pella ran several television commercials, including Pella "Baseball," Pella "Cell," Pella "Romeo & Juliet" and the Emmy-nominated Pella "Elopement," all touting the superiority of Pella windows.

135. In the mid-2000s, Pella began an internet ad campaign intended to cause Pella to appear as the only relevant result in an internet search for replacement windows. Similarly, in the mid to late-2000s, Pella undertook local marketing and website development, specifically intended to drive homeowners to the local Pella websites and local Pella stores.

136.    Pella reinforced its message of excellence with builders and contractors with its "The Power of Yellow" proverb, affirmatively reaching out to builders and contractors to emphasize with builders and contractors Pella's windows with a distinguished level of service and integrity. Builders and contractors, in turn, conveyed that message to consumers.

137.    During the class period, Pella further focused on the ProLine series, in an attempt to penetrate and capture the growing renovation/do-it-yourself market. ProLine windows and doors were heavily marketed through the successful giant home-supply chains such as Home Depot. Although they were less expensive than Pella's other series, the company held out the window and its components as similar in quality. Indeed, to encourage distributors' marketing and sale of ProLine windows, Pella gave distributors a percentage of all ProLine products sold in their territory. Pella also trained them in marketing, servicing and installing ProLine windows. Pella's efforts were successful. According to *Fortune* magazine (November 13, 2000), Pella's sales to home center stores, including Home Depot, probably reached $100 million <u>annually</u> by the end of the 1990s.

138.    By one or more of the direct and indirect means of communications, among other possible means not identified, during the class period, consumers in California, Florida, Illinois, Michigan, New Jersey, New York, and all other states, and specifically including the Plaintiffs, were deceived by the statements and the omissions of Pella.

139.    Defendants have committed deceptive acts or practices within the meaning of the Act by engaging in the acts and practices alleged herein, including, but not limited to, its failure to disclose the material defects.

140. Defendants' conduct alleged herein is furthermore unfair insofar as (a) it offends public policy; (b) it is immoral, unethical, oppressive, and unscrupulous, and (c) it caused substantial injury to consumers.

141. As a direct and proximate result of the unfair acts or practices of Defendants alleged herein, Plaintiffs and other members of the Class and the general public were damaged.

**WHEREFORE,** Plaintiffs, individually and on behalf of the Class of persons described herein, pray for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and/or (b)(3), and certifying the Class defined herein;

B. Designating Plaintiffs as representatives of the Class and their counsel as Class counsel;

C. Entering judgment in favor or Plaintiffs and the Class and against Defendants;

D. Awarding Plaintiffs and Class members their individual damages and attorneys' fees and allowing costs, including interest thereon;

E. Compelling Defendants to establish a program to inspect, remediate and replace any defective Pella windows;

F. Compelling Defendants to establish a program to reimburse its warranty claims previously denied or paid in part and to reimburse Pella customers who have had to pay to repair and/or replace defective Pella windows; and

G. Granting such further relief as the Court deems just.

## COUNT II
### (Declaratory Relief Pursuant to 28 U.S.C. § 2201)

142.     Plaintiffs repeat and reallege the allegations of the prior paragraphs, as if fully stated herein.

143.     There is an actual controversy between Pella and the Class concerning the validity of the time limitations in the warranty on Pella's windows, and concerning installation and maintenance defenses to otherwise valid warranty claims.  A copy of Pella's warranty is attached as Exhibit 1.

144.     Pella's warranty was uniform and applied equally to each member of the class no matter the state in which the class member resides.  Pella's administration of warranty claims was also handled without regard to the state in which the warranty claimant resided.  Each class member has a claim arising from the common and uniform warranty which Pella provided.

145.     Pursuant to 28 U.S.C. § 2201 this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

146.     Pella has wrongfully denied warranty claims as untimely or based on installation and maintenance defenses despite the root cause of leaks and wood rot being the latent defects described herein.

147.     Accordingly, consistent with this Court's order granting certification of a nationwide-class for declaratory relief, Plaintiffs seek a declaration that:

       a.      all ProLine windows have a defect which results in premature rotting and this defect requires disclosure;

       b.      Pella modified its warranty without notice by creating the enhancement program;

       c.      Pella must notify owners of the defect;

     d.     the ten-year limitation in the original warranty is removed;

     e.     Pella will reassess all prior warranty claims related to wood rot; and,

     f.     Pella, upon a class member's request, will pay the cost of inspection to determine whether the wood rot is manifest, with any coverage disputes adjudicated by a Special Master.

**WHEREFORE,** Plaintiffs, individually and on behalf of the Class of persons described herein, pray for an Order containing the foregoing declarations and:

A.     Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and/or (c)(4), and certifying the Declaratory Relief Class defined herein;

B.     Designating Plaintiffs as representatives of the Class and their counsel as Class counsel;

C.     Entering judgment in favor or Plaintiffs and the Class and against Defendants;

D.     Awarding Plaintiffs and Class members their individual damages and attorneys' fees and allowing costs, including interest thereon;

E.     Compelling Defendants to establish a program to inspect, remediate and replace any defective Pella windows;

F.     Compelling Defendants to establish a program to reimburse its warranty claims previously denied or paid in part, reimburse Pella customers who have had to pay to repair and/or replace defective Pella windows; and

G.     Granting such further relief as the Court deems just.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: January 22, 2016

Respectfully submitted,

/s/ Shannon M. McNulty
Robert A. Clifford
rac@cliffordlaw.com
Shannon M. McNulty
smm@cliffordlaw.com
Edward R. Moore, *of counsel*
erm@cliffordlaw.com
CLIFFORD LAW OFFICES
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
T: 312.899.9090

George K. Lang
Lang Law Office
60 B W Terra Cotta, No. 301
Crystal Lake, Illinois 60012
T: 773.575.5848
langlawoffice@att.net

John A. Yanchunis
JYanchunis@ForThePeople.com
Marcio W. Valladares
MValladares@ForThePeople.com
Patrick A. Barthle, II* *pro-hac vice pending*
PBarthle@ForThePeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
T: 813.223.5505

Joel R. Rhine
jrr@rhinelawfirm.com
Rhine Law Firm, P.C.
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Tel: 910.772.9960

*Counsel for Plaintiff(s)*

## CERTIFICATE OF SERVICE

I, Shannon M. McNulty, an attorney, hereby certify that on January 22, 2016, I served the above and foregoing *Seventh Amended Class Action Complaint*, by causing a true and accurate copy of such papers to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system.

/s/ Shannon M. McNulty
Robert A. Clifford
RAC@cliffordlaw.com
Shannon M. McNulty
SMM@cliffordlaw.com
CLIFFORD LAW OFFICES
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
T: 312-899-9090
