**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

KENT EUBANK, JERRY DAVIS, RICKY
FALASCHETTI, RITA CICINELLI,
ROBERT JOSEPHBERG, JEFFREY ACTON,
KENNETH HECHTMAN, LEO BATEMAN,
JAMES NEIMAN, AMY CHASIN and
EDWARD RUHNKE, individually and on
behalf of all others similarly situated;

Plaintiffs,

v.

PELLA CORPORATION, an Iowa corporation,
and PELLA WINDOWS AND DOORS, INC.,
a Delaware corporation,

Defendants.

No.: 06 cv 4481

Honorable Sharon Johnson Coleman

Class Action

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' UNCONTESTED MOTION
FOR PRELIMINARY APPROVAL**

## INTRODUCTION

The Settlement Agreement negotiated between Plaintiffs and Defendants Pella

Corporation ("Pella") and Pella Windows and Doors, Inc. ("PWD") (hereinafter jointly referred

to as "Defendants") is fair, reasonable, and adequate.  (*See* Settlement Agreement (ECF No. 672-

1).)  If approved, it will establish a Settlement Fund of $25,750,000, purposed to provide

substantial benefits to members of a nationwide class who have experienced, or will in the future

experience, Eligible Damage to their Pella ProLine Casement Windows and surrounding

property.  Under Fund A ($23,750,000), Claimants experiencing Eligible Damage prior to the

Claim Deadline will be entitled to cash benefits for costs of replacement product, installation,

finishing, and repairing other property damage.  Under Fund B (a $2,000,000 Pella reserve),

qualified Claimants who experience Eligible Damage after the Claim Deadline will receive

certain benefits above and beyond those provided for in the Pella Limited Warranty, with

discounted replacement product and installation (if the subject windows are more than ten but

less than fifteen years old). The Settlement Agreement also provides that Pella will pay any award of attorneys' fees, costs, expenses, and disbursements up to $9,000,000.00—separate and apart from the Settlement Fund, such that it does not reduce benefits to the Settlement Class—and will pay for Class Notice Expenses.

These Settlement Agreement benefits compare favorably to the expected value of continued litigation, which would be expensive, time-consuming, and produce highly uncertain results. To obtain any form of Rule 23(b)(3) class relief through continued litigation, Plaintiffs would have to: (a) overcome Pella's pending *Daubert* and dispositive motions, which posit arguments and legal defenses that Pella and other construction product manufacturers have successfully relied upon in similar matters; (b) overcome Pella's anticipated motion to decertify the six (b)(3) subclasses pursuant to Rule 23(c)(1)(C); (c) prevail in the class trial as to all "common issues" litigated for the six (b)(3) subclasses; and (d) after prevailing at the class trial, each individual eligible class member for those six states separately would have to litigate and prevail on issues that were not certified for class treatment but deferred for later adjudication on an individual basis, such as proximate causation, damages, and certain of Pella's defenses, including its statute of limitations defense. Even then, relief would only be afforded to the subset of the Settlement Class that resides in the six certified subclass states, who have already replaced their ProLine Casement Windows exhibiting wood rot, and who prevail on the individual issues that were deferred. Nationwide relief, to the extent even possible given the law and the Court's previous deferral of Rule 23(b)(2) proceedings, would require a second class trial under Rule 23(b)(2) and survival of additional decertification and dispositive motions, followed by another round of individual-issues litigation to establish whether and to what extent any individual class member is entitled to relief. In short, continued litigation would be a long, expensive and

- 2 -

complex endeavor that would provide at best uncertain benefits to only a subset of the Settlement Class entitled to immediate relief under the Settlement Agreement.

For all of these reasons and the reasons discussed below, the proposed Settlement Agreement is well within the range of possible approval, and the Court should grant Plaintiffs' uncontested motion for preliminary approval.

## BACKGROUND

### I.     Procedural Posture

Plaintiffs in this action seek damages and declaratory relief in relation to alleged defects in certain vintages of Pella ProLine casement, awning, and transom windows.  They contend that the windows "contain a latent defect that allows water to penetrate and leak behind the aluminum cladding, resulting in premature wood rot and other physical damage to both the window and the main structure." (ECF No. 540 ¶ 1.)  In 2009, the Court certified a "statutory consumer fraud class" pursuant to Federal Rule of Civil Procedure 23(b)(3), consisting of six state subclasses— California, Florida, Illinois, Michigan, New Jersey, and New York. (ECF No. 163 at 5, 30.)[1] Each subclass was composed of persons in one of the six subclass states, "whose windows have exhibited wood rot and who have replaced the affected windows." (*Id.* at 30.)  Consistent with Rule 23(c)(4), the Court carved out from its certification order the individual issues of proximate causation, damages, and certain of Pella's defenses including the statute of limitations.  (*Id.* at 26-27); *see also Pella Corp. v. Saltzman*, 606 F.3d 391, 393 (7th Cir. 2010) ("The district court explicitly declined to certify issues related to causation, damages, and statute of limitations."). As part of the same order, the Court certified a nationwide class action pursuant to Rule 23(b)(2), composed of owners of ProLine casement windows "whose windows have not manifested the

---

[1] The Court denied class certification under Plaintiffs' unjust enrichment theory, and Plaintiffs did not seek class certification under their common law fraud by omission theory. (ECF No. 163 at 2-3, 5, 29-30.)

alleged defect and whose windows have some wood rot but have not yet been replaced." (ECF No. 163 at 5, 30.) The (b)(2) class seeks declaratory relief in the form of six determinations by the Court, related to the defectiveness of the windows, warranties for the windows, and remedial actions that Plaintiffs believe Pella should take. (See ECF No. 163 at 2-3 n.3; ECF No. 492, ¶ 148; ECF No. 503 at 1-2.) Both the Rule 23(b)(3) and (b)(2) classes were affirmed by the Seventh Circuit. *See Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010).

Following the Seventh Circuit's order affirming class certification, the parties entered into a class settlement agreement, which received preliminary and final approval by the Court. (ECF Nos. 301, 353.) Objectors to the settlement appealed, and the Seventh Circuit reversed. *See Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014). The Seventh Circuit concluded that, due to conflicts of interest and other considerations, former class counsel Paul Weiss and former named plaintiff Leonard Saltzman had to be replaced as class counsel and class representative, respectively, and that certain named plaintiffs that had been removed by former class counsel were to be reinstated. The panel further discussed certain characteristics of the approved settlement agreement it identified as "red flags," and remanded for further proceedings.

Following this remand in 2014, the Court appointed new class counsel (ECF No. 469), and the parties continued to litigate the action. Merits discovery ensued, including document production and deposition discovery. Defendants filed motions to dismiss, addressing the propriety of the new Named Plaintiffs' claims. (*See* ECF Nos. 500, 545.) In addition, the parties addressed questions as to the propriety of continued class certification. In particular, although the Court certified a nationwide (b)(2) class, it had previously observed that the class must be divided into subclasses "to the extent that the underlying state law diverges," and that Plaintiffs must "identify the substantive law underlying the declarations in the Rule 23(b)(2) class and recommend subclass groupings to the extent that law diverges." (ECF No. 228; *see also* ECF

Nos. 481, 479-1 (ordering Plaintiffs to make this identification).)  Plaintiffs filed a brief purporting to comply with the Court's directive.  (ECF No. 503.)  However, in Pella's view, Plaintiffs' submission did not identify the law underlying the declarations in any meaningful way, and so Pella moved to decertify the 23(b)(2) class.  (*See* ECF No. 509.)  Although the Court did not ultimately decertify the (b)(2) class in response to this motion, it did express reservations regarding the (b)(2) class, and ruled that the (b)(2) class trial could not be held with the (b)(3) class trial, but rather would have to be deferred.  *See* 7/15/2016 Hr'g Tr. (Ex. 1).  Accordingly, the parties proceeded to prepare for the 23(b)(3) trial, which the Court set to commence in October 2017.

In May 2017, Pella filed *Daubert* motions to exclude all of Plaintiffs' experts, including engineering expert Eric Schroter of Simpson, Gumpertz and Heger ("SGH"); wood treatment expert Jerrold Winandy; and statistics expert Allise Wachs.  (ECF Nos. 600-602, 606-607, 609-610, 631, 637, 640, 641.)  Pella also moved for summary judgment, seeking dismissal of all of the Named Plaintiffs' individual claims, as well as class-wide judgment on the merits for the California and New Jersey subclasses, on grounds that the pleaded consumer fraud claims are not cognizable under the applicable state laws.  (ECF Nos. 611-613, 634, 647.)

In late 2016, the Court referred this action to United States Magistrate Judge M. David Weisman for settlement discussions. (ECF No. 577). Judge Weisman subsequently met with the parties' counsel to facilitate negotiations on numerous occasions.  (*See* ECF Nos. 586, 589, 590, 596, 599, 650, 652.)  In July 2017, after the parties had completed their respective *Daubert* and dispositive motion filings, Judge Weisman offered recommended financial settlement terms to the parties, reflecting a compromise position for both sides.  (ECF Nos. 650, 652.)  Judge Weisman's recommendation was ultimately accepted by the parties, who thereafter reduced their agreement to writing.

## II.     The Proposed Settlement Agreement

The proposed Settlement Agreement (ECF No. 672-1) provides immediate and practical value to a national class of current and former homeowners with Pella ProLine Casement Windows.[2]  It establishes a Settlement Fund totaling $25,750,000.00, which will be used to provide benefits to Settlement Class Members whose Pella ProLine Casement Windows have developed, or in the future develop, Eligible Damage.[3]

**The Proposed Settlement Class.**  The proposed Settlement Agreement provides designated relief to the following proposed class (the "Settlement Class"):

> [A]ll persons in the United States who are current or former owners of Structures containing Pella ProLine® brand casement, awning, and/or transom windows (including 250 and 450 Series) manufactured by Pella Corporation between January 1, 1991 and December 31, 2009.

(Settlement Agreement ¶ 2.46 (ECF No. 672-1).)  The following groups are excluded: (1) persons who timely opt out, (2) persons who have brought legal proceedings against Defendants that have been resolved or agreed to be resolved prior to entry of a Preliminary Approval Order, and (3) Defendants' current employees and Pella's counsel.  (*Id.*)  Pella does not object to the conditional certification of this Settlement Class for the purpose of settlement only.

**The Settlement Fund.**  The proposed Settlement Agreement provides that "Pella shall collectively dedicate a total of $25,750,000 for a common Settlement Fund against which any

---

[2] "Pella ProLine Casement Windows" shall hereinafter refer to the following aluminum clad window products covered by the proposed Settlement Agreement: "Pella ProLine® brand aluminum clad wood casement, awning, and/or transom windows (including 250 and 450 Series) manufactured by Pella Corporation between January 1, 1991 and December 31, 2009."  (*See* Settlement Agreement ¶ 2.46 (ECF No. 672-1).)

[3] "Eligible Damage" is defined in the Settlement Agreement as: "water related damage including to the Window or Windows and/or to the Sash because of water penetrating between the aluminum cladding of the window and the window Sash, as well as the consequences of such water penetration and damage."  (Settlement Agreement ¶ 2.22 (ECF No. 672-1).)  It includes damage to window finishing, damage to other property surrounding the window, and labor costs necessary to replace a window or sash because it is or was damaged from water penetration as described above or is or was causing damage to other property.  (*Id.*)

Eligible Claimant may file a claim for Eligible Damage." (Settlement Agreement ¶ 4.01 (ECF No. 672-1).)[4] This Settlement Fund is comprised of two components: (a) "Fund A," containing a total of $23,750,000.00; and (b) "Fund B," a Pella reserve totaling $2,000,000.00. (Settlement Agreement ¶ 4.01.) Fund A is intended to pay out (i) claims for Eligible Damage submitted by Eligible Claimants prior to the Claim Deadline (the 120-day period following entry of the Preliminary Approval Order); (ii) Named Plaintiff "Service Awards" (up to $25,000.00 per Named Plaintiff); and (iii) class administration expenses. (*Id.* ¶¶ 4.01, 4.03, 2.09, 2.06, 6.04.) Fund B is intended to fund benefits related to Eligible Damage submitted *after* the Claim Deadline, but prior to 15 years from the Date of Sale of the subject Window, for windows manufactured before 2007. (*Id.* ¶¶ 4.01, 2.22, 2.23, 2.24, 2.38.)

**Settlement Agreement Benefits.** The Settlement Agreement provides relief for qualified Settlement Class Members who have suffered Eligible Damage. (*Id.* ¶ 5.01.) Settlement Class Members can apply for relief by completing and submitting a Claim Form. (*Id.* ¶ 5.05.) Claimants "can establish Eligible Damage by providing contemporaneous documentation of wood deterioration damage to one or more Windows and, if applicable, contemporaneous documentation of water damage to surrounding property . . ., and a statement that such damage was caused, materially or substantially in part, by water penetrating between the aluminum cladding of the window and the window sash." (Settlement Agreement ¶ 5.02(4).)

**Fund A Benefits.** Settlement Class Members who have sustained Eligible Damage to or from Pella ProLine Casement Windows, and who submit a Claim Form in accordance with

---

[4] An "Eligible Claimant" is defined as: "each Settlement Class Member who (1) is the current or former owner of real property in the United States with a Structure or Structures in which a Pella ProLine Casement Window is or was installed; (2) timely signs and submits, under penalty of perjury, a properly completed Claim Form signed by the claimant as a declaration under 28 U.S.C. § 1746; (3) timely supplies all information, documents, and photographs required by this Agreement and the Claim Form; and (4) meets all the relevant criteria set forth in the Agreement." (Settlement Agreement ¶ 2.21.)

paragraph 5.05 of the Settlement Agreement, are eligible for cash benefits from Fund A. If Eligible Damage to or from a Window has already been repaired or replaced, claimants are "entitled to receive cash for actual expenditures and for actual expenses necessary to address Eligible Damage to or from a Window." (*Id.* ¶ 5.04(1).) Depending on the time between the dates of sale and repair of the subject Window, the cash award will be for all or a portion of the following four categories of costs: (1) the cost of the product (per window or sash), (2) the cost of the installation labor (per window or sash), (3) the cost of finishing (per window or sash), and (4) the cost to repair damage to other property. (*Id.*)[5]

If the Eligible Damage to or from a Pella ProLine Casement Window has *not* already been repaired or replaced, claimants are entitled to Fund A cash benefits for all or a portion (depending on the time between the dates of sale and repair of the Window) of the actual costs of installation, finishing, and the repair of damage to other property, together with either replacement product from Pella or additional cash benefits to cover all or a portion of the cost of such replacement product. (Settlement Agreement ¶ 5.04(2).) "The Notice and Settlement Administrator shall determine whether the Settlement Class Member has Eligible Damage," and shall document its decision, along with the amounts incurred or to be incurred for repair or replacement. (*Id.* ¶ 5.02(4).)

If Fund A is not sufficient to pay all Eligible Claimants, awards will be paid out on a *pro rata* basis up to available amounts in Fund A, in a manner to be determined by the Notice and Settlement Administrator. (*Id.* ¶¶ 5.03(6), 5.04(3).) If there are amounts remaining in Fund A after Fund A awards are completed, Defendants will be entitled to reimbursement for the Class

---

[5] For Eligible Damage to or from a Window that was repaired or replaced within 15 years after the Date of Sale, "the cash award will be the sum of these four categories of costs." (*Id.* ¶ 5.04(1).) For Eligible Damage to or from a Window that was repaired or replaced more than 15 years after the Date of Sale, "the cash award will be 25% of the sum of these four categories of costs." (*Id.*)

Notice Expenses paid to the Notice and Settlement Administrator; no portion of any amounts remaining in Fund A will otherwise be returned or reimbursed to Defendants. (*Id.* ¶¶ 5.04 (4)(a), 2.14.) To the extent there are additional amounts remaining in Fund A after reimbursement of Class Notice Expenses, that remainder shall be distributed, first, to Settlement Class Members as set forth in the Settlement Agreement, and then, to the extent additional amounts remain, "in a manner directed by the Court upon petition by the Parties." (*Id.* ¶¶ 5.04(4)(b), 5.04(4)(c).)

**Fund B Benefits.** Qualified Settlement Class Members who have Pella ProLine Casement Windows or Structures that manifest Eligible Damage after the Claim Deadline are eligible to make a claim for benefits under the Pella Limited Warranty and an additional program known as the "ProLine Service Enhancement Program," or "PSEP." PSEP provides wood durability related service coverage over and above that provided by the Pella Limited Warranty, by providing product replacement discounts in years 11 through 15 following the sale of affected ProLine Casement Windows manufactured before 2007. (*Id.* ¶ 2.38, 5.06.) PSEP benefits are to be paid from Fund B, and will be administered by Pella, as opposed to the Notice and Settlement Administrator. (*Id.* ¶ 5.06(1), 5.07.) To request Fund B relief, Settlement Class Members who have Eligible Damage after expiration of the Claims Period will be able to contact the Pella Customer Service Department. (*Id.* ¶ 5.07.)

**Attorneys' Fees and Costs.** Separate and apart from the Settlement Fund totaling $25,750,000.00, Pella has agreed to pay any attorneys' fees, costs, expenses, and disbursements awarded by the Court, "up to and including nine million U.S. dollars ($9 Million)." (*Id.* ¶ 6.02, 6.06.) The Settlement Agreement expressly provides that "Defendants will have no obligation to pay any attorneys representing the Class or any Settlement Class Members in this Lawsuit more than the aggregate amount of nine million ($9 Million) for attorneys' fees, costs, expenses, and disbursements in this Lawsuit." (*Id.* ¶ 6.02.)

## STANDARD OF REVIEW

A district court may approve a class action settlement if it finds it to be fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2); *see also Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011); *Synfuel Technologies v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (2006); *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 279 (7th Cir. 2002); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). Courts consider a number of factors in determining the fairness of proposed class action settlements, including "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, as assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to the settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of the settlement." *Isby*, 75 F.3d at 1198-99. "The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *Synfuel*, 463 F.3d at 653 (quoting *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979)). Courts "'do not focus on individual components of the settlement[], but rather view them in their entirety in evaluating their fairness.'" *Isby*, 75 F.3d at 1199 (citation omitted).

At the preliminary settlement approval stage, the district court's purpose is "to determine whether the proposed settlement is 'within the range of possible approval.'" *Armstrong v. Board of School Directors*, 616 F.2d 305, 314 (7th Cir. 1980); *see also McCue v. MB Fin., Inc.*, No. 1:15-cv-00988, 2015 U.S. Dist. LEXIS 28151, at *3 (N.D. Ill. March 6, 2015) (Johnson Coleman, J.) ("At the preliminary approval stage, the court's task is merely to 'determine whether the proposed settlement is within the range of possible approval.'"); *Kessler v. Am. Resorts Int'l's Holiday Network, Ltd.*, Nos. 05 C 5944 & 07 C 2439, 2007 U.S. Dist. LEXIS

- 10 -

84450, at *17 (N.D. Ill. Nov. 14, 2007) ("Although [the 'fair, reasonable, and adequate'] standard and the factors used to measure it are ultimately questions for the fairness hearing that comes after a court finds that a proposed settlement is within approval range, a more summary version of the same inquiry takes place at the preliminary phase.").  Preliminary approval "is not a fairness hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Armstrong*, 616 F.2d at 314.  "If the district court finds a settlement proposal 'within the range of possible approval,' it then proceeds to the second step in the review process, the fairness hearing." *Id.*

## ARGUMENT

For the reasons discussed below, the Proposed Settlement is "within the range of possible approval," and the Court should grant Plaintiffs' uncontested motion for preliminary approval.

### I.    Continued Litigation Through Class Recovery Would Be Complex, Lengthy, Expensive, and Would Produce Uncertain Results.

"The 'most important factor relevant to the fairness of a class action settlement' is . . . 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel*, 463 F.3d at 653.  This evaluation begins with an evaluation of "the net expected value of the continued litigation," *Reynolds*, 288 F.3d at 284-85, and "requires acknowledgment of potential defenses and the risk of failure for the class," *Kaufman v. Am. Express Travel Related Servs. Co.*, No. 16-1691, 2017 U.S. App. LEXIS 24698, at *17 (7th Cir. Dec. 7, 2017) (citing *Williams*, 658 F.3d at 653).

Here, as discussed above, the Court certified, and the Seventh Circuit affirmed certification of, two classes of homeowners with Pella ProLine Casement Windows: (a) a Rule 23(b)(3) class comprised of homeowners from Illinois, California, Michigan, Florida, New York and New Jersey, whose ProLine Casement Windows have exhibited wood deterioration and have been replaced; and (b) a nationwide Rule 23(b)(2) class comprised of homeowners "whose

windows have not manifested the alleged defect and whose windows have some wood rot but have not yet been replaced." In a hearing held on July 15, 2016, the Court ordered that the Rule 23(b)(2) class could not be tried with the Plaintiffs' Rule 23(b)(3) consumer fraud subclass claims, and would have to be deferred. *See* 7/15/2016 Hr'g Tr. (Ex. 1). The class trial for the Rule 23(b)(3) class was subsequently set for October 2017, while a Rule 23(b)(2) class trial was left uncalendared.

As elaborated in greater detail below, if the parties were to litigate the Rule 23(b)(3) and (b)(2) classes through recovery, proceedings would be highly complex, time-consuming, expensive, and would provide uncertain benefits to only a small subset of the Settlement Class Members poised to benefit from the current proposed Settlement Agreement.

### A. Litigating the Rule 23(b)(3) Class through Recovery Would Be Expensive, Challenging, and Would at Best Provide Uncertain Relief to a Small Subset of the Settlement Class.

To obtain any form of Rule 23(b)(3) class relief through continued litigation, Plaintiffs would have to: (a) overcome Pella's pending *Daubert* and dispositive motions, which posit arguments and legal defenses that Pella and other construction product manufacturers have successfully relied upon in similar matters; (b) overcome Pella's anticipated motion to decertify pursuant to Rule 23(c)(1)(C); (c) prevail in the class trial as to all "common issues" litigated; and (d) after prevailing at the class trial, each individual eligible class member separately would have to pursue and prevail on the individual issues that were deferred: proximate causation, damages, and Pella's statute of limitations defense. Even then, relief would only be afforded to a subset of the Settlement Class: those who reside in the six certified subclass states, who have already replaced their ProLine Casement Windows exhibiting wood rot, and who prevail on the individual issues that were deferred. A Rule 23(b)(3) class trial *would not afford even the*

*potential for relief* to class members who have not replaced their windows, or who have replaced their windows but reside outside of the six subclass states.

### 1. Pella's pending *Daubert* and dispositive motions.

Pella's pending motions to exclude and for summary judgment represent a significant hurdle to class recovery through continued litigation. Pella has moved to exclude each of Plaintiff's designated experts, including their engineering expert, Eric Schroter of SGH, who opines as to the alleged design defects in the ProLine Casement Windows. As reflected in Pella's motion papers (*see* ECF No. 610), Mr. Schroter failed to comply with applicable ASTM and AAMA standards in performing his water testing, and improperly extrapolated the results of his testing to the class as the foundation for his opinions, without accounting for an inadequate sample size or selection bias. One of Mr. Schroter's engineering colleagues at SGH (Michael Louis) was excluded for these very reasons in class-action litigation regarding Pella's Architect Series and Designer Series windows. *See In re: Pella Corp. Architect and Designer Series Windows Marketing, Sales Practices and Products Liability Litigation*, MDL 2514, Case No. 14-mn-0001, 214 F.Supp.3d 478 (D.S.C. 2016), motion for reconsideration denied, __ F.Supp.3d __, 2017 WL 3650188 (D.S.C. 2017). A different SGH colleague was effectively excluded in earlier class action litigation regarding Milgard windows, where the court found there was no "foundation . . . that would justify extrapolation of the test results to the universe of windows at issue—approximately 1.3 million." *Camenson v. Milgard Mfg., Inc.*, No. A115829, 2008 WL 2381904, at *4 (Cal. Ct. App. June 12, 2008). Other courts have excluded engineering experts on similar grounds. *See, e.g.*, *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-md-2359, 2018 U.S. Dist. LEXIS 90, at *24-36 (D. Minn. Jan. 2, 2018) (concluding engineering expert's methods were "fundamentally flawed and untrustworthy and his opinions are unhelpful and unreliable" where, among other things, he failed to comply with ASTM test standards, and

improperly extrapolated test results to class as a whole); *Haley v. Kolbe & Kolbe Millwork Co.*, No. 14-cv-99-bbc, 2016 U.S. Dist. LEXIS 39771, at *19 (W.D. Wis. March 25, 2016) (excluding expert who "did not follow established European or American standards for drying tests but developed his own methodology that has not been tested, published or reviewed by anyone other than his coworkers," and unjustifiably extrapolated results of extreme testing to class as a whole), *aff'd* 863 F.3d 600 (7th Cir. 2017). Pella's *Daubert* challenges to the opinions of Plaintiffs' experts Winandy and Wachs are equally compelling.

In the event one or more of Pella's *Daubert* motions were granted, Plaintiffs would lack an expert to opine upon a class-wide defect, and their certified class claims would be subject to either decertification or summary judgment. *See In re Hardieplank*, 2018 U.S. Dist. LEXIS 90, at *40-42 (finding lack of commonality where there was no common proof of the alleged class-wide defect after exclusion of plaintiffs' engineering expert); *Haley*, 2016 U.S. Dist. LEXIS 39771, at *21 ("Plaintiffs have based their defect theories and class definitions on their experts' opinions that certain types of windows sold by defendant during the class period contained one or more defects. I find the opinions unreliable and unhelpful to a trier of fact and therefore inadmissible. Without those opinions, plaintiffs cannot meet their burden of demonstrating that common questions of fact predominate or that they have a viable method of showing class-wide injury with common proof."); *see also* Order on Scope of Proof, *Glazer v. Whirlpool Corp.*, No. 1:08-wp-65000, ECF No. 427 (N.D. Ohio Oct. 6, 2014) ("In order to prevail, Plaintiffs must prove that all twenty (20) Duet Washing Machine models included in the Ohio certified class, regardless of when they were sold, suffered from the same alleged design defect.") (Ex. 2).

Pella also has moved for complete summary judgment, seeking to dismiss all of the individual Named Plaintiffs' claims on various grounds, to dismiss all six subclasses for lack of valid named subclass representatives, and to dismiss five of the six subclasses, in whole or in

part, on the legal merits. As discussed in Pella's motion papers, Pella contends that all of the Named Plaintiffs' individual statutory consumer protection claims are flawed in various respects—including grounds based on statute of limitations and lack of *prima facie* evidence on essential elements, among others—rendering them vulnerable to dismissal; and the laws of at least two of the certified states (California, New Jersey) do not even recognize the type of consumer protection claims alleged in this case. Pella believes that a decision on its pending summary judgment motion would likely result in the dismissal of at least some of the Named Plaintiffs' individual claims—leading to either the dismissal/decertification of unrepresented subclasses or else further scheduling delays while Plaintiffs identify viable replacements—as well as the dismissal with prejudice of the California and New Jersey subclasses, whose laws do not support the pleaded causes of action. Pella further believes there is substantial risk that one or more of Plaintiffs' experts could be excluded, which could both threaten the continued viability of the 23(b)(3) class, and handicap Plaintiffs' efforts to prevail on the merits at trial.

### 2. Pella's anticipated motion to decertify.

Federal Rule of Civil Procedure 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." In the event any portion of the Rule 23(b)(3) class survived Pella's *Daubert* and dispositive motions, Pella would likely pursue decertification. Pella believes its grounds for decertification of the Rule 23(b)(3) class would be strong, and several courts faced with putative class actions involving construction products have declined to certify Rule 23(b)(3) or (b)(2) classes, where, as here: (a) there is no admissible proof of a class-wide defect, (b) there are individual issues as to causation, damages, and defenses including statute of limitations, and (c) issue class certification under Rule 23(c)(4) fails to provide a superior method of adjudication relative to individual actions. *See, e.g.*, *In re Hardieplank*, 2018 U.S. Dist. LEXIS 90 (siding); *Romig v. Pella Corp.*, No. 14-cv-00433, 2016

WL 3125472 (D.S.C. June 3, 2016) (Pella Architect Series and Designer Series windows); *Naparala v. Pella Corp.*, No. 14-cv-03465, 2016 WL 3125473 (D.S.C. June 3, 2016) (same); *Haley v. Kolbe & Kolbe Millwork Co.*, No. 14-cv-99-bbc, 2015 U.S. Dist. LEXIS 169266 (W.D. Wis. Dec. 18, 2015), *aff'd*, 863 F.3d 600 (7th Cir. 2017) (Kolbe & Kolbe windows).

### 3. The class trial.

Even if the 23(b)(3) class were to survive Pella's pending and anticipated motions, the Plaintiffs may not prevail at trial. Pella always has denied and continues to deny the existence of a common defect in its Pella ProLine Casement Windows, or that it knowingly sold any defective products. Indeed, Pella believes the expert opinions on record, including those of Plaintiffs' experts, establish the opposite. (*See* ECF No. 610 at 20-23 (discussing that half of the windows tested by Plaintiffs' expert Schroter did not even leak, notwithstanding extreme and non-standard test conditions); ECF No. 612 at 11-14 (discussing that Plaintiffs lack even *prima facie* evidence of actual knowledge of defect prior to October 2001).) Throughout discovery, Pella has provided Plaintiffs with data that demonstrates low ten-year Replacement Rates:

Table 3.   Ten-year wood deterioration R&A rates by window type and vintage year.

| Vintage Year | ProLine Series | | |
|---|---|---|---|
| | Casement | Awning | Transom |
| 1997 | 3.87 | 2.72 | 0.34 |
| 1998 | 3.55 | 2.21 | 0.68 |
| 1999 | 3.88 | 2.66 | 0.75 |
| 2000 | 3.15 | 3.05 | 0.62 |
| 2001 | 3.23 | 1.97 | 0.49 |
| 2002 | 4.58 | 2.33 | 0.46 |
| 2003 | 3.84 | 1.71 | 0.29 |
| 2004 | 0.83 | 0.29 | 0.06 |
| 2005 | 0.61 | 0.18 | 0.04 |
| 2006 | 0.26 | 0.09 | 0.03 |
| 2007[†] | 0.16 | 0.09 | 0.02 |
| 2008[†] | 0.19 | 0.07 | 0.04 |
| 2009[†] | 0.13 | 0.02 | 0.13 |

[†] R&A rates projected to 10 years

(ECF 607-5 at 27.) These low Replacement Rates do not support Plaintiffs' claims of a class-wide defect or that Pella knowingly sold a defective product.[6] *See In re Toyota Motor Corp. Hybrid Brake Mktg.*, 288 F.R.D. 445, 449 (C.D. Cal. 2013) (Where "the substantial majority of class members never suffered an actual injury that was caused by a manifest defect," the question of "whether there is a manifest defect" could not be decided with "common or generalized proof," but "[had to] be done by an individualized and particularized inquiry for each member of the proposed class."); *In re Canon Cameras Litig.*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006) ("where the portion of the proposed class that even suffered malfunctions appears to be tiny, plaintiffs' proposal to certify the class of all camera owners, then determine which few suffered malfunctions, and then determine which few of those few even arguably can attribute the malfunctions to the design defect here alleged, would render the class action device nothing more than a façade for conducting a small number of highly individualized cases."); *Thompson v. Zimmer, Inc.*, No. 11-CV-3099, 2013 U.S. Dist. LEXIS 137391, at *17 (D. Minn. Sept. 25, 2013) ("Truman's failure to explain the extraordinarily low reported fracture rate (other than by speculating that it must be inaccurate), coupled with her inability to quantify the risk of fracture, renders her opinion that the device is prone to premature fracture highly questionable.") For this and other reasons, Pella continues to believe that Plaintiffs would face substantial risk of not prevailing in a class action trial on "common issues."

### 4. Individual proceedings on causation, damages, statutes of limitations, and other individual issues.

Even if Plaintiffs prevail, a class action trial victory would not itself result in relief. Rather, members of the Rule 23(b)(3) class would individually need to litigate and prevail on the

---

[6] As the Court previously recognized, scienter is required for recovery under the consumer protection laws of some of the states whose laws cover the Rule 23(b)(3) subclasses. (ECF No. 163 at 23-25 n.12.)

issues not certified for class resolution but deferred—including those related to causation, damages, and statutes of limitations.

Significantly, only members of the Rule 23(b)(3) class would even be eligible to attempt to pursue individual relief at this stage. Thus, a class action trial victory would impact only a narrow subset of the current Settlement Class—namely, those homeowners who reside in one of the six subclass states (to the extent those states are not disqualified from class relief through dispositive motion or otherwise), and who have ProLine Casement Windows that have both (a) exhibited wood deterioration and (b) been replaced. All other homeowners would receive no benefit from the Rule 23(b)(3) class trial, and would be ineligible to pursue individual relief at that time.

Moreover, even among the Rule 23(b)(3) class members who are eligible, not everyone would choose to pursue individual relief. Litigation on the issues of causation, damages, and statutes of limitation would require class members to produce admissible evidence relating to each of those issues, participate in legal proceedings that may require retention of counsel, and be subject to cross-examination. Based on its actual claims and litigation history, Pella believes that the percentage of eligible class members opting to proceed would be low. And even among those who do choose to proceed, not all of them would prevail. As courts, Plaintiffs' experts, and learned members of the construction industry have all universally acknowledged, there are multiple potential causes of wood deterioration of and water infiltration through wood windows.[7]

---

[7] *See* Schroter Rpt. at 104 (discussing condensation and improper installation as potential causes of wood deterioration) (ECF No. 610, Exhibit 3); *In re Pella Corp. Architect & Designer Series Windows Mktg., Sales Pracs. & Prods. Liab. Litig.*, 214 F. Supp. 3d 478, 484 (D.S.C. 2016) ("Because it is impossible to determine the specific cause of wood staining by simply viewing the stain itself . . . the SGH Experts must rely on more than visual observations to support their conclusion that defect-related leakage, and not some other mechanism, such as improper installation or construction defects, caused the observed wood staining and deterioration."); *see also* ASTM E2112 at § 4.3 (ECF No. 610, Exhibit 18) ("Improper installation of [window] units contributes to excessive air, water and sound leakage, and condensation. It may promote the

To prevail in their efforts to obtain monetary relief, class members would have to prove on a window-by-window basis that any water-related damage was caused by the alleged defects, as opposed to one or more alternative factors. Based on its history of investigations of such claims, and even the small sampling of window inspections of the Named Plaintiffs' homes performed by Pella's experts (*see* ECF No. 610, Ex. 15 (Will Smith Expert Report); ECF No. 610, Ex. 16 (Greg Gerdes Expert Report)), Pella believes that it would prevail on the issue of causation for a significant majority of individuals seeking relief. Likewise, based on its experience defending similar claims, Pella believes that it would prevail on statute of limitations grounds against a significant portion of individuals who seek to pursue their individual damages. *See, e.g.*, *Wegner v. Pella Corp.*, No. 2:14-mn-01993, 2015 U.S. Dist. LEXIS 60927, at *32-33 (D.S.C. May 5, 2015) ("Geetings alleges that he began to notice that his windows were leaking in 2010. Plaintiffs' ICFA claims stem from the allegation that Pella did not disclose the fact that their windows were defective. As of 2010, Geetings had discovered that the windows were defective or, at the very least, was on notice of all facts that would have been disclosed by a reasonably diligent investigation. Therefore, because this action was filed more than two years later, his ICFA claim is barred by the statute of limitations."); *Naparala v. Pella Corp.*, 153 F. Supp. 3d 884, 890 (D.S.C. 2015) ("When Naparala noticed excessive moisture in all of the rooms in his house the fall following the 2006 service call, he had possession of essential facts which would, if diligently investigated, disclose the fraud.").

---

deterioration of wall constructions, insulation, fenestration products [windows] and their respective finishes."); AAMA 2400-10 at § 4.1 (ECF No. 610, Exhibit 19) ("the effectiveness and durability of installed [window] units depend not only on the choice and quality of materials, design, adequacy of assembly, and support system, but also on their proper installation."); ASTM E 2128-01a at § X3.8.8 (ECF No. 610, Exhibit 6) ("Windows are often wrongfully blamed for leaks because the interior symptom of the leak appears at the window, even though the cause is elsewhere."); 2006 Criterium Engineers Construction Quality Survey (ECF No. 610, Exhibit 11) (noting improper window installation in 28% of new homes, and water intrusion from defective siding in 19%).

**B. Litigating the Rule 23(b)(2) Class Through Recovery Would Be Complex, Time-Consuming, Expensive, and Would Produce Uncertain Results.**

As discussed above, there are several hurdles to any actual recovery for the 23(b)(3) class, and even if Plaintiffs prevail every step along the way, a 23(b)(3) victory would provide the potential for relief to only a narrow subset of the group that comprises the current Settlement Class. The vast majority of homeowners with Pella ProLine Casement Windows would receive no relief as a result of the 23(b)(3) efforts, and their entitlement to any relief at all would depend on the resolution of the Rule 23(b)(2) declaratory judgment claims.

Yet, the prospect of Rule 23(b)(2) relief is even less likely than with 23(b)(3). As an initial matter, and as this Court has observed, a Pella victory at the 23(b)(3) stage would spell almost certain doom for the Rule 23(b)(2) class. *See* 7/15/2016 Hr'g Tr. at 12:3-5 ("In theory, Pella could win on all of the (b)(3) claims, in which case we probably won't worry about (b)(2) at all.") (Ex. 1). Thus, if Pella prevails for any reason in the Rule 23(b)(3) proceeding—by dispositive motion, decertification, or on the merits at trial—the prospect for 23(b)(2) relief is virtually eliminated.

Even if Pella were not to prevail at the 23(b)(3) stage, Plaintiffs would have additional obstacles to overcome for (b)(2) relief. Foremost, they would need to identify the legal bases underlying their requested declarations. The Court has already ordered Plaintiffs to identify the underlying law on multiple occasions (ECF Nos. 228, 481, 479-1), but Plaintiffs have yet to provide any sort of meaningful response. (*See* ECF Nos. 503, 509; 7/15/2016 Hr'g Tr. (Ex. 1).) Plaintiffs would also need to overcome Pella's anticipated motion to decertify, and then prevail in a second class trial.

Even if the parties were to make the substantial investments necessary to complete two separate class trials, and even if Plaintiffs were to prevail on both, the net result for (b)(2) class members would be declaratory relief only. This relief would not provide monetary or practical

benefits on its own, but rather would set the stage for an additional round of individual litigation to resolve disputed issues of causation, damages, and applicability of statute of limitations defenses. *See Pella Corp. v. Saltzman*, 606 F.3d 391, 395 (7th Cir. 2010) (describing "[t]he contemplated process" that would ensue in the event plaintiffs were to prevail on all six requested declarations at a 23(b)(2) class trial). Practical relief, in the form of replacement product, service, or an injunction—to the extent even possible based on the underlying law Plaintiffs have yet to identify—would only be available after resolution of individual issues, including causation. *See Haley v. Kolbe & Kolbe Millwork Co.*, No. 14-cv-99-bbc, 2015 U.S. Dist. LEXIS 169266, at *63 (W.D. Wis. Dec. 18, 2015) (discussing Seventh Circuit's *Saltzman* decision affirming 23(b)(2) certification, observing that "[a]lthough it is not entirely clear from *Pella*, it appears that the court envisioned that the special master would resolve the individual issues of causation and coverage before a class member was entitled to the injunctive relief."), *aff'd*, 863 F.3d 600 (7th Cir. 2017). And for the same reasons discussed above in the context of individual (b)(3) post-trial litigation, the actual rate of recovery among class members is likely to be low.

Significantly, the Court expressly acknowledged in 2016 that bifurcated treatment of the Rule 23(b)(3) and (b)(2) classes—even though it was necessary—was going to be "very expensive, . . . difficult, [and] . . . a pain in the neck." *See* 7/15/2016 Hr'g Tr. at 12:7-9 (Deferring Rule 23(b)(2) issues pending completion of the Rule 23(b)(3) class trial, and stating, "[i]f you want to tell me that it's going to be very expensive, it's going to be difficult, it's going to be a pain in the neck, I agree, but the structure is the existing one."). This was true in 2016, and it is no less true now.

For all of the above reasons, if the parties were to continue litigation of the Rule 23(b)(3) and (b)(2) class claims through recovery, the proceedings would be expensive, lengthy, complex,

and would result in only speculative and uncertain recovery for a small subset of the Settlement Class now poised to receive significant relief under the Settlement Agreement.

## II. The Value of the Proposed Settlement Compares Favorably to the Value of Continued Litigation.

The proposed Settlement Agreement establishes a Settlement Fund of $25,750,000.00. Fund A, consisting of $23,750,000.00, provides cash benefits to Settlement Class Members who have suffered Eligible Damage, compensating claimants for all or a portion of the costs of replacement product, installation, finishing, and the repair of other property damage. Fund B, consisting of a $2,000,000.00 reserve, will fund benefits to Settlement Class Members observing Eligible Damage after the Claim Deadline, up to 15 years after the Date of Sale for Windows manufactured before 2007. In addition to this Settlement Fund, Pella has agreed to separately pay for Class Notice Expenses, as well as any award of attorneys' fees, costs, expenses, and disbursements up to $9,000,000.00.

The value and immediacy of relief provided by the Settlement Agreement compares favorably to the expected value of continued litigation. As discussed above, continued litigation through class recovery would be expensive, time-consuming, complex, and would produce highly uncertain results. Even in the event of a class action trial victory, the individual litigation required to resolve the deferred individual issues would be a substantial hurdle to actual recovery for many class members; and even for those who ultimately recover, would likely cause a long delay. In contrast, the Settlement Agreement provides benefits to Settlement Class Members who have experienced Eligible Damage. It removes many of the obstacles that otherwise would stand in the way of class member recovery, and saves substantial legal expenses on both sides. For all of these reasons, the proposed Settlement Agreement is well "within the range of possible approval." *Armstrong*, 616 F.2d at 314; *McCue*, 2015 U.S. Dist. LEXIS 28151, at *3; *see also*

*Isby*, 75 F.3d at 1199 ("Viewed in light of the obstacles to success on the merits, the district court did not abuse its discretion in its consideration of this factor.").

### III. The Proposed Settlement Was Negotiated at Arms Length and Provides Fair and Reasonable Benefits to Settlement Class Members.

The Settlement Agreement here is the product of arms-length negotiations. *See Williams*, 658 F.3d at 634 (District courts must closely scrutinize class settlements where there is evidence of collusion between defendants and class counsel); *Reynolds*, 288 F.3d at 283. Indeed, the parties did not come to agreement until the eve of trial, after substantial motion practice had either been filed or completed, including motions to dismiss, a motion for decertification, competing *Daubert* motions to exclude, and Pella's motion for summary judgment. Moreover, Judge Weisman was actively engaged in facilitating settlement discussions among the parties, and actually recommended the ultimately agreed-upon settlement amount as a compromise position for both parties. (*See* ECF No. 650.) Such circumstances confirm the parties' negotiations were made at arm-length and were proper. *See Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014) (concluding "there were no 'suspicious circumstances'" surrounding settlement where "[t]he settlement was reached through extensive arm's-length negotiations with an experienced third party mediator, [and] the parties contentiously litigated a motion to dismiss").

In addition, the fairness of the Settlement Agreement is underscored by the concrete, class-member-focused benefits provided by the Settlement Fund. The purpose of the Settlement Fund (both Fund A and Fund B) is to benefit Settlement Class Members, as opposed to Defendants or counsel. Pella's agreement to pay any award of attorneys' fees up to $9,000,000.00 is separate, and will be paid independently of the Settlement Fund. To the extent money remains in Fund A after the Claims Deadline, Pella at most can be reimbursed for Class Notice Expenses; the distribution of any unclaimed Fund A dollars after that will be directed

either to Settlement Class Members as set forth in the Settlement Agreement, or elsewhere as determined by the Court. (Settlement Agreement ¶ 5.04(4) (ECF No. 672-1).) These factors favor a finding of fairness. *See Martin v. Reid*, 818 F.3d 302, 309 (7th Cir. 2016) ("Nothing in Rule 23 prohibits the deferral of the final fee award until after the agreement is approved, especially for an agreement structured as this one is, where the fees are kept entirely separate from the funds that will be available for compensation. This type of provision is to be encouraged, not criticized.").

Importantly, the concerns precipitating the Seventh Circuit's reversal of the 2012 settlement agreement in this action have been accounted for, and resolved. The class representative conflicts of interest identified by the Panel are not present. *See Eubank*, 753 F.3d at 723 (identifying conflict where "the settlement agreement itself had provided for incentive awards only to the representatives who supported the settlement."); *id.* at 723-24 (observing that family relationship between class counsel and named plaintiff Saltzman created conflict of interest). Attorney Paul Weiss and his firm have been replaced as class counsel, and Leonard Saltzman is no longer a Named Plaintiff. Moreover, with regard to class representative incentive awards, the Settlement Agreement provides for incentive awards regardless of whether a class representative approves the settlement. (*See* Settlement Agreement ¶ 6.04 (ECF No. 672-1).)

The Seventh Circuit's concerns with the value of the 2012 settlement are likewise non-issues here. *See Eubank*, 753 F.3d at 723-25 (observing the 2012 agreement did "not quantify the benefits to class members" and limited class member recovery to $750 per structure or $6000 per structure where class members opt for arbitration). In contrast to the 2012 settlement, the class benefits of the current proposed Settlement Agreement are obvious and substantial. It designates a $23,750,000 Fund A, and no "per structure" caps. Moreover, claimants with Eligible Damage are entitled to Fund A relief that compensates all or a portion of costs for

replacement product, installation, finishing, and repair of other property damage—the same components of damages they would likely seek to recover on an individual basis. For all of these reasons, the deficiencies in the 2012 settlement agreement perceived by the Seventh Circuit are not present in the current proposed Settlement Agreement, and the Court should have no hesitation to grant preliminary approval.

<u>**CONCLUSION**</u>

For all the reasons discussed above, the proposed Settlement Agreement in this case is fair, reasonable, and adequate, and at this stage is well "within the range of approval." Accordingly, Pella respectfully requests that this Court grant the Plaintiffs' uncontested motion for preliminary approval.

Dated: February 9, 2018

**FAEGRE BAKER DANIELS LLP**
John A. Roberts
311 S. Wacker Drive, Suite 4300
Chicago, IL 60606

**FAEGRE BAKER DANIELS LLP**

/s/ John P. Mandler
John P. Mandler, Bar No. 194438
Amy R. Fiterman, Bar No. 285493
Shane A. Anderson, Bar No. 0386531
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Phone: (612) 766-7000

**ATTORNEYS FOR DEFENDANTS**

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on February 9, 2018, a copy of the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFFS' UNCONTESTED MOTION FOR PRELIMINARY APPROVAL** was filed electronically.  Parties may access this filing through the Court's electronic records system.

/s/ John P. Mandler