# Addendum

# <u>ADDENDUM</u>

## <u>TABLE OF CONTENTS</u>

<u>**Authority**</u>                                                                                                      <u>**Page**</u>

*In re Apple Inc. Secs. Litig.*, No. 5:06-cv-05208, 2011 WL 1877988
    (N.D. Cal. May 17, 2011) ............................................................................. Add-1

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, MDL No. 092067,
    2014 WL 4446464 (D. Mass. Sept. 8, 2014) ............................................. Add-6

*In re Citigroup Secs. Litig.*, No. 07-cv-9901(SHS), Dkt. No. 286, Order
    (S.D.N.Y. Sept. 10, 2013) ........................................................................ Add-14

*Grayson v. Berryhill*, No. 4:16-cv-61, 2017 WL 6209703 (N.D. Okla. Dec. 8, 2017) ........ Add-16

*Kirby v. Berryhill*, No. 14 CV 5936, 2017 WL 5891059 (N.D. Ill. Nov. 29, 2017)............. Add-20

*O'Rourke v. Healthdyne, Inc.*, Civ. A. Nos. 84-4295, 84-4296, 1986 WL 923
    (E.D. Pa. Jan. 16, 1986) .......................................................................... Add-22

*In re Penthouse Exec. Club Compensation Litig.*, 2014 WL 185628
    (S.D.N.Y. Jan. 14, 2014)......................................................................... Add-25

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ. A. 03-4578,
    2005 WL 1213926 (E.D. Pa. May 19, 2005) ............................................ Add-34

*In re Qwest Commc'ns Int'l, Inc. Secs. Litig.*, No. 01-cv-1451, 2006 WL 8429707
    (D. Colo. Sept. 29, 2006) ......................................................................... Add-50

Fed. Sec. L. Rep. P 96,312

2011 WL 1877988
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.

In re **APPLE** INC. **SECURITIES LITIGATION**.
This Document Relates To All Actions.

No. 5:06–CV–05208–JF (HRL).
|
May 17, 2011.

**Attorneys and Law Firms**

Patrice L. Bishop, Timothy J. Burke, Stull, Stull &
Brody, Los Angeles, CA, Gary S. Graifman, Kantrowitz
Goldhamer & Graifman PC, Chestnut Ridge, NY,
Howard Theodore Longman, Stull, Stull & Brody, New
York, NY, Michael J. Barry, Grant & Eisenhofer P.A.,
Wilmington, DE, for Martin Vogel on Behalf of Himself
and all Others Similarly Situated.

Charles Thomas Caliendo, Jay W. Eisenhofer, Grant
& Eisenhofer P.A., New York, NY, Lesley Elizabeth
Weaver, Shepherd Finkelman Miller Shah LLP, SF, CA,
Merrill G. Emerick, Anderlini & Emerick LLP, San
Mateo, CA, Michael J. Barry, Grant & Eisenhofer P.A.,
Wilmington, DE, for The New York City Employees'
Retirement System.

Douglas R. Young, Farella Braun & Martel LLP,
Yohance Claude Edwards, Munger, Tolles & Olson LLP,
San Francisco, CA, for Steven P. Jobs.

Carl Holliday Moor, John W. Spiegel, Munger Tolles
& Olson LLP, Los Angeles, CA, Jerome Cary Roth,
Yohance Claude Edwards, Munger Tolles & Olson LLP
San Francisco, CA, for Fred Anderson.

ORDER [1] GRANTING MOTION FOR FINAL
APPROVAL OF CLASS ACTION SETTLEMENT;
GRANTING MOTION FOR ATTORNEYS'
FEES AND EXPENSES; AND GRANTING IN
PART OBJECTOR PEZZATI'S MOTION FOR
ATTORNEYS' FEES AND INCENTIVE AWARD

[1]    This disposition is not designated for publication in
the official reports.

JEREMY FOGEL, District Judge.

**\*1** Lead Plaintiff New York City Employees' Retirement
System ("NYCERS") moves for final approval of a
proposed class action settlement, [2] attorneys' fees, and
expenses. Objector Patrick Pezzati ("Pezzati") moves for
an award of attorneys' fees and an incentive award. For
the reasons set forth below, NYCERS' motions will be
granted, and Pezzati's motion will be granted in part.

[2]    Defendants Apple, Inc. ("Apple"), Steven P. Jobs,
Fred D. Anderson, Nancy R. Heinen, William V.
Campbell, Millard S. Drexler, Arthur D. Levinson,
and Jerome B. York join in NYCERS' motion for
final approval of the settlement.

## I. BACKGROUND

### A. Procedural History
On August 24, 2006, Plaintiffs Martin Vogel ("Vogel")
and Kenneth Mahoney ("Mahoney") filed a securities
fraud class action alleging violations of the Securities and
Exchange Act of 1934 ("the 1934 Act"). On June 27,
2008, Vogel and Mahoney filed a second securities fraud
class action, again alleging violations of the 1934 Act. On
April 8, 2010, the Court consolidated the two actions
under the caption *In re Apple Inc. Securities Litigation,*
Case No. 5:06–cv–05208–JF; appointed NYCERS as lead
plaintiff; and appointed Grant & Eisenhofer as lead
counsel. Shortly thereafter, NYCERS filed an amended
consolidated class action complaint alleging violations of
sections 10(b) and 20(a) of the 1934 Act.

NYCERS claims that Defendants backdated Apple's
employee stock options for more than a decade and issued
false and misleading financial statements. NYCERS'
claims are based on a series of announcements and a
corrective disclosure made by Apple regarding its issuance
of stock option grants.

### B. Terms of the Settlement
After months of negotiations and a formal mediation
session, the parties reached an agreement in September
2010, under which Defendants would establish a $14
million settlement fund for distribution to the class,
donate $2.5 million to the corporate governance programs
of twelve universities, pay administrative costs, pay

attorneys' fees in an amount not exceeding $2 million, reimburse counsel for litigation expenses in an amount not exceeding $450,000, and implement certain corporate governance reforms. In return, the class would release all claims against Defendants arising out of the conduct at issue in this action, whether known or unknown at the time of settlement. The Court granted preliminary approval and conditionally certified a settlement class consisting of all persons and entities who purchased Apple common stock between August 24, 2001 and June 29, 2006.

The parties subsequently amended the settlement agreement by increasing the fund established for distribution to the class from $14 million to $16.5 million, eliminating the separate $2.5 million fund to be donated to the university corporate governance programs, and providing that any amount remaining in the settlement fund after distribution to the class would be donated to nine university corporate governance programs ("*cy pres* component"). The Court granted preliminary approval to the amended agreement ("proposed agreement").

### C. Notice

Notice of the proposed agreement was mailed to more than 1.3 million individuals, 31,886 record holders, and 5,802 bankers, brokers, and other nominees who may hold shares for potential class members. Notice also was published in *Investor's Business Daily* and transmitted over *Business Wire*.

### D. Claims, Exclusions, and Objections

 **\*2**  The Court heard oral argument on February 25, 2011 and requested that the parties provide an update on March 15, 2011 regarding the number of claims, exclusions, and objections submitted by class members. As of March 14, 2011, the claims administrator had received 76,820 proofs of claim, the value of which exceeds $48 million. Eleven [3] class members requested exclusion from the class, and three class members filed objections to the proposed settlement.

[3]    A total of twenty individuals requested exclusion from the class, but nine of them did not provide evidence showing that they are class members as required by this Court's order.

## II. LEGAL STANDARD

In evaluating a settlement, a district court must determine whether the proposed settlement is "fundamentally fair, reasonable, and adequate." *See* Fed.R.Civ.P. 23(e); *Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 458 (9th Cir.2000).

> "Assessing a settlement proposal requires a district court to balance a number of factors, including: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining a class action throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; ... and the reaction of the class members to the proposed settlement."

*Id.* at 458 (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1026 (9th Cir.1998)* (citations omitted)). The district court also must satisfy itself that the proposed settlement is not the product of collusion among the negotiating parties. *Id.*

## III. DISCUSSION

### A. Settlement Class

The instant action satisfies the requirements for class action treatment under Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure. The numerosity requirement is satisfied because the joinder of more than 1.3 million individuals would be impracticable. The commonality requirement is satisfied because the issue of whether Apple issued false and misleading proxy statements is common to all class members. The typicality requirement is met because the claims of NYCERS are identical to those of the other class members, as all of them arise from Apple's allegedly false and misleading proxy statements. The adequacy of representation requirement also is met because NYCERS and its counsel fairly and adequately have protected the interests of the class throughout the litigation. A class action is superior to other methods of adjudication, as

all questions of law or fact that are common to the class members predominate over any questions affecting only individual class members. Accordingly, the proposed class, which includes all persons who purchased Apple common stock between August 24, 2001 and June 29, 2006, is certified for purposes of this settlement agreement.

### B. Notice
The form and content of the notice, which was mailed directly to more than 1.3 million potential class members and published in two media outlets, satisfies the requirements of Rule 23(e) and constitutes the best notice practicable under the circumstances. Class members were given ample opportunity to object to the proposed settlement, to participate in the fairness hearings, and to request exclusion from the class.

### C. The Proposed Settlement
 **\*3** Based on the factors below, the Court concludes that the proposed settlement is fair, reasonable, and adequate.

#### 1. Strength of Plaintiffs' Case
NYCERS asserts that continuing the litigation would be risky, as it might not have been able to meet its burden of proving reliance and loss causation at the summary judgment stage or at trial.

#### 2. Risk, Complexity, and Likely Duration of Further Litigation
The parties attest that this action would have continued for years and that its outcome would have been uncertain had they not reached a settlement. A settlement provides the class with an immediate and substantial recovery.

#### 3. Terms of the Settlement
The terms of the proposed agreement confer considerable benefits on the class. Defendants have agreed to establish a $16.5 million fund to be distributed among class members. Defendants separately will pay Plaintiffs' attorneys' fees and expenses, as well as the costs of administrating the class. Defendants also have agreed to implement a variety of corporate governance programs to prevent a recurrence the alleged conduct.

#### 4. Stage of the Proceedings

Because the parties have been litigating this action for more than four years, they had a thorough understanding of the strengths and weaknesses of their cases during settlement negotiations.

#### 5. Experience and Views of Counsel
Counsel for both parties have many years of experience in litigating securities and complex class actions. Because the settlement is the product of a formal mediation session and several months of negotiations conducted at arm's length, the Court is satisfied that the settlement is not the product of collusion.

#### 6. Reaction of the Class Members
Out of more than 1.3 potential class members, only eleven class members requested exclusions and three class members filed objections. The small number of objections raises a strong presumption that the settlement is favorable to the class. *See In re Omnivision Technologies, Inc.,* 559 F.Supp.2d 1036, 1043 (N.D.Cal.2008). [4] The Court concludes that none of the objections rebuts this presumption.

[4]    George Sibley filed objections but subsequently withdrew them. Geoffrey Wood also filed objections, but he lacks standing to object as he did not provide evidence to show that he is a class member as required by this Court's order. *See San Francisco NAACP v. San Francisco Unified School Dist.,* 59 F.Supp.2d 1021, 1032 (N.D.Cal.1999) ("nonclass members have no standing to object to the settlement of a class action") (citations omitted).

#### a. Pezzati Objection
Patrick Pezzati objected to the settlement's *cy pres* component and to the content of the notice. However, Pezzati withdrew his objection after NYCERS provided documentation showing that the settlement fund will be exhausted by the 76,820 claims received as of March 14, 2011. As will be discussed below, Pezzati now argues that he is entitled to attorneys' fees.

#### b. Kyriazos Objection
Charles Kyriazos claims that Defendants' alleged actions did not harm the class members, and he objects to an award of attorneys' fees to Plaintiffs' counsel. However, while Kyriazos is entitled to his view of the merits, his

objections are not directed to the fairness or adequacy of the settlement, which represents a compromise with respect to the claims asserted by Plaintiffs.

### c. Fekrat Objection

**\*4** Fred Fekrat objects to the plan of allocation because options traders who purchased Apple stock but did not hold their shares until the end of the class period are ineligible to recover under the plan. These investors were excluded from the class for two reasons. First, NYCERS' amended complaint does not allege that options traders suffered an injury as a result of Defendants' alleged conduct; the amended complaint refers only to "common stockholders." Am. Compl. ¶¶ 460, 461. Second, the Supreme Court has held that investors who sell their shares before a corrective disclosure do not necessarily suffer a loss. *See Dura Pharmaceuticals v. Broudo,* 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) ("[I]f the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.").

### D. Attorneys' Fees and Costs Requested by NYCERS

NYCERS requests attorneys' fees in the amount of $1,966,250 and costs in the amount of $395,515.90, or a total of 11.9% of the $16.5 million settlement fund. This percentage is well below the Ninth Circuit's benchmark of 25% of the recovery for the class in common fund cases. *See, e.g., Powers v. Eichen,* 229 F.3d 1249, 1256 (9th Cir.2000). NYCERS negotiated a settlement that provides significant benefits to the class, as discussed above. The settlement allows the class to recover up to $1.70 per share, an amount that reflects the maximum potential recovery class members could have achieved under federal law. The Court is entirely satisfied that the requested award of fees and expenses is warranted in this case.

### E. Attorneys' Fees Requested by Pezzati

Pezzati claims to have conferred a benefit to the class in the amount of $2.5 million. He asserts that the increase of the settlement fund from $14 million to $16.5 million is attributable to his objection to the portion of the original proposed agreement that would have required Defendants to donate $2.5 million to various university programs in corporate governance. At the first hearing for preliminary approval of the settlement, Pezzati argued that such donations would be unlawful because lead counsel are

affiliated with two university programs that were selected to benefit from that portion of the agreement. After Pezzati raised his objection, the parties amended their proposed agreement to eliminate Defendants' $2.5 million donation to the university programs and to increase the settlement fund by $2.5 million.

Because $2.5 million is 15.15% of the total class recovery of $16.5 million, Pezzati requests that his attorneys be awarded 15.15% of the $1,966,250 in fees sought by Plaintiffs' counsel, which would result in award to Pezzati's counsel [5] of $297,916. Pezzati also seeks an incentive payment of $1,000 on the basis that "he exposed himself to the risk of harassing discovery" and "quite likely faced private investigation from the plaintiffs' attorneys." Pezzati's counsel claim that they worked a total of 104 hours on this action, but they do not provide a detailed accounting of their hours.

[5]     Pezzati is represented by Theodore H. Frank, Daniel Greenberg, and Adam Schulman of the Center for Class Action Fairness.

**\*5** When the percentage recovery for objectors' counsel would be either too small or too large in light of the hours devoted to the case, the benchmark percentage should be adjusted or replaced by the lodestar calculation. *See Wininger v. SI Management L.P.,* 301 F.3d 1115, 1127 (9th Cir.2002). Assuming 104 hours expended on this case, an award of $297,916 as requested by Pezzati would result in an excessive hourly rate of more than $2,800. Accordingly, the lodestar calculation is more appropriate in this case. Moreover, "[t]he party petitioning for attorneys' fees bears the burden of submitting detailed time records justifying the hours claimed to have been expended." *In re Washington Public Power Supply System Sec. Litig.,* 19 F.3d 1291, 1305 (9th Cir.1994) (internal quotation marks omitted). "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.*

Pezzati's counsel do not provide detailed records to justify the 104 hours they claim to have expended on their objections to the proposed settlement. It is unclear how drafting Pezzati's limited submissions and making a few short court appearances would have required so much time. At the same time, the Court agrees that Pezzati's objection did benefit the class, and that a fee award in some amount is appropriate. Although NYCERS objects strenuously to any award that would result in a diminution

Case 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 7 of 59 PageID #:25925

of the award to its counsel, it has no objection in principle to an award of fees to Pezzati's attorneys. NYCERS suggests that the Court award Pezzati the difference between what Defendants agreed to pay in attorneys' fees ($2 million), and the amount actually sought by Plaintiffs' counsel ($1,966,250), which is $33,750. NYCERS also points out that although Defendants agreed to pay up to $450,000 in litigation costs, Plaintiffs have requested only $395,515.90 of that amount, leaving an additional sum of approximately $54,480. Defendants' counsel stated at the hearing that Defendants would have no objection to utilization of these funds to pay a fee award to Pezzati, on the condition that Pezzati waive his right to appeal the judgment, which Pezzati agreed to do. Under the circumstances, an award of fees to Pezzati in the amount of $87,000 would result in an hourly rate of approximately $836, which is generous but not overly so. An additional incentive award of $1,000 would bring the total amount awarded to Pezzati to $88,000, which is within the combined limit of $2.45 million for fees and expenses to which the parties agreed. In light of all of the relevant circumstances, the Court concludes that a fee award of $87,000 and an incentive payment of $1,000 fairly will compensate Pezzati and his counsel for their contributions to this litigation. [6]

[6]  At the hearing, Plaintiffs' counsel argued that Pezzati's request for attorneys' fees should be denied entirely because Pezzati solicited class members who were represented by counsel in violation of California Rules of Professional Conduct. The Court is not inclined to consider this argument given that it was not briefed but rather was raised for the first time at the end of the hearing. Even if it were to consider the argument, the Court would conclude that no ethical violation has been established. It is not clear that the California Rules of Professional Conduct have any application in this particular context. Perhaps more to the point, *Hernandez v. Vitamin Shoppe Industries, Inc.,* 174 Cal.App.4th 1441, 95 Cal.Rptr.3d 734 (2009), the case cited by Plaintiffs' counsel at the hearing, is distinguishable. *Hernandez* involved an attorney who sent letters directly to class members who were represented by class counsel; the letters contained misrepresentations of fact and urged class members to opt out of the class and retain the letters' author. There is no evidence of direct solicitation in the instant case. Pezzati's counsel admitted to discussing the case in a blog, but he also stated that Pezzati did not retain him as a result of the blog.

## IV. ORDER

Good cause therefor appearing, IT IS HEREBY ORDERED that:

(1) NYCERS' motion for final approval of the class action settlement is GRANTED;

(2) NYCERS' motion for attorneys' fees and litigation expenses in the amount of $1,966,250 and $395,515.90 respectively is GRANTED; and

 **\*6**  (3) Pezzati's motion for attorneys' fees is GRANTED in the amount of $87,000, and his motion for an incentive award is GRANTED in the amount of $1,000.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 1877988, Fed. Sec. L. Rep. P 96,312

---

                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4446464
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

In re CELEXA AND LEXAPRO MARKETING
AND SALES PRACTICES LITIGATION.

MDL No. 09–2067–NMG.
|
Signed Sept. 8, 2014.

### MEMORANDUM & ORDER

GORTON, District Judge.

**\*1** On July 16, 2014, the Court held a final fairness
hearing with respect to a proposed settlement agreement
between defendants Forest Pharmaceuticals, Inc. and
Forest Laboratories, Inc. (collectively, and for simplicity,
"Forest") and a class of Missouri consumers and third-
party providers who purchased or paid for branded
anti-depressant drugs Celexa or Lexapro between 1998
and 2013 ("plaintiffs"). Plaintiffs allege that Forest
violated the Missouri Merchandising Practices Act by
misrepresenting and concealing material information in
their marketing of Celexa and Lexapro to treat major
depressive disorder in pediatric patients. The case is part
of a nationwide multi-district litigation ("MDL") assigned
to this Court for consolidated proceedings.

Plaintiffs and Forest have moved for the final approval of
the proposed settlement, which would create a common
fund of at least $7,650,000 and no more than $10,350,000
based upon the calculations of damages performed by
experts retained by plaintiffs and Forest. Natalie Luster
("Luster" or "the objector"), the plaintiff in a parallel class
action pending in a Missouri state court, contends that
the common fund is inadequate because her expert has
calculated damages that exceed the amounts calculated
by experts retained by plaintiffs and Forest. She raised
objections to the proposed settlement in writing and at the
final fairness hearing.

Should the Court approve the agreement, class counsel for
plaintiffs move for $2,846,250 in attorneys' fees, $325,000
in expenses and $10,000 in incentive awards for the two
class representatives, Ruth Dunham and Tanya Shippy,
to be paid out of the common fund. Defendants do not

object. Luster, however, contends that the requested fees
are excessive and moves for an award of 50% of the fees
awarded to class counsel, $350,000 in litigation expenses
and her own incentive award of $10,000.

The Court has considered the subject motions and
supporting memoranda and finds that the proposed
settlement agreement is fair, reasonable and adequate.
It will approve the subject settlement, award the class
representatives $10,000 each in incentive awards and
award class counsel the expenses requested and a modified
amount of attorneys' fees based upon ultimate payments
to class members. The Court will also award modest
attorneys' fees to counsel for the objector.

### I. *Procedural History*

The instant action ("the MDL Action") is one of several
lawsuits transferred to this Court for coordinated pretrial
proceedings pursuant to 28 U.S.C. § 1407. It was initially
filed in the Eastern District of Missouri in 2009 by Angela
Jaeckel. Tanya Shippy and Ruth Dunham were joined as
plaintiffs in a Second Amended Complaint filed in May,
2013 and represent a class of consumers and third-party
payors in Missouri who purchased Celexa and Lexapro
for the treatment of pediatric major depressive disorder.

The Second Amended Complaint alleges, *inter alia,* that
Forest violated the Missouri Merchandising Practices
Act (MMPA), Mo.Rev.Stat. §§ 407.025 *et seq.,* by
misrepresenting and concealing material information
about the efficacy of Celexa and Lexapro for treating
pediatric depression. In January, 2014, the Court allowed
plaintiffs' motion to certify a class of consumers and
entities who paid for, purchased or prescribed Celexa or
Lexapro in Missouri for use by a minor from July, 2001
(for Celexa) and from August, 2002 (for Lexapro) until the
present.

**\*2** Objector is the named plaintiff and class
representative in a class action titled *Luster v. Forest
Pharmaceuticals, Inc.,* No. 0922–CC08347 (Mo. Cir. Ct.
filed July 22, 2009), that is currently pending before
the Circuit Court for the City of St. Louis, Missouri
("the Missouri Action"). She represents a certified class
of citizens of Missouri who purchased Celexa for use
by children and adolescents between 1998 and 2005
("the Missouri Class"). In September, 2013, Objector
moved to stay the MDL Action on federal abstention
grounds. The Court denied that motion in the Order

In re: Celexa and Lexapro Marketing and Sales Practices..., Not Reported in...

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 9 of 59 PageID #:25927

2014 WL 4446464

allowing the motion to certify a Missouri class. After multiple continuances, the case was tentatively scheduled to proceed to trial in March, 2014, although Luster had moved for a brief continuance. Forest filed a renewed motion for summary judgment under the MMPA in December, 2013 and a motion to decertify the Luster class in February, 2014. Those motions were pending before the Missouri state court, when the Missouri Action was stayed.

In March, 2014, the parties in the MDL Action informed the Court that they had reached a settlement agreement ("the MDL Settlement Agreement"). Prior to reaching that agreement, Forest also engaged in unsuccessful settlement negotiations with counsel for Luster.

On March 14, 2014, the Court entered an Order Granting Preliminary Approval of Settlement, Directing Notice to the Class, and Scheduling Fairness Hearing ("the Preliminary Order"). The Preliminary Order certified a class ("the MDL Settlement Class") comprised of

> [a]ll Individuals and entities, including third-party payors ... of prescription medicine benefits (other than governmental entities), who purchased, paid for or made a reimbursement for branded Celexa for use by a Minor between January 1, 1998 and December 31, 2013, or who purchased, paid for or made a reimbursement for branded Lexapro for use by a Minor between August 1, 2002 and December 31, 2013, where (*i* ) branded Celexa or Lexapro was prescribed to the Minor in Missouri; or (*ii* ) the Individual or Minor was a domiciliary citizen of Missouri at the time of the prescription or payment; or (*iii* ) for an Individual, payment for the prescription was made in Missouri. This class does not include those Individuals or Minors who are seeking personal injury claims arising out of their purchase or use of branded Celexa and/or Lexapro.

As part of the Preliminary Order, the Court stayed Luster's Missouri Action pursuant to its authority under the All Writs Act, 28 U.S.C. § 1651, to issue all writs necessary or appropriate in aid of its jurisdiction. In June, 2014, the Court denied a motion by Luster to intervene in the MDL Action but allowed her to obtain minimal discovery prior to the final fairness hearing. Luster filed her written objection on June 9, 2014.

The Preliminary Order approved the appointment of Epiq Class Action and Mass Tort Solutions ("Epiq") as the Claims Administrator for the MDL Action. As of July 1, 2014, Epiq had mailed successfully the Third–Party Payor Claim Package to 97% of the entities identified as potential Third–Party Payor Class Members and published a Notice in six local Missouri newspapers with an estimated circulation of over 600,000. It also 1) disseminated about 54 million internet-based and geographicallytargeted "digital banner advertisements," and 2) established a Class Action Information Website and a toll-free phone number for class members and others seeking information about the proposed settlement. As of July 1, 2014, Epiq had received 19 Consumer Claim Forms and 4 Third–Party Payor Forms.

**\*3** On July 9, 2014, Forest and plaintiffs filed a joint motion for the final approval of class settlement and plaintiffs moved for attorneys' fees and incentive awards. On July 15, 2014, on the eve of the final fairness hearing, Luster filed her motion for attorneys' fees and incentive awards.

The Court held a final fairness hearing on July 16, 2014, at which plaintiffs, Forest and Luster proffered arguments with respect to the Proposed MDL Settlement and Luster presented testimony by her expert on damages, Dr. Rena Conti. The Court took the matter under advisement and now issues its rulings on the pending motions.

## II. *Joint Motion for Final Approval of Class Action Settlement*
Plaintiffs and Forest move jointly for final approval of the proposed MDL Settlement Agreement. For the reasons that follow, the Court will allow the motion for final approval of the agreement over the objections of Luster.

### A. Key Provisions of the Proposed Settlement Agreement

In re: Celexa and Lexapro Marketing and Sales Practices..., Not Reported in...
Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 10 of 59 PageID #:25928
2014 WL 4446464

The Proposed MDL Settlement Agreement is described in full in the Order of Preliminary Approval (Docket No. 338) but the key provisions are summarized here.

First, defendants have already made an "initial payment" of $7,650,000 into the Common Fund. *See* Preliminary Order, Docket No. 338, ¶ 15. Any attorneys' fees, expenses incurred by class counsel and incentive awards for class representatives will be paid out of that initial payment, *Id.* ¶ 17, and Forest agrees not to oppose or support any objection to awards of reasonable attorneys' fees not to exceed 34% of the Common Fund and expenses not to exceed $325,000. *See* Settlement Agreement and Release, § IX (Docket No. 337–1). The initial payment will also cover the costs of providing notice to potential class members and administrating the claims process. Preliminary Order, ¶ 17.

After deducting the maximum amounts recoverable as fees, expenses, incentive awards and costs, at least $4,215,000 of the initial payment will be distributed to class members. *Id.* ¶ 16. That amount will be distributed on a pro rata basis if the aggregated amount of all valid claims is less than $4,215,000. *Id* . ¶ 17. If, on the other hand, aggregated valid claims exceed $4,215,000, Forest will pay up to $2,700,000 into the Common Fund to cover additional valid claims. *Id.* ¶ 18. In the unlikely event that the aggregated valid claims, incentive awards, attorneys' fees and expenses exceed $10,350,000, awards to class members will be reduced pro rata. *Id.* ¶ 19.

The amount of each class member who submits a valid claim stands to recover depends on 1) whether the purchase or payment was for Celexa or Lexapro and 2) when the purchase or payment was made. Specifically, the MDL Settlement Agreement provides that class members submitting valid claims stand to receive:

    a.  100% reimbursement for purchases/payments between January 1, 1998 and March 31, 2005;

    b. 65% reimbursement for purchases/payments between April 1, 2005 and March 19, 2009;

  **\*4**  c. 65% reimbursement for purchases/payments between March 20, 2009 and December 31, 2013, where records reflect that the prescription was for a minor who was less than 12 years old;

    d. 20% reimbursement for purchases/payments between March 20, 2009 and December 31, 2013, where records reflect that the prescription was for a minor aged 12 years or older; and

    e. $50 will be paid to individual class members who are unable to identify the amounts they paid pursuant to the Preliminary Order.

*Id.* ¶ 16.

In order to be entitled to reimbursement according to that schedule, a class member must submit a Proof of Claim to the Claims Administrator no later than January 26, 2015. Each Proof of Claim submitted by an Individual Class Member (as opposed to a Third–Party Payor ("TPP")) must include a declaration made under oath that

    a. states the time period over which the Individual Class Member purchased or paid for Celexa or Lexapro that was prescribed to a minor,

    b. identifies the minor and the doctor, hospital, medical facility or pharmacy who prescribed or dispensed the Celexa or Lexapro to the minor,

    c. avers that the prescription was issued in Missouri, the payment was made in Missouri, or that the minor or Individual Class Member was domiciled in Missouri at the time of the prescription or payment,

    d. identifies the amount paid for each prescription, and

    e. authorizes access to records in the event that the claim is selected for an audit.

*Id.* ¶ 13(c).

If a claim is selected for an audit, the Individual Class Member may prove that he or she made the payments or purchases he or she claims with the following evidence: 1) receipts, cancelled checks, or credit card statements evidencing payment, 2) an explanation of benefits or similar document from an insurer or health plan, 3) records from a pharmacy or similar entity, 4) a letter from the minor's physician stating that the amount paid for Celexa or Lexapro or 5) authorizing access to pharmacy or medical records to the extent permitted by HIPAA. *Id.* ¶ 13(d).

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 11 of 59 PageID #:25929
In re Celexa and Lexapro Marketing and Sales Practices..., Not Reported in...
2014 WL 4446464

### B. Legal Standard for Scrutinizing Agreements to Settle Class Actions

A class action may be settled only if a district court finds after a hearing that the proposed settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e); *Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund,* 582 F.3d 30, 44 (1st Cir.2009).

The First Circuit has not established a fixed test for evaluating the fairness of a settlement. *See New Eng. Carpenters Health Benefit Funds v. First Databank, Inc.,* 602 F.Supp.2d 277, 280 (D .Mass.2009). There is, however, a presumption of fairness for settlements that are deemed to be the result of "arms-length negotiations" following "adequate" discovery. *See Drug Stores,* 482 F.3d at 44 (citing *City P'ship Co. v. Atl. Acquisition Ltd. P'ship,* 100 F.3d 1041, 1043 (1st Cir.1996)). Discovery is sufficient if it enables representatives of the parties to act "intelligently" when negotiating a settlement. *Rolland v.. Cellucci,* 191 F.R.D. 3, 6 (D.Mass.2000).

**\*5** In determining the fairness of a settlement, many courts in the First Circuit have relied on factors such as

> (1) [the] risk, complexity, expense and duration of the case; (2) comparison of the proposed settlement with the likely result of continued litigation; (3) reaction of the class to the settlement; (4) stage of the litigation and the amount of discovery completed; and (5) quality of counsel and conduct during litigation and settlement negotiations.

In re *Tyco Int'l, Ltd. Multidistrict Litig.,* 535 F.Supp.2d 259, 259–60 (D.N.H.2007).

### C. Analysis

After considering the submissions of the parties and the evidence presented at the final fairness hearing, the Court finds the Proposed MDL Settlement to be "fair, reasonable and adequate."

As an initial matter, fairness may be presumed because the Court finds that the proposed agreement was the product of an arms-length negotiation following adequate

discovery. *See Drug Stores,* 482 F.3d at 44. This case has been litigated vigorously before this Court for about four years and plaintiffs have provided the Court with records of the extensive discovery taken. Furthermore, while Luster claims that the circumstances bear the hallmarks of a collusive "reverse auction" between Forest and class counsel for plaintiffs, this Court has already rejected that theory in its order denying Luster leave to intervene.

Even if the presumption of fairness did not exist, however, the Court would find the proposed settlement fair for the following reasons.

#### 1. Adequacy of Common Fund

Luster primarily objects to the amount that Forest will pay into the Common Fund. As discussed above, Forest has already paid $7,650,000 into the Common Fund and will pay up to an additional $2,700,000 if valid claims exceed the amount of the initial payment available for distribution to class members. Luster claims that the maximum value of $10,350,000 is inadequate and objects to the fact that Forest may be required to pay less than that amount.

#### a. Estimates of Damages

The dispute centers on the amount of damages that class members stand to recover should the case proceed to trial. Because no one knows the precise number of purchases of Celexa and Lexapro for pediatric use in Missouri between 1998 and 2013, experts for all three parties have estimated potential damages by extrapolating from imperfect data. Experts retained by plaintiffs and Forest reached similar estimates for use of Celexa and Lexapro between 1998 and 2013 that are substantially less than the purported damages estimated by the expert retained by Luster for the use of Celexa between 1998 and 2005.

#### i. Forest's Estimates

Forest retained Pierre–Yves Cremieux, PhD ("Dr.Cremieux"), who is a Managing Principal of the Analysis Group, Inc., an economics research consulting firm, an Adjunct Professor at the University of Quebec and a Lecturer at the Yale School of Management. He received his PhD from the University of California at Berkeley in 1992.

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 12 of 59 PageID #:25930
In re: Celexa and Lexapro Marketing and Sales Practices..., Not Reported in...

2014 WL 4446464

**\*6** Dr. Cremieux estimated that sales to consumers and TPPs between 1998 and 2013 totaled approximately $10,698,444. He reached that figure by determining the net nationwide sales of the two drugs between 1998 and 2013 based upon Forest's profit and loss statements. He then estimated the percentage of net sales that were attributable to consumers and TPPs based upon National Health Expenditure Account data available from the Centers for Medicare and Medicaid Services. Next, he estimated the percentage of net sales to consumers and TPPs that can be attributed to prescriptions for pediatric use based upon a data set of individual patient prescription claims histories for approximately 18 million beneficiaries of self-funded employer health plans. Finally, he estimated the percentage of net pediatric sales attributable to payments by Missouri consumers and TPPs based upon Missouri's share of the pediatric population of the United States according to the U.S. Census for 2000 (1.97%) and 2010 (1.92%).

### ii. Plaintiffs' Estimates

Plaintiffs consulted with Joel W. Hay, PhD ("Dr.Hay"), a pharmaceutical economist and a tenured Professor at the University of Southern California. Dr. Hay earned his PhD in economics from Yale University in 1980.

Dr. Hay estimated that class members incurred $11,354,254 in damages by first estimating that national sales of Celexa and Lexapro for pediatric use between 1998 and 2012 totaled $578,965,000 based on data from IMS Health, the U.S. Medical Expenditure Panel Survey, financial statements produced by Forest and sales data fromdrugs.com. Dr. Hay then multiplied that figure by the percentage determined from Missouri's share of the population of the United States based on the averages of census figures for 2000 and 2010.

### iii. Objector's Estimates

Luster retained Rena Conti, PhD ("Dr.Conti"), who is an Assistant Professor in the Departments of Health Studies and Pediatrics at the University of Chicago. Dr. Conti received her PhD in Health Policy and Economics from Harvard University as part of the Interfaculty Initiative in Health Policy.

Dr. Conti estimated that, between 1998 and 2005, sales of Celexa to members of the class certified in the Missouri Action were between $14,000,000 and $16,000,000. She

calculated that range by first determining the number of units of Celexa sold nationwide during each quarter of each year based on invoices obtained from Forest. Next, she determined the price per unit of Celexa paid by Missouri Medicaid during the same quarters. She multiplied the products of those figures by the percentage of national sales of Celexa attributable to Missouri based on IMS Health data. Finally, she multiplied the resulting figure, which she found to represent total sales of Celexa in Missouri, by the percentage attributable to pediatric use based on data from the IMS National Diagnosis and Therapeutic Index (NDTI).

Dr. Cremieux concluded that Dr. Conti's analysis was flawed because, among other reasons, the NDTI data is drawn from a small sample size and Medicare and Medicaid data may not approximate payments by private insurers.

### b. Analysis

**\*7** The crucial difference between the calculations performed by Dr. Conti and those performed by the other two experts is how the experts determined the percentage of nationwide sales of Celexa attributable to Missouri. Drs. Cremieux and Hay assumed that antidepressant use in Missouri tracked the national average and therefore based their calculations on census data which indicate that the population of Missouri is roughly 2% of the population of the United States. Dr. Conti relied on studies indicating that antidepressant use in Missouri is much higher than the national average and relied on Medicare and Medicaid data that suggests that between 3% and 6% of nationwide purchases of Celexa can be attributed to sales in Missouri.

The Court need not decide, as a matter of law, which method of calculating uncertain damages is more accurate, although it finds noteworthy the similar outcomes reached independently by Dr. Cremieux and Dr. Hay. Even if actual purchases were somewhere between those estimated by Dr. Conti, on the one hand, and those estimated by the other two experts, the Court finds that a settlement of between $7,650,000 and $10,350,000 is eminently reasonable. A settlement need not reimburse 100% of the estimated damages to class members in order to be fair. *See, e.g., O'Brien v. Brain Research Labs, LLC, No. 12–204, 2012 WL 3242365, at \*15* (D.N.J. Aug. 9, 2012 ("When evaluating the fairness of settlements, courts

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 13 of 59 PageID #:25931

In re Celexa and Lexapro Marketing and Sales Practices..., Not Reported in...

2014 WL 4446464

have held that full compensation is not a prerequisite for a fair settlement." (citations omitted)).

Moreover, plaintiffs risked recovering significantly less than what their own expert estimated in damages if they proceeded to trial. Forest has maintained throughout this litigation that actual damages were far less than total sales because some physicians were unaware of the off-label marketing or would have prescribed Celexa notwithstanding that marketing and many class members found the drug to be effective and therefore suffered no damages. *See Rolland v. Cellucci,* 191 F.R.D. 3, 14–15 (D.Mass.2000) (explaining that the reviewing court should not use a benchmark the highest award that plaintiffs could have received after full and successful litigation of the claim).

### 2. Other Objections

Luster's other objections will be addressed only briefly. First, it was reasonable for Forest and plaintiffs to agree that the Common Fund would not include interest or punitive damages and, in any event, recovery of such damages was far from guaranteed. Second, the Court finds that the settlement does not include a "reversionary" arrangement with respect to the $4,215,000 that will be distributed amongst class members who submit valid claims. *Compare Kakani v. Oracle Corp.,* No. 06–06493, 2007 WL 1793774, at *3 (N.D. Cal. June 19, 2007) (disapproving of settlement which did not guarantee a minimum recovery to class members and would return all unclaimed funds to the defendant). Third, Luster's objection to the reduced recovery for class members who purchased Celexa or Lexapro after February, 2005 is meritless, particularly because the class she purports to represent stands to recover 100% of the value of its purchases. It is reasonable for Forest and plaintiffs to tie recovery to the strength of an individual's claim. Similarly, the Court finds no merit in the claim that including purchasers of both Celexa and Lexapro in the settlement class dilutes the claims of purchasers of Celexa.

### III. *Motion by Plaintiffs for Attorneys' Fees, Expenses and Incentive Awards*

#### A. Request for Attorneys' Fees

**\*8** Fed.R.Civ.P. 23(h) provides that a court presiding over a certified class action may award "reasonable attorneys' fees and nontaxable costs that are authorized

by the law or by the parties' agreement." The First Circuit Court of Appeals has approved of at least two different methods for calculating attorneys' fees in the context of a class action: the "percentage of the fund" method or the "lodestar" method. In re *Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295, 307 (1st Cir.1995).

The percentage of the fund ("POF") approach awards counsel a reasonable percentage of the common fund. *Id.* at 305 (citation omitted). The First Circuit has explained that the POF approach may be more efficient and less burdensome on the court, particularly in complex cases. *Id.* at 307. Class counsel ask the Court to apply the POF approach and award $2,846,250 in attorneys' fees, which is 37% of $7,650,000, the minimum amount of the Common Fund, and 27.5% of $10,350,000, the maximum value of the Fund.

While the Court agrees that class counsel have obtained a generous settlement for the class and deserve to be fairly compensated, it disagrees that class counsel are entitled to recover a percentage based on the maximum value of the Common Fund. Courts in this Circuit generally award between 20% and 30% of the amount recovered for the class. *See* In re *Lupron Mktg. & Sales Practices Litig.,* 2005 WL 2006833, at *5 (D.Mass. Aug. 17, 2005) (citation omitted); In re *Compact Disc Minimum Advertised Price Antitrust Lit.,* 216 F.R.D. 197, 216 n. 45 (D.Mass.2003); *see also* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees & Expenses in Class Action Settlements: 1993–2008,* J. of Empirical Legal Stud. 248 (2010) (Table 4) (finding that the median and mean attorneys' fees awarded in the First Circuit are 20%). Here, class counsel have requested fees that would exceed 37% of the initial payment by Forest. Consequently, the Court will award attorneys' fees at least partially based upon valid claims paid. Class counsel will be awarded 30% of the initial payment of $7,650,000, or $2,295,000, immediately. Should valid claims exceed the amount available for distribution to class members from the initial payment, additional attorneys' fees shall be paid to class counsel at the rate of 20% of the amount of additional claims paid, provided, however, that total attorneys' fees (including those to be paid to objector's counsel as set forth below) shall not exceed $2,846,250. The remainder of the Common Fund not specifically allocated to attorneys' fees, expenses and incentive payments shall be distributed

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 14 of 59 PageID #:25932

In re Celexa and Lexapro Marketing and Sales Practices..., Not Reported in...

2014 WL 4446464

on a pro rata basis to class members who have submitted valid claims.

Attorneys Coffin and Baum will be authorized to distribute the fees awarded to class counsel in a manner that fairly compensates each firm for the work contributed to the litigation and the settlement.

### B. Request for Expenses

**\*9** The Court will also allow the request for reimbursement of $325,000 in out-of-pocket expenses incurred during litigation out of the Common Fund. The listed expenses include, among other things, 1) costs of travel to hearings, depositions and meetings, 2) court fees, and 3) the cost of retaining experts and consultants. The Court finds the expenses incurred reasonable and appreciates that counsel capped expenses at $325,000. *See* In re *Fidelity/Micron Securities Litig.,* 167 F.3d 735, 737 (1st Cir.1999) (explaining that reasonableness is the "touchstone" of requests for reimbursement of expenses).

### C. Incentive Awards

Finally, the Court will order that class representatives Tanya Shippy and Ruth Dunham each be awarded $10,000 to be paid out of the Common Fund. The purpose of such incentive awards is to reimburse the plaintiffs for their effort in pursuing the claims on behalf of the entire class. *See, e.g., Bussie v. Allamerica Fin. Corp.,* No. 97–40204, 1999 WL 342042, at \*3–4 (D.Mass. May 19, 1999) (citation omitted). Class counsel represent that Dunham and Shippy worked closely with counsel throughout the entire case, provided information and deposition testimony, produced documents and participated in settlement discussions. The incentive awards were also disclosed in the Notice and no class member has objected to the request. Under the circumstances, the awards are reasonable and will be allowed.

### IV. Motion by Luster for Attorneys' Fees, Expenses and Incentive Awards

Luster also moved on the eve of the fairness hearing for attorneys' fees, expenses and an incentive award to be paid out of the Common Fund. Plaintiffs object on the grounds that 1) the motion was filed after the deadline set by the Court for plaintiff's motion for fees and 2) the Objector has not conferred a benefit on the class.

The Court finds that the motion is not procedurally barred because it was not filed before the deadline for plaintiffs to request attorneys' fees. Luster was not permitted to intervene in the MDL Action and therefore is not bound by the same deadlines as are plaintiffs.

Plaintiffs' objections to the substance of the request have more merit. The Court is permitted to award attorneys' fees to objectors who 1) provided services that contributed to an increase in the size of the common fund available to the class, 2) aided the Court's review of the proposed settlement agreement *or* 3) otherwise advanced the interests of the class. Federal Judicial Center, *Manual for Complex Litigation (Fourth )* § 14.11 (2004); *see also Dubin v. E.F. Hutton Grp.,* 878 F.Supp. 616, 622–23 (S.D.N.Y.1995) (awarding fees to counsel of competing class actions who conferred a benefit on class members and contributed to the size of the settlement award). Here, the objector has not succeeded in persuading the Court that the size of the Common Fund was inadequate. Moreover, the Court is unconvinced that the pending Missouri Action was a significant factor contributing to the settlement of the MDL Action given that Forest negotiated with counsel involved in both actions during the course of several months before settling with the MDL plaintiffs.

**\*10** The Court will, however, award fees in the amount of $50,000 to reimburse counsel, at least in part, for the expenses incurred in objecting to the Proposed MDL Settlement Agreement and appearing at the final fairness hearing. [1] While the Court ultimately disagreed with Luster's contentions, her objections 1) aided the Court in its consideration of the adequacy of the Common Fund and other aspects of the settlement and 2) resulted in the Court scrutinizing the request by plaintiffs for attorneys' fees based upon the maximum value of the Common Fund.

[1] Fees payable to objector's counsel shall be paid out of the portion of the Common Fund reserved for attorneys' fees, i.e. the $2,846,250, of which Class Counsel will receive a minimum of 2,295,000 and a maximum of $2,796,250.

Luster invokes no authority for her request for an incentive award to a plaintiff who is not a class representative. The Court therefore declines to award her $10,000 for her service to the Missouri Action class.

In re Celexa and Lexapro Marketing and Sales Practices..., Not Reported in...

2014 WL 4446464

## *ORDER*

For the foregoing reasons:

1) the joint motion for final approval of the class settlement (Docket No. 409) is **ALLOWED** and the settlement is **APPROVED;**

2) the motion by plaintiffs for attorneys' fees, expenses and incentive awards (Docket No. 412) is **ALLOWED, in part,** and **DENIED, in part,** as follows:

a) plaintiffs are entitled to reimbursement of litigation expenses totaling $325,000 to be paid out of the Common Fund;

b) class representatives Ruth Dunham and Tanya Shippy are each awarded an incentive award of $10,000 to be paid out of the Common Fund;

c) class counsel shall be paid $2,295,000 in attorneys' fees out of the $7,650,000 already paid into the Common Fund and additional fees at the rate of 20% of all amounts paid by Forest to class members in excess of the initial payment, up to a maximum of $2,796,250 in attorneys' fees;

d) the remainder of the Common Fund not specifically allocated to attorneys' fees, expenses and incentive payments shall be distributed on a pro rata basis to the class members who have submitted valid claims; and

3) the motion by objector Natalie Luster for attorneys' fees, expenses and an incentive award (Docket No. 423) is **ALLOWED,** to the extent that counsel to the objector, Natalie Luster, shall be paid $50,000 in attorneys' fees out of the Common Fund, but is, in all other respects, **DENIED.**

**So ordered.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4446464

---

        © 2018 Thomson Reuters. No claim to original U.S. Government Works.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/10/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE CITIGROUP INC. SECURITIES
LITIGATION

---

09 MD 2070 (SHS)
This document relates to:
07 Civ. 9901 (SHS)


ORDER


SIDNEY H. STEIN, U.S. District Judge.

Pro se objector Theodore H. Frank has moved for reimbursement of costs expended in crafting his objection to the attorneys' fees sought by lead plaintiffs' counsel in connection with the settlement of this class action securities litigation. (Dkt. No. 279.) Specifically, he seeks recompense for $19,987.50 paid to two testifying experts and a consulting expert. Frank represents that he is responsible for an additional $26.7 million in recovery to the class and that, although he is ineligible for attorneys' fees as a result of his appearing pro se, *see, e.g., In re Texaco Inc. Shareholder Derivative Litig.*, 123 F. Supp. 169, 172-73 (S.D.N.Y. 2000) (observing that "[t]here is authority in many types of cases for the position that a pro se litigant who is also an attorney should not be awarded attorney's fees" and collecting cases), he contends that fairness dictates that he be reimbursed for his expenses because his efforts benefitted the class.

This Court has, in connection with a motion for attorneys' fees in this action, agreed with the observation that "'objectors have a valuable and important role to perform in policing class action settlements' and may be awarded attorneys' fees and expenses when their efforts improve the settlement or otherwise enhance the adversarial process in a manner that benefits the class." *In re Citigroup Inc. Sec. Litig.*, No. 09 MD 2070 (SHS), Memorandum Order dated Aug. 27, 2013, Dkt. No. 284 (quoting *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 353-54 (S.D.N.Y. 2005), *aff'd in part, vacated in part, remanded sub nom. Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006)). Here, Frank's objections enhanced the adversarial process and played a not insignificant role in focusing the Court on instances of overbilling by plaintiffs' counsel, resulting in a reduction of the attorneys' fees awarded to lead counsel and therefore providing a tangible economic benefit to the class. *See In re Citigroup Inc. Sec. Litig.*, No. 09 MD 2070 (SHS), 2013 WL 3942951, at *6, *19, *20, *22, *24, *27 (S.D.N.Y. Aug. 1, 2013). The Court therefore grants Frank's motion for reimbursement of expenses of $19,987.50, to be paid to the

Center for Class Action Fairness—a nonprofit organization founded by Frank
for the purpose of representing the interests of consumers in class action
settlements. This award shall be deducted from the attorneys' fees awarded
to lead counsel.

Dated: New York, New York
      September 10, 2013

                         SO ORDERED:

                         Sidney H. Stein, U.S.D.J.

2017 WL 6209703
Only the Westlaw citation is currently available.
United States District Court, N.D. Oklahoma.

George Lee GRAYSON, Plaintiff,
v.
Nancy A. BERRYHILL,[1] Acting
Commissioner of Social Security, Defendant.

[1] Effective January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d)(1), Commissioner Berryhill is automatically substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Case No. 4:16–cv–00061–GBC
|
Signed 12/08/2017

Attorneys and Law Firms

Darren Todd Rackley, Gayle Louise Troutman, Troutman & Troutman PC, Tulsa, OK, for Plaintiff.

Jessica Milano, Social Security Administration, Denver, CO, Marianne Smith Hardcastle, United States Attorney's Office, Tulsa, Ok, for Defendant.

**OPINION AND ORDER TO GRANT PLAINTIFF'S MOTION FOR ATTORNEY FEES**

Gerald B. Cohn, United States Magistrate Judge

**\*1** Before the Court are Plaintiff's Motion for Attorney Fees pursuant to 42 U.S.C. § 406(b). (Doc. 33). In Plaintiff's Motion, Plaintiff's counsel seeks approval of an attorney fee award of $15,000.00 pursuant to 42 U.S.C. § 406(b) and the terms of the contingency fee contract between Plaintiff and counsel. (Doc. 33).

**I. STANDARD OF REVIEW**

Unlike fees awarded under other statutes such as the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, fees under 42 U.S.C. § 406(b) are paid from the claimant's

benefits, rather than from agency funds, based on a contract between the claimant and the claimant's attorney. Pursuant to 42 U.S.C. § 406(b), a district court must independently assess the reasonableness of the terms in contingent-fee agreements. Gisbrecht v. Barnhart, 535 U.S. 789, 808 (2002). § 406(b) "calls for court review of such arrangements as an independent check, to assure that they yield reasonable results in particular cases," and to guard against windfalls for lawyers. Id. at 807–08. Decisions on motions for § 406(b) fees "are committed to the district court's sound discretion." McGraw, 450 F.3d at 505. § 406(b) contemplates awarding a reasonable fee only for work performed before the court, not for work performed before the agency. See McGraw, 450 F.3d at 498. Thus, in considering the reasonableness of a § 406(b) request, the court should not consider time enumerated for any work that was performed before the administrative agency. Additionally, where a plaintiff is also awarded attorney fees under the EAJA, plaintiff's attorney must refund the lesser of the two fees to plaintiff. See Gisbrecht, 535 U.S. at 796; Weakley v. Bowen, 803 F.2d 575, 580 (10th Cir. 1986).

**II. BACKGROUND AND
COMMISSIONER RESPONSE**

In this case, the Commissioner issued to Plaintiff a Notice of Award on October 1, 2017, showing Plaintiff and his family were entitled to past due benefits, of which the Commissioner withheld 25 percent, or a total of $24,637.00 ($19,120.00 from Plaintiff's past due benefits and $5,517.00 from his family's past due benefits), for the payment of attorney fees (see Doc. 33–2 at 1, 3). Here, counsel requests $15,000.00 in fees for 20.1 hours of attorney work and 5.8 hours of paralegal work before the court (see Doc. 33 at 2, 6; Doc. 33–4). Although Plaintiff's motion indicates 5.2 paralegal hours (see Doc. 33 at 6), counsel's billing timesheets indicate a total of 5.8 paralegal hours were expended in litigating this matter (see Doc. 25–1; Doc. 33–4). In her response, the Commissioner notes she is "not a party to § 406(b) fee awards and generally takes no position on such petitions ... but rather she defers to the Court's sound discretion as to the reasonableness of the fee award." (Doc. 35).

However, the Commissioner states in calculating the effective hourly rate for the court's reasonableness consideration, Plaintiff applies a multiplier to the

Add-16

paralegal fees (see Doc. 33 at 6–7). Commissioner states Plaintiff cites no authority for doing so and asserts the court should award paralegal fees only at paralegal market rates. See, e.g., La Plant v. Berryhill, No. C14–1143–JCC, 2017 WL 823289, at *3 (W.D. Wash. Mar. 2, 2017) (unpublished) ("As to the paralegal hours, however, the Court does not find it appropriate to apply the ... multiplier." (citing Chandler v. Sec'y of Dep't of Health & Human Servs., 792 F.2d 70, 73 (6th Cir. 1986) (awarding paralegal fees under § 406(b) but only at paralegal rates)). Here, Plaintiff's billing timesheets and EAJA filings indicate counsel's firm billed paralegal work at $100 per hour from 2011 through 2015, and at $120 per hour beginning in 2016 (see Doc. 33–4; Doc. 25 at 8–9). This calculates to a total of $680.00 for paralegal work (0.8 paralegal hours billed in 2015 at the rate of $100 per hour and 5 paralegal hours billed in 2016 and 2017 at the rate of $120 per hour) (see Doc. 25–1; Doc. 33–4). Thus, for purposes of determining the reasonableness of the fees sought for the 20.1 hours of attorney work in this case, Commissioner argues the court should reduce the total amount of § 406(b) fees to $680.00 in paralegal fees (versus the $1,404.00 suggested by Plaintiff's counsel when improperly using a multiplier). Less the $680.00 (for the 5.8 hours of paralegal work billed at the market rate), counsel is requesting $14,320.00 in § 406(b) fees for 20.1 hours of attorney work. Thus, counsel is effectively requesting attorney fees at the rate of $712.44 per hour.

## III. ANALYSIS

**\*2** The court located few social security disability cases analyzing paralegal hours within attorney fee awards. A district court in Colorado found:

> To determine a reasonable fee request, a court must begin by calculating the "lodestar amount." Robinson v. City of Edmond, 160 F.3d 1275, 1281 (10th Cir. 1998). The lodestar amount is the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). With respect to assessing the hours claimed, the Supreme Court has found that certain tasks are non-compensable because they are "purely clerical or secretarial tasks [which] should not be billed at a paralegal rate, regardless of who performs them." Missouri v. Jenkins by Agyei, 491 U.S. 274, 288 n.10 (1989).

Here, plaintiff seeks an award of fees for 0.2 hours related to service of process. Such time is not compensable. See Jenkins, 491 U.S. at 288 n.10. The Court finds that the remainder of the hours claimed are reasonable. In addition, the Court notes that Mr. Seckar undertook a substantial risk of loss in connection with the case, devoted considerable time and effort in presenting plaintiff's position, and obtained a favorable result for plaintiff.

Valenzuela v. Colvin, 2013 WL 1786501, at *2–3 (D. Colo. Apr. 25, 2013). In this case, Plaintiff's counsel submitted billing timesheets indicating clerical time expended, but counsel did not request attorney fees for clerical hours. See Doc. 33–4. Plaintiff's counsel solely requested attorney fees for paralegal and attorney time spent litigating the case. See id. In a district court in Oregon, the court found:

> In those cases that have dealt with the issue of paralegal time, some have excluded the time completely; see Roark v. Barnhart, 221 F.Supp.2d 1020, 1026 (W.D. Mo. 2002); and others have considered paralegal time in assessing the overall reasonableness of the fee request. See Siraco v. Astrue, 806 F. Supp. 2d 272, 278–79 (D. Me. 2011) (noting that the question is not whether paralegal time is compensable or what multiplier for paralegal time is appropriate, but whether the fee is reasonable in light of the legal services provided); Crawford v. Astrue, 586 F.3d 1142, 1151–53 (9th Cir. 2009) (repeatedly referencing paralegal time, but nowhere stating how paralegal services should be accounted for, and discouraging a lodestar based approach). This court adopts the approach set forth in Siraco, whereby the results achieved are compared with the services provided to reach a reasonable fee. Indeed, a discussion of an appropriate paralegal fee versus attorney fee creates the risk that this court will overly rely on a lodestar approach when the focus should be on the contingent-fee agreement, adjusted for reasonableness.

Here, the court concludes that the requested fee is unreasonable. This is driven by two primary factors. The first is that the case was not particularly complex or time consuming and the second is that the retroactive benefits recovered were quite large. The combination of these two factors results in a windfall. In short, "the benefits are large in comparison to the amount of time counsel [and paralegal] spent on the case [and] a

downward adjustment is ... in order." Gisbrecht, 535 U.S. at 808. While giving primacy to the contingent fee agreement, this court concludes that a reasonable fee in this case would constitute 17 percent of the retroactive awards.

**\*3** Atwood v. Comm'r of Soc. Sec., 2011 WL 6372790, at \*2–3 (D. Or. Dec. 19, 2011). In this case, the total award in past benefits was $98,548.00. Thus, if counsel requests $15,0000.00, counsel ultimately requests a little over 15 percent for a total award, when the fee agreement permitted 25 percent. Atwood cited the Siraco case in deciding the fee award. In Siraco, the court concluded:

> The firm's work was successful and it obtained for her a total award of $45,466.50. She will continue to receive benefits into the future, but those future amounts are not counted in the contingency fee calculation. Twenty-five percent of her award of past due benefits is $11,366.62. Since the law firm has already recovered $6,000 in fees for its work on her behalf before the Social Security Administration, the current motion in this court under section 406(b) seeks the remaining $5,366.62 of the percentage contingency for the work done here.

> It is true that Gisbrecht talks about the amount of time "counsel" spent on the case. But there is no suggestion that in using this language the court was focusing on the lawyer's time alone in assessing the reasonableness of a contingent fee and trying to bind Social Security practice to a particular model of law firm structure. As I have stated, if a firm can organize its practice efficiently by using less of its lawyers' time, yet still produce high quality legal work, it should not be penalized in the fee it can recover. A different conclusion would lead this and other lawyers to do more of the work themselves and delegate less to paralegals, to no apparent gain. I conclude that the reasonableness review contemplated by Gisbrecht has to do with the entire fee, compared to the services rendered, and is not limited to the hours put in by someone admitted to the bar.

> Thus, the issue here is not whether paralegal time is compensable or, if so, what multiplier, if any, is appropriate. The issue is whether this percentage contingent fee agreement yields a reasonable fee amount in this case. The answer to that question depends upon the legal services provided, regardless of how the law firm structured its work on the case, and

whether that amount needs to be reduced (Crawford) or whether there is some additional reason beyond the lodestar calculation (Jeter v. Astrue, 622 F.3d 371 (5th Cir. 2010)) to find that some part of the fee was unearned and not due to the law firm's efforts. I conclude that the amount requested here does not create such a windfall.

Siraco v. Astrue, 806 F. Supp. 2d 272, 273–74, 278–79 (D. Me. 2011). The court agrees with Siraco and finds the paralegal fees reasonable within the context of the entire fee award.

In January 2017, after the case was filed and briefed by counsel, the Commissioner filed a motion to remand and the Court entered judgment in favor of Grayson, remanding the case for further proceedings. (Docs. 20, 21, 22). On remand, the agency found on that Grayson had been disabled since June 2010 and that he and his auxiliaries were entitled benefits beginning December 2010. The Notices of Award indicate that the agency withheld $19,120.00 from Grayson's past due benefits and $5,517.00 from the auxiliary back benefits for a total of $24,637.00 in order to pay attorney fees.

As the agency withholds 25 percent of back benefits to pay fees, the notices of award show $98,548.00 in back benefits were awarded on remand. Plaintiff's counsel may request fees for as much as $24,637.00. However, Plaintiff's counsel states in the interests of billing judgment, counsel requests attorney fees for court work for $15,000.00, less than the contractual amount. (Doc. 33). The fee petition for approval of an agency fee of $6,000 remains pending. The EAJA payment of $4,465.60 will also be available for payment of the § 406(b) fees. Once the § 406(b) fee amount is paid in full, the $4,465.60 EAJA payment received by counsel will immediately be refunded to Plaintiff. Therefore, Plaintiff will be out of pocket less than the 25 percent of back benefits he contracted to pay attorney fees even after both the agency fee and court fee are paid. If the agency representative is paid the requested amount of $6,000.00, then there should remain $18,637.00 from the back benefits to pay the § 406(b) fee award. Additionally, the $4,465.60 EAJA award remains available to pay against the remaining amount due for court work. According to law, the excess EAJA award will immediately be refunded to Plaintiff to the extent counsel has been double paid for the same work. This means that once the requested court fees and agency fees are paid,

more than $8,000 should remain to be released to Plaintiff by the agency and court counsel.

**\*4** Thus, the Court concludes that a fee award of $15,000.00 is reasonable in this matter. This amount is consistent with the contract between counsel and Plaintiff and is within the statutory limits of § 406(b).

### IV. CONCLUSION

Plaintiff's Motion for Attorney Fees pursuant to 42 U.S.C. § 406(b) (doc. 33) is hereby GRANTED as follows. The

Court finds $15,000.00 to be a reasonable attorney fee, and that fee is hereby awarded to Plaintiff's attorney. Upon receipt of payment, counsel is required to refund to Plaintiff the smaller of the § 406(b) fees or the EAJA fees pursuant to Weakley, 803 F.2d at 580.

SO ORDERED this 8 December 2017.

**All Citations**

Slip Copy, 2017 WL 6209703

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Add-19

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 22 of 59 PageID #:25940

2017 WL 5891059
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

F. Martin KIRBY, Plaintiff,

v.

Nancy A. BERRYHILL,[1] Acting Commissioner,
Social Security Administration, Defendant.

No. 14 CV 5936
|
Filed 11/29/2017

[1]    Pursuant to Federal Rule of Civil Procedure 25(d),
Nancy A. Berryhill is automatically substituted as the
named defendant in this case.

**Attorneys and Law Firms**

John E. Horn, Horn & Kelley, PC, Attorneys at Law,
Tinley Park, IL, for Plaintiff.

SSA, AUSA, Kathryn Ann Kelly, United States
Attorney's Office, Chicago, IL, for Defendant.

**MEMORANDUM OPINION and ORDER**

Young B. Kim, United States Magistrate Judge

**\*1**  Plaintiff's attorney moves for $51,431.75 in attorney's
fees pursuant to 42 U.S.C. § 406(b) after successfully
securing a decision awarding benefits for Plaintiff. The
motion is granted in the amount of $45,672.20 for the
following reasons:

**Background**

Kirby retained John E. Horn as counsel and applied
for disability insurance benefits in August 2011. (R. 28,
Horn's Mot. ¶ 3; R. 22 at 1.) After the Commissioner
denied his application, Horn appeared with Kirby at a
hearing before an administrative law judge ("ALJ"). (R.
22 at 1.) The ALJ issued a decision denying Kirby benefits
in December 2012 and the Appeals Council denied review
in June 2014. (Id. at 1-2; Administrative Record 1-7.)
In July 2014, Kirby signed an agreement with Horn

providing that Horn would represent him in an appeal of
the Commissioner's decision before this court in exchange
for "25% of any and all backpay awarded by the Social
Security Administration ... upon successful completion of
the case[.]" (R. 28-4, Ex. D ¶ 2.) Kirby then brought this
action, and in July 2016 this court remanded the case for
further administrative proceedings. (R. 22.) On September
5, 2017, after a second hearing before an ALJ, Kirby
and his dependents were awarded $205,727 in past due
benefits. (R. 28, Horn's Mot. ¶ 3.)

Horn now seeks 25 percent of those benefits in attorney's
fees, amounting to $51,431.75.[2] The government argues
that this sum constitutes a windfall because it amounts
to an hourly rate of $1,612.28 for the 31.9 hours Horn
expended on this case. (R. 34, Govt.'s Resp. at 1 (citing
R. 28-1).) The government asks that the court make an
unspecified reduction of the fee amount requested. (Id. at
5-6.)

[2]    Horn has agreed to refund Kirby the $5,759.55 Equal
Access to Justice Act award Horn received as an offset
to any fees the court awards under 42 U.S.C. § 406(b)
pursuant to this motion. (See R. 36, Horn's Reply ¶ 1;
R. 27); see also 28 U.S.C. § 2412.

**Analysis**

The Social Security Act (the "Act") provides that attorney
fees must be reasonable and cannot exceed 25 percent of
the past due benefits. 42 U.S.C. § 406(b). In Gisbrecht
v. Barnhart, 535 U.S. 789, 807 (2002), the Supreme
Court held that the Act does not displace contingent-fee
arrangements, but rather calls for courts to assure that
those arrangements "yield reasonable results in particular
cases." The Court noted that contingent-fee arrangements
might be unreasonable if, for example: (1) the character of
and results achieved from attorney representation do not
justify the amount; (2) the attorney is responsible for delay
such that he or she would profit from the accumulation of
benefits; or (3) the benefits are large in comparison to the
amount of time counsel spent on the case. See id. at 808.

The government does not dispute that Horn's
representation achieved favorable results for Kirby, nor
does she contend that Horn was responsible for any
delays in proceedings. Indeed, these factors weigh in
Horn's favor. He has represented Kirby since 2011
and shepherded his client through multiple hearings

and appeals to a favorable result. Horn also timely filed his briefs with no requests for extensions. Rather, the government argues that the requested fee amount is disproportionately high because it translates to a $1,612.28 hourly rate. (See R. 34, Govt.'s Mem. at 3-7.) The court disagrees. As an initial matter, *Gisbrecht* discouraged giving primacy to the lodestar method of calculating attorney fees in the social security context. *See* 535 U.S. at 793 (favoring the "the primacy of lawful attorney-client fee agreements"); *id.* at 806-08 ("It is also unlikely that Congress, when legislating in 1965, intended to install a lodestar method[.]"). Furthermore, the 31.9 hours Horn spent in this case is not unreasonable given the length of the record (over 800 pages) and the detailed brief he drafted to support Kirby's motion for summary judgment. (See R. 28-1, Ex. A; R. 13, Pl.'s Mem.) This is not a case in which counsel simply filed boilerplate pleadings then demanded a full 25 percent fee. *See McGuire v. Sullivan*, 873 F.2d 974, 981 (7th Cir. 1989) (citation omitted) (stating that a deduction would be proper in such circumstances). If Horn had been less efficient, his imputed hourly rate would of course be lower. But the court is reluctant to rely heavily on a method for determining whether a contingency fee is reasonable that penalizes efficiency. *See Kazanjian v. Astrue*, No. 09 CV 3678, 2011 WL 2847439, at *2 (E.D.N.Y. July 15, 2011); *see also Reindl v. Astrue*, No. 09 CV 2695, 2012 WL 4754737, at *4 (N.D. Ill. Oct. 4, 2012).

**\*2** Moreover, rather than seeking to obtain fees from the government as the losing party, Horn simply seeks to enforce the contractual agreement he executed with his client. *See Mathis v. Comm'r of Soc. Sec.*, No. 13 CV 256, 2017 WL 1483429, at *1 (W.D. Mich. March 17, 2017) (adopted by *Mathis v. Comm'r of Soc. Sec.*, No. 13 CV 256, 2017 WL 1464125, at *1 (W.D. Mich. April 25, 2017)). There is value in enforcing contingency fee agreements as "effective means of ensuring claimant access to attorney representation." *See Gisbrecht*, 535

U.S. at 805; *see also Reindl*, 2012 WL 4754737, at *2. If courts regularly alter contingency agreements because of high lodestar calculations, attorneys might lose their incentive to enter into such agreements in the first place, preventing claimants of limited means with difficult cases from obtaining representation. *See McGuire*, 873 F.2d at 980. As courts in this circuit have recognized, contingent fee agreements also account for an attorney's considerable risk of non-recovery. *See, e.g., id.; Abarca v. Berryhill*, No. 16-cv-459-jdp, 2017 U.S. Dist. LEXIS 176360, at *3-4 (W.D. Wis. Oct. 24, 2017); *Salerno v. Colvin*, No. 10 CV 2582, 2013 WL 4510171, at *1 (N.D. Ill. Aug. 26, 2013); *Koester v. Astrue*, 482 F. Supp. 2d 1078, 1080 (E.D. Wis. 2007).

Finally, even taking the lodestar calculated rate of $1,612.28 per hour into account, the requested fee is not so far afield from what other courts have awarded as to render it inappropriate solely on that basis. *See, e.g., Mathis*, 2017 WL 1483429, at *1 (approving approximately $1,640 per hour); *Smith v. Colvin*, No. 14 CV 3923, Dkt. No. 32 (N.D. Ill. Dec. 21, 2016) (awarding effective rate of $1,437 per hour); *Reindl*, 2012 WL 4754737, at *3 (awarding effective rate of $1,164.51 per hour); *Kazanjian*, 2011 WL 2847439, at *2 (awarding approximately $2,100 per hour).

#### Conclusion

For the foregoing reasons, and because Horn has already recovered $5,759.55 in fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, Horn's motion for attorney's fees is granted in the amount of $45,672.20.

**All Citations**

Slip Copy, 2017 WL 5891059

---

          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

1986 WL 923

1986 WL 923
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Timothy O'ROURKE, on behalf of
himself and all other similarly situated

v

HEALTHDYNE, INC., J. Paul Yokubinas,
J. Terry Dewberry, Parker H. Petit.

Civ. A. Nos. 84–4295, 84–4296.
|
Jan. 16, 1986.

**Attorneys and Law Firms**

Stanley R. Wolfe, Philadelphia, Pa., Robert P. Frutkin, Richard D. Greenfield, Haverford, Pa., for plaintiff.

Arthur D. Felsenfeld, Shea & Gould, New York City, James G. Rosenberg, Philadelphia, Pa., for Healthdyne, Inc., J. Paul Yokubinas, J. Terry Dewberry and Parker H. Petit.

Joseph W. Swain, Jr., Philadelphia, Pa., for Peat, Marwick, Mitchell & Co.

MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

**\*1** Plaintiff brought this action on behalf of a class of all purchasers of common stock of the defendant corporation ("Healthdyne") during the period between January 1, 1983 and December 31, 1984 ("Class Period"). The consolidated amended complaint filed on January 28, 1985 alleged that the defendants violated § 10(b) and § 20 of the Securities Exchange Act of 1934 and Rule 10(b) (5) promulgated thereunder, by engaging in a common scheme or conspiracy to overstate the current and future business prospects and financial condition of Healthdyne, a high technology manufacturer of electronic hospital and home care medical products and provider of health care services, which caused the price of Healthdyne stock to be artificially inflated and thereby damaged plaintiff and members of the class.

On March 21, 1985 all parties to this litigation entered into a Stipulation of Settlement ("Stipulation") which

provided a settlement fund of $3.5 million face value of Healthdyne debentures, $500,000.00 in cash, and $60,000.00 for the payment of the costs of notice, administration and litigation costs, for the benefit of class members. A stipulation of consent to class certification was entered into between plaintiff and defendants certifying the litigation as a class action for purposes of settlement on behalf of purchasers of Healthdyne common stock between January 1, 1983 and December 31, 1984.

Presently before the court is the joint petition of plaintiff's counsel, Berger & Montague, P.C. and Greenfield & Chimicles, for attorneys' fees and reimbursement of litigation costs and expenses. The petitioners request a total fee of $475,000.00 and reimbursement of out-of-pocket disbursements totalling $22,648.92. The requested fee amounts to an award of a multiple of three times the lodestar incurred by the petitioners.

Fee awards in this circuit are controlled by the guidelines set forth in *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.,* 487 F.2d 161, 165 (3d Cir.1973) (Lindy I) and *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.,* 540 F.2d 102, 110 (3d Cir.1976) (Lindy II). Further guidance is provided by *In Re Fine Paper Antitrust Litigation,* 751 F.2d 562 (3d Cir.1984).

The "logical beginning" is to determine the lodestar which is the reasonable number of hours expended, multiplied by the normal billing rate. *Lindy I* at 167; see also, *In Re Fine Paper* at 583. Each law firm has fully documented its hours and fees in the affidavits attached to the petition. The affidavits categorize the hours in detail. A detailed chart is attached, indicating the time spent by each attorney, paralegal, and law clerk employed by the Berger firm, together with the hourly fee applicable to each. That chart indicates a lodestar for the Berger firm of $95,444.00. The Greenfield firm has attached a like detailed chart to its affidavit, indicating a lodestar for that firm of $62,808.75. There is nothing in either chart, or details thereof, to suggest that the records are inaccurate or that the time expended was excessive or duplicative. In fact, the affidavits of the lead counsel for each firm attest that the work was not duplicative, and that it was necessary to the litigation in this case. No objection has been filed to the joint fee petition.

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 25 of 59 PageID #:25943

O'Rourke v. Healmetyne, Inc., Not Reported in F.Supp. (1986)

1986 WL 923

**\*2** We have carefully examined each of the charts and details set forth in each of the law firms' affidavits and find that they are reasonable. The Berger firm shows a total of 754 hours with an hourly rate from $45.00 for paralegals and law clerks to $200.00 for lead counsel, S.R. Wolfe. The Greenfield firm shows a total of 387.25 hours with hourly rates from $50.00 to $240.00. We, therefore, agree to the lodestar of $95,444.00 for the Berger firm, and to the lodestar of $62,808.75 for the Greenfield firm. Each firm requests a multiple of three times the lodestar.

The court may adjust the lodestar upward based upon "the contingent nature of success" and the "quality of an attorney's work." *Lindy I* at 168. In assessing the contingent nature of success, *Lindy II* at 117, states that we should evaluate the complexity of the case, the probability of defendant's liability, evaluation of damages—whether the claims would be difficult or easy to prove, the risks assumed in developing the case, and the quality of the work performed.

We recognize that the petitioners were able to obtain a settlement shortly after the consolidated amended complaint was filed. It is appropriate to emphasize the amount of benefit conferred rather than just the time spent by the attorneys. The benefit to the class is of great importance in determining an award of fees. See: *Levin v. Mississippi River Corp.,* 377 F.Supp. 926, 931 (S.D.N.Y.1974). An award of just the lodestar could discourage rapid settlements. See, a study by Professor Arthur Miller, *Attorneys' Fees in Class Actions* (1980). Awarding fees based on time alone may reward inefficiency and penalize those who are efficient and expeditious in performing their legal tasks. *Blank v. Talley Industries,* 390 F.Supp. 1, 5 (S.D.N.Y.1975). *See also, Mills v. Electric Auto Lite Co.,* 396 U.S. 375, fn. 18 (1970).

We determine that the quality of the services performed by the petitioners warrants a multiplier of the lodestar. The petitioners were very efficient in obtaining a good result in a minimum of time. They used their negotiating skills to generate a substantial settlement fund less than three months after the filing of the consolidated amended complaint. If the parties had been required to litigate through trial and appeal, many more hours would have been expended by the petitioners, possibly with no greater result for the class. This case involves complex issues of law and fact which presented numerous risks inherent in establishing liability of the defendants.

The petitioners prosecuted this case on a contingent fee basis. This risk is a factor to be considered in determining the fee. *City of Detroit v. Grindell Corp.,* 495 F.2d 448, 470 (2d Cir.1974). Contingent fee arrangements have long been approved by courts as the only way an injured party without substantial resources may obtain redress. The petitioners together expended 1141.25 hours in prosecuting this litigation. These hours were expended without any guarantee of success. The standing and ability of the petitioners contributed in producing the fund obtained and the efficiency in which it was obtained.

**\*3** The notice mailed to members of the class stated that plaintiff's counsel would request a fee not to exceed 25% of the settlement fund. No class member has objected to the fee request. The fees requested by the petitioners, a total of $475,000.00, three times the lodestar, are approximately 15% to 17% of the value of the proposed settlement fund which is comprised of a cash component of $560,000.00 and the value of the debentures which the affidavit of John C. Hammerslough places a present value of between $2.2 and $2.7 million.

An examination of the request for reimbursements of expenses also appears reasonable.

We, therefore, award the petitioners the sum of $475,000.00 for fees and reimbursement of expenses incurred in the amount of $22,648.92.

ORDER

The joint petition of plaintiff's counsel for attorneys' fees and reimbursement of litigation costs and expenses is GRANTED.

The firm of Berger & Montague, P.C. is awarded the sum of $286,332.00 for counsel fees to be paid out of the settlement fund.

The firm of Greenfield & Chimicles is awarded the sum of $188,426.25 for counsel fees to be paid out of the settlement fund.

The petitioners are awarded the sum of $22,648.92 as reimbursement of expenses incurred by them, to be paid out of the settlement fund.

O'Rourke v. Healthdyne, Inc., Not Reported in F.Supp. (1986)

1986 WL 923

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1986 WL 923

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 27 of 59 PageID #:25945
In re Penthouse Executive Club Compensation Litigation, Not Reported in F.Supp.2d...

2014 WL 185628

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Sakiko Fujiwara v. Sushi Yasuda Ltd., S.D.N.Y., November 12, 2014

2014 WL 185628
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

In re PENTHOUSE EXECUTIVE CLUB
COMPENSATION LITIGATION.

Master File No. 10 Civ. 1145(KMW).
|
Jan. 14, 2014.

*ORDER GRANTING PLAINTIFFS' MOTION
FOR CERTIFICATION OF THE SETTLEMENT
CLASS, FINAL APPROVAL OF THE CLASS
ACTION SETTLEMENT, APPROVAL OF
THE FLSA SETTLEMENT, AND APPROVAL
OF ATTORNEYS' FEES, REIMBURSEMENT
OF EXPENSES, AND SERVICE AWARDS*

KIMBA M. WOOD, District Judge.

*1 Plaintiffs Stephanie Carratini and Nicole Hughes ("Plaintiffs") [1] are former entertainers (dancers) at the Penthouse Executive Club, an adult night club in New York City. Plaintiffs Stephanie Caraltini and Nicole Hughes filed a class and collective action on December 29.2009, Plaintiff Leslie Liwanag filed a similar case on February 11, 2010. On June 11, 2010. the District Court, Judge Naomi Buchwald presiding, ordered that the two cases be consolidated. ECF No. 20. Plaintiffs alleged that Penthouse misclassified Class Members as independent contractors, denying them the protections of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). ECF Nos. 1, 20. As a result, Plaintiffs claimed, Defendants paid Class Members no wages, unlawfully required them to pay "house fees" and other fees, and unlawfully took Class Members' tips by retaining a portion of Class Members' credit card and "executive dollar" tips. Id. Plaintiffs sought unpaid overtime wages, attorneys' fees and costs, interest, liquidated damages, and injunctive and declaratory relief. Id,

[1] Former plaintiffs Leslie Liwanag and Nicki Mpogiatzis have opted out of the case and are no

longer class representatives. See Martens v. Smith Barney, Inc., 190 F.R.D. 134, 139–40 (S.D.N.Y.1999) ("[N]amed plaintiffs ... who opt out of a settlement no longer remain in the class in any capacity.").

On October 27, 2010, the Court granted Plaintiffs' motion for conditional certification of a FLSA collective action under 29 U.S.C. § 216(b) and for court-authorized notice. ECF No. 34. Twenty additional dancers joined the case. On April 24, 2013, Class Counsel filed an Amended Complaint adding an additional named plaintiff, Nicki Mpogiatzis. ECF No. 108.

After substantial formal discovery and vigorous motion practice, the parties reached a settlement totaling 58,000,000. Decl. of Justin M. Swartz in Supp. of Pls.' Mot. for Certification of the Settlement Class, Final Approval of the Class Action Settlement, and Approval of the FLSA Settlement ("Swartz Decl.") ¶ ¶ 38. The parties reached this settlement after two formal mediations under the supervision of experienced employment law mediators, David Geronemus and Martin F. Scheinman, respectively. Id. ¶¶ 22–25. At the second mediation with Martin F. Scheinman, the parties made further progress towards a settlement and, during the next several months, exchanged more information and nearly finalized a settlement. Id, In order to address the outstanding issues, the parties attended a third mediation session on January 10, 2013. Id. ¶ 26. After several follow-up telephone calls with the mediator, the parties finally reached an agreement on all terms, which they memorialized in a formal settlement agreement ("Settlement Agreement"). Id.

On April 29, 2013, this Court entered an Order preliminarily approving the settlement on behalf of the class set forth therein (the "Class" or the "Class Members"), conditionally certifying the settlement class, and appointing Outten & Golden LLP ("O & G"), Virginia & Ambinder LLP ("V & A"), Leeds Brown Law, PC ("LBL"), and the Urban Justice Center Sex Workers Project ("UJC") as Class Counsel, and authorizing notice to all Class Members, ECF No. 110.

*2 On June 26, 2013, a claims administrator sent Court-approved notice to all Class Members informing them of their rights under the settlement, including the right to opt out or object to the settlement, and of Class Counsel's intention to seek up to one-third of the settlement fund for attorneys' fees, and reimbursement of their out-of-pocket

In re Penthouse Executive Club Compensation Litigation, Not Reported in F.Supp.3d...
Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 28 of 59 PageID #:25946
2014 WL 185628

expenses. Swartz Deck, Ex. C (Patton Deck) ¶ 4. No Class Members objected to the settlement and 22 filed timely opt-out requests. *Id.* ¶¶ 51–52.

On January 7, 2014, Plaintiffs filed a Motion for Certification of the Settlement Class, Final Approval of the Class Action Settlement, and Approval of the FLSA Settlement ("Motion for Final Approval"). That same day, Plaintiffs also filed Motions for Approval of Attorneys' Fees and Reimbursement of Expenses ("Motion for Attorneys' Fees") and for Service Awards ("Motion for Service Awards"). Defendants took no position with respect to any of these motions and did not object to the requests for attorneys' fees, costs, or service payments.

The Court held a fairness hearing on January 14, 2014. No Class Member objected to the settlement at the hearing.

Having considered the Motion for Final Approval, the Motion for Attorneys' Fees and Reimbursement of Expenses, the Motion for Service Awards, and the supporting declarations, the oral argument presented at the January 14, 2014 fairness hearing, and the complete record in this matter, for the reasons set forth therein and stated on the record at the January 14, 2014 fairness hearing, and for good cause shown.

## NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED: CERTIFICATION OF THE SETTLEMENT CLASS

1. The Court certifies the following classes under Federal Rule of Civil Procedure 23(e), for settlement purposes:

> all individuals who perform or performed at the Penthouse Executive Club as entertainers from on or about January 1, 2004 through June 12, 2012, including any individual who has signed an "Entertainer License Agreement" or any other agreement containing a class or collective action waiver.

2. Plaintiffs meet all of the requirements for class certification under Federal Rule of Civil Procedure 23(a) and (b) (3).

3. Plaintiffs satisfy Federal Rule of Civil Procedure 23(a) (1) because there are approximately 1,230 Class Members and, thus, joinder is impracticable. *See Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995) ("[N]umerosity is presumed at a level of 40 members.").

4. The proposed class also satisfies Federal Rule of Civil Procedure 23(a)(2), the commonality requirement. The claims of Plaintiffs and the Class Members share common issues of fact and law, including whether Defendants misclassified Class Member as independent contractors, paid them no wages, unlawfully required them to pay "house fees" and other fees, and unlawfully took their tips, in violation of the FLSA and NYLL. *See Hart v. Rick's Cabaret Int'l Inc.,* No. 09 Civ. 3043, 2010 WL 5297221, at *6 (S.D.N.Y. Dec. 20, 2010) (plaintiff adult entertainers satisfied the Rule 23 commonality requirement because they had "raised several issues that are common to all members of the putative class ... [including] defendants' policy of characterizing entertainers as independent contractors, rather than employees; ... whether cash payments made by the defendants to entertainers in exchange for 'dance dollars' count toward the defendants' minimum wage obligations, or whether those payments are gratuities as a matter of law, as the plaintiffs contend; ... whether the defendants' alleged policy of requiring entertainers to make certain payments to other employees constituted a demand for an unlawful kickback, under [NYLL]; and ... whether fees and deductions allegedly levied against the entertainers violated [NYLL]."); *see also Meyer v. U.S. Tennis Ass'n,* No. 11 Civ. 6268, 2013 WL 1777556, at *6 (S.D.N .Y. Apr. 25, 2013) (commonality satisfied where plaintiffs performed similar work consistent with employer's policies and sought a common determination that their work did not comport with classification as independent contractors); *Reyes v. Altamarea Group, LLC,* No. 10 Civ. 6451, 2011 WL 4599773, at *1–2 (S.D.N.Y. June 3, 2011) (commonality satisfied where plaintiffs contended, among other allegations, that defendant had a policy of misappropriating tips). These common issues satisfy the commonality requirement.

**\*3** 5. Plaintiffs satisfy Federal Rule of Civil Procedure 23(a)(3), typicality, because Plaintiffs' claims arose from the same factual and legal circumstances that form the bases of the class members' claims. *Meyer.* 2013 WL 1777556, at *9 (typicality satisfied where "the duties [umpires alleging they were misclassified as

In re Penthouse Executive Club Compensation Litigation, Not Reported in F.Supp.3d...

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 29 of 59 PageID #:25947

2014 WL 185628

independent contractors] performed resemble those of each other"); *Hart,* 2010 WL 5297221, at *6 (typicality requirement "met by the plaintiffs' allegation that their miscategorization as independent contractors ... was pursuant to a blanket policy that applied to all members of the putative class,").

6. Plaintiffs satisfy Federal Rule of Civil Procedure 23(a)(4) because there is no evidence that the Plaintiffs' and the class members' interests are at odds. *See Beckman v. KeyBank, N.A.,* 293 F.R.D. 467, 473 (S.D.N.Y.2013) (finding adequacy requirement met where there was no evidence that plaintiffs' and class members' interests were at odds); *Morris v. Affinity Health Plan, Inc.,* 859 F.Supp.2d 611, 616 (S.D.N.Y.2012) (same).

7. In addition, Plaintiffs' Counsel are experienced and adequate to serve as Class Counsel. *See, e.g., Beckman,* 293 F.R.D. at 473 (noting that attorneys at Outten & Golden LLP "have substantial experience prosecuting and settling employment class actions, including wage and hour class actions[,] and are well-versed in wage and hour law and class action law," and finding Outten & Golden LLP and Shavitz Law Group, P.A. adequate class counsel) (internal quotation and citation omitted); *Dabrowski v. Abax Inc.,* 84 A.D.d 633, 634 (N.Y.App.Div.2011) (observing that V & A "has demonstrated its expertise and zealous representation of the plaintiffs here, as well as in prior class action cases which have reached this court on appeal"); *Garcia el al. v. The Executive Club,* No. 10 Civ. 1545, Doc. No. 66 (S.D.N.Y. May 11, 2012) (appointing V & A and Leeds Brown Law, P.C., formerly Leeds Morelli Brown P.C., as class counsel); *Clark v. Astrue,* 274 F.R.D. 462, 472 (S.D.N.Y. Mar.18, 2011) (noting that UJC was "qualified, experienced, and generally able to conduct the litigation").

8. Plaintiffs also satisfy Rule 23(b)(3). Plaintiffs' common factual allegations and a common legal theory- that Defendants violated federal and state law by misclassifying them as independent contractors, failing to pay them wages, improperly requiring them to pay fees and improperly withholding their tips—predominate over any factual or legal variations among class members. *See Hernandez v. Merrill Lynch & Co., Inc.,* No. 11 Civ. 8472, 2013 WL 1209563, at *3 (S.D.N.Y, Mar. 21, 2013) (common factual allegations and legal theory predominated over variations in wage and hour misclassification case); *Hart,* 2010 WL 5297221, at *7

(courts have found that "the propriety of the defendants' blanket categorization of the plaintiffs as independent contractors, and, if improper, the legal consequences of that categorization, by their nature tend to predominate over any individual issues."); *Torres v. Gristede's Corp.,* No. 04 Civ. 3316, 2006 WL 2819730, at *16 (S.D.N.Y. Sept. 29, 2006) (plaintiffs "introduced sufficient proof that Defendants engaged in a common practice to deny employees overtime pay," and "[t]his issue predominates over any individual calculations of overtime wages").

**\*4** 9. Class adjudication of this case is superior to individual adjudication because it will conserve judicial resources and is more efficient for class members, particularly those who lack the resources to bring their claims individually. *See Beckman,* 293 F.R.D. at 473 *Morris,* 859 F.Supp.2d at 617. Concentrating the litigation in this Court is desirable because the allegedly wrongful conduct occurred within its jurisdiction.

### *APPROVAL OF THE SETTLEMENT AGREEMENT*

10. The Court hereby grants the Motion for Final Approval and finally approves the settlement as set forth in the Settlement Agreement.

11. Rule 23(e) requires court approval for a class action settlement to ensure that it is procedurally and substantively fair, reasonable, and adequate. Fed.R.Civ.P. 23(e). To determine procedural fairness, courts examine the negotiating process leading to the settlement. *See Wal–Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 116 (2d Cir.2005); *D'Amato v. Deutsche Bank.* 236 F,3d 78, 85 (2d Cir.2001). To determine substantive fairness, courts determine whether the settlement's terms are fair, adequate, and reasonable according to the factors set forth in *City of Detroit v. Grimell Corp.,* 495 F.2d 448, 452 (2d Cir.1974) *abrogated by Goldberger v. Integrated Res., Inc.,* 209 F.3d 43 (2d Cir.2000).

12. Courts examine procedural and substantive fairness in light of the "strong judicial policy in favor of settlements" of class action suits. *Wal–Mart Stores,* 396 F.3d at 116 (internal quotation and citation omitted); *see also In re EVCI Career Colls. Holding Corp. Sec. Litig.,* No. 05 Civ. 10240, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007); *Spann v. AOL Time Warner, Inc.,* No. 02 Civ. 8238, 2005 WL 1330937, at *6 (S.D.N.Y. June 7, 2005).

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 30 of 59 PageID #:25948

In re Famous-Executive Club Compensation Litigation, Not Reported in F.Supp.3d...

2014 WL 185628

13. A "presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal–Mart Stores,* 396 F.3d at 116 (quoting *Manual for Complex Litigation, Third,* § 30.42 (1995)); *see also D'Amato,* 236 F.3d at 85. "Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *In re EVCI Career Colls. Holding Corp. Sec. Litig.,* 2007 WL 2230177, at *4; *see also In re Top Tankers, Inc. Sec. Litig.,* No. 06 Civ. 13761, 2008 WL 2944620, at *3 (S.D.N.Y. July 31, 2008); *In re BankAmerica Corp. Sec. Litig.,* 210 F.R.D. 694, 700 (E.D.Mo.2002).

### Procedural Fairness

14. The settlement is procedurally fair, reasonable, adequate, and not a product of collusion. *See* Fed.R.Civ.P. 23(e); *McMahon v. Olivier C hen g Catering & Events, LLC,* No. 08 Civ. 8713, 2010 WL 2399328, at *4 (S.D.N.Y. Mar.3, 2010), The settlement was reached after the parties had conducted a thorough investigation and evaluated the claims and defenses, after significant discovery and motion practice, and after arm's-length negotiations between the parties, Swartz Decl. ¶¶ 22–27.

 **\*5** 15. The parties attended three mediation sessions over the course of a year, each with an experienced mediator, during which they engaged in a vigorous exchange regarding their respective claims and defenses. Swartz Decl. ¶¶ 22–26. After several follow-up telephone calls with the mediator following the final mediation, the Parties reached an agreement on all terms, which they memorialized in the Settlement Agreement. *Id.* These arm's-length negotiations involved counsel and mediators well-versed in wage and hour law, raising a presumption that the settlement achieved meets the requirements of due process. *See Wal–Mart Stores,* 396 F.3d at 116–17; *McMahon,* 2010 WL 2399328, at *4.

### Substantive Fairness

16. The settlement is substantively fair. All of the factors set forth in *Grinnell,* which provides the analytical framework for evaluating the substantive fairness of a class action settlement, weigh in favor of final approval.

17. The *Grinnell* factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. 495 F.2d at 463.

18. Litigation through trial would be complex, expensive and long. Therefore, the first *Grinnell* factor weighs in favor of final approval,

19. The class's reaction to the settlement was positive. The Notices sent to Class Members included an explanation of the allocation formula, an estimate of each Class Member's award, informed Class Members of their right to object to or exclude themselves from the settlement and explained how to do so. Ex. C (Patton Decl.) Ex. A (Notice) ¶¶ 4, 6, 12. No Class Member has objected to the settlement.[2] Ex. C (Patton Decl.) ¶ 8, Only twenty-two Class Members asked to be excluded from the settlement. No Class Member objected to the settlement. Swartz Decl. ¶ 52; Ex. C (Patton Decl.) ¶¶ 7–8. This response demonstrates strong support for the settlement. *See Davis v. J.P. Morgan Chase & Co.,* 827 F.Supp.2d 172, 177 (W.D.N.Y.2011) (granting final approval and noting "very little negative reaction by class members to the proposed settlement" where 11 out of 3,800 class members opted out, and 3 objected); *Willix v. Healthfirst Inc.,* No. 07 Civ. 1143, 2011 WL 754862, at *4 (E.D.N.Y. Feb. 18, 2011) (granting final approval of the settlement where 7 out of 2,025 class members objected and 2 opted out); *Bellifemine v. Sanofi–Aventis U.S. LLC,* No. 07 Civ. 2207, 2010 WL 3119374, at * 3 (S.D.N.Y. Aug. 6, 2010) (granting final approval where there were no objections but 28 of 5,262 opted out, noting that "[a] small number of objections is convincing evidence of strong support by class members"); *Wright v. Stem,* 553 F.Supp.2d 337, 344–45 (S.D.N.Y.2008) (approving settlement where 13 out of 3,500 class members objected and 3 opted out, noting that "[t]he fact that the vast majority of class members neither objected nor opted out is a strong indication" of fairness).

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 31 of 59 PageID #:25949

In re Patrons Executive Club Compensation Litigation, Not Reported in F.Supp.2d...

2014 WL 185628

2

Although former plaintiff Leslie Liwanag expressed an intent to object to the Settlement, she has not filed any objection and opted out of the Settlement on September 13, 2013. Ex. C (Patton Decl.), Ex. B.

**\*6** 20. The fact that several Class Members represented by the same counsel have opted out of the settlement does not stand in the way of the "silent majority's" right to recover. *In re Lloyd's American Trust Fund Litig.,* No. 96 Civ. 1262, 2002 WL 31663577, at \*24 (S.D.N.Y. Nov. 26, 2002) ("[T]his Court has a fiduciary duty to protect all Class Members-including the silent majority who have not voiced any objections to the Settlement."); *Grant v. Bethlehem Steel Corp.,* 823 F,2d 20, 23 (2d Cir.1987) ("[T]he mere fact that the only class members expressing opinions regarding the settlement were a vocal minority opposing it does not alter the district court's discretion in approving the settlement or its duty to protect the interests of the silent class majority ...,").

21. The parties have completed enough discovery to recommend settlement. The pertinent question is "whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 537 (3d Cir.2004) (internal quotation marks omitted). Here, in addition to conducting thorough pre-suit investigations, Class Counsel reviewed thousands of pages of documents; analyzed time, payroll and tip allocation records, tax documents, and financial records; prepared three Plaintiffs and four opt-in Plaintiffs for their depositions and defended them; served and responded to document requests and interrogatories; took a *Fed.R.Civ.P. 30(b) (6)* deposition; and deposed two of Defendants' managers. The parties' participation in three mediation sessions allowed them to further explore the claims and defenses. The third *Grinnell* factor weighs in favor of final approval.

22. The risk of establishing liability and damages further weighs in favor of final approval. "Litigation inherently involves risks." *In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 126 (S.D.N.Y.1997). Indeed, the primary purpose of settlement is to avoid the uncertainty of a trial on the merits. *See In re Ira Haupt & Co.,* 304 F.Supp. 917, 934 (S.D.N.Y.1969); *see also Velez v. Majik Cleaning Serv., Inc.,* No. 03 Civ. 8698, 2007 WL 7232783, at \*6 (S.D.N.Y. June 25.2007). Here, Plaintiffs faced numerous risks as to both liability and damages, including overcoming Defendants' defenses that Class Members were independent contractors and not employees under

the FLSA or NYLL, and that the tips they earned were not gratuities, but rather mandatory service charges which should be considered wages, among other defenses. The proposed settlement eliminates this uncertainty. This factor therefore weighs in favor of final approval.

23. The risk of obtaining class certification and maintaining both collective and class certification through trial is also present. A contested class certification motion would likely require extensive discovery and briefing. Defendants would also be likely to challenge this Court's certification of the FLSA collective by seeking decertification at a later date, after the close of discovery. If the Court were to grant class certification, Defendants might seek to file an appeal under Federal Rule of Civil Procedure 23(f), the resolution of which would require an additional round of briefing. Settlement eliminates the risk, expense, and delay inherent in the litigation process. The fifth *Grirmell* factor weighs in favor of final approval.

**\*7** 24. Even if Defendants could have withstood a greater judgment, a "defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair." *Frank v. Eastman Kodak Co.,* 228 F.R.D. 174, 186 (W.D.N.Y.2005) (quoting *In re Austrian & German Bank Holocaust Litig.,* 80 F.Supp.2d 164, 178 n. 9 (S.D.N.Y.2000) (alterations and citation omitted)). Accordingly, this factor is neutral and does not preclude the Court from approving the settlement.

25. The amount of the settlement, in light of the best possible recovery and the attendant risks of litigation, weighs in favor of final approval. The determination of whether a settlement amount is reasonable "does not involve the use of a 'mathematical equation yielding a particularized sum.' " *Frank,* 228 F.R.D. at 186 (quoting *In re Austrian & German Bank Holocaust Litig.,* 80 F.Supp.2d at 178). "Instead, 'there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.' " *Id.* (quoting *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972)). These factors also weigh in favor of final approval.

### APPROVAL OF THE FLSA SETTLEMENT
26. The Court hereby approves the FLSA settlement.

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 32 of 59 PageID #:25950

In re Penthouse Executive Club Compensation Litigation, Not Reported in F.Supp.3d...

2014 WL 185628

27. Because, under the FLSA, "parties may elect to opt in but a failure to do so does not prevent them from bringing their own suits at a later date," *McKenna v. Champion Intern. Corp.,* 747 F.2d 1211, 1213 (8th Cir.1984); FLSA collective actions do not implicate the same due process concerns as Rule 23 actions, *McMahon,* 2010 WL 2399328, at *6. Accordingly, the standard for approval of an FLSA settlement is lower than for a class action under Rule 23,

28. Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve *bona fide* disputes. See *Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1353 n. 8 (11th Cir.1982); *McMahon,* 2010 WL 2399328, at *6. Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of the settlement. *Lynn's Food Stores,* 679 F.2d at 1353–54. If the proposed FLSA settlement reflects a reasonable compromise over contested issues, it should be approved. *Id.* at 1354; *McMahon,* 2010 WL 2399328, at *6.

29. In this case, the settlement was the result of vigorous arm's length negotiation Swartz Decl. ¶ 27. During the entire process, Plaintiffs and Defendants were represented by counsel experienced in wage and hour law. Accordingly, the Settlement Agreement resolves a *bona fide* dispute under circumstances supporting a finding that is fair and reasonable.

### DISSEMINATION OF NOTICE

30. Pursuant to the Preliminary Approval Order, the Notices were sent by first-class mail to each respective Class Member at his or her last known address (with re-mailing of returned Notices for which new addresses could be located). The Court finds that the Notices fairly and adequately advised Class Members of the terms of the settlement, as well as the right to opt out of or to object to the settlement, and to appear at the fairness hearing conducted on January 14, 2004. Additional notice was provided on www.stripperweb .com pursuant to this Court's order (ECF No. 116). The Claims Administrator also sent two text messages to Class Members on August 9, 2013 and September 10, 2013, and established a website that provided notice of the settlement. On October 1, 2013, Notices were sent to 28 Class Members for whom the Claims Administrator located new possible addresses. Patton Decl. ¶ 5; ECF No. 123. The second notice period ended on December 26, 2013. No Class Members included

in this second mailing opted out or objected. Class Members were provided with the best notice practicable under the circumstances.

 **\*8** 31. The Court further finds that the Notices and their distribution comported with all constitutional requirements, including those of due process.

32. The Court confirms Settlement Services, Inc. as the Claims Administrator.

### AWARD OF FEES AND COSTS TO CLASS COUNSEL AND AWARD OF SERVICE AWARDS TO PLAINTIFFS

33. On April 29, 2013, the Court appointed Outten & Golden LLP ("O & G"), Virginia & Ambinder LLP ("V & A"), Leeds Brown Law, PC ("LBL"), and the Urban Justice Center Sex Workers Project ("UJC") as Class Counsel because they met all of the requirements of Federal Rule of Civil Procedure 23(g). *See Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152. 165 (S.D.N.Y.2008) (Rule 23(g) requires the court to consider "the work counsel has done in identifying or investigating potential claims in the action, ... counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, ... counsel's knowledge of the applicable law, and ... the resources counsel will commit to representing the class.") (internal quotation marks omitted).

34. Class Counsel are experienced employment lawyers with good reputations among the employment law bar. *See. e.g., Beckman,* 293 F.R.D. at 473 (noting that attorneys at Outten & Golden LLP "have substantial experience prosecuting and settling employment class actions, including wage and hour class actions [,] and are well-versed in wage and hour law and class action law," and finding Outten & Goldem LLP and Shavitz Law Group, P.A. adequate class counsel) (internal quotation and citation omitted); *Dahrowski v. Abax Incorporated,* 84 A.D.3d 643 (1st Dept.2011) (observing that V & A "has demonstrated its expertise and zealous representation of the plaintiffs here, as well as in prior class action cases which have reached this court on appeal"); *Garcia et al. v. The Executive Club,* No. 10 Civ. 1545, Doc. No. 66 (S.D.N.Y. May 11, 2012) (appointing V & A and Leeds Brown Law, P.C. (formerly Leeds Morelli Brown P.C.) as class counsel); *Clark v. Astrue,* 274 F.R.D. 462, 472

In re Penthouse Executive Club Compensation Litigation, Not Reported in F.Supp.2d...

2014 WL 185628

(S.D.N.Y. Mar.18, 2011) (noting that UJC was "qualified, experienced, and generally able to conduct the litigation").

35. The work that Class Counsel has performed in litigating and settling this case demonstrates their commitment to the class and to representing the class's interests. Class Counsel have committed substantial resources to prosecuting this case.

36. The Court hereby grants Plaintiffs' Motion for Attorneys' Fees and awards Class Counsel $2,175,000, which is 27.1875% of the settlement fund.

37. The trend in this Circuit is to use the percentage of the fund method to compensate attorneys in common fund cases like this one. *McDaniel v. County of Sc hen ectady,* 595 F.3d 411, 417 (2d Cir.2010); *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir.2005); *Sewell,* 2012 WL 1320124, at *10; *Beckman,* 293 F.R.D. at 477.

*9 38. Although the Court has discretion to award attorneys' fees based on the lodestar method or the percentage-of-recovery method, *McDaniel,* 595 F.3d at 417, in wage and hour class action lawsuits, public policy favors a common fund attorneys' fee award. *Beckman,* 293 F.R.D. at 477. *McMahon.* 2010 WL 2399328, at *7. Fee awards in wage and hour cases are meant to "encourage members of the bar to provide legal services to those whose wage claims might otherwise be too small to justify the retention of able, legal counsel." *Sand v. Greenberg,* No. 08 Civ. 7840, 2010 WL 69359, at *3 (S.D.N.Y. Jan. 7, 2010). The FLSA and state wage and hour statutes are remedial statutes, the purposes of which are served by adequately compensating attorneys who protect wage and hour rights. *McMahon,* 2010 WL 2399328, at *7; *Sand,* 2010 WL 69359, at *3.

39. Where relatively small claims can only be prosecuted through aggregate litigation, and the law relies on prosecution by "private attorneys general," attorneys who fill the private attorney general role must be adequately compensated for their efforts. *McMahon,* 2010 WL 2399328, at *7; *Sand,* 2010 WL 69359, at *3. If not, wage and hour abuses would go without remedy because attorneys would be unwilling to take on the risk. *Willix v. Healthfirst Inc.,* No. 07 Civ. 1143, 2011 WL 754862, at *6 (E.D.N.Y. Feb. 18, 2011); *Sand,* 2010 WL 69359, at *3 ("But for the separate provision of legal fees,

many violations of the Fair Labor Standards Act would continue unabated and uncorrected.").

41. Class Counsel's request for 27.1875% of the Fund is reasonable and "consistent with the norms of class litigation in this circuit." *McMahon,* 2010 WL 2399328, at *7.

42. Although *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany* does not address a common fund fee petition, it supports class counsel's request for one-third of the fund because " 'reasonable, paying client[s]' ... typically pay one-third of their recoveries under private retainer agreements." *McMahon,* 2010 WL 2399328, at *8 (internal citation and quotations omitted).

43. In addition, in Plaintiffs' retainer agreements with Class Counsel, Plaintiffs agreed that Class Counsel could apply to the Court for up to 33% of a class-wide recovery and that they would pay Class Counsel 33% of any individual recovery. Decl. of Justin M. Swartz in Supp. of Pls.' Mot. for Approval of Attys' Fees and Reimbursement of Expenses and Pls.' Mot. for Approval of Service Awards ("Swartz Fees & Service Awards Decl") ¶ 18; Decl. of Lloyd Ambinder in Supp. of Pls,' Mot. for Approval of Attys' Fees and Reimbursement of Expenses and Pls.' Mot. for Approval of Service Awards ("Ambinder Fees & Service Awards Decl.") ¶ 14. This also provides support for Class Counsel's request for 27.1875% of the fund.

44. No Class Member objected to Class Counsel's request for one-third of the fund, which also provides support for Class Counsel's fee request of 27.1875%.

*10 45. All of the factors in *Goidberger v. Integrated Resources, Inc.,* 209 F.3d 43, 48–49 (2d Cir.2000) weigh in favor of the requested fee award.

46. Applying the lodestar method as a "cross check," *see id.* at 50, the Court finds that the lodestar sought by Class Counsel, approximately 1.13 times, their hourly rates falls within the range granted by courts and is reasonable. "Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers." *Beckman,* 293 F.R.D. at 481; *see also Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1052–54 (9th Cir.2002) (listing nationwide class action settlements

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 34 of 59 PageID #:25952

In re Pfizer Executive Club Compensation Litigation, Not Reported in F.Supp.3d...

2014 WL 185628

where multiplier ranged up to 8.5 times, and in one case 19.6 times); *Sewell,* 2012 WL 1320124, at *13 ("Courts commonly award lodestar multipliers between two and six."); *In re Lloyd's Am. Trust Fund Litig.,* 2002 WL 31663577, at *27 (a "multiplier of 2.09 is at the lower end of the range of multipliers awarded by courts within the Second Circuit"); *see, e.g., Steiner v. Am. Broad. Co.,* 248 F. App'x 780, 783 (9th Cir.2007) (multiplier of 6.85 "falls well within the range of multipliers that courts have allowed"); *Davis,* 827 F.Supp.2d at 184–86 (awarding multiplier of 5.3 in wage and hour class action); *Buccellato v. AT & T Operations, Inc.,* No. 10 Civ. 463, 2011 WL 3348055, at *2 (N.D .Cal. Jun. 30, 2011) (awarding multiplier of 4.3 in wage and hour class action); *New England Carpenters Health Benefits Fund v. First Databank, Inc.,* No. 05 Civ. 11148, 2009 WL 2408560, at *2 (D .Mass. Aug. 3, 2009) (awarding multiplier of 8.3); *In re Enron Corp., Sec., Derivative & ERISA Litig.,* 586 F.Supp.2d 732, 741, 803 (S.D.Tex.2008) (awarding multiplier of 5.2); *In re Cardinal Health Inc. Sec. Litig.,* 528 F.Supp.2d 752, 768, 770 (S.D.Ohio 2007) (awarding multiplier of six times); *In re Rite Aid Sec. Litig.,* 362 F.Supp.2d 587, 589–90 (E.D.Pa.2005) (awarding multiplier of 6.96 times); *Maley v. Del Global Techs. Corp.,* 186 F.Supp.2d 358, 371 (S.D.N.Y.2002) ("modest multiplier" of 4.65 in wage and hour class action was "fair and reasonable"); *In re RJR Nabisco, Inc. Sec. Litig.,* No. 88 Civ, 7905, 1992 WL 210138, at *5 (S.D.N.Y. Aug.24, 1992) (awarding multiplier of 6); *Cosgrove v. Sullivan,* 759 F.Supp. 166, 167 n. 1 (S.D.N.Y.1991) (awarding multiplier of 8.74).

47. The lodestar multiplier Class Counsel seeks is also reasonable because it will diminish over time. *Parker v. Jekyll & Hyde Entm't Holdings, LLC,* No. 08 Civ. 7670, 2010 WL 532960. at *2 (S.D.N.Y. Feb. 9, 2010) ("[A]s class counsel is likely to expend significant effort in the future implementing the complex procedure agreed upon for collecting and distributing the settlement funds, the multiplier will diminish over time"). "[W]here 'class counsel will be required to spend significant additional time on this litigation in connection with implementing and monitoring the settlement, the multiplier will actually be significantly lower' because the award includes not only time spent prior to the award, but after in enforcing the settlement." *Sewell,* 2012 WL 1320124, at *13 (quoting *Bellifemine,* 2010 WL 3119374, at *6). In wage and hour cases. Class Counsel is often called upon to perform work after the final approval hearing, including answering class

member questions, answering questions from the claims administrator, and negotiating and sometimes litigating disagreements with defendants about administering the settlement and distributing the fund. *See* Swartz Fees & Service Awards Decl. ¶ 12. "The fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward also supports their fee request." *See McMahon,* 2010 WL 2399328. at *8.

**\*11** 48. The attorneys' fee percentage should come out of the full settlement amount, rather than the claimed funds. "An allocation of fees by percentage should ... be awarded on the basis of the total funds made available, whether claimed or not." *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 437 (2d Cir.2007). In *Diaz,* the court found that "although the percentage-of-recovery here is based on the entire settlement fund, including the amount that will revert to defendants, rather than on the portion of the fund equal to the claims actually made, the fee requested is nevertheless reasonable in light of the *Goldberger factors." Diaz v. Eastern Locating Serv., Inc.,* No. 10 Civ. 4082, 2010 WL 5507912, at *8 (S.D.N.Y. Nov. 29, 2010). "The whole purpose of fee-shifting statutes is to generate attorneys' fees that are *disproportionate* to the plaintiffs recovery." *Torres v. Gristede's Operating Corp.,* 519 F. App'x 1, 6 (2d Cir.2013) (citing *Millea v. Metro–N. R.R. Co.,* 658 F.3d 154, 169 (2d Cir.2011)). "[T]he value of legal service rendered in the creation of a settlement fund [is not] diminished by the failure of beneficiaries to cash in, regardless of what happens to the surplus." *Alleyne v. Time Moving & Storage Inc.,* 264 F.R.D. 41, 59 (E.D.N.Y.2010).

49. The Court also awards Class Counsel reimbursement of their litigation expenses in the amount of $57,729.06. Courts typically allow counsel to recover their reasonable out-of-pocket expenses. *See In re Indep. Energy Holdings PLC Sec. Litig.,* 302 F.Supp.2d 180, 183 & n. 3 (S.D.N.Y.2003). Here, Class Counsel's unreimbursed expenses, including court and process server fees, postage and courier fees, transportation, working meals, photocopies, electronic research, expert fees, and Plaintiffs' share of the mediator's fees, are reasonable and were incidental and necessary to the representation of the class.

In re Famous Executive Club Compensation Litigation, Not Reported in F.Supp.3d...
2014 WL 185628

50. The attorneys' fees and the amount in reimbursement of litigation costs and expenses shall be paid from the settlement fund.

51. The Court finds reasonable service awards of $15,000 each for named Plaintiffs Stephanie Carattini and Nicole Hughes, and of $8,750 to opt-in Plaintiff Alicia Daniels, in recognition of the services they rendered on behalf of the class. [3] These amounts shall be paid from the settlement fund.

[3]     The Court declines to grant service awards to former named plaintiffs Leslie Liwanag or Nicki Mpogiatzis, or to former opt-in plaintiffs Nadene Speer or Marsha Chalmers because they have opted out of the case and are not participating in the settlement. *See* Morris, 859 F.Supp.2d at 624 (awarding service awards to remaining named plaintiff only, after one named plaintiff objected and other named plaintiff opted out); Martens, 190 F.R.D. at 139–40 ("[N]amed plaintiffs ... who opt out of a settlement no longer remain in the class in any capacity.").

52. Service awards are common in class action cases and serve to "compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff[s]." McMahon, 2010 WL 2399328, at *9. Service awards fulfill the important purpose of compensating plaintiffs for the time they spend and the risks they take. Massiah v. MetroPlus Health Plan, Inc., No. 11 Civ. 5669, 2012 WL 5874655, at *8 (E.D.N.Y. Nov. 20, 2012).

53. The "Effective Date" of the settlement shall be 31 days after the date of this Order if no party appeals this Order. If a party appeals this Order, the "Effective Date" of the settlement shall be the day after all appeals are finally resolved. This Order shall constitute a judgment for purposes of Rule 58 of the Federal Rules of Civil Procedure.

**\*12**  54. Within 3 days of the time to appeal this Order has expired, the claims administrator shall distribute the funds in the settlement account by making the following payments in the order below:

A. Paying Class Counsel 27.1875% of the fund ($2,175,000);

B. Reimbursing Class Counsel for $57,729,06 in litigation costs and expenses;

C. Paying service awards of $15,000 each to named Plaintiffs Stephanie Carattini and Nicole Hughes, and paying a service award of $8,750 to optin Plaintiff Alicia Daniels.

55. Within 3 days of the time to appeal this Order has expired, and after the claims administrator has distributed the funds according the schedule set forth above, Defendants shall make payments to class members in accordance with the allocation plan described in the Settlement Agreement and the Addendum to the Settlement Agreement.

56. The Court retains jurisdiction over this action for the purpose of enforcing the Settlement Agreement and overseeing the distribution of settlement funds. The parties shall abide by all terms of the Settlement Agreement, which are incorporated herein, and this Order.

57. Upon the Effective Date, this litigation shall be dismissed with prejudice, and Class Members who have not excluded themselves from the settlement shall be permanently enjoined from pursuing and/or seeking to reopen claims that have been released pursuant to the settlement. Docket numbers 139, 141 and 147 are granted. The Clerk of court is directed to close this case. Any other pending motions are moot.

It is so ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 185628

---

KeyCite Yellow Flag - Negative Treatment
Distinguished by Meijer, Inc. v. 3M, E.D.Pa., August 14, 2006

2005 WL 1213926
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

THE STOP & SHOP
SUPERMARKET COMPANY, et al.
v.
SMITHKLINE BEECHAM CORP.

No. Civ.A. 03-4578.
|
May 19, 2005.

**Synopsis**
**Background:** Plaintiffs, direct purchasers of prescription drug, brought class action against drug manufacturer, alleging antitrust violations. Following approval of settlement, plaintiffs moved for award of attorneys' fees and costs.

**Holding:** The District Court, Padova, J., held that fees and costs of $20 million would be properly awarded.

Motion granted.

West Headnotes (1)

[1]    **Attorney and Client**
         👉 Allowance and Payment from Funds in
         Court

Attorney fees and costs totaling $20 million would be properly awarded to counsel for plaintiffs, direct purchasers of prescription drug, in settlement of class action against drug manufacturer; costs of $372,357.01 represented reasonable litigation expenses, fees were commensurate with size of settlement fund and number of persons benefited, no objections were raised by settlement class, attorneys exhibited high level of skill and efficiency, and

litigation was lengthy and complex. Fed.Rules
Civ.Proc.Rule 23(h), 28 U.S.C.A.

14 Cases that cite this headnote

**Attorneys and Law Firms**

Jeffrey L. Kodroff, Spector, Roseman & Kodroff, Philadelphia, PA, for Plaintiffs.

Christine C. Levin, George G. Gordon, Joseph A. Tate, Will W. Sachse, Philadelphia, PA, for Defendant.

*MEMORANDUM*

PADOVA, J.

 *1  Plaintiffs, direct purchasers of Paxil brand paroxetine hydrochloride ("Paxil"), have brought this class action antitrust suit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, against SmithKline Beecham Corporation, d/b/a/ GlaxoSmithKline ("GSK" or "Defendant"), alleging, individually and on behalf of a class of all others similarly situated, that GSK has violated Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, by stockpiling and causing patents to be listed with the Food and Drug Administration ("FDA") in a manner which delayed FDA approval of generic paroxetine hydrochloride and enabled Defendant to unlawfully extend its market monopoly for Paxil. Plaintiffs have reached a settlement of their claims against GSK in the amount of $100 million, and the Court approved the Settlement following a Fairness Hearing held on January 28 and February 9, 2005. Before the Court is Plaintiffs' Motion for Award of Attorneys' Fees and Costs. For the reasons that follow, the Court grants the Motion and awards attorneys' fees and costs to counsel for Plaintiffs in the total amount of $20 million.

I. BACKGROUND

Plaintiffs claim that GSK unlawfully excluded competition in the market for Paxil and generic paroxetine hydrochloride [1] by engaging in the following unlawful acts: (1) conducting sham patent infringement litigation against generic manufacturers which triggered automatic 30 month regulatory stays of generic competition; (2) making intentional misrepresentations to the Patent

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 37 of 59 PageID #:25955

Stop & Shop Supermarket Co. v. Smithkline Beecham Corp., Not Reported in...

2005 WL 1213926

and Trademark Office ("PTO") in order to obtain patents related to paroxetine hydrochloride; and (3) making intentional misrepresentations to the Food & Drug Administration ("FDA") which enabled GSK to exclude competition by generic manufacturers. On January 26, 1988, GSK was issued U.S. Patent No. 4,721,723 (the " '723 Patent"), which claims crystalline paroxetine hydrochloride hemihydrate and its use in treating depression. On December 29, 1992, the FDA approved GSK's New Drug Application ("NDA") for a drug containing paroxetine hydrochloride hemihydrate, which GSK markets as Paxil. In connection with its NDA for Paxil, GSK submitted to the FDA a list of all patents it owned that claimed paroxetine hydrochloride, or a method of using that drug. The FDA lists patents for approved drugs in the Approved Drug Products with Therapeutic Equivalence Evaluations publication (the "Orange Book") once an NDA is approved.

1    Generic drugs are drugs which the Food and Drug Administration ("FDA") has found to be bio-equivalents of previously approved brand name drugs. Pursuant to the Hatch-Waxman Act, 21 U.S.C. § 355, to obtain approval of their generic bio-equivalents, generic drug manufacturers submit Abbreviated New Drug Applications to the FDA which incorporate the safety and effectiveness data previously submitted by the company that obtained approval of the brand name drug, and which include detailed information proving that the drug is the bio-equivalent of the brand name drug.

Pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, et seq., once the FDA approved GSK's NDA for Paxil, GSK obtained a five-year statutory monopoly in the market for that drug. In accordance with 21 U.S.C. § 355(c)(2), after GSK obtained approval of its NDA, it was obligated to submit information on any new patent it obtained that claimed paroxetine hydrochloride or methods of its use to the FDA within 30 days of such patent's issuance. The FDA would then list the new patent in a supplement to the Orange Book.

*2 Plaintiffs maintain that, in 1995, GSK began to apply for patents on new anhydrous polymorphs of paroxetine hydrochloride, which patents began to issue in 1999 and which were then submitted by GSK to the FDA for listing in the Orange Book. Patent No. 5,872,132 ("the '132 Patent") was approved by the PTO on February 16, 1999, and claimed an allegedly new crystalline form

of paroxetine hydrochloride anhydrate designated as Form C. Patent No. 4,900,423 ("the '423 Patent") was approved on May 4, 1999 and claimed a second anhydrate crystalline form of paroxetine hydrochloride. GSK submitted both of these patents to the FDA for listing in the Orange Book in 1999. On June 27, 2000, the PTO approved GSK's Patent No. 6,080,759 ("the '759 Patent") for an invention titled Paroxetine "Hydrochloride Form A." The '759 Patent claims a paroxetine hydrochloride anhydrate Form A made according to the process for making paroxetine hydrochloride anhydrate Form A. GSK then submitted this patent to the FDA for listing in the Orange Book. On September 5, 2000, the PTO approved Patent No. 6,113,944 ("the '944 Patent") for "Paroxetine Tablets and Process to Prepare Them" which patent claims a pharmaceutical composition in tablet form containing paroxetine hydrochloride produced on a commercial scale. GSK then submitted the '944 Patent to the FDA for listing in the Orange Book.

As part of their Abbreviated New Drug Applications ("ANDAs"), manufacturers of generic pharmaceuticals must certify that the generic drug will not infringe on any valid, unexpired patent which claims the brand name drug. See 21 U.S.C. § 355(j)(2)(A)(vii). Generic competitors of GSK began to file ANDAs seeking approval of generic bioequivalents of Paxil in 1998. Those ANDAs contained the requisite certifications that they did not infringe on any valid, unexpired patent claiming Paxil. Plaintiffs claim that, after receiving these certifications of noninfringement, GSK filed baseless patent infringement actions against those competitors, alleging that the bioequivalent drugs infringed on the '723 Patent and the other, more recently issued, patents on forms of paroxetine hydrochloride owned by GSK. Pursuant to the Hatch-Waxman Act, 21 U.S.C. § 355, the filing of a patent infringement suit by a branded drug patent owner against a generic competitor automatically blocks the FDA's approval of the competitor's ANDA for up to 30 months. Plaintiffs allege that GSK violated the antitrust laws by filing these baseless patent infringement actions against its competitors in order to block FDA approval of its competitors' ANDAs and, thus, indefinitely extend its market monopoly for Paxil.

The first such suit was brought against Apotex Corporation ("Apotex"), after Apotex submitted ANDA No. 75-356 to the FDA on March 31, 1998, seeking approval of a paroxetine hydrochloride anhydrous drug.

2005 WL 1213926

On June 26, 1998, GSK sued Apotex in the United States District Court for the Northern District of Illinois for infringement of the '723 Patent. On March 3, 2003, Judge Posner, sitting by designation, ruled that Apotex's generic product did not infringe the '723 Patent and dismissed SmithKline's suit with prejudice. *See SmithKline Beecham Corp. v. Apotex Corp.,* 247 F.Supp. 1011 (N.D.Ill.2003) (Posner, J.), *aff'd* 365 F.3d 1306 (Fed.Cir.2004). On April 23, 2004, the United States Court of Appeals for the Federal Circuit (the "Federal Circuit") affirmed Judge Posner's decision on other grounds. *See SmithKline Beecham Corp. v. Apotex Corp.,* 365 F.3d 1306 (Fed.Cir.2004). The Federal Circuit found that Apotex's anhydrous paroxetine hydrochloride would infringe on the '723 Patent, but found that the '723 Patent was invalid as a result of public use of the product claimed in claim 1 of the '723 Patent prior to GSK's application for the '723 Patent. *Id.* at 1315, 1320.

**\*3** GSK filed additional patent infringement actions against Apotex in 1999, 2000 and 2001 in the United States District Court for the Eastern District of Pennsylvania, for infringement of the '423 Patent, the '759 Patent, and the '944 Patent. *See SmithKline Beecham Corp. v. Apotex Corp., et al.,* Civ.A.No. 99-cv-4304 (E.D.Pa.); *SmithKline Beecham Corp. v. Apotex Corp., et al.,* Civ.A.No. 00-cv-4888 (E.D.Pa.); *SmithKline Beecham Corp. v. Apotex Corp., et al.,* Civ.A.No. 01-cv-0159 (E.D.Pa.). GSK also filed two patent infringement actions against Geneva Pharmaceuticals, Inc. ("Geneva") in the United States District Court for the Eastern District of Pennsylvania in 1999 and 2000, for infringement of the '723, '132, '759 and '944 Patents, after Geneva submitted ANDA No. 75-566 to the FDA for approval of paroxetine hydrochloride tablets. *See SmithKline Beecham Corp. v. Geneva Pharm., Inc., et al.,* Civ.A.No. 99-cv-2926 (E.D.Pa.) and *SmithKline Beecham Corp. v. Geneva Pharm., Inc., et al.,* Civ.A.No. 00-cv-5953 (E.D.Pa.). GSK filed a patent infringement action against Zenith Goldline Pharmaceuticals, Inc. ("Zenith") in the Eastern District of Pennsylvania in 2000, claiming infringement of the '723, '423, and '132 Patents after Zenith submitted ANDA No. 75-691 to the FDA seeking approval of paroxetine hydrochloride tablets. *See SmithKline Beecham Corp. v. Zenith Goldline Pharm., Inc., et al.,* Civ.A.No. 00-cv-1393 (E.D.Pa.). GSK also filed a patent infringement action against Pentech Pharmaceuticals, Inc. ("Pentech"), in 2000, after Pentech submitted ANDA No. 75-771 to the FDA for approval of paroxetine hydrochloride capsules.

This lawsuit was filed in the Northern District of Illinois and claimed that Pentech infringed the '723 and '132 Patents. *See SmithKline Beecham Corp. v. Pentech Pharm., Inc., et al.,* Civ.A.No. 1:00-02855 (N.D.Ill.). GSK sued Alphapharm PTY, Ltd. ("Alphapharm") for infringement of '723, '132, '759, and '423 Patents in the United States District Court for the Eastern District of Pennsylvania in 2001, after Alphapharm submitted ANDA No. 75-716 to the FDA for approval of paroxetine hydrochloride tablets. *See SmithKline Beecham Corp. v. Alphapharm PTY, Ltd., et al.,* Civ.A.No. 01-cv-1027 (E. D.Pa.).

Plaintiffs claim that the filing of these baseless lawsuits enabled GSK to unreasonably restrain, suppress and eliminate competition in the market for paroxetine hydrochloride; illegally maintain its monopoly on the market for paroxetine hydrochloride; fix, raise, maintain or stabilize the price for Paxil to supra-competitive prices; and overcharge Plaintiffs and other direct purchasers of Paxil many millions of dollars by depriving them of the benefits of competition from lower-priced generic versions of paroxetine hydrochloride. On July 1, 2003, following Judge Posner's March 2003 decision in *SmithKline Beecham Corp. v. Apotex Corp.,* GSK announced that it had asked the FDA to delist the '759 Patent, along with its patent no. 6,172,233 (which claims a new process for preparing pharmaceutically active compounds, including paroxetine)[2] and its patent no. 6,063,927 (which claims a novel salt of paroxetine which may be used as an alternative to hydrochloride)[3] from the Orange Book. On September 8, 2003, Apotex began to market its generic paroxetine hydrochloride product.

2      *See* U.S. Patent No. 6,172,233 (issued Jan. 9, 2001).

3      *See* U.S. Patent No. 6,063,927 (issued May 26, 2000).

**\*4** Plaintiffs have asserted one claim of monopolization in violation of Section 2 of the Sherman Act on behalf of a nationwide class of persons or entities who purchased Paxil directly from GSK between December 29, 1997 and the present (the "Class"). (Compl. Count I.) Plaintiffs allege that GSK knowingly, willfully and wrongfully maintained its monopoly power over the market for paroxetine hydrochloride in the United States and its territories by prosecuting baseless, sham patent lawsuits against potential generic competitors, and by knowingly and willfully making false and misleading representations to the FDA to obtain multiple listings in the Orange Book. (*Id.*) In connection with this claim, the Complaint

Stop & Shop Supermarket Co. v. Smithkline Beecham Corp., Not Reported in...
2005 WL 1213926

seeks monetary damages and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

A. *Litigation History*
Prior to filing the Complaint, Plaintiffs' counsel investigated all of GSK's patents related to Paxil (including the '723, '423, '132, '759, '944 and '233 Patents); reviewed fifteen New Drug Applications ("NDAs") filed by GSK with the FDA with respect to the various forms of Paxil; reviewed the Abbreviated New Drug Applications ("ANDAs") filed by potential generic competitors Apotex, Geneva, Zenith, Alphapharm, Pentech, and Teva Pharmaceuticals USA, Inc. relating to paroxetine hydrochloride; and reviewed the patent infringement actions which GSK brought against these generic competitors. (Kodroff Decl. ¶¶ 11-13.) Plaintiffs The Stop & Shop Supermarket Company, Giant of Maryland, L.L.C., and American Sales Company, Inc. filed the Complaint in this action on August 6, 2003. It was not, however, the first class action antitrust suit brought against GSK in connection with Paxil. The first such suit was brought by indirect purchasers Robert Nichols and Edith Cousins on December 8, 2000. *See Robert Nichols, et. al. v. SmithKline Beecham Corp.,* Civ.A.No. 00-6222 (E.D.Pa.). That action was later consolidated with four other class action antitrust suits brought by indirect purchasers. [4]

[4]    The cases which were consolidated with the *Nichols* action are: *Dorothy L. Tyminski-Porter v. SmithKline Beecham Corp.,* Civ.A.No. 00-cv-6231 (E.D.Pa.), filed on December 8, 2000; *Lynda Willits v. SmithKline Beecham Corp.,* Civ.A.No. 01-cv-0423 (E.D. Pa.), filed on January 26, 2001; *Terry Kirchoff v. SmithKline Beecham Corp.,* Civ.A.No. 01-cv-6974 (E.D.Pa.), filed on December 26, 2001; and *County of Suffolk, New York, John Kelly and Olivia Haeberger v. Smithkline Beecham Corp.,* Civ.A.No. 03-cv-5620 (E.D.Pa.), filed on October 8, 2003.

Defendant filed its Answer to the Complaint on October 3, 2003. Following status conferences held on October 10 and November 18, 2003, the Court entered a comprehensive Case Management and Scheduling Order on December 2, 2003. Pursuant to this Order, Co-Lead Counsel were appointed to represent the Class and a schedule was established for discovery and merits issues, including expert discovery, class certification,

and dispositive motions. [5] The Case Management and Scheduling Order also directed the parties to coordinate the proceedings in this case with the proceedings in the *Nichols* action to the extent practicable.

[5]    Thomas M. Sobol, Esq. of Hagens Berman, L.L.P. and Jeffrey L. Kodroff of Spector, Roseman & Kodroff, P.C. were appointed as Plaintiffs' Co-Lead Counsel.

Plaintiffs filed their Motion for Class Certification on December 10, 2003. Prior to filing the Motion, Co-Lead Counsel retained Dr. Charles King III of Greylock McKinnon Associates as an expert to address whether the alleged antitrust violations had a common impact on members of the Class, and to identify possible methods for measuring damages on a classwide basis. Dr. King provided Plaintiffs with a Declaration opining that all Class members would have been injured by illegal conduct on the part of GSK which delayed the entry of generic competition for Paxil into the market and that accepted methodologies exist to establish such impact and antitrust damages on a classwide basis.

**\*5** Following the filing of Plaintiffs' Motion for Class Certification, the parties began extensive discovery relevant to class certification. GSK served substantial interrogatories and requests for production of documents on Plaintiffs, which Plaintiffs answered, and sought discovery from absent class members. GSK also took the deposition of a corporate designee for each named Plaintiff. The parties had disagreements with respect to the extent of class certification discovery, and motions were filed and extensively briefed with respect to that discovery during the winter and early spring of 2004. GSK filed its response in opposition to the Motion for Class Certification on May 21, 2004, after which the parties exchanged expert reports and both parties' experts were deposed. Plaintiffs filed a reply memorandum in support of their Motion for Class Certification on June 28, 2004 and a hearing on the Motion for Class Certification was scheduled for August 4, 2004.

While the parties were involved in discovery and briefing relevant to Plaintiff's Motion for Class Certification, they were also engaged in merits discovery. Plaintiffs' Co-Lead Counsel in this action coordinated merits discovery with plaintiffs' counsel in the *Nichols* action. GSK produced hundreds of thousands of documents both in hard copy and electronically. Co-Lead Counsel arranged

2005 WL 1213926

for a document depository and created a document review plan in conjunction with plaintiffs' counsel in *Nichols.* The coordinated document review continued until the parties signed agreements in principal settling the two cases. In addition to reviewing documents produced by GSK, the coordinated discovery efforts also included third party discovery from the manufacturers of generic pharmaceuticals and additional discovery motion practice.

Co-Lead Counsel began settlement negotiations with counsel for GSK in February and March 2004. After the parties had completed substantial merits discovery, Co-Lead Counsel, together with counsel for the *Nichols* plaintiffs, used that discovery in a June 15, 2004 presentation to counsel for GSK. Co-Lead Counsel maintain that this presentation allowed counsel for the parties to more easily scrutinize the strengths and weaknesses of their positions, leading to the eventual settlement of both cases. The parties continued to discuss settlement in both cases throughout the summer, and the hearing on the Motion for Class Certification was continued. In mid-August 2004, Co-Lead Counsel and GSK reached an agreement in principle to settle this action. [6] On October 22, 2004, Plaintiffs filed a Motion for Certification of a Settlement Class and for Preliminary Approval of Settlement. The Motion was granted on November 3, 2004, and the following Settlement Class was certified by the Court pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3):

[6]   Plaintiffs' counsel in the *Nichols* action also reached an agreement with GSK to settle that action. The Settlement Agreement in *Nichols* provides that members of the settlement class in that case will release their claims against GSK in exchange for a cash payment of $65,000,000. *Robert Nichols, et al. v. SmithKline Beecham Corp.,* Civ.A.No. 00-6222 (E.D.Pa.) (Apr. 22, 2005 Mem. and Order at 17-19).

All persons or entities in the United States or its territories who purchased Paxil® directly from SmithKline Beecham Corporation d/b/a GlaxoSmithKline at any time during the period of December 29, 1997 through September 30, 2004. Excluded from the class are SmithKline, and its employees, subsidiaries and affiliates, and all government entities. Also excluded from the Class are claims held by, either directly or through assignment,

CVS Meridian, Inc., Rite Aid Corporation, Walgreen Co., Eckerd Corporation, Albertson's, Inc., The Kroger Company, Safeway, Inc. and Hy-Vee, Inc.

**\*6** (Nov. 3, 2004 Order ¶ 1.) [7]

[7]   The eight corporations which excluded themselves from the Settlement Class, CVS Meridian, Inc., Rite Aid Corporation, Walgreen Co., Eckerd Corporation, Albertson's, Inc., The Kroger Company, Safeway, Inc. and Hy-Vee, Inc., have reached a separate settlement with GSK. (Kodroff Decl. ¶ 95.) These corporations account for slightly more than one-third of the purchases of Paxil by direct purchasers during the class period. (*Id.*)

On January 27, 2005, after notice to the Settlement Class, the Court held a hearing to ascertain the fairness of the settlement. A supplemental hearing was held regarding the Motion for Award of Attorneys' Fees and Costs on February 9, 2005. [8]

[8]   The United States Court of Appeals for the Third Circuit issued an opinion regarding the analysis of applications for attorneys' fees in class actions on January 26, 2005, the day before the Fairness Hearing. *See In re Rite Aid Sec. Litig.,* 396 F.3d 294, 300 (3d Cir.2005). Consequently, the Court gave Co-Lead Counsel time to supplement their Motion for Award of Attorneys' Fees and Costs in light of the *Rite Aid* decision and a Supplemental Hearing on the Motion for Award of Attorneys' Fees and Costs was held on February 9, 2005.

**B.** *Settlement Terms*
The Settlement Agreement outlines the details of the settlement. GSK paid $100 million into an escrow account on behalf of the Settlement Class (the "Settlement Fund"). (Settlement Agreement ¶ 6.) After the Settlement Agreement becomes final, the Settlement Fund, less attorneys' fees and expenses in the amount approved by the Court, and less any modifications allowed under the Settlement Agreement, [9] will be distributed to the Settlement Class. (*Id.* ¶¶ 5, 9.) Plaintiffs' counsel will be paid approved attorneys' fees and expenses from the Settlement Fund within five business days of the Court's order awarding attorneys' fees. (*Id.* ¶ 10.)

[9]   The Settlement Agreement provides that the Settlement Fund will be modified to provide *pro rata* refunds to GSK for members of the Settlement Class who request exclusion from the class ("opt-

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/13 Page 41 of 59 PageID #:25959

Stop & Shop Supermarket Co. v. Smithkline Beecham Corp., Not Reported in...

2005 WL 1213926

outs"). (Settlement Agreement ¶ 12.) GSK is entitled to receive a refund from the Settlement Fund in the same proportion as the purchases of Paxil by opt-outs bear to the total purchases by Class Members during the Class period. (*Id.*) There were no opt-outs from the Settlement Class. (Pohl Aff. ¶ 8.)

Upon the Settlement Agreement becoming final, Plaintiffs and all members of the Settlement Class who have not timely excluded themselves from this action will release all claims against "Defendant and its present and former parents, subsidiaries, divisions, affiliates, stockholders, officers, directors, employees, agents, attorneys and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing)" which relate to "the marketing, sale, manufacture, pricing or purchase of, or the enforcement of intellectual property related to, the drug Paxil® or any form of paroxetine, or in any way arising out of or related to GSK's agreement with Par Pharmaceuticals ("Par") pursuant to which Par is selling paroxetine." (Settlement Agreement ¶ 11.)

### C. *Fairness Hearing*

On January 27 and February 9, 2005, the Court held a hearing to determine the fairness of the proposed Settlement and the Motion for Award of Attorneys' Fees and Costs. Co-Lead Counsel described the notice made to the Settlement Class (the "Notice") and the method of notice. Co-Lead Counsel also outlined the terms of the Settlement Agreement and addressed the Motion for Award of Attorneys' Fees and Costs. In addition, the Court heard the testimony of the Honorable Arlin M. Adams with respect to the reasonableness of the request for attorneys' fees.

## II. MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS

Federal Rule of Civil Procedure 23(h) provides that "[i]n an action certified as a class action, the court may award reasonable attorneys fees and nontaxable costs authorized by law or by agreement of the parties...." Fed.R.Civ.P. 23(h). Plaintiffs seek an award of attorneys' fees and costs in the amount of 30% of the $100 million Settlement Fund. In support of their Motion, Plaintiffs have submitted the Declaration of Jeffrey L. Kodroff, Esq., Co-Lead Counsel for Plaintiffs; the Declaration, and Supplemental Declaration, of the Honorable Arlin M. Adams; the Declaration of Richard Alan Arnold, Esq., who represents

direct purchasers Walgreen Co., Eckerd Corporation, Albertson's, Inc., The Kroger Company, Safeway, Inc., and Hy-Vee, Inc., which reached a separate settlement with GSK; the Declaration of Steve D. Shadowen, Esq., who represents direct purchasers CVS Meridian, Inc. and Rite Aid Corporation, which corporations also reached a separate settlement with GSK; and the Declaration of Thomas A. Hippler, General Counsel for Plaintiff The Stop & Shop Supermarket Company.

### A. *Costs*

**\*7** "Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund." *In re Aetna, Inc. Sec. Litig.,* MDL No. 1219 2001 WL 20928, at \*13 (E.D.Pa. Jan. 4, 2001) (citing *In re Ikon Office Solutions Inc. Sec. Litig.,* 194 F.R.D. 166, 192 (E.D.Pa.2000)). Plaintiffs' request for an award of attorneys' fees of 30% of the Settlement Fund includes reimbursement of litigation costs totaling $372,357.01. (Kodroff Decl. Ex. 11.) The Court finds that the requested litigation expenses are reasonable.

### B. *Attorneys' Fees*

The Supreme Court explained the basis of counsels' right to move for an award of attorneys' fees from a common fund in *Boeing Co. v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980):

> A litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. The common-fund doctrine reflects the traditional practice in courts of equity, and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees. The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity

2005 WL 1213926

by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit.

*Id.* at 478. "Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process." Fed.R.Civ.P. 23(h), advisory committee's note. In ruling on a motion for award of attorneys' fees, the district court has two goals. The court seeks to protect the interests of class members by "acting as a fiduciary for the class." *In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 307 (3d Cir.2005) (citing *In re Cendant Corp. Litig.,* 264 F.3d 201, 231 (3d Cir.2001) ("*Cendant I*" )). The court's fiduciary role arises from a recognition that there is a potential economic conflict of interest between class members, who seek to maximize recovery from a settlement, and lawyers, who seek to maximize fees. *Cendant I,* 264 F.3d at 254-55. The United States Court of Appeals for the Third Circuit ("Third Circuit") has explained that the "divergence in [class members' and class counsel's] financial incentives ... creates the 'danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees.' " *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 730 (3d Cir.2001) (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 820 (3d Cir.1995)). Consequently, "the danger inherent in the relationship among the class, class counsel, and defendants 'generates an especially acute need for close judicial scrutiny of fee arrangements' in class action settlements." ' *Id.* (quoting *In re General Motors,* 55 F.3d at 820). In examining a motion for an award of attorneys' fees from a common fund, the Court also seeks to protect the public interest and, with it, the integrity of the judicial system:

**\*8** [F]or the sake of their own integrity, the integrity of the legal profession, and the integrity of Rule 23, it is important that the courts should avoid awarding "windfall fees" and that they should likewise avoid every appearance of having done so. To this end courts must always heed the admonition of the Supreme Court in *Trustees v. Greenough,* [105 U.S. 527 (1881) ], when it advised that fee awards under the equitable fund doctrine were proper only "if made with moderation and a jealous regard to the rights of those who are interested in the fund."

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 469 (2d Cir.1974) (quoting *Trustees v. Greenough,* 105 U.S. 527, 536, 26 L.Ed. 1157 (1881)), *abrogated on different grounds by Goldberger v. Integrated Resources, Inc.,* 204 F.3d 43 (2d Cir.2000)).

Keeping these two goals in mind, the district courts "must thoroughly review fee petitions for fairness. Although the ultimate decision as to the proper amount of attorneys' fees rests in the sound discretion of the court, the court must set forth its reasoning clearly." *In re Aetna,* 2001 WL 20928, at \*13 (citations omitted). Courts typically use either the percentage of recovery method or the lodestar method to assess attorneys' fees. *In re Rite Aid,* 396 F.3d at 300. The Court will utilize the percentage of recovery method in this case, as that method is "generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.' " *Id.* (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 333 (3d Cir.1998)). When a district court uses the percentage of recovery method, it "first calculates the percentage of the total recovery that the proposal would allocate to attorneys fees by dividing the amount of the requested fee by the total amount paid out by the defendant; it then inquires whether that percentage is appropriate based on the circumstances of the case." *Cendant I,* 264 F.3d at 256 (footnote omitted) (citing *In re Cendant Corp. PRIDES Litig.,* 243 F.3d at 733-35). The Third Circuit has directed the district courts to use the following seven factors in determining whether a percentage of recovery fee award is reasonable:

(1) the size of the fund created and the number of persons benefitted;

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel; and

(7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n. 1 (3d Cir.2000); *see also In re Rite Aid,* 396 F.3d at 301. Although the district courts should "engage in robust assessments of the fee award reasonableness factors when evaluating a fee request," these factors are not to be applied in a formulaic way. *In re Rite Aid,* 396 F.3d at 301-02.

1. *The size of the fund and number of persons benefitted*
**\*9** Plaintiffs' counsel have obtained a substantial cash settlement of $100 million, plus interest, on behalf of the Settlement Class. The Settlement Class is made up of approximately 90 direct purchasers of Paxil. (Adams Decl. ¶ 36.) Plaintiffs' expert estimated total damages to all direct purchasers of Paxil, including CVS Meridian, Inc., Rite Aid Corporation, Walgreen Co., Eckerd Corporation, Albertson's, Inc., The Kroger Company, Safeway, Inc. and Hy-Vee, Inc., at $1,780,251,320. (Mem. in Support of Pls.' Mot. for Certification of a Settlement Class and Prelim. Approval of Settlement, Ex. 1.) However, Plaintiffs recognize that this estimate should be reduced by 20% to account for generic bypass.[10] In addition, Plaintiffs estimate that the direct purchasers who entered into a separate agreement with GSK, CVS Meridian, Inc., Rite Aid Corporation, Walgreen Co., Eckerd Corporation, Albertson's, Inc., The Kroger Company, Safeway, Inc. and Hy-Vee, Inc., account for slightly more than one-third of the total damages. (Kodroff Decl. ¶ 95.) Reducing Plaintiffs' estimate of damages by 20% to account for generic bypass, and reducing the remainder by one-third to account for the corporations which reached a separate settlement with GSK, the estimated total damages to the Settlement Class are approximately $880 million. (Kodroff Decl. ¶ 103.) Consequently, the Settlement Fund amounts to approximately 11.4% of total damages to the Settlement Class. (*Id.*) This percentage compares favorably with the settlements reached in other complex class action lawsuits. *See Cendant I,* 264 F.3d at 231 (approving settlement of 36% of total damages and noting that typical recoveries in complex securities class actions range from 1.6%-14% of estimated damages); *In re Linerboard Antitrust Litig.,* MDL No. 1261, 2004 WL 1221350, at \*5 (E.D.Pa. June 2, 2004) (collecting cases in which courts have approved settlements of 5.35% to 28% of estimated damages in complex antitrust actions); *In re Aetna,* 2001 WL 20928, at \*4 (approving settlement of approximately 10% of total damages of $830 million).

[10]  " 'Generic bypass' occurs when, after a generic is introduced, the wholesaler is bypassed completely and the generic manufacturer sells directly to the customer. Thus, the wholesaler suffers a loss of sales to its prior customers." *In re Terazosin Hydrochloride Antitrust Litig.,* 223 F.R.D. 666, 673 n. 13 (S.D.Fla.2004). The Settlement Class in this case includes pharmaceutical wholesalers.

In cases involving common funds of $100 million or more, commonly referred to as "megafund" cases, the size of the fund is generally given less weight in the analysis of the appropriate fee percentage. *See Cendant I,* 264 F.3d at 283 (citing *In re Prudential,* 148 F.3d at 339). As the common fund nears the $100 million level, the "application of a normal range of fee awards from a common fund may result in a fee that is unreasonably large as a compensation for the benefits conferred." Alba Conte, *Attorney Fee Awards* § 2.09 (2d ed.1993). Indeed, "[i]n final fee awards in cases involving very substantial fund recoveries, courts have recognized the economies of scale inherent in class action recoveries and have awarded fees on a straight percentage basis that fall below the usual range of fund fee awards." *Id.*

The Third Circuit initially adopted a diminishing sliding scale approach to megafund cases. Following the 1985 Third Circuit Task Force Report on Court Awarded Attorney Fees, 108 F.R.D. 237 (1986), the Third Circuit instructed the district courts that "ordinarily, the percentage of a recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases." *Cendant I,* 264 F.3d at 284 n. 55 (citing 1985 Task Force Report, 108 F.R.D. at 256; *In re Prudential,* 148 F.3d at 339; *In re Cendant Corp. PRIDES Litig.,* 243 F.3d at 736). The Third Circuit cautioned district courts weighing attorneys' fee awards in megafund cases to "avoid basing their awards on percentages derived from cases where the settlement amounts were much smaller." *In re Cendant Corp. PRIDES Litig.,* 243 F.3d at 736. In its recent opinion in *In re Rite Aid,* the Third Circuit reiterated the likelihood that the size of the common fund may require a smaller percentage fee award in megafund cases: "[O]ur jurisprudence confirms that it may be appropriate for percentage fees awarded in large recovery cases to be smaller in percentage terms than those with smaller recoveries." *In re Rite Aid,* 396 F.3d at 302. However, the Third Circuit advised that "there is no rule that a district court must apply a declining percentage

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/13 Page 44 of 59 PageID #:25962

Stop & Shop Supermarket Co. v. Smithkline Beecham Corp., Not Reported in F.Supp.2d...

2005 WL 1213926

reduction in every settlement involving a sizable fund." *Id.* at 302 (citing *Cendant I*, 264 F.3d at 284).

**\*10** Having considered the size of the Settlement Fund and the number of persons benefitted, the Court finds that the size of the Settlement Fund in this case weighs against the percentage of recovery sought as an award of attorneys' fees in this case. However, the Court also finds that the facts of this case do not require the formulaic application of a declining percentage reduction to the award of attorneys' fees.

### 2. *Objections*

The Notice provided in this case informed members of the Settlement Class that Plaintiffs' counsel sought an award of up to 33 #/% of the Settlement Fund as attorneys' fees in this case. (Pohl Aff., Ex. A at 10.) Although the Settlement Class in this case is relatively small and consists of sophisticated businesses, not one member of the Settlement Class objected to the requested fee. Indeed, Thomas A. Hippler, Esq., General Counsel for The Stop & Shop Supermarket Company, has submitted a Declaration on behalf of the three named Plaintiffs supporting the fee request. Mr. Hippler states in his Declaration as follows:

> Stop & Shop, Giant and ASC understand that class counsel seek an attorneys' fee award in the amount of 30% of the settlement fund. Based upon all of the relevant considerations (which include the risks of this complex antitrust litigation, the recovery involved, the efficiency and timeliness of counsels' work, counsels' qualifications and experience in such matters and other factors), we assent to the request that is being made by class counsel for a fee and request that the Court enter an order approving it.

(Hippler Decl. ¶ 11.)

The Court finds that the absence of objections, and the support of the three named Plaintiffs, weighs in favor of approval of the requested fee in this case. *See In re Rite Aid*, 396 F.3d at 305 (finding that the "District Court did not abuse its discretion in finding the absence of

substantial objections by class members to the fee requests [sic] weighed in favor of approving the fee request" where objections had been made by only two of 300,000 class members who had received mailed notice); *see also In re Linerboard*, 2004 WL 1221350, at \*5 ("The absence of objections supports approval of the Fee Petition.") (citing *In re Cell Pathways, Inc. Sec. Litig. II*, Civ.A.No. 01-cv-1189, 2002 U.S. Dist. LEXIS 18359, at \*24 (E.D.Pa. Sept. 23, 2002)); *In re Aetna*, 2001 WL 20928, at \*15 (noting that "the Class Members's view of the attorneys' performance, inferred from the lack of objections to the fee petition, supports the fee award").

### 3. *The skill and efficiency of Plaintiffs' counsel*

The skill and efficiency of Plaintiffs' counsel is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." *In re Ikon*, 194 F.R.D. 166 at 194 (citation omitted). Here, Plaintiffs' counsel are highly experienced in complex antitrust class action litigation, as evidenced by the attorney biographies filed with the Court. (Kodroff Decl. Ex. 12, Adams Decl. ¶¶ 38-41.) They have obtained a significant settlement for the Class despite the complexity and difficulties of this case. Defense counsel are also very experienced in complex class action antitrust litigation, and displayed great skill in defending this suit. Accordingly, the Court finds that this factor favors approval of the percentage of recovery requested as a fee in this case.

### 4. *Complexity and duration of the litigation*

**\*11** This litigation presented enormously complex legal and factual issues. An antitrust class action is "arguably the most complex action to prosecute" as "[t]he legal and factual issues involved are always numerous and uncertain in outcome." *In re Linerboard Antitrust Litig.*, 296 F.Supp.2d 568, 577 (E.D.Pa.2003) (citations and internal quotation marks omitted). Although the parties have been actively litigating this action for more than a year, in the absence of settlement complex legal and factual issues would remain to be decided in this case, including certification of the putative class, the validity of GSK's patents relating to Paxil, the time at which generic competitors would have been ready to enter the market for paroxetine hydrochloride, and the pricing of Paxil

and its generic competitors at various times. In addition, even though the parties have completed substantial merits discovery, the Court recognizes that significant costs would still be incurred in the absence of settlement. At the time the parties first informed the Court they had arrived at a settlement, the parties had not concluded merits discovery, the Motion for Class Certification had not yet been heard, the parties would likely have filed dispositive motions, and this case would have required a lengthy trial. Given the enormous amounts of money at stake, and the vigorous advocacy of counsel for both parties over the course of this litigation, it can reasonably be expected that whichever party did not prevail at trial would file post-trial motions and an appeal. Consequently, it is reasonable to expect that this case would have continued for several more years absent settlement. Accordingly, the Court finds that this factor favors approval of the percentage of recovery requested as a fee in this case.

5. *Risk of nonpayment*

This action also presented considerable risk of non-payment. Plaintiffs recognize that they faced potentially insurmountable barriers to establishing liability in this case. Plaintiffs claimed that GSK violated Section 2 of the Sherman Act by engaging in sham patent litigation against generic manufacturers of paroxetine hydrochloride in order to prevent or delay their entry into the market. GSK, however, claims that its actions are protected by the *Noerr-Pennington* doctrine, pursuant to which the Supreme Court recognized that the Sherman Antitrust Act does not restrain "attempts to influence the passage or enforcement of laws." *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 135-36, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *see also United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.") (underscore added). In *Cal. Motor Transp. Co. v. Trucking Unltd.,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Supreme Court extended the *Noerr-Pennington* doctrine to the right to access the courts, but noted that the filing of sham litigation would not be immune from suit under the Sherman Act. *Id.* at 510-11 (citing *Noerr,* 365 U.S. at 144). In order to prevail on their claim that GSK's patent infringement suits constituted sham litigation, Plaintiffs would have to demonstrate that GSK's actions were both "objectively baseless" and "an attempt to interfere directly with the business relationships of a competitor." *Prof.*

*Real Estate Investors, Inc. v. Columbia Picture Indus., Inc.,* 508 U.S. 49, 60-61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (citations omitted). As Judge Adams has noted, Plaintiffs would have faced significant hurdles in demonstrating that the patent infringement suits filed by GSK constitute sham litigation. (Adams Decl. ¶ 47.) Indeed, Judge Posner has stated, with respect to GSK's filing of a patent infringement suit against Pentech in connection with the '723 patent, that "there is nothing to suggest that [GSK's] claim of infringement was frivolous." *Asahi Glass Co. v. Pentech Pharm., Inc.,* 289 F.Supp.2d 986, 992 (N.D.Ill.2003) (Posner, J.). Furthermore, Plaintiffs would also have had to overcome a *Noerr-Pennington* defense to their claim that GSK's listings of patents claiming Paxil in the Orange Book were fraudulent.

**\*12** Moreover, this action was riskier than many other antitrust class actions because there was no prior government investigation, or prior finding of civil or criminal liability based on antitrust violations, in this case. (Adams Decl. ¶ 48.) In addition, unlike typical antitrust class actions, in which many lawsuits are filed and the risks of litigation are spread across many law firms, this is the only direct purchaser antitrust class action which was filed against GSK pertaining to Paxil, and only three law firms were involved in prosecuting this action on behalf of the Class. (*Id.* ¶ 49, Kodroff Decl. Ex. 11.) The Court, therefore, finds that this factor favors approval of the percentage of recovery requested as a fee in this case.

6. *The amount of time devoted to this case*

Plaintiffs' counsel had expended 4,239.8 hours on this action as of January 10, 2005. (Kodroff Decl. ¶ 109, Ex. 11.) The amount of attorney time devoted to this litigation is quite small in relationship to the requested fee of $30 million. Indeed, plaintiffs' counsel in *Nichols* requested only $19.5 million in fees although they had invested approximately 17,000 hours of attorney time in that case. The Court recognizes that Plaintiffs' counsel should not be penalized for prosecuting this case in an efficient manner, or for keeping down the number of hours which they were required to devote to this case by coordinating merits discovery with plaintiffs' counsel in *Nichols.* Nonetheless, in considering whether a particular percentage of the common fund is an appropriate fee, the Court may consider the amount of time devoted to a case by counsel as disfavoring the requested fee. In this case, the 4,239.8 hours expended by Plaintiffs' counsel in prosecuting this case is dwarfed by request for fees

Add-43

amounting to 30% of the $100 million Settlement Fund. Consequently, the Court finds that the amount of time devoted to this case weighs against the percentage of recovery requested as a fee in this case.

### 7. Awards in similar cases

This factor requires the Court to compare the percentage of recovery requested as a fee in this case against the percentage of recovery awarded as a fee in other common fund cases in which the percentage of recovery method, rather than the lodestar method, was used. *In re Cendant Corp. PRIDES Litig.,* 243 F.3d at 737. This Court awarded a fee of 30% of the common fund as attorneys fees in *Nichols. See Robert Nichols, et. al. v. SmithKline Beecham Corp.,* Civ.A.No. 00-6222 (E.D.Pa.) (Apr. 22, 2005 Mem. and Order). Although, at first glance, *Nichols* would appear to be the most comparable common fund case against which the fee award in this case should be measured, there are significant differences between the cases which strongly counsel against the automatic application of the same percentage in this case. The most obvious difference is that *Nichols* is not a megafund case. The common fund in *Nichols* is $65 million, substantially less than the common fund in this case. In addition, plaintiffs' counsel in *Nichols* prosecuted that action for nearly four years prior to reaching a settlement with GSK and devoted more than 17,000 hours to that case as of February 1, 2005, approximately four times the number of hours expended by Plaintiffs' counsel in this action. Consequently, the Court must also look to other common fund cases to determine whether the percentage of recovery fee award requested in this case is appropriate.

**\*13** The Court has, therefore, examined three previously published surveys of fee awards in common fund class actions, as well as recently reported fee awards in megafund cases in this judicial district and in other courts which were not included in those surveys. Many cases appear in more than one of the previously published surveys of attorneys' fee awards. Combining the cases identified in the three surveys, and the Court's own review of recent fee awards, the Court has identified 80 cases in which percentage based attorneys' fees were awarded in megafund cases.

In 2003, the Class Action Reporter published a survey of fee awards in common fund class actions. *See* Stuart J. Logan, Dr. Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions,* 24

Class Action Rep. 167-234 (2003). Sixty-four of the cases included in the survey involved common funds over $100 million. *Id.* at 169-70. The average percentage of recovery awarded as attorneys' fees and costs in cases with common funds over $100 million was 15.1%. *Id.* The percentage of recovery awarded as a fee alone was 30% or more in only six of those cases, and 25% or more in sixteen of those cases. *Id.* The Class Action Reporter survey also lists the hours for which fees were awarded in 40 of the 64 megafund cases. *Id.* Of those 40 cases, there were seven in which less than 10,000 attorney hours were expended. *Id.* The award of attorneys' fees and costs did not exceed 5.5% of the common fund in any of those cases. *Id.*

In 2002, the United State Court of Appeals for the Ninth Circuit (the "Ninth Circuit") surveyed percentage based attorneys' fee awards in thirty-four common fund cases. *See Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir.2002) (surveying percentage of recovery attorneys' fee awards granted between 1996 and 2001 in cases with common funds of $50-200 million). The awards included in the survey ranged from 2.8% to 40% of the common fund. *Id.* at 1052-54. Eighteen of the thirty-four cases analyzed by the Ninth Circuit involved settlements of $100 million or more. Attorneys' fees of 30% of the common fund were awarded in only three of those cases. [11] *Id.* Percentage based fees of 25% or more were awarded in nine of the eighteen megafund cases surveyed. *Id.* The *Vizcaino* court affirmed a fee award of 28% of a common fund of approximately $97,000,000. *Id.* at 1052.

[11]    One of those three cases, *In re Merry-Go-Round Enter., Inc.,* 244 B.R. 327 (Bankr.D.Md.2000), was not a class action, but an adversary proceeding against the debtor's former accountant which was prosecuted in accordance with a previously approved contingent fee agreement. *Id.* at 330. Consequently, the Court does not consider *In re Merry-Go-Round* comparable to the instant litigation.

The Third Circuit examined the percentage based fee awards in eighteen megafund cases in *In re Cendant Corp. PRIDES Litig.,* 243 F.3d at 737-38. The "attorneys' fee awards ranged from 2.8% to 36% of the common fund in those cases." *Id.* at 738. Percentage based fees of 30% or more were awarded in only three of the cases reviewed by the Third Circuit. *Id.* The fee award was more than 25% of the common fund in five of the eighteen cases. *Id.*

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 47 of 59 PageID #:25965

Stop & Shop Supermarket Co. v. Smithkline Beecham Corp., Not Reported in...

2005 WL 1213926

In its own review of reported megafunds cases, this Court has found one additional case in which attorneys' fees of less than 10% of the common fund were awarded,[12] three additional cases in which attorneys' fees amounting to 30% or more of the settlement fund were approved,[13] and one additional case in which attorneys' fees of 25% of the common fund were approved.[14] All together, attorneys' fees amounting to 25% or more of the common fund were awarded in 21 of the 80 individual megafund cases reviewed by the Court. Attorneys' fees amounting to 30% or more of the common fund were awarded in only nine of those 80 cases.[15]

[12]    Attorneys fees in the amount of $220 million, or 6.5% of the settlement fund of $3.3 billion were awarded in *In re Visa Check/Mastermoney Antitrust Litig.,* 297 F.Supp.2d 503 (E.D.N.Y.2003), *aff'd Walmart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96 (2d Cir.2005).

[13]    Thirty-three percent of a common fund of $220 million was awarded as fees in *In re Buspirone Antitrust Litig.,* Civ.A.No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003). *See In re Visa,* 297 F.Supp.2d at 525 n. 33 (collecting cases). Thirty percent of a common fund of $110 million was awarded as fees in *In re Cardizem CD Antitrust Litig.,* Civ.A.No. 99-MD-1278 (E.D.Mich. Nov. 26, 2002). *See In re Visa,* 297 F.Supp.2d at 525 n. 33. Attorneys' fees of approximately 30% of the common fund were approved in this judicial district in *In re Linerboard.* 2004 WL 1221350, at *5 (approving attorney's fee award of 30% of a settlement fund of approximately $200,000,000).

[14]    Attorneys' fees of 25% of the common fund of $126.6 million were awarded to plaintiffs' counsel in *In re Rite Aid. In re Rite Aid Sec. Litig.,* 362 F.Supp.2d 587 (E.D.Pa.2005).

[15]    Those cases are:
         (1) *In re Vitamins Antitrust Litig.,* MDL No. 1285 (D.D.C. July 16, 2001) (awarding fees of $123,188,000, which amounted to 34% of common fund of $365,188,000). *See Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 169-70.
         (2) *Weatherford Roofing Co. v. Employers Nat. Ins. Co.,* No. 91-05637 (Tex. Dist. Ct. Dallas Co. Ct.) (awarding fees of $60,075,000, which amounted to 31.6% of common fund of approximately $190 million). *See Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 169.

         (3) *In re Combustion, Inc.,* 968 F.Supp. 1116, 1136 (W.D.La.1997) (setting a maximum cap reserve for attorneys fees of 36% of common fund of $127 million).
         (4) *Kurzweil v. Philip Morris Co., Inc.,* Civ.A.Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105, at *1 (S.D.N.Y Nov. 30, 2000) (awarding fees of 30% of common fund of approximately $124 million).
         (5) *In re Ikon,* 194 F.R.D. 166, 192-196 (E.D.Pa.2000) (awarding attorneys' fees of 30% of common fund (less costs) of $108 million with in excess of 45,000 attorney hours).
         (6) *In re Buspirone Antitrust Litig.,* Civ.A.No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003) (awarding fees of 33% of common fund of $220 million). *See In re Visa,* 297 F.Supp.2d at 525 n. 33 (collecting cases).
         (7) *In re Cardizem CD Antitrust Litig.,* Civ.A.No. 99-MD-1278 (E.D.Mich. Nov. 26, 2002) (awarding attorneys fees of 30% of common fund of $110 million). *See In re Visa,* 297 F.Supp.2d at 525 n. 33.
         (8) *In re Linerboard,* 2004 WL 1221350, at *5 (awarding fees of 30% of settlement fund of $202,572,489).
         (9) *In re Informix Corp. Sec. Litig.,* No. 9701289 (N.D.Cal. Nov. 23, 1999) (awarding attorneys fees of 30% of common fund of $137 million). *See Vizcaino,* 290 F.3d at 1052.

**\*14**    After considering studies of percentage of recovery fee awards in comparable megafund cases, and performing its own examination of percentage of recovery fee awards in reported megafund cases, the Court finds that the percentage requested in this case is among the highest that has ever been awarded in megafund cases. Moreover, the *Gunter* analysis requires the Court to examine awards in factually similar cases. In order to compare the fee request in the instant action with awards in factually similar megafund cases, the Court has also examined the published data regarding the total attorney hours expended in other megafund cases which was included in the survey published in the Class Action Reporter. *See Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 169-70. In megafund cases in which counsel expended less than 10,000 hours, the highest percentage of the common fund awarded as an attorneys' fee was 5.5%. This percentage is considerably less than 30% requested in this case in which counsel expended only 4,239.8 total attorney hours. *Id.* The Court has also examined the available information regarding the hours expended by counsel in those megafund cases in which fees of 30% or more of the common fund

Stop & Shop Supermarket Co. v. SmithKline Beecham Corp., Not Reported in...

2005 WL 1213926

were awarded. Of the four cases in which such data was available, not one involved the expenditure of less than 28,000 hours.[16]

16    Those cases are: (1) *Weatherford Roofing Co. v. Employers Nat. Ins. Co.,* No. 91-05637 (Tex. Dist. Ct. Dallas Co. Ct.) (50,000 total attorney hours). *See Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 169.
(2) *In re Ikon,* 194 F.R.D. 166, 192-196 (E.D.Pa.2000) (in excess of 45,000 attorney hours).
(3) *In re Linerboard,* 2004 WL 1221350 (51,268 attorney hours).
(4) *In re Buspirone,* Civ.A.No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003) (28,727 attorney hours). (Pls. Supp. Mem. Ex. 5 at 35.)

Plaintiffs have submitted declarations from counsel for the eight direct purchasers of *Paxil* who entered into a separate settlement with GSK as additional support of their request for a fee award of 30% of the Settlement Fund. Richard Alan Arnold, Esq. represented Walgreen Co., Albertson's, Inc., Eckerd Corp., Hy Vee Inc., Kroger Co. and Safeway, Inc. in connection with their settlement with GSK. He states that he represented his clients in this case on a contingent fee basis and that contingent fees of 30% are usual in cases brought for substantial corporations, with the client paying the ongoing costs of litigation. (Arnold Decl. ¶¶ 3-4.) He also states that this case was riskier than many cases in which major corporate clients entered into contingent fee arrangements providing for counsel to obtain more than 30% of the recovery. (*Id.* ¶¶ 5-10.) Steve D. Shadowen, Esq. represented CVS Meridian, Inc. and Rite Aid Corporation in connection with settlement of their claims against GSK over the sale of *Paxil*. (Shadowen Decl. ¶ 9.) He states that the going contingency rate for experienced counsel representing corporate plaintiffs in complex antitrust matters is one-third of the recovery. (*Id.* ¶ 4.)

Despite the support provided by these affidavits, the Court finds that the percentage of the Settlement Fund requested as an attorneys' fee in this case does not compare favorably to the percentage based fees awarded in factually similar cases. The fee request in this case is comparable to the highest percentages awarded in megafund cases and is more than five times the highest percentage awarded in cases with a similar investment of attorney time. Consequently, the Court finds that this

factor weighs against the percentage of the common fund requested as a fee in this case.

**\*15** Having exhaustively reviewed the *Gunter* factors, the Court concludes that three of those factors, the size of the fund, the time devoted to this case, and the awards in similar cases, do not support the attorneys' fees requested in this case. The Court further finds that these factors are not outweighed by the remaining *Gunter* factors, the absence of objections, the skill and efficiency of counsel, the complexity and duration of the litigation, and the risk of non-recovery. Consequently, the Court concludes that the *Gunter* factors do not support Plaintiffs' request for an award of 30% of the Settlement Fund as attorneys' fees in this case.

### 8. *Lodestar cross-check*

The Third Circuit has suggested that, in addition to reviewing the *Gunter* factors, "it is 'sensible' for district courts to 'cross-check' the percentage fee award against the 'lodestar' method." *In re Rite Aid,* 396 F.3d at 305 (citing *In re Prudential,* 148 F.3d at 333). The purpose of the lodestar cross-check echoes the second goal of the Court's analysis of motions for attorneys' fees: the avoidance of "windfall fees." *See Grinnell,* 495 F.2d at 469. The lodestar cross-check is performed to "ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple." *In re Cendant Corp. Sec. Litig.,* 404 F.3d 173, 188 (3d Cir.2005) ("Cendant II") (citations omitted). "The goal of this practice is to ensure that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall' to lead counsel." *Cendant I,* 264 F.3d at 285.

The lodestar is calculated by "multiplying the number of hours worked by the normal hourly rates of counsel. The court may then multiply the lodestar calculation to reflect the risks of nonrecovery, to reward an extraordinary result, or to encourage counsel to undertake socially useful litigation." *In re Aetna,* 2001 WL 20928, at \*15 (citing *In re Ikon,* 194 F.R.D. at 195). "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records. Furthermore, the resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award." *In re Rite Aid,* 396 F.3d at 306-07 (footnotes and citations omitted).

Add-46

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/13 Page 49 of 59 PageID #:25967

Stop & Shop Supermarket Co. v. SmithKline Beecham Corp., Not Reported in...

2005 WL 1213926

It is appropriate for the court to consider the multipliers utilized in comparable cases. *Id.* at 307 n. 17.

The lodestar in this case is $1,255,911.14, based on the actual billing rates of all attorneys who worked on this case. (Kodroff Decl. ¶ 109.) Plaintiffs' counsel seek an award of 30% of the $100 million Settlement Fund in attorneys' fees and reimbursement of their costs of litigation. Their costs of litigation in this case total $372,357.01. The portion of the request which represents only attorneys' fees is, therefore, $29,627,642.99. A fee award of $29,627,642.99 would result in a lodestar multiplier of 23.59. The application of such a multiplier in this case would be unprecedented.

**\*16** The Third Circuit has recognized that multipliers " 'ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.' " *In re Cendant Corp. PRIDES Litig.,* 243 F.3d at 742 (quoting *In re Prudential,* 148 F.3d at 341). Of the eighteen megafund cases analyzed in *In re Cendant Corp. PRIDES Litig.,* all but two cases in which lodestar multipliers were reported had multipliers between 1 and 2.95. *Id.* at 737-38. The other two cases are *In re Cendant Corp. PRIDES Litig.,* 51 F.Supp.2d 537 (D.N.J.1999) (lodestar multiplier of between 7 and 10) and *In re Cendant Corp. Litig.,* 109 F.Supp.2d 285 (D.N.J.2000) (lodestar multiplier of 32.7). *In re Cendant Corp. PRIDES Litig.,* 243 F.3d at 737. The awards of attorneys fees were vacated by the Third Circuit in both of those cases. *See id.* at 744 (finding that the district court had "strayed from all responsible discretionary parameters" by awarding a fee which resulted in a lodestar between 7 and 10 without explaining how such a high multiplier was justified); *Cendant I,* 264 F.3d at 285-86 (noting that even a lodestar multiplier of 24 would be "extraordinarily high"). On remand, the district court awarded a fee of $55 million in *In re Cendant Corp. Litig.,* which resulted in a lodestar in the mid-single digits. *See In re Cendant Corp.,* 243 F.Supp.2d 166, 174 (D.N.J.2003), *aff'd Cendant II,* 404 F.3d 173 (3d Cir.2005); *see also Cendant II,* 404 F.3d at 183 n. 4.

The 2003 Class Action Reporter survey found that the average lodestar multiplier was 4.5 for percentage of recovery fee awards in cases with common funds of $100 million or more. *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 170. The lodestar multipliers for the cases surveyed by the Ninth Circuit in

*Vizcaino* ranged from .06 to 8.5. *Vizcaino,* 290 F.3d at 1052-54. The fee awarded in *In re Buspirone* resulted in a multiplier of 8.46; the fee awarded in *In re Cardizem CD* resulted in a multiplier of 3.7; the fee awarded in *Kurzweil* resulted in a multiplier of 2.46. *See In re Visa,* 297 F.Supp.2d at 525 n. 33. The fee awarded in *In re Visa* resulted in a multiplier of 3.5. *Id.* at 524. The fee awarded in *In re Linerboard* resulted in a multiplier of 3.67 using counsel's current rates. *In re Linerboard,* 2004 WL 1221350, at \*16 n. 9. The lodestar multiplier on the fee ultimately awarded in *Rite Aid* was 6.96. *In re Rite Aid,* 2005 WL 697461, at \*1.

Plaintiffs' counsel have also asked the Court to consider the following cases, which they contend support a lodestar multiplier of 23.59 in this case: *In re R.J.R. Nabisco Sec. Litig.,* MDL No. 818(MBM), 1992 U.S. Dist. LEXIS 12702, at \*16 (S.D.N.Y. Aug. 24, 1992) (approving request for fees and expenses totaling 25% of the settlement amount, resulting in a lodestar multiplier of 6); *Muchnick v. First Fed. Sav. & Loan Assoc.,* Civ.A.No. 86-1104, 1986 U.S. Dist. LEXIS 19798 (E.D.Pa. Sept. 30, 1986) (approving fee request of $250,000 from a settlement fund of between $4 million and $6.8 million, resulting in a lodestar multiplier of 8); *Cosgrove v. Sullivan,* 759 F.Supp. 166 (S.D.N.Y.1991) (approving fee of $1 million, or 1% of medicare benefits paid by HHS pursuant to the settlement; the fee represented a multiplier of 8.75 of the lodestar of $114,398.00); *Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 198 (S.D.N.Y.1995) (approving attorney's fee award of $19,154,144.62, which was 16.66% of the $115 million common fund and represented a lodestar multiplier of 5.5); *Weiss v. Mercedes-Benz of N. Am.,* 899 F.Supp. 1297, 1304 (D.N.J.1995) (awarded fee of $11,250,000 which represented 15% of the present value of the settlement which was calculated as $75,000,000. Plaintiffs state that this represents a lodestar multiplier of 9.3, but the lodestar and multiplier are not cited or discussed in the opinion). The Court notes that the lodestar multiplier which would result from an award of 30% of the Settlement Fund as attorneys' fees in this case is more than twice the highest multiplier in cases supplied by Plaintiffs.

**\*17** In *In re Rite Aid,* the Third Circuit explained that:

The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award. Even when used as a cross-

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 50 of 59 PageID #:25968

Stop & Shop Supermarket Co. v. SmithKline Beecham Corp., Not Reported in...

2005 WL 1213926

check, courts should "explain how the application of a multiplier is justified by the facts of a particular case."

*In re Rite Aid,* 396 F.3d at 306 (quoting *In re Prudential,* 148 F.3d at 340-41). After exhaustive review of the lodestar multipliers in other, similar, megafund cases, the precedent supplied by counsel, and the Supplemental Declaration of Arlin M. Adams, the Court concludes that the percentage of recovery attorneys' fee requested in this case would lead to a lodestar multiplier that is extraordinarily and unjustifiably high. After having thoroughly reviewed all of the *Gunter* factors in this case, and having performed the lodestar cross-check, the Court finds that the percentage of the common fund requested as a fee in this case is not fair and reasonable.

## III. CONCLUSION

As the Court has determined that the 30% fee award sought by Plaintiffs' counsel is not reasonable, it must reconsider Plaintiffs' request for fees under the percentage-of-recovery method. *In re Rite Aid,* 396 F.3d at 306. In reconsidering the calculation of attorneys' fees, the Court has re-examined the *Gunter* factors mindful of the Third Circuit's admonition that "[t]hese fee award factors 'need not be applied in a formulaic way ... and in certain cases, one factor may outweigh the rest.' " *Id.* at 301 (quoting *Gunter,* 223 F.3d at 195 n. 1).

The Court finds that Plaintiffs' counsel obtained an early and excellent result in an extremely complex and risky case. The size of the fund is substantial and, as a percentage of estimated damages, well within the norm for cases which present the degree of risk undertaken by Plaintiffs' counsel in this case. The number of persons benefitted and absence of objections from a small and sophisticated class further supports an attorneys' fee award which provides counsel with an incentive for undertaking complex and risky litigation, particularly in light of the support offered by the three named Plaintiffs. The Court, naturally, recognizes the skill and experience brought to bear by counsel throughout the year they spent actively litigating this case, and the economy with which they were able to achieve such a noteworthy settlement. Having also considered the time invested in this case by counsel, which resulted in a lodestar of $1,255,911.14, and the awards in comparable cases, the Court finds that 20% percent of the Settlement Fund results in a fair and reasonable award of attorneys' fees and costs in this action. The Court further finds that this award is justified

by the high caliber of Plaintiffs' counsels' work in this case, even though the percentage of recovery represented by the fee in this case is greater than the average percentage of recovery awarded as a fee in megafund cases. *See Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 170.

**\*18** The Court further notes that the high lodestar multiplier (15.6) which results from the Court's award of attorneys' fees in this case is neutralized with respect to the reasonableness of a percentage fee award of 20% by the extraordinary support Plaintiffs have shown for counsel's request for fees. Not one member of the Settlement Class, which is made up of approximately 90 sophisticated businesses, objected to the Motion for Award of Attorneys' Fees, even though the Notice informed members of the Settlement Class that Plaintiffs' counsel would apply for an award of fees amounting to 33% of the Settlement Fund. In addition, the General Counsel of The Stop and Shop Supermarket Company provided a Declaration in support of counsels' request for fees, in which he states that all three named Plaintiffs assent to counsel's request for a 30% fee. (Hippler Decl. ¶ 11.) The Court has taken such support as a clear indicator that the market supports a dramatic bonus for work so timely and well done.

Having thoroughly analyzed the *Gunter* factors and the lodestar cross-check in this case, and for the reasons stated above, the Court grants Plaintiffs' Motion for Award of Attorneys' Fees and Costs and awards attorneys' fees and costs of litigation in this case in the total amount of $20,000,000.

An appropriate order follows.

## ORDER

AND NOW, this 19th day of May, 2005, upon consideration of Plaintiffs' "Motion for Award of Attorneys' Fees and Costs" (Docket No. 75), the papers filed in support thereof, and the Fairness Hearing held on January 27 and February 9, 2005, and for the reasons stated in the accompanying Memorandum, IT IS HEREBY ORDERED that Plaintiffs' Motion is GRANTED and Plaintiffs' counsel are hereby awarded attorneys' fees and costs in the total amount of 20% of

Case: 1:06-cv-04481 Document #: 683-2 Filed: 05/21/18 Page 51 of 59 PageID #:25969

Stop & Shop Supermarket Co. v. SmithKline Beecham Corp., Not Reported in...

2005 WL 1213926

the Settlement, to be allocated among Class Counsel as reasonably determined by Co-Lead Counsel.

IT IS FURTHER ORDERED that this case is DISMISSED WITH PREJUDICE.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1213926

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 8429707



2006 WL 8429707
Only the Westlaw citation is currently available.
United States District Court,
D. Colorado.

IN RE QWEST COMMUNICATIONS
INTERNATIONAL, INC. SECURITIES LITIGATION

Civil Case No. 01–cv–01451–REB–CBS
|
Consolidated with Civil Action
Nos. 01–cv–01472–REB–CBS
|
01–cv–01527–REB–CBS
|
01–cv–01616–REB–CBS
|
01–cv–01799–REB–CBS
|
01–cv–01930–REB–CBS
|
02–cv–00333–REB–CBS
|
02–cv–00374–REB–CBS
|
02–cv–00507–REB–CBS
|
02–cv–00658–REB–CBS
|
02–cv–00755–REB–CBS
|
02–cv–00798–REB–CBS
|
04–cv–00238–REB–CBS
|
Signed 09/28/2006
|
Filed 09/29/2006

## ORDER AWARDING ATTORNEY
## FEES AND EXPENSES

Robert E. Blackburn, United States District Judge

**\*1** This matter is before me on **Lead Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses** [#929], filed February 27, 2006. Several objections filed by class members, including those docketed as [#960], [#962], [#1003], [#1014], and [#1016], include objections to lead counsel's request for an award of attorney fees and expenses. The lead plaintiffs reply to those objections in their reply [#984], filed April 28, 2006. Lead counsel's motion for an award of attorney fees and reimbursement of expenses is granted in part and denied in part.

## A. JURISDICTION

I have jurisdiction over this case under 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

## B. BACKGROUND

This case is a class action securities suit involving claims for violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. In an order issued concurrently with this order, I have approved a class action settlement agreed to by the lead plaintiffs and all but two of the defendants. The terms of the settlement are contained in the parties'Stipulation of Partial Settlement [#386], filed November 23, 2005 (Stipulation). Capitalized terms in this order refer to terms defined in the Stipulation.

In essence, the Stipulation requires the Settling Defendants to pay 400 million dollars into a Settlement Fund for the benefit of the plaintiff class. In addition, the parties have agreed to use their best efforts to persuade the Securities and Exchange Commission (SEC) to permit 250 million dollars held by the SEC to be added to the Settlement Fund (SEC Distribution Fund). Defendant Qwest paid 250 million dollars to the SEC under the terms of a judgment entered against Qwest and in favor of the SEC in a separate civil suit. If the SEC Distribution Fund is not contributed to the settlement fund, then the plaintiffs may, at their option, terminate the stipulated settlement. The Stipulation also contains a plan of distribution, which will determine how much each plaintiff will receive from the settlement fund.

In their motion for an award of attorney fees and expenses, lead counsel for the plaintiffs seek an award of attorney fees based on the fee agreement negotiated between lead counsel and the lead plaintiffs. Based on that agreement, lead counsel seeks an award of 24 percent of the 400 million dollars that the Settling Defendants have agreed to contribute to the Settlement Fund. This would result

in an award of 96 million dollars for attorney fees. The SEC Distribution fund is not a relevant factor in the attorney fees award. In addition, the lead plaintiffs seek reimbursement of 2,106,768.88 dollars for costs and expenses incurred in prosecuting this case, and certain costs and expenses incurred by lead plaintiffs.

## C. STANDARD OF REVIEW

This case is controlled by the Private Securities Litigation Reform Act of 1995 (PSLRA). The PSLRA provides that the "[t]otal attorneys'fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u–4(a)(6). This provision is consistent with case law adopting the common fund doctrine. Under the common fund doctrine, attorneys who pursue litigation on behalf of a class, and whose efforts create a common fund for the benefit of the class, are entitled to an award of attorney fees from the common fund. *See, e.g., Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988). This ensures that the fund's beneficiaries share in the cost of creating the fund. *Id.* In such cases, attorney fees are based primarily on a percentage of the common fund created by counsel's efforts. *Brown*, 838 F.2d at 454. Based on the PSLRA, *Brown*, the authorities cited by the *Brown* court, and the authorities cited by the parties, I conclude that one key factor in determining an appropriate award of attorney fees is a reasonable percentage of the common fund created by counsel.

**\*2** Of course, the key issue is a determination of a reasonable percentage. In determining a reasonable percentage, I must articulate the specific reasons on which my determination of a reasonable percentage is based. *Brown*, 838 F.2d at 454. In determining reasonable attorney fee awards, "federal courts have relied heavily on the factors articulated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)." *Id.* Although *Johnson* was not a common fund case, the Tenth Circuit has concluded that consideration of the *Johnson* factors is "appropriate in setting and reviewing percentage fee awards in common fund cases." *Brown*, 838 F.2d at 454. I have considered carefully each of the twelve *Johnson* factors in determining a reasonable percentage of the common fund to be awarded to lead counsel.

I note that the percentage proposed by lead counsel is based on lead counsel's fee agreement with the lead plaintiffs. I agree with the Third Circuit that "courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel." *In re Cendant Corp. Litigation*, 264 F.3d 201, 282 (3rd Cir. 2001). This presumption respects the right of private parties to reach agreements on terms that they conclude will serve their best interests. Applying this initial presumption of reasonableness, I presume to be reasonable lead counsel's request for an award of 24 percent of the 400 million dollars to be contributed to the Settlement Fund by the Settling Defendants. Again, applying the terms of the fee agreement would result in an award of 96 million dollars for attorney fees. *Dowd Declaration* [#930], filed February 27, 2006, pp. 81—82.

However, the interests of the plaintiff class as a whole also must be considered. "The trial judge in a common fund case must act as a fiduciary for the beneficiaries of the fund. Attorneys'fees necessarily reduce the amount that the common fund beneficiaries recover." *Brown*, 838 F.2d at 456. "(T)he trial judge must determine a reasonable fee by weighing the appropriate interests of the beneficiaries in light of the efforts of counsel on their behalf." *Id.* The *Johnson* factors provide guidance in striking an appropriate balance between these two fundamental considerations.

## D. JOHNSON FACTORS

The twelve *Johnson* factors are 1) the time and labor involved; 2) the novelty and difficulty of the questions; 3) the skill requisite to perform the legal service properly; 4) the preclusion of other employment by the attorney due to acceptance of the case; 5) the customary fee for similar work; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or the circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation, and ability of the attorneys; 10) the undesirability of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717 –719 (5th Cir. 1974), *abrogated in part by Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989) (limiting

application of *Johnson* contingency fee factor as ceiling on fee awards when applying 42 U.S.C. § 1988). Based on the circumstances of a particular case, a court may assign different relative weights to the factors –that is, none of the factors is inherently equiponderant, preponderant, or dispositive. *Brown*, 838 F.2d at 456. A discussed below, I conclude that some of the factors should be combined for the purpose of this case.

**1. The time and labor involved**—Plaintiffs'lead counsel reports that counsel, their para-professionals, and their in-house experts expended 53,795.87 hours prosecuting this litigation. *Motion for award of attorney* fees [#929], filed February 27, 2006, p. 15. Declarations filed in support of the motion document this figure. Based on the law firms'current rates, the billable value of these hours is 18,547,453.65 dollars. *Id.* This figure is known as a lodestar –total hours expended times the reasonable hourly rate. The requested fee of 96 million dollars represents a multiple of about 5.1 times the lodestar amount.

**\*3** There is no doubt that the litigation of this case required a large investment of sophisticated expertise, time, labor, and other resources by lead counsel. Nothing in the record is contrary to this conclusion, and I will summarize very briefly the effort made by lead counsel. This case required extensive investigation to support allegations in highly fact specific complaints. Great specificity in a complaint is required under the pleading standards of the PSLRA. This investigation necessarily included interviews with many witnesses and detailed analysis of Qwest's financial statements and many underlying transactions. As the case progressed, plaintiffs' counsel litigated several complex motions to dismiss, a complex motion for temporary restraining order, many complex discovery motions, and the plaintiffs'motion for class certification. Discovery was voluminous and required sophisticated analysis. In addition, settlement and mediation efforts took place over an extended period of time, and negotiation of the final settlement terms clearly required substantial talent, time, and effort.

I note also that lead counsel's documentation of time spent on this case includes time spent by paralegals, in-house accountants, and document clerks. At least one objector challenges the inclusion of these costs as a basis for an award of attorney fees. I conclude that, in this case, such costs properly may be considered along with time spent by attorneys as part of the first *Johnson* factor. Time spent by paralegals and other professionals frequently is billed to clients by the hour. The assistance of such professionals is indispensable in a case like this case. Document clerks often are viewed as overhead, rather than as time that is billed separately. This case is document intensive in the extreme. For the purposes of this case, I will include the nearly 800,000 dollars of time attributed to document clerks in the lodestar amount, though I consider this element of the lodestar to be somewhat inflated.

In a common fund case, the lodestar figure serves as one consideration in determining a reasonable fee. The *Brown* court noted that this factor may be given less weight in a common fund case than in a statutory fee case, where the lodestar figure is an essential touchstone of reasonableness. *Brown*, 838 F.2d at 456. Although some objectors have criticized the amount of time billed by various people associated with lead counsel, I conclude that there has not been a persuasive challenge to the reasonableness of the time spent by lead counsel on this case. I am intimately familiar with the history of this case, and I conclude that the hours spent on this case by lead counsel and their staff are within the realm of reason. Although there may be areas in which lead counsel might have used time and other resources more efficiently, I find that any such inefficiencies are not so prevalent that the gross number of hours claimed by lead counsel should be amended by reduction for the purpose of this analysis. Overall, the hourly rates outlined in counsel's declarations in support of the motion for award of attorney fees are generous but within the range of reasonable hourly rates for the type of work at issue here.

Having reviewed lead counsel's declarations and the relevant objections, I conclude that a lodestar amount of 18 million dollars is a reasonably accurate figure for the purpose of applying the *Johnson* analysis to this case. Having considered the record and the relevant circumstances, I conclude that the lodestar amount is an important factor in the overall reasonableness analysis because it is a tangible, determinate measure of the value of the time and labor involved.

**2. The novelty and difficulty of the questions**—There are few simple class action cases involving securities law. This area of law may not be novel, but it generally is complex and difficult. In this case, lead counsel pursued securities claims that involved a large and complex

corporation and complex accounting issues. As discussed above, the PSLRA requires great specificity in pleading such claims. Simply investigating the facts in order to file a legally sufficient complaint under the PSLRA required substantial effort and expertise. In addition, as summarized above, many of the issues litigated by lead counsel were complex and difficult. Able defense counsel zealously and survigrously litigated on behalf of the defendants, and lead counsel were required to meet these challenges at most every turn. In short, the issues presented by this case were very difficult and complex. This factor, closely related to factor three, below, carries significant weight, and tends to support a generous award of attorney fees.

**\*4  3. The skill requisite to perform the legal service properly**—This factor is closely related to the ninth factor —the experience, reputation, and ability of the attorneys. I consider factors three and nine together. If the issues in a case are complex and difficult, then obviously it will take great skill to address and resolve those issues successfully. Plaintiffs'lead counsel are highly skilled and specialized attorneys who use their substantial experience and expertise to prosecute complex securities class actions. The defendants were represented by lawyers of similar expertise and experience. Particularly in a case as complex as this case, lead counsel must have a very high level of experience and expertise if the plaintiffs are to have any chance of success. In this case, there is no serious challenge to the conclusion that lead counsel possesses a high level of skill and expertise in securities class action suits. This factor carries significant weight because the plaintiff class likely would not have obtained any relief without the assistance of counsel with a high level of skill and expertise. Further, lead counsel should be rewarded for their successful application of their skill and expertise. This factor augurs toward a substantial fee award.

**4. The preclusion of other employment by the attorney due to acceptance of the case**—Without doubt, time spent by lead counsel on this case was at the expense of time that lead counsel could have spent on other cases. Lead counsel, however, does not cite any particular legal business that was turned away because of the demands of this case. It is fair to assume, however, that lead counsel's efforts on this case could have been devoted to other cases, which may have proven worthwhile. This assumption, however, does not weigh heavily in my analysis.

**5. The customary fee for similar work**—This factor is very similar to factor number twelve –awards in similar cases. I consider factors five and twelve together. The lead plaintiffs analyze this factor in terms of the customary percentage fee for complex commercial cases that involve a contingent fee. In this realm, the lead plaintiffs argue, contingent fees of 30 to 40 percent of the recovery are considered to be acceptable. The lead plaintiffs cite a variety of class action cases in which the recovery exceeded 100 million dollars, and the percentage of attorney fees awarded ranged from 25 to 36 percent. *Motion for attorney fees* [#929], pp. 19—21. The objecting class members cite other cases in which the percentage of attorney fees awarded is much lower. *See, e.g., Objection of Graham, et. al.* [#942], filed March 6, 2006, pp. 8—11; *Objection of Pennsylvania State Employees'Retirement System* [#1014], filed May 17, 2006, pp. 1—2.

Similarly, the lead plaintiffs and objecting class members cite cases in which a percentage fee award was cross-checked against the lodestar amount in an effort to judge the reasonableness of the fee. The lead plaintiffs cite cases in which the fees awarded represented multiples of the lodestar amount ranging from 4.65 to 10.73. *Motion for attorney fees* [#929], p. 25, n. 12. The objecting class members cite cases in which the fees awarded represented lodestar multiples ranging from 1.35 to 4.0. *Objection of Graham, et. al.* [#942], filed March 6, 2006, pp. 8—11; *Objection of Pennsylvania State Employees'Retirement System* [#1014], filed May 17, 2006, pp. 1—2.

Of course, a variety of relevant circumstances were in play in the various comparison cases cited by the parties. However, neither the lead plaintiffs nor any objector has proposed a persuasive analytical scheme that explains why high percentages or high lodestar multiples are awarded in some cases, and lower percentages or lodestar multiples are awarded in other cases. For the purposes of this case, I conclude that the awards in similar cases convey two fundamental messages that are applicable to this case. First, lead counsel who create a common fund for the benefit of a class are rewarded with fees that often are at least two times the reasonable lodestar figure, and in some cases reach as high as five to ten times the lodestar figure. Second, judging an attorney fee award solely as a percentage of the common fund or solely as a lodestar multiple does not adequately accommodate all relevant considerations. For example, a fee that equals 25 percent of a common fund also might result in a

very low lodestar multiple. *See In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 443—448 (25 percent of common fund awarded as attorney fees, a lodestar multiple of 1.35; applying *Johnson* factors). The customary fee factor carries significant weight in my analysis, but the fees awarded in other cases provide only a rough guide to reasonableness.

**\*5 6. Whether the fee is fixed or contingent**—In many circumstances, a contingent fee will result in the payment of a higher total fee to counsel than the total fee an hourly fee would have generated. Of course, if the litigation is not successful, a contingent fee often will leave counsel without any fee. A contingent fee, and the potential for a relatively high fee, is designed to reward counsel for taking the risk of prosecuting a case without payment during the litigation, and the risk that the litigation may be unsuccessful. These considerations are applicable here. As noted above, I accord a presumption of reasonableness to the 24 percent contingent fee to which lead counsel and the lead plaintiffs agreed at the outset of this case. In the context of this case, this factor carries significant weight. However, as the *Johnson* court noted, the key "criterion for the court is not what the parties agreed but what is reasonable." *Johnson*, 488 F.2d at 718.

**7. Time limitations imposed by the client or the circumstances**—The *Johnson* court concluded that priority work that delays a lawyer's other work is entitled to a premium. *Id.* I agree with the lead plaintiffs that this factor is not relevant in this case.

**8. The amount involved and the results obtained**—This factor may be given a greater weight in a common fund case when the court determines that the recovery "was highly contingent and that the efforts of counsel were instrumental in realizing recovery on behalf of the class." *Brown*, 838 F.2d at 456. The *Brown* court indicated that the time and labor factor need not be evaluated using the lodestar formulation if the trial court determines that other factors are sufficient to determine a reasonable fee. *Id.*

In this case, I conclude that recovery for the class was contingent on many variables, and that the efforts of lead counsel were instrumental in overcoming those risks and realizing some recovery for the class. From the outset, lead counsel faced substantial risks in prosecuting this case. At the extreme, the risk was that lead counsel would

expend substantial resources but end up with no recovery. For example, the risk that Qwest would file bankruptcy frequently was present during the course of this litigation. In addition, the risks inherent to litigation are legion, and need not be reviewed here. However, in the context of this case, I conclude that the lodestar calculation outlined above remains a significant consideration in determining reasonableness. This fundamental measure of value provides important context in balancing the other considerations.

It is difficult to describe 400 million dollars as anything other than a huge amount of money. On its face, the amount of money recovered for the class by lead counsel is prodigious. However, relative to the losses the plaintiff class claims the Settling Defendants caused them, 400 million dollars represents a relatively small amount of money. For example, the Pennsylvania State Employees' Retirement System argues that class members are receiving only about 15 cents per share from the Settlement Fund when many suffered a market loss in excess of 58 dollars per share during the class period. *Objection of Pennsylvania State Employees' Retirement System* [#1014], filed May 17, 2006, p. 2. Similar dramatic losses have been claimed frequently in this case. Whether these numbers accurately reflect the comparison between the total losses caused by the defendants' alleged securities violations and the total recovery obtained via this lawsuit, I cannot determine. However, it is clear that the losses generally claimed by the plaintiffs are far greater than the recovery that will result from the creation of the Settlement Fund. In short, the amount of the Settlement Fund is impressively large, but that impression is tempered by the plaintiffs' consistent claim, a claim often advanced by lead counsel, that the plaintiff class suffered losses that are much larger. From the plaintiffs' perspective, the plaintiffs are recovering only a small proportion of the losses caused by the Settling Defendants. From this perspective the results obtained are better than nothing, but they pale in comparison to the losses claimed.

**\*6** It is important to note, however, that there probably would not have been any recovery for the plaintiff class absent the efforts of lead counsel. Many class members may perceive the recovery to be inadequate, compared to their claimed losses, but the class also faced a distinct risk of no recovery. Further, I conclude that lead counsel's efforts serve the broader purpose of creating an incentive for the defendants and others to comply with the securities

laws in the future. That incentive is another aspect of the success achieved by lead counsel. Overall, the eighth *Johnson* factor carries substantial weight in my analysis, but this factor pulls in two directions. The large amount of the settlement augurs toward a generous award of fees. The fact that the settlement amount pales in comparison to the claimed losses weighs in favor of a reduced fee award so that the plaintiff class can recover more –albeit a modicum –of its total claimed losses.

**9. The experience, reputation, and ability of the attorneys**— This factor has been considered as part of factor number three, above.

**10. The undesirability of the case**—The risks presented to lead counsel who undertook this case were substantial. I summarized some of those risks in discussing factor eight, above. At a minimum, this case required lead counsel to advance large amounts of time, money, and other resources to determine if any recovery might be had. Quintessentially, the risk to lead counsel was financial. Most attorneys are unable or unwilling to take such a financial risk. There are other factors that may have made this case undesirable to counsel, but the financial risk stands out as the key factor. I note, however, that lead counsel long has been in the business of undertaking such risks in the realm of class action securities litigation. Thus, lead counsel had the ability to assess and assume the risk, and to make an informed judgment about the potential ratio between risk and reward in this case. This factor carries significant weight and weighs in favor of a substantial fee award.

**11. The nature and length of the professional relationship with the client**—In describing this factor, the *Johnson* court noted that a lawyer may vary his or her fee for similar work in light of the professional relationship of the client with the lawyer. There is no indication that lead counsel adjusted the agreed fee in this case based on any special relationship with the lead plaintiffs. I consider this factor to have no application in this case. To the extent this factor might be read as requiring respect for a fee agreement between lead counsel and lead plaintiffs, that adequately has been addressed elsewhere in this order.

**12. Awards in similar cases**—This factor has been considered as part of factor number five, above.

### E. CONCLUSION—ATTORNEY FEES

The fee agreement between the lead plaintiffs and lead counsel provides for an award of attorney fees equal to 24 percent of the Settling Defendants'400 million dollar contribution to the settlement fund. Such an award would amount to 96 million dollars. My analysis began with a presumption that the fee agreement is reasonable. The *Johnson* factors demonstrate that lead counsel provided highly valuable services on behalf of the plaintiff class, took substantial risks, and obtained significant relief on behalf of the class. Judged by the standard of the billable hour, the lodestar value of those services is in the neighborhood of 18 million dollars, but counsel was not being paid by the hour as this case was litigated. The fee agreement and the usual practice in class action cases both contemplate that successful lead counsel may be rewarded with fees judged, at least in part, as a proportion of the common fund created. Such rewards frequently consume a significant proportion of the common fund, and often are equal two to five times the lodestar figure. Considered together, these factors largely weigh in favor of awarding fees under the terms of the fee agreement.

**\*7** On the other hand, an important factor weighs heavily in the opposite direction. The common fund created in this case will compensate the plaintiff class for only a fraction of the losses the plaintiff class claims the Settling Defendants caused the class to suffer. The gross amount of the settlement achieved is large, but it will compensate only a small proportion of the plaintiffs'claimed losses. In these circumstances, it is particularly important for me to "determine a reasonable fee by weighing the appropriate interests of the beneficiaries in light of the efforts of counsel on their behalf." *Brown*, 838 F.2d at 456. In addition, I note that the lodestar amount, the basic measure of value, by itself would lead to handsome compensation for lead counsel.

Unfortunately, balancing the relevant factors does not lead to a precise algorithm that prescribes a reasonable fee. Rather, I must exercise my informed discretion to strike a balance between the competing factors. I conclude that an attorney fee award to lead counsel in the amount of 60 million dollars is reasonable because this amount strikes a reasonable balance among the relevant *Johnson* factors. Such a fee recognizes and very handsomely rewards the efforts and skill of counsel, the risks undertaken

In re Sears, Roebuck and Co. Securities Litigation, Slip Copy (2008)
2006 WL 8429707

by counsel, and the results obtained by counsel with a payment that is more than three times the generous hourly rates claimed by counsel in their lodestar calculation. Converted to an hourly fee, this award leads to payment of over 1,100 dollars for each hour spent by any lawyer on the lead counsel team, and for every hour spend by other professionals and support staff on lead counsel's team. Judged as a percentage of the 400 million dollar fund, this award amounts to 15 percent of the fund. Judged by any and all of these measures, this fee is reasonable, fair, and, for lead counsel, quite lucrative.

To the extent this award necessarily alters the fee agreement between lead counsel and the lead plaintiffs, I conclude that the other relevant circumstances rebut the presumption that the fee agreement itself defines a reasonable fee. Lead counsel and lead plaintiffs could not have known the result of this litigation when they entered into the agreement. Now that the result and the surrounding circumstances are known, I conclude that the 24 percent fee agreement exceeds the purview of reasonableness under the circumstances of this case. Having considered all of the relevant circumstances, I find and conclude that an award of 60 million dollars is reasonable. I award lead counsel attorney fees to be paid from the settlement fund in the amount of 60 million dollars.

## F. REASONABLE EXPENSES

Again, the PSLRA provides that the "[t]otal attorneys'fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u–4(a)(6). As with attorney fees, the common fund doctrine allows for an award of costs so that the beneficiaries of the fund share the cost of creating the fund.

Here, lead counsel seeks an award of costs totaling 2,219,063.84 dollars. I have reviewed the costs outlined in lead counsel's declarations and generally find the costs sought by counsel to be reasonable in the context of this case. Some of the costs claimed are not documented in great detail, but the gross amounts claimed are within the realm of reason in the context of this case. On a relatively insignificant note, I agree with the observation of one group of objectors, *see* objection [#942], filed March 6,

2006, that charging 25 cents per copy for high volume, in-house copying exceeds the bounds of reason. *Dowd Declaration* [#939], filed February 27, 2006, p. 29. Rather than burden lead counsel, the lead plaintiffs, the class, and this court with the exercise of punctiliously examining an even more detailed cost accounting, I exercise my discretion and award costs in the amount two million dollars, which I find to be reasonable, necessary, and circumstantiated. These costs are to be paid from the Settlement Fund.

**\*8** Finally, the PSLRA permits an award to the lead plaintiffs of their "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u–4(a)(4). Four lead plaintiffs have requested an award of such costs and expenses, as documented in their declarations [#935], [#936], [#937], and [#938]. I find the costs and expenses claimed to be reasonable. The New England Health Care Employees' Pension Fund is awarded 13,215.56 dollars in costs and expenses. Sat Pal Singh is awarded 7,650.00 dollars in costs and expenses. Tejinder Singh is awarded 8,431.41 dollars in costs and expenses. Clifford Mosher is awarded 11,280.00 dollars in costs and expenses. These costs and expenses are to be paid from the Settlement Fund.

## G. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. That **Lead Counsel's Motion for Award of Attorneys'Fees and Reimbursement of Expenses** [#929], filed February 27, 2006, is **GRANTED** to the extent that lead counsel for the plaintiff class is **AWARDED** attorney fees in the amount of 60 million dollars ($60,000,000) to be paid from the Settlement Fund in this case;

2. That **Lead Counsel's Motion for Award of Attorneys'Fees and Reimbursement of Expenses** [#929], filed February 27, 2006, is **GRANTED** to the extent that lead counsel is **AWARDED** two million dollars ($2,000,000) in costs to be paid from the Settlement Fund in this case;

3. That **Lead Counsel's Motion for Award of Attorneys'Fees and Reimbursement of Expenses** [#929],

In re: qwest communications international, inc: Securities Litigation, Slip Copy (2006)
2006 WL 8429707

filed February 27, 2006, is **GRANTED** to the extent that lead plaintiff, The New England Health Care Employees'Pension Fund, is **AWARDED** 13,215.56 dollars in costs and expenses to be paid from the Settlement Fund in this case;

4. That **Lead Counsel's Motion for Award of Attorneys'Fees and Reimbursement of Expenses** [#929], filed February 27, 2006, is **GRANTED** to the extent that lead plaintiff Sat Pal Singh is **AWARDED** 7,650.00 dollars in costs and expenses to be paid from the Settlement Fund in this case;

5. That **Lead Counsel's Motion for Award of Attorneys'Fees and Reimbursement of Expenses** [#929], filed February 27, 2006, is **GRANTED** to the extent that lead plaintiff Tejinder Singh is **AWARDED** 8,431.41 dollars in costs and expenses to be paid from the Settlement Fund in this case;

6. That **Lead Counsel's Motion for Award of Attorneys'Fees and Reimbursement of Expenses** [#929], filed February 27, 2006, is **GRANTED** to the extent that lead plaintiff Clifford Mosher is **AWARDED** 11,280.00

dollars in costs and expenses to be paid from the Settlement Fund in this case;

7. That **Lead Counsel's Motion for Award of Attorneys'Fees and Reimbursement of Expenses** [#929], filed February 27, 2006, is **DENIED** otherwise;

8. That to the extent the objections of any of the objectors, including the objections docketed as [#960], [#962], [#1003], [#1014], and [#1016], challenge **Lead Counsel's Motion for Award of Attorneys'Fees and Reimbursement of Expenses** [#929], filed February 27, 2006, those objections are **SUSTAINED** to the extent Lead counsel's motion has been denied; and

9. That to the extent the objections of any of the objectors, including those docketed as [#960], [#962], [#1003], [#1014], and [#1016], challenge **Lead Counsel's Motion for Award of Attorneys'Fees and Reimbursement of Expenses** [#929], filed February 27, 2006, those objections otherwise are **OVERRULED** and **DENIED**.

**All Citations**

Slip Copy, 2006 WL 8429707

---

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.