## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## ILLINOIS EASTERN DIVISION

| | |
|---|---|
| KENT EUBANK, JERRY DAVIS, RICKY FALASCHETTI, RITA CICINELLI, ROBERT JOSEPHBERG, JEFFREY ACTON, KENNETH HECHTMAN, JAMES NEIMAN, AMY CHASIN and EDWARD RUHNKE, individually and on behalf of all others similarly situated; | No.: 06 C 4481 |
| Plaintiffs, | Honorable Sharon Johnson Coleman |
| v. | Class Action |
| PELLA CORPORATION, an Iowa corporation, and PELLA WINDOWS AND DOORS, INC., a Delaware corporation, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, COSTS AND SERVICE AWARDS

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES    1

I.    INTRODUCTION    4

II.    PROCEDURAL HISTORY    7

    A.  The Proposed Settlement    12

    B.  Status of Claims Process    13

III.    ARGUMENT    16

    A.  Legal Standard    16

    B.  The Requested Fee is Reasonable Under
        Any Method of Calculation    18

        1.  The Lodestar Method    18

        2.  Percentage of the Common Fund May
           Also be Applied    21

    C.  The Total Amount of Requested Fees is Reasonable    24

        1.  The Base Lodestar Totals Understate
           The Amount of Work performed on behalf of
           Class    24

        2.  Counsel's Rates are Reasonable and Within the
           Range of Rates Previously Approved by
           Other Courts    24

        3.  Counsel's Rates are Commensurate with what
           Counsel have actually received from fee-paying
           Clients    25

        4.  The Requested Fee is Reasonable in Light
           of Pella's likely defense costs    26

        5.  The Requested Multiplier is Appropriate    27

D.  All Other Factors to be Considered Weigh in Favor
    of Approval of the Requested Fee                           29

    1.  The lawsuit involved complex, novel questions
        Of fact and law                                        29

    2.  The degree of success obtained                         30

    3.  Public interest considerations                         30

    4.  Preclusion of other work                               31

E.  Class Counsel's Costs and Expenses are Reasonable          31

F.  The Requested Service Awards for Class
    Representatives Should be Approved                          33

IV.    CONCLUSION                                              36

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

I.      <u>**INTRODUCTION**</u>

Four years ago, the Honorable James B. Zagel appointed Robert A. Clifford and George A. Lang as co-lead counsel of this case. The appointment came on the heels of a now well-known Judgment entered on June 2, 2014 by the Seventh Circuit. That Judgment reversed a prior settlement that had been submitted to the Court, approved, and then reversed. The Judgment expelled the counsel associated with the settlement as well as the named class representative. Upon remand, Judge Zagel appointed Messrs. Clifford and Lang. Plaintiffs' Lead Counsel then joined forces with other attorneys, namely Shannon M. Ya from Clifford Law Offices, P.C., John A. Yanchunis and Marcio W. Valladares from Morgan & Morgan; Joel R. Rhine from the Rhine Law Firm; and Edward R. Moor, from the Moor Law Firm[1].

Named Plaintiffs in this certified class action—Kent Eubank, Jerry Davis, Ricky Falaschetti, Rita Cicinelli, Robert Josephberg, Jeffrey Acton, Kenneth Hetchman, James Neiman, Amy Chasin and Edward Ruhnke—are ten homeowners who were caused to believe they were purchasing premium windows only to learn the windows were predisposed to extensive, premature wood rot. Unbeknownst to Plaintiffs, and thousands of consumers just like them, Pella manufactured during the class period approximately 7,000,000 Proline casement windows with a design that allowed water to accumulate behind the exterior aluminum cladding and rot the wood. The aluminum cladding hid the rotting wood and Pella hid all of this from consumers. Even when contacted by consumers whose homes were affected by the rotting wood, Pella denied responsibility and often blamed the very consumers for the rot. (*See e.g.* Ex. 1, Gerdes's Report at p. 11 ¶ 7(a)(viii), p. 14 at ¶ 7(g)(iv), p. 15 at ¶ 7(h)(v), and p. 24 at ¶ 6, second bullet point).

---

[1] Hereinafter referred to as "Lead Plaintiffs' Counsel" or "Plaintiffs' Counsel."

Nonetheless, not all of the Proline casement windows succumb to wood rot. There is a failure rate that remains hotly contested between Pella and Plaintiffs (Docs. 606, 607, 609, 631).

The consumers were caused to initiate litigation for redress. Two classes were certified. In both certified classes, the consumers purchased Pella ProLine casement windows manufactured between January 1991 and June 2009. The Rule 23(b)(2) class is a nationwide (i.e. 50-state) class comprised of consumers in whose windows rot has not yet manifested. (Doc. 163 at p. 30; Doc. 540 ¶ 100). The Rule 23(b)(3) class is comprised only of consumers from six states with comparable consumer fraud statutes, namely, California, Florida, Illinois, Michigan, New Jersey and New York. The (b)(3) class members are those consumers "whose windows have exhibited wood rot and who have replaced the affected windows." (Doc. 163 at p. 2 n.1 and p. 30; Doc. 540 ¶ 101) (emphasis added). Importantly, despite class certification, the issues of causation, reliance and damages remained subject to individualized proof for each consumer's claim. *Pella Corp. v. Saltzman*, 606 F.3d 391, 392 (7th Cir. 2010) (Posner, J.) (*Saltzman I*). Consequently, the practical effect of class certification was strained by the undeniable fact that each consumer was still required to show that the design defect, and not some other matter such as installation or condensation, caused the wood rot. Further, though arguably less onerous, each consumer was required demonstrate damages. Additionally, Pella argued throughout the litigation that Plaintiff had no "admissible evidence of a defect" citing *Ervin v. Johnson & Johnson*, 429 F.32d 901 (7th Cir. 2007), as well as an absence of evidence concerning reliance and causation.

As set forth in more detail in Plaintiffs' Memorandum in Support of Preliminary Approval (Doc. 672), and consequent upon Plaintiffs' concurrent Motion for Preliminary Approval (Doc. 671) the case has preliminarily been approved to settle for $25.75 million (comprising the "Fund A" $23.750 million, non-reversionary fund for existing claims and the

5

"Fund B" $2 million reserved for future claims) in a common fund for payment to qualifying affected consumers. Separate from the relief available to consumers, Pella has agreed to separately allocate $9 million for attorneys' fees and expenses. That is, the $25.76 million afforded to consumers is not diminished by any payment by Pella for attorneys' fees, costs and expenses. Additionally, the $9 million is designated for reimbursement of all fees, costs and expenses ordered by the Court.

Lead Plaintiffs' Counsel now seeks the Court's approval of attorneys' fees and costs of $9 million, which includes payment of litigation costs in the amount of $1,206,387.33 (plus additional expenses to be incurred through the date of approval). Lead Plaintiffs' Counsel also seeks service awards to each of the named Plaintiffs in the amount of $25,000 per household. Defendant Pella has agreed to pay Class Counsel's reasonable attorneys' fees and costs up to $9 million as determined by the Court pursuant to adversarial motion practice.

The relief sought here is reasonably and amply justified by record. Plaintiffs' Counsel tirelessly litigated this hotly contested matter and prepared the case for trial. Not only did Plaintiffs' Counsel initiate and fully implement discovery on the merits of the case, but counsel also retained competent consultants and experts to discern actual facts and evidence that spoke to all fundamental issues in the case, including causation and damages. Plaintiffs' counsel fully prepared this case for trial, and case remains trial ready; it was not trial ready simply to yield a settlement. Unfortunately, throughout the litigation, counsel was burdened with the case history, and took calls from hundreds of consumers who were hostile toward counsel as a consequence of the case history, often confusing current counsel for prior counsel. Unlike most cases, in this instance, Plaintiffs' Counsel were saddled with a case history that made consumers angry and suspicious, a disillusionment that Plaintiffs' Counsel worked equally hard to dispel with focused determination in preparing the case

for trial. Ultimately, Plaintiffs' Counsel achieved a settlement that provides substantial relief for thousands of consumers, in the form of meaningful cash payments, in amounts that approximate the maximum relief that class members could have recovered pursuant to a complete victory at trial. Moreover, Plaintiffs' Counsel engaged thousands of consumers, such that they might understand the rigor of this litigation, and also understand the distinctions between the prior and current iterations of the case.

As demonstrated, herein, the requested fee award is reasonable under any method of review, including the lodestar multiplier analysis. Plaintiffs' Counsel's lodestar specifically attributable to prosecution of the claims is $8,051,377.50. Exhibits A, B. The lodestar number includes only time specifically attributable to prosecution of claims and not does not include time more generally incurred in connection with restoring consumers' confidence, the actual time incurred that advanced the litigation and most appropriately should be considered as understated. Moreover, given the magnitude and quality of the work performed and the results achieved, the modest 1.9 multiplier requested is appropriate based upon analysis of the relevant factors and as compared to multiples approved in other cases.

## II.  PROCEDURAL HISTORY

As fully recounted described in Plaintiffs' Memorandum in Support of Preliminary Approval (Doc. 672) (hereinafter, "Plaintiffs' Preliminary Approval Memorandum"), the Settlement was reached after nearly ten years of contentious litigation in this Court. Even so, the bona fide prosecution of this action, which became the fundament of the Settlement, unfolded in the last four years. *See Pella Corp. v. Saltzman*, 753 F.3d 718, 729 (7th Cir. 2010) (Posner, J.) (*Saltzman II*) (reversing prior settlement in this action) ("To conclude . . . After eight

largely wasted years, much remains to be done in this case."). Only during the time of Plaintiffs' Counsel's oversight of this case was there significant discovery and meaningful document production and review, all of which went to the merits of the case and its preparation for an actual trial. More than one million documents were reviewed and utilized in depositions and expert reports. Depositions of reliable consumers and inspections of consumers' homes occurred all over the United States. Hundreds of rotting windows were shipped to Plaintiffs' Counsel, which were then visually examined and stored. Plaintiffs' counsel retained, consulted and proffered expert testimony from by the most highly qualified and well-known experts in the fields of wood science, fenestration and reliability.

During the course of discovery, which occurred during the time of Plaintiffs' Counsel's appointment to the case, there was regular motion practice on the pleadings. (Doc. 672, p. 9). Plaintiffs' Counsel prevailed on the pleadings, Defendants finally answered and the discovery intensified. Plaintiffs' Counsel remained wholly committed to preparing the case for trial for several reasons. First, vigorous discovery was the only way to fully exhaust all theories and merits of the case. Second, discovery was the only way to restore consumer confidence in the process, in light of the first settlement. Third, the Seventh Circuit's opinion made clear that the initial resolution of this matter, shortly after class certification, and with certain constraints imposed on relief conceivably available to consumers under that settlement model, had sold the case short. *Saltzman II*, 753 F.3d at 796 ("Class Counsel sold out the class."). Fourth, the notion of class-wide relief, despite certification, was largely illusory. That is, the class certification was such that it would not really afford relief to most consumers. More specifically, because reliance, causation and damages all remained subject to individualized proof, the class certification did nothing immediate or concrete for consumers in the form of either a trial or a settlement.

In the end, what brought the case to successful conclusion was Plaintiffs' Counsel's willingness, ability and firm commitment to do the complex work, analysis and preparation required to successfully prepare this complex action for trial.

Class Counsel Shannon McNulty's Declaration attached to Plaintiffs' Preliminary Approval Memorandum (Doc. 672-6) delineates some, but certain not all, of the extraordinary efforts made in this hotly contested litigation. In the few years since their appointment, and among many other things, Class Counsel

- Served extensive written discovery, including exhaustive, specific and detailed Interrogatories, and Requests for Production of documents. (Doc. 672-6 at ¶¶ 10-14).

- Obtained hundreds of thousands of documents from a variety of sources, caused the same to be downloaded into a searchable document management system data base and, along with consulting and testifying experts, reviewed the same. (Doc. 672-6 at ¶ 13).

- Amended the operative complaint a number of times, responded to consequent defense motions to dismiss and to decertify almost each new iteration of the operative complaint, and caused Pella, despite aggressive, nuanced, and complex motion practice, to finally answer and assert affirmative defenses to the Seventh Amended Complaint. (Doc. 672-6 at ¶¶ 9, 20).

- Vetted and substituted an almost completely new slate of Named Plaintiffs (i.e., substitute class representatives). (Doc. 672-6 at ¶ 8).

- Vetted and retained a completely new slate of expert witnesses, including a nationally recognized industrial statistician and failure analyst, a nationally recognized and accomplished and one of the world's foremost wood scientists. (Doc. 672-6 at ¶¶ 6, 7, 12, 14, 15, 16).

- Took or defended approximately 33 depositions, including fifteen 30(b)(6) depositions and ten expert depositions. (Doc. 672-6 at ¶ 15).

- Undertook significant motions practice including, but not limited to, the following:

  o Motion to Dismiss and to Strike Class Allegations (Doc. 498)

  o Motion to Dismiss and to Strike Class Allegations (Doc. 543)

  o Motion to Decertify (Doc. 507)

  o Motion to Clarify (Doc. 553)

  o Motion for Summary Judgment (Doc. 603)

  o Cross-*Daubert* Motions concerning the following experts:

    § Chin (Doc. 617)

    § Saraf (Doc. 617)

    § Schroter (Doc. 609)

    § Winandy (Doc. 600)

    § Middleswart (Doc. 617)

    § Gerdes (*see* Doc. 617 and related filings)

    § Ray (*see* Doc. 617 and related filings)

    § Smith (*see* Doc. 617 and related filings)

    § Wachs (*see* Doc. 606 and related filings)

As a result of these efforts, Plaintiffs' counsel developed facts they believed supported Plaintiffs' claims. Plaintiffs' Counsel transformed the data produced in discovery into undeniable facts that plainly demonstrated Pella's conduct and supported the testimony of legitimate consumers who lived with the windows at issue.

Discovery concluded with the disclosure of expert opinions and rebuttal expert opinions,

along with corresponding expert testimony. The parties then intensively engaged in motion practice, including multiple cross-*Daubert* challenges and Defendants' motions for summary judgment. *See* Docs. 603, 606, 609, 611, 617 and related papers. At that point, this Court, with the able assistance of Magistrate Judge M. David Weisman, who managed the settlement conferences and the settlement discussions, encouraged the parties to engage in discussions concerning settlement potential. All formal settlement conferences occurred in the courthouse with Magistrate Judge Weisman. The parties were highly conscientious in having consent of the parties before proceeding in the discussions and, in particular, of apprising the named plaintiffs as the discussions advanced and, occasionally, receded. The named plaintiffs' support was memorialized in writing after having been counseled. Eventually, when the parties were deadlocked in their respective positions, after months of contentious negotiations, Magistrate Judge Weisman made a recommendation as to proposed terms under which the case might settle. Each side had an opportunity to accept or reject the proposed terms. In this instance, both sides accepted Magistrate Judge Weisman's proposed terms.

Notably, the issue of attorneys' fees was to be decided in a contested proceeding before the Court, however, as a condition of settlement, Pella would pay no more than $9 million, total, for all fees, costs and expenses in the case. Equally notable, in this instance, Lead Plaintiffs' Counsel neither needed nor sought an advance from Pella for any fees, costs or expenses, as had occurred in the prior settlement rejected by the Seventh Circuit. This fact, in conjunction with the fact that the fees are to be paid separately from benefits that are paid to consumers, underscores that there has been no collusion regarding fees that can infect settlement negotiations, nor was there any conflict of interest between the consumers' recoveries and the payment of attorneys' fees. More than just ensuring that the attorneys' fees are free from any

possible taint of collusion, however, the provision that fees be paid separately and without regard to the settlement benefits also maximizes the recovery to the class members, as their recoveries will not be decreased regardless of the outcome of the instant motion. Finally, Lead Plaintiffs' Counsel have declined the outreach of other prior attorneys in connection with any negotiation concerning a perceived entitlement to any so-called split of fees or costs from the $9 million.

A.   **The Proposed Settlement**

The Settlement Agreement and Release ("SA") (Doc. 672-1), attached as Exhibit 1 to and described in detail in Plaintiffs' Motion for Preliminary Approval (Doc. 672-1, pp. 5-6, 10-23). The Settlement effectively provides complete recovery for consumers with Proline casement windows that display wood rot, including an allocation of funds for windows that have not yet shown manifestations of wood rot.

The Parties and the Settlement Administrator identified approximately 743,0000 consumers that conceivably have affected windows; notice was designed to be robust and thorough, with a target saturate rate of 80%, reaching approximately 80% of the class members on average of two times each. See Peak Decl. attached to Plaintiffs' Preliminary Approval Memo, (Doc. 672-3, ¶¶ 9, 16). Once a consumer receives notice, a form must be completed. Completion of the form is necessary because the value of the relief is significant, such that some proof of having the affected windows must be submitted to verify that the consumer has Proline and not another model of Pella window, and to prevent any false claims that would conceivably limit relief rightfully owed to affected consumers. *See also* Doc. 672-2 (Claim Form). Two hallmarks of anti-consumerism, caps on relief and an arbitration clause, are not part of this settlement. In light of the fact that all eligible consumers are entitled to meaningful relief without the threat of a cap or the hassle and expense of a separate arbitration against

Pella, the claim form requires sufficient information to identify a window and verify that the claimant has not already received relief from Pella. For consumers who paid out-of-pocket for replacement of wood-rotted windows, the Settlement also provides the opportunity to obtain full reimbursement. Consumers who chose to replace a defective window will be reimbursed for the amount that sufficient documentary proof shows they actually paid for the replacement window. SA, § 5.04.

B.     **Status of Claims Process**

The Settlement Administrator sent out Notice and established the Settlement Website as ordered by the Court. As part of their continuing vigorous representation of affected consumers, Plaintiffs' Counsel immediately vetted the Settlement Website and claims process functionality and identified certain inadequacies brought to the attention of Defendants and the Settlement Administrator. Those inadequacies were fixed within a few days.

The claims process is ongoing. According to the latest report from the Settlement Administrator, to date, approximately 1,600 claims have been received with 16 opt-outs. In addition, lead Plaintiffs' counsel have received a significant amount of emails from consumers concerning the settlement. Regrettably, some of those consumers did so to, once again, deride Plaintiffs' Counsel for the work of prior class counsel. Nonetheless, the claims process has been successful in generating claims of deserving consumers.

Indeed, the Settlement provides *more* relief than what could have been achieved even if lead Plaintiffs' counsel won the scheduled trial, sustained that victory on appeal, and successfully applied that liability victory nationwide (via trial or otherwise). As this Court undoubtedly knows from motion practice and the supervision of settlement discussions, the six-state class certification in this case was based on the windows all displaying wood rot and the

13

windows having been replaced by the consumer. Even so, the issue of causation (i.e., wood rot caused by a design defect versus improper installation, excessive humidity, condensation, etc.) and reliance (did the consumer rely on a statement made by Pella as an inducement to purchase) remained subject to individualized proof, as did damages. Meaning, if a consumer's windows experienced wood rot and the consumer replaced the window, their case would potentially reach a jury. Then, even if a jury determined that there was a defect and Pella knew of the defect, the best result at the October 2017 trial would still require additional work-up of each and every consumer's case for purposes of a trial, or some other extra-judicial proceeding, at which time a consumer would likely have to offer proof to rebut Pella's defenses that the consumer never relied on any statements from Pella, that the rot is caused by a myriad of reasons outside of Pella control, and that the damages are discernible pursuant to the law of the six states. Of course, many consumers in the (b)(3) class would not be able to withstand evidentiary scrutiny in such a trial. That is because the (b)(3) class definition required that the consumer have suffered a rotting window and also that they replaced that window. Not many consumers have the old rotting windows on hand. Indeed, not many consumers could afford to replace rotting windows and, instead, were waiting for this litigation to conclude.

For consumers who replaced rotting windows but whose states were not certified, they would be out of luck. For consumers with windows that had not yet shown manifestation of wood rot, the outcome would have included the entry of relief in the form of declarations that, someday, the consumer could file in a court or law for the purpose of initiating litigation. Class certification afforded consumers no certain or uniform relief. Every consumer would still have to try significant portions the consumer's case to obtain final relief.

At a minimum, class members would likely have had to navigate through some type of

quasi-judicial claims process in order to get compensation pursuant to any class-wide liability judgment. Moreover, in the event of a victory at trial, class members' recovery would have been reduced by the amount of attorneys' fees awarded, as there is no nation-wide uniform legal entitlement to fee shifting. Here, Plaintiffs' Counsel effectively secured a liability judgment that provides the opportunity for significant reimbursement on the merits and exclusive of attorneys' fees, *and* a claims process negotiated by counsel that is likely far less burdensome (and far less costly) than what any class member would have had to prove in any judicial adjudication of their claims. The reality that *any* claims process results in only a percentage of deserving class members actually taking advantage of the opportunity to be compensated should not detract from the value created by Plaintiffs' Counsel.

From an overall damages perspective, despite the extensive liability evidence marshaled by Plaintiffs' Counsel, at trial, Pella would likely put forth evidence that, according to its own witnesses, the Proline casement failure rate was much less than what Plaintiffs' reliability statistician calculated. (Docs. 580, 607, 608). Equally notable, the methodology of the failure rate calculation was highly disputed, however, there were also competing opinions concerning the use of warranty codes and the assumptions one makes concerning the data set. (Doc. 617). Of course, arguments a consumer could reasonably expect from Defendants at trial are handily set out in Pella's above-referenced motions for summary judgment (and related replies) and in the *Daubert* briefing. *See* Docs. 603, 606, 609, 611, 617 and related papers.

Notwithstanding disputed evidence and expertise, Plaintiffs note that with more than a month left to make eligible claims, the *claims rate* in the settlement is already above the rate range suggested by Defendants' experts and employees. Further, the expected payout is likely going to be at least double the classwide damages suggested by Defendants' databases, warranty

statistics, experts, and designee testimony. Accordingly, it is almost certain that the settlement represents a better result for class members than the best possible result achievable by litigation of this action through trial.

## III.    ARGUMENT

### A.    Legal Standard

In class action settlements, the district court has discretion to measure an award of attorneys' fees in an equitable manner, by either the lodestar with multiplier method (based on the hours expended by class counsel advocating for the class) or the percentage method (in relation to the total benefits available to the class where the value of those benefits are capable of reasonable calculation). *Americana Art China Company, Inc. v. Foxfire Printing and Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014); *see also Florin v. NationsBank of Ga., N.A.,* 34 F.3d 560, 566 (7th Cir. 1994) (holding that both the lodestar approach and the percentage approach are appropriate ways to determine attorneys' fee awards, and the decision of which method to use remains in the discretion of the court.); *In re Trans Union Corp. Privacy Litig.,* 2009 U.S. Dist.LEXIS 116934, at *13 (N.D. Ill. Oct. 1, 2009) (awarding attorneys' fees based on a percentage of the recovery or lodestar remains within the discretion of the district court).

If litigation succeeds in creating a common fund, the expected percentage sought would reflect the ratio of (1) the fee to (2) the fee plus what the class members received. *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014). Importantly, application of this ratio incentivizes class counsel to design the claims process so as to maximize the settlement benefits actually received by the class, rather than formulating claims-filing procedures that discourage filing. *Id.* Courts typically calculate 25% of the fund as the "benchmark" for a reasonable fee award in cases involving recoveries of between $5 million and $15 million. *Abrams v. Van Kampen*

*Funds, Inc.*, 2006 WL 163023, at *19 (N.D. Ill. Jan. 18, 2006). However, certain circumstances which arise in the litigation might warrant a different percentage, which is why the aforementioned ratio is important. Nonetheless, any departure or "special circumstances" requires adequate support and explanation in the record. *Id.*

The lodestar method is also an appropriate and equitable method for measuring the amount of the attorneys' fees under the circumstances presented by this case. *See In re Southwest Airlines Voucher Litig.*, 799 F.3d 701 (7th Cir. 2015). Under the lodestar method, the court calculates a base lodestar by multiplying a reasonable hourly rate by the number of hours reasonably expended. *Gastineau v. Wright,* 592 F.3d 747, 748 (7th Cir. 2010). The court then adjusts the base lodestar using the following twelve factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.; see also Hensley v. Eckerhart,* 461 U.S. 424, 430 n. 3 (1983). Many of these factors usually are subsumed, however, within the initial calculation of hours reasonably expended at a reasonable hourly rate. *In re Southwest Airlines Voucher Litig.,* No. 11 C 8176, 2013 WL 5497275, at **10-11 (N.D. Ill. Oct. 3, 2013) (citing *Anderson v. AB Painting and Sandblasting Inc.,* 578 F.3d 542, 544 (7th Cir. 2009)). The key factors arguably not subsumed in the lodestar calculation in the present case are the novelty/complexity of the legal issues involved, the degree of success obtained, the public interest advanced by the litigation, the fact that fees were contingent on the outcome of the case, and to a lesser extent the preclusion of certain Class

Counsel from working on other cases. *In re Southwest Voucher Litig.*, No. 11 C 176, 2013 WL 5497275, at *8 (citing *Gastineau*, 592 F.3d at 748) (judgment amended by *In re Southwest Voucher Litig.*, No. 11 C 176, 2014 WL 2809016 (N.D. Ill. June 20, 2014)). Each of these factors readily supports the relatively modest multiplier requested in the instant case.

B. **The Requested Fee Is Reasonable Under Any Method**

1. **The Lodestar Method.**

The "touchstone" for a district court's calculation of attorneys' fees is the lodestar method. *Gastineau*, 592 F.3d at 748; *Schlacher v. Law Offices of Phillip J. Rotche & Assocs., P.C.*, 574 F.3d 852, 856 (7th Cir. 2009). The Seventh Circuit has recognized that the lodestar approach has certain advantages over the percentage method, including the fact that it alleviates "concerns that a percentage approach result[s] in over-compensation for attorneys," it provides "greater accountability" for the attorneys by requiring an explicit accounting of their hours and rates, and it allows for reasonable compensation based on both the hours worked and the risk assumed in undertaking the case. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991). Indeed, a recent Seventh Circuit decision to examine a fee request in a class action utilized the lodestar with multiplier method to calculate attorneys' fees, even in the context of a coupon settlement subject to the Class Action Fairness Act ("CAFA"), which often receive enhanced scrutiny. *In re Southwest Airlines Voucher Litig.*, 799 F.3d 701 (7th Cir. 2015).

In *In re Southwest Airlines Voucher Litig.*, 799 F.3d 701 (7th Cir. 2015), the parties reached a settlement where the class received only $5 drink coupons to be used on future Southwest flights, and no actual cash benefits. Defendant Southwest also agreed, pursuant to a "clear sailing" agreement, to pay class counsel fees of up to $3 million, which represented a multiple of 2.63 on class counsel's reported lodestar. *Southwest*, 2013 WL 549725, at *3.

18

Despite the lack of an adversarial filing by defendant Southwest, the district court applied the lodestar method, made certain adjustments to class counsel's lodestar, and ultimately awarded approximately $1.65 million in attorneys' fees, which represented a 1.5 multiplier on class counsel's adjusted lodestar. *Southwest*, 2014 WL 2809016, at **6-7.

Class-member objectors appealed the district court's use of the lodestar-plus-multiplier award. *Southwest*, 799 F.3d at 704. The objectors argued that the district court erred in using the lodestar method, that fees were disproportionately high when compared to the benefits actually claimed by settlement class members, and that the fee should be calculated *only* as a percentage of the benefits actually claimed by class members. *Id.* In rejecting these arguments, the Seventh Circuit held that even in a pure coupon settlement subject to CAFA, which is wholly distinguishable from the case *sub judice*, the lodestar method is a proper method to evaluate attorneys' fees. *Id.* The court noted that while the settlement did involve coupons, the class members received "essentially complete relief" and that such a settlement "is the model for an adequate settlement." *Id.* at 711. The court further held that in such cases, class counsel "should be compensated accordingly." *Id.* at 712.

Where, as here, there is no inherent conflict of interest between class counsel and the class with respect to the amount of fees (*i.e.* no "clear sailing" clause or attorney-client conflicts); where class counsel litigated on behalf of the class for four years, developing a significant factual record through intensive discovery and highly-qualified expert discovery, and fully preparing the case for trial; and where class members are receiving real "make-whole" cash relief, the lodestar method is a very appropriate and equitable approach.

Naturally, the lodestar method compensates counsel for actual time spent litigating the case, where the time resulted in clear and tangible benefits to the class. In light of defendants'

vigorous defense of this matter, coupled with the case history, but for Plaintiffs' Counsel spending that time to shepherd the case on the merits, consumers would have received nothing. Moreover, use of the lodestar method is equitable in the instant case, as any requirement that the fee be measured only as it relates to the benefits claimed by the class would impose an artificial "cap" on fees reminiscent of the prior claims-made settlement, and its resulting related history, that has, in part, drawn this case out for close to a decade. *Robinson v. City of Edmond*, 160 F.3d 1275, 1284 (10th Cir. 1998) ("one of the factors useful in evaluating the reasonableness of the number of attorney hours in a fee request is the responses necessitated by the maneuvering of the other side"); *Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 860 (1st Cir. 1998) (increased fee award to plaintiffs justified because of defendant's "Stalingrad defense"); *Wolf v. Frank*, 555 F.2d 1213, 1217 (5th Cir. 1997) ("Obviously, the more stubborn the opposition, the more time would be required . . ."). Indeed, placing an artificial cap upon the amount of work that will be compensated could render it economically impracticable for complicated, protracted cases like this to be litigated to conclusion. This is particularly applicable here where the full amount of the fee awarded will impact only defendants—and not class members.

Indeed, that Plaintiffs' Counsel here were willing to move forward with the settlement to secure valuable benefits for class members without any certainty with respect to the amount of attorneys' fees with the risk that this Court may award fees less than what Class Counsel may deem appropriate and warranted is *prima facie* evidence that there is no conflict of interest between class members' recoveries and the payment of attorneys' fees. Plaintiffs' Counsel should be compensated equitably and fairly for the significant relief achieved on behalf of the settlement class after many long years of litigation.

In sum, where, as here, class counsel have advocated tirelessly on behalf of the class for years without pay in the face of law that changed since the inception of the case, use of competent litigation tactics by defendants, aggressive discovery schedules and participation in settlement conferences that resulted in a settlement that pays class members sizeable cash benefits approximating what they would receive at trial, the lodestar-plus multiplier method equitably compensates class counsel.

2. **Percentage of the Common Fund may also be applied to the instant settlement.**

Equally applicable is the percentage-of-the recovery formula utilized in *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014), and *Pearson v. NBTY, Inc.,* 772 F.3d 778, 780 (7th Cir. 2014). The expected percentage would reflect the ratio of (1) the fee to (2) the fee plus what the class members received. *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014). In the instant case, that would translate to (1) $9 million to (2) $34.75 million. Very significantly, the $9 million allocation for fees and expenses was a recommendation proposed by the Magistrate Judge, and not one contrived by Plaintiffs' Counsel and Pella[2]. Quite plainly, the Magistrate Judge's recommendation fits squarely within the Seventh Circuit's algorithm. *See also Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2006 WL 163023, at *19 (N.D. Ill. Jan. 18, 2006), (courts typically calculate 25% of the fund as the "benchmark" for a reasonable fee award in cases involving recoveries of between $5 million and $15 million).

In this case, the common fund is $25.75 million, and Plaintiffs' Counsel propose that $9 million for attorneys' fees, costs and expenses is justified, fair and reasonable. Indeed, under a

---

[2] Plaintiffs' Counsel do not suggest that the recommendation was, in any way, a recommendation specific to Plaintiffs' Counsel. Instead, the straight-forward statement is intended to show that Plaintiffs' Counsel and Defendant did not jointly discuss and arrive at the number of $9 million, and, further, that the number is reflective of calculations utilized in the Seventh Circuit.

percentage-based fee calculation, in this case, the $9 million is reflective of how that process is intended to work. First, the common fund is already established for the class; this is not a claims-made settlement. Second, the proposed $9 million sought by Plaintiffs' Counsel is consistent with the algorithm applied in this District and the Seventh Circuit. Third, the proposed amount of $9 million allocated for fees and expenses is not a number conceived by the Parties, rather, the number came as one element of the Magistrate Judge's settlement recommendation consequent upon the Parties' reaching an impasse on several issues in the settlement conferences.

*Redman* was a FACTA case involving additional digits printed on credit card receipts, which (unlike the instant case), settled quickly before any substantive motions had been filed. Settlement class members were to receive $10 coupons (no actual cash), whereas class counsel was to receive $1 million in fees pursuant to a "clear sailing" agreement. *Redman,* 768 F.3d at 629. Notably, the features that troubled the Seventh Circuit in *Redman* are not present in the instant case. This case was fully litigated; *Redman* was barely litigated. The fee here was the not product of the Parties collaboration and is subject to full argument before this Court, thus instilling adversity that the Seventh Circuit found lacking in *Redman.* Furthermore, there is no concern about "the fairness of the division of the settlement pie" in the instant case because the settlement's approval and the decision on petitions for fees and expenses are treated separately. Moreover, there are no lurking conflicts/improper relationships between the ten Class Representative Plaintiffs (who have all supplied declarations in support of the Settlement) and Plaintiffs' Counsel. Finally, there is also no concern about consumers receiving nothing but coupons of a dubious nature. In the instant case, consumers are receiving real cash pursuant to a claims process that is less than the process they would have to navigate even if Plaintiffs'

Counsel secured a complete victory at trial.

In *Pearson,* the settlement was reached a mere 8 months after filing, with each class member to receive only a "very modest" award of $3-$5. *Pearson,* 772 F.3d at 783. As in *Redman*, defendants agreed up front to pay attorneys' fees up to an amount certain in a "clear sailing" clause. *Id.* at 708. In reversing the district court's award of nearly $2 million in attorneys' fees, the Seventh Circuit, as in *Redman*, focused squarely on the problems inherent with clear sailing clauses. The court held that in such cases, there is an "incentive of class counsel, in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judges approve a settlement involving a meager recovery or the class but generous compensation for the lawyers," *id.* at 787, and that in such cases, a judge should look to the actual value of what the class received when evaluating the fee, *id.* at 781. The court further criticized other characteristics of the settlement, including a large *cy pres* award to an organization that did not benefit the class. None of those defects are applicable to the instant case. As with *Redman*, the aspects of the settlement in *Pearson* that drew the court's concern are simply not present here.

Compensation of Plaintiffs' Counsel in the amount of $9 million for fees and expenses is further supported by the Seventh Circuit's holding in *Americana Art China Company, Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247-48 (7th Cir. 2014). The court explicitly stated that a district court must not place undue focus upon the calculus of the class recovery, but instead should choose the method that most equitably compensates class counsel for the results achieved and the risks undertaken in accepting and litigating the case—be that the percentage method *or* the lodestar method.

In *Americana Art,* the Seventh Circuit affirmed the district court's discretion to measure

23

attorneys' fees using the lodestar method instead of the percentage method even where the percentage method would have yielded a fee significantly less than lodestar, stating that the district court had already taken the amount of recovery into account when deciding between the lodestar method and the percentage method, and that "that is exactly what we have suggested a district court *should* do" when evaluating a request for attorneys' fees. 743 F.3d at 47 (emphasis in original). As *Americana Art* suggests, the method for determining attorneys' fees must not be formulaic, but rather should be at the district court's discretion based on the unique facts of each case. *Id.* (noting that while district courts *may* consider the amount received by the class, they must not rely "*solely* on the degree of success in determining fee awards") (emphasis in original) (citing *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007)). In this case, under any method applied, $9 million is a fair and reasonable amount to compensate Plaintiffs' Counsel for fees and expenses.

## C. The Total Amount of Requested Fees is Reasonable

### 1. The base lodestar totals understate the amount of work performed on behalf of the class.

The submitted lodestar is a conservative estimate of time spent litigating on behalf of the class. *See e.g.*, Counsels' Declarations. Plaintiffs' Counsel loaded documents into a common database such that all counsel could search document, thereby reducing travel time and meeting time. Depositions were scheduled with the same efficiencies in mind. The extra resources expended for managing consumer perceptions (non-class rep) were not billed. Accordingly, the total claimed lodestar in the instant petition does not reflect the full effort put into the case.

### 2. Counsel's rates are reasonable and within the range of rates previously approved by other courts.

A reasonable hourly rate is "one that is derived from the market rate for the services

24

rendered." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011) (internal quotation marks omitted). The focus is "the prevailing market rate for lawyers engaged in the type of litigation in which the fee is being sought." *Cooper v. Casey,* 97F.3d 914, 920 (7th Cir. 1996) (emphasis omitted); *see also Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 555 (7th Cir. 1999).

The rates of class counsel are set forth in the charts included in or attached to the declarations of counsel submitted as Exhibits 2-7. These rates are at or below rates approved in similar class actions in this circuit. *See, e.g., Abbott v. Lockheed Martin Corp.*, No. 3:06-cv-701-MJR-DGW, 2015 WL 4398475, at *3 (S.D. Ill. July 17, 2015) (finding reasonable rates as follows: $974/hour (25+ years experience); $826/hour (15-24 years exp.); $595/ hour (5-14 years exp.); $447/ hour (2-4 years exp.); $300/hour (Paralegals and Law Clerks); $186/ hour (Legal Assistants)); *Beesley v. Int'l Paper Co.*, No. 3:06-cv-703-DRH-CJP2014, 2014 WL 375432, at **3-4 (S.D. Ill. Jan. 31, 2014) (finding reasonable rates as follows: $892/hour (25+ years exp.); $757/hour (15-24 years exp.); $545/hour (5-14 years exp.); $394/hour (2-4 years exp.); $275/hour (Paralegals and Law Clerks); $170/hour (Legal Assistants)).

These same rates have also been approved in other cases of a similar nature litigated by class counsel, which is further evidence of their reasonableness. *Spegon v. Catholic Bishops of Chicago,* 175 F.3d 544, 557 (7th Cir. 1999) ("evidence of fee awards from prior similar case relevant to a district court's determination of a reasonable hourly rate and cannot be ignored out of hand."). Numerous courts around the country have approved counsel's same rates for similar work.

        3.    **Counsel's rates are commensurate with what counsel have actually received from fee-paying clients.**

While Class Counsel primarily practice in the realm of contingent fee litigation, Co-Lead

25

Counsel, Robert A. Clifford and Clifford Law Offices, has also received hourly compensation from clients based on the same rates as requested here. Where an attorney has an actual billing rate that he or she typically charges and obtains for similar litigation, that is presumptively his or her hourly rate. *Pickett,* 664 F.3d at 640 ("an attorney's actual billing rate for similar litigation is appropriate to use as the market rate"); *Denius v. Dunlap,* 330 F.3d 919, 930 (7th Cir. 2003) (same); *Blackwell v. Kalinowski,* No. 08 C 7257, 2012 WL 469962, at \*\*2-3 (N.D. Ill. Feb. 13, 2012) ("the attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate") (quoting *Denius*). Here, the requested rates are the same as rates charged by Robert A. Clifford and certain other class counsel to their hourly fee-paying clients in the normal course of business. This is *prima facie* evidence of the reasonableness of the hourly rates.

    4.    **The Requested Fee is Reasonable in light of Pella's likely defense costs.**

When defendants challenge a lodestar-based fee application, the reasonableness of class counsel's fee cannot be reviewed in isolation without considering defendants' own litigation costs. *See also United States ex rel. Liotine v. CDW Gov't, Inc.*, 2013 U.S. Dist. LEXIS 54882, at \*\*4-6 (S.D. Ill. Apr. 15, 2013) (in a case litigated for over eight years, it is appropriate for the district court judge "to examine the [defendant's] billing records as a comparison tool as he conducts his analysis of [plaintiff's] attorney's fees"); *see also Robinson v. City of Edmond*, 160 F.3d 1275, 1284 (10th Cir. 1998) (noting that the Supreme Court has recognized that part of an attorney's calculus of the amount of time reasonably necessary for a case is the vigor which the opponents bring to the dispute) (citing *City of Riverside v. Rivera*, 477 U.S. 561 (1986) (plurality opinion)); *Patrick v. Board of Trustees*, 603 F. Supp. 754, 759 (E.D. Tex. 1984) (with respect to fee award disputes, "what is sauce

for the goose is sauce for the gander").

Indeed, this District's Local Rule 54.3(d)(5) makes clear that defendants' litigation costs are a relevant factor when considering fee disputes. In its essence, the rule requires parties involved in a fee dispute to confer and attempt in good faith to agree on the amount of fees or related nontaxable expenses that should be awarded prior to filing a fee motion, and if no agreement is reached, defendants must provide the same information to plaintiffs that plaintiffs provided to defendants (which includes the time and work records pertaining to the litigation, evidence of the hourly rates for all billers paid by defendants during the litigation, evidence of the specific expenses incurred or billed in connection with the litigation, and any other evidence the defendant will use to oppose the requested hours, rates, or related nontaxable expenses). N.D. Ill. L.R. 54.3(d)(5). Plaintiffs' Counsel need not review Defendants' attorneys' fees and litigation expenses, but the quality of counsel and counsel's work in this litigation strongly suggest that the rates are within the range of Plaintiffs' Counsels' rate. This is a factor weighing in favor of approval of the requested fee. *See also Camden Condominium Ass'n v. Dunkle,* 946 F.2d 768, 772 n.3 (11th Cir. 1991) (in assessing the quality of representation by Class Counsel, Court also should consider the quality of their opposing counsel).

### 5. **The Requested Multiplier is Appropriate.**

A court "must award a multiplier when attorneys' fees are contingent upon the outcome of the case (i.e., there is the possibility that the attorney will not receive any fee)." Southwest, 2013 549727, at *12-13 (citing Cook v. Niedert, 142 F.3d 1004, 1013 (7th Cir. 1998); see also Skelton v. Gen. Motors Corp., 860 F.2d 250, 255 (7th Cir. 1988) (suggesting that "a standard risk multiplier be used in all contingent fee arrangements" and that "reasonable compensation may demand more than the hourly rate multiplied by the hours worked, for that is exactly what

the attorneys would have earned from clients who agreed to pay for services regardless of success."). The choice of a particular multiplier is a matter of discretion, with the overall standard being "whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case." Southwest, 2013 WL 549727, at **12-13 (quoting Connolly v. Nat'l Sch. Bus. Serv., Inc., 177 F. 3d 593, 597 (7th Cir. 1999). The multiplier is designed to reflect the fact that, no matter how many hours were invested, there was, at the outset, the possibility of no recovery. Harman, 945 F.2d at 976 (7th Cir. Ill. 1991) (rejecting the argument that the element of complexity is adequately compensated by the fact that increased complexity results in increased hours which produce a higher lodestar).

Plaintiffs respectfully submit that a multiplier of 1.9 is appropriate in this case. A multiplier of 1.9 is well within the range of multipliers approved in this jurisdiction. See Harman, 945 F.2d at 975 (noting "[a risk] multiplier is, within the court's discretion, appropriate when counsel assume a risk of non-payment in taking a suit" and "[m]ultipliers anywhere between one and four . . . have been approved"); In re Cenco, Inc. Sec. Litig., 519 F. Supp. at 327 (applying a lodestar multiplier of 4 to lead counsel's lodestar and 2 to other counsels' lodestar); In re Brand Name Prescription Drugs Antitrust Litig., No. 9 C 897, 2000 WL 204112, (N.D. Ill. Feb. 9, 2000) (awarding $91 million above lodestar and noting that "[an] award of more than two times the lodestar calculation is believed to be fair and just in these circumstances"); see generally Theodore Eisenberg & Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 J. Empirical Legal Stud. 248, 272 (Table 14) (2010) (noting that between 1993 and 2008 the mean multiplier in class actions in the Seventh Circuit was 1.85).

Given the increased difficulty of legal issues and stakes of this litigation, the greater degree of legal success achieved, the absence of any red flags that might signal collusion, and the extra

burden of restoring consumers' confidence in the litigation, a slightly higher multiplier is appropriate. *Southwest*, 2013 WL 5497275, at *12 (reducing multiplier from 2.0 to 1.5 due to "relative lack of complexity" and "modest" success achieved).

> **D.** **All Other Factors to be Considered Weigh In Favor of Approval of the Requested Fee**

> **1.** **The lawsuit involved complex, novel questions of fact and law.**

As is evident by the trial docket, this case did not have a straightforward path to victory for plaintiffs. This case involved complex issues of multi-state class certification that, as a practical matter, worked against consumers; liability standards; architecture and engineering; fenestration and wood science; advanced statistics; and, uncertainty regarding how to prove damages except on some individual basis. Plaintiffs' Counsel inherited the case with class certification, but then had to engage in extensive motion practice on the changes to state law that occurred since the time of class certification, as well as the development of a trial plan that would account for changes in law and the notion of a declaratory judgment arising from various states' laws. Plaintiffs' Counsel also fought and prevailed on repeated attempts to dismiss the complaint in its entirety and to strike plaintiffs' class allegations. Plaintiffs' Counsel initiated merits discovery, and built a factual and expert record making summary judgment impossible. As a result, Plaintiffs' Counsel largely prevailed in the pre-trial litigation phase and were prepared and ready to try the case against Defendants at the time settlement was reached shortly before trial.

Similarly, this case was complicated from a factual perspective, involving complicated questions regarding design defects, acceptable failure rates, acceptable calculation of failure rates and the digestion complex engineering and design information regarding the Proline Casement Windows. During the nearly four year span of this litigation that was devoted to the

merits of the case, Plaintiffs' Counsel reviewed hundreds of thousands of pages of documents, and conducted numerous depositions all over the country. Exhibit B. Indeed, the most critical progress towards settlement was achieved only after the *Daubert* cross-motions and summary judgment motions were fully briefed.

2. <strong><u>The degree of success obtained</u></strong>.

Plaintiffs achieved a significant degree of success on behalf of consumers, both legally and practically (in terms of benefits being offered to the class). This is not a case that was quickly settled for relatively meager or illusory compensation for the class, nor does the settlement cause consumers to make additional purchases from Pella. As noted above, Settlement Class Members are entitled to claim *cash* reimbursements for having wood-rotted windows, including out-of-pocket losses resulting from replacement of windows. For the most part relief is not capped, and there is no arbitration requirement in which defendant can submit evidence to refute the claim. Instead of facing the uncertainty of a potential award in their favor years from now, the Settlement allows Plaintiffs and Class Members to receive immediate and certain relief. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011) ("Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.") (citation omitted). As noted in *Southwest*, a settlement that provides nearly complete relief to class members is the model of an adequate settlement warranting commensurate compensation for class counsel. 799 F.3d at 704. This weighs in favor of approval of the requested fee.

3. <strong><u>Public Interest Considerations</u></strong>.

The legal victories achieved by Plaintiffs in this litigation were significant. Plaintiffs' Counsel advanced existing law and, in at least one instance cited by the Court, created new law

30

in the area of sustaining declaratory relief for consumer claims where state law is applied, though not uniformly. [Doc. xx]. These victories transcend this case and have and will benefit consumers in many other cases, demonstrating the strong public interest in Plaintiffs' litigation efforts.

### 4. Preclusion of other work.

All the work described herein that resulted in the final trial package required significant work from all involved attorneys over the four years expended developing this litigation on the merits. During discovery, the case demanded constant daily attention. It required large swaths of time by the attorneys, often causing those involved to forego other matters. It also required a significant use of cash to fund the litigation, all of which came from Plaintiffs' Counsel and not any private equity or funding sources.

Without these extraordinary efforts and sacrifices by Plaintiffs' Counsel, consumers would not have realized the significant benefits that this settlement provides. In sum, this was not a straightforward case factually or legally, and plaintiffs faced the real possibility of a lesser recovery. Absent Plaintiffs' Counsel's dedication to this matter from the time of their appointment as lead, class members would have received little if anything. This weighs in favor of the requested fee. *Cook*, 142 F.3d at 1015 ("the unenhanced lodestar does not reflect the factual and legal merits of the claim – the fact that at the outset of the litigation, no matter how dazzling the array of legal talent or how many hours will eventually be logged, there is nonetheless the possibility of no recovery.")

### E. Class Counsel's Costs and Expenses are Reasonable

Federal Rule of Civil Procedure 23(h) allows a court approving a class settlement to "award reasonable . . . nontaxable costs that are authorized by law or by the parties' agreement."

31

Fed. R. Civ. P. 23(h). The Seventh Circuit instructs that costs and expenses should be awarded based on the types of "expenses private clients in large class actions (auctions and otherwise) pay." *Synthroid*, 264 F.3d at 722; *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994); *see also Spicer v. Chi. Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1256 (N.D. Ill. 1993) (noting that courts regularly award reimbursement of those expenses that are reasonable and necessarily incurred in the course of litigation).

Reimbursable expenses include many litigation expenses beyond those narrowly defined "costs" recoverable from an opposing party under Rule 54(d), such as: expert fees; travel; long distance and conference telephone; postage; delivery services; and computerized legal research. *See, e.g. In re Cont'l*, 962 F.2d at 570 ("clear error" to deny reimbursement of LEXIS and Westlaw expenses because "the arms' length market reimburses" such expenses); *Beesley*, 2014 WL 375432, at *3 (granting reimbursement from common fund for litigation expenses including "expert witness costs; computerized research; court reports; travel expense; copy, phone and facsimile expenses and mediation."); *City of Greenville*, 904 F. Supp. 2d at 910 (granting reimbursement of expenses "of the type that are routinely reimbursed by paying clients," including "experts' fees, other consulting fees, deposition expenses, travel, and photocopying costs").

A chart of the costs and expenses sought by Plaintiffs' Counsel in this Action is contained in Exhibits A and C. Class Counsel has incurred these expenses over the course of four years, but do not seek to compensate for the time value of this money or the costs associated with advancing these expenses to the Class. In light of the length and complexity of this litigation, Counsel's request for reimbursement of costs and expenses should be approved as fair and reasonable. Plaintiffs' Counsel had a strong incentive to keep expenses at a reasonable level due to the high

32

risk of no recovery when the fee is contingent, as well as the fact that all expenses were advanced by Plaintiffs' Counsel and not a funding source. *See Beesley v. Int'l Paper Co.*, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014). Further, the fact that Class Counsel does not seek interest as compensation for the time value of money or costs associated with advancing these expenses to the Class makes this request all the more reasonable. *Id.*

F.  **The Requested Service Awards for Class Representative Should be Approved**

As part of the Settlement, defendants have agreed to pay, subject to court approval, a service award for each Named Plaintiff in recognition of the time and effort they have personally invested in this Action. Plaintiffs' Counsel seeks $25,000.00 for each of the Named Plaintiffs.

Each of the Named Plaintiffs in this action have engaged in the litigation above and beyond the typical class representative. First, the Named Plaintiffs responded to written discovery, supplying valid documentation of purchases, estimates, replacements, inspections, and written assurances, all of which was necessary to sustain the claims. The Named Plaintiffs were also rigorously deposed by defendants' counsel, with several having to take off from work and/or travel significant distance to appear for deposition. In addition, each Class Representative supplied all-day access to their homes on several occasions, so as to allow for Plaintiffs' Counsel to ascertain the condition of the windows; Plaintiffs' consultants to inspect and record the entire home, not just windows; and then allow for Defendant and its experts similar access to the home. The Named Plaintiffs also remained fully engaged in the litigation for the purpose of being able to review and consent to settlement terms. Without question, the Named Plaintiffs played key roles in carefully reviewing all details of the written settlement proposals.[3] Further, even though

_____

[3] *See* Declaration of John Yanchunis, attached to Plaintiffs' Preliminary Approval Memorandum at Doc. 672-8 at ¶ 21 ("Throughout the settlement process, my co-counsel and I carefully weighed with the class representatives: (1) the benefits to the Class under the terms of this Settlement,

each of these plaintiffs supports approval of the Settlement, payment of the Service Award is not contingent on such support. Notably, none of the current Named Plaintiffs were part of the initial settlement of this case that was ultimately rejected by the Seventh Circuit in *Saltzman II*. 753 F.3d at 722-23; *see, e.g.*, Declarations of George K. Lang and John Yanchunis, attached (respectively) to Plaintiffs' Preliminary Approval Memorandum at Docs. 672- 8 at ¶ 7 and 672-8 at ¶¶ 20-21.

Service awards are common in class action litigation such as this case, and they serve to encourage class members to serve as class representatives and to reward individual efforts that they take on behalf of the classes they seek to represent. Plaintiffs were prepared to litigate this action through trial to properly represent the Class and fight for significant class relief. Their actions, input, and participation have conferred a significant benefit on the Settlement Class.

Federal courts often exercise their discretion under Rule 23(d) and (e) to approve incentive awards to the named plaintiffs who prosecuted the action on the theory that there would be no class wide benefit absent the named plaintiffs' suit. Service awards compensating class representatives for work done on behalf of the Class attempt to account for financial or reputational risks associated with litigation, and promote the public policy of encouraging individual plaintiffs to undertake the responsibility of representative lawsuits. *See Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (recognizing that "because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit"); *see also In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) ("Incentive

_____

which provides significant relief to the Class; (2) the attendant risks and uncertainty of an appeal; (3) the risks and uncertainties of individual trials on causation and damages; (4) Defendants' vigorous defense of the litigation and continued denial of the claims contained in the Complaint; (5) the desirability of consummating the present Settlement to ensure that the Class receives a fair and reasonable Settlement; and (6) providing Class Members prompt relief.").

awards are justified when necessary to induce individuals to become named representatives."). Factors relevant to determining whether an incentive award is proper and the amount of such award "include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff has expended in pursuing the litigation." *Cook*, 142 F.3d at 1016.

The requested service awards are reasonable and are well within the range of awards granted in this district and awards affirmed by the Seventh Circuit. *See, e.g., Cook*, 142 F.3d at 1004, 1016 (affirming service awards of $25,000 per class representative); *In re Southwest Airlines Voucher Litig.*, No. 11-8176, 2013 WL 4510197, at *11 (N.D. Ill. Aug. 26, 2013) (affirming awards of $15,000 for each to two named plaintiffs); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11-cc-4492, 2015 WL 1399367, at *17-19 (N.D. Ill. March 23, 2015) (awarding $25,000 service award to plaintiff in TCPA case); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 C 2898, 2012 WL 651727, at *17 (N.D. Ill. Feb. 28, 2012) (awarding seven plaintiffs $25,000 each); *Spicer v. Chi. Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) ($30,000 awarded from settlement fund of $10 million); *see also Abbott v. Lockheed Martin Corp.*, No. 06-CV-701-MJR-DGW, 2015 WL 4398475, at *1 (S.D. Ill. July 17, 2015) (awarding $25,000 each to six of the seven class representatives); *Beesley v. Int'l Paper Co.*, 2014 WL 375432, at *4 (S.D. Ill. Jan. 31, 2014) ("Awards of 15,000 to 425,000 for a Named Plaintiff and total Named Plaintiff awards of less than one percent of the fund well within the ranges that are typically awarded in comparable cases.") (citing *Cook*); *Heekin v. Anthem, Inc.*, No. 1:05-01908, 2012 WL 5878032, at *1 (S.D. Ind. Nov. 20, 2012) (approving $25,000 incentive award to lead class plaintiff over objection); ); *Will v. Gen. Dynamics Corp.*, Civil No. 06-698-GPM, 2010 WL 4818174, at *4 (S.D. Ill. Nov. 22, 2010) (awarding $25,000 to each of

three named plaintiffs); *see also, In re Dun & Bradstreet Credit Servs. Customer Litig.,* 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (granting service awards of $55,000 and 435,000 per class representative); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 37 F.R.D. 240, 250-51 (S.D. Ohio 1991) (approving $50,000 service awards).

## IV.   CONCLUSION

Class Counsel's request for an award of attorneys' fees, costs and expenses in the amount of $9,000,000, and an incentive award of $25,000 for each Named Plaintiff, is fair, appropriate and reasonable. As such, Class Counsel and Plaintiffs respectfully request that the Court grant this request for relief and any other further relief that the Court deems just and proper.

DATED: May 21, 2018                    Respectfully submitted,

/s/ Shannon M. McNulty
Robert A. Clifford
rac@cliffordlaw.com
Shannon M. McNulty
smm@cliffordlaw.com
CLIFFORD LAW OFFICES
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090

George K. Lang
langlawoffice@att.net
LANG LAW OFFICE
60 B W. Terra Cotta, No. 301
Crystal Lake, Illinois 60012
(773) 575-5848

John A. Yanchunis
JYanchunis@ForThePeople.com
Marcio W. Valladares
MValladares@ForThepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602

(813) 223-5505

Joel R. Rhine
jrr@rhinelawfirm.com
RHINE LAW FIRM, P.C.
1612 Military Cutoff Rd
Suite 300
Wilmington N.C. 28403
(910) 772-9960

Edward R. Moor
erm@moorlaw.net
MOOR LAW OFFICE, P.C.
One N. LaSalle Street, Suite 600
Chicago, Illinois 60602
(312) 726-6207

## CERTIFICATE OF SERVICE

I certify that on May 21, 2018, a copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FEES, COSTS, AND SERVICE AWARDS was filed and served on all counsel of record via the Court's CM/ECF electronic filing system.

/s/ Shannon M. McNulty
Robert A. Clifford
rac@cliffordlaw.com
Shannon M. McNulty
smm@cliffordlaw.com
CLIFFORD LAW OFFICES
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090