# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | |
|---|---|
| KENT EUBANK, JERRY DAVIS, RICKY FALASCHETTI, RITA CICINELLI, ROBERT JOSEPHBERG, JEFFREY ACTON, KENNETH HECHTMAN, JAMES NEIMAN, AMY CHASIN and EDWARD RUHNKE, individually and on behalf of all others similarly situated; <br><br> Plaintiffs, <br><br> v. <br><br> PELLA CORPORATION, an Iowa corporation, and PELLA WINDOWS AND DOORS, INC., a Delaware corporation, <br><br> Defendants. | No.: 06 C 4481 <br><br> Honorable Sharon Johnson Coleman <br><br> Class Action |

## DECLARATION OF SHANNON M. MCNULTY

I, Shannon M. McNulty, pursuant to 28 U.S.C. § 1746, hereby declare on oath as follows:

1. I am a partner at Clifford Law Offices, P.C. I am over the age of eighteen, licensed to practice law in the State of Illinois, and I am fully competent to make this declaration. I make this declaration based upon personal knowledge unless otherwise indicated. If called upon to testify as to the matters stated herein, I could and would competently do so.

2. At Clifford Law Offices, I have practiced law fifteen years. I am presently a partner, and I have responsibility for leading the firm's consumer and class action practice. In addition, I practice in the area of complex civil litigation, including cases involving product liability.

3. In this case, Clifford Law Offices represents the class, including several class representatives. Further, and more specifically, upon remand of this case from the Seventh Circuit, Robert A. Clifford and George K. Lang were appointed co-lead counsel. In addition to Messrs.

Clifford and Lang, our co-counsel who assisted in the development of this case for trial included John A. Yanchunis and Marcio Valladares (Morgan & Morgan Complex Litigation Group); Joel R. Rhine (Rhine Law Firm) and Edward R. Moor (Moor Law Offices). Though some of the trial team knew one another from other cases, several of the attorneys did not know one another. That neutrality amongst the team members was a benefit; no one had a relationship that perpetuated any personal opinions or distracted from the task at hand. From the onset, the team dynamic centered on the preparation of the case for trial and that preparation, indeed, was the only focus.

4. At the time of the trial team's involvement, the case had not undergone any substantial discovery. There had been some minimal discovery, however, the focus had largely been on class certification and settlement. The then-operative complaint did not have adequate class representatives. Either the homeowners did not have Proline casement windows, or the representatives were not from the six states certified, or the representative had been admonished by the Seventh Circuit. Consequently, our first task at hand was to make contact with consumers who lived in the six states. We made certain to fully vet prospective class representatives and to counsel them about the role and obligations of a class representative, requiring a commitment, in writing, with consent to fulfill the role of class representatives.

5. The trial team immediately began its identification of experts in the areas of wood science, building science, engineering and reliability statistics. At that time, the defect and, more specifically, the mechanism of failure, had not been credibly identified and isolated. The case required development of a rigorous, and statistically sound, testing protocol to credibly isolate the failure mode that was causing a unique, discreet pattern of wood rot. None of the experts utilized for the earlier class certification were adequate for that purpose. The experts had not developed a statistically sound methodology to ascertain the actual cause of the wood rot or the reasons why

the wood preservatives, as installed were inadequate. Further, the expert's testimony and opinions about Pella's knowledge of the defects was similarly inadequate and unsupported. Upon information and belief, one expert had a familial relationship with one of the former plaintiffs' attorneys.

6. After extensive searching, the team selected Eric Schroter at SGH for engineering; Jerry Winandy, a pioneer in his field, for wood science; and Allise Wachs, not merely a statistician, but one of very few reliability experts in the country, for the purpose of analyzing Pella's own data concerning failure and wood rot. In addition, Plaintiffs' Counsel retained non-testifying consultants, as well, including consultants on humidity and condensation, economic analysis and forecasting, and discrete legal issues.

7. With Eric Schroter, the trial team developed a statistically meaningful testing protocol to assess Proline casement windows. The purpose of the protocol was two-fold. First, we needed to discover the entry point for the moisture that was causing a pattern of wood rot. It was not acceptable to merely characterize the defect as water entering the cladding. Second, we needed to undertake testing and defend our evaluation of the trapping of water behind the cladding. Third, we needed to evaluate Pella's testing, which they claimed was simply research driven. Fourth, we delved into the testing performed by third-parties that Pella relied upon. Doing so allowed us to generate evidence of Pella knowing there had been a defect at the time the windows were manufactured and sold.

8. At trial, it would not have been sufficient for plaintiffs to merely show a jury that the windows rot. We needed to understand the mechanism of failure and correlate that failure mode with the pattern of rot we were recording in the field. Additionally, we needed to eliminate other sources of moisture that Pella had developed, which was intended to refute Plaintiffs' allegations.

3

We had to reliably demonstrate why the windows, as designed, allowed for moisture to accumulate despite design considerations intended to eliminate accumulated moisture. We accomplished these goals, and more.

9. It was our trial team that worked the case so as to satisfy our burden of proof, with credible, admissible evidence, and to eliminate speculation. The work in this case concerning the identification and isolation of the actual failure mode, consistent across vintage years and design changes incorporated throughout the years, as well as the elimination of other sources of moisture possibly causing the rot and decay we were observing on windows in the field, was uniquely accomplished by our trial team.

10. With Jerry Winandy, we studied wood rot and, in particular, incipient decay. This aspect of evidence was examined at a microscopic level. We also studied wood preservatives and methods of application. We investigated industry standards and Pella's role in various professional organizations that conceivably influenced the industry's selection of minimum wood preservative application standards, which, in turn, contributed to the Proline casement windows' susceptibility to wood rot. Our team pressed for answers to the questions concerning *how* moisture accumulated in the sash, and *how* exposure to moisture behind the aluminum cladding initiated decay processes in the wood that ultimately constituted the wood rot discovered by so many homeowners and when Pella clearly understood the problematic truths.

11. While working with Eric Schroter and Jerry Winandy, George Lang immediately began traveling all over the country to consumers' homes for the purpose of recording observations in the field. Our experts then tested windows in actual homes to ascertain certain data points that further developed, and proved, our theory of the case, including the mechanism of failure. Our team worked with Mr. Schroter on the various window design elements upon which

4

Pella relied to prevent water trapage. For example, according to Pella, air pressure equilibrium was obtained by virtue of a rain screen design, thus inhibiting water intrusion and causing drainage to the exterior. Through depositions, research, testing and document work, we and our experts are prepared to demonstrate that Pella failed to test the elements of a rain screen principle, that members of their engineering departments were relying on a conflicting, contradictory and inapposite barrier system design and using their own documents, showed why the rain screen design was inadequate. As a result, the water that Pella admitted its design allowed to enter (through, for example, the intentional gap in every leaf weather-strip corner, the intentional gap in each cladding corner, through the glazing seal) was trapped within the window assembly, causing wood rot.

12. Joel Rhine worked with Jerry Winandy to develop evidence of the decay process that was uniquely observed in the field. Dr. Winandy demonstrated how incipient decay weakened the wood at a molecular level, often undetected until the window hardware fell out. Jerry Winandy informed the trial team as to the acceptable wood window manufacturing, including standards regarding wood preservatives used in window manufacturing. Dr. Winandy buttressed his own personal knowledge with extensive research to prove the known deficiencies in Pella's wood treatment processes. The team worked with Dr. Winandy to transform his technical and scientific details into terms a grade school science class could understand. Again, that was important for a jury to make sense of the science.

13. With Allise Wachs, the trial team sought a reliability analysis using the data collected by Pella during the years at issue. Dr. Wachs made failure rate comparisons amongst casements in all three product lines, so as to demonstrate the discernible differences in product performance across the three product lines. The data showed significantly higher failure rates for

the Proline casements. Dr. Wachs did not simply calculate failure rates, she was also able to opine as to which data points would have, or at least should have, alerted Pella to an unacceptable rate of failures in the Proline casement Windows. Shannon McNulty worked closely with Dr. Wachs, drafting discovery requests and culling data from Pella's discovery production for the purpose of conducting analyses. The trial team wanted to demonstrate to a jury, using Pella's own data, that Pella made assurances to consumers despite knowing, or having data that should have caused them to know, that the windows were not performing as promised or expected.

14. Though Pella had made some production of materials in the class certification phase of the case, more detailed discovery was needed for proving the merits of the case at trial. Shannon McNulty and Edward Moor and others drafted written discovery. Shannon McNulty, Edward Moor and John Yanchunis engaged in conferrals with Pella concerning discovery responses, and ensured that the team received the information it had sought for development of evidence. With Pella producing in several parts materials not previously sought or produced in the case, the trial team used Relativity to store, organize and search the million pages produced by Pella.

15. George Lang, Joel Rhine, Ed Moor and Shannon McNulty took depositions of Pella's witnesses, searching the database for supporting documents and proof that would tell the story of the windows. More than 800 exhibits were created for use in depositions. Joel Rhine, Shannon McNulty, Ed Moor and George Lang took the depositions of Pella's eight expert witnesses, and defended the depositions of Plaintiffs' experts.

16. John Yanchunis, Marcio Valladares, George Lang and Shannon McNulty completed written discovery for the class representatives, and presented the class representatives for their depositions. The class representatives made their entire homes accessible no less than three times so that plaintiffs' consultants, plaintiffs' experts and defendants' experts could have

6

access to the home and windows. The class representatives located records that demonstrated the problems experienced and efforts to contact Pella. They also located records that showed the representations made about the windows at the time of purchase. The class representatives appeared for depositions that lasted several hours. They were meticulously questioned by Pella for hours (none for less than half a day), for the purpose of Pella continuing its efforts to decertify the class and dismiss claims under the various consumer fraud laws. The class representatives took time off of work and, in the case of two class representatives, took time away from their caretaking duties owed to seriously ill family members, to serve the class in the bona fide prosecution of this case.

17. Dozens of consumers shipped their windows to Illinois, in an effort to support the trial team's forensic analysis and supply evidence of the defect alleged. More than a hundred windows are presently in storage. The trial team was not content with merely stating the obvious: that water was rotting the wood behind the cladding. Instead, the team was intent on isolating the mechanism of failure, and did so for each vintage year of window, continuing the analysis to even explain why modifications to the design in certain years did not remedy the problem.

18. Ed Moor, Marcio Valladares and Shannon McNulty were the primary drafters of the many response briefs, motions and complaints in the case. George Lang, John Yanchunis and Joel Rhine supplied technical input for the briefs and motions. Nearly all of the briefs were oversized. The team coordinated so as to eliminate writing redundancies, while at the same time cohesively exhausting factual and legal support for plaintiffs' positions in the litigation. The team typically had a weekly call to discuss tactical efforts, however, there were also several in-person meetings during critical points of the litigation.

19. Motion practice in this case included repeated efforts to decertify the class, namely

because of changes to the consumer fraud laws that Pella argued made impossible to try the case for the six certified states. Pella also attacked the declaratory count, arguing that there was no substantive law upon which to place the declaratory judgment act. Pella moved for relief with respect to a trial plan, citing the arguments raised in its motions to dismiss and decertify.

20. Upon discovery ending and disclosure of expert opinions, Pella moved for summary judgment and there was intensive cross-*Daubert* motions. In defending the *Daubert* motions, the strengths of Plaintiffs' experts were reinforced. In response to Pella's criticism of the methodologies used by Eric Schroter and Allise Wachs, the trial team retained consulting experts in the same fields to independently evaluate the experts' work. Importantly, Plaintiffs' counsel purposefully did not confer with the independent experts, Kami Farahmandpour (review of Eric Schroter's work) or Fred Schenkelberg (review of Allise Wachs' work), beyond stating the purpose of our retention and supplying access to the respective expert's complete file. In both instances, the consulting experts vindicated the methodologies used by Plaintiffs' experts, and their reports and affidavits were supplied to the Court. (Docs. 631-1, 631-2, 631-10).

21. In Pella's motion for summary judgment, Pella attempted to argue the changes to the consumer fraud laws of the six states and the legal implications, Pella argued, caused by those changes.

22. Completing the briefing for both the summary judgment and *Daubert* motions, at effectively the same time, required a tremendous coordination of, and effort by, the trial team. With briefing of summary judgment and *Daubert* motions completed, and confirmation of the trial date, the parties accepted a referral to Magistrate Judge M. David Weisman for the purpose of a settlement discussion. Over the course of several weeks, Magistrate Judge Weisman engaged the parties in a dialogue with focused rigor. Plaintiffs' engaged their consulting expert to provide

statistical and economic analysis to each of Pella's proposals. A *Reynolds* analysis was a core guide for all discussions, and all discussions concerning any terms or conditions were managed by Magistrate Judge Weisman. At one point, after several rounds of supervised discussions, Magistrate Judge Weisman made a final recommendation, which both parties accepted. The settlement established nationwide relief in the form of a common fund without any need for further arbitration or quasi-judicial proceedings.

23. The Settlement is subject to the approval of and determination by the Court as to the fairness, reasonableness and adequacy of the Settlement, which, if approved, will result of the dismissal of the Action with prejudice. It is my opinion that the Settlement achieves a result which is fair, reasonable and adequate.

24. As set out in Plaintiffs' Memorandum In Support Of Motion For Attorneys' Fees, Costs, Expenses And Service Awards, our firms' efforts in this matter resulted in substantial and exhaustive discovery; class representatives who owned Proline casement windows and who acted without undue influence; preparation of the case for an actual trial; and, a settlement dialogue supervised by the Court and resulting in a settlement that brings genuine relief to consumers.

25. The Parties and the Settlement Administrator identified approximately 743,0000 consumers that conceivably have affected windows; notice was designed to be robust and thorough, with a target saturate rate of 80%, reaching approximately 80% of the class members on average of two times each. *See* Peak Decl. attached to Plaintiffs' Preliminary Approval Memo, (Doc. 672-3, ¶¶ 9, 16).

26. As detailed in the chart below, in connection with the work described herein and in the fee petition, the team has logged 12,502.19 hours in uncompensated time, resulting in a total balance of $8,051,377.50 in attorneys' fees, plus $1,208,212.33 in costs. In addition, the chart

9

reflects the level of experience, billable rates, and the hours worked on this matter.

| ATTORNEY (POSITION) | YEARS OF EXPERIENCE | HOURS | HOURLY RATE | TOTAL |
|---|---|---|---|---|
| Robert A. Clifford (Partner and Co-lead) | 42 | 375.2 | $950.00 | $356,440.00 |
| George K. Lang (Partner and Co-lead) | 25 | 4,521 | $650.00 | $2,938,650.00 |
| John A. Yanchunis (Partner) | 38 | 948.4 | $950.00 | $900,980.00 |
| Joel R. Rhine (Partner) | 30 | 1,392 | $717.00 | $998,064.00 |
| Edward C. Moor (Partner) | 28 | 550 | $717.00 | $394,350.00 |
| Marcio Valladares (Partner) | 25 | 1,728.80 | $650.00 | $1,123,720.00 |
| Shannon McNulty (Partner) | 14 | 1,538.07 | $650.00 | $999,745.50 |
| Patrick Barthle (associate) | 6 | 104 | $450.00 | $46,800.00 |
| Dara Damery (associate) | 8 | 101.75 | $450.00 | $45,787.50 |
| Jeannette McClelland-Reasor (paralegal) | 22 | 222.5 | $150.00 | $33,375.00 |
| Stephanie Chase (paralegal) | 14 | 195.5 | $150.00 | $29,325.00 |
| Sarah Marquez (paralegal) | 11 | 182 | $150.00 | $27,300.00 |
| Chris Goll (paralegal) | 6 | 29.42 | $150.00 | $4,413.00 |
| Lauren Lent (paralegal) | 25 | 3.75 | $150.00 | $562.50 |
| Lisa Lewis (paralegal) | 2 | 3.00 | $150.00 | $450.00 |
| Erin Young (paralegal) | 2 | 5.5 | $150.00 | $825.00 |
| Barry Walsh (law clerk) | 4 | 596 | $250.00 | $149,000.00 |
| David Reign, Investigator | | 1.4 | $300.00 | $420.00 |
| Lee Walters, Investigator | | 3.9 | $300.00 | $1,170.00 |
| | | | TOTAL | $8,051,377.50 |

27. The attorney rate used to calculate the base lodestar are comparable to those charged by attorneys with equivalent experience, skill, and reputation for similar services in the Chicago legal market, as well as other comparable markets throughout the country.

28. It was the policy of co-lead counsel that attorneys were assigned necessary work and are responsible for keeping track of their billable time by at least the tenth of the hour.

10

Attorneys used software and/or paper formsets to record time and the records were maintained in the ordinary course of each firm's business. The team did not bill for time deemed to be unnecessary or of no benefit to the class.

29. In my opinion, the expenditure of my time on this matter, and the time of my colleagues on the trial team, is reasonable.

30. The hourly rates used to calculate the lodestar figure are the same as those charged to our firm's hourly paying clients.

31. My rates have been approved in the Northern District of Illinois as reasonable.

I declare under penalty of perjury that the foregoing is true and correct.

Date: May 21, 2018

/s/ Shannon M. McNulty
Shannon M. McNulty
Clifford Law Offices, P.C.
120 N. LaSalle Street, 31st Floor
Chicago, Illinois 60602
312.899.9090
SMM@cliffordlaw.com