IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | |
|---|---|
| KENT EUBANK, JERRY DAVIS, RICKY FALASCHETTI, RITA CICINELLI, ROBERT JOSEPHBERG, JEFFREY ACTON, KENNETH HECHTMAN, JAMES NEIMAN, AMY CHASIN and EDWARD RUHNKE, individually and on behalf of all others similarly situated;<br><br>Plaintiffs,<br><br>v.<br><br>PELLA CORPORATION, an Iowa corporation, and PELLA WINDOWS AND DOORS, INC., a Delaware corporation,<br><br>Defendants. | No.: 06 C 4481<br><br>Honorable Sharon Johnson Coleman<br><br>Class Action |

## PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR FEES, COSTS AND SERVICE AWARDS (DOCS. 687 & 688)

Plaintiffs, Kent Eubank, Jerry Davis, Ricky Falaschetti, Rita Cicinelli, Robert Josephberg, Jeffrey Acton, Kenneth Hetchman, James Neiman, Amy Chasin and Edward Ruhnke, on behalf of themselves and all others similarly situated ("**Plaintiffs**"), through their counsel, reply in support of Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards ("Plaintiffs' Fee Motion") (Docs. 687 & 688). Plaintiffs respond to points pressed by Complex Litigation Group LLC ("Complex Litigation Group" or "CLG")[1] in CLG's Response to Class

---

[1] Complex Litigation Group, formerly known as "Freed & Weiss LLC", is now known as "Quantum Legal LLC". (Doc. 686 at 1 & n. 1). Plaintiffs' reference herein to Complex Litigation Group also refers to Complex Litigation Group's former and later iterations.

1

Counsels' Motion for Award of Attorney Fees, Costs and Expenses (Doc. 697).[2]

On May 21, 2018, Plaintiffs filed Plaintiffs' Fee Motion, requesting (1) an award of attorneys' fees and costs in the amount of $9,000,000 and (2) a service award of $25,000 for each Named Plaintiff. (Docs. 687 & 688). On the same date, CLG moved for an award of fees and costs in the amount of $3,420,589.50. (Docs. 685 & 686). CLG requests this relief for work performed by CLG in this action before 2014, when then-class counsel Paul Weiss and Weiss's law firm, CLG, were disqualified by the Seventh Circuit as a result of Weiss's and CLG's sundry conflicts of interest and alleged misconduct. *See* Doc. 412; *Saltzman v. Pella Corp.*, 753 F.3d 718, 729 (7th Cir. 2014) (*Saltzman II*). On June 20, 2018, Plaintiffs filed Plaintiffs' Omnibus Response in Opposition to Fee Petitions of Complex Litigation Group and Theodore Frank ("Plaintiffs' Omnibus Fee Response"). (Doc. 698). Plaintiffs' Omnibus Response articulates in detail the legal and factual bases for Plaintiffs' unequivocal position that CLG's request for fees and costs lacks merit and should be denied. (Doc. 698 at pp. 4-19).[3] CLG's opposition to Plaintiffs' Motion replicates and recycles same arguments asserted by CLG in support of CLG's motion for fees and costs, arguments which, save a few items discussed below, Plaintiffs have already addressed. Plaintiffs stand by their Fee Motion and their Omnibus Fee Response. For brevity and expediency, Plaintiffs respond only to the following items asserted by CLG.[4]

---

[2] In accord with the Court's recent minute entry and Order (Docs. 717 and 718), Plaintiffs will submit a reply concerning Michael Schulz's Objection (Doc. 701) on or before July 27, 2018.

[3] Per Plaintiffs' Omnibus Fee Response (Doc. 698 n.1), Plaintiffs reserve submitting a response to attorney John Pentz's fee petition in the event the Court grants Mr. Pentz's motion (Doc. 689) for leave to file his petition out of time. Plaintiffs oppose Mr. Pentz's motion (Doc. 689) for leave to file out of time because Mr. Pentz's terse and unsubstantiated motion fails to articulate good cause for the requested relief. Mr. Pentz, who appears on the docket as "Pro hac vice counsel attorney to be noticed", fails to explain why he was "unaware" of the fee petition deadline (to which Plaintiffs, Complex Litigation Group and Frank adhered) and "was alerted to the deadline only by the filing of the Motion for Attorney's Fees of Theodore Frank . . . ." (Doc. 689 at 1).

[4] Notably, CLG does not reference or otherwise criticize Plaintiffs' Motion for Fees to the extent of the

**Class Certification, Discovery and Trial Preparation**

CLG continues to rely (almost exclusively) on its obtaining (and preserving) class certification, arguing that certification in this case was fundamentally "critical" to, and the principle catalyst for, the Settlement before the Court. The record alone, however, refutes the notion and would lead a disinterested observer to conclude otherwise. And as painstakingly articulated by Plaintiffs in their papers—including Plaintiffs' Memorandum of Law in Support of Preliminary Approval and supporting declarations (Doc. 672), Plaintiffs' Motion for Fees and supporting declarations (Doc. 688), and Plaintiff's Omnibus Fee Response (Doc. 698 at pp. 5-8)—the class certification expressly precluded actual and concrete relief for the class, was not a factor in the Settlement, and restrained Plaintiffs' Counsel's effort in prosecuting the case and in reaching a settlement.

> That the case was certified had no effect on the preparation of the case for trial or the ability to reach a proposed settlement in the case. In fact, the certification as it existed was not as useful as one would generally expect. Class certification in this case comprised six states on the consumer fraud theory and a nationwide class for the prospect of declaratory relief. In either instance, certification did not change the fact that causation and damages were individualized thus elements expressly excluded from certification. For the six certified states, that meant, for instance, that even if a Michigan class representative prevailed at trial, every Michigan consumer still had to prove their own causation and damages. Likewise, if an Illinois class representative prevailed at trial, every Illinois consumer would still have to prove his or her own causation and damages. Unlike most cases with class certification, in this case, thousands of consumers would be caused to prove causation and damages, to a jury, in a courtroom, and with experts. Class certification typically provides a framework that allows for the success of one to serve as the success for many; not so here. In

---

requested Service Awards for the Named Plaintiffs.

> this case, the success of one class representative did not transfer or replicate to the other class members. Similarly, if successful, the nationwide class was entitled to a trial. More specifically, at the first multi-plaintiff trial, the Court may, based on the facts and law submitted at trial, enter some, all or none of the declarations. The declarations, if entered in favor of Plaintiffs, would simply allow plaintiffs in other states to file the declarations in their own cause of action. Again, the class certification expressly precluded actual or tangible relief for all. Instead, each consumer would be subjected to prosecuting their own judicial or quasi-judicial proceeding and proving substantial elements (causation and damages) of their claims in the hope of obtaining a favorable judgment with tangible relief.

(Doc. 698 at pp. 7-8).

Further, CLG's discovery efforts yielded no benefit or head-start to Plaintiffs' Counsel in the well-documented and exhaustive factual and expert discovery that Plaintiffs' Counsel were required to undertake to prepare the case for trial and, consequentially, to effect the Settlement. CLG concedes, as it must, that any discovery it conducted was bound by a discovery bifurcation order that permitted only class discovery. (Doc. 697 at p. 7) ("ComplexLit Group was thus precluded from preparing the case for trial (the Phase II issues) by a court order prior to class certification").

Notably, CLG undertook no opposition to bifurcated discovery and, instead, willingly and jointly proposed to the Court a bifurcated discovery plan. (Doc. 37, ¶ 1). CLG's decision to set aside merits discovery was at its own hand and "strategic decisions have consequences, which bind the elector." *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, No. 12 C 3233, 2016 WL 7034074, at *4 (N.D. Ill. Dec. 2, 2016) (citing *McKune v. Lile*, 536 U.S. 24, 41 (2002)); *Crowe ex rel. Crowe v. Zeigler Coal Co.*, 646 F.3d 435, 444 (7th Cir. 2011); *Abbott Laboratories v. Takeda Pharmaceutical Co. Ltd*, 476 F.3d 421 (7th Cir. 2007); *Silc v. Crossetti*, 2013 WL 3872196, 3 (N.D. Ill.

2013). That discovery, as Plaintiffs' Counsel quickly found out, was wholly insufficient for proving any theory of liability and required Plaintiffs' counsel to retain an entirely new team of experts, conduct discovery with a focus on establishing legally plausible theories of liability, complete expert discovery, and engage in extensive paper practice (including hotly contested and extensively briefed *Daubert* motions, both to and fro) that actually spoke to the merits of the case. *See, e.g.*, Class Counsel Shannon McNulty's Declaration in support of Plaintiffs' Motion for Preliminary Approval, Doc. 672-6; *see also* Docs. 688 at 9-11 and 698 at 8.

### Old Settlement vs. New Settlement

CLG argues that the settlement it negotiated, though deemed by the Seventh Circuit "inequitable—even scandalous" and "one-sided[]",[5] is, effectively, the same or perhaps even better than the Settlement before the Court. (Doc. 697 at 8). Again, the record, including the respective settlements, speaks for itself. *See, e.g.*, Plaintiffs' Memorandum in Support of Preliminary Approval, Doc. 672 at 10-31. CLG overlooks the clear deficiencies in the failed settlement that CLG negotiated, including the $750 cap on damages unless a consumer wanted to arbitrate against Pella with all of its defenses, including statutes of limitation, intact. CLG also courses through tortured and inaccurate speculation about settlement terms and settlement administration that, at the very least, are not supported by evidence or even ripe for consideration. Thus, for instance, CLG criticizes the "extremely low claims rate," based on Plaintiffs' reporting to the Court two months ago that, as of May 21 "approximately 1,600 claims" had been received by KCC, the Settlement Administrator. (Doc. 697 at 10). But, as the Court well knows, the final

---

[5] *Saltzman* II, 753 F.3d at 721, 729.

claims rate will be supplemented and reported to the Court through competent and complete evidence.[6] Further, CLG speculates about the significance of a few objections that have been filed in this case, a matter that is again premature and which, per the Court's Preliminary Approval Order, the Parties are entitled to respond to by separate briefing on or before August 20.

As a another example, even though the settlement it negotiated exacted steep caps on what each individual claimant could recover, CLG condemns the current Settlement's provision which, with respect to Eligible Damage to or from a Window that has not yet been repaired or replaced and involves a Window with a Date of Sale that is more than 15 years before the Direct Class Notice Date, class members are entitled to receive 25% of actual expenses necessary to repair or replace the four categories of costs. *See* Settlement (Doc. 672-1 at ¶¶ 5.04(2)(c) and 5.03(4)). But CLG wholly overlooks the fact that Fund A ($23,750,000) under the Settlement, with the exception of reimbursing Defendants for Class Notice Expenses, is non-reversionary. Per the waterfall provision of the Settlement (Doc. 672-1 at ¶ 5.04(4)), if there is indeed a low claims rate and the claims do not exhaust Fund A for any reason, any of the allotted excess funds will, after first utilized to reimburse Defendants for the Class Notice Expenses, then be used to increase, on a *pro rata* basis, the recovery of class members whose claims were limited to 25% of actual expenses necessary to address Eligible Damage.[7]

---

[6] On July 13, 2018, KCC notified counsel for the Parties that, as of that week, KCC had entered 2,727 claims and that KCC was in the process of entering 5,000 additional claims.

[7] Per paragraph of 5.04(4) of the Settlement, to the extent that funds remain in Fund A after the Settlement Administrator has made all payments to Eligible Claimants, the Settlement Administrator will distribute the unclaimed funds as follows: First, to reimburse Defendants for the Class Notice Expenses; second, to increase recovery on a *pro rata* basis of those Eligible Claimants whose claims were limited to 25% of actual expenditures necessary to address Eligible Damage; and, third, in a manner directed by the

Conclusion

Plaintiffs stand by the Settlement, Plaintiffs' well-documented efforts in preparing this case for trial, the Settlement and the concrete and significant monetary relief that it affords class members, and Plaintiffs' Counsel's Motion for Fees.

DATED: July 20, 2018                  Respectfully submitted,

/s/ Shannon M. McNulty
Robert A. Clifford
rac@cliffordlaw.com
Shannon M. McNulty
smm@cliffordlaw.com
CLIFFORD LAW OFFICES
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090

George K. Lang
langlawoffice@att.net
LANG LAW OFFICE
60 B W. Terra Cotta, No. 301
Crystal Lake, Illinois 60012
(773) 575-5848

John A. Yanchunis
JYanchunis@ForThePeople.com
Marcio W. Valladares
MValladares@ForThepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505

Joel R. Rhine
jrr@rhinelawfirm.com
RHINE LAW FIRM, P.C.
1612 Military Cutoff Rd
Suite 300

Court upon petition by the parties. *Id.*

Wilmington N.C. 28403
(910) 772-9960

Edward R. Moor
erm@moorlaw.net
MOOR LAW OFFICE, P.C.
One N. LaSalle Street, Suite 600
Chicago, Illinois 60602
(312) 726-6207

## CERTIFICATE OF SERVICE

I certify that on July 20, 2018, a copy of the foregoing was filed and served on all counsel of record via the Court's CM/ECF electronic filing system.

/s/ Shannon M. McNulty
Robert A. Clifford
rac@cliffordlaw.com
Shannon M. McNulty
smm@cliffordlaw.com
CLIFFORD LAW OFFICES
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090

8