**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KENT EUBANK, JERRY DAVIS, RICKY FALASCHETTI, RITA CICINELLI, ROBERT JOSEPHBERG, JEFFREY ACTON, KENNETH HECHTMAN, JAMES NEIMAN, AMY CHASIN and EDWARD RUHNKE, individually and on behalf of all others similarly situated; | |
| | No.: 06 C 4481 |
| Plaintiffs, | |
| | Honorable Sharon Johnson Coleman |
| v. | |
| | Class Action |
| PELLA CORPORATION, an Iowa corporation, and PELLA WINDOWS AND DOORS, INC., a Delaware corporation, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR FINAL APPROVAL OF CLASS SETTLEMENT, CERTIFYING SETTLEMENT
CLASS, APPROVING SERVICE AWARDS FOR THE CLASS REPRESENTATIVES,
AWARDING ATTORNEYS' FEES, COSTS AND EXPENSES TO CLASS COUNSEL
AND OTHER RELIEF AND  RESPONSE TO OBJECTORS**

Plaintiffs, through undersigned Class Counsel, submit this Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Settlement, Certifying Settlement Class, Approving Service Awards for the Class Representatives and Other Relief.

# I. INTRODUCTION[1]

## A. Nature of Class Action and Procedural History

In this class action, the Court appointed representatives of the Settlement Class, Named Plaintiffs Kent Eubank, Jerry Davis, Ricky Falaschetti, Rita Cicinelli, Robert Josephberg, Jeffrey Acton, Kenneth Hetchman, James Neiman, Amy Chasin and Edward Ruhnke, on behalf of themselves and the preliminarily certified Settlement Class ("Class Representatives" or "Plaintiffs"), sued Defendants, Pella Corporation and Pella Windows and Doors, Inc. ("Pella" or "Defendants"), to recover damages that Plaintiffs suffered because of allegedly defective windows that were designed, manufactured and placed in the stream of commerce by Defendants. *See* Plaintiffs' Seventh Amended Class Action Complaint (Doc. 540). As current and former owners of homes and other structures containing these windows, Plaintiffs allege that the windows suffer from water intrusion and rot, a defect that potentially also damages surrounding building components and property. (Doc. 540). In 2009, the Court certified two classes, (1) a Rule 23(b)(3) six-state consumer protection class comprised of consumers whose Pella ProLine casement windows rotted and were replaced and who sought money damages, and (2) a Rule 23(b)(2) nationwide class comprised of consumers whose windows had not been replaced and who sought declaratory relief, *Saltzman v. Pella Corp.,* 257 F.R.D. 471, 479 (N.D.

---

[1] Plaintiffs articulate in detail the nature of the claims and this dispute, the procedural history, the fact and expert discovery, the dispositive motions practice, the *Daubert* and motions *in limine* practice, the trial preparation, the negotiations leading to the Settlement, the Settlement and it salient terms, and the Notice Plan for the Settlement are explained in detail in Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Settlement, Conditional Certification of Settlement Class, Approval of Notice Plan, Appointment of Named Plaintiffs as Representatives of Settlement Class, Appointment of Class Counsel as Counsel for Settlement Class, and Related Relief (Doc. 675) and supporting declarations and exhibits ("Plaintiffs' Memorandum in Support of Preliminary Approval"), which Plaintiffs incorporate herein by reference.

Ill. 2009) (Doc. 163). In 2010, the Seventh Circuit affirmed, *Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010) (Doc. 181).

In 2012, the parties at that time reached a class settlement (Doc. 277), which was finally approved by the Court over objections (Doc. 353). In 2014, the Seventh Circuit reversed that settlement and the Court's final approval of same, for, among other things, prior class counsel's improprieties, as well as deficiencies in the substantive terms of the settlement and in the claims process, *Eubank v. Pella Corp.*, 753 F.3d 718, 729 (7th Cir. 2014) (Doc. 412). On remand, and from among a group of nine attorneys seeking appointment as class counsel, the Court appointed Robert A. Clifford and George K. Lang as co-lead class counsel (Doc. 469). Following their appointment, Messrs. Clifford and Lang assembled the undersigned team of attorneys ("Class Counsel" or "Plaintiffs' Counsel"). Because nothing more than limited discovery concerning class certification occurred in the first phase of the case, current Class Counsel effectively commenced litigation of this action anew and in earnest. Class counsel engaged Defendants in comprehensive and document-intensive fact discovery, vetted and retained subject matter experts and engaged in expert discovery, extensive motion practice and trial preparation.

Class Counsel and their team of experts—informed by hundreds of thousands of documents, numerous fact and 30(b)(6) and expert depositions and reports—delved deeply into the relevant subjects of window design, building science, engineering, physics, wood preservatives, window manufacturing processes and operations, industry standards, statistics, warranty and claims analyses, and marketing issues, along with a whole host of cutting-edge legal questions. Declaration of Shannon M. McNulty in Support of Plaintiffs' Motion for Preliminary Approval (Doc. 672-6 at ¶¶ 6-19, 23-24) ("McNulty Dec."). The discovery processes were significantly adversarial and contentious. Indeed not a single aspect of the discovery process escaped scrutiny. (McNulty Dec. ¶¶ 6-19, 23-24).

Plaintiffs amended the operative complaint a number of times, surviving persistent dispositive motions based on material issues including theories of liability, aspects and subtleties of varying and changing state law, class definitions, and nationwide or state law on which to base declaratory relief and trial plans (Docs. 482, 488, 492, 540). Plaintiffs successfully averted Defendants' repeated attempts to dismiss and to strike the class by filing the Seventh Amended Complaint (Doc. 540), to which Defendants answered and asserted affirmative defenses (Doc. 560). The Court ordered that Plaintiffs' Rule 23(b)(2) class could not be tried with the Plaintiffs' Rule 23(b)(3) subclass claims and would have to be deferred. (Doc. 566, Hearing Tr., June 15, 2016). Defendants then moved for summary judgment (Doc. 603), under sundry factual premises and legal theories; having compiled a complete evidentiary record in support of their factual and legal claims, Plaintiffs responded in opposition; Defendants replied. (Docs. 604, 612, 634, 635, 646). In anticipation of trial, the parties cross-filed and briefed *Daubert* motions regarding testimony of ten expert witnesses. (Docs. 617, 630, 637, 638, 640, 641, 642). Having undertaken substantial and exhaustive fact and expert discovery on complex subjects, Plaintiffs prepared for trial scheduled to occur in October and November 2017. (Doc. 578).

Given the nature of the two certified classes, and the Court's decision to defer consideration of the Rule 23(b)(2) class until after the Rule 23(b)(3) trials for the six subclasses, the trial would not have concluded this dispute for the members of the classes. Instead, a perfectly successful outcome of the Rule 23(b)(3) consumer protection class expressly would not resolve the issues of (1) proximate cause, (2) actual damages, and (3) certain of Pella's defenses including statutes of limitations, issues which were expressly excluded by the order on class certification. *See Saltzman*, 606 F.3d at 393. Complete relief for the (b)(3) class members would need to await numerous time consuming separate individual trials (or some other quasi-judicial proceeding) by each (b)(3) class member on the non-certified issues of proximate cause, actual

damages, and Pella's defenses, all of which would have been expensive (because of the obvious need for experts to prove causation in each "case") and time consuming, and would likely have resulted in uncertain and inconsistent results for class members. Declaration of Robert A. Clifford in support of Motion for Preliminary Approval (Doc. 672-7 at ¶¶ 7-9) ("Clifford Dec."). Further, even assuming a perfectly successful outcome of the (b)(3) trial, and the subsequent (b)(2) declaratory relief class (which would be tried in a separate proceeding after the trial on the six (b)(3) subclasses after plaintiffs identified the underlying law supporting their claims), whose members had not yet replaced their windows, would not result in replacement of their defective windows nor in payment of damages that would make them whole. (Clifford Dec. ¶ 7). Instead, a successful trial would arm these consumers with a series of declarations that each class member could then use in resource-intense separate individual trials throughout the country in an attempt to seek full relief. (Clifford Dec. ¶ 7). If every potential class member pursued this course of action, the result would have been the filing of hundreds of cases, and setting trials for each, a process that would likely take years to complete. (Clifford Dec. ¶¶ 7-9).

## B. Settlement Negotiation and Settlement

From intensive discovery and motion practice through trial preparation, the notion of settlement was an equally contested subject between the parties. (Doc. 582). In very late 2016, the Court referred this action to United States Magistrate Judge M. David Weisman for discovery supervision and settlement discussion. (Doc. 577). Consequently, starting in March 2017 and over the course of several months, the parties participated in a number of in-person and telephonic settlement conferences with Judge Weisman. (Clifford Dec. ¶ 8). During this same time, the parties were engaged in mutual *Daubert* attacks. In May 2017, the settlement discussions had been exhausted without any agreement between the parties. (Doc. 596). In July 2017, after the parties had filed expanded briefs concerning summary judgment and expert

challenges, the parties re-engaged Judge Weisman to supervise settlement discussions. Finally, after months of negotiations facilitated and supervised by Judge Weisman, Judge Weisman prepared and presented to the parties a mediator's recommendation that was ultimately accepted by the parties. The parties reached a nationwide, comprehensive settlement that affords concrete and comprehensive relief to consumers—nationwide—for damages incurred in replacing allegedly defective Pella windows. (Clifford Dec. ¶ 8).

### C.   Terms of Settlement

The final, executed, and preliminarily approved (Doc. 675) Settlement Agreement and Release ("Settlement Agreement" or "Settlement" or "SA") appears on the record at Doc. 672-1. The Settlement creates a total common fund of $25,750,000 that will undeniably and materially deliver relief to consumers throughout the country. (SA Section IV). This total common fund of $25,750,000 is comprised of (1) $23,750,000 ("Fund A") to pay Settlement Class Members during the claims period and (2) $2,000,000 ("Fund B") to pay Settlement Class Members who file claims during the extended claims period. (SA Section IV). Adding to the strength and value of the settlement are Defendants' agreement to pay separately for the class notice costs and expenses. (SA ¶ 4.02). With the exception of using any unclaimed funds from the $23,750,000 in Fund A to reimburse Defendants for the class notice costs and expenses, Fund A—which amounts to 92.2% of the Settlement's total common fund of $25,750,000—is expressly non-reversionary. (SA ¶ 5.04 4.) Only unexpended amounts of Fund B ($2 million reserved for future claims) may revert to Pella. Further, per terms negotiated separately by the parties and through the guidance and recommendation of Judge Weisman, Defendants agree to pay separately Plaintiffs' fees, costs, and expenses in an amount—not to exceed $9,000,000—to be sought separately and, of course, subject to Court approval. (SA Section VI). In short, over

$34.75 million has been designated to finally resolve this protracted litigation on a nationwide, comprehensive basis. (SA Sections IV, V, VI).

The parties have made every effort to construct an efficient claims process that submits an adequate showing of eligibility proportionate to the substantial relief available. Settlement Class Members who have already repaired or replaced Eligible Damage are addressed separately from those who have not yet done so. Both groups of Settlement Class Members may seek benefits by submitting a Claim Form to the Settlement Administrator. (SA ¶ 5.05). In addition, Settlement Class Members who suffer Eligible Damage that manifests after the Claims Period as explained further below, will still be eligible for warranty benefits as well as certain other benefits. (SA ¶¶ 5.06, 5.07).

The Claim Form (SA, Exhibit 1) was designed to assist Claimants applying for benefits to do so quickly, efficiently, and with reasonable ease. For example, the Claim Form contains clear instructions on completing the form, including diagrams and pictures that visibly show the location of stamps, etches and labels that easily identify qualifying Windows. Flexibility is important. Thus, alternatively, Claimants may submit documentation establishing that their windows qualify for benefits, such as a signed contractor statement. With respect to Eligible Damage, the process and Claim Form provides the Claimants with as much flexibility as possible to demonstrate the same. For example, the Claimant may provide contemporaneous documentation of wood deterioration damage to one or more windows or water damage to surrounding property along with a contractor's statement that such damage was caused, materially or substantially in part, by water penetrating between the aluminum cladding of the window and the window sash. Of course, other ways of establishing Eligible Damage are available, including submitting photographs or providing documentation from a Pella or window contractor.

## 1.  Fund A Benefits and Payments

Settlement Fund A is designed to satisfy Claims for Eligible Damage that are filed before the Claims Deadline (SA ¶ 5.04), set by the Court to be June 20, 2018 (Doc. 675).  Depending on the time between the dates of sale and repair of the subject Window, the cash award will be for all or a portion of the following four categories of costs (1) the cost of the product (per window or sash), (2) the cost of the installation labor (per window or sash), (3) the cost of finishing (per window or sash), and (4) the cost to repair damage to other property.[2]  There are two basic types of Settlement Fund A claims:

> a.  Settlement Class Members who have already experienced Eligible Damage and have already repaired or replaced such damage (SA ¶ 5.04); and
>
> b.  Settlement Class Members who have experienced Eligible Damage but have yet to repair or replace such damage (SA ¶ 5.04).
>
> c.  Subject to the provisions of paragraphs 3 and 4 of Section 5.04 of the Settlement Agreement, an Eligible Claimants' recoveries from Fund A will depend on the Date of Sale of their Windows.

Claimants who have repaired or replaced Eligible Damage will receive a cash sum based on (1) the cost of the product (per window or sash), (2) the cost of the installation labor (per window or sash), (3) the cost of finishing (per window or sash), and (4) the cost to repair damage to other property.  (SA ¶  5.04(1)).  For Eligible Damage to or from a Window that was repaired or replaced within 15 years after the Date of Sale, "the cash award will be the sum of these four categories of costs."  (SA ¶ 5.04(1)).  For Eligible Damage to or from a Window that was

---

[2] For Eligible Damage to or from a Window that was repaired or replaced within 15 years after the Date of Sale, "the cash award will be the sum of these four categories of costs."  (SA ¶ 5.04(1)).  For Eligible Damage to or from a Window that was repaired or replaced more than 15 years after the Date of Sale, "the cash award will be 25% of the sum of these four categories of costs."  (SA ¶ 5.04(1), also ¶¶ 5.03(4) and 5.04(2)(c)).

repaired or replaced more than 15 years after the Date of Sale, "the cash award will be 25% of the sum of the four categories of costs." (SA ¶ 5.04(1), also ¶ 5.03(4)).

In order to make the process run smoothly and fairly, the Parties have anticipated circumstances where it is not possible or difficult for the Settlement Administrator to identify the portions of Eligible Damage for which costs were incurred or need to be incurred. Thus, the Settlement Agreement provides that if the Settlement Administrator is unable to identify and/or verify how much of the submitted costs were incurred for replacement product, installation, finishing, and/or damage to other property, respectively, based on the invoices, receipts, and/or other repair documentation submitted, then based on Pella historical claim data the costs will be allocated and payments made as follows:

(i)     If the Eligible Damage was repaired within 10 years after the Date of Sale, then costs shall be deemed allocated as follows:

|  | If damage to other property | If no damage to other property |
|---|---|---|
| 1.  cost of product: | 39% | 55% |
| 2.  cost of installation: | 23% | 34% |
| 3.  cost of finishing: | 8% | 11% |
| 4.  cost to repair damage to other property: | 30% | 0% |

(SA ¶ 5.04(1)(b)(i)).

(ii)    If the Eligible Damage was repaired more than 10 years after the Date of Sale, then costs shall be deemed allocated as follows:

|  | If damage to other property | If no damage to other property |
|---|---|---|
| 1.  cost of product: | 27% | 39% |
| 2.  cost of installation: | 33% | 46% |
| 3.  cost of finishing: | 10% | 15% |
| 4.  cost to repair damage to other property: | 30% | 0% |

(SA ¶ 5.04(1)(b)(ii)).

Claimants who have not yet repaired Eligible Damage as of the Direct Notice Date (the first notice sent out to potential Class Members) will receive either product or cash for replacement product, depending on vintage, and cash benefits for (1) the cost of the installation labor, (2) the cost of finishing, and (3) the cost to repair damage to other property. (SA ¶ 5.04 2.).

For Eligible Damage to or from a Window that has not yet been repaired or replaced and involves a Window with a Date of Sale that is within 15 years before the Direct Class Notice Date, and depending on the Date of Sale of the Window, Eligible Claimants will be entitled to receive the actual costs of installation, finishing, and the repair of damage to other property, together with either replacement product from Pella or additional cash for the cost of replacement product. For Eligible Damage to or from a Window that has not yet been repaired or replaced and involves a Window with a Date of Sale that is more than 15 years before the Direct Class Notice Date, Eligible Claimants are entitled to receive 25% of actual expenses necessary to repair or replace the four categories of costs. (SA ¶ 5.04(2)(c), also ¶ 5.03(4)).

The Settlement Agreement again contemplates situations where it will be difficult or not possible for the Settlement Administrator to determine how the actual costs to repair Eligible Damage should be broken down among the categories covered under the Settlement Agreement. If a Claimant submits a Claim for actual expenses necessary to repair or replace Eligible Damage, but the Settlement Administrator is unable to identify and/or verify how much of those costs are for the cost of replacement product, installation, finishing, and/or damage to other property based on the quotes, invoices, receipts, and/or other repair documentation submitted, then based on Pella historical claims data the costs will be allocated according to the following default percentages, and amounts may be awarded in each category:

If the Eligible Damage involves a Window with a Date of Sale that is 10 years or less before the Direct Class Notice Date, then the costs shall be deemed allocated as follows:

|  | If damage to other property | If no damage to other property |
|---|---|---|
| cost of product: | 39% | 55% |
| cost of installation: | 23% | 34% |
| cost of finishing: | 8% | 11% |
| cost to repair damage to other property: | 30% | 0% |

(SA ¶ 5.04(2)(e) (i).

If the Eligible Damage involves a Window with a Date of Sale that is more than 10 years before the Direct Class Notice Date, then costs shall be deemed allocated as follows:

|  | If damage to other property | If no damage to other property |
|---|---|---|
| cost of product: | 27% | 39% |
| cost of installation: | 33% | 46% |
| cost of finishing: | 10% | 15% |
| cost to repair damage to other property: | 30% | 0% |

(SA ¶ 5.04 (2)( d)(ii).

## 2. Fund B Benefits and Payments

Settlement Fund B provides benefits for Settlement Class Members with pre-2007 Windows that have not manifested any Eligible Damage before the Claim Deadline but may manifest Eligible Damage within 15 years of the Date of Sale and during the Extended Claim Period (the time period from the end of the Claims Period). (SA ¶ 5.06). The benefits are primarily based on the terms of the Limited Warranty and a program called the ProLine Service Enhancement Program ("PSEP"). These claims will be administered directly by Pella. Thus, after the Claims Deadline, Claimants will contact the Pella Customer Service Department at

(888) 977-6387 in order to receive Fund B benefits under the Pella Limited Warranty and/or PSEP.  (SA ¶ 5.07).

In addition, each Pella branch may choose to provide similar discounts on finishing and installation services for customers in these situations.  (SA ¶ 2.38).

### 3. Claims-made Contingencies

The Settlement Administrator will pay Claimants on the Claims Payment Date on a *pro rata* basis up to the available amounts in Fund A in a manner to be determined by the Settlement Administrator. (SA ¶ 5.04(3)).

To the extent that funds remain in Fund A after the Settlement Administrator has made all payments to Eligible Claimants, the Settlement Administrator will distribute the unclaimed funds as follows:  First, to reimburse Defendants for the Class Notice Expenses; second, to increase recovery on a *pro rata* basis of those Eligible Claimants whose claims were limited to 25% of actual expenditures necessary to address Eligible Damage; and, third, in a manner directed by the Court upon petition by the parties*. (SA ¶ 5.04(4)).

### 4. Releases

Upon final approval of the Settlement, all Settlement Class Members who do not opt-out will release the Defendants and the related parties from all Released Claims, as that term is defined in the Settlement Agreement. (SA Section VIII).  This release broadly applies to all damages related to the Pella ProLine Casement Windows, except for personal injury claims.  *Id.*

### 5. Opt-outs and Objections to Settlement

Any member of the Settlement Class may request to be excluded from the Settlement Class by sending the Settlement Administrator an appropriate, timely request for exclusion or opt-out before a date to be set by the Court.  (SA ¶¶ 2.35, 7.01).  Any request for exclusion or opt-out must be exercised individually by a Settlement Class Member or by a Settlement Class

Member's attorney. (SA ¶ 7.01). Any Settlement Class Member who does not properly submit a timely, compliant written request for exclusion or opt-out from the Settlement Class will be bound by all proceedings, orders, and judgments in the Lawsuit. (SA ¶ 7.01).

### D. Preliminary Approval, Implementation of Notice Plan, and Objections

On February 16, 2018, upon motion and supporting papers and evidence submitted by the Parties (Docs. 671, 672, and 673) and after holding a hearing (Doc. 674), the Court preliminarily approved the Settlement (Doc. 675) ("Preliminary Approval Order"). The Court found that "[w]ith the able assistance and guidance of United States Magistrate Judge M. David Weisman, acting as the Court-appointed mediator, the Settlement Agreement has been negotiated by the parties at arms' length, is not collusive, and is preliminarily determined to be fair, reasonable, adequate, and in the best interests of the proposed Settlement Class." (Doc. 675 at 2.) The Court further "approve[d], as to form and content, the Notice Plan and Class Notice attached to the Settlement Agreement," and found that they were "reasonable, constitute the best notice practicable under the circumstances, constitute due and sufficient notice of the settlement and the matters set forth in said notice to all persons entitled to receive notice, and fully satisfy the requirements of due process and of Fed. R. Civ. P. 23." *Id.* at 6.

In March 2018, in accordance with the Court's Preliminary Approval Order, KCC started implementing the Notice Plan. This consisted of the following.

- On March 22, 2018, mailed 311,329 Postcard Notices to physical address available on the data list. *See* Exhibit A hereto, Declaration of Alex Thomas ¶ 6 ("Thomas Dec.").

- On March 2, 2018, KCC issued a press release regarding the settlement. *Id.* ¶ 7.

- In April and May 2018, KCC published Indirect Notice advertisements in *Good Housekeeping*, *People*, and *Reader's Digest* magazines. *Id.*

- From March 2 to April 5, 2018, and again from May 18 to May 30, 2018, KCC executed an internet media campaign, in which Indirect Notice advertisements were run through Google Display and Facebook. *Id.*

- On March 2, 2018, KCC established a website for the settlement at www.pellawindowsettlement.com, where visitors could view answers to frequently asked questions, download important case documents including the Claim Form, Settlement Agreement, Preliminary Approval Order, Notice documents, and select case pleadings, together with a copy of the long-form Notice in Spanish. *Id.* ¶ 4.

- On March 2, 2018, KCC established a toll-free telephone number for Settlement Class Members call regarding the settlement. *Id.* ¶ 5.

KCC has commenced processing the Claim Forms that have been submitted; that process remains underway. To date, KCC has processed 4,721 timely Claim Forms. *Id.* ¶ 10. Approaching the June 20, 2018 Claims Deadline, KCC received a large volume of claims; KCC continues to input and process paper claim forms into its digital system. *Id.* KCC has opened and scanned, and is still in the process of electronically inputting approximately 5,283 claims, for an approximate total of 10,004 claims. *Id.* The aggregate dollar value of the 4,721 claims already entered into KCC's system exceeds the amount of the Settlement Fund. *Id.* ¶ 11. KCC has not yet segregated the claims or claim amounts into Windows older than 15 years (entitled to a potential 25% recovery) and Windows younger than 15 years (entitled to a potential 100% recovery). KCC also has not yet reviewed the sufficiency of the claims submitted, to ensure that the claimed amounts actually relate to ProLine Casement Windows with Eligible Damage. *Id.*

53 Settlement Class Members have opted out of the Settlement Agreement. *Id.* ¶ 8. Eleven (11) objections to the fairness of the Settlement have been submitted (Docs. 676, 691,

695, 702, 703, 704, 705, 706, 711, 713; Papke Objection (Exhibit B, <u>attached hereto</u>). These objections fall broadly into the following categories:

- The Settlement Agreement provides only 25% recovery (not 100%) for ProLine Casement Windows older than 15 years with wood deterioration: Papke Objection; Docs. 691, 695, 702, 703, 704);

- It is unfair to impose a *pro rata* distribution of claim amounts from Fund A, to the extent Fund A is exhausted (Doc. 706);

- The Claims Process, including the Claim Form, is too complicated because it requires claimants to obtain window information to demonstrate product identity and produce either receipts or a contractor's estimate to support the claim amount (Docs. 676, 695, 711);

- The Settlement Class Notice was inadequate (Docs. 676, 695);

- The $9 Million fee provision is a red flag of an unfair settlement (Doc. 695);

- The Settlement Agreement should cover products other than ProLine Casement Windows, including double hung and single hung windows, and other product lines (Docs. 702, 705); and

- One Objector seeks a waiver of the June 20, 2018 deadline to submit claims, because he or she did not receive a Notice in the mail, as a result of a change of address that had not been registered by Plaintiffs' counsel (Doc. 713).

As discussed in greater detail below, the objections lack merit and offer no reason to depart from the Court's preliminary conclusion that the Settlement is fair, reasonable and adequate; the objections should be overruled.

## II. ARGUMENT

### A. The Guidelines for the Preliminary Approval of the Settlement

"'Federal courts naturally favor the settlement of class action litigation.'" *In re: Sears, Roebuck & Co. Front-loading Washer Prod. Liab. Litig.*, No. 06 C 7023, 2016 WL 772785, at *6 (N.D. Ill. Feb. 29, 2016) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); *see also Armstrong v. Bd of Sch. Directors of the City of Milwaukee*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."). Rule 23(e) requires judicial approval of class settlements. Specifically, consequent upon preliminary approval, members of the Settlement Class must be given notice of the proposed Settlement and the Court must conduct a fairness hearing, after which the Court must decide whether the proposed Settlement is fair, reasonable, and adequate. *See Kaufman v. Am. Express Travel-Related Servs. Co.*, 877 F.3d 276, 284-85 (7th Cir. 2017); *Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011); *Synfuel Technologies v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (2006); *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 279 (7th Cir. 2002); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).

The Seventh Circuit has provided trial courts with direction on determining whether a settlement is fair, reasonable, and adequate.

> In deciding whether to preliminarily approve a settlement, courts must consider: (1) the strength of plaintiffs' case compared to the terms of the proposed settlement; (2) the likely complexity, length and expense of continued litigation; (3) the amount of opposition to settlement among effected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and the amount of discovery completed.

*In re AT&T Mobility Wireless*, 270 F.R.D. at 346; *see also Wong v Accretive Health, Inc.*, 773 F.3d 859 (7th Cir. 2014) (setting forth relevant factors for determining fairness of class action settlement). The Court should recognize "that the first factor, the relative strength of the plaintiffs' case on the merits as compared to what the defendants offer by way of settlement, is the most important consideration." *Isby*, 75 F.3d at 1199; *Synfuel Techs., Inc. v. DHL Express*

*(USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (*citing Isby*, 75 F.3d at 1199). That said, a settlement ought not be confused or conflated with a perfect trial win. The Court should "consider the facts in the light most favorable to the settlement." *Isby*, 75 F.3d at 1198-99. Further, "[t]he essence of settlement is compromise . . . . Thus the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution after trial.*" EEOC v. Hiram Walker & Sons*, 768 F.2d 884, 889 (7th Cir. 1985). The Court should not reject a settlement "solely because [the settlement] does not provide a complete victory to the plaintiffs." *Isby*, 75 F.3d at 1200. As recently encapsulated by the Seventh Circuit:

> Though we have elucidated several factors to guide a district court's analysis of whether a proposed settlement is fair, reasonable, and adequate, we have repeatedly stated that "[t]he 'most important factor relevant to the fairness of a class action settlement' is ... 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *Synfuel Techs., Inc.*, 463 F.3d at 653 (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979)); accord *Isby*, 75 F.3d at 1199. In analyzing this factor, the district court should consider "the range of possible outcomes and ascrib[e] a probability to each point on the range." *Synfuel Techs., Inc.*, 463 F.3d at 653 (alteration in original) (quoting *Reynolds* [*v. Beneficial Nat'l Bank*, 288 F.3d 277, 285 (7th Cir. 2002)]. This requires acknowledgment of potential defenses and the risk of failure for the class. See *Williams v. Rohm and Haas Pension Plan*, 658 F.3d 629, 634 (7th Cir. 2011). However, we have instructed the district courts "to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights." *Isby*, 75 F.3d at 1196–97 (quoting *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985)). We have also taught that the *Synfuel/Reynolds* evaluation of potential outcomes need not always be quantified, particularly where there are other reliable indications that the settlement reasonably reflects the relative merits of the case. See *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014).

*Kaufman v. Am. Express Travel Related Servs. Co.*, 877 F.3d 276, 284–85 (7th Cir. 2017).

**B. The Settlement Agreement Satisfies the Criteria for Approval**

### 1. The strength of the Settlement compares favorably to Plaintiffs' case

As stated above, a salient factor for the Court's consideration at this preliminary approval juncture is the strength of the Plaintiff's case balanced against the benefits offered in the Settlement. *Isby*, 75 F.3d at 1196-97; *Synfuel Techs Inc.*, 463 F.3d at 653; *Reynolds*, 288 F.3d at 285; *Kaufman*, 877 F.3d 276, 284-85. This issue was consistently addressed in the parties' settlement discussions entirely supervised and facilitated by Judge Weisman. While Plaintiffs are proud of the long strides that they have accomplished in this action after remand, having effectively started anew after reversal of the prior settlement by the Seventh Circuit, and although Plaintiffs are confident about their trial posture, even a complete win at trial of the all claims at issue does not end the dispute, and, ultimately, success is far from certain. Each class member in each of the certified classes would still be required, individually, to later litigate proximate cause and damages. Undeniably, that cannot be accomplished without marshalling experts to set forth evidence and opinions and to rebut Pella's defenses. Consequently, despite the issues resolved by and the declarations emanating from trial here, the subsequent, separate trials would still have been expert-driven, costly, time-consuming, and uncertain. (Clifford Dec. ¶¶ 7, 9). In stark contrast, the Settlement affords concrete, measurable relief to class members on a nationwide basis, and does so without need for individual trials on proximate cause and damages or the inherent delay, cost, and uncertainty of such individual trials. (Clifford Dec. ¶¶ 9-10).

Under these unique but self-evident circumstances, and by applying the reduced "range of possible approval" standard, the settlement compares quite favorably to Plaintiffs' case, and this important factor weighs heavily in favor of final approval. *Kaufman*, 877 F.3d 276, 284-85.

**2. The complexity, length and expense of continued litigation favors settlement**

The second factor calls upon the Court to evaluate the action's complexity, expense and time required to conclude the matter. In this instance, this factor vigorously favors preliminary approval. Simply put, this consumer-protection/product-defect hybrid class action is almost certainly one of the more complex, expensive and lengthy litigations of its kind in the country. Though certified under six states' consumer fraud laws, the (b)(3) class must still demonstrate a defect in the window. Not only are the legal issues unique, difficult and technical, the expert-driven testimony is esoteric and encompasses some of the more complex scientific topics and statistical analyses that may be encountered in trial practice. For example, the Parties' experts have engaged in all-out battles over statistical analyses of claims, returns and allowances; disputes over adequate penetration and retention of various wood preservatives; proper design of drainage when utilizing the rain screen and barrier principles; and much more. (McNulty Dec. ¶¶ 6, 7, 12, 14-19, 23).

And with complexity comes expense. When the new litigation team was appointed, all facets of litigation and trial preparation effectively commenced anew. Unable to rely on previous experts and discovery, which was minimal and restricted to class certification, Class Counsel necessarily started from scratch. No former expert was utilized or consulted. Instead, Plaintiffs gathered an expert team necessary to address the issues in this type of case. With the guidance of counsel, the experts conducted significant research, investigation, testing, document review and more. Counsel took dozens of depositions across the country. In short, since appointment of Lead Class Counsel, Plaintiffs' Counsel has advanced over $1 million in costs alone. (McNulty Dec. ¶ 21). Class Counsel believe this amount will easily and quickly double, if not more, should the litigation continue. (McNulty Dec. ¶ 21).

Despite the fact that the litigation has moved swiftly since current counsel was appointed, significant time has passed since the initial filing of this action. Even after an initial (b)(3) trial, and assuming Plaintiffs prevail on all claims comprising the six certified states, years of further litigation will necessarily follow in individual trials concerning causation and damages. Moreover, depending on the outcome of the first trial, the court's application of law relative to entering the (b)(2) declarations sought is a nuanced matter for which relief is still incomplete. With the prospect of the substantial, hard-fought results reached by the parties in the Settlement, the interests of affected consumers are concrete, measurable and wide-ranging; the interests of these consumers are clearly best-served by the Settlement. (Clifford Dec. ¶¶ 7-10); (McNulty Dec. ¶ 24); Declaration of George Lang in Support of Preliminary Approval (Doc. 672-8 ¶¶ 6-11) ("Lang Dec."); Declaration of John Yanchunis in Support of Preliminary Approval (Doc. 672-9 ¶¶ 19-24) ("Yanchunis Dec.").

### 3. The opinion of competent counsel and the serious, informed, and non-collusive negotiations

"Federal Rule of Civil Procedure 23(e) requires court approval of any settlement that effects the dismissal of a class action. Before such a settlement may be approved, the district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 279 (7th Cir. 2002). Plaintiffs' trial team is led by Robert A. Clifford, a nationally recognized and respected trial attorney. (Clifford Dec. ¶ 6 and Exhibits A and B). Mr. Clifford's desire and willingness to try cases is well-established and persisted throughout the litigation. Had the parties not reached a prospective settlement that offered meaningful relief in a relatively short time frame, and for as many consumers as possible, Mr. Clifford and Class Counsel would not have recommended settlement. (Clifford Dec. ¶ 6).

Not only do Class Counsel steadfastly agree that the Settlement is beneficial and in the best interest of the Settlement Class, the manner in which it was achieved lends the Settlement additional, firm credence. Specifically, Judge Weisman served as mediator in the Lawsuit. Judge Weisman's efforts were extraordinary, diligent and fair, ensuring the parties' negotiations were at arms-length and in good faith. Indeed, Judge Weisman proposed the Settlement amounts—both for the common fund and for the award of attorneys' fees and costs—and the Settlement was borne from his recommendations and from his diligent involvement as the Court-appointed mediator. (Clifford Dec at ¶¶ 7, 8, 9).

When it is a product of arms-length negotiations, a proposed settlement is presumed to be fair and reasonable. *See Mars Steel v. Continental Ill. Nat'l Bank & Trust*, 834 F. 2d 677, 681-82 (7th Cir. 1987); *Armstrong*, 616 F.2d at 325; *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D 369, 375-76 (D.D.C. 2002) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length negotiations") (internal quotation omitted); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 145-46 (E.D.N.Y. 2000) (in determining fairness, the "consideration focuses on the negotiating process by which the settlement was reached") (internal quotation omitted). The presumption certainly applies here.

### 4. The stage of the proceedings and the amount of discovery completed

The proposed settlement came after the case had been completely worked-up for trial, while numerous dispositive motions pended. In order to reach this stage, the parties engaged in extensive written discovery, document production, depositions of numerous personnel and employees of Defendants, depositions of Named Plaintiffs, disclosure of experts, expert written discovery and document production, exchange of expert reports and rebuttal reports and sur-rebuttal reports, depositions of experts and rebuttal experts, and in extensive procedural and

case-dispositive motions practice. The case's lengthy docket report speaks for itself. Simply put, this has been a heavy-weight fight, which took the Plaintiffs' new legal team nearly three years to prosecute. The facts, issues, strengths and weaknesses are known to all. Each parties' counsel's knowledge, informed by extensive discovery and motions practice, bodes well for settlement approval. (McNulty Dec. ¶¶ 23-24).

### 5. The deficiencies in the previous settlement do not exist in the Settlement

As the Court is well aware, a prior settlement was rejected by the Seventh Circuit. The problems that plagued the previous tainted litigation were cured when current counsel was appointed. The Settlement at issue now affirmatively and purposefully contains none of those deficiencies. For example,

    a. The Seventh Circuit criticized the motives of prior class counsel, as well as the relationships and agreements between class counsel and class representatives. Current class counsel did not have any of those alleged motives or any relation to any class member, and none of same exists now.

    b. The previous settlement provided incentive awards only to class representatives who approved the settlement, thereby creating a conflict of interest. The Settlement has no such condition; indeed, as noted above the Service Award provision of the Settlement is severable and, regardless of whether and for what amount the Court ultimately grants Service Awards for each of the Named Plaintiffs, the Settlement persists.

    c. In the previous settlement, four class representatives did not approve the settlement; they were consequently removed and replaced. Now, all class representatives approve of the settlement, without any threat to their status, and no Settlement Class Members have any objection to the Settlement.

    d. The Settlement allows Defendants to be reimbursed only for the Claims Notice Expenses—nothing else—from unclaimed funds from Fund A. If there are no unclaimed funds, Defendants bear the full costs of Claims Notice Expenses.

    e. The previous settlement's valuation was deemed inflated and elusive by the Seventh Circuit. The current Settlement requires the deposit of $23,750,000 into Fund A and reservation of $2,000,000 for Fund B—clear numbers affording clear valuation, which translate into clear relief for the affected consumers.

f. The Seventh Circuit found that the previous settlement had a complicated notice to settlement class members. The current proposed Notice Plan is modern, simple, robust and targeted.

g. The proposed Settlement is clean and simple, requires no arbitrations and contains no caps per structure, as the prior settlement did.

h. The Seventh Circuit found that the previous Claim Form to be long, and confusing. The proposed Claim Form is simple, self-explanatory, clear and flexible, and designed and tailored by counsel for the parties for that very purpose. Assistance is made available for those who required additional instruction or clarification.

## C. Certification of the Settlement Class is Appropriate

### 1. Rule 23 prerequisites for class certification are satisfied

In 2009, the Court granted in part, and denied in part, plaintiffs' motion for class certification. (Doc. 163). To effectuate the Settlement at issue now, the Court must conditionally certify a Settlement Class, which is different than the two classes certified in 2009 by Judge Zagel (Doc. 169). Specifically, the preliminarily approved Settlement Class comprises:

All persons in the United States who are current or former owners of Structures containing Pella ProLine® brand wood casement, awning, and/or transom windows (including 250 and 450 Series) manufactured by Pella Corporation between January 1, 1991 and December 31, 2009 (hereinafter "ProLine Casement Windows"). The Settlement Class excludes: (1) All persons who timely opt out of the Lawsuit pursuant to the terms of this Agreement; (2) All persons who, individually or as a member of a class, have brought legal proceedings against Defendants (other than in the Lawsuit brought by Named Plaintiffs), which, before entry of the Preliminary Approval Order in the Lawsuit brought by Named Plaintiffs, are resolved or agreed to be resolved by settlement,

judgment, release, dismissal, or other final disposition resulting in the termination of the proceedings; and (3) All of Defendants' current employees.

(SA ¶ 2.46). The proposed Settlement Class satisfies Rule 23's requirements.

### 2. Rule 23(a)

Rule 23(a)(1)-(4) requires that any proposed class meet four (4) prerequisites: numerosity, commonality, typicality and adequacy of representation. Each element is satisfied here.

#### a. Numerosity—Rule 23(a)(1)

The Settlement Class Members are numerous, rendering permissive joinder impracticable. "Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient." *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002); *see also Muro v. Target Corp.*, No. 04 C 6267, 2005 WL 1405828, at *13 (N.D. Ill. July 15, 2005) ("Although there is no 'magic number' for numerosity, 'permissive joinder is usually deemed impracticable where the class members number 40 or more.'") (citation omitted). Based on KCC's Notice Plan, as implemented, and the more than 10,000 of claims being processed by KCC, numerosity is clearly met. (SA Exhibit 2 at ¶ 16).

#### b. Commonality—Rule 23(a)(2)

Commonality asks whether class members share at least one common question of law or fact. *Barragan v. Evanger's Dog & Cat Food Co.*, 259 F.R.D. 330, 334 (N.D. Ill. 2009). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). The element "does not necessitate every class member's factual or legal situation to be a carbon copy of those of the

named plaintiffs, so the 'low commonality hurdle is easily surmounted.'" *Kaufman v. American Express Travel Related Servs. Co*., 264 F.R.D. 438, 442 (N.D. Ill. 2009) (citation omitted).

The Settlement Class satisfies the commonality requirement. The common nuclei of operative facts that led to Judge Zagel's 2009 class certification is far more developed now than then. The factual and exert discovery and the hearty dispositive motions practice yielded an evidentiary and legal evolution of the claims at issue to be tested, modified, refined and readied. Further, based on expert work and analysis, the alleged damages suffered by the Class are understood and have been addressed fairly in the Settlement. (McNulty Dec. ¶ ).

### c. Typicality—Rule 23(a)(3)

The typicality requirement under Rule 23(a)(3) is "liberally construed" and easily satisfied. *Saltzman v. Pella Corp.,* 257 F.R.D. 471, 479 (N.D. Ill. 2009); *see also Owner-Operator Indep. Drivers Ass'n v. Allied Van Lines, Inc*., 231 F.R.D. 280, 282 (N.D. Ill. 2005) (typicality is a "low hurdle" requiring "neither complete coextensively nor even substantial identity of claims"). A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (quoting *De La Fuente v. Stokely-Van Camp, Inc*., 713 F.2d 225, 232 (7th Cir. 1983)).

Again, the Settlement Class' claims derive from the same overarching operative facts and bases for relief. This element is satisfied.

### d. Adequate representation—Rule 23(a)(4)

Rule 23(a)(4) requires that the class representatives and class counsel "fairly and adequately protect the interests of the class." This element requires that the class representative (1) has a "sufficient interest in the outcome to ensure vigorous advocacy" and (2) does "not have interests that conflict with those of the class"; the element also requires that the class

representative's lawyers be "qualified, experienced, and able to conduct the litigation." *Holtzman v. Turza*, No. 08 C 2014, 2009 WL 3334909, at \*5 (N.D. Ill. Oct. 14, 2009), *affirmed on other grounds*, 728 F.3d 682 (7th Cir. 2013); *see also Rosario v. Livadtis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("[W]e have not previously interpreted Rule 23(a)(3) to require all class members suffer the same injury as the named class representative. Instead, we look to the defendant's conduct the plaintiff's legal theory to satisfy Rule 23(a)(3).") (citation omitted).

"Thus, the adequacy requirement places only a "modest" burden on a class representative to demonstrate '[a]n understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery.'" *Murray v. E\*Trade Fin. Corp.*, 240 F.R.D. 392, 398 (N.D. Ill. 2006) (quoting and citing *Cavin v. Home Loan Center, Inc.*, 236 F.R.D. 287, 393-94 (N.D. Ill. 2006)).

The Named Plaintiffs' interests and claims are entirely consistent with those held by the Settlement Class they represent. *See In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 343 (N.D. Ill. 2010). As indicated by each of their declarations, submitted in support of preliminary approval as "Composite Exhibit 6" (Doc. 672-6), the Class Representatives fully understand and accept their charge as class representatives of staying informed about the progress of the case and of conferring with Class Counsel regarding developments, including court filings and discovery and, of course, the Settlement and its terms. The Class Representatives also fully understand and accept their charge as class representatives of bringing suit on behalf of other people with similar concerns regarding the Windows and of their duty to act to protect the interests of other class members. (Doc. 672-6.) Further, since neither conflicting nor antagonistic claims exist among class members, there are no conflicts of interest, let alone disqualifying ones. *Rosario*, 963 F.2d at 1018.

Finally, Class Counsel are reputable and highly experienced litigators, having handled numerous consumer protection, products liability, and other types of complex class actions. The litigation in this case has been fierce, and Class Counsel have steadfastly held their ground and prosecuted the claims with diligence and vigor. Plaintiffs and their attorneys have demonstrated they are fully capable of litigating this case and that the interests of the Settlement Class have been and will be fairly and adequately protected. (Clifford Dec. ¶ 10); (McNulty Dec. ¶¶ 22-24).

### 3. Rule 23(b)(3)

Once Rule 23(a) is satisfied, the Court must proceed to consider the predominance and superiority requirements of Rule 23(b)(3), whether "questions of law or fact common to the class predominate over any [individualized questions], and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs satisfy these requirements.

### a. Common questions predominate

The first part of Rule 23(b)(3) is satisfied when "common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 815 (7th Cir. 2012) (quoting Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1778 (3d ed. 2011)). "'Considerable overlap exists between the court's determination of commonality and a finding of predominance. A finding of commonality tends strongly to satisfy a finding of predominance because, like commonality, predominance is found where there exists a common nucleus of operative facts.'" *Pella*, 257 F.R.D. at 484 (quoting *Fournigault v. Independence One Mortgage Corp.*, 234 F.R.D. 641, 644 (N.D. Ill. 2006)).

Here, common questions that would be decided on a class-wide basis have been certified,

and, as well, have since survived Defendants' attempts to decertify those common questions. Further, because conditional certification of a Settlement Class is sought here and there will be no trial, the Court need not inquire whether the case, if tried, would present manageability problems with individualized issues. *Smith v. Sprint Communications Co., L.P.*, 37 F.3d 612, 614 (7th Cir. 2004) (*quoting Amchem Prods.*, 521 U.S. at 591)).

### b. A class action is the superior method for adjudicating this controversy

The second Rule 23(b) element—superiority of class adjudication—is easily established here. "A class action is the more efficient procedure for determining liability and damages in a case such as this, involving a defect that may have imposed costs on tens of thousands of consumers yet not a cost to any one of them large enough to justify the expense of an individual suit." *Butler v. Sears, Roebuck and Co.*, 702 F.3d 359, 362 (7th Cir. 2012). Rule-makers designed the class action device for a case like this: a large number of claims, in the thousands, which would be uneconomical to pursue on an individual basis. As the Supreme Court stressed:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem Prods.*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).

In this case, the potential number of Settlement Class Members is far too numerous, and the typical individual claim is too small for each individual Settlement Class Member to litigate in a separate action. The class action device is the only viable vehicle by which the vast majority of persons injured by Defendants' allegedly wrongful conduct may obtain a remedy. A class action is the appropriate and superior method for adjudication of these claims, and as such, Rule

23(b)(3) is satisfied.

> ### c. The Class Notice provided notice to the vast majority of the Settlement Class

As discussed above, KCC started implementing the Notice Plan in March 2018, with the distribution of 311,329 Postcard Notices to potential Settlement Class Members, and issuance of Indirect Notice through a nationwide press release, popular magazine advertisements, and an internet media campaign using Google Display and Facebook. KCC also established a website (pellawindowsettlement.com) and a toll-free number for Settlement Class Members to learn about the Settlement. As this Court previously recognized, this Notice Plan was "reasonable, constitute[d] the best notice practicable under the circumstances, constitute[d] due and sufficient notice of the settlement and the matters set forth in said notice to all persons entitled to receive notice, and fully satisf[ied] the requirements of due process and of Fed. R. Civ. P. 23." (Doc. 675 at 6.)

"Courts frequently look to the number of opt-outs or objectors as bearing on . . . the fairness of the settlement . . . The idea is that if few class members seek to exclude themselves after reviewing the terms of a propose settlement, this tends to be a vote of confidence in the settlement by the parties most affected." T. Eisenberg and G. Miller, *The Role of Opt-Outs and Objections in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L. Rev. 1529, 1537 (2004); *see also Synfuel*, 463 F.3d at 653 ("a district court must consider . . . an evaluation of the amount of opposition to settlement among affected parties); Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges*, 3rd Ed., Federal Judicial Center, 31-32 (2010).

As of the June 20 Claims Deadline, KCC received a total of 53 requests for exclusion from the Settlement Class. The 53 opt-outs represent 0.007% of Settlement Class Members, and

0.017% of Settlement Class Members sent Notice, respectively. This rate compares favorably to reported overall class action opt-out rates of 0.6% for all types of class actions and opt-out rates of 0.2% specific to consumer class actions. Eisenberg and Miller at 1549; *see also Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 680 (7th Cir. 1987) ("Only 1.5 percent of the class members had opted out, a surprisingly small fraction if the settlement is as bad as [objector] argues."). Eleven (11) alleged class members filed objections to the fairness of the Settlement Agreement with either KCC, counsel, or directly with the Court. (*See* Docs. 676, 691, 695, 702, 703, 704, 705, 706, 711, 713; Papke Objection). When compared to the estimated 734,000 Settlement Class Members and approximately 311,000 to whom Notices were sent directly, 11 objectors represents 0.001% and 0.004% of each group, respectively, rates which compare favorably to reported overall class action objection rates of 1.1% for all types of class actions and objection rates of .1% specific to consumer class actions. Eisenberg and Miller at 1550.

As implemented, the Notice Plan, included various components, including direct mail, internet banner notices, and publication notice to known Settlement Class Members, and publication to unknown Settlement Class Members, and satisfies the requirements of Rule 23. *See, e.g.*, *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) (approving a notice for a nationwide class that consisted of publication in one publication of national circulation and the posting of the notice on a website set up by a settlement administrator); *Kaufman*, 264 F.R.D. at 446; *In re Kentucky Grilled Chicken Coupon Mktg. & Sales Pracs. Litig.*, 280 F.R.D. 362 (N.D. Ill. 2011) (approving notice plan consisting of publication, internet advertising, maintained website containing notice, targeted on-line advertising, and sponsored key-word search advertisements).

D.       **Award of Attorneys' Fees, Costs and Expenses and Service Awards**

With respect to the motion for fees, costs, and expenses timely submitted by Class Counsel (Doc. 687) and other counsel of record, the responses, the objections, and the replies, Plaintiffs rely the papers they have submitted relating to same.  To the same extent, Plaintiffs rely on their papers with respect to their motion (Doc. 687) for Service Awards of $25,000 to each of the Class Representatives.

E.       **The Objections to the Settlement Lack Merit and Should Be Overruled**

The few objections filed in this case primarily articulate a lack of understanding of the settlement terms and the law, coupled with a failure to access the resources supplied by the claims administrator to facilitate understanding; a discontent with having to supply some level of detail before receiving substantial relief; or a discontent with having fifteen years pass between the date of purchase and the date of the settlement such that the relief has been calculated with a reduction for having used the windows for ten years (the fifteen year mark still exceeds the ten year warranty that accompanied the windows). Notably, the objectors consistently claim to have known of the defect many years prior to the settlement, but for an assortment of reasons took no action to pursue their claims. None should have solely relied on a settlement in this hotly contested case, but now the correct action is for them to opt out as opposed to reject the settlement. That is because there is not a model of relief, in either a hypothetical settlement or a prospective trial in *this* case, that will give them the type of relief they seek. *See EEOC v. Hiram Walker & Sons*, 768 F.2d 884, 889 (7th Cir. 1985) ("[t]he essence of settlement is compromise . . . .  Thus the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution after trial."). Only a trial of their own claims will give them a chance at obtaining that type of relief.

**Shifrin** (Doc. 676).

Sanford Shifrin filed with the Court an objection to the settlement. (Doc. 676). Dr. Shifrin advises the court that he owns a home with the subject windows, however, he does not make any attempt whatsoever to supply proof of having the affected windows. To be clear, Dr. Shifrin owns a condominium unit that may or may not contain the windows at issue. (Exhibit C). Importantly, the settlement requires that condominium dwellers supply proof that they are responsible for replacement of the unit's windows, as opposed to the homeowners association. Furthermore, Dr. Shifrin has not submitted a claim form nor has he opted out of the settlement.

Dr. Shifrin's complaint is that the claim form is too complicated. In particular, he claims that it is too difficult for an owner to determine when the windows were installed; too difficult to obtain an estimate for prospective replacement; too difficult to provide proof of past replacement; and too difficult to add a page for windows if the homeowner has more than two affected windows.

Notably, Dr. Shifrin did not complete a claim form, did not opt out, and there exists no record of Dr. Shifrin having contacted the KCC helpline for assistance concerning either. Combined with the absence of any evidence that he has the affected windows or responsibility for their replacement, Dr. Shifrin has no standing to object to the settlement. Of course, even if one were set aside his lack of standing, the sum of Dr. Shifrin's objection overlooks the fact that the potential relief for consumers is significant, and depending upon the severity of their individual damages, in the range of thousands of dollars. The claim form demands more than a signature that one indeed has or had the affected windows. This is not a matter of consumers receiving a coupon for a discount on their next purchase at a supermarket, or receiving a *de minimis* amount for having purchased a small product. The substantial relief at issue demands, and the class deserves, a certain rigor associated with the claims process, so as to ensure that the

substantial amount of relief available is only going to *bona fide* consumers with eligible windows.

In the case of Dr. Shifrin, he could have phoned KCC for further assistance, including with respect to whether he was a class member, what any particular term meant, or for assistance in completing his form. If he could not recall that he purchased his condo unit from the builder in 2000, he could have consulted his recorded documents so as to determine when the condo units were built, he could have asked a neighbor, or he could have consulted his condominium declarations which have been repeatedly utilized by Dr. Shifrin since his initial purchase of the condo unit in 2000.

Dr. Shifrin's objection references hypothetical consumers, and scenarios that *he* supposes could happen. He references so-called qualified lawyers being unable to make sense of the claims process. He misapprehends the instances in which a contractor's estimate is requested, and instead suggests that one must track down contractors, when that is simply not accurate.

Dr. Shifrin lacks standing to object, and misapprehends the terms of the settlement and the purpose of the claim form. Because Mr. Shifrin did not submit a claim form or any evidence that he is a class member, and because the objection cites purely hypothetical issues, the Court should not entertain his objection.

**Andrews** (Doc. 691)

Mr. and Mrs. Andrews object to the settlement primarily because they contend a settlement took too long. They further suggest that because the settlement took too long, they are denied adequate relief. Mr. and Mrs. Andrews observed damage to their windows in 2005, one full year before suit was filed. (Doc. 691). When suit was filed in 2006, the Andrews' say that their windows were already eight (8) years old, and now they are twenty years old. The Andrews do not specify the warranty they received when they purchased the windows, but it was

likely a ten year warranty, which was consistent with the warranty available at the time of purchase in 1998. Consequently, if they observed damage in year eight, the Andrews had access to relief before suit was even filed pursuant to the product warranty. Nevertheless, the Andrews did not pursue that relief at that time, instead depending on this case to afford them relief.

This settlement does afford them relief. As noted above, it is true that the settlement contemplates a reduced rate of reimbursement for windows that are fifteen years or older. That very issue was rigorously discussed in the settlement conferences overseen by the Magistrate Judge. In handling the issue of window age, there was consideration given to the fact of some consumers having warranties that afforded them relief. There is also the issue of usage of the window for the years between purchase and now. Where a window has not been replaced, and has therefore been used, the settlement dialogue gave consideration to that fact, and also the fact that the consumer purchased a window based on a ten year warranty, or ten years of a guaranteed usage without defect. Where a window was observed to be defective in fewer than ten years, the settlement dialogue gave consideration to the notion that the consumer had the benefit of warranty coverage at that time, which is what the consumer relied on in purchasing the window.

The Andrews suggest that the double-hung windows and casement windows should perform the same. The discovery and related data analyses in this case show that the design of the casement and the double-hung windows are not the same, and the failure rates are noticeably different. (Docs. 631, 634). The Andrews would not necessarily have reason to know that, however, the current class counsel explored the similarities and differences amongst the product lines, including a full analysis of failure rates. Those designs and the corresponding data do not influence the fairness of this settlement. Moreover, class counsel had a duty owed to the members of the class as defined and certified.

As to the history of the case, current class counsel had an obligation to the class, particularly in light of the Seventh Circuit's order rejecting the prior settlement, to conduct merits discovery and prepare the case for trial. While the prior class counsel may have contributed to some delay by not having conducted any merits discovery in the first phase of the case, it is difficult for current counsel to say with any certainty how the prior settlement (with its damages caps and defenses available to Pella in any arbitration) would have made the Andrews whole. They certainly would not have fared better than in the current settlement. Equally difficult is knowing whether the Andrews would fare better at trial, however, they certainly had the opportunity to opt out of the settlement and pursue additional relief. The objection posed by Mr. and Mrs. Andrews is not reflective of any unfairness to the class.

**Brasley** (Doc. 702)

Mr. and Mrs. Brasley object to the settlement because it pro-rates relief for windows that are fifteen years old. They also object because the settlement does not include windows other than Proline casement windows. The Brasleys did not supply notice to lead counsel for either the plaintiff or defendant. Notably, the Brasleys' letter suggests that they do <u>not</u> actually have Proline casement windows. Moreover, there is no indication that the Brasleys submitted a claim to KCC. The reduction of relief allocated for windows that are more than fifteen years old has been addressed, herein. However, Plaintiffs contend that the Brasleys lack standing to object. They do not appear to have the windows at issue, and have supplied nothing to suggest otherwise. Moreover, as discussed above, the design differences have already been addressed by the Court, and specifically explored in the merits discovery and expert disclosures. The Brasleys' specific objection should not be considered by the Court.

**Carnivale** (Doc. 703)

Gary Carnivale objects to the pro-rated recovery for windows older than fifteen years. Similar to the Brasleys and the Andrews (with nearly identical correspondence in not only content, but formatting as well), Mr. Carnivale argues that he is deserving of more relief. Again, the opt out mechanism was available so as to allow Mr. Carnivale to proceed with a claim against Pella particularly with all of the evidence he claims to have accumulated.

Mr. Carnivale submitted a claim (Exhibit D) and indicated that he repaired seventeen windows in 2014 and additional windows thereafter. Mr. Carnivale contends that he spent money not only on windows, but money on experts used to identify the defect present in his windows. Further, he contends that he engaged in discussions with Pella. Quite plainly, if Mr. Carnivale had notice as to the defect at issue as early as he suggests, and retained experts to prove it, he should have initiated suit once armed with that expertise. That is because Kansas consumers were not part of the consumer fraud sub-classes. So his relief in the instant case, at best, was never going to be more than a set of declarations that allowed Mr. Carnivale to file suit in his home jurisdiction. And that would have been known to Mr. Carnivale as of the entry of the Seventh Circuit's order in 2010 (Doc. 182). Even after the case's first settlement rejected by the Seventh Circuit, Mr. Carnivale's damages would have been capped at a few hundred dollars or he would have needed to proceed to an arbitration, still with a damages cap. Either option would not have been adequate for the costs described by Mr. Carnivale, but even the claim form suggests that he may not have been armed with the evidence needed to prevail in an arbitration. No matter, Mr. Carnivale could have made his case, now, by opting out of the current settlement.

Again, the 25% relief paid for windows older than fifteen years is a consequence of the fact that the windows had ten year warranties and the consumer kept the windows in their home for more than ten years without replacement (if replaced within fifteen years, 100% reimbursement is available). In Mr. Carnivale's case, he did not effectuate warranty or pursue a

claim to enforce the warranty, nor did he replace the windows within a fifteen year period of time. And that was despite reporting that he observed and investigated a defect very soon after moving into his home. Moreover, in cases involving products, courts have held that the relief owed for a misrepresented or defective product must take into consideration the fact of a consumer having had some use of the product, including in recent cases against General Motors and Volkswagen.

**Lee** (Doc. 704)

Ms. Lee makes the same objection concerning the 25% payment, arguing that the time frame is arbitrary and capricious. In actuality, most of the affected windows, including Ms. Lee's windows, would have had a ten year warranty at the time of purchase. The objecting consumers would have received more than ten years usage. The parties ultimately agreed to fifteen years. Ms. Lee does not give any indication as to whether the windows she has are Proline casement windows affected by wood rot. Moreover, current class counsel does not have a record of Ms. Lee having made any inquiry; that doesn't mean she didn't try to reach prior counsel or some other lawyer who may have had an appearance in the case at some point. Hundreds of class members did contact current class counsel. In the instance of a consumer from South Dakota, the consumer would have been informed by class counsel that there should be no dependence on a prospective settlement, and that South Dakota law did not permit for class certification on the consumer fraud claim. Countless consumers from the majority of states (all but six) were advised as such. Lastly, Ms. Lee did not supply notice of her objection to class counsel, defense counsel or KCC.

**Bossier** (Doc. 705)

Mr. Bossier has submitted a claim form with photos for his Pella Proline casement windows. He appears to be entitled to relief. Nevertheless, Mr. Bossier objects to the settlement

because it does not include other lines of Pella windows or Pella doors, for that matter. The class was defined and further discovery on the matter demonstrated that there was not an evidentiary means to expand a class that had been defined by law. Not only were other product lines not included, but the state of Mississippi was not a sub-class for the consumer fraud claim. Mr. Bossier submitted his objection with his claim to KCC, however, neither class counsel nor defense counsel were served the objection. The objection concerning a desire for the class to be expanded should not be considered by the Court, because those facts and products were simply not part of this case.

**Hockmeier** (Doc. 706)

The Hockmeiers submitted an objection to the court, but did not submit the objection or proof of claim to lead counsel or defense counsel. Nevertheless, the Hockmeiers' facts are unique in that the windows are not to be used with stucco or other "floating" wall systems. The Hockemeiers say they have been engaged in discussions with Pella for many years on this issue. Notably, the law of Missouri did not permit for Missouri consumers to be part of the consumer fraud sub-class, but even the declarations may not have been adequate for the Hockmeiers to prove their case. Given the nature of the instant case, the facts concerning the Hockmeiers, namely, the stucco and the evidence of damage within the warranty period, the Hockmeiers' frustration is not solved by rejecting the current settlement. Opting out of the settlement (assuming the Hockmeiers have Proline casement windows which is not known to Class Counsel) is the only way for the Hockmeiers to proceed with their claim against Pella.

**Theissen** (Doc. 711)

Mr. Theissen did not send notice of his objection to class counsel, so it is unclear to class counsel as to whether Mr. Theissen does have an affected window for which he submitted a claim. Nonetheless, Mr. Theissen's objection is hypothetical and speculative. He essentially

contends that the settlement should be rejected because attorneys will be paid more than the funds available to the class. The settlement terms clearly demonstrate that Mr. Theissen's contention are incorrect. Moreover, Mr. Theissen contends the settlement is too complicated. That argument was addressed in response to the Shifrin objection and that response applies here.

**Papke**

Mr. and Mrs. Papke's objection was not received by lead counsel for the plaintiffs, but was received by counsel for Pella who supplied it to class counsel. The Papkes objection is essentially the same objection as that of Andrews, Lee, and Carnivale. They contend that the value of their claim should not be reduced as a consequence of their windows being more than fifteen years old. As with the objections of Andrews, Lee and Carnivale, the Papkes claim to have discovered evidence of wood rot by 2001, very shortly after purchasing the windows. Having purchased the windows in 1994, with a one-year warranty, the Papkes have had the two claimed windows for twenty-four years. Had they replaced within fifteen years of purchase the two windows claimed, they would have been entitled to 100% reimbursement. Notably, the Papkes are residents of North Dakota, a state with laws that were incompatible with the consumer fraud theory of the case. The Papkes' state law prevented them from being part of the consumer fraud class; they would have been caused to present their evidence in a judicial proceeding, even if this case did not settle. Nevertheless, the Papkes relied on the potential for a class settlement rather than pursuing relief in their jurisdiction. For the reasons described in relation to the other objectors, the Papkes' dissatisfaction with their relief in the settlement is not reflective of any unfairness of the settlement terms, and they can ascertain their relief under North Dakota law, if the law affords them relief, by opting out and pursuing a claim against Pella.

**The Bandas Objectors**

Two additional objectors, Mr. Schulz and Mr. Tucker, are represented by Attorney Christopher Bandas. Schulz is represented by Mr. Bandas, along with Theodore Frank and Thomas Weigand. Tucker is represented by Mr. Bandas, along with Jonathon Novoselsky and Eric Stewart.

Schulz does not object to the settlement, but instead to the fees. (Doc. 701). Plaintiffs have previously addressed the meritless arguments of Schulz, and incorporates them, herein, as if set forth in full. (See Docs. 716 and 724). Notably, Pella takes no position as to fees, except that Pella has only agreed to a settlement that allocates up to $9 million in total fees and costs. Equally notable, the amount of $9 million was not a figure devised by the parties, rather, it was a figure contained within the Magistrate Judge's settlement recommendation, and either party was free to reject the settlement recommendation. With Plaintiffs having already made arguments as to Schulz, it is worth repeating that Schulz has waived his right to object; he lacks standing. He has not submitted a claim, he has not opted out, nor has he submitted any evidence that he is a class member. (See Doc. 724).

That said, neither Schulz, nor his attorneys, Bandas, Frank or Weigand, have added any value to the instant settlement, in particular where Schulz cannot even establish that he is a member of the class. Further, although Frank and Bandas claim credit for an objection to the prior settlement, none of that contributed to the settlement at hand. The instant settlement was not a consequence of any objection. The alleged objection did not refine any aspect of a settlement. Instead, what has caused a settlement in this case, is the dogged determination and resources of class counsel and the extensive litigation concerning the merits of the case. The case was prepared for and was proceeding to trial under the supervision of this Court. After discovery had been completed, the parties agreed to participate in mediation with the assistance of the

Magistrate Judge, who after numerous in person and telephonic sessions decided to make a recommendation that both parties could accept or reject, and only with mutual acceptance would the case settle. Nothing Schulz, Frank or Bandas did created the settlement at hand, and Schulz was only involved in the case for a short period of time, facing no risks in his involvement. *In re Petrobras Sec. Litig.*, 14-CV-9662 (JSR), 2018 WL 3866716, at *3 (S.D.N.Y. Aug. 14, 2018).

Unlike its use of Schulz, through Attorney Tucker (Doc. 695) the Bandas group attempts to object to the settlement. Of course, it is significant to note that Tucker's involvement as an objector was bought by Bandas with a promised payment of $5,000.00. Tucker testified that "He would pay me 5,000 out of his money to assist in objecting to the settlement." (Ex. E, p. 182). The self-described promise for compensation to assist in objecting to the settlement hangs heavier than any aspect of Tucker's meritless arguments. Nonetheless, as was evident from the deposition testimony of Tucker (Ex. E), he objects to the settlement of a case that he hasn't investigated.

Turning to Tucker's objection, he first contends that notice was defective and burdensome. Tucker argues that the class notice should be more like that of the notice used in the case of *Adams vs. Cradduck*. At his deposition, Attorney Tucker testified that he did not know the subject matter of the *Adams* case he favors (county jail detainees submitting cash upon entry, and receiving a gift card upon release) and did not know if a claims administrator had been used (one had not been used—the county administered the claims). (Exhibit E, pp.111-114). Tucker testified that he hadn't even read the notice in *Adams* and he could not specify what language in the *Adams* notice he favored for his hypothetical notice in the case at bar. (Ex. E, pp. 113).

That Tucker had not read any notice other than the postcard he received in this case is not surprising. (Ex. E, pp. 114). He also did not read any depositions, including those of any experts (Ex. E). He did not read any of the Daubert motion practice. (Ex. E). He read part of Plaintiffs'

response to the summary judgment motion; he did not read depositions or expert disclosures, making the summary judgment response difficult to appreciate. (Ex. E, pp. 110, 165). Tucker simply does not like the settlement. (Ex. E, p. 173).

Mr. Tucker's carelessness in assessing the case was further demonstrated by the fact that he does not actually have the twenty-two windows he averred to in submitting his claim form. After taking him through photos of his home and its windows, Attorney Tucker conceded that he does not have twenty-two windows as claimed. Instead, Tucker only has two Pella windows, at most. (Ex. E, pp. 138, 141).

Tucker also claims that the proposed settlement is unfair because Tucker speculates that Plaintiffs' counsel and Pella conspired on the $9 million fee allocation. (Ex. E.). Tucker complains of a clear-sailing provision, but then testifies that he doesn't know if the settlement has such a provision or not, nor did he think it important to know that before making the argument. (Ex. E, pp. 124-125). Acknowledging his erroneous assertions, Tucker conceded at his deposition that he has not reviewed anything in the docket that suggests an agreement between Pella and class counsel as to fees and, more importantly, nothing about the settlement impedes the Court's discretion in awarding fees. (Ex. E, pp. 128-130).

Similarly, the ill-conceived hypothetical calculations concerning payments to the class and attorneys' fees are without any factual basis. Tucker admitted he has not received any information concerning the number of claims or the amounts of claims. (Ex. E, pp. 131-132). Indeed, the wild assertions concerning claims volume and amounts (Doc. 695, pp. 6-8) is inaccurate and, frankly, irresponsible. The Bandas group's pure conjecture as to claims and fees simply has no place in this case, and stands to serve as a genuine source of confusion for those who actually do follow the case.

Tucker also criticizes the service awards sought for the class representatives in this case. Tucker admits, however, he has no idea what the class representatives in this case did, nor did he read their depositions. (Ex. E, p. 167). Unbeknownst to Tucker, the class representatives in this case answered extensive written discovery which required them locating and submitting documents to support their claims and completing written responses to interrogatories. They had several in-home day–long inspections, losing time from work or time with family. Groups of attorneys with experts and equipment came through the homes of class representatives for a minimum of three inspections, sometimes more. Windows were taken out, water was sprayed, testing was performed and access was needed both inside and outside of the home. The class representatives sat for lengthy and invasive depositions, again having to forego another day of work or, in more than one instance, forego daily care for a loved one with cancer or a child with special needs. The class representatives were made available for consultation of the proposed settlement terms. They read the terms several times in a variety of documents, and assisted in the preparation of declarations. They asked questions, and easily put in well over one hundred hours each. Distinct from the promise from Bandas to pay Tucker $5,000.00, none of the class representatives were promised compensation at any point in this case. Their commitment was to advance the claims of the class with a hope of holding Pella accountable. In this case, with the volume of time and access to one's home that was required of the class members, $25,000 for their service and commitment of time over the course of four years is well within reason.

Tucker's objection ends with more criticism of the fees being paid with a lodestar and suggesting the impropriety of other hypothetical scenarios that are simply not reflected in the record or supported by fact. For instance, the private allocation of fees opposed by Tucker is imaginary; the record does not even hint at such a concept, unless, of course, Tucker is thinking of Ted Frank's promise to pay Bandas from his own fees awarded. (Doc. 683, p.11). In that case,

Tucker says he does not object to Frank privately paying Bandas. (Ex. E, p. 175). As for the lodestar method, it is merely one way a court can assess fee requests, and not a condition of the settlement.

Tucker's objection is premised upon largely non-existent aspects of fictional settlement terms not before this Court, and remains wholly unsupported by any facts or critical analysis, even by his own testimony. (Ex E.). The objection is made further suspect by the peculiarities surrounding Tucker's role as objector and Bandas representing the only two objectors represented by a lawyer, Schulz and Tucker, albeit two objectors with opposing views of the settlement that would ordinarily cause a representation conflict for an attorney except that Bandas had Schulz and Tucker waive the conflict. (Ex. E, pp. 55-57). Nonetheless, Tucker's objection does not do anything for the class and, in some instances, serves to merely confuse the record. The objection should be over-ruled.

The objections to the Settlement should be overruled in their entirety.

## III. CONCLUSION

Based upon the foregoing and all matters of record, including Plaintiffs' Memorandum in Support of Preliminary Approval (Doc. 672), and because the proposed Settlement is fair, reasonable, and adequate, Plaintiffs respectfully request that the Court enter the Proposed Final Approval Order attached as Exhibit 1 to Plaintiffs' Motion for Final Approval.

DATED:  August 23, 2018                    Respectfully submitted,

*/s/ Shannon M. McNulty*
Robert A. Clifford
rac@cliffordlaw.com
Shannon M. McNulty
smm@cliffordlaw.com
CLIFFORD LAW OFFICES
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602

(312) 899-9090

George K. Lang
langlawoffice@att.net
LANG LAW OFFICE
60 B W. Terra Cotta, No. 301
Crystal Lake, Illinois 60012
(773) 575-5848

John A. Yanchunis
JYanchunis@ForThePeople.com
Marcio W. Valladares
MValladares@ForThepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505

Joel R. Rhine
jrr@rhinelawfirm.com
RHINE LAW FIRM, P.C.
1612 Military Cutoff Rd
Suite 300
Wilmington N.C. 28403
(910) 772-9960

Edward R. Moor
erm@moorlaw.net
MOOR LAW OFFICE, P.C.
One N. LaSalle Street, Suite 600
Chicago, Illinois 60602
(312) 726-6207

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 23, 2018, a copy of the foregoing was filed and served on all counsel of record via the Court's CM/ECF electronic filing system.

*/s/ Shannon M. McNulty*
　　Robert A. Clifford
　　rac@cliffordlaw.com
　　Shannon M. McNulty
　　smm@cliffordlaw.com
　　CLIFFORD LAW OFFICES
　　120 N. LaSalle Street, Suite 3100
　　Chicago, IL 60602
　　(312) 899-9090