# EXHIBIT E

                                          Page 1

1            IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION
4    KENT EUBANK, JERRY DAVIS,     )
     RICKY FALASCHETTI, RITA       )
5    CICINELLI, ROBERT JOSEPH      )
     BERG, JEFFREY ACTON, KENNETH  )
6    HECHTMAN, LEO BATEMAN, JAMES  )
     NEWMAN, AMY CHASIN, and       )
7    EDWARD RUHNKE, individually   )
     and on behalf of all others   )
8    similarly situated,           )
             Plaintiffs,           )
9        vs.                       ) No. 06 CV 4481
     PELLA CORPORATION, an Iowa    )
10   corporation, and PELLA        )
     WINDOWS AND DOORS, INC., a    )
11   Delaware corporation,         )
             Defendants.           )
12
13       The deposition of DONALD TUCKER, called for
14   examination pursuant to Subpoena and the Rules of
15   Civil Procedure for the United States District
16   Courts pertaining to the taking of depositions,
17   taken before Elizabeth L. Vela, an Illinois
18   Certified Shorthand Reporter, at 120 North LaSalle
19   Street, Chicago, Illinois, on July 12, 2018, at the
20   time of 10:17 a.m.
21   (Proceedings concluded at 3:31 p.m.)
22
23   Reported by:  Elizabeth L. Vela, CSR
24   License No.:  084-003650

```
                                          Page 2

 1       APPEARANCES:
              CLIFFORD LAW OFFICES, by
 2            MS. SHANNON M. McNULTY,
              120 North LaSalle Street, Suite 3100
 3            Chicago, IL 60602
              (312) 899-9090
 4            smm@cliffordlaw.com
                   Representing the Plaintiffs,
 5

 6
              FAEGRE BAKER DANIELS, by
 7            MR. KEVIN L. MORROW,
              311 South Wacker Drive, Suite 4300
 8            Chicago, IL 60606
              (312) 212-6500
 9            kevin.morrow@faegrebd.com
                   Representing the Defendants,
10

11
              HUSEMAN & STEWART, PLLC, by
12            MR. ERIC STEWART,
              615 North Upper Broadway, Suite 2000
13            Corpus Christi, TX 78401
              (361) 883-3563
14            estewart@husemanstewart.com
                   Representing the Deponent.
15

16
     ALSO PRESENT:
17            Mr. George Lang.
18

19

20

21

22

23

24
```

```
                                                    Page 3

1                    I N D E X

     WITNESS                              EXAMINATION

2    DONALD TUCKER

         BY MS. McNULTY                        4

3

                     E X H I B I T S

4    NUMBER                          MARKED FOR ID

     Tucker Deposition

5    Exhibit 1 - Total Body Essential Nutrition, Inc.

     and Counsel Financial Services, LLC Cases   25

6

     Exhibit 2 - Subpoena, Exhibits attached to

7    Objection, Warranty, Objection          43

8    Exhibit 3 - LinkedIn Profile           61

9    Exhibit 4 - Facebook Post              63

10   Exhibit 5 - Facebook Ad               66

11   Exhibit 6 - Objection of Donald Tucker  70

12   Exhibit 7 - Objection to Class Settlement 72

13   Exhibit 8 - Photo                    97

14   Exhibit 9 - Photo                    98

15   Exhibit 10 - Photo                  103

16   Exhibit 11 - Photo                  105

17   Exhibit 12 - Photo                  105

18   Exhibit 13 - Notice of Settlement    112

19

20

21

22

23

24
```

Page 4

1          (Witness sworn.)

2      MS. McNULTY:  Allow the record to reflect this

3  is the deposition of Donald Tucker, taken pursuant

4  to subpoena, in accord with the federal rules of

5  civil procedure, the local rules here in the

6  Northern District of Illinois, and the Illinois

7  Supreme Court Rules, as well.

8                    DONALD TUCKER,

9  called as a witness herein, having been first duly

10  sworn, was examined and testified as follows:

11                    EXAMINATION

12  BY MS. McNULTY:

13      Q.   Mr. Tucker, can you please state your

14  name?

15      A.   Donald J. Tucker.

16      Q.   Okay.  And is it okay if I call you Donald

17  or --

18      A.   Don, Donald.

19      Q.   Don, Donald?

20      A.   Yeah.

21      Q.   Okay.  Have you given a deposition before?

22      A.   Never.

23      Q.   You've never given a deposition?

24      A.   Never.

```
                                         Page 5
```

1      Q.   Okay.  You've certainly participated in

2  depositions?

3      A.   I've taken depositions early in my career.

4      Q.   Okay.  And in what years were you taking

5  depositions?

6      A.   That was when I was directly out of law

7  school and was admitted to the bar.  I worked for a

8  law firm in Buffalo, O'Shea, Reynolds, Napier,

9  Cummings & Kirby.  I worked there for about eight

10  months and I probably took a handful of depositions

11  during that time.

12      Q.   Okay.  Are you married?

13      A.   Yes.

14      Q.   What's your wife's name?

15      A.   Laura.

16      Q.   Is Laura a lawyer?

17      A.   No.

18      Q.   Does Laura work outside of the home?

19      A.   Yes, she does.

20      Q.   What's her profession?

21      A.   She is a pharmacy manager at the

22  University of Buffalo.  She's not a pharmacist.

23  She just manages the office.

24      Q.   Do you have children?

Page 6

1      A.    Yes.

2      Q.    How many?

3      A.    Three.

4      Q.    What are their ages?

5      A.    My oldest son is 22, my middle son is 21,

6  and my youngest son is 17.

7      Q.    What are their names in that same order?

8      A.    The oldest is Adam, the middle son is

9  Jonathan, and my youngest son is Matthew.

10      Q.    Are they all in school or are any of them

11  out of school?

12      A.    My oldest son is out of school and he is

13  starting a job as a police officer on Monday, my

14  middle son is going to be a junior at the

15  University of Alabama, and my youngest son is going

16  to be a senior in high school.

17      Q.    Do you have any siblings?

18      A.    Yes.

19      Q.    How many siblings?

20      A.    I have an identical twin brother.

21      Q.    And what's his name?

22      A.    Ronald.

23      Q.    How many total do you have?

24      A.    I have a sister.

Page 7

1      Q.    Okay.

2      A.    And her name is Ginger and she lives here

3  in Chicago.

4      Q.   I see.  And in what -- is she in Chicago

5  proper or in a suburb?

6      A.    She lives on Lake Shore Boulevard, I think

7  it is, Lake Shore -- is that the correct name, Lake

8  Shore Boulevard?

9      Q.    It might be if she's here downtown.

10      A.    She's right around the Navy Pier area.

11  She lives in an apartment on the waterfront.

12      Q.    Are any of your siblings lawyers?

13      A.    No.

14      Q.    Where did you grow up?

15      A.    I grew up in a small town called Barker,

16  New York, B-a-r-k-e-r.

17      Q.    Where did you go to college?

18      A.    My first two years of college were at

19  Genesee Community College in Batavia, New York.

20  Then, I transferred to the State University College

21  at Buffalo, also known as Buffalo State College.

22            And after that, I went to Ohio Northern

23  University School of Law in Dayton, Ohio for one

24  year.  And then, I transferred back to the

```
                                              Page 8
 1    University of Buffalo Law School for my final two
 2    years, and that's where I received my degree.
 3         Q.   In what year did you complete your
 4    undergraduate studies at Buffalo State?
 5         A.   1987.
 6         Q.   With what degree did you --
 7         A.   Actually -- hold on.  '87.
 8         Q.   What was your degree?
 9         A.   Criminal justice.
10         Q.   In what year did you receive your law
11    degree?
12         A.   1991.
13         Q.   Did you work at all between the time of
14    completing your undergraduate studies and law
15    school?
16         A.   Yes.
17         Q.   Where did you work?
18         A.   I worked as a security guard for -- it's
19    now a Six Flags Amusement Park.  It's called
20    Darien Lake.
21         Q.   Is that in New York?
22         A.   Yes.  It's in Darien, New York.
23         Q.   And for what years did you work as a
24    security guard?
```

Page 9

1      A.   I worked there for two years.  For the
2   first year after I was out of undergraduate before
3   going to law school, and then, not the preceding
4   year, but the year before that, I worked at
5   Darien Lake as a security guard.
6      Q.   Are your parents alive?
7      A.   Yes.
8      Q.   What is the profession of your father?
9      A.   My father is retired, but he was a welder
10   at General Motors for approximately 35 years.
11      Q.   Did your mother have a profession outside
12   of the home?
13      A.   No.
14      Q.   What was your first job outside of law
15   school?
16      A.   As I mentioned, it was working for O'Shea
17   Reynolds --
18      Q.   That's right.
19      A.   -- Napier, Cummings & Kirby.
20      Q.   How long?
21      A.   I was there for eight months.
22      Q.   And then, where did you go?
23      A.   Then, I was hired at the Niagara County
24   District Attorney's Office, located in Lockport,

Page 10

1    New York.

2         Q.   What was your title there?

3         A.   Assistant District Attorney.

4         Q.   What were the cases that you prosecuted?

5         A.   For the first year and a half, I was the

6    drug prosecutor.  So I prosecuted the sale and

7    possession of illegal drugs.

8              I also was the asset forfeiture attorney.

9    So if there was proceeds of crime or

10   instrumentalities of crime, then I would step in

11   and try to seize that if the federal government

12   wasn't interested in the asset.

13        Q.   And is that all just for the first year

14   and a half?

15        A.   That was for the first year and a half.

16   And then, after that, I was promoted to the

17   Grand Jury Bureau Chief.

18             And there, I was responsible for

19   overseeing the proceedings of the Grand Jury,

20   presenting most of the cases that came into the

21   office from the lower court, whether it was held

22   over after a felony hearing or if it was a direct

23   presentment case.  I would present those.  It could

24   involve robbery, burglary, homicide, sexual

Page 11

1   assault, rape, any of those cases.

2       Q.   For how many years were you with the

3   Niagara County DA?

4       A.   Approximately four and a half.

5       Q.   How many cases did you try to verdict?

6       A.   Approximately 28 felonies, but I was also

7   assigned to varying town courts.

8            So I would go out at night and I was a

9   town prosecutor in various town courts.  And there,

10  I would prosecute just low-level misdemeanors,

11  violations.  And I probably tried maybe 50 to 100

12  DWI cases, harassment, disorderly conduct, larceny,

13  those kinds of things.

14      Q.   At the end of your time with the Niagara

15  County DA, who was your next employer?

16      A.   Nationwide Insurance Company out of

17  Columbus, Ohio.

18      Q.   What is the business of Nationwide

19  Insurance?

20      A.   They're a Fortune 100 insurance company

21  and financial institution.

22      Q.   What role did you fulfill at Nationwide

23  Insurance?

24      A.   When I was initially hired, my title was

Page 12

1    claims legal counsel.  So I provided legal support

2    to the claims department in the area of New York

3    from Syracuse and west to Buffalo.

4            So we had claims offices in Syracuse,

5    Rochester, Buffalo, Jamestown.  And they were

6    staffed by claims adjustors, also some people from

7    the underwriting department.

8            And when they needed legal advice or

9    counsel on coverage matters, claims issues,

10   valuation of cases, liability, those types of

11   things, then I would provide legal advice.

12       Q.   So that's how you -- that was the position

13   in which you started.  What was your title when you

14   left Nationwide?

15       A.   When I left, I was assistant general

16   counsel.

17       Q.   Why did you leave Nationwide?

18       A.   I took the job that I currently hold.

19   That was after 17 and a half years.

20       Q.   While you were at Nationwide serving as

21   assistant general counsel, did you go and seek

22   other employment offers?

23       A.   While I was there, no.

24       Q.   Was there a per --

Page 13

1      A.   There was one time when I -- toward the

2  end of the 17 and a half years when I had made an

3  application or at least discovered a job opening at

4  Utica Mutual Insurance Company, but that required

5  me to move to Utica, New York, and I didn't want to

6  move to Utica, New York.

7      Q.   When you were assistant general counsel,

8  who was it by name and title that you immediately

9  reported to?

10     A.   His name was Raymond Waugh.  He was an

11  assistant vice president and he managed attorneys

12  in the Northeast United States and several states.

13     Q.   How are you spelling Raymond's last name?

14     A.   W-a-u-g-h.

15     Q.   So at some point while you're assistant

16  general counsel at Nationwide, you make an

17  application for a position at Utica Mutual, is that

18  right?

19     A.   I believe it was a posting on Monster or

20  one of those job advertisement type sites and I

21  sent a cover letter and resume.

22          The person who was seeking attorneys for

23  the position, sort of the headhunter-type person

24  had given me a call, told me that I was exactly the

Page 14

1    person that they were looking for, but in order to

2    take the job, you had to be staffed in Utica, and I

3    told them that was a no-go.

4        Q.   Okay.  So was the position at Utica Mutual

5    the only instance in which you used a headhunter to

6    seek employment --

7        A.   Well, the headhunter was employed by

8    Utica Mutual.  I'm sorry.

9        Q.   You got to let me finish.

10       A.   Yeah.

11       Q.   Was the -- strike that and we'll start

12   over just so that we have --

13       A.   Yeah.

14       Q.   -- a clean record.  And you know, I'll do

15   the same.  If I cut you off, just let me know.

16            Was the position at Utica Mutual the only

17   instance in which you submitted a resume through

18   the headhunter for employment outside of

19   Nationwide?

20       A.   Now that I'm thinking about it, there may

21   have been some other cover letters and resumes that

22   were sent.

23       Q.   To who?

24       A.   And I could tell you if I looked at my

Page 15

1    computer and my thumb drive who those were sent to.

2          I think that there was one that was sent

3    to HSBC Bank.  There may have been a nursing home

4    they were advertising for general counsel.  I think

5    I submitted a resume for that position.

6          There was also a position at Mattel,

7    Fisher-Price I may have sent -- I think I did send

8    a resume and cover letter to them.

9    Q.    Would it be fair to say that for the other

10   positions for which you submitted a resume or a

11   resume and cover letter during the time for which

12   you were assistant general counsel at Nationwide,

13   you perceived those positions to be better

14   positions than the one you held at Nationwide at

15   that time?

16   A.    Some would have been essentially a

17   lateral-type move.

18          The one thing about working inside an

19   insurance company is that they go through

20   reorganizations all the time.  So within

21   Nationwide's general counsel's office, there were

22   two or three times when they reorganized,

23   downsized, and they would let some attorneys go.

24          In some instances, you had to reapply for

Page 16

1    your job.  You had to re-interview for your job.

2    So when there were rumblings of potential

3    reorganization of the legal department, then, of

4    course, people would become a little scared and

5    they would seek employment elsewhere in case they

6    didn't have a job at Nationwide.

7         Q.    During your time at Nationwide while

8    serving as assistant general counsel, when

9    Nationwide would undergo these periods of

10   reorganization, were you ever caused to

11   re-interview for a job?

12        A.    Yes.

13        Q.    How many times?

14        A.    Once, but that was for a different

15   position.

16        Q.    Were you hired for that position?

17        A.    Yes.  That was the position that I left

18   at, assistant general counsel with different

19   responsibilities than I had before.

20        Q.    For what period of time did you hold the

21   title assistant general counsel at Nationwide?

22        A.    Approximately a year and a half to two

23   years.

24        Q.    How did you -- strike that.  Am I

Page 17

1  understanding correctly that you left Nationwide to

2  accept a position at Counsel Financial?

3      A.   That's correct.

4      Q.   Okay.  How did you come upon the vacant

5  position at Counsel Financial?  Was that through a

6  headhunter?

7      A.   No.  The person that hired me into

8  Nationwide in 1996 was managing counsel of New York

9  State and we had worked together at Nationwide for

10  approximately 15 or 16 years.

11          He left the company to take a position at

12  Counsel Financial.  And when a position opened at

13  Counsel Financial, he called me on the phone and

14  asked me to come over and interview for the

15  position.

16      Q.   What is his name?

17      A.   His name is Joseph Kasouf, K-a-s-o-u-f.

18      Q.   Okay.  Now, you said that Mr. Kasouf was

19  managing counsel of New York State for

20  Nationwide --

21      A.   Correct.

22      Q.   -- is that right?

23      A.   Yes.

24      Q.   Okay.  And at some point, Mr. Kasouf left

1    Nationwide to accept a position at

2    Counsel Financial.  And was that as general

3    counsel?

4        A.   Yes.

5        Q.   And approximately what year --

6        A.   Well, he didn't start as general counsel.

7    There was another person that worked at Nationwide

8    who went over to Counsel Financial.

9            And he was general counsel for several

10   years, and then, at some point in time -- and I

11   wasn't there, the -- they were co-general counsel,

12   and then, he became general counsel.

13       MR. STEWART:  Can I have just a second?  Just

14   let her finish the question.

15       THE WITNESS:  Okay.

16       MR. STEWART:  Just let her get all the way

17   through the question.

18   BY MS. McNULTY:

19       Q.   I think you mentioned it a moment ago, but

20   I want to be clear on this.

21       A.   Yeah.

22       Q.   What year did you begin your employment

23   with Counsel Financial?

24       A.   2014, possibly.  I don't remember the

Page 19

1    exact year.

2        Q.   What year did Mr. Kasouf start his

3    employment, approximately?

4        A.   I don't know.

5        Q.   Are you able to characterize it in any way

6    in terms of time before you started there, meaning

7    do you recall him being there a year before you or

8    10 years before you?

9        A.   I don't know when he started the position.

10       Q.   Tell me, what is your current title at

11   Counsel Financial?

12       A.   Deputy general counsel.

13       Q.   To whom do you immediately report?

14       A.   I report to Megan Payne, P-a-y-n-e, and

15   she is our chief operating officer.

16       Q.   So as deputy general counsel, where does

17   Mr. Kasouf fit into your chain of command?

18       A.   He really doesn't.  He does essentially

19   the same thing that I do at the company, but he

20   has -- with some expanded responsibilities.

21            If the company is going to an event, like

22   AAJ, Trial Lawyers, something like that, he may

23   make a presentation on what Counsel does for

24   attorneys.

Page 20

1          So he has the general counsel title for

2   that reason, but I don't directly report to him.

3   He doesn't perform my performance reviews or

4   anything like that.

5          Q.   Now, I see that there are three deputy

6   general counsel that work for Counsel Financial --

7          A.   Correct.

8          Q.   -- is that right?  Okay.  And do all three

9   deputy general counsel perform the same role or

10  function?

11         A.   There's deputy general counsel

12  Jamie Verrico.  I hold the position.  And there's

13  also -- I believe her title was changed.

14  Kelly Anthony.  And she's deputy general counsel,

15  but she does not perform the same function that

16  Jamie and I do.

17         Q.   Okay.  Tell me what your day-to-day

18  responsibilities are as deputy general counsel.

19         A.   I'm essentially a legal underwriter for

20  the company.

21          So if a law firm comes to us and they are

22  seeking a line of credit to finance their firm, the

23  application comes in, I perform an initial

24  interview of the client, essentially to find out

Page 21

1   what their business model is, what their portfolio

2   of cases looks like, what their revenue may be over

3   the course of several years.

4         I speak with them about their legal

5   careers, how they came to that point, what they

6   would use the line of credit for.  Essentially,

7   just a get-to-know-you type conversation.  I would

8   review their case list.

9         And if it was something that we were

10  interested in pursuing, then I would go out and I

11  would visit the firm and discuss their application

12  in more detail.

13     Q.  Now, more broadly, tell us the business of

14  Counsel Financial.

15     A.  Counsel Financial's primary business is

16  giving lines of credit to law firms.  And we do so

17  throughout the country.

18         If a law firm has any kind of gaps in

19  income and they're having trouble financing their

20  firm or financing cases and they want to use a line

21  of credit for that purpose, then they will come to

22  us and they will make an application for that type

23  of financing.

24     Q.  And what -- how does Counsel Financial

Page 22

1  benefit from that type of financing?

2       A.   The client pays interest.

3       Q.   And what are the -- strike that.  What is

4  the range of amounts that a lawyer can borrow from

5  Counsel Financial?

6       A.   We will do lines of credit from 250,000 to

7  5 million.

8       Q.   Okay.  And is there a cap at 5 million?

9       A.   Yes.

10      Q.   Have you ever made a loan for more than

11  5 million?

12      A.   Have I made a loan for 5 million or more?

13      Q.   Has Counsel Financial?

14      A.   I don't know.

15      Q.   Okay.  Have you in your underwriting?

16      A.   No.

17      Q.   I think I read in some of the materials

18  associated with Counsel Financial that there are

19  loans available to the amount of 25 million.  Have

20  you ever heard of that?

21      A.   No.

22      Q.   Would you be surprised to hear that?

23      A.   There's other businesses within

24  Counsel Financial.  So if it -- if it's something

Page 23

1    that's outside a line of credit, it could be that

2    much.

3              So if an attorney settled a class action

4    case and their attorney fee was going to be X

5    amount and they wanted to get an advance on that

6    fee or at least take it early, then we would extend

7    financing under that request if the case was

8    preliminarily settled before a court.

9              If they had a personal injury case that

10   may have settled, certainly, the amount in that

11   side of the business could be up to 25 million, but

12   individual law firms, usually, the most that we

13   loan is $5 million.

14        Q.   And I'm understanding from your testimony

15   a moment ago that your colleague, Mr. Verrico, he

16   does the same thing that you do in terms of the

17   day-to-day?

18        A.   Correct.

19        Q.   Do you and Mr. Verrico have any regional

20   division between the two of you?

21        A.   No.

22        Q.   How is it that you and Mr. Verrico are

23   assigned to an applicant?

24        A.   We get the assignment from Megan Payne,

Page 24

1    who is the chief operating officer, and we process

2    the application.

3        Q.   You've indicated that the range of loans

4    available reaches 5 million.  What is the range of

5    the interest rate on those loans?

6        A.   The top is 18 percent.

7        Q.   Fair to say that 18 percent is pretty much

8    the typical interest rate for these loans?

9        A.   I don't know what the average interest

10   rate is.  I don't know the interest rate for every

11   borrower.  That is something that is done by those

12   folks on the business and financial side.

13       Q.   From time to time, your applicants do not

14   pay on their loans made by Counsel Financial,

15   correct?

16       A.   I'm not involved in that side of the

17   business.  I'm not in the collection end.  I don't

18   really get involved in that part.  I'm a legal

19   underwriter.

20            So if -- I mean, I know that the default

21   rate is very low, because we have strong legal

22   underwriting and we make sure that it's a solid

23   firm.  Before we give them the line of credit, we

24   make sure that the collateral is something that

1  will support the line of credit, the cases are

2  worthy and have the value that we ascribe to them,

3  but do clients not pay, I have no idea.  That's not

4  my part of the business.

5                          (Whereupon, Tucker Deposition

6                          Exhibit 1 was marked for

7                          identification.)

8  BY MS. McNULTY:

9      Q.   I'm going to tender to you what I am

10 marking as Tucker Group Exhibit 1.

11     A.   Can I pull my glasses out of my backpack?

12     Q.   Of course you can.  Okay.  And you'll see

13 that Group Exhibit 1 includes two cases.

14          The first is In Re:  Total Body Essential

15 Nutrition, Inc., Products Liability Litigation, MDL

16 1985.  And that is a Northern District of Alabama

17 case from 2012.

18          And then, as well, there's a 2013 case,

19 Counsel Financial Services, LLC vs. David McQuade

20 Leibowitz, et al.  And that is pending in the -- it

21 looks like State Court of Texas, Corpus Christi.

22 Do you see that?

23     A.   Uh-huh.  Yes.

24     Q.   When Counsel Financial services takes a

Page 26

1    client to court or engages them in litigation, what

2    role, if any, do you have in that recovery effort?

3        A.    None.

4        Q.    Who do you understand to be engaged in the

5    role of recuperating defaults from

6    Counsel Financial's own clients?

7        A.    If there's a default and it requires

8    litigation, then typically, we hire outside

9    counsel.  We engage them to pursue the default.

10       Q.    And are you part of that process by which

11   Counsel Financial engages outside counsel to

12   address the loss by Counsel Financial?

13       A.    No.

14       Q.    In your time with Counsel Financial, how

15   many times have you traveled to Corpus Christi?

16       A.    Corpus Christi?

17       Q.    Yes.

18       A.    One time.

19       Q.    And for what purpose?

20       A.    To meet with a new client.

21       Q.    And who was that client?  You're shaking

22   your head no.

23       A.    I'm shaking my head no because I don't

24   want to disclose the -- we don't disclose our

Page 27

1  clients.  So I'm not going to disclose that client.

2      Q.   Okay.  So I'm going to ask for the

3  question to be read again.

4                    (Whereupon, the record was read.)

5  BY MS. McNULTY:

6      Q.   You understand the pending question?

7      A.   I do.

8      Q.   Okay.  I'm looking for the name of the

9  client with whom you met in Corpus Christi.

10          And are you informing me that despite

11  being under Federal Subpoena to give your

12  deposition today, you are not going to answer that

13  question?

14     A.   I understand that I'm under subpoena.  I

15  don't quite understand what that has to do with

16  Eubank vs. Pella Windows.

17          Our clients, when they come to us, they

18  expect a certain amount of confidentiality.  They

19  may not want other people in the business to know

20  whether or not they're receiving financing from

21  Counsel Financial.  And that's something that we

22  take very seriously.

23          So I don't want to disclose who that

24  client is.  There's certain privacy expectations on

Page 28

1    behalf of the business and I'm going to abide by

2    those.

3        Q.   So you're going to choose your own

4    business preferences in terms of handling client

5    confidentiality, as opposed to the authority of the

6    Federal Court Subpoena, is that right?  Am I

7    understanding that?

8        A.   I don't think you're understanding that

9    correctly.

10       Q.   Okay.  So then, I'm going to ask you the

11   question again.

12       A.   Okay.

13       Q.   When you traveled to Corpus Christi that

14   one time to meet with a client, who was the client

15   with whom you met?

16       A.   I'm not going to provide the name of the

17   client for privacy reasons.

18            I think there's an expectation of privacy

19   on behalf of that person, as there is in many

20   banking regulations and with those kinds of

21   transactions.  And I don't think that -- without a

22   disclosure agreement that I am able to provide that

23   name to you.

24       Q.   Well, I'm going to mark the record for the

Page 29

1  purpose of moving to strike the nonresponsive

2  answer, which is, frankly, self-serving, given your

3  affirmative choice to engage in this litigation.

4          I will offer to you that if you care to

5  answer that question today, consistent with the

6  Court rules, that the matter of any confidentiality

7  can be addressed by your attorneys, Mr. Novoselsky

8  and Mr. Stewart in a format that would be

9  appropriate for the Court to consider, as opposed

10  to a unilateral effort to not answer questions

11  under oath.

12      A.    Sure.

13      Q.    So with that, I will again ask the

14  question, can you identify for me the client with

15  whom you met in Corpus Christi?

16      A.    I will not identify the client.  I will

17  tell you that it was not Mr. Bandas.

18      Q.    Well, that is still nonresponsive to my

19  question and I'm going to ask for that question to

20  be certified.

21          You understand the pending question,

22  right?

23      A.    I understand the question.

24      Q.    And it is -- are you represented by

Page 30

1   counsel today?

2       A.   Yes.

3       Q.   Okay.  And your counsel hasn't taken this

4   position on that question, but is it that you on

5   your own, with or without counsel's advice, are not

6   going to answer that question?

7       A.   I've answered the question to the best of

8   my ability.

9       Q.   You agree that you know the name of the

10  client, you're just choosing to not tell me, is

11  that right?

12      A.   I will not reveal the name of the client.

13      Q.   And you know the name of that client,

14  correct?

15      A.   I know the name of the client.

16      Q.   Okay.  Do you know Joseph DiNardo?

17      A.   I do.

18      Q.   And who is he?

19      A.   He was the founder and former CEO of

20  Counsel Financial.

21      Q.   You're saying he was the former CEO?

22      A.   Yes.

23      Q.   Okay.  And so what is his current title?

24      A.   I'm not sure I know what his formal title

```
1    is.
2         Q.   It's indicated that he is director and
3    founder.  Does that sound familiar?
4         A.   Founder does, yeah.  I don't have
5    knowledge of him having a title as director.
6         Q.   Paul Cody is the president and CEO?
7         A.   Correct.
8         Q.   With respect to Mr. DiNardo, what's your
9    understanding of why he was disbarred in the state
10   of New York?
11        A.   I have no understanding.
12        Q.   Have you ever heard that he had been
13   disbarred in the state of New York?
14        A.   I heard it, yes.
15        Q.   Do you have an understanding that the
16   charge was tax evasion?
17        A.   I had heard something about that, yeah.
18        Q.   And you have an understanding that he was
19   convicted of the same and held under house arrest
20   for a number of years?
21        A.   I don't know the extent of that, no.
22        Q.   You've heard all of that, though, before?
23   I'm not telling you anything you haven't heard?
24        A.   It may have been mentioned somewhere.
```

Page 32

1     Q.   With respect to Mr. Bandas, how is it that
2  you came to retain him?
3     A.   He made an application to
4  Counsel Financial for a line of credit.
5     Q.   And was he given a line of credit?
6     A.   He was offered a line of credit, but he
7  didn't take it.
8     Q.   Okay.  Now --
9     A.   And the reason why I'm disclosing that is
10  because he said that I was authorized to do that.
11     Q.   Have you ever met him in person?
12     A.   No.
13     Q.   Okay.  So that's how you met him.  You've
14  never met him in person, right?
15     A.   No.
16     Q.   You've spoken to him over the phone?
17     A.   Yes.
18     Q.   In connection with his application for
19  credit?
20     A.   No.
21     Q.   You've spoken to him over the phone in
22  connection with what?
23     A.   This case.
24     Q.   Okay.  And so how did you come to be the

Page 33

1    client of Mr. Bandas?

2        A.   He had made the application for the line

3    of credit.  Another legal underwriter went out and

4    met with him.

5            When Joe Kasouf came back, he had

6    mentioned what his case load was and the types of

7    cases that he handled.  I knew that he had done

8    some objecting in class action litigation.

9            So when I received the notice of this

10   settlement, the Pella Windows settlement, I

11   prepared an objection, I had him review it, and

12   then, I asked him if he would be willing to

13   represent me as the objector.

14       Q.   So it sounds like you undertook an effort

15   to determine if he had done objecting in class

16   settlements, is that right?

17       A.   I knew that he had done objecting in class

18   settlements by virtue of his cases.  That was

19   something that Mr. Kasouf had told me.

20       Q.   Okay.  And so that's what I was going to

21   ask.  So you didn't do the underwriting?

22       A.   No.

23       Q.   But now, you're saying that Mr. Kasouf

24   told you that Mr. Bandas had done objecting in

1   class litigation and that Mr. Kasouf came to know

2   that because Mr. Bandas used those cases and his

3   role in those cases as a basis to secure financing

4   for his firm, is that right?

5       A.   I'm not sure I understand the question.

6   There's a lot there.

7       Q.   Let me break it down.

8       A.   Sure.

9       Q.   You did not have any role in the

10  underwriting of Mr. Bandas' application for

11  financing?

12      A.   I did not.

13      Q.   Mr. Kasouf did?

14      A.   Yes.

15      Q.   Mr. Kasouf told you that Mr. Bandas was an

16  objector?

17      A.   It was mentioned that that was a part of

18  the portfolio of cases that he handled.

19      Q.   If you were not involved in the

20  underwriting process, what was the circumstance

21  under Mr. -- strike that.

22           If you were not involved in the

23  underwriting process for Mr. Bandas, what was the

24  circumstance under which Mr. Kasouf came and told

Page 35

1    you that Mr. Bandas has cases in which he serves as

2    an objector?

3       A.    It was probably mentioned at an

4    underwriting meeting when we come together and we

5    discuss applications.  It could have been

6    watercooler talk, talking around the office with

7    the other underwriters.  When he came back from

8    Corpus Christi, he may have mentioned some of the

9    areas of the cases.

10         Do I know or recollect a specific

11   conversation, I do not.  All I know is that at some

12   point in time, I learned that he did some cases

13   that involved objecting to class action

14   settlements.

15      Q.    And you perceived that as -- meaning you

16   perceived the business of Mr. Bandas serving as an

17   objector to be sufficiently recognizable as a means

18   of supporting his application for financing?

19      A.    I have no idea whether that collateral or

20   that fee collateral was something that was

21   considered, because I didn't work on that

22   application.  I didn't work on that particular

23   loan.

24      Q.    So if you weren't working on the loan and

Page 36

1    you didn't give any thought as to that portion of

2    Mr. Bandas' business as being supportive of his

3    application for financing from your office, why

4    would you talk about it at a watercooler?

5         A.   Because that's just something that we talk

6    about.  We collaborate on some -- sometimes.

7              Sometimes, when somebody comes back from

8    visiting a potential client, they'll casually talk

9    about the type of cases that they have, if they

10   have an interesting case, a big case, a trucking

11   accident, a huge value case, we'll talk about those

12   cases.

13             At some point, it came up in our

14   conversations that Mr. Bandas handled objections by

15   people who were unsatisfied with a class action

16   settlement.

17        Q.   And what did you --

18        A.   Do I know the specifics of his cases, no,

19   I do not.

20        Q.   What did you do with that information once

21   you received it from Mr. Kasouf?

22        A.   I held it in the back of my brain.

23        Q.   What was the time period during which

24   Mr. Kasouf told you about Mr. Bandas' business as

Page 37

1    an objector?

2        A.    I believe it was sometime this year,

3    probably in March or April, possibly.

4        Q.    And you held it in the back of your brain

5    for how long?

6        A.    It's still there.

7        Q.    Okay.

8        A.    It's still there.

9        Q.    With respect to holding it in the back of

10   your brain, that's one thing that you say you did

11   with the information concerning Mr. Bandas'

12   objector business.  What else did you do with it?

13       A.    With that information?

14       Q.    Yes.

15       A.    Nothing.  There's nothing to do with it.

16   It was something that was mentioned to me.

17            We have several clients throughout the

18   country.  I could probably tell you what kinds of

19   cases -- even the clients that don't specifically

20   deal with me, I may have a general idea of what

21   kind of cases they handle or what their firm

22   handles, but that was something that stuck with me.

23       Q.    Did you phone Mr. Bandas?

24       A.    Did I phone him?

Page 38

1    Q.   Did you --

2    A.   When?

3    Q.   -- phone him after the conversation

4  sometime in March or April when you learned of his

5  objector business?

6    A.   I've spoken with him on the phone.

7    Q.   Okay.  After you received the information

8  concerning his objector business in March or April,

9  when was the first time you spoke with him?

10    A.   I don't know.  I don't know.

11    Q.   When was the last time you spoke with him?

12    A.   Yesterday.

13    Q.   For how long did you speak with him

14  yesterday?

15    A.   Two or three minutes.

16    Q.   Did you phone him or did he phone you?

17    A.   My attorney phoned him.

18    Q.   Okay.

19    A.   Mr. Stewart.

20    Q.   And so you got on the phone or --

21    A.   It was on speaker.

22    Q.   Okay.  Who else did you meet with

23  yesterday, either in person or by phone?

24    A.   My sister.  That was it.

Page 39

1     Q.   You received a copy of your subpoena,
2   correct?
3     A.   Correct.
4     Q.   From whom did you receive that?
5     A.   It was e-mailed to me.
6     Q.   By who?
7     A.   Somebody from Mr. Bandas' office, I
8   believe, if I'm not mistaken.
9     Q.   How long ago did you receive the e-mail
10   with the subpoena?
11     A.   I don't know how long I've had it.  I
12   don't know.
13     Q.   More than a week?
14     A.   Probably more than a week, yeah.
15     Q.   More than two weeks?
16     A.   The first time I saw the subpoena, by the
17   way, was when I looked on PACER after my objection
18   was submitted and I saw the subpoena.
19     Q.   And I appreciate --
20     A.   And then, it was later delivered to me
21   through e-mail.
22     Q.   And I appreciate that but --
23     MS. McNULTY:  Can you repeat the pending
24   question?

Page 40

1              (Whereupon, the record was read.)

2      THE WITNESS:  Probably more than two weeks.

3  BY MS. McNULTY:

4      Q.   Since the time of learning that you were

5  going to sit for a deposition in this matter, have

6  you prepared for this deposition?

7      A.   I have.

8      Q.   Okay.  How did you prepare?

9      A.   I went through many of the documents on

10  PACER.

11      Q.   And you -- who supplied for you those

12  documents?

13      A.   I looked at them.

14      Q.   You have a PACER log-in?

15      A.   Uh-huh.  Yes.

16      Q.   And what is that?

17      A.   What's the PACER log-in?

18      Q.   Yeah.

19      A.   I'm not comfortable giving that out.

20      Q.   The log-in.  Not your password, the

21  log-in.  We can redact it from any --

22      A.   I think the log-in name is E Delaney.

23      Q.   And who is E Delaney?

24      A.   Her name is Erin Delaney.  She's an

Page 41

1   attorney at Counsel Financial.

2        Q.   So you used her log-in to access PACER in

3   this case?

4        A.   Correct.

5        Q.   And does she -- does Ms. Delaney know that

6   you used her log-in for that purpose?

7        A.   Yes.

8        Q.   Did Ms. Delaney assist you in preparing

9   your objection in this case?

10       A.   No.

11       Q.   Did you meet with Ms. Delaney to review

12  the documents that you accessed on PACER using her

13  log-in?

14       A.   No.

15       Q.   Does Ms. Delaney know that you're an

16  objector in this case?

17       A.   No.

18       Q.   For what reason did you tell her you were

19  using her log-in to access documents in this case?

20       A.   I didn't tell her that I was using it to

21  access documents in this case.

22            If we need to access documents off of

23  PACER, then either I ask her to pull them off of

24  PACER or I have her log-in information and I can

Page 42

1    pull them off of PACER myself.

2        Q.   Okay.  And Ms. Delaney is senior counsel

3    at Counsel Financial?

4        A.   Yes.

5        Q.   Does anyone at Counsel Financial know that

6    you're an objector in this case?

7        A.   Yes.

8        Q.   Who?

9        A.   Jamie Verrico, Joseph Kasouf, and

10   Megan Payne.

11       Q.   Other than pulling many documents on

12   PACER, did you do anything else to prepare for your

13   deposition today?

14       A.   I met with Eric yesterday.

15       Q.   Okay.  And where did you meet?

16       A.   The Grand Sheridan Hotel or the Sheridan

17   Grand Hotel.

18       Q.   And for how long did you meet?

19       A.   Two to three hours.

20       Q.   And who all was present for that meeting,

21   either in person or by phone?

22       A.   Just he and I, and then, a short

23   conversation with Mr. Bandas.

24       Q.   Did you review any documents with Eric?

Page 43

1      A.   He didn't provide me with any documents.

2   I had some documents with me, and one or two, I may

3   have showed him.

4      Q.   Do you have those documents with you here

5   today?

6      A.   Yes.

7      Q.   Are you able to access them?

8      A.   Yes.

9      Q.   Okay.  We'll take a minute for you to do

10  so.

11                    (A short break was taken.)

12  BY MS. McNULTY:

13     Q.   So we took a short break for you to pull

14  the documents that you used in preparation for

15  today.  And what I'd like to do is, if you can hand

16  me the stack --

17     A.   Sure.

18     Q.   -- I'm just going to mark it as Group

19  Exhibit 2.

20                    (Whereupon, Tucker Deposition

21                    Exhibit 2 was marked for

22                    identification.)

23  BY MS. McNULTY:

24     Q.   And it looks like it's the notice of

Page 44

1  issuance of subpoena.  It is a postcard notice and

2  the long form notice.  It is proof of you having

3  submitted a claim and the Windows -- strike that.

4  The exhibits that were attached to your objection.

5  It looks like it is a letter from Window & Door

6  Solutions, LLC.

7         Then, you have a copy of a limited

8  warranty certificate.  And the warranty is a 2010

9  year warranty.  There's not a date, but the 2010

10  designation is helpful to us.  And it has a 1996

11  copyright.

12         Then, it is a copy of your objection, your

13  declaration, neither of which have the ECF stamp.

14  And it looks like it's also an objection filed by a

15  Ms. Von Bergen Wessels and Mr. Wessels,

16  Mr. Theisen, Ms. Hockemeier, and some of the other

17  letters from class members not represented by

18  counsel in making their objection.

19         Okay.  With respect to the limited

20  warranty certificate, what about this -- strike

21  that.  Did this document inform you as to your

22  objection?

23      A.   No.

24      Q.   Where did you receive this limited

Page 45

1  warranty certificate?

2       A.   I took that from the Pella website.  I

3  think it's a historical -- they have historical

4  warranties on their website.

5       Q.   And why did you select this particular

6  warranty?

7       A.   Because I thought that that was the one --

8  or believed that that's the one that applies to my

9  windows.

10      Q.   And when did you print this warranty?

11      A.   Sometime after I received the notice of

12  class settlement.

13      Q.   And then, sort of the last bundle of

14  papers are objections filed by other class members

15  who are not represented by counsel.  And when did

16  you print those?

17      A.   Monday or Tuesday.

18      Q.   And are these printed objections the

19  documents that you referenced in your answer a

20  short moment ago when you said you reviewed many

21  documents on PACER?  Are these the documents that

22  you're talking about?

23      A.   Yes.

24      Q.   I'm just going to set that aside.

Page 46

1      MR. STEWART:  Did you mark all those as 2

2  together?

3      MS. McNULTY:  I did, yeah.  That's Group 2.

4  Yeah.

5  BY MS. McNULTY:

6      Q.   Okay.  Where does Counsel Financial's pool

7  of financing come from when you're underwriting a

8  client or an applicant?

9      A.   What bank does it come from?

10     Q.   Is it a bank?  I don't know.

11     A.   Uh-huh, a bank.

12     Q.   Is that a yes?

13     A.   Yes.

14     Q.   Okay.

15     A.   Bank of America.

16     Q.   Okay.  So Bank of America is the source of

17  financing for the loans that are made by

18  Counsel Financial, is that right?

19     A.   A portion of it, yes.

20     Q.   Okay.  What portion of it?  Is it a

21  percentage of it?

22     A.   80 percent.

23     Q.   And then, there's also individual --

24  individuals who are also investors for the purpose

Page 47

```
 1    of financing the loans made by Counsel Financial?
 2         A.   Correct.
 3         Q.   And is there a public disclosure as to who
 4    the individuals are?
 5         A.   I have no idea.
 6         Q.   When you have your underwriting meetings
 7    that you referenced a moment ago, are there ever
 8    individuals who are serving as investors present
 9    for those meetings?
10         A.   No.
11         Q.   Are there meetings that are held in which
12    the individual investors are present?
13         A.   I have no idea.  I have no knowledge.  I
14    don't meet with them.
15         Q.   Who does?
16         A.   I don't know.
17         Q.   With respect to the underwriting of
18    Mr. Bandas' application for a loan, the component
19    of his submission that referenced his objector
20    business, that was considered profitable with
21    respect to his application for financial
22    assistance?
23         A.   I have no knowledge of what took place and
24    what was considered.  I was not the legal
```

Page 48

1    underwriter on that particular application.  So if

2    Mr. Kasouf had discussions with someone else about

3    that, I would have no knowledge and I don't have

4    any knowledge.

5         Q.   You are an attorney, right?

6         A.   Correct.

7         Q.   Okay.  And you -- at some point, you

8    engaged the services of Mr. Bandas, correct?

9         A.   Correct.

10        Q.   And there is a written representation

11   agreement between the two of you?

12        A.   Yes.

13        Q.   Did you ever undertake any effort to

14   ascertain Mr. Bandas' skill or success in objecting

15   in cases?

16        A.   No.

17        Q.   Did you ever undertake any effort to

18   ascertain the status of any of the cases that

19   Mr. Kasouf spoke to you about in the offhanded

20   watercooler conversation we discussed a moment ago?

21        A.   I don't even know what specific cases he

22   may have had.  All I know is that it was mentioned

23   that part of his business was objecting in class

24   action settlements.  That's all I knew.

Page 49

1      Q.   As you sit here today, do you know if
2   Mr. Bandas is successful in that book of business?
3      A.   I have no idea and I haven't asked him.
4      Q.   Why?
5      A.   It just never came up.  It was somebody
6   that was mentioned that handles class action
7   objections.  I had an objection to this particular
8   settlement and I asked him to review the case and
9   see if he would like to represent me.
10      Q.   With respect to the written representation
11   agreement, who else -- what other lawyers are on
12   that representation agreement?
13      A.   I don't remember.  I believe it was just
14   Mr. Bandas' firm, but I haven't looked at it in a
15   while.
16      Q.   You have a copy of it, right?
17      A.   Not with me.
18      Q.   No.  You --
19      A.   I do.
20      Q.   Yeah.  It's a document that you could go
21   home or go to your office, wherever you keep
22   important documents, and you could find it --
23      A.   Oh, sure.
24      Q.   -- and ascertain --

Page 50

1      A.   Yes.

2      Q.   I'm sorry.  You could find it and

3  ascertain what lawyers are on that representation

4  agreement, correct?

5      A.   Correct.

6      Q.   And as you sit here today, it's more than

7  just Mr. Bandas that is on the representation

8  agreement?

9      A.   I don't know.

10      Q.   Do you know if Mr. Bandas has been

11  sanctioned for his objector activities?

12      A.   I have no knowledge.

13      Q.   Is that something that you as an

14  underwriter, including in your process for legal

15  underwriting in your line of work, would want to

16  know?

17      A.   Are you asking me if a similar applicant

18  came to me and they had a similar line of business,

19  is that something that I would want to know?

20      Q.   No.  I'll do my best to rephrase the

21  question.

22      A.   Sure.

23      Q.   You've described in your work as an

24  underwriter that there is legal underwriting.

Page 51

1        And that must involve assessing an

2    applicant's book of business for the purpose of

3    determining risk and your willingness to finance

4    that lawyer, correct?

5        A.   Yes.

6        Q.   So it seems that you would be equally

7    careful in assessing and selecting a lawyer to

8    represent you in litigation, is that true?

9        A.   It depends on the case.

10       Q.   Did you consider this Pella Windows case

11   an important case?

12       A.   I did and I still do.

13       Q.   Did you -- you agree that you did not

14   undertake any so-called legal underwriting

15   concerning Mr. Bandas' representation of you in

16   this matter, correct?

17       A.   Did I do -- perform due diligence on

18   Mr. Bandas?

19       Q.   That's right.

20       A.   Is that the question that you're asking

21   me?

22       Q.   Yes.

23       A.   No.  Not extensive, no.

24       Q.   Do you know what percentage of Mr. Bandas'

Page 52

1    book of business, for lack of a better term,

2    encompasses objecting in cases?

3        A.    I don't know how much.  I do not.

4        Q.    For how long have you been represented by

5    Mr. Bandas?

6        A.    Approximately two to three months.  It was

7    sometime after I received the class notice.

8        Q.    Now, how does Mr. Novoselsky fit into your

9    relationship with Mr. Bandas?

10       A.    I believe he's local counsel in Illinois

11   for purposes of going to court, doing whatever

12   needs to be done at the local level in Illinois.

13       Q.    Has anyone ever told you that local

14   counsel was necessary for you to place an objection

15   in this litigation?

16       A.    All I know is that when I spoke with

17   Mr. Bandas or Mr. Clore from Mr. Bandas' office,

18   they mentioned that they would be designating an

19   attorney -- a local attorney to assist with the

20   case.

21       Q.    How many times have you met with

22   Mr. Novoselsky?

23       A.    I have not met with him.

24       Q.    How many times have you spoken by phone

Page 53

1   with Mr. Novoselsky?

2       A.   I've never spoken with Mr. Novoselsky.

3       Q.   How many times have you e-mailed with

4   Mr. Novoselsky?  Ever?

5       A.   I don't know.

6       Q.   What other lawyers are representing you in

7   this matter?  You may not ask your lawyer.

8       A.   I mean, when you say what other lawyers --

9       Q.   Oh, okay.

10      A.   -- I mean, he's representing me here

11  today.

12      Q.   Okay.  And you're pointing to Mr. Stewart?

13      A.   Correct.

14      Q.   And what firm is he with?

15      A.   I don't think I remember the name of the

16  firm.

17      Q.   You don't know the name of the firm?  How

18  many times, other than yesterday, have you met with

19  Mr. Stewart?

20      A.   Yesterday was the first time.

21      Q.   How many times have you spoken by phone

22  with Mr. Stewart?  Ever?

23      A.   One or two.

24      Q.   And when was that?

Page 54

1      A.    Within the past week or two.

2      Q.    Before the deposition started, Mr. Stewart

3  mentioned to us all that he lives in both Waco and

4  Corpus Christi, is that right?

5      A.    Correct.

6      Q.    And did you know that before he had

7  mentioned that?

8      A.    I did not.

9      Q.    And you know that Mr. Bandas lives in

10  Corpus Christi, right?

11      A.    I don't know where he lives.  No, I don't

12  know.

13      Q.    Okay.  You do know that Mr. Bandas

14  represents another objector in this case?

15      A.    I do.

16      Q.    Did you ever ask any question as to how

17  Mr. Bandas represents your interest, in which you

18  take a position that the settlement, including

19  fees, are inadequate, and the position of another

20  objector, who says that the settlement is A-Ok, but

21  he opposes certain fee requests?

22      A.    Uh-huh.

23      Q.    Did that ever come up?

24      A.    Yes.

Page 55

1      Q.   And what was that discussion?

2      A.   It was resolved between he and I and the

3   other objector.

4      Q.   And who is that other objector?

5      A.   I believe his name is Schultz.

6      Q.   And have you ever spoken with him?

7      A.   No.

8      Q.   Did you ever have any kind of a meeting

9   between the three of you?

10      A.   No.

11      Q.   And what did Mr. Bandas tell you about his

12   ability to represent two objectors with essentially

13   opposing views in the same litigation?

14      A.   I'm not going to talk about what we

15   discussed.

16      Q.   With respect to the fact of there being a

17   discussion, at the conclusion of that discussion,

18   irrespective of what was specifically discussed, an

19   agreement was reached between you and Mr. Bandas

20   and Mr. Schultz and Mr. Bandas, and effectively,

21   you and Mr. Schultz, is that right, meaning that

22   all three of you were okay with sort of that dual

23   representation?

24      A.   I can only speak for myself.  I was okay

Page 56

1   with it and it was taken care of.  It was resolved

2   from my end.

3        Q.   And how was it resolved?

4        THE WITNESS:  Does this fall within the

5   privilege or no?

6        MR. STEWART:  No.

7        THE WITNESS:  I signed a waiver.  I waived the

8   conflict.

9   BY MS. McNULTY:

10       Q.   As part of that waiver -- strike that.

11  Who was a party to that waiver?  Just you and

12  Mr. Bandas?

13       A.   I'd have to look at it.

14       Q.   At the time you signed that waiver, did

15  you have the understanding that Mr. Schultz had

16  been informed of the conflict, as well?

17       A.   Yes.

18       Q.   At the time you signed that waiver, did

19  you have the understanding that Mr. Schultz was

20  also entering a similar waiver?

21       A.   At some point, it was probably mentioned

22  to me that the conflict was waived by both of us,

23  and therefore, Mr. Bandas could represent me, as

24  well.

Page 57

1      Q.    Okay.

2      A.    But that's my understanding.

3      Q.    And you never considered getting other

4   counsel, right?  You were going to stick with

5   Mr. Bandas?

6      A.    I did not consider anyone other than

7   Mr. Bandas.

8      Q.    Did Mr. Novoselsky at any time counsel you

9   on that conflict?

10     A.    I've never had a conversation with

11   Mr. Novoselsky.

12     Q.    We talked a moment ago about the

13   representation agreement.  And I know you don't

14   recall offhand all who was on that agreement, but

15   you've never had a conversation with

16   Mr. Novoselsky.  Is it fair to say he is not on

17   that agreement?

18     A.    I wouldn't be able to answer the question

19   unless I looked at the agreement.

20     Q.    I'm going to read some firm names and I'm

21   going to ask if you have had any encounter

22   whatsoever personally or professionally with the

23   firms --

24     A.    Sure.

Page 58

1      Q.   -- okay?  Aronovitz Trial Lawyers out of

2   Miami, Florida?

3      A.   No.

4      Q.   Bandas Law Firm --

5      A.   Yes.

6      Q.   -- we've already discussed.

7   Edward Bezdecki out of Toms River, New Jersey?

8      A.   No.

9      Q.   Wexler Wallace out of Chicago?

10     A.   I've heard of them.  I certainly know that

11  they are a firm in Chicago with an excellent

12  reputation.  Their name is often tossed around in

13  different litigations, but have I ever met with

14  them or talked with them, no.

15     Q.   Have you ever underwritten for them?

16     A.   I don't know.  Not in my time.

17     Q.   Brunick, LLC out of Chicago?

18     A.   No.

19     Q.   Whitfield, Bryson & Mason out of Raleigh,

20  North Carolina?

21     A.   No.

22     Q.   Quantum Legal out of St. Louis, Missouri?

23     A.   No.

24     Q.   And only because this lawyer has been in a

Page 59

1  few firms during the time of this litigation,

2  Richard J. Burke?

3       A.   No.

4       Q.   Clifford Law Offices, my firm?  We've not

5  done any work?

6       A.   We have not done any work, but I know of

7  you, because I heard Mr. Clifford speak at a

8  keynote luncheon about a month ago.

9       Q.   Okay.  Merlin Law Group in Chicago?

10      A.   No.

11      Q.   Farmer, Jaffe, Weissing, Edwards, Fistos &

12 Lehrman in Fort Lauderdale?

13      A.   No.

14      Q.   Seeger Weiss out of Philadelphia?

15      A.   Oh, yes.  Yeah.

16      Q.   Gustafson Gluek, Minneapolis?

17      A.   I've heard the name.

18      Q.   Anderson & -- I think it's Wanca out of

19 Rolling Meadows?

20      A.   No.

21      Q.   Lipkin & Higgins in Chicago?

22      A.   No.

23      Q.   What about Peter Higgins?

24      A.   No.

Page 60

```
 1      Q.   Lang Law Office?

 2      A.   No.

 3      Q.   Moore Law Office?

 4      A.   No.

 5      Q.   MoloLamken?

 6      A.   No.

 7      Q.   Have you ever had any conversation with an

 8  attorney named Eric Nitz?

 9      A.   Eric Nitz, no.

10      Q.   Novoselsky Law, we've already covered.

11  Bock, Hatch, Lewis & Oppenheim in Chicago?

12      A.   No.

13      Q.   The Law Offices of Darrell Palmer?

14      A.   No.

15      Q.   Law offices of John Pens?

16      A.   No.

17      Q.   The Lakin Law Firm?

18      A.   The Lincoln --

19      Q.   Lakin?

20      A.   -- Law Firm?

21      Q.   Lakin, L-a-k-i-n?

22      A.   No.

23      Q.   Ryan Martin Law Firm?

24      A.   No.
```

Page 61

1     Q.   Law Offices of Hall Adams?

2     A.   No.

3     Q.   Andersen, Schwartzman, Woodard,

4  Brailsford, PLLC out of Boise, Idaho?

5     A.   No.

6     Q.   Kohn, Swift & Graf out of Philadelphia?

7     A.   No.

8     Q.   Winget, Spadafora & Schwartzberg out of

9  Chicago?

10    A.   No.

11    Q.   Sweetnam, LLC?

12    A.   No.

13    Q.   Morgan & Morgan?

14    A.   Morgan & Morgan, sure.  I've heard of

15  them, yeah, provided they're the ones from Florida.

16    Q.   They are, yeah.

17    A.   Yeah.

18    Q.   I'm going to mark as Exhibit 3 a printout

19  from your social media.

20               (Whereupon, Tucker Deposition

21               Exhibit 3 was marked for

22               identification.)

23  BY MS. McNULTY:

24    Q.   So go ahead and just take a look at that,

Page 62

1    and then, let me know when I can ask you a

2    question.

3        MR. STEWART:   Is there another copy of that?

4    Thank you.

5        THE WITNESS:   Okay.

6    BY MS. McNULTY:

7        Q.   So does Exhibit 3 truly and accurately

8    represent your posted LinkedIn -- your publicly

9    posted LinkedIn account as it exists today?

10       A.   If this was printed today.  I --

11       Q.   Well, let me ask you this.  Have you made

12   any changes to your LinkedIn account in the last

13   48 hours?

14       A.   No.

15       Q.   And you agree that this is your LinkedIn

16   account information, correct?

17       A.   Correct.

18       Q.   And it mostly summarizes your professional

19   and education history, correct?

20       A.   It appears to reflect most of it, yes.

21       Q.   Do you have a separate law office?

22       A.   I do.

23       Q.   Okay.  And what is the name of that firm?

24       A.   The Tucker Law Office.

Page 63

1      Q.   And where is that firm located?

2      A.   It's a part-time law firm that I operate

3  out of my home.

4      Q.   And who are its employees?

5      A.   There are no employees.  I do everything.

6      Q.   And what do you do?

7      A.   Typically, vehicle and traffic offenses

8  for family, friends, real estate closings for

9  family and friends, and I currently represent

10  several clients throughout the country in various

11  mass tort litigations.  And that's through a joint

12  representation agreement with other firms.

13                      (Whereupon, Tucker Deposition

14                      Exhibit 4 was marked for

15                      identification.)

16  BY MS. McNULTY:

17      Q.   Okay.  So I'm going to tender to you what

18  I've marked as Exhibit 4.  And do you know what is

19  depicted on Exhibit 4?

20      A.   I do.

21      Q.   And what is that?

22      A.   That's a comment that I would have placed

23  on Facebook.

24      Q.   And what is the comment that you're making

Page 64

1   there?

2       A.   I believe that there was a post on

3   Facebook and it had to do with hernia mesh and

4   hernia mesh litigation.

5           And I was looking through it, and if I'm

6   not mistaken, this person was complaining that they

7   were experiencing problems with hernia and mesh

8   that was implanted within them.

9       Q.   So am I understanding your testimony

10  correctly that you contend that post was made in

11  direct response to someone making an inquiry?

12      A.   I don't think anyone was particularly

13  making an inquiry.  I was just -- I had seen that

14  they had complained of injuries and that they were

15  potentially within the litigation.  So I just

16  mentioned to them that we were handling these types

17  of cases.

18      Q.   And who's we?

19      A.   That would be the firm that I

20  joint-ventured the cases with.

21      Q.   Who are those other firms?

22      A.   The firm in LA is Troy Brenes, Brenes Law

23  Firm.  And the other firm is Lawrence Litigation

24  Group.

Page 65

1      Q.    And are either Brenes Law Firm or Lawrence

2   Litigation Group clients of Counsel Financial?

3      A.    I won't answer that question.

4      Q.    And so --

5      A.    For the same reasons that I mentioned

6   before when you were asking me to disclose the name

7   of the applicant from Corpus Christi.  For privacy

8   concerns, I won't answer those questions.

9      Q.    And just so that I'm clear, as you sit

10  here today, you know the answer to that question,

11  you're choosing to not answer the question?

12     A.    That's correct.

13     Q.    Will you answer the question if we redact

14  from the transcript that answer?

15     A.    I will not disclose the names of any of

16  our clients, other than ones who have authorized me

17  to disclose their names, such as Mr. Bandas.

18          And Mr. Bandas is not a client, but I

19  asked him if it was okay to disclose that he had

20  made an application to Counsel Financial.  So he

21  specifically authorized that disclosure.

22     Q.    Counsel Financial finances the hernia mesh

23  litigation, correct?

24          There are -- in other words -- let me make

Page 66

1  it a better question, frankly.

2       Counsel Financial supplies financing to

3  lawyers who are engaged in hernia mesh litigation?

4       A.   Correct.  Yes.

5       Q.   And you -- in your position at

6  Counsel Financial, you have underwritten loans for

7  lawyers that have hernia mesh litigation as part of

8  their business?

9       A.   I've reviewed lawyers' firms that have

10 those cases in their portfolio.

11                      (Whereupon, Tucker Deposition

12                      Exhibit 5 was marked for

13                      identification.)

14 BY MS. McNULTY:

15      Q.   I'll tender to you what I've marked as

16 Exhibit 5.  Okay.  Is this a post that you made?

17      A.   No.

18      Q.   What is this?

19      A.   It appears to be a post that somebody else

20 made saying that they were offering some help for

21 hernia mesh victims.

22      Q.   And did you repost it?  I'm not completely

23 savvy in this type of social media.  I don't know

24 if it's a retweet or a repost, but did you repeat

Page 67

1    that information on your own social media?

2        A.   Did I repeat it?

3        Q.   Yeah.  And I'm using, you know --

4        A.   It showed up on my wall, on my page, I

5    believe, but I did not share it with anyone else.

6        Q.   Okay.  Are you familiar with the website

7    consumeralertservices.com?

8        A.   I am not, no.

9        Q.   Have you ever heard of it before?

10       A.   No.

11       Q.   With respect to the preparation of your

12   objection, you indicated that you wrote your

13   objection, is that right?

14       A.   I wrote a draft of an objection, yes.

15       Q.   Okay.  And when did you write the draft?

16       A.   Shortly after I received the postcard in

17   the mail.

18       Q.   Okay.  And where did you write the draft?

19       A.   In my family room.

20       Q.   On a computer?

21       A.   On a computer.

22       Q.   And what did you do with that draft?

23       A.   I forwarded it to Mr. Bandas.

24       Q.   And do you have a copy of that draft still

Page 68

```
 1    on your home computer?

 2         A.    I have a copy in my bag.

 3         Q.    Okay.  And that's fine.  Is the draft

 4    still on your home computer?

 5         A.    Yes.

 6         Q.    Prior to drafting this objection, had you

 7    ever objected in a case before?

 8         A.    No.

 9         Q.    Have you made any objections since?

10         A.    No.

11         Q.    Prior to engaging with Mr. Bandas in

12    placing this objection, had you ever worked with

13    Mr. Bandas on any other matters?

14         A.    No.

15         Q.    Have you engaged Mr. Bandas, either as

16    client or as co-counsel, on any matters since

17    filing your objection?

18         A.    No.

19         Q.    When you sent it to Mr. Bandas, that was

20    by e-mail, correct?

21         A.    Correct.

22         Q.    And what did he do with it or say about

23    it?

24         A.    He said it was very well written.  He said
```

Page 69

1    that it contained an argument that he had not

2    thought of.  That's about it.

3        Q.   What was the argument that he had

4    purportedly not thought of?

5        A.   The way the settlement is structured, I'm

6    within the class of people -- or the subclass of

7    people that only gets 25 percent reimbursement.

8             If this settlement, the one that we're

9    currently talking about or that is currently

10   pending was reached before in 2013 or '14 when the

11   original settlement that was overturned was done,

12   then I would have been within the class that gets

13   full reimbursement for the windows.

14            So because of all of the problems with the

15   prior settlement with the attorney, Mr. Weiss, and

16   the problems with the claims and the notice and the

17   potential collusion and ethical things that were

18   going on, my argument was that the period between

19   the prior settlement going through the appellate

20   process until now, that should all be excluded,

21   similar to a tolling for a statute of limitations

22   on fraud, and that I should be brought within the

23   class that receives full reimbursement.

24        Q.   Now, had you signed the waiver with

Page 70

1  Mr. Bandas before sending him the objection?

2       A.   I don't know.  I don't have a recollection

3  of that.

4       Q.   In that conversation, did Mr. Bandas also

5  discuss with you the fact that he had taken an

6  opposite position that this version of the

7  settlement had brought increased and adequate

8  relief to the class?  Did he mention that?

9       A.   I've never had that conversation with him.

10      MS. McNULTY:  I will mark as Exhibit 6

11 Document 695, which I assume everyone has.  Do you

12 have it?  Do you need it?  Do you want it?  Are you

13 okay?

14      MR. STEWART:  I'd like to see what it is.  I

15 may not need a copy of it.  I'm all right, though.

16 I don't need a copy of that.  I don't know the

17 documents by number.

18      MR. MORROW:  I've got it in front of me, so

19 thanks.

20      MR. STEWART:  There you go.  Save that tree.

21      MS. McNULTY:  Thank you.

22                    (Whereupon, Tucker Deposition

23                    Exhibit 6 was marked for

24                    identification.)

Page 71

1    BY MS. McNULTY:

2        Q.    Okay.  So you just flipped through --

3        A.    I flipped through it, yes.

4        Q.    And that is the entirety of what was filed

5    on your behalf in terms of your objection in this

6    case, correct?

7        A.    It appears to be, yes.

8        Q.    Okay.  Now, does that document reflect

9    your draft?

10       A.    No.

11       Q.    Okay.  So you mentioned you had your draft

12   here, is that right?

13       A.    Yes.

14       Q.    Do you want to pull that out and we'll

15   mark it so we can --

16       A.    But it wasn't the document that was

17   actually submitted on my behalf.  It was just a

18   draft with some thoughts and some potential

19   arguments opposing the current settlement.

20       Q.    Okay.  So we can take a minute and you can

21   retrieve that from your bag, and then, I'll mark it

22   as an exhibit.

23       A.    It's important in some way?

24       Q.    Yeah.  Thank you.

Page 72

1        MR. STEWART:  Can I talk to him for a second?

2     Can we take a quick break while he looks through

3     his luggage?

4        MS. McNULTY:  Sure.

5                          (A short break was taken.)

6     BY MS. McNULTY:

7        Q.    Okay.  Do you have that?

8        A.    Yeah, I do.

9        Q.    Okay.  So I will now mark as Exhibit 7

10    what is 12 numbered pages and the 13th page

11    indicating copies to be sent.  It's entitled Notice

12    of Objection to Class Settlement.

13                          (Whereupon, Tucker Deposition

14                          Exhibit 7 was marked for

15                          identification.)

16    BY MS. McNULTY:

17       Q.    And Mr. Tucker, is Exhibit 7 what you have

18    referred to as the draft of your objection?

19       A.    Yes, this is the draft that I prepared.

20       Q.    Okay.  And how many versions of a draft

21    did you go through before reaching the point of

22    that draft that we've marked as Exhibit 7?

23       A.    Maybe two or three.

24       Q.    And did you send Mr. Bandas all two or

Page 73

1  three drafts?

2      A.    I sent him the final draft, what we have

3  here in Exhibit 7.

4      Q.    Okay.  So this is Exhibit 7.  And it looks

5  like you finalized this draft on April 2nd, 2018,

6  is that right?

7      A.    That's the date that's on it.

8      Q.    Yep.

9      A.    When you say you finalized it on that

10 date, I'm not sure what that means.  I don't think

11 that there's ever a final of a draft.  I mean, it's

12 just a draft.

13     Q.    Okay.  And so my point is that your final

14 draft was finished on April 2nd, 2018, as indicated

15 on Page 12?

16     A.    It might have been finished before that

17 and that's the date that I put on it.  I don't

18 know.  I don't know what significance that date

19 has, other than it's what appears on the paper.  I

20 may have finished that draft a couple of days

21 before and just re-dated it.

22          So if you're asking me is that a final

23 copy with -- as of that date, I don't know the

24 specific date, other than that's the date that

Page 74

1   appears on the document.

2       Q.   So let me -- it's like a whole separate

3   case.  So Exhibit 7 is your draft of your objection

4   in this case?

5       A.   No, it's not my objection.  My objection

6   is what is filed with the Court that was filed by

7   Mr. Bandas.  That's just a draft that I sent to

8   Mr. Bandas.

9       Q.   Yeah, this is --

10      MR. STEWART:  She asked you if it was a draft.

11  BY MS. McNULTY:

12      Q.   -- your draft.  That's what is says.

13      A.   It is my draft.

14      Q.   Yeah.  That was my question, right?

15      A.   You said is it a draft of your objection

16  that you filed with the Court.

17      Q.   I asked you --

18      A.   And I said no.

19      Q.   I said this is your draft of your

20  objection?

21      A.   That you filed with the Court.

22      Q.   So let me -- I'll withdraw that question

23  and -- just so that we get a nice clean record --

24      A.   Okay.

Page 75

1      Q.   -- on this.  Exhibit 7 is a document that
2   you pulled from your bag just a moment ago.
3           And I understand Exhibit 7 to constitute
4   your draft of your objection that you forwarded to
5   Mr. Bandas?
6      A.   Correct.
7      Q.   And I also understand that there might
8   have been two or three other drafts that existed
9   prior to the version we've marked as Exhibit 7
10  being the final draft?
11     A.   Yes.
12     Q.   Okay.  On Page 12, there's a signature
13  block that indicates your name, Donald J. Tucker,
14  Esquire.
15          And it also indicates
16  thetuckerlawoffice@gmail.com.  And that's your
17  signature in blue ink?
18     A.   Correct.
19     Q.   To the left of your signature block, it
20  says dated April 2, 2018, is that right?
21     A.   Yes.
22     Q.   That date, April 2, 2018, is a date that
23  you personally typed onto that document?
24     A.   Yes.

Page 76

1    Q.   The date April 2, 2018 was affixed to this

2  document by you on or around the day that you

3  finalized this draft?

4    A.   Yes.  There you go.

5    Q.   You may have added some minor change to it

6  on April 3rd, you might have also never touched the

7  document again after April 1st, but you put the

8  date April 2nd, 2018 and that date represents the

9  time on or about which you completed your draft?

10    A.   Correct.

11    Q.   Okay.  On Pages 2 and 3 of your draft,

12  Exhibit 7, there are photographs, is that right?

13    A.   Yes.

14    Q.   And those photographs on Pages 2 and 3

15  represent the two windows that you have identified

16  damage on the ProLine casement window, is that

17  right?

18    A.   Correct.  Yes.

19    Q.   Are -- so just looking at Page 2 of

20  Exhibit 7, those two pictures on Page 2 are of the

21  same window, correct?

22    A.   Yes.

23    Q.   And then, looking at Page 3, those two

24  photos depict the same window, correct?

Page 77

1      A.   Yes.

2      Q.   Okay.  Now, if we look at your filed

3  objection, you attached photos.  And it looks like

4  it's Exhibit -- it's Document No. 695-3, which is

5  Exhibit 2.

6           And it looks like there's three photos

7  depicting each window, is that right?

8      A.   Can I see it?

9      Q.   Sure.  And you should have one -- I think

10  I marked -- yeah.  It's Exhibit 6.

11      A.   Okay.

12      Q.   So you got it?

13      A.   Yeah.

14      Q.   So looking at your Exhibit 2 to your filed

15  objection -- and Exhibit 2 is Document No. 695-3.

16           That first page of Exhibit 2 is not

17  numbered, but it depicts three photos, correct?

18      A.   Correct.

19      Q.   And those three photos are of one window,

20  correct?

21      A.   One window unit, yes.

22      Q.   And so when you say one window unit, tell

23  me the distinction that you are making.

24      A.   It's a single window that has two windows

Page 78

1    that crank out.

2        Q.    Okay.  So there's a left and a right?

3        A.    There's a left and a right.

4        Q.    Okay.  And so the photo on the bottom is

5    depicting the left casement window in that unit?

6        A.    Correct.

7        Q.    And the photo in the middle is depicting

8    what?

9        A.    The left.

10       Q.    Okay.  And then, the top photo is

11   depicting the right --

12       A.    The right.

13       Q.    -- is that correct?

14       A.    Correct.

15       Q.    Okay.  And what room in your home contains

16   this window unit?

17       A.    The master bathroom.

18       Q.    Okay.  And how many photos of the master

19   bathroom window have you taken over the years?

20       A.    None.

21       Q.    Just these three?

22       A.    Yeah.  I have no reason to take a picture

23   of a window, yeah.

24       Q.    In the prior settlement --

Page 79

1      A.    Yeah.

2      Q.    -- did you take photos of your windows?

3      A.    No.   I never got that far.

4      Q.    And is it your understanding that this

5   master bath window is a ProLine casement window.

6      A.    That's my understanding, yes.

7      Q.    Okay.   And did anyone tell you that or

8   what's the source of your information that gives

9   you that understanding?

10      A.    When the last settlement took place, the

11   claim form was, I think, 26 or 27 pages long.   It

12   was a voluminous document.

13          And I began to prepare the claim form.

14   And it had instructions on how to identify it as a

15   window that would fall within the settlement.

16          So my recollection from doing that before

17   is that these two windows had etchings or numbers

18   that fell within the settlement.   So I assume that

19   they are case line windows.

20      Q.    Okay.   Other than your own personal

21   examination of the window etchings at the time of

22   the prior settlement, is there any other resource

23   you consulted to ascertain or verify that these

24   were ProLine?

Page 80

1      A.   When Window & Door Solutions came to my

2  home to prepare the estimate and looked at the

3  windows, he didn't suggest that they were not part

4  of the settlement.  So I assumed that they were.

5      Q.   And who is he?

6      A.   His name is probably on the estimate, but

7  he was one of the estimators for the company.

8      Q.   Did he imply to you or outright represent

9  to you that he was involved in the settlement

10  process, in particular, with ascertaining

11  eligibility?

12      A.   No.

13      Q.   Okay.  With respect to the estimate that

14  you received, the estimate was for a designer

15  casement window, is that right, for your bathroom?

16      A.   For the bathroom, a designer casement

17  window?

18      Q.   Yeah, with blinds.

19      A.   I -- what I mentioned to him was that I

20  had to have an estimate to replace that particular

21  window.

22           And he had some promotional materials

23  going through different windows that Pella makes,

24  different series.  I didn't select anything.  All I

Page 81

1   wanted was an estimate to replace that window.

2       Q.   Okay.  And so the letter dated June 5,

3   2018 indicates that you received two estimates.

4   One is if for Pella ProLine wood interior series

5   windows and doors.

6           Do you see that in the second full

7   paragraph?  One is if for Pella ProLine wood

8   interior series windows and doors.

9           The second is for Pella ProLine in the

10  living room and the master bath and patio door are

11  is Pella designer wood interior series.  Do you see

12  that?

13      A.   I see that, yes.

14      Q.   Okay.  And did I read that accurately --

15      A.   You did.

16      Q.   -- from the letter?  Okay.  When the

17  estimator was at your home, did you ever outright

18  ask him or her to tell you if the bathroom window

19  unit was a ProLine unit?

20      A.   I don't recall.

21      Q.   And did you actually order a replacement

22  window for your bathroom?

23      A.   No.

24      Q.   Is the -- is the window depicted on the

Page 82

1   first page of Exhibit 2 in the front of the house

2   or in the rear of the house?

3       A.   The rear of the house.

4       Q.   Turning to the second set of windows

5   contained within your Exhibit 2, which is document

6   695-3, are the three photos depicting the same

7   window?

8       A.   Yes.

9       Q.   And in what room is this window?

10      A.   The family room.

11      Q.   Is it a fixed window?

12      A.   It's a fixed window, yes.

13      Q.   Where did you find the window etching on

14  this window?

15      A.   I believe it was in the lower right-hand

16  side of the window.

17      Q.   And did you have this window replaced

18  since receiving the estimate?

19      A.   No.

20      Q.   Am I understanding correctly that both

21  this fixed window in your living room and as well

22  the casement unit in your master bath are presently

23  still installed?

24      A.   Yes.

Page 83

1      Q.    Have you had any other estimates done?

2      A.    No.

3      MS. McNULTY:  Now, let me see.  Okay.  So I

4  think what I'll do is -- why don't we take a little

5  break and I'm going to have some copies made of

6  Exhibit 7.

7           And do you guys want to just take a short

8  little lunch break and start up again at -- I don't

9  know.  What time?  Quarter to, 1:00 o'clock?

10     MR. LANG:  We'll shoot for --

11     MR. STEWART:  I'd rather just keep going.  I

12  know we both want to leave when we can leave.  So

13  unless somebody has some medical reason they need

14  lunch --

15     MS. McNULTY:  Why don't we start up again at

16  quarter to?  Would that be okay?

17     MR. STEWART:  Quarter to 1:00, not a quarter to

18  2:00, right?  Okay.  I'm just making sure.  That's

19  fine.

20                    (A lunch break was taken.)

21  BY MS. McNULTY:

22     Q.    Okay.  So we're back from our break and I

23  want to clarify a few points.

24           First, am I understanding correctly that

Page 84

1   with respect to the rejected settlement, the first

2   settlement that was ultimately rejected, you did

3   not file a claim, is that right?

4       A.   I did not.

5       Q.   Okay.  And why not?

6       A.   It was too cumbersome.  I was probably a

7   couple of pages through and didn't feel it was

8   worth my time and effort to go through all of that

9   for whatever benefit the settlement would provide.

10      Q.   And with respect to that first settlement,

11  what did you calculate as the amount you would have

12  been provided in that settlement?

13      A.   I think it might have been 750 bucks.

14      Q.   Okay.

15      A.   Dollars.

16      Q.   And -- but you weren't an objector in that

17  case either, right?

18      A.   I was not, no.

19      Q.   Right.  So your issue was simply that the

20  form was too long, you didn't get around to it, but

21  you were okay with that version of the settlement?

22      A.   I wouldn't say that I was okay with that

23  version of the settlement.  I just didn't want to

24  go through a 27-page form in order to submit the

Page 85

1    claim.

2        Q.    If your form had somehow been less than

3    27 pages, you would have -- meaning the relief

4    portion of it, you were okay with $750?

5        A.    Let me say, you know, the last settlement

6    was in 2013 or 2014.  And if I wasn't still working

7    at Nationwide Insurance Company, I was probably

8    transitioning.  So it was during that time period.

9             And when I was working for Nationwide,

10   this whole world of class actions and mass torts,

11   different things, I didn't even know that it

12   existed.  What I knew existed were personal injury

13   cases, truck wrecks, car wrecks, property losses.

14            So I didn't even probably know that I

15   could object to a class action.  I probably never

16   read through the information enough to know, but

17   now, having started this position with

18   Counsel Financial, I know a little bit more.  I

19   have a better breadth of knowledge about what goes

20   on.  So on this one, I decided to object.

21       Q.    So with the last settlement, you -- was it

22   the same two windows that would have --

23       A.    It was the same two windows.

24       Q.    The same two windows would have displayed

Page 86

1    wood rot at the time of the last settlement?

2        A.   Yes.

3        Q.   And you did read through that settlement

4    notice, right?

5        A.   I probably skimmed it.

6        Q.   I mean, you knew enough that you knew it

7    was going to be 27 pages of work for you?

8        A.   Oh, I was holding the form in my hand

9    walking around the house trying to fill the thing

10   out.

11       Q.   And you understood that you had the option

12   of a cap on your relief at $750,000 or you could --

13       MR. LANG:  750.

14       THE WITNESS:  750.

15       MS. McNULTY:  What did I say?

16       MR. LANG:  750,000.

17       MS. McNULTY:  Oh.  Did I?

18       THE WITNESS:  Yeah, I was thinking that.  I

19   would have filled out that form five times.

20   BY MS. McNULTY:

21       Q.   Excuse me.  So let me strike that and

22   withdraw that question.

23            You understood at the time you were

24   reviewing that form that you had the potential

Page 87

1   relief of $750?

2        A.    I believe I had that belief, yes.

3        Q.    And nothing about that settlement

4   motivated you or resonated with you in a way that

5   provoked you to object, is that fair to say?

6        A.    I'm not sure I knew I could object at that

7   time.  I didn't have enough knowledge of class

8   action lawsuits to know what the process was, what

9   the procedure was.

10            All I knew at that time is that the claim

11  form was 27 pages.  I had to hire a contractor.  I

12  had to stay home, meet with the contractor, go

13  through all of this in order to get 750 bucks.

14       Q.    At the time of the last settlement, you

15  had been a licensed attorney for 20 years?

16       A.    Yes.

17       Q.    But your testimony is that you didn't know

18  enough about class actions then, right?

19       A.    Yes, that's my testimony.

20       Q.    And then, you get hired by

21  Counsel Financial -- and was that in 2014?

22       A.    Yes.

23       Q.    And am I correct in understanding that as

24  a consequence of your employment with

Page 88

1   Counsel Financial, now, you do know enough about

2   class actions to know you can object?

3       A.   Yeah.  I wouldn't say it was a

4   consequence.  I would say it was a result.

5       Q.   Okay.  And so what new information did you

6   acquire that you didn't have in 2013 or 2014 that

7   you have now?

8       A.   Just meeting with clients, learning about

9   class actions, how the process goes through the

10  court system.  I didn't have that experience at

11  Nationwide.

12      Q.   And so when you meet with clients -- and

13  we're talking about lawyers who are seeking

14  financial loans from Counsel Financial, right?

15  Those are your clients?

16      A.   Yes.

17      Q.   Okay.  When you meet with these lawyers

18  who are seeking financing, are the lawyers

19  describing for you class actions and the mechanism

20  of objecting in a class action in relation to your

21  evaluation and the underwriting process?

22      A.   No.

23      Q.   Okay.  And so when are -- or how are the

24  lawyers -- what are the circumstances in which the

Page 89

1   lawyers began talking to you about class actions if

2   not as part of the underwriting process?

3       A.   Well, they would have talked to me about

4   specific cases that they would have had in their

5   portfolio that are class action lawsuits.

6           And then, over a course of time, when you

7   deal with enough lawyers that are in that business

8   and you do your own independent research being an

9   attorney and looking at different journals,

10  articles, you give yourself enough knowledge to

11  understand what a class action lawsuit is and what

12  it's about.

13      Q.   And you did not look at professional

14  journals or articles or cases during your time with

15  Nationwide?

16      A.   I had no need to, especially regarding

17  class actions.  That wasn't a part of my job

18  duties.

19      Q.   Does -- you're licensed in New York?

20      A.   Yes.

21      Q.   Okay.  Does New York have a continuing

22  legal education requirement?

23      A.   Uh-huh.  Yes.

24      Q.   And do you belong to any bar associations?

Page 90

1      A.   I think I just received a six-month trial

2  membership to the American Bar Association.

3      Q.   Earlier --

4      A.   On and off with the New York State Bar

5  Association, not a continuous membership that I've

6  held over the years.

7      Q.   Do you ever -- in the time since having

8  your license, have you ever been the recipient of

9  professional magazines or professional journals?

10     A.   Sure.  Yes.

11     Q.   When you have acquired this information

12  concerning class cases or mass tort cases in

13  relation to your position at Counsel Financial, in

14  some instances, that has been for the purpose of

15  evaluating an applicant's -- it's meant for the

16  purpose of valuing or valuating an applicant, is

17  that right?

18     A.   Their cases, yes.

19     Q.   And so what are the criteria that you

20  consider when evaluating their cases?

21     A.   How long do we have?  There's a lot that

22  goes into it.  I mean, it's --

23     Q.   Maybe four more -- three more hours.

24     A.   Yeah.  I mean --

Page 91

1    Q.   And so when you say there's a lot that

2  goes into it, are you -- can you enumerate some of

3  those factors that you consider when placing a

4  value on an applicant's case or cases?

5    A.   There's several factors.  Whether or not

6  the class has been certified, that's certainly an

7  important factor in evaluating a class action.

8         If the class has not been certified, is it

9  something that has been a class action before,

10  where there's a good probability that the class

11  will be certified.  You take that into

12  consideration.

13        And has the case been settled, is there a

14  preliminary settlement, is there a fairness hearing

15  scheduled.

16    Q.   And then, with respect to cases submitted

17  by an applicant for which they are serving as an

18  objector, you consider those same criteria, and

19  then, what additional criteria do you consider for

20  an objector applicant?

21    A.   I've never considered an objector

22  applicant.  I've never underwritten a law firm that

23  had objector cases as a part of their fee

24  collateral.

Page 92

```
 1        Q.   You've seen applications that include
 2   cases where the applicant is an objector and it's
 3   part of their case inventory?
 4        A.   I'm aware of it --
 5        Q.   Yeah.
 6        A.   -- in Mr. Bandas' case, but I have never
 7   been a part of underwriting a law firm that objects
 8   to class actions.
 9        Q.   When you were having the informal
10   conversation -- you know, I think your words were,
11   you know, the watercooler conversation with
12   Mr. Kasouf, did he or did anyone, even at an
13   underwriting meeting, ever discuss with you what
14   they consider when evaluating an applicant who has
15   objector cases as part of their application?
16        A.   No.
17        Q.   With respect to the criteria you just
18   described in relation to your case valuation and
19   underwriting work, did you apply those same
20   criteria and concepts to any evaluation of this
21   matter?
22        A.   I'm sure that it had something to do with
23   my evaluation of the settlement and the fairness of
24   the settlement.
```

Page 93

1      Q.   And so what criteria did you apply when
2  you were evaluating the fairness of the settlement?
3      A.   How much I was getting and how much others
4  were getting.
5      Q.   And that would be the similar analysis to
6  what you would do when reviewing cases in your
7  day-to-day responsibilities of underwriting?
8      A.   It's much different, because I was
9  evaluating this case from a personal class person,
10  as opposed to evaluating it as an attorney for
11  Counsel Financial.
12          This was affecting me personally and my
13  wife and our home.  So that's a different
14  perspective than looking at it from a business
15  standpoint.
16      Q.   A moment ago, we were discussing your not
17  having participated in the prior settlement, the
18  rejected settlement, but that you understood the
19  available relief would have been capped at $750,
20  right?
21      A.   Right.
22      Q.   Okay.  What have you calculated as your
23  relief -- or potential relief in this case?
24      A.   $880.

Page 94

1      Q.   And what is the formula you use to reach

2   that number?

3      A.   25 percent of the estimates that were

4   attached to my claim form.

5      Q.   Approximately when did you first observe a

6   defect in the windows?

7      A.   That's difficult, because they're windows

8   that we don't open, close, look out every day.  The

9   one is very inconvenient.  But I would say the

10  first time that I noticed it was around the time of

11  the last settlement.

12     Q.   So in 2013?

13     A.   Yeah.

14     Q.   And refresh my memory.  Your home was

15  built in -- was it 2001?

16     A.   2001.

17     Q.   And was it that you directly purchased the

18  windows from Pella?

19     A.   No.

20     Q.   Who purchased the windows from Pella?

21     A.   The builder.

22     Q.   With respect to Exhibit 2 to your

23  objection, which is Document No. 695-3, the fixed

24  casement in the living room --

Page 95

1      A.   Family room.

2      Q.   Excuse me.  The family room.  I think the

3  estimate says living room.

4           So it's -- your testimony before the break

5  was that you believe the glass etching was in the

6  lower right-hand corner, is that right?

7      A.   I believe so.

8      Q.   Okay.  And are you able to describe what

9  that etching looks like?

10     A.   It's fairly well-faded.  It was difficult

11  to take a picture of it.

12          In fact, I tried several times to get a

13  clear picture and it wasn't able to do it, but it's

14  just a glazed, kind of scratched-in set of numbers

15  and letters that I was able to get some of the

16  information from that's in the claim form.

17     Q.   And what are the letters?  They're part of

18  a serial number or what letters are you thinking

19  of?

20     A.   In my draft objection --

21     Q.   Yep.

22     A.   -- if you look at the pictures of the

23  windows in that exhibit --

24     Q.   Yes.

Page 96

1      A.    -- and then, down below --

2      Q.    Yes.

3      A.    -- that would be probably exactly how the

4  information is etched into the window.  I would

5  have done it -- or at least attempted to do it

6  exactly as it appears on the window.

7      Q.    Was your home custom-built?

8      A.    It was.

9      Q.    And you identified the builder.  Did the

10  builder -- are you in a subdivision or is it --

11      A.    Yes, a subdivision.

12      Q.    And did the builder build all of the homes

13  in the subdivision?

14      A.    98 percent of them, yes.

15      Q.    And are they of a similar model and style?

16      A.    No.  No.  Ours is much more custom than

17  what otherwise is in the neighborhood.

18      Q.    How so?

19      A.    It's a floor plan that wasn't used by a

20  lot of other neighbors, people living in the

21  development.

22          And we customized the front porch.  It has

23  a couple of columns that go all the way up to the

24  second floor with -- I think they call it a pedico

Page 97

1    or something like that, a porch over top of that.

2    It's a brick front home.  There are very few brick

3    homes in the front.

4            On the inside of the home, we did a lot of

5    custom work with regard to the archways and

6    different things.  So it's more custom than most

7    homes in the neighborhood.

8                        (Whereupon, Tucker Deposition

9                        Exhibit 8 was marked for

10                       identification.)

11   BY MS. McNULTY:

12       Q.   I'm going to tender to you what I've

13   marked as Exhibit 8.

14           And does Exhibit 8 fairly and accurately

15   depict the front of your home -- or at least a

16   portion of the front of your home and the garage?

17       A.   A portion of the front of the home.  This

18   is an older picture.

19       Q.   Okay.  What has changed since this picture

20   was taken?

21       A.   Well, I no longer have that car.  That was

22   a Nationwide company car.  The tree on the left

23   side of the picture is no longer there.  That would

24   be it.

Page 98

1      Q.   Okay.  The front of the home, its facade
2    exists today as it did in this picture?
3      A.   It does.
4                      (Whereupon, Tucker Deposition
5                      Exhibit 9 was marked for
6                      identification.)
7    BY MS. McNULTY:
8      Q.   I'm going to tender to you what I've
9    marked as Exhibit 9, which is a closer shot of the
10   same picture.
11         And in particular, focussing on the roof
12   to the right, it looks like there's a little bit of
13   shingle damage there.  Do you see that?
14     A.   Yeah.  That's been replaced.  The roof has
15   been replaced.
16     Q.   Okay.  And was there any problem with
17   those shingles or was there a defect or what was
18   the diagnosis on those shingles?
19     A.   They were bad shingles.
20     Q.   And were they the subject of any
21   litigation?
22     A.   Yes.
23     Q.   And did you participate in that
24   litigation?

Page 99

1      A.   I did, yes.

2      Q.   And is that how you recovered shingles --

3   replacement shingles?

4      A.   Part of it, yes.

5      Q.   Okay.  And so what was that cause of

6   action?

7      A.   It was a Canadian roofing company called

8   VP.  And they were the subject of class action

9   litigation.

10         It was an organic roofing shingle that

11  they used.  And Marrano had used that extensively

12  on all of the homes they built for a while.  So

13  because of improper gluing down of the pebbles or

14  the stones on the shingle, they were falling off,

15  and that became a class action.

16     Q.   And where had that case been pending?

17     A.   I believe it was in Canada.

18     Q.   And did you receive notice of a settlement

19  in that case?

20     A.   No.

21     Q.   How did you come to learn of that case?

22     A.   Because other neighbors had found out

23  about the settlement when they had to replace their

24  roof.  And they submitted claims and they were

Page 100

1    permitted reimbursement or given reimbursement

2    or -- of a portion of their cost to replace the

3    roof.

4         Q.   Did you submit a claim in that case?

5         A.   I did.

6         Q.   And when did you submit that claim?

7         A.   I don't know the exact date.

8         Q.   Do you maintain a copy of what you

9    submitted in connection with that claim?

10        A.   I don't have a copy of it, because my

11   neighbor that lives behind me submitted a claim,

12   and he came to me and he told me that he was having

13   some difficulty filling out the claim form and

14   asked me if he could borrow my copy so that he

15   could use it to assist him.

16             I've asked for that claim form back.  He

17   misplaced it.  So I don't have a copy.

18        Q.   That's very un-Nationwide of you.

19        A.   I should have made him a copy, but --

20   so -- yeah.

21        Q.   Do you remember where you sent that claim

22   to?

23        A.   It was submitted on line, yeah.  It was

24   submitted on line.

Page 101

1      Q.   And then, you printed it out?

2      A.   I printed it out afterwards for my

3   records, yes.

4      Q.   And then, you let this other fellow borrow

5   the copy?

6      A.   I did.

7      Q.   And you think he still has it, you just

8   haven't --

9      A.   Oh, I've asked him to give it back,

10   because other neighbors asked me to use it.  So I

11   went to him and I said can you please give it back

12   to me so that the other neighbor can use it and he

13   said I don't have it.

14      Q.   And so what was your compensation received

15   in that claims process?

16      A.   It depended.

17      Q.   I'm asking, what did you get?

18      A.   I received somewhere in the neighborhood

19   of $4,000.

20      Q.   And what proof, if any, did you have to

21   submit in connection with making that claim?

22      A.   Photographs, a claim form, and an

23   estimate, I would assume.

24      Q.   And did you -- what type of photographs

Page 102

1    did you submit with that claim?

2        A.    I don't remember.

3        Q.    Did you go up on your roof and --

4        A.    Oh, no.

5        Q.    -- take --

6        A.    No, no.

7        Q.    Did you have someone go up there when you

8    get an estimate?

9        A.    I have to think about that, because it was

10   a while ago.

11          I think -- you know, I think a roofer that

12   had initially put the roofing on the home -- it was

13   called Big G Roofing.  They came out and they took

14   the pictures for me.

15       Q.    Was the entire roof submitted in

16   connection with the claim in that case --

17       A.    Yeah.

18       Q.    -- or was it just -- okay.

19       A.    Yeah, it was the entire roof.  Yeah.

20       Q.    And then, how much did you pay a

21   contractor to replace your roof?

22       A.    7 or 8,000 maybe.

23       Q.    And how long ago was that roof replaced?

24       A.    Four, maybe five years ago.

```
                                              Page 103

 1                    (Whereupon, Tucker Deposition

 2                    Exhibit 10 was marked for

 3                    identification.)

 4    BY MS. McNULTY:

 5        Q.   Okay.  I'll tender to you now what I've

 6    marked as Tucker 10.

 7             And does Exhibit 10 fairly and accurately

 8    depict the side of your home?

 9        A.   It does.

10        Q.   Okay.  And is that the north, south, east,

11    or west side of your home?

12        A.    South.

13        Q.   And is -- so on the top of your home in

14    Exhibit 10, it looks like those are double-hungs,

15    true?

16        A.   Yes.

17        Q.   Okay.  And then, on the bottom, it looks

18    like you have two casement windows, right?

19        A.   This is -- this is the window that's

20    depicted in --

21        Q.   I'm getting there.

22        A.   -- my objection.  Okay.

23        Q.   I'm getting there.  So you have two

24    casement windows depicted on the lower level of
```

Page 104

1    Exhibit 10 --

2         A.    Correct.

3         Q.    -- right?

4         A.    Yes.

5         Q.    Okay.  And then, the one that is on the

6    right-hand side, the lower-level right-hand window

7    is one of the windows that is the subject of your

8    claim in this case, correct?

9         A.    Correct.  Yes.

10        Q.    Okay.  And that's a fixed window, right?

11        A.    Yes.

12        Q.    Okay.  Do you know if your builder used

13   Pella casements for the fixed windows?

14        A.    I don't know.

15        Q.    The window on the lower level to the left,

16   that's a casement window.  Does that open?

17        A.    Yes.

18        Q.    And what is that room?

19        A.    That's the family room.

20        Q.    Still the family room?

21        A.    Yes.

22        Q.    Okay.  If you could look back at -- yeah,

23   Exhibit 8 -- let me see if I have this here.  Here.

24   Let me give you another one.  Keep Exhibit 8 out.

Page 105

1    I start misplacing them, so just bear with me.  I'm

2    going to mark this photo as Exhibit 11.

3        A.   Okay.

4                        (Whereupon, Tucker Deposition

5                        Exhibit 11 was marked for

6                        identification.)

7    BY MS. McNULTY:

8        Q.   Okay.  And that's just another view of the

9    front of your home, right?

10       A.   Correct.

11       Q.   Okay.  Am I correct that all of the

12   windows on the front facade of the home, with the

13   exception of the little arched window over your

14   front door, those are all double-hung?

15       A.   Correct.

16                       (Whereupon, Tucker Deposition

17                       Exhibit 12 was marked for

18                       identification.)

19   BY MS. McNULTY:

20       Q.   Okay.  Here is Exhibit 12.  Is the photo

21   in Exhibit 12 your home?

22       A.   No.

23       Q.   Okay.  And it took you a little time to

24   answer.  And I appreciate that you're stalking the

Page 106

1   photo.

2          The backs of the homes in your subdivision

3   strongly resemble one another, is that fair?

4      A.   From the back?

5      Q.   Yeah.

6      A.   Yeah.

7      Q.   The backs of the homes are relatively

8   similar --

9      A.   Sure.

10     Q.   -- to one another, right?

11     A.   Yeah.

12     Q.   And so I'll represent to you that this is

13  your neighbor's house.

14     A.   It is.  It is, yeah.

15     Q.   Is it getting creepy?

16     A.   No.

17     Q.   So this is your neighbor's home?

18     A.   This is a much newer picture.  That's kind

19  of creepy, but that's okay.

20     Q.   And this is representative of what the

21  rear windows in your home look like, is that right?

22     A.   Similar.

23     Q.   Okay.  You have double-hungs upstairs, and

24  then, a row of casement on the lower level?

Page 107

1       A.    I just want to make sure that I'm clear.

2       Q.    Yeah.  Take your time.

3       A.    So you're talking about the back of the

4   home, correct?

5       Q.    Yes.

6       A.    On the upper level, the windows across the

7   back are the master bathroom, which we talked

8   about.

9       Q.    And that's casement?

10      A.    And then, there are two other windows that

11  are also casement, double-hung.

12            I think I'm a little confused about what

13  you're referring to as double-hung and casement.

14  Double-hung is just they slide up and down,

15  correct?

16      Q.    Uh-huh.

17      A.    Yeah, two of those.

18      Q.    Yeah.  You've got two double-hung, and

19  then, you have the master bath, which is casement?

20      A.    Correct.

21      Q.    And then, in the front of the home, you've

22  got all double-hung --

23      A.    All double-hung.

24      Q.    -- except you got a fixed --

Page 108

1      A.   Except for the --

2      Q.   -- window above the door -- the front

3  door.  And then, on the south side of the home,

4  we've reviewed that you have double-hung on the

5  upper level, which is consistent with what you just

6  said a moment ago, and then, you've got these two

7  casement on the lower level, one of which is fixed?

8      A.   Correct.

9      Q.   Okay.  So we got that -- you can set those

10  aside, I think.

11           All right.  So now, I would like to refer

12  to what we marked as Tucker 6 --

13      A.   Okay.

14      Q.   -- which is your objection.  And you know

15  what I didn't do on the break is, I didn't have a

16  copy of the draft made.  So let's just go off the

17  record for one second.

18                    (A short break was taken.)

19  BY MS. McNULTY:

20      Q.   With respect to the filed objection, did

21  you develop the table of authorities?

22      A.   No.

23      Q.   Who did?

24      A.   I don't know.

Page 109

1      Q.   Okay.  Did you -- strike that.  Looking at
2  the table of authorities, the very first case is
3  Adams vs. Cradduck.
4           And do you have an understanding of what
5  that case is about?
6      A.   No.
7      Q.   And your brief uses Adams vs. Cradduck as
8  a way to distinguish for the Court what you say
9  would be the correct language for notice, as
10  opposed to the language that is in the current
11  class notice, is that fair to say?
12     A.   That's what's within the objection.
13     Q.   Yeah.  And what about Cradduck do you say
14  is the right way to do it?
15          And you're kind of flipping ahead.  So I'm
16  assuming -- am I right that you're not really able
17  to address the Cradduck case without referring to
18  its cite in connection with the argument made in
19  the brief?
20     A.   I'd have to read the case.
21     Q.   Yeah.  Have you -- in the table of
22  authorities, have you read all of those cases?
23     A.   I read Eubank vs. Pella Corporation.  I
24  don't have a recollection of reading any of the

Page 110

1   other cases.

2       Q.   With respect to the Eubank case that you

3   cite and which you indicate to have read, am I

4   right, that's the Seventh Circuit's opinion?

5       A.   Correct.

6       Q.   Okay.  Have you read the minute entries

7   and orders entered in the case since being remanded

8   to the Northern District of Illinois?

9       A.   You mean what's currently on the docket --

10      Q.   Yeah.  So from --

11      A.   -- since 2014?

12      Q.   From August 2014, have you read all of the

13  orders and the Court's minute entries?

14      A.   Not all of them, no.

15      Q.   Okay.  Are there some that you're thinking

16  you have read or haven't?

17          I mean, you've obviously read the order

18  concerning preliminary approval for settlement, is

19  that true?

20      A.   I've read most of that, yes.

21      Q.   Okay.  Is there any other order you can

22  think of that you have read since August of 2014?

23      A.   I read the plaintiff's opposition to

24  defendant's motion for summary judgment in the

Page 111

1    case.

2        Q.    Okay.  Did you read any depositions?

3        A.    No.

4        Q.    Did you read any expert reports?

5        A.    No.

6        Q.    Did you ever contact Clifford Law Offices,

7    by either phone or e-mail, to discuss any aspect of

8    the case?

9        A.    No.

10       Q.    Did you ever phone or e-mail Lang Law

11   Office to discuss any aspect of the case?

12       A.    No.

13       Q.    Do you know who lead counsel are in the

14   case?

15       A.    I believe it's you.

16       Q.    Do you know who the judge is in the case?

17       A.    No.

18       Q.    Going back to this Cradduck case --

19   Adams vs. Cradduck from the Western District of

20   Arkansas, you have a criticism of the language used

21   in the current notice of settlement in this case

22   and you cite that you favor the notice language

23   used in the Adams vs. Cradduck case, is that right?

24       A.    I believe that's in the body of the

Page 112

1    memorandum.

2        Q.   Did you ever review the notice of

3    settlement used in the Adams vs. Cradduck case?

4        A.   No.

5        Q.   As you sit here today, do you have any

6    understanding as to who the class members are in

7    the Adams vs. Cradduck case?

8        A.   No.

9        Q.   Do you know if they used a claims

10   administrator in the Adams vs. Cradduck case?

11       A.   No.

12       Q.   I'm going to tender what I will mark as

13   Group Exhibit -- excuse me.  As Tucker Exhibit 13.

14       A.   Okay.

15                    (Whereupon, Tucker Deposition

16                    Exhibit 13 was marked for

17                    identification.)

18   BY MS. McNULTY:

19       Q.   And I'll represent to you this has been

20   pulled from the Western District of Arkansas'

21   docket in the Adams vs. Cradduck case.  And am I

22   right you've never seen that before?

23       A.   I've never seen it before, no.

24       Q.   Okay.  Concerning your position concerning

Page 113

1   the language of the current notice of settlement in

2   this case versus the language in the notice of

3   settlement in the Adams case, looking at the

4   notice, are you able to tell me looking at that

5   notice what it is that you wanted in the Pella

6   settlement notice?

7           And I appreciate that you want to look at

8   the argument, but I guess I'm trying to get a sense

9   what you know independent of what's been placed in

10  your brief.

11          And so I'm asking, without referencing

12  your argument, first, if you can tell me what about

13  the notice in the Adams case is sort of the piece

14  of information or the magic language that you favor

15  over the notice in Pella.

16      A.    I can't answer that question right now.

17      Q.    Okay.  Do you have an understanding of how

18  many times the Court required the counsel in Adams

19  to submit proposed notice language?

20      A.    No.

21      Q.    In relation to the Pella case, did you

22  undertake any effort to research the work of KCC?

23      A.    KCC?

24      Q.    That's right.

Page 114

1       A.    No.

2       Q.    Do you know who KCC is?

3       A.    I don't.

4       Q.    Prior to filing your objection, did you

5  review the affidavit of Carla Peak?

6       A.    No.

7       Q.    Other than the postcard that you received

8  at home, can you tell me what other methods of

9  notice were used in the Pella case?

10      A.    Other than the postcards, I read in some

11  of the information that there were other manners of

12  giving notice, but I don't specifically recall what

13  they were.

14      Q.    Do you recall what efforts were undertaken

15  by the parties and by the claims administrator to

16  supply notice to consumers, specifically, you know,

17  the various modes, including by name?  Do you know?

18      A.    Do I know what efforts they took?

19      Q.    Yeah.

20      A.    No.

21      Q.    Do you think that counsel for the parties

22  designed a notice plan that was only postcard

23  notice or do you know?

24      A.    I don't know.  I know now that there was

Page 115

1   more, but at the time I received the postcard

2   notice, I assumed that that was the only notice

3   that I would get or needed to look for.

4        Q.   When you received the postcard notice, did

5   you go to the website?

6        A.   I had to in order to print the claim form.

7        Q.   And did you read any of the information on

8   the website?

9        A.   Sure.

10       Q.   Why did you not review the affidavit of

11  Carla Peak?

12       A.   I didn't know that there was a reason to.

13       Q.   Okay.  So you're a lawyer and you're a

14  former assistant general counsel for Nationwide

15  Insurance and you are a deputy general counsel now

16  working in the field of litigation financing.

17            You've indicated that you have log-in

18  access through your colleague, the senior counsel,

19  and that you did go to the docket in this case.

20            Did you consider, at any time when

21  drafting your objection or before filing an

22  objection for this Court, to consider that you

23  might review the entire petition for approval

24  submitted by the parties?

1      A.   I reviewed the general petition.  I

2  don't -- didn't review all of the exhibits.

3      Q.   And in reviewing the general petition, you

4  make an objection concerning the fact of not

5  receiving a 100 percent dollar-for-dollar

6  reimbursement because your windows are from 2001?

7      A.   Correct.

8      Q.   But you also object to the notice in this

9  case.  And would it have not been important to you

10  to fully understand the extent and the breadth of

11  the notice before engaging the Court and counsel in

12  an objection concerning the same?

13      A.   What I know is that that notice is not

14  enough, and if you did more, that's fine.

15      Q.   Well, I'm going to --

16      A.   But how do people know that they can go

17  out looking for a website and looking for something

18  else, and say, hey, I might be a member of a class

19  settlement.  That's how you get notice to a class.

20      Q.   What are you pointing at?

21      A.   The -- my postcard notice.

22      MS. McNULTY:  Okay.  So I'm going to just move

23  to strike the answer as nonresponsive and

24  argumentative, because now, we're getting into

Page 117

1    pointing, and I don't think that's needed in this

2    context, but I'm going to also ask for the court

3    reporter to please read my question that remains

4    pending.

5              And I'm going to ask the witness,

6    Mr. Tucker, to please respond to the pending

7    question, as opposed to trying to create

8    self-gratifying or self-serving testimony, okay?

9                        (Whereupon, the record was read.)

10       THE WITNESS:   No.

11   BY MS. McNULTY:

12       Q.   Okay.  Have you ever issued notice in any

13   class case?

14       A.   No.

15       Q.   Have you ever had any reason to issue

16   notice or to alert a body of consumers to their

17   legal rights in any way -- in any way you could

18   possibly be related to a case?  Have you ever --

19       A.   No.

20       Q.   Do you know the frequency with which

21   postcard notice is used in class action litigation?

22       A.   Often.

23       Q.   The notice of which you are an advocate

24   from this Adams case, do you know how the class was

Page 118

1    notified in that case?

2        A.   I don't know.

3        Q.   Okay.  Then, what makes your -- why are

4    you so in favor of this notice of settlement in the

5    Adams case over the method used in the Pella case?

6        A.   Are you talking about this particular

7    document or the notice of settlement, in general,

8    including the postcard notice?

9        Q.   Yeah.  No.  What I'm talking about is that

10   you have relied on the Adams case to suggest that

11   the Adams case got it right and we got it wrong.

12            And so I'm asking specifically, what about

13   the Adams case do you so strongly favor that causes

14   you to single it out as the model for what you

15   think notice should be?

16       A.   For most people, this is clear, it's

17   concise, and it's readable.

18       Q.   Okay.  And you say that without knowing

19   how the class was notified, correct?

20       A.   You just asked me why this notice of

21   settlement was better than the one that you

22   prepared.

23       Q.   Right.  And that includes, of course --

24   notice of settlement includes, right, the actual

1    alerting of the class members to the settlement, in

2    addition to supplying the terms to them.

3              And we agreed that first off, you don't

4    know what the Adams case is about, right?

5        A.   I don't.

6        Q.   Okay.  And you don't know if there was a

7    claims administrator or not, right?

8        A.   I don't.

9        Q.   Okay.  And you don't know who the class

10   was, right?

11       A.   I know that it was people who were

12   released from the Benton County Jail, who needed

13   money back on a debit card or something, just from

14   reading it now.

15       Q.   Right, just from a moment ago.

16       A.   Before today, no.

17       Q.   You don't know where any of those people,

18   live, right?

19       A.   No.

20       Q.   You're shrugging your shoulders.  Okay.

21   You don't know how many of them there are?

22       A.   No.

23       Q.   Do any of those factors influence your

24   opinion that the Adams vs. Cradduck case is the

Page 120

```
 1    more ideal notice over that which was used in this
 2    case?
 3         A.    Can you rephrase the question?
 4         Q.    Sure.  Wouldn't you want to know those
 5    other details that we agreed you don't know before
 6    you hold out the Adams case and its notice as the
 7    poster child for ideal notice?
 8         A.    Do I need to know the facts of the case?
 9         Q.    Wouldn't you want to know -- no?
10         A.    I didn't --
11         Q.    Not -- wait.  Stop.  No, not the facts of
12    the case alone.
13              We've gone through what you don't know
14    about Adams, okay?  You don't know what the case is
15    about?
16         A.    Uh-huh.  Correct.
17         Q.    You only know now who the class is, but
18    you didn't when we started the line of questioning?
19         A.    Right.
20         Q.    You don't know if there's an administrator
21    or not.  You don't know how the class was notified.
22    You don't know where they lived, how many there
23    are.  I mean, we've gone over what you don't know
24    about this case.
```

Page 121

1      A.    Uh-huh.

2      Q.    But what I'm asking -- you've,

3   nevertheless, held it out as the ideal notice for a

4   class action.

5            And so what I'm asking is, wouldn't you

6   want to know those other details before identifying

7   and holding out the Adams vs. Cradduck case as the

8   case that got it right?

9      A.    I'm sure Mr. Clore reviewed all of that in

10  deciding to cite --

11     Q.    Who's Mr. Clore?

12     A.    Robert Clore.  He's the one that worked on

13  the objection, the brief.

14     Q.    Am I missing something?

15     A.    He's an attorney that works with

16  Mr. Bandas.

17     Q.    Okay.  He's not on the brief and he

18  doesn't have an appearance.

19            Did you know that Mr. Bandas does not have

20  an appearance in this case?

21     A.    I think he retained local counsel to make

22  an appearance on my behalf.

23     Q.    My question is, do you know that

24  Mr. Bandas and Mr. Clore do not have an appearance

Page 122

1    in this case?

2         A.   Yeah, I think I know that.

3         Q.   Do you know the saturation rate of the

4    notice plan in this case?

5         A.   Saturation rate of notice -- you have to

6    define what saturation rate means before I can

7    answer the question.

8         MR. LANG:  I'm sorry.  Can you ask that again?

9    I miss -- you're -- can you say that again, please?

10        THE WITNESS:  I don't know what saturation rate

11   is.

12        MR. LANG:  Okay.  Thank you.

13   BY MS. McNULTY:

14        Q.   Do you know the expected percentage of

15   consumers that will be breached as a consequence of

16   this notice plan?

17        A.   I glanced through and I saw something

18   about that, that maybe an expert was hired in this

19   case to review the notice and try to come up with a

20   plan to reach as many people as possible.

21        Q.   You saw that somewhere?

22        A.   It was in some of the documents on PACER.

23   I thought I saw it somewhere.

24        Q.   Didn't we already review everything that

Page 123

1    you had reviewed on PACER?

2        A.   I don't know which document it came from.

3    It may have come from the ones that I mentioned

4    that I reviewed.

5        Q.   But we agree that your testimony is, you

6    did not review the declaration of Carla Peak?

7        A.   I did not.

8        Q.   Do you know how many times the notice is

9    expected to reach consumers?

10       A.   I don't, no.

11       Q.   When you leave here today, at some point,

12   are you going to read the declaration of

13   Carla Peak?

14       A.   Am I?

15       Q.   Yeah.

16       A.   I don't know.

17       Q.   As you sit here today, do you know how

18   many claims have been filed?

19       A.   I don't know how many as of today, no.

20       Q.   So looking at your filed objection, which

21   I think is Exhibit 6, the first page, which is the

22   preliminary statement, you state because so few

23   claims were filed -- that's the beginning of one of

24   your sentences.

Page 124

1          Do you take the position that so few

2     claims were filed?  Is that a premise of your

3     objection?

4          A.   That's -- yes.

5          Q.   Okay.  But as you sit here today, you

6     don't know how many claims were filed?

7          A.   I only knew how many were filed at the

8     time that that objection was prepared.

9          Q.   How many were filed at that time?

10         A.   What was conveyed to me was 1,600.

11         Q.   And how was it that you obtained that

12    information?

13         A.   Mr. Clore.

14         Q.   And where did Mr. Clore obtain that

15    information?

16         A.   I assume he obtained it from court

17    filings, dockets, somewhere.

18         Q.   Did you ever specifically discuss with him

19    where he obtained that information?

20         A.   No.  It may be contained in a footnote.

21         Q.   What's your understanding of what a clear

22    sailing provision is?

23         A.   A clear sailing provision, my

24    understanding is that the defendant will not oppose

Page 125

1  the plaintiff's request for attorneys' fees as part

2  of the settlement.

3      Q.    And is it your position that that is a

4  condition -- or a term, rather, of this settlement?

5      A.    I don't know if it's a term of the

6  settlement or not.

7      Q.    As you sit here today, whether it is or

8  isn't, you don't know.  Does it matter to you

9  either way?

10     A.    It does, yeah.

11     Q.    And so what's your position that you're

12  taking in this case?

13          In making an objection, what position are

14  you taking on the clear sailing provision if you

15  don't know if it exists or not?

16          Let me back up, because your counsel looks

17  confused.  A moment ago, I asked you does this

18  proposed settlement contain a clear sailing

19  provision, right?  Do you remember me asking that?

20     A.    And I said I don't know if it does or it

21  doesn't.

22     Q.    All right.  Should you have determined

23  that one way or the other before making an

24  objection on that?

Page 126

1      A.   I think the reason why I don't know is

2   because I don't know if it's specifically stated in

3   the settlement agreement, but it appears that there

4   is one somewhere, because the defendant is not

5   contesting attorneys' fees -- or at least my

6   understanding is that they're not contesting

7   attorneys' fees.

8      Q.   And what's the basis of that

9   understanding?  Is it a person, is it --

10      A.   Just information that I've read from the

11   court docket.

12      Q.   Did Mr. Bandas tell you that?

13      A.   No.  No.

14      Q.   What has been your discussion with

15   Mr. Bandas concerning the purported clear sailing

16   provision?

17      A.   I'm not going to answer anything that I

18   discussed with Mr. Bandas.

19      Q.   What do you think is the role of a court

20   in terms of considering fee petitions?  Do you

21   think the court has a role?

22      A.   Absolutely, yes.

23      Q.   And describe for me what you understand

24   that role to be.

Page 127

1      A.   To set an appropriate fee for the work the

2  class counsel did in the case.

3      Q.   And do you think something about the

4  current proposed settlement prevents the Court from

5  doing that?

6      A.   I don't think the Court is prevented from

7  doing that if they consider the issue.

8      Q.   Okay.  If they consider what issue?  What

9  are you saying?

10     A.   The issue of attorneys' fees and whether

11 the amount is adequate or more than is needed to

12 compensate class attorneys for doing what they did

13 in this particular case.

14     Q.   And so I'm not totally sure if you're

15 answering the question I asked or just trying to

16 get some statements in, but my question is, is

17 there anything about the proposed settlement that

18 disrupts or interferes or impede's the Court's

19 role -- specifically, the Court's gate-keeping

20 function, including in the consideration of any

21 attorneys' fees to be awarded in the case or not?

22     A.   I think that they'll look at it.  They

23 have an application for attorneys' fees in front of

24 them.  So no, I don't think there's anything to

Page 128

1    prevent them from doing that.

2        Q.    When you say that Pella has agreed to not

3    oppose the fee request -- you're shaking your head

4    no.

5        A.    I didn't say that.  I didn't say that they

6    agreed.

7        Q.    Okay.  So I'm just going to indicate on

8    Page 2, your signed objection says the parties

9    bargained that Pella would not oppose the fee

10   request appears to have compromised class benefits.

11           You agree that I just read the parties

12   bargained that Pella would not oppose the fee

13   request?

14       A.    I said I don't know if there was an

15   agreement.

16       Q.    Well, that's what you're saying and that's

17   what we're trying to -- if you could look at

18   Page 2, this is where it gets a little difficult,

19   because the benefit of the deposition is

20   determining what you know and what you don't and

21   whether what you're saying is what you mean.

22           So on Page 2, at the very top, you

23   indicate in your brief that there is a clear

24   sailing provision, and then, you go on to say and

Page 129

1    the parties bargained that Pella would not oppose

2    the fee request appears to have compromised class

3    benefits.  Do you see that?

4        A.   Uh-huh.

5        Q.   Is that a yes?

6        A.   Yes.

7        Q.   Okay.  What is the parties bargained?

8    What are you talking about there?

9        A.   An agreement between the parties.  A

10   bargain.

11       Q.   So you're saying that the fact that

12   9 million was allocated for attorneys' fees, you're

13   saying that constitutes a bargain between the

14   parties?

15       A.   I think there's an implication that that

16   is the bargain between the parties.

17       Q.   And when you say you think there's an

18   implication, what do you mean?

19       A.   Well, Pella is not opposing the fee

20   request.

21       Q.   Do --

22       A.   So my assumption is that it was talked

23   about in your settlement negotiations, and when

24   they arrived at a settlement, maybe it was agreed

Page 130

1   that there would not be any opposition from Pella

2   to your attorneys' fees.

3        Q.   And what research or investigation or any

4   efforts at all did you undertake to corroborate

5   your assumption?

6        A.   I looked at the documents that were on

7   PACER.

8        Q.   What did you look at?

9        A.   If I'm not mistaken, Pella made a motion

10  to confirm the settlement or -- I forget the exact

11  legal term, but I thought that they had made a

12  motion to support the settlement, but in doing the

13  motion, they didn't oppose attorneys' fees.

14       Q.   Did you undertake any efforts whatsoever

15  to ascertain where the number $9 million came from?

16  You can answer.

17       A.   No.

18       Q.   Your objection that class counsel should

19  not be awarded a $9 million fee, when the class may

20  take less, first, are you only opposing the fee

21  petition of current class counsel?

22       A.   I'm opposing a fee of $9 -- $9 million if

23  it exceeds the recovery by the class when the

24  settlement is done.

Page 131

1      Q.   Do you know what the current recovery

2   amount to the class is?

3      A.   I don't.

4      Q.   Did your lawyer tell you anything lately

5   about that?

6           He told you that there were 1,600 claims.

7   Do you know what relief has been allocated to the

8   class thus far?

9      A.   What relief has been allocated to the

10  class?

11     Q.   Right.

12     A.   I don't think there's any allocation until

13  there's been a final fairness hearing, correct?

14     Q.   There's no distribution.

15     A.   Right.

16     Q.   Right.  But in other words, your attorney

17  is telling you that 1,600 claims have come in?

18     A.   Correct.

19     Q.   Okay.  What's the value of those 1,600

20  claims, do you know?

21     A.   I don't know.

22     Q.   Your lawyer was able to tell you that

23  there was 1,600 claims.  Is there a reason he was

24  unable to ascertain what the value of those claims

```
                                          Page 132
 1   is?

 2        A.   I don't know.

 3        Q.   Did you ever ask him?

 4        A.   What the value of the claims were?

 5        Q.   Right, that if there's 1,600 claims, how

 6   much does that translate into dollars?

 7        A.   No.

 8        Q.   As you sit here today, you don't know one

 9   way or the other what the class is currently

10   scheduled to receive if the settlement is approved?

11        A.   No.  Cumulative benefits, no, I do not

12   know.

13        Q.   Any benefits whatsoever?  Do you --

14        A.   I know what I would receive.

15        Q.   All right.  Now, you make a comment in

16   your brief that moreover, given the history of

17   prior representation and that some attorneys who

18   advocated in favor of the prior sham settlement are

19   now seeking fees, class counsel should not be given

20   a lump sum to be allocated privately among the

21   firms.

22             The history of prior representation, who

23   are you referring to there?

24        A.   Any of the attorneys from the previous
```

Page 133

```
1    settlement --
2         Q.   Do you know --
3         A.   -- that was overturned.
4         Q.   Do you know any of them by name?
5         A.   Paul Weiss, Yan -- it starts with a Y, but
6    I don't remember the name.
7         Q.   Mr. Yanchunis?
8         A.   I believe so, yes.
9         Q.   Okay.  What's your understanding of the
10   role Mr. Yanchunis had in the --
11        A.   I think complex --
12        Q.   -- first version of the litigation?
13        A.   I don't know what his role was.
14        Q.   You're critical of it, though?
15        A.   Pardon me?
16        Q.   Are you critical of Mr. Yanchunis?
17        A.   No.
18        Q.   Your footnote in relation to that
19   statement references Docket No. 688 at Page 6,
20   noting, quote, current class counsel
21   John Yanchunis, filed his declaration in support of
22   final approval and for attorneys' fees on
23   January 13th, 2013.  Do you see that in your filed
24   version?
```

Page 134

1      A.    What page?

2      Q.    Page 2.  It's Footnote 6.

3      A.    It says that.

4      Q.    Did you read the declaration of

5   John Yanchunis that you're citing there?

6      A.    I can't remember if I did or not.

7      Q.    When you -- well, you can't remember if

8   you did or not.

9            Do you know what Mr. Yanchunis did in the

10  prior version of this case?

11     A.    No.  I don't recall if that was one of the

12  class reps, Saltzman.  I just don't -- I don't have

13  enough facts right now as I sit here today,

14  recollection of everything that I've read as of

15  right now.

16           So to say that I know what -- no, I don't

17  know what he did, because I just don't recall it

18  correctly, all the names and --

19     Q.    Well, I'll tell you that Mr. Yanchunis did

20  not --

21     A.    Did not --

22     Q.    -- represent --

23     A.    Okay.

24     Q.    -- Mr. Saltzman.  Does that change your

Page 135

1  suggestion that Mr. Yanchunis was advocating in
2  favor of a prior sham settlement?  Does that change
3  your view on that at all?
4      A.   No.
5      Q.   Okay.  Then, you go on to say class
6  counsel should not be given a lump sum to be
7  allocated privately among the firms.
8           What have you read or reviewed that causes
9  you to think that's anything close to a component
10  of the proposed settlement?
11      A.   Nothing.
12      Q.   Okay.  But you're still making that
13  argument --
14      A.   Yes.
15      Q.   -- even though there's nothing in the
16  proposed settlement that suggests that anyone is
17  seeking a lump sum to be allocated privately among
18  the firms?
19      A.   I think what the argument is is in case
20  that is what happens that it should not be allowed.
21      Q.   Did you read plaintiff's counsel's
22  submission?
23      A.   I may have.  Whether I did or -- I don't
24  recall.

Page 136

1    Q.   Do you understand that there are class

2  members who really are depending on the relief

3  afforded by this settlement?

4    A.   I know that probably one-third of the

5  class is looking for it, but you know what my

6  concern is is that there are a lot of people out

7  there who are not getting benefits.

8    Q.   Well, a moment ago, you told me that it

9  was you that you were concerned about.

10    A.   I never said that it was just me that I

11  was concerned about.  I'm concerned about the other

12  650,000 people that won't be submitting claims.

13  I'm concerned about my neighbor, who I -- who I've

14  offered to assist in filling out the claims form,

15  and they said, for what, 400 bucks?

16        I'm concerned about my friend who lives in

17  Lancaster, New York, who says why am I going to

18  fill out this claim form, it's going to take me

19  more time than it's worth.  Those are the people

20  that I'm concerned about.  I just don't care about

21  myself.

22    Q.   Here's a question for you.  Here's a

23  question for you.  You read that you were going to

24  sit for a deposition today, right?

Page 137

1      A.   Yes.

2      Q.   You knew that when you filed the

3   objection, right?

4      A.   I didn't know at that time, because I

5   wasn't subpoenaed.

6      Q.   You knew from the order that you were to

7   make yourself available for deposition 30 days

8   after filing your objection, correct?  Did you read

9   that order?

10     A.   The order --

11     Q.   Entered February 20th, 2018?

12     A.   I don't believe so.

13     Q.   Okay.  You received a subpoena and

14  understood that you were sitting for a deposition?

15     A.   Correct.

16     Q.   And you signed this objection?

17     A.   I signed the objection.

18     Q.   You indicate that Pella casement windows

19  were installed in the home.

20     A.   In my home.

21     Q.   Yeah.

22     A.   Yes.

23     Q.   It says in the home.  Okay.  We've gone

24  over the photos in your home and we've

Page 138

1    distinguished the difference between casement and

2    double-hung windows, true?

3        A.   Yes.

4        Q.   Okay.  You indicate that you have

5    22 windows.

6             You do not have 22 casement windows, we

7    agreed, correct?

8        A.   Correct.

9        Q.   With respect to your suggestion that your

10   relief in this settlement is $880 -- strike that.

11            With respect to the aspect of the

12   settlement of which you are the most critical, that

13   being that you are entitled to 25 percent of the

14   total repair costs for your windows, did you have

15   any discussion with anyone concerning damages

16   models in consumer product cases?

17       A.   No.

18       Q.   Did you undertake any analysis of the

19   applicable state laws for damages under the

20   certified class theory of the case?

21       A.   No.

22       Q.   Did you conduct any analysis at all of any

23   kind concerning what your relief would look like in

24   a trial circumstance under New York law?

Page 139

1    A.    No.  The only analysis I did was, I looked

2  at the settlement benefits and I saw that a third

3  of the class -- or approximately a third of the

4  class was getting full reimbursement and I was

5  getting 25 percent.

6    Q.    What's your understanding of the relief to

7  which you would have been entitled under the

8  New York Consumer Fraud Act if you had brought this

9  case in 2003, 2005, or any of the times thereafter?

10    A.    What would have been my expectation --

11    Q.    No.

12    A.    -- or my understanding?

13    Q.    Your understanding of the relief to which

14  you would have been entitled under the New York

15  Consumer Fraud Act.

16    A.    If it was brought under the general

17  business law, then I would have been -- and it was

18  shown to be defective and a pattern on the part of

19  the defendant, I think I would have been able to

20  get damages, plus treble damages in some amount.

21    Q.    Is it your position that all you had to do

22  under consumer fraud law in New York was prove that

23  a product was defective?

24    A.    No.  I think you have to prove that it is

Page 140

1    a pattern or some kind of a pattern of behavior on

2    the part of the manufacturer, whatever --

3        Q.    When's the last time --

4        A.    -- to defraud.

5        Q.    When is the last time you looked at the

6    Consumer Fraud Act for New York?

7        A.    Probably four or five years maybe when I

8    worked at Nationwide.

9        Q.    Did you, in any way whatsoever, consider

10   how your legal rights as a consumer in New York are

11   affected by privity?

12       A.    No.

13       Q.    Did you, at any time during the pendency

14   of this case, contact your builder?

15       A.    Yes.

16       Q.    When?

17       A.    At the time of the last settlement.  Oh.

18   You said this case.  This case, no.

19       Q.    No, the pendency of the Pella ProLine

20   windows case.  So it doesn't matter at what phase

21   but --

22       A.    Yeah, I --

23       Q.    So if it was in 2012 or 2013?

24       A.    Yeah, I think I did contact them.

Page 141

1    Q.    Okay.  For what purpose?

2    A.    To see if they had any records of our

3  build, our file, and of the windows.

4    Q.    When you saw damage on the windows, did

5  you ever call the builder to say, hey, I think you

6  have a problem with the windows you installed in my

7  home?

8    A.    I did not call the builder, no.

9    Q.    You called the builder to find out if they

10  had any documents to show that you had Pella

11  Windows installed in your home, right?

12    A.    To assist with the claim.

13    Q.    And we agreed and you testified earlier

14  that with respect to the fixed casement, you don't

15  know one way or the other if that's a Pella?

16    A.    The one in the front?

17    Q.    Right.

18    A.    No.

19    Q.    Did you ever make an insurance claim on

20  your homeowners?

21    A.    Did I ever make an insurance claim?

22    Q.    For the windows.

23    A.    No.

24    Q.    Why not?

Page 142

1       A.    Because it's excluded.

2       Q.    Why?

3       A.    Mold, wet, dry rot.

4       Q.    There's an exclusion in your policy?

5       A.    Absolutely, in every homeowners policy in

6    New York State.

7       Q.    Did you consider opting out of the

8    settlement?

9       A.    No.

10      Q.    Why not?

11      A.    I don't know.  I just never considered it.

12      Q.    Do you agree that your relief individually

13   under the New York Consumer Fraud Act would result

14   in you having more money than the potential relief

15   that will be allocated for you in this case?

16      A.    Potential yes.

17      Q.    You agree with that?

18      A.    If my recollection, understanding of the

19   general business law is correct, yes, I think that

20   the relief would have been higher if I had brought

21   the claim myself.

22      Q.    And you agree that opting out would have

23   allowed you to do just that?

24      A.    Potentially, yeah.

Page 143

1      Q.   With respect to your hernia mesh cases, do

2  you plead violations of states' consumer fraud

3  acts?

4      A.   I'm not involved in the litigation.  I

5  don't file the claims or the plaintiff fact sheets

6  or the short form complaints, long form complaints.

7  I don't do that.

8      Q.   Okay.  But you're in the litigation,

9  right?

10     A.   I review the files, I review the medical

11 records, but I'm not involved in actually

12 litigating the cases.

13     Q.   Are you on representation agreements --

14     A.   Yes.

15     Q.   -- for those cases?  You assume

16 professional responsibility for those cases?

17     A.   Absolutely.

18     Q.   You know what's being filed in those

19 cases?

20     A.   Absolutely.

21     Q.   Okay.  Are you pursuing Consumer Fraud Act

22 claims in those cases?

23     A.   I would assume that that's the case,

24 depending on what the complaint looks like, the

Page 144

1  short form complaint or the long form complaint or

2  the plaintiff fact sheets.

3        Again, I don't actually file those.  That

4  is done by our attorney in Los Angeles.

5     Q.  Do you counsel your clients in those cases

6  to opt out of settlement algorithms?

7     A.   Settlement algorithms?

8     MR. STEWART:  Are you asking what his legal

9  advice is to his clients in the other cases?

10    MS. McNULTY:  No.

11 BY MS. McNULTY:

12    Q.  Have you ever had -- have you ever advised

13 a client in your mass tort product cases to opt out

14 of settlement relief in those cases?

15    A.  I've never been a part of a litigation

16 that settled as an attorney.  Risperdal has not

17 settled and hernia mesh has not settled.  So I have

18 no experience with that yet.

19    Q.  What other tort -- mass tort cases are you

20 involved with?

21    A.  PPI.

22    Q.  Okay.  Have any of those settled?

23    A.  No.

24    Q.  Are you in any vaginal mesh cases?

Page 145

1      A.    No.

2      Q.    While you were at Nationwide, did

3  Nationwide settle its claims always at 100 percent?

4      A.    No.

5      Q.    Why not?

6      A.    When you say 100 percent, let's clarify.

7  Are you saying 100 percent of the plaintiff's

8  demand?

9      Q.    We'll start there, sure.

10      A.    No, unless it was a policy limits case.

11  So if the plaintiff -- if the value of the injury

12  was $300,000 and the plaintiff made a demand for

13  100,000 and the case was worth that, then we would

14  pay 100 percent of our policy.

15      Q.    So did you ever have the occasion in any

16  way whatsoever to learn of or partake in settlement

17  of auto crash cases for auto insureds?

18      A.    That was mostly done by claims adjusters.

19      Q.    But you had familiarity with it, right?

20      A.    Sure.

21      Q.    Yeah.  And if an insured purchased a

22  vehicle or the victim of collision by an insured --

23  if a driver purchased a new vehicle in 2010, and

24  then, they got into a crash in 2014 and they submit

Page 146

1  a claim saying I paid $15,000 for my car in 2003 or

2  2001, would Nationwide accept that that claimant

3  was therefore entitled to $15,000 in 2014?

4      A.   No, because the policy doesn't allow it.

5  We have a contract with our insured that says that

6  you pay the fair market value or repair cost.

7  That's different than this.

8      Q.   There's no question pending.  I think I

9  asked you this, but it's worth clarifying just in

10  case.

11         Have you reviewed any judgments or

12  decisions in any legal cases concerning damages

13  models for products cases?

14      A.   No.

15      Q.   Looking at Page 4, when you talk about

16  poor class participation -- and we've covered some

17  of this, but that very first sentence, after the

18  Seventh Circuit rejected the former settlement that

19  produced minimal claims, class counsel knew greater

20  efforts were needed to induce claims.

21         What does that mean, class counsel knew

22  that greater efforts were needed to induce claims?

23      A.   Because I believe that the settlement was

24  overturned because the claims notice was cumbersome

Page 147

 1    for people to fill out.  And there's other

 2    objectors in this settlement who have made the same

 3    claim.

 4            It was a process in order to fill out the

 5    form, call the contractor, submit the claim, and do

 6    everything that was needed.

 7        Q.   No, but what --

 8        A.   In addition to that, even getting notice

 9    to people.

10        Q.   You're not being responsive to my

11    question --

12        A.   Oh.

13        Q.   -- which means you mustn't understand it.

14    So let me do my best to restate it.

15            In the very first sentence of Roman

16    Numeral I, the paragraph itself, it says after the

17    Seventh Circuit rejected the former settlement that

18    produced minimal claims.  Do you see that?

19        A.   Uh-huh.

20        Q.   Class counsel knew greater efforts were

21    needed to induce claims.

22            What does greater efforts were needed to

23    induce claims -- what are you saying there?

24        A.   That something needed to be done by class

Page 148

1    counsel to make it easy for people to submit

2    claims.  Something had to be done to make sure that

3    notice was getting to all of the people in the

4    class.

5              If there's 750 potential class members and

6    only a handful are submitting claims, and that was

7    in the previous settlement, maybe even less,

8    something more needs to be done.  Something needs

9    to be done.  When my neighbor tells me --

10        Q.   There's no question pending.  It's

11   becoming argumentative when you're doing that.

12        A.   I'm not being argumentative at all.

13        Q.   It's --

14        A.   I'm just trying to be informative.

15        Q.   I'm not suggesting that it's a fight, but

16   it's my deposition, and you're a lawyer and it's

17   not like you don't know this, all right?

18             Okay.  You go on to say -- you talk about

19   1,600 claims have been filed as of May 2018.  The

20   parties predicted this result.

21             What does that mean?  What are you saying

22   there, the parties predicted this result?

23        A.   The parties could be either the plaintiff

24   or the defendant.

1           And I think that it was reasonable to

2    assume that if the same or similar notice and

3    notice provisions and claim forms were used in

4    the -- the same as the prior settlement that you

5    were going to have a very low claims rate.  And

6    that is an advantage to Pella.

7        Q.   What was -- you're saying the parties

8    predicted.  That -- what are you getting at?

9    That's what I don't understand.

10          What are you saying was predicted, if you

11   know?  And if you don't know --

12       A.   I don't know.

13       Q.   Okay.  And then, you go on to say it is

14   actually, quote, above the rate range suggested by

15   defendant's experts.  Do you see that?

16       A.   I see that.

17       Q.   Okay.  Do you understand what's being

18   referred to in Document 688 at Page 15 when the

19   statement is made above the rate range suggested by

20   defendant's experts?

21       A.   I don't know.

22       Q.   You don't know what that means?  Okay.

23   Did you intend -- did you attend any court

24   proceedings whatsoever in this case?

Page 150

1      A.    No.

2      Q.    Did any of your lawyers -- the two from

3  Mr. Bandas' office or Eric, who's here today, or

4  John Novoselsky, did any of them ever attend any of

5  the status hearings?

6      A.    I don't know.

7      Q.    As a client of an attorney that you've

8  engaged, would you expect your attorney to

9  communicate to you if they had attended a status

10  hearing on behalf of your interests?

11      A.    I wouldn't have any expectations with

12  regard to that.

13      Q.    Further down on Page 4, about midway

14  through that second full paragraph, you state,

15  obviously, few homeowners know the brand of windows

16  in their homes.  What's the basis for that

17  statement?

18      A.    Just from personal experience maybe.

19      Q.    Did you attempt to corroborate your

20  personal opinion with any consumer or homeowner

21  survey data that exists?

22      A.    No.

23      Q.    As you sit here today, do you know that

24  you have Pella windows in your home?

Page 151

1      A.    Do I know that?

2      Q.    Yeah, do you know that?

3      A.    Yes.  I do.

4      Q.    And how do you know that?  We agreed we

5    don't know that about the living room window?

6      A.    What do you mean we agreed that we don't

7    know that about the living room window?

8      Q.    You said you don't know if that's -- if

9    that fixed window is a Pella ProLine casement or

10   not.

11     A.    Well, the one above the door, the front

12   door, not the living room.  The one in the hallway,

13   I know is not a Pella window.

14     Q.    And you agree that none of your photos

15   show any of the expected markings of Pella on any

16   of the lower right-hand corners, which is where you

17   described the serial number was?

18     A.    My photo -- no, that's -- by the time a

19   flash goes off and you have glare on windows, it's

20   very hard to take a picture of an etching on glass.

21     Q.    Would you be amenable to having an

22   informed contractor look at your windows to verify

23   that they are Pella ProLine casement windows?

24   Would you have any problem with that?

Page 152

1      A.   I wouldn't have any problem with it, but

2  why wouldn't we just know from what I put in the

3  objection whether it is or it isn't?

4          They know the serial numbers.  Pella does.

5  They know whether that falls within it.

6      Q.   Yeah.  Unfortunately, it's so sad to say

7  that a serial number or a person claiming to have a

8  serial number doesn't necessarily mean that they

9  actually have the window with that serial number in

10  their home or in a home that they previously lived

11  in.

12          So that's why I'm asking, but I think I'm

13  understanding that you don't oppose somebody coming

14  to your home to verify that, indeed, the two

15  windows that are the subject of your claim are, in

16  fact, Pella ProLine casement windows.  You're okay

17  with that?

18      A.   That's fine.

19                    (A short break was taken.)

20  BY MS. McNULTY:

21      Q.   All right.  With respect to --

22      A.   Can I just mention that during the break,

23  I do have a picture with the Pella etching on the

24  family room window --

Page 153

1      Q.    Yeah.

2      A.    -- that actually shows it better than a

3  copy.

4      Q.    Okay.

5      A.    Just don't mark my phone as an exhibit.

6      Q.    No.   You're -- that's --

7      A.    Did you see the Pella?   It says Pella in

8  script.

9      Q.    Yeah, I do.   I see the window that is on

10  your phone.

11      A.    So I should correct my testimony from

12  before, because I think -- unless I said it was the

13  lower right window where I said the etching was.

14      Q.    You said it was the lower right.

15      A.    Yeah.   Don't get frustrated with me.   I'm

16  just trying to be helpful here.

17      Q.    I'm not getting frustrated with you, but

18  I'm trying to -- you know, your counsel is asking

19  me to move things along and I'm trying to do that.

20  So I'm not at all frustrated with you.   I think

21  I've been pretty, you know, hospitable and

22  respectful.

23          So you know, looking at Page 6 of your

24  objection, you state courts must be particularly

Page 154

1   vigilant for subtle signs that class counsel have

2   allowed pursuit of their own self-interest to

3   infect negotiations.

4           Do you see signs that class counsel have

5   allowed pursuit of their own self-interest to

6   infect negotiations in this case?

7       A.   Have I seen signs?

8       Q.   That's right.

9       A.   I haven't looked for signs.

10      Q.   Do you have any understanding as to the

11  process that was undertaken in relation to any

12  settlement discussion?

13      A.   I have no knowledge.

14      Q.   Is it your position that the parties in

15  this case have created a selfish deal?

16      A.   Yes.

17      Q.   And how so?

18      A.   Because I think the defendant is paying a

19  lot less than they should be paying in order to

20  settle this case.  I think the attorneys are

21  getting a lot more than they should be, if the

22  settlement numbers are what I may think they will

23  come out to be.

24          I think the class representative getting

Page 155

1   $25,000 is ridiculous.  That's selfish.  So yeah, I

2   think there's a lot of indications that this is a

3   settlement that benefits everybody but the class.

4       Q.   You've never worked on a case like this,

5   right?  Right?

6       A.   Do I have to in order to understand the

7   settlement?

8       Q.   Please answer the question.  This is where

9   we start to run afoul.  Everyone wants to get home

10  and get on a plane, but then, we want to get

11  argumentative.

12           And so I'm going to ask you to please

13  answer the question.  Have you ever been involved

14  in a case like this?

15      A.   Have I been a member of a class?

16      Q.   No.  Have you been trial counsel in -- let

17  me start with this.

18           Have you been trial counsel in a products

19  case?

20      A.   Well, hernia and mesh is a products case.

21      Q.   Well, you told me you weren't involved

22  with those.

23      A.   Of course I'm involved.  I'm on a joint

24  representation agreement.  I'm reviewing medical

Page 156

1    records.  Of course, I'm involved.

2            If you're asking me have I ever litigated

3    those cases, no, if that's the question.

4        Q.   Have you ever tried a products case?

5        A.   No.

6        Q.   Have you ever tried a Consumer Fraud Act

7    case?

8        A.   No.

9        Q.   How many mesh cases do you have?

10       A.   Why is that important?

11       Q.   Answer the question, please.

12       A.   Why is that important?

13       Q.   Counsel, I'm not here for my deposition,

14   okay?  Do you understand the question that's

15   pending?

16       A.   I do.

17       Q.   Okay.  How many of the mesh cases do you

18   have?

19            You've just stated that you're involved in

20   litigating them.  You've given an opinion on what

21   the value of this case is, and now, I'm entitled to

22   explore that opinion.  How many mesh cases do you

23   have?

24       A.   It's not important.  It's irrelevant.  Why

Page 157

1    is that relevant?  It makes no difference whether I

2    have 1 or 5,000 in this case.

3        Q.   I'm going to move to strike the answer as

4    being nonresponsive and argumentative and I'm going

5    to give you a chance to now answer the question

6    again?

7        MS. McNULTY:  Ms. Court Reporter, can you

8    please read back the question?

9                         (Whereupon, the record was read.)

10   BY MS. McNULTY:

11       Q.   Sir, are you going to answer that

12   question?  You're looking around.  You're looking

13   down at the papers.  You're --

14       A.   I'm taking time to think about an answer.

15       Q.   Okay.

16       A.   Because some cases, you don't know if

17   they're a case if you don't have product ID.  You

18   may not have a case.  If you don't have an injury,

19   you may not have a case.

20            So while they're going through the

21   screening process to find out if we do have a

22   viable case, I can't sit here today and tell you

23   the exact number of cases that I have.

24       Q.   How many representation agreements do you

Page 158

1   have?  Give me your best estimate as you sit here

2   today.

3        A.   220.

4        Q.   How many of those cases have you tried?

5        A.   None have gone to trial yet.  There's been

6   no Bellwether trials.

7        Q.   Do you have any trial dates set in any of

8   those cases?

9        A.   No.

10       Q.   What are the theories of liability in

11  those cases for your clients?

12       A.   Defective design, basic products liability

13  theories.

14       Q.   Have you disclosed experts?

15       A.   Have I?  I'm not on the plaintiff's

16  steering committee.  It's multi-district

17  litigation.

18       Q.   I understand what it is.  Do you --

19       A.   Why would I disclose experts?  You're

20  asking if I disclosed experts.  What experts would

21  I have?

22       Q.   Well, I'm not here to tell you how to work

23  your case, but I'm asking -- and I think your

24  answer is no, irrespective of why, you've not had

Page 159

1   any reason to disclose any experts in your cases,

2   correct?

3       A.   No.

4       Q.   Have you ever had a case in which you

5   alleged a defect against a manufacturer of a home

6   product, whether it be shingles or windows or

7   siding, anything -- drywall, anything like that?

8   Have you ever done a case like that?

9       A.   No.

10      Q.   Okay.  And how many times have you taken a

11  deposition in any of your mesh cases?

12      A.   None.

13      Q.   Have you ever taken --

14      A.   They haven't been selected as Bellwether

15  cases.  And I don't know if they will.  So there

16  may not even be a deposition.

17      Q.   None was sufficient, but I appreciate the

18  extra bit of explanation.

19           And I'm wondering, have you ever taken a

20  deposition of a defendant manufacturer in a

21  products case?

22      A.   No.

23      Q.   Have you ever had a class decertified?

24      A.   No.

Page 160

1      Q.   Have you ever had a class in which a class
2   was certified, but causation and damages remained
3   individualized?
4      A.   No.
5      Q.   Have you ever -- in the instance of your
6   two windows, have you ever, at any time since 2001,
7   considered issues of causation in relation to the
8   wood rot?
9      A.   No.
10     Q.   Not even after the leaky roof?
11     A.   I'm not sure I understand what you just
12   said.
13     Q.   Sure.
14     A.   What is --
15     Q.   When I say causation, do you know what I
16   mean?  I mean, if -- I'm really not trying to be
17   funny.
18     A.   Well, you just said you weren't trying to
19   be argumentative.  You know as a lawyer that I've
20   been in this business for 26 years.
21     Q.   Okay.  So then --
22     A.   Of course I know what causation is.
23     Q.   Okay.  So I'm asking, have you considered
24   the issue of causation in terms of your damaged

Page 161

1    windows and proving that the damage on your windows

2    was caused by a defect in the window, as opposed to

3    any other cause?

4         A.    I've never looked into that.

5         Q.    Why not?

6         A.    Probably because at about the time that

7    the last class notice came out was when I -- was

8    when I was actually -- started looking at the

9    windows and noticed the damage, knew that I was

10   part of a class action.

11             I didn't fill out the form, but once that

12   was done, I figured that maybe I don't have a claim

13   anymore if it's settled and I haven't submitted a

14   claim form.  So I was done.

15        Q.    What about at the time you read the

16   Seventh Circuit's opinion?  Do you recall what the

17   Seventh Circuit said about causation?

18        A.    I don't.  I don't remember what they said

19   about causation, no.

20        Q.    As an attorney and as someone who handles

21   plaintiffs' cases, do you think that considerations

22   of causation on an individualized level would be an

23   important consideration for the class?

24        A.    Yes.

Page 162

1    Q.   Did anyone ever tell you that conceivably,

2    your leaky roof was causing any damage to that

3    bathroom window upstairs?

4    A.   I never said I had a leaky roof.

5    Q.   The damaged shingles.  I'm sorry.

6    A.   The damaged shingles?

7    Q.   Yeah.  Do you remember the class action

8    case in which you --

9    A.   Yeah.

10   Q.   -- submitted the claim for the damaged

11   shingles and we looked at them on the photo?

12   A.   But who claimed that there was a leaky

13   roof?

14   Q.   Nobody did.  I said I'm sorry, yeah, but

15   my point is simply that the shingles were

16   defective, correct?

17   A.   Right.

18   Q.   And in at least one photo, there is

19   evidence of the shingles coming off of the roof,

20   right?

21   A.   Uh-huh.

22   Q.   Is that a yes?

23   A.   There were four or five that were coming

24   off the garage.

                                    Page 163

1      Q.    Yeah.  And others are sort of turning up?

2      A.    Curled, yes.

3      Q.    Curling in a way that shingles should not

4   do?

5      A.    They should not.

6      Q.    Yeah.  So when you observed the rot in the

7   bathroom window, did anyone ever tell you or did it

8   ever occur to you that there was moisture reaching

9   that window as a consequence of ineffective

10  shingles?

11     A.    Uh-uh.  No.  No.  The only information I

12  have about that is when the gentleman from Pella,

13  who sold Pella Windows from Window & Door Solutions

14  came out.

15          He said that Pella had used a defective

16  sealant for many years to seal their windows and

17  that this damage was likely caused from a damaged

18  seal and the only way to prevent other windows from

19  having that problem in the future is to reseal all

20  of them at $10 a window.

21          So I figured by listening to him, that was

22  probably pretty well the cause of the rot on my

23  windows.  I think he knew.

24     Q.    But as you sit -- and let me just make

                                        Page 164

1    that clear.

2           He did not hold himself out as being

3    engaged in the litigation, correct?

4       A.   No.

5       Q.   Did he suggest to you that somehow, he was

6    aware of what the defect was, as alleged in this

7    litigation?

8       A.   He -- I told him when he came to my home

9    that this was for submission in the class action

10   settlement.

11          And that's when he made the statement that

12   Pella has known about the bad sealant for a long

13   time.  They have improved the sealant, and now, the

14   windows are better.  That's, in essence, what he

15   said, not quoting what he said, but that's what he

16   told me.

17          And the only way to prevent the other

18   windows from doing the same thing, if they weren't

19   replaced, if it was going to happen, was to reseal

20   those windows with the new sealant at $10 per

21   window.

22      Q.   Which he would have been able to do, is

23   that -- that was his sale -- or his attempt to sell

24   that service to you?

Page 165

1      A.    Yeah, he could do that.  Yes.

2      Q.    Now, in acquainting yourself with the

3  issues surrounding this case, and in particular,

4  this settlement and your objection, did you ever

5  come to learn what the plaintiff's theory is

6  concerning the alleged defect?

7      A.    I don't know if I'm saying it right, but

8  there was something about the Butyl bead, which

9  implies to me that maybe it has to do with what the

10  contractor was talking about.  And that is a

11  sealant in the window.

12          But do I know specifically all of the

13  allegations of the win -- no, I don't.

14      Q.    And you did not read any expert reports?

15      A.    No.

16      Q.    And you did not make any phone calls to

17  any of plaintiff's counsel to ascertain the theory

18  or the evidence?

19      A.    The only information I have on that is

20  from your response to defendant's motion for

21  summary judgment, where you went through and said

22  that the evidence discloses that Pella knew about

23  this problem of rotting windows for a long time and

24  actively concealed it from consumers.

Page 166

1       Q.   And do you know what that evidence is?

2       A.   I would assume that you obtained the

3    evidence through discovery if you were going to

4    allege it in a motion under affidavit or whatever

5    else.

6       Q.   And that -- we have done that.

7       A.   So --

8       Q.   That is in the record.  And what I'm

9    asking you is, do you know what that evidence is?

10      A.   Do I know what evidence you obtained to

11   make that assertion?

12      Q.   That's right.

13      A.   I don't.

14      Q.   When you read --

15      A.   I would imagine it's pretty good evidence.

16      Q.   When you read that assertion, did you want

17   to know?  I mean, did it cause you to think, hey,

18   maybe I'll call these people and --

19      A.   Absolutely.

20      Q.   How come you didn't call?

21      A.   How come I didn't call?

22      Q.   Right.

23      A.   I didn't think that I needed to.  If

24   you're the attorneys and you're doing the discovery

Page 167

1   and you have the reports and you have the evidence

2   to make those statements, I would assume that you

3   would make those statements and not be --

4        Q.   I guess I'm understanding that you read

5   that after you received notice of the settlement.

6        A.   Yes.

7        Q.   And so what I'm suggesting is that when

8   you received notice of the settlement, your -- you

9   don't like that notice and you don't like the

10  relief, and so in reading that document, how come

11  you didn't call to ask what is -- you know, why are

12  we settling this way or why not give me 100 percent

13  or -- how come you didn't call?

14       A.   I objected.  I didn't think it would

15  change anything, so I objected.

16       Q.   Do you know what the class representatives

17  did in this case?

18       A.   I don't.

19       Q.   Did you read any deposition of any class

20  representative?

21       A.   I did not.

22       Q.   Do you know what fee Mr. Schultz is

23  petitioning the Court to receive?

24       A.   No.

Page 168

1 Q. Do you know the fee that Mr. Schultz'

2 attorneys are petitioning the Court to receive?

3 A. No.

4 Q. Does that information affect your

5 criticism of any fee petitions?

6 A. I don't have that information.

7 Q. Right.  I mean, it's on the docket.  My

8 point is, would that information be relevant to

9 your construction of an objection concerning fee

10 petitions?

11 A. I don't think so.

12 Q. You reviewed the filing before it was

13 actually filed, right?  You read it in its entirety

14 and you signed it?

15 A. My objection?

16 Q. Yeah.

17 A. Yes.

18 Q. On Page 11, in the very bottom paragraph,

19 you do some calculations.

20 And I'm wondering, are those your

21 calculations or those of your attorneys?

22 A. My attorney.

23 Q. On Page 12, at the top, the objection

24 states though there were risks, Pella had already

Page 169

1   demonstrated a willingness to settle.  What did you

2   identify as the risks?

3       A.   I would assume the risks of going to

4   trial.

5       Q.   What are the -- what were the risks or is

6   it just that broad category of the risk of trial?

7       A.   The risk of trial for both sides.

8       Q.   You stated that the case should have

9   settled for more, is that right?

10      A.   Yes.

11      Q.   What factors and/or variables did you

12  consider when making that determination?

13      A.   The factor of fairness to the whole class.

14  That's a big -- that's a big factor.  If some of

15  the class is getting their windows fully replaced,

16  all of us should get our windows fully replaced.

17      Q.   Have you had any opportunity or occasion

18  in your practice to negotiate settlements on behalf

19  of a class against a defendant manufacturer?

20      A.   No.

21      Q.   Do you expect that in such a negotiation,

22  the defendant manufacturer doesn't take a position

23  on settlement value, as opposed to the option for

24  trial?

```
                                           Page 170

 1       A.    I'm not sure I understand that question.

 2       Q.    Sure.

 3       A.    If you could help me out with that.

 4       Q.    You're suggesting that the case should

 5   have settled for more --

 6       A.    Right.

 7       Q.    -- is that right?

 8       A.    Correct.

 9       Q.    And so is it your position that Pella was,

10   therefore, willing to pay more in a settlement

11   versus assume any alternative risk in a trial

12   setting?

13       A.    I don't have an opinion on that.

14       Q.    Did you give any consideration to that?

15       A.    I'm not even sure I know what you're

16   asking, to tell the truth.

17       Q.    Okay.  Did you give any consideration to

18   what the trial of these cases would have entailed?

19       A.    Of course.

20       Q.    What's your understanding?

21       A.    It's complex litigation.  There's risk on

22   both sides.

23             But once I read your brief, which

24   recounted some of the evidence in the case and some
```

Page 171

1    of the fraudulent factors that may have been going

2    on with Pella in their advertising and their

3    concealing of known defects and rotting windows, I

4    thought you had a pretty good case.

5            And I would figure that an office as

6    prestigious as the Clifford Law Offices would win

7    that case.

8        Q.   Did you have any understanding or give any

9    consideration to how the issue of individualized

10   proof of causation and damages would factor into a

11   trial, including for relief for someone like

12   yourself?

13       A.   I did not think about it that in-depth.

14       Q.   Was it your understanding that if the case

15   were tried for the class representatives and if the

16   class representatives' individual trials were

17   plaintiff verdicts that you and all members of the

18   class would then automatically be entitled to

19   relief?

20       A.   No, not all.  I wouldn't think that all

21   class members would be entitled to relief unless

22   they qualified for the settlement.

23       Q.   If --

24       A.   If it was settled.

Page 172

1      Q.   If the class representatives' trials had

2   proceeded and there were plaintiff verdicts in all

3   of those class representative trials --

4      A.   Uh-huh.  Yes.

5      Q.   -- what did you expect would have been the

6   next step for your claim, your case?

7      A.   Settlement.

8      Q.   Did you factor into that process the fact

9   of you and all class members having to individually

10  show evidence and Pella being allowed to defend the

11  individualized proof of both causation and damages?

12     A.   Did I factor that in?

13     Q.   Yeah.

14     A.   To what?

15     Q.   The steps between class representatives

16  prevailing at a trial and you, Mr. Tucker, getting

17  a settlement.

18     A.   No.

19     Q.   As you sit here today, are you starting to

20  understand, maybe just from the line of questioning

21  that indeed, the District Court and the Seventh

22  Circuit Court of Appeals would have required you

23  and all class members to supply an individualized

24  showing of proof of both causation and damages

Page 173

1   pursuant to, in your case, the New York Consumer

2   Fraud Act?  Did you know that?

3       A.   All I know is that there's a settlement

4   and I don't like it for many reasons.

5       Q.   Does your filed objection articulate all

6   of the reasons that you don't like the settlement,

7   meaning you didn't leave anything out?

8       A.   It captures the main reasons why I don't

9   like the settlement.

10      Q.   Are there reasons that have not been

11  articulated in your brief or tangentially in your

12  deposition today?  Are there reasons that have not

13  been disclosed?

14      A.   The filed objection is marked as an

15  exhibit, and then, you marked as an exhibit the one

16  draft that I prepared, and then, gave to counsel,

17  Mr. Bandas.  So there's additional reasons in there

18  why I don't like the settlement.

19      Q.   Why weren't those reasons -- and forgive

20  me, I've only gotten that today.  And so I've not

21  been able to do any real side-by-side comparison.

22           Why did reasons in your draft, which we

23  marked as Exhibit 7, not make it into your filed

24  objection marked as Exhibit 6?

Page 174

1          A.    15-page limit, I think, with the Court.

2     We had to pick and choose, decide what was going to

3     be placed in the final final.

4          Q.    On Page 13, Roman Numeral VI, no private

5     allocation of fees should be permitted.

6               And you start out, the Court should not

7     defer to class counsel to allocate fees.  Do you

8     see that?

9          A.    I do.

10         Q.    And you agree that at this time, there is

11    no evidence in the record of any class counsel

12    attempting to allocate fees?  Do you agree?

13         A.    I agree.

14         Q.    Okay.  And then, you know, moving on, you

15    say assurances that fees will be distributed

16    fittingly are hollow, given the prior breaches of

17    trust against the class members.

18               You agree that there has been no such

19    assurance raised or offered that that suggestion

20    that class counsel is going to allocate fees simply

21    is not at issue in this case?  Do you agree with

22    that?

23         A.    I don't know if it's an issue sitting here

24    today.

Page 175

1      Q.    Okay.  Do you recall seeing anywhere that

2  class counsel said they were going to allocate or

3  distribute fees?

4      A.    I didn't see anything regarding that.

5      Q.    Now that you mention it, do you recall

6  seeing in any document that you've reviewed or

7  glanced at that Mr. Frank, Ted Frank, is

8  petitioning the Court for several million dollars

9  and is going to pay Mr. Bandas from those proceeds?

10  Do you recall seeing that?

11      A.    No, I don't --

12      Q.    Do you recall reading our petition where

13  we actually opposed that suggestion?

14      A.    Uh-uh.

15      Q.    Would you have a problem if Ted Frank

16  received several million dollars, and then, he paid

17  Mr. Bandas, who did not submit a fee petition?

18  Would that cause a problem for you?

19      A.    I haven't really thought about it.

20      Q.    Well, on -- so I'm a little bit asking you

21  to do that now.

22          If an attorney were to receive several

23  million dollars and that attorney assured the Court

24  that he was going to take care of another attorney;

Page 176

1    in this case, Mr. Bandas, who doesn't have a fee

2    petition on file and did not maintain a log of his

3    hours in this case, would you have a problem with

4    that occurring, that one attorney is going to

5    receive fees and pay another attorney in a private

6    deal off the record?  Would that cause a problem

7    for you?

8        A.   No.  Attorneys do it all the time in

9    referral cases and personal injury cases.  You have

10   the attorney of record and you have the referral

11   attorney, and when the fee comes in, you send money

12   to the referral attorney.

13       Q.   Well, I can't speak to what others do, but

14   I can assure you that here in Illinois, there is

15   law concerning that, and that does not accurately

16   reflect the law in Illinois, but I cannot speak to

17   other jurisdictions.

18       A.   Right.

19       Q.   But you agree that there's a difference

20   between a duty owed to an individual client and a

21   duty owed to a class, right?  You know that now?

22       A.   From an attorney perspective?

23       Q.   Yes.

24       A.   The duty to an individual client is

Page 177

1    different than to the class.

2        Q.   There are different nuances between the

3    two?

4        A.   Well, there are different nuances of

5    litigation, but the duties are the same to

6    represent the class and all of the class members

7    and make sure you get a settlement that is adequate

8    to compensate the entire class and is fair to

9    everyone involved.

10       Q.   And so one attorney receiving a fee and

11   paying a second attorney, who does not represent

12   the class, that is inconsistent with what you just

13   described, right?

14       A.   I don't think it's inconsistent.  How do

15   we know what the other attorney did and didn't do?

16       Q.   That's right.  That's right.

17       MS. McNULTY:  Okay.  So let's just take a

18   short, you know, five-minute break, and then -- do

19   you have questions?

20       MR. MORROW:  Uh-uh.

21       MS. McNULTY:  So just like a short five-minute

22   break.

23       MR. STEWART:  Are you getting close to the end?

24       MS. McNULTY:  Yeah.

Page 178

1                    (A short break was taken.)

2    BY MS. McNULTY:

3        Q.   So just going back on the record, just to

4    kind of follow up on the last little bit of

5    questioning, you were talking about fee petitions

6    and fees being paid to or by one lawyer to another.

7              And with respect to your representation by

8    Mr. Bandas, is that a contingency fee agreement?

9        A.   That's between he and I.  That's

10   privileged.

11       MR. STEWART:  Hold on a second.

12                    (A short break was taken.)

13   BY MS. McNULTY:

14       Q.   Go ahead.  Your counsel just gave you some

15   guidance and --

16       A.   Yeah.

17       Q.   -- it's a little --

18       A.   I want to talk with him outside.

19       Q.   You got a question --

20       MR. LANG:  Pending.

21   BY MS. McNULTY:

22       Q.   -- pending.

23       MR. STEWART:  The only question is whether the

24   answer is privileged or not.  That's the only thing

Page 179

1   we're discussing.  We're not discussing anything

2   about what the answer is, just whether it's

3   privileged.

4       MS. McNULTY:  Well -- and I appreciate,

5   particularly from your position, what guidance you

6   might want to give him and you can go and talk

7   after there's an answer.

8   BY MS. McNULTY:

9       Q.   So do you understand that there's a

10  question pending?

11      A.   Yes.  My understanding is that that might

12  be privileged information.  I'd like to speak with

13  my attorney before I answer any further.

14      Q.   Well, you're not allowed to do that,

15  but -- I mean, you already know that.

16      MR. STEWART:  He's allowed to do that.

17      THE WITNESS:  Why am I not allowed to do that?

18      MR. STEWART:  He's allowed to discuss whether

19  the answer to the question is privileged.

20      THE WITNESS:  I answered the question.

21  BY MS. McNULTY:

22      Q.   You really didn't, you know, and you're

23  smiling.  And so I know you think that you're being

24  strategic, but --

Page 180

1    MR. STEWART:  This is really simple.  He gets

2    to discuss whether it's privileged or not before he

3    answers the question, not what the question is

4    about, not what the answer to the question is.

5        MS. McNULTY:  If you're defending him in the

6    deposition, you can call privilege; in which case,

7    then I simply have the question certified.  There's

8    not a break to discuss privilege.

9            So he's been kind of, you know, answering

10   questions and deciding, with no doubt your

11   preparation, when he's going to answer something or

12   not, but you don't get to take a break to discuss

13   what his prospective answer is going to be.  So

14   there's a question pending.  Are you invoking

15   privilege?

16       MR. STEWART:  I'm not invoking privilege.  If

17   you want to ask him a question and he chooses to

18   answer it how he answers it and you certify, then

19   do it that way.

20           I'm telling you we can do it -- we can

21   discuss it and he can answer the question or not

22   answer the question or you could do it that way.

23   It's your choice.

24

Page 181

1    BY MS. McNULTY:

2        Q.   Okay.  So do you remember the question or

3    do you need it read back?

4        A.   Whether or not the agreement I have with

5    Mr. Bandas is a contingent fee?

6        Q.   Yeah.

7        A.   Is that what the question was?

8        Q.   That's right.

9        A.   The reason why I'm hesitating is because

10   also, I don't think I know.  I don't remember,

11   because the fee arrangement wasn't that important

12   to me.

13            What was important to me was making sure

14   that I came forward and assisted other members of

15   the class who weren't getting the same benefits as

16   others.

17            So the money -- I don't know.  I don't

18   know if it's contingent fee.  I don't know if it's

19   some other fee.  I don't know.  It doesn't really

20   matter to me.

21       Q.   And it may not matter to you, but it

22   matters in that I'm asking the question, and it's

23   relevant for a further assessment of the bona fides

24   of this objection.

                                        Page 182

1           And so I am asking, do you know -- strike

2    that.  You have a fee agreement with Mr. Bandas,

3    correct?

4        A.   Yes.

5        Q.   We've already discussed that.  Do you know

6    if it's a contingency fee?

7        A.   I don't know.

8        Q.   You expect that Mr. Bandas will be paid

9    from proceeds you receive in this case or you pay

10   him hourly?

11       A.   In my agreement, I think that there is

12   proposed compensation of $5,000.  That number seems

13   to stick in my head, similar to a class rep fee.

14       Q.   Okay.  And you would -- you personally

15   would pay him that $5,000?

16       A.   No.  He would pay me 5,000 out of his

17   money to assist in objecting to the settlement,

18   similar to a class rep.

19       Q.   Okay.  I see.  To date, have you received

20   any payment from Mr. Bandas?

21       A.   No.

22       Q.   Have you received any payment from

23   Mr. Novoselsky?

24       A.   No.

Page 183

1    Q.   Are you aware of a retainer having been

2   paid to Mr. Novoselsky to serve as local counsel?

3    A.   No.

4    Q.   Who is paying Mr. Novoselsky?

5    A.   I don't know.  Not me.

6    Q.   Is Mr. Schultz being compensated by

7   Mr. Bandas in a similar fashion in this class rep

8   fashion that you described?

9    A.   I would have no idea about that.  That's

10   between he and Mr. Schultz, not --

11    Q.   Was it part of any of the discussion

12   concerning the waiver because of the conflict?

13    A.   I don't know if that came up or not.  It

14   may have.  It may not have.

15    Q.   You don't remember that?

16    A.   It may have been talked about, but

17   regardless, I agreed to waive any conflicts.

18    Q.   Yeah.  Right.  No, I understood that you

19   waived that for sure.

20        And you're a lawyer and Mr. Schultz is not

21   a lawyer, and you understood that, right?  But he's

22   also involved in the field of litigation as some

23   kind of an expert.  Do you know that?

24    A.   I don't know that.

                                              Page 184

1        Q.   Okay.  Yeah.  And -- but you think that
2    Schultz has a similar service award, the same as
3    you have with Bandas?
4        A.   I don't know.
5        Q.   Okay.  You just know for sure what your
6    deal is, right?  That much, you remember?
7        A.   Yeah, if I remember correctly.
8        Q.   Yeah.
9        A.   I'm just trying to be as specific and tell
10   you what I think I know, but --
11       Q.   Right.
12       A.   -- I don't know without looking at it.
13       MS. McNULTY:  Well, it's been a long day.  I
14   think that we're done.  Counsel, do you have
15   anything that you wanted to ask?  You're good?
16       MR. MORROW:  I'm good.  Thank you.
17       THE WITNESS:  I can go for a couple more hours.
18       MS. McNULTY:  So you have the right to review
19   the transcript.  You can't change your testimony,
20   but you may review it for the purpose of verifying
21   that the court reporter has accurately transcribed
22   everything said in the room today.  The court
23   reporter is from Veritext.
24           And so if you instead trust that the court

Page 185

1    reporter has accurately transcribed today, then you

2    may waive signature.

3            Which do you favor?  Would you like to

4    review and sign or waive?

5        THE WITNESS:  I'll review it.

6        MS. McNULTY:  Okay.  Thank you, both.

7        THE WITNESS:  Thank you.

8                    (Discussion off the record.)

9        MS. McNULTY:  So at the end of this deposition,

10   counsel for Mr. Tucker asked if I had supplied

11   Mr. Tucker with his mileage fee check, and I did

12   not.

13           And I offered to send that check to

14   counsel, who then suggested that I can either send

15   it to counsel, who will mail it then to Mr. Tucker,

16   or offered that I may go ahead and mail it directly

17   to Mr. Tucker.

18           And Mr. Tucker, do you have a preference

19   one way or the other?  Do you want for me to just

20   mail it directly to your home?

21       THE WITNESS:  You can mail it to me, that's

22   fine.

23       MS. McNULTY:  Okay.  And so that is what we'll

24   do and we'll just have that check.

Page 186

1          MR. STEWART:   And that's good with me.

2               (FURTHER DEPONENT SAITH NOT)

Page 187

1    STATE OF ILLINOIS  )

2                       )  SS:

3    COUNTY OF C O O K  )

4        I, Elizabeth L. Vela, an Illinois Certified

5    Shorthand Reporter, do hereby certify that

6    heretofore, to-wit, on the 12th day of July, 2018,

7    personally appeared before me, at 120 North LaSalle

8    Street, Chicago, Illinois, DONALD TUCKER, in a

9    cause now pending and undetermined in the United

10   States District Court, wherein KENT EUBANK, et al.

11   are the Plaintiffs, and PELLA CORPORATION, et al.

12   are the Defendants.

13       I further certify that the said witness was

14   first duly sworn to testify the truth, the whole

15   truth and nothing but the truth in the cause

16   aforesaid; that the testimony then given by said

17   witness was reported stenographically by me in the

18   presence of the said witness, and afterwards

19   reduced to typewriting by Computer-Aided

20   Transcription, and the foregoing is a true and

21   correct transcript of the testimony so given by

22   said witness as aforesaid.

23       I further certify that the signature to the

24   foregoing deposition was reserved by the witness.

Page 188

1      I further certify that the taking of this

2  deposition was pursuant to Subpoena, and that there

3  were present at the deposition the attorneys

4  hereinbefore mentioned.

5      I further certify that I am not counsel for nor

6  in any way related to the parties to this suit, nor

7  am I in any way interested in the outcome thereof.

8      IN TESTIMONY WHEREOF:  I have hereunto set my

9  hand this 13th day of July, 2018.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
                                                        Page 189
 1                          Veritext Legal Solutions
                               1100 Superior Ave
 2                                Suite 1820
                            Cleveland, Ohio 44114
 3                          Phone: 216-523-1313
 4
     July 13, 2018
 5

     To: Eric Stewart
 6

     Case Name: Eubank, Kent, et al. v. Pella Corporation, etc., et al.
 7

     Veritext Reference Number: 2958507
 8

     Witness:  Donald Tucker      Deposition Date:  7/12/2018
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24   NO NOTARY REQUIRED IN CA
```

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 2958507
 3  CASE NAME: Eubank, Kent, et al. v. Pella Corporation, etc.
    DATE OF DEPOSITION: 7/12/2018
 4  WITNESS' NAME: Donald Tucker
 5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have made no changes to the testimony
    as transcribed by the court reporter.
 8
    _____        _____
 9  Date                         Donald Tucker
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25
```

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 2958507
 3  CASE NAME: Eubank, Kent, et al. v. Pella Corporation, etc.
    DATE OF DEPOSITION: 7/12/2018
 4  WITNESS' NAME: Donald Tucker
 5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7        I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9        I request that these changes be entered
    as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                    Donald Tucker
14
          Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date
```

Page 192

1                        ERRATA SHEET

              VERITEXT LEGAL SOLUTIONS MIDWEST

2                   ASSIGNMENT NO: 7/12/2018

3    PAGE/LINE(S) /          CHANGE          /REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19

     _____        _____

20   Date                          Donald Tucker

21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22   DAY OF _____, 20_____ .

23                     _____

                       Notary Public

24

                       _____

25                     Commission Expiration Date

**&**

**&** 2:11 5:9 9:19
44:5 58:19 59:11
59:18,21 60:11
61:6,8,13,14 80:1
163:13

**0**

**06** 1:9
**084-003650** 1:24

**1**

**1** 3:5 25:6,10,13
157:2
**1,600** 124:10 131:6
131:17,19,23
132:5 148:19
**10** 3:15 19:8 103:2
103:6,7,14 104:1
163:20 164:20
**100** 11:11,20 116:5
145:3,6,7,14
167:12
**100,000** 145:13
**103** 3:15
**105** 3:16,17
**10:17** 1:20
**11** 3:16 105:2,5
168:18
**1100** 189:1
**112** 3:18
**12** 1:19 3:17 72:10
73:15 75:12
105:17,20,21
168:23
**120** 1:18 2:2 187:7
**12th** 187:6
**13** 3:18 112:13,16
174:4 189:4
**13th** 72:10 133:23
188:9

**14** 69:10
**15** 17:10 149:18
174:1
**15,000** 146:1,3
**16** 17:10
**17** 6:6 12:19 13:2
**18** 24:6,7
**1820** 189:2
**1985** 25:16
**1987** 8:5
**1991** 8:12
**1996** 17:8 44:10
**1:00** 83:9,17
**1st** 76:7

**2**

**2** 3:6 43:19,21
46:1,3 75:20,22
76:1,11,14,19,20
77:5,14,15,16 82:1
82:5 94:22 128:8
128:18,22 134:2
**20** 87:15 190:16
191:22 192:22
**2000** 2:12
**2001** 94:15,16
116:6 146:2 160:6
**2003** 139:9 146:1
**2005** 139:9
**2010** 44:8,9 145:23
**2012** 25:17 140:23
**2013** 25:18 69:10
85:6 88:6 94:12
133:23 140:23
**2014** 18:24 85:6
87:21 88:6 110:11
110:12,22 145:24
146:3
**2018** 1:19 73:5,14
75:20,22 76:1,8
81:3 137:11
148:19 187:6

**188:9** 189:4
**20th** 137:11
**21** 6:5
**212-6500** 2:8
**216-523-1313**
189:3
**22** 6:5 138:5,6
**220** 158:3
**25** 3:5 22:19 23:11
69:7 94:3 138:13
139:5
**25,000** 155:1
**250,000** 22:6
**26** 79:11 160:20
**27** 79:11 84:24
85:3 86:7 87:11
**28** 11:6
**2958507** 189:7
190:2 191:2
**2:00** 83:18
**2nd** 73:5,14 76:8

**3**

**3** 3:8 61:18,21
62:7 76:11,14,23
**30** 137:7
**300,000** 145:12
**3100** 2:2
**311** 2:7
**312** 2:3,8
**35** 9:10
**361** 2:13
**3:31** 1:21
**3rd** 76:6

**4**

**4** 3:2,9 63:14,18,19
146:15 150:13
**4,000** 101:19
**400** 136:15
**43** 3:7

**4300** 2:7
**44114** 189:2
**4481** 1:9
**48** 62:13

**5**

**5** 3:10 22:7,8,11,12
23:13 24:4 66:12
66:16 81:2
**5,000** 157:2 182:12
182:15,16
**50** 11:11

**6**

**6** 3:11 70:10,23
77:10 108:12
123:21 133:19
134:2 153:23
173:24
**60602** 2:3
**60606** 2:8
**61** 3:8
**615** 2:12
**63** 3:9
**650,000** 136:12
**66** 3:10
**688** 133:19 149:18
**695** 70:11
**695-3** 77:4,15 82:6
94:23

**7**

**7** 3:12 72:9,14,17
72:22 73:3,4 74:3
75:1,3,9 76:12,20
83:6 102:22
173:23
**7/12/2018** 189:8
190:3 191:3 192:2
**70** 3:11
**72** 3:12
**750** 84:13 85:4
86:13,14 87:1,13

93:19 148:5
**750,000** 86:12,16
**78401** 2:13

**8**

**8** 3:13 97:9,13,14
 104:23,24
**8,000** 102:22
**80** 46:22
**87** 8:7
**880** 93:24 138:10
**883-3563** 2:13
**899-9090** 2:3

**9**

**9** 3:14 98:5,9
 129:12 130:15,19
 130:22,22
**97** 3:13
**98** 3:14 96:14

**a**

**a.m.** 1:20
**aaj** 19:22
**abide** 28:1
**ability** 30:8 55:12
**able** 19:5 28:22
 43:7 57:18 95:8
 95:13,15 109:16
 113:4 131:22
 139:19 164:22
 173:21
**absolutely** 126:22
 142:5 143:17,20
 166:19
**accept** 17:2 18:1
 146:2
**access** 41:2,19,21
 41:22 43:7 115:18
**accessed** 41:12
**accident** 36:11
**accord** 4:4

**account** 62:9,12
 62:16
**accurately** 62:7
 81:14 97:14 103:7
 176:15 184:21
 185:1
**acknowledge**
 190:11 191:16
**acquainting** 165:2
**acquire** 88:6
**acquired** 90:11
**act** 139:8,15 140:6
 142:13 143:21
 156:6 173:2
 190:14 191:20
**action** 23:3 33:8
 35:13 36:15 48:24
 49:6 85:15 87:8
 88:20 89:5,11
 91:7,9 99:6,8,15
 117:21 121:4
 161:10 162:7
 164:9
**actions** 85:10
 87:18 88:2,9,19
 89:1,17 92:8
**actively** 165:24
**activities** 50:11
**acton** 1:5
**acts** 143:3
**actual** 118:24
**ad** 3:10
**adam** 6:8
**adams** 61:1 109:3
 109:7 111:19,23
 112:3,7,10,21
 113:3,13,18
 117:24 118:5,10
 118:11,13 119:4
 119:24 120:6,14
 121:7

**added** 76:5
**addition** 119:2
 147:8
**additional** 91:19
 173:17
**address** 26:12
 109:17 189:15
**addressed** 29:7
**adequate** 70:7
 127:11 177:7
**adjusters** 145:18
**adjustors** 12:6
**administrator**
 112:10 114:15
 119:7 120:20
**admitted** 5:7
**advance** 23:5
**advantage** 149:6
**advertisement**
 13:20
**advertising** 15:4
 171:2
**advice** 12:8,11
 30:5 144:9
**advised** 144:12
**advocate** 117:23
**advocated** 132:18
**advocating** 135:1
**affect** 168:4
**affidavit** 114:5
 115:10 166:4
**affirmative** 29:3
**affixed** 76:1
 190:15 191:21
**afforded** 136:3
**aforesaid** 187:16
 187:22
**afoul** 155:9
**ages** 6:4
**ago** 18:19 23:15
 39:9 45:20 47:7

48:20 57:12 59:8
 75:2 93:16 102:10
 102:23,24 108:6
 119:15 125:17
 136:8
**agree** 30:9 51:13
 62:15 123:5
 128:11 142:12,17
 142:22 151:14
 174:10,12,13,18
 174:21 176:19
**agreed** 119:3
 120:5 128:2,6
 129:24 138:7
 141:13 151:4,6
 183:17
**agreement** 28:22
 48:11 49:11,12
 50:4,8 55:19
 57:13,14,17,19
 63:12 126:3
 128:15 129:9
 155:24 178:8
 181:4 182:2,11
**agreements**
 143:13 157:24
**ahead** 61:24
 109:15 178:14
 185:16
**aided** 187:19
**al** 25:20 187:10,11
 189:6,6 190:3
 191:3
**alabama** 6:15
 25:16
**alert** 117:16
**alerting** 119:1
**algorithms** 144:6
 144:7
**alive** 9:6

**allegations** 165:13
**allege** 166:4
**alleged** 159:5
    164:6 165:6
**allocate** 174:7,12
    174:20 175:2
**allocated** 129:12
    131:7,9 132:20
    135:7,17 142:15
**allocation** 131:12
    174:5
**allow** 4:2 146:4
**allowed** 135:20
    142:23 154:2,5
    172:10 179:14,16
    179:17,18
**alternative** 170:11
**amenable** 151:21
**america** 46:15,16
**american** 90:2
**amount** 22:19
    23:5,10 27:18
    84:11 127:11
    131:2 139:20
**amounts** 22:4
**amusement** 8:19
**amy** 1:6
**analysis** 93:5
    138:18,22 139:1
**andersen** 61:3
**anderson** 59:18
**angeles** 144:4
**answer** 27:12 29:2
    29:5,10 30:6
    45:19 57:18 65:3
    65:8,10,11,13,14
    105:24 113:16
    116:23 122:7
    126:17 130:16
    155:8,13 156:11
    157:3,5,11,14

158:24 178:24
    179:2,7,13,19
    180:4,11,13,18,21
    180:22
**answered** 30:7
    179:20
**answering** 127:15
    180:9
**answers** 180:3,18
**anthony** 20:14
**anymore** 161:13
**apartment** 7:11
**appeals** 172:22
**appear** 190:11
    191:15
**appearance**
    121:18,20,22,24
**appearances** 2:1
**appeared** 187:7
**appears** 62:20
    66:19 71:7 73:19
    74:1 96:6 126:3
    128:10 129:2
**appellate** 69:19
**appended** 191:11
    191:18
**applicable** 138:19
**applicant** 23:23
    46:8 50:17 65:7
    90:16 91:17,20,22
    92:2,14
**applicant's** 51:2
    90:15 91:4
**applicants** 24:13
**application** 13:3
    13:17 20:23 21:11
    21:22 24:2 32:3
    32:18 33:2 34:10
    35:18,22 36:3
    47:18,21 48:1
    65:20 92:15

127:23
**applications** 35:5
    92:1
**applies** 45:8
**apply** 92:19 93:1
**appreciate** 39:19
    39:22 105:24
    113:7 159:17
    179:4
**appropriate** 29:9
    127:1
**approval** 110:18
    115:23 133:22
**approved** 132:10
**approximately**
    9:10 11:4,6 16:22
    17:10 18:5 19:3
    52:6 94:5 139:3
**april** 37:3 38:4,8
    73:5,14 75:20,22
    76:1,6,7,8
**arched** 105:13
**archways** 97:5
**area** 7:10 12:2
**areas** 35:9
**argument** 69:1,3
    69:18 109:18
    113:8,12 135:13
    135:19
**argumentative**
    116:24 148:11,12
    155:11 157:4
    160:19
**arguments** 71:19
**arkansas** 111:20
    112:20
**aronovitz** 58:1
**arrangement**
    181:11
**arrest** 31:19

**arrived** 129:24
**articles** 89:10,14
**articulate** 173:5
**articulated** 173:11
**ascertain** 48:14,18
    49:24 50:3 79:23
    130:15 131:24
    165:17
**ascertaining** 80:10
**ascribe** 25:2
**aside** 45:24 108:10
**asked** 17:14 33:12
    49:3,8 65:19
    74:10,17 100:14
    100:16 101:9,10
    118:20 125:17
    127:15 146:9
    185:10
**asking** 50:17
    51:20 65:6 73:22
    101:17 113:11
    118:12 121:2,5
    125:19 144:8
    152:12 153:18
    156:2 158:20,23
    160:23 166:9
    170:16 175:20
    181:22 182:1
**aspect** 111:7,11
    138:11
**assault** 11:1
**assertion** 166:11
    166:16
**assessing** 51:1,7
**assessment** 181:23
**asset** 10:8,12
**assigned** 11:7
    23:23
**assignment** 23:24
    190:2 191:2 192:2

**assist** 41:8 52:19
100:15 136:14
141:12 182:17
**assistance** 47:22
**assistant** 10:3
12:15,21 13:7,11
13:15 15:12 16:8
16:18,21 115:14
**assisted** 181:14
**associated** 22:18
**association** 90:2,5
**associations** 89:24
**assume** 70:11
79:18 101:23
124:16 143:15,23
149:2 166:2 167:2
169:3 170:11
**assumed** 80:4
115:2
**assuming** 109:16
**assumption**
129:22 130:5
**assurance** 174:19
**assurances** 174:15
**assure** 176:14
**assured** 175:23
**attached** 3:6 44:4
77:3 94:4 191:7
**attempt** 150:19
164:23
**attempted** 96:5
**attempting** 174:12
**attend** 149:23
150:4
**attended** 150:9
**attorney** 10:3,8
23:3,4 38:17 41:1
48:5 52:19,19
60:8 69:15 87:15
89:9 93:10 121:15
131:16 144:4,16

150:7,8 161:20
168:22 175:22,23
175:24 176:4,5,10
176:11,12,22
177:10,11,15
179:13
**attorney's** 9:24
**attorneys** 13:11,22
15:23 19:24 29:7
125:1 126:5,7
127:10,12,21,23
129:12 130:2,13
132:17,24 133:22
154:20 166:24
168:2,21 176:8
188:3
**august** 110:12,22
**authorities** 108:21
109:2,22
**authority** 28:5
**authorize** 191:11
**authorized** 32:10
65:16,21
**auto** 145:17,17
**automatically**
171:18
**available** 22:19
24:4 93:19 137:7
**ave** 189:1
**average** 24:9
**award** 184:2
**awarded** 127:21
130:19
**aware** 92:4 164:6
183:1

**b**

**b** 3:3 7:16
**back** 7:24 33:5
35:7 36:7,22 37:4
37:9 83:22 100:16
101:9,11 104:22

106:4 107:3,7
111:18 119:13
125:16 157:8
178:3 181:3
189:15
**backpack** 25:11
**backs** 106:2,7
**bad** 98:19 164:12
**bag** 68:2 71:21
75:2
**baker** 2:6
**bandas** 29:17 32:1
33:1,24 34:2,10,15
34:23 35:1,16
36:2,14,24 37:11
37:23 39:7 42:23
47:18 48:8,14
49:2,14 50:7,10
51:15,18,24 52:5,9
52:17,17 54:9,13
54:17 55:11,19,20
56:12,23 57:5,7
58:4 65:17,18
67:23 68:11,13,15
68:19 70:1,4
72:24 74:7,8 75:5
92:6 121:16,19,24
126:12,15,18
150:3 173:17
175:9,17 176:1
178:8 181:5 182:2
182:8,20 183:7
184:3
**bank** 15:3 46:9,10
46:11,15,16
**banking** 28:20
**bar** 5:7 89:24 90:2
90:4
**bargain** 129:10,13
129:16

**bargained** 128:9
128:12 129:1,7
**barker** 7:15
**basic** 158:12
**basis** 34:3 126:8
150:16
**batavia** 7:19
**bateman** 1:6
**bath** 79:5 81:10
82:22 107:19
**bathroom** 78:17
78:19 80:15,16
81:18,22 107:7
162:3 163:7
**bead** 165:8
**bear** 105:1
**becoming** 148:11
**began** 79:13 89:1
**beginning** 123:23
**behalf** 1:7 28:1,19
71:5,17 121:22
150:10 169:18
**behavior** 140:1
**belief** 87:2
**believe** 13:19
20:13 37:2 39:8
49:13 52:10 55:5
64:2 67:5 82:15
87:2 95:5,7 99:17
111:15,24 133:8
137:12 146:23
**believed** 45:8
**bellwether** 158:6
159:14
**belong** 89:24
**benefit** 22:1 84:9
128:19
**benefits** 128:10
129:3 132:11,13
136:7 139:2 155:3
181:15

**benton** 119:12
**berg** 1:5
**bergen** 44:15
**best** 30:7 50:20
  147:14 158:1
**better** 15:13 52:1
  66:1 85:19 118:21
  153:2 164:14
**bezdecki** 58:7
**big** 36:10 102:13
  169:14,14
**bit** 85:18 98:12
  159:18 175:20
  178:4
**blinds** 80:18
**block** 75:13,19
**blue** 75:17
**bock** 60:11
**body** 3:5 25:14
  111:24 117:16
**boise** 61:4
**bona** 181:23
**book** 49:2 51:2
  52:1
**borrow** 22:4
  100:14 101:4
**borrower** 24:11
**bottom** 78:4
  103:17 168:18
**boulevard** 7:6,8
**brailsford** 61:4
**brain** 36:22 37:4
  37:10
**brand** 150:15
**breached** 122:15
**breaches** 174:16
**breadth** 85:19
  116:10
**break** 34:7 43:11
  43:13 72:2,5 83:5
  83:8,20,22 95:4

108:15,18 152:19
  152:22 177:18,22
  178:1,12 180:8,12
**brenes** 64:22,22
  65:1
**brick** 97:2,2
**brief** 7:9,19
  113:10 121:13,17
  128:23 132:16
  170:23 173:11
**broad** 169:6
**broadly** 21:13
**broadway** 2:12
**brother** 6:20
**brought** 69:22
  70:7 139:8,16
  142:20
**brunick** 58:17
**bryson** 58:19
**bucks** 84:13 87:13
  136:15
**buffalo** 5:8,22
  7:21,21 8:1,4 12:3
  12:5
**build** 96:12 141:3
**builder** 94:21 96:9
  96:10,12 104:12
  140:14 141:5,8,9
**built** 94:15 96:7
  99:12
**bundle** 45:13
**bureau** 10:17
**burglary** 10:24
**burke** 59:2
**business** 11:18
  21:1,13,15 23:11
  24:12,17 25:4
  27:19 28:1,4
  35:16 36:2,24
  37:12 38:5,8
  47:20 48:23 49:2

50:18 51:2 52:1
  66:8 89:7 93:14
  139:17 142:19
  160:20
**businesses** 22:23
**butyl** 165:8

**c**

**c** 187:3
**ca** 189:24
**calculate** 84:11
**calculated** 93:22
**calculations**
  168:19,21
**call** 4:16 13:24
  96:24 141:5,8
  147:5 166:18,20
  166:21 167:11,13
  180:6
**called** 1:13 4:9
  7:15 8:19 17:13
  51:14 99:7 102:13
  141:9
**calls** 165:16
**canada** 99:17
**canadian** 99:7
**cap** 22:8 86:12
**capped** 93:19
**captures** 173:8
**car** 85:13 97:21,22
  146:1
**card** 119:13
**care** 29:4 56:1
  136:20 175:24
**career** 5:3
**careers** 21:5
**careful** 51:7
**carla** 114:5 115:11
  123:6,13
**carolina** 58:20
**case** 10:23 16:5
  21:8 23:4,7,9

25:17,18 32:23
  33:6 36:10,10,11
  41:3,9,16,19,21
  42:6 49:8 51:9,10
  51:11 52:20 54:14
  68:7 71:6 74:3,4
  79:19 84:17 91:4
  91:13 92:3,6,18
  93:9,23 99:16,19
  99:21 100:4
  102:16 104:8
  109:2,5,17,20
  110:2,7 111:1,8,11
  111:14,16,18,21
  111:23 112:3,7,10
  112:21 113:2,3,13
  113:21 114:9
  115:19 116:9
  117:13,18,24
  118:1,5,5,10,11,13
  119:4,24 120:2,6,8
  120:12,14,24
  121:7,8,20 122:1,4
  122:19 125:12
  127:2,13,21
  134:10 135:19
  138:20 139:9
  140:14,18,18,20
  142:15 143:23
  145:10,13 146:10
  149:24 154:6,15
  154:20 155:4,14
  155:19,20 156:4,7
  156:21 157:2,17
  157:18,19,22
  158:23 159:4,8,21
  162:8 165:3
  167:17 169:8
  170:4,24 171:4,7
  171:14 172:6
  173:1 174:21

176:1,3 180:6
182:9 189:6 190:3
191:3
**casement** 76:16
78:5 79:5 80:15
80:16 82:22 94:24
103:18,24 104:16
106:24 107:9,11
107:13,19 108:7
137:18 138:1,6
141:14 151:9,23
152:16
**casements** 104:13
**cases** 3:5 10:4,20
11:1,5,12 12:10
21:2,20 25:1,13
33:7,18 34:2,3,18
35:1,9,12 36:9,12
36:18 37:19,21
48:15,18,21 52:2
64:17,20 66:10
85:13 89:4,14
90:12,12,18,20
91:4,16,23 92:2,15
93:6 109:22 110:1
138:16 143:1,12
143:15,16,19,22
144:5,9,13,14,19
144:24 145:17
146:12,13 156:3,9
156:17,22 157:16
157:23 158:4,8,11
159:1,11,15
161:21 170:18
176:9,9
**casually** 36:8
**category** 169:6
**causation** 160:2,7
160:15,22,24
161:17,19,22
171:10 172:11,24

**cause** 99:5 161:3
163:22 166:17
175:18 176:6
187:9,15
**caused** 16:10
161:2 163:17
**causes** 118:13
135:8
**causing** 162:2
**ceo** 30:19,21 31:6
**certain** 27:18,24
54:21
**certainly** 5:1
23:10 58:10 91:6
**certificate** 44:8,20
45:1 191:11
**certification** 190:1
191:1
**certified** 1:18
29:20 91:6,8,11
138:20 160:2
180:7 187:4
**certify** 180:18
187:5,13,23 188:1
188:5
**chain** 19:17
**chance** 157:5
**change** 76:5
134:24 135:2
167:15 184:19
189:13,14 191:8
192:3
**changed** 20:13
97:19
**changes** 62:12
189:12 190:7
191:7,9
**characterize** 19:5
**charge** 31:16
**chasin** 1:6

**check** 185:11,13
185:24
**chicago** 1:19 2:3,8
7:3,4 58:9,11,17
59:9,21 60:11
61:9 187:8
**chief** 10:17 19:15
24:1
**child** 120:7
**children** 5:24
**choice** 29:3 180:23
**choose** 28:3 174:2
**chooses** 180:17
**choosing** 30:10
65:11
**christi** 2:13 25:21
26:15,16 27:9
28:13 29:15 35:8
54:4,10 65:7
**cicinelli** 1:5
**circuit** 146:18
147:17 161:17
172:22
**circuit's** 110:4
161:16
**circumstance**
34:20,24 138:24
**circumstances**
88:24
**cite** 109:18 110:3
111:22 121:10
**citing** 134:5
**civil** 1:15 4:5
190:5 191:5
**claim** 44:3 79:11
79:13 84:3 85:1
87:10 94:4 95:16
100:4,6,9,11,13,16
100:21 101:21,22
102:1,16 104:8
115:6 136:18

141:12,19,21
142:21 146:1
147:3,5 149:3
152:15 161:12,14
162:10 172:6
**claimant** 146:2
**claimed** 162:12
**claiming** 152:7
**claims** 12:1,2,4,6,9
69:16 99:24
101:15 112:9
114:15 119:7
123:18,23 124:2,6
131:6,17,20,23,24
132:4,5 136:12,14
143:5,22 145:3,18
146:19,20,22,24
147:18,21,23
148:2,6,19 149:5
**clarify** 83:23
145:6
**clarifying** 146:9
**class** 3:12 23:3
33:8,15,17 34:1
35:13 36:15 44:17
45:12,14 48:23
49:6 52:7 69:6,12
69:23 70:8 72:12
85:10,15 87:7,18
88:2,9,19,20 89:1
89:5,11,17 90:12
91:6,7,8,9,10 92:8
93:9 99:8,15
109:11 112:6
116:18,19 117:13
117:21,24 118:19
119:1,9 120:17,21
121:4 127:2,12
128:10 129:2
130:18,19,21,23
131:2,8,10 132:9

132:19 133:20
134:12 135:5
136:1,5 138:20
139:3,4 146:16,19
146:21 147:20,24
148:4,5 154:1,4,24
155:3,15 159:23
160:1,1 161:7,10
161:23 162:7
164:9 167:16,19
169:13,15,19
171:15,16,18,21
172:1,3,9,15,23
174:7,11,17,20
175:2 176:21
177:1,6,6,8,12
181:15 182:13,18
183:7
**clean** 14:14 74:23
**clear** 18:20 65:9
95:13 107:1
118:16 124:21,23
125:14,18 126:15
128:23 164:1
**cleveland** 189:2
**client** 20:24 22:2
26:1,20,21 27:1,9
27:24 28:4,14,14
28:17 29:14,16
30:10,12,13,15
33:1 36:8 46:8
65:18 68:16
144:13 150:7
176:20,24
**clients** 25:3 26:6
27:1,17 37:17,19
63:10 65:2,16
88:8,12,15 144:5,9
158:11
**clifford** 2:1 59:4,7
111:6 171:6

**cliffordlaw.com**
2:4
**clore** 52:17 121:9
121:11,12,24
124:13,14
**close** 94:8 135:9
177:23
**closer** 98:9
**closings** 63:8
**cody** 31:6
**collaborate** 36:6
**collateral** 24:24
35:19,20 91:24
**colleague** 23:15
115:18
**collection** 24:17
**college** 7:17,18,19
7:20,21
**collision** 145:22
**collusion** 69:17
**columbus** 11:17
**columns** 96:23
**come** 17:4,14
21:21 27:17 32:24
35:4 46:7,9 54:23
99:21 122:19
123:3 131:17
154:23 165:5
166:20,21 167:10
167:13
**comes** 20:21,23
36:7 176:11
**comfortable** 40:19
**coming** 152:13
162:19,23
**command** 19:17
**comment** 63:22,24
132:15
**commission**
190:19 191:25
192:25

**committee** 158:16
**communicate**
150:9
**community** 7:19
**company** 11:16,20
13:4 15:19 17:11
19:19,21 20:20
80:7 85:7 97:22
99:7
**comparison**
173:21
**compensate**
127:12 177:8
**compensated**
183:6
**compensation**
101:14 182:12
**complained** 64:14
**complaining** 64:6
**complaint** 143:24
144:1,1
**complaints** 143:6
143:6
**complete** 8:3
**completed** 76:9
189:15
**completely** 66:22
**completing** 8:14
**complex** 133:11
170:21
**component** 47:18
135:9
**compromised**
128:10 129:2
**computer** 15:1
67:20,21 68:1,4
187:19
**concealed** 165:24
**concealing** 171:3
**conceivably** 162:1

**concepts** 92:20
**concern** 136:6
**concerned** 136:9
136:11,11,13,16
136:20
**concerning** 37:11
38:8 51:15 90:12
110:18 112:24,24
116:4,12 126:15
138:15,23 146:12
165:6 168:9
176:15 183:12
**concerns** 65:8
**concise** 118:17
**concluded** 1:21
**conclusion** 55:17
**condition** 125:4
**conduct** 11:12
138:22
**confidentiality**
27:18 28:5 29:6
**confirm** 130:10
**conflict** 56:8,16,22
57:9 183:12
**conflicts** 183:17
**confused** 107:12
125:17
**connection** 32:18
32:22 100:9
101:21 102:16
109:18
**consequence**
87:24 88:4 122:15
163:9
**consider** 29:9
51:10 57:6 90:20
91:3,18,19 92:14
115:20,22 127:7,8
140:9 142:7
169:12

[consideration - court]                                                                    Page 8

consideration
  91:12 127:20
  161:23 170:14,17
  171:9
considerations
  161:21
considered  35:21
  47:20,24 57:3
  91:21 142:11
  160:7,23
considering
  126:20
consistent  29:5
  108:5
constitute  75:3
constitutes  129:13
construction
  168:9
consulted  79:23
consumer  138:16
  139:8,15,22 140:6
  140:10 142:13
  143:2,21 150:20
  156:6 173:1
consumeralertse...
  67:7
consumers  114:16
  117:16 122:15
  123:9 165:24
contact  111:6
  140:14,24
contain  125:18
contained  69:1
  82:5 124:20
contains  78:15
contend  64:10
contesting  126:5,6
context  117:2
contingency  178:8
  182:6

contingent  181:5
  181:18
continuing  89:21
continuous  90:5
contract  146:5
contractor  87:11
  87:12 102:21
  147:5 151:22
  165:10
conversation  21:7
  35:11 38:3 42:23
  48:20 57:10,15
  60:7 70:4,9 92:10
  92:11
conversations
  36:14
conveyed  124:10
convicted  31:19
copies  72:11 83:5
copy  39:1 44:7,12
  49:16 62:3 67:24
  68:2 70:15,16
  73:23 100:8,10,14
  100:17,19 101:5
  108:16 153:3
copyright  44:11
corner  95:6
corners  151:16
corporation  1:9
  1:10,11 109:23
  187:11 189:6
  190:3 191:3
corpus  2:13 25:21
  26:15,16 27:9
  28:13 29:15 35:8
  54:4,10 65:7
correct  7:7 17:3
  17:21 20:7 23:18
  24:15 30:14 31:7
  39:2,3 41:4 47:2
  48:6,8,9 50:4,5

51:4,16 53:13
  54:5 62:16,17,19
  65:12,23 66:4
  68:20,21 71:6
  75:6,18 76:10,18
  76:21,24 77:17,18
  77:20 78:6,13,14
  87:23 104:2,8,9
  105:10,11,15
  107:4,15,20 108:8
  109:9 110:5 116:7
  118:19 120:16
  131:13,18 137:8
  137:15 138:7,8
  142:19 153:11
  159:2 162:16
  164:3 170:8 182:3
  187:21
corrections  189:12
  191:17
correctly  17:1
  28:9 64:10 82:20
  83:24 134:18
  184:7
corroborate  130:4
  150:19
cost  100:2 146:6
costs  138:14
counsel  3:5 12:1,9
  12:16,21 13:7,16
  15:4,12 16:8,18,21
  17:2,5,8,12,13,19
  18:2,3,6,8,9,11,12
  18:23 19:11,12,16
  19:23 20:1,6,6,9
  20:11,14,18 21:14
  21:15,24 22:5,13
  22:18,24 24:14
  25:19,24 26:6,9,11
  26:11,12,14 27:21
  30:1,3,20 32:4

41:1 42:2,3,5
  44:18 45:15 46:6
  46:18 47:1 52:10
  52:14 57:4,8 65:2
  65:20,22 66:2,6
  68:16 85:18 87:21
  88:1,14 90:13
  93:11 111:13
  113:18 114:21
  115:14,15,18
  116:11 121:21
  125:16 127:2
  130:18,21 132:19
  133:20 135:6
  144:5 146:19,21
  147:20 148:1
  153:18 154:1,4
  155:16,18 156:13
  165:17 173:16
  174:7,11,20 175:2
  178:14 183:2
  184:14 185:10,14
  185:15 188:5
counsel's  15:21
  30:5 135:21
country  21:17
  37:18 63:10
county  9:23 11:3
  11:15 119:12
  187:3 190:10
  191:15
couple  73:20 84:7
  96:23 184:17
course  16:4 21:3
  25:12 89:6 118:23
  155:23 156:1
  160:22 170:19
court  1:1 4:7
  10:21 23:8 25:21
  26:1 28:6 29:6,9
  52:11 74:6,16,21

88:10 109:8
113:18 115:22
116:11 117:2
124:16 126:11,19
126:21 127:4,6
149:23 157:7
167:23 168:2
172:21,22 174:1,6
175:8,23 184:21
184:22,24 187:10
190:7
**court's** 110:13
127:18,19
**courts** 1:16 11:7,9
153:24
**cover** 13:21 14:21
15:8,11
**coverage** 12:9
**covered** 60:10
146:16
**cradduck** 109:3,7
109:13,17 111:18
111:19,23 112:3,7
112:10,21 119:24
121:7
**crank** 78:1
**crash** 145:17,24
**create** 117:7
**created** 154:15
**credit** 20:22 21:6
21:16,21 22:6
23:1 24:23 25:1
32:4,5,6,19 33:3
**creepy** 106:15,19
**crime** 10:9,10
**criminal** 8:9
**criteria** 90:19
91:18,19 92:17,20
93:1
**critical** 133:14,16
138:12

**criticism** 111:20
168:5
**csr** 1:23
**cumbersome** 84:6
146:24
**cummings** 5:9
9:19
**cumulative** 132:11
**curled** 163:2
**curling** 163:3
**current** 19:10
30:23 71:19
109:10 111:21
113:1 127:4
130:21 131:1
133:20
**currently** 12:18
63:9 69:9,9 110:9
132:9
**custom** 96:7,16
97:5,6
**customized** 96:22
**cut** 14:15
**cv** 1:9

**d**

**d** 3:1
**da** 11:3,15
**damage** 76:16
98:13 141:4 161:1
161:9 162:2
163:17
**damaged** 160:24
162:5,6,10 163:17
**damages** 138:15
138:19 139:20,20
146:12 160:2
171:10 172:11,24
**daniels** 2:6
**darien** 8:20,22 9:5
**darrell** 60:13

**data** 150:21
**date** 44:9 73:7,10
73:17,18,23,24,24
75:22,22 76:1,8,8
100:7 182:19
189:8 190:3,9,19
191:3,13,25
192:20,25
**dated** 73:21 75:20
81:2
**dates** 158:7
**david** 25:19
**davis** 1:4
**day** 20:17,17
23:17,17 76:2
93:7,7 94:8
184:13 187:6
188:9 190:16
191:22 192:22
**days** 73:20 137:7
189:18
**dayton** 7:23
**deal** 37:20 89:7
154:15 176:6
184:6
**dear** 189:10
**debit** 119:13
**decertified** 159:23
**decide** 174:2
**decided** 85:20
**deciding** 121:10
180:10
**decisions** 146:12
**declaration** 44:13
123:6,12 133:21
134:4
**deed** 190:14
191:20
**deemed** 189:19
**default** 24:20 26:7
26:9

**defaults** 26:5
**defect** 94:6 98:17
159:5 161:2 164:6
165:6
**defective** 139:18
139:23 158:12
162:16 163:15
**defects** 171:3
**defend** 172:10
**defendant** 124:24
126:4 139:19
148:24 154:18
159:20 169:19,22
**defendant's**
110:24 149:15,20
165:20
**defendants** 1:11
2:9 187:12
**defending** 180:5
**defer** 174:7
**define** 122:6
**defraud** 140:4
**degree** 8:2,6,8,11
**delaney** 40:22,23
40:24 41:5,8,11,15
42:2
**delaware** 1:11
**delivered** 39:20
**demand** 145:8,12
**demonstrated**
169:1
**department** 12:2,7
16:3 189:22
**depended** 101:16
**depending** 136:2
143:24
**depends** 51:9
**depict** 76:24 97:15
103:8
**depicted** 63:19
81:24 103:20,24

**depicting** 77:7
78:5,7,11 82:6
**depicts** 77:17
**deponent** 2:14
186:2
**deposition** 1:13
3:4 4:3,21,23 25:5
27:12 40:5,6
42:13 43:20 54:2
61:20 63:13 66:11
70:22 72:13 97:8
98:4 103:1 105:4
105:16 112:15
128:19 136:24
137:7,14 148:16
156:13 159:11,16
159:20 167:19
173:12 180:6
185:9 187:24
188:2,3 189:8,11
190:1,3 191:1,3
**depositions** 1:16
5:2,3,5,10 111:2
**depth** 171:13
**deputy** 19:12,16
20:5,9,11,14,18
115:15
**describe** 95:8
126:23
**described** 50:23
92:18 151:17
177:13 183:8
**describing** 88:19
**design** 158:12
**designating** 52:18
**designation** 44:10
**designed** 114:22
**designer** 80:14,16
81:11
**despite** 27:10

**detail** 21:12
**details** 120:5
121:6
**determination**
169:12
**determine** 33:15
**determined**
125:22
**determining** 51:3
128:20
**develop** 108:21
**development**
96:21
**diagnosis** 98:18
**difference** 138:1
157:1 176:19
**different** 16:14,18
58:13 80:23,24
85:11 89:9 93:8
93:13 97:6 146:7
177:1,2,4
**difficult** 94:7
95:10 128:18
**difficulty** 100:13
**diligence** 51:17
**dinardo** 30:16
31:8
**direct** 10:22 64:11
**directly** 5:6 20:2
94:17 185:16,20
**director** 31:2,5
**disbarred** 31:9,13
**disclose** 26:24,24
27:1,23 65:6,15,17
65:19 158:19
159:1
**disclosed** 158:14
158:20 173:13
**discloses** 165:22
**disclosing** 32:9

**disclosure** 28:22
47:3 65:21
**discovered** 13:3
**discovery** 166:3
166:24
**discuss** 21:11 35:5
70:5 92:13 111:7
111:11 124:18
179:18 180:2,8,12
180:21
**discussed** 48:20
55:15,18 58:6
126:18 182:5
**discussing** 93:16
179:1,1
**discussion** 55:1,17
55:17 126:14
138:15 154:12
183:11 185:8
**discussions** 48:2
**disorderly** 11:12
**displayed** 85:24
**disrupts** 127:18
**distinction** 77:23
**distinguish** 109:8
**distinguished**
138:1
**distribute** 175:3
**distributed** 174:15
**distribution**
131:14
**district** 1:1,2,15
4:6 9:24 10:3
25:16 110:8
111:19 112:20
158:16 172:21
187:10
**division** 1:3 23:20
**docket** 110:9
112:21 115:19
126:11 133:19

168:7
**dockets** 124:17
**document** 44:21
49:20 70:11 71:8
71:16 74:1 75:1
75:23 76:2,7 77:4
77:15 79:12 82:5
94:23 118:7 123:2
149:18 167:10
175:6
**documents** 40:9
40:12 41:12,19,21
41:22 42:11,24
43:1,2,4,14 45:19
45:21,21 49:22
70:17 122:22
130:6 141:10
**doing** 52:11 79:16
127:5,7,12 128:1
130:12 148:11
164:18 166:24
**dollar** 116:5,5
**dollars** 84:15
132:6 175:8,16,23
**don** 4:18,19
**donald** 1:13 3:2,11
4:3,8,15,16,18,19
75:13 187:8 189:8
190:4,9 191:4,13
192:20
**door** 44:5 80:1
81:10 105:14
108:2,3 151:11,12
163:13
**doors** 1:10 81:5,8
**double** 103:14
105:14 106:23
107:11,13,14,18
107:22,23 108:4
138:2

**doubt**  180:10
**downsized**  15:23
**downtown**  7:9
**draft**  67:14,15,18
  67:22,24 68:3
  71:9,11,18 72:18
  72:19,20,22 73:2,5
  73:11,12,14,20
  74:3,7,10,12,13,15
  74:19 75:4,10
  76:3,9,11 95:20
  108:16 173:16,22
**drafting**  68:6
  115:21
**drafts**  73:1 75:8
**drive**  2:7 15:1
**driver**  145:23
**drug**  10:6
**drugs**  10:7
**dry**  142:3
**drywall**  159:7
**dual**  55:22
**due**  51:17
**duly**  4:9 187:14
**duties**  89:18 177:5
**duty**  176:20,21,24
**dwi**  11:12

**e**

**e**  3:1,3 7:16 19:14
  39:5,9,21 40:22,23
  53:3 68:20 111:7
  111:10
**earlier**  90:3
  141:13
**early**  5:3 23:6
**east**  103:10
**eastern**  1:3
**easy**  148:1
**ecf**  44:13
**education**  62:19
  89:22

**edward**  1:7 58:7
**edwards**  59:11
**effectively**  55:20
**effort**  26:2 29:10
  33:14 48:13,17
  84:8 113:22
**efforts**  114:14,18
  130:4,14 146:20
  146:22 147:20,22
**eight**  5:9 9:21
**either**  38:23 41:23
  42:21 65:1 68:15
  84:17 111:7 125:9
  148:23 185:14
**eligibility**  80:11
**elizabeth**  1:17,23
  187:4
**email**  189:17
**employed**  14:7
**employees**  63:4,5
**employer**  11:15
**employment**  12:22
  14:6,18 16:5
  18:22 19:3 87:24
**enclosed**  189:11
**encompasses**  52:2
**encounter**  57:21
**engage**  26:9 29:3
**engaged**  26:4 48:8
  66:3 68:15 150:8
  164:3
**engages**  26:1,11
**engaging**  68:11
  116:11
**entailed**  170:18
**entered**  110:7
  137:11 191:9
**entering**  56:20
**entire**  102:15,19
  115:23 177:8
  190:5 191:5

**entirety**  71:4
  168:13
**entitled**  72:11
  138:13 139:7,14
  146:3 156:21
  171:18,21
**entries**  110:6,13
**enumerate**  91:2
**equally**  51:6
**eric**  2:12 42:14,24
  60:8,9 150:3
  189:5
**erin**  40:24
**errata**  189:13,18
  191:7,10,18 192:1
**especially**  89:16
**esquire**  75:14
**essence**  164:14
**essential**  3:5 25:14
**essentially**  15:16
  19:18 20:19,24
  21:6 55:12
**estate**  63:8
**estewart**  2:14
**estimate**  80:2,6,13
  80:14,20 81:1
  82:18 95:3 101:23
  102:8 158:1
**estimates**  81:3
  83:1 94:3
**estimator**  81:17
**estimators**  80:7
**et**  25:20 187:10,11
  189:6,6 190:3
  191:3
**etched**  96:4
**etching**  82:13 95:5
  95:9 151:20
  152:23 153:13
**etchings**  79:17,21

**ethical**  69:17
**eubank**  1:4 27:16
  109:23 110:2
  187:10 189:6
  190:3 191:3
**evaluating**  90:15
  90:20 91:7 92:14
  93:2,9,10
**evaluation**  88:21
  92:20,23
**evasion**  31:16
**event**  19:21
**everybody**  155:3
**evidence**  162:19
  165:18,22 166:1,3
  166:9,10,15 167:1
  170:24 172:10
  174:11
**exact**  19:1 100:7
  130:10 157:23
**exactly**  13:24 96:3
  96:6
**examination**  1:14
  3:1 4:11 79:21
**examined**  4:10
**exceeds**  130:23
**excellent**  58:11
**exception**  105:13
**excluded**  69:20
  142:1
**exclusion**  142:4
**excuse**  86:21 95:2
  112:13
**executed**  191:10
**execution**  190:14
  191:19
**exhibit**  3:5,6,8,9
  3:10,11,12,13,14
  3:15,16,17,18 25:6
  25:10,13 43:19,21
  61:18,21 62:7

63:14,18,19 66:12
66:16 70:10,23
71:22 72:9,14,17
72:22 73:3,4 74:3
75:1,3,9 76:12,20
77:4,5,10,14,15,16
82:1,5 83:6 94:22
95:23 97:9,13,14
98:5,9 103:2,7,14
104:1,23,24 105:2
105:5,17,20,21
112:13,13,16
123:21 153:5
173:15,15,23,24
**exhibits** 3:6 44:4
116:2
**existed** 75:8 85:12
85:12
**exists** 62:9 98:2
125:15 150:21
**expanded** 19:20
**expect** 27:18 150:8
169:21 172:5
182:8
**expectation** 28:18
139:10
**expectations**
27:24 150:11
**expected** 122:14
123:9 151:15
**experience** 88:10
144:18 150:18
**experiencing** 64:7
**expert** 111:4
122:18 165:14
183:23
**experts** 149:15,20
158:14,19,20,20
159:1
**expiration** 190:19
191:25 192:25

**explanation**
159:18
**explore** 156:22
**extend** 23:6
**extensive** 51:23
**extensively** 99:11
**extent** 31:21
116:10
**extra** 159:18

### f

**f** 17:17
**facade** 98:1
105:12
**facebook** 3:9,10
63:23 64:3
**fact** 55:16 70:5
95:12 116:4
129:11 143:5
144:2 152:16
172:8
**factor** 91:7 169:13
169:14 171:10
172:8,12
**factors** 91:3,5
119:23 169:11
171:1
**facts** 120:8,11
134:13
**faded** 95:10
**faegre** 2:6
**faegrebd.com** 2:9
**fair** 15:9 24:7
57:16 87:5 106:3
109:11 146:6
177:8
**fairly** 95:10 97:14
103:7
**fairness** 91:14
92:23 93:2 131:13
169:13

**falaschetti** 1:4
**fall** 56:4 79:15
**falling** 99:14
**falls** 152:5
**familiar** 31:3 67:6
**familiarity** 145:19
**family** 63:8,9
67:19 82:10 95:1
95:2 104:19,20
152:24
**far** 79:3 131:8
**farmer** 59:11
**fashion** 183:7,8
**father** 9:8,9
**favor** 111:22
113:14 118:4,13
132:18 135:2
185:3
**february** 137:11
**federal** 4:4 10:11
27:11 28:6
**fee** 23:4,6 35:20
54:21 91:23
126:20 127:1
128:3,9,12 129:2
129:19 130:19,20
130:22 167:22
168:1,5,9 175:17
176:1,11 177:10
178:5,8 181:5,11
181:18,19 182:2,6
182:13 185:11
**feel** 84:7
**fees** 54:19 125:1
126:5,7 127:10,21
127:23 129:12
130:2,13 132:19
133:22 174:5,7,12
174:15,20 175:3
176:5 178:6

**fell** 79:18
**fellow** 101:4
**felonies** 11:6
**felony** 10:22
**fides** 181:23
**field** 115:16
183:22
**fight** 148:15
**figure** 171:5
**figured** 161:12
163:21
**file** 84:3 141:3
143:5 144:3 176:2
**filed** 44:14 45:14
71:4 74:6,6,16,21
77:2,14 108:20
123:18,20,23
124:2,6,7,9 133:21
133:23 137:2
143:18 148:19
168:13 173:5,14
173:23
**files** 143:10
**filing** 68:17 114:4
115:21 137:8
168:12
**filings** 124:17
**fill** 86:9 136:18
147:1,4 161:11
**filled** 86:19
**filling** 100:13
136:14
**final** 8:1 73:2,11
73:13,22 75:10
131:13 133:22
174:3,3
**finalized** 73:5,9
76:3
**finance** 20:22 51:3
**finances** 65:22

**financial** 3:5 11:21
17:2,5,12,13 18:2
18:8,23 19:11
20:6 21:14,24
22:5,13,18,24
24:12,14 25:19,24
26:11,12,14 27:21
30:20 32:4 41:1
42:3,5 46:18 47:1
47:21 65:2,20,22
66:2,6 85:18
87:21 88:1,14,14
90:13 93:11
**financial's** 21:15
26:6 46:6
**financing** 21:19,20
21:23 22:1 23:7
27:20 34:3,11
35:18 36:3 46:7
46:17 47:1 66:2
88:18 115:16
**find** 20:24 49:22
50:2 82:13 141:9
157:21 189:11
**fine** 68:3 83:19
116:14 152:18
185:22
**finish** 14:9 18:14
**finished** 73:14,16
73:20
**firm** 5:8 20:21,22
21:11,18,20 24:23
34:4 37:21 49:14
53:14,16,17 57:20
58:4,11 59:4
60:17,20,23 62:23
63:1,2 64:19,22,23
64:23 65:1 91:22
92:7
**firms** 21:16 23:12
57:23 59:1 63:12

64:21 66:9 132:21
135:7,18
**first** 4:9 7:18 9:2
9:14 10:5,13,15
25:14 38:9 39:16
53:20 77:16 82:1
83:24 84:1,10
94:5,10 109:2
113:12 119:3
123:21 130:20
133:12 146:17
147:15 187:14
**fisher** 15:7
**fistos** 59:11
**fit** 19:17 52:8
**fittingly** 174:16
**five** 86:19 102:24
140:7 162:23
177:18,21
**fixed** 82:11,12,21
94:23 104:10,13
107:24 108:7
141:14 151:9
**flags** 8:19
**flash** 151:19
**flipped** 71:2,3
**flipping** 109:15
**floor** 96:19,24
**florida** 58:2 61:15
**focussing** 98:11
**folks** 24:12
**follow** 178:4
**follows** 4:10
**footnote** 124:20
133:18 134:2
**foregoing** 187:20
187:24 190:13
191:18
**forfeiture** 10:8
**forget** 130:10

**forgive** 173:19
**form** 44:2 79:11
79:13 84:20,24
85:2 86:8,19,24
87:11 94:4 95:16
100:13,16 101:22
115:6 136:14,18
143:6,6 144:1,1
147:5 161:11,14
**formal** 30:24
**format** 29:8
**former** 30:19,21
115:14 146:18
147:17
**forms** 149:3
**formula** 94:1
**fort** 59:12
**fortune** 11:20
**forward** 181:14
189:15
**forwarded** 67:23
75:4
**found** 99:22
**founder** 30:19
31:3,4
**four** 11:4 90:23
102:24 140:7
162:23
**frank** 175:7,7,15
**frankly** 29:2 66:1
**fraud** 69:22 139:8
139:15,22 140:6
142:13 143:2,21
156:6 173:2
**fraudulent** 171:1
**free** 190:14 191:20
**frequency** 117:20
**friend** 136:16
**friends** 63:8,9
**front** 70:18 82:1
96:22 97:2,3,15,16

97:17 98:1 105:9
105:12,14 107:21
108:2 127:23
141:16 151:11
**frustrated** 153:15
153:17,20
**fulfill** 11:22
**full** 69:13,23 81:6
139:4 150:14
**fully** 116:10
169:15,16
**function** 20:10,15
127:20
**funny** 160:17
**further** 150:13
179:13 181:23
186:2 187:13,23
188:1,5
**future** 163:19

**g**

**g** 13:14 102:13
**gaps** 21:18
**garage** 97:16
162:24
**gate** 127:19
**general** 9:10 12:15
12:21 13:7,16
15:4,12,21 16:8,18
16:21 18:2,6,9,11
18:12 19:12,16
20:1,6,9,11,14,18
37:20 115:14,15
116:1,3 118:7
139:16 142:19
**genesee** 7:19
**gentleman** 163:12
**george** 2:17
**getting** 57:3 93:3,4
103:21,23 106:15
116:24 136:7
139:4,5 147:8

148:3 149:8
153:17 154:21,24
169:15 172:16
177:23 181:15
**ginger** 7:2
**give** 24:23 27:11
36:1 89:10 101:9
101:11 104:24
157:5 158:1
167:12 170:14,17
171:8 179:6
**given** 4:21,23
13:24 29:2 32:5
100:1 132:16,19
135:6 156:20
174:16 187:16,21
**gives** 79:8
**giving** 21:16 40:19
114:12
**glanced** 122:17
175:7
**glare** 151:19
**glass** 95:5 151:20
**glasses** 25:11
**glazed** 95:14
**gluek** 59:16
**gluing** 99:13
**gmail.com.** 75:16
**go** 7:17 9:22 11:8
12:21 14:3 15:19
15:23 21:10 49:20
49:21 61:24 70:20
72:21 76:4 84:8
84:24 87:12 96:23
102:3,7 108:16
115:5,19 116:16
128:24 135:5
148:18 149:13
178:14 179:6
184:17 185:16

**goes** 85:19 88:9
90:22 91:2 151:19
**going** 6:14,15 9:3
19:21 23:4 25:9
27:1,2,12 28:1,3
28:10,16,24 29:19
30:6 33:20 40:5
43:18 45:24 52:11
55:14 57:4,20,21
61:18 63:17 69:18
69:19 80:23 83:5
83:11 86:7 97:12
98:8 105:2 111:18
112:12 116:15,22
117:2,5 123:12
126:17 128:7
136:17,18,23
149:5 155:12
157:3,4,11,20
164:19 166:3
169:3 171:1 174:2
174:20 175:2,9,24
176:4 178:3
180:11,13
**good** 91:10 166:15
171:4 184:15,16
186:1
**gotten** 173:20
**government** 10:11
**graf** 61:6
**grand** 10:17,19
42:16,17
**gratifying** 117:8
**greater** 146:19,22
147:20,22
**grew** 7:15
**group** 25:10,13
43:18 46:3 59:9
64:24 65:2 112:13
**grow** 7:14

**guard** 8:18,24 9:5
**guess** 113:8 167:4
**guidance** 178:15
179:5
**gustafson** 59:16
**guys** 83:7

**h**

**h** 3:3 13:14
**half** 10:5,14,15
11:4 12:19 13:2
16:22
**hall** 61:1
**hallway** 151:12
**hand** 43:15 82:15
86:8 95:6 104:6,6
151:16 188:9
**handful** 5:10
148:6
**handle** 37:21
**handled** 33:7
34:18 36:14
**handles** 37:22
49:6 161:20
**handling** 28:4
64:16
**happen** 164:19
**happens** 135:20
**harassment** 11:12
**hard** 151:20
**hatch** 60:11
**head** 26:22,23
128:3 182:13
**headhunter** 13:23
14:5,7,18 17:6
**hear** 22:22
**heard** 22:20 31:12
31:14,17,22,23
58:10 59:7,17
61:14 67:9
**hearing** 10:22
91:14 131:13

150:10
**hearings** 150:5
**hechtman** 1:6
**held** 10:21 15:14
31:19 36:22 37:4
47:11 90:6 121:3
**help** 66:20 170:3
**helpful** 44:10
153:16
**hereinbefore** 188:4
**heretofore** 187:6
**hereunto** 188:8
**hernia** 64:3,4,7
65:22 66:3,7,21
143:1 144:17
155:20
**hesitating** 181:9
**hey** 116:18 141:5
166:17
**higgins** 59:21,23
**high** 6:16
**higher** 142:20
**hire** 26:8 87:11
**hired** 9:23 11:24
16:16 17:7 87:20
122:18
**historical** 45:3,3
**history** 62:19
132:16,22
**hockemeier** 44:16
**hold** 8:7 12:18
16:20 20:12 120:6
164:2 178:11
**holding** 37:9 86:8
121:7
**hollow** 174:16
**home** 5:18 9:12
15:3 49:21 63:3
68:1,4 78:15 80:2
81:17 87:12 93:13

94:14 96:7 97:2,4
97:15,16,17 98:1
102:12 103:8,11
103:13 105:9,12
105:21 106:17,21
107:4,21 108:3
114:8 137:19,20
137:23,24 141:7
141:11 150:24
152:10,10,14
155:9 159:5 164:8
185:20
**homeowner**
150:20
**homeowners**
141:20 142:5
150:15
**homes** 96:12 97:3
97:7 99:12 106:2
106:7 150:16
**homicide** 10:24
**hospitable** 153:21
**hotel** 42:16,17
**hourly** 182:10
**hours** 42:19 62:13
90:23 176:3
184:17
**house** 31:19 82:1,2
82:3 86:9 106:13
**hsbc** 15:3
**huge** 36:11
**huh** 25:23 40:15
46:11 54:22 89:23
107:16 120:16
121:1 129:4
147:19 162:21
172:4
**hung** 105:14
107:11,13,14,18
107:22,23 108:4
138:2

**hungs** 103:14
106:23
**huseman** 2:11
**husemanstewart....**
2:14

**i**

**idaho** 61:4
**idea** 25:3 35:19
37:20 47:5,13
49:3 183:9
**ideal** 120:1,7
121:3
**identical** 6:20
**identification** 25:7
43:22 61:22 63:15
66:13 70:24 72:15
97:10 98:6 103:3
105:6,18 112:17
**identified** 76:15
96:9
**identify** 29:14,16
79:14 169:2
**identifying** 121:6
**il** 2:3,8
**illegal** 10:7
**illinois** 1:2,17,19
4:6,6 52:10,12
110:8 176:14,16
187:1,4,8
**imagine** 166:15
**immediately** 13:8
19:13
**impede's** 127:18
**implanted** 64:8
**implication**
129:15,18
**implies** 165:9
**imply** 80:8
**important** 49:22
51:11 71:23 91:7
116:9 156:10,12

156:24 161:23
181:11,13
**improper** 99:13
**improved** 164:13
**inadequate** 54:19
**include** 92:1
**included** 189:13
**includes** 25:13
118:23,24
**including** 50:14
54:18 114:17
118:8 127:20
171:11
**income** 21:19
**inconsistent**
177:12,14
**inconvenient** 94:9
**incorporated**
191:12
**increased** 70:7
**independent** 89:8
113:9
**indicate** 110:3
128:7,23 137:18
138:4
**indicated** 24:3
31:2 67:12 73:14
115:17
**indicates** 75:13,15
81:3
**indicating** 72:11
189:13
**indications** 155:2
**individual** 23:12
46:23 47:12
171:16 176:20,24
**individualized**
160:3 161:22
171:9 172:11,23
**individually** 1:7
142:12 172:9

**individuals** 46:24
47:4,8
**induce** 146:20,22
147:21,23
**ineffective** 163:9
**infect** 154:3,6
**influence** 119:23
**inform** 44:21
**informal** 92:9
**information** 36:20
37:11,13 38:7
41:24 62:16 67:1
79:8 85:16 88:5
90:11 95:16 96:4
113:14 114:11
115:7 124:12,15
124:19 126:10
163:11 165:19
168:4,6,8 179:12
**informative**
148:14
**informed** 56:16
151:22
**informing** 27:10
**initial** 20:23
**initially** 11:24
102:12
**injuries** 64:14
**injury** 23:9 85:12
145:11 157:18
176:9
**ink** 75:17
**inquiry** 64:11,13
**inside** 15:18 97:4
**installed** 82:23
137:19 141:6,11
**instance** 14:5,17
160:5
**instances** 15:24
90:14

institution 11:21
instructions 79:14
instrumentalities 10:10
insurance 11:16 11:19,20,23 13:4 15:19 85:7 115:15 141:19,21
insured 145:21,22 146:5
insureds 145:17
intend 149:23
interest 22:2 24:5 24:8,9,10 54:17 154:2,5
interested 10:12 21:10 188:7
interesting 36:10
interests 150:10
interferes 127:18
interior 81:4,8,11
interview 16:1,11 17:14 20:24
inventory 92:3
investigation 130:3
investors 46:24 47:8,12
invoking 180:14 180:16
involve 10:24 51:1
involved 24:16,18 34:19,22 35:13 80:9 143:4,11 144:20 155:13,21 155:23 156:1,19 177:9 183:22
iowa 1:9
irrelevant 156:24
irrespective 55:18 158:24

issuance 44:1
issue 84:19 117:15 127:7,8,10 160:24 171:9 174:21,23
issued 117:12
issues 12:9 160:7 165:3

**j**

j 4:15 59:2 75:13
jaffe 59:11
jail 119:12
james 1:6
jamestown 12:5
jamie 20:12,16 42:9
january 133:23
jeffrey 1:5
jerry 1:4
jersey 58:7
job 6:13 9:14 12:18 13:3,20 14:2 16:1,1,6,11 89:17
joe 33:5
john 60:15 133:21 134:5 150:4
joint 63:11 64:20 155:23
jonathan 6:9
joseph 1:5 17:17 30:16 42:9
journals 89:9,14 90:9
judge 111:16
judgment 110:24 165:21
judgments 146:11
july 1:19 187:6 188:9 189:4
june 81:2

junior 6:14
jurisdictions 176:17
jury 10:17,19
justice 8:9

**k**

k 7:16 17:17 60:21 187:3
kasouf 17:17,18 17:24 19:2,17 33:5,19,23 34:1,13 34:15,24 36:21,24 42:9 48:2,19 92:12
kcc 113:22,23 114:2
keep 49:21 83:11 104:24
keeping 127:19
kelly 20:14
kenneth 1:5
kent 1:4 187:10 189:6 190:3 191:3
kevin 2:7
kevin.morrow 2:9
keynote 59:8
kind 21:18 37:21 55:8 95:14 106:18 109:15 138:23 140:1 178:4 180:9 183:23
kinds 11:13 28:20 37:18
kirby 5:9 9:19
knew 33:7,17 48:24 85:12 86:6 86:6 87:6,10 124:7 137:2,6 146:19,21 147:20 161:9 163:23 165:22

know 14:14,15 19:4,9 21:7 22:14 24:9,10,20 27:19 30:9,13,15,16,24 31:21 34:1 35:10 35:11 36:18 38:10 38:10 39:11,12 41:5,15 42:5 46:10 47:16 48:21 48:22 49:1 50:9 50:10,16,19 51:24 52:3,16 53:5,17 54:6,9,11,12,13 57:13 58:10,16 59:6 62:1 63:18 65:10 66:23 67:3 70:2,16 73:18,18 73:23 83:9,12 85:5,11,14,16,18 87:8,17 88:1,2 92:10,11 100:7 102:11 104:12,14 108:14,24 111:13 111:16 112:9 113:9 114:2,16,17 114:18,23,24,24 115:12 116:13,16 117:20,24 118:2 119:4,6,9,11,17,21 120:4,5,8,9,13,14 120:17,20,21,22 120:23 121:6,19 121:23 122:2,3,10 122:14 123:2,8,16 123:17,19 124:6 125:5,8,15,20 126:1,2 128:14,20 131:1,7,20,21 132:2,8,12,14 133:2,4,13 134:9 134:16,17 136:4,5

137:4 141:15
142:11 143:18
148:17 149:11,11
149:12,21,22
150:6,15,23 151:1
151:2,4,5,7,8,13
152:2,4,5 153:18
153:21,23 157:16
159:15 160:15,19
160:22 165:7,12
166:1,9,10,17
167:11,16,22
168:1 170:15
173:2,3 174:14,23
176:21 177:15,18
179:15,22,23
180:9 181:10,17
181:18,18,19
182:1,5,7 183:5,13
183:23,24 184:4,5
184:10,12
**knowing** 118:18
**knowledge** 31:5
47:13,23 48:3,4
50:12 85:19 87:7
89:10 154:13
**known** 7:21
164:12 171:3
**kohn** 61:6

**l**

**l** 1:17,23 2:7 60:21
187:4
**la** 64:22
**lack** 52:1
**lake** 7:6,7,7 8:20
9:5
**lakin** 60:17,19,21
**lancaster** 136:17
**lang** 2:17 60:1
83:10 86:13,16
111:10 122:8,12

178:20
**language** 109:9,10
111:20,22 113:1,2
113:14,19
**larceny** 11:12
**lasalle** 1:18 2:2
187:7
**lately** 131:4
**lateral** 15:17
**lauderdale** 59:12
**laura** 5:15,16,18
**law** 2:1 5:6,8 7:23
8:1,10,14 9:3,14
20:21 21:16,18
23:12 58:4 59:4,9
60:1,3,10,13,15,17
60:20,23 61:1
62:21,24 63:2
64:22 65:1 91:22
92:7 111:6,10
138:24 139:17,22
142:19 171:6
176:15,16
**lawrence** 64:23
65:1
**laws** 138:19
**lawsuit** 89:11
**lawsuits** 87:8 89:5
**lawyer** 5:16 22:4
51:4,7 53:7 58:24
115:13 131:4,22
148:16 160:19
178:6 183:20,21
**lawyers** 7:12
19:22 49:11 50:3
53:6,8 58:1 66:3,7
66:9 88:13,17,18
88:24 89:1,7
150:2
**lead** 111:13

**leaky** 160:10
162:2,4,12
**learn** 99:21 145:16
165:5
**learned** 35:12 38:4
**learning** 40:4 88:8
**leave** 12:17 83:12
83:12 123:11
173:7
**left** 12:14,15 16:17
17:1,11,24 75:19
78:2,3,5,9 97:22
104:15
**legal** 12:1,1,8,11
16:3 20:19 21:4
24:18,21 33:3
47:24 50:14,24
51:14 58:22 89:22
117:17 130:11
140:10 144:8
146:12 189:1
192:1
**lehrman** 59:12
**leibowitz** 25:20
**leo** 1:6
**letter** 13:21 15:8
15:11 44:5 81:2
81:16 189:19
**letters** 14:21 44:17
95:15,17,18
**level** 11:10 52:12
103:24 104:6,15
106:24 107:6
108:5,7 161:22
**lewis** 60:11
**liability** 12:10
25:15 158:10,12
**license** 1:24 90:8
**licensed** 87:15
89:19

**limit** 174:1
**limitations** 69:21
**limited** 44:7,19,24
**limits** 145:10
**lincoln** 60:18
**line** 20:22 21:6,20
23:1 24:23 25:1
32:4,5,6 33:2
50:15,18 79:19
100:23,24 120:18
172:20 189:13
191:7 192:3
**lines** 21:16 22:6
**linkedin** 3:8 62:8,9
62:12,15
**lipkin** 59:21
**list** 21:8
**listed** 191:7,17
**listening** 163:21
**listing** 191:7
**litigated** 156:2
**litigating** 143:12
156:20
**litigation** 25:15
26:1,8 29:3 33:8
34:1 51:8 52:15
55:13 59:1 64:4
64:15,23 65:2,23
66:3,7 98:21,24
99:9 115:16
117:21 133:12
143:4,8 144:15
158:17 164:3,7
170:21 177:5
183:22
**litigations** 58:13
63:11
**little** 16:4 83:4,8
85:18 98:12
105:13,23 107:12
128:18 175:20

178:4,17
**live** 119:18
**lived** 120:22
152:10
**lives** 7:2,6,11 54:3
54:9,11 100:11
136:16
**living** 81:10 82:21
94:24 95:3 96:20
151:5,7,12
**llc** 3:5 25:19 44:6
58:17 61:11
**load** 33:6
**loan** 22:10,12
23:13 35:23,24
47:18
**loans** 22:19 24:3,5
24:8,14 46:17
47:1 66:6 88:14
**local** 4:5 52:10,12
52:13,19 121:21
183:2
**located** 9:24 63:1
**lockport** 9:24
**log** 40:14,17,20,21
40:22 41:2,6,13,19
41:24 115:17
176:2
**long** 9:20 37:5
38:13 39:9,11
42:18 44:2 52:4
79:11 84:20 90:21
102:23 143:6
144:1 164:12
165:23 184:13
**longer** 97:21,23
**look** 56:13 61:24
77:2 89:13 94:8
95:22 104:22
106:21 113:7
115:3 127:22

128:17 130:8
138:23 151:22
**looked** 14:24
39:17 40:13 49:14
57:19 80:2 130:6
139:1 140:5 154:9
161:4 162:11
**looking** 14:1 27:8
64:5 76:19,23
77:14 89:9 93:14
109:1 113:3,4
116:17,17 123:20
136:5 146:15
153:23 157:12,12
161:8 184:12
**looks** 21:2 25:21
43:24 44:5,14
72:2 73:4 77:3,6
95:9 98:12 103:14
103:17 125:16
143:24
**los** 144:4
**loss** 26:12
**losses** 85:13
**lot** 34:6 90:21 91:1
96:20 97:4 136:6
154:19,21 155:2
**louis** 58:22
**low** 11:10 24:21
149:5
**lower** 10:21 82:15
95:6 103:24 104:6
104:15 106:24
108:7 151:16
153:13,14
**luggage** 72:3
**lump** 132:20 135:6
135:17
**lunch** 83:8,14,20
**luncheon** 59:8

**m**

**m** 2:2
**madam** 189:10
**magazines** 90:9
**magic** 113:14
**mail** 39:9,21 67:17
68:20 111:7,10
185:15,16,20,21
**mailed** 39:5 53:3
**main** 173:8
**maintain** 100:8
176:2
**making** 44:18
63:24 64:11,13
77:23 83:18
101:21 125:13,23
135:12 169:12
181:13
**managed** 13:11
**manager** 5:21
**manages** 5:23
**managing** 17:8,19
**manners** 114:11
**manufacturer**
140:2 159:5,20
169:19,22
**march** 37:3 38:4,8
**mark** 28:24 43:18
46:1 61:18 70:10
71:15,21 72:9
105:2 112:12
153:5
**marked** 3:4 25:6
43:21 61:21 63:14
63:18 66:12,15
70:23 72:14,22
75:9 77:10 97:9
97:13 98:5,9
103:2,6 105:5,17
108:12 112:16
173:14,15,23,24

**market** 146:6
**marking** 25:10
**markings** 151:15
**marrano** 99:11
**married** 5:12
**martin** 60:23
**mason** 58:19
**mass** 63:11 85:10
90:12 144:13,19
**master** 78:17,18
79:5 81:10 82:22
107:7,19
**materials** 22:17
80:22
**mattel** 15:6
**matter** 29:6 40:5
51:16 53:7 92:21
125:8 140:20
181:20,21
**matters** 12:9
68:13,16 181:22
**matthew** 6:9
**mcnulty** 2:2 3:2
4:2,12 18:18 25:8
27:5 39:23 40:3
43:12,23 46:3,5
56:9 61:23 62:6
63:16 66:14 70:10
70:21 71:1 72:4,6
72:16 74:11 83:3
83:15,21 86:15,17
86:20 97:11 98:7
103:4 105:7,19
108:19 112:18
116:22 117:11
122:13 144:10,11
152:20 157:7,10
177:17,21,24
178:2,13,21 179:4
179:8,21 180:5
181:1 184:13,18

185:6,9,23
**mcquade** 25:19
**mdl** 25:15
**meadows** 59:19
**mean** 24:20 53:8
  53:10 73:11 86:6
  90:22,24 110:9,17
  120:23 128:21
  129:18 146:21
  148:21 151:6
  152:8 160:16,16
  166:17 168:7
  179:15
**meaning** 19:6
  35:15 55:21 85:3
  173:7
**means** 35:17 73:10
  122:6 147:13
  149:22
**meant** 90:15
**mechanism** 88:19
**media** 61:19 66:23
  67:1
**medical** 83:13
  143:10 155:24
**meet** 26:20 28:14
  38:22 41:11 42:15
  42:18 47:14 87:12
  88:12,17
**meeting** 35:4
  42:20 55:8 88:8
  92:13
**meetings** 47:6,9,11
**megan** 19:14
  23:24 42:10
**member** 116:18
  155:15
**members** 44:17
  45:14 112:6 119:1
  136:2 148:5
  171:17,21 172:9

172:23 174:17
  177:6 181:14
**membership** 90:2
  90:5
**memorandum**
  112:1
**memory** 94:14
**mention** 70:8
  152:22 175:5
**mentioned** 9:16
  18:19 31:24 33:6
  34:17 35:3,8
  37:16 48:22 49:6
  52:18 54:3,7
  56:21 64:16 65:5
  71:11 80:19 123:3
  188:4
**merlin** 59:9
**mesh** 64:3,4,7
  65:22 66:3,7,21
  143:1 144:17,24
  155:20 156:9,17
  156:22 159:11
**met** 27:9 28:15
  29:15 32:11,13,14
  33:4 42:14 52:21
  52:23 53:18 58:13
**method** 118:5
**methods** 114:8
**miami** 58:2
**middle** 6:5,8,14
  78:7
**midway** 150:13
**midwest** 189:17
  192:1
**mileage** 185:11
**million** 22:7,8,11
  22:12,19 23:11,13
  24:4 129:12
  130:15,19,22
  175:8,16,23

**minimal** 146:19
  147:18
**minneapolis** 59:16
**minor** 76:5
**minute** 43:9 71:20
  110:6,13 177:18
  177:21
**minutes** 38:15
**misdemeanors**
  11:10
**misplaced** 100:17
**misplacing** 105:1
**missing** 121:14
**missouri** 58:22
**mistaken** 39:8
  64:6 130:9
**model** 21:1 96:15
  118:14
**models** 138:16
  146:13
**modes** 114:17
**moisture** 163:8
**mold** 142:3
**mololamken** 60:5
**moment** 18:19
  23:15 45:20 47:7
  48:20 57:12 75:2
  93:16 108:6
  119:15 125:17
  136:8
**monday** 6:13
  45:17
**money** 119:13
  142:14 176:11
  181:17 182:17
**monster** 13:19
**month** 59:8 90:1
**months** 5:10 9:21
  52:6
**moore** 60:3

**morgan** 61:13,13
  61:14,14
**morrow** 2:7 70:18
  177:20 184:16
**mother** 9:11
**motion** 110:24
  130:9,12,13
  165:20 166:4
**motivated** 87:4
**motors** 9:10
**move** 13:5,6 15:17
  116:22 153:19
  157:3
**moving** 29:1
  174:14
**multi** 158:16
**mustn't** 147:13
**mutual** 13:4,17
  14:4,8,16

|            n            |
| --- |

**n** 3:1 19:14 60:21
**name** 4:14 5:14
  6:21 7:2,7 13:8,10
  13:13 17:16,17
  27:8 28:16,23
  30:9,12,13,15
  40:22,24 53:15,17
  55:5 58:12 59:17
  62:23 65:6 75:13
  80:6 114:17 133:4
  133:6 189:6 190:3
  190:4,15 191:3,4
  191:21
**named** 60:8
**names** 6:7 57:20
  65:15,17 134:18
**napier** 5:8 9:19
**nationwide** 11:16
  11:18,22 12:14,17
  12:20 13:16 14:19
  15:12,14 16:6,7,9

16:21 17:1,8,9,20
18:1,7 85:7,9
88:11 89:15 97:22
100:18 115:14
140:8 145:2,3
146:2
**nationwide's**
15:21
**navy** 7:10
**necessarily** 152:8
**necessary** 52:14
**need** 41:22 70:12
70:15,16 83:13
89:16 120:8 181:3
**needed** 12:8 115:3
117:1 119:12
127:11 146:20,22
147:6,21,22,24
166:23
**needs** 52:12 148:8
148:8
**negotiate** 169:18
**negotiation** 169:21
**negotiations**
129:23 154:3,6
**neighbor** 100:11
101:12 136:13
148:9
**neighbor's** 106:13
106:17
**neighborhood**
96:17 97:7 101:18
**neighbors** 96:20
99:22 101:10
**neither** 44:13
**never** 4:22,23,24
32:14 49:5 53:2
57:3,10,15 70:9
76:6 79:3 85:15
91:21,22 92:6
112:22,23 136:10

142:11 144:15
155:4 161:4 162:4
**nevertheless** 121:3
**new** 7:16,19 8:21
8:22 10:1 12:2
13:5,6 17:8,19
26:20 31:10,13
58:7 88:5 89:19
89:21 90:4 136:17
138:24 139:8,14
139:22 140:6,10
142:6,13 145:23
164:20 173:1
**newer** 106:18
**newman** 1:6
**niagara** 9:23 11:3
11:14
**nice** 74:23
**night** 11:8
**nitz** 60:8,9
**nonresponsive**
29:1,18 116:23
157:4
**north** 1:18 2:2,12
58:20 103:10
187:7
**northeast** 13:12
**northern** 1:2 4:6
7:22 25:16 110:8
**notarized** 189:14
**notary** 189:24
190:10,18 191:15
191:23 192:23
**note** 189:12
**notice** 3:18 33:9
43:24 44:1,2
45:11 52:7 69:16
72:11 86:4 99:18
109:9,11 111:21
111:22 112:2
113:1,2,4,5,6,13

113:15,19 114:9
114:12,16,22,23
115:2,2,4 116:8,11
116:13,19,21
117:12,16,21,23
118:4,7,8,15,20,24
120:1,6,7 121:3
122:4,5,16,19
123:8 146:24
147:8 148:3 149:2
149:3 161:7 167:5
167:8,9
**noticed** 94:10
161:9
**notified** 118:1,19
120:21
**noting** 133:20
**novoselsky** 29:7
52:8,22 53:1,2,4
57:8,11,16 60:10
150:4 182:23
183:2,4
**nuances** 177:2,4
**number** 3:4 31:20
70:17 94:2 95:18
130:15 151:17
152:7,8,9 157:23
182:12 189:7,13
**numbered** 72:10
77:17
**numbers** 79:17
95:14 152:4
154:22 191:7
**numeral** 147:16
174:4
**nursing** 15:3
**nutrition** 3:5
25:15

**o**

**o** 17:17 187:3,3
**o'clock** 83:9
**o'shea** 5:8 9:16
**oath** 29:11
**object** 85:15,20
87:5,6 88:2 116:8
**objected** 68:7
167:14,15
**objecting** 33:8,15
33:17,24 35:13
48:14,23 52:2
88:20 182:17
**objection** 3:7,7,11
3:12 33:11 39:17
41:9 44:4,12,14,18
44:22 49:7 52:14
67:12,13,14 68:6
68:12,17 70:1
71:5 72:12,18
74:3,5,5,15,20
75:4 77:3,15
94:23 95:20
103:22 108:14,20
109:12 114:4
115:21,22 116:4
116:12 121:13
123:20 124:3,8
125:13,24 128:8
130:18 137:3,8,16
137:17 152:3
153:24 165:4
168:9,15,23 173:5
173:14,24 181:24
**objections** 36:14
45:14,18 49:7
68:9
**objector** 33:13
34:16 35:2,17
37:1,12 38:5,8
41:16 42:6 47:19

50:11 54:14,20
55:3,4 84:16
91:18,20,21,23
92:2,15
**objectors** 55:12
147:2
**objects** 92:7
**observe** 94:5
**observed** 163:6
**obtain** 124:14
**obtained** 124:11
124:16,19 166:2
166:10
**obviously** 110:17
150:15
**occasion** 145:15
169:17
**occur** 163:8
**occurring** 176:4
**offenses** 63:7
**offer** 29:4
**offered** 32:6
136:14 174:19
185:13,16
**offering** 66:20
**offers** 12:22
**offhand** 57:14
**offhanded** 48:19
**office** 5:23 9:24
10:21 15:21 35:6
36:3 39:7 49:21
52:17 60:1,3
62:21,24 111:11
150:3 171:5
**officer** 6:13 19:15
24:1
**offices** 2:1 12:4
59:4 60:13,15
61:1 111:6 171:6
**official** 190:15
191:21

**oh** 49:23 53:9
59:15 86:8,17
101:9 102:4
140:17 147:12
**ohio** 7:22,23 11:17
189:2
**ok** 54:20
**okay** 4:16,16,21
5:1,4,12 7:1 14:4
17:4,18,24 18:15
20:8,17 22:8,15
25:12 27:2,8
28:10,12 30:3,16
30:23 32:8,13,24
33:20 37:7 38:7
38:18,22 40:8
42:2,15 43:9
44:19 46:6,14,16
46:20 48:7 53:9
53:12 54:13 55:22
55:24 57:1 58:1
59:9 62:5,23
63:17 65:19 66:16
67:6,15,18 68:3
70:13 71:2,8,11,20
72:7,9,20 73:4,13
74:24 75:12 76:11
77:2,11 78:2,4,10
78:15,18 79:7,20
80:13 81:2,14,16
83:3,16,18,22 84:5
84:14,21,22 85:4
88:5,17,23 89:21
93:22 95:8 97:19
98:1,16 99:5
102:18 103:5,10
103:17,22 104:5
104:10,12,22
105:3,8,11,20,23
106:19,23 108:9
108:13 109:1

110:6,15,21 111:2
112:14,24 113:17
115:13 116:22
117:8,12 118:3,18
119:6,9,20 120:14
121:17 122:12
124:5 127:8 128:7
129:7 131:19
133:9 134:23
135:5,12 137:13
137:23 138:4
141:1 143:8,21
144:22 148:18
149:13,17,22
152:16 153:4
156:14,17 157:15
159:10 160:21,23
170:17 174:14
175:1 177:17
181:2 182:14,19
184:1,5 185:6,23
**older** 97:18
**oldest** 6:5,8,12
**once** 16:14 36:20
161:11 170:23
**ones** 61:15 65:16
123:3
**open** 94:8 104:16
**opened** 17:12
**opening** 13:3
**operate** 63:2
**operating** 19:15
24:1
**opinion** 110:4
119:24 150:20
156:20,22 161:16
170:13
**oppenheim** 60:11
**opportunity**
169:17

**oppose** 124:24
128:3,9,12 129:1
130:13 152:13
**opposed** 28:5 29:9
93:10 109:10
117:7 161:2
169:23 175:13
**opposes** 54:21
**opposing** 55:13
71:19 129:19
130:20,22
**opposite** 70:6
**opposition** 110:23
130:1
**opt** 144:6,13
**opting** 142:7,22
**option** 86:11
169:23
**order** 6:7 14:1
81:21 84:24 87:13
110:17,21 115:6
137:6,9,10 147:4
154:19 155:6
**orders** 110:7,13
**organic** 99:10
**original** 69:11
**outcome** 188:7
**outright** 80:8
81:17
**outside** 5:18 9:11
9:14 14:18 23:1
26:8,11 178:18
**overseeing** 10:19
**overturned** 69:11
133:3 146:24
**owed** 176:20,21

**p**

**p** 19:14
**p.m.** 1:21
**pacer** 39:17 40:10
40:14,17 41:2,12

41:23,24 42:1,12
45:21 122:22
123:1 130:7
**page** 67:4 72:10
73:15 75:12 76:19
76:20,23 77:16
82:1 84:24 123:21
128:8,18,22
133:19 134:1,2
146:15 149:18
150:13 153:23
168:18,23 174:1,4
189:13,15 191:7
192:3
**pages** 72:10 76:11
76:14 79:11 84:7
85:3 86:7 87:11
**paid** 146:1 175:16
178:6 182:8 183:2
**palmer** 60:13
**paper** 73:19
**papers** 45:14
157:13
**paragraph** 81:7
147:16 150:14
168:18
**pardon** 133:15
**parents** 9:6
**park** 8:19
**part** 24:18 25:4
26:10 34:17 48:23
56:10 63:2 66:7
80:3 89:2,17
91:23 92:3,7,15
95:17 99:4 125:1
139:18 140:2
144:15 161:10
183:11 191:9
**partake** 145:16
**participate** 98:23

**participated** 5:1
93:17
**participation**
146:16
**particular** 35:22
45:5 48:1 49:7
80:10,20 98:11
118:6 127:13
165:3
**particularly** 64:12
153:24 179:5
**parties** 114:15,21
115:24 128:8,11
129:1,7,9,14,16
148:20,22,23
149:7 154:14
188:6
**party** 56:11
**password** 40:20
**patio** 81:10
**pattern** 139:18
140:1,1
**paul** 31:6 133:5
**pay** 24:14 25:3
102:20 145:14
146:6 170:10
175:9 176:5 182:9
182:15,16
**paying** 154:18,19
177:11 183:4
**payment** 182:20
182:22
**payne** 19:14 23:24
42:10
**pays** 22:2
**peak** 114:5 115:11
123:6,13
**pebbles** 99:13
**pedico** 96:24
**pella** 1:9,10 27:16
33:10 45:2 51:10

80:23 81:4,7,9,11
94:18,20 104:13
109:23 113:5,15
113:21 114:9
118:5 128:2,9,12
129:1,19 130:1,9
137:18 140:19
141:10,15 149:6
150:24 151:9,13
151:15,23 152:4
152:16,23 153:7,7
163:12,13,15
164:12 165:22
168:24 170:9
171:2 172:10
187:11 189:6
190:3 191:3
**pendency** 140:13
140:19
**pending** 25:20
27:6 29:21 39:23
69:10 99:16 117:4
117:6 146:8
148:10 156:15
178:20,22 179:10
180:14 187:9
**pens** 60:15
**people** 12:6 16:4
27:19 36:15 69:6
69:7 96:20 116:16
118:16 119:11,17
122:20 136:6,12
136:19 147:1,9
148:1,3 166:18
**perceived** 15:13
35:15,16
**percent** 24:6,7
46:22 69:7 94:3
96:14 116:5
138:13 139:5
145:3,6,7,14

167:12
**percentage** 46:21
51:24 122:14
**perform** 20:3,9,15
20:23 51:17
**performance** 20:3
**period** 16:20
36:23 69:18 85:8
**periods** 16:9
**permitted** 100:1
174:5
**person** 13:22,23
14:1 17:7 18:7
28:19 32:11,14
38:23 42:21 64:6
93:9 126:9 152:7
**personal** 23:9
79:20 85:12 93:9
150:18,20 176:9
**personally** 57:22
75:23 93:12
182:14 187:7
190:11 191:15
**perspective** 93:14
176:22
**pertaining** 1:16
**peter** 59:23
**petition** 115:23
116:1,3 130:21
175:12,17 176:2
**petitioning** 167:23
168:2 175:8
**petitions** 126:20
168:5,10 178:5
**pharmacist** 5:22
**pharmacy** 5:21
**phase** 140:20
**philadelphia**
59:14 61:6
**phone** 17:13 32:16
32:21 37:23,24

38:3,6,16,16,20,23
42:21 52:24 53:21
111:7,10 153:5,10
165:16 189:3
**phoned** 38:17
**photo** 3:13,14,15
3:16,17 78:4,7,10
105:2,20 106:1
151:18 162:11,18
**photographs**
76:12,14 101:22
101:24
**photos** 76:24 77:3
77:6,17,19 78:18
79:2 82:6 137:24
151:14
**pick** 174:2
**picture** 78:22
95:11,13 97:18,19
97:23 98:2,10
106:18 151:20
152:23
**pictures** 76:20
95:22 102:14
**piece** 113:13
**pier** 7:10
**place** 47:23 52:14
79:10
**placed** 63:22
113:9 174:3
**placing** 68:12 91:3
**plaintiff** 143:5
144:2 145:11,12
148:23 171:17
172:2
**plaintiff's** 110:23
125:1 135:21
145:7 158:15
165:5,17
**plaintiffs** 1:8 2:4
161:21 187:11

**plan** 96:19 114:22
122:4,16,20
**plane** 155:10
**plead** 143:2
**please** 4:13 101:11
117:3,6 122:9
155:8,12 156:11
157:8 189:11,11
**pllc** 2:11 61:4
**plus** 139:20
**point** 13:15 17:24
18:10 21:5 35:12
36:13 48:7 56:21
72:21 73:13
123:11 162:15
168:8
**pointing** 53:12
116:20 117:1
**points** 83:23
**police** 6:13
**policy** 142:4,5
145:10,14 146:4
**pool** 46:6
**poor** 146:16
**porch** 96:22 97:1
**portfolio** 21:1
34:18 66:10 89:5
**portion** 36:1 46:19
46:20 85:4 97:16
97:17 100:2
**position** 12:12
13:17,23 14:4,16
15:5,6 16:15,16,17
17:2,5,11,12,15
18:1 19:9 20:12
30:4 54:18,19
66:5 70:6 85:17
90:13 112:24
124:1 125:3,11,13
139:21 154:14
169:22 170:9

179:5
**positions** 15:10,13
15:14
**possession** 10:7
**possible** 122:20
**possibly** 18:24
37:3 117:18
**post** 3:9 64:2,10
66:16,19
**postcard** 44:1
67:16 114:7,22
115:1,4 116:21
117:21 118:8
**postcards** 114:10
**posted** 62:8,9
**poster** 120:7
**posting** 13:19
**potential** 16:2
36:8 69:17 71:18
86:24 93:23
142:14,16 148:5
**potentially** 64:15
142:24
**ppi** 144:21
**practice** 169:18
**preceding** 9:3
**predicted** 148:20
148:22 149:8,10
**preference** 185:18
**preferences** 28:4
**preliminarily** 23:8
**preliminary** 91:14
110:18 123:22
**premise** 124:2
**preparation** 43:14
67:11 180:11
**prepare** 40:8
42:12 79:13 80:2
**prepared** 33:11
40:6 72:19 118:22
124:8 173:16

**preparing** 41:8
**presence** 187:18
**present** 2:16 10:23
42:20 47:8,12
188:3
**presentation**
19:23
**presenting** 10:20
**presently** 82:22
**presentment**
10:23
**president** 13:11
31:6
**prestigious** 171:6
**pretty** 24:7 153:21
163:22 166:15
171:4
**prevailing** 172:16
**prevent** 128:1
163:18 164:17
**prevented** 127:6
**prevents** 127:4
**previous** 132:24
148:7
**previously** 152:10
**price** 15:7
**primary** 21:15
**print** 45:10,16
115:6
**printed** 45:18
62:10 101:1,2
**printout** 61:18
**prior** 68:6,11
69:15,19 75:9
78:24 79:22 93:17
114:4 132:17,18
132:22 134:10
135:2 149:4
174:16
**privacy** 27:24
28:17,18 65:7

**private** 174:4
176:5
**privately** 132:20
135:7,17
**privilege** 56:5
180:6,8,15,16
**privileged** 178:10
178:24 179:3,12
179:19 180:2
**privity** 140:11
**probability** 91:10
**probably** 5:10
11:11 35:3 37:3
37:18 39:14 40:2
56:21 80:6 84:6
85:7,14,15 86:5
96:3 136:4 140:7
161:6 163:22
**problem** 98:16
141:6 151:24
152:1 163:19
165:23 175:15,18
176:3,6
**problems** 64:7
69:14,16
**procedure** 1:15
4:5 87:9 190:5
191:5
**proceeded** 172:2
**proceedings** 1:21
10:19 149:24
**proceeds** 10:9
175:9 182:9
**process** 24:1 26:10
34:20,23 50:14
69:20 80:10 87:8
88:9,21 89:2
101:15 147:4
154:11 157:21
172:8

**produced** 146:19
147:18
**product** 138:16
139:23 144:13
157:17 159:6
**production** 189:15
189:17,22
**products** 25:15
146:13 155:18,20
156:4 158:12
159:21
**profession** 5:20
9:8,11
**professional** 62:18
89:13 90:9,9
143:16
**professionally**
57:22
**profile** 3:8
**profitable** 47:20
**proline** 76:16 79:5
79:24 81:4,7,9,19
140:19 151:9,23
152:16
**promoted** 10:16
**promotional** 80:22
**proof** 44:2 101:20
171:10 172:11,24
**proper** 7:5
**property** 85:13
**proposed** 113:19
125:18 127:4,17
135:10,16 182:12
**prosecute** 11:10
**prosecuted** 10:4,6
**prosecutor** 10:6
11:9
**prospective**
180:13
**prove** 139:22,24

**provide** 12:11
28:16,22 43:1
84:9
**provided** 12:1
61:15 84:12
**proving** 161:1
**provision** 124:22
124:23 125:14,19
126:16 128:24
**provisions** 149:3
**provoked** 87:5
**public** 47:3 190:10
190:18 191:15,23
192:23
**publicly** 62:8
**pull** 25:11 41:23
42:1 43:13 71:14
**pulled** 75:2 112:20
**pulling** 42:11
**purchased** 94:17
94:20 145:21,23
**purported** 126:15
**purportedly** 69:4
**purpose** 21:21
26:19 29:1 41:6
46:24 51:2 90:14
90:16 141:1
184:20
**purposes** 52:11
**pursuant** 1:14 4:3
173:1 188:2
**pursue** 26:9
**pursuing** 21:10
143:21
**pursuit** 154:2,5
**put** 73:17 76:7
102:12 152:2

**q**

**qualified** 171:22
**quantum** 58:22

**quarter** 83:9,16,17
83:17
**question** 18:14,17
27:3,6,13 28:11
29:5,14,19,19,21
29:23 30:4,6,7
34:5 39:24 50:21
51:20 54:16 57:18
62:2 65:3,10,11,13
66:1 74:14,22
86:22 113:16
117:3,7 120:3
121:23 122:7
127:15,16 136:22
136:23 146:8
147:11 148:10
155:8,13 156:3,11
156:14 157:5,8,12
170:1 178:19,23
179:10,19,20
180:3,3,4,7,14,17
180:21,22 181:2,7
181:22
**questioning**
120:18 172:20
178:5
**questions** 29:10
65:8 177:19
180:10
**quick** 72:2
**quite** 27:15
**quote** 133:20
149:14
**quoting** 164:15

**r**

**r** 7:16,16
**raised** 174:19
**raleigh** 58:19
**range** 22:4 24:3,4
149:14,19

rape  11:1
rate  24:5,8,10,10
  24:21 122:3,5,6,10
  149:5,14,19
raymond  13:10
raymond's  13:13
reach  94:1 122:20
  123:9
reached  55:19
  69:10
reaches  24:4
reaching  72:21
  163:8
read  22:17 27:3,4
  40:1 57:20 81:14
  85:16 86:3 109:20
  109:22,23 110:3,6
  110:12,16,17,20
  110:22,23 111:2,4
  114:10 115:7
  117:3,9 123:12
  126:10 128:11
  134:4,14 135:8,21
  136:23 137:8
  157:8,9 161:15
  165:14 166:14,16
  167:4,19 168:13
  170:23 181:3
  190:5,6,12 191:5,6
  191:17
readable  118:17
reading  109:24
  119:14 167:10
  175:12 189:19
real  63:8 173:21
really  19:18 24:18
  109:16 136:2
  160:16 175:19
  179:22 180:1
  181:19

reapply  15:24
rear  82:2,3 106:21
reason  20:2 32:9
  41:18 78:22 83:13
  115:12 117:15
  126:1 131:23
  159:1 181:9
  189:14 191:8
  192:3
reasonable  149:1
reasons  28:17 65:5
  173:4,6,8,10,12,17
  173:19,22
recall  19:7 57:14
  81:20 114:12,14
  134:11,17 135:24
  161:16 175:1,5,10
  175:12
receipt  189:18
receive  8:10 39:4,9
  44:24 99:18
  132:10,14 167:23
  168:2 175:22
  176:5 182:9
received  8:2 33:9
  36:21 38:7 39:1
  45:11 52:7 67:16
  80:14 81:3 90:1
  101:14,18 114:7
  115:1,4 137:13
  167:5,8 175:16
  182:19,22
receives  69:23
receiving  27:20
  82:18 116:5
  177:10
recipient  90:8
recognizable
  35:17
recollect  35:10

recollection  70:2
  79:16 109:24
  134:14 142:18
record  4:2 14:14
  27:4 28:24 40:1
  74:23 108:17
  117:9 157:9 166:8
  174:11 176:6,10
  178:3 185:8 191:9
records  101:3
  141:2 143:11
  156:1
recounted  170:24
recovered  99:2
recovery  26:2
  130:23 131:1
recuperating  26:5
redact  40:21 65:13
reduced  187:19
refer  108:11
reference  189:7
  190:2 191:2
referenced  45:19
  47:7,19 190:11
  191:15
references  133:19
referencing
  113:11
referral  176:9,10
  176:12
referred  72:18
  149:18
referring  107:13
  109:17 132:23
reflect  4:2 62:20
  71:8 176:16
refresh  94:14
regard  97:5
  150:12
regarding  89:16
  175:4

regardless  183:17
regional  23:19
regulations  28:20
reimbursement
  69:7,13,23 100:1,1
  116:6 139:4
rejected  84:1,2
  93:18 146:18
  147:17
related  117:18
  188:6
relation  88:20
  90:13 92:18
  113:21 133:18
  154:11 160:7
relationship  52:9
relatively  106:7
released  119:12
relevant  157:1
  168:8 181:23
relied  118:10
relief  70:8 85:3
  86:12 87:1 93:19
  93:23,23 131:7,9
  136:2 138:10,23
  139:6,13 142:12
  142:14,20 144:14
  167:10 171:11,19
  171:21
remained  160:2
remains  117:3
remanded  110:7
remember  18:24
  49:13 53:15
  100:21 102:2
  125:19 133:6
  134:6,7 161:18
  162:7 181:2,10
  183:15 184:6,7
reorganization
  16:3,10

**reorganizations** 15:20
**reorganized** 15:22
**rep** 182:13,18 183:7
**repair** 138:14 146:6
**repeat** 39:23 66:24 67:2
**rephrase** 50:20 120:3
**replace** 80:20 81:1 99:23 100:2 102:21
**replaced** 82:17 98:14,15 102:23 164:19 169:15,16
**replacement** 81:21 99:3
**report** 19:13,14 20:2
**reported** 1:23 13:9 187:17
**reporter** 1:18 117:3 157:7 184:21,23 185:1 187:5 190:7
**reports** 111:4 165:14 167:1
**repost** 66:22,24
**represent** 33:13 49:9 51:8 55:12 56:23 62:8 63:9 76:15 80:8 106:12 112:19 134:22 177:6,11
**representation** 48:10 49:10,12 50:3,7 51:15 55:23 57:13 63:12 132:17,22 143:13

**representative** 106:20 154:24 167:20 172:3
**representatives** 167:16 171:15,16 172:1,15
**represented** 29:24 44:17 45:15 52:4
**representing** 2:4,9 2:14 53:6,10
**represents** 54:14 54:17 76:8
**reps** 134:12
**reputation** 58:12
**request** 23:7 125:1 128:3,10,13 129:2 129:20 191:9,11
**requests** 54:21
**required** 13:4 113:18 172:22 189:24
**requirement** 89:22
**requires** 26:7
**reseal** 163:19 164:19
**research** 89:8 113:22 130:3
**resemble** 106:3
**reserved** 187:24
**resolved** 55:2 56:1 56:3
**resonated** 87:4
**resource** 79:22
**respect** 31:8 32:1 37:9 44:19 47:17 47:21 49:10 55:16 67:11 80:13 84:1 84:10 91:16 92:17

94:22 108:20 110:2 138:9,11 141:14 143:1 152:21 178:7
**respectful** 153:22
**respond** 117:6
**response** 64:11 165:20
**responsibilities** 16:19 19:20 20:18 93:7
**responsibility** 143:16
**responsible** 10:18
**responsive** 147:10
**restate** 147:14
**result** 88:4 142:13 148:20,22
**resume** 13:21 14:17 15:5,8,10,11
**resumes** 14:21
**retain** 32:2
**retained** 121:21
**retainer** 183:1
**retired** 9:9
**retrieve** 71:21
**returned** 189:18
**retweet** 66:24
**reveal** 30:12
**revenue** 21:2
**review** 21:8 33:11 41:11 42:24 49:8 112:2 114:5 115:10,23 116:2 122:19,24 123:6 143:10,10 184:18 184:20 185:4,5 189:12 190:1 191:1
**reviewed** 45:20 66:9 108:4 116:1

121:9 123:1,4 135:8 146:11 168:12 175:6
**reviewing** 86:24 93:6 116:3 155:24
**reviews** 20:3
**reynolds** 5:8 9:17
**richard** 59:2
**ricky** 1:4
**ridiculous** 155:1
**right** 7:10 9:18 13:18 17:22 20:8 28:6 29:22 30:11 32:14 33:16 34:4 46:18 48:5 49:16 51:19 54:4,10 55:21 57:4 67:13 70:15 71:12 73:6 74:14 75:20 76:12 76:17 77:7 78:2,3 78:11,12 80:15 82:15 83:18 84:3 84:17,19 86:4 87:18 88:14 90:17 93:20,21 95:6,6 98:12 103:18 104:3,6,6,10 105:9 106:10,21 108:11 109:14,16 110:4 111:23 112:22 113:16,24 118:11 118:23,24 119:4,7 119:10,15,18 120:19 121:8 125:19,22 131:11 131:15,16 132:5 132:15 134:13,15 136:24 137:3 141:11,17 143:9 145:19 148:17 151:16 152:21

**[right - service]**

153:13,14 154:8
155:5,5 162:17,20
165:7 166:12,22
168:7,13 169:9
170:6,7 176:18,21
177:13,16,16
181:8 183:18,21
184:6,11,18
**rights**  117:17
140:10
**risk**  51:3 169:6,7
170:11,21
**risks**  168:24 169:2
169:3,5
**risperdal**  144:16
**rita**  1:4
**river**  58:7
**robbery**  10:24
**robert**  1:5 121:12
**rochester**  12:5
**role**  11:22 20:9
26:2,5 34:3,9
126:19,21,24
127:19 133:10,13
**rolling**  59:19
**roman**  147:15
174:4
**ronald**  6:22
**roof**  98:11,14
99:24 100:3 102:3
102:15,19,21,23
160:10 162:2,4,13
162:19
**roofer**  102:11
**roofing**  99:7,10
102:12,13
**room**  67:19 78:15
81:10 82:9,10,21
94:24 95:1,2,3
104:18,19,20
151:5,7,12 152:24

184:22
**rot**  86:1 142:3
160:8 163:6,22
**rotting**  165:23
171:3
**row**  106:24
**ruhnke**  1:7
**rules**  1:14 4:4,5,7
29:6 190:5 191:5
**rumblings**  16:2
**run**  155:9
**ryan**  60:23

**s**

**s**  3:3 17:17 189:15
191:8,8 192:3
**sad**  152:6
**sailing**  124:22,23
125:14,18 126:15
128:24
**saith**  186:2
**sale**  10:6 164:23
**saltzman**  134:12
134:24
**sanctioned**  50:11
**saturation**  122:3,5
122:6,10
**save**  70:20
**savvy**  66:23
**saw**  39:16,18
122:17,21,23
139:2 141:4
**saying**  30:21 33:23
66:20 127:9
128:16,21 129:11
129:13 145:7
146:1 147:23
148:21 149:7,10
165:7
**says**  54:20 74:12
75:20 95:3 128:8
134:3 136:17

137:23 146:5
147:16 153:7
**scared**  16:4
**scheduled**  91:15
132:10
**school**  5:7 6:10,11
6:12,16 7:23 8:1
8:15 9:3,15
**schultz**  55:5,20,21
56:15,19 167:22
168:1 183:6,10,20
184:2
**schwartzberg**
61:8
**schwartzman**  61:3
**scratched**  95:14
**screening**  157:21
**script**  153:8
**seal**  163:16,18
190:15 191:21
**sealant**  163:16
164:12,13,20
165:11
**second**  18:13 72:1
81:6,9 82:4 96:24
108:17 150:14
177:11 178:11
**secure**  34:3
**security**  8:18,24
9:5
**see**  7:4 20:5 25:12
25:22 49:9 70:14
77:8 81:6,11,13
83:3 98:13 104:23
129:3 133:23
141:2 147:18
149:15,16 153:7,9
154:4 174:8 175:4
182:19
**seeger**  59:14

**seeing**  175:1,6,10
**seek**  12:21 14:6
16:5
**seeking**  13:22
20:22 88:13,18
132:19 135:17
**seen**  64:13 92:1
112:22,23 154:7
**seize**  10:11
**select**  45:5 80:24
**selected**  159:14
**selecting**  51:7
**self**  29:2 117:8,8
154:2,5
**selfish**  154:15
155:1
**sell**  164:23
**send**  15:7 72:24
176:11 185:13,14
**sending**  70:1
**senior**  6:16 42:2
115:18
**sense**  113:8
**sent**  13:21 14:22
15:1,2,7 68:19
72:11 73:2 74:7
100:21
**sentence**  146:17
147:15
**sentences**  123:24
**separate**  62:21
74:2
**serial**  95:18
151:17 152:4,7,8,9
**series**  80:24 81:4,8
81:11
**seriously**  27:22
**serve**  183:2
**serves**  35:1
**service**  164:24
184:2

services  3:5 25:19
  25:24 48:8
serving  12:20 16:8
  29:2 35:16 47:8
  91:17 117:8
set  45:24 82:4
  95:14 108:9 127:1
  158:7 188:8
setting  170:12
settle  145:3 154:20
  169:1
settled  23:3,8,10
  91:13 144:16,17
  144:17,22 161:13
  169:9 170:5
  171:24
settlement  3:12,18
  33:10,10 36:16
  45:12 49:8 54:18
  54:20 69:5,8,11,15
  69:19 70:7 71:19
  72:12 78:24 79:10
  79:15,18,22 80:4,9
  84:1,2,9,10,12,21
  84:23 85:5,21
  86:1,3 87:3,14
  91:14 92:23,24
  93:2,17,18 94:11
  99:18,23 110:18
  111:21 112:3
  113:1,3,6 116:19
  118:4,7,21,24
  119:1 125:2,4,6,18
  126:3 127:4,17
  129:23,24 130:10
  130:12,24 132:10
  132:18 133:1
  135:2,10,16 136:3
  138:10,12 139:2
  140:17 142:8
  144:6,7,14 145:16

146:18,23 147:2
  147:17 148:7
  149:4 154:12,22
  155:3,7 164:10
  165:4 167:5,8
  169:23 170:10
  171:22 172:7,17
  173:3,6,9,18 177:7
  182:17
settlements  33:16
  33:18 35:14 48:24
  169:18
settling  167:12
seventh  110:4
  146:18 147:17
  161:16,17 172:21
sexual  10:24
shaking  26:21,23
  128:3
sham  132:18
  135:2
shannon  2:2
share  67:5
sheet  189:13 191:7
  191:10,18 192:1
sheets  143:5 144:2
sheridan  42:16,16
shingle  98:13
  99:10,14
shingles  98:17,18
  98:19 99:2,3
  159:6 162:5,6,11
  162:15,19 163:3
  163:10
shoot  83:10
shore  7:6,7,8
short  42:22 43:11
  43:13 45:20 72:5
  83:7 108:18 143:6
  144:1 152:19
  177:18,21 178:1

178:12
shorthand  1:18
  187:5
shortly  67:16
shot  98:9
shoulders  119:20
show  141:10
  151:15 172:10
showed  43:3 67:4
showing  172:24
shown  139:18
  189:16
shows  153:2
shrugging  119:20
siblings  6:17,19
  7:12
side  23:11 24:12
  24:16 82:16 97:23
  103:8,11 104:6
  108:3 173:21,21
sides  169:7 170:22
siding  159:7
sign  185:4
signature  75:12,17
  75:19 185:2
  187:23 188:20
  189:14
signed  56:7,14,18
  69:24 128:8
  137:16,17 168:14
  190:13 191:18
significance  73:18
signing  189:19
signs  154:1,4,7,9
similar  50:17,18
  56:20 69:21 93:5
  96:15 106:8,22
  149:2 182:13,18
  183:7 184:2
similarly  1:8

simple  180:1
simply  84:19
  162:15 174:20
  180:7
sincerely  189:21
single  77:24
  118:14
sir  157:11 189:10
sister  6:24 38:24
sit  40:5 49:1 50:6
  65:9 112:5 123:17
  124:5 125:7 132:8
  134:13 136:24
  150:23 157:22
  158:1 163:24
  172:19
sites  13:20
sitting  137:14
  174:23
situated  1:8
six  8:19 90:1
skill  48:14
skimmed  86:5
slide  107:14
small  7:15
smiling  179:23
smm  2:4
social  61:19 66:23
  67:1
sold  163:13
solid  24:22
solutions  44:6
  80:1 163:13 189:1
  192:1
somebody  36:7
  39:7 49:5 66:19
  83:13 152:13
son  6:5,5,6,8,9,12
  6:14,15
sorry  14:8 50:2
  122:8 162:5,14

**sort** 13:23 45:13
  55:22 113:13
  163:1
**sound** 31:3
**sounds** 33:14
**source** 46:16 79:8
**south** 2:7 103:10
  103:12 108:3
**spadafora** 61:8
**speak** 21:4 38:13
  55:24 59:7 176:13
  176:16 179:12
**speaker** 38:21
**specific** 35:10
  48:21 73:24 89:4
  184:9
**specifically** 37:19
  55:18 65:21
  114:12,16 118:12
  124:18 126:2
  127:19 165:12
**specifics** 36:18
**spelling** 13:13
**spoke** 38:9,11
  48:19 52:16
**spoken** 32:16,21
  38:6 52:24 53:2
  53:21 55:6
**ss** 187:2
**st** 58:22
**stack** 43:16
**staffed** 12:6 14:2
**stalking** 105:24
**stamp** 44:13
**standpoint** 93:15
**start** 14:11 18:6
  19:2 83:8,15
  105:1 145:9 155:9
  155:17 174:6
**started** 12:13 19:6
  19:9 54:2 85:17

120:18 161:8
**starting** 6:13
  172:19
**starts** 133:5
**state** 4:13 7:20,21
  8:4 17:9,19 25:21
  31:9,13 90:4
  123:22 138:19
  142:6 150:14
  153:24 187:1
  190:10 191:15
**stated** 126:2
  156:19 169:8
**statement** 123:22
  133:19 149:19
  150:17 164:11
  190:13,14 191:19
  191:19
**statements** 127:16
  167:2,3
**states** 1:1,15 13:12
  13:12 143:2
  168:24 187:10
**status** 48:18 150:5
  150:9
**statute** 69:21
**stay** 87:12
**steering** 158:16
**stenographically**
  187:17
**step** 10:10 172:6
**steps** 172:15
**stewart** 2:11,12
  18:13,16 29:8
  38:19 46:1 53:12
  53:19,22 54:2
  56:6 62:3 70:14
  70:20 72:1 74:10
  83:11,17 144:8
  177:23 178:11,23
  179:16,18 180:1

180:16 186:1
  189:5
**stick** 57:4 182:13
**stones** 99:14
**stop** 120:11
**strategic** 179:24
**street** 1:19 2:2
  187:8
**strike** 14:11 16:24
  22:3 29:1 34:21
  44:3,20 56:10
  86:21 109:1
  116:23 138:10
  157:3 182:1
**strong** 24:21
**strongly** 106:3
  118:13
**structured** 69:5
**stuck** 37:22
**studies** 8:4,14
**style** 96:15
**subclass** 69:6
**subdivision** 96:10
  96:11,13 106:2
**subject** 98:20 99:8
  104:7 152:15
**submission** 47:19
  135:22 164:9
**submit** 84:24
  100:4,6 101:21
  102:1 113:19
  145:24 147:5
  148:1 175:17
**submitted** 14:17
  15:5,10 39:18
  44:3 71:17 91:16
  99:24 100:9,11,23
  100:24 102:15
  115:24 161:13
  162:10

**submitting** 136:12
  148:6
**subpoena** 1:14 3:6
  4:4 27:11,14 28:6
  39:1,10,16,18 44:1
  137:13 188:2
**subpoenaed** 137:5
**subscribed** 190:10
  191:14 192:21
**subtle** 154:1
**suburb** 7:5
**success** 48:14
**successful** 49:2
**sufficient** 159:17
**sufficiently** 35:17
**suggest** 80:3
  118:10 164:5
**suggested** 149:14
  149:19 185:14
**suggesting** 148:15
  167:7 170:4
**suggestion** 135:1
  138:9 174:19
  175:13
**suggests** 135:16
**suit** 188:6
**suite** 2:2,7,12
  189:2
**sum** 132:20 135:6
  135:17
**summarizes** 62:18
**summary** 110:24
  165:21
**superior** 189:1
**supplied** 40:11
  185:10
**supplies** 66:2
**supply** 114:16
  172:23
**supplying** 119:2

| | | | |
|---|---|---|---|
| **support** 12:1 25:1 130:12 133:21 | 169:22 175:24 177:17 180:12 | **tender** 25:9 63:17 66:15 97:12 98:8 103:5 112:12 | 90:1 92:10 95:2 96:24 101:7 102:9 102:11,11 107:12 |
| **supporting** 35:18 | **taken** 1:17 4:3 5:3 | **term** 52:1 125:4,5 | 108:10 110:22 |
| **supportive** 36:2 | 30:3 43:11 56:1 | 130:11 | 114:21 117:1 |
| **supreme** 4:7 | 70:5 72:5 78:19 | **terms** 19:6 23:16 | 118:15 121:21 |
| **sure** 24:22,24 | 83:20 97:20 | 28:4 71:5 119:2 | 122:2 123:21 |
| 29:12 30:24 34:5 | 108:18 152:19 | 126:20 160:24 | 126:1,19,21 127:3 |
| 34:8 43:17 49:23 | 159:10,13,19 | **testified** 4:10 | 127:6,22,24 |
| 50:22 57:24 61:14 | 178:1,12 | 141:13 | 129:15,17 131:12 |
| 72:4 73:10 77:9 | **takes** 25:24 | **testify** 187:14 | 133:11 135:9,19 |
| 83:18 87:6 90:10 | **talk** 35:6 36:4,5,8 | **testimony** 23:14 | 139:19,24 140:24 |
| 92:22 106:9 107:1 | 36:11 55:14 72:1 | 64:9 87:17,19 | 141:5 142:19 |
| 115:9 120:4 121:9 | 146:15 148:18 | 95:4 117:8 123:5 | 146:8 149:1 |
| 127:14 145:9,20 | 178:18 179:6 | 153:11 184:19 | 152:12 153:12,20 |
| 148:2 160:11,13 | **talked** 57:12 58:14 | 187:16,21 188:8 | 154:18,20,22,24 |
| 170:1,2,15 177:7 | 89:3 107:7 129:22 | 190:6,7 191:6,9,12 | 155:2 157:14 |
| 181:13 183:19 | 183:16 | **texas** 25:21 | 158:23 161:21 |
| 184:5 | **talking** 35:6 45:22 | **thank** 62:4 70:21 | 163:23 166:17,23 |
| **surprised** 22:22 | 69:9 88:13 89:1 | 71:24 122:12 | 167:14 168:11 |
| **surrounding** | 107:3 118:6,9 | 184:16 185:6,7 | 171:13,20 174:1 |
| 165:3 | 129:8 165:10 | **thanks** 70:19 | 177:14 179:23 |
| **survey** 150:21 | 178:5 | **theisen** 44:16 | 181:10 182:11 |
| **sweetnam** 61:11 | **tangentially** | **theories** 158:10,13 | 184:1,10,14 |
| **swift** 61:6 | 173:11 | **theory** 138:20 | **thinking** 14:20 |
| **sworn** 4:1,10 | **tax** 31:16 | 165:5,17 | 86:18 95:18 |
| 187:14 190:10,13 | **ted** 175:7,15 | **thereof** 188:7 | 110:15 |
| 191:14,18 192:21 | **tell** 14:24 19:10 | **thetuckerlawoffi...** | **third** 136:4 139:2 |
| **syracuse** 12:3,4 | 20:17 21:13 29:17 | 75:16 | 139:3 |
| **system** 88:10 | 30:10 37:18 41:18 | **thing** 15:18 19:19 | **thirty** 189:18 |
| | 41:20 55:11 77:22 | 23:16 37:10 86:9 | **thought** 36:1 45:7 |
| **t** | 79:7 81:18 113:4 | 164:18 178:24 | 69:2,4 122:23 |
| **t** 3:3 | 113:12 114:8 | **things** 11:13 12:11 | 130:11 171:4 |
| **table** 108:21 109:2 | 126:12 131:4,22 | 69:17 85:11 97:6 | 175:19 |
| 109:21 | 134:19 157:22 | 153:19 | **thoughts** 71:18 |
| **take** 14:2 17:11 | 158:22 162:1 | **think** 7:6 15:2,4,7 | **three** 6:3 15:22 |
| 23:6 27:22 32:7 | 163:7 170:16 | 18:19 22:17 28:8 | 20:5,8 38:15 |
| 43:9 54:18 61:24 | 184:9 | 28:18,21 40:22 | 42:19 52:6 55:9 |
| 71:20 72:2 78:22 | **telling** 31:23 | 45:3 53:15 59:18 | 55:22 72:23 73:1 |
| 79:2 83:4,7 91:11 | 131:17 180:20 | 64:12 73:10 77:9 | 75:8 77:6,17,19 |
| 95:11 102:5 107:2 | **tells** 148:9 | 79:11 83:4 84:13 | 78:21 82:6 90:23 |
| 124:1 130:20 | | | |
| 136:18 151:20 | | | |

**thumb** 15:1
**time** 1:20 5:11
8:13 11:14 13:1
15:11,15,20 16:7
16:20 18:10 19:6
24:13,13 26:14,18
28:14 35:12 36:23
38:9,11 39:16
40:4 53:20 56:14
56:18 57:8 58:16
59:1 63:2 76:9
79:21 83:9 84:8
85:8 86:1,23 87:7
87:10,14 89:6,14
90:7 94:10,10
105:23 107:2
115:1,20 124:8,9
136:19 137:4
140:3,5,13,17
151:18 157:14
160:6 161:6,15
164:13 165:23
174:10 176:8
**times** 15:22 16:13
26:15 52:21,24
53:3,18,21 86:19
95:12 113:18
123:8 139:9
159:10
**title** 10:2 11:24
12:13 13:8 16:21
19:10 20:1,13
30:23,24 31:5
**today** 27:12 29:5
30:1 42:13 43:5
43:15 49:1 50:6
53:11 62:9,10
65:10 98:2 112:5
119:16 123:11,17
123:19 124:5
125:7 132:8

134:13 136:24
150:3,23 157:22
158:2 172:19
173:12,20 174:24
184:22 185:1
**told** 13:24 14:3
33:19,24 34:15,24
36:24 52:13
100:12 131:6
136:8 155:21
164:8,16
**tolling** 69:21
**toms** 58:7
**top** 24:6 78:10
97:1 103:13
128:22 168:23
**tort** 63:11 90:12
144:13,19,19
**torts** 85:10
**tossed** 58:12
**total** 3:5 6:23
25:14 138:14
**totally** 127:14
**touched** 76:6
**town** 7:15 11:7,9,9
**traffic** 63:7
**transactions** 28:21
**transcribed**
184:21 185:1
190:7
**transcript** 65:14
184:19 187:21
189:11,12 190:5
190:12 191:5,11
191:17
**transcription**
187:20
**transferred** 7:20
7:24
**transitioning** 85:8

**translate** 132:6
**traveled** 26:15
28:13
**treble** 139:20
**tree** 70:20 97:22
**trial** 19:22 58:1
90:1 138:24
155:16,18 158:5,7
169:4,6,7,24
170:11,18 171:11
172:16
**trials** 158:6 171:16
172:1,3
**tried** 11:11 95:12
156:4,6 158:4
171:15
**trouble** 21:19
**troy** 64:22
**truck** 85:13
**trucking** 36:10
**true** 51:8 103:15
110:19 138:2
187:20
**truly** 62:7
**trust** 174:17
184:24
**truth** 170:16
187:14,15,15
**try** 10:11 11:5
122:19
**trying** 86:9 113:8
117:7 127:15
128:17 148:14
153:16,18,19
160:16,18 184:9
**tucker** 1:13 3:2,4
3:11 4:3,8,13,15
25:5,10 43:20
61:20 62:24 63:13
66:11 70:22 72:13
72:17 75:13 97:8

98:4 103:1,6
105:4,16 108:12
112:13,15 117:6
172:16 185:10,11
185:15,17,18
187:8 189:8 190:4
190:9 191:4,13
192:20
**tuesday** 45:17
**turning** 82:4 163:1
**twin** 6:20
**two** 7:18 8:1 9:1
15:22 16:22 23:20
25:13 38:15 39:15
40:2 42:19 43:2
48:11 52:6 53:23
54:1 55:12 72:23
72:24 75:8 76:15
76:20,23 77:24
79:17 81:3 85:22
85:23,24 103:18
103:23 107:10,17
107:18 108:6
150:2 152:14
160:6 177:3
**tx** 2:13
**type** 13:20,23
15:17 21:7,22
22:1 36:9 66:23
101:24
**typed** 75:23
**types** 12:10 33:6
64:16
**typewriting**
187:19
**typical** 24:8
**typically** 26:8 63:7

| u |
| --- |

**u** 13:14 17:17
**uh** 25:23 40:15
46:11 54:22 89:23

107:16 120:16
121:1 129:4
147:19 162:21
163:11,11 172:4
175:14,14 177:20
177:20
**ultimately** 84:2
**un** 100:18
**unable** 131:24
**undergo** 16:9
**undergraduate**
8:4,14 9:2
**understand** 26:4
27:6,14,15 29:21
29:23 34:5 75:3,7
89:11 116:10
126:23 136:1
147:13 149:9,17
155:6 156:14
158:18 160:11
170:1 172:20
179:9
**understanding**
17:1 23:14 28:7,8
31:9,11,15,18
56:15,19 57:2
64:9 79:4,6,9
82:20 83:24 87:23
109:4 112:6
113:17 124:21,24
126:6,9 133:9
139:6,12,13
142:18 152:13
154:10 167:4
170:20 171:8,14
179:11
**understood** 86:11
86:23 93:18
137:14 183:18,21
**undertake** 48:13
48:17 51:14

113:22 130:4,14
138:18
**undertaken**
114:14 154:11
**undertook** 33:14
**underwriter** 20:19
24:19 33:3 48:1
50:14,24
**underwriters** 35:7
**underwriting** 12:7
22:15 24:22 33:21
34:10,20,23 35:4
46:7 47:6,17
50:15,24 51:14
88:21 89:2 92:7
92:13,19 93:7
**underwritten**
58:15 66:6 91:22
**undetermined**
187:9
**unfortunately**
152:6
**unilateral** 29:10
**unit** 77:21,22 78:5
78:16 81:19,19
82:22
**united** 1:1,15
13:12 187:9
**university** 5:22
6:15 7:20,23 8:1
**unsatisfied** 36:15
**upper** 2:12 107:6
108:5
**upstairs** 106:23
162:3
**use** 21:6,20 94:1
100:15 101:10,12
**uses** 109:7
**usually** 23:12
**utica** 13:4,5,6,7
14:2,4,8,16

## v

**v** 189:6 190:3
191:3
**vacant** 17:4
**vaginal** 144:24
**valuating** 90:16
**valuation** 12:10
92:18
**value** 25:2 36:11
91:4 131:19,24
132:4 145:11
146:6 156:21
169:23
**valuing** 90:16
**variables** 169:11
**various** 11:9 63:10
114:17
**varying** 11:7
**vehicle** 63:7
145:22,23
**vela** 1:17,23 187:4
**ventured** 64:20
**verdict** 11:5
**verdicts** 171:17
172:2
**verify** 79:23
151:22 152:14
**verifying** 184:20
**veritext** 184:23
189:1,7 192:1
**veritext.com.**
189:17
**verrico** 20:12
23:15,19,22 42:9
**version** 70:6 75:9
84:21,23 133:12
133:24 134:10
**versions** 72:20
**versus** 113:2
170:11

**vi** 174:4
**viable** 157:22
**vice** 13:11
**victim** 145:22
**victims** 66:21
**view** 105:8 135:3
**views** 55:13
**vigilant** 154:1
**violations** 11:11
143:2
**virtue** 33:18
**visit** 21:11
**visiting** 36:8
**voluminous** 79:12
**von** 44:15
**vp** 99:8
**vs** 1:9 25:19 27:16
109:3,7,23 111:19
111:23 112:3,7,10
112:21 119:24
121:7

## w

**w** 13:14
**wacker** 2:7
**waco** 54:3
**wait** 120:11
**waive** 183:17
185:2,4
**waived** 56:7,22
183:19 189:19
**waiver** 56:7,10,11
56:14,18,20 69:24
183:12
**walking** 86:9
**wall** 67:4
**wallace** 58:9
**wanca** 59:18
**want** 13:5 18:20
21:20 26:24 27:19
27:23 50:15,19
70:12 71:14 83:7

83:12,23 84:23
107:1 113:7 120:4
120:9 121:6
155:10 166:16
178:18 179:6
180:17 185:19
**wanted** 23:5 81:1
113:5 184:15
**wants** 155:9
**warranties** 45:4
**warranty** 3:7 44:8
44:8,9,20 45:1,6
45:10
**watercooler** 35:6
36:4 48:20 92:11
**waterfront** 7:11
**waugh** 13:10
**way** 18:16 19:5
39:17 69:5 71:23
87:4 96:23 109:8
109:14 117:17,17
125:9,23 132:9
140:9 141:15
145:16 163:3,18
164:17 167:12
180:19,22 185:19
188:6,7
**we've** 58:6 59:4
60:10 72:22 75:9
108:4 120:13,23
137:23,24 146:16
182:5
**website** 45:2,4
67:6 115:5,8
116:17
**week** 39:13,14
54:1
**weeks** 39:15 40:2
**weiss** 59:14 69:15
133:5

**weissing** 59:11
**welder** 9:9
**went** 7:22 18:8
33:3 40:9 101:11
165:21
**wessels** 44:15,15
**west** 12:3 103:11
**western** 111:19
112:20
**wet** 142:3
**wexler** 58:9
**whatsoever** 57:22
130:14 132:13
140:9 145:16
149:24
**when's** 140:3
**whereof** 188:8
**whitfield** 58:19
**wife** 93:13
**wife's** 5:14
**willing** 33:12
170:10
**willingness** 51:3
169:1
**win** 165:13 171:6
**window** 44:5
76:16,21,24 77:7
77:19,21,22,24
78:5,16,19,23 79:5
79:5,15,21 80:1,15
80:17,21 81:1,18
81:22,24 82:7,9,11
82:12,13,14,16,17
82:21 96:4,6
103:19 104:6,10
104:15,16 105:13
108:2 151:5,7,9,13
152:9,24 153:9,13
161:2 162:3 163:7
163:9,13,20
164:21 165:11

**windows** 1:10
27:16 33:10 44:3
45:9 51:10 69:13
76:15 77:24 79:2
79:17,19 80:3,23
81:5,8 82:4 85:22
85:23,24 94:6,7,18
94:20 95:23
103:18,24 104:7
104:13 105:12
106:21 107:6,10
116:6 137:18
138:2,5,6,14
140:20 141:3,4,6
141:11,22 150:15
150:24 151:19,22
151:23 152:15,16
159:6 160:6 161:1
161:1,9 163:13,16
163:18,23 164:14
164:18,20 165:23
169:15,16 171:3
**winget** 61:8
**wit** 187:6
**withdraw** 74:22
86:22
**witness** 3:1 4:1,9
18:15 40:2 56:4,7
62:5 86:14,18
117:5,10 122:10
179:17,20 184:17
185:5,7,21 187:13
187:17,18,22,24
189:8,11 190:1,4
190:11 191:1,4,15
**witness'** 189:14
**wondering** 159:19
168:20
**wood** 81:4,7,11
86:1 160:8

**woodard** 61:3
**words** 65:24 92:10
131:16
**work** 5:18 8:13,17
8:23 20:6 35:21
35:22 50:15,23
59:5,6 86:7 92:19
97:5 113:22 127:1
158:22
**worked** 5:7,9 8:18
9:1,4 17:9 18:7
68:12 121:12
140:8 155:4
**working** 9:16
15:18 35:24 85:6
85:9 115:16
**works** 121:15
**world** 85:10
**worth** 84:8 136:19
145:13 146:9
**worthy** 25:2
**wrecks** 85:13,13
**write** 67:15,18
**written** 48:10
49:10 68:24
**wrong** 118:11
**wrote** 67:12,14

---

**x**

**x** 3:1,3 23:4

---

**y**

**y** 19:14 133:5
**yan** 133:5
**yanchunis** 133:7
133:10,16,21
134:5,9,19 135:1
**yeah** 4:20 14:10
14:13 18:21 31:4
31:17 39:14 40:18
46:3,4 49:20
59:15 61:15,16,17

67:3 71:24 72:8
74:9,14 77:10,13
78:22,23 79:1
80:18 86:18 88:3
90:24 92:5 94:13
98:14 100:20,23
102:17,19,19
104:22 106:5,6,11
106:14 107:2,17
107:18 109:13,21
110:10 114:19
118:9 122:2
123:15 125:10
137:21 140:22,24
142:24 145:21
151:2 152:6 153:1
153:9,15 155:1
162:7,9,14 163:1,6
165:1 168:16
172:13 177:24
178:16 181:6
183:18 184:1,7,8
**year** 7:24 8:3,10
9:2,4,4 10:5,13,15
16:22 18:5,22
19:1,2,7 37:2 44:9
**years** 5:4 7:18 8:2
8:23 9:1,10 11:2
12:19 13:2 16:23
17:10 18:10 19:8
21:3 31:20 78:19
87:15 90:6 102:24
140:7 160:20
163:16
**yep** 73:8 95:21
**yesterday** 38:12
38:14,23 42:14
53:18,20
**york** 7:16,19 8:21
8:22 10:1 12:2
13:5,6 17:8,19

31:10,13 89:19,21
90:4 136:17
138:24 139:8,14
139:22 140:6,10
142:6,13 173:1
**youngest** 6:6,9,15

```
            Federal Rules of Civil Procedure

                        Rule 30
```

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.