# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| EDELSON PC, an Illinois professional corporation, individually, and on behalf of all others similarly situated, | Case No. 1:16-cv-11057 |
| *Plaintiff*, | Hon. Rebecca R. Pallmeyer |
| *v.* |  |
| THE BANDAS LAW FIRM PC, a Texas professional corporation, CHRISTOPHER BANDAS, an individual, LAW OFFICES OF DARRELL PALMER PC d/b/a DARRELL PALMER LAW OFFICE, a suspended California professional corporation, JOSEPH DARRELL PALMER, an individual, NOONAN PERILLO & THUT LTD., an Illinois corporation, C. JEFFERY THUT, an individual, GARY STEWART, an individual, and JOHN DOES 1-20, |  |
| *Defendants*. |  |

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Edelson PC ("Edelson") individually and on behalf of a class of other similarly situated entities and/or individuals, brings this Amended Class Action Complaint against Defendants The Bandas Law Firm PC, Christopher Bandas, Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office, Joseph Darrell Palmer, Noonan Perillo & Thut Ltd., C. Jeffery Thut, Gary Stewart, and John Does 1-20 (specifically unknown objector associates of the named Defendants) (collectively, "Defendants") based upon Defendants' practice of extorting monetary payments to themselves to which they have no legal right. Plaintiff, for its First Amended Class Action Complaint, alleges as follows upon personal knowledge as to itself and its own acts and experiences and, as to all other matters, upon information and belief, including investigation

conducted by its attorneys.

## NATURE OF ACTION

1.     Defendants are among the most notorious and prolific "professional objectors" in the United States. Together, Defendants plan and coordinate actions to extort unjustified profits for themselves from legitimate and court-approved class action settlements, including Plaintiff and the Class here. To further this plan, Defendants formed an association and enterprise of individuals and entities with the explicit purpose of extorting money for themselves through class action objections ("the Illinois Objector Enterprise").

2.     Defendants file last-minute objections to class action settlements, intend that their objections will be overruled, and then threaten to or actually appeal the overruling of the objection to a higher court unless counsel agrees to participate in a "mediation." During these sham mediations, Defendants make threats of economic harm that will be carried out unless they are paid protection money in the form of "attorneys' fees" which they are not entitled to by law. Defendants do all of this with no intention of improving the terms of the class action settlement for the betterment of the class members; their only interest is setting up "settlement negotiations" that they claim must be kept secret, and where they extort unjustified payments for themselves for minimal work.

3.     Defendants know that the merit of their objection is irrelevant because the threat of an appeal of the underlying class action will delay payment to the class and class counsel for years. Defendants' goal, and the way they fund the Illinois Objector Enterprise, then, is to offer to forego or withdraw their appeal for a payment of "attorneys' fees"—sometimes as high as $500,000—which they would be unable to obtain even if their objection or appeal had merit and was successful.

4.     Defendants' actions have caused courts across the country to determine, for instance, that "Bandas is a professional objector who is improperly attempting to 'hijack' the settlement of this case from deserving class members and dedicated, hard working counsel, solely to coerce ill-gotten, inappropriate and unspecified 'legal fees.'"[1] And that "Mr. Palmer is likely a serial objector and other courts have recognized similar behavior. …this Court finds such behavior in bad faith and also potentially violative of local and ethical rules."[2]

5.     A material part of this scheme relies on clients who collude with Defendants to extort class counsel. These clients represent to the court and class counsel that they are class members and good-faith objectors with legitimate concerns about the pending settlement (e.g., that the class is getting a bad deal). However, these objectors and their testimony are bought and paid for by the Illinois Objector Enterprise. Defendants use the Illinois Objector Enterprise to find dodgy clients who, in exchange for the promise of thousands of dollars, are willing to, among other things, (i) file objections to class actions without cause, (ii) file objections with false and misleading testimony, and (iii) drop their objection and/or appeals after the Illinois Objector Enterprise has been paid.

6.     Through their Illinois Objector Enterprise, Defendants have routinely targeted cases where Plaintiff has been appointed class counsel abused the objection devise to obtain unjustified "attorneys' fees" for themselves without ever requesting or securing any benefit for the class. Plaintiff has expended considerable unreimbursed attorney time and out-of-pocket expenses to accumulate the evidence necessary to force Defendants to leave empty-handed. Each

---

[1]     *Brown v. Wal-Mart Stores, Inc.*, No. 01 L 85, Order Denying Objections to the Settlement and Fees and the Motion to Intervene and for Pro Hac Vice Admission at 2 (Ill. Cir. Ct. 14th Cir. Oct. 29, 2009) (emphasis added).

[2]     *Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP, 2013 WL 752637, at *3 (S.D. Ind. Feb. 27, 2013).

day that Defendants delay court-approved payments to the class and class counsel causes economic harm to Plaintiff. For instance, Plaintiff has been hampered in its ability to improve firm infrastructure, cover its operating expenses without taking on debt, and pay off existing debt. The delay caused by the Defendants' scheme also harms Plaintiff and class members by requiring them to spend money on costs of staff required to respond to the waiting class members, printing costs, PACER fees, research fees, transportation fees, and more ("Delay Costs").

7. That said, Defendants keep coming back, case after case, and Plaintiff's efforts to contain Defendants' nefarious effects have thus far been unable to prevent their return. *Cf.* Harry S. Miller, *The Cat Came Back* (1893). Even with Defendant Palmer suspended from the practice of law, Defendants (including Palmer) still conspire to extort Plaintiff.

8. Recently, the Illinois Objector Enterprise targeted a class action settlement where Plaintiff was appointed class counsel. There, Defendants filed an objection which, as they intended, was overruled by the court. Then, after Defendants made threats to appeal the court's ruling, they engaged with Plaintiff over interstate wires with an ultimatum: pay them $225,000 in unjustified "attorneys' fees" (with no benefit the class) or else they would file an appeal and hold up, indefinitely, the payment of claims to the class and court-approved attorneys' fees to class counsel. Faced with this lose-lose situation, Plaintiff agreed to pay $225,000 to Defendants and has incurred Delay Costs for which they now seek relief from this Court.

9. Accordingly, Plaintiff Edelson PC, on behalf of the Class, brings this lawsuit under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq*. ("RICO") for acts of extortion under the Hobbs Act (18 U.S.C. § 1951), Wire Fraud (18 U.S.C. § 1343), Mail Fraud (18 U.S.C. § 1341), and acts in violation of 18 U.S.C. § 1503 (influencing an

officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS 5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering). Also on behalf of the Class, Edelson PC brings a claim for common law abuse of process under Illinois law and seeks injunctive relief pursuant to the All Writs Act, 28 U.S.C. § 1651 labeling Defendants vexatious litigants and prohibiting them from:

      a.     making or threatening to make objections to class action settlements not for the purpose of improving the settlements but for extracting payments for themselves;

      b.     filing with any court objections to class action settlements or appeals of overruled objections without prior screening or approval by the Court where their status as vexatious litigants must be disclosed along with a copy of the injunction entered pursuant to this suit;

      c.     withdrawing any objection or appeal from the overruling of any objection without disclosing payment in exchange for doing so and any corresponding benefit provided to the class, along with an order awarding damages, and costs and reasonable attorneys' fees;

      d.     ghostwriting objections for the purpose of making their objections seem *pro se*.

10.     On an individual basis, Plaintiff also seeks an order pursuant to the Illinois Attorney Act, 705 ILCS 205, enjoining Christopher Bandas and Joseph Darrell Palmer (and their respective firms) from continuing their unauthorized practice of law in Illinois.

## PARTIES

11.     Plaintiff Edelson PC is a professional corporation incorporated and existing under the laws of the State of Illinois with its principal place of business at 350 N LaSalle Street, 13th

Floor, Chicago, Illinois 60654.

12.     Defendant The Bandas Law Firm is a professional corporation incorporated and existing under the laws of the State of Texas with its principal place of business located at 500 N. Shoreline Boulevard, #1020, Corpus Christi, Texas 78401.

13.     Defendant Christopher Bandas is a natural person and citizen of the State of Texas. Defendant Bandas, individually and through his law firm, Defendant The Bandas Law Firm, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

14.     Defendant Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office is a suspended professional corporation incorporated and existing under the laws of the State of California with its principal place of business located at 603 North Highway, 101 Suite A, Solana Beach, California 92075.

15.     Defendant Joseph Darrell Palmer is a natural person and citizen of the State of California. Defendant Palmer, individually and through his law firm, Defendant Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District..

16.     Defendant Noonan Perillo & Thut Ltd., is a corporation incorporated and existing under the laws of the State of Illinois with its principal place of business located at 25 North County Street, Waukegan, Illinois 60085.

17.     Defendant C. Jeffery Thut is a natural person and citizen of the State of Illinois. Defendant Thut, individually and through his law firm, Defendant Noonan Perillo & Thut Ltd., does business in Illinois and this District and has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

18.     Defendant Gary Stewart is a natural person and citizen of the State of California.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 because they arise under RICO (18 U.S.C. §§ 1961, *et seq*.), which is a federal statute. This Court additionally has subject matter jurisdiction over this matter pursuant to 18 U.S.C. § 1964(c) because Plaintiff seeks recovery for injuries to business and property caused by violations of RICO (18 U.S.C. §§ 1961, *et seq*.), which states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court."

20.     In the alternative, the Court has original jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332(d)(2) because (a) at least one member of the putative Class is a citizen of a state different from a Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

21.     The Court has personal jurisdiction over Defendant Noonan Perillo & Thut Ltd. because it is a corporation incorporated and existing under the laws of the State of Illinois.

22.     The Court has personal jurisdiction over Defendant Thut because he is a resident of the State of Illinois and an attorney licensed to practice in the State of Illinois.

23.     The Court also has personal jurisdiction over Defendant Thut and Defendant Noonan Perillo & Thut Ltd., because they do business in Illinois and in this District and committed tortious acts within and purposefully directed at Illinois that were designed to create an injury in this state.

24.     The Court has personal jurisdiction over Defendant Bandas because Defendant Bandas has enlisted Defendant Thut to act as his agent in Illinois and this District. Moreover,

Defendant Bandas committed tortious acts purposefully directed at Illinois and such conduct was designed to create an injury in Illinois and this District. In addition, Defendant Bandas regularly conducts business in Illinois and has availed himself of Illinois courts.

25.     The Court has personal jurisdiction over Defendant The Bandas Law Firm PC because it ratified the conduct of its principal, Defendant Bandas, and at all times know of his actions. Further, Defendant The Bandas Law Firm PC regularly conducts business in the State of Illinois and employs one or more attorneys who are admitted to practice before this Court and/or the United States Court of Appeals for the Seventh Circuit.

26.     The Court has personal jurisdiction over Defendant Palmer because Defendant Palmer committed tortious acts purposefully directed at Illinois and this District, and such conduct was designed to create an injury in Illinois. In addition, Defendant Palmer regularly conducts business in Illinois and has availed himself of Illinois courts.

27.     The Court has personal jurisdiction over Defendant Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office because it ratified the conduct of its principal, Defendant Palmer, and at all times know of his actions.

28.     The Court has personal jurisdiction over Defendant Stewart because Defendant Stewart has committed tortious acts purposefully directed at Illinois and this District and such conduct was designed to create an injury in Illinois. The Court also has personal jurisdiction over Defendant Stewart because he purposefully availed himself of the laws of the State of Illinois by his participation in a lawsuit in an Illinois court.

29.     Venue is proper because Defendants do business in this District and the causes of action arose, in substantial part, in this District. Venue is additionally proper in this District under 28 U.S.C. § 1391 because Noonan Perillo & Thut Ltd., is a resident of this District in that

is a corporation organized under the laws of this State and it does business in this District.

## FACTUAL ALLEGATIONS

**I.**    **"Professional Objectors" Use Objections to Class Action Settlements to Extort an Unauthorized Payment of Fees with No Benefit to the Class.**

30.    Each year, thousands of class action lawsuits reach settlement. As required by Civil Rule 23 and rules of civil procedure of the several states (including the Illinois Code of Civil Procedure), class counsel seek approval of these settlements in courts across the country to provide relief to consumers and closure to defendants. Class members are allowed to file objections to voice displeasure or highlight possible cause for concern.

31.    While many objections are legitimate and seek to provide a benefit to the class, some people like Defendants and others in their enterprise use the objection process as a stepping stone to reach "settlement discussions" that allow them to extort unjustified attorneys' fees for themselves while keeping their actions hidden from the courts. Known as "professional objectors," these attorneys file a last-minute objection to a class action settlement, lose (on purpose), and then threaten to or actually appeal to a higher court. The goal is to extort an unjustified payment of attorneys' fees from class counsel who have a fiduciary duty to the class to avoid substantial delay in payments to their clients that will be cause by the appeal. Once they've received their unjustified payments, the professional objectors move on to their next target, dropping their objection and leaving the underlying settlement unchanged.

32.    The National Law Review has aptly described the professional objector's modus operandi:

> The broad right of any class action objector to appeal a district court's final judgment approving a settlement has given rise to what are referred to as professional objectors—attorneys who file specious objections for the sole purpose of using appellate delay to hold a class action settlement hostage in order to extort self-interested payments. Unlike legitimate objectors, who help police

the class action settlement process, professional objectors engage in what courts and commentators have characterized as "objector blackmail."[3]

33.      Others have called this scheme for what it is—extortion:

The business of professional objectors is to make insubstantial objections to class settlements on behalf of nonnamed class members, then threaten to appeal the judgment approving the settlement unless paid to desist. The business is extortion, and it is profitable because class counsel have a powerful incentive to avoid the costs that an appeal would impose.[4]

The United States Court of Appeals for the Seventh Circuit reached the same conclusion:

In the context of intervening in a class action settlement, extortion would mean intervening not to increase the value of the settlement, but in order to get paid to go away.[5]

34.      More have warned that attorneys and class members should increasingly "[w]atch out … for canned objections filed by professional objectors who seek out class actions to simply extract a fee for lodging generic, unhelpful protests."[6]

35.      The rise in professional objectors has been so great that new rules have been proposed to Federal Rule of Civil Procedure 23, which governs class actions. In that new rule,

an objector can't be paid off to drop their objection without approval by the district court," said Leslie Brueckner, senior attorney at Public Justice. "That could have a big impact because it could effectively halt the problem of so-called 'professional objectors,' who basically hold up class action settlements for their own pecuniary gain, by basically exposing that kind of practice to the light of day.[7]

---

[3]      Anna C. Haac, *Ninth Circuit Grants Summary Affirmance In Objectors' Appeal From Class Action Settlement: A Case Study In Dealing With Serial Objectors*, Nat'l L. Rev. (Dec. 12, 2013), https://perma.cc/CE6H-9DWF (emphasis omitted).

[4]      John E. Loptaka & D. Brooks Smith, *Class Action Professional Objectors: What to do about Them?*, 39 Fla. St. U.L. Rev. 863, 929 (2012).

[5]      *Vollmer v. Selden*, 350 F. 3d 656, 660 (7th Cir. 2003).

[6]      Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, at 11 (2005), https://perma.cc/BT93-GV7D.

[7]      Anna C. Haac, *Ninth Circuit Grants Summary Affirmance In Objectors' Appeal From Class Action Settlement: A Case Study In Dealing With Serial Objectors*, Nat'l L. Rev. (Dec. 12, 2013), https://perma.cc/CE6H-9DWF.

36.     As described below, Defendants are extortionists, seeking to unjustifiably profit from the labor of class counsel across the country who prosecute fair and court approved class action settlements.

## II.   Defendants Are Notorious "Professional Objectors" Who Abuse Legal Process for Personal Profit

37.     The website SerialObjector.com was created in 2015 to transparently track the filings of professional objectors in courts throughout the country. As the site explains,

> [s]erial objectors "subsist primarily off of the skill and labor of, to say nothing of the risk borne by, more capable attorneys. These are the opportunistic objectors. Although they contribute nothing to the class, they object to the settlement, thereby obstructing payment to lead counselor of the class in the hope that lead plaintiff will pay them to go away. Unfortunately, the class-action kingdom has seen a Malthusian explosion of these opportunistic objectors…" Class action settlements are often delayed by serial objectors objecting to the suit.[8]

38.     According to SerialObjector.com's data, Bandas and Palmer are the most prolific of these "opportunistic objectors," filing almost as many objections (103) as the next five top objectors (113).[9] A review of Bandas's and Palmer's, along with their new associate Thut's, objections demonstrate that they add nothing of value to the class actions to which they object but instead "object to the settlement[s] … in the hope that lead plaintiff[s] will pay them to go away."[10]

A.      *Bandas is, ostensibly, the most prolific and notorious professional objector in the country.*

39.     The Bandas Law Firm, a small Texas outfit headed by Mr. Bandas, is a notorious "professional objector" who abuses the court system to file baseless objections to class action

---

[8]     *About - Serial Objector Index*, https://perma.cc/8TJS-5GFM.
[9]     *Persons - Serial Objector Index*, https://perma.cc/96LD-XJ49.
[10]    *Id.*

settlements and threatens to appeal their inevitable rejection, all in an attempt to extort an unjustified payment of attorneys' fees from class counsel through sham settlement mediations without ever providing any benefit to the class or informing the court.

40.     On SerialObjector.com, Bandas is listed as having filed 66 objections over the past decade, almost an objection every other month—the most of any objector. However, these 66 objections likely represent only a small fraction of the total number of objections in which Bandas has been involved—Plaintiff's internal investigation reveals at least 85 cases to which Bandas and associates have objected to, with more that they can't find because either Defendants acted as ghostwriters or because they were filed in state court.

41.     A review of the objections listed reveals that **none** of Bandas's objections have provided any benefit to the settlement class. According to SerialObjector's data, Bandas's objections are overruled, a notice of appeal is filed, and then it is subsequently withdrawn, which means that Bandas successfully coerced payout from class counsel. As noted below, Bandas has likely extracted millions of dollars from class counsel in exchange for going away without providing any corresponding benefit to anyone but the Illinois Objector Enterprise.

42.     Bandas makes false representations to counsel, courts, and others that he is an attorney for an objector who has legitimate criticism of a class action settlement. Instead, Bandas represents puppet clients who have little to no understanding of the class action settlement to which they're objecting (because they're often not even class members), have no understanding of the basis for the objections that are being made by Bandas, and, at times, are ignorant that they're objecting at all. And when Bandas successfully extorts class counsel for fees (sometimes as much as $500,000 or more), Bandas's own client retainer agreements limit the amount of the funds that goes to the "client" to only $5,000. As a result, were Bandas to hold up a class action

settlement for $500,000 in protection money, the "client" would get only $5,000 and Bandas would get $495,000.

43.     Courts routinely criticize Bandas for his actions, but nonetheless he persists. For example, one federal judge has found that "Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain [and] has been excoriated by Courts for this conduct."[11] Another federal judge on the other side of the country described Bandas as "a known vexatious appellant" who has been "repeatedly admonished for pursuing frivolous appeals of objections to class action settlements."[12]

44.     Yet another federal judge held that objections filed by Bandas to a class action settlement "were filed for the improper purpose of obtaining a cash settlement in exchange for withdrawing the objections."[13] Specifically, that court found Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away—Bandas was using the threat of questionable litigation to tie up the settlement unless the payment of an unjustifiable sum of attorneys' fees was made to Bandas.

45.     In 2009, an Illinois Court took notice of Bandas's conduct and stated:

The Bandas Objection filed on behalf of Ms. Carlson is a generic boilerplate objection prepared and filed by attorneys working for their own personal benefit and not for the benefit of this Class or for those lawyers' clients. The record before the Court demonstrates that **Bandas is a professional objector who is improperly attempting to 'hijack' the settlement of this case from deserving class members and dedicated, hard working counsel, solely to coerce ill-**

---

[11]     *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012).
[12]     *In re Gen. Elec. Co. Sec. Litig.*, No. 09 Civ. 1951(DLC), 2014 WL 534970, at *9 (S.D.N.Y. Feb. 11, 2014).
[13]     *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09md2087 BTM (KSC), 2013 WL 5275618, at *5 (S.D. Cal. Sept. 17, 2013).

**gotten, inappropriate and unspecified 'legal fees.'**[14]

46.     And in February 2017, the United States District Court for the Southern District

of New York determined that while it lacked jurisdiction to sanction Bandas:

> This Court joins the other courts throughout the country in finding that
> Bandas has orchestrated the filing of a frivolous objection in an attempt to
> throw a monkey wrench into the settlement process and to extort a pay-
> off. His plan was thwarted when the Court permitted discovery to proceed
> on the sanctions motions, which ultimately, apparently, created more risk
> for Bandas than he was prepared to endure. [Bandas's client] testified that
> in Bandas' numerous representations of him in objections to class action
> settlements, [Bandas's client] has never received funds from the settlement
> of any of his objections, whereas Bandas has. See Deposition of Sean Hull
> at 44:1–45:8.13 That testimony, if true, is gravely concerning. It indicates
> that Bandas' settlement of objections has been without any benefit to his
> client … or to the class, supporting the conclusion that many, if not most,
> of the objections being raised by Bandas are not being pursued in good
> faith.[15]

47.     These reactions from the courts are just a sample of the harsh words describing

Bandas's conduct. However, they serve to cement Bandas's pattern of using objections to class

actions as a stepping-stone to extort legally unjustified money for the Illinois Objector

Enterprise.

*B.*     *Palmer is second only to Bandas in the world of professional objectors.*

48.     Like Bandas, Palmer is a prolific and notorious professional objector. And like his

colleague Bandas, Palmer files objections to class action settlements as a stepping-stone to later

extorting legally unjustifiable payments for the Illinois Objector Enterprise without ever

providing the class any benefit.

---

[14]     *Brown v. Wal-Mart Stores, Inc.,* No. 01 L 85, Order Denying Objections to the
Settlement and Fees and the Motion to Intervene and for Pro Hac Vice Admission at 2 (Ill. Cir.
Ct. 14th Cir. Oct. 29, 2009) (emphasis added).
[15]     *Garber v. Office of the Comm'r of Baseball*, No. 12-cv-3704, slip op. at 11-12 (S.D.N.Y.
Feb. 27, 2017).

49. According to SerialObjector.com, Palmer is listed as having filed 53 objections—second only to Bandas—which likely represent only a small of Palmer's total objections. A review of Palmer's objections listed on SerialObjector.com reveals that he too nearly always has his objection overruled, notices an appeal, and then withdraws the appeal after extorting a payment without benefit to the class or informing the court.

50. Courts across the country have admonished Palmer for his exploitative schemes, a sample includes the following:

- "Palmer has been widely and repeatedly criticized as a serial, professional, or otherwise vexatious objector."[16]

- "Mr. Palmer has been deemed a 'serial objector'" with a history of "admitted . . . 'bad faith and vexatious conduct'"[17]

- "Finally, the Court does find evidence of bad faith or vexatious conduct on the part of appellants. Mr. Paul appears to be represented by an attorney who has not entered an appearance in this case. It is worth noting that attorney Darrell Palmer ('Mr. Palmer'), previously requested leave to appear *pro hac vice* in this case. However, this request was withdrawn after the Court scheduled a teleconference to address Mr. Palmer's motion. Despite this, Mr. Palmer is listed as the payor of Mr. Paul's Notice of Appeal filing fee. Mr. Palmer's office also emailed Plaintiffs a notice and copy of Mr. Paul's most recent filing. Plaintiffs have produced evidence that Mr. Palmer is likely a serial objector and other courts have recognized similar behavior. …this Court finds such behavior in bad faith and also potentially violative of local and ethical rules."[18]

51. Worse, Palmer has a history of secretly objecting through others by "ghostwriting" objections. In a recent case in Illinois, Plaintiff uncovered Palmer's scheme to secretly profit from a court approved and fair class action settlement. Specifically, Plaintiff, discovered that a purportedly *pro se* objection was actually "ghostwritten" by Palmer. Worse,

---

[16] *Dennis v. Kellogg Co.*, No. 09-cv-1786, 2013 WL 6055326 (S.D. Cal. Nov. 14, 2013).
[17] *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 159 n. 40 (E.D. La. Jan.11, 2013).
[18] *Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP, 2013 WL 752637, at *3 (S.D. Ind. Feb. 27, 2013).

Palmer actively concealed his involvement in writing the objection, and the objector was even

not a member of the settlement class. As explained more below, the reason that Palmer

concealed his involvement from the court was not an innocent one—Palmer was then facing

attorney disciplinary charges in his home state of California. While such disciplinary charges

were pending, Palmer was not eligible under Illinois Supreme Court Rule 707 to receive

permission as an out-of-state attorney to provide legal services in Illinois.

52.     Palmer's actions in that case did not go unnoticed by the court. The Honorable

Neil Cohen appointed the Honorable Gilbert J. Grossi (ret.), to investigate "whether indirect

criminal contempt proceedings are warranted against" Palmer. In his report, Judge Grossi

concluded:

> It appears clear from the substance and legal sophistication of the arguments made
> in the objection, that Ms. House [the objector] did not write this objection without
> the aid of legal counsel.  This is confirmed by a series of emails sent between
> [defense counsel] and Joseph Darrell Palmer [].  In these emails, Mr. Palmer
> acknowledges being Ms. House's attorney in this matter. Mr. Palmer, however,
> has never filed an appearance before Judge Cohen in this case.
>
> …
>
> Regarding … Palmer, he acknowledged being Susan House's attorney in an email
> to [defense counsel]. He clearly composed the objection which Susan House
> submitted to the Court. Mr. Palmer also never submitted any written
> documentation to corroborate or substantiate any text supposed to have been
> received by Ms. House or any notice of her being a class member. When I spoke
> to Mr. Palmer on March 12, 2014, he refused to answer any questions and
> referred me to his attorney. After a mediation in California, a settlement was
> reached. However, to my knowledge, nothing was paid to Ms. House and she has
> attempted to withdraw her objection before this Court. Mr. Palmer's conduct
> appears questionable, suspicious and in apparent bad faith. Whether this rises to
> the level of proof beyond a reasonable doubt is a debatable issue.[19]

53.     Judge Grossi stated that he would submit his report to "any proper authorities in

---

[19]     A true and accurate copy of Judge Grossi's Report is attached hereto as Exhibit A.
(citations omitted).

California which may be investigating Mr. Palmer."[20] In fact, soon after Judge Grossi issued his report, the State Bar of California's investigation against Palmer concluded, "finding him culpable of three counts of moral turpitude for the grossly negligent making of false statements in sworn affidavits filed in federal class actions."[21] Mr. Palmer appealed and in affirming the hearing judge's decision, the State Bar of California Review Department stated:

> We … agree with the hearing judge's conclusion that Palmer acted with gross negligence, amounting to moral turpitude, in executing and filing the false affidavits.
>
> …
>
> In 2002, [Palmer] was convicted of a Colorado criminal offense for failing to properly report roughly $4,000 in sales taxes … . As a result of this conviction, the Colorado Supreme Court imposed discipline on Palmer … .
>
> …
>
> Palmer admits that he executed and filed three sworn affidavits, between June 2010 and July 2012, in which he declared falsely that he had never been subject to attorney discipline.
>
> …
>
> [S]uch lack of diligence was common in Palmer's practice. His long-time paralegal, who prepared the affidavits for his approval and signature, testified that Palmer "did not thoroughly review what [she] put in front of him to sign." This lack of attention is substantially below the ethical standard of care required of attorneys when signing and filing documents under oath.
>
> …
>
> For the foregoing reasons, we recommend that Joseph Darrell Palmer be suspended from the practice of law for two years, that execution of that suspension be stayed, and that Palmer be placed on probation for two years on the [meeting of certain] conditions … .[22]

---

[20]   *Id.*
[21]   *In re Palmer*, No. 12-O-16924, 2016 WL 364192 (Cal. Bar Ct. Jan. 6, 2016),
[22]   *Id.*

54.     Although Palmer's suspension was to be stayed so long as he fulfilled certain conditions, Palmer apparently failed to meet them. Palmer is still suspended from practicing law in California.

55.     This Court's Local Rule 83.26(a) requires attorneys admitted to the bar of this Court to notify the clerk when they are subjected to public discipline, and Local Rule 83.13 requires attorneys who are transferred to inactive status to notify the clerk. However, the Northern District of Illinois's website still indicates that Palmer is an active member of this Court's general bar.

56.     Palmer also disregards his suspended status and continues to practice law by assisting in preparing and filing of objections to class action settlements. On October 26, 2016, Palmer once again was involved in the preparation of an objection, this time in *Clark v. Gannett Co., Inc.*, Case No. 16-CH-06603 (Cir. Ct. Cook Cty., Ill.). There, and as described more below, Palmer co-opted a friend, Gary Stewart, into filing an objection to a class action settlement and had Stewart state he was represented by Bandas and Thut. Notably, Palmer (and Bandas) never filed an appearance with the Court in *Gannett*, nor could he because he is presently suspended from the practice of law. On November 14, 2016, the Honorable Kathleen Kennedy overruled the objection and granted final approval of the *Gannett* settlement (the "*Gannett* Settlement").

C.     *Thut has partnered with Bandas and Palmer as a professional objector.*

57.     Jeff Thut is a former Illinois traffic ticket prosecutor, turned personal injury lawyer, turned professional objector who has repeatedly worked with Bandas and/or Palmer. Like Bandas and Palmer, Thut has filed objections on behalf of himself and his immediate family members, on at least one instance without their knowledge or permission, to attempt to extort a payment in exchange for withdrawing an objection without making any change to the settlement

agreement.[23]

58.     Thut's rapid descent into the world of professional objecting caused him to be

profiled in a July 2015 Reuters report about professional objectors. There, Thut described how he

(and Bandas) attempted to extort payment from class counsel in an Illinois State Court

proceeding:

> Jeffrey Thut, who is working with Bandas on the MetLife case, said Bandas is
> "nothing but professional." He said Bandas first called him to serve as local
> counsel for [an] objector, after the judge in the case ordered discovery. When he
> entered an appearance, he said, class counsel [] called to ask if he knew about
> Bandas' history. Thut, who told me he'd never worked on a class action before
> the MetLife case, said, "Is Chris Bandas a serial objector? I don't know. I'll let
> you make up your own mind. In my experience, he knows his stuff. He doesn't
> have horns."
>
> Thut said he has tried repeatedly **to convince** [class counsel] **to settle** the MetLife
> case **and lock in** [class counsel's] **$8.2 million in fees and costs**. . . . .
>
> [The] serialobjector.com website has a dossier on Thut, too. His class action
> experience may have begun with the MetLife case but it didn't end there. He and
> Bandas have since teamed up to represent objectors in two other cases, a Chicago
> federal court class action against Chase and a Minnesota class action against Life
> Time Fitness. (Both are TCPA cases.) The objector Thut and Bandas represent in
> the Life Time class action is named Lindsey Thut – the same name as
> a University of Michigan soccer player whose father is Jeff Thut. I asked Thut if
> Life Time objector Lindsey Thut is his daughter. "I'll let you figure that out on
> your own," he said.[24]

59.     Discovery into the objection revealed that Lindsey Thut was Thut's daughter, that

he personally filed a claim in the case with his personal information and apparently without her

knowledge, and that Thut enlisted Bandas to assist him in the objection in order to extort a

payment without any corresponding benefit to the class members.

---

[23]     *See e.g.*, *Wright v. Nationstar*, No. 14-cv-10457, Dkt. 79 (listing Thut as objector
represented by Bandas); *In re Lifetime Fitness TCPA Litig.*, No. 14-md-2564, Dkt. 121 (detailing
Thut's use of his daughter as an objector without her knowledge)

[24]     Allison Frankel, A New Way for Class Action Firms to Combat Serial Objectors, Reuters
(June 29, 2015), https://perma.cc/RCW8-TZJD.

60.     In other cases, Thut has turned to business associates to serve as purportedly good-faith objectors. In *Allen v. JPMorgan Chase*, 13-cv-08285 (N.D. Ill.) and *Birchmeier v. Caribbean Cruise Line* 12-cv-04069 (N.D. Ill.), Thut—at the behest of Bandas and other members of the Illinois Objector Enterprise—solicited longtime associate and client Robert Burack to file objections to settlements.

D.     *Stewart and other unnamed class-member objectors take cash for false and misleading testimony.*

61.     An integral part of Defendants' scheme is the cooperation of at least one class member per class action settlement. These class members represent to the courts that they are objecting to class action settlements in good faith. Yet, deposition testimony and obtained retention agreement reveal that their testimony has been bought by the Enterprise.

62.     For example, in *Chambers v. Whirlpool Corporation*, No. 11-cv-01733-FMO (C.D. Cal. 2016), a pair of objectors, Christine Knott and Kimberly Smith, filed with the court affidavits "declar[ing] under penalty of perjury under the laws of the United States of America that the foregoing is true and correct" that they objected to the class action settlement "for the reasons stated in my objection." *See* Exhibit B. In their objection, Knott and Smith state, among other things, that they object to the settlement agreement "reward[ing] class representative, Steve Chambers, a remarkable $100,000 for two websites … ." Exhibit C at 2. However, in her deposition, Knott admitted that she did not know of the website sale and she did not have "an opinion one way or the other whether it was appropriate for Whirlpool to make that purchase [of Chambers' websites] if the settlement is approved." Exhibit D at 149.

63.     Indeed, as the Court stated, "During a deposition on June 30, 2016, Knott contradicted the allegations in the Objection, stating that Whirlpool's purchase of the lead plaintiff's website 'makes sense[,]' and that she would not object even if the court awarded more

in attorney's fees than class counsel had requested." Exhibit E at 1 (citations omitted). Knott's ignorance is understandable considering (1) she is "good friend[s]" with Bandas's paralegal, Exhibit D at 34:19-23 and (2) she was promised cash for her testimony.

     i.    Objectors are invariably friends, family, or business associates of Bandas, Thut, and Palmer.

64.    As the *Whirlpool* case demonstrates, the objectors are not independent parties seeking to bring additional benefits to members of a class. Instead, they are invariably related in some way to Bandas and his associates. For instance:

- Kimberly Smith objected to *Whirlpool* case but then "On November 23, 2016 objector Kimberly Smith withdrew her objection and appeal. At her deposition, taken at her husband's law office, Ms. Smith had confirmed that her husband Perry Smith is an attorney." Exhibit F. Perry Smith is a known associate of Defendant Thut.

- Lindsey Thut objected to *In re Lifetime TCPA*. She is Defendant Thut's daughter.

- Aaron Petrus objected to *Walker v. Discover Financial Services*. He is related to Bandas's office manager, Jan Petrus.

- Gary Stewart objected to the *Gannett* Settlement. He is Palmer's longtime friend.

     ii.    Objectors are promised a cut of recovered fees in exchange for their false and misleading testimony.

65.    Beyond having relations with Bandas and company, the objectors all have been bought and paid for. As a part of Defendants' scheme, objectors sign retainer agreements with at least Bandas's law firm. In that document, Bandas makes the objector agree that they will not receive more than $5,000 from their objection, and that it will be in the form of a court-approved incentive award. But, under closer scrutiny of the retainer and how Defendants' schemes operate,

it is evident that objectors are not paid from any court-approved fund. Instead, objectors receive a cut of the "attorneys' fees" extorted, an unethical practice. *See* ABA Model Rules of Professional Conduct Rule 5.4(a) ("A lawyer or law firm shall not share legal fees with a nonlawyer.").

66. For example, Exhibit G is a retainer agreement between Judd Clayton (the objector in *Fauley v. Met Life*, 14-ch-1518 (Lake Cnty., Ill.)) and the Bandas Law Firm, P.C. It states that Bandas "may petition the Court for a payment to you, *or may ask class counsel or defendant(s) to make a payment to you*, in recognition of your service as an objector and/or *for other factors* related to your service as an objector." *Id.* at 3.2. It goes on that the payment "will never exceed $5,000."[25]

67. As Exhibit H describes though, Bandas failed to deny the allegation that he was offering $25,000 out of the funds he received from class counsel to payoff an objector. Exhibit H ¶ 76 ("I jokingly said to Mr. Bandas that I wondered whether this was a settlement offer coming from him, rather than from class counsel. He became very defensive, but also said that if the offer had been from him, he would have offered $100,000 to make sure there was no chance Mr. Collins would decline the offer. From this statement I infer that Mr. Bandas is being offered at least $200,000, and likely much more, to dismiss his appeal.")

68. And in the *Gannett* Settlement, described more below, Bandas never negotiated for a separate fee for the objector Stewart, let alone a court approved fee. Instead, Bandas insisted that he did not want to file *anything* with any court and negotiated only for a single $225,000 fee.

---

[25] In some instances, though, the Illinois Objector Enterprise does pay more than $5,000 to the objectors. *See* Section III below.

69.     In addition, Amirali Jabrani (husband of Janet Jabrani, the objector in *Allen v. JP Morgan Chase Bank, N.A.*, 13-cv-08285-RRP (N.D. Ill.)) testified in a deposition as to his understanding of this fee sharing arrangement with Bandas:

Q:      So how would you get an incentive as an objector?

A:      I'm not asking, if that's what [Bandas's] taking the case you know, and he's awarding me $5,000, I will take $5,000, whatever it is.

Q:      Who's that from, from Mr. Bandas will give you $5,000?

A:      Could be anything, whatever it says there.

Q:      I want to know your understanding.

A:      It could be anybody, it could be Wells Fargo, it could be you, it could be Chris Bandas, it could be anybody, I don't know exactly.

Dep. Tr. of Amirali Jabrani at 22:18–23:4, *Fladell, et al., v. Wells Fargo Bank, N.A.*, 13-cv-60721 (S.D. Fla.) .

                iii.     Objectors are ignorant of their objections and submit false and misleading testimony.

70.     A review of publicly available deposition transcripts and other documents demonstrates that the objectors are invariably ignorant of their objections at the time they make them, have only the vaguest understanding of class actions, and fail to review settlement documents, but file testimony with courts representing specific objections to complex deals.

71.     In deposition after deposition, a pattern emerges:

Q: Have you actually ever read the settlement?

A: No, sir, just read through here. I don't know the actual facts about it. … My attorney [Bandas] is the one that … went through this.

Dep. Tr. of Ronnie Garcia at 47:13–48:1, *In re Chinese-Manufactured Drywall Products Liability Litigation*, 09-md-02047-EEF-JCW (E.D. La.).

Q: Let me ask you this then. We'll start with, did you ever review the settlement agreement in this case?

A: No.

Dep. Tr. of Amirali Jabrani at 56:1-5 *In re: CertainTeed Fiber Cement Siding Litigation*, 11-md-02270-TON (E.D. Penn.)

    Q: Now, in this case you've testified under oath that you did not read the stipulation of settlement in this case. Right?

    A: Yes.

Dep. Tr. of Christina Knott at 163:11-14, *Chambers v. Whirlpool Corporation, et al.*, 11-cv-01733-FMO-JCG (C.D. Cal.).

    Q: Have you read the settlement agreement in this matter, Everbank?

    A: I did.

    Q. You did. Did you review it before you filed your objection?

    A: I can't remember.

Dep. Tr. of Amirali Jabrani at 33:12-21, *Wilson et al., v Everbank, N.A., et al.*, 14-cv-22264-BB (S.D. Fla.).

    Q: And at the time that you signed this document and the one for Wells Fargo, tell me everything you had personally looked at in connection with the Wells Fargo and SunTrust settlements?

    A: Nothing

Dep. Tr. Janet Jabrani at 25:16-20, *Fladell, et al., v. Wells Fargo Bank, N.A.*, 13-cv-60721 (S.D. Fla.).

    Q: Have you ever visited the settlement website at www.LifeTimeTCPAsettlement.com?

    A: I have not.

    Q: Have you ever read the long form notice available on the website?

    A: No, I have not.

    Q: Have you ever read the consolidated complaint in this litigation?

    A: I don't know what a consolidated complaint is.

Q: Have you ever read any complaint in this litigation?

A: No.

Q: Have you ever read the settlement agreement in this litigation?

A: No.

Q: Have you ever read class counsel's fee petition in this litigation?

A: No.

Q: What documents have you viewed related to this litigation?

A: I'm not sure.

Q: Have you reviewed any documents related to this litigation?

A: I don't really know what I reviewed and what I have not reviewed.

Q: But you know you haven't reviewed the things we just discussed?

A: Yes.

Dep. Tr. of Lindsey Thut at 34:16-35:18, In re Life Time Fitness Inc., TCPA Litigation, 14-md-02564-JNE-SER (D. Minn.).

A: I know that any claim that was filed by me would have been filed by Bandas's law firm.

…

Q: Did you do any research in the underlying case?

A: I did not other than what we've already referred to in previous exhibits. … All documents I received in connection with this case came from Chris Bandas's office.

…

Q: Okay. The second paragraph, the second sentence reads: "This is a settlement with a difficult and burdensome claims process where the defendant has a reversionary interest in the unclaimed funds and there is also a cy pres component." Do you see that?

A: I do.

Q: How was the claims process difficult and burdensome?

A: I don't know. Whoever wrote that can answer that question.

Q: But you did not write that, correct?

A: Obviously not.

Dep. Tr. of Judd Clayton, Jr. at 35:21-7, 52:7-16, 87:12-24, Fauley et al., v. Metropolitan Life Insurance Company, et al., 14-CH-1518 (Lake Cty., Ill.).

72.     Other documents show that the objectors will often contradict their own objection when challenged:

> During a deposition on June 30, 2016, Knott contradicted the allegations in the Objection, stating that Whirlpool's purchase of the lead plaintiff's website "makes sense[,]" and that she would not object even if the court awarded more in attorney's fees than class counsel had requested.

Civil Minutes Order Re: Pending Motions [for Sanctions], *Chambers v. Whirlpool Corp.*, 11-cv-1733-FMO (C.D. Cal. Aug. 6, 2016).

73.     As these examples demonstrate, objections orchestrated by Defendants are not examples of attorneys zealously advocating for their clients. Legitimate objections seek to root out collusion or unfairness in class action settlements. And with attorney assistance, they put forth arguments that identify potential problems can be explained with reference to facts and buttressed by citations to case law. Implicit in that type of legitimate objection, though, is that the objector has agency in his or her testimony and has a basic knowledge of the settlement to which he or she objects.

74.     Defendants' objectors are different. Despite attesting that their objections are true and correct, the objectors are ignorant of the arguments, purported problems in the settlements, and, sometimes, of the case itself. Courts across the country have caught on to this and have stated, for example:

THE COURT: -- was it your client or someone else's that objected without even reading the settlement agreement?

MR. MANOCHI [Bandas's local attorney]: Well, that's why they -- that's why they hire counsel, Your Honor.

THE COURT: Well, you object without even knowing what you're objecting to.[26]

And,

THE COURT: No, Mr. Bandas. When pressed over whether there was a probability of reversing the decision of Judge Scheindlin to do an injunctive-only class, you said you had no idea, which means you did not do your homework. You had no idea to advise your client. Mr. Hull [the objector] is not the issue. The issue is you. This is not Mr. Hull. You wrote the objection. You were the one who advised that he had an objection. You are one that is defending that this is a good-faith objection.[27]

## III. Defendants Coordinate Their Actions in Attempts to Extort Plaintiff and Class Counsel in Illinois and Throughout the Country.

75.     Although the individual actions of Defendants are alarming on their own,

Defendants' level of coordination reveals their scheme to profit through acts of extortion, wire

and mail fraud, bribery, corrupt influence of courts, tampering with witnesses (purported good-

faith objectors), money laundering, and bribery of purported good-faith objectors. As described

above, Defendants, through the Illinois Objector Enterprise, have schemed to make at least 15

objections since 2009. Those objections were accomplished through the Illinois Objector

Enterprise whereby Defendants would seek out which class actions to object to, solicit family,

employees, or friends as "clients" to use, agree on which "arguments" to push, arrange sham

"mediations" in order to shield their actions from the courts, and decide on their pay-off price.

76.     Defendants' scheme and unlawful Illinois Objector Enterprise were revealed

---

[26] Transcript of Motion Hearing at 33:18-23, *In re: CertainTeed Fiber Cement Siding Litigation*, 11-md-02270-TON, Dkt. 123 (E.D. Penn. April 11, 2014).
[27] Court Transcript at 44:18-25, *Garber v. Office of the Commissioner of Baseball, Major League Baseball Enterprises, Inc*, 12-cv-3704, Dkt. 596 (S.D.N.Y. Aug. 1, 2016).

when a former associate wrote a whistleblower-like account to the United States Court of

Appeals for the Seventh Circuit, and when Reuters news service obtained previously-secret

communications.

77. After another attorney refused to coordinate with Bandas and accept payment to

drop an appeal of an overruled objection, that attorney submitted a detailed account of how

Bandas and his associates operate, and filed it with the United States Court of Appeals for the

Seventh Circuit under penalty of perjury:

> Mr. Bandas proposed that I receive a contingent fee of a share of the proceeds of
> settled objections in cases where I performed consulting. … However, I grew
> uncomfortable with receiving a percentage of settled objections, both because I
> disagreed with the idea of settling objections for money at the expense of the
> class, and because I was concerned that I was most often being consulted in
> difficult cases where Mr. Bandas's actions before I became involved was putting
> him at risk of sanctions and where payment was thus unlikely. In 2013, Mr.
> Bandas and I agreed to a set of new retainer agreements where I would be paid by
> the hour, subject to a monthly minimum payment, with separate payments and
> separate retainers for cases where I made an appearance on behalf of one of Mr.
> Bandas's clients. The contingent payments I had received to date would be
> retroactively treated as a partial payment in advance for my appearance and
> argument in a Seventh Circuit appeal … .
>
> …
>
> I understood that my pay from Mr. Bandas was made possible and would not have
> occurred without Mr. Bandas profitably settling cases where I was not counsel of
> record, but rationalized accepting that money because of the benefit to caselaw of
> victories [] that might not have occurred if I was not assisting Mr. Bandas.
>
> …
>
> I grossed about $33,000 from Mr. Bandas in 2013, $125,000 in 2014, and $95,000
> between January 1 and June 4, 2015 … . Mr. Bandas apparently found these
> profitable sums to pay, because he became very upset when I terminated my
> business relationship with him.
>
> …
>
> Mr. Bandas indicated to me on numerous occasions, including as recently as June
> 4, 2015, that I could increase my total income considerably if I … worked for him

full-time. Mr. Palmer made me a similar offer in late 2013 or early 2014. I declined both gentlemen's offers.

…

In May 2015, a reporter contacted me and stated that class action attorneys had complained to him that "bad" objectors who settled cases for money were using my name to threaten class counsel into settling. I acknowledged that I had been retained in a number of class action appeals, … explained the limitations on my willingness to represent for-profit class-action objectors, and noted that that threat only made a difference if the underlying objection was meritorious. …[28]

78.     As the author described, the world of professional objectors—and Defendants' Illinois Objector Enterprise specifically—is filled with coordinated back-room deals for illicit gain. Indeed, the author described the "threats" used by professional objectors used to get "class counsel into settling." While the author seemingly exhibits remorse from his brief association with Defendant Bandas, he recounts how he reluctantly assisted in Bandas's and Palmer's "profitable" business of objecting that was often "putting [them] at risk of sanctions and where payment was thus unlikely."

79.     That author's story is corroborated by an in-depth report by Reuters (*see* paragraph 58 above). There, Reuters uncovered how Defendants' Illinois Objector Enterprise engaged in similar backroom deals, improper use of acquaintances as client objectors, and secret schemes to extract money from legitimate class action settlements. Reuters reports:

In [the] MetLife case, Bandas is not counsel of record for objector [Clayton]. [Thut] signed Clayton's brief to the Illinois appellate court. But Anderson & Wanca obtained Clayton's retainer agreement after the state court judge overseeing the class action ordered discovery from him and another objector. As Clayton conceded at his deposition, Bandas is his lead lawyer. (Clayton said Bandas is a professional acquaintance who decades ago used him as an expert witness in a couple of personal injury suits. He also said he "presumed" Bandas was responsible for filing a previous objection Clayton attempted to bring in a New Jersey class action against Hertz.)

---

[28]     A true and accurate copy of the account is attached hereto as Exhibit H.

Clayton's retainer agreement in the MetLife case, which was an exhibit at his deposition, included an interestingly vague clause about what reward he could expect as an objector. He could be entitled to an incentive payment from class counsel or the defendants in recognition of his service, the contract said. "Any incentive award or payment sought," the agreement added, "will never exceed $5,000."

Bandas, however, requests much more than $5,000 to settle appeals, based on two cases in which information about his settlements has become public. … Bandas allegedly told a lawyer for the defendant in a false advertising class action against the maker of Hydroxycut dietary supplements that he would withdraw for a payment of about $400,000 … .

The defense lawyer testified at an evidentiary hearing that Bandas subsequently called claiming he'd had a "senior moment" and forgotten their conversation. But the judge concluded that "Mr. Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away. Mr. Bandas was using the threat of questionable litigation to tie up the settlement unless the payment was made." Judge Moskowitz later denied a motion by class counsel in the Hydroxycut case to sanction Bandas for allegedly falsifying the signature of a client. The judge said he took the allegation very seriously but didn't have jurisdiction over Bandas because Bandas did not enter an appearance before him.[29]

80.     Bandas and employees of the Bandas Law Firm have admitted in open court that he has no legal basis to seek hundreds of thousands of dollars in fees. On February 23, 2017, attorney Robert Clore, who works for the Bandas Law Firm, appeared before Hon. Matthew F. Kennelly of this District on behalf of an objector at a final fairness hearing. When asked by Judge Kennelly whether the Bandas Law Firm would seek an award of attorneys' fees in connection with its representation of the objector, Clore at first declined to answer. After a brief pause, during which Clore spoke to Bandas by telephone at the court's request, Clore advised Judge Kennelly that:

If the Court were to reduce [class counsel's fees] and it were based on that – what

---

[29]     Allison Frankel, *A new way for class action firms to combat serial objectors?* (June 29, 2015), https://perma.cc/RCW8-TZJD.

you discussed, and we actually would intend on applying an application [for attorneys' fees]. We would request an opportunity – we haven't done the legal research on the appropriate methodology if we're entitled to anything at all[.]

Bandas and his firm, in other words, have been demanding attorneys fees for *years* both

in this District and in other districts without having ever done legal research that would

demonstrate that they are entitled to any money at all.

81.    In the same case before Judge Kennelly, Bandas himself appeared the following

week. At that appearance, he indicated that if he and his firm sought fees from the Court, they

would ask for only their lodestar with no multiplier—a far lower sum than Bandas has demanded

when extorting class counsel after appealing.

82.    Unfortunately, members of the Illinois Objector Enterprise have often avoided

sanctions and reprimand from courts. Not from a lack of improper or illegal conduct, but because

Defendants routinely and purposely fail to file appearances in cases where they attempt to extort

class counsel through improper objections as a means to avoid consequences.

83.    For instance, in the recent *Gannett* case, Defendants aimed their Illinois Objector

Enterprise machine at Plaintiff and organized a scheme to misuse the objection process to put

them into a situation where they could extort a profit for the Illinois Objector Enterprise. There,

Thut admitted to skirting his obligations as an Illinois attorney in order to assist Bandas and

Palmer in filing of Defendant Gary Stewart's objection in the *Gannett* Settlement (the "Stewart

Objection"). Upon receiving the Objection, Plaintiff called Thut to attempt to explain the

numerous factual misstatements in the brief he signed. But while his brief is focused on a

claimed "lack of information," Thut refused to discuss the information he claimed was lacking,

mistakenly believed the case was about text messaging (it's not), and the only thing Thut could

recall about the case was that the settlement website said Plaintiff, as court approved class

counsel, were getting $5 million in fees. (This statement was unsurprising, as bad faith objectors like Thut, Bandas, Palmer, and Stewart look solely at fees because of the greater opportunity for extortion.) Thut was candid about why he knew so little about the brief he signed and filed: Bandas wrote the brief and Thut took Bandas's word for everything asserted in the brief without performing an independent investigation of his own.

84.     The reason Thut conducted no independent investigation—despite his duty to his client and the court to do so—is that the Illinois Objector Enterprise didn't need him to. The objection itself is not the Illinois Objector Enterprise's goal; it's merely a tool that the enterprise uses to position itself to extort money. Thut's role in the Illinois Objector Enterprise is not to zealously advocate for his client's stated position in the objection filed on his behalf. It's to help make sure that the objection gets denied, so that Bandas can threaten to appeal and extort a payment from class counsel.

## IV.    Defendants Propose to Resolve The Stewart Objection Through Mediation But Hijack the Mediation to Extort Plaintiff.

85.     Consistent with the operation of their scheme, after the *Gannett* Court overruled the Stewart Objection, Defendants proposed that Plaintiff engage in mediation resolve the objection and forego any appeal of the Court's order granting final approval.

86.     Specifically, on November 17, 2016 and November 30, 2016, Defendant Bandas communicated with Plaintiff via telephone and email. As a result of these exchanges, Plaintiff was told that Bandas would not discuss anything outside the presence of a mediator. Bandas then proposed that Defendants' Stewart Objection could be resolved through mediation with Rodney A. Max of the Florida- and Alabama-based Upchurch, Watson, White, and Max mediation group.

87.     On November 30, 2016, Mr. Max agreed to conduct the mediation and had

forwarded a "confidentiality" agreement that he and Bandas knew would allow them to claim the Illinois Objector Enterprise's extortion could not be disclosed.

88.     At the time Plaintiff agreed to the "mediation," it was unaware that Mr. Max was had repeatedly accepted money to assist Bandas in extorting class counsel with full knowledge that the "attorneys' fees" Bandas demanded has no basis in law, that no benefit to the class was ever demanded or obtained, and that Bandas would use Max to shield his actions from courts.

89.     Plaintiff accepted this opportunity to allow Defendants to ostensibly inform it of the changes they would like made to the settlement necessary to resolve the objection or obviate the threatened appeal. Although Plaintiff believed that the Court was correct in overruling Defendants' objection on the merits, Plaintiff was (and is) cognizant of its obligation to provide the relief guaranteed through the settlement to the class members with as minimal a delay as possible.

90.     On December 1, 2016, Mr. Max facilitated a telephonic mediation with Plaintiff and Defendants' representative, Defendant Bandas.

91.     At no time during the settlement negotiation did Mr. Bandas suggest any change or improvement to the class action settlement agreement.

92.     During the mediation, Defendant Bandas demanded that Plaintiff pay $400,000 to settle outstanding issues. Bandas's only argument at mediation to support his demand of $400,000 in attorneys' fees was that if the fees aren't paid, he would delay the settlement payments to the class and the court-approved fees to Class Counsel. Defendants' demands are more than they could ever have been awarded by a Court if they were to have succeeded on their objection or its appeal.

93.     Through this "mediation," Plaintiff accepted Defendants' extortion demand of

$225,000 and informed Defendants that it would disclose the agreement and seek approval of the court as required by Illinois law. In response to Plaintiff's statements that it was required to seek Court approval, Defendants, again through Defendant Bandas and his counsel in this case, demanded that nothing be reported to the court and falsely claimed additional terms remained to be negotiated.

## CLASS ALLEGATIONS

94.     **Class Definition:** Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of itself and a class of similarly situated persons, defined as follows:

> Any individual or entity that was deprived or money or property by the Illinois Objector Enterprise in the form of a payment of attorney fees, expended uncompensated attorney time, mediation expenses, threat of economic harm, or other compensable damages related to an objection in a class action settlement, wherein, the Illinois Objector Enterprise agreed to not pursue its objections and no modifications were made to the settlement and/or no court approved any payment.

95.     **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of at least 40 persons. Members of the Class can be easily identified through Defendants' records.

96.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

    a.   Whether Defendants' conduct violated RICO;

    b.   Whether Defendants' conduct constituted extortion under the Hobbs Act;

c.  Whether Defendants' conduct constituted Wire Fraud;

d.  Whether Defendants' conduct constituted Mail Fraud;

e.  Whether Defendants' conduct violated 18 U.S.C. § 1503 (influencing an officer);

f.  Whether Defendants' conduct violated 18 U.S.C. § 1512 (tampering with a witness);

g.  Whether Defendants' conduct violated 18 U.S.C. § 201(b)(3) (bribery);

h.  Whether Defendants' conduct violated 18 U.S.C. § 1956 (laundering of monetary instruments)

i.  Whether a permanent injunction is proper to restrain Defendants' conduct of filing vexatious objections to class action settlements;

j.  Whether Defendants should be deemed vexatious litigants;

k.  Whether Defendants have abused the court process; and

l.  Whether Plaintiff and members of the Class are entitled to damages.

97.  **Adequate Representation**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Proposed Class Counsel is competent and experienced in complex litigation and class actions.[30] Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages as a result of Defendants' uniform wrongful conduct. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff is committed to vigorously prosecuting this action on behalf of the members of the Class, and it has the resources

---

[30]  Putative Class Counsel, Edelson PC, disclaims any interest in attorneys' fees to compensate it for serving as Class Counsel, as well as any interest in an incentive award to compensate it for serving at the Class Representative.

to do so. Plaintiff does not have any interest adverse to those of the other members of the Class.

98.     **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable, and the damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered, and uniformity of decisions ensured.

99.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

**COUNT I**
**RICO 18 U.S.C. § 1962(c)**
**As Against All Defendants on Behalf of Plaintiff and on Behalf of the Class**

100.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

101.     Defendants are culpable persons or entities who are capable of holding legal or beneficial interests in property.

102.     Defendants operated, managed, controlled, conducted, and participated in the

enterprise's affairs, and each played a major role in directing those affairs.

103. To further the purpose of the Illinois Objector Enterprise, which was and is the extortion of legally unjustified sums of money from class counsel in class action settlements, the Defendants agreed to and did conduct and participate in the conduct of the Illinois Objector Enterprise's affairs through a pattern of racketeering activity.

104. Defendants and other members of the Illinois Objector Enterprise willfully and intentionally violated numerous state and federal laws with the goal of obtaining money, directly and indirectly, through a pattern of racketeering activities composed of numerous indictable offenses, including but not limited to acts of extortion under the Hobbs Act (18 U.S.C. § 1951), Wire Fraud (18 U.S.C. § 1343), Mail Fraud (18 U.S.C. § 1341), and acts in violation of 18 U.S.C. § 1503 (influencing an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 1956 (money laundering), and 18 U.S.C. § 201(b)(3) (bribery).

### The Illinois Objector Enterprise

105. The Illinois Objector Enterprise is an association-in-fact comprised of the Defendants and others, known and unknown, who are engaged in and whose activities affect interstate commerce and which have affected and damaged interstate commercial activity.

106. Defendants Bandas, Thut, Palmer, (and their respective law firms), and Stewart are members of the Illinois Objector Enterprise. Each has participated in the operation and management of the Illinois Objector Enterprise with the common and shared purpose of extorting legally unjustifiable sums of money from legitimate class action settlements. And with other Illinois Objector Enterprise members, known and unknown, each Defendant benefits from these extortion efforts.

107. There are additional former members of the Illinois Objector Enterprise who are

not, as of now, named as defendants in this action. Those include Illinois attorney Alan Barinholtz and Peter F. Higgins of Lipkin & Higgins.

108.    The purpose of the Illinois Objector Enterprise was and is to use an objection to a class action settlement to put members of the enterprise in a position to extort hundreds of thousands of dollars in legally unjustifiable attorneys' fees from class counsel. For years, Defendants have collaborated together to object to a dozen of class action cases pending in Illinois state and federal courts, and several others pending throughout the country.

109.    The affairs of the Illinois Objector Enterprise were conducted in such a way that form a pattern of racketeering activity. Beyond the predicate acts below, the Illinois Objector Enterprise's general pattern of activity consists of:

      a.    Promising to pay objectors thousands of dollars in exchange for the filing of purportedly good-faith objections;

      b.    Filing objections designed to be overruled in class action settlements for the purpose of extorting the lawyers representing the class who fear the economic hardship caused by the delay the objections cause;

      c.    Filing objections with false or misleading testimony;

      d.    Concealing which members are participating in each objection;

      e.    Concealing that unlicensed attorneys represent objectors;

      f.    Sharing attorneys' fees with non attorneys (e.g., objectors);

      g.    Sharing attorneys' fees with unlicensed attorneys;

      h.    Demanding payment, without any benefit to the settlement class, in exchange for withdrawing each objection;

      i.    Threatening to appeal overruled objections unless they are paid;

> j.      Engaging the services of purportedly neutral mediators to add both an air of purported legitimacy to their demands (when, in fact, the mediator is bought and paid for and not neutral) as well as guaranteeing confidentiality; and
>
> k.      Demanding payment to which they have no legal entitlement, without any benefit to the settlement class, in exchange for not appealing or withdrawing their appeal

| Date of Objection | Case Name | Known Enterprise Members | Pattern of Activity |
|---|---|---|---|
| 9/28/09 | Brown v. Walmart, 01-L-85 (Rock Island Cty, Ill.) | Bandas Barinholtz | Objected, Overruled, Appealed |
| 3/22/12 | Walker v. Discover Financial, 10-cv-06994 (N.D. Ill.) | Bandas | Objected, Overruled, Appealed, Appeal Withdrawn |
| 1/29/13 | Saltzman v. Pella Corporation, 06-cv-04481 (N.D. Ill.) | Bandas Higgins Palmer | Objected, Overruled, Appealed, Appeal Denied In Part, Ongoing |
| 2/19/14 | Lockett v. MoGreet, Inc., 13-ch-21352 (Cook Cty, Ill.) | Bandas Palmer | Objected, Overruled (Demand to Withdraw Objection) |
| 6/4/14 | In Re Lifetime Fitness TCPA Litig., No. 14-md-02564 (D. Minn.) | Bandas Thut | Objected, Overruled, Appealed, Lost Appeal |
| 10/6/14 | Wilkins v. HSBC Bank, 14-cv-00190 (N.D. Ill.) | Bandas Higgins Palmer | Objected, Overruled, Appealed, Appeal Withdrawn |
| 10/17/14 | Fauley v. Met Life, 14-ch-1518 (Lake Cnty, Ill.) | Bandas Higgins Thut | Objected, Overruled, Appealed, Lost Appeal |
| 10/24/14 | In Re Capital One TCPA, 12-cv-10064 (N.D. Ill.) | Bandas Higgins Palmer | Objected, Overruled, Appealed, Appeal Withdrawn (~$200,000 Paid) |
| 2/9/15 | Gehrich v. Chase, 12-cv-05510 (N.D. Ill.) | Bandas Palmer Thut | Objected, Overruled, Appealed, Appeal Withdrawn |
| 6/18/15 | Franklin v. Wells Fargo Bank, No. 14-cv-2349 (S.D. Cal.) | Bandas Palmer Thut | Objected, Overruled, No Appeal |
| 9/3/15 | Allen v. JPMorgan Chase, 13-cv-08285 (N.D. Ill.) | Bandas Burack Thut | Objected, Overruled, Appealed, Appeal Withdrawn |
| 2/18/16 | Douglas v. The Western Union, 14-cv-01741 (N.D. Ill.) | Bandas Thut | Objected, Awaiting Final Approval Order |
| 4/1/16 | Wright v. Nationstar, 14-cv-10457 (N.D. Ill.) | Bandas Thut | Objected, Objection Withdrawn (Payment Demanded) |
| 5/27/2016 | Chambers v. Whirlpool Corp., No. 11-cv-01733 (C.D. Cal.) | Bandas Palmer Thut | Objected, Overruled, Appealed, (Motion for Sanctions Pending) |
| 10/21/16 | Clark v. Gannett Co, 16-CH-06603 (Cook Cty, Ill.) | Bandas Thut Palmer Stewart | Objected, Overruled, Appeal, ($225,000 Agreed to be Paid) (Motion for Sanction Pending) |

(**Table 1**, listing class action settlements to which the Illinois Objector Enterprise targeted, listing only known members of the enterprise.)

110.    The Illinois Objector Enterprise has operated continuously since at least 2009 and

has attempted to or did execute their scheme in at least 15 class actions nationwide, including 12 that were or are pending in Illinois state or federal courts. Table 1 contains the known class action settlement from which the Illinois Objector Enterprise executed their scheme.

111.    Because the members of the Illinois Objector Enterprise attempt to hide each other's involvement in the enterprise's scheme, only the members that have been revealed through investigation have been listed in Table 1.

112.    For instance, in Exhibit H, one attorney who has worked with Bandas testified that he and Bandas agreed to only reveal his involvement "in cases where there was no prospect of settlement." Exhibit H ¶ 24.

113.    And in other cases, such as in *Walker v. Discover Financial*, 10-cv-06994 (N.D. Ill.) and *Lockett v. MoGreet, Inc.*, 13-ch-21352 (Cir. Ct. Cook Cty, Ill.), the Illinois Objector Enterprise has misled courts by having objector clients purport to be *pro se*. Then, after the court has overruled the "*pro se*" objection, members of the Illinois Objector Enterprise appeal the decision and then file appearances with the appellate court or by contacting class counsel to begin "negotiations" for the extortion payments.

*Structure of the Illinois Objector Enterprise*

114.    Table 1 also demonstrates the continuity and ascertainable structure of the Illinois Objector Enterprise. The Illinois Objector Enterprise's structure is comprised of leadership (Bandas), associate attorneys (Thut, Palmer, Barinholtz, and other known and unknown members), and objectors (Stewart, Burack, and other known and unknown members).

115.    As the current leader of the Illinois Objector Enterprise, Bandas has final say over the actions of the enterprise, including when to file objections and how much money to accept as a payment for "settling" the objection. The purported client does not have the final decision as to

when to settle his case or waive his right to appeal—Bandas does. Bandas also doles out the profits of the Illinois Objector Enterprise to the other members.

116.    Bandas manages a group of associate attorneys, who are integral to the scheme. The associate attorneys have two main functions. First, they help secure "clients" for the Illinois Objector Enterprise. That is, they find people who are willing to put their names on objections to class action settlements in exchange for being promised a payout if the objection is successful. On some occasions the associate attorneys themselves act as both objector and counsel (as Defendant Thut did in *Wright v. Nationstar*). Second, they act as local counsel to allow Bandas to orchestrate extortion schemes in districts where he is not admitted to practice law. Currently, that role is mainly filled by Defendant Thut and his firm.

117.    Before Thut joined the enterprise, the associate attorney role was filled by Alan Barinholtz and then Peter F. Higgins. In his role as local counsel, Barinholtz recruited "clients" to serve as an objector for the enterprise. He then acted as local counsel for Bandas in Illinois court. Barinholtz left the enterprise after he was reprimanded by the Illinois Attorney Registration and Disciplinary Commission for his participation in the enterprise. Starting in 2013, Peter F. Higgins then acted as local counsel for the enterprise.

118.    Defendant Palmer also fills the associate attorney role, although his participation in that role has been involuntarily limited since his law license was suspended. Although he can no longer act as local counsel, he still recruits clients for the enterprise and (unlawfully) provides them with legal advice.

119.    Finally, the enterprise includes the "clients" themselves—the people on behalf of whom the objections are filed. Bandas and the associate attorneys depend on these clients, many of whom are repeat players, to swear to the statements contained in the objections so that the

attorneys can later extort a payment. In return, if the extortion scheme is successful, the "clients" share in the profits.

120.    Bandas (and his law firm) has acted as the boss of the Illinois Objector Enterprise, providing the leadership and overall command of the Illinois Objector Enterprise and has authored the objections and conducted "negotiations" for extortion payments, often through a purportedly neutral mediator, amongst other acts. Thut, and Palmer (and their respective firms) have directed and managed the affairs of the Illinois Objector Enterprise for years under Bandas.

121.    For their parts, Thut (and his firm), Palmer (and his firm), and other attorney members coordinate with Bandas and each other to find objectors, sign documents, file appearances and appeal overruled objections. Finally, objectors Burack, Stewart, and other members agree to act as purported good-faith objectors to class action settlements in exchange for a cut of the thousands of dollars in recovered attorneys' fees.

*Illinois Objector Enterprise Members Bandas and the Bandas Law Firm*

122.    Throughout the operation of the Illinois Objector Enterprise, Bandas directed the Illinois Objector Enterprise and took primary responsibility for activities of the enterprise. As Exhibits B and C reveal, Bandas provides the system of authority and directs the Enterprise's affairs on a continuing basis, by, for example, seeking out new members of the Illinois Objector Enterprise to serve in specific capacities and controlling the payouts to members of the Illinois Objector Enterprise.

123.    For instance, as Exhibit I describes, Bandas solicited Barinholtz to serve as local counsel in the filing of an objection to a class action settlement. The objection would provide cover for their scheme to extract money from class counsel of at least "$100,000." *See* Exhibit I At that time, Bandas did not represent any purported objector—instead, Bandas identified the

class action to which he wanted to extort and hoped to find a client later, asking Barinholtz if he knew anyone who "would be eligible to file an objection to the settlement."

124.    This pattern was repeated when Thut joined the enterprise. Reuters reported the following:

> [Thut] said Bandas first called him to serve as local counsel for Clayton, the MetLife objector, after the judge in the case ordered discovery. When he entered an appearance, he said, class counsel Wanca called to ask if he knew about Bandas' history. Thut, who told me he'd never worked on a class action before the MetLife case, said, "Is Chris Bandas a serial objector? I don't know. I'll let you make up your own mind. In my experience, he knows his stuff. He doesn't have horns."[31]

125.    Similarly, Exhibit H recounts how Bandas "telephoned" a former associate to recruit him to "perform legal work for him." Exhibit H ¶ 20. Exhibit H goes on, detailing that "Bandas suggested that his contacts with other professional objectors could help" ensure objections were successful, *id* ¶ 21, with the understanding that "settling objections for money was much more profitable than bringing successful objections." *Id.* ¶ 22.

126.    Exhibit H further describes the process by which Bandas doles out the money to the other members of the Illinois Objector Enterprise. *Id.* ¶¶ 74, 91. There, the author describes how Bandas communicates with class counsel and negotiates a payment, communicates that payment to the attorney level enterprise members (e.g., Bandas, Palmer, Higgins, etc.) who then communicate the payoff fee to the objector level enterprise members (e.g., Stewart and other unnamed objectors). *Id.*

127.    As these documents illustrate, Bandas organizes and conducts the affairs of the Illinois Objector Enterprise by, for example, (1) identifying class action settlements for the

---

[31]    Allison Frankel, *A new way for class action firms to combat serial objectors?*, June 29, 2015, https://perma.cc/RCW8-TZJD.

Illinois Objector Enterprise to target, such as *Gannett*; (2) sharing in and distributing any attorneys' fees or other money obtained through any objections to class action settlements; (3) threatening to file or actually filing objections to position Bandas to extort "attorneys' fees" through sham mediations; (4) ghostwriting, in whole or in part, objections to settlements; and (5) participating in "mediations" to "resolve" objections to class actions, including in the Stewart Objection to the *Gannett* Settlement with the mediator knowing that it would be used for the improper purpose of demanding legally unjustifiable payments without any benefit to the *Gannett* Settlement class and keeping the result secret from the court.

128.    The Bandas Law Firm PC agreed to conduct the affairs of the Illinois Objector Enterprise by ratifying the actions of its principal, Christopher Bandas, identified, in part, above

*Illinois Objector Enterprise Members Palmer and the Law Offices of Darrell Palmer*

129.    Joseph Darrell Palmer agreed to conduct the affairs of the Illinois Objector Enterprise by, for example, agreeing to (1) identify class action settlements for the Illinois Objector Enterprise to object to, including the *Gannett* and *Mogreet* Settlements; (2) share in any attorneys' fees or other money obtained through the any objections to class action settlements, including the *Gannett* and *Mogreet* Settlement; (3) threaten to file or actually file objections to position Bandas or himself to extort "attorneys' fees" through sham mediations; (4) recruit his long-time associate Gary Stewart to file an objection in the *Gannett* Settlement; and (5) ghostwrite, in whole or in part, the Stewart Objection to the *Gannett* and the objection to the *Mogreet* Settlement.

130.    Moreover, Defendant Palmer's conduct and participation in the Illinois Objector Enterprise was not related to the provision of professional legal services because Defendant Palmer participated in the Illinois Objector Enterprise's acts described throughout this complaint.

Defendant Palmer was not acting as an attorney for the Illinois Objector Enterprise nor was he participating only for his own enrichment. That is, Palmer was not acting in his professional capacity as an attorney and providing a service at an hourly rate to the enterprise, unaware of its activity. Instead, Defendant Palmer entered into agreements to share in the profits generated by the Illinois Objector Enterprise's fraudulent schemes and actively took part in the operation of the Enterprise. Palmer was only enriched when the Enterprise was enriched, and received nothing when the Enterprise's scheme failed.

131. Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed to conduct the affairs of the Illinois Objector Enterprise by ratifying the actions of its principal, Joseph Darrell Palmer, identified, in part, above.

*Illinois Objector Enterprise Members Thut and Noonan Perillo & Thut LTD*

132. C. Jeffery Thut agreed to conduct the affairs of the Illinois Objector Enterprise by, for example, agreeing to file the objection of Gary Stewart in the *Gannett* Settlement and regularly recruit associates and family members to lend their name to the enterprise for the filing of an objection. Thut also agreed to represent to the *Gannett* Court that he was the only attorney for Stewart despite agreeing to share any recovered attorneys' fees with the members of the Illinois Objector Enterprise, including Palmer who he knew was then (and still is) suspended from the practice of law.

133. Moreover, Defendant Thut's conduct and participation in the Illinois Objector Enterprise was not related to the provision of professional legal services because Defendant Thut participated in the Illinois Objector Enterprise's acts described throughout this complaint. Defendant Thut was not acting as an attorney for the Illinois Objector Enterprise nor was he participating only for his own enrichment. That is, Thut was not acting in his professional

capacity as an attorney and providing a service at an hourly rate to the enterprise, unaware of its activity. Instead, Thut entered into agreements to share in the profits generated by the Illinois Objector Enterprise's fraudulent schemes and actively took part in the operation of the Enterprise. Thut was only enriched when the Enterprise was enriched, and he received nothing when the Enterprise's scheme did not yield a payout.

134.    Noonan Perillo & Thut LTD agreed to conduct the affairs of the Illinois Objector Enterprise by ratifying the actions of one of its principals, C. Jeffery Thut, identified, in part, above.

*Illinois Objector Enterprise Member Gary Stewart*

135.    Gary Stewart agreed to conduct the affairs of the Illinois Objector Enterprise by, for example, agreeing to be a purported objector in the *Gannett* Settlement. Stewart knew that his objection would be overruled. Once overruled, Stewart knew that he and members of the Illinois Objector Enterprise would profit by demanding a payment from Plaintiff and members of the Class in exchange for withdrawing his objection and/or appeal.

*Presently Unknown and/or Unnamed Illinois Objector Enterprise Members*

136.    John Does 1-20 are unknown to Plaintiff at this time but are necessary parties without whom the court cannot accord complete relief among existing parties.

137.    Moreover, there exist unnamed parties who are current or former members of the Illinois Objector Enterprise. Although they likely maintain discoverable records and will be called upon as witnesses, they are not necessary parties where the court could not accord complete relief among existing parties.

138.    As a part of the Illinois Objector Enterprise, each Defendant joined together to enrich themselves and further the common interests of the group as a whole. *See* Exhibit H ¶ 26

(describing how associates of Bandas agree to "receive a contingent fee of a share of the proceeds of settled objections in cases where [he] performed consulting."); Exhibit J at 4 (stating that Illinois Objector Enterprise member Barinholtz agreed with Bandas to "receive 15% of any fees" recovered from "purported objections to the proposed settlement."); Exhibit G at 3.2 (outlining payments of up to $5,000 to purported class member acting as the objector).

139. In addition, each individual Defendant acted in concert with the others to pursue the common interest of the Illinois Objector Enterprise and profit therefrom. Defendants consulted with one another to find and identify class action settlements in which to file objections. *See* Exhibit H ("Mr. Bandas suggested that his contacts with other professional objectors could help […] in cases with multiple objectors.").

140. The wrongful conduct of the Defendants and others has been and remains part of the Illinois Objector Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiff's and the Class's property, including additional Delay Costs. Without the repeated violative acts and intentional coordination between all Defendants, the Illinois Objector Enterprise's scheme would not have succeeded and would not pose a threat to Plaintiff and the Class into the future.

**Predicate Acts Violating the Hobbs Act, 18 U.S.C. § 1951**

141. The Hobbs Act, 18 U.S.C. § 1951, prohibits persons "in any way or degree" from "obstruct[ing], delay[ing], or affect[ing] commerce" by "extortion or attempts or conspires to do so."

142. The Hobbs Act defines "extortion" to mean "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951 (b)(2).

143.     Defendants, through the Illinois Objector Enterprise, intentionally used acts of extortion to deprive or attempt to deprive Plaintiff and the Class of money and property.

144.     Specific to Plaintiff, through the objection brought by Defendants in *Clark v. Gannett Co., Inc.*, Case No. 16-CH-06603 (Cir. Ct. Cook Cty.), Defendants deprived Plaintiff of $225,000 or, alternatively, attempted to deprive Plaintiff of $225,000.

145.     Defendants deprived Plaintiff of $225,000 knowingly and willfully through an act of extortion (by making Plaintiff to agree to pay Defendants $225,000). Specifically, Defendants created a fear of economic harm for Plaintiff that, if the fee demanded was not paid, Defendants would intentionally delay the *Gannett* Settlement through an appeal that would cause Plaintiff financial harm in substantial the delay of court-approved attorneys' fees in the *Gannett* Settlement, including the Delay Costs.

146.     As a result of Defendants' legally unjustified demand of $225,000 from Plaintiff, the interstate commerce associated with the resolution and final approval of the nationwide *Gannett* Settlement was obstructed and delayed. Defendants' objection has directly delayed the distribution of monetary benefits to Gannett class members across the United States.

147.     Defendants, through the Illinois Objector Enterprise, carried out nearly identical violations of the Hobbs Act as against members of the Class. Through dozens of class settlements over a period of years, Defendants have coordinated their efforts through the Illinois Objector Enterprise to object to class action settlements, demand legally unjustifiable monetary payments unrelated to any benefit provided to the settlement class, and after such objections are purposefully overruled, demand legally unjustifiable monetary payments to not appeal or withdraw such appeals, all without ever adding value to the settlements or benefit to the settlement classes or informing the courts. The Illinois Objector Enterprise has successfully

extorted millions of dollars in unwarranted fees and other money through Defendants' racketeering activities and violations of the Hobbs Act.

148.    At all times, it was reasonably foreseeable that Defendants' violations of the Hobbs Act would be used to further the racketeering activities. And, as described throughout the Complaint, each Defendant agreed to the commission of the Hobbs Act violation. For instance:

      a.      Christopher Bandas agreed to coordinate the actions of the Defendants and to assist in the preparation and filing of the Stewart Objection, demanded $225,000 (an amount he had no legal right to) in order to forgo the appeal, and knew that the threat of delay would cause substantial economic fear in and harm to Plaintiff and amounted to extortion.

      b.      The Bandas Law Firm PC agreed to ratify the actions of its principal, Christopher Bandas, at all times knowing of Defendant Bandas's actions.

      c.      Joseph Darrell Palmer agreed to recruit Defendant Stewart to act as the purported objector in the Stewart Objection and to assist in the preparation and filing of the objection, despite knowing that Bandas would later demand unjustifiable sums of attorneys' fees to forgo the appeal, and that such delay would cause economic fear in and harm to Plaintiff and amounted to extortion.

      d.      Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed to ratify the actions of its principal, Joseph Darrell Palmer, at all times knowing of Defendant Palmer's actions.

      e.      C. Jeffery Thut agreed to act as the purported sole representative of Defendant Stewart to the *Gannett* Court despite knowing that Bandas would later demand unjustifiable sums of attorneys' fees to forgo the appeal, and that such delay would cause

economic fear in and harm to Plaintiff and amounted to extortion.

f.    Noonan Perillo & Thut LTD agreed to ratify the actions of one of its
principals, C. Jeffery Thut, at all times knowing of Defendant Thut's actions.

g.    Gary Stewart agreed to be the named objector in the Stewart Objection
despite knowing that Bandas would later demand unjustifiable sums of attorneys' fees to
forgo the appeal, and that such delay would cause economic fear in Plaintiff and
amounted to extortion.

149.   Because of their violations of the Hobbs Act, Plaintiff and members of the Class
were deprived of money and property as detailed herein.

150.   As Table 1 illustrates, the Illinois Objector Enterprise has engaged in the same
conduct in at least 15 other class action settlements. In those instances, Defendants and members
of the Illinois Objector Enterprise plan to, did, or attempted to cause economic fear in class
counsel by objecting to class action settlements to put Bandas or another enterprise member in
the position to be able to initiate a sham mediation or settlement negotiations wherein they would
demand legally unjustifiable "attorneys' fees" without any benefit provided to the settlement
class.

**Predicate Acts of Wire Fraud, 18 U.S.C. § 1343**

151.   Defendants, through the Objector Enterprise, intentionally used acts of artifice or
deceit in attempts to deprive Plaintiff and the Class out of money and property.

152.   At all times, it was reasonably foreseeable that interstate wires would be used to
further these acts of artifice or deceit. For instance, Defendants knew that they would use emails
and interstate phone calls to further their scheme, thereby transmitting electronic signals and oral
communications across interstate wires to communicate with Plaintiff, the Class, sham mediators

such as Max, and they did in fact send such email communications and make phone calls over interstate wires.

153.    As described herein, Defendants engaged in a plan and scheme to defraud Plaintiff. Specifically, on November 30, 2016, Defendants communicated with Plaintiff via interstate Internet wires and represented that Defendants had an (i) objection to the *Gannett* Settlement (ii) made by a good-faith objector that (iii) could be resolved to the benefit of the class (iv) in a mediation conducted by a neutral third party. Plaintiff accepted Defendants' proposal with the understanding that Defendants would in fact inform them of the changes that Defendants would require in the settlement necessary to resolve the objection and benefit the *Gannett* Settlement class.

154.    With that understanding, on December 1, 2016, Plaintiff participated with Defendants' representative Defendant Bandas in the mediation facilitated over interstate telephone and Internet wire: Plaintiff participated from San Francisco, Bandas participated from Texas, and Max participated from Florida.

155.    Plaintiff paid a $2,500 to Max in interstate commerce as Max's fee to conduct the mediation, which, as Plaintiff now knows, was a sham.

156.    During the mediation, Defendants demanded over interstate wires that Plaintiff pay $225,000 in return for Defendants forgoing an appeal in the *Gannett* Settlement. Defendants, through Defendant Bandas, did not suggest, request, or require that any changes be made to the *Gannett* Settlement in any form. In addition, contrary to Defendants' representation, the mediation was conducted by a non-neutral party whom Defendants had routinely relied on to facilitate their scheme. And, the objector was not a good-faith objector, but a member of the Illinois Objector Enterprise who stood to profit from his objection by and through unethical

sharing of attorneys' fees or even a bribe. Defendants' demand was made in writing through the mediator over interstate internet wires.

157.     As a direct and proximate cause of Defendants' plan and scheme, Plaintiff entered into an agreement to pay $225,000 to Defendants in exchange for Defendants' agreement to forgo appeal in the *Gannett* Settlement.

158.     After Plaintiff and Bandas (on behalf of the enterprise) agreed on the terms of the payment, Bandas sent an email to Plaintiff, over interstate wires, that read in part: "Please note that I do not agree to disclosure or filing of any information about this confidential process with any court." If Defendants had engaged in a *bona fide* mediation designed to obtain a legitimate settlement, as opposed to a settlement conducted under fraudulent pretenses, Defendants would have had no need to keep the terms of the agreement secret from the court.

159.     Defendants' misrepresentations were material because Plaintiff (and members of the Class defrauded by the same scheme) would not otherwise have engaged in the mediation and agreed to pay unjustifiable amounts of "attorneys' fees" or the costs for the sham mediation.

160.     Defendants intended to profit from their scheme and obtain property belonging to Plaintiff. Defendants intended that Plaintiff would pay to Defendants and Defendants would obtain $225,000 as a result of the purported mediation.

161.     As described throughout the Complaint, each Defendant agreed to the commission of the Wire Fraud. For instance:

     a.     Christopher Bandas agreed to participate, as representative of Defendants, in the purported mediation despite not being licensed to practice law in Illinois. Defendant Bandas knew that, despite Defendants' representation that the Stewart Objection was filed as a mechanism to improve the *Gannett* Settlement for the benefit of

the class, Defendants demanded a legally unjustifiable sum of $225,000 in exchange for

foregoing the appeal without any benefit to the class. Moreover, Defendant Bandas knew

that the mediation would and did occur over interstate wires and that Defendants intended

to obtain the $225,000 from Plaintiff through a wire transfer over state lines.

b.      The Bandas Law Firm PC agreed to ratify the actions of its principal

Christopher Bandas, at all times knowing of Defendant Bandas's actions.

c.      Joseph Darrell Palmer agreed to allow Defendant Bandas to act as his and

the other Defendants' representative in the purported mediation. Defendant Palmer knew

that, despite Defendants' representation that the Stewart Objection was filed as a

mechanism to improve the *Gannett* Settlement for the benefit of the class, Defendants

demanded a legally unjustifiable sum of $225,000 in exchange for forgoing the appeal

without any benefit to the class. Moreover, Defendant Palmer knew that the mediation

would occur over interstate wires and that Defendants intended to obtain the $225,000

from Plaintiff through a wire transfer over state lines.

d.      The Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office

agreed to ratify the actions of its principal Joseph Darrell Palmer, at all times knowing of

Defendant Palmer's actions.

e.      C. Jeffery Thut agreed to allow Defendant Bandas to act as his and the

other Defendants' representative in the purported mediation. Defendant Thut knew that,

despite Defendants' representation that the Stewart Objection was filed as a mechanism

to improve the *Gannett* Settlement for the benefit of the class, Defendants demanded a

legally unjustifiable sum of $225,000 in exchange for foregoing the appeal without any

benefit to the class. Moreover, Defendant Thut knew that the mediation would occur over

interstate wires and that Defendants intended to obtain the $225,000 from Plaintiff through a wire transfer over state lines.

f.      Noonan Perillo & Thut LTD agreed to ratify the actions of one of its principals C. Jeffery Thut, at all times knowing of Defendant Thut's actions.

g.      Gary Stewart agreed to allow Defendant Bandas to act as his and the other Defendants' representative in the purported mediation. Defendant Stewart knew that, despite Defendants' representation that the Stewart Objection was filed as a mechanism to improve the *Gannett* Settlement for the benefit of the class, Defendants demanded a legally unjustifiable sum of $225,000 in exchange for foregoing the appeal without any benefit to the class. Moreover, Defendant Stewart knew that the mediation would occur over interstate wires and that Defendants intended to obtain the $225,000 from Plaintiff through a wire transfer over state lines.

## Predicate Acts of Wire Fraud, 18 U.S.C. § 1343

162.    Defendant Thut, in collaboration with Bandas and other members of the Illinois Objector Enterprise intentionally used acts of artifice or deceit in attempts to deprive Plaintiff and the Class out of money and property.

163.    At all times, it was reasonably foreseeable that Defendants would use interstate wires to further these acts of artifice or deceit. Defendants knew that they would use the internet to further their scheme to transmit electronic signals across interstate wires to submit fraudulent claim forms.

164.    Specifically, on April 13, 2015, Illinois Objector Enterprise member Thut used the internet to submit a fraudulent claim form in a class action pending in federal court to further the goals of the Illinois Objector Enterprise.

165.    Exhibit J is the transcript of the deposition of purported objector Lindsey Thut, daughter of Defendant Thut. In that transcript, Lindsey Thut is asked about her submission of a claim form in the *In re Lifetime TCPA* class action pending in the District of Minnesota. Lindsey Thut states that she could not remember if she ever filled out a claim form in her name but that it listed her father's work address, phone number, and email address.

166.    When asked if she filled out the claim form just several months prior to the deposition, Lindsey Thut falsely claimed she didn't know:

Q:      Now, are you sure you completed this form?

A:      No, I told you I wasn't sure.

Q:      Do you think it's possible your father completed this form for you?

A:      I'm not sure.

Q:      You don't know if it's possible?

A:      I don't know.

Q:      Who else would have completed this form for you?

A:      No one.

Q:      So it's either you or your father?

A:      I don't know.

Q:      When you say you don't know, what does that mean? You don't know now or you've never known?

A:      I don't think I've ever known.

Q:      You've never known who has completed this form?

A:      I'm sure I've known at some point, but I do not recall who completed the form.

Exhibit J at 47:15-48:6.

**Predicate Acts of Mail Fraud, 18 U.S.C. § 1341**

167. The members of the Illinois Objector Enterprise all participated in a scheme to defraud Plaintiff and the putative Class. As described herein, Defendants and other members of the Illinois Objector Enterprise targeted class actions to which they would object and then would solicit friends, family, and business associates to purport to be good-faith objectors.

168. The scheme relies on the objection being overruled by the district court because once the objections are overruled, the Illinois Objector Enterprise threatens class counsel to or actually will file an appeal to hold up payment to class members and class counsel in the targeted case. During this time, Defendants and members of the Illinois Objector Enterprise will begin making demands to class counsel or suggesting "mediation" to "settle" the objection to the class action settlement. However, the "settlement" amounts are legally unjustifiable and the "mediation" is nothing more than an attempt to keep their extortion from being disclosed to the courts.

169. Defendants and members of the Illinois Objector Enterprise at all times knew that the initial mailings of the objections were a necessary step in their scheme. And, Defendants and members of the Illinois Objector Enterprise knew that the goal of the scheme was to defraud and extort class counsel. As described above, Defendant Bandas's "contacts with other professional objectors" (i.e., the Illinois Objector Enterprise) and that his scheme made it so "settling objections for money was much more profitable than bringing successful objections." *See* Exhibit H ¶¶ 21, 22.

170. Table 2 documents the Illinois Objector Enterprise's known usage of the mail system in furtherance of its scheme to defraud:

| Date of Mailing | Case Name | From | To | Description |
|---|---|---|---|---|
| 3/22/12 | Walker v. Discover Financial, 10-cv-06994 (N.D. Ill.) | Aaron Petrus Jan Petrus (Christopher Bandas) | Nagel Rice, LLP Stroock & Stroock & Lavan LLP | Objection |
| 1/29/13 | Saltzman v. Pella Corporation, 06-cv-04481 (N.D. Ill.) | Michael J. Schulz Peter F. Higgins | Complex Litigation Group, LLC James A. O'Neal John P. Mandler | Objection |
| 2/19/14 | Lockett v. MoGreet, Inc., 13-ch-21352 (Cook Cty, Ill.) | Susan House (Joseph Darrell Palmer) | Edelson PC Venable LLP | Objection |
| 6/4/14 | In Re Lifetime Fitness TCPA Litig., No. 14-md-02564 (D. Minn.) | Lindsey Thut (C. Jeffrey Thut) | Baillon Thom Jozwiak & Wanta LLP Faegre Baker Daniels LLP | Objection |
| 10/6/14 | Wilkins v. HSBC Bank, 14-cv-00190 (N.D. Ill.) | Dawn Weaver Joseph Darrell Palmer | Lieff Cabraser Heimann & Bernstein, LLP Stroock & Stroock & Lavan LLP | Objection |
| 10/6/14 | Wilkins v. HSBC Bank, 14-cv-00190 (N.D. Ill.) | Peter F. Higgins Kelley Casey Antonia Carrasco | Lieff Cabraser Heimann & Bernstein, LLP Stroock & Stroock & Lavan LLP | Objection |
| 10/17/14 | Fauley v. Met Life, 14-ch-1518 (Lake Cnty, Ill.) | Judd Clayton, Jr. Peter F. Higgins | Anderson Wanca Shutts & Bowen LLP | Objection |
| 10/24/14 | In Re Capital One TCPA, 12-cv-10064 (N.D. Ill.) | Antonia Carrasco Peter F. Higgins | Terrell Marshall Daudt & Willie, PLLC Lieff Cabraser Heimann & Bernstein, LLP Faegre Baker Daniels Sessions, Fishman, Nathan & Israel LLC Hinshaw & Culbertson LLP | Objection |
| 2/9/15 | Gehrich v. Chase, 12-cv-05510 (N.D. Ill.) | Kristina Lopez C. Jeffrey Thut | GCG Terrell Marshall Daudt & Willie PLLC Stroock & Stroock & Lavan LLP | Objection |
| 2/9/15 | Gehrich v. Chase, 12-cv-05510 (N.D. Ill.) | Dawn Weaver Susan House Joseph Darrell Palmer | Terrell Marshall Daudt & Willie PLLC Stroock & Stroock & Lavan LLP | Objection |
| 6/18/15 | Franklin v. Wells Fargo Bank, No. 14-cv-2349 (S.D. Cal.) | C. Jeffrey Thut Timothy R. Hanigan | Kazerouni Law Group, APC Law Offices of Douglas J. Campion APC Hyde & Swigart Severson & Werson, APC | Objection |
| 9/3/15 | Allen v. JPMorgan Chase, 13-cv-08285 (N.D. Ill.) | Janet Jabrani Robert Burack C. Jeffrey Thut | Keogh Law, Ltd. Stroock & Stroock & Lavan LLP | Objection |
| 2/18/16 | Douglas v. The Western Union, 14-cv-01741 (N.D. Ill.) | John Knott C. Jeffrey Thut | Epiq Systems, Inc. Siprut PC Latham & Watkins LLP | Objection |
| 4/1/16 | Wright v. Nationstar, 14-cv-10457 (N.D. Ill.) | C. Jeffrey Thut | Edelson PC Reed Smith LLP | Objection |

(**Table 2.**)

171.     The mailings of the objections constitute an essential part of the Illinois Objector Enterprise's scheme. The sham objections to class action settlements are necessary for the Illinois Objector Enterprise to gain the cover of legitimacy and allow the Illinois Objector Enterprise to begin gaining leverage for obtaining extortion payments. Without mailing the objections the Illinois Objector Enterprise cannot gain leverage over the targeted class counsel.

**Predicate Acts of Influencing or injuring officer or juror generally, 18 U.S.C. § 1503**

172.     Defendants' scheme to defraud was predicated on soliciting class members to act as good-faith objectors to the targeted class action settlements pending in federal courts. Defendants (and the objectors themselves) represent to the court that their objectors are objecting in good faith and by their own accord. But as described herein, Defendants' objectors are in collusion with or are actual members of the Illinois Objector Enterprise. By filing the objections, Defendants and members of the Illinois Objector Enterprise endeavored to and actually influenced, obstructed, and impeded the due administration of justice.

173.     Table 3 lists the class action settlements pending in federal court to which the Illinois Objector Enterprise endeavored to or actually influenced, obstructed, and impeded the due administration of justice:


\*                    \*                    \*




\*                    \*                    \*

| Case Name | Known Enterprise Members | Objector (and connection) | Pattern of Activity |
|---|---|---|---|
| Walker v. Discover Financial, 10-cv-06994 (N.D. Ill.) | Bandas | Aaron Petrus (relation of Bandas's office manager) | Objected, Overruled, Appealed |
| Saltzman v. Pella Corporation, 06-cv-04481 (N.D. Ill.) | Bandas Higgins Palmer | Michael J. Schulz Dave Thomas | Objected, Overruled, Appealed, Appeal Denied In Part, Ongoing |
| In Re Life Time Fitness TCPA Litig., No. 14-md-02564 (D. Minn.) | Bandas Thut | Lindsey Thut (Thut's daughter) | Objected, Overruled, Appealed, Lost Appeal |
| Wilkins v. HSBC Bank, 14-cv-00190 (N.D. Ill.) | Bandas Higgins Palmer | Antonia Carrasco Kelley Casey Dawn Weaver | Objected, Overruled, Appealed, Appeal Withdrawn |
| In Re Capital One TCPA, 12-cv-10064 (N.D. Ill.) | Bandas Higgins Palmer | Antonia Carrasco | Objected, Overruled, Appealed, Appeal Withdrawn (~$200,000 Paid) |
| Gehrich v. Chase, 12-cv-05510 (N.D. Ill.) | Bandas Palmer Thut | Susan House Kristina Lopez (likely relation of Bandas's paralegal) Dawn Weaver | Objected, Overruled, Appealed, Appeal Withdrawn |
| Franklin v. Wells Fargo Bank, No. 14-cv-2349 (S.D. Cal.) | Bandas Palmer Thut | Jan Sterling Thut | Objected, Overruled, No Appeal |
| Allen v. JPMorgan Chase, 13-cv-08285 (N.D. Ill.) | Bandas Thut | Janet Jabrani Robert Burack (known associate of Thut) | Objected, Overruled, Appealed, Appeal Withdrawn |
| Douglas v. The Western Union, 14-cv-01741 (N.D. Ill.) | Bandas Thut | John Knot (Husband of friend of Bandas's secretary) | Objected, Awaiting Final Approval Order |
| Wright v. Nationstar, 14-cv-10457 (N.D. Ill.) | Bandas Thut | Thut | Objected, Objection Withdrawn |
| Chambers v. Whirlpool Corp., No. 11-cv-01733 (C.D. Cal.) | Bandas Palmer Thut | Christine Knott (friend of Bandas's secretary) Kimberly Smith (known associate of Thut) John Hightower | Objected, Overruled, Appeal, ($225,000 Agreed to be Paid) (Motion for Sanction Pending) |

(**Table 3.**)

174.     At all times, Defendants acted corruptly in effectuating their scheme. Defendants knowingly and intentionally took action from which obstruction of justice was reasonably foreseeable result. Defendants and members of the Illinois Objector Enterprise knew that if they presented *bona fide* objectors to the court (i.e., objections that would likely be sustained) they would not profit.

175.     For instance, if the Illinois Objector Enterprise filed good faith objections that sought to benefit the class, the court would sustain the objections, benefit the class, and the settlement would likely be approved. The Illinois Objector Enterprise could then petition the court for attorneys' fees and an incentive award for the objector—the fees sought would be

commensurate with the benefit the Illinois Objector Enterprise obtained for the class. Per Bandas's statement to the Judge Kennelly, that means lodestar with no multiplier. Under this hypothetical, though, the attorneys' fees the Illinois Objector Enterprise could obtain from the court would be far less than what they obtain under their scheme.

176.    Defendants and members of the Illinois Objector Enterprise also knew that only meritless objections would further their scheme. The Illinois Objector Enterprise scheme relies on federal district courts overruling their objections because without the delay of an appeal, the Illinois Objector Enterprise could not impede the court approved class action settlements and thereby extract an extortion payment from class counsel.

### Predicate Acts of Tampering With a Witness, 18 U.S. Code § 1512

177.    Class actions pending in federal courts are official proceedings as defined by 18 U.S. Code § 1515(a)(1)(A) because they are "proceeding[s] before a judge or court of the United States [or] a United States magistrate judge."

178.    Defendants' and the Illinois Objector Enterprise's scheme to pay objectors to submit false and misleading objections to federal courts is "misleading conduct" as defined by 18 U.S. Code § 1515(a)(3).

179.    Defendants' scheme to defraud was predicated on soliciting class members to act as good-faith objectors to the targeted class action settlements pending in federal courts. Defendants and the objectors represent to the court that their objections are made in good faith and by the objector's own accord. But as described herein, Defendants' objectors are in collusion with or are actual members of the Illinois Objector Enterprise and stand to profit from their filing their objections and participation in the scheme.

180.    Defendants and other members of the Illinois Objector Enterprise attempt to and

actually corruptly persuade objectors to file objections with false or misleading testimony and facts. *See* Section II.D.iii.

181.    In exchange for agreeing to represent themselves to the court to be good-faith objectors, Defendants promise to pay the objectors up to $5,000. In some instances, however, Defendants and Illinois Objector Enterprise obtain more than $5,000 for the objectors. *See* Exhibit H (describing how Bandas and associates offered $25,000 to an objector who was ostensibly hard to corrupt); Section 3.D.ii (describing how objectors are paid by Bandas out of recovered attorneys' fees or general funds).

182.    Moreover, by promising to or actually paying objectors to file objections with federal courts, Defendants and members of the Illinois Objector Enterprise could ensure that the objectors would agree to withdraw their objection and/or appeal once the Illinois Objector Enterprise obtained an extortion payment.

183.    Good-faith objectors are those who object to class action settlements "for the public interest and the benefit of the class, and [who] d[o] not wish to settle [an] appeal solely to benefit [themselves]." *See* Exhibit H at 15. But, Illinois Objector Enterprise objectors will "accept an unethical settlement offer, notwithstanding [any] retainer agreement and [] reliance upon it and [the objector's] declaration under oath." *Id* ¶ 81.

184.    <u>Table 4</u> enumerates the class action settlements in federal court to which the Illinois Objector Enterprise attempted to or actually engaged in misleading conduct towards another person with the intent to influence, delay, or prevent the testimony of objectors in official proceeding:

| Case Name | Known Enterprise Members | Objector (and connection) | Pattern of Activity |
|---|---|---|---|
| Walker v. Discover Financial, 10-cv-06994 (N.D. Ill.) | Bandas | Aaron Petrus (relation of Bandas's office manager) | Objected, Overruled, Appealed |
| Saltzman v. Pella Corporation, 06-cv-04481 (N.D. Ill.) | Bandas Higgins Palmer | Michael J. Schulz Dave Thomas | Objected, Overruled, Appealed, Appeal Denied In Part, Ongoing |
| In Re Life Time Fitness TCPA Litig., No. 14-md-02564 (D. Minn.) | Bandas Thut | Lindsey Thut (Thut's daughter) | Objected, Overruled, Appealed, Lost Appeal |
| Wilkins v. HSBC Bank, 14-cv-00190 (N.D. Ill.) | Bandas Higgins Palmer | Antonia Carrasco Kelley Casey Dawn Weaver | Objected, Overruled, Appealed, Appeal Withdrawn |
| In Re Capital One TCPA, 12-cv-10064 (N.D. Ill.) | Bandas Higgins Palmer | Antonia Carrasco | Objected, Overruled, Appealed, Appeal Withdrawn (~$200,000 Paid) |
| Gehrich v. Chase, 12-cv-05510 (N.D. Ill.) | Bandas Palmer Thut | Susan House Kristina Lopez (likely relation of Bandas's paralegal) Dawn Weaver | Objected, Overruled, Appealed, Appeal Withdrawn |
| Franklin v. Wells Fargo Bank, No. 14-cv-2349 (S.D. Cal.) | Bandas Palmer Thut | Jan Sterling Thut | Objected, Overruled, No Appeal |
| Allen v. JPMorgan Chase, 13-cv-08285 (N.D. Ill.) | Bandas Thut | Janet Jabrani Robert Burack (known associate of Thut) | Objected, Overruled, Appealed, Appeal Withdrawn |
| Douglas v. The Western Union, 14-cv-01741 (N.D. Ill.) | Bandas Thut | John Knot (Husband of friend of Bandas's secretary) | Objected, Awaiting Final Approval Order |
| Wright v. Nationstar, 14-cv-10457 (N.D. Ill.) | Bandas Thut | Thut | Objected, Objection Withdrawn |
| Chambers v. Whirlpool Corp., No. 11-cv-01733 (C.D. Cal.) | Bandas Palmer Thut | Christine Knott (friend of Bandas's secretary) Kimberly Smith (known associate of Thut) John Hightower | Objected, Overruled, Appeal, ($225,000 Agreed to be Paid) (Motion for Sanction Pending) |

(**Table 4**.)

185.    The Illinois Objector Enterprise scheme described herein is a "trick, scheme, or device" that the Illinois Objector Enterprise used to "mislead" class counsel, opposing counsel, the courts, and others. *See* 18 U.S. Code § 1515(a)(3)(E).

186.    At all times, Defendants acted corruptly in effectuating their scheme. Defendants knowingly and intentionally took action from which obstruction of justice was reasonably foreseeable result. Defendants and members of the Illinois Objector Enterprise knew that if they filed objections with good-faith objectors they would not profit because the good-faith objectors would require a benefit to the class before withdrawing their objections, would make meaningful objection arguments, and would only accept payment from court approved incentive awards.

187.    Defendants and members of the Illinois Objector Enterprise also knew that only objections with paid-for testimony would further their scheme. For the Illinois Objector Enterprise's scheme to work, federal district courts have to overrule the Illinois Objector Enterprise's objections, only then could the impede the court approved class action settlement (through the delay resulting from an appeal) and thereby engage in a sham mediation or settlement negotiations to extract an extortion payment from class counsel.

188.    As this complaint lays out, Defendants' and members of the Illinois Objector Enterprise's actions were not in connection with any *bona fide* legal representation services in connection with an official proceeding.

### Predicate Acts of Bribery, 18 U.S.C. § 201(b)(3)

189.    18 U.S.C. § 201(b)(3) prohibits any person from "directly or indirectly, corruptly giv[ing], offer[ing], or promis[ing] anything of value to any person … with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court."

190.    Defendants' scheme to defraud was predicated on soliciting class members to act as good-faith objectors to the targeted class action settlements pending in federal courts. Defendants represent to the court that their objectors are objecting in good faith and by their own accord. But as described herein, Defendants' objectors are in collusion with or are actual members of the Illinois Objector Enterprise and stand to profit from their filing their sham objections, false testimony, and participation in the scheme.

191.    Defendants and other members of the Illinois Objector Enterprise promise to pay, promised to pay, or actually paid purportedly good-faith objectors for false testimony. In exchange for agreeing to represent to the court that they are good-faith objectors, Defendants

promise to pay the objectors up to $5,000. In some instances, however, Defendants and Illinois Objector Enterprise obtain more than $5,000 for the objectors. *See e.g.,* Exhibit H (describing how Bandas and associates offered $25,000 to an objector who was ostensibly hard to corrupt); Section 3.D.ii (describing how objectors are paid by Bandas out of recovered attorneys' fees or general funds).

192.    Moreover, by promising to or actually paying objectors to file objections with federal courts, Defendants and members of the Illinois Objector Enterprise could ensure that the objectors would agree to withdraw their objection and/or appeal once the Illinois Objector Enterprise obtained an extortion payment.

193.    Good-faith objectors are those who object to class action settlements "for the public interest and the benefit of the class, and [who] d[o] not wish to settle [an] appeal solely to benefit [themselves]." *See* Exhibit H at 15. But, Illinois Objector Enterprise objectors will "accept an unethical settlement offer, notwithstanding [any] retainer agreement and [] reliance upon it and [the objector's] declaration under oath." *Id* ¶ 81.

194.    Table 5 shows the cases in which the Illinois Objector Enterprise has endeavored to or actually influenced, obstructed, and impeded the due administration of justice by promising and/or paying purported good-faith objectors to submit objections to class action settlements.

\*              \*              \*

| Case Name | Known Enterprise Members | Objector (and connection) | Pattern of Activity |
|---|---|---|---|
| Walker v. Discover Financial, 10-cv-06994 (N.D. Ill.) | Bandas | Aaron Petrus (relation of Bandas's office manager) | Objected, Overruled, Appealed |
| Saltzman v. Pella Corporation, 06-cv-04481 (N.D. Ill.) | Bandas Higgins Palmer | Michael J. Schulz Dave Thomas | Objected, Overruled, Appealed, Appeal Denied In Part, Ongoing |
| In Re Life Time Fitness TCPA Litig., No. 14-md-02564 (D. Minn.) | Bandas Thut | Lindsey Thut (Thut's daughter) | Objected, Overruled, Appealed, Lost Appeal |
| Wilkins v. HSBC Bank, 14-cv-00190 (N.D. Ill.) | Bandas Higgins Palmer | Antonia Carrasco Kelley Casey Dawn Weaver | Objected, Overruled, Appealed, Appeal Withdrawn |
| In Re Capital One TCPA, 12-cv-10064 (N.D. Ill.) | Bandas Higgins Palmer | Antonia Carrasco | Objected, Overruled, Appealed, Appeal Withdrawn (~$200,000 Paid) |
| Gehrich v. Chase, 12-cv-05510 (N.D. Ill.) | Bandas Palmer Thut | Susan House Kristina Lopez (likely relation of Bandas's paralegal) Dawn Weaver | Objected, Overruled, Appealed, Appeal Withdrawn |
| Franklin v. Wells Fargo Bank, No. 14-cv-2349 (S.D. Cal.) | Bandas Palmer Thut | Jan Sterling Thut | Objected, Overruled, No Appeal |
| Allen v. JPMorgan Chase, 13-cv-08285 (N.D. Ill.) | Bandas Thut | Janet Jabrani Robert Burack (known associate of Thut) | Objected, Overruled, Appealed, Appeal Withdrawn |
| Douglas v. The Western Union, 14-cv-01741 (N.D. Ill.) | Bandas Thut | John Knot (Husband of friend of Bandas's secretary) | Objected, Awaiting Final Approval Order |
| Wright v. Nationstar, 14-cv-10457 (N.D. Ill.) | Bandas Thut | Thut | Objected, Objection Withdrawn |
| Chambers v. Whirlpool Corp., No. 11-cv-01733 (C.D. Cal.) | Bandas Palmer Thut | Christine Knott (friend of Bandas's secretary) Kimberly Smith (known associate of Thut) John Hightower | Objected, Overruled, Appeal, ($225,000 Agreed to be Paid) (Motion for Sanction Pending) |

(**Table 5.**)

195.     At all times, Defendants acted corruptly in effectuating their scheme. Defendants knowingly and intentionally took action from which obstruction of justice was reasonably foreseeable result. Defendants and members of the Illinois Objector Enterprise knew that if they filed objections with good-faith objectors they would not profit because the good-faith objectors would require a benefit to the class before withdrawing their objections, would make meaningful objection arguments, and would only accept payment from court approved incentive awards.

196.     Defendants and members of the Illinois Objector Enterprise also knew that only objections with paid-for testimony from objectors would further their scheme because federal district courts would have to overrule objections before the Illinois Objector Enterprise could

impede the court approved class action settlements and thereby engage in a sham mediation or settlement negotiations to extract an extortion payment from class counsel.

197.    The Illinois Objector Enterprise's acts of bribery were the actual and proximate cause of Plaintiff's injury because without making unlawful payments to objectors, the Illinois Objector Enterprise would not have been able to hold up the *Gannett* settlement.

### Predicate Acts of Bribery 720 ILCS 5/33-1

198.    Under Illinois law, "A person commits bribery when: (a) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he or she promises or tenders to that person any property or personal advantage which he or she is not authorized by law to accept." 720 Ill. Comp. Stat. Ann. 5/33-1

199.    Furthermore, "Bribery is a Class 2 felony," *id*, where "The sentence of imprisonment shall be a determinate sentence of not less than 3 years and not more than 7 years." 730 ILCS 5/5-4.5-35 (a).

200.    Defendants' scheme to defraud was predicated on soliciting class members to act as good-faith objectors to the targeted class action settlements pending in courts across the country. Defendants represent to the court that their objectors are objecting in good faith and by their own accord. But as described herein, Defendants' objectors are in collusion with or are actual members of the Illinois Objector Enterprise and stand to profit from their filing their sham objections, false testimony, and participation in the scheme.

201.    Defendants and other members of the Illinois Objector Enterprise promise to pay, promised to pay, or actually paid purportedly good-faith objectors for false testimony. In exchange for agreeing to represent to the court that they are good-faith objectors, Defendants promise to pay the objectors up to $5,000. In some instances, however, Defendants and Illinois

Objector Enterprise obtain more than $5,000 for the objectors. *See e.g.,* Exhibit H (describing how Bandas and associates offered $25,000 to an objector who was ostensibly hard to corrupt); Section 3.D.ii (describing how objectors are paid by Bandas out of recovered attorneys' fees or general funds).

202.     Moreover, by promising to or actually paying objectors to file objections with the courts, Defendants and members of the Illinois Objector Enterprise could ensure that the objectors would agree to withdraw their objection and/or appeal once the Illinois Objector Enterprise obtained an extortion payment.

203.     Good-faith objectors are those who object to class action settlements "for the public interest and the benefit of the class, and [who] d[o] not wish to settle [an] appeal solely to benefit [themselves]." *See* Exhibit H at 15. But, Illinois Objector Enterprise objectors will "accept an unethical settlement offer, notwithstanding [any] retainer agreement and [] reliance upon it and [the objector's] declaration under oath." *Id* ¶ 81.

204.     The objectors are not authorized by law to accept any such promise or actual payment. Objectors are not authorized by law, for instance, to proffer false and misleading testimony regarding their position on the sufficiency of any class action settlement. Nor are they authorized by law to share in attorneys' fees as non-lawyers.

205.     Table 6 shows the cases in which the Illinois Objector Enterprise has promised or tendered to objectors money or personal advantage:

| Date of Objection | Case Name | Known Enterprise Members | Objector |
|---|---|---|---|
| 1/29/13 | Saltzman v. Pella Corporation, 06-cv-04481 (N.D. Ill.) | Bandas Higgins (Illinois resident) Palmer | Michael J. Schulz (Illinois resident) |
| 6/4/14 | In Re Lifetime Fitness TCPA Litig., No. 14-md-02564 (D. Minn.) | Bandas Thut (Illinois resident) | Lindsey Thut (Illinois resident) |
| 10/6/14 | Wilkins v. HSBC Bank, 14-cv-00190 (N.D. Ill.) | Bandas Higgins (Illinois resident) Palmer | Antonia Carrasco (Illinois resident) Kelley Casey Dawn Weaver |
| 10/17/14 | Fauley v. Met Life, 14-ch-1518 (Lake Cnty, Ill.) | Bandas Higgins Thut (Illinois resident) | Judd Clayton Jr. |
| 10/24/14 | In Re Capital One TCPA, 12-cv-10064 (N.D. Ill.) | Bandas Higgins (Illinois resident) Palmer | Antonia Carrasco (Illinois resident) |
| 2/9/15 | Gehrich v. Chase, 12-cv-05510 (N.D. Ill.) | Bandas Palmer Thut (Illinois resident) | Susan House Kristina Lopez Dawn Weaver |
| 6/18/15 | Franklin v. Wells Fargo Bank, No. 14-cv-2349 (S.D. Cal.) | Bandas Palmer Thut (Illinois resident) | Sterling Jan Thut (Illinois resident) |
| 9/3/15 | Allen v. JPMorgan Chase, 13-cv-08285 (N.D. Ill.) | Bandas Burack Thut (Illinois resident) | Janet Jabrani Robert Burack |
| 2/18/16 | Douglas v. The Western Union, 14-cv-01741 (N.D. Ill.) | Bandas Thut (Illinois resident) | John Knott |
| 4/1/16 | Wright v. Nationstar, 14-cv-10457 (N.D. Ill.) | Bandas Thut (Illinois resident) | Thut (Illinois resident) |
| 5/27/2016 | Chambers v. Whirlpool Corp., No. 11-cv-01733 (C.D. Cal.) | Bandas Palmer Thut (Illinois resident) | Christine Knott Kimberly Smith (Illinois resident) |
| 10/21/16 | Clark v. Gannett Co, 16-CH-06603 (Cook Cty, Ill.) | Bandas Thut (Illinois resident) Palmer Stewart | Gary Stewart |

(**Table 6.**)

206.    The instances of bribery in <u>Table 6</u> either concern an Illinois resident who received the bribe or sufficient activity occurred in Illinois for the law to apply.

207.    At all times, Defendants acted with the specific intent of having objectors file objections with false and misleading testimony in exchange for cash payments or the promise of cash payments.

208.    The Illinois Objector Enterprise's acts of bribery were the actual and proximate cause of Plaintiff's injury because without making unlawful payments to objectors, the Illinois Objector Enterprise would not have been able to hold up the *Gannett* settlement.

## Predicate Acts of Money Laundering, 18 U.S.C. § 1956

209.     Defendants, through the Illinois Objector Enterprise, conducted a financial transaction affecting interstate commerce with property representing the proceeds of an illegal activity, knew that the property represented illegal proceeds, and conducted the transaction with the intent of promoting the unlawful activity.

210.     Defendants used the proceeds from previous extortionate schemes to fund its scheme in this case. Specifically, Defendants Bandas and the Bandas Law Firm make all or nearly all of their income by extorting money from class counsel in class action settlements, in violation of a number of federal and state statutes as explained in detail above.

211.     Defendants Bandas and the Bandas Law Firm, in furtherance of the goals of the Illinois Objector Enterprise, used profits that the Illinois Objector Enterprise obtained from previous schemes to pay $2,500 to Upchurch Watson White & Max for the sham mediation in the *Gannett* case.

212.     Bandas and the Bandas Law Firm are located in Texas, and Upchurch Watson White & Max is located in Florida.

213.     Bandas and the Bandas Law Firm knew that the $2,500 it paid to Upchurch Watson White & Max represented the illegal proceeds of the Illinois Objector Enterprise's previous schemes.

214.     Bandas and the Bandas Law Firm paid the $2,500 to Upchurch Watson White & Max with the intention of promoting illegal activity, including extortion, wire fraud, and mail fraud, and bribery as described in detail above, which constitute "specified unlawful activity" under 18 U.S.C. § 1956(c)(7).

215.     The Illinois Objector Enterprise regularly uses Max's services—and pays Max in

interstate commerce—to extort class counsel under the guise of a mediation. Each time, they use the proceeds of previous objections to pay Max.

**Defendants' Knowingly Participated in the Management or Operation of the Enterprise**

216.     As described herein, each Defendant knew that their agreement to participate in the commission of the predicate acts described above formed a pattern of racketeering activity. For instance:

        a.     Christopher Bandas entered into an agreement with Palmer and Thut to secretly represent Stewart in the *Gannett* Objection and to share in recovered attorneys' fees and other money knowing that (1) Palmer could not represent anyone because he was suspended from the practice of law; (2) he, Palmer, and Thut are notorious "professional" objectors who have been admonished by courts across the country for filing objections to class action settlements to extract profit through extortion; (3) the objection was intended to be overruled; (4) any appeal of their overruled objection would be solely to delay payments; (5) the mediation was based upon fraud (*i.e.*, Defendant Bandas knew that the Illinois Objector Enterprise did not seek to improve the *Gannett* Settlement in any way but rather was carried out solely for personal profit, that the mediator was not neutral, and that Stewart was not a good-faith objector); (6) the mediation would use interstate telephone and internet wires; and (7) demanding $225,000 in exchange for foregoing an appeal of the Illinois Objector Enterprise's *Gannett* Settlement objection without improving the terms of settlement would cause economic fear in Plaintiff. And as Tables 1-6 demonstrate, Bandas repeated the same and/or similar conduct with members of the Illinois Objector Enterprise in 15 other class action cases. Those actions fit within and are a continuation of the scheme of Defendants' Illinois Objector Enterprise. Prior to agreeing to participate, Defendant Bandas knew of the Illinois Objector Enterprise's plan and scheme, and in

fact, played a primary role in creating it. As such, Defendant Bandas knew that his agreement to participate in the scheme described above, including violations of the Hobbs Act (18 U.S.C. § 1951), acts of Wire Fraud (18 U.S.C. § 1343), acts of Mail Fraud (18 U.S.C. § 1341), and acts in violation of 18 U.S.C. § 1503 (influencing an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS 5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering), was furthering a pattern of racketeering activity.

      b.      The Bandas Law Firm PC knew that its ratification of the actions of its principal, Christopher Bandas, which constitute violations of the Hobbs Act (18 U.S.C. § 1951), acts of Wire Fraud (18 U.S.C. § 1343), acts of Mail Fraud (18 U.S.C. § 1341), and acts in violation of 18 U.S.C. § 1503 (influencing an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS 5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering), was furthering a pattern of racketeering activity.

      c.      Joseph Darrell Palmer entered into an agreement with Bandas and Thut to secretly represent Stewart in the *Gannett* Objection and to share in recovered attorneys' fees and other money knowing that (1) he could not represent anyone because he was suspended from the practice of law; (2) he, Bandas, and Thut are notorious "professional" objectors who have been admonished by courts across the country for filing vexatious objections to class action settlements to extract profit; (3) any appeal of their overruled objection would be baseless; (4) the mediation was based upon fraud (*i.e.*, Defendant Palmer knew that the Illinois Objector Enterprise did not seek to improve the *Gannett* Settlement in any way but rather was carried out solely for personal profit, that the mediator was not neutral, and that Stewart was not a good-faith objector); (5) the mediation would use interstate telephone and internet wires; and (6) demanding $225,000 in exchange for forgoing an appeal of the Illinois Objector Enterprise's *Gannett*

Settlement objection without improving the terms of settlement would cause economic fear in Plaintiff. Those actions fit within and are a continuation of the scheme of Defendants' Illinois Objector Enterprise. Prior to agreeing to participate, Defendant Palmer knew of the Illinois Objector Enterprise's plan and scheme, and in fact, played a primary role in creating it. As such, Defendant Palmer knew that his agreement to participate in the scheme described above, including violations of the Hobbs Act (18 U.S.C. § 1951), acts of Wire Fraud (18 U.S.C. § 1343), acts of Mail Fraud (18 U.S.C. § 1341), and acts in violation of 18 U.S.C. § 1503 (influencing an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS 5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering), was furthering a pattern of racketeering activity.

      d.      Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office knew that its ratification of the actions of its principal, Joseph Darrell Palmer, which constitute violations of the Hobbs Act (18 U.S.C. § 1951), acts of Wire Fraud (18 U.S.C. § 1343), acts of Mail Fraud (18 U.S.C. § 1341), and acts in violation of 18 U.S.C. § 1503 (influencing an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS 5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering), was furthering a pattern of racketeering activity.

      e.      C. Jeffery Thut entered into an agreement with Bandas and Palmer to represent Stewart in the *Gannett* Objection and to share in recovered attorneys' fees and other money knowing that (1) he, Bandas, and Palmer are notorious "professional" objectors who have been admonished by courts across the country for filing objections to settlements to extract profit; (2) Palmer was suspended from the practice of law; (3) any appeal of their overruled objection would be baseless; (4) the mediation was based upon fraud (*i.e.*, Defendant Thut knew

that the Illinois Objector Enterprise did not seek to improve the *Gannett* Settlement in any way but rather was carried out solely for personal profit, that the mediator was not neutral, and that Stewart was not a good-faith objector); (5) the mediation would use interstate telephone and internet wires; and (6) that demanding $225,000 in exchange for foregoing an appeal of the Illinois Objector Enterprise's *Gannett* Settlement objection without improving the terms of settlement would cause economic fear in Plaintiff. Those actions fit within and are a continuation of the scheme of Defendants' Illinois Objector Enterprise. Prior to agreeing to participate, Defendant Thut knew that his agreement to participate in the scheme described above, including violations of the Hobbs Act (18 U.S.C. § 1951), acts of Wire Fraud (18 U.S.C. § 1343), acts of Mail Fraud (18 U.S.C. § 1341), and acts in violation of 18 U.S.C. 1503 (influencing an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS 5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering), was furthering a pattern of racketeering activity.

f.      Noonan Perillo & Thut LTD knew that its ratification of the actions of one of its principals, C. Jeffery Thut, which constitute violations of the Hobbs Act (18 U.S.C. § 1951), acts of Wire Fraud (18 U.S.C. § 1343), acts of Mail Fraud (18 U.S.C. § 1341), and acts in violation of 18 U.S.C. § 1503 (influencing an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS 5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering), was furthering a pattern of racketeering activity.

g.      Gary Stewart has known Palmer for decades and knew that Palmer was suspended from the practice of law, that he along with all other Defendants did not have a good faith basis for objecting to the class action settlement, and that the goal of the *Gannett* Settlement objection was solely to extract personal profit from Plaintiff. Stewart also knew that demanding a

large sum of money ($225,000) in exchange for foregoing an appeal of his objection without adding benefit to the class would cause economic fear in and harm to Plaintiff. Those actions fit within and are a continuation of the scheme of Defendants' Illinois Objector Enterprise. And Defendant Stewart knew of the plan and scheme for the Illinois Objector Enterprise and knowingly carried out acts necessary for its operation, specifically filing an objection to the *Gannett* case. Stewart (along with the other members of the Illinois Objector Enterprise) knew that his participation was necessary for the furtherance of the scheme because without Stewart, the Illinois Objector Enterprise would have to convince a *bona fide* class member to file a false and misleading objection, mislead the court, and accept unethical payments from the Illinois Objector Enterprise. Defendant Stewart knew that his agreement to participate in the scheme described above, including violations of the Hobbs Act (18 U.S.C. § 1951), acts of Wire Fraud (18 U.S.C. § 1343), acts of Mail Fraud (18 U.S.C. § 1341), and acts in violation of 18 U.S.C. § 1503 (influencing an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS 5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering), was furthering a pattern of racketeering activity.

217.    While operating this pattern of racketeering, the Illinois Objector Enterprise has engaged in and affected interstate trade. The Illinois Objector Enterprise has transacted business in several states, across state lines, using various instrumentalities of interstate commerce such as telephones, the Internet, email, and the United States mail to communicate in furtherance of the activities of the Illinois Objector Enterprise in targeting class actions pending in Illinois state and federal courts.

218.    The pattern of racketeering activity conducted by the members of the Illinois Objector Enterprise is distinct from the Illinois Objector Enterprise itself, as each act of

racketeering is a separate offense committed by an entity or individual while the Illinois Objector Enterprise itself is an association of entities and individuals. The Illinois Objector Enterprise has an ongoing structure and/or organization supported by personnel and/or associates with continuing functions or responsibilities.

219.    The racketeering acts set out in this Complaint, and others, had the same pattern and similar purpose of extorting Plaintiff and members of the Class for the benefit of the Illinois Objector Enterprise and its members. Each racketeering act was related, had a similar purpose, involved the same or similar participants and methods of commission, and had similar results affecting Plaintiff and members of the Class. The racketeering acts, including violations of the Hobbs Act (18 U.S.C. § 1951), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1503 (influencing an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS 5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering) also related to each other in that they were part of the Illinois Objector Enterprise's goal of reaping illicit and unlawful profits from and through the extortion of Plaintiff and the Class to pay attorneys' fees and other money.

220.    Plaintiff and members of the Class were deprived of money and property that they would not otherwise have lost. Indeed, as direct and proximate result of the Defendants' racketeering activities, Plaintiff and members of the Class have been injured in their business and property. Moreover, Plaintiff and members of the putative class have spent hundreds of hours of attorney time, have had to pay costs such as postage, printing fees, sham mediation fees, among other costs, in responding to Defendants' and the Illinois Objector Enterprise's schemes.

221.    Plaintiff and members of the class have also been damaged because the unjustified and unjustifiable delay in receiving attorneys' fee payments hampers their ability to

conduct their business. As a direct and proximate cause of Defendants' unlawful scheme, Plaintiff has had to pay Delay Costs and has accrued debt to pay business operating expenses and has delayed paying off existing debt.

222.    Under 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to treble their damages, plus interest, costs, and reasonable attorneys' fees.

**COUNT II**
**RICO § 1962(d)**
**As Against All Defendants on Behalf of Plaintiff and on Behalf of the Class**

223.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein, explicitly including all of Count I.

224.    18 USC § 1962 (d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

225.    As described throughout, and in detail in Count I, even if they did not direct or manage the affairs of the Illinois Objector Enterprise, Defendants conspired to commit the outlined predict acts in violation of § 1962 (c), including violations of the Hobbs Act (18 U.S.C. § 1951), acts of Wire Fraud (18 U.S.C. § 1343), acts of Mail Fraud (18 U.S.C. § 1341), and acts in violation of 18 U.S.C. § 1503 (influencing an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS 5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering).

226.    Defendants acted knowingly at all times when agreeing to facilitate the activities of the Illinois Objector Enterprise and its directors.

227.    Specifically, Defendant Stewart knowingly agreed to allow Bandas and Thut to file an objection in *Gannett* under his name for the purpose of facilitating the activities of the Illinois Objector Enterprise, including the unlawful predicate acts described above.

228.     Plaintiff and members of the Class were deprived of money and property that they would not otherwise have lost. As direct and proximate result of the Defendants' racketeering activities, Plaintiff and members of the Class have been injured in their business and property in that by paying fees to the Defendants and by spending hundreds of hours of attorney time and paying costs such as postage, printing fees, sham mediation fees, among other costs, in responding to Defendants' and the Illinois Objector Enterprise's scheme.

229.     Plaintiff and members of the class have also been damaged because the unjustified and unjustifiable delay in receiving attorneys' fee payments hampers their ability to conduct their business. As a direct and proximate cause of Defendants' unlawful scheme, Plaintiff has had to pay Delay Costs and has accrued debt to pay business operating expenses and has delayed paying off existing debt.

230.     Under 18 U.S.C. § 1964(c), Plaintiffs and the Class are entitled to treble their damages, plus interest, costs, and reasonable attorneys' fees.

### COUNT III
**Permanent Injunction Pursuant to the All Writs Act, 28 U.S.C. § 1651**
**As Against Defendants Christopher Bandas, The Bandas Law Firm PC, Joseph Darrell Palmer, Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office, C. Jeffery Thut, Noonan Perillo & Thut LTD, and John Does 1-20 on Behalf of Plaintiff and the Class**

231.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

232.     Defendants Christopher Bandas, The Bandas Law Firm PC, Joseph Darrell Palmer, Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office, C. Jeffery Thut, and Noonan Perillo & Thut LTD (the "Attorney Defendants") are vexatious litigants and Plaintiff and the Class seek a permanent injunction to protect against the Attorney Defendants' conduct.

233.     Under the All Writs Act, this Court "may issue all writs necessary or appropriate

in aid of [its] respective jurisdiction[] and agreeable to the usages and principles of law." 28

U.S.C. § 1651 (a). Courts have read the All Writs Act to authorize the restriction of access to

federal courts to parties who repeatedly file vexatious litigation.

234.     State and federal courts look to five factors to determine whether a litigant is a

vexatious litigant and that a pre-filing order should be entered against them. The factors are: (1)

the litigant's history of litigation and in particular whether it entailed vexatious, harassing, or

duplicative suits; (2) the litigant's motive in pursuing the litigation (i.e., whether the litigant had

a good faith expectation of prevailing); (3) whether the litigant is represented by counsel; (4)

whether the litigant has caused unnecessary expense to the parties or placed a needless burden on

the courts; and (5) whether other sanctions would be adequate to protect the courts and other

parties.

235.     First, as described herein, the Attorney Defendants have a long history of

vexatious and harassing litigation. Specifically, the Attorney Defendants have filed vexatious

objections to legitimate class actions settlements throughout the country where Plaintiff and

members of the Class are class counsel. Defendant Bandas has filed more than 55 objections

within the past decade. Defendant Palmer has filed more than 48 objections within the past

decade. Defendant Thut has filed at least six objections just since October 2014. As described in

Section II, courts around the country have reprimanded the Attorney Defendants for filing

vexatious objections to legitimate class actions.

236.     Second, the Attorney Defendants have an unlawful motive in pursuing their

objections and do not have good faith expectations of prevailing. Specifically, the Attorney

Defendants file their objections knowing that the courts will deny them. That is by design.

Should courts sustain the Attorney Defendants' objections, there would likely not be any

lucrative payout. But by filing objections that the courts must overrule, the Attorney Defendants can then file or threaten to file an appeal, knowing that their appeals (and the underlying class actions) will take months or years to be resolved.

237.    At that moment, the Attorney Defendants contact class counsel and offer to withdraw their objections and threat of or actual appeal for a price. The Attorney Defendants use the threat of appeal of objections to extort a payment from class counsel. The Attorney Defendants' practice is well documented and noted by courts throughout the country. *See* Sections II and Section III, supra.

238.    Third, courts have looked to whether the litigant is represented by counsel as a factor in determining whether the litigant is vexatious because courts often provide protections to *pro se* litigants. But where the Attorney Defendants are attorneys, as is here, that protection is unwarranted.

239.    Fourth, the Attorney Defendants have caused unnecessary expense to Plaintiff and the Class and have placed a needless burden on the courts. As described above, the Attorney Defendants' filings serve no legitimate purpose and are filed with the Attorney Defendants knowing that the objections will be overruled. Yet, the Attorney Defendants file their vexatious objections only to harass and extort money from Plaintiff and the Class and never require any change to a class settlement or benefit to the class in exchange for payment. As a result of each and every objection, Plaintiff and the Class must spend time and money, such as attorney time, hard costs (filing fees, printing costs, and more), and discovery costs, responding to their objections.

240.    Moreover, the Attorney Defendants have placed needless burden on the court systems. The Attorney Defendants' objections have totaled more than 109 over the past decade

and have resulted in almost as many appeals. Courts and their staff have spent countless hours accepting, reading, filing, addressing, and, ultimately, overruling the Attorney Defendants' objections that are filed for an improper purpose.

241.    Fifth, no other sanctions would be adequate to protect the courts, Plaintiff, and the Class. The Attorney Defendants often (purposely) fail to file appearances in the courts where they file objections so as to avoid the courts levying sanctions against them. As a result, those forum courts (and the class counsel representing class members settling claims) are left without any other means to prevent the Attorney Defendants from filing vexatious objections.

242.    Plaintiff and the Class have already suffered harm by and through the Attorney Defendants' objections and will suffer irreparable harm if the Attorney Defendants are not enjoined from filing further objections without merit.

243.    Because the Attorney Defendants continue to file vexatious objections, even in the face of repeated judicial reprimand and public disapproval, Plaintiff and the Class have no adequate remedy at law. Extortion and improper use of the judicial process are unlawful, and Plaintiff and the Class have a clear and ascertainable right to be protected from the Attorney Defendants' repeated and wrongful acts.

244.    As such, Plaintiff and the Class seek a permanent injunction labeling the Attorney Defendants vexatious litigants and prohibiting them from (1) ghostwriting objections for the purpose of making their objection seem *pro se*, (2) making or threatening to make objections to class action settlements not for the purpose of improving the settlement but for extracting a payment for themselves, (3) filing with any court objections to class action settlements or appeals of overruled objections without prior screening or approval by the court where their status as vexatious litigants must be disclosed along with a copy of the injunction entered

pursuant to this suit, and (4) withdrawing any objection or appeal from the overruling of any

objection without disclosing whether they received payment in exchange for doing so and

whether they provided any benefit to the class.

## COUNT IV
**Abuse of Process**
**As Against All Defendants on Behalf of Plaintiff and the Class**

245.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth

herein.

246.     As described herein, Defendants have instituted proceedings against Plaintiff and

the Class for an improper purpose. Specifically, Defendants have filed bad-faith objections to

legitimate class action settlements throughout the country where Plaintiff are class counsel.

Knowing that the courts will deny their objections, Defendants then appeal or threaten to appeal

such decisions. Defendants know that their appeals (and the underlying class action) will take

years to be resolved and offer to withdraw their appealed objections for a price. That is,

Defendants use the threat of appeal of overruled objections to extort a payment from class

counsel. Defendants never require any change to a class settlement or benefit to the class in

exchange for payment.

247.     Defendants have used the class action objection mechanism in a way not proper in

the regular prosecution of the proceedings. As described herein, Defendants have engaged in the

misapplication of the objection process and have used the objection process to accomplish results

(the extortion of class counsel for personal profit) beyond the process's purview. The purpose of

the class action objection is, in part, to reveal divergent interests of class members or exhibit the

need to alter the class definition or to designate subclasses. In other words, it is not the intended

purpose of a class action objection to extort payments from class counsel.

248.     Nevertheless, Defendants have used the class action objection process to accomplish a result the objection itself could not accomplish. Courts award fees to objectors who provide a benefit to the class. When used properly, the objection device cannot be employed to obtain payment from class counsel or the class without providing a service or benefit to the class and without securing court approval. Yet, Defendants have used the class action objection process, and specifically the court's denial of their objections, in an attempt to extort a payment of fees from class counsel without making or seeking to make any change to a class action settlement.

249.     Plaintiff and the Class have been damaged by Defendants' scheme. As a proximate and foreseeable result of the Defendants' abuse of process, Plaintiff and the Class have lost money, paid attorneys' fees, court costs, and suffered damages in an amount to be determined at trial.

250.     Defendants' abuse of process is outrageous conduct that constitutes a fraud on the court and demonstrates reckless indifference for the rights others, including Plaintiff and class members. Punitive damages are therefore also warranted.

**COUNT V**
**The Unauthorized Practice of Law**
**As Against Defendants The Bandas Law Firm PC, Christopher Bandas, Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office, Joseph Darrell Palmer, and John Does 1-20**
**On Behalf of Plaintiff**
**(For Injunctive Relief)**

251.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

252.     The Illinois Attorney Act, 705 ILCS 205/1 requires that:

No person shall be permitted to practice as an attorney or counselor at law within this State without having previously obtained a license for that purpose from the

Supreme Court of this State. No person shall receive any compensation directly or indirectly for any legal services other than a regularly licensed attorney, nor may an unlicensed person advertise or hold himself or herself out to provide legal services.

…

Any person practicing, charging or receiving fees for legal services or advertising or holding himself or herself out to provide legal services within this State, either directly or indirectly, without being licensed to practice as herein required, is guilty of contempt of court and shall be punished accordingly.

253. Defendants The Bandas Law Firm PC, Christopher Bandas, Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office, Joseph Darrell Palmer ("Unauthorized Defendants") and others known and unknown, willfully and knowingly did combine, conspire, and agree together and with each to violate the Illinois Attorney Act by facilitating or actually taking part in the unauthorized practice of law. The Unauthorized Defendants' acts were intentionally misleading and deceptive, and intended to defraud the court and other litigants.

254. Such violations include, but are not limited to, the following:

a. Since at least January 6, 2016, Defendant Palmer has been suspended from the practice of law.

b. Defendant Palmer and his law firm continue to practice law by assisting in the preparation and filing of objections to class action settlements nationwide and in the state of Illinois. On October 26, 2016, Palmer took part in the preparation of an objection in the *Gannett* case. There, Palmer co-opted a personal friend, Gary Stewart, into filing an objection to a class action settlement and had Stewart state he was represented by Defendants Bandas and Thut in order to conceal his involvement and deceive the court and the other litigants. Defendant Palmer did not file an appearance in the case.

c. Additionally, Defendant Bandas is not licensed to practice law in Illinois,

did not move for pro hac vice admission, and did not file an appearance with the Court in *Gannett* in order to avoid submitting himself to the jurisdiction of the court despite acting as counsel for Stewart in the *Gannett* action.

255.    All Unauthorized Defendants have participated in and facilitated the unauthorized practice of law by Defendant Palmer and Defendant Bandas. Each Defendant had knowledge of Palmer's suspended status and took steps to conceal his role in ongoing litigation and objections from the court and other litigants.

256.    Likewise, each Unauthorized Defendants had knowledge that Defendant Bandas had failed to obtain pro hac vice admission and file an appearance in the *Gannett* action.

257.    All Unauthorized Defendants have or will improperly share in attorneys' fees with Defendants Palmer and Bandas even though they had not filed appearances on behalf of Defendant Stewart.

258.    Unauthorized Defendants have improperly acted as legal counsel in numerous class action objections without filing an appearance with the relevant court. Defendants likewise have improperly shared in attorneys' fees in numerous cases without complying with relevant state law concerning the practice of law.

259.    As described throughout the Complaint, each Unauthorized Defendants agreed to the commission of the Illinois Attorney Act Violation. For instance:

a.    Christopher Bandas agreed to coordinate and prepare the Stewart Objection, represent Defendant Stewart in the objection, arrange the mediation, appear at the mediation, agree to a settlement for payment of attorneys' fees, and share in any attorneys' fees or other money obtained through the Stewart Objection despite never filing an appearance with the *Gannett* Settlement Court. Moreover, Defendant Bandas

knew that Defendant Palmer was suspended from the practice of law but nevertheless

agreed to co-representation of Defendant Stewart with Defendant Palmer. As such,

Defendant Bandas knew that his actions would contribute to his and Defendant Palmer's

unlawful practice of law in Illinois, a violation of the Illinois Attorney Act.

b.    The Bandas Law Firm PC agreed to ratify the actions of its principal,

Christopher Bandas, at all times knowing of Defendant Bandas's actions.

c.    Joseph Darrell Palmer agreed to solicit and recruit Defendant Stewart as

an objector, prepare the Stewart Objection, represent Defendant Stewart in the objection,

and share in any attorneys' fees or other money obtained through the Stewart Objection

despite never filing an appearance with the *Gannett* Settlement Court and being

suspended from the practice of law. As such, Defendant Palmer knew that his actions

would constitute the unlawful practice of law in Illinois, a violation of the Illinois

Attorney Act.

d.    Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed

to ratify the actions of its principal, Joseph Darrell Palmer, at all times knowing of

Defendant Palmer's actions.

260.    Plaintiff is an Illinois law firm. All of its shareholders and all of the attorneys in

its Illinois office are licensed to practice law in the State of Illinois.

261.    As an Illinois law firm, Plaintiff suffers irreparable harm from the Unauthorized

Defendants' continued and unlawful provision of legal services in Illinois without the requisite

expertise, competence, or licensure.

262.    Any remedy available at law is inadequate to compensate for the injury Plaintiff

suffers by way of the Unauthorized Defendants' unlawful practice of law.

263.     Because the unauthorized practice of law causes irreparable harm to the public and the judicial system, equity and the public interest support enjoining the Unauthorized Defendants from the practice of law in Illinois unless and until they obtain authorization from the Supreme Court of Illinois to practice law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Edelson PC prays for the following relief:

a.     Certify this case as a class action on behalf of the Class defined above, appointing Edelson PC as representative of the Class, and appointing it as class counsel;

b.     An order under the All Writs Act labeling the Attorney Defendants as vexatious litigants and a judgment for injunctive relief prohibiting the Attorney Defendants from filing objections to class actions without prior screening and approval of the Court, amongst other things;

c.     An order finding that Defendants actions were an abuse of process;

d.     An order finding that Defendants' actions, as set out above:

    i.     violate RICO, the Hobbs Act (18 U.S.C. § 1951), 18 U.S.C. § 1503 (influencing an officer), 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 201(b)(3) (bribery), 720 ILCS 5/33-1 (bribery), and 18 U.S.C. § 1956 (money laundering), and constitute Wire Fraud (18 U.S.C. § 1343) and Mail Fraud (18 U.S.C. § 1341); and,

    ii.     constitute a conspiracy to commit RICO violations (§ 1962(d)).

e.     An order finding that the Unauthorized Defendants' actions as set out above constitute the unauthorized practice of law in Illinois and enjoining them from the further practice of law in Illinois unless and until they obtain authorization from the Supreme Court of

Illinois to practice law;

     f.     Enter judgment against Defendants for monetary, actual, consequential, and

compensatory damages caused by their unlawful conduct;

     g.     Award punitive damages for Defendants' abuse of process;

     h.     Award Plaintiff reasonable costs;

     i.     Award Plaintiff pre- and post-judgment interest;

     j.     Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to

protect the interests of Plaintiff and the Class; and,

     k.     Award such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

                    Respectfully Submitted,

                    **EDELSON PC**, individually and on behalf of all
                    others similarly situated,

Dated: March 8, 2017        By:  /s/ Rafey S. Balabanian
                        One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
Eve-Lynn Rapp
erapp@edelson.com

EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435