1            IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF ILLINOIS
               EASTERN DIVISION

3   KENT EUBANK, JERRY DAVIS, RICKY      ) No. 06 C 4481
    FALASCHETTI, RITA CICINELLI, ROBERT    )
4   JOSEPHBERG, JEFFREY ACTON, KENNETH     )
    HECHTMAN, LEO BATEMAN, JAMES NEIMAN, AMY )
5   CHASIN, and EDWIN RUHNKE, individually   )
    and on behalf of all others similarly    )
6   situated,                             )
                                       )
7               Plaintiffs,          )
                                       )
8         v.                        )
                                       )
9   PELLA CORPORATION, an Iowa corporation, ) September 14, 2018
    and PELLA WINDOWS AND DOORS, INC., a     ) Chicago, Illinois
10   Delaware corporation,               ) 10:40 a.m.
                                       )
11            Defendants.         ) Fairness Hearing

12             TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE SHARON JOHNSON COLEMAN
13   APPEARANCES:

14   For the Plaintiffs:       CLIFFORD LAW OFFICES
                          120 North LaSalle Street
15                          Suite 3100
                         Chicago, Illinois  60602
16                          BY:  MR. ROBERT A. CLIFFORD
                               MS. SHANNON M. McNULTY
17

                         LANG LAW OFFICE
18                          60 B. W Terra Cotta, No. 301
                         Crystal lake, Illinois 60012
19                          BY:  MR. GEORGE K. LANG

20                          RHINE LAW FIRM, P.C.
                         1612 Military Cutoff Road
21                          Suite 300
                         Wilmington, North Carolina  28403
22                          BY:  MR. JOEL RHINE

23           TRACEY DANA McCULLOUGH, CSR, RPR
               Official Court Reporter
24            219 South Dearborn Street
                    Room 1426
25            Chicago, Illinois  60604
                  (312) 435-5570

```
 1   APPEARANCES CONTINUED:

 2                                   MORGAN & MORGAN
                                     COMPLEX LITIGATION GROUP
 3                                   201 North Franklin Street
                                     7th Floor
 4                                   Tampa, Florida  33602
                                     BY:  MR. JOHN A. YANCHUNIS
 5                                        MR. MARCIO W. VALLDARES

 6                                   MOOR LAW OFFICE P.C.
                                     One North LaSalle Street
 7                                   Suite 600
                                     Chicago, Illinois  60602
 8                                   BY:  MR. EDWARD R. MOOR

 9                                   QUANTUM LEGAL LLC
                                     1010 Market Street
10                                   Suite 1310
                                     St. Louis, Missouri  63101
11                                   BY:  MR. RICHARD J. BURKE

12                                   QUANTUM LEGAL LLC
                                     513 Central Avenue #300
13                                   Highland Park, Illinois 60602
                                     BY:  MR. JEFFREY A. LEON
14                                        MR. GRANT Y. LEE

15
     For the Defendants:            FAEGRE BAKER DANIELS LLP
16                                   90 South 7th Street
                                     2200 Wells Fargo Center
17                                   Minneapolis, Minnesota  55402
                                     BY:  MR. JOHN P. MANDLER
18
                                     FAEGRE BAKER DANIELS LLP
19                                   311 South Wacker Drive
                                     Suite 4300
20                                   Chicago, Illinois  60606-1229
                                     BY:  MR. JOHN A. ROBERTS
21
     For the Movant                 MOLO LAMKEN LLP
22   Theodore H. Frank:             300 North LaSalle Street
                                     SUITE 5525
23                                   Chicago, Illinois  60654
                                     BY:  MR. THOMAS J. WIEGAND
24

25
```

1          THE CLERK:  06 CV 4481, Saltzman versus Pella

2   Corporation.

3          THE COURT:  All right.  Just stay where you are and

4   state your name from there.  You can stand up.

5          MR. CLIFFORD:  Thank you, Your Honor.  Robert

6   Clifford, along with my partner Shannon McNulty.  The other

7   gentlemen will say their names as well.

8          THE COURT:  They will say their names.  Miss McNulty

9   can say her name too.

10     (Laughter.)

11         THE COURT:  She says it regularly, Mr. Clifford.  All

12  right.  And I know you were being helpful.  Thank you.

13         MR. LANG:  George Lang, Your Honor.

14         THE COURT:  All right.

15         MR. YANCHUNIS:  Good morning, Your Honor.  John

16  Yanchunis.  Good to see you again.

17         MR. VALLADARES:  May it please the Court, Your Honor.

18  Marcio Valladares with Morgan & Morgan on behalf of the

19  plaintiffs.

20         THE COURT:  Thank you.

21         MR. RHINE:  I'm Joel Rhine.

22         MR. MOOR:  Good morning, Your Honor.  Ed Moor on

23  behalf of the plaintiffs.

24         THE COURT:  All right.  Thank you.

25         MR. BURKE:  Good morning, Your Honor.  Richard Burke

1   for Complex Litigation.

2           MR. LEON:  And Jeff Leon also.

3           MR. LEE:  Grant Lee, Your Honor.

4           THE COURT:  All right.  Thank you.

5           MR. MANDLER:  Good morning, Your Honor.  John Mandler

6   on behalf of the Pella defendants.

7           MR. ROBERTS:  John Roberts on behalf of the Pella

8   defendants.

9           THE COURT:  All right.  Thank you very much.  All

10  right.  You may have a seat.  Do we have -- we're going to sort

11  of bifurcate this.  I'm going to start out with the objectors,

12  if there are any who wish to speak.  Are they at the tables or

13  out in the courtroom?

14          MR. YANCHUNIS:  Would you like me to sound the hall,

15  Your Honor.

16          THE COURT:  Yes, would you please.

17          MR. YANCHUNIS:  Absolutely.

18          THE COURT:  I'm going to state their names in just a

19  second and see if we have anybody step up.  The Court notes

20  this matter was set for 10:30, and it's now almost 10:45.  All

21  right.

22          MR. YANCHUNIS:  Your Honor, I sounded the halls.

23  There was no one who is present or announced any interest.

24          THE COURT:  All right.  And once again I'm going to

25  state the names instead of just their general status as

1    objectors.  What I had listed was Penie Von Bergen Wessels and
2    Michael J. Wessels, Michael Theisen or Theisen, T-H-E-I-S-E-N.
3    Farrell and Peggy Hockemeier, Reginald Edwin Bossier, Tamara
4    Lee, Gary Carnivale, Michael and Amy Brasley, and Donald
5    Tucker.
6             All right.  Does anyone have any additional
7    information about who might be out there that I might have
8    missed?  And no one else is standing up saying they're an
9    objector.  All right.  Yes.  Step forward.
10            MR. WIEGAND:  Tom Wiegand.  I'm here on behalf of Ted
11   Frank, who is counsel for an objector for the initial
12   settlement.
13            THE COURT:  All right.  And are you arguing -- you're
14   only arguing fees, though, isn't that correct?
15            MR. WIEGAND:  Yes.
16            THE COURT:  All right.  I'm talking about the
17   objectors.  Thank you.
18            MR. WIEGAND:  Sorry.  I didn't know --
19            THE COURT:  No.  No.  That's okay.  But you need to
20   be -- you need to be here.  Are you going to make an argument
21   as to fees today?
22            MR. WIEGAND:  Yes, Your Honor.
23            THE COURT:  All right.  Why don't you step up and sit
24   a little closer.
25            MR. WIEGAND:  All right.  Thank you.

1       THE COURT:  So you don't -- come out of the crowd.

2   All right.  Thank you.  So we're going to move on then, and

3   I'll just put my conclusions, which won't take long, briefly in

4   writing as to the objectors when I issue my entire opinion.  As

5   to -- and also gives them a few minutes if somebody's late or

6   lost, and we'll make sure that is covered.

7       All right.  So with the attorneys' fees argument that

8   we are having here, do the parties have a plan on how they wish

9   to proceed?

10      MR. CLIFFORD:  Your Honor, again good morning.

11  Robert Clifford.  I'd like to make a few words of introduction

12  on behalf of the lawyers who are handling this case now as lead

13  counsel, and have a few of my colleagues address the Court, if

14  they may, on certain discrete aspects.

15      THE COURT:  All right.  That sounds good to me, Mr.

16  Clifford.

17      MR. CLIFFORD:  Thank you.  If it please the Court.

18      THE COURT:  It does.

19      MR. CLIFFORD:  Your Honor, as the record reflects in

20  this case, I became involved in this litigation around the

21  spring of 2014 when I was aware of the appeal that was going

22  on, the purported settlement.  I saw it.  And I had been

23  contacted.  As I think the Court knows, I have an office that

24  has a wide reach in the community.  And we had been contacted

25  by potential interested plaintiffs and, and people having

1    claims, and also counsel who were interested in the case.

2          And so I started to dig a little deeper and made some

3    inquiries, and I called my friend John Yanchunis from the

4    Morgan & Morgan firm.  Mr. Yanchunis, at the risk of being

5    patronizing, enjoys a terrific national reputation as one of

6    the leading lawyers for plaintiffs and claimants in class

7    action litigation and complex mass torts.  And he apprised me

8    of what was going on with the appeal, and then suddenly the

9    opinion comes out from the Seventh Circuit saying the things

10   that it said, creating an opening and a void in the leadership

11   of the prosecution of the claim.  And by that time we had

12   specific clients of Clifford Law who had an interest.  And my

13   partner Shannon McNulty and I made the decision to seek

14   application before the Court and to seek the lead counsel

15   position.

16         And we were ultimately successful in that regard, and

17   we were appointed co-lead counsel along with Mr. Lang, George

18   Lang, who had been involved in the original matter, but was

19   also one of the men who objected to that settlement and

20   ultimately the appeal.  And Mr. Lang rightly ended up that part

21   of the litigation and, and then joined in the new phase in a

22   new style of litigation at least as far as I was concerned.

23   There's a dramatic difference between the procedural aspect of

24   dealing with class cert issues and preparing a case for trial

25   on the merits.

1    And so what I did once being appointed as lead

2  counsel, we formed a team of trial lawyers, and we, we made a

3  commitment to the case to prosecute the claim and to seek the

4  case out on its merits and make considerable efforts in that

5  regard.  The team worked to prepare the case for trial.  We

6  took as --

7    THE COURT:  After that had been transferred to me, as

8  I -- I came in at about the same time as you did.

9    MR. CLIFFORD:  Right.  It was a, it was a new venture

10  in many ways for both of us, and -- but we did what you would

11  expect lawyers to do.  And that is, we, we mapped out a

12  strategy for the prosecution of the case.  We identified proper

13  experts.  We engaged in the analysis, and we, we retained

14  discovery experts.  We implemented a relativity database for

15  the assembly of all the documents and, and the pages, thousands

16  and thousands of pages of material that were assembled during

17  our discovery.  We vetted new class representatives, who made a

18  commitment to be committed to the case and be prepared to be

19  there for the long haul of preparing a case for trial, and the

20  case was prepared for trial.

21    And I note one of the questions that I have, as Your

22  Honor knows, I believe.  You know, my firm here, we have over

23  20 lawyers, 25 lawyers, and, and I do get engaged in the

24  administration of, of a case, of the caseload.  And I always

25  meet with my lawyers to look at what they do and how they're

1    doing it.  And one of my tricks of management, Judge, is to

2    look at the case expense.  Because I know that if a lawyer

3    isn't spending money on a case, incurring costs, that lawyer is

4    not working on that case.

5              So when I see in a review of file with one of my

6    lawyers and I see that in the last 6 months or 12 months there

7    hasn't been a lot of case expense incurred there, as a general

8    proposition that means that they haven't been working up this

9    file on the merits.  And that came as a thought that occurred

10   to me when I looked at the case expenses that are incurred

11   here.  You know, and roughly speaking the team that we've

12   assembled incurred well in excess of a million dollars in

13   expenses.  1.2, as I recall, in comparison to those folks who

14   are seeking fees that we don't think they're entitled to who

15   have spent about $170,000.  That tells me just as an

16   administrator of a law firm a lot in terms of who did what and

17   what kind of work.

18             And as Your Honor knows, we did a lot of motion work

19   here.  All these motions, whether it's on Daubert or summary

20   judgment, they were fully briefed.  They were ready for ruling

21   I think at the point in time.  And yet it was at that phase of

22   the final phase of the motion practice where Judge Weisman was

23   appointed and undertook the task of supervising any settlement

24   discussions.  And then those discussions -- Mr. Mandler, who's

25   here today, he's a formidable adversary.  I have great respect

1    for.  You know, he -- he's, he's consistent.  He is a, a
2    gentleman with a great accomplishment and stature on his side
3    of the aisle.  And, and when he tells you something, you may
4    not like it, but you can rely on it.  And we were in these
5    negotiations with him.  And I didn't like what he was saying,
6    and he didn't like what we were saying, but we still
7    nevertheless got along as the Court would expect.

8         And, and ultimately Judge Weisman came to the
9    conclusion that the best way to bring the parties together was
10   to put a mediator's/magistrate's recommendation forward, which
11   he did, and which ultimately both sides accepted.  And that's
12   the proposed settlement that we ultimately presented to the
13   Court for your preliminary approval, which, which you gave.

14        So we're here today seeking final approval of that
15   settlement for fees that were well earned in the trenches doing
16   the merit work that had to be done to bring this case to a
17   successful conclusion on behalf of the class.  And, and I'd
18   like to -- there are details of that work and of the settlement
19   that I'd like to put forward and have my team tell you about,
20   if I could.  And so I have designated three of our lawyers.

21        Mr. Lang with your permission will address the role
22   of the class representatives in this case.  Mr. Yanchunis will
23   highlight the features of the settlement, the status of the
24   claims process, and explain why the objectors have
25   misapprehended the settlement and mischaracterized the

1   settlement.  And then my partner Shannon McNulty will address

2   the fees and expenses.  And also here today, they've introduced

3   themselves to the Court, Mr. Moor and Mr. Rhine had some

4   technical matters on the details of the workup of the file that

5   if necessary can be answered for Your Honor.

6            And then Mr. Valladares is here to discuss the

7   specific details of the paperwork that is fas -- it always

8   fascinates me, this class action paperwork, Judge, because you

9   look at what some of these pages with the little bitty print,

10  and you just -- you gloss over that.  That's what guys like

11  Marcio do and does it well.

12           THE COURT:  All right.

13           MR. CLIFFORD:  So with your permission I'd like to

14  ask Mr. Lang to take the podium and address the Court.

15           THE COURT:  The Court gives the permission.  I would

16  say as to your position on what the objectors' position may be,

17  that should be a very truncated presentation since we have no

18  objectors here.

19           MR. CLIFFORD:  Thank you, Your Honor.

20           THE COURT:  All right.  Thank you.

21           MR. CLIFFORD:  Mr. Lang.

22           MR. LANG:  Thank you, Your Honor.  And taking your

23  lead, I will say that the work of the class members in this

24  case was above and beyond what normally takes place in a class

25  case.  There was a vetting process that was very thorough.

1    Once the class reps were vetted, that vetting process included

2    inspecting their homes, talking with them.  Once they were

3    vetted and approved, the 10 class members -- or excuse me, the

4    10 class representatives participated in the discovery.  And

5    those depositions went up to seven hours long.

6          They made their homes available to testing both by

7    plaintiffs, and that was up to three days of water testing on

8    their homes, and also a full day of inspection by Pella's

9    experts.  And then thirdly, I can tell you without waiving the

10   attorney/client privilege that these class reps participated in

11   every step of the case, in every major decision more so than

12   one would expect.  The, the communications between the class

13   reps and the attorneys was very abundant in this case.

14         Changing the subject a little bit on the fee.  There

15   was a hint that a fee should be awarded to one of the objectors

16   for their work in the appeal and the settlement.  And on that I

17   want to say that that on its face is unfair, because the

18   defrocked class reps mentioned by the Seventh Circuit, they

19   objected to the settlement before it was -- the prior

20   settlement before it was even done.  They participated in the

21   appeal of that.  They came to court for the 23 (g) hearing, and

22   there was no objector that participated that much.  So if

23   there's an award for a fee for any class rep for that time

24   period, it should go to the defrocked class reps as opposed to

25   an objector.

1    Two final thoughts, Your Honor.  I have a unique role

2    in the case from what was done pre-certification, what was done

3    during the appeal, and what was done after.  If the Court has

4    any specific questions of me now or later, I will gladly answer

5    those.  There's a lot of back and forth in the paperwork, and I

6    can help the Court cut through that.

7    THE COURT:  All right.  And also, Counsel, I have no

8    problem in interrupting you and telling you to go where I want

9    you to go.

10    MR. LANG:  Okay.

11    THE COURT:  My previous life.  So go ahead.

12    MR. LANG:  Okay.  And then I have one final thought

13    for the Court.  And that is, when the defrocked class reps and

14    when we -- and I, I call them my clients.  When my clients and

15    I started this process of getting a better settlement and a

16    better reward for the class, we never even thought that our

17    work would create a financial reward for prior class counsel or

18    any professional objector.  And I speak on behalf of them and

19    myself and say that's -- in this instance it would be unfair

20    for any award to go to them.

21    THE COURT:  And that includes -- are you including

22    the, the lawyers who handled the appeal in that?

23    MR. LANG:  Your Honor, the -- I wrote the brief.  I

24    was the one who led the way on that.  I was the one mentioned

25    by the Seventh Circuit.  If you look at my brief compared to

1    the opinion, that's what it was.  A lawyer who was working with

2    me did the oral argument.  The, the heavy lifting was done by

3    the defrocked plaintiffs and myself.  I think I've spoken with

4    Mr. Frank five minutes over the course of this entire case.

5                THE COURT:  All right.  Well, you know what, I think

6    this is a good time to have you come up.

7                MR. LANG:  Thank you, Your Honor.

8                MR. WIEGAND:  Thank you, Your Honor.  May it please

9    the Court.  Tom Wiegand on behalf of Ted Frank.  So, Your

10   Honor, as to the issue of how to divide the fees, the fees that

11   have been set aside of $9 million between Mr. Frank and class

12   counsel, what, what we know is that as the Appellate Court

13   said, this case, quote, underscores the importance of objectors

14   in class litigation.  And again, if, quote, objectors persuade

15   the judge to disapprove the settlement, and as a consequence a

16   settlement more favorable to the class is negotiated and

17   approved, the objectors will receive a cash award that can be

18   substantial.  Now, that's with Judge Posner.

19               The Trans Union case presents the best precedent for

20   how to determine the split between appellate counsel and then

21   class counsel who subsequently took the case on remand and

22   improved the settlement.  In Trans Union the Court affirmed a

23   split that was 37 percent to the objectors' counsel and

24   63 percent to class counsel.  Here Mr. Frank is seeking 1/6th.

25   Much less than the 37 percent.  Even if we were to give

1    Mr. Lang equal credit on the appeal, the appeal should -- as we
2    posed in our opening brief, the appeal should be credited for
3    33 percent.  That's slightly less than what was determined in
4    Trans Union.  And, and Mr. Frank is merely seeking half of the
5    33 percent.  He wants 1/6th.

6            Mr. Frank filed his appellate brief first in this
7    case.  Mr. Frank had the majority argument on oral argument.
8    He, he purposely and, and by agreement of all counsel batted
9    cleanup so that he could address any issues the Court was truly
10   concerned about.  Mr. Frank is known to be a nationwide expert
11   in class action settlement fairness and fiduciary duties to
12   class members.  Mr. Frank is not doing this for himself.  Mr.
13   Frank truly believes that one needs to benefit class members.
14   And as Judge Posner said, when you do that and you are
15   successful, you will be compensated.

16           Now, not surprisingly class counsel has proposed that
17   a lodestar approach be used here because of all the time that
18   they then spent subsequently on the case.  Now, we know that,
19   that the Court is not supposed to look back and look at how
20   much time was spent and use that to decide what's the proper
21   split.  The Court is supposed to put itself back in time at the
22   beginning of this venture and decide ex ante what would have
23   been done at the time.

24           If you had gone to Mr. Frank and Mr. Clifford prior
25   to the Seventh Circuit appeal and said what portion of the fees

1    do you think we should apportion for appellate counsel and what

2    portion of the fees should we apportion for you if indeed we

3    can get this reversed?  Because remember what we were facing

4    was a trial court judge who had overwritten the objections that

5    were being made.  Mr. Lang, as he said, he came in.  He did his

6    best.  He tried to get the trial court to not approve the

7    settlement.  He was not successful.  So we go to the Seventh

8    Circuit at great risk to appellate counsel.  Now, there's going

9    to be deference given to the trial court judge.  You've got to

10   overcome that.  This was no easy job.  There is great risk in

11   taking on this appeal.  And so you would have to assume some

12   kind of risk multiplier.

13           Also look at the -- at what you would expect an

14   appeal to cost.  My -- I am sure that if you were to be able to

15   determine any hours that are in the lodestar that were spent on

16   the appeal, that the other -- that class counsel spent over

17   $500,000 on the class appeal.  And what -- we're not able to

18   tell from their lodestar how much was the appeal.  So the

19   lodestar method becomes very difficult in this case as a, as a

20   way of apportioning how much should each side get.  It's

21   looking backwards, not forwards, and there's no breakdown.

22   There's no detail as to how those hours were spent.

23           We, we know that lodestars encourage class counsel to

24   bill useless hours at the class' expense.  I am quoting from

25   *Newberg on Class Actions*.  It is a reason why one has to be

1   somewhat suspect when looking at lodestars.  The Seventh
2   Circuit has said basically the same thing in the case In Re:
3   Synthroid Marketing Litigation in 2003.

4        Second, Your Honor, when we look at the lodestar,
5   98 percent of the time in the lodestar was partner time.
6   There's no justification for that.  Many activities could have
7   been accomplished by associates.  Frankly associates should be
8   doing that kind of work.  They should be taking depositions.
9   They should be drafting briefs.  That's how young attorneys
10  learn.  And just from an efficiency point of view, they should
11  have been doing it.

12       Now, lastly, Your Honor, let's look at some of the
13  actual submissions here.  George Lang is listed for about 4500
14  hours.  That's three times the next highest biller.  That must
15  include some time from the pre-appeal period.  We don't know
16  because there's no detail even given there.  That we just know
17  somehow somewhere Mr. Lang has spent that amount of time on the
18  case.  Both the Seventh Circuit as well as class counsel
19  themselves have, have referred to that -- I'll use the Seventh
20  Circuit's term, quote, eight largely wasted years.  Class
21  counsel has said that that pre-appeal period was useless in
22  terms of the case.  I think Mr. Clifford's comments were
23  consistent with that when he said that they had to completely
24  redo their approach to the case.  I, I don't doubt any of that.
25  That, that they had to do that.

1    So asking for -- it appears that Mr. Lang is asking

2    for pre-appeal hours.  I don't know how else he got to 4500

3    when nobody else was at a third of that.  But we don't know

4    because of the lack of detail in the lodestar.  It's another

5    reason why lodestars are dangerous to use.

6        THE COURT:  Well, Counsel you just stated that as Mr.

7    Clifford said, they had a lot of work to do that as they came

8    in on it.  That was post appeal.

9        MR. WIEGAND:  That's post appeal.  So my concern is

10   that Mr. Lang's -- he is trying to collect for hours from Mr.

11   Lang pre appeal.  That's how Mr. Lang's hours got to 4500 hours

12   in the lodestar.

13       THE COURT:  Who's trying to collect?  Again --

14       MR. WIEGAND:  Mr. --

15       THE COURT:  -- Clifford wasn't in it.

16       MR. WIEGAND:  Cliff -- so Clifford's lodestar in this

17   case that reaches $8 million includes $4500 -- 4500 hours from

18   Mr. Lang.  That 4500 hours must include pre-appeal time.  I

19   just -- there's no way to tell.

20       THE COURT:  Go ahead.

21       MR. WIEGAND:  Next, Your Honor -- and again, there's

22   so little detail, one can't really decipher what's going on.

23   Mr. Yanchunis, a perfectly good attorney I'm sure.  I don't

24   know him personally, but, but the point isn't that.  He

25   requested a role as class counsel.  He was rejected in favor of

1   Mr. Clifford and Mr. Lang.  That decision was made just prior I
2   believe to the case being moved to Your Honor.  And, and yet he
3   bills almost a thousand hours in this case at the same rate as
4   Mr. Clifford does.  He's at $950 an hour.  There's no shown
5   need for why we had another partner at $950, especially when he
6   had asked for but didn't receive a role as leading the case.
7   If you would adjust his time down to an associate's time, well,
8   that starts telling you that the lodestar is too high.
9          THE COURT:  So they already had the case come back in
10  quite stark terms from Judge Posner.  And you're saying they --
11  they didn't need -- they could have some, you know, lowly
12  associate help get it back on track.
13         MR. WIEGAND:  Well, I, I think they should have had
14  Mr. Clifford and Mr. Lang as lead counsel, and they had Shannon
15  McNulty, who Mr. Clifford said was his I guess lower level
16  partner, junior partner leading the charge.  We now have three
17  partners who are each billing plenty of time on the case and
18  running the case.
19         THE COURT:  Don't take it personally.
20         MR. CLIFFORD:  No.
21         MR. WIEGAND:  And, and -- well, I'm just going from
22  the billing rates of, of the people as listed on the chart.
23  So, so that's a good structure for a case.  Now, you should add
24  four associates and go get the case done.  That would be a
25  reasonable structure.  That's not what they did.  They added

1    another $950 an hour partner, and then they added other people

2    from outside of Mr. Clifford's firm or Mr. Lang's firm.  And,

3    and those partners were also billing time at partner rates.

4         So I would propose that the three partners, which

5    seems a reasonable structure, and then you should have some

6    associate time.  There's no justification offered anywhere in

7    the submissions, the sworn submissions as to why this structure

8    was needed.  Certainly the structure was not needed.  And, and

9    I'm not proposing that they take lowly associates.  I'm

10   proposing that they take Bob Clifford when he's a fourth year

11   associate and put him on the case.  He's got those associates.

12   Those people exist.

13        THE COURT:  All right.

14        MR. WIEGAND:  That's the role that they should take.

15        THE COURT:  All right.  As we are discussing roles,

16   just so everybody isn't confused, you are looking at my

17   externs, not my law clerks.  For the semester I have Loyola and

18   I have Northwestern, and I have Washington University.  Just

19   letting you know so you can keep looking at me.

20        MR. WIEGAND:  I'm, I'm --

21        THE COURT:  Not just you.  I want everybody to know.

22   Sometimes people do want to talk to the clerk too that they

23   think is -- they're not out here.

24        MR. WIEGAND:  It's, it's -- I apologize, Your Honor.

25   It is --

1        THE COURT:  No need to apologize.

2        MR. WIEGAND:  It is strictly --

3        THE COURT:  I just thought I'd let you know.

4        MR. WIEGAND:  -- it is strictly a need to look, to

5    look at whoever is looking at me.

6        THE COURT:  Whoever's in the room.  All right.  Good.

7        MR. WIEGAND:  And I didn't want to look backwards.

8        THE COURT:  Good.  Good.  Okay.  You're not the first

9    one.

10       MR. WIEGAND:  So if I continue to look to them, it's,

11   it's just that.  I can't help it.

12       THE COURT:  No problem.  I just want you to know

13   you're not the first one.  So I thought I'd make that clear.

14   All right.

15       MR. WIEGAND:  I appreciate it.  Finally, Your Honor,

16   in getting, in getting the hours the way we have them in the

17   lodestar, which is just in bulk without delineations as to

18   years, without any delineation as to what tasks were done,

19   these hours were done for this deposition, these depositions,

20   there's no attempt to, to say these hours were done for this

21   brief.  These hours were done for the appeal or something.  We

22   just cannot tell whether or not they were efficiently spent,

23   whether or not there was double billing.

24       I don't know if they sent one partner or three

25   partners to depositions.  I don't know how many people were

1    involved in preparing for a deposition.  If there were 30

2    depositions and you put 30 hours for each deposition, that's

3    something like 900 hours.  I don't, I don't know how one gets

4    to the number of hours that they've got.  They've talked about

5    internal meetings.  I'm guessing from looking at the travel

6    expenses of the Florida attorneys, that a lot of internal

7    meetings occurred in Chicago and so that's why they have such

8    significant flight and hotel expense.  I don't know.  I'm

9    guessing.

10             And, and so you can't use a lodestar method to

11   determine fees in a case when there's so little detail provided

12   with the lodestar.  Courts have allowed lodestars of general

13   terms like this to be used as a cross check maybe, but you have

14   to be somewhat suspicious when you look at the numbers.  And,

15   and so for all these reasons I, I just do not believe that a

16   looking backwards at lodestar can be used in this case because

17   we're incentivizing people to, to be inefficient and to write

18   down hours, round them up.  Use people that aren't necessary.

19   I'm not saying anybody intended that at any given moment.  It's

20   just not an efficient method to do it.  Nor do we see the

21   Seventh Circuit having done that in important cases like this.

22             So let me turn to what the precedents are.  I've

23   already talked about Trans Union, which I continue to believe

24   is by far the best analogy here.  They have cited their cases

25   in support of why a lodestar should be used.  So let's talk

1   about those cases.  American Art China Company, there there was

2   a class settlement of up to $6 million, but the class received

3   only $400,000 at the end of the day.  And so there the Seventh

4   Circuit said -- where the counsel had sought $2 million as

5   one/third of the $6 million that was made available for the

6   class.  Well, there the Seventh Circuit said this one/third,

7   this percentage stuff isn't a good idea in this case because we

8   only have $400,000 that we want to the class.  And, and they,

9   they didn't use the percentage of the $400,000.

10          There they said, well, let's look at how much time

11  the attorneys actually spent on the case, and, and maybe with

12  some fairness that that made some sense.  In that case.  That's

13  not this case, Your Honor.

14          Next, Your Honor, they refer to Schlacher versus the

15  Law Offices of Phillip Rotche.  There, Your Honor, it was

16  statutory fees under a federal statute.  It's got nothing to do

17  with how the Seventh Circuit determines common benefit fees.

18          And then finally, Your Honor, Southwest Airlines

19  Voucher Litigation, they emphasize that.  They talked about the

20  2015 decision.  In the 2015 decision the Seventh Circuit was

21  wrestling with the question of whether or not under a statutory

22  fee provision a lodestar method was appropriate.  That's a

23  federal statute.  Very different than how the Seventh Circuit

24  determines fees in a common bene -- in a common fund situation.

25          And, and even -- so Southwest Airlines as you no

1  doubt are aware came out with another appellate decision on
2  August 2nd, since the time of the briefing.  And there what the
3  Court said was that it needed to determine the fees for the
4  objector in that case.  And what the Seventh Circuit said was
5  give 10 percent of the improved value to the objector.  That is
6  not a lodestar method.  So Southwest Airlines actually says
7  that the Seventh Circuit believes you should use a percentage
8  method, a value method in determining the fees for an objector
9  attorney.  And 10 percent of the improved $20 million, that
10 would be $2 million.  That's more than we've asked for here.
11 We've asked for 1/6th.
12            I continue to believe that using an ex ante approach,
13 that telling an appellate attorney if you can get this over the
14 line and get it back to the trial court so that we can do a
15 proper case and a proper settlement, you would give that
16 attorney 1/6th.  And that's all we're asking for.  Thank you,
17 Your Honor.
18            THE COURT:  Thank you, Counsel.  Any brief reply?
19            MR. CLIFFORD:  Thank you, Your Honor.  Miss McNulty
20 will, will do that with one exception, and that is, counsel
21 made the representation he just can't understand how Mr. Lang
22 billed 4500 or put in 4500 hours in this matter since the new
23 undertaking.  And No. 1, I vouch for the fact that he did.  And
24 No. 2, it's because the case was worked up as it should have
25 been.

25

1          THE COURT:  Thank you very much, Mr. Clifford.

2          MS. McNULTY:  Good morning again, Your Honor.  So to,

3 to respond to counsel's comments, a few just preliminary issues

4 that deserve the Court's attention before I get into responding

5 to some of the specifics.  And that is that Mr. Wiegand

6 represents Mr. Frank, who's not a class member.  He represents

7 Mr. Schulz, who there's no evidence in the record that

8 Mr. Schulz is a class member.  And who is also represented by

9 attorney Christopher Bandas.  Mr. Bandas also represents

10 another objector, who takes a slightly different view, and

11 that's Mr. Tucker, who's not here today.  And he opposes the

12 settlement.

13          And then we also have concerning objections to our

14 fees, Complex Litigation Group and Mr. Pentz, who represents

15 Mr. Pickering.  And I think it's worth the Court's attention to

16 consider Rule 23 (h).  Any of these attorneys is permitted by

17 order of the, the Court in this case to submit a petition for a

18 fee.  However, with respect to making an objection to our fee,

19 you can call it a response brief.  You can call it a reply

20 brief.  It's an objection to what class counsel is seeking.

21 And none of them with the exception of Tucker, he, he appears

22 to be a, a class member, although there's other issues with him

23 and those aren't concerning the fee.  But Mr. Schulz is, is not

24 a class member, and he lacks standing to oppose a fee.

25          And Mr. Frank is not a class member.  And while he

1    may make a petition for his fee, he cannot oppose our fee.  And
2    the same is true for Mr. Wiegand.

3              THE COURT:  Let me stop you just one second.

4              MS. McNULTY:  Sure.

5              THE COURT:  I just got a note from our deputy, who
6    said there is one at least who objector who thought the hearing
7    was on the 12th floor.  She's coming now.  I don't know who
8    that is, but we may have people coming belatedly on that.  All
9    right.  Proceed.

10              MS. McNULTY:  And so I, I guess I would ask the Court
11   to in the first instance strike the objections to class
12   counsel's fee made by attorneys and other folks who don't have
13   standing in this case.  And my partner Mr. Yanchunis will
14   address that in more detail later.  However, I think that it's
15   also worth noting that while there is importance to objectors
16   and objections, and that's why class counsel has not been
17   vigorous in trying to block any filings made before this Court,
18   the fact is, is that Mr. Frank has, has not demonstrated that
19   he improved the value of this case.  And his entire argument is
20   premised upon the belief that there was always a settlement at
21   bay.

22              And, of course, this Court knows first hand, as does
23   Magistrate Judge Weisman, that that was not the case.  And that
24   the Seventh Circuit's ruling demanded that class counsel
25   prepare this case vigorously, exhaustively, and prepare it for

1  trial, which was done, Your Honor.  Mr. Frank contends that he
2  seeks one half of a one/third fee because he did the majority
3  of the argument in the Appellate Court.  And that's simply not
4  the case.  Document No. 721, which was a pleading filed by
5  Complex Litigation Group, contains the transcript for that
6  Appellate Court argument.  And it's evident from the record
7  that really before argument started with anyone, although I
8  think it was Mr. Oppenheimer who went first, the Seventh
9  Circuit was already on to the issues that, that ultimately
10 became the subject of its ruling.  And there was nothing
11 substantially remarkable about the comments Mr. Frank made to
12 the Court.
13            However, what's very important for the Court to know
14 is that plaintiffs' counsel's time starts with plaintiffs'
15 counsel's appointment in this case.  There is no piece of our
16 fee petition that includes any of the, the work from the more
17 famous phase of this case.  And, in fact, Your Honor --
18            THE COURT:  You know what, let me hold on one second.
19 I need the object -- the person who came to announce herself.
20 Ma'am.  Let me talk to her.  Step up please.  How are you?
21            MS. BLACHARCZYK:  I'm fine.
22            THE COURT:  Good.  Good.  Step up to the mike right
23 here.  Can you give me your name, please.
24            MS. BLACHARCZYK:  Christina Blacharczyk.
25            THE COURT:  All right.  And --

1    MS. BLACHARCZYK: B-L-A-C-H-A-R-C-Z-Y-K.

2    THE COURT: And why are you here again, ma'am?

3    MS. BLACHARCZYK: I am here because I know this Pella

4    hearing. And I -- my window got purchased in '99, in August.

5    August 27th I think. And 2000 we purchased, and I have a

6    damage. Very big damage of the slide door from -- for the

7    patio. And I have, I have already estimate from the -- for the

8    replacing. And I have a notice that it's hearing. So I stop,

9    you know, change this windows because they are very expensive.

10   Because I call two different estimates from different company.

11   So they charge me 36,000, which is --

12   THE COURT: Ma'am, I'm over here.

13   MS. BLACHARCZYK: Yes, ma'am. I'm sorry. Forgive

14   me, because I am first time in court.

15   THE COURT: Okay.

16   MS. BLACHARCZYK: Never been in my life.

17   THE COURT: So, so when did you learn of this?

18   MS. BLACHARCZYK: I learned that, you know, that, you

19   know, window they selling with defect of the glueing. And the

20   windows are beautiful, but I have a big damage in my house.

21   THE COURT: This is the first time you're bringing --

22   MS. BLACHARCZYK: Yes.

23   THE COURT: -- a statement explaining this?

24   MS. BLACHARCZYK: Yes.

25   THE COURT: All right. And you know that there's --

```
 1                MS. BLACHARCZYK:  I, I --
 2                THE COURT:  Do you know why we're here today?
 3                MS. BLACHARCZYK:  I claim to the Portland, Oregon and
 4    to the Kansas City.
 5                THE COURT:  Do you know why we're here today?
 6                MS. BLACHARCZYK:  Yes.  Yes, I want -- found I had a
 7    chance cooperated with company or I have to, you know, open the
 8    pocket, because in the winter coming, and really two windows I
 9    lost wood.
10                THE COURT:  Do you know that there is a settlement on
11    the table here?  Do you understand that?
12                MS. BLACHARCZYK:  Yes.  Yes.
13                THE COURT:  Have you had a chance to review that?
14                MS. BLACHARCZYK:  I am not good on money, but I want
15    to know I have rights in company going further.
16                THE COURT:  You just wanted to make sure your
17    interests are covered?
18                MS. BLACHARCZYK:  Yes.
19                THE COURT:  Or are you objecting to the settlement?
20                MS. BLACHARCZYK:  No, I --
21                THE COURT:  You want to make sure you're part of it?
22                MS. BLACHARCZYK:  We want to become part of the
23    responsibility --
24                THE COURT:  You wanted to make sure you're a part of
25    the settlement, or do you object to the settlement?
```

1      MS. BLACHARCZYK:  Yes.  No, I think that I am part of
2  the settlement.

3      THE COURT:  Okay.  And what information or response
4  do we have on this?  Is she part of the settlement?

5      MR. YANCHUNIS:  Good morning again, Your Honor.  John
6  Yanchunis.  I had my partner go back and talk to her.

7      THE COURT:  Okay.

8      MR. YANCHUNIS:  He did confirm that she did receive
9  from KCC the notice administrator appointed by the Court a
10  notice.  And obviously we'd like some time to talk to her --

11      THE COURT:  Right.  I --

12      MR. YANCHUNIS:  -- to make certain.

13      THE COURT:  Okay.

14      MR. YANCHUNIS:  So she doesn't object.  She has
15  apparently a claim.  And --

16      THE COURT:  Okay.

17      MR. YANCHUNIS:  -- if we could do that, we'll do our
18  best --

19      THE COURT:  And you can.  I just didn't want it to
20  happen in the courtroom without me knowing who she was and what
21  her general statement was.  I wanted that on the record.  If
22  you wish to have somebody talk with her out in the, the witness
23  room, that will be fine.

24      MR. YANCHUNIS:  Thank you, Your Honor.

25      THE COURT:  All right.  Thank you very much.  Get

1   your purse, ma'am.  Step back.

2          MS. BLACHARCZYK:  Thank you.

3          THE COURT:  And if you still want to talk to me, you

4   can do so afterwards.  If there's anyone else who wants to join

5   that conversation, you can go ahead and do that to be there.

6   All right.  All right.  Thank you.

7          MS. McNULTY:  Okay.  So, Your Honor, I think I was at

8   the point of explaining that our, our time submitted starts

9   with the point of Mr. Clifford's appointment as co-lead

10  counsel.  None of the time submitted by plaintiffs' counsel

11  includes any of the tasks performed in connection with the

12  first phase of this case or the appeal.  Mr. Lang's time, as

13  this Court likely knows from the record, relates to the fact

14  that he was traveling with the experts to perform the testing

15  of the windows at class rep and other consumers' homes.  That

16  testing formed a basis for the opinions of our experts.

17          Those were experts who were going to testify at a

18  trial, and experts who were challenged and we expected to be

19  challenged by Pella.  And the Court, of course, is aware of

20  that briefing, and it's all in the record for anyone to follow

21  this case.  People who try cases would recognize that the

22  record in this case since the time of our appointment reflects

23  the work of preparing a case for trial, not preparing a case

24  for a settlement.

25          THE COURT:  Had we not set a trial date?  I believe

1   we --

2           MS. McNULTY:  We did have a trial date, Your Honor.

3   And so the, the notion that Mr. Frank's work improved the value

4   of a settlement is premised upon as are most of the assumptions

5   or hypotheticals raised in counsel's argument, they're raised

6   on, on perceptions that have no basis in fact.  And so we, we

7   know that the record is very clear for this Court and that we

8   have appeared before this Court, and the Court has, has managed

9   this case, you know, on a, on a very regular and routine, you

10  know, system of appearances and, and informing the Court such

11  that the Court knows what the work was in this case.  And it is

12  evidenced in the record both in terms of the deposition

13  transcripts, the, the motion practice, the pleadings.  And in

14  particular the, the workup of the case for the trial date that

15  had been set.  And I think it was an October 30th or 31st date,

16  Your Honor.

17          Mr. Frank, his own submission indicates that he had a

18  $167,000 lodestar.  And yet his request is for a $1.5 million

19  fee.  And, and part of the reason he seeks the $1.5 million is

20  because he's offered that he will pay Mr. Bandas.  He says that

21  in the pleadings.  And Mr. Bandas didn't keep any hours, but

22  counsel assures us that Mr. Bandas did do work.  And again, I,

23  I have to go back to the, the constellation that has assembled

24  itself here in that both of the primary persons who oppose

25  either the settlement or the fee are effectively under the

1  umbrella of Mr. Bandas.

2  And so all of Mr. Schulz, Mr. Frank, Mr. Wiegand,

3  they're all in line with Mr. Bandas.  Mr. Tucker, he's in line

4  with Mr. Bandas.  And so I think it's, it's important to, to

5  keep that, you know, very simple fact in, in the forefront of

6  any analysis done on, on Mr. Frank's or Mr. Schulz's petitions

7  before this Court.

8  There also seems to be an insistence that somehow

9  Mr. Yanchunis was part of the Complex Litigation Group's

10 efforts in the first phase of this case.  And as our own

11 pleadings make clear, Your Honor, Mr. Yanchunis submitted time

12 for .6 hours in the first phase of this case.  And he was not,

13 as evidenced by that time submission, he was not actively

14 engaged in the litigation or the preparation of that case in

15 the first phase in any meaningful way.  He did not testify or

16 give any endorsements of the settlement other than he himself

17 submitted for .6 hours.  And that is in, in the record.

18 With, with respect to the other remarks, there is a

19 presupposition that somehow associates should have been

20 designated as responsible for working up this case.  And, and

21 quite frankly, Your Honor, there, there was -- there was really

22 an effort to work rather leanly.  The entire group of lawyers

23 that worked this case are assembled at this table.  There was a

24 need to be able to prosecute a case that was being vigorously

25 defended by Mr. Mandler and his colleagues.  And, and that is,

1   you know, in addition to simply the resources that a corporate

2   defendant can allocate in defense of, of a case this size and

3   with this history.

4           And so, you know, it is important to understand that

5   not only were we needing competent counsel to prepare this case

6   for trial and to try the case to make sure that we could

7   satisfy our evidentiary burden and withstand the scrutiny of

8   not only the Seventh Circuit but the, the very passionate

9   motions that Pella was routinely filing in an effort to derail

10  this case.  But, Your Honor, as well, the simple fact is that

11  we, we did that very leanly.  And the lodestar hours are not

12  our suggestion for necessarily how a fee should be calculated.

13  The lodestar was submitted as an auxiliary analysis for the

14  benefit of the Court.

15          It is very clear that Magistrate Judge Weisman's

16  proposal contemplated the Seventh Circuit's view of common fund

17  fees.  We have a $25.5 million settlement, and a recommendation

18  that the fees not exceed $9 million.  And so that condition was

19  accepted by both parties.  But as well our fee petition is for

20  just slightly over $8 million.  We, we supply the lodestar to

21  demonstrate that the hours worked do justify the percentage of

22  a, a one/third fee percentage, which would be typical in, in

23  our market here.

24          And I might also add that I have brought for in

25  camera review by the Court if necessary the class

1  representation agreements in which there was a one/third fee

2  agreement for any settlement of the case and a 40 percent fee

3  agreement for any trial of the case.  And so that is, again,

4  just another indicator of the percentage of the common fund

5  being satisfied by any market analysis for the fees in this

6  area.

7      But the lodestar again, Your Honor, is simply a cross

8  check of the common fund percentage approach.  And under either

9  method that the Court might apply here, the fees are, are

10 warranted and substantiated by the work performed in this case.

11 There is again with respect to the hourly rate charged, the

12 record has been made clear that the fees are customary for

13 lawyers of similar practice area and similar expertise, similar

14 experience.  And the, the class itself had been in agreement

15 with, you know, all aspects of the settlement and informed of

16 all aspects of the settlement.

17     We would urge the Court to avoid basing any opinion

18 on supposition, speculation, proposed business models of how

19 litigation should be pursued when preparing a case for trial.

20 We again would with respect to Mr. Frank and Mr. Schulz, we

21 would again ask the Court to consider before ruling on any

22 notion of fee whether these individuals have any standing to

23 object to a fee separate and aside from whether they are

24 eligible for petitioning for themselves for a fee.

25     The Frank brief relies on, on Trans Union as a basis

1    for suggesting that our fee has been miscalculated or is

2    somehow inappropriate.  And Trans Union is, is not a case on

3    which the Court or, or even plaintiffs exclusively should rely

4    or even do rely.  In actuality, however, the, the Trans Union

5    analysis has in part been recently addressed in the Fed Ex

6    Ground Package System case pending in South Bend.  And that's

7    251 F.Supp.3d 1225.  And in that case, Your Honor, the Court

8    again uses a, a lodestar and common fund approach to justify

9    the fees.

10          But the, the important point, and that Court raises

11    its issue in its analysis as well and this Court should

12    consider is that our fee request is for just over 8 million,

13    and it also includes our case expenses, which is 1.2 million.

14    And, Your Honor, we actually -- when Judge Weisman made that

15    proposal, we actually sought clarification.  Did the 9 million

16    refer to fees only, or was it inclusive of expenses?  And the

17    judge indicated that his proposal was inclusive of both fees

18    and expenses.  So under either analysis, Your Honor, we are

19    within the threshold limits of what this Circuit expects.

20          THE COURT:  All right.  Thank you.

21          MS. McNULTY:  And, Your Honor, I have the arguments

22    for other -- if others are going to argue as well.  But I --

23          THE COURT:  It's easier for me to go back and forth.

24          MS. McNULTY:  Agreed.

25          THE COURT:  Thank you very much.

1      MS. McNULTY:  Okay.  Thank you.

2      THE COURT:  I will say again if someone wants to go

3  and talk to our objector, possibly objector, all right, you can

4  do that.  Thank you, Counsel.

5      MR. YANCHUNIS:  Hopefully she's only a class member.

6  Good morning again, Your Honor.  John Yanchunis of Morgan &

7  Morgan.  My comments will be brief.  I, I hopefully at this

8  point in my career listen to the bench and issues that has been

9  raised or could be raised.

10     We did a very thorough job of, of addressing in our

11  motion for preliminary approval as we did in our final approval

12  all the elements of adequacy, fairness, and reasonableness.

13  And I won't belabor those.  If the Court has at some point some

14  questions.  In connection with the objections I can address all

15  those.  But again, we did a very thorough job in our papers of

16  addressing first by Mr. Shifrin, Schulz, the Brasleys, and, and

17  Bossier have no standing.  And under the cases -- the Seventh

18  Circuit cases of Martin versus Reed and Agretti versus ANR

19  Freight System, Inc., they cannot satisfy the necessary

20  foundation to advance an objection, and their comments should

21  not be considered.

22     But in an abundance of caution, Your Honor, we have

23  addressed those substantively, and all should be found to be

24  meritless.  Again, I can address all of the objections.  We

25  would ask that the Court make specific findings in connection

1    with both standing as well as addressing those.

2         THE COURT:  All right.

3         MR. YANCHUNIS:  And, in fact, at some point, Your

4    Honor, after today's proceedings if the Court -- and I'm not

5    being presumptuous, but if we would be permitted to propose a

6    post-fairness hearing's final judgment as well as an order on

7    fees, costs, and expenses.

8         THE COURT:  A proposed order, or a -- you want to

9    have more briefing?  Which that would be really presumptuous.

10        MR. YANCHUNIS:  No.  Not, not -- no.  No.

11        THE COURT:  Just, just after today's hearing you're

12   saying you just want to submit a proposed order?

13        MR. YANCHUNIS:  A pro -- yes.  We would ask the Court

14   to consider both the entry of a final order if the Court were

15   so inclined, as well as a separate order on fees, costs, and

16   expenses merely to advance what has been articulated today as

17   an assistance for the Court.

18        THE COURT:  All right.

19        MR. YANCHUNIS:  Just a suggestion.

20        THE COURT:  As long as that would be it with no

21   argument.

22        MR. YANCHUNIS:  No.

23        THE COURT:  You each can -- everybody can do that.

24   I'm going to end up with my own ruling obviously anyway.  But

25   if you wish to do that to point the Court to what you think my

1  final ruling will be, that would be fine.  I'd have no problem
2  with that.

3          MR. YANCHUNIS:  Thank you, Your Honor.

4          THE COURT:  And it can't hurt.  All right.

5          MR. YANCHUNIS:  Thank you.

6          THE COURT:  All right.  Thank you very much.  All
7  right.  And so we have -- Mr. Clifford.

8          MR. CLIFFORD:  I was just --

9          THE COURT:  No, go ahead.

10         MR. LANG:  Thank you, Your Honor.  I was just going
11 to say on that note we have nothing to add to the discussion at
12 this point.

13         THE COURT:  All right.

14         MR. CLIFFORD:  And are available as Your Honor
15 directs.

16         THE COURT:  All right.

17         MR. BURKE:  Yes, Your Honor.  Thank you.  Sorry,
18 John.

19         THE COURT:  Mr. Wiegand, yes.

20         MR. WIEGAND:  Could I briefly address.  A couple
21 issues came up.  I just wanted to -- if, if I could reply.

22         THE COURT:  Usually, usually a reply is it, but go
23 ahead.  Come on.  Proceed.

24         MR. WIEGAND:  Your Honor, the issue of, of standing
25 we had had a previous argument where this came up briefly.

1  Consistent with what I had said at that time, I'll say the same
2  thing now, which is that the Court's order actually allowed
3  Mr. Schulz to, to submit an objection.  I will also point out
4  that Mr. Frank had injury in fact.  Indeed he had standing.
5  And, therefore, he had a right to submit an objection to the
6  request for fees that did not include a penny for him.  And so
7  it was appropriately submitted on his behalf, and I signed the
8  brief on behalf of Mr. Frank as well as objector Schulz.
9        And, and to show that that was indeed proper and
10  allowed, when class counsel submitted their objection to Mr.
11  Frank's request for fees, they did not do it on behalf of a
12  class member.  They did not have any class members sign it.
13  And, and so that -- and indeed that admits that attorneys can
14  themselves submit an objection to a request for fees by other
15  counsel.
16        And on the standing point the reason that even on the
17  Schulz issue that the standing is a little bit different, the
18  $9 million is a set aside.  No class member under their theory
19  would have a -- would have standing to object to what portion
20  of the $9 million goes to which counsel or whether or not the
21  full $9 million should be paid, because not a penny of that
22  amount regardless of how their outcome -- the outcome of their
23  argument, not a penny of that amount is going to increase the
24  class payment.  It's a separate fund.  And for that reason
25  their -- under their theory there can be no standing of any

1   class member to object regarding how the $9 million is spent.

2   And so Mr. Schulz as per this Court's order has as much -- has

3   a right to submit that objection.

4        Finally, Your Honor, there were unique arguments

5   presented by Mr. Frank at the appellate argument.  And we would

6   posit since everybody's speculating who caused the Seventh

7   Circuit to think the way they did, that the reason the Seventh

8   Circuit started that argument with a fire in its belly is

9   because Mr. Frank was involved in briefing the case, and they

10  had indeed read the briefs prior to oral argument.  And Mr.

11  Frank indeed presented unique arguments that others had not

12  presented in the appeal, and those are outlined in our opening

13  brief where we talked about Mr. Frank's role in this case.

14  Thank you, Your Honor.

15       THE COURT:  All right.  Thank you very much.  All

16  right.

17       MR. MANDLER:  Your Honor, if I could briefly.

18       THE COURT:  Yes.

19       MR. MANDLER:  John Mandler for the Pella defendants.

20  We've moved into sort of a mixed argument between the

21  settlement itself and the fees.  I think it's obvious from the

22  briefing Pella's taking no position on the fees portion of this

23  other than we did accept Judge Weisman's recommendation for

24  the, the $9 million award, and Pella's liability is limited to

25  that amount.

1            On the settlement itself the role I was to play

2    today, and again, only if it's needed and, and requested by the

3    Court is like Mr. Lang, I'm in the position of having been part

4    of the case since it was first filed in August of 2006.  And

5    the defendants are in a different position as to the Reynolds

6    analysis to offer our view on the value of the case going

7    forward.  Obviously we spent many pages in our briefing and

8    gave very detailed analysis of the Reynolds -- that portion of

9    the Reynolds analysis of the value of the case going forward.

10           I'm happy to go through that.  I suspect the Court

11   isn't -- doesn't want that level of detail at this point, but

12   I'm, I'm willing to answer any questions or any concerns the

13   Court may have on value of the case going forward as it relates

14   to Reynolds.

15           THE COURT:  At this point, no, I don't, Counsel.

16           MR. MANDLER:  Thank you.

17           THE COURT:  But if I will, I will definitely have you

18   come up.  All right.

19           MR. MANDLER:  I appreciate that.

20           THE COURT:  Thank you.  Next.  All right.  Counsel.

21           MR. BURKE:  Good morning, Your Honor.  My name is

22   Richard Burke.  I'm here for the previous class counsel.  And

23   I'd like to start with a, a shoutout to my -- another Wash U

24   alumni.  I'm from St. Louis.  I'm glad when they do good, as it

25   were.  And obviously having a job in this court is, is --

1    qualifies as certainly doing good.

2           We are not objecting to Mr. Clifford's attorney's

3    fees.  We are -- this -- we are here on an allocation.  And so

4    I'd like to start out by discussing the original certification

5    hearing, briefs, motions.  We all know that Justice Posner had

6    a tendency for acerbity.  The harshness of the opinion was a

7    tremendous discredit to Judge Zagel.  Judge Zagel by the time

8    we were replaced, not disqualified, had over 400 docket

9    entries.  There were only over a little 600 in the end anyway.

10   We were in here all the time before that certification.

11          He monitored this case closely.  I can guarantee you

12   if at the end of this you write a two-page order finally

13   approving this settlement, it's going to be reversed.  And

14   that's what happened here.  All of this argument about

15   disciplinary proceedings, all of that was heard by Judge Zagel.

16   Everything was before that Court, and he made a decision on it.

17   Judge Posner never mentions that in his order.  He never

18   mentions that there was an evidentiary hearing in that, in that

19   prior case.

20          And then for some reason decides that he is going to

21   write an order trashing in the harshest terms one could imagine

22   one of the counsel for Complex Litigation.  That to be

23   perfectly honest with you, I'll just say it, it's shameful.

24   Judge Zagel didn't look the other way.  Judge Zagel didn't

25   ignore the facts of the case.  Judge Zagel was on this case day

1    in and -- well, I wouldn't say day in and day out.  But you
2    know the rigors of a District Court judge.

3          Now, let's talk a little bit about the original class
4    certification order and its affirmance.  Complex Litigation is
5    only requesting attorney's fees for what it did up until it
6    defeated the petition for certiorari in the United States
7    Supreme Court.  That's all we're seeking.  About 7200 hours
8    worth of work and 147,000 in hard expenses.

9          Now, Mr. Clifford -- and, by the way, let me say, I
10   think this class was very fortunate to have Mr. Clifford take
11   over this case, because he's a good lawyer.  And I'm sure his
12   crew is good.  He, he even took with him Mr. Yanchunis -- I'm
13   sorry, John.  I'm going to say John.  I can't remember how to
14   pronounce his last name.  Who for his apparent .6 hours worth
15   of work made a fee application to Judge Zagel for $40,000.
16   Okay.  He apparently had no problem with the settlement the
17   first time around.

18         The biggest thing about this case that -- and I think
19   is the most important is that this class certification not only
20   created the class so there could be a benefit to them, but
21   it -- the District Court opinion certifying the class was cited
22   284 times.  The Seventh Circuit opinion, which certified this
23   class, and the appointment, I might add, of Complex Litigation
24   Group has been cited 544 times.  Complex Litigation's work not
25   only benefited this class, but from the depth of -- the extent

1   of these citations, and I'll discuss what that new theory was

2   created by us, essentially by me, okay, has benefited every

3   consumer class action case in the United States.  Every one.

4   You don't get 544 citations to, I might add, Judge Posner's

5   Pella 1 opinion affirming the certification unless something

6   really remarkable happened.

7          And what that theory was was the combination of a

8   declaratory judgment and a warranty claim combined with

9   separate state actions for consumer fraud.  And it's

10   interesting that Judge Zagel at one point commented, and it's

11   in the briefing, that he was at some judicial conference and a

12   lawyer from Maine had come up to him and mentioned the

13   significance of the Pella certification finding.  So this was a

14   monumental case, which I am very very proud of.

15          Now, to somehow come in here and say that our

16   $147,000 in expenses is indicative of not very much work being

17   done is a little unfair, but whatever we get, they don't get.

18   So I understand.  But we had bifurcated discovery.  We weren't

19   allowed to go beyond that under the, under the order that Judge

20   Zagel entered regarding bifurcated discovery.  We still had

21   experts, but we certainly were not in a position to spend the

22   money as in preparation for trial.  Good for them that they

23   prepared for this case for trial.  But at the end of the day

24   where you end up is very close to what happened in the original

25   settlement.

1        Now, I don't want to -- I'll speak in a minute about
2   the valuations.  Okay.  But the truth of the matter was we had
3   a certified class that severed causation, severed damages.
4   Now, the settlement was -- the original settlement was a claims
5   made settlement.  Of course, we would rather have had a common
6   fund settlement.  Everybody wants a common fund settlement.
7   But I can tell you Mr. Mandler didn't get busy once we left.
8   Mr. Mandler didn't get less passionate once we left.  He didn't
9   get less rigorous once we left.  He was a hard guy.  He was --
10  his client was well served.

11       And so all of these remarkable difficulties were in
12  the case from the beginning.  The DeBouse restrictions, the
13  severance of causation and damages.  All of those legal
14  problems, and there were a lot of them, were all there.  Now, I
15  think that the first settlement foresaw those problems.  And
16  there was a mountain of briefing and record upon which Judge
17  Zagel could have justified that prior settlement, but he didn't
18  do it.  I go to a lot of federal courts.  And I got to tell
19  you, I can't even imagine telling you what to do.  Okay.  Or
20  telling you how you should write your order.

21       And I -- and frankly from Judge Zagel's point, he was
22  so involved in this case, I expected a lot more than that at
23  the end.  And it's because that didn't happen that it -- is why
24  it was reversed.  It had nothing to do with Paul Weiss.
25  Nothing to do with the disciplinary proceedings.  The claim

1    that, that we somehow sold out the class was a shameful remark

2    by the, by the Circuit Court.  Because here's what we had to

3    deal with:  We had to deal not only with the way the -- where

4    it lay, so to speak, using a golfing term.  It was a very

5    difficult case to settle.  And, and good for them.  But even

6    the current settlement carries forward many, if not all, of the

7    original attributes of the prior settlement.

8            For instance, the distinction between repaired and

9    replaced.  The distinction between not repaired and replaced.

10   The distinction regarding 15 years before and after.  The

11   distinction between what the claims -- the claimant still has

12   to establish.  And if you look at page 19 of the settlement,

13   you'll see that all of those things are identified.  For

14   instance, they still have to prove actual damages.  They still

15   have to prove causation.  They still have to prove that they

16   had an eligible claim.  In other words, water penetration

17   behind the aluminum cladding.  So the only difference in a

18   meaningful way between this settlement and the prior settlement

19   is the fact that you have a common fund.

20           Now, the truth of the matter is, is that $9 million

21   is not going to get everybody paid.  Attorneys are so

22   expensive.  And the next time you, you talk to one of your law

23   clerks, I would remind them that the best lesson on what

24   lawyers cost is to have to hire one.  And let me tell you, you

25   might as well mortgage your house.  Okay.  Attorneys are very

1  very expensive.  Okay.  So this idea that we somehow didn't do
2  very much work is, you know, kind of really not fair to be
3  perfectly honest you with.  And we're not asking for anything
4  after that certification.
5          Now, I'd also point out that -- the valuation idea.
6  When you have a common fund, it's a pretty easy process.  I
7  mean, it's the number.  Okay.  We had an uncapped fund.  And if
8  you want to know how we came up with the valuation of
9  $90 million, which, by the way, the only person who was capable
10 of determining the value of that fund was the District Court,
11 Judge Zagel.  He wasn't given any deference at all.  He wasn't
12 even given kindness.  Okay.  He didn't blow this.  He didn't
13 write an order --
14         THE COURT:  Counsel, you have protected defendant
15 Judge Zagel quite a bit on some of the language.
16         MR. BURKE:  Well, I'm happy to do it.  Okay.
17         THE COURT:  That was Posner's language.  Let's go on.
18         MR. BURKE:  Okay.  So I think that in this case the
19 meaningfulness of class certification here -- and, by the way,
20 all of those class members that were removed are still -- class
21 representatives are still class members.  There's no standing
22 question here.  The certification was extremely meaningful, and
23 you can see that the settlements were driven by what both of
24 us, Mr. Clifford and I, what both of us were handed.  We were
25 handed a really complex case.  It was, it was a shoal to be

1    navigated.  Okay.  And it took lots of twists and turns.

2          We had 12,000 -- it was approximately 12,000

3    claimants.  I'm not sure what the claims rate here is, but I'm

4    suspecting it's probably a 10th of that maybe.  Okay.  Those

5    people got the rug pulled out from under them.  Now,

6    Mr. Clifford's briefing talks about how they had to deal with

7    high rate former class -- or then class members.  No kidding.

8    Okay.  They had filed their claims form and done all of this,

9    and now they're going to be told, oh, yeah, by the way, it's

10   all scrapped.  See you in five years.  Okay.

11         The limitation at the year 2006, also an attribute of

12   the original certification.  So the structure of the

13   certification -- of the settlements is driven not by

14   attentiveness of counsel, not by work or no work.  The

15   structure of both of these settlements, which is very close,

16   was driven by the nature of the certification order that was

17   written.  So -- and, and, of course, we invited you to speak to

18   Judge Zagel, but you can do that or not.  It's your decision.

19         But having been, been -- having had bifurcated

20   discovery imposed on us was a real restriction in, in candidly

21   what could be done.  Now, I submitted a declaration, which is

22   attached to our original filing, which is I believe 672 -- let

23   me get the right number for you, Judge.  I'm sorry.

24         THE COURT:  That's okay.

25         MR. BURKE:  But it's a declaration that discusses in,

1   in significant detail how -- oh, here it is.  It's 686-1.  And

2   it's a long one.  Because what was done, and I suspect was also

3   done by Mr. Clifford, is we took a statistical analysis of

4   about 144,000 claims that Pella had under its warranty

5   database.  It's called returns and allowances.  And so what we

6   did is we tried to find out both liability and damages.  For

7   instance, liability.  Obviously the big question is now and has

8   always been, how many of these windows are really going to

9   fail?  And since we only had one database, and that was the

10  returns and allowances database, the 144,000, we broke it up.

11          But most, most of those allowances from Pella had

12  rejected the water deterioration claim.  And it wasn't until

13  the, the ProLine Service Enhancement Program that we had any

14  real data of accepted claims for the water damage, which was

15  the subject matter of the lawsuit.  So rather than take the

16  overall claims rate to determine the failure rate, we selected

17  what we believed was the proper subset of that.  In other

18  words, the claims after they acknowledged the water

19  deterioration problem.

20          And what we did is we took every vintage year, I

21  think it was 15 years, of every window and calculated the

22  probability of not only would it fail, but when would it fail.

23  Would it fail in the first year, in the 10th year, in the 12th

24  year?  So from a -- and we ended up with something close to

25  44 -- 14 percent.  And so what we saw when we graphed it out

1   was that this was a very rapid acceleration right near the time
2   of the expiration of the warranty.

3          And so when this, this idea of complexity is raised.
4   The truth is is that it, one, it was a very complex case.  And
5   two, it's still complex.  This is still a complicated
6   settlement.  It's going to be a complicated settlement.  And I
7   think it should be approved because I'm sure I have a lot of
8   reasons, not the least of which is please God end this thing.

9          But the -- what we wanted to do was try to maximize
10  the recovery for those who have already repaired and replaced
11  and spent the money.  We wanted to lock in the ProLine Service
12  Enhancement Program, which was not a contractual obligation, so
13  nail that done.  Okay.  We wanted the claim -- the warranty
14  process to go forward with new rules, which is what the
15  original class certification affirmance order discussed.  It
16  says essentially this is an enhanced warranty program, and it's
17  true, it is, in which you -- you would have to submit.

18         But they -- but even now Pella is not giving up on
19  causation in this new settlement.  Okay.  You still have to
20  prove it.  You still have to prove you have eligible damage and
21  actual expenses, and they can still object.  Except instead of
22  having an arbiter, they're now going to use the claims
23  administrator to do it, whose decision is final.  Okay.  So the
24  unfortunate part is that $9 million for a case like this is --
25  you know, it may sound like a lot, but my gosh, man, people

1    sure have used a lot of that up and then some.  Okay.  But that

2    was agreed to.  That's what we're about.  So this is -- the

3    entirety of this case is about allocation.

4         Now, I happen to agree with Mr. -- the -- I'm going

5    to say Mr. Clifford's side with respect to the objector.  Two,

6    two big takeaways from Judge Posner's second opinion.  Number

7    one, no class member -- no relatives can be class members.

8    Okay.  Well, that wasn't the law before that.  Now it is.

9    Okay.

10        And secondly, you darn -- you really need to write a

11   big order.  I think that's just -- I mean, you have -- at this

12   point you're going to have to dot a lot of I's and cross a lot

13   of T's to, to get through what appears to be now required for

14   certification orders.  Fine.  You know, okay.  All right.  And,

15   and the truth of the matter was -- is that that first set --

16   that these two settlements are the product of the class

17   certification order to be perfectly honest with you.  And you

18   know because I -- we, we -- I looked at the docket entries, and

19   all of the things that were brought up beforehand came back to

20   haunt everybody.  Mr. Mandler never gave up on anything and

21   still hasn't.  God bless him.  By somebody else's god

22   hopefully.

23        THE COURT:  All right.

24        MR. BURKE:  But that's simple reality.  You are a

25   court of equity.  To somehow say that this monumental class

1    certification meant nothing is just not equitable.

2              THE COURT:  All right.

3              MR. BURKE:  Thank you, Your Honor.

4              THE COURT:  The Court understands the argument.

5    Thank you.  Any -- Miss McNulty.

6              MS. McNULTY:  Thank you, Your Honor.  Your Honor,

7    whatever misapprehension any of the petitioners has concerning

8    the, the settlement is adequately addressed in our papers.  And

9    I trust that between the papers and Judge Weisman and what this

10   Court has itself preliminarily approved, that the record is

11   sufficient on, on those points.  Except to say that there is I

12   think a good deal of misapprehension that, that makes it worth,

13   you know, reflecting the, the true relief offered by the

14   settlement.

15             Complex Litigation Group says they're just asking for

16   fees and expenses in relation to class certification.  And yet

17   there's an awful lot of argument devoted to what the old

18   settlement was, what Judge Zagel said, what Judge Posner said.

19   And none of that, Your Honor, is, is really relevant for, for

20   any aspect concerning whether or not Complex Litigation Group

21   is entitled to a fee.  The fact is is that when they were found

22   in, in -- to be in conflict with the class and they breached

23   their duty to the class, and they were -- they were I, I

24   think -- you know, we can get into the semantics of whether

25   they were asked to step aside, discharged.  It doesn't really

54

1   matter, because what matters is that all of that constitutes a

2   waiver of their fee.

3          And so, Your Honor, you know, we, we can get into the

4   issues of who asked for bifurcated discovery and why the record

5   was inadequate to support the, the prior settlement, but all

6   that really matters is what class certification did for the,

7   the class in this case.  Under a trial scenario it really did

8   nothing, Your Honor.  And the Court knows that.  We've argued

9   that.  We've been attacked by, by Pella, and that's been

10  briefed.  And so we feel that we can, can rest on that record.

11         However, it, it is very much a recurring theme in

12  this case that, you know, any, any unclean hands necessitates

13  forfeiture of, of a fee.

14         THE COURT:  All right.  Thank you.

15         MS. McNULTY:  Thank you, Your Honor.

16         THE COURT:  All right.  There are a lot of recurring

17  themes here, and they have been argued to the Court in a

18  variety of ways, but that's another reason why we needed

19  another hearing to make sure the last word is said and written

20  before the Court hopefully brings a close to this matter.

21  Anything else this side of the table?

22         MR. BURKE:  No, Your Honor.

23         THE COURT:  All right.  Anything else?

24         MR. CLIFFORD:  Nothing to add to the discussion,

25  Judge.

1        THE COURT:  All right.  Can you give me some

2 follow-up on my objector here.

3        MR. VALLADARES:  Yes, Your Honor.  Marcio Valladares

4 again.  I was happy to speak -- I'm afraid I'm going to butcher

5 her last name.  Miss Blacharczyk.

6        THE COURT:  All right.

7        MR. VALLADARES:  And I, I spoke with her and I

8 advised her that as far as the settlement is concerned, that

9 I'm quite happy and I -- to help her in any way that I can.  I

10 gave her my card.  She did submit a claim.  I'll make sure that

11 that claim is received by KCC -- was received by KCC and then

12 duly processed.

13        In addition, two, two other members of the class or

14 putative members of the class came to me.  They just wanted to

15 see what the proceedings were about.  I gave them my card, and

16 asked them to call me --

17        THE COURT:  And they did not step in the courtroom?

18        MR. VALLADARES:  They did want to -- they were in the

19 courtroom to see what was going on.  They did not want to speak

20 or raise any objections.  They just said they just wanted to

21 see what was going on.  And I gave them my information and, and

22 offered my help and assistance to make sure that their claims,

23 and they each submitted a claim -- gets processed and they were

24 considered.

25        THE COURT:  All right.  Thank you.

1          MR. VALLADARES:  Thank you, Your Honor.

2          THE COURT:  Anyone want to speak on that?  All right.

3     The Court would like about 5 minutes, 5 or 10 minutes, and then

4     I'll let you know where we're going to go from there.  All

5     right.  Thank you.

6          MR. CLIFFORD:  Thank you, Your Honor.

7          (Short break taken.)

8          THE COURT:  All right.  The Court really thanks

9     everyone for their submissions, your arguments today.  This

10    Court can say that there is a lot of information given, and

11    everyone has been thorough on all sides.  And I guess it just

12    leaves me with maybe a question that can't be answered, but is

13    especially important to me considering calculations are not my

14    forte.  And I would start with Mr. Clifford, this side of the

15    room.

16         Your argument is clearly that your fees are

17    reasonable, correct, and much deserved?  Your request.

18         MR. CLIFFORD:  Yes, Your Honor.

19         THE COURT:  All right.  And then we have on this side

20    Complex Litigation.  Your fees are very much deserved and

21    reasonable, is that correct?  Correct?

22         MR. BURKE:  Yes, Your Honor.

23         THE COURT:  All right.  And then as to Mr. Frank, the

24    fees are totally reasonable?

25         MR. WIEGAND:  Yes, deserved.

1       THE COURT:  And well deserved.  All right.  For the
2  appellate work.
3       MR. WIEGAND:  And, and determined the way the Seventh
4  Circuit believes they should be determined, as for value given.
5       THE COURT:  Doesn't that based on my weak
6  calculations add up to more than the amount that's provided for
7  in the settlement of $9 million?  Is that a yes from everybody?
8  Would that math be correct?
9       MR. CLIFFORD:  Well, considering that I made my
10 partner, my full partner a -- made her bill out at a Groupon
11 rate and got her insulted today by counsel, but other than
12 that, you know, yes.  But, Your Honor --
13      THE COURT:  I'd be right on that, is that correct?
14      MR. CLIFFORD:  Yes, you are.
15      THE COURT:  So, so each one of you can tell me how
16 does that happen.  How do I do that?
17      MR. CLIFFORD:  Well, because --
18      THE COURT:  What's your suggestion?
19      MR. CLIFFORD:  Well, my suggestion is that you --
20      THE COURT:  If everybody is right, if I looked at
21 that, everybody gets exactly what they're asking for.
22      MR. CLIFFORD:  Well, I don't think -- as we've stated
23 in our briefs, we do not think that they are entitled to the
24 relief that they're asking for.  They may feel that their fees
25 are reasonable, their positions are reasonable.  But, but

1   candidly as fully briefed in this matter, they're wrong.  And
2   not for -- I'm answering your question.  My question about the
3   reasonableness of our fees is my answer.  That is not my answer
4   as it relates to these two gentlemen and the remarks that
5   they've made today.  We challenge those remarks.  And, and
6   didn't use -- they didn't use any of their brain power to work
7   this case up the way it should have been.

8           Your Honor, as you know, every case has an intrinsic
9   value.  I'm routinely hired on aviation matters and other such
10  things.  The day the event occurs every claim has an intrinsic
11  value.  But it's the experience of counsel properly preparing
12  the case, putting it forward in an organized way to be prepared
13  to bring it to a jury that allows that intrinsic value to be
14  presented and manifested fully in a court of law.  And, and in
15  all such matters where there are credible arguments against the
16  merit of the claim, you take into account the merits of the
17  defense to the claim in your valuation of the case.

18          And as I tell clients on a routine basis, you and I
19  may think that your case is worth 10 units, whatever a unit is.
20  When they offer you nothing or two units, you've got a trial on
21  your hands.  What you do you do when they offer you seven?  Are
22  you so right about the 10, that you'll turn down the 7 to the
23  fight over the 3?  When we approached this case in the
24  beginning, the commitment that I made to myself and to my
25  partners and, and the fact that we were getting involved is

1    that I would never read about me, my law firm, or the people I

2    associated with in a way that I've read about this matter and

3    the way it was handled before we got involved.

4            And that's the approach that we've taken here.  It's

5    the approach we take in all such cases.  We've made a judgment

6    about the fair and reasonableness of the case, the fair and

7    reasonable approach we've taken to fees.  And we stand by it.

8    And I personally committed my firm along with my colleagues the

9    resources, the capital necessary to work up a case to get it to

10   where a guy like Mandler, who's a tough guy you've heard all

11   day today, would have to reckon with the fact that he's got a

12   real fight on his hands.

13           THE COURT:  Okay.

14           MR. CLIFFORD:  So that's how I feel about this

15   matter, Your Honor.

16           THE COURT:  All right.  Thank you.

17           MR. BURKE:  Your Honor, to answer --

18           THE COURT:  Counsel.

19           MR. BURKE:  To answer your question --

20           THE COURT:  And in either no longer than that or --

21           MR. BURKE:  No, it will be shorter.

22           THE COURT:  All right.

23           MR. BURKE:  To answer your question directly, it's

24   because we are using lodestar as opposed to allocation

25   analysis.  The cap was set by virtue of the settlement.  Okay.

1    And because every -- and I think I've mentioned this.  There

2    was more attorneys' effort and time and money in the case than

3    the $9 million is to account for.  So what we're talking about

4    is an allocation.  Now, if you take a pro rata allocation and

5    you take whatever everybody gives and you pro rata that against

6    the 9 million, then you come out with $9 million.  Okay.

7             Now, I'm sorry.  I just don't believe that Mr.

8    Clifford has a monopoly on an honorable lawyer.  Okay.  We, we

9    worked very hard and we created absolutely spectacular law on

10   consumer class actions.  And we're not asking for any more than

11   that.  When they talk about the intrinsic value of the case,

12   well, what was it?  $30 million?  That's the intrinsic value?

13   Well, then we got the intrinsic value in the first settlement

14   if that's the, if that's the standard.  Okay.  Mr. Lang in the

15   Seventh Circuit said the intrinsic value was $380 million.

16   Okay.  So apparently Mr. Clifford's intrinsic value is

17   different than Mr. Lang's.  Okay.

18            But, of course, we all are committed to our clients.

19   Of course, we all did a good job.  Of course, we do.  We're

20   experienced lawyers too.  I'm probably older than he is.  Okay.

21   So the answer to your question really is a question of

22   allocation.  To what extent are the equities to be, to be a

23   slice of a pie.  Okay.  And we think in our case we're asking

24   for roughly a third if you look at the relative lodestar, okay,

25   to get a class certified.  Of course, we didn't prepare it for

1    trial.  There was no trial to be had.  Okay.  It was certified.

2    We're only asking for the certification portion.  It is the

3    most monumental event in every single class action.  Okay.  So

4    thank you, Your Honor.

5              THE COURT:  Thank you.  Counsel.

6              MR. WIEGAND:  Your Honor, our, our position on prior

7    counsel is stated in our briefs.  They're not entitled to fees

8    both as a matter of law and for value delivered to the class

9    settlement.  In terms of then how does one divvy up the $9

10   million between Mr. Frank and, and trial counsel on remand, I

11   continue to go back to Trans Union.  He's seeking 1/6th.  That

12   is a reasonable portion.  That's consistent with what the

13   Second Circuit -- Seventh Circuit recently said in the

14   Southwest case, 10 percent of the value delivered.  And, and so

15   I do not believe one needs to go past the 9 million.  And we

16   have never made that argument that we believe one needs more.

17   We believe he gets a sixth of the fees.  Thank you.

18             THE COURT:  All right.  Thank you very much for

19   answering a question that only I can answer with your closing

20   statements.  If you didn't figure that out, that's what that

21   was.  All right.  And again, the matter is going to be taken

22   under advisement.  I will let you know.  It's very very

23   unlikely, but if I need that calculation that you suggested

24   that the Court get as to setting forth all of the, the bases

25   for your submissions or your claims as to fees, I will let you

1  know that.  I don't think I need anything further except for to

2  review your arguments and then issue a ruling.  All right.

3         So if there's nothing else, thank you again.  Have a

4  good weekend everyone.

5         MR. BURKE:  Thank you, Your Honor.

6         MR. MANDLER:  Thank you, Your Honor.

7         MR. CLIFFORD:  Thank you, Your Honor.

8         MR. WIEGAND:  Thank you, Your Honor.

9                    CERTIFICATE

10         I HEREBY CERTIFY that the foregoing is a true,

11  correct and complete transcript of the proceedings had at the

12  hearing of the aforementioned cause on the day and date hereof.

13

14  /s/TRACEY D. McCULLOUGH              September 22, 2018

15  Official Court Reporter                      Date
   United States District Court
16  Northern District of Illinois
   Eastern Division
17

18

19

20

21

22

23

24

25